**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Turner P. Smith
L.P. Harrison 3rd
Andrew H. Seiden
Peter J. Behmke
101 Park Avenue
New York, New York 10178
*Counsel for Plaintiffs*
      -and-
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Daniel P. Cunningham
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Special Counsel for Intervenor-Plaintiff, Official Committee of*
*Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., | : : : : : : : | Adversary Proceeding No.: 12-01044 (JMP) |
| Plaintiffs and | : | |
| Plaintiff Intervenor, | : | |
| | : | |
| -against- | : | |
| | : | |
| | : | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC., CITI CANYON LTD., and CITI SWAPCO INC. | : : : | **SECOND AMENDED COMPLAINT AND CLAIMS OBJECTION** |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------ X

Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corporation ("LBCC" and collectively with LBSF and LBCS, the "Lehman Subsidiaries"), and Lehman Brothers Holdings Inc. ("LBHI"; and together with the Lehman Subsidiaries, "Lehman") as debtors and debtors in possession, and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee"; and together with Lehman, "Plaintiffs"), by their undersigned attorneys, allege the following against defendants Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd. ("Citi Global"), Citigroup Financial Products Inc. ("Citi Financial"), Citigroup Energy Inc. ("Citi Energy"), Citi Canyon Ltd. ("Citi Canyon"), and Citi Swapco Inc. ("Citi Swapco"; and collectively with Citibank, Citi Global, Citi Financial, Citi Energy, and Citi Canyon, "Citi"):

## PRELIMINARY STATEMENT

1.      Approximately three months prior to Lehman's bankruptcy cases, Citi extracted more than $2 billion of cash from LBHI.  Throughout these cases, Citi has refused to return that cash to Lehman.  As set forth herein, Citi is not entitled to apply that cash to secure its claims against Lehman for trading losses.  Not surprisingly, Citi submitted claims in the Lehman bankruptcy cases for over $2 billion in the hope of sustaining claims in excess of the cash it holds and converting that cash into collateral security that it might retain.

2.      In addition to unlawfully refusing to return Lehman's cash, Citi artificially inflated the value of its claims arising under derivative agreements with the Lehman Subsidiaries by more than $2.2 billion. It did so by systematically charging for phantom losses it did not suffer, failing to offset counterbalancing positions, and opportunistically selecting highly favorable valuation dates and times.  Citi was so eager to profit from Lehman's demise that just hours after LBHI filed its chapter 11 petition Citi attempted to resuscitate trades it had successfully novated away, for the sole purpose of declaring them in default and asserting yet

-2-

more claims for hypothetical losses. All the while, its eyes were trained on the $2 billion of cash that it extracted from Lehman three months prior to bankruptcy, which it planned to use to ensure a 100 percent recovery of its contrived claims. Contrary to its fictitious derivatives claims of $1.93 billion, Citi's derivatives claims should actually total only $25 million. In addition, Citi owes Lehman more than $243 million as the result of the termination of certain of the parties' derivatives agreements.

3.      The derivatives claims submitted by Citi were built on nonexistent losses and defy commercial reality. The actual value of the derivatives portfolio between the Lehman Subsidiaries and Citi (net of collateral) was $291 million in the Lehman Subsidiaries' favor as of the close of business on Friday, September 12, 2008. Yet, inexplicably, Citi's proofs of claim would have the Court believe that the value of those positions somehow plunged to more than $1.93 billion *in Citi's favor* when LBHI commenced its chapter 11 case on Monday, September 15, 2008 (the "Commencement Date"). That $2.2 billion difference is not remotely attributable to any shift in the market value of those positions over that single business day.

4.      The actual change in market value of the derivatives portfolio from September 12, 2008 to September 15, 2008, based on independently available market data, was $150 million in favor of Citi. That $150 million swing in value takes into account the substantial movements that occurred in the market on the Commencement Date. Yet, Citi inflated its claims by nearly 15 times that already substantial market movement to tack on another $2.2 billion. There is no basis in economic reality for inflating the claims to this stratospheric level.

5.      A simple graph comparing Citi's valuation of the derivatives portfolio on September 12, 2008 and the amount of its claims on September 15, 2008 with those calculated using independent, publicly available market sources starkly illustrates how Citi's dramatically inflated claims bore no relation to the true market value of its positions:

**Calculation Based on Independent Market Data v. Citi Valuation of Derivatives Portfolio, Net of Collateral, on September 12, 2008 and September 15, 2008[1]**



It defies imagination to believe that Citi actually gained $2.2 billion on its derivative portfolio with the Lehman Subsidiaries in a single day when the actual market movements were only a tiny fraction of that figure. Undoubtedly, Citi did not.

6.      Certainly, if the commencement of Lehman's bankruptcy cases suddenly left Citi exposed to billions of dollars of new risk, one would have expected to see a public disclosure of that risk by Citi. Lehman is unaware of any such disclosure. Presumably, Citi's exposure was substantially smaller than Citi alleges or Citi was able to alleviate that risk.

7.      In fact, Citi's own disclosures filed with the Securities and Exchange Commission do not appear consistent with the methodology it used for calculating its claim against Lehman. In filings before and after the Lehman bankruptcy, Citi disclosed that it incorporated "adjustments" into its fair value estimates for its derivative positions which served

---

[1]   The value of the portfolio on September 12, net of collateral ($291 million in the Lehman Subsidiaries' favor), adjusted for the $150 million market move in Citi's favor on September 15 and $78 million in net cash payments made by the Lehman Subsidiaries to Citi under the swap agreements after September 12, resulted in a net value of $219 million to the Lehman Subsidiaries as of the end of the day on September 15.

to "ensure that the fair value reflects the price at which the entire position could be liquidated."
*See* Citigroup, Inc., Third Quarter 2008 Quarterly Report (Form 10-Q) at 41, 128.  In other
words, Citi had previously considered how to close out a large derivatives portfolio and had
established a methodology for determining the liquidation value of its positions.  Plaintiffs
believe that if Citi used its own pre-existing fair value adjustment methodology to calculate the
close-out value of its derivatives portfolio with Lehman, such adjustment would be a small
fraction of its filed claim and, in fact, Citi would owe money to Lehman.  Instead, Citi concocted
inflated derivatives claims by violating the governing contracts, New York law, and U.S.
bankruptcy law in several important respects.

8.      ***First***, both the contracts and bankruptcy law mandated that Citi calculate
its claims by valuing the terminated trades as of the date of termination selected by Citi
(September 15, 2008 under almost all agreements), so long as values could be determined as of
that date.  Commercially reasonable determinants of value existed for all of Citi's derivatives
positions on September 15, as evidenced by the ability of other Lehman counterparties to value
hundreds of thousands of similar trades as of that date.  Unfazed by the clear requirement of the
contracts and bankruptcy law, Citi instead valued a vast majority of its trades as of later dates
when it would be more profitable to do so.  For each of the four types of derivatives products in
its portfolio for which there were substantial positions – credit, rates, foreign exchange, and
securitized products – Citi opportunistically valued the vast majority of the trades on the date
that produced the larger claim.  The sole purpose of this exercise was to inflate Citi's claims and
generate unearned profits.  Citi inflated its claims by more than $400 million in this manner in
blatant disregard of the parties' contracts and the law.

9.      ***Second***, Citi inflated its claims by at least $1.6 billion through the addition
of phantom charges for self-described "losses" that Citi never incurred or would have incurred.

Other than in a few, rare instances, Citi's claims for losses are not based on actual replacement

trades, but rather on hypothetical replacement trades yielding hypothetical losses that would

never have been incurred. Instead of hypothetically closing out trades at their actual mid-market

value – the price at which the potential for loss is offset by the potential for gain – Citi charged a

higher price by tacking on "add-on" costs that it never incurred. As a market-maker with access

to the inter-dealer market, Citi was not exposed to these costs. Citi was, and is, a market-maker

with a very large customer base and access to the inter-dealer markets. Thus, in connection with

its Lehman exposure, Citi was generally able to transact at or near mid-market values. Indeed,

because of Citi's large customer base, Citi would have been able to profit from bid/offer spreads,

not be punished by them.

            10.    Therefore, instead of costs, the add-ons were actually built-in profits that

Citi took for itself.  In reality, many of the "add-ons" claimed by Citi do not reflect actual friction

costs, but rather are attempts by Citi to collect profits.  Citi cannot justify taking add-ons today

based on hypothetical losses that may or may not occur in the future, when they are holding the

positions that have an equal chance of increasing or decreasing in value in the future.  Moreover,

even if Citi had replaced the trades and actually incurred these types of charges, which it did not,

Citi would have paid at most a tiny percentage of the $1.6 billion in charges it now claims.  Citi

artificially ballooned these hypothetical costs by, for example, using spreads that are typically

charged by market-makers to end users with limited market access, ignoring that as a market-

maker with a large customer base and access to the inter-dealer market where trades are

generally done at or near mid-market, Citi typically traded with small or no spreads and in

certain cases would have been able to profit from bid/offer spreads.  These inflated, phantom

losses produced a windfall for Citi that is barred by the swap agreements and governing law,

which only permit the non-defaulting party to receive the economic equivalent of the terminated trades.

11.      ***Third***, Citi disregarded its own internal risk management practice of managing its derivatives book on a portfolio basis.  As Citi described in its 2008 Annual Report, stress testing for derivatives, "is performed on both individual trading portfolios, and on **aggregations of portfolios** and businesses," and "[t]he Chief Risk Officer . . . monitors and controls major risk exposures and concentrations across the organization. This means **aggregating risks**, within and across businesses . . . ."  *See* Citigroup, Inc., 2008 Annual Report (Form 10-K) at 91 and 51 (emphasis added).  However, instead of applying portfolio aggregation to determine the economic equivalent of the material terms of the transactions as a group – as any reasonable trader or risk manager would do, as Citi customarily did, and as commercial reasonableness requires – Citi closed out the vast majority of the trades individually so it could maximize the number of charges for hypothetical losses included in its claims.  Even where there were functionally identical offsetting trades, Citi in certain instances added hypothetical add-on charges to both trades.  Citi's failure to aggregate risk in connection with the calculation of its hypothetical losses was a commercially unreasonable procedure that generated commercially unreasonable claims.  It greatly inflated the amount of hypothetical losses claimed by Citi and violates the principle under New York law that requires counterparties to mitigate losses when seeking breach of contract damage claims.

12.      Clearly Citi knew how to mitigate losses by aggregating trades.  Citi's most egregious conduct vis-à-vis Lehman related to a group of trades whereby Citi's exposure to Lehman matched perfectly with Lehman's exposure to a third counterparty.  Prior to the commencement of Lehman's bankruptcy cases, Citi and the third party arranged a novation with one another whereby they would face each other and Lehman would be taken out of the middle

of the exposure. Citi matched 29 positions it had with Lehman with 87 positions Lehman had

with another counterparty and eliminated the Lehman risk. Shockingly, rather than embrace this

transaction and pursue other means of loss mitigation, after the Commencement Date Citi sought

to resurrect these same trades for the sole purpose of terminating them and adding grossly

inflated claims for hypothetical losses. Clearly, Citi viewed Lehman's bankruptcy as a license to

profit, especially from the $2 billion of LBHI cash that it was holding. By attempting to revive

these trades and adding phantom losses, Citi inflated its claim by an additional $109 million (*see*

paragraphs 205 through 216 herein).

        13.    While the $1.93 billion in artificially-inflated claims bears no resemblance

to any actual losses, it does closely approximate the $2 billion of cash that Citibank extracted

from LBHI three months prior to its bankruptcy as a "comfort" deposit to cover clearing and

settlement overdrafts. Citibank has wrongfully withheld the $2 billion and has taken the position

that it may setoff and apply LBHI's cash to pay itself dollar-for-dollar on claims that would

otherwise be unsecured. Defendants have also: (i) refused to return $500 million of LBHI cash

that LBHI transferred to the account of its broker-dealer subsidiary at Citibank hours before the

LBHI bankruptcy filing; and (ii) refused to pay approximately $204 million owed to LBCC

under the parties' clearance agreement.

        14.    Without Citi's fabricated derivatives claims, Citibank would have had to

return the $2 billion to LBHI. In this manner, Citi has seized upon the close-out of the Lehman

Subsidiaries' derivatives portfolio as a profit-making opportunity of historic proportions. While

other Lehman creditors stand to recover cents on the dollar for their actual losses, Citi is seeking

to earn a $2.2 billion profit by claiming a 100 cent recovery on phantom losses.

        15.    This action seeks to remedy the harm perpetrated as a result of Citibank's

efforts to elevate its position against Lehman over similarly situated creditors. Citi should be

ordered to return to the LBHI estate the approximately $2.5 billion that it is improperly withholding, its grossly inflated claims should be disallowed or reduced and it should be ordered to pay the hundreds of millions of dollars it owes to the Lehman Subsidiaries under the parties' contracts.

## THE PARTIES

16.     LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

17.     LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

18.     LBCC is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

19.     LBCS is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

20.     The Committee is a statutory committee appointed by the Office of the United States Trustee under section 1102 of the Bankruptcy Code in the above-captioned chapter 11 cases on or about September 16, 2008, whose intervention in this case was stipulated to by Citibank.

21.     Citibank is a national banking association chartered under the laws of the United States, with its principal place of business in New York, New York.

-9-

22.     Citi Global is organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom.

23.     Citi Financial is organized under the laws of Delaware with its principal place of business in New York, New York.

24.     Citi Canyon is organized under the laws of the Cayman Islands.

25.     Citi Energy is organized under the laws of Delaware with its principal place of business in Houston, Texas.

26.     Citi Swapco is organized under the laws of Delaware with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

27.     Plaintiffs bring this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seek relief under Sections 2201 and 2202 of title 28 of the United States Code, Sections 105(a), 502, 541, 542, 544, 548, and 550 of the Bankruptcy Code, and applicable provisions of state law.

28.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (c).  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the Order dated July 10, 1984 Referring to Bankruptcy Judges for this District any or all proceedings under Title 11, this Court may exercise subject matter jurisdiction.  Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

29.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K) and (O).

30.     Defendants, by agreement, have consented to the entry of a final order by the Bankruptcy Court, within the meaning of 28 U.S.C. § 157(b)(1), and appeals, if any, shall be made pursuant to 28 U.S.C § 158(a)(1).

-10-

31.     Pursuant to, *inter alia*, 11 U.S.C. 502(a) and Rule 3007(b) of the Federal
Rules of Bankruptcy Procedure, joinder of the objections asserted herein with the remaining
counts requesting relief is proper.

## FACTUAL ALLEGATIONS

### A.     Citibank is Wrongfully Withholding $2.5 Billion in Cash Belonging to Lehman

(a)     *Background*

32.     Prior to its bankruptcy, LBHI and its subsidiaries constituted the fourth
largest investment bank in the United States. It offered an array of financial services in equity
and fixed income sales, trading and research, investment banking, asset management, private
investment management, and private equity.

33.     Citibank provided clearing and settlement services, including foreign
exchange-related services, for Lehman.  One way in which it provided those services was
pursuant to a Continuous Linked Settlement ("CLS") Services Amended and Restated
Agreement for CLS User Members (the "CLS Agreement"), under which Citibank acted as the
Designated Settlement Member for certain LBHI subsidiaries – *i.e.*, Lehman Brothers Inc.
("LBI"), LBCC, LBSF and Lehman Brothers International (Europe) (collectively, the "Trading
Subsidiaries").  CLS is a daily cash settlement system and service that is offered by CLS Bank
International through its members and is designed to eliminate settlement risk in foreign
exchange transactions.  When a foreign exchange transaction is settled under the CLS system,
the trading counterparties each pay one currency into the CLS bank and receive a different
currency in return.

34.     Because participation in the CLS foreign exchange netting and clearing
service is only available by or through a "settlement member," and Citibank was one of only 69
members while Lehman was not, the Trading Subsidiaries used Citibank to affect their foreign

exchange trades under the CLS system.  Citibank received tens of millions of dollars in fees from Lehman in exchange for providing that service.

35.     Due to the timing differences in settling currency trades in markets across the globe, the Trading Subsidiaries would occasionally incur overdrafts in their trading accounts in the course of Citibank performing clearing services and settling their currency trades.  When providing clearing services, Citibank permitted the Trading Subsidiaries to incur daylight overdrafts.  The Trading Subsidiaries would, in the ordinary course, reduce their overdrafts to zero at the end of the day, when all trades settled.

36.     Citibank performed CLS settlement and clearing services for Lehman from 2004 through 2008, without any material modification to the parties' respective contractual obligations.  The clearing services that Citibank provided to Lehman were vital to Lehman's ability to conduct its ordinary business operations.

37.     In addition to foreign exchange trades effected through CLS, which constituted the substantial majority of clearing services provided by Citibank to Lehman, Citibank provided other clearing and settlement services, including cash clearing services in emerging markets and in the United States.  The Trading Subsidiaries also would occasionally incur overdrafts in their trading accounts in the course of Citibank performing those clearing and settlement services.

38.     Pursuant to a Guaranty dated January 7, 2004 (the "2004 Guaranty"), LBHI agreed to guaranty the payment of obligations under extensions of credit from Citibank to certain specifically identified Lehman entities.  The 2004 Guaranty did not provide a guaranty of obligations incurred in connection with Citibank's performance of clearing services, and it did not extend to cover any obligations of LBI, whether for clearing related overdrafts or broader indebtedness.

(b)     *The $2 Billion June 2008 Transfer*

39.     During the period of market deterioration that followed the collapse of

Bear Stearns in March 2008, Citibank began making inquiries regarding Lehman's cash position

and liquidity.

40.     On the morning of June 12, 2008, reacting to what it perceived were

negative market signals regarding Lehman, Citibank made a hasty request that LBHI transfer $3-

5 billion in cash to an account held at Citibank "to cover intraday exposures" to the Trading

Subsidiaries arising out of clearing and settlement activities.  If LBHI did not acquiesce, Citibank

would not continue to clear and settle Lehman's trades or provide related extensions of credit to

Lehman.  Citibank did not request the funds in connection with the parties' derivatives contracts,

unsecured lines of credit, or any other business conducted between the firms.

41.     After a rushed discussion among top Citibank and LBHI executives, LBHI

agreed that same day to segregate $2 billion from its general deposit account held at Citibank

into a separate special purpose account.  The contemplated transfer and segregation of the funds

would not be made in the ordinary course of LBHI's business.  Unlike LBHI's general deposits

with Citibank, the parties understood that LBHI would not withdraw the segregated $2 billion,

but would instead leave the cash in the Citibank system.  Citibank subjected the funds to a

number of internal controls designed to restrict their release – such that LBHI did not have the

ability to withdraw the funds on a unilateral basis. Citibank internally referred to the $2 billion as

"captive funds."

42.     Critically, Citibank knowingly relinquished any rights of setoff with

respect to the $2 billion, opting to trade those rights for the prompt receipt and segregation of the

funds.  Indeed, LBHI specifically refused Citibank's request for setoff rights with respect to the

$2 billion during the discussions on June 12, 2008, and further refused Citibank's request that it

be granted a lien or any other security interest with respect to the $2 billion. Citibank accepted the transfer on those terms. According to internal Citibank documents, Citibank's purpose was to obtain "comfort" that the funds would be available in its system; its primary goal was "keeping the liquidity within Citibank and being able to control the release of the deposit."

43.    Pursuant to these conditions, on June 13, 2008, Citibank debited $2 billion from LBHI's general demand deposit account at Citibank and transferred those funds to a separate Citibank account in Nassau, Bahamas.

44.    Later, in June 2008, consistent with the limited purpose of the $2 billion, LBHI used $210 million of the $2 billion to avoid an overdraft in an account of a Trading Subsidiary. LBHI replaced the funds the next business morning. LBHI never withdrew the segregated $2 billion from the Citibank system, nor accessed those funds for any other purpose.

(c)    *Citibank's Failed Attempt to Obtain a Lien or Right of Setoff With Respect to the $2 Billion*

45.    Internal Citibank e-mails circulated on June 12, 2008, demonstrate that Citibank recognized it had neither a "clean right of offset" nor a lien on LBHI's $2 billion. Similarly, a June 17, 2008 e-mail from the head of Risk Management at Citibank to his fellow Citibank executives reported that the $2 billion "offers us little protection."

46.    Accordingly, in July 2008, the parties began discussions about entering into a pledge agreement, whereby LBHI would pledge cash or securities to Citibank to secure clearing-related obligations of the Trading Subsidiaries and would grant to Citibank a right of setoff with respect to such cash or securities.

47.    On or about July 18, 2008, Citibank requested that LBHI enable Citibank to retain the $2 billion as security for the overdrafts of the Trading Subsidiaries. LBHI refused. Instead, the parties explored a potential pledge of investment grade collateral as security for any

-14-

Trading Subsidiary overdrafts.  In contemplation of reaching such an agreement, Citibank

reserved a collateral account at Citibank in the name of "LBHI Pledge to Citibank."

48.     The parties' discussions continued through August 2008. Ultimately,

however, the parties did not reach agreement on the terms of a pledge agreement, nor could they

agree on what collateral would be pledged under such an agreement.  Accordingly, the parties

never executed a pledge agreement, and one never took effect. Instead, in September 2008,

Citibank attempted use its leverage to improve its position with respect to the $2 billion at the

expense of other similarly situated creditors.

(d)     *Citibank Forces LBHI to Execute the September Amendment*

49.     As of the morning of September 9, 2008, LBHI intended to release its

preliminary earnings report for the third fiscal quarter of 2008 on September 17, 2008.  However,

because news in the marketplace of the collapse of talks between Lehman and the Korea

Development Bank (which had been considering an equity investment in Lehman) and analysts'

estimates of losses caused a sharp drop in LBHI's stock price on September 9, 2008, senior

management of LBHI decided to release the preliminary earnings report earlier, on Wednesday,

September 10, 2008, at 7:30 a.m.

50.     In response to these events, Citibank acted swiftly to improve its position

over the $2 billion at the expense of other similarly situated creditors.  On September 9, 2008,

Citibank presented LBHI with a draft amendment to the 2004 Guaranty (the "September

Amendment") and demanded that it be executed that evening.  The draft amendment purported

to add LBI and other LBHI subsidiaries as entities whose obligations would be subject to the

2004 Guaranty, and further purported to expand the scope of obligations subject to the 2004

Guaranty to include, for the first time, trading obligations arising under the CLS Agreement.  In

Citibank's view, the September Amendment would finally allow Citibank to set off the $2 billion against the trading obligations of LBI and the other newly added LBHI subsidiaries.

51.     To force LBHI to accede to its demands, Citibank reduced the Trading Subsidiaries' clearing lines significantly, some to zero.  Citibank further threatened that "we will not open you [Lehman] in Asia" unless LBHI agreed to guaranty the obligations of all entities as proposed by Citibank.  Citibank's threat, if carried out, would have resulted in LBHI's Asian subsidiaries publicly defaulting on their trading obligations in the early morning of September 10, 2008, New York time, and only hours before Lehman's life-or-death earnings call scheduled for 7:30 a.m. on September 10, 2008.  As a practical and commercial reality, LBHI had no choice but to provide the requested September Amendment with its core terms intact.

52.     The September Amendment provided no new rights or any other consideration to LBHI.  At the time it was executed, LBHI was insolvent and/or undercapitalized and, on information and belief, LBI was insolvent and only days away from an insolvency proceeding.  As such, LBHI could not (and did not) obtain reasonably equivalent value in return for entering into the September Amendment.

