**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York  10010 | TEL: (212) 849-7000  FAX: (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7282**

WRITER'S INTERNET ADDRESS
**andrewrossman@quinnemanuel.com**

February 21, 2014

<u>VIA ELECTRONIC CASE FILING</u>

Honorable Shelley C. Chapman
United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, New York 10006

Re:    ***Lehman Bros. Holdings Inc. et al. v. Citibank, N.A. et al.***
       ***(In re Lehman Bros. Holdings Inc.)***, No. 12-01044 (Bankr. S.D.N.Y.)

Dear Judge Chapman:

       We write on behalf of Lehman Brothers Holdings, Inc. and certain of its affiliates
(collectively, "Lehman") and the Official Committee of Unsecured Creditors (together with Lehman,
"Plaintiffs") pursuant to Local Rule 7007-1(b) and Your Honor's Chamber Rules to request an
informal conference with the Court to address discovery disputes between Plaintiffs and relevant
non-parties ICAP North America Inc. ("ICAP"), ICAP's affiliate TriOptima North America LLC
("TriOptima"), Bloomberg Finance L.P. ("Bloomberg") and KPMG LLP ("KPMG").[1]

       The instant adversary proceeding arises out of a dispute between Plaintiffs and Citibank,
N.A. and certain of its affiliates (collectively, "Citibank") regarding Citibank's close-out valuation of
more than 29,000 derivatives trades following Lehman's chapter 11 filing on September 15, 2008.
Specifically, the Second Amended Complaint, filed on January 29, 2014, alleges, among other

---

       [1]   Because these discovery disputes generally relate to common issues of law and fact,
and for purposes of judicial efficiency, Plaintiffs respectfully request that this Court set a single
discovery conference at which time Plaintiffs will address each specific discovery dispute with
each respective party.  To provide this Court additional background, appendices are attached
hereto describing in detail the nature of each dispute.  *See*  Appendix A – ICAP and TriOptima;
Appendix B – Bloomberg; and Appendix C – KPMG.

---

Hon. Shelley C. Chapman
Page 2

things, that Citibank systematically and opportunistically inflated the value of its claims against the Lehman estates by more than $2.1 billion by claiming phantom losses, including various "add-on" charges that it did not incur, making other "adjustments" that deviated from the actual mark-to-market value of their positions and ignoring the offsetting nature of trades in the portfolio. In particular, Lehman alleges that such valuations violated the plain language of the governing ISDA Master Agreements, which explicitly required that Citibank close out and value the trades in a commercially reasonable manner and achieve commercially reasonable results.

To establish the commercial unreasonableness of Citibank's claims, Plaintiffs have sought document discovery from both Citibank and third parties to demonstrate how major derivatives dealers valued trades, similar to those at issue here, both prior to and after Lehman's bankruptcy filing. Given the nature of these issues, as well as the amount at stake in this litigation, Lehman has served more than thirty subpoenas *duces tecum* on dealers, brokers, prominent derivatives market participants, clearinghouses, market data providers, and other non-parties that uniquely possess documents or information relevant to assessing the reasonableness of the values Citibank assigned to its trades. While the majority of these subpoena recipients have produced documents in response to Lehman's discovery requests, ICAP, TriOptima, and Bloomberg have categorically refused to comply.

As explained in Appendices A and B, **ICAP**, **TriOptima** and **Bloomberg** are leading providers of market data in their respective areas and each possesses specific information needed to demonstrate how the derivatives marketplace functioned in and around the time of Lehman's bankruptcy filing. None of these third parties denies that it maintains information relevant to matters at issue in this litigation. Instead, they rely on unsubstantiated boilerplate assertions regarding relevance and burden in an attempt to excuse their noncompliance. These objections are utterly without merit. As a result, Plaintiffs are forced to seek an order compelling them to produce materials responsive to Plaintiffs' document requests.

As explained in Appendix C, **KPMG**, Citibank's outside auditor, possesses documents relevant to demonstrating how Citibank closed out and valued derivative trades following Lehman's bankruptcy filing. Although KPMG has produced some documents in response to Plaintiffs' requests, many of those documents have been redacted to remove what often appears to be the most relevant passages based on purported assertions of the work product doctrine. At the direction of Citibank, KPMG has redacted material that appears to fall outside of the protections of the work product doctrine, including material that would have been created by Citibank and/or KPMG in the ordinary course of business and that therefore was not created in anticipation of litigation. It was Citibank and KPMG's burden to establish a basis for application of the work product doctrine to these documents. They have failed to do so, and accordingly Plaintiffs will seek an order compelling production of these documents in unredacted form, or at a minimum, will request *in camera* review of the relevant documents and a judicial determination of whether the work product doctrine applies.

