Brad S. Karp
Claudia L. Hammerman
Stephen J. Shimshak
Douglas R. Davis
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global Markets Ltd.,*
*Citigroup Financial Products Inc., Citigroup Energy Inc.,*
*Citi Canyon Ltd. and Citi Swapco Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                    Debtors. | Chapter 11<br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,<br><br>                    Plaintiffs and<br>                    Plaintiff Intervenor<br><br>          - against -<br><br>CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC., CITI CANYON LTD., CITI SWAPCO INC., FYI LTD., FFI FUND LTD., and OLIFANT FUND, LTC.,<br><br>                    Defendants. | Adversary Proceeding<br>No. 12-01044 (SCC)<br><br><br>**ANSWER TO SECOND AMENDED COMPLAINT AND RESPONSE TO CLAIMS OBJECTION** |

Defendants Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd.

("CGML"), Citigroup Financial Products Inc. ("CFPI"), Citigroup Energy Inc. ("Citi Energy"),

Citi Canyon Ltd. ("Citi Canyon"), and Citi Swapco Inc. ("Citi Swapco," and together with

Citibank, CGML, CFPI and Citi Energy, "Citi"), by their attorneys Paul, Weiss, Rifkind,

Wharton & Garrison LLP, hereby answer the Second Amended Complaint and Claims Objection

(the "SAC") of plaintiffs Lehman Brothers Holdings Inc. ("LBHI," and together with its

subsidiaries and affiliates, "Lehman"), Lehman Brothers Special Financing Inc. ("LBSF"),

Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corp.

("LBCC"), and the Official Committee of Unsecured Creditors of LBHI, and state as follows:

## INTRODUCTION

Filed more than a year after the First Amended Complaint and mere days before

the deadline for "substantial completion" of document discovery, plaintiffs' Second Amended

Complaint makes exceedingly modest changes.  Despite the vast amount of additional discovery,

plaintiffs fail to address any of the fatal deficiencies in their central claims against Citi, which

deficiencies have been explained – repeatedly, in detail, and with citation to contemporaneous

documents – in the Answers that Citi has filed to plaintiffs' original Complaint and First

Amended Complaint.

The centerpiece of the original Complaint was LBHI's attempt to recover from

Citibank (i) a $2 billion deposit LBHI made on June 12, 2008, and (ii) a $500 million transfer

LBHI made to Lehman Brothers, Inc. ("LBI") on September 14, 2008.  As pointed out in Citi's

Answer, Anton R. Valukas, the Lehman Examiner, exhaustively investigated both transactions

(reviewing millions of pages of documents and interviewing scores of witnesses) and specifically

concluded that LBHI had no colorable claim with respect to either transaction.  Citi's Answer

quoted at length from the documents supporting the Examiner's conclusions on these two points

– many of which come from LBHI's own files and are publicly available (hyperlinked to the

citations in his Report), yet were completely ignored in the Complaint.  Neither the First

Amended Complaint nor the Second Amended Complaint contain a single additional allegation

with respect to the $2 billion deposit or the $500 million transfer and both simply ignore the

contemporaneous documents that fatally undermine their claims.

        The original Complaint also purported to object to Citi's $1.9 billion of

derivatives claims, asserting that these were overstated "by over $1 billion."  Without receiving

any additional information with respect to these claims, plaintiffs filed a First Amended

Complaint in which they "doubled down" – quite literally – on their claim objection, perhaps

because Citi's Answer had made clear that plaintiffs had no hope of prevailing on their claims

with respect to the $2 billion deposit or $500 million transfer.  The First Amended Complaint

alleged that Citi's derivatives claims were overstated by more than $2 billion, such that Citi in

fact owed Lehman over $200 million for the terminated trades.  While plaintiffs' original

contention of more than 50% inflation by Citi was not remotely credible, the revised contention

of more than 100% inflation was simply absurd.  As demonstrated (in considerable detail) in

defendants' Answer to the First Amended Complaint, the only way plaintiffs can meaningfully

reduce Citi's derivatives claims is by advancing unprecedented – indeed, outlandish – arguments

directly contradicted by the industry-standard liquidated damages provisions in the parties' ISDA

agreements, publicly available derivatives market data, longstanding industry practice, and

established law.  The Second Amended Complaint addresses none of these deficiencies but

simply repeats – wholesale and without a single edit – the baseless arguments in the First

2

Amended Complaint.  If anything, these unedited derivatives allegations – presumably, plaintiffs' "best shot" at impugning Citi's derivatives claims – confirm that Citi calculated its derivatives claims in good faith, in a commercially reasonable manner, and consistent with the governing contracts and applicable law.

The original Complaint also sought to avoid an amendment to a guaranty LBHI executed on September 9, 2008 (the "September Amendment").  Citi's Answer showed that this claim, too, lacks merit.  The September Amendment was executed to induce Citibank to continue extending billions of dollars of credit to clear foreign exchange and other transactions for LBI and other newly-guaranteed subsidiaries, and thus is insulated from avoidance by the safe harbors and, in any event, supported by reasonably equivalent value.  Plaintiffs' First and Second Amended Complaints do not offer a single additional allegation in support of this claim.  In all events, given Citibank's extensive and successful efforts to recover from LBI (the primary obligor) and others, the benefit to plaintiffs from avoiding the September Amendment is not appreciable.

Finally, the original Complaint (and First Amended Complaint) sought to collect a $200 million obligation allegedly due to LBCC.  Citi's Answer admitted owing approximately $198 million (subject to available setoffs) with respect to LBCC trades, but explained (as plaintiffs well knew) that because LBI may have a competing claim to these funds, Citi required consent from LBI before it could pay the amount to LBCC (to avoid the risk of having to pay the debt twice) as well as plaintiffs' general agreement to Citi's calculation of amounts due.  After Citi concluded a global settlement with LBI in which LBI released any claim to these funds, the parties were able to reach agreement, in May 2013, resolving the majority of these issues.  Under the agreement, Citi paid LBCC $167 million and the parties reserved their rights with respect to

Citi's claimed setoff rights as well as certain minor aspects of Citi's calculations. Virtually all of the substantive changes in the Second Amended Complaint relate to this agreement and the much-narrowed areas that remain in dispute.

**$2 Billion Deposit:** The Second Amended Complaint (like the original and First Amended Complaint) alleges that the $2 billion deposit was created as a "segregated," "special purpose account" solely for clearing exposure; thus, LBHI contends, Citibank cannot use the LBHI deposit to set off against non-clearing exposures, such as the derivatives and loan claims Citibank has filed in the LBHI bankruptcy, but must instead return the deposit to LBHI. In point of fact, the $2 billion deposit has none of the hallmarks of a "special account." LBHI deposited the $2 billion in an overnight call account with Citibank. That account paid interest at Citibank's overnight rate (Fed Funds target minus $1/8$), and the deposit was commingled with other Citibank funds. LBHI's own documents (cited in the Examiner's Report) confirm that LBHI considered the deposit to be a "$2B term deposit, callable daily."[1] The Examiner, who was specifically charged with investigating the $2 billion deposit, never even discussed the possibility that the $2 billion deposit could be a "special account," even though the "special account" issue was being actively litigated in the Bank of America adversary proceeding at the time. To the contrary, the Examiner's Report specifically contemplates that Citibank will set off its allowed derivative, loan and other LBHI claims against the $2 billion deposit. (Report at 1826–27.) The $2 billion deposit is indisputably a general deposit, available to Citibank to offset against general obligations owed to it by LBHI, including Citibank's derivatives and loan claims.

---

[1] *See* Report of Anton R. Valukas, Examiner, dated March 11, 2010 ("Report") at 1238 n.4616 (quoting LBEX-AM 008660).

Not content to allege, without support, that the $2 billion is a "special purpose account," the Second Amended Complaint (like the First Amended Complaint and the original Complaint) further alleges that Citibank specifically agreed, during a conversation with LBHI on June 12, 2008, to waive its setoff rights in the account. According to the Second Amended Complaint, "Citibank agreed to waive any right it may have had to apply the $2 billion, or any portion thereof, to general obligations of LBHI." The Second Amended Complaint alleges that "LBHI's initial and continued reliance" on this waiver, in depositing and then not withdrawing the $2 billion over a three-month period, "was both reasonable and foreseeable to Citibank." But the Second Amended Complaint (like the First Amended Complaint and the original Complaint) fails to provide even the most basic information about this supposed multi-billion-dollar waiver. For example, the Second Amended Complaint nowhere identifies who at Citibank allegedly agreed to such a waiver or who at LBHI allegedly heard and relied upon it. Moreover, despite the fact that the parties have engaged in almost two years of document discovery, plaintiffs have neither produced nor pointed to a single document evidencing Citibank's alleged multibillion-dollar waiver of setoff rights.

The Examiner interviewed virtually everyone who participated in the conversations surrounding the $2 billion deposit; yet there is no mention in the Examiner's Report of Citibank's purported waiver of its setoff rights. Indeed, the Examiner found, and LBHI's own documents cited in the Report demonstrate, the precise opposite: "Citi officials informed Lehman that Citi believed it had a general right of offset against the $2 billion deposit." (Report at 1242.) For example, an internal Lehman "Call Report" notes that Citibank made this clear in a conversation with LBHI's Treasurer on August 7, 2008, when the parties were discussing alternatives to the $2 billion deposit: "Citi did point out that according to NY law,

5

Citi would have the right to offset deposits, but not securities which were not pledged." (*See* LBEX-DOCID 1035842, cited in Report at 1258 n.4722.)  Similarly, Emil Cornejo, an LBHI Treasury official and principal player in discussions surrounding the $2 billion deposit, describes the deposit as follows in an internal email:  "There is no agmt [agreement].  It is a callable deposit. . . .  Accdg [according] to ny law, citi has a right of offset." (*See* LBEX-DOCID 1078385, cited in Report at 1262 n.4742.)

In its answers to interrogatories propounded by Citi (but, again, not in its original, First Amended or Second Amended Complaint), LBHI has identified Paolo Tonucci and Ian Lowitt as the Lehman individuals it contends heard and relied on Citi's purported waiver.[2]  Both were interviewed by the Examiner and Tonucci has already testified under oath (in the Bank of America adversary proceeding) that he is not aware that Lehman ever requested a waiver of setoff rights when Lehman made this and other cash deposits with banks in 2008.[3]  For his part, Lowitt has already stated (in a recorded interview with Congress' Financial Crisis Inquiry Commission) that he does not recall being involved in discussions with Citi on June 12, 2008, about the $2 billion.[4]  As LBHI's own documents acknowledge and the testimony of its own witnesses make clear, LBHI's waiver claim is a contrivance.  Citibank never waived its setoff rights with respect to the $2 billion deposit and LBHI never relied (much less reasonably relied) on any purported waiver.

---

[2]    Lehman Pls.' Resps. and Objections to Defs.' First Set of Interrogs, Resp. 3.

[3]    Transcript of Evidentiary Hearing on Motions for Summary Judgment at 193:1–5, *Bank of Am., N.A.* v. *Lehman Bros. Special Fin. Inc.*, No. 08-13555-jmp (Bankr. S.D.N.Y. Feb. 1, 2010).

[4]    Interview by Fin. Crisis Inquiry Comm'n with Ian Lowitt (Aug. 25, 2010), *available at* http://cybercemetery.unt.edu/archive/fcic/20110310171826/http://fcic.gov/resource/interviews (last accessed February 13, 2013).

**$500 Million Transfer:**  The Second Amended Complaint (like the original and First Amended Complaint) seeks to recover, as constructively or intentionally fraudulent, a $500 million transfer LBHI made to LBI on September 14, 2008.  LBHI contends it can recover this amount from Citibank as a "subsequent transferee" under Section 550 of the Bankruptcy Code because Citibank set off $1 billion of LBI obligations against a $1 billion LBI deposit that supposedly contained the $500 million originally transferred from LBHI.  In fact, the transfer is not avoidable and, in all events, it cannot be recovered from Citibank.

The Examiner specifically investigated this transfer and concluded that it was safe harbored.  Although conveniently omitted from the Second Amended Complaint (as it was from the original and First Amended Complaint), LBHI documents cited in the Examiner's Report demonstrate that LBHI made the $500 million transfer so that LBI could fund its obligations in connection with settling foreign exchange trades through the Continuous Linked Settlement ("CLS") system.  (*See* LBEX DOCID 457630, cited in Report at 1282 n.4852.)  The Examiner therefore concluded that the $500 million transfer, if made on September 14 (the date alleged in the Amended Complaint), is safe harbored.  (Report at 1828.)  The Examiner never considered the question of intentional fraud, doubtless because there is no conceivable factual basis for such a claim; none is offered in the Second Amended Complaint, notwithstanding plaintiffs' obligation to plead intentional fraud with particularity and the extensive document discovery plaintiffs have undertaken for almost two years.  To the contrary, the contemporaneous documents make clear that LBHI made the $500 million transfer to preserve the value of its subsidiary in anticipation of an eventual sale for the benefit of creditors, not to defraud them.  In all events, the $500 million transfer cannot be recovered from Citibank.  Putting aside the fact that only a portion of the $500 million was actually used to fund the $1 billion deposit, Citibank

7

is not a "subsequent transferee" from which a fraudulent transfer can be recovered because a setoff is not a "transfer" under the Bankruptcy Code.

**Derivatives Objection:**  The Second Amended Complaint (like the First Amended Complaint) reflects plaintiffs decision to "double down" on its derivatives claim objection, alleging that Citi has overstated its $1.9 billion of derivatives claims by more than $2 billion, such that Citi actually owes Lehman over $200 million for the terminated trades.  In fact, Citi closed out its more than 30,000 derivatives trades (with a combined notional amount of $1.18 trillion) in good faith, in a commercially reasonable manner, and fully consistent with the governing contracts and applicable law; further, Citi's valuations are amply supported by available data.  The principal arguments plaintiffs make with respect to Citi's derivatives valuations (repeated verbatim in the Second Amended Complaint) are directly contrary to the governing contracts, longstanding industry practice, and applicable law.  These arguments fall into three main categories.

*First*, plaintiffs argue that unless Citi actually replaced a specific terminated trade at the time of the close-out, Citi can only recover the mid-market value – as opposed to the replacement value – of the terminated trades.  This limitation is precisely contrary to, and effectively rewrites, the terms of the parties' ISDA agreements.  Those agreements expressly provide that the non-defaulting party can claim the replacement cost of the terminated trades, whether or not replacement transactions were actually executed.[5]  Replacement cost is not only

---

[5]   The Close-out Amount method (which applies to most of the ISDAs) expressly provides that the non-defaulting party shall calculate "losses or costs. . . *that are or would be incurred under then prevailing circumstances . . . in replacing,* or in providing . . . the economic equivalent of . . . the material terms of that Terminated Transaction or group of Terminated Transactions . . . ."  2002 ISDA Master Agreement § 14 (emphasis added).  By contrast, the 2002 ISDA Master Agreement provides that only in rare circumstances – specifically, when a contract has been terminated due to force majeure or illegality – will the Close-out Amount be calculated as the mid-market value.  *See id.* § 6(e)(ii)(3).

what Citi is entitled to under the ISDA's liquidated damages provision; it also corresponds

directly to Citi's "actual damages" in that it reflects the amount Citi would have to pay to replace

what was lost as a result of Lehman's default and thus provide Citi with the benefit of its

bargain.  Replacement value necessarily includes cost components above mid-market –

specifically, bid/offer charges and liquidity premiums for large-sized trades – that a party would

have to pay in the market to enter into new trades.  While plaintiffs derisively label these

elements of Citi's derivatives claim as "Hypothetical Charges," these charges are very real; they

are charged by all dealers in the OTC derivatives markets to compensate for transaction costs

and risks and they are a critical component of any close-out valuation, whether or not a

replacement trade was actually executed.  Indeed, it would be commercially *unreasonable* to

require the non-defaulting party to actually replace all terminated trades at the time of close-out

as a condition to recovering benefit-of-the-bargain damages.  A non-defaulting party may be

unable to enter into replacement trades at close-out for any number of reasons, including the

sheer number and size of trades to be closed out, the illiquid nature of particular trades, or the

lack of funds to enter into costly replacements.  Further, a rule that required counterparties to

enter into replacement trades to recover benefit-of-the-bargain damages would be contrary to the

interests of all future debtors and their creditors.  In the face of such a rule, counterparties would

overrun the market, seeking to transact at almost any price.  The increased demand would,

without question, move the market and substantially *increase* the derivatives claims against the

defaulting party.  Had Citi gone to the market to replace all of its 30,000 derivatives trades, Citi's

derivatives claims would almost certainly be substantially higher than its claims today.

Consistent with the terms of the industry-standard agreement, longstanding industry practice, and

applicable law, Citi is properly claiming the replacement cost of its terminated trades, without regard to whether Citi actually executed replacements at the time of the close-out.

**Second**, plaintiffs contend that Citi inflated its derivatives claim by failing to net offsetting positions. In fact, Citi appropriately netted offsetting positions, thereby reducing its net derivatives claim by hundreds of millions of dollars. To the extent Citi overlooked any such offsetting positions in calculating the value of its more than 30,000 trades, Citi will correct the error. But plaintiffs are not really concerned with "offsetting" trades; instead, they argue that Citi should have netted entirely *dissimilar* trades on the theory that their prices moved in a correlated fashion. For example, plaintiffs argue that Citi should have netted credit default swaps referencing two different high-yield indices, on the theory that these indices track 72 common reference entities and the prices of the different indices tended to move in a correlated fashion. But 28 reference entities – or more than a quarter of the names – in each index are different and thus netting the two indices is not commercially reasonable because it would have left Citi with substantial uncompensated risk. Even more ludicrous, however, is plaintiffs' argument that Citi should have netted *all* of its credit default swaps referencing RMBS, on the theory that all RMBS are "based on pools of mortgages that had similar economic characteristics" – *i.e.*, subprime or Alt-A residential mortgages – and, according to plaintiffs, "the overall price movement between [Citi's] buys and sells" of protection on RMBS were "highly correlated." This argument is specious. Credit default swaps protect against the default of a particular reference entity. The fact that prices for credit default protection on different reference entities might move in a correlated fashion has no bearing whatsoever on whether a party would be left in a neutral risk position if it netted a sale of protection on one reference entity against a buy of protection on another. To pick an obvious example, the price of credit

10

protection on U.S. broker-dealers tended to move in a highly correlated fashion, as demonstrated

by the chart below, which graphs the price of credit protection for Lehman, Goldman Sachs,

Morgan Stanley, and Merrill Lynch from August 2005 through August 2008.



Yet, a party that, on September 1, 2008, netted a five-year buy of protection on Lehman against a

five-year sale of protection on Merrill Lynch, certainly would not have been left in a neutral risk

position.  Similarly, RMBS are in no way interchangeable – some reference stronger mortgage

pools, some have more excess collateral, and some have defaulted while others have not.

Correlated price movements do not mean that risks are offsetting.  Citi appropriately netted

offsetting risk, and it would not be commercially reasonable to require Citi, or counterparties

generally, to go further and accept significant uncompensated risk solely to benefit the defaulting

party.

> **Third**, plaintiffs complain that Citi improperly inflated its derivatives claims by

"opportunistically selecting highly favorable valuation dates and times."  Specifically, plaintiffs

complain that Citi valued most of its credit trades on September 16, 2008 – the day after the

termination date – allegedly in violation of the parties' contracts and bankruptcy law.  In fact, the

ISDA contracts did not require Citi to value all of its trades as of the termination date if it was not commercially reasonable to do so. The legislative history of Section 562 of the Bankruptcy Code also specifically acknowledges that a counterparty may not be able to value a large portfolio on a single day. Citi had 19,000 credit trades to close out and, to permit time for effective organization and coordination across businesses and desks, most were closed out on September 16, 2008. This was clearly commercially reasonable and, in all events, plaintiffs allege that the one-day delay "inflated" Citi's claim by $48 million – a relatively small amount in comparison to Citi's $1.9 billion of claims. Plaintiffs' other main "timing" complaint, ironically, concerns Citi's close-out of its generic U.S. dollar interest rate derivatives on September 15, 2008. While these interest rate trades were closed out on the termination date, plaintiffs are unhappy with the time of day Citi chose. Citi's close-out time was approximately 8:30 am, but plaintiffs argue Citi should have valued these trades as of "the typical end-of-day time of 3:00 pm," which, due to the exceptional volatility that day, would decrease Citi's claim by more than $100 million. But nothing in the ISDA agreements or bankruptcy law requires Citi to value its trades at the time of day most favorable to the defaulting party. Moreover, there is nothing "typical" about 3:00 pm when, under the Derivatives Settlement Framework that Lehman developed and used to settle the claims of its largest bank counterparties, interest rate trades are valued as of 11:00 am, not 3:00 pm. If Citi's interest rate trades had been valued at 11:00 am – rather than 8:30 am – Citi's claim would, in fact, *increase* by more than $14 million. Citi's various derivatives businesses organized the close-out process in good faith and in the way they considered commercially reasonable for the respective businesses, closing out the various trades as soon as reasonably practicable. Plaintiffs' complaints on this score, too, are meritless.

**September Amendment:** The Second Amended Complaint (like the original and First Amended Complaint) seeks to avoid the September Amendment as constructively and intentionally fraudulent. The Examiner concluded that there was a colorable claim to avoid the September Amendment as a constructive fraudulent transfer only if a court were to adopt both a narrow construction of the safe harbors and a narrow view of the direct and indirect benefits accruing to LBHI. But, a narrow construction of the safe harbors that would protect "transfers" but not "obligations" (which "obligations," of course, include derivatives contracts themselves) is not tenable as applied to the September Amendment.[6] Nor is a definition of "indirect benefit" that fails to credit the value LBHI obtained in securing time to attempt to negotiate a transformative transaction, such as the one almost achieved in this case. The Examiner, again, never even considered the question of intentional fraud and there is no conceivable factual basis to support it; none is offered in the Second Amended Complaint, notwithstanding plaintiffs' obligation to plead intentional fraud with particularity and the extensive document discovery plaintiffs have engaged in for almost two years. In all events, the benefit to the estate from avoiding the September Amendment would not be appreciable, given Citibank's successful efforts to recover from LBI (the primary obligor) and others.

**$200 Million Obligation:** The original and First Amended Complaint sought to recover a $200 million payable allegedly owed to LBCC with respect to CLS. The Second Amended

---

[6]   We recognize that this Court's decision in *LBHI* v. *JPMorgan Chase Bank, N.A. (In re LBHI)*, Adv. Proc. No. 10-03266 (Bankr. S.D.N.Y. Apr. 19, 2012), suggests that Section 546(e) of the Bankruptcy Code does not protect the incurrence of "obligations" to the same extent as "transfers." We respectfully submit that the safe harbor provisions of Section 546 apply to the September Amendment, either by directly insulating the September Amendment from avoidance, or indirectly by protecting the individual transactions to which the Amendment applied. Further, no matter how narrowly Sections 546 and 548(a)(1)(B) are construed, neither limits the applicability of the safe harbor in Section 560, which provides that Citibank's ability to exercise its contractual rights under the September Amendment to offset amounts it is owed in connection with swap agreements, "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title." 11 U.S.C. § 560 (2006).

Complaint, by contrast, has been updated to reflect the parties' May 2013 agreement resolving

most of the issues with respect to this payable as well as Citi's CLS-related calculations. Under

the parties' agreement, Citi paid LBCC $167 million with respect to CLS, Citi held back $32

million (the "LBCC holdback") to preserve its setoff rights against LBCC, and plaintiffs reserved

the right to contest Citi's setoff rights as well as certain minor aspects of Citi's CLS-related

calculations.[7] Ironically, the narrowing of the dispute has led to a proliferation of new counts in

the Second Amended Complaint addressing the limited issues reserved in the 2013 agreement.

As to those issues, Citi has a clear right to set off the remaining debt owed to LBCC against

LBCC debts owed to Citi; further, Citi's CLS-related calculations are appropriate.[8]

## SPECIFIC RESPONSES

      1.      Defendants deny the allegations in paragraph 1 of the SAC, except admit

that LBHI deposited approximately $2 billion in cash with Citibank on or about June 12, 2008,

and that defendants have filed claims totaling more than $2.2 billion against the Lehman estates.

Defendants further admit that Citibank takes the position that it has the right under New York

statutory and common law, applicable contractual provisions, the relevant safe harbor provisions

and Section 553 of the Bankruptcy Code, to set off the $2 billion LBHI deposit against general

obligations owing to it by LBHI.[9]

      2.      Defendants deny the allegations in paragraph 2 of the SAC, except admit

that defendants' derivatives claims total approximately $1.9 billion. Citi further states that it

---

[7]    Among other things, plaintiffs reserved the right to challenge approximately $6 million of Citi's calculation of amounts due to LBCC and approximately $10 million of Citi's calculation of amounts due from LBSF.

[8]    In the one new count unrelated to this agreement , plaintiffs object to Citibank's claim for post-petition interest against LBHI. Citibank, however, is an oversecured creditor and is therefore clearly entitled to post-petition interest from LBHI up to the value of its collateral.

[9]    In addition, defendants deny any and all averments in the headings of the SAC.

calculated its contractual damages arising from the sudden termination of over 30,000 Lehman-facing derivatives trades (with a combined notional amount of more than $1.18 trillion) in good faith, strictly in accordance with the industry-standard liquidated damages provision found in the parties' ISDA agreements. Accordingly, Citi calculated the replacement cost for these terminated trades in a commercially reasonable manner, and as soon as reasonably practicable following Lehman's default. To defeat Citi's commercially reasonable derivatives claims, plaintiffs have been forced to take extreme positions directly contrary to the governing contracts, longstanding industry practice, and governing law. First, plaintiffs argue that unless Citi actually replaced a specific terminated trade at close-out, Citi can only recover the mid-market value – as opposed to the contractually mandated replacement value – of the terminated trades. Second, plaintiffs argue that Citi should have netted trades that were not in fact offsetting. Third, plaintiffs claim that Citi not only was required to close out all 30,000 trades on a single day (regardless of the organization and coordination required to do so in an efficient and effective manner), but was required to do so at the time of day most favorable to plaintiffs. Versions of these three baseless arguments run through all of the derivatives allegations in the SAC, drive virtually all of the supposed "inflation" plaintiffs allege with respect to Citi's claims, and explain virtually all of the discrepancies plaintiffs depict in their many charts.

   3.  Defendants deny the allegations in paragraph 3 of the SAC. Defendants further state that, prior to Lehman's default, these more than 30,000 trades, with a combined notional amount of over $1.18 trillion, spanning all major OTC derivative products and markets worldwide, were substantially in-the-money for Citi. Indeed, Lehman had posted over $700 million of margin for these trades, reflecting their mid-market value as of September 11, 2008. Citi's claims of $1.9 billion with respect to these trades reflect both a substantial market move in

Citi's favor (which even plaintiffs concede) as well as the transaction costs (including bid/offer[10] and liquidity[11] adjustments) necessary to arrive at the replacement value for these trades. Moreover, Citi's $1.9 billion of derivatives claims is entirely consistent with the derivatives exposure estimated by Citi's internal risk models (and shared with Citi's regulators) in the event of a Lehman default. From May 2008 to September 2008, Citi's standard risk metric for predicting derivatives exposure upon a counterparty default estimated exposure of $1.6 billion to $2.2 billion upon a Lehman default, with respect to LBSF alone.[12]

4.     Defendants deny the allegations in paragraph 4 of the SAC, except admit that the market moved substantially in Citi's favor from September 12 to September 15, 2008. For example, the mid-market values that Citi recorded in its systems for just the Lehman-facing credit trades[13] increased dramatically – jumping by more than $100 million from September 11 to 12 and jumping another $290 million from September 12 to 15, as reflected in the chart below.

---

[10]   The "bid/offer" spread refers to the difference between the price at which a dealer or other market participant will buy (the "bid") or sell (the "offer") a given position. The width of the bid/offer spread is driven by the transaction costs associated with entering the trade and the amount of risk associated with buying or selling the position. *See* Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions* 287 (4th ed. 2010). Generally speaking, the greater the risk, the wider the bid/offer spread. The "mid-market" value refers to the point between the bid and the offer price – it is not a price at which parties can actually transact in the market but, rather, a hypothetical value derived from actual market prices.

[11]   Dealers in the OTC derivatives market charge more to enter into trades that exceed the market standard size. John C. Hull, *Risk Management and Financial Institutions* 448 (3d ed. 2012). For trades above the standard size, dealers will increase the bid/offer spread. *Id.* As used in this answer, "liquidity premium" refers to the incremental cost of the increase in the bid/offer spread for a trade that is too large to buy or sell at a standard quoted bid/offer price.

[12]   This metric, referred to as "PSLE" (pre-settlement loan equivalent), is used by Citi to estimate its *expected* derivatives exposure upon a counterparty default. Citi uses a separate risk metric, not discussed here, to estimate its maximum potential derivatives exposure upon a counterparty default.

[13]   As used in this Answer, "credit trades" refers to all credit default swaps ("CDS") between Citi and Lehman, including single-name and index CDS referencing corporate and sovereign debt, as well as CDS referencing securitized products, such as residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs"). At the time of Lehman's bankruptcy, there were over 19,000 credit trades between Citi and Lehman.



It bears emphasizing that the system marks reflected in the chart were used generally across

Citi's derivatives portfolio to value all similar trades on those dates; these system values are in

no way specific to the Lehman portfolio.  The 25% increase in the mid-market value of the

Lehman-facing credit portfolio over a two-day period reflects the extreme volatility in the market

resulting from the financial crisis in general and Lehman's bankruptcy in particular.  This

volatility also explains why bid/offer spreads and other transaction costs widened over this

period and, in fact, stayed wide for months:  market participants were concerned about taking on

exposure – particularly, large or illiquid exposures – during this period of unprecedented

uncertainty.

     5.     Defendants deny the allegations in paragraph 5 and footnote 1 of the SAC.

Defendants further state that, even if Citi's $1.9 billion of claims is assumed to consist entirely of

transaction costs (when, in fact, a significant portion reflects an increase in mid-market values),

that would reflect only 0.16% of the combined notional amount of these trades of approximately

$1.18 trillion.  An aggregate bid/offer adjustment of 0.16% is facially reasonable, if not

conservative where, as here, Citi's claims include a large number of illiquid, bespoke, and

extremely large trades as well as an enormous purchase of credit protection on RMBS, during a

time of unprecedented market volatility.  In fact, the claim values Citi calculated are amply

supported by actual quotes, third-party market data, and the models and systems Citi uses in the

ordinary course of business – precisely the data the ISDA agreements direct parties to consult in

determining replacement cost.

6.      Defendants deny the allegations in paragraph 6 of the SAC, and refer to

Citi's public disclosures for their contents.

7.      Defendants deny the allegations in paragraph 7 of the SAC, and refer to

Citigroup Inc.'s Third Quarter 2008 Form 10-Q for its contents.  Defendants further state that

Citi's "fair value" estimates of derivatives positions, as reflected in Citigroup's disclosures, are

calculated in accordance with Financial Accounting Standards Board Statement of Financial

Accounting Standards No. 157 ("SFAS 157").  Contrary to plaintiffs' suggestion, the objectives

and requirements of SFAS 157 are entirely distinct from the objectives and requirements of

closing out derivatives transactions under an ISDA.

8.      Defendants deny the allegations in paragraph 8 of the SAC, except admit

that the majority of their derivatives trades facing Lehman were valued as of September 16,

2008, lack knowledge or information sufficient to form a belief about the valuation dates used by

other Lehman counterparties, and refer to the relevant contracts, Section 562 of the Bankruptcy

Code, and its legislative history for their contents.  Defendants further state that the relevant

contracts and bankruptcy law did not require Citi to value all 30,000 Lehman-facing trades as of

the termination date; instead, the relevant contracts provide that trades must be valued as of the

termination date "or, if that would not be commercially reasonable, as of the date or dates

following the [termination date] as would be commercially reasonable."  2002 ISDA Master

Agreement § 14 (definition "Close-out Amount").  Similarly, the legislative history of

18

Section 562 of the Bankruptcy Code specifically acknowledges that "in certain unusual circumstances, such as . . . liquidation of very large portfolios, there may be no commercially reasonable determinants of value . . . for liquidating all such agreements and contracts in a large portfolio on a single day." H.R. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 134-35 (2005). Citi's various derivatives businesses organized the close-out process in good faith and in the way each considered commercially reasonable for the respective business, closing out the trades as soon as reasonably practicable. Of the more than 30,000 Lehman-facing derivatives trades, Citi closed out over 8,700 on September 15 (the termination date), over 18,600 on September 16, and over 2,600 on September 17, 2008, with only a relative few closed out thereafter.

9.      Defendants deny the allegations in paragraph 9 of the SAC, except admit that Citi is a market-maker with access to the interdealer market, and admit that Citi calculated the replacement cost of the terminated trades even where, as in the majority of cases, Citi did not execute a replacement trade at the close-out. Defendants further state that the liquidated damages provisions in the relevant contracts expressly provide that the proper measure of damages is the estimate of replacement costs "that are or would be incurred under then prevailing circumstances." 2002 ISDA Master Agreement § 14 (definition "Close-out Amount"). These replacement costs necessarily include bid/offer charges, as well as liquidity adjustments for larger-sized trades. Plaintiffs' allegation that Citi could have avoided these charges because it was "a market-maker with access to the inter-dealer market" is purely fanciful. It is also specifically refuted by actual quotes in the interdealer market during the week of September 15, 2008. For example, data from the GFI Group Inc. ("GFI")[14], a leading

---

[14]     GFI is a global provider of wholesale brokerage, clearing, execution, and trading support services, and a leading interdealer broker of CDS. As such, GFI has access to one of the largest data sets of executable market pricing

interdealer broker for credit default swaps ("CDS"), clearly shows that bid/offer charges are in fact quoted and paid even by large and sophisticated financial institutions in the interdealer market.  In fact, were Citi to revalue its CDS trades using the quoted spreads found in the GFI data, Citi's derivatives claims would have been *higher*, not lower.[15]  This interdealer market data (which, upon information and belief, plaintiffs obtained years ago) corroborates that the bid/offer adjustments Citi applied in calculating its claims were commercially reasonable under "then prevailing circumstances."