(e)     *The $500 Million Transfer to LBI's Account at Citibank*

53.     Later that week, in the evening of September 14, 2008, LBHI transferred $500 million at Citibank's insistence and direction from LBHI's general deposit account at Citibank to LBI's general deposit account at Citibank.  LBHI itself would file for bankruptcy protection only hours after the transfer was executed.

54.     LBHI received no consideration for this $500 million transfer to LBI. Further, at the time of the transfer, LBHI was insolvent and/or undercapitalized, and on information and belief, LBI was insolvent. Accordingly, LBHI did not receive reasonably equivalent value in exchange for the $500 million transfer to LBI.

(f)    *Bankruptcy Filing and Citibank Claims*

55.    LBHI filed for protection under chapter 11 of the Bankruptcy Code in the early morning of September 15, 2008.

56.    Later that week, Citibank applied $1 billion of funds in LBI's account, which included LBHI's $500 million, to $1 billion of claims purportedly owed by LBI to Citibank.

(g)    *Citibank Refuses to Return LBHI's $2 Billion, and Asserts Claims Under the September Amendment*

57.    On September 19, 2008, Citibank terminated the CLS Agreement and other relevant agreements governing Citibank's role as clearing agent for Lehman.  The agreed upon purpose of the $2 billion was thereby extinguished, and LBHI requested that Citibank return the $2 billion to the estate for distribution to creditors.  Although it had no right to do so, Citibank refused LBHI's request and purported to lock down the $2 billion for itself.

58.    With $2 billion of cash now purportedly available to cover obligations of the Lehman Subsidiaries – which would have to be returned to Lehman unless Citi could manufacture a basis for withholding it – Citi had every incentive to inflate its claims, including those arising under the parties' swap agreements.  In fact, Citi submitted claims under those agreements totaling close to $2 billion – a convenient match to the amount of the deposit.

59.    In its proof of claim against LBHI, Citibank asserts rights as a secured creditor on the purported basis that it can now set off the $2 billion against approximately $1.7 billion of its claims arising under swap agreements with LBHI subsidiaries.  Ordinarily, such swap agreement claims would be unsecured, or secured only to the extent provided in the swap agreements themselves. Yet Citibank is now attempting to use the $2 billion of LBHI funds that were transferred and segregated in connection with the parties' clearing relationship, to pay itself

-17-

dollar-for-dollar on these inflated swap agreement claims.  Specifically, in proof of claim

number 67736, Citibank asserts the following claims are secured by the $2 billion:

    (i)    $1,640,084,656 under the LBSF-Citibank Agreement;

    (ii)    $60,015,440 related to a purported ISDA Master Agreement between Citibank and LBI;

    (iii)    $18,017,039 under the LBCC-Citibank Agreement;

    (iv)    $2,210,646 under an ISDA Master Agreement between Citibank and LBCS dated as of February 21, 2006; and

    (v)    $841,032 under an ISDA Master Agreement between Citibank and Lehman Brothers Commercial Corporation Asia Limited ("LBCCA") dated as of July 12, 2007.

60.    Citibank's attempt to pay itself using LBHI's $2 billion is not limited to its

inflated swap agreement claims.  The proof of claim asserts over $320 million of other

miscellaneous claims against the $2 billion that are also completely unrelated to the parties'

clearance and settlement relationship, as follows:

    (i)    $281,225,562 under a Revolving Loan Agreement between Citibank and LBCCA;

    (ii)    $35,844,833 related to a securities claim primarily against LBCCA;

    (iii)    $2,592,932 under the Amended and Restated Principal Paying Agency Agreement between Citibank, LBHI and LB Securities;

    (iv)    $175,498 related to fees and expenses under an Undertaking Deed with LBCCA;

    (v)    $116,206 related to an overdraft in a Lehman ALI general deposit account; and

    (vi)    $85,296 related to an alleged overdraft in the general deposit account of LBCS.

61.    Finally, in the proof of claim, Citibank asserts more than $295 million of

additional claims against LBHI purportedly arising under the avoidable September Amendment,

as well as a "contingent" $1 billion claim related to the setoff effectuated by Citibank against

purported LBI obligations, and further claims a right to set off any portion of LBHI's $2 billion

against those claims.  Specifically:

    (i)    $1 billion related to LBI's alleged obligations under the CLS Agreement that would be rendered unpaid if Citibank is ordered to return to the LBI estate all or any portion of the $1 billion against which Citibank exercised purported setoff rights, as described above;

    (ii)    $260,326,894 related to LBI's alleged obligations under the CLS Agreement;

    (iii)    $12,795,775 related to misdirected wires concerning LBI;

    (iv)    $12,199,628 related to an overdraft in an LBI account;

    (v)    $8,358,995 related to securities lending activity between Citibank and LBI;

    (vi)    $604,496 related to account fees for an LBI account;

    (vii)    $584,897 related to LBSF's alleged obligations under the CLS Agreement;

    (viii)    $207,624 related to a late settlement claim between Citibank and LBI;

    (ix)    $199,449 related to custody services between Citibank and LBI; and

    (x)    $35,389 related to a check fraud claim concerning LBI.

62.    Citibank has no right to apply any of the $2 billion to the above claims.

The $2 billion should be returned to the LBHI estate for equitable distribution to creditors.

    (h)    *Citibank's $204 Million Payable to LBCC Under the CLS Agreement*

63.    Prior to the Lehman bankruptcy filings, as a result of LBCC's foreign

exchange trades settled in the CLS system, Citibank received approximately $204 million on

LBCC's behalf.  On information and belief, Citibank wrongfully used $4.5 million of those

LBCC funds to pay itself for an alleged obligation of Lehman Brothers International (Europe)

("LBIE") to Citibank. Further, although it had no right to do so, Citibank continued to withhold the remaining LBCC funds for years following the Lehman bankruptcy filings.

64.     Pursuant to a Court-approved stipulation dated May 14, 2013, Citibank has since paid LBCC $166 million of the approximately $204 million that it owes to LBCC. At a minimum, the LBCC estate is entitled to prejudgment interest to compensate its creditors for Citibank's wrongful withholding of those funds through the date of payment.

65.     Further, Citibank continues to wrongfully withhold $38.5 million of the LBCC payable, including the $4.5 million that it used to pay itself for the purported obligation of LBIE. Citibank claims, without basis, that it can use $34 million of those funds to pay itself for fees under the parties' CLS agreement, and to set off the remainder against the inflated claims that Citibank has manufactured against LBCC under the parties' derivatives contract (as described below). That $38.5 million should be paid over to the LBCC estate, with interest, for the benefit of creditors.

**B.      Citi's Derivatives Claims Violate the Master Agreements, New York Law, and the Bankruptcy Code**

(a)     *Background*

66.     Prior to LBHI's bankruptcy filing on September 15, 2008, Citi was among the Lehman Subsidiaries' largest global counterparties in derivatives transactions. Citi and Lehman were two of only a relatively small number of major global dealers in derivatives. Both firms were sophisticated in that regard, and had in place massive infrastructures for executing transactions, marking trades to market, valuing their respective positions, and exchanging collateral to reflect the net value of those positions.

67.     Derivatives trading between the firms was governed by a number of "Master Agreements," each between Citi and a Lehman Subsidiary. Plaintiffs object to Citi's

-20-

claims under the following nine Master Agreements (with their related schedules, confirmations

and credit support annexes, the "Master Agreements"):

| | Date | Lehman Subsidiary | Citi entity | Type | Agreement |
|---|---|---|---|---|---|
| 1. | October 6, 2005 | LBSF | Citi Canyon | ISDA | "LBSF-Canyon Agreement" |
| 2. | May 14, 1992 | LBSF | Citibank | ISDA | "LBSF-Citibank Agreement" |
| 3. | August 15, 1989 | LBSF | Salomon Brothers Holding Company Inc. / Citi Financial | ISDA | "LBSF-Financial Agreement" |
| 4. | February 16, 2000 | LBSF | Salomon Brothers International Limited / Citi Global | ISDA | "LBSF-Global Agreement" |
| 5. | March 29, 1993 | LBCC | Citibank | ISDA | "LBCC-Citibank Agreement" |
| 6. | February 1, 2006 | LBCS | Citi Energy | ISDA | "LBCS-Energy Agreement" |
| 7. | April 17, 2007 | LBCS | Citi Global | ISDA | "LBCS-Global ISDA Agreement" |
| 8. | March 13, 2008 | LBCS | Citi Global | EFET | "LBCS-Global EFET Agreement" |
| 9. | August 16, 1996 | LBSF | Citi Swapco / Salomon Swapco Inc. | ISDA | "LBSF-Swapco Agreement" |

LBHI is a guarantor of the Lehman Subsidiaries' obligations under each of these Master

Agreements and, therefore, is a "Credit Support Provider" under the Master Agreements.

68.     In the normal course of business prior to the LBHI bankruptcy filing, at

the end of each trading day Citi and the Lehman Subsidiaries marked to market the value of their

derivatives portfolios under each Master Agreement, agreed on those values, and exchanged cash

collateral to secure whichever party was "in-the-money" on a net basis under each Master

Agreement.

69.     Under the Master Agreements, the terminating party had been designated

as the party with responsibility for calculating the amount that was due upon early termination.

The procedure for calculating that amount depended on the method the parties had selected.

Each of the calculation methods are intended to value the parties' positions on all outstanding transactions as of the Early Termination Date, and to determine the overall net amount owed (in either direction) on those transactions. The Master Agreements expressly require the terminating party to calculate each overall net amount in good faith, to use commercially reasonable procedures, and to produce a commercially reasonable result.

> (i)     *The COA Master Agreements*

70.     The LBSF-Financial Agreement was entered into using the 1987 form ISDA Interest Rate and Currency Exchange Agreement. Under this agreement, the settlement amount due upon early termination is determined by the Market Quotation method. The remaining seven ISDA Master Agreements were entered into using the 1992 form ISDA Master Agreement. Under that form the parties have the choice of either Market Quotation or Loss as the measure of the settlement amount upon early termination.

71.     However, in August 2008 the Lehman Subsidiaries and a number of Citi entities adopted certain provisions related to close-out calculations from the 2002 ISDA Master Agreement by executing the Close-out Amount Multilateral Agreement (the "Close-out Amount Agreement"). The following seven Master Agreements, representing the vast majority of derivative trades between the Lehman Subsidiaries and Citi, were amended by the Close-out Amount Agreement:

1. the LBSF-Citibank Agreement;
2. the LBSF-Financial Agreement;
3. the LBSF-Global Agreement;
4. the LBCC-Citibank Agreement;
5. the LBCS-Energy Agreement;
6. the LBCS-Global ISDA Agreement; and
7. the LBSF-Swapco Agreement (collectively, the "COA Master Agreements").

72.    Under the COA Master Agreements, the parties agreed to use the Close-out Amount method to determine the settlement amount upon early termination.  "Close-out Amount" is defined as:

> *[T]he amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances* (expressed as a positive number) *or gains of the Determining Party that are or would be realized under then prevailing circumstances* (expressed as a negative number) *in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of the Terminated Transaction or group of Terminated Transactions*, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii) and (b) the options rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.
>
> Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. . . . Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

2002 ISDA Master Agreement § 14 (emphasis added).  Thus, each Close-out Amount should have been calculated by Citi based on a commercially reasonable, good faith determination of its total losses and costs (or gains) that are or would be incurred (or realized) under then prevailing circumstances in connection with Terminated Transaction(s) as of the Early Termination Date (or as soon thereafter as was commercially reasonable).  *See* 2002 ISDA User's Guide at 24-25. The Close-out Amount method is designed to provide a set of procedures and valuation tools by which a Determining Party may calculate losses it actually incurred, or the economic equivalent thereof, on the Terminated Transactions under the contract.

73.    The definition of "Close-out Amount" includes four specific requirements that Citi was mandated to comply with in its calculations of the amounts due upon termination of the COA Master Agreements.

- **First**, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).  Section 562 of the Bankruptcy Code similarly requires that a party terminating a Master Agreement measure its damages as of the date of termination, unless "there are not any commercially reasonable determinants of value" as of that date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562(a), (b).

- **Second**, the calculation of Close-out Amount must be made using "commercially reasonable procedures."  2002 ISDA Master Agreement § 14.

- **Third**, those close-out procedures must produce a "commercially reasonable result."  *Id.*

- **Fourth**, the Close-out Amount only entitles the non-defaulting party to the "economic equivalent" of "the material terms of the Terminated Transactions or group of Terminated Transactions," not a windfall profit.  *Id.*

Citi violated each of these four requirements in its calculations of the Close-out Amounts due upon termination of the COA Master Agreements.

(ii)    *The LBSF-Canyon Agreement*

74.    Citi Canyon was not a party to the Close-out Amount Agreement.  The

LBSF-Canyon Agreement was entered into using the 1992 form of the ISDA Master Agreement,

and the parties elected to use the Market Quotation method to measure the settlement amount

upon early termination.  Market Quotation is defined as:

> [A]n amount determined on the basis of quotations from Reference
> Market-makers.  Each quotation will be for an amount, if any,
> that . . . would have the effect of preserving for such party the
> economic equivalent of any payment or delivery . . . that would,
> but for the occurrence of the relevant Early Termination Date, have
> been required after that date.

1992 ISDA Master Agreement § 14.  Under the 1992 form ISDA Master Agreement, a non-

defaulting party may calculate the settlement amount for particular transactions or groups of

transactions via the Loss method if a Market Quotation amount cannot be determined for those

trades.  *See id.* (defining "Settlement Amount" in part as "such party's Loss . . . for each

Terminated Transaction or group of Terminated Transactions for which a Market Quotation

cannot be determined").

75.    Citi Canyon asserted that it did not receive a sufficient number of

quotations to determine Market Quotation values for the transactions under the LBSF-Canyon

Agreement.  As a result, Citi Canyon determined the amounts due upon termination of the

transactions under this agreement in accordance with the definition of "Loss."

76.    Section 14 of the 1992 ISDA Master Agreement defines "Loss" as

follows:

> **[A]n amount that [the determining] party reasonably determines
> in good faith to be its total losses and costs (or gain, in which
> case expressed as a negative number)** . . . including any loss of
> bargain, cost of funding or, at the election of such party but
> **without duplication**, loss or cost incurred as a result of its
> terminating, liquidating, obtaining or reestablishing any hedge or

related trading position (or any gain resulting from any of them) . .
. . A party may (but need not) determine its Loss by reference to
quotation of relevant rates or prices from one or more leading
dealers in the relevant markets.

1992 ISDA Master Agreement §14 (emphasis added).  In other words, under the "Loss" method

a non-defaulting party is required to calculate reasonably and in good faith its net losses, costs,

and gains incurred as a result of the early termination of the Terminated Transactions plus

Unpaid Amounts.  *See* 1992 ISDA User's Guide at 25.

> (iii)    *The LBCS-Global EFET Agreement*

77.    The LBCS-Global EFET Agreement was entered into using version 2.1(a)

of the European Federation of Energy Traders General Agreement Concerning the Delivery and

Acceptance of Electricity ("EFET Agreement").  Under that Agreement, the terminating party

was required to determine the amount due upon termination of the agreement "by calculating the

sum (whether positive or negative) of all Settlement Amounts for all Individual Contracts plus

any or all other amounts payable between the Parties under or in connection with the

Agreement."  EFET Agreement § 11.1.  Settlement Amount is defined as:

[T]he ***Gains less the aggregate of the Losses and Costs*** which the
Terminating Party incurs as a result of the termination of the
Individual Contract.  For purposes of this provision:

(a) "**Costs**" means brokerage fees, commissions and other third
party costs and ***expenses reasonably incurred by the Terminating
Party either in terminating any arrangement pursuant to which it
hedged its obligations or entering into new arrangements which
replace a terminated Individual Contract*** and all reasonable legal
fees, costs and expenses incurred by the Terminating Party in
connection with its termination of such Individual Contract;

(b) "**Gains**" means an amount equal to the ***present value of the
economic benefit*** to the Terminating Party, if any (exclusive of
Costs), resulting from the termination of an Individual Contract,
determined ***in a commercially reasonable manner***; and

-26-

(c) "**Losses**" means an amount equal to the ***present value of the economic loss*** to the Terminating Party, if any (exclusive of Costs), resulting from the termination of an Individual Contract, determined ***in a commercially reasonable manner***.

*Id.* § 11.2 (emphasis added).  In other words, under the EFET Agreement the non-defaulting party must calculate the amount due at termination in a commercially reasonable manner, based on the present value of its economic gains and losses, and may only include costs reasonably incurred in actual replacement transactions or hedging transactions.

(iv)   *Citi Inflates its Claims*

78.     Under the terms of the Master Agreements, the commencement of LBHI's bankruptcy case on September 15, 2008 constituted an "Event of Default" by the Lehman Subsidiaries and gave Citi the right to terminate the transactions under the Master Agreements. Later that same day, Citibank, Citi Global, Citi Financial, and Citi Energy notified the Lehman Subsidiaries that they were terminating the derivatives transactions under each of their Master Agreements and designating September 15, 2008 as the "Early Termination Date."  Citi Canyon notified LBSF on September 17, 2008 that it was terminating the transactions under its Master Agreement with LBSF, designating September 18, 2008 as the "Early Termination Date."

79.     On September 18, 2009 and September 22, 2009, Citi filed proofs of claim against the Lehman Subsidiaries for losses purportedly arising under the Master Agreements and, with respect to LBHI, in its capacity as Credit Support Provider under the Master Agreements. Subsequently, on November 18, 2011, certain of the Citi entities filed amended proofs of claim against Lehman.  Citi submitted revised calculation statements, dated September 14, 2009 or September 16, 2009, as its basis for the calculation of its claims.

80.     A proper calculation of the amounts due upon termination of the Master Agreements, calculated as of the close of business on the Early Termination Dates using readily

available market data and industry standard third-party pricing services, results in a net claim of

only $25,235,826 under two of the Master Agreements, while the Lehman Subsidiaries are in

fact owed a total of $243,842,733 under the parties' other seven Master Agreements.  However,

Citi has submitted claims under the Master Agreements for $1,930,484,787 against the Lehman

Subsidiaries and LBHI as guarantor.  These claims consist of aggregate termination amounts of

$2,728,110,204, less the collateral already held by Citi (which Citi claims totals $711,953,592),[2]

less net unpaid amounts[3] of $85,671,825 credited to the Lehman Subsidiaries.

81.    The chart below shows the difference between Citi's calculation of the

sum of all Close-out Amounts under each Master Agreement, and Lehman's calculation of the

same, which is based upon independent, publicly available market sources.

---

[2]  Plaintiffs calculate the net amount of collateral held by Citi as $712,421,555.

[3]  "Unpaid amounts" are amounts that became payable under a Master Agreement on or prior to the termination date but remained unpaid.  Under the Master Agreements, certain unpaid amounts are due from Citi and other unpaid amounts are due from the Lehman Subsidiaries.  According to Citi's claims, on a net basis $85,671,825 of unpaid amounts are owed by Citi to the Lehman Subsidiaries.  That net amount is a credit to the Lehman Subsidiaries in the close-out calculations under the Master Agreements.  However, Plaintiffs calculate the net unpaid amount that should be credited to the Lehman Subsidiaries as $48,076,292.

| Comparison of Citi's Calculation and Market-Based Calculation of Close-out Amounts [values in USD to the Lehman Subsidiaries][4] | | | |
|---|---|---|---|
| Master Agreement | Citi Close-out Amount[5] | Market-Based Calculation of Close-out Amount | Difference ($) |
| LBSF-Canyon | 763,043 | 958,630 | 195,587 |
| LBSF-Citibank | (2,072,323,937) | (249,608,958) | 1,822,714,979 |
| LBSF-Financial | (248,852,591) | (223,685,221) | 25,167,370 |
| LBSF-Global | (47,800,564) | 164,305,046 | 212,105,610 |
| LBCC-Citibank | (404,376,578) | (296,364,126) | 108,012,452 |
| LBCS-Energy | 10,413,248 | 23,885,115 | 13,471,867 |
| LBCS-Global ISDA | (7,825,571) | (7,349,001) | 476,570 |
| LBCS-Global EFET | 4,999,693 | 6,226,192 | 1,226,499 |
| LBSF-Swapco | 36,893,053 | 39,741,383 | 2,848,330 |
| TOTAL | (2,728,110,204) | (541,890,939) | 2,186,219,265 |

To achieve this remarkable claim inflation of more than $2.1 billion, Citi employed a number of improper procedures, as detailed below.

> (b)   *Citi Improperly Chose Close-out Dates to its Advantage, in Violation of the Master Agreements and the Bankruptcy Code*

82.    In an effort to inflate its claims against the Lehman Subsidiaries, Citi disregarded the requirements of the Master Agreements and the Bankruptcy Code by valuing a majority of the terminated trades as of September 16, 2008 or later, instead of the designated Early Termination Date of September 15, 2008.  In fact, Citi predominantly closed out each major type of derivatives product as of the date that produced the largest claim during the week of LBHI's bankruptcy.  In so doing, Citi improperly inflated its claims by over $400 million in violation of the Master Agreements and the Bankruptcy Code.

---

[4]   Values are presented from the point of view of the Lehman Subsidiaries.  Thus, negative numbers represent amounts due to Citi.

[5]   As described above, the termination amount shown under the LBSF-Canyon Agreement is a "Loss" amount and the termination amount shown under the LBCS-Global EFET Agreement is a "Settlement Amount."

83.     Citibank, Citi Financial, Citi Global, Citi Energy, and Citi Swapco all terminated their Master Agreements with the Lehman Subsidiaries via letters delivered on September 15, 2008.  In those letters, Citi designated September 15, 2008 as the Early Termination Date for the LBSF-Citibank Agreement, LBSF-Financial Agreement, LBSF-Global Agreement, LBCC-Citibank Agreement, LBCS-Energy Agreement, LBCS-Global ISDA Agreement, LBCS-Global EFET Agreement, and LBSF-Swapco Agreement.[6]

84.     By designating September 15 as the Early Termination Date, Citi was obligated to value the terminated transactions under these agreements as of that date.  In the COA Master Agreements, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).  Similarly, section 562 of the Bankruptcy Code requires that a party terminating a swap agreement measure its damages as of the date of termination, unless "there are not any commercially reasonable determinants of value" as of that date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562(a), (b); *see also In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 248-49 (3d Cir. 2011).

85.     Under the Bankruptcy Code, a swap participant that measures its damages as of a date other than the date the transactions under a Master Agreement are terminated "has the burden of proving that there were no commercially reasonable determinants of value" as of the termination date.  11 U.S.C. § 562(c).  Ample commercially reasonable determinants of value

---

[6]  By letter of September 17, 2008, Citi Canyon designated September 18, 2008 as the Early Termination Date for the LBSF-Canyon Agreement.

existed for the relevant types of derivatives transactions on September 15, 2008.  Thus, Citi was clearly required by both the Master Agreements and the Bankruptcy Code to value all of the trades under the eight agreements listed in paragraph 82 as of September 15, 2008.

86.    Nonetheless, Citi ignored this legal and contractual requirement and instead valued a majority of these trades as of September 16 or later.  When the valuation dates chosen by Citi are examined by type of derivatives product, a distinct pattern is clear:  Citi predominantly valued each major derivatives product as of either September 15 or a later date, depending on which date produced the larger claim.  On a net basis, the portfolios of credit, foreign exchange ("FX"), and securitized products trades between Citi and the Lehman Subsidiaries each increased in value for Citi between September 15 and the later date when Citi closed out these transactions.