The parties have been unable to reach meaningful resolutions with respect to these disputes. With the deadline for the substantial completion of document discovery having past, Plaintiffs must seek this Court's assistance to obtain these discovery materials.

Hon. Shelley C. Chapman
Page 3

      For these reasons, and for the reasons set forth in Appendices A through C attached hereto, Plaintiffs respectfully request a conference before the Court.

Respectfully submitted,

Andrew J. Rossman

cc:  Counsel of Record and Counsel to each of the Responding Parties

**Appendix A**

This appendix summarizes the Plaintiffs' discovery dispute with third party ICAP North America Inc. ("ICAP") and its affiliate, TriOptima North America LLC ("TriOptima").

Plaintiffs' Requests to ICAP

The discovery sought from ICAP relates directly to Plaintiffs' allegations that Defendants Citibank, N.A. and certain of its affiliates ("Citibank") systematically inflated its close-out values by charging various "add-ons" that Citibank contends it would have had to (but did not in fact) pay to replace each of the derivatives trades that terminated upon the Chapter 11 filing of Lehman Brothers Holdings Inc. and certain of its affiliates (collectively "Lehman"). Chief among these add-on charges is a charge ostensibly representing the bid/offer spread that Citibank claims it would have had to pay to replace each trade in the inter-dealer market. As one means of demonstrating the commercial unreasonableness of these add-ons, Lehman intends to show that major derivatives dealers consistently traded with one another in the over-the-counter market at negotiated prices that were at or near the mid-market price of the subject instrument, in contrast to the inflated bid/offer spread that Citibank has incorporated. Citibank has disputed this position, contending that the bid/offer spread in the inter-dealer market was in fact wider or greater than in the overall market.

As a leading derivatives broker representing nearly a quarter of the entire market in over-the-counter derivatives brokering at the time of the Lehman Bankruptcy, ICAP is undisputedly in possession of documents reflecting the actual prices that derivatives dealers bid, offered, and transacted. Lehman has separately obtained data regarding the price at which interest rate and credit derivatives contracts were transacted on a daily basis between June and December 2008. By comparing these *executed* trade prices to the initial price at which a dealer *bid* or *offered* to enter into a derivatives contract, Lehman will show that, as a matter of course, derivatives dealers negotiated between themselves to narrow the bid/offer spread substantially such that the actual bid and offer prices at which dealers transacted approached the mid-market price. Additionally, Lehman separately seeks data regarding the price at which dealers bid or offered to enter into derivatives contracts with non-dealer customers; by comparing quotations from the inter-dealer market with quotations from the dealer-customer market, Lehman will show that, as a matter of course, bid/offer spreads for derivatives contracts were narrower in the inter-dealer market than in the dealer-customer market.

ICAP has not denied that it possesses relevant, responsive information. Yet ICAP has refused to produce even a single responsive document, primarily on the ground that it sells bid and offer data through a third-party market data provider. But as ICAP itself has acknowledged, the data it sells does not represent the *actual* bids and offers that it received from its dealer clients; instead, the data it sells constitutes the value at which ICAP itself marketed its clients' bids and offers to other derivatives market participants.

There is accordingly no dispute that ICAP possesses information that directly bears on the claims at issue in the instant litigation—thereby satisfying the liberal standard for discovery under the Federal Rules—and that cannot be obtained from ICAP's proposed alternative source. ICAP's boilerplate and unsubstantiated burden objections are refuted by the production of

comparable volumes of market data by other subpoena recipients.  Plaintiffs therefore seek an order compelling ICAP to produce documents responsive to subpoena Request 1 for documents sufficient to show all quotations transmitted to ICAP; subpoena Request 3 for any summaries or reports regarding quotations transmitted to ICAP; and subpoena Request 5 for documents sufficient to describe the process by which ICAP obtained such quotations, for the period June 1 to December 31, 2008.

Plaintiffs' Requests to TriOptima

The discovery sought from TriOptima also relates directly to the allegations in Plaintiffs' Amended Complaint and Claims Objection—namely that Citibank acted unreasonably and in violation of the governing ISDA Master Agreements by failing to net offsetting positions in its derivatives portfolio, instead inflating its claim by assigning individual close-out values to the vast majority of its Lehman trades that include add-ons for each trade that were not actually incurred and would never be incurred by a reasonable portfolio manager.  Lehman intends to show that major dealers, including Citibank, in the regular course of their business aggregated the positions in their derivatives portfolios to minimize hedging costs, minimize operational costs, and manage risk by netting offsetting (or nearly offsetting) trades.