10.    Defendants deny the allegations in paragraph 10 of the SAC.  Defendants further state that whether or not Citi replaced a trade, replacement value is not only the contractually mandated measure of damages, it is also, by definition, the measure of damages required for Citi to obtain the benefit of its bargain.  Plaintiffs' essential theory – that, as a market-maker with access to the interdealer market, Citi could have replaced the trades "at or near mid-market" – is pure fiction and directly contradicted by readily available data from interdealer brokers.  This same data refutes plaintiffs' contention that Citi "ballooned" its claims by using bid/offer spreads "typically charged by market-makers to end users with limited market access," instead of the supposedly advantageous prices available in the interdealer markets.  Had Citi used the quoted spreads available from interdealer brokers such as GFI, Citi's claims would have actually increased (*see supra* n.12).  Indeed, plaintiffs' theory that the interdealer market

---

in the interdealer market for CDS, including records of quotations and trades during the week of September 15, 2008.  This data can be obtained from GFI pursuant to a standard license agreement.

[15]    GFI data contains two-sided quotes (*i.e.*, both a bid and an offer) for trades with the same or similar maturity to 1,422 trades in Citi's credit claim for which Citi's bid/offer charges are identified (using quotes that either match the maturity of a trade in Citi's claim, or come within one year of matching a trade in Citi's claim).  If these trades were revalued using the best (*i.e.*, most favorable to Lehman) GFI bid/offer spreads for standard-size trades, the bid/offer portion of Citi's claim (excluding any liquidity charges) would increase by $25.1 million – from $44.0 million to $69.1 million – or *an increase of over 57%*.  These numbers are, if anything, conservative.  Virtually all of the quotes in the GFI data are for trades with standard maturities (*i.e.*, five- and ten-year CDS).  The overwhelming majority of credit trades in Citi's claim were at nonstandard, comparatively less liquid maturities at the time of Lehman's default, and therefore would have been more costly to replace.

provides insider/wholesale prices whereas dealers always charge inflated retail prices to their

customers (*i.e.*, the end-user market), is simply not supported by available data.  For example, a

comparison of quotes from GFI, a leading interdealer broker for CDS, with pricing data from the

end-user market obtained from Credit Market Analysis Ltd. ("CMA"),[16] shows that the end-user

market had access to substantially *narrower* spreads than could be found in the interdealer

market during the week of September 15, 2008.[17]

11.     Defendants deny the allegations in paragraph 11 of the SAC, and refer to

the quoted documents for their contents.  Defendants further state that, contrary to plaintiffs'

allegations, Citi did a substantial amount of netting (what plaintiffs sometimes refer to as

"aggregation") and consequently *reduced* its derivatives claims against Lehman by hundreds of

millions of dollars.  Indeed, it was Citi's objective to net all offsetting trades that existed under

any ISDA agreement; to the extent Citi has overlooked any such trades (where netting would

leave Citi in a neutral risk position) Citi will correct the error.  There is, in fact, no actual dispute

between the parties with respect to netting offsetting trades.  Rather, the dispute in this case

concerns plaintiffs' contention that Citi should have done substantially more netting, even as to

dissimilar trades, and, in the process, accepted uncompensated risks solely for purposes of

---

[16]   CMA is a leading provider of data to participants in the OTC derivatives market through its "Quotevision" and
"Datavision" products.  Datavision is an aggregation service that collects, on a daily basis, quoted bids and
offers from approximately 40 buy-side participants in the OTC derivatives market.  These participants represent
some of the largest and most active credit investors, and include institutions across the U.S. and Europe,
spanning the universe of credit hedge funds, as well as proprietary trading desks and credit correlation trading
desks at tier 1 investment banks.  As a result, CMA is considered a leading provider of credible pricing data,
and provides clients with end-of-day CDS bids and offers for over 1,000 reference entities based on actual
quotes received from multiple sources.  This data can be obtained from CMA pursuant to a standard license
agreement.

[17]   There are approximately 191 reference entities in Citi's claim (out of over 1,000 total corporate and sovereign
reference entities) for which there are two-sided quotes available in both the GFI and CMA datasets from
September 16, 2008 (using only five-year quotations in a running spread format to facilitate direct comparison).
The average bid/offer spread across these reference entities was 27.1 basis points ("bps") for GFI, but only 15.6
bps for CMA.  That is, the average bid/offer spread was almost twice as wide in the interdealer market.

diminishing its claims against Lehman – a position that has no support in the relevant contracts or applicable law.

12.     Defendants deny the allegations in paragraph 12 of the SAC, except admit that Citi, Lehman, and funds controlled by Bracebridge Capital L.L.C. ("Bracebridge") consented to a trade collapse transaction that would have become effective on September 16, 2008 had Lehman not defaulted on September 15, 2008.  Defendants further state that Lehman expressly agreed on September 15, 2008 that the proposed collapse transaction was null and void and the original trades between the parties remained in force.  Plaintiffs' accusation that Citi is seeking to "resurrect" cancelled trades thus could not be further from the truth.  Rather, it is plaintiffs who are improperly and opportunistically seeking to resurrect an abandoned transaction – the collapse transaction – to unjustly enrich the Lehman estate at Citi's expense.  But this abandoned transaction is instructive with respect to the netting principles Citi applies in arm's-length transactions in the ordinary course of business.  The netting contemplated by this proposed transaction was entirely consistent with the netting principles Citi applied in valuing the terminated derivatives trades:  trades had to be fully offsetting in *all* material terms so Citi would not be left with residual risk.  The aggressive netting that plaintiffs advocate in the SAC is manifestly contrary to the way Citi conducts business in the ordinary course and is commercially unreasonable.

13.     Defendants deny the allegations in paragraph 13 of the SAC, except admit that Citibank takes the position that it has the right under New York statutory and common law, applicable contractual provisions, and the relevant safe harbor provisions and Section 553 of the Bankruptcy Code, to set off the $2 billion LBHI deposit against general obligations owing to it by LBHI.  Defendants further state that Citibank, pursuant to a stipulation between the parties,

has remitted $166,956,937 of the payable owed to LBCC, and that the remaining amount of the LBCC payable is subject to setoff against the amount owing from LBCC to Citibank under the ISDA Master Agreement between Citibank and LBCC arising from Citibank's early termination of derivatives trades facing LBCC, plus interest and legal fees.

14.     Defendants deny the allegations in paragraph 14 of the SAC.  Defendants further state that Citi's derivatives claims are consistent with exposure estimates generated by Citi's internal risk models in the months leading up to Lehman's default.  The claims were calculated in accordance with the parties' agreements and governing law and reflect the estimated replacement cost of the terminated trades – the measure of damages necessary to provide Citi with the benefit of its bargain.  In addition to its derivatives claims, Citibank asserts the right to set off over $300 million of non-derivative claims against the $2 billion deposit under applicable New York statutory and common law, relevant contractual provisions, and Section 553 of the Bankruptcy Code.[18]  While disagreeing with Citibank's right of setoff, plaintiffs' SAC does not otherwise object to these non-derivative claims.

15.     Defendants deny the allegations in paragraph 15 of the SAC, except admit that plaintiffs seek the recovery of funds, the payment of funds, and the reduction or disallowance of certain claims.

16.     Upon information and belief, Defendants admit the allegations in paragraph 16 of the SAC.

17.     Upon information and belief, Defendants admit the allegations in paragraph 17 of the SAC.

---

[18]   Citibank also asserts the right to set off certain guaranteed obligations of LBI (arising from foreign exchange trades settled through CLS) on the same basis and by virtue of the safe harbors under the Bankruptcy Code.

18.    Upon information and belief, Defendants admit the allegations in paragraph 18 of the SAC.

19.    Upon information and belief, Defendants admit the allegations in paragraph 19 of the SAC.

20.    Upon information and belief, Defendants admit the allegations in paragraph 20 of the SAC.

21.    Defendants admit the allegations in paragraph 21 of the SAC.  Defendants further state that Citibank's main office, as set forth in its articles of association, is in Sioux Falls, South Dakota.

22.    Defendants admit the allegations in paragraph 22 of the SAC.

23.    Defendants admit the allegations in paragraph 23 of the SAC.

24.    Defendants admit the allegations in paragraph 24 of the SAC.

25.    Defendants admit the allegations in paragraph 25 of the SAC.

26.    Defendants admit the allegations in paragraph 26 of the SAC.

27.    Defendants admit the allegations in paragraph 27 of the SAC.

28.    Defendants admit the allegations in paragraph 28 of the SAC.

29.    Defendants admit that this is a core proceeding within the meaning of 28 U.S.C. § 157.

30.    Defendants admit that they have consented to the entry of a final order by the Bankruptcy Court, but deny the remaining allegations in paragraph 30 of the SAC. Defendants further state that pursuant to the parties' agreement, defendants have expressly preserved all of their appellate rights.

31.    Defendants admit the allegations in paragraph 31 of the SAC.

32.     Defendants admit the allegations in paragraph 32 of the SAC, except lack knowledge or information sufficient to form a belief as to whether Lehman was the fourth-largest investment bank in the United States.

33.     Defendants admit the allegations in paragraph 33 of the SAC, and refer to the CLS Agreement for its contents.

34.     Defendants admit the allegations in paragraph 34 of the SAC, except deny that Citibank "received tens of millions of dollars in fees from Lehman in exchange for providing" CLS services.

35.     Defendants deny the allegations in paragraph 35 of the SAC, except admit that Citibank extended credit to the Trading Subsidiaries by providing uncommitted intraday overdraft lines in connection with clearing and settling foreign exchange trades, admit that the Trading Subsidiaries regularly used these overdraft lines, and admit that the Trading Subsidiaries were obligated to eliminate any overdrafts by the end of the day and that, in the ordinary course, they would do so.  Defendants further state that these uncommitted overdraft lines were provided solely as an accommodation and could be withdrawn at any time in Citibank's sole discretion.

36.     Defendants deny the allegations in paragraph 36 of the SAC, except admit that Citibank performed CLS settlement and clearing services for LBI and LBCC from 2004 through 2008, and lack knowledge or information sufficient to form a belief as to whether "[t]he clearing services that Citibank provided to Lehman were vital to Lehman's ability to conduct its ordinary business operations."

37.     Defendants deny the allegations in paragraph 37 of the SAC, except admit that Citibank provided other clearing and settlement services (such as cash clearing and securities clearing around the world) to Lehman entities, including the Trading Subsidiaries,

admit that Citibank extended credit to these Lehman entities when it provided uncommitted

intraday overdraft lines in connection with those clearing and settlement services, and admit that

the Lehman entities regularly used these overdraft lines.  Defendants further state that the

Lehman entities were obligated to eliminate any overdrafts by the end of the day and that, in the

ordinary course, they would do so.  These uncommitted overdraft lines were provided solely as

an accommodation and could be withdrawn at any time in Citibank's sole discretion.

38.    Defendants deny the allegations in paragraph 38 of the SAC, except admit

that the 2004 Guaranty unconditionally guarantees the payment of all obligations of the specified

Lehman subsidiaries under any and all extensions of credit extended or maintained by any

Citigroup subsidiary, admit that LBI was not included as a guaranteed subsidiary under the 2004

Guaranty until the execution of the September Amendment, and refer to the 2004 Guaranty and

the September Amendment for their contents.  Defendants further state that by permitting

Lehman entities to incur overdrafts in connection with the clearing and settlement of their trades,

Citibank extended credit to such entities within the meaning of the 2004 Guaranty.

39.    Defendants deny the allegations in paragraph 39 of the SAC, except admit

generally the characterization of the financial markets following the collapse of Bear Stearns,

admit that Citibank has always been interested in the financial position and liquidity of its

broker-dealer customers, including Lehman, and admit that this interest intensified after the

collapse of Bear Stearns.

40.    Defendants deny the allegations in paragraph 40 of the SAC, except admit

that, on the morning of June 12, 2008, Citibank requested that LBHI deposit between $3–$5

billion with Citibank, admit that the request was made in light of the substantial exposure

Citibank had to LBHI and its subsidiaries, including, most prominently, the more than $19

billion of uncommitted intraday overdraft lines that Citibank, in its sole discretion, provided to

Lehman entities to facilitate the clearing and settlement of their trades, admit that the request was

made in the context of significant market uncertainty surrounding Lehman, and refer to the

quoted document for its contents.  Defendants further state that on June 9, 2008, Lehman

announced that it expected a $2.8 billion loss for the second quarter and, before the market

opened on June 12, 2008, Lehman announced it had replaced its Chief Financial Officer and

Chief Operating Officer.  The market responded very negatively to these and other

developments.  Over that week, Lehman's stock price fell dramatically, its usage of its intraday

overdraft lines at Citibank increased significantly and, on June 12, 2008, Citi received a record

number of novation requests from Lehman's counterparties seeking to get out of derivatives

trades facing Lehman.  On June 12, 2008, Citibank became concerned about accepting any

additional unsecured exposure to Lehman and a senior risk officer made the decision that Citi

traders should refuse these novation requests and that Citibank should lower the uncommitted

intraday overdraft lines it made available to Lehman entities.  That day, Citi requested that

Lehman keep some of its reported $45 billion in liquidity with Citibank to allay institutional

concerns about Lehman's credit.  Specifically, Citi requested that LBHI pledge $3–$5 billion of

cash to Citibank.  LBHI refused to pledge cash but agreed to deposit $2 billion in a call account

with Citibank's Risk Treasury desk.  The directive not to accept novations was reversed after the

$2 billion was received.

       41.     Defendants deny the allegations in paragraph 41 of the SAC, except admit

that, on June 12, 2008, discussions occurred among Citibank and LBHI executives, admit that

LBHI agreed to transfer $2 billion from its main demand deposit account ("DDA") at Citibank

into a time deposit account, callable daily, booked with Citibank's Risk Treasury desk, and refer

to the quoted document for its contents.  Defendants further state that the $2 billion deposit has

none of the hallmarks of a "special account."  LBHI never requested segregation of the $2 billion

and the $2 billion was never segregated; instead, the funds were commingled with Citibank Risk

Treasury's other funds in an account at Citibank's Nassau branch and earned interest at

Citibank's overnight rate (Fed Funds target minus $\frac{1}{8}$).  Time deposits and call accounts are

standard products in the Eurodollar market and LBHI routinely "sold" excess funds to Citibank's

Risk Treasury desk to earn overnight interest.  LBHI could withdraw the funds in the call

account on a same-day basis.  LBHI's own documents (cited in the Lehman Examiner's Report)

show that LBHI considered the deposit to be a "$2B term deposit, callable daily."  (*See* Report at

1238 n.4616 (quoting LBEX-AM 008660).)  A senior Citi risk officer did instruct the Risk

Treasury desk to notify him of any request by LBHI for a return of the $2 billion and that no

funds should be returned without his approval.  It was critical that Citi's risk officer be advised

of any such withdrawal request precisely because the availability of the $2 billion as a potential

setoff was a material consideration for Citi in determining the nature and amount of Lehman

exposure it was willing to accept.  If LBHI called the funds, Citi's risk officer would need to

determine what action, if any, to take with respect to Lehman's credit limits and whether to set

off any then-outstanding exposure before returning the funds to LBHI by the close of the

Fedwire that day.  Defendants further state that the Examiner, who was specifically charged with

investigating the $2 billion deposit, never even discussed the possibility that the $2 billion

deposit could be a "special account," even though the "special account" issue was being actively

litigated in the Bank of America adversary proceeding at the time.  The Examiner's Report

specifically contemplates that Citibank will set off its allowed derivative, loan, and other LBHI

claims against the $2 billion deposit.  (Report at 1826–27.)  The $2 billion deposit is plainly a

general deposit, available to Citibank to offset against general obligations owed to it by LBHI.

42.     Defendants deny the allegations in paragraph 42 of the SAC, except admit

that LBHI refused to pledge the $2 billion of cash it deposited in the call account at Citibank, and

refer to the quoted documents for their contents.  Defendants further state that Citibank never

agreed to waive its setoff rights with respect to the $2 billion deposit and LBHI was indisputably

aware that Citibank claimed setoff rights in the deposit.  As reflected in an internal Lehman "Call

Report" (cited by the Examiner), "Citi did point out" in an August 7, 2008 call with Lehman's

Treasurer discussing alternatives to the $2 billion deposit, "that according to NY law, Citi would

have the right to offset deposits, but not securities which were not pledged."  (*See* LBEX-

DOCID 1035842, cited in Report at 1258 n.4722.)  Lehman never objected to Citibank's stated

position that it had setoff rights in the deposit, much less assert that Citibank had expressly

waived any setoff rights.  Despite extensive document discovery in this proceeding, plaintiffs do

not provide any details or point to a single document supporting their position that Citibank

"knowingly relinquished" its setoff right with respect to the $2 billion deposit.  Indeed, on

September 13, 2008, when LBHI was trying to assess its liquidity position on the eve of

bankruptcy, Emil Cornejo, an LBHI Treasury official and principal player in discussions

surrounding the $2 billion deposit, stated in an internal email that the $2 billion is "a callable

deposit," but noted that "Accdg [according] to ny law, citi has a right of offset."  (*See* LBEX-

DOCID 1078385, cited in Report at 1262 n.4742.)  The SAC fails to identify who at Lehman

allegedly witnessed Citibank's purported waiver of setoff rights with respect to the $2 billion.  In

answer to interrogatories, however, plaintiffs have stated that they presently are aware of only

two individuals at Lehman who allegedly witnessed Citibank's purported waiver:  Paolo Tonucci

and Ian Lowitt.[19]   In fact, Mr. Tonucci testified in the Bank of America adversary proceeding

that, in the several instances in which banks requested deposits from Lehman in 2008 (including

a deposit in the billions of dollars), Tonucci was "not aware" that Lehman asked any bank to

waive its setoff rights with respect to those deposits, and was "not aware" of any request by

Lehman that those deposits be segregated from other funds.[20]   For his part, Mr. Lowitt has

previously told the staff of Congress's Financial Crisis Inquiry Commission that he "[did not]

recall being involved" in the June 12, 2008 discussions with Citibank concerning the $2 billion

deposit.  And in response to the question of whether he considered Citi's demand for the deposit

to be reasonable at the time, Lowitt answered:

> A:  Well I think that we, as a general matter often put money on deposit with
> different banks.  I mean, my sense of that deposit was it was just part of our
> liquidity pool that was on deposit with Citi; it didn't have, there weren't
> restrictions on it, and it certainly was a time where people were more nervous
> about exposure to Lehman, and while they were keen to be helpful, they also were
> looking, they were also focused on risk to a greater extent than possibly than they
> had been before.[21]

Plaintiffs' purported witnesses do not support – indeed, directly contradict – plaintiffs' claim that

Citi waived its setoff rights.

43.   Defendants deny the allegations in paragraph 43 of the SAC.  Defendants

further state that on June 12, 2008, LBHI agreed to transfer $2 billion from its main DDA at

Citibank into a time deposit, callable daily, with Citibank's Risk Treasury desk.  Two transfers

totaling $2 billion were made that day from LBHI's DDA account to a Citibank Risk Treasury

---

[19]   Lehman Pls.' Resps. and Objections to Defs.' First Set of Interrogs, Resp. 3.

[20]   Transcript of Evidentiary Hearing on Motions for Summary Judgment at 192:4-193:9, *Bank of Am, N.A.* v.
*Lehman Bros. Special Fin. Inc.*, No. 08-13555-jmp (Bankr. S.D.N.Y. Feb. 1, 2010).

[21]   Interview by Fin. Crisis Inquiry Comm'n with Ian Lowitt (Aug. 25, 2010)  at 1:02:44, *available at*
http://cybercemetery.unt.edu/archive/fcic/20110310171826/http://fcic.gov/resource/interviews (last accessed
February 13, 2013).

account at Citibank's Nassau branch and Citibank's Risk Treasury desk booked two overnight time deposits for LBHI that day. Time deposits are a standard product in the Eurodollar market in which the seller of funds (*i.e.*, Lehman) "sells" cash to the buyer of funds (*i.e.*, Citibank) for a stated period at an agreed interest rate. Because at that time onshore DDA accounts could not pay interest, Lehman routinely "sold" excess funds to Citibank's Risk Treasury desk toward the end of the day to earn overnight interest. Indeed, Lehman did so over 190 times between January 1, 2008 and June 11, 2008. On June 13, 2008, the two time deposits were rolled into a single LBHI call account of $2 billion booked with Citibank Risk Treasury at Citibank's Nassau Branch. Call accounts are also a standard product in the Eurodollar market, in which the seller of funds earns interest on an overnight basis from the buyer; however, a call account has no stated maturity and is not returned to the seller unless and until the seller requests its return (*i.e.*, "calls" the funds). Once called, the funds must be returned on a same-day basis before the close of the Fedwire (usually 6:00 pm EST). The LBHI call account paid interest at the Fed Funds target rate minus $^1/_8$, which amounted to 1.88% over the relevant period. Each business day, Citibank credited the overnight interest to LBHI's DDA. LBHI's $2 billion was never segregated; instead, the funds were commingled with Citibank Treasury's other funds in its account at Citibank's Nassau branch. At no time did Citibank agree to waive its setoff rights with respect to the $2 billion deposit.

44.     Defendants deny the allegations in paragraph 44 of the SAC, except admit that on June 30, 2008, LBHI withdrew $210 million from its $2 billion call account to fund an overdraft in one of its subsidiary's accounts, admit that LBHI deposited $210 million into the call account the next day, and admit that LBHI never otherwise requested to withdraw, in whole or in part, the funds in the call account.

45.     Defendants deny the allegations in paragraph 45 of the SAC, and refer to
the quoted documents for their contents.  Defendants further state that, read in context, the emails
discuss the two significant deficiencies that Citibank found with the $2 billion deposit:
(i) notwithstanding Citibank's setoff rights, Citibank did not control the deposit and the funds
could be withdrawn on a same-day basis; and (ii) while Citibank had significant exposure to non-
guaranteed subsidiaries, Citibank would not have the right to offset that exposure against the
deposit due to a lack of mutuality.

46.     Defendants deny the allegations in paragraph 46 of the SAC, except admit
that in July 2008 the parties discussed entering into a pledge agreement, admit that those
discussions contemplated a pledge of investment grade securities, and admit that any pledge
agreement would preserve Citibank's right of setoff.  Defendants further state that a substantial
portion of Citibank's Lehman exposure was to LBI, an unguaranteed subsidiary, whose
obligations to Citibank therefore could not be set off against the LBHI $2 million deposit due to
lack of mutuality.  A pledge agreement could have created a contractual setoff right with respect
to all Lehman subsidiaries to the extent of the pledged assets; a pledge also would have
eliminated Citi's concern that LBHI might withdraw the cash on a same-day basis, before Citi
could take appropriate action to limit its exposure.  Lehman, for its part, also wished to replace
the $2 billion of cash with securities.  While Lehman refused to pledge the $2 billion deposit,
Citibank made clear that it would only accept securities in lieu of cash if the securities were
pledged, so that Citibank could preserve its setoff rights.  As reflected in an internal Lehman
"Call Report" (cited by the Examiner), on an August 7, 2008 call with Lehman's Treasurer, "Citi
did point out that according to NY law, Citi would have the right to offset deposits, but not
securities which were not pledged."  (*See* LBEX-DOCID 1035842, cited in Report at 1258

n.4722.)  Lehman never objected to Citibank's stated position that it had setoff rights in the

deposit, much less assert that Citibank had expressly waived any setoff rights.

47.    Defendants deny the allegations in paragraph 47 of the SAC, except admit

that LBHI refused Citibank's request that LBHI pledge the $2 billion deposit, admit that the

parties discussed a potential pledge of investment grade securities as collateral to secure

overdrafts by LBHI subsidiaries, and admit that, in connection with the discussions concerning a

potential pledge of securities, Citibank established a collateral account with the name "Lehman

Brothers Holdings Inc., Pledge to Citibank," which account was never used.

48.    Defendants deny the allegations in paragraph 48 of the SAC, except admit

that discussions concerning a potential pledge of securities continued through August 2008,

admit that LBHI and Citibank never reached agreement on the terms of a pledge agreement or on

the collateral that might be pledged thereunder, admit that no pledge agreement was ever

executed and admit that on September 9, 2008, Citibank requested that LBHI execute an

amendment to the 2004 Guaranty.

49.    Defendants lack knowledge or information sufficient to form a belief

regarding the allegations in paragraph 49 of the SAC, except admit that on September 9, 2008,

the market was aware that Korea Development Bank would not make an equity investment in

LBHI, admit that LBHI's stock price dropped sharply on September 9, 2008, and admit that

LBHI accelerated its preliminary earnings report for the third quarter of 2008 to September 10,

2008.

50.    Defendants deny the allegations in paragraph 50 of the SAC, except admit

that on September 9, 2008, in view of the increasing market anxiety about Lehman's prospects,

Citibank requested that LBHI execute an amendment to the 2004 Guaranty before 6:00 pm that

day, admit that the draft amendment added 18 Lehman entities (including LBI) as guaranteed

subsidiaries of LBHI, admit that Citibank believed that adding these entities as guaranteed

subsidiaries of LBHI would give Citibank the right to set off the obligations of LBHI in respect

of these newly-guaranteed subsidiaries against the $2 billion LBHI deposit, and refer to the 2004

Guaranty and the September Amendment for their contents. Defendants further state that –

wholly apart from the September Amendment – extensions of credit by Citi in connection with

CLS or any other clearing or settlement services were covered obligations under the 2004

Guaranty with respect to any subsidiary guaranteed under that document.

51.    Defendants deny the allegations in paragraph 51 of the SAC, except admit

that on September 9, 2008, Citibank made the institutional decision not to accept any Lehman

exposure that could not be offset against the $2 billion deposit and thus Citibank requested that

18 unguaranteed subsidiaries, including Asian subsidiaries, be added to the 2004 Guaranty,

admit that Citibank exercised its discretion to reduce or eliminate certain overdraft lines, lack

knowledge or information sufficient to form a belief as to whether Lehman's September 10,

2008 earnings call was a matter of "life-or-death," and refer to the quoted document for its

contents. Defendants further state that, without overdraft lines, Lehman entities could clear their

trades through Citibank so long as they prefunded their accounts. LBHI was not "force[d] . . . to

accede to [Citi's] demands" and, in fact, by 6:00 pm, LBHI executed a guaranty for LBI only

(and none of the other 17 entities that Citi had initially requested), and LBHI subsequently

refused to add nine of the remaining subsidiaries to the amended guaranty.

52.    Defendants deny the allegations in the first sentence of paragraph 52 of the

SAC, and refer to the September Amendment for its contents. Defendants lack knowledge or

information sufficient to form a belief as to whether LBHI or LBI were insolvent or

undercapitalized on September 9, 2008, but, upon information and belief, deny that LBHI did not receive reasonably equivalent value in exchange for executing the September Amendment. Defendants further state that, in consideration for the September Amendment, Citi thereafter extended billions of dollars of credit to the newly-guaranteed subsidiaries.

53.    Defendants deny the allegations in paragraph 53 of the SAC, except admit that on Sunday night, September 14, 2008, Citibank transferred $500 million from an LBHI account at Citibank to an LBI account at Citibank (the "LBI DDA"), and admit that LBHI filed for bankruptcy protection in the early morning hours of September 15, 2008. Defendants further state that it was LBHI – not Citibank – that requested the transfer so that LBI could fund its obligations in connection with settling foreign exchange trades through the CLS system. Upon information and belief, LBHI made the transfer to keep LBI in business during the week of September 15 to allow for an orderly sale of LBI's business to Barclays. Upon information and belief, such a sale was believed to be in the best interest of LBHI, its creditors, and the financial markets generally. Indeed, contemporaneous documents reflect that Lehman believed it was critical for LBI's trades to settle in CLS if Lehman was to "have any chance to sell the broker." (*See* CITI-LEH00440952.) Citibank agreed to make this Sunday night transfer even though LBHI had informed Citibank that LBHI would be filing for bankruptcy before Monday's open and this $500 million in LBHI's account would otherwise have been available to Citibank to set off against LBHI obligations. The Lehman Examiner cites Citi's willingness to effect the transfer on September 14, 2008 as one instance, among many, in which "Citi endeavored to assist Lehman." (Report at 1281–82.)

54.     Defendants deny the allegations in paragraph 54 of the SAC, except lack

knowledge or information sufficient to form a belief as to whether LBHI or LBI were insolvent

or undercapitalized at the time of the transfer.

55.     Defendants admit the allegations in paragraph 55 of the SAC.

56.     Defendants deny the allegations in paragraph 56 of the SAC, except admit

that on September 19, 2008, Citibank set off $1 billion of LBI obligations owing to it against a

$1 billion LBI deposit.  Defendants further state that the $1 billion deposit was not in the LBI

DDA but was in a separate account at Citibank, one created on September 15, 2008 and funded

with $700 million from an LBI account at JPMorgan Chase and $300 million from the LBI

DDA.  Given the payments made in and out of the LBI DDA before this $300 million transfer,

no more than approximately $136 million of the original $500 million from LBHI could have

been used to fund the $1 billion LBI deposit.  Defendants further state, upon information and

belief, that LBHI has already recovered some or all of this transfer from LBI, the initial

transferee.

57.     Defendants deny the allegations in paragraph 57 of the SAC, except admit

that on September 19, 2008, Citibank terminated the CLS Agreement with respect to LBI,

effective September 22, 2008.  Defendants further state that LBHI has never, before filing the

Complaint, formally requested the return of the $2 billion.  Indeed, LBHI's September 18, 2008

Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming

Status of Citibank Clearing Advances (Docket No. 109) (the "Citibank Clearing Motion"), and

the order granting that motion, expressly acknowledge that Citibank's continued maintenance of

the $2 billion cash deposit "does not constitute a unilateral administrative hold or a violation of

the automatic stay," and that an administrative hold would not be deemed to commence until

"LBHI requests a withdrawal . . . and Citibank refuses to comply."  (*Id.* ¶ 16.)  Following the

entry of that Order, LBHI has repeatedly stipulated to Citibank's continued maintenance of the

deposit.

58.     Defendants deny the allegations in paragraph 58 of the SAC, except admit

that Citibank asserts a right to set off its LBHI claims, including approximately $1.7 billion in

derivatives claims, against the $2 billion deposit.  Defendants further state that Citi's derivatives

claims are entirely in line with estimates generated by Citi's internal risk models in the months

leading up to Lehman's default.

59.     Defendants deny the allegations in paragraph 59 of the SAC, except admit

that Citibank asserts rights as a secured creditor in its proof of claim against LBHI, admit that

Citibank asserts rights to set off LBHI obligations, including approximately $1.7 billion arising

under guaranteed swap agreements, against the $2 billion LBHI deposit, admit that Citibank

asserts that the derivatives claims referred to in paragraphs 59(i) and 59(iii)–(v) may be set off

against the $2 billion, and refer to proof of claim number 67736 for its contents.  Defendants

further state that Citibank does not claim to be owed amounts under the LBI-Citibank ISDA (as

alleged in paragraph 59(ii)) and instead (as made clear in answer to plaintiffs' original Complaint

and First Amended Complaint) has reported a payable to LBI under that contract.  Further, by

letter agreement dated January 31, 2013, Citibank agreed to withdraw the purported claim of

$60,015,440 (which had always been asserted as a payable owed by Citibank to LBI, rather than

a claim against LBI) from proof of claim number 67736.

60.     Defendants deny the allegations in paragraph 60 of the SAC, except admit

that Citibank asserts that the claims referred to in paragraphs 60(i)–(iii) and 60(v)–(vi) may be

set off against the $2 billion, state that Citibank intends to withdraw the $175,498 claim referred

to in paragraph 60(iv), and refer to proof of claim number 67736 for its contents. Defendants further state that the specific LBHI guarantees supporting the claims referred to in paragraphs 60(i), (ii), (v), and (vi) expressly state that Citi may "set off and apply any and all deposits (general or special, time or demand, provisional or final but excluding any amounts held by [Citi] in a trustee [or] fiduciary capacity . . .)" against covered obligations.[22] Defendants further state that the specific guarantee supporting the claim referred to in paragraph 60(i), (ii), (v), and (vi) provides that Citi's setoff rights could not be waived or amended "unless the same is in writing and signed by Citibank, N.A."[23]

61.     Defendants deny the allegations in paragraph 61 of the SAC, except admit that they assert the right to offset claims arising under the September Amendment against the $2 billion deposit, and refer to proof of claim number 67736 for its contents. Defendants further state that, as a result of a settlement between LBI and Citibank, Citibank has withdrawn, by letter agreement dated January 31, 2013, the claims referenced in paragraph 61(iii)–(vi) and (viii)–(x). Further, the obligation owed by LBSF referred to in paragraph 61(vii) may be offset against the $2 billion deposit by virtue of numerous guarantees, including the 2004 Guaranty, without regard to the September Amendment.