87.    Specifically, Citi predominantly used September 16 as the valuation date for credit trades, a date when the market was more favorable for Citi's credit positions than it was on September 15.  Similarly, Citi valued many securitized products trades as of September 16 or 17, which likewise increased its claims compared to September 15.  Although Citi claimed to have closed out its FX portfolio as of September 15, it appears that it actually used market values from September 19, when the values were more lucrative for Citi.  In each case, commercially reasonable determinants of value were available as of September 15, but they were ignored in favor of higher values later in the week.

88.    In contrast to these three products, the portfolio of rates trades actually decreased in net value to Citi after September 15.  However, unlike the other products, Citi predominantly used September 15 as the valuation date for these transactions, again selecting the most favorable date for itself.  But instead of valuing these rates trades as of the end of the day

on September 15, as would be customary, Citi used prices from approximately 8:30 am, which were far more favorable than were the end of day prices.

89.     These actions will be described in detail below, but taken together they illustrate a pattern in which Citi opportunistically chose close-out dates and times in order to maximize its claims.  By valuing many trades as of days other than the Early Termination Date, Citi improperly inflated its claims by over $400 million in clear violation of the Master Agreements and the Bankruptcy Code.

       (c)    *Citi's Claims for Hypothetical Charges Are Improper and Should Be Disallowed*

90.     Citi further inflated its claims against the Lehman Subsidiaries by including more than $1.6 billion for purported "add-on" charges that Citi contends it would have paid had it entered into new trades to replace each of the terminated transactions ("Hypothetical Charges").  But in most cases Citi never actually entered into the replacement transactions, and thus did not actually incur the Hypothetical Charges.  Citi's inclusion of these Hypothetical Charges in its claims violates the Master Agreements, New York law, and the Bankruptcy Code.

       (i)    *Citi's Claims for Hypothetical Charges Violate the Master Agreements*

91.     Citi violated the Master Agreements by including Hypothetical Charges in its claims.  The Hypothetical Charges do not correspond to any losses actually incurred by Citi.  Instead, Citi's receipt of these amounts would constitute a windfall profit far above "the economic equivalent" of "the material terms" of the terminated transactions.

92.     The Close-out Amount for the trades under each COA Agreement should have been the amount of losses or gains that would provide Citi with "the economic equivalent" of "the material terms" of the terminated transactions.  *See* 2002 ISDA Master Agreement § 14. Instead of calculating the Close-out Amount in the manner mandated by the Master Agreements,

-32-

Citi included Hypothetical Charges in its Close-out Amount calculations that bore no relationship to the economic equivalent of the material terms of the terminated transactions.

93.     The Hypothetical Charges included in Citi's claims consist of purported "add-on" charges that Citi contends it would have paid above and beyond the actual mid-market price had it entered into new trades to replace each of the terminated transactions.  One example of such an add-on is a charge for a "bid/offer" spread.  The main component of the bid/offer spread is the markup that a market-maker adds to the mid-market value as its profit for intermediating a trade.  *See* John-Peter Castagnino, Derivatives: The Key Principles 25 (3d ed. 2009) ("The spread is the profit made by the market-maker . . . .").  A bid/offer spread only represents a pecuniary loss when a counterparty, usually a non-dealer end user of a derivative, actually pays the spread by entering into a replacement trade with a dealer whose price reflects a bid/offer spread.  But Citi included charges for bid/offer spreads in its claims under the Master Agreements even though it did not actually enter into replacement trades.  Citi's claims for these phantom Hypothetical Charges are thus seeking damages above the actual mid-market value of the transactions based on losses that were never incurred.

94.     Not only did Citi impermissibly include profits for bid/offer spreads on account of non-existent replacement trades, it did so using inflated amounts that would not have been charged if those replacement trades had actually occurred.  As major derivatives dealers, both Citi and Lehman had access to the inter-dealer market in which dealers trade with one another at or very close to mid-market prices.  Yet the bid/offer spreads applied by Citi to inflate its claims were extremely large, and in many instances were significantly higher even than those that would have occurred between dealers and customers or end users.

95.     Citi also included add-ons for liquidity charges that it purportedly would have been charged had it entered into particular replacement transactions.  Citi applied these

additional liquidity charges to certain trades based on the rationale that the trades were of relatively large size, even when it did not actually enter into the replacement trades.  Moreover, the liquidity charges applied by Citi were far above any such charges that actually existed in the market.  These inflated liquidity add-ons do not correspond to any loss actually incurred by Citi.

96.    The Hypothetical Charges included in Citi's claims, including bid/offer spreads and liquidity charges, violate the Master Agreements because they constitute pure profits for Citi in excess of "the economic equivalent" of "the material terms" of the terminated transactions, and do not correspond to any actual losses.

(ii)    *The Hypothetical Charges are Not Recoverable under New York Law*

97.    The Hypothetical Charges are also not recoverable under New York law. Under New York law, to sustain a claim for damages, a claimant must demonstrate actual loss, and the damages being claimed must be commensurate with the amount of actual loss.  *Scalp & Blade, Inc. v. Advest, Inc.*, 765 N.Y.S.2d 92, 97 (4th Dep't 2003) (noting that in a cause of action for breach of contract, the object of compensatory damages, which measure "fair and just compensation, commensurate with the loss or injury sustained from the wrongful act" is to make the plaintiff whole) (internal citations and quotations omitted); *see also Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) ("It is axiomatic that, except where punitive damages are allowable, the law awards damages for breach of contract to compensate for injury caused by the breach . . . . [I]t is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed.").

98.    General contract damages principles provide that damages are meant to put a non-breaching party in the same position it would be "but for" the breach -- not a better position.  *See Freund*, 34 N.Y.2d at 382 (rejecting damages awards that would "place [plaintiff]

in a far better position than he would have occupied had the defendant fully performed"); *Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977) ("[O]ne whose contract has been breached is not entitled to be placed, because of that breach, in a position better than that which he would have occupied had the contract been performed.").

99.    In addition, under New York law a non-breaching party must calculate its actual loss as of the date of the breach, and a breaching party is not responsible for any subsequent market fluctuations. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the date of the breach."); *Kovens v. Paul*, 04 CIV. 2238 (TPG), 2009 WL 562280 (S.D.N.Y. Mar. 4, 2009) (holding that "changes in value after breach are not relevant to the calculation of damages"), *aff'd*, 358 F. App'x 228 (2d Cir. 2009).

100.    This same principle applies to Citi's calculation of the damages that resulted from Lehman's default under the Master Agreements, and is violated by Citi's inclusion of theoretical liquidity charges in its claims.  Citi added these charges to certain positions that it claimed were large relative to the daily trading volume of the relevant instrument.  But the prices of these positions had the potential to increase as well as decrease, and both of these possibilities were already incorporated into the market prices on the date of the breach.  By holding the positions instead of entering into replacement trades, while at the same time charging Lehman hypothetical liquidity charges to protect against a price decline, Citi retained the upside market potential and forced Lehman to protect them against the downside risk.  This one-sided approach disregarded that the market price already took into account future outcomes.  Accordingly, it provided a windfall to Citi, penalized Lehman, and was impermissible under New York law.

101.    Any argument by Citi that the Close-out Amount and Loss provisions are liquidated damages clauses that allow for these types of add-ons and Hypothetical Charges must

be rejected.  That interpretation of the Close-out Amount and Loss provisions would be contrary

to New York law, which only recognizes as valid liquidated damages provisions that fix a pre-

estimate of damages at the time of contracting.  *See Jarro Bldg. Indus. Corp. v. Schwartz*, 281

N.Y.S.2d 420, 426 (2d Dep't 1967) (stating that "a liquidated damages provision to be valid

must fix the damages in advance and be for an amount certain" (citing *Frankel's Carpet*

*Fashions, Inc. v. Abraham*, 228 N.Y.S.2d 123 (Sup. Ct. Nassau County 1962))).

102.   Even if the Close-out Amount and Loss provisions were to be construed as

liquidated damages clauses, recovery of the Hypothetical Charges would still be impermissible

under New York law because they would constitute a penalty.  Whether a damages provision is

in fact an unenforceable penalty is a question of state law.  *See In re Ionosphere Clubs, Inc.*, 262

B.R. 604, 613 (Bankr. S.D.N.Y. 2001).  Under New York law, "contractual terms providing for

the payment of a sum disproportionate to the amount of actual damages exact a penalty and are

unenforceable."  *Id.* at 614.  New York has a strong public policy against the enforcement of

such penalty clauses.  A contractual provision that provides specific consequences to a breaching

party operates as an unenforceable penalty unless both:  (1) the damages from the breach were

difficult to ascertain at the time the parties entered into the contract; and (2) the consequences

from the breach bear a reasonable relationship to the amount of damages that would be expected

to result from the breach.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 416-17 (Bankr.

S.D.N.Y. 2007) (invalidating prepayment penalty because "it bore no reasonable relationship to

any damages that could have been suffered by Defendants").  "Moreover, courts should resolve

any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper

liquidated damages clause in favor of a construction which holds the provision to be a penalty."

*In re Ionosphere*, 262 B.R. at 614.

103.    Neither of these requirements is met here.  First, the actual damages that would be incurred as a result of a default under the Master Agreements were readily ascertainable at the time the contracts were entered into – they would be the mid-market values of the transactions under each Master Agreement.  Second, Citi's claims significantly departed from these actual damages by seeking recovery for Hypothetical Charges that do not correspond to any loss Citi suffered.  As a result, Citi's inclusion of Hypothetical Charges in its Loss and Close-out Amount calculations constitutes an unenforceable penalty under New York law.

(iii)    *Citi's Claims for Hypothetical Charges Are Unenforceable Penalties that are Disallowed or Subordinated in Priority of Payment under the Bankruptcy Code*

104.    To the extent Citi's claims are penalties, they are subject to disallowance under the Bankruptcy Code.  Section 502(b)(1) of the Bankruptcy Code provides for disallowance of claims that are not enforceable under state law.  *See* 11 U.S.C. § 502(b)(1) (stating that a claim shall not be allowed if it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured").

105.    As explained above, the Close-out and Loss provisions are not enforceable as liquidated damages provisions under New York state law.  Thus, section 502(b)(1) of the Bankruptcy Code mandates disallowance of Citi's claims for Hypothetical Charges.  *See, e.g.*, *In re Premier Enter. Biloxi, LLC*, 413 B.R. 370, 374 (Bankr. S.D. Miss. 2009) (disallowing claim for liquidated damages under lease pursuant to section 502(b)(1) of Bankruptcy Code when lease provision was not enforceable under state law); *In re Ionosphere Clubs, Inc.*, 262 B.R. 604, 613-14 (Bankr. S.D.N.Y. 2001) (capping indemnity at tax rate in effect at time of alleged default rather than contractual rate provided for under tax benefit transfer agreement because tax rate in effect represented actual loss; noting "courts should resolve any reasonable doubt as to whether a

provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty").

106.    Pursuant to the claims, Citi seeks to recover Hypothetical Charges that were not actually incurred.  Thus, instead of compensating Citi for actual, pecuniary loss it may have suffered, the claims simply penalize Lehman.  The Bankruptcy Code disfavors such claims that are in the nature of penalties, subjecting them to disallowance or subordination in priority of payment.

107.    For example, while section 506(b) of the Bankruptcy Code allows an oversecured creditor "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose," claims for those charges (*e.g.*, prepayment premiums) are disallowed to the extent that they constitute penalties and fail to correspond to actual damages.[7] *See* 11 U.S.C. § 506(b); *In re Schwegmann Giant Super Markets,* 287 B.R. 649, 655-56 (E.D. La. 2002) (disallowing prepayment penalty under section 506(b) of Bankruptcy Code that constituted over 18% of prepaid loan balance); *In re Vest Assocs.*, 217 B.R. 696, 702-03 (Bankr. S.D.N.Y. 1998) (disallowing secured creditor's claim for postpetition interest at default rate where default rate set so high as to be deemed a "disguised" penalty against junior creditors); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993) (disallowing claim for prepayment charges in loan agreement where such charges were not tied to actual damages likely to be incurred by lender upon a prepayment and holding that "[a] prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as a either a penalty on the debtor or a windfall to a lender at the expense of other creditors of the bankruptcy estate").

---

[7]    Plaintiffs do not concede that Citi is an oversecured creditor and dispute that the $2 billion cash deposit secures any or all of Citibank's claims against Lehman.

108.     Similarly, the Bankruptcy Code differentiates between claims that compensate for actual loss and those that are simply punitive and non-compensatory, subjecting the latter category of claims to subordination in priority of payment.  *See* 11 U.S.C. § 507(a)(8)(G) (affording eighth priority to "allowed unsecured claims of governmental units, only to the extent that such claims are for . . . . (G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss"); *id.* § 726(a)(4) (subordinating to all other claims, claims for fines, penalties, or forfeitures "to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim").[8]  Indeed, claims for fines, penalties, or forfeiture that are not compensatory are subordinated below late filed claims under section 726(a)(3) of the Bankruptcy Code.  *See* 11 U.S.C. § 726(a)(3).

109.     Because the Hypothetical Charges are commercially unreasonable, unenforceable under New York law, and unenforceable under the Bankruptcy Code, the Hypothetical Charges should be disallowed in their entirety.

(d)     *Citi's Failure to Apply Portfolio Aggregation to Offsetting Transactions Improperly Exaggerated the Amount of Hypothetical Charges*

110.     In order to maximize the amount of Hypothetical Charges included in its claims, Citi for the most part applied the charges on a transaction-by-transaction basis rather than taking into account the loss-mitigating effect of portfolio aggregation by netting offsetting positions.  Citi's failure to apply portfolio aggregation when calculating its losses was itself a

---

[8]   *Cf. Schultz Broadway Inn v. United States*, 912 F.2d 230, 234 (8th Cir. 1990) (applying section 726(a)(4) in chapter 11 case and affirming lower court's holding that general unsecured creditors who suffered actual losses should be paid in priority to a claim for non-pecuniary tax loss penalty; this holding "accords with the legislative history of the Bankruptcy Reform Act [of 1978], which generally prefers claims for actual losses over purely punitive claims.").

commercially unreasonable procedure that generated commercially unreasonable results.  It was contrary to Citi's own risk management procedures and the governing Master Agreements.

111.    Citi's practice of portfolio aggregation can be shown by way of example. Citi and the Lehman Subsidiaries were parties to several thousand interest rate swaps in which the floating rate was indexed to a commonly used reference rate such as LIBOR; Citi acted as a floating rate payer in certain trades and a floating rate receiver in other trades.  The interest rate risk of certain transactions in this portfolio in which Citi paid LIBOR (and received a fixed rate) was offset by other transactions in which the same Citi entity received LIBOR (and paid a fixed rate).

112.    Portfolio aggregation is a widely-accepted practice for the management of derivatives portfolios.  This is particularly true for large market-making institutions such as Citi. Derivatives dealers cannot possibly hedge each of the hundreds of thousands of trades that they enter into with their customers.  Instead, they use portfolio aggregation as a means of minimizing hedging costs and efficiently managing the material economic risks of a derivatives portfolio.

113.    It is not merely unreasonable, it is utterly inconceivable that Citi would attempt to enter into some 20,000 individual replacement trades and incur bid/offer charges on every one when portfolio aggregation would provide the same material economic benefit at a fraction of the cost.  In fact, it is contrary to Citi's own stated risk management practices.

114.    Citi, like any other large sophisticated financial institution with significant over-the-counter derivatives positions, recognized the importance of portfolio aggregation in assessing risk.  Citigroup stated in its 10-K filing for 2008 with the Securities and Exchange Commission that Citi managed its risk to derivatives counterparties on an aggregate portfolio basis, including in its stress testing, fair value measurements, and computation of industry-standard risk metrics such as value at risk and credit valuation adjustments.  *See* Citigroup, Inc.,

2008 Annual Report (Form 10-K) at 73 ("[Stress testing] is performed on both individual trading portfolios, and on aggregations of portfolios and businesses."); *id.* at 91 ("Individual derivative contracts that are subject to an enforceable master netting agreement with a counterparty are aggregated for this purpose [of calculating credit valuation adjustments], since it is those aggregate net cash flows that are subject to nonperformance risk."); *id.* at 194 ("[C]redit-risk adjustments take into account the effect of credit-risk mitigants, such as pledged collateral and any legal right of offset (to the extent such offset exists) with a counterparty through arrangements such as netting agreements."); *see generally id.* at 51 ("The Chief Risk Officer, as noted above, monitors and controls major risk exposures and concentrations across the organization. This means aggregating risks, within and across businesses . . . .").

        (i)      *Citi's Failure to Apply Portfolio Aggregation Violated the Master Agreements*

115.    In accordance with standard risk management practice, the COA Master Agreements themselves contemplate that a Determining Party will calculate the Close-out Amount for terminated transactions on an aggregate basis. Specifically, "Close-out Amount" is defined as the amount of losses or gains that would be incurred or realized "in replacing, or in providing for the Determining Party the **economic equivalent** of, (a) the material terms of the Terminated Transaction **or group of Terminated Transactions**, . . . and (b) the options rights of the parties in respect of that Terminated Transaction **or group of Terminated Transactions**." 2002 ISDA Master Agreement § 14 (emphasis added). By explicitly defining Close-out Amount to include groups of terminated transactions, the COA Master Agreements envision that the Determining Party will net any offsetting transactions together when calculating the Close-out Amount.

-41-

116.    Citi implicitly acknowledged the propriety of portfolio aggregation as it did in fact net a minimal number of substantially identical offsetting trades when calculating portions of its claims relating to rates and FX trades.  But even there, the degree of portfolio aggregation applied by Citi did not begin to approach the minimum amount that could be considered commercially reasonable.

117.    When compared with its own risk management practices, Citi's purported Close-out Amounts, which were calculated predominantly on an individual position basis, are not commercially reasonable.  By failing to apply portfolio aggregation, Citi unduly inflated the amount of Hypothetical Charges included in its claims.  Because Citi managed risk on an aggregate portfolio basis, Citi would never have incurred, and in fact did not incur, actual losses in the exaggerated amount of the Hypothetical Charges that it now claims.  Citi should not be permitted to inflate its claims through the use of these procedures.

(ii)    *Citi's Failure to Apply Portfolio Aggregation Violated New York Law*

118.    Citi's conduct is also impermissible under New York law for violating the implied covenant of good faith and fair dealing.  Implicit in all contracts governed by New York law is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384,389 (1995) (internal quotation marks omitted).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.*

119.    The methodology used by Citi in calculating the Close-out Amounts on a transaction-by-transaction basis represents an irrational exercise of discretion in construing the Master Agreements.  As a sophisticated market participant, Citi calculated risk exposure with the

Lehman Subsidiaries on an aggregate portfolio basis in the normal course of business.

Nonetheless, Citi failed to apply portfolio aggregation in its calculation of the Close-out

Amounts.  Citi's attempt to maximize damages in this manner violates the terms of the Master

Agreements and the obligations of good faith and fair dealing implied in every contract under

New York law.

      120.    Furthermore, Citi's failure to take into account the loss-mitigating effects

of portfolio aggregation contradicted New York law principles requiring mitigation of damages.

When proving damages in a breach of contract claim, a claimant must necessarily demonstrate

that it fulfilled its duty to expend reasonable efforts to mitigate the damages claimed.  *See*

*Williams v. Bright*, 658 N.Y.S.2d 910, 911-12 (1st Dep't 1997) ("For a hundred years it has been

settled law in this state that a party who claims to have suffered damage . . . is bound to use

reasonable and proper efforts to make the damage as small as practicable and if an injured party

allows the damages to be unnecessarily enhanced, the incurred loss justly falls upon him.")

(internal citations and quotations omitted);  *Korea Life Ins. Co. v. Morgan Guaranty Trust Co.*,

No. 99 Civ. 12175 (AKH), 2004 WL 1858314, at *7 (S.D.N.Y. Aug. 20, 2004) ("[T]he party

seeking damages is under the duty to make a reasonable effort to avoid consequences of the act

complained of.  It is, indeed, a rule of broad acceptance that no recovery may be had for losses

which the person injured might have prevented by reasonable efforts and expenditures.")

(internal quotation marks omitted); *Lund v. Chem. Bank*, 797 F. Supp. 259, 271 (S.D.N.Y. 1992)

("A party generally is not . . . allowed to recover for a loss which it could have reasonably

mitigated itself.").

      121.    This well-recognized principle of mitigation of damages dictates that a

commercially reasonable damages calculation must include portfolio aggregation.  The use of

portfolio aggregation in the calculation of damages results in a measure of damages that

represents actual mitigation efforts undertaken by parties through acknowledging offsetting risks

positions, taking what would otherwise be an inflated gross claim and yielding a reduced net

claim that more closely reflects the actual injury suffered by the injured party.  By failing to net

offsetting position in calculating its claims and by including Hypothetical Charges on a

transaction-by-transaction basis, Citi failed to take into account the mitigating effects of portfolio

aggregation.

**C.**      **Citi Did Not Use Commercially Reasonable Procedures to Close Out its CDS Portfolios with LBSF**

122.    Citi breached the Master Agreements and disregarded New York law and

the Bankruptcy Code to achieve a nearly $1.3 billion inflation of its claims arising from credit

default swaps ("CDS") with LBSF.  Citi had a large portfolio of 17,623 CDS with LBSF at the

time of LBHI's bankruptcy.  The parties had entered into CDS under the LBSF-Citibank, LBSF-

Global, and LBSF-Financial Agreements, with LBSF as the net seller of protection.  As

illustrated in the table below, Citi submitted claims for these CDS in an amount nearly $1.3

billion greater than the values calculated by Lehman from readily available market data, with

most of the overstatement arising from Citibank's valuation of CDS under the LBSF-Citibank

Agreement.

**Close-out Amount Calculations for CDS Portfolios**
[values in USD to LBSF]

| Master Agreement | Category | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
|---|---|---|---|---|---|
| LBSF-Citibank | Single Name CDS | 12,309 | (821,552,321) | (116,487,932) | 705,064,389 |
| | Index CDS | 711 | (693,063,792) | (502,481,629) | 190,582,163 |
| | Index Tranche | 371 | 3,387,187 | 115,038,873 | 111,651,686 |
| | OTHER | 637 | (21,016,480) | 32,736,723 | 53,753,203 |
| | **TOTAL** | **14,028** | **(1,532,245,406)** | **(471,193,966)** | **1,061,051,441** |
| LBSF-Financial | Single Name CDS | 3,039 | (123,912,599) | (9,116,039) | 114,796,560 |
| | Index CDS | 195 | (47,202,484) | (10,281,440) | 36,921,044 |
| | Index Tranche | 130 | (2,713,695) | 36,229,572 | 38,943,267 |
| | OTHER | 72 | (37,599,585) | (26,080,649) | 11,518,935 |
| | **TOTAL** | **3,436** | **(211,428,363)** | **(9,248,557)** | **202,179,806** |
| LBSF-Global | Single Name CDS | 130 | (34,634,116) | (28,268,069) | 6,366,048 |
| | Index CDS | 11 | 24,557,472 | 24,933,234 | 375,762 |
| | Index Tranche | 11 | 53,987,807 | 59,732,919 | 5,745,112 |
| | OTHER | 7 | (20,773,083) | (16,769,041) | 4,004,041 |
| | **TOTAL** | **159** | **23,138,081** | **39,629,043** | **16,490,963** |
| | **GRAND TOTAL** | **17,623** | **(1,720,535,689)** | **(440,813,479)** | **1,279,722,210** |

123.    Out of a total of 17,623 CDS, the two largest types of transactions were single name CDS (15,478 trades) and index CDS (917 trades).  These are also the source of the greatest valuation differences.