The clearest example of such portfolio aggregation is the participation of major dealers (including Citibank) in portfolio compression runs performed by third-party service providers such as TriOptima.  During such runs, dealers submit a catalog of their portfolio of a given derivative product type to the third-party provider, together with risk tolerance parameters identifying the degree of incremental risk that a participant is willing to assume in order to achieve a compressed portfolio.  The third-party provider then compares the submitted portfolios, identifies offsetting or nearly-offsetting positions between and among the submitting entities, and then identifies the bilateral and multilateral transactions that the participants would need to execute between and among themselves to obtain a risk-neutral (or nearly risk-neutral) contraction of their respective portfolios.  By presenting evidence of widespread participation in such portfolio compression runs, including evidence that major dealers routinely agreed to compress trades, Plaintiffs intend to show that a standard of commercial reasonableness required Citibank to close out its Lehman derivatives portfolio on a portfolio rather than a trade-by-trade basis—and that Citibank could have done so.

TriOptima was the primary (and nearly exclusive) provider of trade compression services at and around the time of the Lehman bankruptcy; in 2008, according to company statistics, it compressed $14.8 trillion (notional) in interest rate derivatives and more than $30 trillion (notional) in credit derivatives.  TriOptima therefore possesses contemporaneous evidence of dealer participation in portfolio compression runs, including the risk tolerances dealers were willing to assume to achieve compressions.  TriOptima has nevertheless refused to produce even a single document in response to Plaintiffs' subpoena, arguing that Plaintiffs have not adequately demonstrated the relevance of the requested material and baldly asserting that the requested materials are in the possession, custody or control of an overseas affiliate, but declining to meet and confer or otherwise provide any evidence or support for such objections.  For the reasons given, the requested materials easily meet the liberal standard for relevance under the Federal Rules, and publicly available information suggests that TriOptima has the legal right and practical ability to obtain the materials from its overseas affiliate (assuming TriOptima's claim as

to the location of the materials is accurate). *See Matter of Marc Rich & Co., A.G.*, 707 F.2d 663, 667 (2d Cir. 1983) ("If the party subpoenaed has the practical ability to obtain the documents, the actual physical location of the documents—even if overseas—is immaterial."). TriOptima's refusal to produce any documents in response to Plaintiffs' subpoena is therefore wholly unjustified, and Plaintiffs seek an order compelling TriOptima to produce documents responsive to subpoena Request 5 for the materials submitted to TriOptima by market participants, including both trade portfolios and risk tolerances, to allow TriOptima to perform compression runs; subpoena Request 6 for materials showing the results of compression runs in the form of unwound or compressed portfolios; and subpoena Request 7 for documents sufficient to describe TriOptima's process of portfolio compression.

For the foregoing reasons, Plaintiffs respectfully request a conference before the Court and, if necessary, permission to file a motion to compel ICAP and TriOptima to produce documents responsive to Plaintiffs' subpoenas.

**Appendix B**

This appendix summarizes the Plaintiffs' discovery dispute with third party Bloomberg Finance, LP ("Bloomberg").

The requested materials relate directly to Plaintiffs' allegations that Defendant Citibank, N.A. and certain of its affiliates ("Citibank") systematically inflated its close-out values by charging various "add-ons" that Citibank contends it would have had to (but did not in fact) pay to replace each of the derivatives trades that terminated upon the Chapter 11 filing of Lehman Brothers Holdings Inc. and certain of its affiliates (collectively, "Lehman"). Chief among these add-on charges is a charge ostensibly representing the bid/offer spread that Citibank claims it would have had to pay to replace each trade in the inter-dealer market. To demonstrate the commercial unreasonableness of these add-ons, Lehman intends to show that major derivatives dealers consistently traded with one another in the over-the-counter ("OTC") market at negotiated prices that were at or near the mid-market price of the subject instrument, in contrast to the inflated bid/offer spread that Citibank has incorporated. Citibank has disputed this position and contends that bid/offer spreads are wider in the inter-dealer market than in the dealer-customer market.