62.     Defendants deny the allegations in paragraph 62 of the SAC.

63.     Defendants deny the allegations in paragraph 63 of the SAC, except admit that Citibank owed approximately $198 million as a result of settling LBCC's foreign exchange trades in the CLS system, and refer to proof of claim number 67734 for the exact amount of the obligation owed to LBCC. Defendants further state that, pursuant to the Citibank CLS

---

[22]   LBHI-Citigroup, Inc. Guaranty § 8 (Aug. 30, 2007); 2004 Guaranty § 8; LBHI-Citigroup, Inc. Guaranty § 8 (July 26, 2005); 2004 Guaranty (as modified by the September Amendment) § 8.

[23]   LBHI-Citigroup, Inc. Guaranty § 11 (Aug. 30, 2007).

Settlement Services CCSS Third Party Customer Static Data Requirements executed by LBCC

on November 4, 2003 (the "Static Data Requirements"), Citibank was instructed to make CLS

payments due to LBCC into LBI accounts.  Prior to the commencement of this litigation,

Citibank explained to plaintiffs its concern that it may be vulnerable to a competing claim by

LBI and agreed to pay the $198 million to LBCC (subject to available setoffs) provided Citibank

receive a consent or release from LBI (and subject to an agreement on the amounts due and

owing in connection with CLS services).  In May 2013, following Citi's global settlement with

LBI  (in which LBI released any claim to this payable), the parties reached an agreement

resolving most of these issues.  Pursuant to that agreement, Citibank paid LBCC $167 million

and the parties reserved their rights with respect to Citibank's asserted setoff rights as well as

certain minor aspects of Citibank's CLS-related calculations, including the $4.5 million debit

referred to by plaintiffs.  Citibank appropriately debited the $4.5 million from the LBCC

account, in partial settlement of amounts due from LBIE under the CLS Agreement, because the

account was used by both LBCC and LBIE for CLS payments; indeed, Citibank routinely

debited the account for amounts due from LBIE with respect to CLS.

        64.    Defendants deny the allegations in paragraph 64 of the SAC, except admit

that, pursuant to the Stipulation and Order Between Plaintiffs Lehman Brothers Holdings Inc.,

Lehman Brothers Commercial Corp., Lehman Brothers Special Financing Inc., and Official

Committee of Unsecured Creditors and Defendants Citibank, N.A. and Citigroup Global Markets

Ltd. With Respect to Certain Continuous Linked Settlement Agreement Unwind Amounts (the

"Stipulation"), dated May 14, 2013, Citibank paid to LBCC an amount of $167 million, and refer

to the Stipulation for its contents.

65.    Defendants deny the allegations in paragraph 65 of the SAC, except admit that Citibank takes the position that it has the right to setoff the remainder of the LBCC payable against amounts owed to Citibank by LBCC under the ISDA Master Agreement between the parties, plus interest and legal fees.

66.    Defendants deny the allegations in paragraph 66 of the SAC, except admit, upon information and belief, that prior to LBHI's bankruptcy filing, Citi and Lehman were among the largest global dealers in derivatives, and admit that Citi has made substantial investments in people and systems to appropriately transact in the derivatives market.

67.    Defendants admit the allegations in paragraph 67 of the SAC.

68.    Defendants deny the allegations in paragraph 68 of the SAC, except admit that, in the ordinary course of business, Citi regularly marked-to-market its derivatives portfolio and calculated daily margin calls on a net basis under each of the Master Agreements. Defendants further state that margin was calculated using mid-market values (not replacement costs) and, from time to time, the parties had margin disputes that arose from differences in their mid-market calculations.  Margin disputes are common in the OTC derivatives market because trading counterparties, each acting reasonably and in good faith, may use different models and inputs to calculate mid-market prices.  At the time of LBHI's bankruptcy filing, Citi held net margin from the Lehman Subsidiaries of over $700 million, reflecting that Citi was substantially in-the-money with respect to the Lehman-facing trades.

69.    Defendants deny the allegations in paragraph 69 of the SAC, except admit that each Master Agreement provides that, in the event of a counterparty default (such as occurred here), the non-defaulting party shall calculate the overall net amount owed (in either direction) with respect to all outstanding terminated trades, admit that each Master Agreement

40

sets forth the methodology that the parties have agreed shall govern the non-defaulting party's

calculations, admit that commercial reasonableness and good faith are overarching obligations in

calculating amounts owed under each Master Agreement, and refer to the Master Agreements for

their contents.

70.    Defendants admit the allegations in paragraph 70 of the SAC.  Defendants

further state that, until August 2008, Market Quotation was the calculation method selected by

the parties under the majority of the ISDA Master Agreements.[24]  Under Market Quotation, the

non-defaulting party determines the amount owed on each terminated trade (or group of trades)

based on quotations for replacement transactions, regardless of whether any replacement

transactions are actually executed.  Specifically, the non-defaulting party is required to seek

quotations from leading market-makers for the amount that "would be paid" by (or to) the non-

defaulting party "in consideration of an agreement between [the non-defaulting party and the

quoting market-maker] to enter into a transaction (the 'Replacement Transaction') that would

have the effect of preserving for such [non-defaulting party] the economic equivalent" of the

terminated transaction or group of transactions.  1992 ISDA Master Agreement § 14 (definition

"Market Quotation").[25]  The Market Quotation method specifies that, if the non-defaulting party

receives more than three quotations, "the arithmetic mean of the quotations" should be used,

after excluding the highest and lowest quote; if exactly three quotations are received, the non-

defaulting party should use the middle quotation, disregarding the highest and lowest quote; and,

---

[24]    The LBCS-Global ISDA Agreement and LBCS-Energy Agreement selected the Loss calculation method.
These Agreements account for 672 of the terminated trades between Citi and Lehman.

[25]    *See also* 1987 ISDA Interest Rate and Currency Exchange Agreement § 14 (definition "Market Quotation") (the
non-defaulting party must "determine[] on the basis of quotations from Reference Market-makers . . . the
amount that would be or would have been payable on the relevant Early Termination Date . . . in consideration
of an agreement between such party and the quoting Reference Market-maker . . . that would have the effect of
preserving for such party the economic equivalent of the payment obligations . . .").

41

if fewer than three quotations are received, the Market Quotation for the transaction cannot be

determined. *Id.* In that case, the non-defaulting party is required to use the Loss methodology to

determine the amount owed on such terminated trade or group of trades. *Id.* (definition

"Settlement Amount"). Under the Loss method, the non-defaulting party must determine, in

good faith, the amount of its "total losses and costs . . . including any loss of bargain, cost of

funding or, at the election of such party but without duplication, loss or cost incurred as a result

of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position."

The Loss method specifies that the non-defaulting party "may (but need not) determine its Loss

by reference to quotations of relevant rates or prices from one or more leading dealers in the

relevant market." *Id.* (definition "Loss"). Neither the Market Quotation nor Loss method says

anything about, much less requires, the non-defaulting party to actually execute any replacement

transactions.[26] Further, under both methods, transaction costs (including bid/offer charges and

liquidity premium) that would be charged for entering into replacement transactions are

unquestionably recoverable by the non-defaulting party, regardless of whether replacement

trades are actually executed. These transaction costs are, by definition, incorporated into the

quotations from market-makers on which Market Quotation must be determined and on which

Loss (expressly) may be determined.

71.    Defendants admit the allegations in paragraph 71 of the SAC. Defendants

further state that, in August 2008, virtually all of the major derivatives dealers (including all of

the Lehman Subsidiaries and all of the Citi defendants other than Citi Canyon), executed the

Close-out Amount Multilateral Agreement whereby all existing 1992 ISDA Master Agreements

---

[26]    Indeed, Market Quotation is an "arithmetic mean" rather than an existing quotation at which the non-defaulting party could transact; alternatively, if only three quotes are obtained, Market Quotation is the middle quote at which, all things being equal, no party would ever transact.

between the signatories were amended to adopt certain provisions of the 2002 ISDA Master

Agreement and, specifically, the "Close-out Amount" measure of damages (replacing the

"Market Quotation" and "Loss" methods from the 1992 version).  As the User's Guide to the

ISDA 2002 Master Agreement explains, "Close-out Amount" was "developed to offer greater

flexibility" and to "address some of the potential weaknesses of Market Quotation that became

apparent during periods of market stress in the late 1990s."  User's Guide to the ISDA 2002

Master Agreement at 24 (2003).  In particular, the "need for increased flexibility was highlighted

during the market crises in 1998 and 1999," when many non-defaulting parties could not obtain

the requisite number of quotations from leading market-makers, as required under Market

Quotation.  *Id.*  Like Market Quotation, Close-out Amount contemplates that the non-defaulting

party will calculate the replacement costs for the terminated transactions (regardless of whether

replacement trades are actually executed), but it provides more flexibility in doing so.  "Close-

out Amount" is defined, with respect to each terminated trade (or groups of trades), as the

amount of "losses or costs . . . that *are or would be incurred* under then prevailing circumstances

. . . *in replacing*, or in providing . . . the economic equivalent of . . . the material terms of that

Terminated Transaction or group of Terminated Transactions . . . ."  2002 ISDA Master

Agreement § 14 (emphasis added).  In determining a Close-out Amount, the non-defaulting party

is expressly permitted to consider any relevant information including, specifically,

(i) "quotations (either firm or indicative) for replacement transactions supplied by one or more

third parties," (ii) other "relevant market data . . . supplied by one or more third parties," and

(iii) quotations or market data "from internal sources . . . if that information is of the same type

used by the Determining Party in the regular course of its business for the valuation of similar

transactions."  *Id.*  "Third parties," from whom quotations and market data may be sought,

"include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information." *Id.* The non-defaulting party is required to calculate the Close-out Amount "as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable." *Id.* In calculating the Close-out Amount, the non-defaulting party is required to "act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result." *Id.* The contract also expressly acknowledges that it may be commercially reasonable to apply "different valuation methods" to the terminated transactions depending on the type, complexity, size, or number of the transactions. *Id.*

72.    Defendants deny the allegations in paragraph 72 of the SAC, and refer to the Close-out Amount Agreement, the 2002 ISDA Master Agreement, and the 2002 ISDA User's Guide for their contents. Defendants further state that the Close-out Amount definition adopted by the derivatives industry in the 2002 ISDA Master Agreement – and adopted by all major dealers, including all Lehman Subsidiaries, in place of Market Quotation and Loss in all of the 1992 ISDA Master Agreements between them – expressly entitles the non-defaulting party to recover the estimated replacement costs of the terminated trades, whether or not replacement trades are actually executed.

73.    Defendants deny the allegations in paragraph 73 of the SAC, and refer to the Close-out Amount Agreement, the COA Master Agreements, the 2002 ISDA Agreement, and Section 562 of the Bankruptcy Code and its legislative history for their contents.

74.    Defendants admit the allegations in paragraph 74 of the SAC, and refer to the LBSF-Canyon Agreement and the 1992 ISDA Master Agreement for their contents.

44

Defendants further state that plaintiffs' quotation from the 1992 ISDA Master Agreement

selectively omits critical language that appears in the standard form contract and the LBSF-

Canyon Agreement.  The language selectively omitted expressly provides that the quotations

sought under Market Quotation should be for replacement transactions – and not for mid-market

values, as plaintiffs apparently contend.  Plaintiffs' quotation is reproduced below with the

omitted material in bold:

> [A]n amount determined on the basis of quotations from Reference
> Market-makers.  Each quotation will be for an amount, if any, that **would
> be paid to such party . . .  or by such party . . .  in consideration of an
> agreement between such party . . .  and the quoting Reference
> Market-maker to enter into a transaction (the "Replacement
> Transaction") that** would have the effect of preserving for such party the
> economic equivalent of any payment or delivery . . . that would, but for
> the occurrence of the relevant Early Termination Date, have been required
> after that date.

1992 ISDA Master Agreement § 14 (emphasis added).

      75.    Defendants admit the allegations in paragraph 75 of the SAC.

      76.    Defendants deny the allegations in paragraph 76 of the SAC, and refer to

the 1992 ISDA Master Agreement and 1992 ISDA User's Guide for their contents.

      77.    Defendants deny the allegations in paragraph 77 of the SAC, except admit

that the LBCS-Global EFET Agreement was entered into using version 2.1(a) of the European

Federation of Energy Traders General Agreement Concerning the Delivery and Acceptance of

Electricity, and refer to the LBCS-Global EFET Agreement and the standard form EFET

Agreement for their contents.  Defendants further state that, while plaintiffs have quoted

provisions from the standard form EFET Agreement, they fail to quote the materially different

terms of the actual agreement between LBCS and Citi Global as set forth in the Election Sheet to

the LBCS-Global EFET Agreement.  Specifically, in part II, section 11 of the Election Sheet, the

45

parties expressly amended section 11.2 of the General Agreement by replacing the last sentence

of that section with the following:

> In calculating the Settlement Amounts, Gains and Losses shall, as far as
> reasonably practicable, be determined by reference to quotations of relevant rates
> or prices from one or more leading dealers in the relevant markets or from one or
> more first-class international financial information services such as Reuters or
> Bloomberg. ***For the avoidance of doubt, the Non-Defaulting Party shall not be
> required to enter into any replacement transactions in order to determine the
> Termination Amount***.

EFET Agreement, Election Sheet, part II, section 11 (emphasis added).  Contrary to plaintiffs'

assertion that, under the EFET Agreement, CGML "may only include costs reasonably incurred

in actual replacement transactions," the parties' agreement expressly provides that losses shall be

calculated by reference to market quotations, regardless of whether replacement transactions are

actually executed.  Accordingly, all of the Master Agreements at issue in this litigation expressly

provide that Citi can recover the replacement cost of the terminated trades (necessarily including

the transaction costs that any dealer would charge), regardless of whether Citi actually executed

replacement trades as of the close-out.

> 78.    Defendants admit the allegations in paragraph 78 of the SAC.

> 79.    Defendants admit the allegations in paragraph 79 of the SAC.

> 80.    Defendants deny the allegations in paragraph 80 and footnotes 2 and 3 of

the SAC, except admit that Citi has submitted claims under the Master Agreements for

approximately $1.9 billion against the Lehman Subsidiaries and LBHI as guarantor, and admit

that these claims consist of aggregate termination amounts of approximately $2.7 billion, less

collateral held by Citi, and less net Unpaid Amounts credited to the Lehman Subsidiaries.[27]

---

[27]   Based on reconciliation efforts with Lehman, as of the filing of Citi's Answer to the FAC on February 14, 2013,
Citi calculated that it is owed $1,913,700,725.  This net claim reflects aggregate termination amounts of
$2,721,136,704, unpaid amounts and cash breaks owed to Lehman in an amount of $95,482,388, and margin

81.     Defendants deny the allegations in paragraph 81 and footnotes 4 and 5 of the SAC.  While plaintiffs allege that their purported "Market-Based Calculation of Close-out Amount" (set forth in the chart in paragraph 81) is based on "independent, publicly available market sources," plaintiffs have refused to disclose precisely what market data they are relying on.  In all events, it is clear that plaintiffs are making an "apples-to-oranges" comparison.  Given the extreme positions plaintiffs have staked out in the SAC, their so-called "Market-Based" calculation, upon information and belief, reflects an estimate of mid-market value only, rather than the replacement cost (including bid/offer charges and liquidity premiums) of the terminated trades which is mandated by the parties' agreements and necessary to provide Citi with the benefit of its bargain.  In addition, Citi disagrees with certain claim amounts, and a corrected version of the chart appears below.[28]

---

held by Citi in an amount of $711,953,592.  Citi refers plaintiffs to the documents bearing Bates numbers CITI-LEH00962090-98 for the most up-to-date calculation of Citi's derivatives claim.

[28]  Defendants note that the tables in plaintiffs' SAC are identical to those in the First Amended Complaint.  Plaintiffs therefore have failed to correct even obvious errors (including typographical errors) pointed out by defendants in their Answer to the First Amended Complaint and have failed to incorporate any of the additional information obtained through the parties' continuing efforts (since the filing of the First Amended Complaint) to reconcile trade populations.  Following plaintiffs' lead, defendants, too, will reproduce in this Answer the tables set forth in their Answer to the First Amended Complaint and note that, in the context of this lawsuit, the modifications that would otherwise be required to the numbers in the tables are relatively minor.  Citi refers plaintiffs to the documents bearing Bates numbers CITI-LEH00962090-98 for the most up-to-date calculation of Citi's derivatives claim.

| Master Agreement | Citi Close-out Amount | ~~Market-Based Calculation of Closeout Amount~~ | ~~Difference ($)~~ |
|---|---|---|---|
| LBSF-Canyon | 763,043 | ~~958,630~~ | ~~195,587~~ |
| LBSF-Citibank | ~~(2,072,323,937)~~ **(2,072,960,601)** | ~~(249,608,958)~~ | ~~1,822,714,979~~ |
| LBSF-Financial | (248,852,591) | ~~(223,685,221)~~ | ~~25,167,370~~ |
| LBSF-Global | ~~(47,800,564)~~ **(40,190,400)** | ~~164,305,046~~ | ~~212,105,610~~ |
| LBCC-Citibank | (404,376,578) | ~~(296,364,126)~~ | ~~108,012,452~~ |
| LBCS-Energy | 10,413,248 | ~~23,885,115~~ | ~~13,471,867~~ |
| LBCS-Global ISDA | (7,825,571) | ~~(7,349,001)~~ | ~~476,570~~ |
| LBCS-Global EFET | 4,999,693 | ~~6,226,192~~ | ~~1,226,499~~ |
| LBSF-Swapco | 36,893,053 | ~~39,741,383~~ | ~~2,848,330~~ |
| TOTAL | ~~(2,728,110,204)~~ **(2,721,136,704)** | ~~(541,890,939)~~ | ~~2,186,219,265~~ |

82.    Defendants deny the allegations in paragraph 82 of the SAC, except admit

that a majority of the terminated trades were valued by Citi as of September 16, 2008.

Defendants further state that the terminated trades were closed out in good faith and as soon as it

was commercially reasonable to do so, consistent with the requirements of the Master

Agreements and the Bankruptcy Code.  Each of the Master Agreements allows the non-

defaulting party some leeway to value the terminated trades as soon as "commercially

reasonable," 2002 ISDA Master Agreement § 14, or "reasonably practicable," 1992 ISDA

Master Agreement § 14.  The legislative history of Section 562 of the Bankruptcy Code (which

applies to the termination and valuation of swap agreements), recognizes that in "unusual

circumstances, such as dysfunctional markets or liquidation of very large portfolios," it may not

be feasible or commercially reasonable to value all terminated transactions as of the termination

date or to "liquidat[e] all such agreements and contracts in a large portfolio on a single day."

H.R. 109-31, Pt. 1, 109th Cong. 1st Sess. 134-35 (2005).  Given the size and scope of Citi's

Lehman-facing portfolio (consisting of over 30,000 trades across different products and markets

worldwide) and the turmoil in the markets caused by Lehman's bankruptcy, it was neither

feasible nor commercially reasonable to value all of the transactions as of September 15, 2008.

83.     Defendants admit the allegations in paragraph 83 and footnote 6 of the

SAC, and refer to the cited documents for their contents.

84.     Defendants deny the allegations in paragraph 84 of the SAC, and refer to

the COA Master Agreements, the 2002 ISDA Master Agreement, Section 562 of the Bankruptcy

Code, and the cited document for their contents.

85.     Defendants deny the allegations in paragraph 85 of the SAC, and refer to

Section 562 of the Bankruptcy Code and its legislative history for their contents.

86.     Defendants deny the allegations in paragraph 86 of the SAC, except admit

that Citi valued the majority of its trades as of September 16, 2008.

87.     Defendants deny the allegations in paragraph 87 of the SAC, except admit

that Citi's credit and securitized products businesses – which, in aggregate, had almost 20,000 of

the 30,000 terminated trades – predominantly valued the trades as of September 16, 2008 (the

day following the Termination Date) so as to allow time for effective organization and

coordination across businesses and desks.

88.     Defendants deny the allegations in paragraph 88 of the SAC, except admit

that Citi valued its USD interest rate trades at approximately 8:30 am (EDT) on September 15,

2008 (the Termination Date), and admit, upon information and belief, that valuing this portfolio

at the end of that day would have yielded values more favorable to Lehman.  Defendants further

state that nothing in the parties' agreements or applicable law requires a non-defaulting party to

calculate the Close-out Amount as of a particular time of day, much less at the time of day most

favorable to the defaulting party.

89.    Defendants deny the allegations in paragraph 89 of the SAC.

90.    Defendants deny the allegations in paragraph 90 of the SAC, except admit that Citi did not execute replacement transactions for the majority of the 30,000 terminated trades at the time of the close-out. Defendants further state that the liquidated damages provision in each of the Master Agreements expressly entitles Citi, the non-defaulting party, to recover the replacement cost of the terminated trades, regardless of whether replacement trades were actually executed. Specifically, under the "Close-out Amount" method, the non-defaulting party is entitled to the costs "that are or would be incurred under then prevailing circumstances . . . in replacing, or in providing . . . the economic equivalent of," the material terms of the terminated trades. 2002 ISDA Master Agreement § 14. By including the conditional tense (i.e., "that are or would be incurred"), the contract unambiguously provides that the non-defaulting party is entitled to replacement cost even if it did not, in fact, enter into a replacement transaction.[29] Replacement cost necessarily includes cost components above mid-market value – specifically, "bid/offer" charges and liquidity premiums for oversized trades – that a party would have to pay in the market to enter into new trades. While Plaintiffs improperly refer to these elements of Citi's derivatives claim as "Hypothetical Charges," these charges are very real; they are charged by all dealers in the OTC derivatives markets to compensate for transaction costs and risks, and as such they are critical components of determining the Close-out Amount, whether or not a

---

[29]    Citi is also entitled to recover replacement costs under the express terms of the two Master Agreements that do not incorporate the "Close-out Amount" from the 2002 ISDA Master Agreement. The LBSF-Canyon Agreement, under which Citi Canyon claims approximately $760,000, is governed by "Market Quotation" and "Loss," as defined under the 1992 ISDA Master Agreement. As shown above, "Market Quotation" is expressly based on quotations from market-makers for replacement transactions, while "Loss" expressly permits non-defaulting parties to calculate their claims based on such quotes. The LBCS-Global EFET Agreement, under which CGML claims approximately $5 million, expressly provides (in language specifically inserted by the parties) that the non-defaulting party should calculate the amount owed based on quotes from leading dealers in the relevant market and that the non-defaulting party is not required to enter into any actual replacement transactions.

replacement trade is actually executed.  Indeed, it would be commercially unreasonable to require the non-defaulting party to actually replace all terminated trades at the time of close-out as a condition to recovering benefit-of-the-bargain damages.  A non-defaulting party may be unable to enter into replacement trades at close-out for any number of reasons, including the sheer number and size of the trades to be closed out, the illiquid nature of particular trades, or the lack of funds to enter into costly replacements.  Further, a rule that required the non-defaulting party to enter into replacement trades in order to recover benefit-of-the-bargain damages would be contrary to the interests of all future debtors and their creditors.  In the face of such a rule, counterparties would overrun the market seeking to transact; the increased demand would move the market and substantially increase the derivatives claims against the defaulting party.  Consistent with the terms of the industry-standard liquidated damages provision, longstanding industry practice and applicable law, Citi is properly claiming the replacement cost of its terminated trades, without regard to whether Citi actually executed replacements at the time of the close-out.

91.    Defendants deny the allegations in paragraph 91 of the SAC, and refer to the Master Agreements for their contents.  Defendants further state that replacement cost not only is what Citi is expressly entitled to under the ISDA's liquidated damages provision, it also corresponds directly to Citi's "actual damages" because it reflects the amount Citi would have to pay to replace what was lost as a result of Lehman's default – *i.e.*, the amount required to provide Citi with the benefit of its bargain.

92.    Defendants deny the allegations in paragraph 92 of the SAC, and refer to the COA Master Agreements and the 2002 ISDA Master Agreement for their contents.

93.     Defendants deny the allegations in paragraph 93 of the SAC, except admit

that market-makers charge bid/offer spreads when executing trades, and refer to the quoted

document for its contents.  Defendants further state that plaintiffs' contention that a non-

defaulting party is somehow limited to recovering mid-market value where that party did not

actually execute a replacement trade is directly contrary to the parties' agreement.  Indeed, the

2002 ISDA Master Agreement specifically identifies the very rare circumstances where Close-

out Amount should be calculated as the mid-market value of the terminated trades.

Section 6(e)(ii)(3) of the 2002 ISDA Master Agreement, entitled "Mid-Market Events," provides

that if the agreement is terminated due to illegality or a force majeure event, then parties seeking

quotations should ask for "mid-market quotations" and, in all events, parties should use "mid-

market values" for purposes of determining the Close-out Amount.  Interestingly, in adopting

"Close-out Amount" in the COA Agreement, the dealer community did not specifically adopt

this provision from the 2002 ISDA Master Agreement concerning mid-market termination

events.  Whatever the reason for that decision, it is abundantly clear that the drafters of the 2002

ISDA Master Agreement and the sophisticated signatories to the COA Agreement (which

adopted certain provisions of the 2002 ISDA) knew how to specify that mid-market values

should be used, rather than replacement cost, when that result was intended.  It was not intended

here.

94.     Defendants deny the allegations in paragraph 94 of the SAC.  Defendants

further state that Citi appropriately included transaction costs, such as bid/offer charges, in its

derivatives claims consistent with the parties' contracts and applicable law.  Plaintiffs'

contention that Citi somehow could have avoided paying bid/offer by transacting in the "inter-

dealer market," where trades supposedly occur "at or very close to mid-market prices," is wrong.

It is specifically refuted by actual quotes from the interdealer market that Citi relied on in

computing its claims and, in fact, submitted to Lehman as supporting documentation in 2009,

when Citi completed the Derivatives Questionnaire pursuant to the Bar Date Order.[30]  Plaintiffs'

contention is also easily refuted by data that anyone can purchase (and that, upon information

and belief, Lehman has purchased) from interdealer brokers covering the week of September 15,

2008.  For example, data purchased from GFI, the leading interdealer broker for credit products,

clearly shows that bid/offer charges were quoted, and paid, in the interdealer market.  In fact, if

Citi had used the bid/offer spreads quoted by GFI, Citi's derivatives claim would have been

*higher*, not lower.[31]

95.     Defendants deny the allegations in paragraph 95 of the SAC, except admit

that, in appropriate instances, Citi included liquidity charges – which reflect the increased

bid/offer spread market participants charge to deal in outsized positions – in the estimate of

replacement costs for particular trades.  It is indisputable that, to execute a trade that is

substantially larger than the standard size, a party typically will have to pay a wider bid/offer.

John C. Hull, *Risk Management and Financial Institutions* 448 (3d ed. 2012). [32]

96.     Defendants deny the allegations in paragraph 96 of the SAC, and refer to

the Master Agreements for their contents.

97.     Defendants deny the allegations in paragraph 97 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that each of the Master

---

[30] Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving of the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. July 2, 2009), Dkt. No. 4271 (the "Bar Date Order").

[31] *See supra*, n.12, for a description of the calculation.

[32] *See id.*  ("This is because the market maker knows that as the size of a trade increases, the difficulty of hedging the exposure created by the trade also increases.").

Agreements contains an enforceable liquidated damages provision governing the calculation of

damages in the event of breach.[33]  Under well-established New York law, a liquidated damages

provision will be upheld where, as here, "the amount liquidated bears a reasonable proportion to

the probable loss and the amount of actual loss is incapable or difficult of precise estimation."

*JMD Holdings Corp.* v. *Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (quoting *Truck Rent-A-Ctr.,*

*Inc.* v. *Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977)); *see also United Air Lines, Inc.* v.

*Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (liquidated damages provision will be

invalidated as unenforceable penalty only where liquidated amount "is plainly or grossly

disproportionate to the probable loss anticipated when the contract was executed").  Courts

evaluate a liquidated damages provision as of the time the parties executed the contract.

*Rattigan* v. *Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) ("The reasonableness

of the liquidated damages and the certainty of actual damages both must be measured as of the

time the parties enter the contract, not as of the time of the breach.") (internal quotation and

citation omitted); *see also Truck Rent-A-Ctr.*, 41 N.Y.2d at 425.  When the parties entered into

the various Master Agreements, they obviously could not have predicted the amount of actual

loss that would be suffered upon a breach.  Among other things, the parties had no idea which of

them would breach, what trades would be outstanding between them at the time, or what market

conditions would prevail.  Further, the liquidated amount clearly "bears a reasonable proportion"

---

[33]   The parties specifically agreed in the ISDA Master Agreements that "Close-out Amount" (under the 2002
version) and  "Market Quotation" (under the 1992 version) are each "a reasonable pre-estimate of loss and not a
penalty" and, further, that:

   Such amount is payable for the loss of bargain and the loss of protection against future risks,
   and, except as otherwise provided in this Agreement, neither party will be entitled to recover
   any additional damages as a consequence of the termination of the Terminated Transactions.

   2002 ISDA Master Agreement § 6(e)(v); *see also* 1992 ISDA Master Agreement § 6(e)(iv).

to the probable loss; in fact, it is a method of calculating the actual loss.[34]  The liquidated

measure is the estimated replacement cost of the terminated trades – that is, the amount that the

non-breaching party would have to pay in the market to replace the trades that had been lost and

thereby obtain the benefit of its bargain.  This is exactly what an award of actual damages is

meant to do.  *Freund* v. *Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) ("[S]o far as

possible, [New York] law attempts to secure to the [non-breaching] party the benefit of his

bargain . . . .") (cited at SAC ¶¶ 97, 98).

           98.    Defendants deny the allegations in paragraph 98 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that Citi's calculation of

damages with respect to the terminated derivatives trades is governed by an enforceable – and

industry-standard – liquidated damages provision.  Under controlling New York law, Citi's

actual damages as a result of Lehman's breach "have little relevance to the validity of a

liquidated damages clause."  *Walter E. Heller & Co.* v. *Am. Flyers Airline Corp.*, 459 F.2d 896,

898 (2d Cir. 1972).  "It thus makes no difference whether the actual damages are ultimately

higher or lower" than the liquidated amount.  *Id.* at 899.  Here, however, Citi's general contract

damages are essentially congruent with the liquidated amount asserted in Citi's claim.  If Citi

were, in fact, seeking general (rather than liquidated) damages, Citi would be entitled to recover

---

[34]    In a leading treatise, published before Lehman's bankruptcy, Weil Gotshal (lead bankruptcy counsel for the
Lehman plaintiffs) states that "*the [ISDA] formulae for calculating damages appear to strive to measure 'actual
damages' not 'anticipated damages.*'"  2 Weil, Gotshal & Manges LLP, Reorganizing Filing Businesses:  A
Comprehensive Review and Analysis of Financial Restructuring and Business Reorganization 20-36 (Marvin E.
Jacob & Sharon Youdelman eds., rev. ed. 2006) (emphasis added).  Weil's treatise acknowledges that there "is
some debate whether calculating damages by reference to the market quotations method . . . is a measure of
anticipated damages or actual damages," but notes that, "[b]ecause the market quotations method attempts to
determine the *replacement cost* of obtaining an identical swap, the calculation of those damages simply may be
*a method for calculating actual damages*."  *Id.* at 20-36 – 20-37 (emphasis added).  The treatise concludes that,
even if Market Quotation "measures liquidated damages from a theoretical standpoint," it is unlikely to
constitute a penalty because "[a]ctual damages following the termination of a swap agreement are difficult to
estimate" and "by measuring replacement cost, [Market Quotation] likely is to be considered a reasonable
estimation of anticipated loss."  *Id.* at 20-37.

the full replacement cost of the trades – benefit-of-the bargain damages – whether or not Citi

entered into replacement trades at the close-out.  Under New York law, courts award expectation

damages based on the market price of a substitute without regard to – and often with no

discussion whatsoever about – whether a substitute contract was actually executed.[35]  Indeed, the

U.C.C. – which governs many of the foreign exchange and commodities trades in Citi's claims

(and has been applied as persuasive precedent even to cases involving securities)[36] – specifically

provides that a non-breaching party's failure to "cover," by entering into a substitute contract,

does not affect his entitlement to all available damages.  N.Y. U.C.C. Law § 2-712(3)

(McKinney 2012) ("Failure of the [non-breaching] buyer to effect cover . . . does not bar him

from any other remedy.").  Under general New York contract law, Citi is entitled to recover the

market price of replacement trades – which market price necessarily includes the transaction

costs plaintiffs improperly refer to as "Hypothetical Charges" – regardless of whether Citi

actually executed replacement trades following Lehman's default.

---

[35]  *See*, *e.g.*, *Schonfeld* v. *Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("When a defendant's breach of contract
deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the 'market value' of the asset,"
typically by reference to prices in an established market or based on a "hypothetical market standard"); *Maxim
Group LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y 2010) (holding that damages for
breach of obligation to issue or honor a warrant should be calculated "by comparing the warrant's strike price to
the market price of the stock on the date of attempted exercise") (internal quotation omitted); *Kovens* v. *Paul*,
No. 04 Civ. 2238(TPG), 2009 WL 562280, at *4 (S.D.N.Y. Mar. 4, 2009) ("[T]h[e] measure of [expectation]
damages does not require that a plaintiff be able to 'cover' the sale by acquiring the same quantity of the asset
from another source.") (cited at SAC ¶ 99); *Viacom Outdoor, Inc.* v. *Wixon Jewelers, Inc.,* 906 N.Y.S.2d 776
(Table) (N.Y. Sup. Ct. 2009) ("If there is a market for the performance, the market price will generally be the
standard used to measure damages, either by considering the market price in comparison to the contract price,
or by comparing the contract price to the cost of substitute performance actually obtained in the market.")
(citing 24 Lord, *Williston on Contracts* § 64.4, at 48–49 (4th ed. 2002)); Joseph M. Perillo, *Calamari and
Perillo on Contracts* § 14.20, at 592 (5th ed. 2003) ("The traditional measure of damages for a total breach of
contract by the seller is the difference between the market price of the goods and the contract price.  The UCC
continues this rule, but has *added an alternative measure* . . . .  The buyer *may choose* to cover . . . .") (emphasis
added).