(a)    *Citi Closed Out its Portfolio of CDS on a Date Other than the Early Termination Date*

124.    Citi closed out 16,039 of the 16,395 index CDS and single name CDS on a date other than the Early Termination Date, as illustrated in the table below.  This resulted in a net inflation of Citi's claims by at least $48 million.

-45-

| Effect of Using a Close-out Date Other Than the Early Termination Date | | | | | |
|---|---|---|---|---|---|
| Early Termination Date | Citi Close-out Date | No. Trades | Market-Based Calculation of Close-out Amounts as of Citi Close-out Date ($) | Market-Based Calculation of Close-out Amounts as of Early Termination Date ($) | Difference ($) |
| 9/15/2008 | 9/16/2008 | 14,239 | (664,215,476) | (611,706,050) | 52,509,426 |
| 9/15/2008 | 9/17/2008 | 1,715 | (41,948,991) | (46,614,107) | (4,665,116) |
| 9/15/2008 | 9/18/2008 | 41 | (4,252,375) | (2,712,216) | 1,540,159 |
| 9/15/2008 | 9/19/2008 | 44 | 3,136,883 | 2,152,160 | (984,723) |
| **TOTAL** | | 16,039 | (707,279,959) | (658,880,214) | 48,399,745 |

125.    Citi has provided very little information regarding the methodology used or the specific timing of the close-out process for the CDS portfolio.  Citi had an obligation under the Master Agreements and the Bankruptcy Code to value the trades on the Early Termination Date since commercially reasonable determinants of value existed as of that date. Citi is an active market maker in CDS and was in the business of valuing these exact CDS on a daily basis.  There is no reason to believe that the very same data that Citi used to value these trades primarily on September 16, 2008 was not equally available the prior day.

126.    Other major market-makers who were in the same position as Citi had no difficulty finding reasonable determinants of value sufficient to value the same CDS on September 15.  Citi closed out 906 index CDS covering 138 indices on a date other the Early Termination Date.  Citi also closed out 15,156 single name CDS covering 961 different names on a date other than the Early Termination Date.  Plaintiffs reviewed claims submitted by a group of other large financial institutions and found 27 separate claims where: 1) the CDS portfolio contained at least one of these 138 indices or 961 single names, and 2) the counterparty valued the related trade(s) on September 15, 2008.  As the table below shows, the claims

submitted by this group contained an aggregate of 121 of the 138 indices in Citi's portfolio (88

percent), and 911 of the 961 single names (95 percent).[9]  The counterparties submitting these

claims were able to value 121,207 such CDS on September 15, 2008.

| CDS Common between Citi and Other Large Financial Institutions where Other Institution was able to value as of September 15, 2008 | | | | |
|---|---|---|---|---|
| | Citi | | Other Large Institutions | |
| Category | Index or Single Name Present in Citi Population | No. Trades | Index or Single Name in Common with Citi | No. Trades |
| Index | 138 | 906 | 121 | 9,602 |
| Single Name | 961 | 15,156 | 911 | 111,605 |
| **TOTAL** | 1,099 | 16,062 | 1,032 | 121,207 |

Using readily available market data, Lehman was able to price all 906 of these index CDS and all

15,156 of these single name CDS as of the Early Termination Date.

127.    Not only did Citi price nearly all of its CDS as of a date after the Early

Termination Date, but Citi also appears to have priced these trades as of inconsistent times of

day.  Citi provided a mid-market value for 15,327 of its index and single name CDS trades.  The

table below shows a comparison of Citi's purported mid-market values with a calculation as of

the stated close-out date, based on publicly available market data.

---

[9]   This does not imply that the remaining indices and single names could not be priced as of September 15, 2008.  It simply means the portfolios of this group did not have CDS involving the index or single name, or that the counterparty used different valuation dates.

| Comparison of Citi Mid-Market Values to Proper Calculation [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Mid-Market Calculation ($) | Market-Based Calculation as of the Close-out Date ($) | Difference ($) |
| LBSF-Citibank | 12,211 | (912,857,878) | (847,305,621) | 65,552,257 |
| LBSF-Financial | 123 | 10,183,880 | 11,116,009 | 932,129 |
| LBSF-Global | 2,993 | (34,418,037) | (38,403,727) | (3,985,690) |
| **TOTAL** | 15,327 | (937,092,035) | (874,593,339) | 62,498,696 |

Plaintiffs have reviewed these mid-market valuations and are unable to determine a consistent time of day used by Citi when closing out its index and single name CDS trades. Not surprisingly, the net result of this "inconsistency" is an inflation of Citi's claims by at least $62 million.

   (b)  *Citi Failed to Apply Portfolio Aggregation as Required by Commercially Reasonable Procedures*

   128.  In closing out its CDS portfolio, Citi employed an excessively narrow method of portfolio aggregation that is inconsistent with industry practice. Specifically, Citi only aggregated trades that were *identical* in every detail other than notional value. This narrow interpretation of portfolio aggregation meant that Citi provided LBSF with the benefit of only a tiny fraction of the real portfolio effect, which was massive for this portfolio of CDS. This practice directly contradicted the Close-out Amount definition in the COA Master Agreements, which required Citi to determine the economically equivalent value of the material terms of its portfolio. By engaging in a close-out process that almost completely ignored portfolio aggregation, Citi was able to inflate its claims by many hundreds of millions of dollars. In essence, Citi engaged in an intentional and concerted effort to create a process that would maximize the amount of Hypothetical Charges included in its claims.

129.     The index CDS under the LBSF-Citibank Agreement amply demonstrate

Citi's lack of portfolio aggregation and the significant inflation of its claims that resulted.  The

total difference between Citibank's values and the values calculated by LBSF using available

market data as of the Early Terminated Date for these 711 CDS is over $190 million.  This

portfolio contains CDS related to 103 indices.  The table below shows the 15 largest valuation

differences per index.  It also shows the total valuation difference for the remaining 88 indices.

The top 15 largest valuation differences alone total almost $153 million.

| Largest Valuation Differences By Index for LBSF-Citibank Agreement [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Index | Maturity Date | No. Trades | Citi Calculation of Close-out Amount ($) | Market-Based Calculation of Proper Close-out Amount ($) | Difference ($) |
| DJCDX-NAHYS5-5Y | 12/20/2010 | 8 | (32,684,631) | (9,750,860) | 22,933,771 |
| CDX-NAHYS8-3Y | 6/20/2010 | 3 | 100,260,707 | 122,102,719 | 21,842,012 |
| DJCDX-NAHYS4-5Y | 6/20/2010 | 10 | (20,174,064) | 78,972 | 20,253,036 |
| ITRAXX-EUROPES6-5Y | 12/20/2016 | 8 | (77,839,717) | (61,903,011) | 15,936,705 |
| ITRAXX-EUROPES7-5Y | 6/20/2017 | 6 | (51,335,588) | (39,983,229) | 11,352,359 |
| DJCDX-NAHYS3-5Y | 12/20/2009 | 12 | (5,302,949) | 3,292,528 | 8,595,478 |
| DJCDX-NAIGS7-10Y | 12/20/2011 | 3 | (90,213,250) | (81,931,955) | 8,281,294 |
| DJCDX-NAIGS7-10Y | 12/20/2016 | 7 | (99,528,844) | (91,427,498) | 8,101,346 |
| CDX-NAIGS8-3Y | 6/20/2012 | 4 | (100,392,872) | (93,595,444) | 6,797,428 |
| DJCDX-NAIGHVOLS4-4Y | 6/20/2010 | 6 | (46,972,614) | (40,354,147) | 6,618,467 |
| CDX-NAIGS9-1Y | 12/20/2017 | 5 | (71,958,594) | (65,875,651) | 6,082,943 |
| LCDXNAS10-3Y | 6/20/2013 | 28 | (34,218,178) | (29,912,466) | 4,305,712 |
| CDX-NAHYS8-10Y | 6/20/2012 | 4 | (43,449,365) | (39,148,984) | 4,300,382 |
| DJCDX-NAIGHVOLS3-4Y | 3/20/2015 | 2 | (14,835,643) | (10,865,728) | 3,969,915 |
| DJCDX-NAHYBS6-5Y | 6/20/2011 | 12 | 6,203,772 | 9,713,154 | 3,509,382 |
| Remaining 88 Index Positions | | 593 | (110,621,962) | (72,920,030) | 37,701,932 |
| TOTAL | | 711 | (693,063,792) | (502,481,629) | 190,582,163 |

130.     A particularly egregious example of the claim inflation caused by

Citibank's failure to apply commercially reasonable portfolio aggregation can be seen by

examining the second and third largest differences above.  The rows have been highlighted for

-49-

ease of identification.  These two indices were each comprised of 100 different non-investment

grade corporate entities domiciled in North America that trade with relatively strong liquidity in

the CDS market.  Both matured on June 20, 2010.  Most importantly, the two indices had 72

individual names in common.  In one instance, in the second row above, Citibank was a net seller

of protection.  In the other instance, in the third row above, Citibank was a net buyer of

protection.  The graph below shows the price level for these two indices from March 31, 2008 to

September 30, 2008.



131.    The graph clearly shows the strong relationship between these two

particular indices, whose prices movements tracked one another with 96 percent correlation.

Again this is not surprising since 72 percent of the names making up each index were identical.

Furthermore, the indices were designed in such a way that the remaining names had similar characteristics.

132.    Citibank's long protection position in one index provides a natural and powerful hedge for Citibank's short position in the other.  But Citibank ignored the portfolio effect provided by these offsetting positions and instead sought individual quotes on each index with add-ons embedded in each quote, which inflated Citibank's claim by millions of dollars. Citibank's own actions further support the commercial reasonableness of portfolio aggregation, as Citibank did not replace the individual index positions.

133.    Serious questions also exist as to how Citi determined many of the mid-market CDS values used to calculate its claims.  In some instances it appears that the mid-market values may have been shifted to reflect more favorable valuations for Citi.  For example, the table below compares Citibank's mid-market values and a calculation based on publicly available market data of the market values on the date Citi closed out the trades – September 16, 2008 – for three "High Yield" indices underlying index CDS under the LBSF-Citibank Agreement.

| Mid-Market Valuation Comparison for Three High Yield Indices Underlying LBSF-Citibank Trades [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Index | Citibank Mid-Market Value (S) | Market-Based Calculation of Mid-Market Value as of Date Citi Closed out Trades | Difference ($) | LBSF Buyer/Seller |
| DJCDX-NAHYS5-5Y | (24,563,737) | (18,871,227) | 5,692,511 | Seller |
| DJCDX-NAHYS4-5Y | (13,331,808) | (7,057,404) | 6,274,405 | Seller |
| CDX-NAHYS8-3Y | 117,338,391 | 135,447,191 | 18,108,800 | Buyer |
| TOTAL | 79,442,846 | 109,518,560 | 30,075,716 | |

134.    All three of the indices in the table above were constructed to track the credit risk of a representative and largely identical group of high yield bonds.  In fact, the second two listed are the same indices whose 96% correlation was demonstrated in paragraph 129

above.  The table shows that Citibank asserted a mid-market valuation that is more favorable to

Citibank than that calculated using readily available market data in all three cases.  During the

week of September 15, 2008, each one of these index positions should have become more

valuable to the buyer of protection as credit spreads widened (*i.e.*, credit protection generally

became more expensive to purchase) in the aftermath of the LBHI bankruptcy filing.  But here,

Citibank is claiming that the market moved more favorably for Citibank (relative to LBSF)

regardless of whether Citibank was a buyer or seller of protection on substantially identical high

yield indices. This scenario, which defies market realities, leads to a mid-market valuation

difference that exceeds $30 million on these three indices alone.  This casts a large cloud of

doubt over the integrity of Citibank's purported mid-market values.  Citi also engaged in this

pattern of behavior with respect to other trade types of CDS trades, which further inflated its

claims.

       (c)     *Citi Included Exaggerated Hypothetical Charges that it Did Not Incur and*
              *Never Expected to Incur*

       135.    Citi included exaggerated hypothetical bid/offer charges in its Close-out

Amounts for the CDS portfolio.  As the table below shows, Citi has disclosed nearly $1.1 billion

of Hypothetical Charges that were included in its CDS claims.  Nearly $1 billion of these

fictitious charges were associated with single name, index, and index tranche CDS.  In addition,

there are millions of dollars of additional bid/offer charges embedded in valuations for which

Citi did not disclose separate mid-market values and bid/offer charges.  This huge overstatement

was made possible to a very large degree by Citi's failure to apply commercially reasonable

portfolio aggregation.

| Citi Hypothetical Bid/Offer Charges [values in USD to Lehman] | | | | |
|---|---|---|---|---|
| Category | No. Trades | Citi Mid-Market Value ($) | Citi Final Close-out Amount ($) | Bid/Offer Charge ($) |
| SINGLE NAME CDS | 14,962 | (238,895,519) | (975,650,237) | 736,754,718 |
| INDEX CDS | 685 | (612,620,083) | (776,931,814) | 164,311,731 |
| INDEX TRANCHE | 489 | 122,495,276 | (14,204,158) | 136,699,434 |
| SINGLE NAME LCDS | 645 | (23,646,792) | (52,953,970) | 29,307,178 |
| RECOVERY LOCK | 29 | 7,971,418 | (7,384,142) | 15,355,560 |
| CDO | 8 | 8,977,074 | 5,127,746 | 3,849,328 |
| INDEX TRANCHE PO | 3 | (1,331,279) | (3,431,279) | 2,100,000 |
| CDO SQUARED | 1 | (2,271,644) | (2,697,643) | 425,999 |
| SPREAD OPTION | 2 | 3,564,277 | 3,490,494 | 73,783 |
| TOTAL | 16,824 | (735,757,271) | (1,824,635,003) | 1,088,877,732 |

136. Citi employed such an artificially narrow view of portfolio aggregation that it effectively added a bid/offer charge to every index CDS and nearly every single name and index tranche CDS. Further, the charges were typically many multiples of the bid/offer charges that a market-maker like Citi would have expected to pay. In fact, Citi had access to the inter-dealer market. On many trades Citi could have transacted at mid-market valuations. To the extent Citi would transact with its customer, as the market-maker, it would profit from bid/offer spreads. In sum, Citi would have paid far smaller spreads, if any at all, if it had actually entered into replacement CDS transactions – which, of course, it did not.

137. As an example, Plaintiffs have identified 322 CDS related to 54 different indices under the LBSF-Citibank Agreement where: 1) Citibank provided a mid-market value for the CDS; and 2) Citibank appears to have provided consistent valuations for the trades involving that particular index. This group represents 45 percent of all index CDS trades under the LBSF-Citibank Agreement. Citibank identified bid/offer and liquidity charges on this group of trades totaling over $101 million. 55 of these trades – or over 17 percent – are related to 12 different "CDX_IG" indices. Citi's identified bid/offer and liquidity charges on this group of 55 trades total $37 million. The CDX_IG indices were created to track a group of investment grade

corporations.  The indices were created six months apart and typically have many names in

common.  For example the IG_10 five year and the IG_9 five year were created six months apart

and track a list of corporations that have a 94 percent overlap.

138.    CDS related to CDX_IG indices have a typical bid-offer charge of only a

few basis points for end users, while market-makers will generally enter into these trades with

each other at or very close to the mid-market price.  For example, on September 12, 2008, the

Lehman Subsidiaries entered into CDS related to CDX_IG indices with a total notional amount

of $16.9 billion.  As a market-maker, Lehman charged bid/offer spreads on many of these indices

that were one basis point wide.  Moreover, Lehman was only one of multiple market-makers in

index CDS and the total market volume was multiples of the notional amount traded by Lehman

that day.  The following Monday, September 15, 2008 – the Early Termination Date for nearly

all of Citi's index CDS trades – was one of the most active trading days ever for CDS, with

considerably higher volumes than normal.

139.    The table below shows the net position in each of the twelve individual

CDX_ IG indices and the Hypothetical Charges that Citibank included in its claim.  As can be

seen, Citibank added Hypothetical Charges ranging from 7.6 basis points to a shocking 16.1

basis points on positions where customers less sophisticated than Citibank would realistically

expect to pay less than two basis points.

**LBSF-Citibank Index CDS Postions Related to "CDX_IG"**
[values in USD to LBSF]

| Index | Maturity Date | No. Trades | Average Size of Trade between Citibank and LBSF ($) | Citibank's Net Position with LBSF ($) | Number of Average Size Trades Required to Close Out Citibank Positon | Credit Spread of Index on 9/15/2008 (basis points) | Hypothetical Charges Included by Citibank ($) | Hypothetical Charges Included by Citibank (Basis Points) |
|---|---|---|---|---|---|---|---|---|
| DJCDX-NAIGS1-5Y | 3/20/2009 | 6 | 34,802,667 | (139,376,000) | 4.0 | 186 | 112,878 | 16.1 |
| DJCDX-NAIGS2-5Y | 9/20/2009 | 3 | 90,933,333 | (173,600,000) | 1.9 | 206 | 942,640 | 15.8 |
| DJCDX-NAIGS4-5Y | 6/20/2010 | 3 | 33,166,667 | 500,000 | 0.0 | 244 | 489 | 6.0 |
| CDX-NAIGS10-3Y | 6/20/2011 | 2 | 592,500,000 | 1,185,000,000 | 2.0 | 194 | 5,897,464 | 12.0 |
| DJCDX-NAIGS7-5Y | 12/20/2011 | 3 | 485,000,000 | (1,455,000,000) | 3.0 | 233 | 2,267,494 | 7.6 |
| CDX-NAIGS8-5Y | 6/20/2012 | 4 | 386,875,000 | (1,547,500,000) | 4.0 | 217 | 273,726 | 16.1 |
| CDX-NAIGS9-5Y | 12/20/2012 | 5 | 124,098,000 | (496,490,000) | 4.0 | 204 | 6,515,474 | 16.0 |
| DJCDX-NAIGS7-5Y | 12/20/2013 | 2 | 303,875,000 | (387,750,000) | 1.3 | 224 | 2,553,642 | 16.0 |
| DJCDX-NAIGS1-5Y | 3/20/2014 | 6 | 22,320,000 | 133,920,000 | 6.0 | 184 | 9,351,415 | 15.9 |
| CDX-NAIGS9-5Y | 12/20/2014 | 9 | 27,335,333 | 14,018,000 | 0.5 | 196 | 2,130,814 | 12.0 |
| DJCDX-NAIGS7-5Y | 12/20/2016 | 7 | 145,928,571 | (1,021,500,000) | 7.0 | 209 | 81,565 | 12.0 |
| CDX-NAIGS9-5Y | 12/20/2017 | 5 | 177,500,000 | (887,500,000) | 5.0 | 190 | 6,803,092 | 12.0 |
| **TOTAL** | | 55 | | | | | 36,930,693 | |

140.    Citibank will presumably contend that the positions it was left with were of considerable size and would require wider bid/offer and liquidity charges than typically would be expected.  The table above demonstrates the fallacy of this argument.  For each index, the table shows the average size of the trade that Citibank had entered into with LBSF.  More importantly, the table shows how many of the average size trades Citibank would need to do if it were to replace the entire position – which it did not.  In a number of instances Citibank would have needed to enter into two average-sized new trades or less to replace the position.  Given Citibank's access to liquidity, its large customer base, and the large transaction volumes that occurred on September 15, 2008, it is inconceivable that Citibank would have incurred bid/offer charges for these index CDS even remotely close to those reflected in its claim.

141.    By ignoring portfolio aggregation, Citi is attempting to create the false impression that it would have had to enter into a significant number of trades to replace the economic equivalent of the CDS portfolio with LBSF.  Citi's own actions demonstrate the disingenuous nature of this position.  Citi did not enter into replacement trades because the economic risk it was facing was significantly less than what it is attempting to portray.  Citi was

the beneficiary of significant portfolio effects and had CDS positions with LBSF that were significantly offsetting.

142.    On September 15, 2008, Citi's market-making business had ample opportunities to replace the economic equivalent of its LBSF CDS portfolio at minimal cost, if any.  To the extent its claims are predicated on the false assumption that it would have been costly to do so, they are divorced from reality.

(d)    *Combined Effect of Citi's Improper Actions*

143.    The actions described above are typical of the behavior that Citi engaged in to close out the entire CDS portfolio materially and unfairly in its favor.  The net result was the creation of a complicated series of overstated claims.  Two examples from the single name CDS portfolio – CDS on the single name reference entities AMBAC and Venezuela – illustrate the practices employed by Citi.  These reference entities produced the two largest valuation differences for single name CDS under the LBSF-Citibank Agreement, at approximately $47 million and $27 million, respectively.

(i)    *Portfolio of CDS based on AMBAC*

144.    LBSF and Citibank had a portfolio of 76 CDS based on AMBAC with a common set of economic characteristics at the time of LBHI's bankruptcy.  The portfolio was fairly evenly balanced with a large number of both buys and sells, and a small net exposure.  Using readily available information, LBSF is able to estimate the value of the credit protection as a percent of notional for each individual trade.  The table below illustrates the value of the credit protection (as a percentage) for each trade, which are sorted by maturity.



145.    The smooth green series of dots is the value calculated by LBSF for

AMBAC CDS at each of the standard maturity dates.  It is based on information provided by

Markit Partners for September 15, 2008.[10]  The pricing curve received a "AA" rating from

Markit indicating that a large number of market participants had submitted pricing curves and

that the curves were all relatively similar.  The LBSF curve has a logical progression in that the

value of the credit protection gradually increases over time.

146.    The red diamonds on the above graph are Citibank's valuations of

AMBAC CDS where LBSF sold protection to Citibank.  The blue triangles are Citibank's

valuations of AMBAC CDS where LBSF bought protection from Citibank.  The graph shows

---

[10]   Markit Partners is a private company headquartered in London.  Markit data is widely used and relied
on in the CDS market.  Markit provides users of its data with a CDS end-of-day service that aggregates
valuation information for the credits that trade in the CDS market, drawn from numerous financial
institutions including inter-dealer brokers, electronic trading platforms, major market makers, and many
significant buy side firms.  Markit aggregates over one million data points daily using sophisticated
algorithms to create a single, independent, reliable source of price data for CDS.

significant anomalies in Citibank's prices.  Generally – though not always – Citibank assigned a

low price when LBSF bought protection and a higher price when LBSF sold protection.  In

addition, the graph illustrates that Citibank used inconsistent pricing even for CDS with the same

maturity date.  Specifically, Citibank has inexplicable pricing differences of 30 percent of

notional on trades with similar maturities.  Citibank also has valued some of these CDS at more

than 70 percent of their notional value.  These values are irrational in that they are greater than

the assumed maximum loss that the market was using in its pricing at the time.

(ii)    <i>Portfolio of CDS based on Venezuela</i>

147.    LBSF and Citibank also had a portfolio of 37 CDS referencing Venezuela

with a common set of economic characteristics at the time of LBHI's bankruptcy.  Citibank was

the net buyer of protection in this portfolio.  The table below shows the value of the protection

(as a percentage of notional) for each trade.  Again, the trades are sorted by maturity.