To this end, Plaintiffs requested documents from Bloomberg reflecting bid and offer prices quoted by dealers to customers for OTC derivatives that were published by Bloomberg between June and December 2008. During that period, Bloomberg regularly published OTC derivatives quotations via a number of "screens" that were accessible on Bloomberg terminals, including the ALL-Q, BGN, Composite Data, and BVAL screens referenced in the subpoena. The subpoena to Bloomberg requested this quotation information for the financial instruments in the portfolio of OTC derivatives positions between Lehman and Citibank. To facilitate Bloomberg's production, Plaintiffs provided Bloomberg with a complete list of these instruments.

As a leading provider of financial market data and host of an industry-leading electronic trading platform, Bloomberg is undisputedly in possession of the prices at which dealers bid and offered for derivatives positions. Lehman separately seeks data regarding the price at which interest rate and credit derivatives contracts were quoted between dealers on a daily basis between June and December 2008. By comparing these quotations to the price at which a dealer bid or offered to enter into a derivatives contract with its customers, Lehman will show that, as a matter of course, bid/offer spreads for derivatives contracts were narrower in the inter-dealer market than in the dealer-customer market.

Bloomberg has not denied that it possesses relevant, responsive information. Yet Bloomberg has failed to produce even a single document, continuously delaying production through a prolonged meet and confer process that has never resulted in production. Although Plaintiffs have consistently offered to work with Bloomberg to alleviate any burden caused by the request, Bloomberg has neither articulated facts supporting a showing of burden, undue or otherwise, nor has it offered any reasonable narrowing of the requested categories.

Bloomberg possesses information that directly bears on the claims at issue in the instant litigation—thereby satisfying the liberal standard for discovery under the Federal Rules. And

Bloomberg's boilerplate burden objection is refuted by the production of comparable volumes of market data by other subpoena recipients.  Plaintiffs therefore seek an order compelling Bloomberg to produce documents responsive to subpoena requests 1 - 9, 12, and 13, which seek price quotations on derivative instruments contained in the portfolio of positions between Lehman and Citibank that were published by Bloomberg via its ALL-Q, BGN, Composite Data, and BVAL screens between June and December 2008 inclusive.

## Appendix C

This appendix summarizes the Plaintiffs' discovery dispute with third party KPMG LLP ("KPMG") and Defendants Citibank, N.A. and certain affiliates ("Citibank") related to a subpoena served on KPMG..

As Citibank's outside auditors, KPMG possesses information relevant to various aspects of the parties' dispute, including Citibank's valuation of its portfolio of derivative trades with Lehman following the Chapter 11 filing of Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliates (collectively, "Lehman"), Citibank's proofs of claim with respect to the Lehman bankruptcy, LBHI's deposit of $2 billion at Citibank in June 2008, and LBHI's transfer of $500 million to a Lehman Brothers Inc. ("LBI") account at Citibank in September 2008.  Plaintiffs therefore served KPMG with a subpoena seeking relevant documents and information in April, 2013.

KPMG produced certain materials responsive to the subpoena.  Upon reviewing KPMG's production, however, Plaintiffs discovered extensive redactions based on assertions of the work product doctrine, all of which were made with the input and at the direction of Citibank. Although, one week before the deadline for substantial completion of document discovery, KPMG and Citibank produced a supplemental production that rolled back many of the original redactions, and revised the privilege log to provide greater detail, KPMG and Citibank continue to make excessively broad assertions of the work product doctrine that appear indefensible.

The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3) (as applicable here via Federal Rule of Bankruptcy Procedure 7026), provides a qualified protection from disclosure of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."  The doctrine "preserve[s] a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,'" *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998), and "is intended to prevent a litigant from taking a free ride on the research and thinking of his opponent's lawyer and to avoid the resulting deterrent to a lawyer's committing his thoughts to paper," *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999).

To that end, materials are "deemed prepared 'in anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'"  *Adlman*, 134 F.3d at 1202 (quoting Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, 8 Fed. Prac. & Proc. § 2024 (1994)).  Critically, however, "[i]t is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated."  *United States v. Textron Inc.*, 577 F.3d 21, 29 (1st Cir. 2009) (en banc).  "Nor is it enough that the materials were prepared by lawyers or represent legal thinking," for "[e]ven if prepared by lawyers and reflecting legal thinking, '[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by'" the doctrine.  *Id.* at 29-30 (quoting Fed. R. Civ. P. 26 advisory committee note).  "Even if such documents might also help in preparation for litigation, they do not qualify for protection

because it could not fairly be said that they were created 'because of' actual or impending litigation." *Adlman*, 134 F.3d at 1202.