[36]  *See Intershoe, Inc.* v. *Bankers Trust Co.,* 77 N.Y.2d 517, 521 (1991) ("There seems to be no question that the
UCC applies to foreign currency transactions."); *Kovens*, 2009 WL 562280 (S.D.N.Y. 2009) (cited at SAC ¶ 99)
(applying UCC measure of damages to breach of contract to sell securities); N.Y. U.C.C. Law § 2-105 cmt. 1
(McKinney 2012) ("'Goods' is intended to cover the sale of money when money is being treated as a
commodity.").

99.    Defendants deny the allegations in paragraph 99 of the SAC, and refer to the cited documents for their contents.  Defendants further state that, in the absence of a contractual clause governing when damages should be calculated, New York law generally provides that damages should be calculated as of the date of breach.  Here, however, the parties' agreements specifically address when damages should be calculated under the liquidated damages provisions.  They should be calculated as of the termination date or as soon as "commercially reasonable" (under the 2002 ISDA Master Agreement) or "reasonably practicable" (under the 1992 version).  Defendants complied with these contractual provisions and acted in good faith and in a commercially reasonable manner, closing out their more than 30,000 Lehman-facing trades on September 15, 2008 and the days that followed.

100.    Defendants deny the allegations in paragraph 100 of the SAC.  Defendants further state that liquidity charges reflect the increased bid/offer spread that dealers charge to enter into outsized trades.  Citi's claim calculation includes bid/offer and, where appropriate, liquidity charges because these are a necessary component of the replacement cost of the trades. Plaintiffs appear to be arguing that, in including these charges without actually executing a replacement trade, Citi somehow "retained the upside market potential" while protecting itself "against a price decline."  This allegation makes no sense.  Citi calculated the replacement cost (including appropriate bid/offer and liquidity charges) at the time it closed out the trades.  The fact that Citi did not – and often could not – replace a terminated trade at close-out did not give Citi some type of "free option" to ride the market without risk of loss.  To the contrary, Citi faced substantial market risk with respect to these non-replaced trades, during a time of unprecedented market volatility.  The price to replace these trades could go up or down in the

future such that Citi's claim (as determined at the close-out) might be either more or less than Citi would need to execute a replacement trade.

101.     Defendants deny the allegations in paragraph 101 of the SAC, and refer to the cited documents for their contents.  Contrary to plaintiffs' assertion, New York law is clear that a valid liquidated damages clause can set forth a formula or method for calculating the liquidated amount, rather than specifying a single, fixed amount.  *See*, *e.g.*, *United Air Lines*, 867 F.2d at 740–41 (2d Cir. 1988) (enforcing liquidated damages clause setting forth a calculation methodology); *JMD Holding Corp.*, 4 N.Y.3d at 382–83 (same); *Truck Rent-A-Ctr.*, 41 N.Y.2d at 425 (same); *see also Merrill Lynch Capital Servs., Inc.*, v. *UISA Fin.*, No. 09 Civ. 2324 (RJS), 2012 WL 1202034, at *22–23 (S.D.N.Y. Apr. 10, 2012) (approving use of ISDA Market Quotation and Loss methodologies to calculate damages).

102.     Defendants deny the allegations in paragraph 102 of the SAC, and refer to the cited documents for their contents.  Defendants further state that the liquidated damages provision in the parties' agreements constitutes a reasonable "estimate, made by the parties at the time they enter[ed] into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."  *Truck Rent-A-Ctr.*, 41 N.Y.2d at 424; *see also JMD Holdings Corp.*, 4 N.Y.3d at 382–83.  Plaintiffs bear the burden of proving that these industry-standard liquidated damages provisions – employed by the entire OTC derivatives market – are, instead, unenforceable penalties that call for a measure of damages "plainly or grossly disproportionate to the probable loss."  *Truck Rent-a-Ctr.*, 41 N.Y.2d at 425; *see also Rattigan*, 739 F. Supp. at 170 (breaching party "has the burden of proving that the liquidated damages clause to which it freely contracted is, in fact, a penalty").  Plaintiffs will not remotely be able to carry their burden.  First, it cannot seriously be questioned that actual damages upon breach of the Master Agreements

were "incapable or difficult of precise estimation" at the time the contracts were executed.

Indeed, courts in this jurisdiction cite "the complex nature of derivative transactions and the

difficulty in assessing damages efficiently after the fact" as grounds for enforcing the ISDA's

close-out methodology. *Merrill Lynch Capital Servs.*, 2012 WL 1202034, at *22. Second, the

liquidated damages measure, which is the estimated replacement cost of the terminated trades, is

plainly proportional – indeed, likely identical – to the probable loss upon breach. Replacement

cost – that is, the price Citi would have to pay in the market to replace the trades that were lost –

represents the damages necessary to provide Citi with the "benefit of its bargain" and to place

Citi in the same position it would have occupied "but for" Lehman's breach. Replacement cost

necessarily includes the transaction costs (including bid/offer and liquidity premium for

oversized trades) charged in the market. *See id.*, at *23 (enforcing a liquidated damages

calculation that included "the bid/offer spread to reflect the cost to MLCS of reestablishing the

positions that MLCS had under the Swap") (internal quotations omitted). By contrast, mid-

market value is a manifestly unreasonable measure of damages for the terminated trades because,

by definition, it is insufficient to procure replacements in the market. *Cf. United States* v.

*Cartwright*, 411 U.S. 546 (1973) (use of "asked" price to value shares was unreasonable where

shareholder could only sell at the "bid" price). The industry-standard liquidated damages

provisions in the parties' agreements are, without doubt, enforceable. *See JMD Holdings*, 4

N.Y.3d at 388 (reasonableness of liquidated damages provision bolstered by fact that it was a

"common feature in [industry agreements] negotiated by sophisticated commercial parties"); *GFI

Brokers, LLC* v. *Santana*, Nos. 06 Civ. 3988(GEL), 06 Civ. 4611(GEL), 2009 WL 2482130, at

*9 (S.D.N.Y. Aug. 13, 2009) (the "fact that similar liquidated damages clauses are prevalent in the industry" supports finding of reasonableness).[37]

103.    Defendants deny the allegations in paragraph 103 of the SAC.

104.    Defendants deny the allegations in paragraph 104 of the SAC, and refer to Section 502(b)(1) of the Bankruptcy Code for its contents.  Defendants further state that Citi calculated its derivatives claims pursuant to the enforceable liquidated damages provisions in the parties' agreements and therefore Citi's derivatives claims do not include any penalty component subject to disallowance under the Bankruptcy Code.  Indeed, Citi's liquidated damages are essentially congruent with the benefit-of-the-bargain damages Citi would be entitled to in the absence of a liquidated damages clause.

105.    Defendants deny the allegations in paragraph 105 of the SAC, and refer to Section 502(b)(1) of the Bankruptcy Code and the cited documents for their contents.

106.    Defendants deny the allegations in paragraph 106 of the SAC.

---

[37]    Plaintiffs cite only two cases where a liquidated damages provision was found to constitute a penalty.  The clauses at issue in those cases bear no conceivable resemblance to the industry-standard ISDA provisions at issue here.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 417 (Bankr. S.D.N.Y. 2007) (invalidating prepayment penalty that "in effect charged the Debtor 76% of the principal amount of its own money if it repaid the putative loan after one day") (cited at SAC ¶ 102); *In re Ionosphere Clubs, Inc.*, 262 B.R. 604, 613 (Bankr. S.D.N.Y. 2001) (invalidating tax indemnification clause that would require debtor to compensate party based on 46% tax rate when party was only subject to 35% tax rate) (cited at SAC ¶ 102).

Plaintiffs also cite *In re Ionosphere* for the proposition that "courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty."  262 B.R. at 614.  Here, however, there can be no reasonable doubt that ISDA's industry-standard provision is enforceable.  In all events, New York's highest court has made clear that the presumption, in fact, should run the other way – *i.e.*,  in favor of enforcement. While *Ionosphere* relied on older cases from lower courts, the New York Court of Appeals in *JMD Holding Corp.* recently cautioned against interfering with parties' agreements and favorably cited a Seventh Circuit decision noting "an emerging presumption against interpreting liquidated damages clauses as penalty clauses." *JMD Holdings Corp.*, 4 N.Y.3d at 380–81 (quoting *XCO Intl. Inc.* v. *Pac. Scientific Co.*, 369 F.3d 998, 1002-03 (7th Cir. 2004); *see also Koninklijke Philips Elecs. N.V.* v. *Cinram Int'l, Inc.*, Nos. 08-0515, 08-4068, 08-4070, 08-4071, 2012 WL 4074419, at *12 (S.D.N.Y. Aug. 13, 2012) (finding presumption in favor of enforcing liquidated damages provisions particularly strong when damages amount is "assessed among sophisticated parties to a negotiated agreement"); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 196 (Bankr. S.D.N.Y. 2012) (burden of proving that liquidated damages clause is punitive "must be considered in light of the admonition that the historical distinction between liquidated damages and penalties has become increasingly difficult to justify, and courts should not interfere with the parties' agreement regarding liquidated damages 'absent some persuasive justification.'") (quoting *GFI Brokers*, 2009 WL 2482130, at *2).

107.     Defendants deny the allegations in paragraph 107 and footnote 7 of the SAC, and refer to Section 506(b) of the Bankruptcy Code and the cited documents for their contents.

108.     Defendants deny the allegations in paragraph 108 and footnote 8 of the SAC, and refer to Sections 507(a)(8)(G) and 726(a)(3) of the Bankruptcy Code for their contents.

109.     Defendants deny the allegations in paragraph 109 of the SAC.

110.     Defendants deny the allegations in paragraph 110 of the SAC.  Defendants further state that in closing out the terminated trades, Citi did substantial netting (what plaintiffs sometimes refer to as "aggregation"), thereby reducing its derivatives claims against Lehman by hundreds of millions of dollars.  Indeed, Citi intended to net all offsetting trades that existed under any ISDA agreement; if Citi overlooked any such trades (where netting would leave Citi in a neutral risk position), Citi will correct the error.  There is, in fact, no actual dispute between the parties with respect to netting *offsetting* trades.  Rather, plaintiffs contend that Citi should have done substantially more netting of dissimilar trades, and accepted uncompensated risks solely for purposes of diminishing its claims against Lehman – a position that has no support in the relevant contracts or applicable law.

111.     Defendants deny the allegations in paragraph 111 of the SAC, except admit that Citi and the Lehman Subsidiaries were parties to several thousand interest rate swaps in which the floating rate was indexed to a commonly used reference such as LIBOR, and that Citi acted as a floating rate payer in certain trades and a floating rate receiver in other trades. Defendants further state that they performed substantial netting with respect to interest rate swaps.  For example, Citi's netting of its G10 USD vanilla interest rate swaps alone reduced its claim by approximately $150 million.

61

112.     Defendants deny the allegations in paragraph 112 of the SAC, except admit that, for risk management purposes, Citi looks at its derivatives trades under various scenarios and groupings (*i.e.*, "aggregation") and admit that Citi does not execute a specific hedging transaction to offset each and every one of the trades it executes with customers.

113.     Defendants deny the allegations in paragraph 113 of the SAC, except admit that Citi would not have been able to enter into replacements for all of the terminated trades on or around the date of LBHI's bankruptcy filing.  Defendants further state that there are over 30,000 terminated derivatives trades, not 20,000 as alleged by plaintiffs in paragraph 113 (indeed, there were nearly 20,000 credit trades alone).

114.     Defendants deny the allegations in paragraphs 114 of the SAC, and refer to Citigroup Inc.'s 2008 Annual Report for its contents.  Throughout the SAC, plaintiffs invoke Citi's "risk management practices" as a reason Citi supposedly was obligated to net more aggressively when calculating its derivatives claims against Lehman.  But Citi's risk management practices – whatever they might be, for plaintiffs' allegations lack any specificity – in no way limit Citi's entitlement to benefit-of-the-bargain damages upon Lehman's default.  As a fundamental part of its business model, Citi takes risks in order to earn profits.  Citi's risk management policies and practices are developed to contain these risks, but certainly not to eliminate them.  Where, as here, a counterparty has breached a contract with Citi, Citi is entitled to recover its replacement cost (*i.e.,* the benefit of its bargain) and cannot be forced to accept uncompensated risk simply because, in certain circumstances, Citi might be willing to take on similar risk in the pursuit of profit.  In calculating its claim, Citi appropriately netted transactions in a manner that did not expose Citi to undue and uncompensated risks.  It would not be commercially reasonable to require Citi to do more.

115.    Defendants deny the allegations in paragraph 115 of the SAC, and refer to the COA Master Agreements and 2002 ISDA Master Agreement for their contents.

116.    Defendants deny the allegations in paragraph 116 of the SAC, except admit that they netted offsetting rates and FX trades.

117.    Defendants deny the allegations in paragraph 117 of the SAC.

118.    Defendants deny the allegations in paragraph 118 of the SAC, and refer to the cited document for its contents.  Under the parties' agreements, Citi was required to calculate the replacement cost of the terminated trades in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result.  The netting principles Citi adopted were commercially reasonable and, in fact, wholly consistent with the netting to which Citi would agree in the ordinary course of business.

119.    Defendants deny the allegations in paragraph 119 of the SAC.

120.    Defendants deny the allegations in paragraph 120 of the SAC, except refer to the cited documents for their contents.  Defendants further state that under New York law, "[m]itigation of damages is not relevant when there is a valid liquidated damages clause." *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 639 (2d Dep't 2000).  Rather, "once liquidated damages are awarded pursuant to a valid contract provision, the plaintiff need not make efforts to mitigate those damages and subtract the mitigation from the liquidated damages award."  *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 351 n.3 (S.D.N.Y. 2003).  Citi was obligated to calculate its damages pursuant to a valid liquidated damages clause and did so in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result.

121.    Defendants deny the allegations in paragraph 121 of the SAC.

63

122.    Defendants deny the allegations in paragraph 122 of the SAC, except admit that, prior to Lehman's bankruptcy, the parties entered into credit default swap ("CDS") trades under the LBSF-Citibank, LBSF-Global, and LBSF-Financial Agreements, and admit that Citi was the net buyer of protection.  Defendants further state that there were 17,673 CDS trades[38] under these agreements, for which Citi calculated a net claim of $1.731 billion pursuant to the industry-standard liquidated damages provision.  Plaintiffs have refused to disclose the alleged "readily available market data" underlying their so-called "Market-Based Calculation of Proper Close-out Amount" (as reflected in the chart at paragraph 122).  Given the extreme positions plaintiffs have staked out in the SAC, however, plaintiffs' chart clearly presents an illegitimate, "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' calculations reflect a mid-market value only, even though replacement cost is the measure of damages mandated by the parties' agreements and necessary to provide Citi with the benefit of its bargain.  Further, upon information and belief, plaintiffs' calculations are performed as of September 15, 2008, whereas Citi – following commercially reasonable procedures – closed out the majority of CDS trades on September 16, 2008.  Citi also disagrees with certain trade counts and claim amounts set forth in the chart, and a corrected version of the chart appears below.

---

[38]   Citi's credit derivatives businesses trade CDS on securitized products in addition to CDS on single names, indices, and index tranches.  In total, Citi's credit businesses closed out approximately 19,000 Lehman-facing trades.  Plaintiffs' SAC, however, treats CDS on securitized products as a separate category.  To prevent confusion, and in order to provide meaningful responses, Citi has attempted to follow plaintiffs' convention when responding to (and correcting) the charts and tables in the SAC.

**Close-out Amount Calculations for CDS Portfolios**
[values in USD to LBSF]

| Master Agreement | Category | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
|---|---|---|---|---|---|
| LBSF-Citibank | Single Name CDS | 12,309 **12,348** | (821,552,321) **(815,865,570)** | (116,487,932) | 705,064,389 |
| | Index CDS | 711 **706** | (693,063,792) **(674,571,215)** | (502,481,629) | 190,582,163 |
| | Index Tranche | 371 **383** | 3,387,187 **(3,113,410)** | 115,038,873 | 111,651,686 |
| | OTHER | 637 **647** | (21,016,480) **(47,979,880)** | 32,736,723 | 53,753,203 |
| | TOTAL | 14,028 **14,084** | (1,532,245,406) **(1,541,530,074)** | (471,193,966) | 1,061,051,441 |
| LBSF-Financial **LBSF-Global** | Single Name CDS | 3,039 **3,045** | (123,912,599) **(127,163,130)** | (9,116,039) | 114,796,560 |
| | Index CDS | 195 **193** | (47,202,484) **(46,004,249)** | (10,281,440) | 36,921,044 |
| | Index Tranche | 130 **125** | (2,713,695) **(688,742)** | 36,229,572 | 38,943,267 |
| | OTHER | 72 **70** | (37,599,585) **(38,763,161)** | (26,080,649) | 11,518,935 |
| | TOTAL | 3,436 **3,433** | (211,428,363) **(212,619,282)** | (9,248,557) | 202,179,806 |
| LBSF Global **LBSF-Financial** | Single Name CDS | 130 **132** | (34,634,116) **(57,512,823)** | (28,268,069) | 6,366,048 |
| | Index CDS | 11 **8** | 24,557,472 **23,994,765** | 24,933,234 | 375,762 |
| | Index Tranche | 11 | 53,987,807 | 59,732,919 | 5,745,112 |
| | OTHER | 7 **5** | (20,773,083) **2,668,332** | (16,769,041) | 4,004,041 |
| | TOTAL | 159 **156** | 23,138,081 | 39,629,043 | 16,490,963 |
| | GRAND TOTAL | 17,623 **17,673** | (1,720,535,689) **(1,731,011,276)** | (440,813,479) | 1,279,722,210 |

123.   Defendants deny the allegations in paragraph 123 of the SAC, except admit that single name CDS and index CDS account for the substantial majority of credit derivatives in Citi's claim.  Defendants further state that, out of 17,673 CDS trades, 15,525 are single name CDS and 907 are index CDS.

124.   Defendants deny the allegations in paragraph 124 of the SAC, except admit that Citi closed out the substantial majority of its CDS trades on September 16, 2008, the day following the Early Termination Date.  Defendants further state that this one day provided

the time needed for Citi to organize and coordinate the close-out across Citi's various credit

businesses. Lehman's default was an unprecedented event in the OTC derivatives market; no

major dealer had ever before defaulted on its derivatives obligations and Citi had never before

closed out a derivatives portfolio anywhere near the size of its over 30,000 Lehman-facing

trades. Almost two-thirds – or nearly 20,000 – of these trades resided in Citi's various credit

businesses.[39] Because these businesses traded certain overlapping products (including single

name CDS), Citi undertook to transfer all such trades to the particular credit desk that acted as a

market-maker for the underlying reference entity (*e.g.*, General Motors Company (GM),

International Business Machines Corporation (IBM), JPMorgan Chase & Co. (JPM)). That way,

all trades referencing a particular name could be closed out at a consistent time and by traders

with the most market knowledge and experience trading that particular name. In light of this

effort (which resulted in the transfer of more than 2,300 credit trades), Citi traders did not begin

to close out most credit trades until the morning of September 16, 2008. The traders then

proceeded to close out the trades over the course of that day, as expeditiously as possible. The

overwhelming majority of CDS trades were closed out on September 16, 2008, with a minority

closed out over the following days. Plaintiffs' purported "Market Based Calculation of Close-

out Amounts" as of both "Citi's Close-out Date" and the "Early Termination Date" (as set forth

in the chart at paragraph 124), depict deeply flawed results because, upon information and belief,

they reflect only mid-market valuations, rather than replacement cost valuations, as mandated by

---

[39]   Citi's credit businesses include Global Credit Trading, Emerging Markets, Portfolio & Exotics Credit
Derivatives, Global Securitized Markets, and the Subprime Portfolio Group. As previously noted, businesses
that trade securitized products are considered part of Citi's credit business. In responding to and correcting the
charts in the SAC, however, Citi follows plaintiffs' convention and treats CDS on securitized products
separately.

the parties' agreements.  A corrected version of the chart in paragraph 124 of the SAC appears

below.

| Effect of Using a Close-out Date Other Than the Early Termination Date | | | | | |
|---|---|---|---|---|---|
| Early Termination Date | Citi Close-out Date | No. Trades | ~~Market-Based Calculation of Close-out Amounts as of Citi Close-out Date ($)~~ | ~~Market-Based Calculation of Close-out Amounts as of Early Termination Date ($)~~ | ~~Difference ($)~~ |
| 9/15/2008 | 9/16/2008 | ~~14,239~~ **14,288** | ~~(664,215,476)~~ | ~~(611,706,050)~~ | ~~52,509,426~~ |
| 9/15/2008 | 9/17/2008 | ~~1,715~~ **1,728** | ~~(41,948,991)~~ | ~~(46,614,107)~~ | ~~(4,665,116)~~ |
| 9/15/2008 | 9/18/2008 | ~~41~~ **47** | ~~(4,252,375)~~ | ~~(2,712,216)~~ | ~~1,540,159~~ |
| 9/15/2008 | 9/19/2008 | 44 | ~~3,136,883~~ | ~~2,152,160~~ | ~~(984,723)~~ |
| **TOTAL** | | ~~16,039~~ **16,107** | ~~(707,279,959)~~ | ~~(658,880,214)~~ | ~~48,399,745~~ |

125.    Defendants deny the allegations in paragraph 125 of the SAC, except

admit that Citi is a market-maker in CDS.  Defendants further state that, far from violating the

contracts or applicable law, Citi's effort to effectively organize the credit close-out was a

commercially reasonable – indeed, commendable – procedure, clearly aimed at producing a

commercially reasonable result.  Plaintiffs' allegation that "Citi has provided very little

information regarding the methodology or the specific timing of the close-out process for the

CDS portfolio," is disingenuous.  Citi submitted extremely detailed responses to the Derivatives

Questionnaire (far beyond what was required under the Bar Date Order)[40] and provided Lehman

with direct access to the head traders who oversaw the credit close-out process in a series of

lengthy, in-person meetings during the spring and summer of 2010.  During those meetings,

---

[40]    These responses were subsequently updated and can be found at CITI-LEH00962090-98.

Citi's credit traders described the close-out process in detail, including the fact that Citi took the time to transfer trades to the relevant market-maker and that CDS trades were valued over the course of the day on September 16 and, to a lesser extent, the days that followed.

126.    Defendants deny the allegations in paragraph 126 of the SAC and footnote 9, except lack knowledge or information sufficient to form a belief about the valuation dates used by Lehman's other, unnamed counterparties or the composition of their CDS portfolios with Lehman.  Defendants further state, upon information and belief, that many of Lehman's big bank counterparties valued CDS on dates other than September 15, 2008.  Indeed, the Derivatives Settlement Framework that Lehman developed and used to settle the claims of ten of its largest bank counterparties, values a counterparty's credit trades on either September 15, 16, 17, 18, or 19, depending on which date each counterparty valued the "preponderance" of these trades. Defendants further state that they disagree with the trade counts reflected in plaintiffs' chart in paragraph 126 of the SAC, and a corrected version appears below.

| CDS Common between Citi and Other Large Financial Institutions where Other Institution was able to value as of September 15, 2008 | | | | |
|---|---|---|---|---|
| | Citi | | ~~Other Large Institutions~~ | |
| Category | Index or Single Name Present in Citi Population | No. Trades | ~~Index or Single Name in Common with Citi~~ | ~~No. Trades~~ |
| Index | ~~138~~ **135** | ~~906~~ **900** | ~~121~~ | ~~9,602~~ |
| Single Name | ~~961~~ **949** | ~~15,156~~ **15,207** | ~~911~~ | ~~111,605~~ |
| **TOTAL** | ~~1,099~~ **1,084** | ~~16,062~~ **16,107** | ~~1,032~~ | ~~121,207~~ |

127.    Defendants deny the allegations in paragraph 127 of the SAC, except admit that Citi valued CDS trades over the course of the day on September 16 and, to a lesser extent, the days that followed.  Defendants further state that nothing in the governing ISDA

agreements or applicable law required Citi to value its trades at any particular time of day, or at the same time of day. While plaintiffs allege that the chart at paragraph 127 of the SAC compares Citi's mid-market claim on its CDS trades with mid-market values plaintiffs have derived from "publicly available market data," plaintiffs have refused to disclose the data they are relying on for their supposedly market-based calculations. In fact, Citi's mid-market values for these CDS trades are *entirely consistent* with mid-market values implied by data from either GFI, the leading interdealer broker for CDS, or CMA, one of the world's leading sources of independent data on the OTC markets.[41] A corrected version of the chart in paragraph 127 of the SAC, reflecting the correct trade count and Citi's mid-market valuation for its CDS trades, appears below.

| Comparison of Citi Mid-Market Values to Proper Calculation [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Mid-Market Calculation ($)** | ~~**Market-Based Calculation as of the Close-out Date ($)**~~ | ~~**Difference ($)**~~ |
| LBSF-Citibank | ~~12,211~~ **12,820** | ~~(912,857,878)~~ **(645,155,075)** | ~~(847,305,621)~~ | ~~65,552,257~~ |
| LBSF-Financial | ~~123~~ **75** | ~~10,183,880~~ **19,682,687** | ~~11,116,009~~ | ~~932,129~~ |
| LBSF-Global | ~~2,993~~ **2,978** | ~~(34,418,037)~~ **(21,879,199)** | ~~(38,403,727)~~ | ~~(3,985,690)~~ |
| **TOTAL** | ~~**15,327**~~ **15,873** | ~~**(937,092,035)**~~ **(647,351,586)** | ~~**(874,593,339)**~~ | ~~**62,498,696**~~ |

128.    Defendants deny the allegations in paragraph 128 of the SAC. Defendants further state that, while the Master Agreements clearly permit netting – providing a "Close-out

---

[41]    GFI data contains two-sided quotes (*i.e.*, both a bid and an offer) for trades with the same or similar maturity to 1,422 CDS trades in Citi's claim for which Citi's mid-market values are identified (using quotes that either match the maturity of a trade in Citi's claim, or come within one year of matching a trade in Citi's claim). The "best" GFI spreads (*i.e.*, most favorable for Lehman) for these trades imply an aggregate mid-market value that is only $8.8 million lower than Citi's aggregate mid-market value for these trades. CMA data, by contrast, provides bid and offer curves based on actual observed quotations for 13,136 of the CDS trades in the close-out with identified mid-market values. The CMA data implies an aggregate mid-market value that is only $32.4 million lower than Citi's mid-market values across all 13,136 trades.

Amount" should be determined for each "Terminated Transaction or group of Terminated

Transactions" – they say nothing about the degree of netting that is appropriate, other than the

overriding obligation of commercial reasonableness.  Citi netted the terminated trades in a

commercially reasonable fashion when calculating its claim.  For credit trades, in particular, Citi

netted trades that had the same reference entity, maturity, and strike, even if the trades had

different notional amounts.[42]  This methodology is not, as plaintiffs allege, "excessively narrow."

Rather, it provides plaintiffs with the benefits of netting trades that are truly risk equivalent, but

charges Lehman for defaulting on trades that cannot be netted without imposing undue risks on

Citi.  This methodology is consistent with industry practice as well as the parties' own course of

dealing.  Plaintiffs' Second Amended Complaint supplies a perfect example.  In September 2008,

prior to LBHI's bankruptcy, a trade collapse transaction was proposed whereby Lehman would,

essentially, net down a portion of its CDS portfolio:  Citi would step into certain CDS trades

where Lehman faced Bracebridge and Citi would cancel offsetting trades where Citi faced

Lehman.  The initial proposal was that Citi would step into 93 trades with Bracebridge (where

Bracebridge had sold protection to Lehman on specific RMBS) and cancel 31 trades with

Lehman (where Lehman had sold protection to Citi on the exact same RMBS).  Citi agreed that

most of the proposed trades could be collapsed, because they had matching reference obligations,

maturities and strikes.  Citi, however, rejected one set of trades where the strikes differed by

seven basis points (or 0.07%) and Lehman flagged another set that differed on strikes by ten

basis points (or 0.1%).  The parties agreed that these mismatched trades would not be included in

---

[42]   For CDS, the "reference entity" refers to the underlying bond for which credit protection is bought or sold (*e.g.*,
       General Motors, IBM, News Corp., and the like).  The "notional amount" is the dollar amount of credit
       protection bought or sold.  "Maturity" refers to the date on which the CDS protection ends.  The "strike" is the
       annual coupon payment owed, which is a percentage of the notional amount, and is expressed in basis points.
       For example, if the protection buyer pays 5% annually for $10 million notional of protection, the strike price for
       the trade is 500 bps.

the proposed transaction because they were not, in fact, offsetting, and therefore netting them would leave undue risk. Indeed, commercial entities, including TriOptima AB, provide multi-lateral netting services (sometimes referred to as "trade compression") to market participants, so that parties with massive CDS portfolios – like Citi and other dealers – can net down these portfolios to limit operational and other risks. TriOptima AB nets trades only where, among other things, they have the same reference entities, maturity, and strike. The aggressive netting – including across entirely different reference entities – that plaintiffs advocate in the SAC bears no resemblance to the commercially reasonable netting Citi (like other market participants) is willing to do in the ordinary course of business without additional compensation.

129.    Defendants deny the allegations in paragraph 129 of the SAC. While plaintiffs have refused to disclose the alleged "available market data" underlying their purported "Market-Based Calculation of Proper Close-out Amount" with respect to index CDS, plaintiffs' chart, again, clearly presents an illegitimate comparison. Upon information and belief, plaintiffs' calculations reflect a mid-market value only (while replacement cost is the measure mandated by the parties' agreements) and plaintiffs admit their calculation is as of September 15 (while Citi, following commercially reasonable procedures, closed out the majority of its index CDS on September 16). In addition, there are various typographical errors in the list of indices and certain mistakes with respect to trade count and claim amounts in plaintiffs' chart. A corrected version of the chart appears below.

**Largest Valuation Differences By Index for LBSF-Citibank Agreement**
[values in USD to LBSF]

| Index | Maturity Date | No. Trades | Citi Calculation of Close-out Amount ($) | ~~Market-Based Calculation of Proper Close-out Amount ($)~~ | ~~Difference ($)~~ |
|---|---|---|---|---|---|
| DJCDX-NAHYS5-5Y | 12/20/2010 | 8 | (32,684,631) | ~~(9,750,860)~~ | ~~22,933,771~~ |
| CDX-NAHYS8-3Y | 6/20/2010 | 3 | 100,260,707 | ~~122,102,719~~ | ~~21,842,012~~ |
| DJCDX-NAHYS4-5Y | 6/20/2010 | 10 | (20,174,064) | ~~78,972~~ | ~~20,253,036~~ |
| ~~ITRA XX EUROPES6 5Y~~ **ITRAXX-EUROPES6-10Y** | 12/20/2016 | 8 | (77,839,717) | ~~(61,903,011)~~ | ~~15,936,705~~ |
| ~~ITRA XX EUROPES7 5Y~~ **ITRAXX-EUROPES7-10Y** | 6/20/2017 | 6 | (51,335,588) | ~~(39,983,229)~~ | ~~11,352,359~~ |
| DJCDX-NAHYS3-5Y | 12/20/2009 | ~~12~~ **17** | (5,302,949) | ~~3,292,528~~ | ~~8,595,478~~ |
| ~~DJCDX-NAIGS7 10Y~~ **DJCDX-NAIGS7-5Y** | 12/20/2011 | 3 | (90,213,250) | ~~(81,931,955)~~ | ~~8,281,294~~ |
| DJCDX-NAIGS7-10Y | 12/20/2016 | 7 | (99,528,844) | ~~(91,427,498)~~ | ~~8,101,046~~ |
| ~~CDX-NAIGS8-3Y~~ **CDX-NAIGS8-5Y** | 6/20/2012 | 4 | (100,392,872) | ~~(93,595,444)~~ | ~~6,797,428~~ |
| ~~DJCDX-NAIGHVOLS4 4Y~~ **DJCDX-NAIGHVOLS4-5Y** | 6/20/2010 | ~~6~~ **7** | (46,972,614) | ~~(40,354,147)~~ | ~~6,618,467~~ |
| ~~CDX-NAIGS9 1Y~~ **CDX-NAIGS9-10Y** | 12/20/2017 | 5 | (71,958,594) | ~~(65,875,651)~~ | ~~6,082,943~~ |
| ~~LCDXNA S10 3Y~~ **LCDXNA S10-5Y** | 6/20/2013 | 28 | (34,218,178) | ~~(29,912,466)~~ | ~~4,305,712~~ |
| ~~CDX-NAHYS8 10Y~~ **CDX-NAHYS8-5Y** | 6/20/2012 | 4 | (43,449,365) | ~~(39,148,984)~~ | ~~4,300,382~~ |
| ~~DJCDX-NAIGHVOLS3 4Y~~ **DJCDX-NA IGHVOLS3-10Y** | 3/20/2015 | 2 | (14,835,643) | ~~(10,865,728)~~ | ~~3,969,915~~ |
| DJCDX-NAHYBS6-5Y | 6/20/2011 | 12 | 6,203,772 | ~~9,713,154~~ | ~~3,509,382~~ |
| Remaining 88 Index Positions | | ~~593~~ **582** | ~~(110,621,962)~~ **(92,129,385)** | ~~(72,920,030)~~ | ~~37,701,932~~ |
| **TOTAL** | | ~~711~~ **706** | ~~(693,063,792)~~ **(674,571,215)** | ~~(502,481,629)~~ | ~~190,582,163~~ |

130.     Defendants deny the allegations in paragraph 130 of the SAC, except admit that the two high-yield indices described by plaintiffs – the CDX-NAHYS8-3Y (the "HYS8") and the DCDX-NAHYS4-5Y (the "HYS4") – share 72 out of 100 component names in common and contain 28 unique names, and admit that Citi was a net seller of protection on the HYS8 and a net buyer of protection on the HYS4. Defendants further state that there was very little liquidity in these "off-the-run" indices – both the HYS8 and HYS4 were outdated products that did not trade with frequency over the time period specified in plaintiffs' chart. As a result,

defendants lack knowledge or information sufficient to form a belief about the "price

correlation" for these products from March 2008 through September 2008 and plaintiffs have

refused to disclose the data underlying their chart.  In any event, the alleged "price correlation"

(even if it could be verified) is irrelevant to the question of whether trades in *different* indices

nonetheless present offsetting risk that should be netted.  They do not.  More than a quarter of the

high-yield names in each of these indices are different.  Thus, requiring Citi to net these trades at

close-out would not be commercially reasonable, because doing so would have left Citi with

substantial uncompensated risk.