148.    The inclusion of inflated Hypothetical Charges is clear based on Citibank's consistently exaggerated valuations.  In addition, a hypothetical bid/offer charge is applied to every single trade, illustrating a complete lack of portfolio aggregation.  In fact, Citibank was so determined to inflate the Hypothetical Charges that it did not aggregate trades that were functionally identical and perfectly offsetting in terms of economic risk. The egregiousness of Citibank's action are demonstrated in the table below which shows two nearly identical trades under the LBSF-Citibank Agreement that Citibank closed out separately instead of aggregating.

| Example of Nearly Identical Trades that Citibank Did Not Aggregate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Maturity Date | Reference Entity | Direction of Credit Protection | Notional ($) | Annual Price paid for protection (pct) | Citibank Submitted Mid-Market ($) | Citibank Final Close-out Amount ($) | Market-Based Calculation of Value as of Early Termination Date ($) |
| 7/20/2012 | Venezuela | Lehman Buys | 25,000,000 | -2.44% | 5,845,125 | 5,210,430 | 4,534,485 |
| 7/20/2012 | Venezuela | Lehman Sells | (25,000,000) | 2.53% | (5,780,907) | (6,417,407) | (4,465,544) |
| TOTAL | | | 0 | 0.09% | 64,218 | (1,206,977) | 68,941 |

149.    In this example, Citibank had both purchased and sold credit protection with LBSF on the sovereign debt of Venezuela.  The two transactions were identical in every regard except for the price that was paid for the credit protection.  In one instance LBSF paid an annual price of 2.44% of the notional and in the other instance Citibank paid 2.53% of the notional.  Thus, in the aggregate, LBSF was receiving a net annual payment of 0.09% of the notional, or $22,500.  Taking this aggregation into account, LBSF assigned a small net value to the two trades of $68,941.  Citibank also submitted a small net mid-market value for these two

trades of $64,218.  However, Citibank then applied individual bid/offer charges to each of the two offsetting trades creating a claim of more than $1.2 million for Citibank.

150.    It is inconceivable that in actually managing this portfolio, Citibank would not take advantage of the offsetting effect of protection bought and sold on the same name with the same or very close maturities and instead would pay bid/offer charges on every single one of these CDS.  Clearly, the imposition of hypothetical bid/offer charges that Citibank never would have paid is a fiction created solely to inflate its close-out valuations.

151.    The AMBAC and Venezuela CDS examples shown illustrate just how far from commercial reality Citi was willing to depart in order to close out the CDS portfolio in its favor.  Citi's actions in closing out the CDS portfolio with LBSF resulted in an unjustifiable inflation of its claims by over $1.2 billion.

**D.    Citi Did Not Use Commercially Reasonable Procedures to Close Out its Rates Portfolio with LBSF**

152.    Citi also achieved a massive claim inflation of nearly $450 million in closing out its interest rate portfolio by engaging in a number of commercially unreasonable practices.  LBSF had a large portfolio of 7,503 interest rate derivative trades with Citi at the time of LBHI's bankruptcy.  Lehman has used readily available market information to determine that the mid-market close-out value of LBSF's interest rate derivatives with Citi should have been $1,328,574,268 in favor of LBSF.  Yet Citi valued these trades at only $878,925,684 in LBSF's favor, as illustrated in the table below.

-60-

**Close-out Amount Calculations for Generic Interest Rate Swaps**
[values in USD to LBSF]

| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
|---|---|---|---|---|
| LBSF-Citibank | 6,748 | 1,090,415,643 | 1,525,065,437 | 434,669,794 |
| LBSF-Financial | 635 | (264,857,651) | (256,572,740) | 8,284,911 |
| LBSF-Global | 107 | 16,788,139 | 20,422,913 | 3,634,775 |
| LBSF-Swapco | 9 | 36,893,054 | 39,741,383 | 2,848,330 |
| LBSF-Canyon | 4 | (313,500) | (102,726) | 210,774 |
| **TOTAL** | 7,503 | 878,925,684 | 1,328,574,268 | 449,648,584 |

153.    An examination of the transaction types with the largest valuation differences reveals several sizeable exaggerations within Citi's rates claims.  Specifically, as the table below shows, a valuation difference of $227 million arose from two categories of trades: Swaption/Callable Swap ("Swaptions"); and Swap-Generic ("Generic Swaps").

**Valuation Differences by Trade Category[11]**
[values in USD to LBSF]

| Trade Category | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
|---|---|---|---|---|
| SWAPTION/CALLABLE SWAP | 489 | (228,525,353) | (102,347,460) | 126,177,893 |
| SWAP - GENERIC | 6,179 | 1,278,755,703 | 1,379,650,648 | 100,894,945 |
| SWAP - XCCY | 191 | 2,829,166 | 14,837,552 | 12,008,385 |
| EXOTIC | 16 | (7,478,536) | 1,920,118 | 9,398,653 |
| INFLATION - SWAP/CAP | 81 | 78,482,523 | 84,831,088 | 6,348,565 |
| SWAP - AVG/BASIS | 316 | (16,358,738) | (13,295,445) | 3,063,293 |
| OTHER | 80 | (11,684,987) | (8,831,413) | 2,853,574 |
| CAP/FLOOR - CMS/CMT | 50 | (13,703,723) | (11,189,128) | 2,514,595 |
| CAP/FLOOR - GENERIC | 56 | (13,506,644) | (13,482,313) | 24,330 |
| FRA - GENERIC | 45 | (2,133,517) | (3,519,378) | (1,385,861) |
| **TOTAL** | 7,503 | 1,066,675,895 | 1,328,574,268 | 261,898,373 |

---

[11]    In addition, Citi disclosed that nearly $188 million of inappropriate bid/offer charges were added to its valuations on top of the Close-out Amounts listed in this table.  These bid/offer charges along with Citi's inflation of the close-out values for Generic Swaps and Swaptions totaled almost $415 million, which is more than 92 percent of Citi's total rates claim inflation of $450 million.

154.    Generic Swaps and Swaptions are two of the most common and liquid types of derivatives.  Valuation differences in these categories of transactions should therefore be extremely small.  That Citi and Lehman would disagree by $227 million on the value of these trades can only be fairly explained by extraordinarily aggressive close-out procedures employed by Citi.

(a)    *Citibank Appears to Have Opportunistically Selected a Close-out Time for Generic USD Interest Rate Derivatives*

155.    One way Citi inflated its rates claims was through Citibank's opportunistic selection of a close-out time for rates trades under the LBSF-Citibank Agreement.  The major valuation difference in the rates portfolio between LBSF and Citi comes from the trades under this Master Agreement.

156.    Broadly, this portfolio of Generic Swaps and Swaptions had two major types of risk exposure.  The first was to the general level of interest rates. This is commonly called "delta" risk.  The second major risk exposure was to the level of volatility of interest rates. This exposure is commonly called "vega" risk.  When the market views interest rates as becoming more uncertain, option values increase.

157.    LBSF was the net "receiver of the fixed rate / payer of floating rate" on this portfolio of swaps and swaptions.  In common parlance, LBSF was "long delta."  The position was such that each one basis point move lower in interest rates would lead to an increase in the value of the combined portfolio of almost $4 million in LBSF's favor.  LBSF was also "long vega" on the combined portfolio.  Each movement upward by one percent in "implied volatility" would increase the value of the portfolio by approximately $13 million in LBSF's favor.

158.    During the course of the day on September 15, 2008, interest rates for USD swaps generally moved lower and "implied volatility" generally increased.  Both of these movements increased the value of LBSF's positions.

159.    It was thus highly beneficial to Citibank to select a close-out time early in the New York morning.  The difference in value between the time as of which Citibank closed-out this combined portfolio and the typical end-of-day time of 3:00 pm was more than $100 million in Citibank's favor.  Thus, Citibank's selection of a close-out time for rates conforms to the pattern visible across every major product, in which Citi closed-out each type of derivatives trade as of a date and time that maximized its claims.

(b)    *Citi Included Exaggerated, Hypothetical Bid/Offer Charges and Shifted Mid-Market Curves to its Benefit*

160.    Citi provided valuation information for its Generic Swap portfolio in two different manners.  For the four major currencies – dollar ("USD"), euro ("EUR"), yen ("JPY"), and pound ("GBP") – and two others, Citi provided its mid-market value for each trade as of its close-out date and time.  Separately, Citi provided additional bid/offer add-on charges for each of these six currencies.  For the swaps in most of the remaining 21 currencies, Citi only provided its final swap valuation without separating bid/offer add-ons from the mid-market values.

(i)    *USD, EUR, JPY and GBP Generic Swaps*

161.    For the four major currencies, Citi included bid/offer add-on charges of over $40 million, many of which were Hypothetical Charges.  The bid/offer charges that Citi added on to its Generic Swap close-out valuations were many multiples of market standards.  For example, Citi generally included a one basis point charge when closing out trades in the USD swap portfolio.  This charge is multiple times larger than the charge a similarly situated end user would have expected to pay.  Citi is among the leading market-makers in USD swaps.  It is

highly sophisticated, has a large customer base, and has access to the inter-dealer market where trades are generally done at mid-market.  It is indefensible for Citi to claim that it paid or ever would have paid a one basis point charge when entering into USD swaps.

162.    On September 15, 2008, transaction volumes in the USD swap market were exceptionally high.  Thus, Citi had ample opportunity to close out its USD swap portfolio at a fraction of the stated Hypothetical Charges, if it incurred any costs at all.

163.    An examination of Citi's USD swap position with LBSF further illustrates the absurdity of Citi's inclusion of a one basis point charge for USD swaps.  Citi was a net payer of the fixed rate on its USD swap portfolios with LBSF.  This meant that after terminating the Master Agreements with LBSF, Citi, if it chose to do so, was in a position where it could go into the market and again pay the fixed rate to replace the swaps.  As discussed above, interest rates moved lower throughout the day on September 15, 2008.  Thus, Citi would have been able to pay lower and lower fixed rates on the USD swaps.  This would have been highly beneficial to Citi. Each basis point lower in rates on average that Citi paid would have benefitted Citi by approximately $6 million on the Generic Swap portfolio (or $4 million on the combined Generic Swap and Swaption portfolio).  The considerable drop in interest rates throughout the day indicates that there was substantial interest from counterparties to receive the fixed rate.  This is exactly what Citi needed if it intended to replace the economic equivalent of its USD swap portfolio.  In essence, customers were lined up to help Citi replace its risk if it chose to do so. These customers would have dealt with Citi at extremely aggressive levels – and in many instances may have paid Citi a bid/offer charge to transact.  This same pattern holds true for the portfolios of EUR, JPY, and GBP Generic Swaps between LBSF and Citi.

164.    As a result, it is inconceivable given Citi's risk position and the market movements and conditions on September 15, 2008 that Citi would ever have paid or expected to

pay a one basis point charge to close out the transactions in its USD, EUR, JPY, and GBP swap portfolios.

(ii)    *Remaining 21 Currencies for Generic Swaps*

165.    Citi provided varying amounts of information regarding its close-out method for Generic Swaps in the 21 remaining currencies. An examination of the valuations and information submitted indicates that Citi engaged in commercially unreasonable practices for these transactions as well. First, in some instances Citi appears to have shifted mid-market curves in its favor. Second, in some instances Citi did not apply portfolio aggregation and included exaggerated Hypothetical Charges.

166.    The total valuation difference for the Generic Swap portfolios in the remaining 21 currencies is almost $28 million. The largest differences are concentrated in Taiwanese Dollar ("TWD") and Mexican Peso ("MXN"), amounting to $15.8 million and $5.7 million respectively.

167.    An examination of the close-out values for TWD Generic Swaps indicates that Citi shifted the mid-market curve approximately five basis points higher than readily available market closing swap rates. In addition Citi did not apply portfolio aggregation and instead included exaggerated, hypothetical bid/offer charges on each trade of 7.5 to 13 basis points. Typical bid/offer charges to sophisticated customers would have been a fraction of this amount.

168.    For MXN Generic Swaps, Citi provided a purported mid-market MXN swap rate curve with its claims that is reasonable and supported by available data. However, based on the valuations of these trades Citi appears not to have used this curve. Instead, many of the swap rates used in Citi's close-out of MXN swaps do not reflect the actual MXN market and are not even internally consistent. For example, in multiple cases Citi valued two MXN swaps

-65-

with the same maturity date using rates that differed by more than 30 basis points from one another – an irrational difference.

169.    In addition to the inappropriate close-out values detailed above, Citi included inflated hypothetical bid/offer charges in its close-out of the Swaption portfolio. Plaintiffs believe that $29.7 million of such Hypothetical Charges were tacked onto the USD Swaption portfolio.

(c)    *Citi in Some Instances did not Apply Portfolio Aggregation, Particularly Across Multiple Trading Desks*

170.    Citi in some instances failed to apply portfolio aggregation to interest rate derivative trades under the same Master Agreement, particularly with respect to pairs of trades booked for different trading desks within the same Citi entity.  Portfolio aggregation is a standard and valuable risk mitigation practice.  Traders have every incentive to minimize the costs associated with managing their risk positions, and it would be commercially unreasonable for traders to ignore offsetting and partially offsetting risks.  However, Citi did not net offsetting risks across trading desks in the USD rates portfolio.

171.    Citi included Hypothetical Charges for four different USD rates trading desks in excess of $31 million.  If Citi had netted trades under the same Master Agreement across trading desks, as it should have, the $31 million in Hypothetical Charges would have been reduced to $17 million.  It would have been commercially unreasonable for the four different trading desks in the same Citi entity not to communicate and offset risks.  Thus, Citi could never have incurred Hypothetical Charges of the magnitude included in its rates claims.

172.    Furthermore, when Citi did apply some portfolio aggregation to certain segments of the rates portfolio, it did so at a significantly lower level of aggregation than a reasonable trader would actually apply.  In addition to aggregating identical and substantially

similar trades, traders would at a minimum also look for opportunities to offset risk across

different maturities.  Applying a commercially reasonable level of portfolio aggregation would

result in a large reduction of Citi's rates claims.

> (d)    *Citi Valued Certain Trades in an Inconsistent and Self-Serving Manner*

173.    An analysis of the Close-out Amounts assigned by Citi to rates

transactions reveals that Citi did not value trades on a consistent basis, but instead assigned

dramatically different prices to identical or nearly identical swaps, in some cases even pricing

nearly identical trades dozens of basis points apart.  Citi's egregious use of inconsistent

valuations is particularly prevalent in its Swaption portfolio.

174.    Citi had a large portfolio of Swaptions with LBSF at the time of LBHI's

bankruptcy.  More than half of the trades in this portfolio were denominated in USD.  As the

table below shows, Citi assigned a net value to the USD Swaption trades under the LBSF-

Citibank and LBSF-Financial Agreements that was more than $96 million more favorable to Citi

than that calculated by Lehman using readily available market data.

| Close-out Amount Calculations for Swaptions [values in USD to Lehman Subsidiaries] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Trade CCY | No. Trades | Citi Calculation of Close-out Amt. | Market-Based Calculation of Proper Close-out Amt. | Difference |
| LBSF-Citibank | Non-USD | 160 | 25,082,049 | 30,337,705 | 5,255,656 |
| LBSF-Financial | Non-USD | 20 | (5,480,881) | (6,316,334) | (835,454) |
| LBSF-Global | Non-USD | 10 | 18,200,135 | 20,595,160 | 2,395,024 |
| LBSF-Citibank | USD | 271 | (244,118,307) | (145,839,734) | 98,278,573 |
| LBSF-Financial | USD | 25 | (22,082,013) | (24,075,948) | (1,993,935) |
| **TOTAL** | | 486 | (228,399,017) | (125,299,153) | 103,099,864 |

175.    As described above, Citi purports to have closed out the USD Swaption

portfolio early in the morning, New York time, on September 15, 2008.  In general, across the

entire Swaption portfolio, that time is nearly the worst possible time of day for Lehman and

significantly more favorable for Citi than the standard end of day closing prices.

176.    However, Plaintiffs have identified fifteen individual trades that should have been valued more favorably for LBSF than the valuations asserted by Citi, based upon Citi's use of an early morning valuation time.  These valuations therefore could not have been the product of an 8:30 am valuation time on September 15, and are inconsistent with the rest of Citi's Close-out Amounts.  As the table below demonstrates, over $57 million of the $96 million difference in the USD swaption portfolio is comprised of these 15 trades alone.  The 15 trades have been separated in two groups in the below table, based on their risk characteristics.

| Close-out Amount Calculations for USD Swaptions [values in USD to Lehman Subsidiaries] | | | | | | |
|---|---|---|---|---|---|---|
| Group | No. Trades | Vega Exposure | Rates Exposure | Citi Calculation of Close-out Amt. | Market-Based Calculation of Proper Close-out Amt. | Difference |
| Group A | 6 | (8,767,869) | 2,184,174 | (414,905,000) | (380,565,329) | 34,339,671 |
| Group B | 9 | 16,758,718 | 1,983,582 | (124,350,902) | (101,503,614) | 22,847,288 |
| Remaining | 281 | 4,882,042 | (1,906,511) | 273,055,582 | 312,153,260 | 39,097,679 |
| TOTAL | 296 | 12,872,891 | 2,261,245 | (266,200,320) | (169,915,683) | 96,284,637 |

177.    The Close-out Amounts provided by Citi for the six trades included in Group A are the most at variance with what the values should have been as of 8:30 am on September 15.  The Lehman Subsidiaries experienced an $8.8 million loss in value on this group of trades for every one point (1%) increase in interest rate volatility, or an $8.8 million gain for every one point decrease in volatility.  Given the level of volatility at that time, the valuation of this group of transactions should have been more favorable for the Lehman Subsidiaries in the morning hours.  Further, these trades were also positively exposed to higher interest rates.  Since interest rates were higher in the morning, this is another significant factor that should have made a morning valuation more favorable to Lehman than a close of business valuation for these six particular trades.  Lehman estimates that if these transactions were priced at 8:30 am, the Close-out Amounts should have been approximately $345 million in Citi's favor, which is actually more favorable to LBSF than the end of day market-based value ($380 million in favor of Citi)

-68-

would have been.  But instead, Citi used an unknown methodology to determine values for these six trades that totaled nearly $415 million – more than $70 million more favorable to Citi than they should have been using prices from the morning of September 15.

178.    The nine trades included in Group B are a further indication of Citi's use of an inconsistent methodology to determine the Close-out Amounts for swaptions.  Based on the risk exposures of these trades to interest rates and interest rate volatility, Plaintiffs estimate that the effect of using a morning valuation instead of end of day valuation should be a net benefit to LBSF in the range of $5 million to $10 million.  Despite this, Citi's close-out valuations are worse for LBSF than Lehman's September 15 close of business valuation by nearly $23 million.  Combining this with the effect of time of day, Plaintiffs estimate that the valuation would have been approximately $30 million more favorable to LBSF than that provided by Citi, if Citi had valued this group of trades consistently with the overall portfolio.  These values used by Citi are thus inconsistent with the methods used to value the rest of its USD swaptions, and are much more favorable to Citi than can be justified using market data.

(e)    *Citi Valued Rates Trades as of Dates Other Than the Early Termination Date*

179.    In a number of instances Citi valued rates trades as of dates other than the Early Termination Date of September 15, 2008, despite the fact that commercially reasonable determinants of value existed as of September 15, as demonstrated by Lehman's ready ability to price all of the Generic Swaps as of that date.

180.    An example of Citi using a close-out date other than the Early Termination Date involves 306 USD Generic Swaps under the LBSF-Citibank Agreement that Citibank valued as of September 17, 2008.  By valuing the trades as of this date, instead of the Early

Termination Date of September 15, 2008, Citibank was able to inflate its claim by approximately

$3 million.

**E.** **Citi Did Not Use Commercially Reasonable Procedures to Close Out its Securitized Products Portfolio with the Lehman Subsidiaries**

181.     The Lehman Subsidiaries and Citi also had a portfolio of securitized

products trades, which are CDS written on products such as mortgage backed securities or

collateralized debt obligations.  The parties entered into 821 such CDS under the LBSF-Citibank,

LBSF-Global, and LBSF-Canyon Agreements, with LBSF as the net seller of protection.  As

illustrated in the table below, Citi submitted claims for these securitized products trades in an

amount more than $229 million above the values calculated by LBSF using publicly available

market data, with most of this overstatement arising from Citibank's valuation of trades under

the LBSF-Citibank Agreement.

| Close-out Amount Calculations for Securitized Products [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-Out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBSF-Canyon | 6 | 1,077,659 | 1,076,217 | (1,442) |
| LBSF-Citibank | 758 | (1,626,664,467) | (1,395,909,138) | 230,755,329 |
| LBSF-Global | 57 | 154,438,917 | 153,130,689 | (1,308,228) |
| **TOTAL** | 821 | (1,471,147,891) | (1,241,702,233) | 229,445,659 |

182.     In closing out its portfolio of securitized products CDS, Citibank failed to

engage in any portfolio aggregation and instead employed a market quotation process that, by

design, yielded artificially conservative quotes incorporating inflated bid/offer charges.  The

result of this improper process was an inflation of Citibank's claim by more than $229 million.

183.     A majority of the trades in the securitized products portfolio between Citi

and LBSF carried similar types of risk.  Specifically, these were trades in which Citi purchased

or sold protection on subprime or Alt-A residential mortgage backed securities ("RMBS"). The

table below shows the Close-out Amount calculations for the 546 securitized products trades that

were CDS on RMBS.

| Close-out Amount Calculations for Single Name CDS on RMBS<br>[values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBSF-Citibank | 508 | (1,057,278,227) | (878,339,836) | 178,938,391 |
| LBSF-Global | 38 | 147,990,013 | 148,906,789 | 916,776 |
| **TOTAL** | 546 | (909,288,214) | (729,433,047) | 179,855,168 |

184.    These CDS on RMBS are less liquid than more standardized derivatives

and consequently are associated with wider individual bid/offer charges.  However, these trades

tend to change value in a highly correlated fashion since they all relate to similar pools of

residential mortgages that tend to perform in a similar manner.  The result is that these

securitized products trades are typically managed on a portfolio basis for risk management

purposes, with individual trade attention given only to unique risk.

185.    To demonstrate the necessity and significance of portfolio aggregation to

these transactions, Lehman reviewed the 508 CDS on RMBS trades under the LBSF-Citibank

Agreement and identified 375 of the trades that had been in existence since at least March 31,

2008 – over five months prior to the LBHI bankruptcy.  Out of these 375 trades, there were 168

trades where LBSF purchased protection and 207 trades where LBSF sold protection.  The graph

below shows the average CDS value (defined as a percent of notional amount) for the "buys" of

protection and for the "sells" of protection.  As can be seen, the buys had a slightly higher

average value than the sells.  However, since both buys and sells were based on pools of

mortgages that had similar economic characteristics, the overall price movement between the

buys and sells was highly correlated.  Nearly every day that the buys increased in value so did

the sells, and vice versa.[12]

**Average Daily Value of CDS on RMBS in LBSF-Citibank Agreement**



186.    The above graph clearly illustrates the significance of the portfolio effect.

The 168 LBSF buys of protection substantially offset the risk and price movement in the 207

sales of protection.  It would make no sense to individually replace each of these securitized

products transactions and incur a substantial bid/offer charge on every CDS when the net

portfolio had significantly less risk.  Yet this is exactly how Citibank constructed its claim.

187.    Instead of engaging in a good faith attempt to value these positions, Citi

chose to obtain market quotations for individual securitized products CDS.  According to Citi's

claims, it derived these valuations from market quotations that were provided to them by other

---

[12]    In fact, the only anomalous points on the graph are related to the timing of cash payments.

dealers between September 15, 2008 and September 17, 2008.   To obtain these quotations, Citi

requested quotes for bids on a list of individual securitized products and also separately

requested quotes for offers on a list of individual securitized products.  This created a situation

where the institutions providing the quotes had no confidence that they would be able to acquire

offsetting positions.  Instead, they were left with the risk of acquiring a large "one-way" position,

which created a natural incentive to provide extremely wide, defensive quotes.  This process, by

design, led to artificially wide quotes that Citi used to create a large hypothetical loss that it

never incurred or expected to incur.