Here, KPMG has redacted or withheld, based on a "work product" objection, 185 documents based on what it and Citibank describe as discussion of the LBHI Bankruptcy, the likelihood of recovery on Citibank's claims against the LBHI estate, and/or litigation reserves set at the direction of counsel. Thus, the documents—all of which appear to have been prepared by KPMG, not Citibank or its counsel—relate directly to matters of central importance in this adversary proceeding, including most notably the specific actions that Citibank took following the Lehman bankruptcy on September 15, 2008 to, as they put it, "adjust" a mark-to-market exposure of $125 million on September 12, 2008 to a revised exposure amount of more than $2 billion as of the termination date of the trades on September 15.

Many of the redacted documents describe in precise detail the "adjustments" that Citibank made to its derivatives close-out valuations. For instance, KPMG and Citibank have redacted various versions of quarterly and final sign-off memoranda describing KPMG's auditing of Citibank's Institutional Client Group for the final quarters of 2008 and for the 2008 fiscal year. These memoranda include a detailed description of the steps that Citibank took, both before and after September 15, 2008, to identify its derivatives-related exposure to Lehman and to close out and value the tens of thousands of derivatives in its Lehman portfolio. Similarly, KPMG and Citibank have redacted portions of an internal KPMG e-mail describing the "adjustments" made to the September 12 mark-to-market values that resulted in its termination claim values, and providing instructions to KPMG personnel in auditing those adjustments. At Citibank's direction, KPMG has redacted the balance of a paragraph in this e-mail beginning "We have been advised by product control in NY that local product controllers should be familiar with each component of the adjustments recorded on each desk to record the overall claim amount as of the termination date," and has redacted the fourth bullet in a bulleted list of "review procedures" that auditors were instructed to perform.

Nothing on the face of these documents suggests that they (or their redacted portions) were created "*because of*" actual or impending litigation, such as Citibank's claims against the LBHI estate. *Adlman*, 134 F.3d at 1202. To the contrary, the context and content of the documents makes clear that they were "prepared to support financial filings and gain auditor approval" for those filings. *Textron*, 577 F.3d at 31-32 (denying work product protection to documents "calculat[ing] reserves to be entered on the company books to account for contingent tax liability").

KPMG and Citibank have nevertheless taken the position that these materials are subject to the work product doctrine because they describe the advice of counsel regarding Citibank's claims in bankruptcy as well as actions taken by Citibank or KPMG that *reflected or related to* such advice.[1]  Even if that were so—which, as set forth above, is certainly not obvious from the

---

[1]  KPMG and Citibank have not asserted the attorney-client privilege here, nor could they. "[N]o confidential accountant-client privilege exists under federal law," *Couch v. United States*, 409 U.S. 322, 335 (1973), and it is well established that disclosure to an accountant or auditor generally waives attorney-client privilege, *United States v. Adlman*, 68 F.3d 1495, 1499 (footnote continued)

face of the documents—it would not justify application of the work product doctrine because KPMG and Citibank cannot show that the materials were prepared "*because of*" the bankruptcy litigation. To the contrary, the materials at issue appear to have been created in the ordinary course of KPMG's audit of Citibank's financial activity in advance of its quarterly and annual filings. Work product protection simply does not attach to such materials, even if they address "subject matter [that] relates to a subject that might conceivably be litigated" or "reflect[] legal thinking." *Textron*, 577 F.3d at 29-30.

Plaintiffs therefore believe that KPMG, at Citibank's direction, has redacted or withheld materials that are not entitled to the work product protection, including materials that KPMG created in the ordinary course of its audit of Citibank or that would have been created in essentially the same form irrespective of Citibank's claims against the Lehman estate. *Adlman*, 134 F.3d at 1202-03.

In light of the immediate relevance of the redacted and withheld materials to the parties' dispute, and the existence of redactions that look improper on their face, Plaintiffs respectfully seek an order compelling KPMG and Citibank to produce material that has been improperly withheld on the basis of the work product doctrine or, in the alternative, *in camera* review of the withheld material, starting with a representative sample of approximately twenty redacted documents. For the foregoing reasons, Plaintiffs respectfully request a conference before the Court and, if necessary, permission to file a motion to compel seeking, *inter alia*, the relief described above.

---

(2d Cir. 1995) ("The privilege applies only to communications between lawyer and client; in general, communications between accountants and their clients enjoy no privilege."); *In re Honeywell Int'l, Inc.*, 230 F.R.D. 293, 298 (S.D.N.Y. 2003) (attorney-client privilege "does not extend to communications between a company and its accountants or auditors").