131.    Defendants deny the allegations in paragraph 131 of the SAC.

132.    Defendants deny the allegations in paragraph 132 of the SAC, except

admit that Citi did not execute replacement trades at close-out with respect to its massive

positions in these "off-the-run" indices.  Defendants further state that plaintiffs' contention that

Citi should have netted HYS4 trades against HYS8 trades ignores commercial reality, and seeks

to impose unjustified costs and risks on Citi, solely to benefit Lehman, the defaulting party.  The

fact that Citi did not replace its massive positions in the HYS8 (in which Citi, on a net basis, sold

$2.7 billion of protection) and HYS4 (in which Citi, on a net basis, bought $1.1 billion of

protection) at the close-out is factually and legally irrelevant – Citi calculated its claims

reasonably and in good faith, in a manner consistent with the liquidated damages clause in the

parties' agreements.  But, given the lack of liquidity in these "off-the-run" indices, it is doubtful

that Citi could have replaced these extremely large positions at the close-out, if it had tried.

133.    Defendants deny the allegations in paragraph 133 of the SAC, except

admit that plaintiffs' chart accurately notes whether LBSF was the buyer or seller of protection

and accurately reflects Citi's mid-market values for the three indices listed.  Defendants further

73

state that plaintiffs have refused to identify the source of the "publicly available market data" used to calculate plaintiffs' alleged "market-based" mid-market values for these three "off-the-run" indices.

134.    Defendants deny the allegations in paragraph 134 of the SAC, except admit that the three indices referenced in paragraph 134 are high-yield indices, admit that two of these are the indices for which plaintiffs purported to calculate price correlation in paragraph 129 and admit that credit spreads generally widened and "credit protection generally became more expensive to purchase" in the aftermath of LBHI's bankruptcy.  Plaintiffs' allegation that "Citi is claiming that the market moved more favorably for Citibank (relative to LBSF) regardless of whether Citibank was a buyer or seller of protection" on the three high-yield indices referenced in paragraph 134 is utterly without foundation.  In support, plaintiffs point to their allegation that Citi's mid-market valuations on all three indices are higher than some other alleged "market-based" valuation (the source of which plaintiffs have refused to disclose).  But Citi's mid-market valuations are "point-in-time" calculations.  The fact that they may be higher (with respect to both buys and sells on different indices) than some other "point-in-time" valuations says nothing at all about Citi's view of the direction the market was moving on these trades or on credit protection more generally.  In all events, far from undermining Citi's mid-market calculations, the alleged valuation differences actually suggest *extremely small* disagreements over the mid-market value for these trades.  On each of the three indices, as a percentage of notional, Citi's valuation is no more than 0.7% apart from plaintiffs' alleged "market-based" valuation.  It is only because these positions are enormous – totaling nearly $5 billion in aggregate – that very minor differences in pricing can add up to a valuation difference of more than $30 million.

Plaintiffs' alleged "market-based" valuations with respect to these indices actually support the commercial reasonableness of Citi's claim values.

135.    Defendants deny the allegations in paragraph 135 of the SAC.  Defendants further state that, consistent with the ISDA agreements and applicable law, Citi calculated the replacement costs of the terminated trades.  These replacement costs included reasonable bid/offer charges and, where appropriate, liquidity premiums for large-size positions.  Off-setting CDS positions were netted.  Citi's Derivatives Questionnaire response (submitted to Lehman pursuant to the Bar Date Order and subsequently updated at CITI-LEH00962090-98) provided, wherever possible, a break-out of the specific components – mid-market, bid/offer and, if applicable, liquidity premium – of Citi's valuation.  In certain cases – including where Citi valued a trade based on a quotation that did not specify these components – Citi was unable to provide a breakdown of these components and, instead, provided an "all-in" close-out amount for the trade.  A corrected version of the chart in paragraph 135 of the SAC appears below.

**Citi Hypothetical Bid/Offer Charges**
[values in USD to Lehman]

| Category | No. Trades | Citi Mid-Market Value ($) | Citi Final Close-out Amount ($) | Bid/Offer Charge [Includes Liquidity Premiums] ($) |
|---|---|---|---|---|
| SINGLE NAME CDS | ~~14,962~~ **14,743** | ~~(238,895,519)~~ **(105,682,264)** | ~~(975,650,237)~~ **(808,496,610)** | ~~736,754,718~~ **703,893,108** |
| INDEX CDS | ~~685~~ **689** | ~~(612,620,083)~~ **(596,998,194)** | ~~(776,931,814)~~ **(759,285,151)** | ~~164,311,731~~ **158,498,318** |
| INDEX TRANCHE | ~~489~~ **494** | ~~122,495,276~~ **118,944,041** | ~~(14,204,158)~~ **(18,239,095)** | ~~136,699,434~~ **137,183,135** |
| SINGLE NAME LCDS | ~~645~~ **633** | ~~(23,646,792)~~ **(53,122,509)** | ~~(52,953,970)~~ **(81,552,861)** | ~~29,307,178~~ **28,436,232** |
| RECOVERY LOCK | ~~29~~ **58** **(29 pairs)** | 7,971,418 | (7,384,142) | 15,355,560 |
| CDO | ~~8~~ **4** | ~~8,977,074~~ **9,721,181** | ~~5,127,746~~ **6,172,111** | ~~3,849,328~~ **3,549,070** |
| INDEX TRANCHE PO | 3 | (1,331,279) | (3,431,279) | 2,100,000 |
| CDO SQUARED | 1 | (2,271,644) | (2,697,643) | 425,999 |
| SPREAD OPTION | 2 | 3,564,277 | 3,490,494 | 73,783 |
| TOTAL | ~~16,824~~ **16,627** | ~~(735,757,271)~~ **(619,203,973)** | ~~(1,824,635,003)~~ **(1,671,424,174)** | ~~1,088,877,732~~ **1,049,515,205** |

136.     Defendants deny the allegations in paragraph 136 of the SAC, except

admit that Citi is a market-maker and that Citi has access to the interdealer market.  Defendants

further state that plaintiffs' allegation that Citi – as a market-maker with access to the interdealer

market – could have replaced the terminated trades "at mid-market valuations," is false and

directly contradicted by available data.  As discussed (*supra* ¶¶ 9, 10 & n.17 ), data from GFI –

the leading interdealer broker for CDS – clearly shows that bid/offer is charged in the interdealer

market.  Indeed, if Citi revalued the terminated CDS trades using the bid/offer spreads reflected

in the GFI data as of the close-out, Citi's claim would have been *higher,* not lower.  Comparing

the quotes from GFI (the interdealer broker) with those from CMA (which reports end-of-day

bids and offers derived from the end-user market (*supra* n.16)), shows that bid/offer spreads in

the interdealer market were consistently *wider* than CMA's quotes (*supra* ¶ 10 & n.17).  What is

more, the interdealer market tends to be a fairly narrow market, one typically restricted to only

the most liquid CDS, with a focus on standard maturities (*i.e.*, five- and ten-year ).  Thus, GFI

data has contemporaneous quotes for trades within one year of the maturity for only 1,422 of the

18,767 credit trades Citi closed out (*i.e.*, 7.5% of Citi's trades).  CMA, by contrast, provides full

bid/offer curves based on actual quotes for 13,136 of the 18,767 credit trades in Citi's claim – or

70%.  If Citi revalued these 13,136 trades using the bid/offer spreads in the CMA data, Citi's

CDS claim, again, would have been *higher* by more than $70 million.[43]  Publicly available

market data, including from GFI and CMA, clearly supports the commercial reasonableness of

Citi's bid/offer charges.

137.    Defendants deny the allegations in paragraph 137 of the SAC, except

admit that the CDX_IG indices were created to track a group of investment grade corporations

and admit that the CDX_IG_10 five-year and the CDX_IG_9 five-year indices were created six

months apart and track a list of corporations that substantially overlap.

138.    Defendants deny the allegations in paragraph 138 of the SAC, except

admit that there are multiple market-makers with respect to index CDS and lack knowledge or

information sufficient to form a belief about the Lehman Subsidiaries' trading activities on

September 12, 2008.

139.    Defendants deny the allegations in paragraph 139 of the SAC, except

admit that, in addition to charging reasonable bid/offer, Citi charged liquidity premiums for

---

[43]    This calculation compares CMA's bid or offer data that is based on actual quotes observed for standard-sized
trades on the day of the close-out, with Citi's mid-market plus bid/offer claim amounts (excluding liquidity
premiums for large-sized trades).

oversized positions, such as those reflected in the chart at paragraph 139. Defendants further state that the chart in paragraph 139 contains various errors, including clear mistakes in the names of certain indices, the size of Citi's net positions, the number of trades, and the dollar amount of Citi's bid/offer and liquidity charges. A corrected table appears below.

**LBSF-Citibank Index CDS Positions Related to "CDX_IG"**
[values in USD to LBSF]

| Index | Maturity Date | No. Trades | Average Size of Trade between Citibank and LBSF ($) | Citibank's Net Position with LBSF ($) | Number of Average Size Trades Required to Close Out Citibank Position | Credit Spread of Index on 9/15/2008 (basis points) | Bid/Offer Charges and Liquidity Premiums Included by Citibank ($) / Hypothetical Charges Included by Citibank ($) | Hypothetical Charges Included by Citibank (Basis Points) |
|---|---|---|---|---|---|---|---|---|
| DJCDX-NAIGS1-5Y | 3/20/2009 | 6 | 34,802,667 **35,083,333** | (139,376,000) **(140,500,000)** | 4.0 | 186 | 112,878 | 16.1 |
| DJCDX-NAIGS2-5Y | 9/20/2009 | 3 **4** | 90,933,333 **68,750,000** | (173,600,000) **(175,000,000)** | 1.9 | 206 | 942,640 **273,726** | 15.8 |
| DJCDX-NAIGS4-5Y | 6/20/2010 | 3 | 33,166,667 | 500,000 | 0.0 | 244 | 489 | 6.0 |
| CDX-NAIGS10-3Y | 6/20/2011 | 2 | 592,500,000 | 1,185,000,000 | 2.0 | 194 | 5,897,464 **2,267,494** | 12.0 |
| DJCDX-NAIGS7-5Y | 12/20/2011 | 3 | 485,000,000 | (1,455,000,000) | 3.0 | 233 | 2,267,494 **6,515,474** | 7.6 |
| CDX-NAIGS8-5Y | 6/20/2012 | 4 | 386,875,000 | (1,547,500,000) | 4.0 | 217 | 273,726 **5,897,464** | 16.1 |
| CDX-NAIGS9-5Y | 12/20/2012 | 5 | 124,098,000 | (496,490,000) | 4.0 | 204 | 6,515,474 **2,130,814** | 16.0 |
| DJCDX-NAIGS7-5Y **DJCDX-NAIGS7-7Y** | 12/20/2013 | 2 | 303,875,000 | (387,750,000) | 1.3 | 224 | 2,553,642 | 16.0 |
| DJCDX-NAIGS1-5Y **DJCDX-NAIGS1-10Y** | 3/20/2014 | 6 | 22,320,000 **22,500,000** | 133,920,000 **135,000,000** | 6.0 | 184 | 9,351,415 **942,640** | 15.9 |
| CDX-NAIGS9-5Y **CDX-NAIGS9-7Y** | 12/20/2014 | 9 | 27,335,333 | 14,018,000 | 0.5 | 196 | 2,130,814 **81,565** | 12.0 |
| DJCDX-NAIGS7-5Y **DJCDX-NAIGS7-10Y** | 12/20/2016 | 7 | 145,928,571 | (1,021,500,000) | 7.0 | 209 | 81,565 **9,351,415** | 12.0 |
| CDX-NAIGS9-5Y **CDX-NAIGS9-10Y** | 12/20/2017 | 5 | 177,500,000 | (887,500,000) | 5.0 | 190 | 6,803,092 | 12.0 |
| **TOTAL** | | 55 **56** | | (4,775,278,000) **(4,776,722,000)** | | | 36,930,693 | |

140.   Defendants deny the allegations in paragraph 140 of the SAC, except admit that Citi was left with extremely large net positions in these, mostly "off-the-run" indices and Citi's claims reflect the considerable bid/offer and liquidity premium that the market would

charge to replace these positions. Defendants further state that plaintiffs' contentions regarding

the "average size" of the terminated trades between Citi and Lehman, or the number of "average

size trades Citibank would need to do if it were to replace the entire position," are disingenuous,

if not intentionally misleading. The "average size" of the trades that happened to exist between

Citi and Lehman is irrelevant to the bid/offer and liquidity charges that would be applied in the

market to replace these positions; what matters is the *standard size of trades transacted in the*

*market* with respect to these mostly "off-the-run" indices. Market quotations are typically good

only up to the standard sizes. The market charges a liquidity premium (or increased bid/offer)

for trades that are larger than standard size. For example, plaintiffs allege that, to replace Citi's

$1.185 billion position in CDX-NAIGS10-3Y, Citi only "would have needed to enter into two

average-sized new trades." The average size of Citi's trades with Lehman on this index might

happen to be over $590 million, but that is many multiples higher than the standard-sized trade in

this index (the only "on-the-run" index in the list). In using the patently irrelevant "average size"

of the trades Citi happened to have with Lehman, plaintiffs' chart grossly understates the number

of standard-sized trades that would be required to replace Citi's positions in these indices. Citi's

bid/offer and liquidity charges with respect to these indices are commercially reasonable.

141.    Defendants deny the allegations in paragraph 141 of the SAC. Defendants

further state that a substantial proportion of their Lehman-facing trades are non-standard in a

variety of ways – including that they are large positions, have non-standard maturities, reference

off-the-run indices or are otherwise illiquid – and so could not feasibly be replaced at close-out.

Upon information and belief, had Citi actually attempted to enter into replacement trades for all

of the terminated CDS at close-out, the resulting claims would have been *higher*, not lower.[44]  In

the days, weeks, and months that followed LBHI's bankruptcy filing, Citi engaged in CDS

trading in an attempt to rebalance its trading book to the best of its ability given the turbulent

market conditions at the time.  But, these efforts are irrelevant under the industry-standard

liquidated damages measure that the entire OTC derivatives market has embraced:  damages are

determined at close-out based on the replacement cost of the terminated trades.

> 142.    Defendants deny the allegations in paragraph 142 of the SAC.

> 143.    Defendants deny the allegations in paragraph 143 of the SAC.

> 144.    Defendants deny the allegations in paragraph 144 of the SAC, except

admit that there are 79 – not 76 – CDS trades between LBSF and Citibank referencing the

monoline insurer Ambac Assurance Corporation ("Ambac").[45]  Defendants further state that

plaintiffs' chart in paragraph 144 makes an invalid "apples-to-oranges" comparison.

Specifically, upon information and belief, plaintiffs have charted (in green) alleged mid-market

values for September 15, 2008 on Ambac CDS at various maturities.  Plaintiffs then purport to

chart (in red and blue) Citi's close-out amounts with respect to Ambac CDS trades, which Citi

calculated on September 16, 2008, as the replacement cost of the terminated trades, consistent

with the industry-standard liquidated damages provision in the parties' agreement.  Plaintiffs,

therefore, are attempting to compare a mid-market value calculated as of one date against

replacement cost (including appropriate bid/offer and liquidity charges) calculated as of the

---

[44]    This is demonstrated by CMA data based on actual quotes observed in the market on the day of the close-out, which indicates that if Citi had managed to replace its trades at CMA-provided bid and offer prices for standard-sized trades, Citi's overall claim (excluding liquidity premiums for large trades) would have been higher by $70 million than Citi's calculated close-out amounts.  CMA quotes do not take account of the liquidity premium (or increased bid/offer) that would be charged in the market to replace trades where Citi had oversized positions.

[45]    The majority of Ambac's business was placed into rehabilitation by the Wisconsin Commissioner of Insurance in 2010, largely due to the vast amount of credit protection it had written on RMBS and CDOs.  *See Ambac May Seek Bankruptcy After Regulators Step In*, N.Y. Times, Mar. 25, 2010.

following day.  This comparison has nothing to say about the commercial reasonableness of Citi's claim.

145.    Defendants deny the allegations in paragraph 145 and footnote 10 of the SAC, except admit that Markit Partners is a leading data provider that collects mid-market data from numerous financial institutions with respect to various CDS and, using proprietary algorithms, creates a composite mid-market curve with respect to such CDS, and lack knowledge or information sufficient to form a belief with respect to the rating Markit Partners gave to its September 15, 2008 pricing curve for CDS on Ambac.  Defendants further state that, while Markit Partners' pricing curve (generated by a proprietary model *after-the-fact*) may have "a logical progression," the contemporaneous market data with respect to Ambac CDS was actually quite variable and volatile over both September 15 and September 16, 2008.

146.    Defendants deny the allegations in paragraph 146 of the SAC.  Defendants further state that the fact that Citi's protection purchases on Ambac were generally priced higher than Citi's protection sales is hardly an anomaly; rather, it is the result of applying a reasonable bid/offer (and, where applicable, liquidity premium) to the Ambac CDS trades that were not offsetting.  By definition, application of a bid/offer moves the valuation of purchases and sales of CDS protection in opposite directions.  Further, plaintiffs' contention that Citi valued certain Ambac CDS at prices "more than 70 percent of their notional value" is demonstrably false, and appears to reflect an arithmetic error by plaintiffs.  Similarly, plaintiffs' allegation that Citi priced certain Ambac CDS at levels "greater than the assumed maximum loss that the market was using in its pricing at the time" is equally unfounded; all of Citi's close-out values were significantly lower than the maximum loss (70–77%) assumed in the market at the time, as evidenced by prices on recovery swaps quoted at 23–30% as of September 16, 2008 (which

contemporaneous market data was relied on by Citi traders and submitted to Lehman in Citi's

Derivatives Questionnaire response).

147.    Defendants deny the allegations in paragraph 147, except admit that Citi

was a net buyer of protection on Venezuela CDS.  Defendants further state that plaintiffs' chart

in paragraph 147 reflects yet another invalid comparison.  Specifically, plaintiffs appear to have

charted (in green) alleged mid-market values for September 15, 2008, on Venezuela CDS at

various maturities.  Plaintiffs do not claim to be relying on pricing data from Markit Partners,

and they have refused to disclose the basis for their mid-market pricing curve on Venezuela

CDS.  Plaintiffs then purport to chart (in red and blue) Citi's close-out amounts with respect to

its Venezuela CDS trades, which Citi calculated on September 17, based on *actual market

quotes.*  These actual quotes – which Citi traders relied on in calculating the close-out values and

furnished to Lehman in response to the Derivatives Questionnaire – necessarily include

applicable bid/offer charges.  Plaintiffs therefore are attempting to compare a mid-market value

as of one date against the contractually mandated replacement cost (including appropriate

bid/offer and liquidity charges) based on a specific market quotation as of a later date.  This

comparison has nothing to say about the commercial reasonableness of Citi's claim.

148.    Defendants deny the allegations in paragraph 148 of the SAC, except

admit that the chart in paragraph 148 is accurate except with respect to plaintiffs' purported

"Market-Based Calculation of Value."  Defendants further state that none of the parties' CDS on

Venezuela were "perfectly offsetting," as plaintiffs allege.  In calculating the close-out amounts,

Citi netted CDS trades that presented equivalent risks, consistent with market practice and the parties' own course of dealings.[46]

149.    Defendants deny the allegations in paragraph 149 of the SAC, except admit the calculations set forth in the paragraph.  Defendants further state that Citi netted CDS trades that had the same reference entities, maturity, and strike, even if the trades had different notional amounts.  Plaintiffs apparently contend that Citi should have netted trades even where the strikes – that is, the coupon payment owed – were different.  In fact, netting trades with different strikes presents obvious "annuity risk"[47] and Citi's unwillingness to net such trades is entirely consistent with Citi's approach to netting in the ordinary course of business and the parties' course of dealings, as evidenced by the proposed trade collapse transaction between Citi, Lehman, and Bracebridge discussed in the SAC.  In the proposed trade collapse transaction, which would have netted down a portion of LBSF's CDS portfolio, the parties agreed that trades with different strikes should not be included.  Indeed, the parties removed trades where the strikes differed by seven basis points – even less than the nine basis point difference in strikes on the two Venezuela CDS that plaintiffs allege Citi should have netted.  Indeed, the CDS market recognizes – and has attempted to address – the fact that parties will not net trades with mismatched strikes, due to the resulting "annuity risk."  In the Spring of 2009, ISDA

---

[46]    An updated version of Citi's derivatives claim correcting, among other things, isolated netting errors, can be found at Bates numbers CITI-LEH00962090-98.

[47]    "Annuity risk" refers to the risk associated with losing a running income stream resulting from CDS trades that are offsetting in all material respects other than strikes.  For example, among the terminated trades Citi had both a buy and a sell of protection on GMAC LLC, both for $1 million and both maturing on June 20, 2017, but with different strikes.  Citi was receiving 745 bps and paying 500 bps per year for these trades, which meant that over the life of these contracts, Citi would receive over $220,000 (although the income stream would stop if GMAC defaulted).  Had Citi simply netted these positions, as advocated by Lehman, Citi would have lost all of the value associated with these trades.  The close-out amount calculated by Citi for these trades, by contrast, totaled $97,226 – less than half of the annuity Citi might receive over the life of these trades.

promulgated the so-called "Big Bang Protocol," which urged the market to adopt standard coupons for CDS – either 100 bps or 500 bps – to facilitate the netting of trades.[48]

150.    Defendants deny the allegations in paragraph 150 of the SAC.  Defendants further state that, in closing out their CDS portfolios, defendants appropriately netted trades that had the same reference entities, maturities, and strikes, even if the trades had different notional amounts.

151.    Defendants deny the allegations in paragraph 151 of the SAC.

152.    Defendants deny the allegations in paragraph 152 of the SAC.  Defendants further state that there were 7,905 interest rate trades under the Master Agreements, for which Citi calculated a net payable to Lehman of $879 million, pursuant to the industry-standard liquidated damages provisions in the parties' agreements.  Defendants further state that plaintiffs have refused to disclose the "readily available market information" underlying their so-called "Market-Based Calculation of Proper Close-out Amount" (as reflected in the chart at paragraph 152).  Plaintiffs' chart, once again, presents an invalid "apples-to-oranges" comparison.  In the first place, plaintiffs' purported "Market-Based" calculations reflect a mid-market value only (as plaintiffs concede) whereas Citi's "Calculation of Close-out Amount" is appropriately calculated as the replacement cost of the terminated trades.  Even as a mid-market valuation, however, plaintiffs' calculations are improper.  Upon information and belief, plaintiffs calculated mid-market values for the USD interest rate trades in this portfolio as of 3:00 pm (EDT) on September 15, 2008, whereas Citi valued these trades as of 8:30 am (EDT).  Given the extreme volatility of interest rates over the course of that day, plaintiffs' cherry-picked 3:00 pm

---

[48]    *See, e.g.,* Frequently Asked Questions on Credit Derivatives Initiatives, ISDA (June 16, 2010), *available at* http://www.isda.org/c_and_a/pdf/faqcdsstandardizedproducts.pdf.

termination time would significantly reduce Citi's claim. Nothing in the contracts or applicable law required Citi to calculate the close-out amount as of a particular time of day, much less as of the time of day most beneficial to the defaulting party. Citi also disagrees with certain trade counts and claim amounts set forth in the chart, and a corrected version of the chart appears below.

| Close-out Amount Calculations for Generic Interest Rate Swaps<br>[values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades**[49] | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Proper Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Citibank | ~~6,748~~<br>**7,117** | ~~1,090,415,643~~<br>**1,090,095,303** | ~~1,525,065,437~~ | ~~434,669,794~~ |
| LBSF-Financial | ~~635~~<br>**660** | (264,857,651) | ~~(256,572,740)~~ | ~~8,284,911~~ |
| LBSF-Global | ~~107~~<br>**115** | 16,788,139 | ~~20,422,913~~ | ~~3,634,775~~ |
| LBSF-Swapco | 9 | ~~36,893,054~~<br>**36,893,053** | ~~39,741,383~~ | ~~2,848,330~~ |
| LBSF-Canyon | 4 | (313,500) | ~~(102,726)~~ | ~~210,774~~ |
| **TOTAL** | ~~**7,503**~~<br>**7,905** | ~~**878,925,684**~~<br>**878,605,345** | ~~**1,328,574,268**~~ | ~~**449,648,584**~~ |

153.    Defendants deny the allegations in paragraph 153 and footnote 11 of the SAC. Defendants further state that plaintiffs' chart at paragraph 153 improves upon the chart at paragraph 152 because it at least purports to compare Citi's mid-market valuation with plaintiffs' alleged "Market-Based Calculations" of mid-market value. The comparison remains wholly invalid, however, because Citi calculated the close-out amount for its USD interest rate trades as of 8:30 am (EDT) whereas, upon information and belief, plaintiffs have calculated their mid-

---

[49]   Upon information and belief, the differences in trade count largely result from the parties' different methods of recording "straddles" – where a buyer purchases both a swaption to receive a fixed interest rate and a swaption to receive a floating interest rate. Citi records straddles as two separate trades, whereas, upon information and belief, plaintiffs count both swaptions as a single trade.

market values for these trades as of 3:00 pm (EDT).  A corrected version of the chart appears

below.

| Valuation Differences by Trade Category [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Trade Category | No. Trades | Citi Calculation of Close-out Amount | ~~Market-Based Calculation of Proper Close-out Amount~~ | ~~Difference~~ |
| SWAPTION/CALLABLE SWAP | ~~489~~ **780** | ~~(228,525,353)~~ **(228,453,783)** | ~~(102,347,460)~~ | ~~126,177,893~~ |
| SWAP – GENERIC | ~~6,179~~ **6,246** | ~~1,278,755,703~~ **1,271,263,191** | ~~1,379,650,648~~ | ~~100,894,945~~ |
| SWAP – XCCY | ~~191~~ **186** | ~~2,829,166~~ **2,474,337** | ~~14,837,552~~ | ~~12,008,385~~ |
| EXOTIC | ~~16~~ **8** | ~~(7,478,536)~~ **2,026,732** | ~~1,920,118~~ | ~~9,398,653~~ |
| INFLATION - SWAP/CAP | ~~81~~ **84** | ~~78,482,523~~ **77,982,329** | ~~84,831,088~~ | ~~6,348,565~~ |
| SWAP - AVG/BASIS | ~~316~~ **317** | ~~(16,358,738)~~ **(17,682,755)** | ~~(13,295,445)~~ | ~~3,063,293~~ |
| OTHER | ~~80~~ **82** | ~~(11,684,987)~~ **(27,578,862)** | ~~(8,831,413)~~ | ~~2,853,574~~ |
| CAP/FLOOR - CMS/CMT | ~~50~~ **63** | ~~(13,703,723)~~ **1,367,969** | ~~(11,189,128)~~ | ~~2,514,595~~ |
| CAP/FLOOR – GENERIC | ~~56~~ **94** | ~~(13,506,644)~~ **(13,502,670)** | ~~(13,482,313)~~ | ~~24,330~~ |
| FRA – GENERIC | 45 | (2,133,517) | ~~(3,519,378)~~ | ~~(1,385,861)~~ |
| **TOTAL** | ~~7,503~~ **7,905** | ~~1,066,675,895~~ **1,065,762,971** | ~~1,328,574,268~~ | ~~261,898,373~~ |

154.    Defendants deny the allegations in paragraph 154 of the SAC, except

admit that generic swaps and swaptions tend to be among the most common and liquid types of

derivatives products.  Defendants further state that, contrary to plaintiffs' allegation, the

purported $227 million difference in the parties' mid-market calculations is not traceable to any

supposed "extraordinarily aggressive close-out procedures employed by Citi"; there was none.

Instead, the purported $227 million difference is largely a product of Lehman's "extraordinarily

aggressive" effort to turn the ISDA on its head and claim the right, as the defaulting party, to

value the terminated trades itself and to do so at its preferred time of day – a time of day cherry-picked years after the fact.

155.   Defendants deny the allegations in paragraph 155 of the SAC.  Defendants further state that a large portion of the purported "valuation difference" with respect to the interest rate trades under the LBSF-Citibank Agreement is due to plaintiffs' decision to calculate mid-market values for USD swaps as of 3:00 pm (EDT), when, in fact, Citi closed out these trades as of 8:30 am (EDT) – as was Citi's prerogative under the governing contracts and applicable law.

156.   Defendants admit the allegations in paragraph 156 of the SAC.

157.   Defendants deny the allegations in paragraph 157 of the SAC, except admit that LBSF was the net receiver of the fixed rate/payer of the floating rate on the combined portfolio of swaps and swaptions under the LBSF-Citibank Agreement, and admit that LBSF was "long vega" on the combined portfolio.  Defendants further state that, contrary to the allegation in paragraph 157, LBSF was "short delta" – not "long delta" – on the combined portfolio.

158.   Defendants deny the allegations in paragraph 158 of the SAC, except admit that "implied volatility" for USD swaps generally increased over the course of the day on September 15, 2008.  Defendants further state that, contrary to plaintiffs' allegation, interest rates for USD swaps *increased* over the morning until approximately mid-day on September 15, after which they generally decreased.  Indeed, data obtained from ICAP plc ("ICAP"), a large interdealer broker in interest rate derivatives, demonstrates that the USD five-year par swap rate generally increased throughout the morning of September 15, hit its peak just before 11:00 am (EDT), and then decreased over the remainder of the day.

159.     Defendants deny the allegations in paragraph 159 of the SAC, except admit that Citibank closed out its USD swaps as of 8:30 am (EDT), and admit that closing out these positions as of 3:00 pm (EDT) would have resulted in more favorable close-out values for LBSF.  Defendants further state that plaintiffs provide no support for their allegation that a close-out time of 3:00 pm is "typical."  Indeed, under the Derivatives Settlement Framework that Lehman developed and used to settle with ten of its largest bank counterparties, USD interest rate trades must be valued as of 11:00 am (EDT) on September 15, 2008.  Data from ICAP, the leading interdealer broker for interest rate derivatives, show that Citi's claim on these USD vanilla interest rate swaps would have *increased* by more than $14 million if Citi had chosen to close out the trades at 11:00 am (EDT), rather than at 8:30 am (EDT).  Accordingly, plaintiffs' allegation that Citi "maximized its claims" by closing out as of 8:30 am (EDT) is demonstrably false.

160.     Defendants deny the allegations in paragraph 160 of the SAC, except admit that, for its generic swap trades, Citi provided Lehman with a mid-market value and a separate bid/offer charge with respect to swaps in the four major currencies – dollar ("USD"), euro ("EUR"), yen ("JPY"), and pound ("GBP") – and Australian Dollar and New Zealand Dollar.  Defendants further state that, contrary to plaintiffs' allegations, Citi provided Lehman with a mid-market value and a separate bid/offer charge with respect to Swiss Franc, Danish Krone, Norwegian Krone, and Swedish Krona.

161.     Defendants deny the allegations in paragraph 161 of the SAC, except admit that Citi is a market-maker in USD swaps, and admit that Citi generally applied a one-basis point bid/offer charge in closing out its Lehman-facing USD swap positions.  Defendants further state that Citi's one-basis point bid/offer charge is fully supported by contemporaneous

market quotations from Reuters, relied on by Citi traders in closing out Citi's USD swap

positions.  A computer screenshot of this Reuters data was specifically provided to Lehman, as

part of Citi's Derivatives Questionnaire response, in support of this bid/offer charge.  Further,

contemporaneous quotes obtained from two leading interdealer brokers in interest rate

derivatives – ICAP and Tullett Prebon plc ("Tullett") – also support Citi's one-basis point

bid/offer charge.  In fact, quotes from Reuters, ICAP and Tullett would actually support

application of a *two*-basis point bid/offer charge on Citi's USD swaps – *double* the amount that

Citi charged on these positions.  As this contemporaneous market data shows, Citi's USD

interest rate bid/offer charges were, if anything, conservative relative to the market at the time.

Further, Lehman's allegation that "trades are generally done at mid-market" in the interdealer

market is directly contradicted by this and other data easily obtainable (and, which, upon

information and belief, plaintiffs already have obtained) from interdealer brokers, such as ICAP

and Tullett, clearly demonstrating that bid/offer charges are regularly quoted and paid by

sophisticated financial institutions in the interdealer market.

162.    Defendants deny the allegations in paragraph 162 of the SAC, and lack

knowledge or information sufficient to form a belief as to whether transaction volumes in the

USD swap market were "exceptionally high" on September 15, 2008.