188.    Citi never used commercially reasonable procedures or attempted to meet

its good faith obligation to mitigate damages by taking advantage of the significant portfolio

aggregation effect described above.  Simply put, asking for separate bid and offer quotations on

individual trades does not yield an accurate measure of the economic equivalent of the material

terms of the group of securitized products transactions between the parties, as required by the

Close-out Amount definition in the COA Master Agreements.

189.    Moreover, Citi's claims are in direct contradiction to the actions it actually

took.  Citi only entered into a limited number of replacement trades, further supporting that it

managed its securitized products transactions on a portfolio basis.

190.    By valuing its trades individually, Citi created a large hypothetical loss

and maximized the amount of bid/offer charges, most of which were Hypothetical Charges,

enabling it to grossly inflate its claims.  Furthermore, in many instances Citi relied on market

quotations made as of dates after the Early Termination Date.  This is directly contrary to the

Close-out Amount definition in the COA Master Agreements and to section 562 of the

Bankruptcy Code, which both required Citi to value the securitized products portfolio as of

September 15, 2008 if commercially reasonable determinants of value existed on that date.

LBHI's bankruptcy on September 15 had very little direct effect on the securitized products market and did not inhibit Citi's ability to value the trades.  On the contrary, commercially reasonable determinants of value existed, as demonstrated by Lehman's ability to value these same trades as of September 15, 2008.  Citi was thus obligated to value the securitized products transactions as of that date.

191.    In summary, Citi opportunistically, and in a self-serving manner, chose to ignore its obligations under the Master Agreements, New York law, and the Bankruptcy Code, and instead closed out its securitized products trades in bad faith, using commercially unreasonable procedures.  By denying Lehman the benefit of any portfolio effects and valuing many trades as of a date after the Early Termination Date, Citi inflated its claim far beyond the economic equivalent of the material terms of its securitized products positions.  As a result, Citi's claims resulting from the close-out of its securitized products portfolio should be reduced to the proper amounts as reflected in the values obtained by LBSF using readily available market data.

F.    **Citi Did Not Use Commercially Reasonable Procedures to Close Out its FX Portfolio with the Lehman Subsidiaries**

192.    Citi also closed out its foreign exchange ("FX") trades with the Lehman Subsidiaries using commercially unreasonable procedures, resulting in a large and unjustified inflation in Citi's claims.

(a)    *Citi Improperly Closed Out the FX Portfolio Using Price Levels that Did Not Exist on the Early Termination Date*

193.    As with the other derivatives products, it appears Citi closed out its FX trades with the Lehman Subsidiaries as of a date other than the Early Termination Dates designated by Citi under the relevant Master Agreements.  Specifically, although Citi claimed to have closed out its FX portfolio as of September 15, many trades were closed out at values far

-74-

outside those observable in the market on that date.  By way of example, the following chart

illustrates Citibank's close-out values for USD/JPY FX forwards with LBCC.  The trades are

aligned by expiration date on the x-axis and price (in number of yen per dollar) on the y-axis.

The trend lines show the highest and lowest value for these trades at any point in the day on

September 15, 2008.  Thus, any valuations made as of September 15 would fall between these

two lines.  The green points show LBCC's valuation as of the end of day on that date, while the

red and blue points show Citibank's values for these trades.



194.    The chart illustrates that Citibank closed out these USD/JPY FX forwards

at values more favorable for its own positions than any of the market prices that actually

occurred on September 15, 2008.  When these values are compared to the market prices from each day during the week of September 15, it becomes apparent that many of Citibank's close-out values track much more closely to the market as of September 19, 2008.  This pattern can be seen across Citibank's FX close-out.  Therefore, on information and belief, Citibank closed out many of its FX trades with the Lehman Subsidiaries as of September 19, when the values were much more favorable to Citibank, rather than on September 15.

195.    Citi was required to value the terminated FX transactions as of September 15, however, under both the Master Agreements and the Bankruptcy Code.   The FX market is extremely large and liquid with excellent price transparency.  As Citi is a major FX dealer with sophisticated risk management systems, it had substantial access to this deep market.  The LBHI bankruptcy on September 15 did not have a negative effect on the availability of commercially reasonable determinants of value in the FX market.  To the contrary, the USD/JPY exchange rate (the most common currency pair used in trades between the Lehman Subsidiaries and Citi) experienced some of its highest trading volumes ever on that very date, as reported by the CLS Group, the operator of the cash settlement systems used by major financial institutions for spot FX trades.[13]  Ample determinants of value clearly existed to enable Citi to close out its FX trades on September 15.

196.    The graph below illustrates the daily range of the USD/JPY exchange rate for each day between July 1, 2008 and December 31, 2008.

---

[13]    *See* CLS Group, Currency Program Briefing Book, *available at* http://www.cls-group.com/Publications /CLS_Currency_Programme_Briefing_Book.pdf ("Following the collapse of Lehman Brothers in September 2008, market sentiment deteriorated rapidly . . . .   However, ***the FX market continued to function, without material disruption***, ***throughout the market turmoil that followed***.  Many have attributed the smooth functioning of the FX market to the role played by CLS.  ***At the height of the financial crisis during the week commencing September 15, 2008, CLS settled exceptionally high values and volumes of transactions***, a USD equivalent of 26.5 trillion and 4.4 million payment instructions.").



As the graph illustrates, the movement of the USD/JPY exchange rate on September 15, 2008 was not at all anomalous relative to the typical daily movements for the six month period surrounding it.  As a result, Citi had the ability to value the terminated FX transactions as of September 15.  That it chose not to do so, and instead used more favorable prices from September 19, was a blatant attempt to manufacture the largest claim possible and shows a willful disregard for the requirements of the Master Agreements and the Bankruptcy Code.

     (b)    *Citi Failed to Apply Portfolio Aggregation and Included Exaggerated Hypothetical Charges in its Close-out of the FX Portfolio*

    197.    As illustrated in the following table, Citi and the Lehman Subsidiaries had entered into just over 3,000 FX transactions, which Citi improperly closed out at more than $97 million above their actual market value.

| Close-out Amount Calculations for Foreign Exchange Trades [values in USD to Lehman Subsidiaries] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBCC-Citibank | 2,975 | (391,347,954) | (296,348,809) | 94,999,145 |
| LBSF-Citibank | 23 | (695,859) | 928,305 | 1,624,164 |
| LBSF-Financial | 4 | (7,133,021) | (6,741,524) | 391,497 |
| **TOTAL** | 3,002 | (399,176,833) | (302,162,028) | 97,014,805 |

198.    Most of the FX trades between the Lehman Subsidiaries and Citi were entered into under the LBCC-Citibank Agreement.  The following table illustrates that of the 2,975 FX trades under that agreement, 1,908 were plain vanilla forwards and 867 were plain vanilla European options.  These are among the most common and liquid types of FX trades and typically have very small bid/offer charges.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| Product Type | No. Trades | Citibank Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| EUROPEAN OPTION | 867 | (135,880,236) | (57,664,051) | 78,216,185 |
| FORWARDS | 1,908 | (245,813,680) | (238,123,032) | 7,690,648 |
| AMERICAN OPTION | 11 | 2,900,203 | 4,069,206 | 1,169,003 |
| DIGITAL OPTION | 7 | (2,465,470) | (3,994,651) | (1,529,181) |
| BARRIER OPTION | 59 | (10,088,772) | (12,592,762) | (2,503,990) |
| Trades Citi Does Not Know | 123 | n/a | 11,956,481 | 11,956,481 |
| **TOTAL** | 2,975 | (391,347,954) | (296,348,809) | 94,999,145 |

199.    The most common currency pair in the LBCC-Citibank Agreement was

USD/JPY.  It is also the currency pair with the largest inflation of its Close-out Amount by

Citibank, as illustrated below.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| Currency Pair | No. Trades | Citibank Calculation of Close-Out Amount | Market-Based Calculation of Close-Out Amount | Difference |
| USD/JPY | 346 | (28,148,400) | 2,202,909 | 30,351,309 |
| EUR/USD | 246 | (95,465,061) | (81,509,179) | 13,955,882 |
| AUD/USD | 164 | (29,522,224) | (20,372,623) | 9,149,600 |
| GBP/USD | 65 | (69,091,410) | (60,049,293) | 9,042,117 |
| USD/BRL | 150 | (44,458,420) | (39,162,456) | 5,295,965 |
| USD/KRW | 62 | (24,422,594) | (19,740,057) | 4,682,537 |
| Other 66 Currency Pairs | 1,819 | (100,239,845) | (89,674,591) | 10,565,254 |
| **TOTAL** | 2,852 | (391,347,954) | (308,305,290) | 83,042,664 |

200.    An egregious example of Citibank's exaggerated Close-out Amounts for

FX trades is found in Citibank's close-out of low-delta USD/JPY European options.  These are

option trades that due to their characteristics have an extremely low probability (less than 1%) of

having any value when the option expires.  All of these trades were maturing in less than one

year and contained strike prices that were very far from the then-current exchange rate.  The

chart below shows this portfolio of 33 low-delta options.

**Portfolio of Low Delta Options**
[values in USD to LBCC]

| Type (LBCC's perspective) | Strike (Yen) | Expiration Date | USD Notional | Citibank Value | Market-Based Value | Difference |
|---|---|---|---|---|---|---|
| Buy Put | 118 | 9/24/2008 | 100,000,000 | 0 | 22 | 22 |
| Buy Put | 120 | 11/6/2008 | 3,600,000 | 0 | 263 | 263 |
| Buy Put | 120 | 11/6/2008 | 329,513 | 0 | 24 | 24 |
| Buy Put | 125 | 1/16/2009 | 6,970,319 | 0 | 391 | 391 |
| Buy Put | 125 | 1/16/2009 | 4,899,257 | 0 | 275 | 275 |
| Buy Put | 125 | 1/16/2009 | 2,865,000 | 0 | 161 | 161 |
| Buy Put | 125 | 1/16/2009 | 69,703 | 0 | 4 | 4 |
| Buy Put | 125 | 1/16/2009 | 46,229 | 0 | 3 | 3 |
| Buy Put | 125 | 1/16/2009 | 48,877 | 0 | 3 | 3 |
| Sell Put | 110.35 | 9/17/2008 | 30,000,000 | 0 | (1) | (1) |
| Sell Put | 117 | 9/26/2008 | 100,000,000 | (90,000) | (284) | 89,716 |
| Sell Put | 125 | 10/23/2008 | 200,000,000 | (210,000) | (228) | 209,772 |
| Sell Put | 120 | 11/6/2008 | 1,931,800 | (2,318) | (141) | 2,177 |
| Sell Put | 120 | 11/6/2008 | 1,931,800 | (2,318) | (141) | 2,177 |
| Sell Put | 120 | 11/6/2008 | 65,913 | (79) | (5) | 74 |
| Sell Put | 125 | 1/16/2009 | 100,000,000 | (145,000) | (5,611) | 139,389 |
| Sell Put | 125 | 1/16/2009 | 6,970,319 | (10,107) | (391) | 9,716 |
| Sell Call | 65 | 5/8/2009 | 150,000,000 | (600,000) | (16,193) | 583,807 |
| Sell Call | 63 | 6/12/2009 | 150,000,000 | (645,000) | (17,562) | 627,438 |
| Sell Call | 63 | 6/12/2009 | 150,000,000 | (645,000) | (17,562) | 627,438 |
| Sell Call | 63 | 6/12/2009 | 100,000,000 | (430,000) | (11,708) | 418,292 |
| Sell Call | 63 | 6/12/2009 | 75,000,000 | (322,500) | (8,781) | 313,719 |
| Sell Call | 63 | 6/12/2009 | 75,000,000 | (322,500) | (8,781) | 313,719 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 100,000,000 | (425,000) | (8,048) | 416,952 |
| Sell Call | 63 | 7/31/2009 | 200,000,000 | (980,000) | (55,191) | 924,809 |
| Sell Call | 63 | 7/31/2009 | 200,000,000 | (980,000) | (55,191) | 924,809 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 60 | 8/21/2009 | 100,000,000 | (470,000) | (17,123) | 452,877 |
| **TOTAL** | | | 2,609,728,730 | (9,662,332) | (340,800) | 9,321,532 |

201.    LBCC consistently calculated very low values for these options, with the highest individual value being less than 0.3% of the notional amount of the trade.  Furthermore, LBCC's valuations were consistent whether LBCC was long or short the option.  Citibank, on the other hand, assigned massively overstated values to such trades when it owned the option and gave LBCC no value at all if LBCC owned the option.  As a matter of perspective, the Hypothetical Charges included by Citibank on many of these trades were over 100 times what an

end user might expect to pay.[14]  This demonstrates Citibank's effort to include preposterously large bid/offer charges on nearly worthless trades.

202.    Citibank's improper valuation of these 33 trades alone inflated its claim by over $9.3 million.  Close-out Amounts of similarly inflated magnitudes were repeated throughout Citibank's FX options portfolio with LBCC, and greatly contributed to the artificial inflation of Citibank's claims.

203.    Additionally, Citibank disregarded standard portfolio aggregation methods, of the exact nature that it used to manage its own risk, and instead applied exaggerated hypothetical bid/offer charges to offsetting FX option trades.  Citibank went so far in ignoring industry standard practices that it included hypothetical charges even if the trades were *exactly* offsetting each other, resulting in zero economic risk and a combined market value of $0.  The USD/JPY European options portfolio is rife with such examples, one of which is illustrated below.

| Example of Exactly Offsetting FX Trades [values in USD to LBCC] | | | | | |
|---|---|---|---|---|---|
| Type | Strike Price (Yen) | USD Notional ($) | Expiration Date | Market-Based Value ($) | Citibank Value ($) |
| Citibank Sells Put | 114 | 50,000,000 | 2/26/2009 | 175,865 | 72,500 |
| Citibank Buys Put | 114 | 50,000,000 | 2/26/2009 | (175,865) | (242,500) |
| **Total** | | | | 0 | (170,000) |

204.    This example is merely one instance of many in which Citibank tacked huge add-ons onto pairs of trades with offsetting values and zero risk.  For the USD/JPY European options portfolio, there are 74 individual trades that were completely or partially offsetting.  On these trades, Citibank included hypothetical charges of approximately $2.7 million.

---

[14]    As a point of reference, every single option listed above expired worthless.

205.    The commercially unreasonable procedures used by Citi to close out its FX trades with LBCC were an attempt to create an unjustifiable windfall profit.  Citi's claims resulting from the close-out of the FX portfolio should be reduced to the proper amounts as reflected in the values calculated by Lehman using readily available market data.

## G.    Citi's Post-Default Attempt to Undo a Group of Novated Transactions in Order to Manufacture Claims Exemplifies its Bad Faith and Commercial Unreasonableness

206.    The purposefulness with which Citi inflated its claims is epitomized by Citibank's attempt on the day of LBHI's chapter 11 filing to abruptly reverse a successful novation entered into just two business days earlier.  Paradoxically, Citibank tried to restore LBSF as its counterparty after the bankruptcy filing for the purpose of declaring a default and profiting on the termination of the resurrected transactions.  Citibank's actions do not appear to make economic sense unless they were part of a scheme to manipulate its derivatives claims.

207.    On September 11, 2008, Citibank sought to reduce its Lehman credit risk by entering into a three way step-out transaction (the "Collapse Transaction") with LBSF and funds controlled by Bracebridge Capital, LCC (collectively, "Bracebridge").  Thus, Citibank and Bracebridge identified twenty-nine securitized products CDS between Citibank and LBSF and eighty-seven securitized products CDS between Bracebridge and LBSF that perfectly offset.  They recognized these perfectly offsetting trades as attractive candidates for a novation transaction whereby LBSF would step out from the trades facing Bracebridge and Citibank would step into those positions, while at the same time the identical positions between LBSF and Citibank would be terminated.  In this way, Bracebridge and Citibank could each reduce exposure to LBSF while maintaining constant risk positions and without incurring any costs.  On September 11 Bracebridge formally proposed that LBSF "step out" of the offsetting trades by

simultaneously terminating its trades with Citibank and novating its trades with Bracebridge to

Citibank, leaving Citibank and Bracebridge facing each other directly:

> Please consent to the attached collapse of trades between Citibank NA ("CBNA"),
> Lehman Brothers Special Finance ("LBSF") and Olifant Fund Ltd, FYI Ltd, and
> FFI Fund Ltd (collectively, the "Bracebridge Funds"), via the simultaneous
> assignment of the Bracebridge Fund trades from LBSF to CBNA, with the
> relevant Bracebridge Funds as the Remaining Party in each case, and the
> termination of trades between LBSF and CBNA.  CBNA as buyer of protection
> collapses and steps in to face the individual Bracebridge Funds as original sellers
> of protection.

208.    On September 11 at 4:20 pm Citibank consented to the collapse and, in

accordance with industry custom and ISDA-recommended best practices,[15] specified the transfer

date: "t/d 9/11/2008."  Lehman consented at 4:59 pm.  At that point, the Collapse Transaction

was fully binding per the ISDA Novation Protocol II, to which all three parties were adherents.[16]

Accordingly, Lehman processed each of the novations and terminations which comprised the

Collapse Transaction (the "Collapsed Trades") the night of September 11.  Citibank reaffirmed

September 11 as the transfer date in an early morning email on Friday, September 12 and

specified September 16 as the effective date for the transfer of any associated collateral: "t/d

9/11/2008 eff/d 9/16/2008."  Thus, as of September 11, 2008, Lehman had exited the Collapsed

Trades and Citibank and Bracebridge faced each other directly.

209.    The very concern which prompted Citibank and Bracebridge to enter the

Collapse Transaction – avoiding a Lehman default on the Collapsed Trades – was realized early

on September 15, 2008 when LBHI filed for chapter 11 protection.  The morning of September

---

[15]  *See* "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA
Operations Committee (May 4, 2004) available at http://www.isda.org/publications/pdf/BestPracticeStatement.pdf at
2 ("The Novation Date needs to be agreed by all parties in advance of the transfer taking place so that the trade may
be rebooked and reported accurately.").

[16]  *See* Annex I to ISDA Novation Protocol II at 11-12 ("Transferor and Transferee agree that they are legally bound
by the terms of a transfer by novation of a Covered Transaction from the moment they agree to those terms (whether
orally or otherwise), subject only to the condition that evidence of the consent of the Remaining Party to such
transfer is received by the Transferee not later than 6:00 p.m. in the location of the Transferee on the day such
transfer is agreed to.").

15, Citibank sent Lehman a Notice of Termination declaring an Event of Default had occurred, and accordingly it was exercising its right to terminate all the transactions under the LBSF-Citibank Agreement, designating September 15, 2008 as the Early Termination Date. If Citibank's priority on that day had been avoiding Lehman credit risk, it would have been unthinkable that *after* LBHI's bankruptcy Citibank would seek to revive trades that Citibank had just succeeded in novating to a solvent counterparty at zero cost. But, Citibank immediately viewed LBHI's bankruptcy as a profit-making opportunity. Accordingly, its priority that day was maximizing its derivatives claim against Lehman so it could misappropriate the $2 billion in Lehman cash it was holding. When Citibank realized that the Collapse Transaction had cost it the opportunity to include Hypothetical Charges for the Collapsed Trades in its claims, Citibank conspired with Bracebridge to undo the Collapse Transaction.

210.    Bracebridge was a willing participant in the effort to profit from Lehman's demise. On September 15, 2008, the founder and Managing Partner of Bracebridge Capital, LLC forwarded the email chain in which Lehman had consented to the Collapse Transaction to Citibank with the following message:

> I am writing to confirm our conversation and to send you the note requested informing you that given that LBSF defaulted prior to the effective date of 9/16/08 for this trade collapse and that all aspects of the simultaneous assignment and termination were conditioned on Lehman being able to consummate the step out, please confirm that the trade collapse set forth in this email chain is null and void, i.e., Citi has not stepped in and all of the trades remain outstanding between LBSF and us, on the one hand, and between Citi and LBSF, on the other hand. I appreciate your verbal confirmation of this matter earlier and look forward to doing business together.

211.    Three hours later, Citibank responded succinctly: "Citi Agrees." At 6:51 pm, Bracebridge forwarded the email chain to Lehman along with the below message:

> Given the failure to consummate the step-out transactions contemplated by this email chain, we are informing you that the entire collapse, i.e., the simultaneous assignment and termination set forth below involving Citi, is null and void and

deemed not to have occurred.  Accordingly, LBSF was from the original trade dates and remains through today's date counterparty to Olifant Fund Ltd, FYI Ltd and FFI Fund Ltd., respectively, with respect to the original transactions, with LBSF as buyer of protection and the Bracebridge funds as sellers of protection.

Attached is written confirmation from Citi that the simultaneous assignment and termination are deemed null and void. Please confirm your acknowledgement.

212.    It was not possible to resurrect the Collapsed Trades that had been effectively novated on September 11, as there is no provision in the LBSF-Citibank Agreement that would permit previously novated transactions to spring back to life after all the transactions under that Master Agreement had already been terminated.

213.    The stated basis on which Citibank purported to deem the Collapse Transaction null and void was utterly invalid.  First, Citibank fundamentally misconstrued the term "effective date."  "Effective date" simply refers to the due date for payment of any corresponding fees, *not* the date a novation becomes legally binding.  ISDA describes the distinction in its Best Practice Statement for Processing Novations under the heading "Effectiveness of Novations:"

- "The Novation Date is the date that the deal transfers, ie the rights and obligations of the Transferor are novated to the Transferee"

- "Any 'effective date' agreed for the calculation and settlement of fees is quite separate from the operation of Novation Date in relation to the Novation Transaction"[17]

214.    Similarly, the timing of the first and only email mentioning the term "eff/d date" on September 12 - *after* the Collapse Transaction was finalized with the consent of all parties and processed in Lehman's systems - underscores the fact that it did not set the date of the Collapse Transaction.  Similarly, the assertion that LBSF failed to "consummate" the Collapse

---

[17]    "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA Operations Committee (May 4, 2004) available at http://www.isda.org/publications/ppdf/BestPracticeStatement.pdf at 2.

Transaction was baseless. The Collapse Transaction was consummated on September 11 with no steps remaining for LBSF to perform.

215.    Citibank and Bracebridge then included the purportedly resurrected Collapsed Trades on their proofs of claims, charging LBSF exorbitant Hypothetical Charges for each trade, with Citibank claiming its resulting losses were secured by the $2 billion cash deposit.  The windfall Citibank reaped from the Collapsed Trades was exceptional in that its claims for both the Hypothetical Charges <u>and</u> the actual mid-market value of the trades were improper, as the Collapsed Trades no longer legitimately existed as of September 15 and should have been omitted from Citibank's claims entirely.  Thus, through only 29 purportedly resurrected CDS Citibank was able to fabricate the appearance of more than $109 million in Close-out Amounts, in an attempt to retain more than $109 million of the $2 billion it held in Lehman cash.

**Valuations Ascribed to the Collapsed Trades By Citibank and Bracebridge**

| Trades | Total Bracebridge Close-out Amounts | Total Citibank Close-out Amounts |
|---|---|---|
| Collapsed Trades | $ 52,243,380 | $ (109,862,953) |

216.    For these completely offsetting positions, Bracebridge claims that it owed approximately $52 million to LBSF while Citibank claims that LBSF owed it close to $110 million.  Although the Collapsed Trades no longer existed on September 15, LBSF calculated that the total termination value for those transactions would have been $91,480,404 as of that date if they had still been in effect.  This is the amount that should have been payable by Bracebridge to LBSF and by LBSF to Citibank if the Collapse Transaction had not occurred.