163.    Defendants deny the allegations in paragraph 163 of the SAC, except

admit that Citi was "a net payer of the fixed rate" on its USD swap positions with LBSF, and

lack knowledge or information sufficient to form a belief as to whether "there was substantial

interest from counterparties to receive the fixed rate" on September 15, 2008.  Defendants further

state that, contrary to Lehman's allegations, the USD swap rate did not decrease throughout the

day on September 15.  Rather, readily available data from ICAP shows that the USD five-year

par swap rate actually *increased* until approximately 11:00 am on September 15, then decreased

during the remainder of the day.

164.    Defendants deny the allegations in paragraph 164 of the SAC.

165.    Defendants deny the allegations in paragraph 165 of the SAC, except

admit that, given the compressed time frame in which Citi closed out its portfolio of interest rate

swaps, the fact that Citi performed its valuations in different time zones all over the world, and

the fact that interest rate swaps on emerging market currencies are in a separate business (they

are part of Citi's Foreign Exchange trading business rather than its Rates trading business), the

level of detail in the information provided in Citi's Derivatives Questionnaire response varies

with respect to the close-out of generic swaps in different non-major currencies.  Defendants

specifically deny that they "shifted mid-market curves in [their] favor" or "included

exaggerated" bid/offer charges in closing out their interest rate derivatives.  After reviewing the

allegations of the First Amended Complaint, however, Citi discovered certain minor calculation

errors in the close-out of generic swaps in emerging market currencies, the correction of which

would reduce Citi's claim by approximately $6.6 million.[50]

166.    Defendants deny the allegations in paragraph 166 of the SAC.

167.    Defendants deny the allegations in paragraph 167 of the SAC, except

admit that, having reviewed the 53 TWD generic swaps in response to the First Amended

Complaint, Citi concluded that it did not appropriately net these positions and subsequently

corrected this oversight; this correction reduced Citi's claim for TWD generic swaps by less than

$1 million.  Defendants further state that contemporaneous quotes from ICAP, which Citi relied

---

[50]    These minor corrections, among others, are reflected in the updated version of Citi's derivatives claim, which
can be found at Bates numbers CITI-LEH00962090-98.

on in closing out its TWD swaps (and provided to Lehman in Citi's Derivatives Questionnaire response), specifically support both the mid-market value and the bid/offer charge Citi used in valuing its TWD swaps.

168.    Defendants deny the allegations in paragraph 168 of the SAC, except admit that, in valuing its MXN interest rate swaps, Citi used a MXN swap rate curve that is "reasonable and supported by available data." Defendants further state that, having reviewed the MXN swaps in response to the First Amended Complaint, Citi found and corrected a valuation error, which will reduce the MXN swap claim by approximately $5.8 million.

169.    Defendants deny the allegations in paragraph 169 of the SAC. Defendants further state that Citi closed out its swaption portfolio in a commercially reasonable manner, applying appropriate bid/offer charges (and liquidity premiums for large-sized trades) in valuing these positions, consistent with the parties' agreements and applicable law.

170.    Defendants deny the allegations in paragraph 170 of the SAC, except admit that, given the significant number of Lehman-facing interest rate positions, the fact that these positions were closed out in different businesses and different time zones across the world, and the compressed time in which Citi performed the close-out, Citi did not, in certain instances, appropriately net offsetting trades valued by different trading desks. Defendants made clear in their Answer to the First Amended Complaint that the netting protocols should have been applied across trading desks, and Citi agreed to correct any oversight and has done so.[51]

171.    Defendants deny the allegations in paragraph 171 of the SAC, except admit that Citi included a bid/offer charge of approximately $31 million on its USD interest rate

_____

[51]    These corrections, among others, are reflected in the updated version of Citi's derivatives claim, which can be found at Bates number CITI-LEH 00962090-98.

claim across four separate trading desks, admit that Citi failed to appropriately net these positions across desks, and admit that correction of this oversight reduces Citi's USD interest rate claim by approximately $14 million.

172.     Defendants deny the allegations in paragraph 172 of the SAC.  Defendants further state that Citi's derivatives businesses adopted netting protocols that were commercially reasonable for the specific products they traded.  Contrary to plaintiffs' allegation, Citi netted virtually all interest rate products across maturities, using commercially reasonable maturity buckets.  Citi has applied substantial netting to its interest rate portfolio, which has reduced Citi's interest rate claim by hundreds of millions of dollars.

173.     Defendants deny the allegations in paragraph 173 of the SAC.

174.     Defendants deny the allegations in paragraph 174 of the SAC, except admit that Citi had a large portfolio of swaptions with LBSF at the time of LBHI's bankruptcy and that more than half of the trades in this portfolio were denominated in USD.  Defendants further state that plaintiffs have refused to disclose the "readily available market data" underlying their so-called "Market-Based Calculations of Proper Close-out Amount" (as reflected in the chart at paragraph 174).  Plaintiffs appear, however, to be making another invalid "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' purported "Market-Based" calculation is performed as of 3:00 pm (EDT) on September 15, 2008, whereas Citi closed out its USD swaptions as of 8:30 am (EDT) that day.  Citi also disagrees with certain trade counts and claim amounts, and a corrected version of the chart appears below.

| Close-out Amount Calculations for Swaptions [values in USD to Lehman Subsidiaries] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Trade CCY | No. Trades | Citi Calculation of Close-out Amt. | ~~Market-Based Calculation of Proper Close-out Amt.~~ | ~~Difference~~ |
| LBSF-Citibank | Non-USD | ~~160~~ **288** | 25,082,049 | ~~30,337,705~~ | ~~5,255,656~~ |
| LBSF-Financial | Non-USD | ~~20~~ **40** | (5,480,881) | ~~(6,316,334)~~ | ~~(835,454)~~ |
| LBSF-Global | Non-USD | ~~10~~ **16** | 18,200,135 | ~~20,595,160~~ | ~~2,395,024~~ |
| LBSF-Citibank | USD | ~~271~~ **411** | ~~(244,118,307)~~ **(244,173,073)** | ~~(145,839,734)~~ | ~~98,278,573~~ |
| LBSF-Financial | USD | 25 | (22,082,013) | ~~(24,075,948)~~ | ~~(1,993,935)~~ |
| **TOTAL** | | ~~486~~ **780** | ~~(228,399,017)~~ **(228,453,783)** | ~~(125,299,153)~~ | ~~103,099,864~~ |

175.    Defendants deny the allegations in paragraph 175 of the SAC, except

admit that Citi closed out its USD swaptions portfolio as of 8:30 am "New York time" on

September 15, 2008, and admit that closing out at 3:00 pm that day would have resulted in more

favorable claim values for Lehman.  Defendants further state that nothing in the parties'

agreement or applicable law required Citi to close out as of a particular time of day, or the time

of day preferred by the defaulting party, and plaintiffs provide no support for their claim that

their preferred close-out time is "standard."  Indeed, Lehman's own Derivatives Settlement

Framework mandates an 11:00 am valuation of all USD interest rate trades.

176.    Defendants deny the allegations in paragraph 176 of the SAC, except

admit that the claim values for the trades in Group A were not "the product of an 8:30 am

valuation time on September 15," because (as plaintiffs well know) they were valued based on

actual replacement trades Citi executed in the market.  Defendants further state that, contrary to

plaintiffs' allegations, the claim values for the trades in Group B were, in fact, "the product of an

8:30 valuation time on September 15."  Plaintiffs' purported "Market-Based Calculations" (as set

forth in the chart at paragraph 176) are invalid because, upon information and belief, they are

calculated using 3:00 pm (EDT) values on September 15, 2008, whereas Citi closed out its USD

swaptions as of 8:30 am (EDT) that day.  Citi also disagrees with the trade counts and claim

amounts set forth in the chart, and a corrected version appears below.

| Close-out Amount Calculations for USD Swaptions [values in USD to Lehman Subsidiaries] | | | | | |
|---|---|---|---|---|---|
| Group | No. Trades | ~~Vega Exposure~~ | ~~Rates Exposure~~ | Citi Calculation of Close-out Amt. | ~~Market-Based Calculation of Proper Close-out Amt.~~ | ~~Difference~~ |
| Group A | ~~6~~ **9** | ~~(8,767,869)~~ | ~~2,184,174~~ | (414,905,000) | ~~(380,565,329)~~ | ~~34,339,671~~ |
| Group B | ~~9~~ **10** | ~~16,758,718~~ | ~~1,983,582~~ | (124,350,902) | ~~(101,503,614)~~ | ~~22,847,288~~ |
| Remaining | ~~281~~ **417** | ~~4,882,042~~ | ~~(1,906,511)~~ | ~~273,055,582~~ **273,000,816** | ~~312,153,260~~ | ~~39,097,679~~ |
| TOTAL | ~~296~~ **436** | ~~12,872,891~~ | ~~2,261,245~~ | ~~(266,200,320)~~ **(266,255,086)** | ~~(169,915,683)~~ | ~~96,284,637~~ |

177.    Defendants deny the allegations in paragraph 177 of the SAC, except

admit that the close-out values for the swaptions in Group A were not calculated based on an

8:30 am (EDT) close-out on September 15, 2008, because the claim values for these positions

are based on actual replacement trades Citi executed in the market.  Defendants further state that

the trades in Group A did not belong to Citi's Rates trading business and therefore were not

closed out at 8:30 am (EDT) with trades from that business.  These trades belonged to a separate

business – CitiMortgage – which executed replacement trades for the Group A positions and

assigned close-out values for the trades based on those replacements.  Defendants further state

that Citi's close-out values for the Group A trades accurately reflect the costs (including relevant

bid/offer charges) incurred by CitiMortgage in replacing the Group A positions.  Plaintiffs'

allegation that "Citi used an unknown methodology to determine values" for the Group A trades

is disingenuous. Citi specifically informed Lehman, as recently as July 2011, that these trade

values were based on actual replacements and even furnished Lehman with the confirmations for

the replacement trades.

178.    Defendants deny the allegations in paragraph 178 of the SAC. Defendants

further state that the Group B positions also were owned by a separate business at Citi – Citi

Corporate Treasury – but were, in fact, closed out using 8:30 am (EDT) valuations provided by

Citi's Rates trading business. There is no truth to plaintiffs' allegation that Citi used inconsistent

close-out times to improperly increase its claim.

179.    Defendants deny the allegations in paragraph 179 of the SAC, except

admit that Citi closed out a minority of its interest rate trades on dates other than September 15,

2008. Defendants further state that, of the trades closed out after September 15, the vast majority

– 1,338 out of 1,799 – were closed out on September 16 by Citi's derivatives trading desks in

Asia where September 15 was a public holiday and four Asian financial markets (Tokyo, Hong

Kong, Shanghai and Seoul) were closed. The one-day delay in close-out by these desks was not

only commercially reasonable, but simply unavoidable.[52]

180.    Defendants deny the allegations in paragraph 180 of the SAC, except

admit that 305 USD swaps were closed out on September 17, 2008, and admit that, if these

trades had, instead, been closed out on September 15, at 8:30 am (EDT) – consistent with the

methodology of the Rates business – the claim values for these trades would be reduced by

approximately $2 million (not $3 million, as plaintiffs allege). Defendants further state that these

---

[52]    Notably, Lehman's Derivatives Settlement Framework values a counterparty's Asian currency interest rate
trades on September 16 if the counterparty valued a "preponderance" of these trades on that date.

305 trades were owned and closed out by Citi's Foreign Exchange derivatives trading business, not by Citi's Rates trading business.

181.    Defendants deny the allegations in paragraph 181 of the SAC, except admit that, prior to Lehman's bankruptcy, the parties entered into CDS trades referencing securitized products, such as mortgage-backed securities and collateralized debt obligations, under the LBSF-Citibank, LBSF-Global, and LBSF-Canyon Agreements, and admit that Citi was the net buyer of protection.  Defendants further state that there were 820 CDS on securitized products under these agreements, for which Citi calculated a net claim of $1.473 billion pursuant to the industry-standard liquidated damages provision.  While plaintiffs have refused to disclose the alleged "publicly available market data" underlying their so-called "Market-Based Calculation of Close-out Amount" (as set forth in the chart at paragraph 181), plaintiffs appear to be making another "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' calculation reflects a mid-market value only (rather than replacement value as mandated in the parties' agreements) as of September 15, 2008 (rather than as of the date Citi closed out the trades which, for most CDS trades, was September 16).  But, even as a mid-market calculation as of September 15, plaintiffs' valuations appear too low.  In fact, plaintiffs' alleged "Market-Based Calculation" closely approximates Citi's mid-market valuation for these same trades on September 12 at $1.2 billion – a valuation done for purposes of calculating a margin call to Lehman for September 15.[53]  As Lehman's own complaint acknowledges (*see* SAC at ¶ 134), the value of protection moved substantially higher (*i.e.*, in Citi's favor) over that weekend and

---

[53]    Because LBHI filed for bankruptcy in the early morning hours of September 15, 2008, the margin call was never made.  Citi has, however, previously furnished Lehman with these September 12, 2008, calculations.

following LBHI's bankruptcy.  Therefore, a mid-market valuation as of September 15 should be higher than a valuation as of September 12.  A corrected version of the chart appears below.

| Close-out Amount Calculations for Securitized Products [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Canyon | 6 | ~~1,077,659~~ **1,077,658** | ~~1,076,217~~ | ~~(1,442)~~ |
| LBSF-Citibank | ~~758~~ **757** | ~~(1,626,664,467)~~ **(1,628,660,916)** | ~~(1,395,909,138)~~ | ~~230,755,329~~ |
| LBSF-Global | 57 | 154,438,917 | ~~153,130,689~~ | ~~(1,308,228)~~ |
| **TOTAL** | ~~**821**~~ **820** | ~~**(1,471,147,891)**~~ **(1,473,144,340)** | ~~**(1,241,702,233)**~~ | ~~**229,445,659**~~ |

182.    Defendants deny the allegations in paragraph 182 of the SAC.  Defendants further state that plaintiffs' allegation that Citi "failed to engage in any portfolio aggregation" with respect to CDS on securitized products is demonstrably false.  Citi netted CDS on securitized products in the same manner it netted all other CDS in its portfolio:  purchases and sales of protection were netted where they had the same reference obligation, maturity and strike, even if their notional amounts differed.  In fact, plaintiffs are not complaining that Citi failed to net offsetting positions; Citi did so.  Plaintiffs, instead, are insisting that Citi should have netted entirely dissimilar positions.  Specifically, plaintiffs contend that Citi should have indiscriminately netted *all* of its purchases of protection on *any* RMBS against *all* of its sales of protection on *any* RMBS.  But RMBS are not remotely fungible, and what plaintiffs advocate is commercially unreasonable.  The two businesses at Citi that held these trades netted positions that were truly offsetting.  Because these CDS on RMBS were illiquid, the businesses solicited quotations for replacement trades for a majority of the portfolio from the largest dealers in the market that were most active in trading CDS on RMBS.  The New York-based business solicited quotations on September 15, 2008; given the time difference, the London-based business was not

able to do so until September 16.  Where Citi obtained more than one quotation for a position,

Citi used the quote most favorable to Lehman in calculating the close-out amount.  It is clear that

Citi used commercially reasonable procedures in closing out its CDS on RMBS trades.

        183.    Defendants deny the allegations in paragraph 183 of the SAC, except

admit that a majority of the CDS on securitized products were CDS on RMBS.  Defendants

further state that Citi was a net buyer of protection, by an enormous amount, with respect to CDS

on RMBS.  Out of a total $3.6 billion notional amount, Citi had bought protection on $2.3 billion

from Lehman and sold protection on only $1.3 billion to Lehman.  Plaintiffs' allegation that CDS

on subprime or Alt-A RMBS carried "similar types of risk" is false and misleading, as evidenced

by the range of valuations present in Citi's claim:  Citi's close-out valuations for CDS on RMBS

range from less than 10% of notional (reflecting a relatively strong credit with a low implied

probability of loss) to more than 90% of notional (reflecting a credit near default), and cover the

entire spectrum in between.  These valuation differences stem from the fact that the market

values a particular RMBS, and judges its prospect of default, based on a range of factors specific

to that RMBS, including the date the underlying mortgages were originated, the FICO scores of

the borrowers, the geographic diversity of the mortgage pool, the identity of the originators, and

the particular tranche referenced in the CDS on RMBS.  Plaintiffs' alleged "Market-Based

Calculation of Close-out Amounts" (set forth in the chart at paragraph 183) is invalid because,

upon information and belief, it is based on mid-market values for September 15, 2008, whereas

Citi was entitled to recover replacement cost and, following commercially reasonable

procedures, closed out the majority of its CDS on RMBS as of September 16.  A corrected

version of the chart, adding a trade omitted by plaintiffs, appears below.

| Close-out Amount Calculations for Single Name CDS on RMBS [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Citibank | ~~508~~ **509** | ~~(1,057,278,227)~~ **(1,041,338,974)** | (878,339,836) | 178,938,391 |
| LBSF-Global | 38 | 147,990,013 | ~~148,906,789~~ | ~~916,776~~ |
| **TOTAL** | ~~**546**~~ **547** | ~~**(909,288,214)**~~ **(893,348,961)** | ~~**(729,433,047)**~~ | ~~**179,855,168**~~ |

184.    Defendants deny the allegations in paragraph 184 of the SAC, except admit that CDS on RMBS are less liquid and typically have wider bid/offer charges than other derivatives.  Defendants further state that Lehman's claim that "all [CDS on RMBS] relate to similar pools of residential mortgages" is plainly incorrect.  The mortgage pools backing any particular RMBS – and, specifically, the RMBS referenced in the trades between Citi and Lehman – vary dramatically based on vintage (*i.e.*, when the relevant mortgages were issued), the FICO score of the underlying borrowers, the identity of the originator, and the geographic diversity of the mortgage pools.  Each of these factors is critically important to assessing the likely performance of a specific RMBS.  Moreover, CDS on RMBS reference a particular tranche in the underlying RMBS transactions.  These tranches can vary dramatically in seniority, and thus on their rights to receive the cash flow generated by the RMBS.  In the particular trades at issue here, some CDS reference the 15th or 20th tranche in the RMBS (typically rated BBB or BBB- at issuance), while others reference the 3rd, 4th or 5th tranche (typically rated AA or AA+ at issuance).  When Citi solicited quotations on these products after Lehman's bankruptcy, the dealers did not remotely treat these positions as presenting "similar" risks.  Not only were the dealers selective about the particular CDS on RMBS they were willing to quote prices on, but the prices ranged dramatically over the different positions.

185.     Defendants deny the allegations in paragraph 185 and footnote 12 of the

SAC, except lack knowledge or information sufficient to form a belief about the data used to

construct the graph in paragraph 185 of the SAC because plaintiffs have refused to identify its

source.  Defendants further state that, in this instance, plaintiffs (tellingly) do not claim to be

relying on "publicly" or "readily available" data.  Citi is not aware of any third-party pricing

service that provides daily marks for these positions.  Indeed, it is because of the illiquidity of

many of these positions that Citi decided to solicit market quotations for most of its CDS on

RMBS in connection with the close-out.

186.     Defendants deny the allegations in paragraph 186 of the SAC.  Defendants

further state that Citi did not charge bid/offer on every CDS on RMBS and, consistent with its

methodology for valuing terminated CDS trades, netted any offsetting positions that had the

same reference obligation, maturity, and strike.  Plaintiffs' argument that Citi should have

indiscriminately netted all of its CDS on RMBS based on the alleged fact that their overall price

movements are correlated is specious.  Credit default swaps protect against default of a particular

reference entity.  The fact that prices for credit default protection on different reference entities

might move in a correlated fashion has no bearing whatsoever on whether a party would be left

in a neutral risk position if it netted a sale of protection on one reference entity against a buy of

protection on another.  Lehman itself presents an obvious example.  The prices of credit

protection on Lehman and the other major broker-dealers – including Goldman Sachs, Morgan

Stanley and Merrill Lynch – were highly correlated:



**Historical 5 Year CDS Mid-Market Levels by Broker Dealer**

Source: Bloomberg

— Lehman Brothers    — Merrill Lynch    — Goldman Sachs    — Morgan Stanley

But a party that, on September 1, 2008, netted a five-year buy of protection on Lehman against a five-year sale of protection on Merrill Lynch obviously would not be left in a neutral risk position.

187.    Defendants deny the allegations in paragraph 187 of the SAC, except admit that Citi used market quotations provided by other dealers between September 15 and September 17, 2008, to value its positions, and admit that Citi obtained those quotations by requesting bids and offers separately.[54]  Defendants further state that Citi acted in good faith and followed commercially reasonable, standard business practices in seeking market quotations. Plaintiffs' contention that Citi's approach improperly confronted dealers with "the risk of acquiring a large 'one-way' position, which created a natural incentive to provide extremely wide, defensive quotes," is completely off the mark.  Plaintiffs apparently fault Citi for sending

---

[54]  Citi requested bids and offers by sending out "BWIC" and "OWIC" requests (bids or offers "wanted in competition").  BWICs and OWICs are typically sent out via Bloomberg or e-mail messages to a group of leading dealers.  BWICs and OWICs essentially create an auction process in which, pursuant to industry custom, recipients understand that the best bids or offers may be executed by the sender, although the sender is under no obligation to execute.

out the request for bids separately from the request for offers because it supposedly "created a situation where the institutions providing the quotes had no confidence that they would be able to acquire offsetting positions." This makes no sense. In the first place, Citi sent its requests for bids and its requests for offers to the same dealers at approximately the same time. Second, even if Citi had combined these requests into one document, no dealer could know whether it would "win" the auction (*i.e.*, have the best quote) on any particular position or whether Citi would actually execute against any particular quote. Under no circumstances could an institution have "confidence that [it] would be able to acquire offsetting positions." Third, if plaintiffs are arguing that Citi should have required dealers to bid on its entire portfolio of CDS on RMBS as a "block trade," dealers would have been confronted with the exact same risk that plaintiffs are worried about – "the risk of acquiring a large 'one-way' position" – but on an even larger scale: Citi was overwhelmingly the net buyer of protection. Moreover, it likely would have been impossible to negotiate a block sale for a large portfolio of distressed, illiquid, and high-risk positions in a timely fashion in the immediate aftermath of Lehman's bankruptcy filing. Few (if any) counterparties would be interested in acquiring a securitized products portfolio of this kind, as demonstrated by the fact that dealers were very selective and submitted prices only for particular positions, sometimes including size restrictions limiting their quotes to smaller quantities than Citi had requested. Portfolio sales of the kind plaintiffs appear to be suggesting would typically entail weeks of due diligence by the buyer even in less unsettled times.[55] Citi's approach to calculating close-out values for its CDS on RMBS was clearly commercially

---

[55] If Citi had attempted to sell its entire portfolio of CDS on RMBS to a single buyer in the time available, one of two things would have happened. Either (i) Citi would have received no offers at all and plaintiffs would now be complaining that Citi had no market support for its valuations on these illiquid assets or (ii) Citi would have received an offer and plaintiffs would be complaining that the quote was "extremely wide" and highly "defensive" because Citi insisted on a block sale of a largely "one-way" portfolio of highly illiquid positions, yet provided inadequate time for due diligence.

reasonable, whereas plaintiffs' proposals – that Citi should have indiscriminately netted its entire portfolio or should have attempted to sell the entire portfolio in a block sale – clearly are not.

188.    Defendants deny the allegations in paragraph 188 of the SAC, and refer to the relevant Master Agreements for their contents.

189.    Defendants deny the allegations in paragraph 189 of the SAC. Defendants further state that Citi replaced certain CDS on RMBS at the close-out, but replacing many of the trades at issue made no economic sense in light of their high probability of default.

190.    Defendants deny the allegations in paragraph 190 of the SAC, except admit that Citi relied on certain market quotations made as of dates after the Early Termination Date, and refer to the Master Agreements and Section 562 of the Bankruptcy Code for their contents.

191.    Defendants deny the allegations in paragraph 191 of the SAC.

192.    Defendants deny the allegations in paragraph 192 of the SAC. Defendants further state that there were 3,012 foreign exchange ("FX") trades, for which Citi calculated a net claim of $393 million.

193.    Defendants deny the allegations in paragraph 193 of the SAC, except lack knowledge or information sufficient to form a belief about the data used to construct the graph in paragraph 193 of the SAC because plaintiffs have refused to identify its source. Defendants further state that, contrary to plaintiffs' allegations, Citi closed out its USD/JPY FX forward trades as of September 15, 2008. The spot component[56] used to value Citi's forward positions –

---

[56] The market convention for forwards is to quote both the current levels of exchange rates, or spot rates, as well as forward points, which are added to spot rates to determine the all-in forward rate for a given maturity. This convention also reflects the underlying economics because the value of a forward position will depend on both the spot rate and the difference in the interest that can be earned in the two currencies over the maturity of the forward, where the forward points represent a prediction of that interest differential. Spot rates are generally more volatile than interest rate differentials and therefore are more likely to have a substantial effect on the

including the USD/JPY forwards – was taken from the average price of the spot trades Citi
executed in the market following Lehman's bankruptcy to hedge the very substantial spot risk
(also known as "delta" risk) that Citi faced in each currency as a result of Lehman's default. Citi
executed these "macro-hedges" as soon as practicable following Lehman's bankruptcy. As Citi
previously explained to Lehman (including in a lengthy meeting with Citi's head FX traders in
July 2010), Citi calculated the average price of these hedging trades in each currency and used
that average price as the spot price component when computing the close-out value of its FX
spot, forward, and option trades. The spot component Citi used in calculating close-out values
was, in fact, Citi's actual replacement cost for the spot risk. Because Citi's spot replacement cost
in each currency is a calculated average across multiple hedging trades, it will not necessarily
match any particular reported price for a spot trade on that date. However, the spot price Citi
used with respect to USD/JPY – a calculated average of Citi's actual replacement cost – is within
the range of prices for transactions executed in the market beginning at approximately 6:00 pm
(EDT) on September 15 (opening hours for the Japan market on September 16). Plaintiffs' graph
in paragraph 193 is thus irrelevant and misleading for two independent reasons: first, the "trend
lines" plaintiffs have plotted, upon information and belief, reflect only prices seen during U.S.
market hours on September 15 – whereas FX trading (and Citi's business) is global, and
substantial FX volumes trade outside of U.S. market hours. Second, the LBCC end-of-day
valuations that plaintiffs have plotted in green on the chart, upon information and belief, reflect
only mid-market values, whereas Citi's close-out amounts (plotted in red and blue) properly
reflect Citi's estimated replacement cost, including an appropriate bid/offer charge.

---

value of the Lehman-facing forwards. Thus, it was more important for Citi to hedge its spot risk following
Lehman's default.

194.    Defendants deny the allegations in paragraph 194 of the SAC.  Defendants further state that, contrary to plaintiffs' allegation, Citi closed out its USD/JPY FX forwards as of September 15, 2008.  Citi used its actual replacement cost (*i.e.,* the average price of Citi's USD/JPY spot trades in the market) as the spot component in the close-out calculation and then added forward points, using points that are consistent with intra-day and end-of-day pricing reported by ICAP (a leading interdealer broker for FX) for September 15.

195.    Defendants deny the allegations in paragraph 195 and footnote 13 of the SAC, except admit that the FX market is large and liquid with excellent price transparency under normal market conditions, admit that Citi is a major FX dealer with substantial access to the FX market, admit that the USD/JPY exchange rate is the most common currency pair in the terminated trades between Lehman and Citi, lack knowledge or information with respect to whether "the USD/JPY exchange rate . . . experienced some of its highest trading volumes" on September 15, 2008, and refer to the parties' Master Agreements, Section 562 of the Bankruptcy Code, and the cited document for their contents.

196.    Defendants deny the allegations in paragraph 196 of the SAC, except lack knowledge or information sufficient to form a belief about the market data used to construct the graph in paragraph 196 of the SAC because plaintiffs have refused to identify its source. Defendants further state that, contrary to plaintiffs' accusation, Citi did not close out its USD/JPY FX trades as of September 19, 2008.  Instead, as described above (and as Citi's head FX traders specifically described to Lehman), Citi priced these positions in a commercially reasonable manner, using a spot rate derived from actual spot trades executed by Citi on September 15 to replace its USD/JPY spot risk, and adding forward points at September 15 levels (which levels are fully supported by third-party data).

105

197.    Defendants deny the allegations in paragraph 197 of the SAC.  Defendants

further state that while plaintiffs have refused to disclose the source of the data underlying their

so-called "Market-Based Calculation of Close-out Amount" (as reflected in the chart at

paragraph 197), plaintiffs evidently are making another invalid "apples-to-oranges" comparison.

Plaintiffs' purported "Market-Based" calculations, upon information and belief, reflect mid-

market values only, even though replacement cost is the measure of damages mandated by the

parties' agreements and necessary to provide Citi with the benefit of its bargain.  Citi also

disagrees with certain trade counts and claim amounts set forth in the chart, and a corrected

version of the chart appears below.

| Close-out Amount Calculations for Foreign Exchange Trades [values in USD to Lehman Subsidiaries] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBCC-Citibank | ~~2,975~~ **2,987** | ~~(391,347,954)~~ **(393,164,413)** | ~~(296,348,809)~~ | ~~94,999,145~~ |
| LBSF-Citibank | ~~23~~ **21** | ~~(695,859)~~ **6,884,674** | ~~928,305~~ | ~~1,624,164~~ |
| LBSF-Financial | 4 | (7,133,021) | ~~(6,741,524)~~ | ~~391,497~~ |
| **TOTAL** | ~~**3,002**~~ **3,012** | ~~**(399,176,833)**~~ **(393,412,760)** | ~~**(302,162,028)**~~ | ~~**97,014,805**~~ |

198.    Defendants deny the allegations in paragraph 198 of the SAC, except

admit that most of the FX trades between Lehman and Citi were entered into under the LBCC-

Citibank Agreement, and admit that plain vanilla forwards and plain vanilla European options

are among the most common and liquid types of FX trades.  Defendants further state that the

chart in paragraph 198 presents another illegitimate comparison:  plaintiffs' alleged "Market-

Based Calculation of Close-out Amount," upon information and belief, reflects a mid-market

valuation only, while Citi's claim is properly calculated as the replacement value of the

terminated trades. Citi also disagrees with the trade counts and claim amounts set forth in the

chart, and a corrected version of the chart appears below.

**Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement**
[values in USD to LBCC]

| Product Type | No. Trades | Citibank Calculation of Close-out Amount | ~~Market-Based Calculation of Close-out Amount~~ | ~~Difference~~ |
|---|---|---|---|---|
| EUROPEAN OPTION | 867 | (135,880,236) | ~~(57,664,051)~~ | ~~78,216,185~~ |
| FORWARDS | ~~1,908~~ **2,039** | ~~(245,813,680)~~ **(246,632,728)** | ~~(238,123,032)~~ | ~~7,690,648~~ |
| AMERICAN OPTION | 11 | 2,900,203 | ~~4,069,206~~ | ~~1,169,003~~ |
| DIGITAL OPTION | ~~7~~ **8** | ~~(2,465,470)~~ **(2,495,470)** | ~~(3,994,651)~~ | ~~(1,529,181)~~ |
| BARRIER OPTION | ~~59~~ **62** | ~~(10,088,772)~~ **(11,056,183)** | ~~(12,592,762)~~ | ~~(2,503,990)~~ |
| Trades Citi Does Not Know | ~~123~~ | ~~n/a~~ | ~~11,956,481~~ | ~~11,956,481~~ |
| **TOTAL** | ~~**2,975**~~ **2,987** | ~~**(391,347,954)**~~ **(393,164,413)** | ~~**(296,348,809)**~~ | ~~**94,999,145**~~ |

199.    Defendants deny the allegations in paragraph 199 of the SAC, except

admit that the most common currency pair in the LBCC-Citibank Agreement was USD/JPY.

Defendants further state, upon information and belief, that plaintiffs' alleged "Market-Based

Calculation of Close-out Amount" (as reflected in the chart at paragraph 199) reflects a mid-

market valuation only, while Citi's claim is properly calculated as the replacement value of the

terminated trades. For this reason, plaintiffs' attempted comparison is invalid. Citi also

disagrees with the trade counts and claim amounts set forth in the chart, and a corrected version

of the chart appears below.

**Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement**
[values in USD to LBCC]

| Currency Pair | No. Trades | Citibank Calculation of Close-out Amount | ~~Market-Based Calculation of Close-out Amount~~ | ~~Difference~~ |
|---|---|---|---|---|
| USD/JPY | ~~346~~ **371** | ~~(28,148,400)~~ **(28,745,808)** | ~~2,202,909~~ | ~~30,351,309~~ |
| EUR/USD | ~~246~~ **328** | ~~(95,465,061)~~ **(98,394,915)** | ~~(81,509,179)~~ | ~~13,955,882~~ |
| AUD/USD | ~~164~~ **173** | ~~(29,522,224)~~ **(23,919,010)** | ~~(20,372,623)~~ | ~~9,149,600~~ |
| GBP/USD | ~~65~~ **75** | ~~(69,091,410)~~ **(67,924,683)** | ~~(60,049,293)~~ | ~~9,042,117~~ |
| USD/BRL | ~~150~~ **153** | ~~(44,458,420)~~ **(47,595,958)** | ~~(39,162,456)~~ | ~~5,295,965~~ |
| USD/KRW | 62 | (24,422,594) | ~~(19,740,057)~~ | ~~4,682,537~~ |
| Other 66 Currency Pairs | ~~1,819~~ **1,825** | ~~(100,239,845)~~ **(102,161,446)** | ~~(89,674,591)~~ | ~~10,565,254~~ |
| **TOTAL** | ~~**2,852**~~ **2,987** | ~~**(391,347,954)**~~ **(393,164,413)** | ~~**(308,305,290)**~~ | ~~**83,042,664**~~ |

200.    Defendants deny the allegations in paragraph 200 of the SAC, except admit that the referenced USD/JPY options were maturing in less than one year and that the strike prices of these options were not close to the then-current exchange rate.  Defendants further state that these trades, which can be viewed as a sort of "catastrophe bond," were valuable – and not almost worthless, as plaintiffs allege – in September 2008 at the height of the uncertainty in the financial markets.  Indeed, plaintiffs' own graph, purporting to show the volatility of the USD/JPY exchange rate over this period (*see* SAC at ¶ 196) provides ample support for the value of the options.  Citi's standard options pricing model yields a mid-market value for these options of many millions of dollars (consistent with Citi's ultimate close-out value, which added a reasonable bid/offer), giving the lie to plaintiffs' contention that they are worth only $340,000.  Further, plaintiffs' purported "Market-Based Value" (as reflected in the chart at paragraph 200), upon information and belief, reflects only a (deeply flawed) mid-market valuation, whereas Citi is entitled to recover the replacement value of the terminated trades.  In

addition, plaintiffs' chart mislabels the trades at issue – the "puts" are in fact "calls," while the

"calls" are actually "puts" – and a corrected version of the chart appears below.

| Portfolio of Low Delta Options [values in USD to LBCC] | | | | | | |
|---|---|---|---|---|---|---|
| Type (LBCC's perspective) | Strike (Yen) | Expiration Date | USD Notional | Citibank Value | Market-Based Value | ~~Difference~~ |
| ~~Buy Put~~ **Buy Call** | 118 | 9/24/2008 | 100,000,000 | 0 | ~~22~~ | ~~22~~ |
| ~~Buy Put~~**Buy Call** | 120 | 11/6/2008 | 3,600,000 | 0 | ~~263~~ | ~~263~~ |
| ~~Buy Put~~**Buy Call** | 120 | 11/6/2008 | 329,513 | 0 | ~~24~~ | ~~24~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 6,970,319 | 0 | ~~391~~ | ~~391~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 4,899,257 | 0 | ~~275~~ | ~~275~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 2,865,000 | 0 | ~~161~~ | ~~161~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 69,703 | 0 | ~~4~~ | ~~4~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 46,229 | 0 | ~~3~~ | ~~3~~ |
| ~~Buy Put~~**Buy Call** | 125 | 1/16/2009 | 48,877 | 0 | ~~3~~ | ~~3~~ |
| ~~Sell Put~~**Sell Call** | 110.35 | 9/17/2008 | 30,000,000 | 0 | ~~(1)~~ | ~~(1)~~ |
| ~~Sell Put~~**Sell Call** | 117 | 9/26/2008 | 100,000,000 | (90,000) | ~~(284)~~ | ~~89,716~~ |
| ~~Sell Put~~**Sell Call** | 125 | 10/23/2008 | 200,000,000 | (210,000) | ~~(228)~~ | ~~209,772~~ |
| ~~Sell Put~~**Sell Call** | 120 | 11/6/2008 | 1,931,800 | (2,318) | ~~(141)~~ | ~~2,177~~ |
| ~~Sell Put~~**Sell Call** | 120 | 11/6/2008 | 1,931,800 | (2,318) | ~~(141)~~ | ~~2,177~~ |
| ~~Sell Put~~**Sell Call** | 120 | 11/6/2008 | 65,913 | (79) | ~~(5)~~ | ~~74~~ |
| ~~Sell Put~~**Sell Call** | 125 | 1/16/2009 | 100,000,000 | (145,000) | ~~(5,611)~~ | ~~139,389~~ |
| ~~Sell Put~~**Sell Call** | 125 | 1/16/2009 | 6,970,319 | (10,107) | ~~(391)~~ | ~~9,716~~ |
| ~~Sell Call~~**Sell Put** | 65 | 5/8/2009 | 150,000,000 | (600,000) | ~~(16,193)~~ | ~~583,807~~ |
| ~~Sell Call~~**Sell Put** | 63 | 6/12/2009 | 150,000,000 | (645,000) | ~~(17,562)~~ | ~~627,438~~ |
| ~~Sell Call~~**Sell Put** | 63 | 6/12/2009 | 150,000,000 | (645,000) | ~~(17,562)~~ | ~~627,438~~ |
| ~~Sell Call~~**Sell Put** | 63 | 6/12/2009 | 100,000,000 | (430,000) | ~~(11,708)~~ | ~~418,292~~ |
| ~~Sell Call~~**Sell Put** | 63 | 6/12/2009 | 75,000,000 | (322,500) | ~~(8,781)~~ | ~~313,719~~ |
| ~~Sell Call~~**Sell Put** | 63 | 6/12/2009 | 75,000,000 | (322,500) | ~~(8,781)~~ | ~~313,719~~ |
| ~~Sell Call~~**Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~**Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~**Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~**Sell Put** | 60 | 7/9/2009 | 100,000,000 | (425,000) | ~~(8,048)~~ | ~~416,952~~ |
| ~~Sell Call~~**Sell Put** | 63 | 7/31/2009 | 200,000,000 | (980,000) | ~~(55,191)~~ | ~~924,809~~ |
| ~~Sell Call~~**Sell Put** | 63 | 7/31/2009 | 200,000,000 | (980,000) | ~~(55,191)~~ | ~~924,809~~ |
| ~~Sell Call~~**Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~**Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~**Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~**Sell Put** | 60 | 8/21/2009 | 100,000,000 | (470,000) | ~~(17,123)~~ | ~~452,877~~ |
| **TOTAL** | | | **2,609,728,730** | **(9,662,332)** | ~~**(340,800)**~~ | ~~**9,321,532**~~ |

201.    Defendants deny the allegations in paragraph 201 and footnote 14 of the

SAC, except admit plaintiffs' hindsight allegation that, as it turned out, the options would have

expired worthless.

202.    Defendants deny the allegations in paragraph 202 of the SAC.

203.    Defendants deny the allegations in paragraph 203 of the SAC, except admit that, having reviewed these two option trades in response to the SAC, Citi concluded that it did not appropriately net these positions and admit that correcting this oversight reduces Citi's FX claim by approximately $170,000.  Defendants further state that plaintiffs' chart mislabels these trades – instead of "puts," these are "calls" – and a corrected version of the chart appears below.

| **Example of Exactly Offsetting FX Trades** [values in USD to LBCC] | | | | | |
|---|---|---|---|---|---|
| **Type** | **Strike Price (Yen)** | **USD Notional ($)** | **Expiration Date** | **Market-Based Value ($)** | **Citibank Value ($)** |
| ~~Citibank Sells Put~~ **Citibank Sells Call** | 114 | 50,000,000 | 2/26/2009 | ~~175,865~~ | 72,500 |
| ~~Citibank Buys Put~~ **Citibank Buys Call** | 114 | 50,000,000 | 2/26/2009 | ~~(175,865)~~ | (242,500) |
| **Total** | | | | **0** | **(170,000)** |

204.    Defendants deny the allegations in paragraph 204 of the SAC, except lack knowledge or information sufficient to form a belief about the particular trades (allegedly 74 trades) that plaintiffs contend are offsetting, and where netting allegedly would reduce Citi's claim by approximately $2.7 million.  Defendants stated in their Answer to the First Amended Complaint that they would correct any netting errors and have amended their claim accordingly.[57]

205.    Defendants deny the allegations in paragraph 205 of the SAC.

206.    Defendants deny the allegations in paragraph 206 of the SAC.  Defendants further state that, on September 11, 2008, LBSF, Citibank, and Bracebridge attempted to enter

---

[57]  These corrections, among others, are reflected in the updated version of Citi's derivatives claim, which can be found at Bates numbers CITI-LEH00962090-98.

into a three-way collapse transaction with an effective date of September 16, 2008.  Under the

proposed transaction, Citibank would terminate particular trades facing LBSF and step into

LBSF's position in particular trades between LBSF and Bracebridge.  The proposed three-way

collapse transaction was never a "successful novation," as plaintiffs allege, because LBSF

repudiated its obligations before the September 16 effective date of the transaction.  In the face

of this repudiation, all parties – including LBSF – specifically agreed that the three-way collapse

transaction was never effective and the original trades between the parties remained in force.

Even if (contrary to fact) the three-way collapse transaction had been effective and binding in

some way before September 16, LBSF's repudiation of its obligations and specific agreement on

September 15 that the collapse transaction was "null and void" would have been sufficient to

rescind whatever contract might have been formed between the parties.  Indeed, on

September 16, LBSF specifically requested Citibank's confirmation that the original trades

remained in full force and effect (which Citibank gave) and LBSF confirmed that the proposed

novations had been taken down from the DTC system.  Citibank acted in good faith and in a

commercially reasonable manner with respect to the proposed three-way collapse transaction and

the termination and close-out of the original trades.  Plaintiffs' accusation that Citibank is

opportunistically seeking to revive cancelled trades could not be further from the truth.  It is

plaintiffs who are improperly and opportunistically seeking to resurrect an abandoned transaction

– the proposed three-way collapse transaction – to unjustly enrich the Lehman estate at

Citibank's expense.

      207.    Defendants deny the allegations in paragraph 207 of the SAC, except

admit that on or around September 11, 2008, LBSF was a protection seller to Citibank with

respect to 29 CDS on RMBS, admit that LBSF was a buyer of offsetting protection from

Bracebridge with respect to 87 CDS on RMBS, admit that Citibank, LBSF, and Bracebridge

sought to enter into a transaction in which Citibank would terminate its trades facing LBSF and

step into LBSF trades facing Bracebridge that had perfectly offsetting risk positions, and refer to

the quoted document for its contents.  Citibank's consent to the three-way collapse transaction

demonstrates its regular and customary practice regarding netting offsetting CDS trades.

Citibank agreed to replace its Lehman-facing trades with Bracebridge-facing trades only when

the material terms of the trades all matched – here, the specific underlying RMBS, the specific

tranche of the underlying RMBS, the trade maturity date, and the strike price.  In fact, Citibank

refused to collapse an additional proposed trade-pair because they were not truly offsetting; the

strike price on Citibank's trade with Lehman was 0.75, while the strike price on the proposed

corresponding trade between Lehman and Bracebridge was only 0.68.  Citibank refused to step

into the proposed trade facing Bracebridge because Citi was unwilling to accept the annuity risk

created by a seven basis point – or 0.07% – difference in strikes (even where the annuity ran in

Bracebridge's favor).  For its part, Lehman identified an additional trade pair that could not be

included in the collapse because the strike price on Citibank's trade with Lehman was 0.77 while

the strike price on Lehman's trade with Bracebridge was 0.67 – a ten basis point (or 0.10%)

difference in strike.

       208.     Defendants deny the allegations in paragraph 208 and footnotes 15 and 16

of the SAC, except admit that Citibank and LBSF were adherents to the ISDA Novation

Protocol II, lack knowledge or information with respect to whether Bracebridge was an adherent,

and refer to the quoted documents for their contents.  Defendants further state that, consistent

with ISDA's standard novation agreements and published industry guidelines, the parties agreed

on September 11, 2008 that the three-way collapse transaction would not be effective until

September 16, 2008.  As of September 11, Citibank was in the money on its trades facing LBSF, and LBSF was in the money on its trades facing Bracebridge.  Pursuant to the ISDAs and CSAs governing the parties' respective trades, LBSF had posted collateral with Citibank and Bracebridge had posted collateral with LBSF.  A central tenet of the three-way collapse agreement was that each party holding collateral with respect to the original trades would return that collateral on or before the effective date of the transaction.  Likewise, upon unwind and novation, each party that was out of the money would pay its counterparty a termination fee calculated under the ISDA governing its trades.  Citibank, LBSF, and Bracebridge agreed that September 16 was the effective date as well as the date by which cash collateral and termination fees had to change hands.  The parties' agreement to a future effective date was specifically anticipated by the ISDA Novation Best Practices cited by plaintiffs, which provide that "[p]arties may, as part of the consent process on the Novation Trade Date, agree that the transfer will be effective from a forward starting Novation Date."[58]

209.    Defendants deny the allegations in paragraph 209 of the SAC, except admit that LBHI (but not LBSF) filed for chapter 11 protection on September 15, 2008, admit that LBHI's bankruptcy filing constituted an Event of Default under the Citibank-LBSF ISDA Agreement, admit that Citibank sent a Notice of Termination declaring an Event of Default had occurred, and refer to the cited document for its contents.  Defendants further state that, despite LBHI's bankruptcy filing, Citibank and Bracebridge sought to consummate the proposed transaction and sought assurance from LBSF that, notwithstanding the bankruptcy of its Credit Support Provider under the ISDA, LBSF would perform its obligations under the proposed three-

---

[58]    "Best Practice Statement: Processing Novations," published by the Process Working Group of the ISDA Operations Committee (May 4, 2004), *available at* http://www.isda.org/publications/pdf/BestPracticeStatement.pdf at 2.

way collapse transaction.  LBSF declined to provide such assurances or to perform its

obligations.  Upon information and belief, LBSF determined to repudiate its obligations and treat

the proposed collapse transaction as null and void because LBSF concluded that it would be in

its economic interest to do so.  Under standard practices in the derivatives market, a hedge fund

such as Bracebridge must post more collateral to its counterparty (here, LBSF) than a market-

maker such as LBSF must post to its counterparty (Citibank) for an equivalent position.  Thus,

had the three-way proposed collapse transaction proceeded, LBSF would have had to pay out

more cash than it would have received on a net basis.  On September 15, LBSF refused to return

Bracebridge's collateral – no doubt so that LBSF could hold onto as much cash as possible, with

Bracebridge receiving only an unsecured claim should LBSF also file for bankruptcy.

      210.    Defendants deny the allegations in paragraph 210 of the SAC, and refer to

the quoted document for its contents.  Defendants further state, upon information and belief, that

every step in the three-way collapse transaction – from proposal to abandonment – was taken

with LBSF's knowledge and consent.  Following LBSF's refusal to perform its key obligations

under the transaction, each party confirmed that its trading position had not changed:  Citibank

was still a buyer of protection from LBSF and LBSF was still a buyer of protection from

Bracebridge with respect to the relevant CDS on RMBS.

      211.    Defendants deny the allegations in paragraph 211 of the SAC, and refer to

the quoted document for its contents.

      212.    Defendants deny the allegations in paragraph 212 of the SAC.  Defendants

further state that LBSF specifically confirmed to Citibank that the parties' existing trading

positions were not altered by their attempt to enter into the three-way collapse transaction and

that the collapse transaction was to be treated as null and void.  Because the three-way collapse

transaction conceived by the parties on September 11, 2008 was never effective or otherwise null and void, Citibank properly calculated close-out amounts on the original trades in good faith and in a commercially reasonable manner pursuant to the Citibank-LBSF ISDA Agreement.

213.   Defendants deny the allegations in paragraph 213 and footnote 17 of the SAC, and refer to the quoted document for its contents.  Defendants further state that ISDA's standard novation documentation and industry guidelines distinguish between the "Novation Trade Date" and the "Novation Date" on which a novation becomes effective and binding on the parties.[59]  The ISDA Novation Best Practices cited by plaintiffs recognize that "[p]arties may, as part of the consent process on the Novation Trade Date, agree that the transfer will be *effective* from a forward starting Novation Date."[60]  Here, the parties understood and intended that the three-way collapse transaction would not be effective until September 16, 2008.

214.   Defendants deny the allegations in paragraph 214 of the SAC, and refer to the quoted documents for their content.  Defendants further state, upon information and belief, that the future effective date of the three-way collapse transaction was a key component of the transaction negotiated by the parties, and that LBSF agreed that the transaction would not be effective until September 16, 2008.  Plaintiffs' allegation that, as of September 11, there were "no steps remaining for LBSF to perform" with respect to the three-way collapse transaction is unfounded and absurd:  among other things, LBSF was under the obligation to return Bracebridge's collateral and pay Citibank's termination fee by September 16, obligations that it repudiated on or around September 15.

---

[59]   *See* 2004 ISDA Novation Definitions §§ 1.16–1.17, *available at* http://www.isda.org/publications/pdf/2004-Novations-Definitions.pdf.

[60]   *See* "Best Practice Statement: Processing Novations," at 2.

215.    Defendants deny the allegations in paragraph 215 of the SAC, except admit that Citibank's close-out amounts for the 29 trades subject to the proposed collapse transaction total $109,862,953, admit that Citibank asserts setoff rights against LBHI's $2 billion deposit, and lack knowledge or information regarding the close-out amounts calculated by Bracebridge.

216.    Defendants deny the allegations in paragraph 216 of the SAC, except admit that LBSF owes Citibank at least $91,480,404 with respect to these trades.  Defendants further state that, given the outlandish positions plaintiffs advocate in the SAC, plaintiffs' $91,480,404 figure presumably represents a mid-market value only, whereas Citibank is entitled to replacement cost.  In fact, plaintiffs' mid-market valuation effectively validates Citibank's close-out amount.  Assuming that plaintiffs' mid-market calculation of $91,484,404 is accurate (in fact, it is too low), the implied bid/offer adjustment in Citibank's replacement cost valuation of $109,862,953 would be 9.9% of the notional value of the trades.  As plaintiffs themselves concede (see SAC at ¶ 184), CDS on RMBS are "less liquid" and therefore command "wider" bid/offer charges in the market.  In the aftermath of LBHI's bankruptcy, a bid/offer charge of less than 10% of notional for distressed CDS on RMBS was not at all unreasonable.

217.    Defendants deny the allegations in paragraph 217 of the SAC.  Defendants further state that they at all times acted in good faith and in a commercially reasonable manner with respect to the proposed three-way collapse transaction and the close-out of the original trades.

218.    Defendants deny the allegations in paragraph 218 of the SAC.  Defendants further state that their derivatives claims calculations were made in good faith, in a commercially

reasonable manner, and consistent with the governing contracts and applicable law.  There is no

legal or factual basis for equitable subordination of defendants' allowed derivatives claims.

219.    Defendants deny the allegations in paragraph 219 and footnote 18 of the

SAC, and refer to Section 510(c) of the Bankruptcy Code and the cited documents for their

contents.

220.    Defendants deny the allegations in paragraph 220 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that their derivatives claims were

calculated in good faith, in a commercially reasonable manner, and consistent with the governing

contracts and applicable law.  If this Court, however, finds any portion of defendants' derivatives

claims to be invalid under applicable law, then disallowance of that portion of the claims would

provide plaintiffs with a complete remedy.  Equitable subordination, which is reserved for the

worst kind of creditor conduct – described by courts in this district as "fraud, illegality or breach

of fiduciary duty," *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006), "fraud,

overreaching or spoliation to the detriment of others," *In re W.T. Grant Co.*, 4 B.R. 53, 75

(Bankr. S.D.N.Y. 1980), *aff'd* 699 F.2d 599, 609-10 (2d Cir. 1983), and "egregious, improper or

wrongful conduct that damages creditors," *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y.

2008) – is clearly unwarranted.

221.    Defendants deny the allegations in paragraph 221 of the SAC, and refer to

the cited document for its contents.  Defendants further state that applicable law does not

authorize the subordination of their derivatives claims.  Defendants' derivatives claims do not

include any penalties and, specifically, for the reasons set forth above, the bid/offer and liquidity

components of defendants' close-out amounts do not constitute penalties; they are, instead,

appropriate components of replacement value necessary to provide defendants with the benefit of

their bargain.  Moreover, if (contrary to fact) any portion of defendants' derivatives claim were

found to constitute a penalty, then that portion of the claim likely would be invalid under

applicable law; in that circumstance, disallowance of that portion of the claim would provide

plaintiffs with a complete remedy.

222.    Defendants deny the allegations in paragraph 222 of the SAC, and refer to

the cited documents for their contents.

223.    Defendants deny the allegations in paragraph 223 of the SAC.

224.    Defendants admit the allegations in paragraph 224 of the SAC.

225.    Defendants admit the allegations in paragraph 225 of the SAC, and refer

to proof of claim numbers 17895 and 17913 for their contents.

226.    Defendants deny the allegations in paragraph 226 of the SAC.

227.    Defendants admit the allegations in paragraph 227 of the SAC.

228.    Defendants admit the allegations in paragraph 228 of the SAC, and refer

to proof of claim numbers 67733 and 67736 for their contents.

229.    Defendants deny the allegations in paragraph 229 of the SAC.

230.    Defendants admit the allegations in paragraph 230 of the SAC.

231.    Defendants admit the allegations in paragraph 231 of the SAC, and refer

to proof of claim numbers 17926 and 29637 for their contents.

232.    Defendants deny the allegations in paragraph 232 of the SAC.

233.    Defendants admit the allegations in paragraph 233 of the SAC.

234.    Defendants admit the allegations in the first sentence in paragraph 234 of

the SAC, deny the remaining allegations in paragraph 234 and footnote 19, and refer to proof of

claim numbers 29881 and 29882 and Citi Global's Derivatives Questionnaire response for their

contents.  Defendants further state that the lower net claim amount asserted in the Derivatives

Questionnaire response does not represent, as plaintiffs allege, an "acknowledge[ment] [that] an

additional cash payment of $9,823,000 is due to LBSF," but rather reflects the parties' continued

efforts to reconcile and resolve discrepancies between the parties' derivatives trade populations.

Additionally, Citi Global's Derivatives Questionnaire response states that the claim amount

asserted in the response "supersedes and replaces the Early Termination Amount asserted in the

Proof of Claim."  Defendants have continued to engage in good faith efforts to resolve

discrepancies in the parties' trade populations, and as a result of this process, Defendants now

calculate that LBSF owes $215,002,740 under the LBSF-Global Agreement.

235.   Defendants deny the allegations in paragraph 235 of the SAC.

236.   Defendants admit the allegations in paragraph 236 of the SAC.

237.   Defendants admit the allegations in paragraph 237 of the SAC, and refer

to proof of claim numbers 67734 and 67736 for their contents.

238.   Defendants deny the allegations in paragraph 238 of the SAC.

239.   Defendants admit the allegations in paragraph 239 of the SAC.

240.   Defendants admit the allegations in paragraph 240 of the SAC, and refer

to proof of claim numbers 17936 and 17937 for their contents.

241.   Defendants deny the allegations in paragraph 241 of the SAC.

242.   Defendants admit the allegations in paragraph 242 of the SAC.

243.   Defendants admit the allegations in paragraph 243 of the SAC, and refer

to proof of claim numbers 29880 and 29882 for their contents.

244.   Defendants deny the allegations in paragraph 244 of the SAC.

245.   Defendants admit the allegations in paragraph 245 of the SAC.

246.     Defendants admit the allegations in paragraph 246 of the SAC, and refer to proof of claim numbers 29880 and 29882 for their contents.

247.     Defendants deny the allegations in paragraph 247 of the SAC.

248.     Defendants admit the allegations in paragraph 248 of the SAC.

249.     Defendants admit the allegations in paragraph 249 of the SAC, and refer to proof of claim numbers 17933 and 17934 for their contents.

250.     Defendants deny the allegations in paragraph 250 of the SAC.

251.     Defendants deny the allegations in paragraph 251 of the SAC.  Defendants further state that, as demonstrated above, the principal arguments plaintiffs advance in their objection to Citi's derivatives claims – and the only ones that could conceivably result in a material reduction of the claims – are directly contrary to the terms of the Master Agreements, standards of commercial reasonableness and applicable law.  Contrary to plaintiffs' allegations, Citi is not limited to claiming the mid-market value of trades it did not replace at close-out.  The enforceable, industry-standard liquidated damages provisions in the Master Agreements expressly provide that Citi is entitled to recover replacement cost for the terminated trades, whether or not Citi executed actual replacements.  Indeed, the same measure of damages would apply under New York contract law, in the absence of a liquidated damages provision.  Nor is Citi required to net dissimilar trades that would leave Citi with undue and uncompensated risk.  It would not be commercially reasonable to do so.  Finally, Citi was required to close out its more than 30,000 derivatives trades as soon as it was commercially reasonable to do so.  Citi was not required to close out its massive portfolio in a single day, as plaintiffs contend; nor was Citi required to close out the trades at the specific time of day that would be most advantageous to Lehman.  Plaintiffs' so-called "Market-Based Net Claim Amount" (as reflected in the chart at

paragraph 251) is patently invalid.  It incorporates, upon information and belief, each of plaintiffs' wrongheaded arguments:  mid-market valuations (rather than replacement cost) calculated as of plaintiffs' preferred date and time of day (rather than the time of Citi's close-out) and subject to unreasonable netting of dissimilar trades.  A corrected version of the chart appears below.  While plaintiffs have had more than three years to study Citi's derivatives claims, plaintiffs' 82 pages of derivatives-related arguments justify a reduction of Citi's claims by at most $20 million, based on minor calculation errors Citi has identified in responding to the SAC.  Citi's $1.9 billion derivatives claim was calculated in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result.  Subject to very minor corrections, it should be allowed in full.

| | ~~Market-Based Close-out Amount~~ | Collateral Posted | Unpaid Amounts | ~~Market-Based Net Claim Amount~~ | Citi Net Claim Amount |
|---|---|---|---|---|---|
| **LBSF-Canyon** | ~~958,630~~ | ~~(899,430)~~ **(898,517)** | 0 | ~~59,200~~ | (135,474) |
| **LBSF-Citibank** | ~~(249,608,958)~~ | ~~416,280,591~~ **415,935,426** | ~~(9,252,290)~~ **16,304,277** | ~~157,419,343~~ | ~~(1,640,084,656)~~ **(1,640,720,898)** |
| **LBSF-Financial** | ~~(223,685,221)~~ | ~~230,698,657~~ **230,525,248** | ~~(456,250)~~ **(2,857,271)** | ~~6,557,186~~ | (21,184,614) |
| **LBSF-Global** | ~~164,305,046~~ | ~~(184,881,990)~~ **(184,737,740)** | ~~89,634~~ **9,925,401** | ~~(20,487,310)~~ | ~~(232,423,044)~~ **(215,002,740)** |
| **LBCC-Citibank** | ~~(296,364,126)~~ | ~~313,230,362~~ **313,086,000** | ~~58,172,328~~ **73,273,539** | ~~75,038,565~~ | (18,017,039) |
| **LBCS-Energy** | ~~23,885,115~~ | ~~(20,525,656)~~ **(20,510,000)** | ~~(477,130)~~ **(617,598)** | ~~2,882,329~~ | (10,714,350) |
| **LBCS-Global ISDA** | ~~(7,349,001)~~ | ~~2,600,485~~ **2,600,000** | ~~0~~ **(991,986)** | ~~(4,748,516)~~ | (6,217,557) |
| **LBCS-Global EFET** | ~~6,226,192~~ | ~~(6,168,904)~~ **(6,162,000)** | ~~0~~ **446,026** | ~~57,287~~ | (716,281) |
| **LBSF-Swapco** | ~~39,741,383~~ | ~~(37,912,560)~~ **(37,884,825)** | 0 | ~~1,828,824~~ | (991,772) |
| **TOTAL** | ~~(541,890,939)~~ | ~~712,421,555~~ **711,953,592** | ~~48,076,292~~ **95,482,388** | ~~218,606,907~~ | ~~(1,930,484,787)~~ **(1,913,700,725)** |

252.     Defendants deny the allegations in paragraph 252 of the SAC.  Defendants further state that LBSF posted collateral to Citibank in the amount of $415,935,426 as of the Early Termination Date of the LBSF-Citibank Agreement, that $16,304,277 was due to Citibank, but unpaid, and that Citibank submitted a net claim of $1,640,720,898.

253.     Defendants deny the allegations in paragraph 253 of the SAC.

254.     Defendants deny the allegations in paragraph 254 of the SAC.  Defendants further state that they submitted claims in connection with the Master Agreements in the amount of $1,913,700,725.

255.     Regarding the allegations in paragraph 255 of the SAC, defendants repeat and reallege the responses in paragraphs 1–254 of this answer as if fully set forth herein.

256.     Defendants deny the allegations in paragraph 256 of the SAC.  Defendants further state that the $2 billion was deposited on June 12, 2008 into two time deposit accounts with Citibank Risk Treasury, and, on June 13, 2008, the funds were rolled into a single call account.  At all times, the $2 billion was commingled with Citibank's other funds, and earned regular interest, which was deposited each business day into LBHI's general DDA.  The funds were callable daily by LBHI, and could have been withdrawn by LBHI on a same-day basis. The $2 billion deposit was a "general" deposit under New York law and, as such, was a debt owed by Citibank to LBHI, against which Citibank has setoff rights under New York common law, applicable contractual provisions, and Section 151 of the New York Debtor & Creditor Law.  Those rights are preserved by operation of Section 553 and the relevant safe harbor provisions of the Bankruptcy Code.  At no time did Citi waive, or promise to waive, its setoff rights against the $2 billion call account; nor did Citi ever segregate, or promise to segregate, the $2 billion.  Defendants further state that plaintiffs' allegations that Citi agreed to waive setoff rights, or to limit its setoff rights under New York law, are in any case irrelevant to Citi's rights to offset its claims under a Revolving Loan Agreement between Citi, LBHI, and LBCCA (the "LBCCA Loan Claim"), against the $2 billion.  Pursuant to a Guaranty by LBHI dated August 30, 2007 that specifically relates to the revolving loan, Citi has a contractual right to "set off and

apply any and all deposits (general or special, time or demand, provisional or final but excluding any amounts held by Citi in a trustee [or] fiduciary capacity . . .)" to satisfy LBHI's obligations arising from the defaulted loan.  Moreover, these contractual rights cannot be waived or amended by oral agreement; the Guaranty specifically provides that any waiver or amendment of Citi's rights under the Guaranty is ineffective "unless the same is in writing and signed by Citibank, N.A."

257.    Defendants deny the allegations in paragraph 257 of the SAC, except admit that defendants assert a right to set off derivatives and other LBHI obligations against LBHI's $2 billion deposit, and refer to proof of claim number 67736 for its contents.  Defendants further state that the Complaint in this action constitutes plaintiffs' first formal request for the return of the $2 billion.

258.    Defendants deny the allegations in paragraph 258 of the SAC.  Defendants further state that the purported waiver agreement alleged in the SAC – which is not mentioned in the Examiner's Report, and which is contradicted by LBHI's own documents cited in that Report and the testimony of Lehman's supposed witnesses – does not exist.  The parties' agreement with respect to the $2 billion was for the funds to be deposited into a time deposit, callable daily, paying interest at the Fed Funds target minus $1/8$.  Citibank performed its obligations under this agreement, paying LBHI over $10 million in interest between June 12, 2008 and September 15, 2008 and returning funds the same day to LBHI on the one occasion a withdrawal (of $210 million) was requested.

259.    Defendants deny the allegations in paragraph 259 of the SAC.

260.    Regarding the allegations in paragraph 260 of the SAC, defendants repeat and reallege the responses in paragraphs 1–259 of this answer as if fully set forth herein.

261.    Defendants deny the allegations in paragraph 261 of the SAC.  Defendants further state that they did not make any promise to LBHI concerning setoff rights, liens, security interests, or segregation with respect to the $2 billion deposit; nor did LBHI ever request that the funds be placed into a segregated account.  As both the documentary record and the Examiner's Report show, Citi advised LBHI that it had setoff rights against the $2 billion under New York law.  LBHI never promised not to withdraw the funds, and Citi's internal emails throughout the summer of 2008 reflect Citi's persistent concern that LBHI might withdraw the $2 billion.  Defendants further state that, with regard to the LBCCA Loan Claim, LBHI contractually waived any right to assert any defense based on reliance on an oral waiver or agreement.

262.    Defendants deny the allegations in paragraph 262 of the SAC.  Defendants further state that LBHI's internal documents refute any claim that LBHI relied (much less reasonably relied) on an alleged agreement by Citibank to waive setoff rights in the account, or that any such reliance would be foreseeable by Citi.  Defendants further state that, with regard to the LBCCA Loan Claim, LBHI contractually waived any right to assert any defense based on reliance on an oral waiver or agreement.

263.    Defendants deny the allegations in paragraph 263 of the SAC.

264.    Regarding the allegations in paragraph 264 of the SAC, defendants repeat and reallege the responses in paragraphs 1–263 of this answer as if fully set forth herein.

265.    Defendants deny the allegations in paragraph 265 of the SAC.

266.    Defendants deny the allegations in paragraph 266 of the SAC.  Defendants further state that the Complaint in this action is the first formal request LBHI has made for the return of the $2 billion.

267.    Defendants deny the allegations in paragraph 267 of the SAC.

268.     Regarding the allegations in paragraph 268 of the SAC, defendants repeat and reallege the responses in paragraphs 1–267 of this answer as if fully set forth herein.

269.     Defendants deny the allegations in paragraph 269 of the SAC.  Defendants further state that the $2 billion deposit has none of the hallmarks of a "special account" under New York law:  the funds were unsegregated, earned regular interest, and were callable daily by LBHI.  The $2 billion deposit is a "general" deposit under New York law.  Defendants further state specifically with respect to the LBCCA Loan, Citi has a contractual right of setoff against all LBHI deposits, whether special or general, and those contractual rights cannot be waived or amended by an oral agreement.

270.     Defendants deny the allegations in paragraph 270 of the SAC, except admit that Citibank takes the position that under New York common law, applicable contractual provisions, Section 151 of the New York Debtor & Creditor Law, and the relevant safe harbor provisions and Section 553 of the Bankruptcy Code, Citibank may apply the $2 billion deposit to offset general debts owed by LBHI to Citibank.

271.     Defendants admit the allegations in paragraph 271 of the SAC.

272.     Defendants deny the allegations in paragraph 272 of the SAC.  Defendants further state that the $2 billion is not "property of [the] estate," but rather a debt owed by Citibank to LBHI, against which debts owed by LBHI to Citibank may be offset.