217.    Citibank's improper attempt to reverse the Collapse Transaction exemplifies its brazen manipulation of its close-out to create phantom losses and shift them to

Lehman. As of September 15, 2008, Citibank was already out of the Collapsed Trades, having

exited them the prior week at zero cost.  Citibank's calculated decision to try to undo the

Collapse Transaction – resurrecting terminated trades for the sole purpose of immediately

declaring them defaulted and claiming exorbitant Hypothetical Charges – resulted in a bill of

$109,862,953 presented by Citibank to LBSF, a commercially unreasonable result completely

divorced from any actual damages suffered by Citibank.

## H.    If Allowed, Citi's Claims Should Be Equitably Subordinated

218.    As described in detail above, Citi closed out its derivatives transactions

with the Lehman Subsidiaries inequitably and in bad faith, to the detriment of Lehman's other

creditors.  As a result, even if Citi's derivatives claims are allowed, they should be equitably

subordinated under section 510(c) of the Bankruptcy Code.

219.    Section 510(c) of the Bankruptcy Code gives the Court the jurisdiction to

subordinate claims on equitable grounds in the interest of fairness and justice in the

administration of the bankruptcy estate.  Courts have characterized the remedy of equitable

subordination as remedial, designed to undo or offset any inequality in the claim position of a

creditor that will produce injustice or unfairness to other creditors.  *Citicorp Venture Capital,*

*Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003).

Courts typically employ a two prong test in determining whether to equitably subordinate a

claim: (1) the claimant must have engaged in some type of inequitable conduct; and (2) the

misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair

advantage on the claimant.  *See, e.g.*, *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).[18]

---

[18]   The *Mobile Steel* test for equitable subordination originally contained a third prong that became moot
after the passage of the Bankruptcy Code.  *See In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y.
2006) ("The third prong of the Mobile Steel test (requiring that equitable subordination be consistent with
the provisions of bankruptcy law) is of little significance today. Mobile Steel was decided under the

220.    The two prongs of the test for equitable subordination are met here.  The inequitable conduct required for the first prong of the test encompasses "conduct that may be lawful but is nevertheless contrary to equity and good conscience," including, "enrichment brought about by unconscionable, unjust or unfair conduct."  *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).  As described above in detail, Citi closed out its derivatives portfolio with the Lehman Subsidiaries in bad faith.  This bad faith conduct constitutes "inequitable conduct" for purposes of equitable subordination.  *See Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011) ("Because the Amended Complaint adequately alleges that the defendants did not receive fraudulent transfers in good faith, it also adequately alleges that they engaged in inequitable conduct.").  Under the second prong of the test, this inequitable conduct unquestionably injured Lehman's other creditors, whose recovery would be reduced if Citi's claims were allowed to stand and thereby confer an unfair advantage on Citi.

221.    Moreover in certain cases, including with respect to penalty-based claims, courts have been willing to equitably subordinate claims based on the nature and origin of the claim itself and unfairness to the debtor's other innocent unsecured creditors, even absent any inequitable conduct on the part of the claimant.  *See, e.g.*, *In re Colin*, 44 B.R. 806 (Bankr. S.D.N.Y. 1984) (subordinating a punitive damage claim on the ground that punitive damage claims are penalty claims, not imposed to afford redress, but to deter future wrongful conduct, allowance of which would be at the expense of innocent creditors).

222.    The extension of the equitable subordination doctrine to claims that do not reflect an actual loss incurred by the claimant is rooted in the legislative history of section 510(c) of the Bankruptcy Code.  *See* 124 Cong. Rec. H11,095 (Sept. 28, 1978) (statement of Rep.

---

former Bankruptcy Act, which did not specifically provide for equitable subordination. The Bankruptcy Code does.").

Edwards), and 124 Cong. Rec. S17,412 (Oct. 6, 1978) (statement of Sen. DeConcini) ("It is

intended that that term 'principles of equitable subordination' follow existing case law and leave

to the courts development of this principle.  To date, under existing law, a claim is generally

subordinated only if [the] holder of such claim is guilty of inequitable conduct, *or the claim itself*

*is of a status susceptible to subordination, such as a penalty*….") (emphasis added).

223.    Citi calculated its derivatives claims in bad faith, employing a series of

indefensible procedures to maximize its claims to the detriment of Lehman's other creditors.

Moreover, Citi's claims for Hypothetical Charges are tantamount to claims for unenforceable

penalties as the Hypothetical Charges that Citi seeks to recover bear no relation to any actual

loss.  Because allowance of its claims would be detrimental to Lehman's other creditors, Citi's

derivatives claims against the Lehman Subsidiaries should be equitably subordinated under

section 510(c).

I.    **Under a Proper Close-out of the Master Agreements, Citi Owes the Lehman
      Subsidiaries More than $243 Million and its Claims Should Be Reduced to $25
      Million**

**LBSF-Canyon Agreement**

224.    By notice dated September 17, 2008, Citi Canyon terminated the

transactions under the LBSF-Canyon Agreement as of September 18, 2008.  On September 14,

2009, Citi Canyon submitted a revised calculation notice to LBSF pursuant to section 6(d) of the

LBSF-Canyon Agreement.

225.    On September 18, 2009, Citi Canyon filed proof of claim number 17895

against LBSF and proof of claim number 17913 against LBHI for, among other things, amounts

allegedly due to Citi Canyon under the LBSF-Canyon Agreement (the "LBSF-Canyon Claim").

According to Citi Canyon, the amount of the LBSF-Canyon Claim was $135,474.

226.    For the reasons set forth above, the LBSF-Canyon Claim is overstated. Based upon LBSF's calculation, the LBSF-Canyon Claim should be disallowed and expunged and the close-out of the LBSF-Canyon Agreement should result in a payment of $59,200 to LBSF.

### LBSF-Citibank Agreement

227.    By notice dated September 15, 2008, Citibank terminated the transactions under the LBSF-Citibank Agreement as of September 15, 2008.  On September 16, 2009, Citibank submitted a revised calculation notice to LBSF pursuant to section 6(d) of the LBSF-Citibank Master Agreement.

228.    On November 18, 2011, Citibank filed an amended proof of claim number 67733 against LBSF and an amended proof of claim number 67736 against LBHI for, among other things, amounts allegedly due to Citibank under the LBSF-Citibank Agreement (the "LBSF-Citibank Claim").  According to Citibank, the amount of the LBSF-Citibank Claim was $1,640,084,656.

229.    For the reasons set forth above, the LBSF-Citibank Claim is overstated. Based upon LBSF's calculation, the LBSF-Citibank Claim should be disallowed and expunged and the close-out of the LBSF-Citibank Agreement should result in a payment of $157,419,343 to LBSF.

### LBSF-Financial Agreement

230.    By notice dated September 15, 2008, Citi Financial terminated the transactions under the LBSF-Financial Agreement as of September 15, 2008.  On September 16, 2009, Citi Financial submitted a revised calculation notice to LBSF pursuant to section 6(d) of the LBSF-Financial Agreement.

231.    On September 18, 2009, Citi Financial filed proof of claim number 17926

against LBSF and on September 22, 2009 Citi Financial filed proof of claim number 29637

against LBHI for, among other things, amounts allegedly due to Citi Financial under the LBSF-

Financial Agreement (the "LBSF-Financial Claim").  According to Citi Financial, the amount of

the LBSF-Financial Claim was $21,184,614.

232.    For the reasons set forth above, the LBSF-Financial Claim is overstated.

Based upon LBSF's calculation, the LBSF-Financial Claim should be disallowed and expunged

and the close-out of the LBSF-Financial Agreement should result in a payment of $6,557,186 to

LBSF.

### LBSF-Global Agreement

233.    By notice dated September 15, 2008, Citi Global terminated the

transactions under the LBSF-Global Agreement as of September 15, 2008.  On September 16,

2009, Citi Global submitted a revised calculation notice to LBSF pursuant to section 6(d) of the

LBSF-Global Agreement.

234.    On September 22, 2009, Citi Global filed proof of claim number 29881

against LBSF and proof of claim number 29882 against LBHI for, among other things, amounts

allegedly due to Citi Global under the LBSF-Global Agreement (the "LBSF-Global Claim").

According to Citi Global, the amount of the LBSF-Global Claim was $232,423,044.[19]

235.    For the reasons set forth above, the LBSF-Global Claim is overstated.

Based upon LBSF's calculation, the LBSF-Global Claim should be reduced to $20,487,310.

---

[19]   In its response to the Court's derivatives questionnaire, Citi Global acknowledged an additional cash
payment of $9,823,000 is due to LBSF.  However, Citi Global never amended the LBSF-Global Claim to
reflect this amount.

**LBCC-Citibank Agreement**

236.    By notice dated September 15, 2008, Citibank terminated the transactions under the LBCC-Citibank Agreement as of September 15, 2008.  On September 16, 2009, Citibank submitted a revised calculation notice to LBCC pursuant to section 6(d) of the LBCC-Citibank Agreement.

237.    On November 18, 2011, Citibank filed amended proof of claim number 67734 against LBCC and amended proof of claim number 67736 against LBHI for, among other things, amounts allegedly due to Citibank under the LBCC-Citibank Agreement (the "LBCC-Citibank Claim").  According to Citibank, the amount of the LBCC-Citibank Claim was $18,017,039.

238.    For the reasons set forth above, the LBCC-Citibank Claim is overstated. Based upon LBCC's calculation, the LBCC-Citibank Claim should be disallowed and expunged and the close-out of the LBCC-Citibank Agreement should result in a payment of $75,038,565 to LBCC.

**LBCS-Energy Agreement**

239.    By notice dated September 15, 2008, Citi Energy terminated the transactions under the LBCS-Energy Agreement as of September 15, 2008.  On September 16, 2009, Citi Energy submitted a revised calculation notice to LBCS pursuant to section 6(d) of the LBCS-Energy Agreement.

240.    On September 18, 2009, Citi Energy filed proof of claim number 17937 against LBCS and proof of claim number 17936 against LBHI for, among other things, amounts allegedly due to Citi Energy under the LBCS-Energy Agreement (the "LBCS-Energy Claim"). According to Citi Energy, the amount of the LBCS-Energy Claim was $10,714,350.

241.    For the reasons set forth above, the LBCS-Energy Claim is overstated. Based upon LBCS's calculation, the LBCS-Energy Claim should be disallowed and expunged and the close-out of the LBCS-Energy Agreement should result in a payment of $2,882,329 to LBCS.

### LBCS-Global ISDA Agreement

242.    By notice dated September 15, 2008, Citi Global terminated the transactions under the LBCS-Global ISDA Agreement as of September 15, 2008.  On September 16, 2009, Citi Global submitted a revised calculation notice to LBCS pursuant to section 6(d) of the LBCS-Global ISDA Agreement.

243.    On September 22, 2009, Citi Global filed proof of claim number 29880 against LBCS and proof of claim number 29882 against LBHI for, among other things, amounts allegedly due to Citi Global under the LBCS-Global ISDA Agreement (the "LBCS-Global ISDA Claim").  According to Citi Global, the amount of the LBCS-Global ISDA Claim was $6,217,557.

244.    For the reasons set forth above, the LBCS-Global ISDA Claim is overstated.  Based upon LBCS's calculation, the LBCS-Global ISDA Claim should be reduced to $4,748,516.

### LBCS-Global EFET Agreement

245.    By notice dated September 15, 2008, Citi Global terminated the transactions under the LBCS-Global EFET Agreement as of September 15, 2008.  On September 16, 2009, Citi Global submitted a calculation notice to LBCS pursuant to the LBCS-Global EFET Agreement.

246.    On September 22, 2009, Citi Global filed proof of claim number 29880 against LBCS and proof of claim number 29882 against LBHI for, among other things, amounts

allegedly due to Citi Global under the LBCS-Global EFET Agreement (the "LBCS-Global EFET

Claim").  According to Citi Global, the amount of the LBCS-Global EFET Claim was $716,281.

247.    For the reasons set forth above, the LBCS-Global EFET Claim is

overstated.  Based upon LBCS's calculation, the LBCS-Global EFET Claim should be

disallowed and expunged and the close-out of the LBCS-Global EFET Agreement should result

in a payment of $57,287 to LBCS.

### LBSF-Swapco Agreement

248.    By notice dated September 15, 2008, Citi Swapco terminated the

transactions under the LBSF-Swapco Agreement as of September 15, 2008.  On September 16,

2009, Citi Swapco submitted a calculation notice to LBSF pursuant to section 6(d) of the LBSF-

Swapco Agreement.

249.    On September 18, 2009, Citi Swapco filed proof of claim number 17933

against LBSF and proof of claim number 17934 against LBHI for, among other things, amounts

allegedly due to Citi Swapco under the LBSF-Swapco Agreement (the "LBSF-Swapco Claim").

According to Citi Swapco, the amount of the LBSF-Swapco Claim was $991,772.

250.    For the reasons set forth above, the LBSF-Swapco Claim is overstated.

Based upon LBSF's calculation, the LBSF-Swapco Claim should be disallowed and expunged

and the close-out of the LBSF-Swapco Agreement should result in a payment of $1,828,824 to

LBSF.

### J.    Conclusion

251.    Taken collectively, the improper and commercially unreasonable

procedures used by Citi to close out the Master Agreements inflated its claims against the

Lehman Subsidiaries by more than $2.149 billion.  As detailed in the following table, a

commercially reasonable calculation, based on publicly available market sources, of the net

termination amount due under each Master Agreement (using the mid-market valuations as of

the close of business on the early termination date of each agreement) results in Citi owing the

Lehman Subsidiaries more than $243 million under seven Master Agreements, while Citi has

claims totaling $25,235,826 under the remaining two Master Agreements.

[value to Lehman Subsidiaries in USD]

| | Market-Based Close-out Amount | + | Collateral Posted | + | Unpaid Amounts | = | Market-Based Net Claim Amount | v. | Citi Net Claim Amount |
|---|---|---|---|---|---|---|---|---|---|
| LBSF-Canyon | 958,630 | | (899,430) | | 0 | | 59,200 | | (135,474) |
| LBSF-Citibank | (249,608,958) | | 416,280,591 | | (9,252,290) | | 157,419,343 | | (1,640,084,656) |
| LBSF-Financial | (223,685,221) | | 230,698,657 | | (456,250) | | 6,557,186 | | (21,184,614) |
| LBSF-Global | 164,305,046 | | (184,881,990) | | 89,634 | | (20,487,310) | | (232,423,044) |
| LBCC-Citibank | (296,364,126) | | 313,230,362 | | 58,172,328 | | 75,038,565 | | (18,017,039) |
| LBCS-Energy | 23,885,115 | | (20,525,656) | | (477,130) | | 2,882,329 | | (10,714,350) |
| LBCS-Global ISDA | (7,349,001) | | 2,600,485 | | 0 | | (4,748,516) | | (6,217,557) |
| LBCS-Global EFET | 6,226,192 | | (6,168,904) | | 0 | | 57,287 | | (716,281) |
| LBSF-Swapco | 39,741,383 | | (37,912,560) | | 0 | | 1,828,824 | | (991,772) |
| **TOTAL** | (541,890,939) | | 712,421,555 | | 48,076,292 | | 218,606,907 | | (1,930,484,787) |

252.    The above chart illustrates the claims that should have resulted from

commercially reasonable close-outs of the Master Agreements.  For example, Lehman

determined that the proper calculation of the aggregate net Close-out Amount under the LBSF-

Citibank Agreement should have been $249,608,958 in favor of Citibank.  Under that Master

Agreement, LBSF had posted collateral to Citibank in the amount of $416,280,591.  In addition,

$9,252,290 was due to Citibank, but unpaid, at the time the LBSF-Citibank Agreement was

terminated.  Netting these three numbers together yields a final value of $157,419,343 in favor of

LBSF.  In other words, Citibank should have been able to use the collateral it was holding from

LBSF to fully compensate Citibank for the close-out of the LBSF-Citibank Agreement and still

have more than $157 million left over to return to LBSF.  But instead, Citibank submitted a

wildly inflated claim, alleging it was owed $1,640,084,656 under this Master Agreement on top of the $416 million of collateral that LBSF had posted.

253.    In total, a commercially reasonable calculation of the termination amounts due under the Master Agreements, when combined with the posted collateral and Unpaid Amounts under those Agreements, should have resulted claims totaling $25,235,826 under the LBSF-Global and LBCS-Global ISDA Agreements.  At the same time, Citi owes Lehman $243,842,733 under the LBSF-Canyon, LBSF-Citibank, LBSF-Financial, LBCC-Citibank, LBCS-Energy, LBCS-Global EFET, and LBSF-Swapco Agreements.

254.    Instead, Citi submitted claims for $1,930,484,787.  This egregious inflation of $2,149,091,694 is the product of bad faith, commercially unreasonable claims calculations in which Citi concocted phantom claims in order to profit from the $2 billion of cash it had extracted from LBHI.  These claims have no basis in reality, and should be reduced or disallowed.

## CAUSES OF ACTION

## COUNT I

### (Breach of Agreement With Respect to LBHI's $2 Billion)

255.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

256.    Citibank requested that LBHI transfer the $2 billion to a segregated account, and to leave those funds at Citibank, to provide Citibank with "comfort" that the funds would be available in its system.  As a condition for LBHI's agreement to segregate these funds from its general purpose account, and for the funds to remain "captive" at Citibank, Citibank agreed to waive any right it may have had to apply the $2 billion, or any portion thereof, to general obligations of LBHI.

257.   After the various Lehman entities filed for bankruptcy protection, LBHI requested that Citibank return the $2 billion to the LBHI estate.  Citibank refused. Notwithstanding the exclusive purpose for the segregation of the $2 billion and its agreement that the funds would not be subject to setoff, Citibank now asserts in proof of claim number 67736 the right to apply all or a portion of the $2 billion to a host of purported LBHI obligations that are entirely unrelated to clearing and settling activity, including approximately $1.7 billion of claims purportedly arising under the parties' derivatives contracts.

258.   Citibank's refusal to return the $2 billion to LBHI, and its attempt to apply those funds to obligations contrary to the parties' agreement, constitutes a breach of the parties' agreement.

259.   As a result of the foregoing, LBHI has been damaged in an amount not less than $2 billion.

## COUNT II

### (Promissory Estoppel With Respect to LBHI's $2 Billion)

260.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

261.   As described above, on June 12, 2008, Citibank agreed that the $2 billion would not be subject to setoff by Citibank and would not otherwise be subject to a lien or other security interest of Citibank.  Citibank made that promise to induce LBHI to transfer the $2 billion from its general deposit account to a segregated account at Citibank, and to not withdraw those funds from Citibank.

262.   LBHI relied on the June 12, 2008 conversation and Citibank's agreement that the $2 billion would not be subject to setoff, a lien or other security interest, when LBHI agreed to transfer the $2 billion from its general deposit account to the segregated account at

Citibank.  LBHI continued to rely on that promise in not withdrawing those funds from Citibank subsequent to the initial transfer and segregation of the funds.  LBHI's initial and continued reliance was both reasonable and foreseeable to Citibank.

263.    As a result of relying on Citibank's promise, LBHI has been injured, in an amount not less than $2 billion.  Citibank should be estopped from asserting that it now has any right to set off purported obligations of LBHI against the $2 billion, or from withholding LBHI's $2 billion on that basis.

## COUNT III

### (Conversion of LBHI's $2 Billion)

264.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

265.    For all of the reasons discussed above, Citibank has no right to withhold LBHI's $2 billion.

266.    Soon after filing for bankruptcy, LBHI requested that Citibank return the $2 billion to the LBHI estate.  Citibank refused.

267.    As a result of the foregoing, Citibank wrongfully converted $2 billion of LBHI's assets, and LBHI has been damaged thereby. LBHI is entitled to the return of its $2 billion.

## COUNT IV

### (Declaratory Judgment With Respect to LBHI's $2 Billion)

268.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

269.    For all the reasons discussed herein, Citibank has no right to apply any portion of the segregated $2 billion against obligations allegedly owed by LBHI to Citibank.

Among other things, the parties intended for those segregated funds to be held in a special

purpose account not subject to setoff by Citibank.

270.    Citibank has taken the position that, notwithstanding the conditions under

which LBHI's $2 billion was segregated and maintained in a special purpose account, Citibank is

entitled to withhold LBHI's $2 billion and to apply those funds against obligations allegedly

owed by LBHI to Citibank.

271.    There is an actual and justiciable controversy regarding the parties' rights

and obligations with respect to LBHI's $2 billion.

272.    Plaintiffs are entitled to a declaratory judgment that Citibank has no right

to apply any portion of the $2 billion to obligations allegedly owed by LBHI to Citibank, and

that the $2 billion is unencumbered property of LBHI's bankruptcy estate available for

distribution to creditors.

## COUNT V

### (Turnover of LBHI's $2 Billion Under Section 542 of the Bankruptcy Code)

273.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

274.    For the reasons set forth above, Citibank is not entitled to set off amounts

it claims LBHI owes to it against LBHI's $2 billion.  Nor does Citibank have any right to

otherwise withhold the $2 billion.

275.    Citibank is in possession, custody and/or control of the $2 billion, which is

of substantial value and benefit to LBHI's estate and which is property belonging to LBHI that

may be used, sold or leased by LBHI.  Citibank should be ordered to turn over the $2 billion to

LBHI immediately for the benefit of LBHI's unsecured creditors, pursuant to Section 542 of the

Bankruptcy Code.

## COUNT VI

**(Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an Obligation Under Section 548(a)(1)(B) of the Bankruptcy Code)**

276.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

277.    The September Amendment constitutes the incurrence of an obligation for the benefit of Citibank.

278.    LBHI received less than reasonably equivalent value in exchange for its entry into the September Amendment.

279.    Upon information and belief, when LBHI entered into the September Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

280.    Upon information and belief, when LBHI entered into the September Amendment, LBI was insolvent.

281.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Amendment.

282.    By virtue of the foregoing, pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the September Amendment should be avoided for the benefit of LBHI's estate.

## <u>COUNT VII</u>

### (Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an Obligation Under New York DCL Section 273, 275, 278, and/or 279 and Section 544 of the Bankruptcy Code)

283.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

284.     LBHI did not receive fair value in exchange for its entry into the September Amendment.

285.     Upon information and belief, when LBHI entered into the September Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

286.     Upon information and belief, when LBHI entered into the September Amendment, LBI was insolvent.

287.     At all times relevant hereto, there were actual creditors of LBHI holding unsecured claims allowable within the meaning of Bankruptcy Code.

288.     The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Amendment.

289.     As a result of the foregoing, pursuant to Sections 273, 275, 278, and 279 of the New York Debtor and Creditor Law and Section 544(b) of the Bankruptcy Code, the September Amendment should be avoided for the benefit of LBHI's estate.

## <u>COUNT VIII</u>

**(Avoidance of the September Amendment as an Obligation Incurred With the Actual
Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

290.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

291.    LBHI entered into the September Amendment within two years of filing for protection under Chapter 11 of the Bankruptcy Code.

292.    Entry into the September Amendment was an obligation incurred by LBHI to or for the benefit of Citibank.

293.    Entry into the September Amendment was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's entry into the September Amendment.  Among other things, on September 9, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for its expanded obligations under the September Amendment, and the September Amendment was executed on an exigent basis without any meaningful negotiation between LBHI and Citibank.

294.    In addition, Citibank's intent to hinder, delay or defraud creditors of LBHI may be imputed to LBHI.  As described above, LBHI had no choice but to execute the September Amendment in the face of Citibank's threats to cease clearing and settling Lehman's trades unless Citibank's demand for the September Amendment was satisfied.