273.     Regarding the allegations in paragraph 273 of the SAC, defendants repeat and reallege the responses in paragraphs 1–272 of this answer as if fully set forth herein.

274.     Defendants deny the allegations in paragraph 274 of the SAC.

275.     Defendants deny the allegations in paragraph 275 of the SAC.  Defendants further state that the $2 billion is not "property" of the estate, but rather a debt owed by Citibank

to LBHI, against which debts owed by LBHI to Citibank may be offset under Section 553 of the

Bankruptcy Code.  In addition, the safe harbor provisions of Sections 546(e), 546(f), 546(g),

546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the

Bankruptcy Code also apply to the $2 billion.  Consequently, the $2 billion is not subject to

turnover under Section 542.

> 276.    Regarding the allegations in paragraph 276 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–275 of this answer as if fully set forth herein.

> 277.    Defendants admit that the September Amendment constitutes the

incurrence of an obligation, but deny that such incurrence was for the benefit of Citibank.

Defendants further state that the September Amendment was for the benefit of the LBHI

affiliates, including but not limited to LBI, whose debts LBHI guaranteed pursuant to the

September Amendment.

> 278.    Defendants deny the allegations in paragraph 278 of the SAC.  Defendants

further state, upon information and belief, that LBHI received reasonably equivalent value for

the September Amendment as a result of, among other things, Citi's continued extensions of

credit to the newly-guaranteed subsidiaries.  In fact, LBHI considered these extensions of credit

to be so valuable that, on September 18, 2008 – days after filing for bankruptcy – LBHI filed the

Citibank Clearing Motion to assure Citibank that any postpetition credit extended to Lehman

Clearance Parties (defined specifically to include LBI) would be allowed under the 2004

Guaranty (as amended by the September Amendment) and available for setoff against the $2

billion to the same extent as if the credit had been extended prepetition.

> 279.    Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 279 of the SAC.

280.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 280 of the SAC.

281.    Defendants deny the allegations in paragraph 281 of the SAC.  Defendants further state, upon information and belief, that LBHI executed the September Amendment so that Citibank would continue to extend credit in connection with performing clearing and settlement services for the benefit of the newly-guaranteed entities in connection with securities contracts, commodity contracts, and forward contracts, among other things.  As a result, the September Amendment is insulated from avoidance under Section 546(e) of the Bankruptcy Code.

282.    Defendants deny the allegations in paragraph 282 of the SAC.  Defendants further state that, in addition to Section 546(e), the safe harbor provisions of Sections 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the September Amendment.  Consequently, the September Amendment is not subject to avoidance under Section 548(a)(1)(B).

283.    Regarding the allegations in paragraph 283 of the SAC, defendants repeat and reallege the responses in paragraphs 1–282 of this answer as if fully set forth herein.

284.    Defendants deny the allegations in paragraph 284 of the SAC.  Defendants further state, upon information and belief, that LBHI received fair value in exchange for the September Amendment as a result of, among other things, Citi's continued extension of credit to the newly-added subsidiaries.  In addition, Citi requested and received the September Amendment in good faith.

285.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 285 of the SAC.

286.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 286 of the SAC.

287.    Upon information and belief, defendants admit the allegations in paragraph 287 of the SAC.

288.    Defendants deny the allegations in paragraph 288 of the SAC.  Defendants further state, upon information and belief, that LBHI executed the September Amendment so that Citibank would continue to extend credit in connection with performing clearing and settlement services for the benefit of the newly-guaranteed entities in connection with securities contracts, commodity contracts, and forward contracts, among other things.  As a result, Section 546(e) of the Bankruptcy Code applies to the September Amendment.  In addition, the safe harbor provisions of Sections 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the September Amendment.  Consequently, the September Amendment is not subject to avoidance under Section 544.

289.    Defendants deny the allegations in paragraph 289 of the SAC.

290.    Regarding the allegations in paragraph 290 of the SAC, defendants repeat and reallege the responses in paragraphs 1–289 of this answer as if fully set forth herein.

291.    Defendants admit the allegations in paragraph 291 of the SAC.

292.    Defendants admit that the September Amendment was an obligation incurred by LBHI to Citibank, but deny that the September Amendment was incurred for the benefit of Citibank.

293.    Defendants deny the allegations in paragraph 293 of the SAC, except lack knowledge or information sufficient to form a belief about the truth of the allegations concerning

the solvency of LBHI and its subsidiaries.  Defendants further state, upon information and belief, that LBHI's intent in entering into the September Amendment was to benefit its creditors and customers, not to defraud them.  The Bankruptcy Examiner, whose mandate included the investigation of potential avoidance actions, never even addressed intentional fraud in connection with the September Amendment, presumably because he found no conceivable factual basis to support such a claim.  Despite extensive document discovery in this matter, plaintiffs, too, evidently have failed to unearth a single document to support their claim that LBHI entered into the September Amendment with the intent to defraud its creditors.

294.    Defendants deny the allegations in paragraph 294 of the SAC.

295.    Defendants deny the allegations in paragraph 295 of the SAC.

296.    Defendants deny the allegations in paragraph 296 of the SAC.

297.    Regarding the allegations in paragraph 297 of the SAC, defendants repeat and reallege the responses in paragraphs 1–296 of this answer as if fully set forth herein.

298.    Defendants admit the allegations in paragraph 298 of the SAC. Defendants further state that the transfer of $500 million also was for the benefit of LBHI, as LBI's corporate parent.

299.    Defendants deny the allegations in paragraph 299 of the SAC.  Defendants further state, upon information and belief, that LBHI made the $500 million transfer to keep LBI in business and preserve its value while LBHI negotiated a sale of LBI's assets to Barclays.  The sale of LBI's assets to Barclays, which was agreed to later in the week of September 15, 2008, was made for the benefit of LBHI and its creditors.  Upon information and belief, the $500 million transfer conferred substantial direct and indirect benefit to LBHI and its creditors, and LBI received the transfer in good faith.

129

300.    Upon information and belief, defendants admit the allegations in paragraph 300 of the SAC.

301.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 301 of the SAC.

302.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 302 of the SAC.

303.    Defendants admit the allegations in the first and second sentences of paragraph 303 of the SAC, but deny the remaining allegations in the paragraph.  Defendants further state that the $1 billion LBI account against which Citibank exercised a setoff was distinct from LBI's DDA account into which the $500 million was transferred by LBHI.  At most, $136 million of the $500 million transfer that LBHI made into LBI's DDA on September 14, 2008, was used to fund the $1 billion LBI deposit against which Citibank exercised a setoff.  Defendants further state, on information and belief, that LBHI has already recovered some or all of this transfer from LBI, the initial transferee.  In addition, exercising a setoff does not make Citibank an "immediate or mediate transferee" within the meaning of Section 550(a)(2) of the Bankruptcy Code.

304.    Defendants deny the allegations in paragraph 304 of the SAC.  Defendants further state that LBHI expressly made the $500 million transfer to ensure LBI would be able to fund its obligations under foreign exchange trades in the CLS system.  To the extent a portion of the $500 million can be traced into the $1 billion LBI deposit against which Citibank exercised a setoff, the funds were applied to satisfy LBI's obligations to Citibank in connection with CLS.  As the Examiner concluded, the September 14, 2008 transfer is a safe harbored transaction and is insulated from avoidance under Section 546(e) of the Bankruptcy Code.  In addition, the safe

harbor provisions of Sections 546(g), 546(j), 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555,

556, 560, and 561 of the Bankruptcy Code also apply to insulate the $500 million transfer.

Consequently, the $500 million transfer is not subject to avoidance under Section 548(a)(1)(B).

305.    Defendants deny the allegations in paragraph 305 of the SAC.

306.    Regarding the allegations in paragraph 306 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–305 of this answer as if fully set forth herein.

307.    Defendants admit the allegations in paragraph 307 of the SAC.

Defendants further state that the transfer of $500 million also was for the benefit of LBHI, as

LBI's corporate parent.

308.    Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 308 of the SAC.

309.    Defendants deny the allegations in paragraph 309 of the SAC, except lack

knowledge or information sufficient to form a belief about the truth of the allegations concerning

the solvency of LBHI and its subsidiaries.  Defendants further state, upon information and belief,

that LBHI's intent in requesting the $500 million transfer to LBI was to benefit its creditors and

customers and not to defraud them.  The Bankruptcy Examiner, whose mandate included the

investigation of potential avoidance actions, never even addressed the possibility of actual fraud

in connection with that transfer, presumably because he found no conceivable factual basis to

support such a claim.  Despite extensive document discovery in this matter, plaintiffs, too,

evidently have failed to unearth a single document to support their claim that LBHI intended to

defraud its creditors when it made the $500 million transfer to LBI.

310.    Defendants admit the allegations in the first and second sentences of

paragraph 310 of the SAC, and deny the allegations in the third sentence of paragraph 310.

131

Defendants further state that the $1 billion LBI account against which Citibank exercised a setoff was distinct from LBI's DDA account into which the $500 million was transferred by LBHI.  At most, $136 million of the $500 million transfer that LBHI made into LBI's DDA on September 14, 2008 was used to fund the $1 billion LBI deposit against which Citibank exercised a setoff.  Defendants further state, on information and belief, that LBHI has already recovered some or all of this transfer from LBI, the initial transferee.  In addition, exercising a setoff does not make Citibank an "immediate or mediate transferee" within the meaning of Section 550(a)(2) of the Bankruptcy Code.

311.    Defendants deny the allegations in paragraph 311 of the SAC.

312.    Regarding the allegations in paragraph 312 of the SAC, defendants repeat and reallege the responses in paragraphs 1–311 of this answer as if fully set forth herein.

313.    Defendants admit the allegations in the first sentence of paragraph 313 of the SAC, admit that Citibank owed LBCC approximately $198 million (subject to available setoffs) as a result of settling LBCC's foreign exchange trades in the CLS system, deny the remaining allegations in the paragraph, and refer to proof of claim 67734 for the calculation of the amount owed.

314.    Defendants deny the allegations in paragraph 314 of the SAC, except admit that, pursuant to the Stipulation between the parties dated May 14, 2013, Citibank has paid $167 million of the amount owed to LBCC.  Defendants further state that Citibank is entitled to set off the remaining amount of the LBCC payable against amounts owed by LBCC to Citibank under the ISDA Master Agreement between Citibank and LBCC, and that Citibank acted appropriately in debiting $4.5 million from an LBCC account.

315.    Defendants deny the allegations in paragraph 315 of the SAC.

316.     Regarding the allegations in paragraph 316 of the SAC, defendants repeat and reallege the responses in paragraphs 1–315 of this answer as if fully set forth herein.

317.     Defendants deny the allegations in paragraph 317 of the SAC.

318.     Defendants deny the allegations in paragraph 318 of the SAC, except admit that, while Citibank acknowledged that it owed approximately $198 million (subject to available setoffs) with respect to LBCC trades, Citibank required consent from LBI before it could pay the amount to LBCC (in order to avoid the risk of having to pay the debt twice) as well as plaintiffs' general agreement to Citi's calculation of the amounts due, and admit that, pursuant to the Stipulation between the parties dated May 14, 2013, Citibank has paid $167 million of the amount owed to LBCC.  Defendants further state that Citibank is entitled to set off the remaining amount of the LBCC payable against the amount owed by LBCC to Citibank under the ISDA Master Agreement between Citibank and LBCC, and that Citibank acted appropriately in debiting $4.5 million from an LBCC account.

319.     Defendants deny the allegations in paragraph 319 of the SAC.

320.     Regarding the allegations in paragraph 320 of the SAC, defendants repeat and reallege the responses in paragraphs 1–319 of this answer as if fully set forth herein.

321.     Defendants deny the allegations in paragraph 321 of the SAC, except admit that, pursuant to the May 14, 2013 Stipulation between Citibank and LBCC, Citibank paid $167 million of the payable owed to LBCC.  Defendants further state that the remaining amount of the payable may be partially offset under Sections 553, 560, 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555, 556, and 561 of the Bankruptcy Code and applicable law against debts LBCC owes to Citibank.

322.     Defendants deny the allegations in paragraph 322 of the SAC.

323.    Regarding the allegations in paragraph 323 of the SAC, defendants repeat and reallege the responses in paragraphs 1–322 of this answer as if fully set forth herein.

324.    Defendants deny the allegations in paragraph 324 of the SAC to the extent plaintiffs allege that Citibank is liable under Section 542 of the Bankruptcy Code.

325.    Defendants deny the allegations in paragraph 325 of the SAC to the extent plaintiffs allege that property is recoverable from Citibank under Section 542 or 550 of the Bankruptcy Code.

326.    Regarding the allegations in paragraph 326 of the SAC, defendants repeat and reallege the responses in paragraphs 1–325 of this answer as if fully set forth herein.

327.    Defendants admit the allegations in paragraph 327 of the SAC, except deny that plaintiffs have met their burden to overcome the presumption that defendants' claims are valid.

328.    Defendants admit the allegations in the first sentence of paragraph 328 of the SAC, and admit that plaintiffs object to proof of claim number 67736 for the reasons alleged in the paragraph.

329.    Defendants deny the allegations in paragraph 329 of the SAC, except admit that plaintiffs object to the claims asserted in proof of claim number 67736 to the extent they arise under the September Amendment, and refer to proof of claim number 67736 for its contents.  Defendants further state that the fees claimed by Citibank are reimbursable under the CLS Agreement, since they were incurred as a direct result of Citibank unwinding the Lehman parties' foreign exchange trades starting on September 19, 2008.

330.    Defendants deny the allegations in paragraph 330, except admit that, in connection with settling an adversary proceeding with LBI, Citibank received an unsecured

claim against LBI in the approximate amount of $253 million, and admit that in January 2013, Citibank sold this claim against LBI for approximately $161 million. Defendants further state that Citibank's sale of the LBI unsecured claim significantly benefited LBHI by reducing its liability to Citibank, as guarantor.

331.    Defendants deny the allegations in paragraph 331 of the SAC, except admit that plaintiffs object to the claims asserted in proof of claim numbers 17913, 17934, 17936, 29637, 67736, and 29882 to the extent they seek payment from LBHI as guarantor under the relevant Master Agreements. Defendants further state that their proofs of claim were timely and properly filed and thus constitute *prima facie* evidence of their validity and amount. To overcome the presumption that defendants' claims are valid, plaintiffs are required to produce substantial, affirmative evidence that refutes one of the allegations essential to the claim being challenged. For the reasons set forth herein, plaintiffs' objections are insufficient to overcome the *prima facie* evidence of the validity and amount of the claims and present no basis for the relief plaintiffs seek in this proceeding.

332.    Defendants deny the allegations in paragraph 332 of the SAC.

333.    Defendants deny the allegations in paragraph 333 of the SAC, and object to the purported reservation of rights to the extent plaintiffs seek to enlarge or modify any of their rights under applicable law.

334.    Regarding the allegations in paragraph 334 of the SAC, defendants repeat and reallege the responses in paragraphs 1–333 of this answer as if fully set forth herein.

335.    Defendants admit that Citibank asserts it is an oversecured creditor and is therefore entitled to post-petition interest, and refer to proof of claim number 67736 for its contents.

336.    Defendants deny the allegations in paragraph 336 of the SAC.  Defendants

further state that, as an oversecured creditor, Citibank is entitled to post-petition interest under

Sections 506(b) and 1129 of the Bankruptcy Code and the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors confirms this

entitlement since it requires plaintiffs to pay secured claims "in full."  Defendants further state

that the rates of interest claimed by Citibank are hardly "inflated," as plaintiffs assert.  The

highest rate Citibank seeks on its oversecured claims is the rate mandated in the industry-

standard ISDA Master Agreement:  Citibank's cost of funds plus one percent,[61] which, in

Citibank's case, is a rate *substantially less than half* the rate Lehman claims it is owed by

derivatives counterparties based on the *same* contractual provision.

337.    Defendants deny the allegations in paragraph 337 of the SAC.

338.    Defendants deny the allegations in paragraph 338 of the SAC, and object

to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under

applicable law.

339.    Regarding the allegations in paragraph 339 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–338 of this answer as if fully set forth herein.

340.    Defendants deny the allegations in paragraph 340 of the SAC.  Defendants

further state that Citi Canyon calculated the amount owed under the LBSF-Canyon Agreement in

good faith using commercially reasonable procedures to produce commercially reasonable

results consistent with the Master Agreement and governing law.

---

[61]    *See* 1992 ISDA Master Agreement §§ 6(d)(ii), 14 (definitions of "Applicable Rate" and "Default Rate").

136

341.     Defendants deny the allegations in paragraph 341 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

342.     Regarding the allegations in paragraph 342 of the SAC, defendants repeat and reallege the responses in paragraphs 1–341 of this answer as if fully set forth herein.

343.     Defendants deny the allegations in paragraph 343 of the SAC.

344.     Defendants deny the allegations in paragraph 344 of the SAC, except admit that, as the non-defaulting party under the LBSF-Canyon Agreement, Citi Canyon calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Canyon submitted a claim in the amount of $135,474, and refer to the LBSF-Canyon Agreement and proof of claim number 17895 for their contents.  Defendants further state that Citi Canyon calculated the amount owed under the LBSF-Canyon Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

345.     Defendants deny the allegations in paragraph 345 of the SAC.

346.     Regarding the allegations in paragraph 346 of the SAC, defendants repeat and reallege the responses in paragraphs 1–345 of this answer as if fully set forth herein.

347.     Defendants deny the allegations in paragraph 347 of the SAC.  Defendants further state that Citibank calculated the amount owed under the LBSF-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

348.     Defendants deny the allegations in paragraph 348 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

349.     Regarding the allegations in paragraph 349 of the SAC, defendants repeat and reallege the responses in paragraphs 1–348 of this answer as if fully set forth herein.

350.     Defendants deny the allegations in paragraph 350 of the SAC.

351.     Defendants deny the allegations in paragraph 351 of the SAC, except admit that, as the non-defaulting party under the LBSF-Citibank Agreement, Citibank calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citibank submitted a claim in the amount of $1,640,720,898, and refer to the LBSF-Citibank Agreement and proof of claim number 67733 for their contents.  Defendants further state that Citibank calculated the amount owed under the LBSF-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

352.     Defendants deny the allegations in paragraph 352 of the SAC.

353.     Regarding the allegations in paragraph 353 of the SAC, defendants repeat and reallege the responses in paragraphs 1–352 of this answer as if fully set forth herein.

354.     Defendants deny the allegations in paragraph 354 of the SAC.  Defendants further state that Citi Financial calculated the amount owed under the LBSF-Financial Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

355.     Defendants deny the allegations in paragraph 355 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

356.     Regarding the allegations in paragraph 356 of the SAC, defendants repeat and reallege the responses in paragraphs 1–355 of this answer as if fully set forth herein.

357.     Defendants deny the allegations in paragraph 357 of the SAC.

358.     Defendants deny the allegations in paragraph 358 of the SAC, except admit that, as the non-defaulting party under the LBSF-Financial Agreement, Citi Financial calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Financial submitted a claim in the amount of $21,184,614, and refer to the LBSF-Financial Agreement and proof of claim number 17926 for their contents.  Defendants further state that Citi Financial calculated the amount owed under the LBSF-Financial Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

359.     Defendants deny the allegations in paragraph 359 of the SAC.

360.     Regarding the allegations in paragraph 360 of the SAC, defendants repeat and reallege the responses in paragraphs 1–359 of this answer as if fully set forth herein.

361.     Defendants deny the allegations in paragraph 361 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBSF-Global Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

362.    Defendants deny the allegations in paragraph 362 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

363.    Regarding the allegations in paragraph 363 of the SAC, defendants repeat and reallege the responses in paragraphs 1–362 of this answer as if fully set forth herein.

364.    Defendants deny the allegations in paragraph 364 of the SAC.  Defendants further state that Citibank calculated the amount owed under the LBCC-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

365.    Defendants deny the allegations in paragraph 365 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

366.    Regarding the allegations in paragraph 366 of the SAC, defendants repeat and reallege the responses in paragraphs 1–365 of this answer as if fully set forth herein.

367.    Defendants deny the allegations in paragraph 367 of the SAC.

368.    Defendants deny the allegations in paragraph 368 of the SAC, except admit that, as the non-defaulting party under the LBCC-Citibank Agreement, Citibank calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citibank submitted a claim in the amount of $18,017,039, and refer to the LBCC-Citibank Agreement and proof of claim number 67734 for their contents.  Defendants further state that Citibank calculated the amount owed under the LBCC-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

140

369.    Defendants deny the allegations in paragraph 369 of the SAC.

370.    Regarding the allegations in paragraph 370 of the SAC, defendants repeat and reallege the responses in paragraphs 1–369 of this answer as if fully set forth herein.

371.    Defendants deny the allegations in paragraph 371 of the SAC.  Defendants further state that Citi Energy calculated the amount owed under the LBCS-Energy Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

372.    Defendants deny the allegations in paragraph 372 of the Complaint, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

373.    Regarding the allegations in paragraph 373 of the SAC, defendants repeat and reallege the responses in paragraphs 1–372 of this answer as if fully set forth herein.

374.    Defendants deny the allegations in paragraph 374 of the SAC.

375.    Defendants deny the allegations in paragraph 375 of the SAC, except admit that, as the non-defaulting party under the LBCS-Energy Agreement, Citi Energy calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Energy submitted a claim in the amount of $10,714,350, and refer to the LBCS-Energy Agreement and proof of claim number 17937 for their contents.  Defendants further state that Citi Energy calculated the amount owed under the LBCS-Energy Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

376.    Defendants deny the allegations in paragraph 376 of the SAC.

141

377.    Regarding the allegations in paragraph 377 of the SAC, defendants repeat and reallege the responses in paragraphs 1–376 of this answer as if fully set forth herein.

378.    Defendants deny the allegations in paragraph 378 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBCS-Global ISDA Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

379.    Defendants deny the allegations in paragraph 379 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

380.    Regarding the allegations in paragraph 380 of the SAC, defendants repeat and reallege the responses in paragraphs 1–379 of this answer as if fully set forth herein.

381.    Defendants deny the allegations in paragraph 381 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBCS-Global EFET Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

382.    Defendants deny the allegations in paragraph 382 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

383.    Regarding the allegations in paragraph 383 of the SAC, defendants repeat and reallege the responses in paragraphs 1–382 of this answer as if fully set forth herein.

384.    Defendants deny the allegations in paragraph 384 of the SAC.

385.    Defendants deny the allegations in paragraph 385 of the SAC, except admit that, as the non-defaulting party under the LBCS-Global EFET Agreement, Citi Global

calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Global submitted a claim in the amount of $716,281, and refer to the LBCS-Global EFET Agreement and proof of claim number 29880 for their contents.  Defendants further state that Citi Global calculated the amount owed under the LBCS-Global EFET Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

386.     Defendants deny the allegations in paragraph 386 of the SAC.

387.     Regarding the allegations in paragraph 387 of the SAC, defendants repeat and reallege the responses in paragraphs 1–386 of this answer as if fully set forth herein.

388.     Defendants deny the allegations in paragraph 388 of the SAC.  Defendants further state that Citi Swapco calculated the amount owed under the LBSF-Swapco Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

389.     Defendants deny the allegations in paragraph 389 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

390.     Regarding the allegations in paragraph 390 of the SAC, defendants repeat and reallege the responses in paragraphs 1–389 of this answer as if fully set forth herein.

391.     Defendants deny the allegations in paragraph 391 of the SAC.

392.     Defendants deny the allegations in paragraph 392 of the SAC, except admit that, as the non-defaulting party under the LBSF-Swapco Agreement, Citi Swapco calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Swapco submitted a claim in the amount of $991,772, and refer to the LBSF-

Swapco Agreement and proof of claim number 17933 for their contents.  Defendants further

state that Citi Swapco calculated the amount owed under the LBSF-Swapco Agreement in good

faith using commercially reasonable procedures to produce commercially reasonable results

consistent with the Master Agreement and governing law.

393.    Defendants deny the allegations in paragraph 393 of the SAC.

394.    Regarding the allegations in paragraph 394 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–393 of this answer as if fully set forth herein.

395.    Defendants admit that Citibank is entitled under the CLS Agreement to

approximately $1.3 million from LBCC attributable to (1) the reasonable fee Citibank applied to

trades transacted in the market to unwind LBCC's foreign exchange positions, and (2) the costs

Citibank incurred in carrying LBCC's short currency positions, netted against the gain on

carrying LBCC's long currency positions, and refer to proof of claim number 67734 for its

contents.

396.    Defendants deny the allegations in paragraph 396 of the SAC.

397.    Defendants deny the allegations in paragraph 397 of the SAC, and object

to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under

applicable law.

398.    Regarding the allegations in paragraph 398 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–397 of this answer as if fully set forth herein.

399.    Defendants admit that Citibank is entitled under the CLS Agreement to

approximately $700,000 from LBSF attributable to (1) the reasonable fee Citibank applied to

trades transacted in the market to unwind LBSF's foreign exchange positions, and (2) the costs

Citibank incurred in carrying LBSF's short currency positions, netted against the gain on carrying LBSF's long currency positions, and refer to proof of claim 67733 for its contents.

400.    Defendants deny the allegations in paragraph 400 of the SAC.

401.    Defendants deny the allegations in paragraph 401 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

402.    Regarding the allegations in paragraph 402 of the SAC, defendants repeat and reallege the responses in paragraphs 1–401 of this answer as if fully set forth herein.

403.    Defendants deny the allegations in paragraph 403 of the SAC, except admit that the $9.8 million was included in the September 15, 2008 CLS pay-in/pay-out schedule as an amount due and owing from LBSF to Citibank, which amounts Citibank was authorized to debit from LBSF's CLS account in the normal course.

404.    Defendants deny the allegations in paragraph 404 of the SAC, except admit that CGML's Derivatives Questionnaire includes a cash break owed by CGML to LBSF under the ISDA Master Agreement between those parties in the amount of $9.8 million, and admit that the $9.8 million cash break bears the identification number C61F00856.

405.    Defendants deny the allegations in paragraph 405 of the SAC.

406.    Regarding the allegations in paragraph 406 of the SAC, defendants repeat and reallege the responses in paragraphs 1–405 of this answer as if fully set forth herein.

407.    Defendants deny the allegations in paragraph 407 of the SAC.

408.    Defendants deny the allegations in paragraph 407 of the SAC.

409.    Regarding the allegations in paragraph 409 of the SAC, defendants repeat and reallege the responses in paragraphs 1–408 of this answer as if fully set forth herein.

410.    Defendants deny the allegations in paragraph 410 of the SAC.  Defendants further state that it is CGML, not Citibank, that owes $9.8 million to LBSF in the form of a cash break that is included in CGML's Derivatives Questionnaire, bearing the identification number C61F00856.  To the extent plaintiffs assert it is Citibank, not CGML, that owes LBSF the $9.8 million, defendants further state that the $9.8 million was never "property" of the LBSF estate, but rather a debt owed by Citibank to LBSF, against which debts owed by LBSF to Citibank may be offset under Section 553 of the Bankruptcy Code.  In addition, the safe harbor provisions of Sections 546(e), 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the $9.8 million.  Consequently, the $9.8 million is not subject to turnover under Section 542.

411.    Defendants deny the allegations in paragraph 411 of the SAC.

412.    Regarding the allegations in paragraph 412 of the SAC, defendants repeat and reallege the responses in paragraphs 1–411 of this answer as if fully set forth herein.

413.    Defendants deny the allegations in paragraph 413 of the SAC.

414.    Regarding the allegations in paragraph 414 of the SAC, defendants repeat and reallege the responses in paragraphs 1–413 of this answer as if fully set forth herein.

415.    Defendants deny the allegations in paragraph 415 of the SAC.

416.    Defendants deny the allegations in paragraph 416 of the SAC.  Defendants further state that their derivatives claims were calculated in good faith, in a commercially reasonable manner, and consistent with the governing contracts and applicable law.  If any portion of defendants' derivatives claims is invalid under applicable law, then disallowance of that portion would provide plaintiffs with a complete remedy.

417.    Defendants deny the allegations in paragraph 417 of the SAC.

418.     Defendants deny the allegations in paragraph 418 of the SAC.

## AFFIRMATIVE DEFENSES

Defendants allege the following affirmative defenses with respect to the causes of action alleged in the SAC, without assuming the burden of proof where the burden of proof rests on plaintiffs.

## FIRST AFFIRMATIVE DEFENSE

The SAC fails to state a claim upon which relief may be granted against defendants with respect to each cause of action.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of acquiescence, estoppel, and waiver.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by *res judicata* and collateral estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs fail to allege fraud with the required particularity.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs, collectively and individually, consented to, approved, ratified, and authorized the acts and transactions complained of and for which recovery is sought, which precludes them from recovery.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to plaintiffs.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages are nonexistent, speculative, and not of the nature or to the extent alleged.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because defendants' alleged conduct was not the actual or proximate cause of any injury, loss, or damage to plaintiffs.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate or eliminate their damages, if any, and any recovery by plaintiffs should be reduced or denied accordingly.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any claims asserted are subject to the defenses of *in pari delicto* and unclean hands.  Defendants have, at all times, acted in good faith.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent they lack standing to bring them.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims that defendants breached an alleged agreement concerning the $2 billion deposit are barred on the grounds that the alleged agreement is unenforceable for lack of consideration, failure of consideration, vagueness or indefiniteness, mutual or unilateral mistake, fraud or misrepresentation by LBHI, modification, and/or because the agreement is an illusory contract and void for lack of mutuality of obligation.

## THIRTEENTH AFFIRMATIVE DEFENSE

To the extent plaintiffs allege the existence of an oral agreement with defendants concerning the $2 billion deposit that was not capable of being performed within one year, such agreement is unenforceable under the statute of frauds.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are negated by, or are otherwise subject to, defendants' common law, statutory, and/or contractual rights of setoff.

## FIFTEENTH AFFIRMATIVE DEFENSE

The $2 billion is safe harbored and therefore not subject to turnover by virtue of Sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 555, 556, 559, 560, and/or 561 of the Bankruptcy Code.

## SIXTEENTH AFFIRMATIVE DEFENSE

The September Amendment is safe harbored and therefore not subject to avoidance by virtue of Sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 555, 556, 559, 560, and/or 561 of the Bankruptcy Code.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The September Amendment is not subject to avoidance because Citibank took for value and in good faith within the meaning of Section 548(c) of the Bankruptcy Code.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The September Amendment is not subject to avoidance because Citibank gave fair consideration without knowledge of fraud at the time the obligation was incurred, and acted at all relevant times in good faith and without fraudulent intent, within the meaning of Section 278 of the New York Debtor & Creditor Law.

## NINETEENTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiffs with respect to the $500 million transfer, because plaintiffs have failed to seek avoidance of the $500 million transfer against the initial transferee, and have not alleged that the transfer has been avoided on any basis.

## TWENTIETH AFFIRMATIVE DEFENSE

The $500 million transfer is not subject to avoidance because, upon information and belief, LBI took for value and in good faith within the meaning of Section 548(c) of the Bankruptcy Code.

150

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The $500 million transfer is not subject to avoidance because, upon information and belief, LBI gave fair consideration for the transfer without knowledge of fraud at the time the transfer was made, and acted at all relevant times in good faith and without fraudulent intent, within the meaning of Section 278 of the New York Debtor & Creditor Law.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The $500 million transfer is safe harbored and therefore not subject to avoidance by virtue of Sections 546(e), 546(g), 546(j), 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555, 556, 560, and/or 561 of the Bankruptcy Code.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs cannot recover the $500 million transfer from defendants because, to the extent that Citibank received any funds traceable to LBHI's initial transfer of $500 million, Citibank took for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer, within the meaning of Section 550(b)(1) of the Bankruptcy Code.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs cannot recover the $500 million transfer from defendants because plaintiffs are entitled to only a single satisfaction under Section 550(d) of the Bankruptcy Code.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

Plaintiffs are not entitled to interest, costs, or disbursements in connection with this action, or to attorneys' fees.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

Plaintiffs anticipatorily repudiated the proposed three-way collapse transaction between LBSF, Citibank, and Bracebridge.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

To the extent plaintiffs allege the existence of an oral agreement with defendants in which Citi waived contractual setoff rights provided for pursuant to LBHI's Guaranty of the Revolving Loan Agreement between Citi, LBCCA, and LBHI, dated August 30, 2007, that oral agreement is unenforceable pursuant to the parties' written agreement, the statute of frauds, and Section 15-301(1) of the N.Y. General Obligations Law.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

Plaintiffs' failure to return collateral held against Bracebridge and to pay a termination fee to Citibank constituted a failure to satisfy conditions precedent to the proposed three-way collapse transaction between LBSF, Citibank, and Bracebridge.

**RESERVATION OF RIGHT TO AMEND**

Defendants expressly reserve the right to amend and supplement their answer, defenses, and all other pleadings.

152

## REQUEST FOR RELIEF

Accordingly, for all of the reasons set forth above, plaintiffs' SAC should be denied in its entirety and dismissed with prejudice, with attorneys' fees and costs assessed against plaintiffs, and awarding defendants such other relief as the Court deems just and proper.

Dated: February 28, 2014
      New York, New York

                                        **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

                                        By: /s/ Claudia L. Hammerman     

                                        Brad S. Karp
                                        Claudia L. Hammerman
                                        Stephen J. Shimshak
                                        Douglas R. Davis
                                        1285 Avenue of the Americas
                                        New York, New York  10019-6064
                                        Telephone:  (212) 373-3000
                                        Facsimile:  (212) 757-3990

                                        *Attorneys for Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products Inc., Citigroup Energy Inc., Citi Canyon Ltd., and Citi Swapco Inc.*