295.    As a result of LBHI's entry into the September Amendment, LBHI and its creditors have been harmed.

296.    The September Amendment is avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

## COUNT IX

### (Recovery of the $500 Million Transfer as Constructive Fraudulent Transfer Under Section 550(a)(2) of the Bankruptcy Code)

297.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

298.    The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

299.    LBHI did not receive fair consideration for the $500 million transfer to LBI, nor did it otherwise receive reasonably equivalent value in exchange for that transfer.

300.    At all times relevant hereto, there were actual creditors of LBHI holding unsecured claims allowable within the meaning of the Bankruptcy Code.

301.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBHI was insolvent or became insolvent as a result of the transfer; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

302.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

303.    The $500 million transfer to LBI was a transfer of property in which LBHI has an interest. LBI is the initial transferee of the $500 million transfer. Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

304.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the transfer of the $500 million.

305.    By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT X

**(Avoidance of the $500 Million Transfer as a Transfer Made With the Actual Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

306.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

307.    The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

308.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

309.    The $500 million transfer to LBI was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's transfer of those funds.  Among other things, on September 14, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for the $500 million transfer, and the transfer was made at Citibank's insistence and direction without any negotiation only hours before LBHI filed for bankruptcy.

310.    The $500 million transfer to LBI was a transfer of property in which LBHI has an interest. LBI is the initial transferee of the $500 million transfer.  Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

311.     By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT XI

**(Breach of Agreement With Respect to LBCC's $204 Million)**

312.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

313.     LBCC is a party to the CLS Agreement with Citibank.  As a result of foreign exchange trades being settled on LBCC's behalf, Citibank received approximately $204 million that it immediately owed to LBCC.

314.     The LBCC estate requested that Citibank transfer those funds to the LBCC estate.  Citibank refused LBCC's request for years, in breach of the CLS Agreement.  Pursuant to a Court-approved stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.

315.     As a result of the foregoing, LBCC is entitled to damages to compensate its creditors for Citibank's unlawful retention of the $166 million through the date of payment, and is further entitled to recover the $38.5 million, plus interest.

## COUNT XII

**(Conversion With Respect to LBCC's $204 Million)**

316.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

317.    For all of the reasons discussed above, Citibank had no right to withhold the approximately $204 million that it owed to LBCC.

318.    After filing for bankruptcy, the LBCC estate requested that Citibank turn over these funds.  Citibank refused for years.  Pursuant to stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.

319.    As a result of the foregoing, LBCC is entitled to damages to compensate its creditors for Citibank's unlawful conversion of the $166 million through the date of payment, and is further entitled to recover the $38.5 million, plus interest.

## COUNT XIII

### (Turnover With Respect to LBCC's $204 Million Under
### Section 542 of the Bankruptcy Code)

320.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

321.    Citibank retained possession, custody and/or control of approximately $204 million of LBCC's funds, which is of substantial value and benefit to LBCC's estate and which is property belonging to LBCC that may be used, sold or leased by LBCC.  Pursuant to stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.  For the reasons set forth above, Citibank is not entitled to set off amounts it claims LBCC (or LBIE) owes to it against LBCC's $38.5 million.

322.    Citibank should be ordered to turn over the $38.5 million to LBCC immediately for the benefit of LBCC's unsecured creditors, plus interest, pursuant to Section 542 of the Bankruptcy Code.  LBCC is further entitled to the turnover of interest or other return accrued on the $166 million by Citibank through the date of payment.

## COUNT XIV

### (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code)

323.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

324.    Claims held by Citibank against LBHI or LBCC are subject to disallowance under Section 502(d) of the Bankruptcy Code unless and until Citibank has turned over to LBHI or LBCC, respectively, all property transferred, or paid LBHI or LBCC, respectively, the value of such property, for which Citibank is liable under section 542 of the Bankruptcy Code.

325.    In the event that the property is recoverable from Citibank under sections 542 or 550 of the Bankruptcy Code, then all of the claims of Citibank against LBHI or LBCC should be disallowed unless and until Citibank has turned over to LBHI or LBCC, respectively, all property transferred, or paid LBHI or LBCC, respectively, the value of such property, for which it is liable under section 542 of the Bankruptcy Code.

## COUNT XV

### (Objections to the Proofs of Claim Against LBHI)

326.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

327.    Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be deemed "allowed" if a party in interest objects thereto.

328.    On November 18, 2011, Citibank filed proof of claim number 67736 against LBHI.  Plaintiffs object to each of the claims asserted by Citibank in that proof of claim to the extent they assert an interest in, or right of setoff with respect to, the $2 billion of LBHI cash at Citibank.

329.    Plaintiffs also object to each of the claims asserted by Citibank in proof of claim number 67736 to the extent they are based on the avoidable September Amendment to the 2004 Guaranty, are not allowable under the relevant agreements between the parties, or are based on improper calculations of the amounts alleged to be owed.  In the alternative, Plaintiffs object to Citibank's claim seeking payment from LBHI as purported guarantor for millions of dollars in fees allegedly incurred by the Lehman entities under the CLS Agreement.  The CLS Agreement does not authorize the payment of such fees.

330.    In addition, on January 16, 2013, Citibank sold its allowed unsecured claim of $253 million against the LBI estate for obligations purportedly arising under the parties' CLS Agreement (the "LBI CLS Unsecured Claim") for $161 million.  Citibank's sale of the LBS CLS Unsecured Claim resulted in Citibank's release of LBHI's purported obligations under the September Amendment to the extent the sale impaired LBHI's subrogation rights against LBI. In the alternative, the amount claimed by Citibank in proof of claim number 67736 against LBHI as purported guarantor under the September Amendment for alleged obligations of LBI under the CLS Agreement should be reduced to account for proceeds received from the sale of its unsecured claim.

331.    Plaintiffs further object to each of the claims asserted by Defendants against LBHI in proofs of claim numbers 17913, 17934, 17936, 29637, 29882, and 67736 to the extent they seek payment from LBHI as purported guarantor under any of the Master

Agreements.  For the reasons set forth herein, those swap agreement claims are invalid or inflated.

332.    All of the foregoing claims against LBHI should be disallowed and expunged, or reduced and allowed, as appropriate.

333.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XVI

### (Objection to Citibank's Claim for Post-Petition Interest Against LBHI)

334.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

335.    In proof of claim number 67736, Citibank claims a right to collect post-petition interest on its purported claims against LBHI, on the alleged basis that it is an oversecured creditor.

336.    Plaintiffs object to Citibank's claim for post-petition interest with respect to any such claims asserted against LBHI.  Citibank is not entitled to post-petition interest, under Section 506(b) of the Bankruptcy Code or otherwise.  Citibank's claim for post-petition interest is also in contravention of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan").  Even if Citibank were entitled to any post-petition interest – and it is not – the rate of interest claimed by Citibank is inflated and contrary to the applicable law and agreements.

337.    The foregoing claim(s) against LBHI should be disallowed and expunged, or reduced and allowed, as appropriate.

338.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XVII

### (Objection to Claim Under LBSF-Canyon Agreement)

339.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

340.    The LBSF-Canyon Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, and was not calculated in good faith.  As described above, Citi Canyon wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Canyon Agreement using commercially reasonable procedures.

341.    The LBSF-Canyon Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-Canyon Claim, or any other claims filed by Citi Canyon, on any other basis.

## COUNT XVIII

### (Breach of LBSF-Canyon Agreement)

342.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

343.    Citi Canyon breached the LBSF-Canyon Agreement by calculating the Loss under the LBSF-Canyon Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

344.    Under the LBSF-Canyon Agreement, Citi Canyon was required to pay LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Loss under the LBSF-Canyon Agreement would have resulted in a net

payment to LBSF in the amount of $59,200.  Instead, Citi Canyon calculated a Loss under the

LBSF-Canyon Agreement resulting in a net claim by Citi Canyon in the amount of $135,474.

345.    As a direct and proximate result of Citi Canyon's breach of the LBSF-

Canyon Agreement, LBSF has been deprived of $194,674.

## COUNT XIX

### (Objection to Claim Under LBSF-Citibank Agreement)

346.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

347.    The LBSF-Citibank Claim is not a valid claim against LBSF because the

calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  As described above, Citibank wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-

ons, failed to net identical or substantially similar trades, did not value the trades under the

LBSF-Citibank Agreement using commercially reasonable procedures, and included valuations

of trades that had already been terminated as part of the Collapse Transaction between LBSF,

Citibank, and Bracebridge.

348.    The LBSF-Citibank Claim should be disallowed and expunged.  Plaintiffs

hereby expressly reserve the right to further object to the LBSF-Citibank Claim, or any other

claims filed by Citibank, on any other basis.

## COUNT XX

### (Breach of LBSF-Citibank Agreement)

349.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

350.     Citibank breached the LBSF-Citibank Agreement by calculating the Close-out Amount under the LBSF-Citibank Agreement in bad faith using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

351.     Under the LBSF-Citibank Agreement, Citibank was required to pay LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBSF-Citibank Agreement would have resulted in a net payment to LBSF in the amount of $157,419,343.  Instead, Citibank calculated a Close-out Amount under the LBSF-Citibank Agreement resulting in a net claim by Citibank in the amount of $1,640,084,656.

352.     As a direct and proximate result of Citibank's breach of the LBSF-Citibank Agreement, LBSF has been deprived of $1,797,503,999.

## COUNT XXI

### (Objection to Claim Under LBSF-Financial Agreement)

353.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

354.     The LBSF-Financial Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Financial wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Financial Agreement using commercially reasonable procedures.

355. The LBSF-Financial Claim should be disallowed and expunged. Plaintiffs hereby expressly reserve the right to further object to the LBSF-Financial Claim, or any other claims filed by Citi Financial, on any other basis.

## COUNT XXII

### (Breach of LBSF-Financial Agreement)

356. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

357. Citi Financial breached the LBSF-Financial Agreement by calculating the Close-out Amount under the LBSF-Financial Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

358. Under the LBSF-Financial Agreement, Citi Financial was required to pay LBSF for any net gains it enjoyed as a result of termination. A commercially reasonable calculation of the Close-out Amount under the LBSF-Financial Agreement would have resulted in a net payment to LBSF in the amount of $6,557,186. Instead, Citi Financial calculated a Close-out Amount under the LBSF-Financial Agreement resulting in a net claim by Citi Financial in the amount of $21,184,614.

359. As a direct and proximate result of Citi Financial's breach of the LBSF-Financial Agreement, LBSF has been deprived of $27,741,800.

## COUNT XXIII

### (Objection to Claim Under LBSF-Global Agreement)

360. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

361.    The LBSF-Global Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Global wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Global Agreement using commercially reasonable procedures.

362.    The LBSF-Global Claim should be reduced to $20,487,310.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-Global Claim, or any other claims filed by Citi Global, on any other basis.

## COUNT XXIV

### (Objection to Claim Under LBCC-Citibank Agreement)

363.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

364.    The LBCC-Citibank Claim is not a valid claim against LBCC because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citibank wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBCC-Citibank Agreement using commercially reasonable procedures.

365.    The LBCC-Citibank Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBCC-Citibank Claim, or any other claims filed by Citibank , on any other basis.

## COUNT XXV

### (Breach of LBCC-Citibank Agreement)

366.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

367.   Citibank breached the LBCC-Citibank Agreement by calculating the Close-out Amount under the LBCC-Citibank Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

368.   Under the LBCC-Citibank Agreement, Citibank was required to pay LBCC for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCC-Citibank Agreement would have resulted in a net payment to LBCC in the amount of $75,038,565.  Instead, Citibank calculated a Close-out Amount under the LBCC-Citibank Agreement resulting in a net claim by Citibank in the amount of $18,017,039.

369.   As a direct and proximate result of Citibank's breach of the LBCC-Citibank Agreement, LBCC has been deprived of $93,055,604.

## COUNT XXVI

### (Objection to Claim Under LBCS-Energy Agreement)

370.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

371.   The LBCS-Energy Claim is not a valid claim against LBCS because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Energy wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBCS-Energy Agreement using commercially reasonable procedures.

372.    The LBCS-Energy Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBCS-Energy Claim, or any other claims filed by Citi Energy, on any other basis.

## COUNT XXVII

### (Breach of LBCS-Energy Agreement)

373.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

374.    Citi Energy breached the LBCS-Energy Agreement by calculating the Close-out Amount under the LBCS-Energy Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

375.    Under the LBCS-Energy Agreement, Citi Energy was required to pay LBCS for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCS-Energy Agreement would have resulted in a net payment to LBCS in the amount of $2,882,329.  Instead, Citi Energy calculated a Close-out Amount under the LBCS-Energy Agreement resulting in a net claim by Citi Energy in the amount of $10,714,350.

376.    As a direct and proximate result of Citi Energy's breach of the LBCS-Energy Agreement, LBCS has been deprived of $13,596,679.

## COUNT XXVIII

### (Objection to Claim Under LBCS-Global ISDA Agreement)

377.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

378.     The LBCS-Global ISDA Claim is not a valid claim against LBCS because

the calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  On information and belief, Citi Global

engaged in improper conduct similar to that described above, by wrongly delaying its close-out

valuations until after the early termination date, improperly charging add-ons, failing to net

identical or substantially similar trades, and not valuing the trades under the LBCS-Global ISDA

Agreement using commercially reasonable procedures.

379.     The LBCS-Global ISDA Claim should be reduced to $4,748,516.

Plaintiffs hereby expressly reserve the right to further object to the LBCS-Global ISDA Claim,

or any other claims filed by Citi Global, on any other basis.

## COUNT XXIX

### (Objection to Claim Under LBCS-Global EFET Agreement)

380.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

381.     The LBCS-Global EFET Claim is not a valid claim against LBCS because

the calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  As described above, Citi Global wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-

ons, failed to net identical or substantially similar trades, and did not value the trades under the LBCS-Global EFET Agreement using commercially reasonable procedures.

382.    The LBCS-Global EFET Claim should be disallowed and expunged. Plaintiffs hereby expressly reserve the right to further object to the LBCS-Global EFET Claim, or any other claims filed by Citi Global, on any other basis.

## COUNT XXX

### (Breach of LBCS-Global EFET Agreement)

383.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

384.    Citi Global breached the LBCS-Global EFET Agreement by calculating the Settlement Amount under the LBCS-Global EFET Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

385.    Under the LBCS-Global EFET Agreement, Citi Global was required to pay LBCS for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Gains and Losses under the LBCS-Global EFET Agreement would have resulted in a net payment to LBCS in the amount of $57,287.  Instead, Citi Global calculated a Settlement Amount under the LBCS-Global EFET Agreement resulting in a net claim by Citi Global in the amount of $716,281.

386.    As a direct and proximate result of Citi Global's breach of the LBCS-Global EFET Agreement, LBCS has been deprived of $773,568.

## COUNT XXXI

### (Objection to Claim Under LBSF-Swapco Agreement)

387.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

388.    The LBSF-Swapco Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Swapco wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Swapco Agreement using commercially reasonable procedures.

389.    The LBSF-Swapco Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-Swapco Claim, or any other claims filed by Citi Swapco, on any other basis.

## COUNT XXXII

### (Breach of LBSF-Swapco Agreement)

390.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

391.    Citi Swapco breached the LBSF-Swapco Agreement by calculating the Close-out Amount under the LBSF-Swapco Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

392.    Under the LBSF-Swapco Agreement, Citi Swapco was required to pay LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable

calculation of the Close-out Amount under the LBSF-Swapco Agreement would have resulted in a net payment to LBSF in the amount of $1,828,824. Instead, Citi Swapco calculated a Close-out Amount under the LBSF-Swapco Agreement resulting in a net claim by Citi Swapco in the amount of $991,772.

393.    As a direct and proximate result of Citi Swapco's breach of the LBSF-Swapco Agreement, LBSF has been deprived of $2,820,596.

## COUNT XXXIII

### (Objection to Claim Against LBCC for Purported Fees and Charges Under CLS Agreement)

394.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

395.    In its proof of claim number 67734, *i.e.*, the LBCC-Citibank Claim, Citibank claims a right to approximately $1.3 million in fees and charges purportedly arising under the parties' CLS Agreement (the "LBCC CLS Claim").

396.    The parties' CLS Agreement does not provide or allow for the fees and charges claimed by Citibank against LBCC. The LBCC CLS Claim should be disallowed and expunged, or in the alternative, reduced.

397.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XXXIV

### (Objection to Claim Against LBSF for Purported Fees and Charges Under CLS Agreement)

398.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

399.    In its proof of claim number 67733, *i.e.*, the LBSF-Citibank Claim, Citibank claims a right to approximately $700,000 in fees and charges purportedly arising under the parties' CLS Agreement (the "LBSF CLS Claim").

400.    The parties' CLS Agreement does not provide or allow for the fees and charges claimed by Citibank against LBSF.  The LBSF CLS Claim should be disallowed and expunged, or in the alternative, reduced.

401.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XXXV

**(Breach of Agreement by Citibank With Respect to $9.8 Million Owed to LBSF)**

402.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

403.    On September 15, 2008, Citibank, purportedly acting as LBSF's CLS agent, transferred $9.8 million out of LBSF's CLS account without authorization from LBSF and without any other legitimate basis.  Upon information and belief, Citibank subsequently transferred that $9.8 million to its affiliate, Citi Global.

404.    Citi Global has claimed in its response to the Court-ordered Derivative Questionnaire that Citi Global owes a "cash break" to LBSF of $9.8 million, with identification number C61F00856, under the LBSF-Global Agreement.  In fact, that amount is owed by Citibank to LBSF pursuant to the parties' CLS Agreement and/or related agreements.  As a result of Citibank's unauthorized transfer of those funds, in its purported role as CLS agent, Citibank owes the $9.8 million to LBSF.

405.    As a result of the foregoing breach of the CLS Agreement and/or related agreements by Citibank, LBSF has been harmed in an amount not less than $9.8 million.

## COUNT XXXVI

### (Conversion With Respect to $9.8 Million Owed to LBSF)

406.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

407.    For all of the reasons discussed above, Citibank had no right to transfer $9.8 million from LBSF's account.

408.    As a result of the foregoing, LBSF is entitled to damages to compensate its creditors for Citibank's unauthorized transfer of $9.8 million from LBSF's account.

## COUNT XXXVII

### (Turnover With Respect to $9.8 Million Owed to LBSF)

409.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

410.    As discussed above, Citibank retained possession, custody and/or control of $9.8 million of LBSF's funds, which is of substantial value and benefit to LBSF's estate and which is property belonging to LBSF that may be used, sold or leased by LBSF.  For the reasons set forth above, Citibank is not entitled to set off amounts it claims LBSF owes to it against LBSF's $9.8 million.  Nor does Citibank have any right to otherwise withhold the $9.8 million.

411.    Citibank should be ordered to turn over $9.8 million to LBSF immediately for the benefit of LBSF's unsecured creditors, plus interest, pursuant to Section 542 of the Bankruptcy Code.

## COUNT XXXVIII

### (In the Alternative, Breach of the LBSF-Global Agreement)

412.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

413.    In the alternative, as a result of the above-described conduct, Citi Global has breached the LBSF-Global Agreement through its failure to pay LBSF the $9.8 million that was wrongfully transferred by Citibank to Citi Global.  LBSF has thereby been damaged by Citi Global in an amount not less than $9.8 million.

## COUNT XXXIX

### (Equitable Subordination)

414.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

415.    The equities in this case dictate that the amounts Lehman allegedly owes to Citi pursuant to the LBSF-Canyon Claim, LBSF-Citibank Claim, LBSF-Financial Claim, LBSF-Global Claim, LBCC-Citibank Claim, LBCS-Energy Claim, LBCS-Global ISDA Claim, LBCS-Global EFET Claim, and LBSF-Swapco Claim (collectively, the "Citi Derivatives Claims") should be subordinated to the claims of all of Lehman's other creditors under 11 U.S.C. § 510(c).  Such equitable subordination is necessary because Citi's inequitable conduct provided Citi with an unfair advantage and resulted in an injury to Lehman's other creditors.

416.    Citi engaged in inequitable conduct, including: opportunistically calculating some of the Citi Derivatives Claims as of dates other than the Early Termination Date under the relevant Master Agreements; including amounts in the Citi Derivatives Claims for Hypothetical Charges that are penalties and do not correspond to any actual losses incurred by Citi; and calculating many of the Citi Derivatives Claims without employing market standard procedures of portfolio aggregation.  This inequitable conduct inflated the Citi Derivatives Claims, thus harming Lehman's other creditors.

417.    Equitable subordination of the Citi Derivatives Claims is consistent with the Bankruptcy Code.

418.    Accordingly, the Citi Derivatives Claims should be equitably subordinated to the claims of all other creditors pursuant to section 510(c) of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment:

a. Awarding LBHI damages against Citibank in an amount not less than $2.5 billion, or in the alternative, ordering Citibank to return the $2.5 billion of LBHI funds to the estate;

b. Avoiding the September Amendment as a fraudulent obligation;

c. Disallowing and/or reducing Citibank's claims against LBHI to the extent they assert rights against the $2 billion, are based on the September Amendment, are based on any of the Master Agreement claims objected to herein, seek the payment of the millions of dollars of fees allegedly incurred by the Lehman entities under the CLS Agreement, or seek payment of post-petition interest;

d. Awarding LBCC millions of dollars in damages against Citibank based on Citibank's wrongful withholding of LBCC's approximately $166 million, and awarding further damages based on Citibank's continued wrongful withholding of $38.5 million owed to LBCC;

e. Disallowing the claims of Citibank against LBHI and/or LBCC unless and until Citibank has turned over to LBHI and/or LBCC, respectively, the value of any property recoverable under sections 542 or 550 of the Bankruptcy Code;

f. Sustaining the Plaintiffs' objections to the LBSF-Canyon Claim, the LBSF-Citibank Claim, the LBSF-Financial Claim, the LBSF-Global Claim, the LBCC-Citibank Claim, the LBCS-Energy Claim, the LBCS-Global ISDA Claim, the LBCS-Global EFET Claim, and the LBSF-Swapco Claim, and reducing or disallowing and expunging such claims as set forth herein;

g. Determining that Citi has breached the LBSF-Canyon Agreement, the LBSF-Citibank Agreement, the LBSF-Financial Agreement, the LBCC-Citibank Agreement, the LBCS-Energy Agreement, the LBCS-Global EFET Agreement, and the LBSF-Swapco Agreement and owe the Lehman Subsidiaries damages in the amounts set forth herein;

h. Sustaining the Plaintiffs' objections to the LBCC CLS Claim and the LBSF CLS Claim, and reducing or disallowing and expunging such claims as set forth herein;

i. Awarding LBSF damages in an amount not less than $9.8 million as a result of Citibank's breach of the CLS Agreement;

-125-

j.   Equitably subordinating the Citi Derivatives Claims to the claims of all
other creditors pursuant to section 510(c) of the Bankruptcy Code;

k.   Awarding statutory interest, as well as costs and disbursements of this
action and attorneys' fees; and

l.   Awarding such other relief as this Court deems just and proper.

*[Remainder of Page Intentionally Left Blank.]*

Dated:  January 29, 2014
New York, New York

Respectfully submitted,


**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
By: */s/ Turner P. Smith*_____
Turner P. Smith
L.P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178
(212) 696-6000

*Counsel for Plaintiffs*


**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
By: */s/ Andrew J. Rossman*_____
Daniel P. Cunningham
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Benjamin Odell
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

*Special Counsel for Intervenor-Plaintiff,
Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc.*

-127-

17430698