**CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP**
101 Park Avenue
New York, New York 10178
Telephone:  (212) 696-6000

*Counsel for Plaintiffs, Lehman Brothers Holdings Inc., et al.*

-and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Counsel for Plaintiff Intervenor, the Official Committee of*
*Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | Ad. Pro. No. 12-01044 (SCC) |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP., and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | **DECLARATION OF** |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | **LINDSAY WEBER IN** |
| INC., | : | **SUPPORT OF** |
| Plaintiffs and | : | **PLAINTIFFS' MOTION** |
| Plaintiff Intervenor, | : | **FOR PARTIAL SUMMARY** |
| | : | **JUDGMENT ON COUNT** |
| -against- | : | **16 OF SECOND AMENDED** |
| | : | **COMPLAINT AND** |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | **DISALLOWING AND** |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | **EXPUNGING CLAIMS OF** |
| CITIGROUP ENERGY INC., CITI CANYON LTD., and | : | **CITIBANK, N.A. AGAINST** |
| CITI SWAPCO INC., FYI LTD., FFI FUND LTD., and | : | **LBHI FOR INTEREST** |
| OLIFANT FUND, LTD., | : | **AND FEES UNDER 11** |
| Defendants and | : | **U.S.C. §§ 502, 506 AND 553** |
| Defendant Intervenors. | : | |

------------------------------------------------------------------------ X

I, LINDSAY WEBER, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am associated with the law firm Quinn Emanuel Urquhart & Sullivan, LLP, special counsel to the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee" and, together with Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Commodity Services Inc., Lehman Brothers Commercial Corp., and Lehman Brothers Special Financing Inc., "Plaintiffs") in the above-captioned adversary proceeding (the "Adversary Proceeding").  I submit this declaration in support of Plaintiffs' Motion Pursuant To Fed. R. Civ. P. 56(a) For Partial Summary Judgment On Count 16 Of Second Amended Complaint And Disallowing And Expunging Claims Of Citibank, N.A. Against LBHI For Interest And Fees Under 11 U.S.C. §§ 502, 506 And 553 (the "Motion").

2.      Attached hereto as Exhibit A is a true and correct copy of Second Amended Complaint and Claims Objection dated January 29, 2014 (Docket No. 43 in Adv. Pro. No. 12-01044 (SCC)) filed against Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products Inc., Citigroup Energy Inc., Citi Canyon Ltd, and Citi Swapco Inc. (collectively, "Defendants").

3.      Attached hereto as Exhibit B is a true and correct copy of Defendants' Answer To Second Amended Complaint And Response To Claims Objection dated February 28, 2014 (Docket No. 51 in Adv. Pro. No. 12-01044 (SCC)).

4.      Attached hereto as Exhibit C is a true and correct copy of Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, If Any, In Respect of Amounts Transferred, dated April 15, 2009 (Docket No. 3372 in Chapter 11 Case No. 08-13555 (SCC)).

5.      Attached hereto as Exhibit D is a true and correct copy of the Plaintiffs' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 502(b), and 509(a), For Entry Of An Order Provisionally Allowing Claims Filed By Citibank, N.A. And Authorizing Lehman Brothers

Holdings Inc. To Satisfy Those Claims With Funds On Deposit (Docket No. 30 in Adv. Pro. No.
12-01044 (SCC)) (without exhibits).

6.      Attached hereto as Exhibit E is a true and correct copy of Citibank's Opposition
to Plaintiffs' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 502(b), and 509(a), For Entry
Of An Order Provisionally Allowing Claims Filed By Citibank, N.A. And Authorizing Lehman
Brothers Holdings Inc. To Satisfy Those Claims With Funds On Deposit (Docket No. 33 in Adv.
Pro. No. 12-01044 (SCC)) (without exhibits).

7.      Attached hereto as Exhibit F is a true and correct copy of relevant excerpts from
Transcript of the 10/23/13 Hearing on Plaintiffs' Motion Pursuant to 11 U.S.C. §§ 105(a),
363(b)(1), 502(b), and 509(a), For Entry Of An Order Provisionally Allowing Claims Filed By
Citibank, N.A. And Authorizing Lehman Brothers Holdings Inc. To Satisfy Those Claims With
Funds On Deposit (Docket No. 37 in Adv. Pro. No. 12-01044 (SCC)).

8.      Attached hereto as Exhibit G is a true and correct copy of relevant excerpts from
Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its
Affiliated Debtors (Docket No. 22973 in Chapter 11 Case No. 08-13555(SCC)).

9.      Attached hereto as Exhibit H is a true and correct copy of Order Confirming
Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its
Affiliated Debtors dated December 6, 2011 (Docket No. 23023 in Chapter 11 Case No. 08-
13555(SCC)) (without exhibits).

10.     Attached hereto as Exhibit I is a true and correct copy of Notice Of Effective Date
And Distribution Date In Connection With The Third Amended Joint Chapter 11 Plan of
Lehman Brothers Holdings Inc. And Its Affiliated Debtors, dated March 6, 2012 (Docket No.
26039 in Chapter 11 Case No. 08-13555 (SCC)).

11.     Attached hereto as Exhibit J is a true and correct copy of the Amended Stipulation
Establishing Distribution Reserves for Claims Filed by Citibank, N.A., Citibank Global Markets

Ltd. And Citibank Global Markets, Inc. in Connection with the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated as of

February 25, 2013.


Dated: New York, New York
       June 13, 2014

                                    By: /s/ *Lindsay Weber*
                                    Lindsay Weber

# Exhibit A

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Turner P. Smith
L.P. Harrison 3rd
Andrew H. Seiden
Peter J. Behmke
101 Park Avenue
New York, New York 10178
*Counsel for Plaintiffs*
              -and-
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Daniel P. Cunningham
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Special Counsel for Intervenor-Plaintiff, Official Committee of*
*Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP., and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | Adversary Proceeding |
| INC., | : | No.:  12-01044 (JMP) |
| Plaintiffs and | : | |
| Plaintiff Intervenor, | : | |
| | : | |
| -against- | : | |
| | : | |
| | : | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | **SECOND AMENDED** |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | **COMPLAINT AND** |
| CITIGROUP ENERGY INC., CITI CANYON LTD., and | : | **CLAIMS OBJECTION** |
| CITI SWAPCO INC. | | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------ X

Plaintiffs Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corporation ("LBCC" and collectively with LBSF and LBCS, the "Lehman Subsidiaries"), and Lehman Brothers Holdings Inc. ("LBHI"; and together with the Lehman Subsidiaries, "Lehman") as debtors and debtors in possession, and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee"; and together with Lehman, "Plaintiffs"), by their undersigned attorneys, allege the following against defendants Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd. ("Citi Global"), Citigroup Financial Products Inc. ("Citi Financial"), Citigroup Energy Inc. ("Citi Energy"), Citi Canyon Ltd. ("Citi Canyon"), and Citi Swapco Inc. ("Citi Swapco"; and collectively with Citibank, Citi Global, Citi Financial, Citi Energy, and Citi Canyon, "Citi"):

## PRELIMINARY STATEMENT

1.    Approximately three months prior to Lehman's bankruptcy cases, Citi extracted more than $2 billion of cash from LBHI.  Throughout these cases, Citi has refused to return that cash to Lehman.  As set forth herein, Citi is not entitled to apply that cash to secure its claims against Lehman for trading losses.  Not surprisingly, Citi submitted claims in the Lehman bankruptcy cases for over $2 billion in the hope of sustaining claims in excess of the cash it holds and converting that cash into collateral security that it might retain.

2.    In addition to unlawfully refusing to return Lehman's cash, Citi artificially inflated the value of its claims arising under derivative agreements with the Lehman Subsidiaries by more than $2.2 billion. It did so by systematically charging for phantom losses it did not suffer, failing to offset counterbalancing positions, and opportunistically selecting highly favorable valuation dates and times.  Citi was so eager to profit from Lehman's demise that just hours after LBHI filed its chapter 11 petition Citi attempted to resuscitate trades it had successfully novated away, for the sole purpose of declaring them in default and asserting yet

-2-

more claims for hypothetical losses.  All the while, its eyes were trained on the $2 billion of cash

that it extracted from Lehman three months prior to bankruptcy, which it planned to use to

ensure a 100 percent recovery of its contrived claims.  Contrary to its fictitious derivatives claims

of $1.93 billion, Citi's derivatives claims should actually total only $25 million.  In addition, Citi

owes Lehman more than $243 million as the result of the termination of certain of the parties'

derivatives agreements.

3.      The derivatives claims submitted by Citi were built on nonexistent losses

and defy commercial reality.  The actual value of the derivatives portfolio between the Lehman

Subsidiaries and Citi (net of collateral) was $291 million in the Lehman Subsidiaries' favor as of

the close of business on Friday, September 12, 2008.  Yet, inexplicably, Citi's proofs of claim

would have the Court believe that the value of those positions somehow plunged to more than

$1.93 billion *in Citi's favor* when LBHI commenced its chapter 11 case on Monday, September

15, 2008 (the "Commencement Date").  That $2.2 billion difference is not remotely attributable

to any shift in the market value of those positions over that single business day.

4.      The actual change in market value of the derivatives portfolio from

September 12, 2008 to September 15, 2008, based on independently available market data, was

$150 million in favor of Citi.  That $150 million swing in value takes into account the substantial

movements that occurred in the market on the Commencement Date.  Yet, Citi inflated its claims

by nearly 15 times that already substantial market movement to tack on another $2.2 billion.

There is no basis in economic reality for inflating the claims to this stratospheric level.

5.      A simple graph comparing Citi's valuation of the derivatives portfolio on

September 12, 2008 and the amount of its claims on September 15, 2008 with those calculated

using independent, publicly available market sources starkly illustrates how Citi's dramatically

inflated claims bore no relation to the true market value of its positions:

-3-

**Calculation Based on Independent Market Data v. Citi Valuation of Derivatives Portfolio,
Net of Collateral, on September 12, 2008 and September 15, 2008[1]**



It defies imagination to believe that Citi actually gained $2.2 billion on its derivative portfolio with the Lehman Subsidiaries in a single day when the actual market movements were only a tiny fraction of that figure.  Undoubtedly, Citi did not.

6.    Certainly, if the commencement of Lehman's bankruptcy cases suddenly left Citi exposed to billions of dollars of new risk, one would have expected to see a public disclosure of that risk by Citi.  Lehman is unaware of any such disclosure.  Presumably, Citi's exposure was substantially smaller than Citi alleges or Citi was able to alleviate that risk.

7.    In fact, Citi's own disclosures filed with the Securities and Exchange Commission do not appear consistent with the methodology it used for calculating its claim against Lehman.  In filings before and after the Lehman bankruptcy, Citi disclosed that it incorporated "adjustments" into its fair value estimates for its derivative positions which served

---

[1]  The value of the portfolio on September 12, net of collateral ($291 million in the Lehman Subsidiaries' favor), adjusted for the $150 million market move in Citi's favor on September 15 and $78 million in net cash payments made by the Lehman Subsidiaries to Citi under the swap agreements after September 12, resulted in a net value of $219 million to the Lehman Subsidiaries as of the end of the day on September 15.

to "ensure that the fair value reflects the price at which the entire position could be liquidated."
*See* Citigroup, Inc., Third Quarter 2008 Quarterly Report (Form 10-Q) at 41, 128.  In other
words, Citi had previously considered how to close out a large derivatives portfolio and had
established a methodology for determining the liquidation value of its positions.  Plaintiffs
believe that if Citi used its own pre-existing fair value adjustment methodology to calculate the
close-out value of its derivatives portfolio with Lehman, such adjustment would be a small
fraction of its filed claim and, in fact, Citi would owe money to Lehman.  Instead, Citi concocted
inflated derivatives claims by violating the governing contracts, New York law, and U.S.
bankruptcy law in several important respects.

8.    ***First***, both the contracts and bankruptcy law mandated that Citi calculate
its claims by valuing the terminated trades as of the date of termination selected by Citi
(September 15, 2008 under almost all agreements), so long as values could be determined as of
that date.  Commercially reasonable determinants of value existed for all of Citi's derivatives
positions on September 15, as evidenced by the ability of other Lehman counterparties to value
hundreds of thousands of similar trades as of that date.  Unfazed by the clear requirement of the
contracts and bankruptcy law, Citi instead valued a vast majority of its trades as of later dates
when it would be more profitable to do so.  For each of the four types of derivatives products in
its portfolio for which there were substantial positions – credit, rates, foreign exchange, and
securitized products – Citi opportunistically valued the vast majority of the trades on the date
that produced the larger claim.  The sole purpose of this exercise was to inflate Citi's claims and
generate unearned profits.  Citi inflated its claims by more than $400 million in this manner in
blatant disregard of the parties' contracts and the law.

9.    ***Second***, Citi inflated its claims by at least $1.6 billion through the addition
of phantom charges for self-described "losses" that Citi never incurred or would have incurred.

-5-

Other than in a few, rare instances, Citi's claims for losses are not based on actual replacement

trades, but rather on hypothetical replacement trades yielding hypothetical losses that would

never have been incurred. Instead of hypothetically closing out trades at their actual mid-market

value – the price at which the potential for loss is offset by the potential for gain – Citi charged a

higher price by tacking on "add-on" costs that it never incurred. As a market-maker with access

to the inter-dealer market, Citi was not exposed to these costs. Citi was, and is, a market-maker

with a very large customer base and access to the inter-dealer markets. Thus, in connection with

its Lehman exposure, Citi was generally able to transact at or near mid-market values. Indeed,

because of Citi's large customer base, Citi would have been able to profit from bid/offer spreads,

not be punished by them.

        10.     Therefore, instead of costs, the add-ons were actually built-in profits that

Citi took for itself.  In reality, many of the "add-ons" claimed by Citi do not reflect actual friction

costs, but rather are attempts by Citi to collect profits.  Citi cannot justify taking add-ons today

based on hypothetical losses that may or may not occur in the future, when they are holding the

positions that have an equal chance of increasing or decreasing in value in the future.  Moreover,

even if Citi had replaced the trades and actually incurred these types of charges, which it did not,

Citi would have paid at most a tiny percentage of the $1.6 billion in charges it now claims.  Citi

artificially ballooned these hypothetical costs by, for example, using spreads that are typically

charged by market-makers to end users with limited market access, ignoring that as a market-

maker with a large customer base and access to the inter-dealer market where trades are

generally done at or near mid-market, Citi typically traded with small or no spreads and in

certain cases would have been able to profit from bid/offer spreads.  These inflated, phantom

losses produced a windfall for Citi that is barred by the swap agreements and governing law,

which only permit the non-defaulting party to receive the economic equivalent of the terminated

trades.

11.     ***Third***, Citi disregarded its own internal risk management practice of

managing its derivatives book on a portfolio basis.  As Citi described in its 2008 Annual Report,

stress testing for derivatives, "is performed on both individual trading portfolios, and on

**aggregations of portfolios** and businesses," and "[t]he Chief Risk Officer . . . monitors and

controls major risk exposures and concentrations across the organization. This means

**aggregating risks**, within and across businesses . . . ."  *See* Citigroup, Inc., 2008 Annual Report

(Form 10-K) at 91 and 51 (emphasis added).  However, instead of applying portfolio aggregation

to determine the economic equivalent of the material terms of the transactions as a group – as

any reasonable trader or risk manager would do, as Citi customarily did, and as commercial

reasonableness requires – Citi closed out the vast majority of the trades individually so it could

maximize the number of charges for hypothetical losses included in its claims.  Even where there

were functionally identical offsetting trades, Citi in certain instances added hypothetical add-on

charges to both trades.  Citi's failure to aggregate risk in connection with the calculation of its

hypothetical losses was a commercially unreasonable procedure that generated commercially

unreasonable claims.  It greatly inflated the amount of hypothetical losses claimed by Citi and

violates the principle under New York law that requires counterparties to mitigate losses when

seeking breach of contract damage claims.

12.     Clearly Citi knew how to mitigate losses by aggregating trades.  Citi's

most egregious conduct vis-à-vis Lehman related to a group of trades whereby Citi's exposure to

Lehman matched perfectly with Lehman's exposure to a third counterparty.  Prior to the

commencement of Lehman's bankruptcy cases, Citi and the third party arranged a novation with

one another whereby they would face each other and Lehman would be taken out of the middle

of the exposure.  Citi matched 29 positions it had with Lehman with 87 positions Lehman had

with another counterparty and eliminated the Lehman risk.  Shockingly, rather than embrace this

transaction and pursue other means of loss mitigation, after the Commencement Date Citi sought

to resurrect these same trades for the sole purpose of terminating them and adding grossly

inflated claims for hypothetical losses.  Clearly, Citi viewed Lehman's bankruptcy as a license to

profit, especially from the $2 billion of LBHI cash that it was holding.  By attempting to revive

these trades and adding phantom losses, Citi inflated its claim by an additional $109 million (*see*

paragraphs 205 through 216 herein).

13.    While the $1.93 billion in artificially-inflated claims bears no resemblance

to any actual losses, it does closely approximate the $2 billion of cash that Citibank extracted

from LBHI three months prior to its bankruptcy as a "comfort" deposit to cover clearing and

settlement overdrafts.  Citibank has wrongfully withheld the $2 billion and has taken the position

that it may setoff and apply LBHI's cash to pay itself dollar-for-dollar on claims that would

otherwise be unsecured.  Defendants have also: (i) refused to return $500 million of LBHI cash

that LBHI transferred to the account of its broker-dealer subsidiary at Citibank hours before the

LBHI bankruptcy filing; and (ii) refused to pay approximately $204 million owed to LBCC

under the parties' clearance agreement.

14.    Without Citi's fabricated derivatives claims, Citibank would have had to

return the $2 billion to LBHI.  In this manner, Citi has seized upon the close-out of the Lehman

Subsidiaries' derivatives portfolio as a profit-making opportunity of historic proportions.  While

other Lehman creditors stand to recover cents on the dollar for their actual losses, Citi is seeking

to earn a $2.2 billion profit by claiming a 100 cent recovery on phantom losses.

15.    This action seeks to remedy the harm perpetrated as a result of Citibank's

efforts to elevate its position against Lehman over similarly situated creditors. Citi should be

ordered to return to the LBHI estate the approximately $2.5 billion that it is improperly

withholding, its grossly inflated claims should be disallowed or reduced and it should be ordered

to pay the hundreds of millions of dollars it owes to the Lehman Subsidiaries under the parties'

contracts.

## **THE PARTIES**

16.     LBHI is a Delaware corporation with its former principal business address

at 745 Seventh Avenue, New York, New York 10019, and its current principal business address

at 1271 Avenue of the Americas, New York, New York 10020.

17.     LBSF is a Delaware corporation with its former principal business address

at 745 Seventh Avenue, New York, New York 10019, and its current principal business address

at 1271 Avenue of the Americas, New York, New York 10020.

18.     LBCC is a Delaware corporation with its former principal business

address at 745 Seventh Avenue, New York, New York 10019, and its current principal business

address at 1271 Avenue of the Americas, New York, New York 10020.

19.     LBCS is a Delaware corporation with its former principal business address

at 745 Seventh Avenue, New York, New York 10019, and its current principal business address

at 1271 Avenue of the Americas, New York, New York 10020.

20.     The Committee is a statutory committee appointed by the Office of the

United States Trustee under section 1102 of the Bankruptcy Code in the above-captioned chapter

11 cases on or about September 16, 2008, whose intervention in this case was stipulated to by

Citibank.

21.     Citibank is a national banking association chartered under the laws of the

United States, with its principal place of business in New York, New York.

22.     Citi Global is organized under the laws of the United Kingdom with its principal place of business in London, United Kingdom.

23.     Citi Financial is organized under the laws of Delaware with its principal place of business in New York, New York.

24.     Citi Canyon is organized under the laws of the Cayman Islands.

25.     Citi Energy is organized under the laws of Delaware with its principal place of business in Houston, Texas.

26.     Citi Swapco is organized under the laws of Delaware with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

27.     Plaintiffs bring this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure and seek relief under Sections 2201 and 2202 of title 28 of the United States Code, Sections 105(a), 502, 541, 542, 544, 548, and 550 of the Bankruptcy Code, and applicable provisions of state law.

28.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and (c).  Pursuant to 28 U.S.C. §§ 157(a) and 157(b)(1) and the Order dated July 10, 1984 Referring to Bankruptcy Judges for this District any or all proceedings under Title 11, this Court may exercise subject matter jurisdiction.  Venue in this district is proper in accordance with 28 U.S.C. § 1409(a).

29.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (K) and (O).

30.     Defendants, by agreement, have consented to the entry of a final order by the Bankruptcy Court, within the meaning of 28 U.S.C. § 157(b)(1), and appeals, if any, shall be made pursuant to 28 U.S.C § 158(a)(1).

31.     Pursuant to, *inter alia*, 11 U.S.C. 502(a) and Rule 3007(b) of the Federal

Rules of Bankruptcy Procedure, joinder of the objections asserted herein with the remaining

counts requesting relief is proper.

## FACTUAL ALLEGATIONS

### A.     Citibank is Wrongfully Withholding $2.5 Billion in Cash Belonging to Lehman

(a)     *Background*

32.     Prior to its bankruptcy, LBHI and its subsidiaries constituted the fourth

largest investment bank in the United States. It offered an array of financial services in equity

and fixed income sales, trading and research, investment banking, asset management, private

investment management, and private equity.

33.     Citibank provided clearing and settlement services, including foreign

exchange-related services, for Lehman.  One way in which it provided those services was

pursuant to a Continuous Linked Settlement ("CLS") Services Amended and Restated

Agreement for CLS User Members (the "CLS Agreement"), under which Citibank acted as the

Designated Settlement Member for certain LBHI subsidiaries – *i.e.*, Lehman Brothers Inc.

("LBI"), LBCC, LBSF and Lehman Brothers International (Europe) (collectively, the "Trading

Subsidiaries").  CLS is a daily cash settlement system and service that is offered by CLS Bank

International through its members and is designed to eliminate settlement risk in foreign

exchange transactions.  When a foreign exchange transaction is settled under the CLS system,

the trading counterparties each pay one currency into the CLS bank and receive a different

currency in return.

34.     Because participation in the CLS foreign exchange netting and clearing

service is only available by or through a "settlement member," and Citibank was one of only 69

members while Lehman was not, the Trading Subsidiaries used Citibank to affect their foreign

-11-

exchange trades under the CLS system. Citibank received tens of millions of dollars in fees from Lehman in exchange for providing that service.

35. Due to the timing differences in settling currency trades in markets across the globe, the Trading Subsidiaries would occasionally incur overdrafts in their trading accounts in the course of Citibank performing clearing services and settling their currency trades. When providing clearing services, Citibank permitted the Trading Subsidiaries to incur daylight overdrafts. The Trading Subsidiaries would, in the ordinary course, reduce their overdrafts to zero at the end of the day, when all trades settled.

36. Citibank performed CLS settlement and clearing services for Lehman from 2004 through 2008, without any material modification to the parties' respective contractual obligations. The clearing services that Citibank provided to Lehman were vital to Lehman's ability to conduct its ordinary business operations.

37. In addition to foreign exchange trades effected through CLS, which constituted the substantial majority of clearing services provided by Citibank to Lehman, Citibank provided other clearing and settlement services, including cash clearing services in emerging markets and in the United States. The Trading Subsidiaries also would occasionally incur overdrafts in their trading accounts in the course of Citibank performing those clearing and settlement services.

38. Pursuant to a Guaranty dated January 7, 2004 (the "2004 Guaranty"), LBHI agreed to guaranty the payment of obligations under extensions of credit from Citibank to certain specifically identified Lehman entities. The 2004 Guaranty did not provide a guaranty of obligations incurred in connection with Citibank's performance of clearing services, and it did not extend to cover any obligations of LBI, whether for clearing related overdrafts or broader indebtedness.

-12-

(b)     *The $2 Billion June 2008 Transfer*

39.     During the period of market deterioration that followed the collapse of

Bear Stearns in March 2008, Citibank began making inquiries regarding Lehman's cash position

and liquidity.

40.     On the morning of June 12, 2008, reacting to what it perceived were

negative market signals regarding Lehman, Citibank made a hasty request that LBHI transfer $3-

5 billion in cash to an account held at Citibank "to cover intraday exposures" to the Trading

Subsidiaries arising out of clearing and settlement activities.  If LBHI did not acquiesce, Citibank

would not continue to clear and settle Lehman's trades or provide related extensions of credit to

Lehman.  Citibank did not request the funds in connection with the parties' derivatives contracts,

unsecured lines of credit, or any other business conducted between the firms.

41.     After a rushed discussion among top Citibank and LBHI executives, LBHI

agreed that same day to segregate $2 billion from its general deposit account held at Citibank

into a separate special purpose account.  The contemplated transfer and segregation of the funds

would not be made in the ordinary course of LBHI's business.  Unlike LBHI's general deposits

with Citibank, the parties understood that LBHI would not withdraw the segregated $2 billion,

but would instead leave the cash in the Citibank system.  Citibank subjected the funds to a

number of internal controls designed to restrict their release – such that LBHI did not have the

ability to withdraw the funds on a unilateral basis. Citibank internally referred to the $2 billion as

"captive funds."

42.     Critically, Citibank knowingly relinquished any rights of setoff with

respect to the $2 billion, opting to trade those rights for the prompt receipt and segregation of the

funds.  Indeed, LBHI specifically refused Citibank's request for setoff rights with respect to the

$2 billion during the discussions on June 12, 2008, and further refused Citibank's request that it

-13-

be granted a lien or any other security interest with respect to the $2 billion. Citibank accepted the transfer on those terms. According to internal Citibank documents, Citibank's purpose was to obtain "comfort" that the funds would be available in its system; its primary goal was "keeping the liquidity within Citibank and being able to control the release of the deposit."

43.     Pursuant to these conditions, on June 13, 2008, Citibank debited $2 billion from LBHI's general demand deposit account at Citibank and transferred those funds to a separate Citibank account in Nassau, Bahamas.

44.     Later, in June 2008, consistent with the limited purpose of the $2 billion, LBHI used $210 million of the $2 billion to avoid an overdraft in an account of a Trading Subsidiary. LBHI replaced the funds the next business morning. LBHI never withdrew the segregated $2 billion from the Citibank system, nor accessed those funds for any other purpose.

(c)     *Citibank's Failed Attempt to Obtain a Lien or Right of Setoff With Respect to the $2 Billion*

45.     Internal Citibank e-mails circulated on June 12, 2008, demonstrate that Citibank recognized it had neither a "clean right of offset" nor a lien on LBHI's $2 billion. Similarly, a June 17, 2008 e-mail from the head of Risk Management at Citibank to his fellow Citibank executives reported that the $2 billion "offers us little protection."

46.     Accordingly, in July 2008, the parties began discussions about entering into a pledge agreement, whereby LBHI would pledge cash or securities to Citibank to secure clearing-related obligations of the Trading Subsidiaries and would grant to Citibank a right of setoff with respect to such cash or securities.

47.     On or about July 18, 2008, Citibank requested that LBHI enable Citibank to retain the $2 billion as security for the overdrafts of the Trading Subsidiaries. LBHI refused. Instead, the parties explored a potential pledge of investment grade collateral as security for any

-14-

Trading Subsidiary overdrafts.  In contemplation of reaching such an agreement, Citibank

reserved a collateral account at Citibank in the name of "LBHI Pledge to Citibank."

48.    The parties' discussions continued through August 2008. Ultimately,

however, the parties did not reach agreement on the terms of a pledge agreement, nor could they

agree on what collateral would be pledged under such an agreement.  Accordingly, the parties

never executed a pledge agreement, and one never took effect. Instead, in September 2008,

Citibank attempted use its leverage to improve its position with respect to the $2 billion at the

expense of other similarly situated creditors.

(d)    *Citibank Forces LBHI to Execute the September Amendment*

49.    As of the morning of September 9, 2008, LBHI intended to release its

preliminary earnings report for the third fiscal quarter of 2008 on September 17, 2008.  However,

because news in the marketplace of the collapse of talks between Lehman and the Korea

Development Bank (which had been considering an equity investment in Lehman) and analysts'

estimates of losses caused a sharp drop in LBHI's stock price on September 9, 2008, senior

management of LBHI decided to release the preliminary earnings report earlier, on Wednesday,

September 10, 2008, at 7:30 a.m.

50.    In response to these events, Citibank acted swiftly to improve its position

over the $2 billion at the expense of other similarly situated creditors.  On September 9, 2008,

Citibank presented LBHI with a draft amendment to the 2004 Guaranty (the "September

Amendment") and demanded that it be executed that evening.  The draft amendment purported

to add LBI and other LBHI subsidiaries as entities whose obligations would be subject to the

2004 Guaranty, and further purported to expand the scope of obligations subject to the 2004

Guaranty to include, for the first time, trading obligations arising under the CLS Agreement.  In

-15-

Citibank's view, the September Amendment would finally allow Citibank to set off the $2 billion

against the trading obligations of LBI and the other newly added LBHI subsidiaries.

51.    To force LBHI to accede to its demands, Citibank reduced the Trading

Subsidiaries' clearing lines significantly, some to zero.  Citibank further threatened that "we will

not open you [Lehman] in Asia" unless LBHI agreed to guaranty the obligations of all entities as

proposed by Citibank.  Citibank's threat, if carried out, would have resulted in LBHI's Asian

subsidiaries publicly defaulting on their trading obligations in the early morning of September

10, 2008, New York time, and only hours before Lehman's life-or-death earnings call scheduled

for 7:30 a.m. on September 10, 2008.  As a practical and commercial reality, LBHI had no

choice but to provide the requested September Amendment with its core terms intact.

52.    The September Amendment provided no new rights or any other

consideration to LBHI.  At the time it was executed, LBHI was insolvent and/or undercapitalized

and, on information and belief, LBI was insolvent and only days away from an insolvency

proceeding.  As such, LBHI could not (and did not) obtain reasonably equivalent value in return

for entering into the September Amendment.

(e)    *The $500 Million Transfer to LBI's Account at Citibank*

53.    Later that week, in the evening of September 14, 2008, LBHI transferred

$500 million at Citibank's insistence and direction from LBHI's general deposit account at

Citibank to LBI's general deposit account at Citibank.  LBHI itself would file for bankruptcy

protection only hours after the transfer was executed.

54.    LBHI received no consideration for this $500 million transfer to LBI.

Further, at the time of the transfer, LBHI was insolvent and/or undercapitalized, and on

information and belief, LBI was insolvent. Accordingly, LBHI did not receive reasonably

equivalent value in exchange for the $500 million transfer to LBI.

-16-

(f)    *Bankruptcy Filing and Citibank Claims*

55.    LBHI filed for protection under chapter 11 of the Bankruptcy Code in the early morning of September 15, 2008.

56.    Later that week, Citibank applied $1 billion of funds in LBI's account, which included LBHI's $500 million, to $1 billion of claims purportedly owed by LBI to Citibank.

(g)    *Citibank Refuses to Return LBHI's $2 Billion, and Asserts Claims Under the September Amendment*

57.    On September 19, 2008, Citibank terminated the CLS Agreement and other relevant agreements governing Citibank's role as clearing agent for Lehman.  The agreed upon purpose of the $2 billion was thereby extinguished, and LBHI requested that Citibank return the $2 billion to the estate for distribution to creditors.  Although it had no right to do so, Citibank refused LBHI's request and purported to lock down the $2 billion for itself.

58.    With $2 billion of cash now purportedly available to cover obligations of the Lehman Subsidiaries – which would have to be returned to Lehman unless Citi could manufacture a basis for withholding it – Citi had every incentive to inflate its claims, including those arising under the parties' swap agreements.  In fact, Citi submitted claims under those agreements totaling close to $2 billion – a convenient match to the amount of the deposit.

59.    In its proof of claim against LBHI, Citibank asserts rights as a secured creditor on the purported basis that it can now set off the $2 billion against approximately $1.7 billion of its claims arising under swap agreements with LBHI subsidiaries.  Ordinarily, such swap agreement claims would be unsecured, or secured only to the extent provided in the swap agreements themselves. Yet Citibank is now attempting to use the $2 billion of LBHI funds that were transferred and segregated in connection with the parties' clearing relationship, to pay itself

-17-

dollar-for-dollar on these inflated swap agreement claims.  Specifically, in proof of claim

number 67736, Citibank asserts the following claims are secured by the $2 billion:

> (i)    $1,640,084,656 under the LBSF-Citibank Agreement;
>
> (ii)    $60,015,440 related to a purported ISDA Master Agreement between
> Citibank and LBI;
>
> (iii)    $18,017,039 under the LBCC-Citibank Agreement;
>
> (iv)    $2,210,646 under an ISDA Master Agreement between Citibank and
> LBCS dated as of February 21, 2006; and
>
> (v)    $841,032 under an ISDA Master Agreement between Citibank and
> Lehman Brothers Commercial Corporation Asia Limited ("LBCCA")
> dated as of July 12, 2007.

60.    Citibank's attempt to pay itself using LBHI's $2 billion is not limited to its

inflated swap agreement claims.  The proof of claim asserts over $320 million of other

miscellaneous claims against the $2 billion that are also completely unrelated to the parties'

clearance and settlement relationship, as follows:

> (i)    $281,225,562 under a Revolving Loan Agreement between Citibank and
> LBCCA;
>
> (ii)    $35,844,833 related to a securities claim primarily against LBCCA;
>
> (iii)    $2,592,932 under the Amended and Restated Principal Paying Agency
> Agreement between Citibank, LBHI and LB Securities;
>
> (iv)    $175,498 related to fees and expenses under an Undertaking Deed with
> LBCCA;
>
> (v)    $116,206 related to an overdraft in a Lehman ALI general deposit
> account; and
>
> (vi)    $85,296 related to an alleged overdraft in the general deposit account of
> LBCS.

61.    Finally, in the proof of claim, Citibank asserts more than $295 million of

additional claims against LBHI purportedly arising under the avoidable September Amendment,

as well as a "contingent" $1 billion claim related to the setoff effectuated by Citibank against

purported LBI obligations, and further claims a right to set off any portion of LBHI's $2 billion

against those claims.  Specifically:

    (i)    $1 billion related to LBI's alleged obligations under the CLS Agreement that would be rendered unpaid if Citibank is ordered to return to the LBI estate all or any portion of the $1 billion against which Citibank exercised purported setoff rights, as described above;

    (ii)    $260,326,894 related to LBI's alleged obligations under the CLS Agreement;

    (iii)    $12,795,775 related to misdirected wires concerning LBI;

    (iv)    $12,199,628 related to an overdraft in an LBI account;

    (v)    $8,358,995 related to securities lending activity between Citibank and LBI;

    (vi)    $604,496 related to account fees for an LBI account;

    (vii)    $584,897 related to LBSF's alleged obligations under the CLS Agreement;

    (viii)    $207,624 related to a late settlement claim between Citibank and LBI;

    (ix)    $199,449 related to custody services between Citibank and LBI; and

    (x)    $35,389 related to a check fraud claim concerning LBI.

62.    Citibank has no right to apply any of the $2 billion to the above claims.

The $2 billion should be returned to the LBHI estate for equitable distribution to creditors.

    (h)    *Citibank's $204 Million Payable to LBCC Under the CLS Agreement*

63.    Prior to the Lehman bankruptcy filings, as a result of LBCC's foreign

exchange trades settled in the CLS system, Citibank received approximately $204 million on

LBCC's behalf.  On information and belief, Citibank wrongfully used $4.5 million of those

LBCC funds to pay itself for an alleged obligation of Lehman Brothers International (Europe)

-19-

("LBIE") to Citibank.  Further, although it had no right to do so, Citibank continued to withhold

the remaining LBCC funds for years following the Lehman bankruptcy filings.

64.    Pursuant to a Court-approved stipulation dated May 14, 2013, Citibank

has since paid LBCC $166 million of the approximately $204 million that it owes to LBCC.  At

a minimum, the LBCC estate is entitled to prejudgment interest to compensate its creditors for

Citibank's wrongful withholding of those funds through the date of payment.

65.    Further, Citibank continues to wrongfully withhold $38.5 million of the

LBCC payable, including the $4.5 million that it used to pay itself for the purported obligation of

LBIE.  Citibank claims, without basis, that it can use $34 million of those funds to pay itself for

fees under the parties' CLS agreement, and to set off the remainder against the inflated claims

that Citibank has manufactured against LBCC under the parties' derivatives contract (as

described below).  That $38.5 million should be paid over to the LBCC estate, with interest, for

the benefit of creditors.

**B.    Citi's Derivatives Claims Violate the Master Agreements, New York Law, and the
Bankruptcy Code**

(a)    *Background*

66.    Prior to LBHI's bankruptcy filing on September 15, 2008, Citi was among

the Lehman Subsidiaries' largest global counterparties in derivatives transactions.  Citi and

Lehman were two of only a relatively small number of major global dealers in derivatives.  Both

firms were sophisticated in that regard, and had in place massive infrastructures for executing

transactions, marking trades to market, valuing their respective positions, and exchanging

collateral to reflect the net value of those positions.

67.    Derivatives trading between the firms was governed by a number of

"Master Agreements," each between Citi and a Lehman Subsidiary.  Plaintiffs object to Citi's

-20-

claims under the following nine Master Agreements (with their related schedules, confirmations

and credit support annexes, the "Master Agreements"):

|    | Date | Lehman Subsidiary | Citi entity | Type | Agreement |
|----|------|-------------------|-------------|------|-----------|
| 1. | October 6, 2005 | LBSF | Citi Canyon | ISDA | "LBSF-Canyon Agreement" |
| 2. | May 14, 1992 | LBSF | Citibank | ISDA | "LBSF-Citibank Agreement" |
| 3. | August 15, 1989 | LBSF | Salomon Brothers Holding Company Inc. / Citi Financial | ISDA | "LBSF-Financial Agreement" |
| 4. | February 16, 2000 | LBSF | Salomon Brothers International Limited / Citi Global | ISDA | "LBSF-Global Agreement" |
| 5. | March 29, 1993 | LBCC | Citibank | ISDA | "LBCC-Citibank Agreement" |
| 6. | February 1, 2006 | LBCS | Citi Energy | ISDA | "LBCS-Energy Agreement" |
| 7. | April 17, 2007 | LBCS | Citi Global | ISDA | "LBCS-Global ISDA Agreement" |
| 8. | March 13, 2008 | LBCS | Citi Global | EFET | "LBCS-Global EFET Agreement" |
| 9. | August 16, 1996 | LBSF | Citi Swapco / Salomon Swapco Inc. | ISDA | "LBSF-Swapco Agreement" |

LBHI is a guarantor of the Lehman Subsidiaries' obligations under each of these Master

Agreements and, therefore, is a "Credit Support Provider" under the Master Agreements.

68.      In the normal course of business prior to the LBHI bankruptcy filing, at

the end of each trading day Citi and the Lehman Subsidiaries marked to market the value of their

derivatives portfolios under each Master Agreement, agreed on those values, and exchanged cash

collateral to secure whichever party was "in-the-money" on a net basis under each Master

Agreement.

69.      Under the Master Agreements, the terminating party had been designated

as the party with responsibility for calculating the amount that was due upon early termination.

The procedure for calculating that amount depended on the method the parties had selected.

Each of the calculation methods are intended to value the parties' positions on all outstanding

transactions as of the Early Termination Date, and to determine the overall net amount owed (in

either direction) on those transactions.  The Master Agreements expressly require the terminating

party to calculate each overall net amount in good faith, to use commercially reasonable

procedures, and to produce a commercially reasonable result.

(i)     *The COA Master Agreements*

70.     The LBSF-Financial Agreement was entered into using the 1987 form

ISDA Interest Rate and Currency Exchange Agreement.  Under this agreement, the settlement

amount due upon early termination is determined by the Market Quotation method.  The

remaining seven ISDA Master Agreements were entered into using the 1992 form ISDA Master

Agreement.  Under that form the parties have the choice of either Market Quotation or Loss as

the measure of the settlement amount upon early termination.

71.     However, in August 2008 the Lehman Subsidiaries and a number of Citi

entities adopted certain provisions related to close-out calculations from the 2002 ISDA Master

Agreement by executing the Close-out Amount Multilateral Agreement (the "Close-out Amount

Agreement").  The following seven Master Agreements, representing the vast majority of

derivative trades between the Lehman Subsidiaries and Citi, were amended by the Close-out

Amount Agreement:

1. the LBSF-Citibank Agreement;
2. the LBSF-Financial Agreement;
3. the LBSF-Global Agreement;
4. the LBCC-Citibank Agreement;
5. the LBCS-Energy Agreement;
6. the LBCS-Global ISDA Agreement; and
7. the LBSF-Swapco Agreement (collectively, the "COA Master Agreements").

72.     Under the COA Master Agreements, the parties agreed to use the Close-out Amount method to determine the settlement amount upon early termination.  "Close-out Amount" is defined as:

> [T]he amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) *or gains of the Determining Party that are or would be realized under then prevailing circumstances* (expressed as a negative number) **in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of the Terminated Transaction or group of Terminated Transactions**, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in Section 2(a)(iii) and (b) the options rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.
>
> Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. . . . Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

2002 ISDA Master Agreement § 14 (emphasis added).  Thus, each Close-out Amount should have been calculated by Citi based on a commercially reasonable, good faith determination of its total losses and costs (or gains) that are or would be incurred (or realized) under then prevailing circumstances in connection with Terminated Transaction(s) as of the Early Termination Date (or as soon thereafter as was commercially reasonable).  *See* 2002 ISDA User's Guide at 24-25. The Close-out Amount method is designed to provide a set of procedures and valuation tools by which a Determining Party may calculate losses it actually incurred, or the economic equivalent thereof, on the Terminated Transactions under the contract.

-23-

73.     The definition of "Close-out Amount" includes four specific requirements that Citi was mandated to comply with in its calculations of the amounts due upon termination of the COA Master Agreements.

- ***First***, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).  Section 562 of the Bankruptcy Code similarly requires that a party terminating a Master Agreement measure its damages as of the date of termination, unless "there are not any commercially reasonable determinants of value" as of that date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562(a), (b).

- ***Second***, the calculation of Close-out Amount must be made using "commercially reasonable procedures."  2002 ISDA Master Agreement § 14.

- ***Third***, those close-out procedures must produce a "commercially reasonable result."  *Id.*

- ***Fourth***, the Close-out Amount only entitles the non-defaulting party to the "economic equivalent" of "the material terms of the Terminated Transactions or group of Terminated Transactions," not a windfall profit.  *Id.*

Citi violated each of these four requirements in its calculations of the Close-out Amounts due upon termination of the COA Master Agreements.

(ii)    *The LBSF-Canyon Agreement*

74.    Citi Canyon was not a party to the Close-out Amount Agreement.  The

LBSF-Canyon Agreement was entered into using the 1992 form of the ISDA Master Agreement,

and the parties elected to use the Market Quotation method to measure the settlement amount

upon early termination.  Market Quotation is defined as:

> [A]n amount determined on the basis of quotations from Reference
> Market-makers.  Each quotation will be for an amount, if any,
> that . . . would have the effect of preserving for such party the
> economic equivalent of any payment or delivery . . . that would,
> but for the occurrence of the relevant Early Termination Date, have
> been required after that date.

1992 ISDA Master Agreement § 14.  Under the 1992 form ISDA Master Agreement, a non-

defaulting party may calculate the settlement amount for particular transactions or groups of

transactions via the Loss method if a Market Quotation amount cannot be determined for those

trades.  *See id.* (defining "Settlement Amount" in part as "such party's Loss . . . for each

Terminated Transaction or group of Terminated Transactions for which a Market Quotation

cannot be determined").

75.    Citi Canyon asserted that it did not receive a sufficient number of

quotations to determine Market Quotation values for the transactions under the LBSF-Canyon

Agreement.  As a result, Citi Canyon determined the amounts due upon termination of the

transactions under this agreement in accordance with the definition of "Loss."

76.    Section 14 of the 1992 ISDA Master Agreement defines "Loss" as

follows:

> **[A]n amount that [the determining] party reasonably determines
> in good faith to be its total losses and costs (or gain, in which
> case expressed as a negative number)** . . . including any loss of
> bargain, cost of funding or, at the election of such party but
> **without duplication**, loss or cost incurred as a result of its
> terminating, liquidating, obtaining or reestablishing any hedge or

-25-

related trading position (or any gain resulting from any of them) . . . A party may (but need not) determine its Loss by reference to quotation of relevant rates or prices from one or more leading dealers in the relevant markets.

1992 ISDA Master Agreement §14 (emphasis added).  In other words, under the "Loss" method a non-defaulting party is required to calculate reasonably and in good faith its net losses, costs, and gains incurred as a result of the early termination of the Terminated Transactions plus Unpaid Amounts.  *See* 1992 ISDA User's Guide at 25.

(iii)   *The LBCS-Global EFET Agreement*

77.    The LBCS-Global EFET Agreement was entered into using version 2.1(a) of the European Federation of Energy Traders General Agreement Concerning the Delivery and Acceptance of Electricity ("EFET Agreement").  Under that Agreement, the terminating party was required to determine the amount due upon termination of the agreement "by calculating the sum (whether positive or negative) of all Settlement Amounts for all Individual Contracts plus any or all other amounts payable between the Parties under or in connection with the Agreement."  EFET Agreement § 11.1.  Settlement Amount is defined as:

[T]he ***Gains less the aggregate of the Losses and Costs*** which the Terminating Party incurs as a result of the termination of the Individual Contract.  For purposes of this provision:

(a) "**Costs**" means brokerage fees, commissions and other third party costs and ***expenses reasonably incurred by the Terminating Party either in terminating any arrangement pursuant to which it hedged its obligations or entering into new arrangements which replace a terminated Individual Contract*** and all reasonable legal fees, costs and expenses incurred by the Terminating Party in connection with its termination of such Individual Contract;

(b) "**Gains**" means an amount equal to the ***present value of the economic benefit*** to the Terminating Party, if any (exclusive of Costs), resulting from the termination of an Individual Contract, determined ***in a commercially reasonable manner***; and

(c) "**Losses**" means an amount equal to the ***present value of the economic loss*** to the Terminating Party, if any (exclusive of Costs), resulting from the termination of an Individual Contract, determined ***in a commercially reasonable manner***.

*Id.* § 11.2 (emphasis added).  In other words, under the EFET Agreement the non-defaulting party must calculate the amount due at termination in a commercially reasonable manner, based on the present value of its economic gains and losses, and may only include costs reasonably incurred in actual replacement transactions or hedging transactions.

(iv)    *Citi Inflates its Claims*

78.    Under the terms of the Master Agreements, the commencement of LBHI's bankruptcy case on September 15, 2008 constituted an "Event of Default" by the Lehman Subsidiaries and gave Citi the right to terminate the transactions under the Master Agreements.  Later that same day, Citibank, Citi Global, Citi Financial, and Citi Energy notified the Lehman Subsidiaries that they were terminating the derivatives transactions under each of their Master Agreements and designating September 15, 2008 as the "Early Termination Date."  Citi Canyon notified LBSF on September 17, 2008 that it was terminating the transactions under its Master Agreement with LBSF, designating September 18, 2008 as the "Early Termination Date."

79.    On September 18, 2009 and September 22, 2009, Citi filed proofs of claim against the Lehman Subsidiaries for losses purportedly arising under the Master Agreements and, with respect to LBHI, in its capacity as Credit Support Provider under the Master Agreements.  Subsequently, on November 18, 2011, certain of the Citi entities filed amended proofs of claim against Lehman.  Citi submitted revised calculation statements, dated September 14, 2009 or September 16, 2009, as its basis for the calculation of its claims.

80.    A proper calculation of the amounts due upon termination of the Master Agreements, calculated as of the close of business on the Early Termination Dates using readily

available market data and industry standard third-party pricing services, results in a net claim of

only $25,235,826 under two of the Master Agreements, while the Lehman Subsidiaries are in

fact owed a total of $243,842,733 under the parties' other seven Master Agreements.  However,

Citi has submitted claims under the Master Agreements for $1,930,484,787 against the Lehman

Subsidiaries and LBHI as guarantor.  These claims consist of aggregate termination amounts of

$2,728,110,204, less the collateral already held by Citi (which Citi claims totals $711,953,592),[2]

less net unpaid amounts[3] of $85,671,825 credited to the Lehman Subsidiaries.

　　　　　81.　　The chart below shows the difference between Citi's calculation of the

sum of all Close-out Amounts under each Master Agreement, and Lehman's calculation of the

same, which is based upon independent, publicly available market sources.

---

[2]  Plaintiffs calculate the net amount of collateral held by Citi as $712,421,555.

[3]  "Unpaid amounts" are amounts that became payable under a Master Agreement on or prior to the
termination date but remained unpaid.  Under the Master Agreements, certain unpaid amounts are due
from Citi and other unpaid amounts are due from the Lehman Subsidiaries.  According to Citi's claims,
on a net basis $85,671,825 of unpaid amounts are owed by Citi to the Lehman Subsidiaries.  That net
amount is a credit to the Lehman Subsidiaries in the close-out calculations under the Master Agreements.
However, Plaintiffs calculate the net unpaid amount that should be credited to the Lehman Subsidiaries as
$48,076,292.

| Comparison of Citi's Calculation and Market-Based Calculation of Close-out Amounts [values in USD to the Lehman Subsidiaries][4] | | | |
|---|---|---|---|
| Master Agreement | Citi Close-out Amount[5] | Market-Based Calculation of Close-out Amount | Difference ($) |
| LBSF-Canyon | 763,043 | 958,630 | 195,587 |
| LBSF-Citibank | (2,072,323,937) | (249,608,958) | 1,822,714,979 |
| LBSF-Financial | (248,852,591) | (223,685,221) | 25,167,370 |
| LBSF-Global | (47,800,564) | 164,305,046 | 212,105,610 |
| LBCC-Citibank | (404,376,578) | (296,364,126) | 108,012,452 |
| LBCS-Energy | 10,413,248 | 23,885,115 | 13,471,867 |
| LBCS-Global ISDA | (7,825,571) | (7,349,001) | 476,570 |
| LBCS-Global EFET | 4,999,693 | 6,226,192 | 1,226,499 |
| LBSF-Swapco | 36,893,053 | 39,741,383 | 2,848,330 |
| TOTAL | (2,728,110,204) | (541,890,939) | 2,186,219,265 |

To achieve this remarkable claim inflation of more than $2.1 billion, Citi employed a number of improper procedures, as detailed below.

      (b)     *Citi Improperly Chose Close-out Dates to its Advantage, in Violation of the Master Agreements and the Bankruptcy Code*

      82.     In an effort to inflate its claims against the Lehman Subsidiaries, Citi disregarded the requirements of the Master Agreements and the Bankruptcy Code by valuing a majority of the terminated trades as of September 16, 2008 or later, instead of the designated Early Termination Date of September 15, 2008. In fact, Citi predominantly closed out each major type of derivatives product as of the date that produced the largest claim during the week of LBHI's bankruptcy. In so doing, Citi improperly inflated its claims by over $400 million in violation of the Master Agreements and the Bankruptcy Code.

---

[4]  Values are presented from the point of view of the Lehman Subsidiaries. Thus, negative numbers represent amounts due to Citi.

[5]  As described above, the termination amount shown under the LBSF-Canyon Agreement is a "Loss" amount and the termination amount shown under the LBCS-Global EFET Agreement is a "Settlement Amount."

83.    Citibank, Citi Financial, Citi Global, Citi Energy, and Citi Swapco all terminated their Master Agreements with the Lehman Subsidiaries via letters delivered on September 15, 2008.  In those letters, Citi designated September 15, 2008 as the Early Termination Date for the LBSF-Citibank Agreement, LBSF-Financial Agreement, LBSF-Global Agreement, LBCC-Citibank Agreement, LBCS-Energy Agreement, LBCS-Global ISDA Agreement, LBCS-Global EFET Agreement, and LBSF-Swapco Agreement.[6]

84.    By designating September 15 as the Early Termination Date, Citi was obligated to value the terminated transactions under these agreements as of that date.  In the COA Master Agreements, the definition of Close-out Amount required that "each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable."  2002 ISDA Master Agreement § 14 ("Close-out Amount" definition).  Similarly, section 562 of the Bankruptcy Code requires that a party terminating a swap agreement measure its damages as of the date of termination, unless "there are not any commercially reasonable determinants of value" as of that date, in which case "damages shall be measured as of the earliest subsequent date or dates on which there are commercially reasonable determinants of value."  11 U.S.C. § 562(a), (b); *see also In re Am. Home Mortg. Holdings, Inc.*, 637 F.3d 246, 248-49 (3d Cir. 2011).

85.    Under the Bankruptcy Code, a swap participant that measures its damages as of a date other than the date the transactions under a Master Agreement are terminated "has the burden of proving that there were no commercially reasonable determinants of value" as of the termination date.  11 U.S.C. § 562(c).  Ample commercially reasonable determinants of value

---

[6]  By letter of September 17, 2008, Citi Canyon designated September 18, 2008 as the Early Termination Date for the LBSF-Canyon Agreement.

existed for the relevant types of derivatives transactions on September 15, 2008.  Thus, Citi was

clearly required by both the Master Agreements and the Bankruptcy Code to value all of the

trades under the eight agreements listed in paragraph 82 as of September 15, 2008.

86.    Nonetheless, Citi ignored this legal and contractual requirement and

instead valued a majority of these trades as of September 16 or later.  When the valuation dates

chosen by Citi are examined by type of derivatives product, a distinct pattern is clear:  Citi

predominantly valued each major derivatives product as of either September 15 or a later date,

depending on which date produced the larger claim.  On a net basis, the portfolios of credit,

foreign exchange ("FX"), and securitized products trades between Citi and the Lehman

Subsidiaries each increased in value for Citi between September 15 and the later date when Citi

closed out these transactions.

87.    Specifically, Citi predominantly used September 16 as the valuation date

for credit trades, a date when the market was more favorable for Citi's credit positions than it

was on September 15.  Similarly, Citi valued many securitized products trades as of September

16 or 17, which likewise increased its claims compared to September 15.  Although Citi claimed

to have closed out its FX portfolio as of September 15, it appears that it actually used market

values from September 19, when the values were more lucrative for Citi.  In each case,

commercially reasonable determinants of value were available as of September 15, but they were

ignored in favor of higher values later in the week.

88.    In contrast to these three products, the portfolio of rates trades actually

decreased in net value to Citi after September 15.  However, unlike the other products, Citi

predominantly used September 15 as the valuation date for these transactions, again selecting the

most favorable date for itself.  But instead of valuing these rates trades as of the end of the day

-31-

on September 15, as would be customary, Citi used prices from approximately 8:30 am, which were far more favorable than were the end of day prices.

89.    These actions will be described in detail below, but taken together they illustrate a pattern in which Citi opportunistically chose close-out dates and times in order to maximize its claims.  By valuing many trades as of days other than the Early Termination Date, Citi improperly inflated its claims by over $400 million in clear violation of the Master Agreements and the Bankruptcy Code.

(c)    *Citi's Claims for Hypothetical Charges Are Improper and Should Be Disallowed*

90.    Citi further inflated its claims against the Lehman Subsidiaries by including more than $1.6 billion for purported "add-on" charges that Citi contends it would have paid had it entered into new trades to replace each of the terminated transactions ("Hypothetical Charges").  But in most cases Citi never actually entered into the replacement transactions, and thus did not actually incur the Hypothetical Charges.  Citi's inclusion of these Hypothetical Charges in its claims violates the Master Agreements, New York law, and the Bankruptcy Code.

(i)    *Citi's Claims for Hypothetical Charges Violate the Master Agreements*

91.    Citi violated the Master Agreements by including Hypothetical Charges in its claims.  The Hypothetical Charges do not correspond to any losses actually incurred by Citi.  Instead, Citi's receipt of these amounts would constitute a windfall profit far above "the economic equivalent" of "the material terms" of the terminated transactions.

92.    The Close-out Amount for the trades under each COA Agreement should have been the amount of losses or gains that would provide Citi with "the economic equivalent" of "the material terms" of the terminated transactions.  *See* 2002 ISDA Master Agreement § 14. Instead of calculating the Close-out Amount in the manner mandated by the Master Agreements,

-32-

Citi included Hypothetical Charges in its Close-out Amount calculations that bore no relationship to the economic equivalent of the material terms of the terminated transactions.

93. The Hypothetical Charges included in Citi's claims consist of purported "add-on" charges that Citi contends it would have paid above and beyond the actual mid-market price had it entered into new trades to replace each of the terminated transactions. One example of such an add-on is a charge for a "bid/offer" spread. The main component of the bid/offer spread is the markup that a market-maker adds to the mid-market value as its profit for intermediating a trade. *See* John-Peter Castagnino, Derivatives: The Key Principles 25 (3d ed. 2009) ("The spread is the profit made by the market-maker . . . ."). A bid/offer spread only represents a pecuniary loss when a counterparty, usually a non-dealer end user of a derivative, actually pays the spread by entering into a replacement trade with a dealer whose price reflects a bid/offer spread. But Citi included charges for bid/offer spreads in its claims under the Master Agreements even though it did not actually enter into replacement trades. Citi's claims for these phantom Hypothetical Charges are thus seeking damages above the actual mid-market value of the transactions based on losses that were never incurred.

94. Not only did Citi impermissibly include profits for bid/offer spreads on account of non-existent replacement trades, it did so using inflated amounts that would not have been charged if those replacement trades had actually occurred. As major derivatives dealers, both Citi and Lehman had access to the inter-dealer market in which dealers trade with one another at or very close to mid-market prices. Yet the bid/offer spreads applied by Citi to inflate its claims were extremely large, and in many instances were significantly higher even than those that would have occurred between dealers and customers or end users.

95. Citi also included add-ons for liquidity charges that it purportedly would have been charged had it entered into particular replacement transactions. Citi applied these

additional liquidity charges to certain trades based on the rationale that the trades were of

relatively large size, even when it did not actually enter into the replacement trades. Moreover,

the liquidity charges applied by Citi were far above any such charges that actually existed in the

market. These inflated liquidity add-ons do not correspond to any loss actually incurred by Citi.

96.     The Hypothetical Charges included in Citi's claims, including bid/offer

spreads and liquidity charges, violate the Master Agreements because they constitute pure profits

for Citi in excess of "the economic equivalent" of "the material terms" of the terminated

transactions, and do not correspond to any actual losses.

   (ii) *The Hypothetical Charges are Not Recoverable under New York*
     *Law*

97.     The Hypothetical Charges are also not recoverable under New York law.

Under New York law, to sustain a claim for damages, a claimant must demonstrate actual loss,

and the damages being claimed must be commensurate with the amount of actual loss. *Scalp &*

*Blade, Inc. v. Advest, Inc.*, 765 N.Y.S.2d 92, 97 (4th Dep't 2003) (noting that in a cause of action

for breach of contract, the object of compensatory damages, which measure "fair and just

compensation, commensurate with the loss or injury sustained from the wrongful act" is to make

the plaintiff whole) (internal citations and quotations omitted); *see also Freund v. Washington*

*Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) ("It is axiomatic that, except where punitive

damages are allowable, the law awards damages for breach of contract to compensate for injury

caused by the breach . . . . [I]t is equally fundamental that the injured party should not recover

more from the breach than he would have gained had the contract been fully performed.").

98.     General contract damages principles provide that damages are meant to

put a non-breaching party in the same position it would be "but for" the breach -- not a better

position. *See Freund*, 34 N.Y.2d at 382 (rejecting damages awards that would "place [plaintiff]

in a far better position than he would have occupied had the defendant fully performed");
*Madison Fund, Inc. v. Charter Co.*, 427 F. Supp. 597, 608 (S.D.N.Y. 1977) ("[O]ne whose
contract has been breached is not entitled to be placed, because of that breach, in a position better
than that which he would have occupied had the contract been performed.").

99.    In addition, under New York law a non-breaching party must calculate its
actual loss as of the date of the breach, and a breaching party is not responsible for any
subsequent market fluctuations. *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d
Cir. 2003) ("New York courts are clear that breach of contract damages are measured from the
date of the breach."); *Kovens v. Paul*, 04 CIV. 2238 (TPG), 2009 WL 562280 (S.D.N.Y. Mar. 4,
2009) (holding that "changes in value after breach are not relevant to the calculation of
damages"), *aff'd*, 358 F. App'x 228 (2d Cir. 2009).

100.    This same principle applies to Citi's calculation of the damages that
resulted from Lehman's default under the Master Agreements, and is violated by Citi's inclusion
of theoretical liquidity charges in its claims.  Citi added these charges to certain positions that it
claimed were large relative to the daily trading volume of the relevant instrument.  But the prices
of these positions had the potential to increase as well as decrease, and both of these possibilities
were already incorporated into the market prices on the date of the breach.  By holding the
positions instead of entering into replacement trades, while at the same time charging Lehman
hypothetical liquidity charges to protect against a price decline, Citi retained the upside market
potential and forced Lehman to protect them against the downside risk.  This one-sided approach
disregarded that the market price already took into account future outcomes.  Accordingly, it
provided a windfall to Citi, penalized Lehman, and was impermissible under New York law.

101.    Any argument by Citi that the Close-out Amount and Loss provisions are
liquidated damages clauses that allow for these types of add-ons and Hypothetical Charges must

-35-

be rejected.  That interpretation of the Close-out Amount and Loss provisions would be contrary

to New York law, which only recognizes as valid liquidated damages provisions that fix a pre-

estimate of damages at the time of contracting.  *See Jarro Bldg. Indus. Corp. v. Schwartz*, 281

N.Y.S.2d 420, 426 (2d Dep't 1967) (stating that "a liquidated damages provision to be valid

must fix the damages in advance and be for an amount certain" (citing *Frankel's Carpet

Fashions, Inc. v. Abraham*, 228 N.Y.S.2d 123 (Sup. Ct. Nassau County 1962))).

102.    Even if the Close-out Amount and Loss provisions were to be construed as

liquidated damages clauses, recovery of the Hypothetical Charges would still be impermissible

under New York law because they would constitute a penalty.  Whether a damages provision is

in fact an unenforceable penalty is a question of state law.  *See In re Ionosphere Clubs, Inc.*, 262

B.R. 604, 613 (Bankr. S.D.N.Y. 2001).  Under New York law, "contractual terms providing for

the payment of a sum disproportionate to the amount of actual damages exact a penalty and are

unenforceable."  *Id.* at 614.  New York has a strong public policy against the enforcement of

such penalty clauses.  A contractual provision that provides specific consequences to a breaching

party operates as an unenforceable penalty unless both:  (1) the damages from the breach were

difficult to ascertain at the time the parties entered into the contract; and (2) the consequences

from the breach bear a reasonable relationship to the amount of damages that would be expected

to result from the breach.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 416-17 (Bankr.

S.D.N.Y. 2007) (invalidating prepayment penalty because "it bore no reasonable relationship to

any damages that could have been suffered by Defendants").  "Moreover, courts should resolve

any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper

liquidated damages clause in favor of a construction which holds the provision to be a penalty."

*In re Ionosphere*, 262 B.R. at 614.

103.    Neither of these requirements is met here.  First, the actual damages that

would be incurred as a result of a default under the Master Agreements were readily

ascertainable at the time the contracts were entered into – they would be the mid-market values

of the transactions under each Master Agreement.  Second, Citi's claims significantly departed

from these actual damages by seeking recovery for Hypothetical Charges that do not correspond

to any loss Citi suffered.  As a result, Citi's inclusion of Hypothetical Charges in its Loss and

Close-out Amount calculations constitutes an unenforceable penalty under New York law.

> (iii)    *Citi's Claims for Hypothetical Charges Are Unenforceable
> Penalties that are Disallowed or Subordinated in Priority of
> Payment under the Bankruptcy Code*

104.    To the extent Citi's claims are penalties, they are subject to disallowance

under the Bankruptcy Code.  Section 502(b)(1) of the Bankruptcy Code provides for

disallowance of claims that are not enforceable under state law.  *See* 11 U.S.C. § 502(b)(1)

(stating that a claim shall not be allowed if it is "unenforceable against the debtor and property of

the debtor, under any agreement or applicable law for a reason other than because such claim is

contingent or unmatured").

105.    As explained above, the Close-out and Loss provisions are not enforceable

as liquidated damages provisions under New York state law.  Thus, section 502(b)(1) of the

Bankruptcy Code mandates disallowance of Citi's claims for Hypothetical Charges.  *See, e.g.*, *In

re Premier Enter. Biloxi, LLC*, 413 B.R. 370, 374 (Bankr. S.D. Miss. 2009) (disallowing claim

for liquidated damages under lease pursuant to section 502(b)(1) of Bankruptcy Code when lease

provision was not enforceable under state law); *In re Ionosphere Clubs, Inc.*, 262 B.R. 604, 613-

14 (Bankr. S.D.N.Y. 2001) (capping indemnity at tax rate in effect at time of alleged default

rather than contractual rate provided for under tax benefit transfer agreement because tax rate in

effect represented actual loss; noting "courts should resolve any reasonable doubt as to whether a

-37-

provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty").

106.    Pursuant to the claims, Citi seeks to recover Hypothetical Charges that were not actually incurred.  Thus, instead of compensating Citi for actual, pecuniary loss it may have suffered, the claims simply penalize Lehman.  The Bankruptcy Code disfavors such claims that are in the nature of penalties, subjecting them to disallowance or subordination in priority of payment.

107.    For example, while section 506(b) of the Bankruptcy Code allows an oversecured creditor "reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose," claims for those charges (*e.g.*, prepayment premiums) are disallowed to the extent that they constitute penalties and fail to correspond to actual damages.[7] *See* 11 U.S.C. § 506(b); *In re Schwegmann Giant Super Markets,* 287 B.R. 649, 655-56 (E.D. La. 2002) (disallowing prepayment penalty under section 506(b) of Bankruptcy Code that constituted over 18% of prepaid loan balance); *In re Vest Assocs.*, 217 B.R. 696, 702-03 (Bankr. S.D.N.Y. 1998) (disallowing secured creditor's claim for postpetition interest at default rate where default rate set so high as to be deemed a "disguised" penalty against junior creditors); *In re Duralite Truck Body & Container Corp.*, 153 B.R. 708, 714 (Bankr. D. Md. 1993) (disallowing claim for prepayment charges in loan agreement where such charges were not tied to actual damages likely to be incurred by lender upon a prepayment and holding that "[a] prepayment charge formula must effectively estimate actual damages, otherwise, the charges may operate as a either a penalty on the debtor or a windfall to a lender at the expense of other creditors of the bankruptcy estate").

---

[7]    Plaintiffs do not concede that Citi is an oversecured creditor and dispute that the $2 billion cash deposit secures any or all of Citibank's claims against Lehman.

108.    Similarly, the Bankruptcy Code differentiates between claims that compensate for actual loss and those that are simply punitive and non-compensatory, subjecting the latter category of claims to subordination in priority of payment.  *See* 11 U.S.C. § 507(a)(8)(G) (affording eighth priority to "allowed unsecured claims of governmental units, only to the extent that such claims are for . . . . (G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss"); *id.* § 726(a)(4) (subordinating to all other claims, claims for fines, penalties, or forfeitures "to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim").[8]  Indeed, claims for fines, penalties, or forfeiture that are not compensatory are subordinated below late filed claims under section 726(a)(3) of the Bankruptcy Code.  *See* 11 U.S.C. § 726(a)(3).

109.    Because the Hypothetical Charges are commercially unreasonable, unenforceable under New York law, and unenforceable under the Bankruptcy Code, the Hypothetical Charges should be disallowed in their entirety.

(d)    *Citi's Failure to Apply Portfolio Aggregation to Offsetting Transactions Improperly Exaggerated the Amount of Hypothetical Charges*

110.    In order to maximize the amount of Hypothetical Charges included in its claims, Citi for the most part applied the charges on a transaction-by-transaction basis rather than taking into account the loss-mitigating effect of portfolio aggregation by netting offsetting positions.  Citi's failure to apply portfolio aggregation when calculating its losses was itself a

---

[8]  *Cf. Schultz Broadway Inn v. United States*, 912 F.2d 230, 234 (8th Cir. 1990) (applying section 726(a)(4) in chapter 11 case and affirming lower court's holding that general unsecured creditors who suffered actual losses should be paid in priority to a claim for non-pecuniary tax loss penalty; this holding "accords with the legislative history of the Bankruptcy Reform Act [of 1978], which generally prefers claims for actual losses over purely punitive claims.").

commercially unreasonable procedure that generated commercially unreasonable results.  It was

contrary to Citi's own risk management procedures and the governing Master Agreements.

111.    Citi's practice of portfolio aggregation can be shown by way of example.

Citi and the Lehman Subsidiaries were parties to several thousand interest rate swaps in which

the floating rate was indexed to a commonly used reference rate such as LIBOR; Citi acted as a

floating rate payer in certain trades and a floating rate receiver in other trades.  The interest rate

risk of certain transactions in this portfolio in which Citi paid LIBOR (and received a fixed rate)

was offset by other transactions in which the same Citi entity received LIBOR (and paid a fixed

rate).

112.    Portfolio aggregation is a widely-accepted practice for the management of

derivatives portfolios.  This is particularly true for large market-making institutions such as Citi.

Derivatives dealers cannot possibly hedge each of the hundreds of thousands of trades that they

enter into with their customers.  Instead, they use portfolio aggregation as a means of minimizing

hedging costs and efficiently managing the material economic risks of a derivatives portfolio.

113.    It is not merely unreasonable, it is utterly inconceivable that Citi would

attempt to enter into some 20,000 individual replacement trades and incur bid/offer charges on

every one when portfolio aggregation would provide the same material economic benefit at a

fraction of the cost.  In fact, it is contrary to Citi's own stated risk management practices.

114.    Citi, like any other large sophisticated financial institution with significant

over-the-counter derivatives positions, recognized the importance of portfolio aggregation in

assessing risk.  Citigroup stated in its 10-K filing for 2008 with the Securities and Exchange

Commission that Citi managed its risk to derivatives counterparties on an aggregate portfolio

basis, including in its stress testing, fair value measurements, and computation of industry-

standard risk metrics such as value at risk and credit valuation adjustments.  *See* Citigroup, Inc.,

2008 Annual Report (Form 10-K) at 73 ("[Stress testing] is performed on both individual trading portfolios, and on aggregations of portfolios and businesses."); *id.* at 91 ("Individual derivative contracts that are subject to an enforceable master netting agreement with a counterparty are aggregated for this purpose [of calculating credit valuation adjustments], since it is those aggregate net cash flows that are subject to nonperformance risk."); *id.* at 194 ("[C]redit-risk adjustments take into account the effect of credit-risk mitigants, such as pledged collateral and any legal right of offset (to the extent such offset exists) with a counterparty through arrangements such as netting agreements."); *see generally id.* at 51 ("The Chief Risk Officer, as noted above, monitors and controls major risk exposures and concentrations across the organization. This means aggregating risks, within and across businesses . . . .").

        (i)    *Citi's Failure to Apply Portfolio Aggregation Violated the Master Agreements*

115.    In accordance with standard risk management practice, the COA Master Agreements themselves contemplate that a Determining Party will calculate the Close-out Amount for terminated transactions on an aggregate basis. Specifically, "Close-out Amount" is defined as the amount of losses or gains that would be incurred or realized "in replacing, or in providing for the Determining Party the **economic equivalent** of, (a) the material terms of the Terminated Transaction **or group of Terminated Transactions**, . . . and (b) the options rights of the parties in respect of that Terminated Transaction **or group of Terminated Transactions**." 2002 ISDA Master Agreement § 14 (emphasis added). By explicitly defining Close-out Amount to include groups of terminated transactions, the COA Master Agreements envision that the Determining Party will net any offsetting transactions together when calculating the Close-out Amount.

-41-

116.    Citi implicitly acknowledged the propriety of portfolio aggregation as it did in fact net a minimal number of substantially identical offsetting trades when calculating portions of its claims relating to rates and FX trades.  But even there, the degree of portfolio aggregation applied by Citi did not begin to approach the minimum amount that could be considered commercially reasonable.

117.    When compared with its own risk management practices, Citi's purported Close-out Amounts, which were calculated predominantly on an individual position basis, are not commercially reasonable.  By failing to apply portfolio aggregation, Citi unduly inflated the amount of Hypothetical Charges included in its claims.  Because Citi managed risk on an aggregate portfolio basis, Citi would never have incurred, and in fact did not incur, actual losses in the exaggerated amount of the Hypothetical Charges that it now claims.  Citi should not be permitted to inflate its claims through the use of these procedures.

(ii)    *Citi's Failure to Apply Portfolio Aggregation Violated New York Law*

118.    Citi's conduct is also impermissible under New York law for violating the implied covenant of good faith and fair dealing.  Implicit in all contracts governed by New York law is "a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (internal quotation marks omitted).  "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.*

119.    The methodology used by Citi in calculating the Close-out Amounts on a transaction-by-transaction basis represents an irrational exercise of discretion in construing the Master Agreements.  As a sophisticated market participant, Citi calculated risk exposure with the

Lehman Subsidiaries on an aggregate portfolio basis in the normal course of business.

Nonetheless, Citi failed to apply portfolio aggregation in its calculation of the Close-out

Amounts. Citi's attempt to maximize damages in this manner violates the terms of the Master

Agreements and the obligations of good faith and fair dealing implied in every contract under

New York law.

120.    Furthermore, Citi's failure to take into account the loss-mitigating effects

of portfolio aggregation contradicted New York law principles requiring mitigation of damages.

When proving damages in a breach of contract claim, a claimant must necessarily demonstrate

that it fulfilled its duty to expend reasonable efforts to mitigate the damages claimed. *See*

*Williams v. Bright*, 658 N.Y.S.2d 910, 911-12 (1st Dep't 1997) ("For a hundred years it has been

settled law in this state that a party who claims to have suffered damage . . . is bound to use

reasonable and proper efforts to make the damage as small as practicable and if an injured party

allows the damages to be unnecessarily enhanced, the incurred loss justly falls upon him.")

(internal citations and quotations omitted); *Korea Life Ins. Co. v. Morgan Guaranty Trust Co.*,

No. 99 Civ. 12175 (AKH), 2004 WL 1858314, at *7 (S.D.N.Y. Aug. 20, 2004) ("[T]he party

seeking damages is under the duty to make a reasonable effort to avoid consequences of the act

complained of. It is, indeed, a rule of broad acceptance that no recovery may be had for losses

which the person injured might have prevented by reasonable efforts and expenditures.")

(internal quotation marks omitted); *Lund v. Chem. Bank*, 797 F. Supp. 259, 271 (S.D.N.Y. 1992)

("A party generally is not . . . allowed to recover for a loss which it could have reasonably

mitigated itself.").

121.    This well-recognized principle of mitigation of damages dictates that a

commercially reasonable damages calculation must include portfolio aggregation. The use of

portfolio aggregation in the calculation of damages results in a measure of damages that

-43-

represents actual mitigation efforts undertaken by parties through acknowledging offsetting risks

positions, taking what would otherwise be an inflated gross claim and yielding a reduced net

claim that more closely reflects the actual injury suffered by the injured party.  By failing to net

offsetting position in calculating its claims and by including Hypothetical Charges on a

transaction-by-transaction basis, Citi failed to take into account the mitigating effects of portfolio

aggregation.

**C.**     **Citi Did Not Use Commercially Reasonable Procedures to Close Out its CDS Portfolios with LBSF**

122.    Citi breached the Master Agreements and disregarded New York law and

the Bankruptcy Code to achieve a nearly $1.3 billion inflation of its claims arising from credit

default swaps ("CDS") with LBSF.  Citi had a large portfolio of 17,623 CDS with LBSF at the

time of LBHI's bankruptcy.  The parties had entered into CDS under the LBSF-Citibank, LBSF-

Global, and LBSF-Financial Agreements, with LBSF as the net seller of protection.  As

illustrated in the table below, Citi submitted claims for these CDS in an amount nearly $1.3

billion greater than the values calculated by Lehman from readily available market data, with

most of the overstatement arising from Citibank's valuation of CDS under the LBSF-Citibank

Agreement.

| Close-out Amount Calculations for CDS Portfolios [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Category | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
| LBSF-Citibank | Single Name CDS | 12,309 | (821,552,321) | (116,487,932) | 705,064,389 |
| | Index CDS | 711 | (693,063,792) | (502,481,629) | 190,582,163 |
| | Index Tranche | 371 | 3,387,187 | 115,038,873 | 111,651,686 |
| | OTHER | 637 | (21,016,480) | 32,736,723 | 53,753,203 |
| | **TOTAL** | **14,028** | **(1,532,245,406)** | **(471,193,966)** | **1,061,051,441** |
| LBSF-Financial | Single Name CDS | 3,039 | (123,912,599) | (9,116,039) | 114,796,560 |
| | Index CDS | 195 | (47,202,484) | (10,281,440) | 36,921,044 |
| | Index Tranche | 130 | (2,713,695) | 36,229,572 | 38,943,267 |
| | OTHER | 72 | (37,599,585) | (26,080,649) | 11,518,935 |
| | **TOTAL** | **3,436** | **(211,428,363)** | **(9,248,557)** | **202,179,806** |
| LBSF-Global | Single Name CDS | 130 | (34,634,116) | (28,268,069) | 6,366,048 |
| | Index CDS | 11 | 24,557,472 | 24,933,234 | 375,762 |
| | Index Tranche | 11 | 53,987,807 | 59,732,919 | 5,745,112 |
| | OTHER | 7 | (20,773,083) | (16,769,041) | 4,004,041 |
| | **TOTAL** | **159** | **23,138,081** | **39,629,043** | **16,490,963** |
| | **GRAND TOTAL** | **17,623** | **(1,720,535,689)** | **(440,813,479)** | **1,279,722,210** |

123.    Out of a total of 17,623 CDS, the two largest types of transactions were single name CDS (15,478 trades) and index CDS (917 trades).  These are also the source of the greatest valuation differences.

(a)    *Citi Closed Out its Portfolio of CDS on a Date Other than the Early Termination Date*

124.    Citi closed out 16,039 of the 16,395 index CDS and single name CDS on a date other than the Early Termination Date, as illustrated in the table below.  This resulted in a net inflation of Citi's claims by at least $48 million.

-45-

| Effect of Using a Close-out Date Other Than the Early Termination Date | | | | | |
|---|---|---|---|---|---|
| Early Termination Date | Citi Close-out Date | No. Trades | Market-Based Calculation of Close-out Amounts as of Citi Close-out Date ($) | Market-Based Calculation of Close-out Amounts as of Early Termination Date ($) | Difference ($) |
| 9/15/2008 | 9/16/2008 | 14,239 | (664,215,476) | (611,706,050) | 52,509,426 |
| 9/15/2008 | 9/17/2008 | 1,715 | (41,948,991) | (46,614,107) | (4,665,116) |
| 9/15/2008 | 9/18/2008 | 41 | (4,252,375) | (2,712,216) | 1,540,159 |
| 9/15/2008 | 9/19/2008 | 44 | 3,136,883 | 2,152,160 | (984,723) |
| **TOTAL** | | 16,039 | (707,279,959) | (658,880,214) | 48,399,745 |

125.    Citi has provided very little information regarding the methodology used or the specific timing of the close-out process for the CDS portfolio. Citi had an obligation under the Master Agreements and the Bankruptcy Code to value the trades on the Early Termination Date since commercially reasonable determinants of value existed as of that date. Citi is an active market maker in CDS and was in the business of valuing these exact CDS on a daily basis. There is no reason to believe that the very same data that Citi used to value these trades primarily on September 16, 2008 was not equally available the prior day.

126.    Other major market-makers who were in the same position as Citi had no difficulty finding reasonable determinants of value sufficient to value the same CDS on September 15. Citi closed out 906 index CDS covering 138 indices on a date other the Early Termination Date. Citi also closed out 15,156 single name CDS covering 961 different names on a date other than the Early Termination Date. Plaintiffs reviewed claims submitted by a group of other large financial institutions and found 27 separate claims where: 1) the CDS portfolio contained at least one of these 138 indices or 961 single names, and 2) the counterparty valued the related trade(s) on September 15, 2008. As the table below shows, the claims

submitted by this group contained an aggregate of 121 of the 138 indices in Citi's portfolio (88

percent), and 911 of the 961 single names (95 percent).[9]  The counterparties submitting these

claims were able to value 121,207 such CDS on September 15, 2008.

| CDS Common between Citi and Other Large Financial Institutions where Other Institution was able to value as of September 15, 2008 | | | | |
|---|---|---|---|---|
| | Citi | | Other Large Institutions | |
| Category | Index or Single Name Present in Citi Population | No. Trades | Index or Single Name in Common with Citi | No. Trades |
| Index | 138 | 906 | 121 | 9,602 |
| Single Name | 961 | 15,156 | 911 | 111,605 |
| **TOTAL** | 1,099 | 16,062 | 1,032 | 121,207 |

Using readily available market data, Lehman was able to price all 906 of these index CDS and all

15,156 of these single name CDS as of the Early Termination Date.

127.    Not only did Citi price nearly all of its CDS as of a date after the Early

Termination Date, but Citi also appears to have priced these trades as of inconsistent times of

day.  Citi provided a mid-market value for 15,327 of its index and single name CDS trades.  The

table below shows a comparison of Citi's purported mid-market values with a calculation as of

the stated close-out date, based on publicly available market data.

---

[9]  This does not imply that the remaining indices and single names could not be priced as of September
15, 2008.  It simply means the portfolios of this group did not have CDS involving the index or single
name, or that the counterparty used different valuation dates.

| Comparison of Citi Mid-Market Values to Proper Calculation [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Mid-Market Calculation ($) | Market-Based Calculation as of the Close-out Date ($) | Difference ($) |
| LBSF-Citibank | 12,211 | (912,857,878) | (847,305,621) | 65,552,257 |
| LBSF-Financial | 123 | 10,183,880 | 11,116,009 | 932,129 |
| LBSF-Global | 2,993 | (34,418,037) | (38,403,727) | (3,985,690) |
| **TOTAL** | 15,327 | (937,092,035) | (874,593,339) | 62,498,696 |

Plaintiffs have reviewed these mid-market valuations and are unable to determine a consistent time of day used by Citi when closing out its index and single name CDS trades. Not surprisingly, the net result of this "inconsistency" is an inflation of Citi's claims by at least $62 million.

> (b)   *Citi Failed to Apply Portfolio Aggregation as Required by Commercially Reasonable Procedures*

128.    In closing out its CDS portfolio, Citi employed an excessively narrow method of portfolio aggregation that is inconsistent with industry practice. Specifically, Citi only aggregated trades that were *identical* in every detail other than notional value. This narrow interpretation of portfolio aggregation meant that Citi provided LBSF with the benefit of only a tiny fraction of the real portfolio effect, which was massive for this portfolio of CDS. This practice directly contradicted the Close-out Amount definition in the COA Master Agreements, which required Citi to determine the economically equivalent value of the material terms of its portfolio. By engaging in a close-out process that almost completely ignored portfolio aggregation, Citi was able to inflate its claims by many hundreds of millions of dollars. In essence, Citi engaged in an intentional and concerted effort to create a process that would maximize the amount of Hypothetical Charges included in its claims.

129.    The index CDS under the LBSF-Citibank Agreement amply demonstrate Citi's lack of portfolio aggregation and the significant inflation of its claims that resulted. The total difference between Citibank's values and the values calculated by LBSF using available market data as of the Early Terminated Date for these 711 CDS is over $190 million. This portfolio contains CDS related to 103 indices. The table below shows the 15 largest valuation differences per index. It also shows the total valuation difference for the remaining 88 indices. The top 15 largest valuation differences alone total almost $153 million.

**Largest Valuation Differences By Index for LBSF-Citibank Agreement**
[values in USD to LBSF]

| Index | Maturity Date | No. Trades | Citi Calculation of Close-out Amount ($) | Market-Based Calculation of Proper Close-out Amount ($) | Difference ($) |
|---|---|---|---|---|---|
| DJCDX-NAHYS5-5Y | 12/20/2010 | 8 | (32,684,631) | (9,750,860) | 22,933,771 |
| CDX-NAHYS8-3Y | 6/20/2010 | 3 | 100,260,707 | 122,102,719 | 21,842,012 |
| DJCDX-NAHYS4-5Y | 6/20/2010 | 10 | (20,174,064) | 78,972 | 20,253,036 |
| ITRAXX-EUROPES6-5Y | 12/20/2016 | 8 | (77,839,717) | (61,903,011) | 15,936,705 |
| ITRAXX-EUROPES7-5Y | 6/20/2017 | 6 | (51,335,588) | (39,983,229) | 11,352,359 |
| DJCDX-NAHYS3-5Y | 12/20/2009 | 12 | (5,302,949) | 3,292,528 | 8,595,478 |
| DJCDX-NAIGS7-10Y | 12/20/2011 | 3 | (90,213,250) | (81,931,955) | 8,281,294 |
| DJCDX-NAIGS7-10Y | 12/20/2016 | 7 | (99,528,844) | (91,427,498) | 8,101,346 |
| CDX-NAIGS8-3Y | 6/20/2012 | 4 | (100,392,872) | (93,595,444) | 6,797,428 |
| DJCDX-NAIGHVOLS4-4Y | 6/20/2010 | 6 | (46,972,614) | (40,354,147) | 6,618,467 |
| CDX-NAIGS9-1Y | 12/20/2017 | 5 | (71,958,594) | (65,875,651) | 6,082,943 |
| LCDXNA S10-3Y | 6/20/2013 | 28 | (34,218,178) | (29,912,466) | 4,305,712 |
| CDX-NAHYS8-10Y | 6/20/2012 | 4 | (43,449,365) | (39,148,984) | 4,300,382 |
| DJCDX-NAIGHVOLS3-4Y | 3/20/2015 | 2 | (14,835,643) | (10,865,728) | 3,969,915 |
| DJCDX-NAHYBS6-5Y | 6/20/2011 | 12 | 6,203,772 | 9,713,154 | 3,509,382 |
| Remaining 88 Index Positions | | 593 | (110,621,962) | (72,920,030) | 37,701,932 |
| TOTAL | | 711 | (693,063,792) | (502,481,629) | 190,582,163 |

130.    A particularly egregious example of the claim inflation caused by Citibank's failure to apply commercially reasonable portfolio aggregation can be seen by examining the second and third largest differences above. The rows have been highlighted for

-49-

ease of identification.  These two indices were each comprised of 100 different non-investment

grade corporate entities domiciled in North America that trade with relatively strong liquidity in

the CDS market.  Both matured on June 20, 2010.  Most importantly, the two indices had 72

individual names in common.  In one instance, in the second row above, Citibank was a net seller

of protection.  In the other instance, in the third row above, Citibank was a net buyer of

protection.  The graph below shows the price level for these two indices from March 31, 2008 to

September 30, 2008.



131.    The graph clearly shows the strong relationship between these two

particular indices, whose prices movements tracked one another with 96 percent correlation.

Again this is not surprising since 72 percent of the names making up each index were identical.

-50-

Furthermore, the indices were designed in such a way that the remaining names had similar characteristics.

132.    Citibank's long protection position in one index provides a natural and powerful hedge for Citibank's short position in the other.  But Citibank ignored the portfolio effect provided by these offsetting positions and instead sought individual quotes on each index with add-ons embedded in each quote, which inflated Citibank's claim by millions of dollars. Citibank's own actions further support the commercial reasonableness of portfolio aggregation, as Citibank did not replace the individual index positions.

133.    Serious questions also exist as to how Citi determined many of the mid-market CDS values used to calculate its claims.  In some instances it appears that the mid-market values may have been shifted to reflect more favorable valuations for Citi.  For example, the table below compares Citibank's mid-market values and a calculation based on publicly available market data of the market values on the date Citi closed out the trades – September 16, 2008 – for three "High Yield" indices underlying index CDS under the LBSF-Citibank Agreement.

| Mid-Market Valuation Comparison for Three High Yield Indices Underlying LBSF-Citibank Trades [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Index | Citibank Mid-Market Value (S) | Market-Based Calculation of Mid-Market Value as of Date Citi Closed out Trades | Difference ($) | LBSF Buyer/Seller |
| DJCDX-NAHYS5-5Y | (24,563,737) | (18,871,227) | 5,692,511 | Seller |
| DJCDX-NAHYS4-5Y | (13,331,808) | (7,057,404) | 6,274,405 | Seller |
| CDX-NAHYS8-3Y | 117,338,391 | 135,447,191 | 18,108,800 | Buyer |
| TOTAL | 79,442,846 | 109,518,560 | 30,075,716 | |

134.    All three of the indices in the table above were constructed to track the credit risk of a representative and largely identical group of high yield bonds.  In fact, the second two listed are the same indices whose 96% correlation was demonstrated in paragraph 129

above.  The table shows that Citibank asserted a mid-market valuation that is more favorable to

Citibank than that calculated using readily available market data in all three cases.  During the

week of September 15, 2008, each one of these index positions should have become more

valuable to the buyer of protection as credit spreads widened (*i.e.*, credit protection generally

became more expensive to purchase) in the aftermath of the LBHI bankruptcy filing.  But here,

Citibank is claiming that the market moved more favorably for Citibank (relative to LBSF)

regardless of whether Citibank was a buyer or seller of protection on substantially identical high

yield indices. This scenario, which defies market realities, leads to a mid-market valuation

difference that exceeds $30 million on these three indices alone.  This casts a large cloud of

doubt over the integrity of Citibank's purported mid-market values.  Citi also engaged in this

pattern of behavior with respect to other trade types of CDS trades, which further inflated its

claims.

> (c)   *Citi Included Exaggerated Hypothetical Charges that it Did Not Incur and Never Expected to Incur*

135.    Citi included exaggerated hypothetical bid/offer charges in its Close-out

Amounts for the CDS portfolio.  As the table below shows, Citi has disclosed nearly $1.1 billion

of Hypothetical Charges that were included in its CDS claims.  Nearly $1 billion of these

fictitious charges were associated with single name, index, and index tranche CDS.  In addition,

there are millions of dollars of additional bid/offer charges embedded in valuations for which

Citi did not disclose separate mid-market values and bid/offer charges.  This huge overstatement

was made possible to a very large degree by Citi's failure to apply commercially reasonable

portfolio aggregation.

| Citi Hypothetical Bid/Offer Charges | | | | |
|---|---|---|---|---|
| [values in USD to Lehman] | | | | |
| Category | No. Trades | Citi Mid-Market Value ($) | Citi Final Close-out Amount ($) | Bid/Offer Charge ($) |
| SINGLE NAME CDS | 14,962 | (238,895,519) | (975,650,237) | 736,754,718 |
| INDEX CDS | 685 | (612,620,083) | (776,931,814) | 164,311,731 |
| INDEX TRANCHE | 489 | 122,495,276 | (14,204,158) | 136,699,434 |
| SINGLE NAME LCDS | 645 | (23,646,792) | (52,953,970) | 29,307,178 |
| RECOVERY LOCK | 29 | 7,971,418 | (7,384,142) | 15,355,560 |
| CDO | 8 | 8,977,074 | 5,127,746 | 3,849,328 |
| INDEX TRANCHE PO | 3 | (1,331,279) | (3,431,279) | 2,100,000 |
| CDO SQUARED | 1 | (2,271,644) | (2,697,643) | 425,999 |
| SPREAD OPTION | 2 | 3,564,277 | 3,490,494 | 73,783 |
| TOTAL | 16,824 | (735,757,271) | (1,824,635,003) | 1,088,877,732 |

136.    Citi employed such an artificially narrow view of portfolio aggregation that it effectively added a bid/offer charge to every index CDS and nearly every single name and index tranche CDS.  Further, the charges were typically many multiples of the bid/offer charges that a market-maker like Citi would have expected to pay.  In fact, Citi had access to the inter-dealer market.  On many trades Citi could have transacted at mid-market valuations.  To the extent Citi would transact with its customer, as the market-maker, it would profit from bid/offer spreads.  In sum, Citi would have paid far smaller spreads, if any at all, if it had actually entered into replacement CDS transactions – which, of course, it did not.

137.    As an example, Plaintiffs have identified 322 CDS related to 54 different indices under the LBSF-Citibank Agreement where: 1) Citibank provided a mid-market value for the CDS; and 2) Citibank appears to have provided consistent valuations for the trades involving that particular index.  This group represents 45 percent of all index CDS trades under the LBSF-Citibank Agreement.  Citibank identified bid/offer and liquidity charges on this group of trades totaling over $101 million.  55 of these trades – or over 17 percent – are related to 12 different "CDX_IG" indices.  Citi's identified bid/offer and liquidity charges on this group of 55 trades total $37 million. The CDX_IG indices were created to track a group of investment grade

corporations. The indices were created six months apart and typically have many names in common. For example the IG_10 five year and the IG_9 five year were created six months apart and track a list of corporations that have a 94 percent overlap.

138. CDS related to CDX_IG indices have a typical bid-offer charge of only a few basis points for end users, while market-makers will generally enter into these trades with each other at or very close to the mid-market price. For example, on September 12, 2008, the Lehman Subsidiaries entered into CDS related to CDX_IG indices with a total notional amount of $16.9 billion. As a market-maker, Lehman charged bid/offer spreads on many of these indices that were one basis point wide. Moreover, Lehman was only one of multiple market-makers in index CDS and the total market volume was multiples of the notional amount traded by Lehman that day. The following Monday, September 15, 2008 – the Early Termination Date for nearly all of Citi's index CDS trades – was one of the most active trading days ever for CDS, with considerably higher volumes than normal.

139. The table below shows the net position in each of the twelve individual CDX_ IG indices and the Hypothetical Charges that Citibank included in its claim. As can be seen, Citibank added Hypothetical Charges ranging from 7.6 basis points to a shocking 16.1 basis points on positions where customers less sophisticated than Citibank would realistically expect to pay less than two basis points.

| LBSF-Citibank Index CDS Postions Related to "CDX_IG" [values in USD to LBSF] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Index | Maturity Date | No. Trades | Average Size of Trade between Citibank and LBSF ($) | Citibank's Net Position with LBSF ($) | Number of Average Size Trades Required to Close Out Citibank Positon | Credit Spread of Index on 9/15/2008 (basis points) | Hypothetical Charges Included by Citibank ($) | Hypothetical Charges Included by Citibank (Basis Points) |
| DJCDX-NAIGS1-5Y | 3/20/2009 | 6 | 34,802,667 | (139,376,000) | 4.0 | 186 | 112,878 | 16.1 |
| DJCDX-NAIGS2-5Y | 9/20/2009 | 3 | 90,933,333 | (173,600,000) | 1.9 | 206 | 942,640 | 15.8 |
| DJCDX-NAIGS4-5Y | 6/20/2010 | 3 | 33,166,667 | 500,000 | 0.0 | 244 | 489 | 6.0 |
| CDX-NAIGS10-3Y | 6/20/2011 | 2 | 592,500,000 | 1,185,000,000 | 2.0 | 194 | 5,897,464 | 12.0 |
| DJCDX-NAIGS7-5Y | 12/20/2011 | 3 | 485,000,000 | (1,455,000,000) | 3.0 | 233 | 2,267,494 | 7.6 |
| CDX-NAIGS8-5Y | 6/20/2012 | 4 | 386,875,000 | (1,547,500,000) | 4.0 | 217 | 273,726 | 16.1 |
| CDX-NAIGS9-5Y | 12/20/2012 | 5 | 124,098,000 | (496,490,000) | 4.0 | 204 | 6,515,474 | 16.0 |
| DJCDX-NAIGS7-5Y | 12/20/2013 | 2 | 303,875,000 | (387,750,000) | 1.3 | 224 | 2,553,642 | 16.0 |
| DJCDX-NAIGS1-5Y | 3/20/2014 | 6 | 22,320,000 | 133,920,000 | 6.0 | 184 | 9,351,415 | 15.9 |
| CDX-NAIGS9-5Y | 12/20/2014 | 9 | 27,335,333 | 14,018,000 | 0.5 | 196 | 2,130,814 | 12.0 |
| DJCDX-NAIGS7-5Y | 12/20/2016 | 7 | 145,928,571 | (1,021,500,000) | 7.0 | 209 | 81,565 | 12.0 |
| CDX-NAIGS9-5Y | 12/20/2017 | 5 | 177,500,000 | (887,500,000) | 5.0 | 190 | 6,803,092 | 12.0 |
| **TOTAL** | | 55 | | | | | 36,930,693 | |

140.     Citibank will presumably contend that the positions it was left with were of considerable size and would require wider bid/offer and liquidity charges than typically would be expected.  The table above demonstrates the fallacy of this argument.  For each index, the table shows the average size of the trade that Citibank had entered into with LBSF.  More importantly, the table shows how many of the average size trades Citibank would need to do if it were to replace the entire position – which it did not.  In a number of instances Citibank would have needed to enter into two average-sized new trades or less to replace the position.  Given Citibank's access to liquidity, its large customer base, and the large transaction volumes that occurred on September 15, 2008, it is inconceivable that Citibank would have incurred bid/offer charges for these index CDS even remotely close to those reflected in its claim.

141.     By ignoring portfolio aggregation, Citi is attempting to create the false impression that it would have had to enter into a significant number of trades to replace the economic equivalent of the CDS portfolio with LBSF.  Citi's own actions demonstrate the disingenuous nature of this position.  Citi did not enter into replacement trades because the economic risk it was facing was significantly less than what it is attempting to portray.  Citi was

the beneficiary of significant portfolio effects and had CDS positions with LBSF that were significantly offsetting.

142.    On September 15, 2008, Citi's market-making business had ample opportunities to replace the economic equivalent of its LBSF CDS portfolio at minimal cost, if any.  To the extent its claims are predicated on the false assumption that it would have been costly to do so, they are divorced from reality.

(d)    *Combined Effect of Citi's Improper Actions*

143.    The actions described above are typical of the behavior that Citi engaged in to close out the entire CDS portfolio materially and unfairly in its favor.  The net result was the creation of a complicated series of overstated claims.  Two examples from the single name CDS portfolio – CDS on the single name reference entities AMBAC and Venezuela – illustrate the practices employed by Citi.  These reference entities produced the two largest valuation differences for single name CDS under the LBSF-Citibank Agreement, at approximately $47 million and $27 million, respectively.

(i)    *Portfolio of CDS based on AMBAC*

144.    LBSF and Citibank had a portfolio of 76 CDS based on AMBAC with a common set of economic characteristics at the time of LBHI's bankruptcy.  The portfolio was fairly evenly balanced with a large number of both buys and sells, and a small net exposure.  Using readily available information, LBSF is able to estimate the value of the credit protection as a percent of notional for each individual trade.  The table below illustrates the value of the credit protection (as a percentage) for each trade, which are sorted by maturity.

-56-



145.    The smooth green series of dots is the value calculated by LBSF for

AMBAC CDS at each of the standard maturity dates.  It is based on information provided by

Markit Partners for September 15, 2008.[10]  The pricing curve received a "AA" rating from

Markit indicating that a large number of market participants had submitted pricing curves and

that the curves were all relatively similar.  The LBSF curve has a logical progression in that the

value of the credit protection gradually increases over time.

146.    The red diamonds on the above graph are Citibank's valuations of

AMBAC CDS where LBSF sold protection to Citibank.  The blue triangles are Citibank's

valuations of AMBAC CDS where LBSF bought protection from Citibank.  The graph shows

---

[10]   Markit Partners is a private company headquartered in London.  Markit data is widely used and relied
on in the CDS market.  Markit provides users of its data with a CDS end-of-day service that aggregates
valuation information for the credits that trade in the CDS market, drawn from numerous financial
institutions including inter-dealer brokers, electronic trading platforms, major market makers, and many
significant buy side firms.  Markit aggregates over one million data points daily using sophisticated
algorithms to create a single, independent, reliable source of price data for CDS.

significant anomalies in Citibank's prices.  Generally – though not always – Citibank assigned a low price when LBSF bought protection and a higher price when LBSF sold protection.  In addition, the graph illustrates that Citibank used inconsistent pricing even for CDS with the same maturity date.  Specifically, Citibank has inexplicable pricing differences of 30 percent of notional on trades with similar maturities.  Citibank also has valued some of these CDS at more than 70 percent of their notional value.  These values are irrational in that they are greater than the assumed maximum loss that the market was using in its pricing at the time.

(ii)  *Portfolio of CDS based on Venezuela*

147.  LBSF and Citibank also had a portfolio of 37 CDS referencing Venezuela with a common set of economic characteristics at the time of LBHI's bankruptcy.  Citibank was the net buyer of protection in this portfolio.  The table below shows the value of the protection (as a percentage of notional) for each trade.  Again, the trades are sorted by maturity.



148.    The inclusion of inflated Hypothetical Charges is clear based on Citibank's consistently exaggerated valuations.  In addition, a hypothetical bid/offer charge is applied to every single trade, illustrating a complete lack of portfolio aggregation.  In fact, Citibank was so determined to inflate the Hypothetical Charges that it did not aggregate trades that were functionally identical and perfectly offsetting in terms of economic risk. The egregiousness of Citibank's action are demonstrated in the table below which shows two nearly identical trades under the LBSF-Citibank Agreement that Citibank closed out separately instead of aggregating.

| Example of Nearly Identical Trades that Citibank Did Not Aggregate | | | | | | | |
|---|---|---|---|---|---|---|---|
| Maturity Date | Reference Entity | Direction of Credit Protection | Notional ($) | Annual Price paid for protection (pct) | Citibank Submitted Mid-Market ($) | Citibank Final Close-out Amount ($) | Market-Based Calculation of Value as of Early Termination Date ($) |
| 7/20/2012 | Venezuela | Lehman Buys | 25,000,000 | -2.44% | 5,845,125 | 5,210,430 | 4,534,485 |
| 7/20/2012 | Venezuela | Lehman Sells | (25,000,000) | 2.53% | (5,780,907) | (6,417,407) | (4,465,544) |
| TOTAL | | | 0 | 0.09% | 64,218 | (1,206,977) | 68,941 |

149.    In this example, Citibank had both purchased and sold credit protection with LBSF on the sovereign debt of Venezuela.  The two transactions were identical in every regard except for the price that was paid for the credit protection.  In one instance LBSF paid an annual price of 2.44% of the notional and in the other instance Citibank paid 2.53% of the notional.  Thus, in the aggregate, LBSF was receiving a net annual payment of 0.09% of the notional, or $22,500.  Taking this aggregation into account, LBSF assigned a small net value to the two trades of $68,941.  Citibank also submitted a small net mid-market value for these two

trades of $64,218.  However, Citibank then applied individual bid/offer charges to each of the two offsetting trades creating a claim of more than $1.2 million for Citibank.

150.    It is inconceivable that in actually managing this portfolio, Citibank would not take advantage of the offsetting effect of protection bought and sold on the same name with the same or very close maturities and instead would pay bid/offer charges on every single one of these CDS.  Clearly, the imposition of hypothetical bid/offer charges that Citibank never would have paid is a fiction created solely to inflate its close-out valuations.

151.    The AMBAC and Venezuela CDS examples shown illustrate just how far from commercial reality Citi was willing to depart in order to close out the CDS portfolio in its favor.  Citi's actions in closing out the CDS portfolio with LBSF resulted in an unjustifiable inflation of its claims by over $1.2 billion.

**D.**    **Citi Did Not Use Commercially Reasonable Procedures to Close Out its Rates Portfolio with LBSF**

152.    Citi also achieved a massive claim inflation of nearly $450 million in closing out its interest rate portfolio by engaging in a number of commercially unreasonable practices.  LBSF had a large portfolio of 7,503 interest rate derivative trades with Citi at the time of LBHI's bankruptcy.  Lehman has used readily available market information to determine that the mid-market close-out value of LBSF's interest rate derivatives with Citi should have been $1,328,574,268 in favor of LBSF.  Yet Citi valued these trades at only $878,925,684 in LBSF's favor, as illustrated in the table below.

| Close-out Amount Calculations for Generic Interest Rate Swaps [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
| LBSF-Citibank | 6,748 | 1,090,415,643 | 1,525,065,437 | 434,669,794 |
| LBSF-Financial | 635 | (264,857,651) | (256,572,740) | 8,284,911 |
| LBSF-Global | 107 | 16,788,139 | 20,422,913 | 3,634,775 |
| LBSF-Swapco | 9 | 36,893,054 | 39,741,383 | 2,848,330 |
| LBSF-Canyon | 4 | (313,500) | (102,726) | 210,774 |
| TOTAL | 7,503 | 878,925,684 | 1,328,574,268 | 449,648,584 |

153.    An examination of the transaction types with the largest valuation differences reveals several sizeable exaggerations within Citi's rates claims.  Specifically, as the table below shows, a valuation difference of $227 million arose from two categories of trades: Swaption/Callable Swap ("Swaptions"); and Swap-Generic ("Generic Swaps").

| Valuation Differences by Trade Category[11] [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Trade Category | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Proper Close-out Amount | Difference |
| SWAPTION/CALLABLE SWAP | 489 | (228,525,353) | (102,347,460) | 126,177,893 |
| SWAP - GENERIC | 6,179 | 1,278,755,703 | 1,379,650,648 | 100,894,945 |
| SWAP - XCCY | 191 | 2,829,166 | 14,837,552 | 12,008,385 |
| EXOTIC | 16 | (7,478,536) | 1,920,118 | 9,398,653 |
| INFLATION - SWAP/CAP | 81 | 78,482,523 | 84,831,088 | 6,348,565 |
| SWAP - AVG/BASIS | 316 | (16,358,738) | (13,295,445) | 3,063,293 |
| OTHER | 80 | (11,684,987) | (8,831,413) | 2,853,574 |
| CAP/FLOOR - CMS/CMT | 50 | (13,703,723) | (11,189,128) | 2,514,595 |
| CAP/FLOOR - GENERIC | 56 | (13,506,644) | (13,482,313) | 24,330 |
| FRA - GENERIC | 45 | (2,133,517) | (3,519,378) | (1,385,861) |
| TOTAL | 7,503 | 1,066,675,895 | 1,328,574,268 | 261,898,373 |

---

[11]   In addition, Citi disclosed that nearly $188 million of inappropriate bid/offer charges were added to its valuations on top of the Close-out Amounts listed in this table.  These bid/offer charges along with Citi's inflation of the close-out values for Generic Swaps and Swaptions totaled almost $415 million, which is more than 92 percent of Citi's total rates claim inflation of $450 million.

154.    Generic Swaps and Swaptions are two of the most common and liquid types of derivatives.  Valuation differences in these categories of transactions should therefore be extremely small.  That Citi and Lehman would disagree by $227 million on the value of these trades can only be fairly explained by extraordinarily aggressive close-out procedures employed by Citi.

(a)    *Citibank Appears to Have Opportunistically Selected a Close-out Time for Generic USD Interest Rate Derivatives*

155.    One way Citi inflated its rates claims was through Citibank's opportunistic selection of a close-out time for rates trades under the LBSF-Citibank Agreement.  The major valuation difference in the rates portfolio between LBSF and Citi comes from the trades under this Master Agreement.

156.    Broadly, this portfolio of Generic Swaps and Swaptions had two major types of risk exposure.  The first was to the general level of interest rates. This is commonly called "delta" risk.  The second major risk exposure was to the level of volatility of interest rates. This exposure is commonly called "vega" risk.  When the market views interest rates as becoming more uncertain, option values increase.

157.    LBSF was the net "receiver of the fixed rate / payer of floating rate" on this portfolio of swaps and swaptions.  In common parlance, LBSF was "long delta."  The position was such that each one basis point move lower in interest rates would lead to an increase in the value of the combined portfolio of almost $4 million in LBSF's favor.  LBSF was also "long vega" on the combined portfolio.  Each movement upward by one percent in "implied volatility" would increase the value of the portfolio by approximately $13 million in LBSF's favor.

158.     During the course of the day on September 15, 2008, interest rates for USD swaps generally moved lower and "implied volatility" generally increased.  Both of these movements increased the value of LBSF's positions.

159.     It was thus highly beneficial to Citibank to select a close-out time early in the New York morning.  The difference in value between the time as of which Citibank closed-out this combined portfolio and the typical end-of-day time of 3:00 pm was more than $100 million in Citibank's favor.  Thus, Citibank's selection of a close-out time for rates conforms to the pattern visible across every major product, in which Citi closed-out each type of derivatives trade as of a date and time that maximized its claims.

    (b)     *Citi Included Exaggerated, Hypothetical Bid/Offer Charges and Shifted Mid-Market Curves to its Benefit*

160.     Citi provided valuation information for its Generic Swap portfolio in two different manners.  For the four major currencies – dollar ("USD"), euro ("EUR"), yen ("JPY"), and pound ("GBP") – and two others, Citi provided its mid-market value for each trade as of its close-out date and time.  Separately, Citi provided additional bid/offer add-on charges for each of these six currencies.  For the swaps in most of the remaining 21 currencies, Citi only provided its final swap valuation without separating bid/offer add-ons from the mid-market values.

    (i)     *USD, EUR, JPY and GBP Generic Swaps*

161.     For the four major currencies, Citi included bid/offer add-on charges of over $40 million, many of which were Hypothetical Charges.  The bid/offer charges that Citi added on to its Generic Swap close-out valuations were many multiples of market standards.  For example, Citi generally included a one basis point charge when closing out trades in the USD swap portfolio.  This charge is multiple times larger than the charge a similarly situated end user would have expected to pay.  Citi is among the leading market-makers in USD swaps.  It is

highly sophisticated, has a large customer base, and has access to the inter-dealer market where trades are generally done at mid-market. It is indefensible for Citi to claim that it paid or ever would have paid a one basis point charge when entering into USD swaps.

162. On September 15, 2008, transaction volumes in the USD swap market were exceptionally high. Thus, Citi had ample opportunity to close out its USD swap portfolio at a fraction of the stated Hypothetical Charges, if it incurred any costs at all.

163. An examination of Citi's USD swap position with LBSF further illustrates the absurdity of Citi's inclusion of a one basis point charge for USD swaps. Citi was a net payer of the fixed rate on its USD swap portfolios with LBSF. This meant that after terminating the Master Agreements with LBSF, Citi, if it chose to do so, was in a position where it could go into the market and again pay the fixed rate to replace the swaps. As discussed above, interest rates moved lower throughout the day on September 15, 2008. Thus, Citi would have been able to pay lower and lower fixed rates on the USD swaps. This would have been highly beneficial to Citi. Each basis point lower in rates on average that Citi paid would have benefitted Citi by approximately $6 million on the Generic Swap portfolio (or $4 million on the combined Generic Swap and Swaption portfolio). The considerable drop in interest rates throughout the day indicates that there was substantial interest from counterparties to receive the fixed rate. This is exactly what Citi needed if it intended to replace the economic equivalent of its USD swap portfolio. In essence, customers were lined up to help Citi replace its risk if it chose to do so. These customers would have dealt with Citi at extremely aggressive levels – and in many instances may have paid Citi a bid/offer charge to transact. This same pattern holds true for the portfolios of EUR, JPY, and GBP Generic Swaps between LBSF and Citi.

164. As a result, it is inconceivable given Citi's risk position and the market movements and conditions on September 15, 2008 that Citi would ever have paid or expected to

pay a one basis point charge to close out the transactions in its USD, EUR, JPY, and GBP swap portfolios.

(ii) <em>Remaining 21 Currencies for Generic Swaps</em>

165.    Citi provided varying amounts of information regarding its close-out method for Generic Swaps in the 21 remaining currencies.  An examination of the valuations and information submitted indicates that Citi engaged in commercially unreasonable practices for these transactions as well.  First, in some instances Citi appears to have shifted mid-market curves in its favor.  Second, in some instances Citi did not apply portfolio aggregation and included exaggerated Hypothetical Charges.

166.    The total valuation difference for the Generic Swap portfolios in the remaining 21 currencies is almost $28 million.  The largest differences are concentrated in Taiwanese Dollar ("TWD") and Mexican Peso ("MXN"), amounting to $15.8 million and $5.7 million respectively.

167.    An examination of the close-out values for TWD Generic Swaps indicates that Citi shifted the mid-market curve approximately five basis points higher than readily available market closing swap rates.  In addition Citi did not apply portfolio aggregation and instead included exaggerated, hypothetical bid/offer charges on each trade of 7.5 to 13 basis points.  Typical bid/offer charges to sophisticated customers would have been a fraction of this amount.

168.    For MXN Generic Swaps, Citi provided a purported mid-market MXN swap rate curve with its claims that is reasonable and supported by available data.  However, based on the valuations of these trades Citi appears not to have used this curve.  Instead, many of the swap rates used in Citi's close-out of MXN swaps do not reflect the actual MXN market and are not even internally consistent.  For example, in multiple cases Citi valued two MXN swaps

with the same maturity date using rates that differed by more than 30 basis points from one

another – an irrational difference.

169.    In addition to the inappropriate close-out values detailed above, Citi

included inflated hypothetical bid/offer charges in its close-out of the Swaption portfolio.

Plaintiffs believe that $29.7 million of such Hypothetical Charges were tacked onto the USD

Swaption portfolio.

(c)    *Citi in Some Instances did not Apply Portfolio Aggregation, Particularly
Across Multiple Trading Desks*

170.    Citi in some instances failed to apply portfolio aggregation to interest rate

derivative trades under the same Master Agreement, particularly with respect to pairs of trades

booked for different trading desks within the same Citi entity.  Portfolio aggregation is a standard

and valuable risk mitigation practice.  Traders have every incentive to minimize the costs

associated with managing their risk positions, and it would be commercially unreasonable for

traders to ignore offsetting and partially offsetting risks.  However, Citi did not net offsetting

risks across trading desks in the USD rates portfolio.

171.    Citi included Hypothetical Charges for four different USD rates trading

desks in excess of $31 million.  If Citi had netted trades under the same Master Agreement

across trading desks, as it should have, the $31 million in Hypothetical Charges would have been

reduced to $17 million.  It would have been commercially unreasonable for the four different

trading desks in the same Citi entity not to communicate and offset risks.  Thus, Citi could never

have incurred Hypothetical Charges of the magnitude included in its rates claims.

172.    Furthermore, when Citi did apply some portfolio aggregation to certain

segments of the rates portfolio, it did so at a significantly lower level of aggregation than a

reasonable trader would actually apply.  In addition to aggregating identical and substantially

similar trades, traders would at a minimum also look for opportunities to offset risk across

different maturities.  Applying a commercially reasonable level of portfolio aggregation would

result in a large reduction of Citi's rates claims.

    (d)    *Citi Valued Certain Trades in an Inconsistent and Self-Serving Manner*

    173.    An analysis of the Close-out Amounts assigned by Citi to rates

transactions reveals that Citi did not value trades on a consistent basis, but instead assigned

dramatically different prices to identical or nearly identical swaps, in some cases even pricing

nearly identical trades dozens of basis points apart.  Citi's egregious use of inconsistent

valuations is particularly prevalent in its Swaption portfolio.

    174.    Citi had a large portfolio of Swaptions with LBSF at the time of LBHI's

bankruptcy.  More than half of the trades in this portfolio were denominated in USD.  As the

table below shows, Citi assigned a net value to the USD Swaption trades under the LBSF-

Citibank and LBSF-Financial Agreements that was more than $96 million more favorable to Citi

than that calculated by Lehman using readily available market data.

| Close-out Amount Calculations for Swaptions [values in USD to Lehman Subsidiaries] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Trade CCY | No. Trades | Citi Calculation of Close-out Amt. | Market-Based Calculation of Proper Close-out Amt. | Difference |
| LBSF-Citibank | Non-USD | 160 | 25,082,049 | 30,337,705 | 5,255,656 |
| LBSF-Financial | Non-USD | 20 | (5,480,881) | (6,316,334) | (835,454) |
| LBSF-Global | Non-USD | 10 | 18,200,135 | 20,595,160 | 2,395,024 |
| LBSF-Citibank | USD | 271 | (244,118,307) | (145,839,734) | 98,278,573 |
| LBSF-Financial | USD | 25 | (22,082,013) | (24,075,948) | (1,993,935) |
| **TOTAL** | | 486 | (228,399,017) | (125,299,153) | 103,099,864 |

    175.    As described above, Citi purports to have closed out the USD Swaption

portfolio early in the morning, New York time, on September 15, 2008.  In general, across the

entire Swaption portfolio, that time is nearly the worst possible time of day for Lehman and

significantly more favorable for Citi than the standard end of day closing prices.

176.     However, Plaintiffs have identified fifteen individual trades that should have been valued more favorably for LBSF than the valuations asserted by Citi, based upon Citi's use of an early morning valuation time.  These valuations therefore could not have been the product of an 8:30 am valuation time on September 15, and are inconsistent with the rest of Citi's Close-out Amounts.  As the table below demonstrates, over $57 million of the $96 million difference in the USD swaption portfolio is comprised of these 15 trades alone.  The 15 trades have been separated in two groups in the below table, based on their risk characteristics.

| Close-out Amount Calculations for USD Swaptions [values in USD to Lehman Subsidiaries] | | | | | | |
|---|---|---|---|---|---|---|
| Group | No. Trades | Vega Exposure | Rates Exposure | Citi Calculation of Close-out Amt. | Market-Based Calculation of Proper Close-out Amt. | Difference |
| Group A | 6 | (8,767,869) | 2,184,174 | (414,905,000) | (380,565,329) | 34,339,671 |
| Group B | 9 | 16,758,718 | 1,983,582 | (124,350,902) | (101,503,614) | 22,847,288 |
| Remaining | 281 | 4,882,042 | (1,906,511) | 273,055,582 | 312,153,260 | 39,097,679 |
| TOTAL | 296 | 12,872,891 | 2,261,245 | (266,200,320) | (169,915,683) | 96,284,637 |

177.     The Close-out Amounts provided by Citi for the six trades included in Group A are the most at variance with what the values should have been as of 8:30 am on September 15.  The Lehman Subsidiaries experienced an $8.8 million loss in value on this group of trades for every one point (1%) increase in interest rate volatility, or an $8.8 million gain for every one point decrease in volatility.  Given the level of volatility at that time, the valuation of this group of transactions should have been more favorable for the Lehman Subsidiaries in the morning hours.  Further, these trades were also positively exposed to higher interest rates.  Since interest rates were higher in the morning, this is another significant factor that should have made a morning valuation more favorable to Lehman than a close of business valuation for these six particular trades.  Lehman estimates that if these transactions were priced at 8:30 am, the Close-out Amounts should have been approximately $345 million in Citi's favor, which is actually more favorable to LBSF than the end of day market-based value ($380 million in favor of Citi)

would have been.  But instead, Citi used an unknown methodology to determine values for these

six trades that totaled nearly $415 million – more than $70 million more favorable to Citi than

they should have been using prices from the morning of September 15.

178.     The nine trades included in Group B are a further indication of Citi's use

of an inconsistent methodology to determine the Close-out Amounts for swaptions.  Based on the

risk exposures of these trades to interest rates and interest rate volatility, Plaintiffs estimate that

the effect of using a morning valuation instead of end of day valuation should be a net benefit to

LBSF in the range of $5 million to $10 million.  Despite this, Citi's close-out valuations are

worse for LBSF than Lehman's September 15 close of business valuation by nearly $23 million.

Combining this with the effect of time of day, Plaintiffs estimate that the valuation would have

been approximately $30 million more favorable to LBSF than that provided by Citi, if Citi had

valued this group of trades consistently with the overall portfolio.  These values used by Citi are

thus inconsistent with the methods used to value the rest of its USD swaptions, and are much

more favorable to Citi than can be justified using market data.

      (e)     *Citi Valued Rates Trades as of Dates Other Than the Early Termination*
                   *Date*

179.     In a number of instances Citi valued rates trades as of dates other than the

Early Termination Date of September 15, 2008, despite the fact that commercially reasonable

determinants of value existed as of September 15, as demonstrated by Lehman's ready ability to

price all of the Generic Swaps as of that date.

180.     An example of Citi using a close-out date other than the Early Termination

Date involves 306 USD Generic Swaps under the LBSF-Citibank Agreement that Citibank

valued as of September 17, 2008.  By valuing the trades as of this date, instead of the Early

-69-

Termination Date of September 15, 2008, Citibank was able to inflate its claim by approximately

$3 million.

**E.    Citi Did Not Use Commercially Reasonable Procedures to Close Out its Securitized Products Portfolio with the Lehman Subsidiaries**

181.    The Lehman Subsidiaries and Citi also had a portfolio of securitized

products trades, which are CDS written on products such as mortgage backed securities or

collateralized debt obligations.  The parties entered into 821 such CDS under the LBSF-Citibank,

LBSF-Global, and LBSF-Canyon Agreements, with LBSF as the net seller of protection.  As

illustrated in the table below, Citi submitted claims for these securitized products trades in an

amount more than $229 million above the values calculated by LBSF using publicly available

market data, with most of this overstatement arising from Citibank's valuation of trades under

the LBSF-Citibank Agreement.

| Close-out Amount Calculations for Securitized Products [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-Out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBSF-Canyon | 6 | 1,077,659 | 1,076,217 | (1,442) |
| LBSF-Citibank | 758 | (1,626,664,467) | (1,395,909,138) | 230,755,329 |
| LBSF-Global | 57 | 154,438,917 | 153,130,689 | (1,308,228) |
| **TOTAL** | 821 | (1,471,147,891) | (1,241,702,233) | 229,445,659 |

182.    In closing out its portfolio of securitized products CDS, Citibank failed to

engage in any portfolio aggregation and instead employed a market quotation process that, by

design, yielded artificially conservative quotes incorporating inflated bid/offer charges.  The

result of this improper process was an inflation of Citibank's claim by more than $229 million.

183.    A majority of the trades in the securitized products portfolio between Citi

and LBSF carried similar types of risk.  Specifically, these were trades in which Citi purchased

-70-

or sold protection on subprime or Alt-A residential mortgage backed securities ("RMBS").  The

table below shows the Close-out Amount calculations for the 546 securitized products trades that

were CDS on RMBS.

| Close-out Amount Calculations for Single Name CDS on RMBS [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBSF-Citibank | 508 | (1,057,278,227) | (878,339,836) | 178,938,391 |
| LBSF-Global | 38 | 147,990,013 | 148,906,789 | 916,776 |
| **TOTAL** | 546 | (909,288,214) | (729,433,047) | 179,855,168 |

184.    These CDS on RMBS are less liquid than more standardized derivatives

and consequently are associated with wider individual bid/offer charges.  However, these trades

tend to change value in a highly correlated fashion since they all relate to similar pools of

residential mortgages that tend to perform in a similar manner.  The result is that these

securitized products trades are typically managed on a portfolio basis for risk management

purposes, with individual trade attention given only to unique risk.

185.    To demonstrate the necessity and significance of portfolio aggregation to

these transactions, Lehman reviewed the 508 CDS on RMBS trades under the LBSF-Citibank

Agreement and identified 375 of the trades that had been in existence since at least March 31,

2008 – over five months prior to the LBHI bankruptcy.  Out of these 375 trades, there were 168

trades where LBSF purchased protection and 207 trades where LBSF sold protection.  The graph

below shows the average CDS value (defined as a percent of notional amount) for the "buys" of

protection and for the "sells" of protection.  As can be seen, the buys had a slightly higher

average value than the sells.  However, since both buys and sells were based on pools of

mortgages that had similar economic characteristics, the overall price movement between the

buys and sells was highly correlated.  Nearly every day that the buys increased in value so did

the sells, and vice versa.[12]

**Average Daily Value of CDS on RMBS in LBSF-Citibank Agreement**



186.    The above graph clearly illustrates the significance of the portfolio effect.

The 168 LBSF buys of protection substantially offset the risk and price movement in the 207

sales of protection.  It would make no sense to individually replace each of these securitized

products transactions and incur a substantial bid/offer charge on every CDS when the net

portfolio had significantly less risk.  Yet this is exactly how Citibank constructed its claim.

187.    Instead of engaging in a good faith attempt to value these positions, Citi

chose to obtain market quotations for individual securitized products CDS.  According to Citi's

claims, it derived these valuations from market quotations that were provided to them by other

---

[12]   In fact, the only anomalous points on the graph are related to the timing of cash payments.

dealers between September 15, 2008 and September 17, 2008.   To obtain these quotations, Citi

requested quotes for bids on a list of individual securitized products and also separately

requested quotes for offers on a list of individual securitized products.  This created a situation

where the institutions providing the quotes had no confidence that they would be able to acquire

offsetting positions.  Instead, they were left with the risk of acquiring a large "one-way" position,

which created a natural incentive to provide extremely wide, defensive quotes.  This process, by

design, led to artificially wide quotes that Citi used to create a large hypothetical loss that it

never incurred or expected to incur.

188.    Citi never used commercially reasonable procedures or attempted to meet

its good faith obligation to mitigate damages by taking advantage of the significant portfolio

aggregation effect described above.  Simply put, asking for separate bid and offer quotations on

individual trades does not yield an accurate measure of the economic equivalent of the material

terms of the group of securitized products transactions between the parties, as required by the

Close-out Amount definition in the COA Master Agreements.

189.    Moreover, Citi's claims are in direct contradiction to the actions it actually

took.  Citi only entered into a limited number of replacement trades, further supporting that it

managed its securitized products transactions on a portfolio basis.

190.    By valuing its trades individually, Citi created a large hypothetical loss

and maximized the amount of bid/offer charges, most of which were Hypothetical Charges,

enabling it to grossly inflate its claims.  Furthermore, in many instances Citi relied on market

quotations made as of dates after the Early Termination Date.  This is directly contrary to the

Close-out Amount definition in the COA Master Agreements and to section 562 of the

Bankruptcy Code, which both required Citi to value the securitized products portfolio as of

September 15, 2008 if commercially reasonable determinants of value existed on that date.

-73-

LBHI's bankruptcy on September 15 had very little direct effect on the securitized products market and did not inhibit Citi's ability to value the trades. On the contrary, commercially reasonable determinants of value existed, as demonstrated by Lehman's ability to value these same trades as of September 15, 2008. Citi was thus obligated to value the securitized products transactions as of that date.

191. In summary, Citi opportunistically, and in a self-serving manner, chose to ignore its obligations under the Master Agreements, New York law, and the Bankruptcy Code, and instead closed out its securitized products trades in bad faith, using commercially unreasonable procedures. By denying Lehman the benefit of any portfolio effects and valuing many trades as of a date after the Early Termination Date, Citi inflated its claim far beyond the economic equivalent of the material terms of its securitized products positions. As a result, Citi's claims resulting from the close-out of its securitized products portfolio should be reduced to the proper amounts as reflected in the values obtained by LBSF using readily available market data.

## F.   Citi Did Not Use Commercially Reasonable Procedures to Close Out its FX Portfolio with the Lehman Subsidiaries

192. Citi also closed out its foreign exchange ("FX") trades with the Lehman Subsidiaries using commercially unreasonable procedures, resulting in a large and unjustified inflation in Citi's claims.

### (a)   *Citi Improperly Closed Out the FX Portfolio Using Price Levels that Did Not Exist on the Early Termination Date*

193. As with the other derivatives products, it appears Citi closed out its FX trades with the Lehman Subsidiaries as of a date other than the Early Termination Dates designated by Citi under the relevant Master Agreements. Specifically, although Citi claimed to have closed out its FX portfolio as of September 15, many trades were closed out at values far

outside those observable in the market on that date.  By way of example, the following chart

illustrates Citibank's close-out values for USD/JPY FX forwards with LBCC.  The trades are

aligned by expiration date on the x-axis and price (in number of yen per dollar) on the y-axis.

The trend lines show the highest and lowest value for these trades at any point in the day on

September 15, 2008.  Thus, any valuations made as of September 15 would fall between these

two lines.  The green points show LBCC's valuation as of the end of day on that date, while the

red and blue points show Citibank's values for these trades.



194.    The chart illustrates that Citibank closed out these USD/JPY FX forwards

at values more favorable for its own positions than any of the market prices that actually

occurred on September 15, 2008.  When these values are compared to the market prices from

each day during the week of September 15, it becomes apparent that many of Citibank's close-

out values track much more closely to the market as of September 19, 2008.  This pattern can be

seen across Citibank's FX close-out.  Therefore, on information and belief, Citibank closed out

many of its FX trades with the Lehman Subsidiaries as of September 19, when the values were

much more favorable to Citibank, rather than on September 15.

195.    Citi was required to value the terminated FX transactions as of September

15, however, under both the Master Agreements and the Bankruptcy Code.   The FX market is

extremely large and liquid with excellent price transparency.  As Citi is a major FX dealer with

sophisticated risk management systems, it had substantial access to this deep market.  The LBHI

bankruptcy on September 15 did not have a negative effect on the availability of commercially

reasonable determinants of value in the FX market.  To the contrary, the USD/JPY exchange rate

(the most common currency pair used in trades between the Lehman Subsidiaries and Citi)

experienced some of its highest trading volumes ever on that very date, as reported by the CLS

Group, the operator of the cash settlement systems used by major financial institutions for spot

FX trades.[13]  Ample determinants of value clearly existed to enable Citi to close out its FX trades

on September 15.

196.    The graph below illustrates the daily range of the USD/JPY exchange rate

for each day between July 1, 2008 and December 31, 2008.

---

[13]    *See* CLS Group, Currency Program Briefing Book, *available at* http://www.cls-
group.com/Publications /CLS_Currency_Programme_Briefing_Book.pdf ("Following the collapse of
Lehman Brothers in September 2008, market sentiment deteriorated rapidly . . . .  However, ***the FX
market continued to function, without material disruption*, *throughout the market turmoil that
followed***.  Many have attributed the smooth functioning of the FX market to the role played by CLS.  ***At
the height of the financial crisis during the week commencing September 15, 2008, CLS settled
exceptionally high values and volumes of transactions***, a USD equivalent of 26.5 trillion and 4.4 million
payment instructions.").

-76-



As the graph illustrates, the movement of the USD/JPY exchange rate on September 15, 2008

was not at all anomalous relative to the typical daily movements for the six month period

surrounding it.  As a result, Citi had the ability to value the terminated FX transactions as of

September 15.  That it chose not to do so, and instead used more favorable prices from

September 19, was a blatant attempt to manufacture the largest claim possible and shows a

willful disregard for the requirements of the Master Agreements and the Bankruptcy Code.

> (b)    *Citi Failed to Apply Portfolio Aggregation and Included Exaggerated Hypothetical Charges in its Close-out of the FX Portfolio*

197.    As illustrated in the following table, Citi and the Lehman Subsidiaries had

entered into just over 3,000 FX transactions, which Citi improperly closed out at more than $97

million above their actual market value.

-77-

| Close-out Amount Calculations for Foreign Exchange Trades [values in USD to Lehman Subsidiaries] | | | | |
|---|---|---|---|---|
| Master Agreement | No. Trades | Citi Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| LBCC-Citibank | 2,975 | (391,347,954) | (296,348,809) | 94,999,145 |
| LBSF-Citibank | 23 | (695,859) | 928,305 | 1,624,164 |
| LBSF-Financial | 4 | (7,133,021) | (6,741,524) | 391,497 |
| **TOTAL** | 3,002 | (399,176,833) | (302,162,028) | 97,014,805 |

198.   Most of the FX trades between the Lehman Subsidiaries and Citi were entered into under the LBCC-Citibank Agreement.  The following table illustrates that of the 2,975 FX trades under that agreement, 1,908 were plain vanilla forwards and 867 were plain vanilla European options.  These are among the most common and liquid types of FX trades and typically have very small bid/offer charges.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| Product Type | No. Trades | Citibank Calculation of Close-out Amount | Market-Based Calculation of Close-out Amount | Difference |
| EUROPEAN OPTION | 867 | (135,880,236) | (57,664,051) | 78,216,185 |
| FORWARDS | 1,908 | (245,813,680) | (238,123,032) | 7,690,648 |
| AMERICAN OPTION | 11 | 2,900,203 | 4,069,206 | 1,169,003 |
| DIGITAL OPTION | 7 | (2,465,470) | (3,994,651) | (1,529,181) |
| BARRIER OPTION | 59 | (10,088,772) | (12,592,762) | (2,503,990) |
| Trades Citi Does Not Know | 123 | n/a | 11,956,481 | 11,956,481 |
| **TOTAL** | 2,975 | (391,347,954) | (296,348,809) | 94,999,145 |

199.    The most common currency pair in the LBCC-Citibank Agreement was

USD/JPY.  It is also the currency pair with the largest inflation of its Close-out Amount by

Citibank, as illustrated below.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| Currency Pair | No. Trades | Citibank Calculation of Close-Out Amount | Market-Based Calculation of Close-Out Amount | Difference |
| USD/JPY | 346 | (28,148,400) | 2,202,909 | 30,351,309 |
| EUR/USD | 246 | (95,465,061) | (81,509,179) | 13,955,882 |
| AUD/USD | 164 | (29,522,224) | (20,372,623) | 9,149,600 |
| GBP/USD | 65 | (69,091,410) | (60,049,293) | 9,042,117 |
| USD/BRL | 150 | (44,458,420) | (39,162,456) | 5,295,965 |
| USD/KRW | 62 | (24,422,594) | (19,740,057) | 4,682,537 |
| Other 66 Currency Pairs | 1,819 | (100,239,845) | (89,674,591) | 10,565,254 |
| **TOTAL** | 2,852 | (391,347,954) | (308,305,290) | 83,042,664 |

200.    An egregious example of Citibank's exaggerated Close-out Amounts for

FX trades is found in Citibank's close-out of low-delta USD/JPY European options.  These are

option trades that due to their characteristics have an extremely low probability (less than 1%) of

having any value when the option expires.  All of these trades were maturing in less than one

year and contained strike prices that were very far from the then-current exchange rate.  The

chart below shows this portfolio of 33 low-delta options.

| Type (LBCC's perspective) | Strike (Yen) | Expiration Date | USD Notional | Citibank Value | Market-Based Value | Difference |
|---|---|---|---|---|---|---|
| **Portfolio of Low Delta Options** [values in USD to LBCC] | | | | | | |
| Buy Put | 118 | 9/24/2008 | 100,000,000 | 0 | 22 | 22 |
| Buy Put | 120 | 11/6/2008 | 3,600,000 | 0 | 263 | 263 |
| Buy Put | 120 | 11/6/2008 | 329,513 | 0 | 24 | 24 |
| Buy Put | 125 | 1/16/2009 | 6,970,319 | 0 | 391 | 391 |
| Buy Put | 125 | 1/16/2009 | 4,899,257 | 0 | 275 | 275 |
| Buy Put | 125 | 1/16/2009 | 2,865,000 | 0 | 161 | 161 |
| Buy Put | 125 | 1/16/2009 | 69,703 | 0 | 4 | 4 |
| Buy Put | 125 | 1/16/2009 | 46,229 | 0 | 3 | 3 |
| Buy Put | 125 | 1/16/2009 | 48,877 | 0 | 3 | 3 |
| Sell Put | 110.35 | 9/17/2008 | 30,000,000 | 0 | (1) | (1) |
| Sell Put | 117 | 9/26/2008 | 100,000,000 | (90,000) | (284) | 89,716 |
| Sell Put | 125 | 10/23/2008 | 200,000,000 | (210,000) | (228) | 209,772 |
| Sell Put | 120 | 11/6/2008 | 1,931,800 | (2,318) | (141) | 2,177 |
| Sell Put | 120 | 11/6/2008 | 1,931,800 | (2,318) | (141) | 2,177 |
| Sell Put | 120 | 11/6/2008 | 65,913 | (79) | (5) | 74 |
| Sell Put | 125 | 1/16/2009 | 100,000,000 | (145,000) | (5,611) | 139,389 |
| Sell Put | 125 | 1/16/2009 | 6,970,319 | (10,107) | (391) | 9,716 |
| Sell Call | 65 | 5/8/2009 | 150,000,000 | (600,000) | (16,193) | 583,807 |
| Sell Call | 63 | 6/12/2009 | 150,000,000 | (645,000) | (17,562) | 627,438 |
| Sell Call | 63 | 6/12/2009 | 150,000,000 | (645,000) | (17,562) | 627,438 |
| Sell Call | 63 | 6/12/2009 | 100,000,000 | (430,000) | (11,708) | 418,292 |
| Sell Call | 63 | 6/12/2009 | 75,000,000 | (322,500) | (8,781) | 313,719 |
| Sell Call | 63 | 6/12/2009 | 75,000,000 | (322,500) | (8,781) | 313,719 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 150,000,000 | (637,500) | (12,072) | 625,428 |
| Sell Call | 60 | 7/9/2009 | 100,000,000 | (425,000) | (8,048) | 416,952 |
| Sell Call | 63 | 7/31/2009 | 200,000,000 | (980,000) | (55,191) | 924,809 |
| Sell Call | 63 | 7/31/2009 | 200,000,000 | (980,000) | (55,191) | 924,809 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 63 | 7/31/2009 | 100,000,000 | (490,000) | (27,596) | 462,404 |
| Sell Call | 60 | 8/21/2009 | 100,000,000 | (470,000) | (17,123) | 452,877 |
| **TOTAL** | | | 2,609,728,730 | (9,662,332) | (340,800) | 9,321,532 |

201.    LBCC consistently calculated very low values for these options, with the

highest individual value being less than 0.3% of the notional amount of the trade.  Furthermore,

LBCC's valuations were consistent whether LBCC was long or short the option.  Citibank, on

the other hand, assigned massively overstated values to such trades when it owned the option and

gave LBCC no value at all if LBCC owned the option.  As a matter of perspective, the

Hypothetical Charges included by Citibank on many of these trades were over 100 times what an

end user might expect to pay.[14]  This demonstrates Citibank's effort to include preposterously large bid/offer charges on nearly worthless trades.

202.    Citibank's improper valuation of these 33 trades alone inflated its claim by over $9.3 million.  Close-out Amounts of similarly inflated magnitudes were repeated throughout Citibank's FX options portfolio with LBCC, and greatly contributed to the artificial inflation of Citibank's claims.

203.    Additionally, Citibank disregarded standard portfolio aggregation methods, of the exact nature that it used to manage its own risk, and instead applied exaggerated hypothetical bid/offer charges to offsetting FX option trades.  Citibank went so far in ignoring industry standard practices that it included hypothetical charges even if the trades were *exactly* offsetting each other, resulting in zero economic risk and a combined market value of $0.  The USD/JPY European options portfolio is rife with such examples, one of which is illustrated below.

| Example of Exactly Offsetting FX Trades [values in USD to LBCC] | | | | | |
| --- | --- | --- | --- | --- | --- |
| Type | Strike Price (Yen) | USD Notional ($) | Expiration Date | Market-Based Value ($) | Citibank Value ($) |
| Citibank Sells Put | 114 | 50,000,000 | 2/26/2009 | 175,865 | 72,500 |
| Citibank Buys Put | 114 | 50,000,000 | 2/26/2009 | (175,865) | (242,500) |
| **Total** | | | | 0 | (170,000) |

204.    This example is merely one instance of many in which Citibank tacked huge add-ons onto pairs of trades with offsetting values and zero risk.  For the USD/JPY European options portfolio, there are 74 individual trades that were completely or partially offsetting.  On these trades, Citibank included hypothetical charges of approximately $2.7 million.

---

[14]   As a point of reference, every single option listed above expired worthless.

205.    The commercially unreasonable procedures used by Citi to close out its FX trades with LBCC were an attempt to create an unjustifiable windfall profit.  Citi's claims resulting from the close-out of the FX portfolio should be reduced to the proper amounts as reflected in the values calculated by Lehman using readily available market data.

**G.    Citi's Post-Default Attempt to Undo a Group of Novated Transactions in Order to Manufacture Claims Exemplifies its Bad Faith and Commercial Unreasonableness**

206.    The purposefulness with which Citi inflated its claims is epitomized by Citibank's attempt on the day of LBHI's chapter 11 filing to abruptly reverse a successful novation entered into just two business days earlier.  Paradoxically, Citibank tried to restore LBSF as its counterparty after the bankruptcy filing for the purpose of declaring a default and profiting on the termination of the resurrected transactions.  Citibank's actions do not appear to make economic sense unless they were part of a scheme to manipulate its derivatives claims.

207.    On September 11, 2008, Citibank sought to reduce its Lehman credit risk by entering into a three way step-out transaction (the "Collapse Transaction") with LBSF and funds controlled by Bracebridge Capital, LCC (collectively, "Bracebridge").  Thus, Citibank and Bracebridge identified twenty-nine securitized products CDS between Citibank and LBSF and eighty-seven securitized products CDS between Bracebridge and LBSF that perfectly offset.  They recognized these perfectly offsetting trades as attractive candidates for a novation transaction whereby LBSF would step out from the trades facing Bracebridge and Citibank would step into those positions, while at the same time the identical positions between LBSF and Citibank would be terminated.  In this way, Bracebridge and Citibank could each reduce exposure to LBSF while maintaining constant risk positions and without incurring any costs.  On September 11 Bracebridge formally proposed that LBSF "step out" of the offsetting trades by

simultaneously terminating its trades with Citibank and novating its trades with Bracebridge to

Citibank, leaving Citibank and Bracebridge facing each other directly:

> Please consent to the attached collapse of trades between Citibank NA ("CBNA"), Lehman Brothers Special Finance ("LBSF") and Olifant Fund Ltd, FYI Ltd, and FFI Fund Ltd (collectively, the "Bracebridge Funds"), via the simultaneous assignment of the Bracebridge Fund trades from LBSF to CBNA, with the relevant Bracebridge Funds as the Remaining Party in each case, and the termination of trades between LBSF and CBNA.  CBNA as buyer of protection collapses and steps in to face the individual Bracebridge Funds as original sellers of protection.

    208.    On September 11 at 4:20 pm Citibank consented to the collapse and, in

accordance with industry custom and ISDA-recommended best practices,[15] specified the transfer

date: "t/d 9/11/2008."  Lehman consented at 4:59 pm.  At that point, the Collapse Transaction

was fully binding per the ISDA Novation Protocol II, to which all three parties were adherents.[16]

Accordingly, Lehman processed each of the novations and terminations which comprised the

Collapse Transaction (the "Collapsed Trades") the night of September 11.  Citibank reaffirmed

September 11 as the transfer date in an early morning email on Friday, September 12 and

specified September 16 as the effective date for the transfer of any associated collateral: "t/d

9/11/2008 eff/d 9/16/2008."  Thus, as of September 11, 2008, Lehman had exited the Collapsed

Trades and Citibank and Bracebridge faced each other directly.

    209.    The very concern which prompted Citibank and Bracebridge to enter the

Collapse Transaction – avoiding a Lehman default on the Collapsed Trades – was realized early

on September 15, 2008 when LBHI filed for chapter 11 protection.  The morning of September

---

[15]  *See* "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA Operations Committee (May 4, 2004) available at http://www.isda.org/publications/pdf/BestPracticeStatement.pdf at 2 ("The Novation Date needs to be agreed by all parties in advance of the transfer taking place so that the trade may be rebooked and reported accurately.").

[16]  *See* Annex I to ISDA Novation Protocol II at 11-12 ("Transferor and Transferee agree that they are legally bound by the terms of a transfer by novation of a Covered Transaction from the moment they agree to those terms (whether orally or otherwise), subject only to the condition that evidence of the consent of the Remaining Party to such transfer is received by the Transferee not later than 6:00 p.m. in the location of the Transferee on the day such transfer is agreed to.").

15, Citibank sent Lehman a Notice of Termination declaring an Event of Default had occurred, and accordingly it was exercising its right to terminate all the transactions under the LBSF-Citibank Agreement, designating September 15, 2008 as the Early Termination Date.  If Citibank's priority on that day had been avoiding Lehman credit risk, it would have been unthinkable that *after* LBHI's bankruptcy Citibank would seek to revive trades that Citibank had just succeeded in novating to a solvent counterparty at zero cost.  But, Citibank immediately viewed LBHI's bankruptcy as a profit-making opportunity.  Accordingly, its priority that day was maximizing its derivatives claim against Lehman so it could misappropriate the $2 billion in Lehman cash it was holding.  When Citibank realized that the Collapse Transaction had cost it the opportunity to include Hypothetical Charges for the Collapsed Trades in its claims, Citibank conspired with Bracebridge to undo the Collapse Transaction.

210.   Bracebridge was a willing participant in the effort to profit from Lehman's demise.  On September 15, 2008, the founder and Managing Partner of Bracebridge Capital, LLC forwarded the email chain in which Lehman had consented to the Collapse Transaction to Citibank with the following message:

> I am writing to confirm our conversation and to send you the note requested informing you that given that LBSF defaulted prior to the effective date of 9/16/08 for this trade collapse and that all aspects of the simultaneous assignment and termination were conditioned on Lehman being able to consummate the step out, please confirm that the trade collapse set forth in this email chain is null and void, i.e., Citi has not stepped in and all of the trades remain outstanding between LBSF and us, on the one hand, and between Citi and LBSF, on the other hand.  I appreciate your verbal confirmation of this matter earlier and look forward to doing business together.

211.   Three hours later, Citibank responded succinctly: "Citi Agrees."  At 6:51 pm, Bracebridge forwarded the email chain to Lehman along with the below message:

> Given the failure to consummate the step-out transactions contemplated by this email chain, we are informing you that the entire collapse, i.e., the simultaneous assignment and termination set forth below involving Citi, is null and void and

-84-

deemed not to have occurred.  Accordingly, LBSF was from the original trade dates and remains through today's date counterparty to Olifant Fund Ltd, FYI Ltd and FFI Fund Ltd., respectively, with respect to the original transactions, with LBSF as buyer of protection and the Bracebridge funds as sellers of protection.

Attached is written confirmation from Citi that the simultaneous assignment and termination are deemed null and void. Please confirm your acknowledgement.

212.    It was not possible to resurrect the Collapsed Trades that had been

effectively novated on September 11, as there is no provision in the LBSF-Citibank Agreement

that would permit previously novated transactions to spring back to life after all the transactions

under that Master Agreement had already been terminated.

213.    The stated basis on which Citibank purported to deem the Collapse

Transaction null and void was utterly invalid.  First, Citibank fundamentally misconstrued the

term "effective date."  "Effective date" simply refers to the due date for payment of any

corresponding fees, *not* the date a novation becomes legally binding.  ISDA describes the

distinction in its Best Practice Statement for Processing Novations under the heading

"Effectiveness of Novations:"

- "The Novation Date is the date that the deal transfers, ie the rights and obligations of the Transferor are novated to the Transferee"

- "Any 'effective date' agreed for the calculation and settlement of fees is quite separate from the operation of Novation Date in relation to the Novation Transaction"[17]

214.    Similarly, the timing of the first and only email mentioning the term "eff/d

date" on September 12 - *after* the Collapse Transaction was finalized with the consent of all

parties and processed in Lehman's systems - underscores the fact that it did not set the date of the

Collapse Transaction.  Similarly, the assertion that LBSF failed to "consummate" the Collapse

---

[17]   "Best Practice Statement: Processing Novations" published by the Process Working Group of the ISDA Operations Committee (May 4, 2004) available at http://www.isda.org/publications/ppdf/BestPracticeStatement.pdf at 2.

Transaction was baseless. The Collapse Transaction was consummated on September 11 with no

steps remaining for LBSF to perform.

215.    Citibank and Bracebridge then included the purportedly resurrected

Collapsed Trades on their proofs of claims, charging LBSF exorbitant Hypothetical Charges for

each trade, with Citibank claiming its resulting losses were secured by the $2 billion cash

deposit.  The windfall Citibank reaped from the Collapsed Trades was exceptional in that its

claims for both the Hypothetical Charges <u>and</u> the actual mid-market value of the trades were

improper, as the Collapsed Trades no longer legitimately existed as of September 15 and should

have been omitted from Citibank's claims entirely.  Thus, through only 29 purportedly

resurrected CDS Citibank was able to fabricate the appearance of more than $109 million in

Close-out Amounts, in an attempt to retain more than $109 million of the $2 billion it held in

Lehman cash.

**Valuations Ascribed to the Collapsed Trades By Citibank and Bracebridge**

| Trades | Total Bracebridge Close-out Amounts | Total Citibank Close-out Amounts |
|---|---|---|
| Collapsed Trades | $ 52,243,380 | $ (109,862,953) |

216.    For these completely offsetting positions, Bracebridge claims that it owed

approximately $52 million to LBSF while Citibank claims that LBSF owed it close to $110

million.  Although the Collapsed Trades no longer existed on September 15, LBSF calculated

that the total termination value for those transactions would have been $91,480,404 as of that

date if they had still been in effect.  This is the amount that should have been payable by

Bracebridge to LBSF and by LBSF to Citibank if the Collapse Transaction had not occurred.

217.    Citibank's improper attempt to reverse the Collapse Transaction

exemplifies its brazen manipulation of its close-out to create phantom losses and shift them to

Lehman. As of September 15, 2008, Citibank was already out of the Collapsed Trades, having

exited them the prior week at zero cost.  Citibank's calculated decision to try to undo the

Collapse Transaction – resurrecting terminated trades for the sole purpose of immediately

declaring them defaulted and claiming exorbitant Hypothetical Charges – resulted in a bill of

$109,862,953 presented by Citibank to LBSF, a commercially unreasonable result completely

divorced from any actual damages suffered by Citibank.

**H.      If Allowed, Citi's Claims Should Be Equitably Subordinated**

218.    As described in detail above, Citi closed out its derivatives transactions

with the Lehman Subsidiaries inequitably and in bad faith, to the detriment of Lehman's other

creditors.  As a result, even if Citi's derivatives claims are allowed, they should be equitably

subordinated under section 510(c) of the Bankruptcy Code.

219.    Section 510(c) of the Bankruptcy Code gives the Court the jurisdiction to

subordinate claims on equitable grounds in the interest of fairness and justice in the

administration of the bankruptcy estate.  Courts have characterized the remedy of equitable

subordination as remedial, designed to undo or offset any inequality in the claim position of a

creditor that will produce injustice or unfairness to other creditors.  *Citicorp Venture Capital,*

*Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 233 (3d Cir. 2003).

Courts typically employ a two prong test in determining whether to equitably subordinate a

claim: (1) the claimant must have engaged in some type of inequitable conduct; and (2) the

misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair

advantage on the claimant.  *See, e.g.*, *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).[18]

---

[18]    The *Mobile Steel* test for equitable subordination originally contained a third prong that became moot
after the passage of the Bankruptcy Code.  *See In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y.
2006) ("The third prong of the Mobile Steel test (requiring that equitable subordination be consistent with
the provisions of bankruptcy law) is of little significance today. Mobile Steel was decided under the

220.    The two prongs of the test for equitable subordination are met here.  The
inequitable conduct required for the first prong of the test encompasses "conduct that may be
lawful but is nevertheless contrary to equity and good conscience," including, "enrichment
brought about by unconscionable, unjust or unfair conduct."  *In re Verestar, Inc.*, 343 B.R. 444,
461 (Bankr. S.D.N.Y. 2006).  As described above in detail, Citi closed out its derivatives
portfolio with the Lehman Subsidiaries in bad faith.  This bad faith conduct constitutes
"inequitable conduct" for purposes of equitable subordination.  *See Picard v. Katz*, 462 B.R. 447,
456 (S.D.N.Y. 2011) ("Because the Amended Complaint adequately alleges that the defendants
did not receive fraudulent transfers in good faith, it also adequately alleges that they engaged in
inequitable conduct.").  Under the second prong of the test, this inequitable conduct
unquestionably injured Lehman's other creditors, whose recovery would be reduced if Citi's
claims were allowed to stand and thereby confer an unfair advantage on Citi.

221.    Moreover in certain cases, including with respect to penalty-based claims,
courts have been willing to equitably subordinate claims based on the nature and origin of the
claim itself and unfairness to the debtor's other innocent unsecured creditors, even absent any
inequitable conduct on the part of the claimant.  *See, e.g.*, *In re Colin*, 44 B.R. 806 (Bankr.
S.D.N.Y. 1984) (subordinating a punitive damage claim on the ground that punitive damage
claims are penalty claims, not imposed to afford redress, but to deter future wrongful conduct,
allowance of which would be at the expense of innocent creditors).

222.    The extension of the equitable subordination doctrine to claims that do not
reflect an actual loss incurred by the claimant is rooted in the legislative history of section 510(c)
of the Bankruptcy Code.  *See* 124 Cong. Rec. H11,095 (Sept. 28, 1978) (statement of Rep.

---

former Bankruptcy Act, which did not specifically provide for equitable subordination. The Bankruptcy
Code does.").

-88-

Edwards), and 124 Cong. Rec. S17,412 (Oct. 6, 1978) (statement of Sen. DeConcini) ("It is

intended that that term 'principles of equitable subordination' follow existing case law and leave

to the courts development of this principle.  To date, under existing law, a claim is generally

subordinated only if [the] holder of such claim is guilty of inequitable conduct, *or the claim itself

is of a status susceptible to subordination, such as a penalty*….") (emphasis added).

223.    Citi calculated its derivatives claims in bad faith, employing a series of

indefensible procedures to maximize its claims to the detriment of Lehman's other creditors.

Moreover, Citi's claims for Hypothetical Charges are tantamount to claims for unenforceable

penalties as the Hypothetical Charges that Citi seeks to recover bear no relation to any actual

loss.  Because allowance of its claims would be detrimental to Lehman's other creditors, Citi's

derivatives claims against the Lehman Subsidiaries should be equitably subordinated under

section 510(c).

I.    **Under a Proper Close-out of the Master Agreements, Citi Owes the Lehman
      Subsidiaries More than $243 Million and its Claims Should Be Reduced to $25
      Million**

**LBSF-Canyon Agreement**

224.    By notice dated September 17, 2008, Citi Canyon terminated the

transactions under the LBSF-Canyon Agreement as of September 18, 2008.  On September 14,

2009, Citi Canyon submitted a revised calculation notice to LBSF pursuant to section 6(d) of the

LBSF-Canyon Agreement.

225.    On September 18, 2009, Citi Canyon filed proof of claim number 17895

against LBSF and proof of claim number 17913 against LBHI for, among other things, amounts

allegedly due to Citi Canyon under the LBSF-Canyon Agreement (the "LBSF-Canyon Claim").

According to Citi Canyon, the amount of the LBSF-Canyon Claim was $135,474.

226.     For the reasons set forth above, the LBSF-Canyon Claim is overstated. Based upon LBSF's calculation, the LBSF-Canyon Claim should be disallowed and expunged and the close-out of the LBSF-Canyon Agreement should result in a payment of $59,200 to LBSF.

**LBSF-Citibank Agreement**

227.     By notice dated September 15, 2008, Citibank terminated the transactions under the LBSF-Citibank Agreement as of September 15, 2008.  On September 16, 2009, Citibank submitted a revised calculation notice to LBSF pursuant to section 6(d) of the LBSF-Citibank Master Agreement.

228.     On November 18, 2011, Citibank filed an amended proof of claim number 67733 against LBSF and an amended proof of claim number 67736 against LBHI for, among other things, amounts allegedly due to Citibank under the LBSF-Citibank Agreement (the "LBSF-Citibank Claim").  According to Citibank, the amount of the LBSF-Citibank Claim was $1,640,084,656.

229.     For the reasons set forth above, the LBSF-Citibank Claim is overstated. Based upon LBSF's calculation, the LBSF-Citibank Claim should be disallowed and expunged and the close-out of the LBSF-Citibank Agreement should result in a payment of $157,419,343 to LBSF.

**LBSF-Financial Agreement**

230.     By notice dated September 15, 2008, Citi Financial terminated the transactions under the LBSF-Financial Agreement as of September 15, 2008.  On September 16, 2009, Citi Financial submitted a revised calculation notice to LBSF pursuant to section 6(d) of the LBSF-Financial Agreement.

231.    On September 18, 2009, Citi Financial filed proof of claim number 17926 against LBSF and on September 22, 2009 Citi Financial filed proof of claim number 29637 against LBHI for, among other things, amounts allegedly due to Citi Financial under the LBSF-Financial Agreement (the "LBSF-Financial Claim").  According to Citi Financial, the amount of the LBSF-Financial Claim was $21,184,614.

232.    For the reasons set forth above, the LBSF-Financial Claim is overstated. Based upon LBSF's calculation, the LBSF-Financial Claim should be disallowed and expunged and the close-out of the LBSF-Financial Agreement should result in a payment of $6,557,186 to LBSF.

**LBSF-Global Agreement**

233.    By notice dated September 15, 2008, Citi Global terminated the transactions under the LBSF-Global Agreement as of September 15, 2008.  On September 16, 2009, Citi Global submitted a revised calculation notice to LBSF pursuant to section 6(d) of the LBSF-Global Agreement.

234.    On September 22, 2009, Citi Global filed proof of claim number 29881 against LBSF and proof of claim number 29882 against LBHI for, among other things, amounts allegedly due to Citi Global under the LBSF-Global Agreement (the "LBSF-Global Claim"). According to Citi Global, the amount of the LBSF-Global Claim was $232,423,044.[19]

235.    For the reasons set forth above, the LBSF-Global Claim is overstated. Based upon LBSF's calculation, the LBSF-Global Claim should be reduced to $20,487,310.

---

[19]    In its response to the Court's derivatives questionnaire, Citi Global acknowledged an additional cash payment of $9,823,000 is due to LBSF.  However, Citi Global never amended the LBSF-Global Claim to reflect this amount.

**LBCC-Citibank Agreement**

236.    By notice dated September 15, 2008, Citibank terminated the transactions under the LBCC-Citibank Agreement as of September 15, 2008.  On September 16, 2009, Citibank submitted a revised calculation notice to LBCC pursuant to section 6(d) of the LBCC-Citibank Agreement.

237.    On November 18, 2011, Citibank filed amended proof of claim number 67734 against LBCC and amended proof of claim number 67736 against LBHI for, among other things, amounts allegedly due to Citibank under the LBCC-Citibank Agreement (the "LBCC-Citibank Claim").  According to Citibank, the amount of the LBCC-Citibank Claim was $18,017,039.

238.    For the reasons set forth above, the LBCC-Citibank Claim is overstated. Based upon LBCC's calculation, the LBCC-Citibank Claim should be disallowed and expunged and the close-out of the LBCC-Citibank Agreement should result in a payment of $75,038,565 to LBCC.

**LBCS-Energy Agreement**

239.    By notice dated September 15, 2008, Citi Energy terminated the transactions under the LBCS-Energy Agreement as of September 15, 2008.  On September 16, 2009, Citi Energy submitted a revised calculation notice to LBCS pursuant to section 6(d) of the LBCS-Energy Agreement.

240.    On September 18, 2009, Citi Energy filed proof of claim number 17937 against LBCS and proof of claim number 17936 against LBHI for, among other things, amounts allegedly due to Citi Energy under the LBCS-Energy Agreement (the "LBCS-Energy Claim"). According to Citi Energy, the amount of the LBCS-Energy Claim was $10,714,350.

-92-

241.    For the reasons set forth above, the LBCS-Energy Claim is overstated. Based upon LBCS's calculation, the LBCS-Energy Claim should be disallowed and expunged and the close-out of the LBCS-Energy Agreement should result in a payment of $2,882,329 to LBCS.

### LBCS-Global ISDA Agreement

242.    By notice dated September 15, 2008, Citi Global terminated the transactions under the LBCS-Global ISDA Agreement as of September 15, 2008.  On September 16, 2009, Citi Global submitted a revised calculation notice to LBCS pursuant to section 6(d) of the LBCS-Global ISDA Agreement.

243.    On September 22, 2009, Citi Global filed proof of claim number 29880 against LBCS and proof of claim number 29882 against LBHI for, among other things, amounts allegedly due to Citi Global under the LBCS-Global ISDA Agreement (the "LBCS-Global ISDA Claim").  According to Citi Global, the amount of the LBCS-Global ISDA Claim was $6,217,557.

244.    For the reasons set forth above, the LBCS-Global ISDA Claim is overstated.  Based upon LBCS's calculation, the LBCS-Global ISDA Claim should be reduced to $4,748,516.

### LBCS-Global EFET Agreement

245.    By notice dated September 15, 2008, Citi Global terminated the transactions under the LBCS-Global EFET Agreement as of September 15, 2008.  On September 16, 2009, Citi Global submitted a calculation notice to LBCS pursuant to the LBCS-Global EFET Agreement.

246.    On September 22, 2009, Citi Global filed proof of claim number 29880 against LBCS and proof of claim number 29882 against LBHI for, among other things, amounts

-93-

allegedly due to Citi Global under the LBCS-Global EFET Agreement (the "LBCS-Global EFET

Claim"). According to Citi Global, the amount of the LBCS-Global EFET Claim was $716,281.

247.    For the reasons set forth above, the LBCS-Global EFET Claim is

overstated. Based upon LBCS's calculation, the LBCS-Global EFET Claim should be

disallowed and expunged and the close-out of the LBCS-Global EFET Agreement should result

in a payment of $57,287 to LBCS.

### LBSF-Swapco Agreement

248.    By notice dated September 15, 2008, Citi Swapco terminated the

transactions under the LBSF-Swapco Agreement as of September 15, 2008. On September 16,

2009, Citi Swapco submitted a calculation notice to LBSF pursuant to section 6(d) of the LBSF-

Swapco Agreement.

249.    On September 18, 2009, Citi Swapco filed proof of claim number 17933

against LBSF and proof of claim number 17934 against LBHI for, among other things, amounts

allegedly due to Citi Swapco under the LBSF-Swapco Agreement (the "LBSF-Swapco Claim").

According to Citi Swapco, the amount of the LBSF-Swapco Claim was $991,772.

250.    For the reasons set forth above, the LBSF-Swapco Claim is overstated.

Based upon LBSF's calculation, the LBSF-Swapco Claim should be disallowed and expunged

and the close-out of the LBSF-Swapco Agreement should result in a payment of $1,828,824 to

LBSF.

**J.    Conclusion**

251.    Taken collectively, the improper and commercially unreasonable

procedures used by Citi to close out the Master Agreements inflated its claims against the

Lehman Subsidiaries by more than $2.149 billion. As detailed in the following table, a

commercially reasonable calculation, based on publicly available market sources, of the net

-94-

termination amount due under each Master Agreement (using the mid-market valuations as of the close of business on the early termination date of each agreement) results in Citi owing the Lehman Subsidiaries more than $243 million under seven Master Agreements, while Citi has claims totaling $25,235,826 under the remaining two Master Agreements.

[value to Lehman Subsidiaries in USD]

| | Market-Based Close-out Amount | + | Collateral Posted | + | Unpaid Amounts | = | Market-Based Net Claim Amount | v. | Citi Net Claim Amount |
|---|---|---|---|---|---|---|---|---|---|
| LBSF-Canyon | 958,630 | | (899,430) | | 0 | | 59,200 | | (135,474) |
| LBSF-Citibank | (249,608,958) | | 416,280,591 | | (9,252,290) | | 157,419,343 | | (1,640,084,656) |
| LBSF-Financial | (223,685,221) | | 230,698,657 | | (456,250) | | 6,557,186 | | (21,184,614) |
| LBSF-Global | 164,305,046 | | (184,881,990) | | 89,634 | | (20,487,310) | | (232,423,044) |
| LBCC-Citibank | (296,364,126) | | 313,230,362 | | 58,172,328 | | 75,038,565 | | (18,017,039) |
| LBCS-Energy | 23,885,115 | | (20,525,656) | | (477,130) | | 2,882,329 | | (10,714,350) |
| LBCS-Global ISDA | (7,349,001) | | 2,600,485 | | 0 | | (4,748,516) | | (6,217,557) |
| LBCS-Global EFET | 6,226,192 | | (6,168,904) | | 0 | | 57,287 | | (716,281) |
| LBSF-Swapco | 39,741,383 | | (37,912,560) | | 0 | | 1,828,824 | | (991,772) |
| **TOTAL** | (541,890,939) | | 712,421,555 | | 48,076,292 | | 218,606,907 | | (1,930,484,787) |

252.    The above chart illustrates the claims that should have resulted from commercially reasonable close-outs of the Master Agreements.  For example, Lehman determined that the proper calculation of the aggregate net Close-out Amount under the LBSF-Citibank Agreement should have been $249,608,958 in favor of Citibank.  Under that Master Agreement, LBSF had posted collateral to Citibank in the amount of $416,280,591.  In addition, $9,252,290 was due to Citibank, but unpaid, at the time the LBSF-Citibank Agreement was terminated.  Netting these three numbers together yields a final value of $157,419,343 in favor of LBSF.  In other words, Citibank should have been able to use the collateral it was holding from LBSF to fully compensate Citibank for the close-out of the LBSF-Citibank Agreement and still have more than $157 million left over to return to LBSF.  But instead, Citibank submitted a

-95-

wildly inflated claim, alleging it was owed $1,640,084,656 under this Master Agreement on top of the $416 million of collateral that LBSF had posted.

253.    In total, a commercially reasonable calculation of the termination amounts due under the Master Agreements, when combined with the posted collateral and Unpaid Amounts under those Agreements, should have resulted claims totaling $25,235,826 under the LBSF-Global and LBCS-Global ISDA Agreements.  At the same time, Citi owes Lehman $243,842,733 under the LBSF-Canyon, LBSF-Citibank, LBSF-Financial, LBCC-Citibank, LBCS-Energy, LBCS-Global EFET, and LBSF-Swapco Agreements.

254.    Instead, Citi submitted claims for $1,930,484,787.  This egregious inflation of $2,149,091,694 is the product of bad faith, commercially unreasonable claims calculations in which Citi concocted phantom claims in order to profit from the $2 billion of cash it had extracted from LBHI.  These claims have no basis in reality, and should be reduced or disallowed.

## CAUSES OF ACTION

## COUNT I

### (Breach of Agreement With Respect to LBHI's $2 Billion)

255.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

256.    Citibank requested that LBHI transfer the $2 billion to a segregated account, and to leave those funds at Citibank, to provide Citibank with "comfort" that the funds would be available in its system.  As a condition for LBHI's agreement to segregate these funds from its general purpose account, and for the funds to remain "captive" at Citibank, Citibank agreed to waive any right it may have had to apply the $2 billion, or any portion thereof, to general obligations of LBHI.

-96-

257.    After the various Lehman entities filed for bankruptcy protection, LBHI requested that Citibank return the $2 billion to the LBHI estate.  Citibank refused. Notwithstanding the exclusive purpose for the segregation of the $2 billion and its agreement that the funds would not be subject to setoff, Citibank now asserts in proof of claim number 67736 the right to apply all or a portion of the $2 billion to a host of purported LBHI obligations that are entirely unrelated to clearing and settling activity, including approximately $1.7 billion of claims purportedly arising under the parties' derivatives contracts.

258.    Citibank's refusal to return the $2 billion to LBHI, and its attempt to apply those funds to obligations contrary to the parties' agreement, constitutes a breach of the parties' agreement.

259.    As a result of the foregoing, LBHI has been damaged in an amount not less than $2 billion.

## COUNT II

### (Promissory Estoppel With Respect to LBHI's $2 Billion)

260.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

261.    As described above, on June 12, 2008, Citibank agreed that the $2 billion would not be subject to setoff by Citibank and would not otherwise be subject to a lien or other security interest of Citibank.  Citibank made that promise to induce LBHI to transfer the $2 billion from its general deposit account to a segregated account at Citibank, and to not withdraw those funds from Citibank.

262.    LBHI relied on the June 12, 2008 conversation and Citibank's agreement that the $2 billion would not be subject to setoff, a lien or other security interest, when LBHI agreed to transfer the $2 billion from its general deposit account to the segregated account at

Citibank. LBHI continued to rely on that promise in not withdrawing those funds from Citibank subsequent to the initial transfer and segregation of the funds. LBHI's initial and continued reliance was both reasonable and foreseeable to Citibank.

263.    As a result of relying on Citibank's promise, LBHI has been injured, in an amount not less than $2 billion. Citibank should be estopped from asserting that it now has any right to set off purported obligations of LBHI against the $2 billion, or from withholding LBHI's $2 billion on that basis.

## COUNT III

### (Conversion of LBHI's $2 Billion)

264.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

265.    For all of the reasons discussed above, Citibank has no right to withhold LBHI's $2 billion.

266.    Soon after filing for bankruptcy, LBHI requested that Citibank return the $2 billion to the LBHI estate. Citibank refused.

267.    As a result of the foregoing, Citibank wrongfully converted $2 billion of LBHI's assets, and LBHI has been damaged thereby. LBHI is entitled to the return of its $2 billion.

## COUNT IV

### (Declaratory Judgment With Respect to LBHI's $2 Billion)

268.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

269.    For all the reasons discussed herein, Citibank has no right to apply any portion of the segregated $2 billion against obligations allegedly owed by LBHI to Citibank.

-98-

Among other things, the parties intended for those segregated funds to be held in a special

purpose account not subject to setoff by Citibank.

270.     Citibank has taken the position that, notwithstanding the conditions under

which LBHI's $2 billion was segregated and maintained in a special purpose account, Citibank is

entitled to withhold LBHI's $2 billion and to apply those funds against obligations allegedly

owed by LBHI to Citibank.

271.     There is an actual and justiciable controversy regarding the parties' rights

and obligations with respect to LBHI's $2 billion.

272.     Plaintiffs are entitled to a declaratory judgment that Citibank has no right

to apply any portion of the $2 billion to obligations allegedly owed by LBHI to Citibank, and

that the $2 billion is unencumbered property of LBHI's bankruptcy estate available for

distribution to creditors.

## COUNT V

### (Turnover of LBHI's $2 Billion Under Section 542 of the Bankruptcy Code)

273.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

274.     For the reasons set forth above, Citibank is not entitled to set off amounts

it claims LBHI owes to it against LBHI's $2 billion.  Nor does Citibank have any right to

otherwise withhold the $2 billion.

275.     Citibank is in possession, custody and/or control of the $2 billion, which is

of substantial value and benefit to LBHI's estate and which is property belonging to LBHI that

may be used, sold or leased by LBHI.  Citibank should be ordered to turn over the $2 billion to

LBHI immediately for the benefit of LBHI's unsecured creditors, pursuant to Section 542 of the

Bankruptcy Code.

## COUNT VI

### (Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an Obligation Under Section 548(a)(1)(B) of the Bankruptcy Code)

276.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

277.    The September Amendment constitutes the incurrence of an obligation for the benefit of Citibank.

278.    LBHI received less than reasonably equivalent value in exchange for its entry into the September Amendment.

279.    Upon information and belief, when LBHI entered into the September Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

280.    Upon information and belief, when LBHI entered into the September Amendment, LBI was insolvent.

281.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the September Amendment.

282.    By virtue of the foregoing, pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the September Amendment should be avoided for the benefit of LBHI's estate.

-100-

## COUNT VII

**(Avoidance of the September Amendment as a Constructive Fraudulent Incurrence of an
Obligation Under New York DCL Section 273, 275, 278, and/or 279 and
Section 544 of the Bankruptcy Code)**

283.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

284.    LBHI did not receive fair value in exchange for its entry into the

September Amendment.

285.    Upon information and belief, when LBHI entered into the September

Amendment, LBHI was insolvent or became insolvent as a result of the obligations incurred;

and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to

pay as such debts matured.

286.    Upon information and belief, when LBHI entered into the September

Amendment, LBI was insolvent.

287.    At all times relevant hereto, there were actual creditors of LBHI holding

unsecured claims allowable within the meaning of Bankruptcy Code.

288.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do

not apply to the September Amendment.

289.    As a result of the foregoing, pursuant to Sections 273, 275, 278, and 279

of the New York Debtor and Creditor Law and Section 544(b) of the Bankruptcy Code, the

September Amendment should be avoided for the benefit of LBHI's estate.

## COUNT VIII

**(Avoidance of the September Amendment as an Obligation Incurred With the Actual Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

290.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

291.    LBHI entered into the September Amendment within two years of filing for protection under Chapter 11 of the Bankruptcy Code.

292.    Entry into the September Amendment was an obligation incurred by LBHI to or for the benefit of Citibank.

293.    Entry into the September Amendment was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's entry into the September Amendment.  Among other things, on September 9, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for its expanded obligations under the September Amendment, and the September Amendment was executed on an exigent basis without any meaningful negotiation between LBHI and Citibank.

294.    In addition, Citibank's intent to hinder, delay or defraud creditors of LBHI may be imputed to LBHI.  As described above, LBHI had no choice but to execute the September Amendment in the face of Citibank's threats to cease clearing and settling Lehman's trades unless Citibank's demand for the September Amendment was satisfied.

295.    As a result of LBHI's entry into the September Amendment, LBHI and its creditors have been harmed.

296.    The September Amendment is avoidable under section 548(a)(1)(A) of the Bankruptcy Code.

-102-

## COUNT IX

### (Recovery of the $500 Million Transfer as Constructive Fraudulent Transfer Under Section 550(a)(2) of the Bankruptcy Code)

297.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

298.    The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

299.    LBHI did not receive fair consideration for the $500 million transfer to LBI, nor did it otherwise receive reasonably equivalent value in exchange for that transfer.

300.    At all times relevant hereto, there were actual creditors of LBHI holding unsecured claims allowable within the meaning of the Bankruptcy Code.

301.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBHI was insolvent or became insolvent as a result of the transfer; was engaged in or about to engage in business or a transaction, for which its remaining property was unreasonably small capital; and/or intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

302.    Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

303.    The $500 million transfer to LBI was a transfer of property in which LBHI has an interest. LBI is the initial transferee of the $500 million transfer. Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

304.    The safe harbor provisions of Section 546(e) of the Bankruptcy Code do not apply to the transfer of the $500 million.

305.     By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT X

**(Avoidance of the $500 Million Transfer as a Transfer Made With the Actual Intent to Hinder, Delay or Defraud Creditors Under Section 548 of the Bankruptcy Code)**

306.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

307.     The $500 million transfer to LBI that occurred on September 14, 2008, constituted a transfer for the benefit of LBI.

308.     Upon information and belief, when LBHI transferred the $500 million to LBI, LBI was insolvent.

309.     The $500 million transfer to LBI was made with an actual intent to hinder, delay or defraud LBHI's creditors.  Such an intent can be inferred from the traditional badges of fraud surrounding LBHI's transfer of those funds.  Among other things, on September 14, 2008, the global markets were experiencing a melt-down, LBHI and many of its subsidiaries were insolvent, LBHI received no consideration in exchange for the $500 million transfer, and the transfer was made at Citibank's insistence and direction without any negotiation only hours before LBHI filed for bankruptcy.

310.     The $500 million transfer to LBI was a transfer of property in which LBHI has an interest. LBI is the initial transferee of the $500 million transfer.  Because Citibank set off purported LBI obligations against the $500 million, Citibank is the subsequent transferee of the $500 million.

-104-

311.    By virtue of the foregoing, the LBHI estate is entitled to recover the $500 million from Citibank as subsequent transferee pursuant to Section 550(a)(2) of the Bankruptcy Code.

## COUNT XI

### (Breach of Agreement With Respect to LBCC's $204 Million)

312.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

313.    LBCC is a party to the CLS Agreement with Citibank.  As a result of foreign exchange trades being settled on LBCC's behalf, Citibank received approximately $204 million that it immediately owed to LBCC.

314.    The LBCC estate requested that Citibank transfer those funds to the LBCC estate.  Citibank refused LBCC's request for years, in breach of the CLS Agreement.  Pursuant to a Court-approved stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.

315.    As a result of the foregoing, LBCC is entitled to damages to compensate its creditors for Citibank's unlawful retention of the $166 million through the date of payment, and is further entitled to recover the $38.5 million, plus interest.

## COUNT XII

### (Conversion With Respect to LBCC's $204 Million)

316.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

-105-

317.    For all of the reasons discussed above, Citibank had no right to withhold the approximately $204 million that it owed to LBCC.

318.    After filing for bankruptcy, the LBCC estate requested that Citibank turn over these funds.  Citibank refused for years.  Pursuant to stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.

319.    As a result of the foregoing, LBCC is entitled to damages to compensate its creditors for Citibank's unlawful conversion of the $166 million through the date of payment, and is further entitled to recover the $38.5 million, plus interest.

## COUNT XIII

### (Turnover With Respect to LBCC's $204 Million Under Section 542 of the Bankruptcy Code)

320.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

321.    Citibank retained possession, custody and/or control of approximately $204 million of LBCC's funds, which is of substantial value and benefit to LBCC's estate and which is property belonging to LBCC that may be used, sold or leased by LBCC.  Pursuant to stipulation dated May 14, 2013, Citibank has since paid $166 million of the amounts owed to LBCC, but continues to wrongfully assert a right to withhold $38.5 million of LBCC's funds, including $4.5 million of LBCC's funds that Citibank used to pay itself for a purported obligation of LBIE to Citibank.  For the reasons set forth above, Citibank is not entitled to set off amounts it claims LBCC (or LBIE) owes to it against LBCC's $38.5 million.

322.     Citibank should be ordered to turn over the $38.5 million to LBCC immediately for the benefit of LBCC's unsecured creditors, plus interest, pursuant to Section 542 of the Bankruptcy Code.  LBCC is further entitled to the turnover of interest or other return accrued on the $166 million by Citibank through the date of payment.

## COUNT XIV

### (Disallowance of Claims Under Section 502(d) of the Bankruptcy Code)

323.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

324.     Claims held by Citibank against LBHI or LBCC are subject to disallowance under Section 502(d) of the Bankruptcy Code unless and until Citibank has turned over to LBHI or LBCC, respectively, all property transferred, or paid LBHI or LBCC, respectively, the value of such property, for which Citibank is liable under section 542 of the Bankruptcy Code.

325.     In the event that the property is recoverable from Citibank under sections 542 or 550 of the Bankruptcy Code, then all of the claims of Citibank against LBHI or LBCC should be disallowed unless and until Citibank has turned over to LBHI or LBCC, respectively, all property transferred, or paid LBHI or LBCC, respectively, the value of such property, for which it is liable under section 542 of the Bankruptcy Code.

## COUNT XV

### (Objections to the Proofs of Claim Against LBHI)

326.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

327.     Pursuant to section 502(a) of the Bankruptcy Code, a proof of claim will not be deemed "allowed" if a party in interest objects thereto.

328.    On November 18, 2011, Citibank filed proof of claim number 67736 against LBHI.  Plaintiffs object to each of the claims asserted by Citibank in that proof of claim to the extent they assert an interest in, or right of setoff with respect to, the $2 billion of LBHI cash at Citibank.

329.    Plaintiffs also object to each of the claims asserted by Citibank in proof of claim number 67736 to the extent they are based on the avoidable September Amendment to the 2004 Guaranty, are not allowable under the relevant agreements between the parties, or are based on improper calculations of the amounts alleged to be owed.  In the alternative, Plaintiffs object to Citibank's claim seeking payment from LBHI as purported guarantor for millions of dollars in fees allegedly incurred by the Lehman entities under the CLS Agreement.  The CLS Agreement does not authorize the payment of such fees.

330.    In addition, on January 16, 2013, Citibank sold its allowed unsecured claim of $253 million against the LBI estate for obligations purportedly arising under the parties' CLS Agreement (the "LBI CLS Unsecured Claim") for $161 million.  Citibank's sale of the LBS CLS Unsecured Claim resulted in Citibank's release of LBHI's purported obligations under the September Amendment to the extent the sale impaired LBHI's subrogation rights against LBI. In the alternative, the amount claimed by Citibank in proof of claim number 67736 against LBHI as purported guarantor under the September Amendment for alleged obligations of LBI under the CLS Agreement should be reduced to account for proceeds received from the sale of its unsecured claim.

331.    Plaintiffs further object to each of the claims asserted by Defendants against LBHI in proofs of claim numbers 17913, 17934, 17936, 29637, 29882, and 67736 to the extent they seek payment from LBHI as purported guarantor under any of the Master

Agreements.  For the reasons set forth herein, those swap agreement claims are invalid or inflated.

332.    All of the foregoing claims against LBHI should be disallowed and expunged, or reduced and allowed, as appropriate.

333.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XVI

## (Objection to Citibank's Claim for Post-Petition Interest Against LBHI)

334.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

335.    In proof of claim number 67736, Citibank claims a right to collect post-petition interest on its purported claims against LBHI, on the alleged basis that it is an oversecured creditor.

336.    Plaintiffs object to Citibank's claim for post-petition interest with respect to any such claims asserted against LBHI.  Citibank is not entitled to post-petition interest, under Section 506(b) of the Bankruptcy Code or otherwise.  Citibank's claim for post-petition interest is also in contravention of the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan").  Even if Citibank were entitled to any post-petition interest – and it is not – the rate of interest claimed by Citibank is inflated and contrary to the applicable law and agreements.

337.    The foregoing claim(s) against LBHI should be disallowed and expunged, or reduced and allowed, as appropriate.

338.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

-109-

## COUNT XVII

### (Objection to Claim Under LBSF-Canyon Agreement)

339.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

340.    The LBSF-Canyon Claim is not a valid claim against LBSF because the

calculation of such claim is not commercially reasonable, is overstated, and was not calculated in

good faith.  As described above, Citi Canyon wrongly delayed its close-out valuations until after

the early termination date, improperly charged add-ons, failed to net identical or substantially

similar trades, and did not value the trades under the LBSF-Canyon Agreement using

commercially reasonable procedures.

341.    The LBSF-Canyon Claim should be disallowed and expunged.  Plaintiffs

hereby expressly reserve the right to further object to the LBSF-Canyon Claim, or any other

claims filed by Citi Canyon, on any other basis.

## COUNT XVIII

### (Breach of LBSF-Canyon Agreement)

342.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

343.    Citi Canyon breached the LBSF-Canyon Agreement by calculating the

Loss under the LBSF-Canyon Agreement in bad faith and using commercially unreasonable

procedures that produced a commercially unreasonable result wholly unrelated to its actual

economic damages.

344.    Under the LBSF-Canyon Agreement, Citi Canyon was required to pay

LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable

calculation of the Loss under the LBSF-Canyon Agreement would have resulted in a net

payment to LBSF in the amount of $59,200.  Instead, Citi Canyon calculated a Loss under the

LBSF-Canyon Agreement resulting in a net claim by Citi Canyon in the amount of $135,474.

346.    As a direct and proximate result of Citi Canyon's breach of the LBSF-

Canyon Agreement, LBSF has been deprived of $194,674.

## COUNT XIX

### (Objection to Claim Under LBSF-Citibank Agreement)

346.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

347.    The LBSF-Citibank Claim is not a valid claim against LBSF because the

calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  As described above, Citibank wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-

ons, failed to net identical or substantially similar trades, did not value the trades under the

LBSF-Citibank Agreement using commercially reasonable procedures, and included valuations

of trades that had already been terminated as part of the Collapse Transaction between LBSF,

Citibank, and Bracebridge.

348.    The LBSF-Citibank Claim should be disallowed and expunged.  Plaintiffs

hereby expressly reserve the right to further object to the LBSF-Citibank Claim, or any other

claims filed by Citibank, on any other basis.

## COUNT XX

### (Breach of LBSF-Citibank Agreement)

349.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

350.    Citibank breached the LBSF-Citibank Agreement by calculating the Close-out Amount under the LBSF-Citibank Agreement in bad faith using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

351.    Under the LBSF-Citibank Agreement, Citibank was required to pay LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBSF-Citibank Agreement would have resulted in a net payment to LBSF in the amount of $157,419,343.  Instead, Citibank calculated a Close-out Amount under the LBSF-Citibank Agreement resulting in a net claim by Citibank in the amount of $1,640,084,656.

352.    As a direct and proximate result of Citibank's breach of the LBSF-Citibank Agreement, LBSF has been deprived of $1,797,503,999.

## COUNT XXI

### (Objection to Claim Under LBSF-Financial Agreement)

353.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

354.    The LBSF-Financial Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Financial wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Financial Agreement using commercially reasonable procedures.

-112-

355.    The LBSF-Financial Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-Financial Claim, or any other claims filed by Citi Financial, on any other basis.

## COUNT XXII

### (Breach of LBSF-Financial Agreement)

356.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

357.    Citi Financial breached the LBSF-Financial Agreement by calculating the Close-out Amount under the LBSF-Financial Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

358.    Under the LBSF-Financial Agreement, Citi Financial was required to pay LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBSF-Financial Agreement would have resulted in a net payment to LBSF in the amount of $6,557,186.  Instead, Citi Financial calculated a Close-out Amount under the LBSF-Financial Agreement resulting in a net claim by Citi Financial in the amount of $21,184,614.

359.    As a direct and proximate result of Citi Financial's breach of the LBSF-Financial Agreement, LBSF has been deprived of $27,741,800.

## COUNT XXIII

### (Objection to Claim Under LBSF-Global Agreement)

360.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

361.    The LBSF-Global Claim is not a valid claim against LBSF because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Global wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBSF-Global Agreement using commercially reasonable procedures.

362.    The LBSF-Global Claim should be reduced to $20,487,310.  Plaintiffs hereby expressly reserve the right to further object to the LBSF-Global Claim, or any other claims filed by Citi Global, on any other basis.

## COUNT XXIV

### (Objection to Claim Under LBCC-Citibank Agreement)

363.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

364.    The LBCC-Citibank Claim is not a valid claim against LBCC because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citibank wrongly delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBCC-Citibank Agreement using commercially reasonable procedures.

365.    The LBCC-Citibank Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBCC-Citibank Claim, or any other claims filed by Citibank , on any other basis.

-114-

## COUNT XXV

### (Breach of LBCC-Citibank Agreement)

366.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

367.    Citibank breached the LBCC-Citibank Agreement by calculating the Close-out Amount under the LBCC-Citibank Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

368.    Under the LBCC-Citibank Agreement, Citibank was required to pay LBCC for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCC-Citibank Agreement would have resulted in a net payment to LBCC in the amount of $75,038,565.  Instead, Citibank calculated a Close-out Amount under the LBCC-Citibank Agreement resulting in a net claim by Citibank in the amount of $18,017,039.

369.    As a direct and proximate result of Citibank's breach of the LBCC-Citibank Agreement, LBCC has been deprived of $93,055,604.

## COUNT XXVI

### (Objection to Claim Under LBCS-Energy Agreement)

370.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

371.    The LBCS-Energy Claim is not a valid claim against LBCS because the calculation of such claim is not commercially reasonable, is overstated, was not calculated in good faith, and produced a commercially unreasonable result that was far in excess of the economic equivalent of the terminated transactions.  As described above, Citi Energy wrongly

-115-

delayed its close-out valuations until after the early termination date, improperly charged add-ons, failed to net identical or substantially similar trades, and did not value the trades under the LBCS-Energy Agreement using commercially reasonable procedures.

372.   The LBCS-Energy Claim should be disallowed and expunged.  Plaintiffs hereby expressly reserve the right to further object to the LBCS-Energy Claim, or any other claims filed by Citi Energy, on any other basis.

## COUNT XXVII

### (Breach of LBCS-Energy Agreement)

373.   Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

374.   Citi Energy breached the LBCS-Energy Agreement by calculating the Close-out Amount under the LBCS-Energy Agreement in bad faith and using commercially unreasonable procedures that produced a commercially unreasonable result wholly unrelated to its actual economic damages.

375.   Under the LBCS-Energy Agreement, Citi Energy was required to pay LBCS for any net gains it enjoyed as a result of termination.  A commercially reasonable calculation of the Close-out Amount under the LBCS-Energy Agreement would have resulted in a net payment to LBCS in the amount of $2,882,329.  Instead, Citi Energy calculated a Close-out Amount under the LBCS-Energy Agreement resulting in a net claim by Citi Energy in the amount of $10,714,350.

376.   As a direct and proximate result of Citi Energy's breach of the LBCS-Energy Agreement, LBCS has been deprived of $13,596,679.

-116-

## COUNT XXVIII

### (Objection to Claim Under LBCS-Global ISDA Agreement)

377.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

378.    The LBCS-Global ISDA Claim is not a valid claim against LBCS because

the calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  On information and belief, Citi Global

engaged in improper conduct similar to that described above, by wrongly delaying its close-out

valuations until after the early termination date, improperly charging add-ons, failing to net

identical or substantially similar trades, and not valuing the trades under the LBCS-Global ISDA

Agreement using commercially reasonable procedures.

379.    The LBCS-Global ISDA Claim should be reduced to $4,748,516.

Plaintiffs hereby expressly reserve the right to further object to the LBCS-Global ISDA Claim,

or any other claims filed by Citi Global, on any other basis.

## COUNT XXIX

### (Objection to Claim Under LBCS-Global EFET Agreement)

380.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

381.    The LBCS-Global EFET Claim is not a valid claim against LBCS because

the calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  As described above, Citi Global wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-

-117-

ons, failed to net identical or substantially similar trades, and did not value the trades under the

LBCS-Global EFET Agreement using commercially reasonable procedures.

382.    The LBCS-Global EFET Claim should be disallowed and expunged.

Plaintiffs hereby expressly reserve the right to further object to the LBCS-Global EFET Claim,

or any other claims filed by Citi Global, on any other basis.

## **COUNT XXX**

### **(Breach of LBCS-Global EFET Agreement)**

383.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

384.    Citi Global breached the LBCS-Global EFET Agreement by calculating

the Settlement Amount under the LBCS-Global EFET Agreement in bad faith and using

commercially unreasonable procedures that produced a commercially unreasonable result wholly

unrelated to its actual economic damages.

385.    Under the LBCS-Global EFET Agreement, Citi Global was required to

pay LBCS for any net gains it enjoyed as a result of termination.  A commercially reasonable

calculation of the Gains and Losses under the LBCS-Global EFET Agreement would have

resulted in a net payment to LBCS in the amount of $57,287.  Instead, Citi Global calculated a

Settlement Amount under the LBCS-Global EFET Agreement resulting in a net claim by Citi

Global in the amount of $716,281.

386.    As a direct and proximate result of Citi Global's breach of the LBCS-

Global EFET Agreement, LBCS has been deprived of $773,568.

## COUNT XXXI

### (Objection to Claim Under LBSF-Swapco Agreement)

387.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

388.    The LBSF-Swapco Claim is not a valid claim against LBSF because the

calculation of such claim is not commercially reasonable, is overstated, was not calculated in

good faith, and produced a commercially unreasonable result that was far in excess of the

economic equivalent of the terminated transactions.  As described above, Citi Swapco wrongly

delayed its close-out valuations until after the early termination date, improperly charged add-

ons, failed to net identical or substantially similar trades, and did not value the trades under the

LBSF-Swapco Agreement using commercially reasonable procedures.

389.    The LBSF-Swapco Claim should be disallowed and expunged.  Plaintiffs

hereby expressly reserve the right to further object to the LBSF-Swapco Claim, or any other

claims filed by Citi Swapco, on any other basis.

## COUNT XXXII

### (Breach of LBSF-Swapco Agreement)

390.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated

herein.

391.    Citi Swapco breached the LBSF-Swapco Agreement by calculating the

Close-out Amount under the LBSF-Swapco Agreement in bad faith and using commercially

unreasonable procedures that produced a commercially unreasonable result wholly unrelated to

its actual economic damages.

392.    Under the LBSF-Swapco Agreement, Citi Swapco was required to pay

LBSF for any net gains it enjoyed as a result of termination.  A commercially reasonable

-119-

calculation of the Close-out Amount under the LBSF-Swapco Agreement would have resulted in a net payment to LBSF in the amount of $1,828,824. Instead, Citi Swapco calculated a Close-out Amount under the LBSF-Swapco Agreement resulting in a net claim by Citi Swapco in the amount of $991,772.

393.    As a direct and proximate result of Citi Swapco's breach of the LBSF-Swapco Agreement, LBSF has been deprived of $2,820,596.

## COUNT XXXIII

### (Objection to Claim Against LBCC for Purported Fees and Charges Under CLS Agreement)

394.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

395.    In its proof of claim number 67734, *i.e.*, the LBCC-Citibank Claim, Citibank claims a right to approximately $1.3 million in fees and charges purportedly arising under the parties' CLS Agreement (the "LBCC CLS Claim").

396.    The parties' CLS Agreement does not provide or allow for the fees and charges claimed by Citibank against LBCC. The LBCC CLS Claim should be disallowed and expunged, or in the alternative, reduced.

397.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XXXIV

### (Objection to Claim Against LBSF for Purported Fees and Charges Under CLS Agreement)

398.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

-120-

399.    In its proof of claim number 67733, *i.e.*, the LBSF-Citibank Claim, Citibank claims a right to approximately $700,000 in fees and charges purportedly arising under the parties' CLS Agreement (the "LBSF CLS Claim").

400.    The parties' CLS Agreement does not provide or allow for the fees and charges claimed by Citibank against LBSF.  The LBSF CLS Claim should be disallowed and expunged, or in the alternative, reduced.

401.    Plaintiffs hereby expressly reserve the right to further object to this claim, or any other claims filed by Defendants, on any other basis.

## COUNT XXXV

**(Breach of Agreement by Citibank With Respect to $9.8 Million Owed to LBSF)**

402.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

403.    On September 15, 2008, Citibank, purportedly acting as LBSF's CLS agent, transferred $9.8 million out of LBSF's CLS account without authorization from LBSF and without any other legitimate basis.  Upon information and belief, Citibank subsequently transferred that $9.8 million to its affiliate, Citi Global.

404.    Citi Global has claimed in its response to the Court-ordered Derivative Questionnaire that Citi Global owes a "cash break" to LBSF of $9.8 million, with identification number C61F00856, under the LBSF-Global Agreement.  In fact, that amount is owed by Citibank to LBSF pursuant to the parties' CLS Agreement and/or related agreements.  As a result of Citibank's unauthorized transfer of those funds, in its purported role as CLS agent, Citibank owes the $9.8 million to LBSF.

405.    As a result of the foregoing breach of the CLS Agreement and/or related agreements by Citibank, LBSF has been harmed in an amount not less than $9.8 million.

-121-

## COUNT XXXVI

### (Conversion With Respect to $9.8 Million Owed to LBSF)

406.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

407.    For all of the reasons discussed above, Citibank had no right to transfer $9.8 million from LBSF's account.

408.    As a result of the foregoing, LBSF is entitled to damages to compensate its creditors for Citibank's unauthorized transfer of $9.8 million from LBSF's account.

## COUNT XXXVII

### (Turnover With Respect to $9.8 Million Owed to LBSF)

409.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

410.    As discussed above, Citibank retained possession, custody and/or control of $9.8 million of LBSF's funds, which is of substantial value and benefit to LBSF's estate and which is property belonging to LBSF that may be used, sold or leased by LBSF.  For the reasons set forth above, Citibank is not entitled to set off amounts it claims LBSF owes to it against LBSF's $9.8 million.  Nor does Citibank have any right to otherwise withhold the $9.8 million.

411.    Citibank should be ordered to turn over $9.8 million to LBSF immediately for the benefit of LBSF's unsecured creditors, plus interest, pursuant to Section 542 of the Bankruptcy Code.

## COUNT XXXVIII

### (In the Alternative, Breach of the LBSF-Global Agreement)

412.    Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

-122-

413.     In the alternative, as a result of the above-described conduct, Citi Global has breached the LBSF-Global Agreement through its failure to pay LBSF the $9.8 million that was wrongfully transferred by Citibank to Citi Global.  LBSF has thereby been damaged by Citi Global in an amount not less than $9.8 million.

## COUNT XXXIX

### (Equitable Subordination)

414.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

415.     The equities in this case dictate that the amounts Lehman allegedly owes to Citi pursuant to the LBSF-Canyon Claim, LBSF-Citibank Claim, LBSF-Financial Claim, LBSF-Global Claim, LBCC-Citibank Claim, LBCS-Energy Claim, LBCS-Global ISDA Claim, LBCS-Global EFET Claim, and LBSF-Swapco Claim (collectively, the "Citi Derivatives Claims") should be subordinated to the claims of all of Lehman's other creditors under 11 U.S.C. § 510(c).  Such equitable subordination is necessary because Citi's inequitable conduct provided Citi with an unfair advantage and resulted in an injury to Lehman's other creditors.

416.     Citi engaged in inequitable conduct, including: opportunistically calculating some of the Citi Derivatives Claims as of dates other than the Early Termination Date under the relevant Master Agreements; including amounts in the Citi Derivatives Claims for Hypothetical Charges that are penalties and do not correspond to any actual losses incurred by Citi; and calculating many of the Citi Derivatives Claims without employing market standard procedures of portfolio aggregation.  This inequitable conduct inflated the Citi Derivatives Claims, thus harming Lehman's other creditors.

417.     Equitable subordination of the Citi Derivatives Claims is consistent with the Bankruptcy Code.

418.    Accordingly, the Citi Derivatives Claims should be equitably subordinated

to the claims of all other creditors pursuant to section 510(c) of the Bankruptcy Code.

[*Remainder of Page Intentionally Left Blank*]

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment:

    a.  Awarding LBHI damages against Citibank in an amount not less than $2.5 billion, or in the alternative, ordering Citibank to return the $2.5 billion of LBHI funds to the estate;

    b.  Avoiding the September Amendment as a fraudulent obligation;

    c.  Disallowing and/or reducing Citibank's claims against LBHI to the extent they assert rights against the $2 billion, are based on the September Amendment, are based on any of the Master Agreement claims objected to herein, seek the payment of the millions of dollars of fees allegedly incurred by the Lehman entities under the CLS Agreement, or seek payment of post-petition interest;

    d.  Awarding LBCC millions of dollars in damages against Citibank based on Citibank's wrongful withholding of LBCC's approximately $166 million, and awarding further damages based on Citibank's continued wrongful withholding of $38.5 million owed to LBCC;

    e.  Disallowing the claims of Citibank against LBHI and/or LBCC unless and until Citibank has turned over to LBHI and/or LBCC, respectively, the value of any property recoverable under sections 542 or 550 of the Bankruptcy Code;

    f.  Sustaining the Plaintiffs' objections to the LBSF-Canyon Claim, the LBSF-Citibank Claim, the LBSF-Financial Claim, the LBSF-Global Claim, the LBCC-Citibank Claim, the LBCS-Energy Claim, the LBCS-Global ISDA Claim, the LBCS-Global EFET Claim, and the LBSF-Swapco Claim, and reducing or disallowing and expunging such claims as set forth herein;

    g.  Determining that Citi has breached the LBSF-Canyon Agreement, the LBSF-Citibank Agreement, the LBSF-Financial Agreement, the LBCC-Citibank Agreement, the LBCS-Energy Agreement, the LBCS-Global EFET Agreement, and the LBSF-Swapco Agreement and owe the Lehman Subsidiaries damages in the amounts set forth herein;

    h.  Sustaining the Plaintiffs' objections to the LBCC CLS Claim and the LBSF CLS Claim, and reducing or disallowing and expunging such claims as set forth herein;

    i.  Awarding LBSF damages in an amount not less than $9.8 million as a result of Citibank's breach of the CLS Agreement;

j.   Equitably subordinating the Citi Derivatives Claims to the claims of all
other creditors pursuant to section 510(c) of the Bankruptcy Code;

k.   Awarding statutory interest, as well as costs and disbursements of this
action and attorneys' fees; and

l.   Awarding such other relief as this Court deems just and proper.


*[Remainder of Page Intentionally Left Blank.]*

Dated:  January 29, 2014
New York, New York

Respectfully submitted,


**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**
By: */s/ Turner P. Smith*_____
Turner P. Smith
L.P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178
(212) 696-6000

*Counsel for Plaintiffs*


**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
By: */s/ Andrew J. Rossman*_____
Daniel P. Cunningham
Andrew J. Rossman
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Benjamin Odell
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

*Special Counsel for Intervenor-Plaintiff,
Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc.*

-127-

# Exhibit B

Brad S. Karp
Claudia L. Hammerman
Stephen J. Shimshak
Douglas R. Davis
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global Markets Ltd.,*
*Citigroup Financial Products Inc., Citigroup Energy Inc.,*
*Citi Canyon Ltd. and Citi Swapco Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>               Debtors. | Chapter 11<br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,<br><br>               Plaintiffs and<br>               Plaintiff Intervenor<br><br>        - against -<br><br>CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC., CITI CANYON LTD., CITI SWAPCO INC., FYI LTD., FFI FUND LTD., and OLIFANT FUND, LTC.,<br><br>               Defendants. | Adversary Proceeding<br>No. 12-01044 (SCC)<br><br><br>**ANSWER TO SECOND AMENDED COMPLAINT AND RESPONSE TO CLAIMS OBJECTION** |

Defendants Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd. ("CGML"), Citigroup Financial Products Inc. ("CFPI"), Citigroup Energy Inc. ("Citi Energy"), Citi Canyon Ltd. ("Citi Canyon"), and Citi Swapco Inc. ("Citi Swapco," and together with Citibank, CGML, CFPI and Citi Energy, "Citi"), by their attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP, hereby answer the Second Amended Complaint and Claims Objection (the "SAC") of plaintiffs Lehman Brothers Holdings Inc. ("LBHI," and together with its subsidiaries and affiliates, "Lehman"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Commercial Corp. ("LBCC"), and the Official Committee of Unsecured Creditors of LBHI, and state as follows:

## INTRODUCTION

Filed more than a year after the First Amended Complaint and mere days before the deadline for "substantial completion" of document discovery, plaintiffs' Second Amended Complaint makes exceedingly modest changes. Despite the vast amount of additional discovery, plaintiffs fail to address any of the fatal deficiencies in their central claims against Citi, which deficiencies have been explained – repeatedly, in detail, and with citation to contemporaneous documents – in the Answers that Citi has filed to plaintiffs' original Complaint and First Amended Complaint.

The centerpiece of the original Complaint was LBHI's attempt to recover from Citibank (i) a $2 billion deposit LBHI made on June 12, 2008, and (ii) a $500 million transfer LBHI made to Lehman Brothers, Inc. ("LBI") on September 14, 2008. As pointed out in Citi's Answer, Anton R. Valukas, the Lehman Examiner, exhaustively investigated both transactions (reviewing millions of pages of documents and interviewing scores of witnesses) and specifically

concluded that LBHI had no colorable claim with respect to either transaction.  Citi's Answer

quoted at length from the documents supporting the Examiner's conclusions on these two points

– many of which come from LBHI's own files and are publicly available (hyperlinked to the

citations in his Report), yet were completely ignored in the Complaint.  Neither the First

Amended Complaint nor the Second Amended Complaint contain a single additional allegation

with respect to the $2 billion deposit or the $500 million transfer and both simply ignore the

contemporaneous documents that fatally undermine their claims.

       The original Complaint also purported to object to Citi's $1.9 billion of

derivatives claims, asserting that these were overstated "by over $1 billion."  Without receiving

any additional information with respect to these claims, plaintiffs filed a First Amended

Complaint in which they "doubled down" – quite literally – on their claim objection, perhaps

because Citi's Answer had made clear that plaintiffs had no hope of prevailing on their claims

with respect to the $2 billion deposit or $500 million transfer.  The First Amended Complaint

alleged that Citi's derivatives claims were overstated by more than $2 billion, such that Citi in

fact owed Lehman over $200 million for the terminated trades.  While plaintiffs' original

contention of more than 50% inflation by Citi was not remotely credible, the revised contention

of more than 100% inflation was simply absurd.  As demonstrated (in considerable detail) in

defendants' Answer to the First Amended Complaint, the only way plaintiffs can meaningfully

reduce Citi's derivatives claims is by advancing unprecedented – indeed, outlandish – arguments

directly contradicted by the industry-standard liquidated damages provisions in the parties' ISDA

agreements, publicly available derivatives market data, longstanding industry practice, and

established law.  The Second Amended Complaint addresses none of these deficiencies but

simply repeats – wholesale and without a single edit – the baseless arguments in the First

Amended Complaint.  If anything, these unedited derivatives allegations – presumably, plaintiffs' "best shot" at impugning Citi's derivatives claims – confirm that Citi calculated its derivatives claims in good faith, in a commercially reasonable manner, and consistent with the governing contracts and applicable law.

The original Complaint also sought to avoid an amendment to a guaranty LBHI executed on September 9, 2008 (the "September Amendment").  Citi's Answer showed that this claim, too, lacks merit.  The September Amendment was executed to induce Citibank to continue extending billions of dollars of credit to clear foreign exchange and other transactions for LBI and other newly-guaranteed subsidiaries, and thus is insulated from avoidance by the safe harbors and, in any event, supported by reasonably equivalent value.  Plaintiffs' First and Second Amended Complaints do not offer a single additional allegation in support of this claim.  In all events, given Citibank's extensive and successful efforts to recover from LBI (the primary obligor) and others, the benefit to plaintiffs from avoiding the September Amendment is not appreciable.

Finally, the original Complaint (and First Amended Complaint) sought to collect a $200 million obligation allegedly due to LBCC.  Citi's Answer admitted owing approximately $198 million (subject to available setoffs) with respect to LBCC trades, but explained (as plaintiffs well knew) that because LBI may have a competing claim to these funds, Citi required consent from LBI before it could pay the amount to LBCC (to avoid the risk of having to pay the debt twice) as well as plaintiffs' general agreement to Citi's calculation of amounts due.  After Citi concluded a global settlement with LBI in which LBI released any claim to these funds, the parties were able to reach agreement, in May 2013, resolving the majority of these issues.  Under the agreement, Citi paid LBCC $167 million and the parties reserved their rights with respect to

3

Citi's claimed setoff rights as well as certain minor aspects of Citi's calculations.  Virtually all of

the substantive changes in the Second Amended Complaint relate to this agreement and the

much-narrowed areas that remain in dispute.

**$2 Billion Deposit:**  The Second Amended Complaint (like the original and First

Amended Complaint) alleges that the $2 billion deposit was created as a "segregated," "special

purpose account" solely for clearing exposure; thus, LBHI contends, Citibank cannot use the

LBHI deposit to set off against non-clearing exposures, such as the derivatives and loan claims

Citibank has filed in the LBHI bankruptcy, but must instead return the deposit to LBHI.  In point

of fact, the $2 billion deposit has none of the hallmarks of a "special account."  LBHI deposited

the $2 billion in an overnight call account with Citibank.  That account paid interest at Citibank's

overnight rate (Fed Funds target minus $1/8$), and the deposit was commingled with other Citibank

funds.  LBHI's own documents (cited in the Examiner's Report) confirm that LBHI considered

the deposit to be a "$2B term deposit, callable daily."[1]  The Examiner, who was specifically

charged with investigating the $2 billion deposit, never even discussed the possibility that the $2

billion deposit could be a "special account," even though the "special account" issue was being

actively litigated in the Bank of America adversary proceeding at the time.  To the contrary, the

Examiner's Report specifically contemplates that Citibank will set off its allowed derivative,

loan and other LBHI claims against the $2 billion deposit.  (Report at 1826–27.)  The $2 billion

deposit is indisputably a general deposit, available to Citibank to offset against general

obligations owed to it by LBHI, including Citibank's derivatives and loan claims.

---

[1]    *See* Report of Anton R. Valukas, Examiner, dated March 11, 2010 ("Report") at 1238 n.4616 (quoting LBEX-
AM 008660).

Not content to allege, without support, that the $2 billion is a "special purpose account," the Second Amended Complaint (like the First Amended Complaint and the original Complaint) further alleges that Citibank specifically agreed, during a conversation with LBHI on June 12, 2008, to waive its setoff rights in the account.  According to the Second Amended Complaint, "Citibank agreed to waive any right it may have had to apply the $2 billion, or any portion thereof, to general obligations of LBHI."  The Second Amended Complaint alleges that "LBHI's initial and continued reliance" on this waiver, in depositing and then not withdrawing the $2 billion over a three-month period, "was both reasonable and foreseeable to Citibank."  But the Second Amended Complaint (like the First Amended Complaint and the original Complaint) fails to provide even the most basic information about this supposed multi-billion-dollar waiver. For example, the Second Amended Complaint nowhere identifies who at Citibank allegedly agreed to such a waiver or who at LBHI allegedly heard and relied upon it.  Moreover, despite the fact that the parties have engaged in almost two years of document discovery, plaintiffs have neither produced nor pointed to a single document evidencing Citibank's alleged multibillion-dollar waiver of setoff rights.

The Examiner interviewed virtually everyone who participated in the conversations surrounding the $2 billion deposit; yet there is no mention in the Examiner's Report of Citibank's purported waiver of its setoff rights.  Indeed, the Examiner found, and LBHI's own documents cited in the Report demonstrate, the precise opposite:  "Citi officials informed Lehman that Citi believed it had a general right of offset against the $2 billion deposit." (Report at 1242.)  For example, an internal Lehman "Call Report" notes that Citibank made this clear in a conversation with LBHI's Treasurer on August 7, 2008, when the parties were discussing alternatives to the $2 billion deposit:  "Citi did point out that according to NY law,

5

Citi would have the right to offset deposits, but not securities which were not pledged." (*See* LBEX-DOCID 1035842, cited in Report at 1258 n.4722.)  Similarly, Emil Cornejo, an LBHI Treasury official and principal player in discussions surrounding the $2 billion deposit, describes the deposit as follows in an internal email:  "There is no agmt [agreement].  It is a callable deposit. . . .  Accdg [according] to ny law, citi has a right of offset." (*See* LBEX-DOCID 1078385, cited in Report at 1262 n.4742.)

In its answers to interrogatories propounded by Citi (but, again, not in its original, First Amended or Second Amended Complaint), LBHI has identified Paolo Tonucci and Ian Lowitt as the Lehman individuals it contends heard and relied on Citi's purported waiver.[2]  Both were interviewed by the Examiner and Tonucci has already testified under oath (in the Bank of America adversary proceeding) that he is not aware that Lehman ever requested a waiver of setoff rights when Lehman made this and other cash deposits with banks in 2008.[3]  For his part, Lowitt has already stated (in a recorded interview with Congress' Financial Crisis Inquiry Commission) that he does not recall being involved in discussions with Citi on June 12, 2008, about the $2 billion.[4]  As LBHI's own documents acknowledge and the testimony of its own witnesses make clear, LBHI's waiver claim is a contrivance.  Citibank never waived its setoff rights with respect to the $2 billion deposit and LBHI never relied (much less reasonably relied) on any purported waiver.

---

[2]    Lehman Pls.' Resps. and Objections to Defs.' First Set of Interrogs, Resp. 3.

[3]    Transcript of Evidentiary Hearing on Motions for Summary Judgment at 193:1–5, *Bank of Am., N.A.* v. *Lehman Bros. Special Fin. Inc.*, No. 08-13555-jmp (Bankr. S.D.N.Y. Feb. 1, 2010).

[4]    Interview by Fin. Crisis Inquiry Comm'n with Ian Lowitt (Aug. 25, 2010), *available at* http://cybercemetery.unt.edu/archive/fcic/20110310171826/http://fcic.gov/resource/interviews (last accessed February 13, 2013).

**$500 Million Transfer:**  The Second Amended Complaint (like the original and First Amended Complaint) seeks to recover, as constructively or intentionally fraudulent, a $500 million transfer LBHI made to LBI on September 14, 2008.  LBHI contends it can recover this amount from Citibank as a "subsequent transferee" under Section 550 of the Bankruptcy Code because Citibank set off $1 billion of LBI obligations against a $1 billion LBI deposit that supposedly contained the $500 million originally transferred from LBHI.  In fact, the transfer is not avoidable and, in all events, it cannot be recovered from Citibank.

The Examiner specifically investigated this transfer and concluded that it was safe harbored.  Although conveniently omitted from the Second Amended Complaint (as it was from the original and First Amended Complaint), LBHI documents cited in the Examiner's Report demonstrate that LBHI made the $500 million transfer so that LBI could fund its obligations in connection with settling foreign exchange trades through the Continuous Linked Settlement ("CLS") system.  (*See* LBEX DOCID 457630, cited in Report at 1282 n.4852.)  The Examiner therefore concluded that the $500 million transfer, if made on September 14 (the date alleged in the Amended Complaint), is safe harbored.  (Report at 1828.)  The Examiner never considered the question of intentional fraud, doubtless because there is no conceivable factual basis for such a claim; none is offered in the Second Amended Complaint, notwithstanding plaintiffs' obligation to plead intentional fraud with particularity and the extensive document discovery plaintiffs have undertaken for almost two years.  To the contrary, the contemporaneous documents make clear that LBHI made the $500 million transfer to preserve the value of its subsidiary in anticipation of an eventual sale for the benefit of creditors, not to defraud them.  In all events, the $500 million transfer cannot be recovered from Citibank.  Putting aside the fact that only a portion of the $500 million was actually used to fund the $1 billion deposit, Citibank

7

is not a "subsequent transferee" from which a fraudulent transfer can be recovered because a setoff is not a "transfer" under the Bankruptcy Code.

**Derivatives Objection:** The Second Amended Complaint (like the First Amended Complaint) reflects plaintiffs decision to "double down" on its derivatives claim objection, alleging that Citi has overstated its $1.9 billion of derivatives claims by more than $2 billion, such that Citi actually owes Lehman over $200 million for the terminated trades. In fact, Citi closed out its more than 30,000 derivatives trades (with a combined notional amount of $1.18 trillion) in good faith, in a commercially reasonable manner, and fully consistent with the governing contracts and applicable law; further, Citi's valuations are amply supported by available data. The principal arguments plaintiffs make with respect to Citi's derivatives valuations (repeated verbatim in the Second Amended Complaint) are directly contrary to the governing contracts, longstanding industry practice, and applicable law. These arguments fall into three main categories.

*First*, plaintiffs argue that unless Citi actually replaced a specific terminated trade at the time of the close-out, Citi can only recover the mid-market value – as opposed to the replacement value – of the terminated trades. This limitation is precisely contrary to, and effectively rewrites, the terms of the parties' ISDA agreements. Those agreements expressly provide that the non-defaulting party can claim the replacement cost of the terminated trades, whether or not replacement transactions were actually executed.[5] Replacement cost is not only

---

[5]   The Close-out Amount method (which applies to most of the ISDAs) expressly provides that the non-defaulting party shall calculate "losses or costs. . . *that are or would be incurred under then prevailing circumstances . . . in replacing,* or in providing . . . the economic equivalent of . . . the material terms of that Terminated Transaction or group of Terminated Transactions . . . ." 2002 ISDA Master Agreement § 14 (emphasis added). By contrast, the 2002 ISDA Master Agreement provides that only in rare circumstances – specifically, when a contract has been terminated due to force majeure or illegality – will the Close-out Amount be calculated as the mid-market value. *See id.* § 6(e)(ii)(3).

what Citi is entitled to under the ISDA's liquidated damages provision; it also corresponds

directly to Citi's "actual damages" in that it reflects the amount Citi would have to pay to replace

what was lost as a result of Lehman's default and thus provide Citi with the benefit of its

bargain. Replacement value necessarily includes cost components above mid-market –

specifically, bid/offer charges and liquidity premiums for large-sized trades – that a party would

have to pay in the market to enter into new trades. While plaintiffs derisively label these

elements of Citi's derivatives claim as "Hypothetical Charges," these charges are very real; they

are charged by all dealers in the OTC derivatives markets to compensate for transaction costs

and risks and they are a critical component of any close-out valuation, whether or not a

replacement trade was actually executed. Indeed, it would be commercially *unreasonable* to

require the non-defaulting party to actually replace all terminated trades at the time of close-out

as a condition to recovering benefit-of-the-bargain damages. A non-defaulting party may be

unable to enter into replacement trades at close-out for any number of reasons, including the

sheer number and size of trades to be closed out, the illiquid nature of particular trades, or the

lack of funds to enter into costly replacements. Further, a rule that required counterparties to

enter into replacement trades to recover benefit-of-the-bargain damages would be contrary to the

interests of all future debtors and their creditors. In the face of such a rule, counterparties would

overrun the market, seeking to transact at almost any price. The increased demand would,

without question, move the market and substantially *increase* the derivatives claims against the

defaulting party. Had Citi gone to the market to replace all of its 30,000 derivatives trades, Citi's

derivatives claims would almost certainly be substantially higher than its claims today.

Consistent with the terms of the industry-standard agreement, longstanding industry practice, and

applicable law, Citi is properly claiming the replacement cost of its terminated trades, without regard to whether Citi actually executed replacements at the time of the close-out.

**Second**, plaintiffs contend that Citi inflated its derivatives claim by failing to net offsetting positions. In fact, Citi appropriately netted offsetting positions, thereby reducing its net derivatives claim by hundreds of millions of dollars. To the extent Citi overlooked any such offsetting positions in calculating the value of its more than 30,000 trades, Citi will correct the error. But plaintiffs are not really concerned with "offsetting" trades; instead, they argue that Citi should have netted entirely *dissimilar* trades on the theory that their prices moved in a correlated fashion. For example, plaintiffs argue that Citi should have netted credit default swaps referencing two different high-yield indices, on the theory that these indices track 72 common reference entities and the prices of the different indices tended to move in a correlated fashion. But 28 reference entities – or more than a quarter of the names – in each index are different and thus netting the two indices is not commercially reasonable because it would have left Citi with substantial uncompensated risk. Even more ludicrous, however, is plaintiffs' argument that Citi should have netted *all* of its credit default swaps referencing RMBS, on the theory that all RMBS are "based on pools of mortgages that had similar economic characteristics" – *i.e.*, subprime or Alt-A residential mortgages – and, according to plaintiffs, "the overall price movement between [Citi's] buys and sells" of protection on RMBS were "highly correlated." This argument is specious. Credit default swaps protect against the default of a particular reference entity. The fact that prices for credit default protection on different reference entities might move in a correlated fashion has no bearing whatsoever on whether a party would be left in a neutral risk position if it netted a sale of protection on one reference entity against a buy of protection on another. To pick an obvious example, the price of credit

10

protection on U.S. broker-dealers tended to move in a highly correlated fashion, as demonstrated

by the chart below, which graphs the price of credit protection for Lehman, Goldman Sachs,

Morgan Stanley, and Merrill Lynch from August 2005 through August 2008.



Yet, a party that, on September 1, 2008, netted a five-year buy of protection on Lehman against a

five-year sale of protection on Merrill Lynch, certainly would not have been left in a neutral risk

position.  Similarly, RMBS are in no way interchangeable – some reference stronger mortgage

pools, some have more excess collateral, and some have defaulted while others have not.

Correlated price movements do not mean that risks are offsetting.  Citi appropriately netted

offsetting risk, and it would not be commercially reasonable to require Citi, or counterparties

generally, to go further and accept significant uncompensated risk solely to benefit the defaulting

party.

        ***Third***, plaintiffs complain that Citi improperly inflated its derivatives claims by

"opportunistically selecting highly favorable valuation dates and times."  Specifically, plaintiffs

complain that Citi valued most of its credit trades on September 16, 2008 – the day after the

termination date – allegedly in violation of the parties' contracts and bankruptcy law.  In fact, the

ISDA contracts did not require Citi to value all of its trades as of the termination date if it was

not commercially reasonable to do so. The legislative history of Section 562 of the Bankruptcy

Code also specifically acknowledges that a counterparty may not be able to value a large

portfolio on a single day. Citi had 19,000 credit trades to close out and, to permit time for

effective organization and coordination across businesses and desks, most were closed out on

September 16, 2008. This was clearly commercially reasonable and, in all events, plaintiffs

allege that the one-day delay "inflated" Citi's claim by $48 million – a relatively small amount

in comparison to Citi's $1.9 billion of claims. Plaintiffs' other main "timing" complaint,

ironically, concerns Citi's close-out of its generic U.S. dollar interest rate derivatives on

September 15, 2008. While these interest rate trades were closed out on the termination date,

plaintiffs are unhappy with the time of day Citi chose. Citi's close-out time was approximately

8:30 am, but plaintiffs argue Citi should have valued these trades as of "the typical end-of-day

time of 3:00 pm," which, due to the exceptional volatility that day, would decrease Citi's claim

by more than $100 million. But nothing in the ISDA agreements or bankruptcy law requires Citi

to value its trades at the time of day most favorable to the defaulting party. Moreover, there is

nothing "typical" about 3:00 pm when, under the Derivatives Settlement Framework that

Lehman developed and used to settle the claims of its largest bank counterparties, interest rate

trades are valued as of 11:00 am, not 3:00 pm. If Citi's interest rate trades had been valued at

11:00 am – rather than 8:30 am – Citi's claim would, in fact, *increase* by more than $14 million.

Citi's various derivatives businesses organized the close-out process in good faith and in the way

they considered commercially reasonable for the respective businesses, closing out the various

trades as soon as reasonably practicable. Plaintiffs' complaints on this score, too, are meritless.

**September Amendment:** The Second Amended Complaint (like the original and First Amended Complaint) seeks to avoid the September Amendment as constructively and intentionally fraudulent.  The Examiner concluded that there was a colorable claim to avoid the September Amendment as a constructive fraudulent transfer only if a court were to adopt both a narrow construction of the safe harbors and a narrow view of the direct and indirect benefits accruing to LBHI.  But, a narrow construction of the safe harbors that would protect "transfers" but not "obligations" (which "obligations," of course, include derivatives contracts themselves) is not tenable as applied to the September Amendment.[6]  Nor is a definition of "indirect benefit" that fails to credit the value LBHI obtained in securing time to attempt to negotiate a transformative transaction, such as the one almost achieved in this case.  The Examiner, again, never even considered the question of intentional fraud and there is no conceivable factual basis to support it; none is offered in the Second Amended Complaint, notwithstanding plaintiffs' obligation to plead intentional fraud with particularity and the extensive document discovery plaintiffs have engaged in for almost two years.  In all events, the benefit to the estate from avoiding the September Amendment would not be appreciable, given Citibank's successful efforts to recover from LBI (the primary obligor) and others.

**$200 Million Obligation:** The original and First Amended Complaint sought to recover a $200 million payable allegedly owed to LBCC with respect to CLS.  The Second Amended

---

[6]    We recognize that this Court's decision in *LBHI* v. *JPMorgan Chase Bank, N.A. (In re LBHI)*, Adv. Proc. No. 10-03266 (Bankr. S.D.N.Y. Apr. 19, 2012), suggests that Section 546(e) of the Bankruptcy Code does not protect the incurrence of "obligations" to the same extent as "transfers."  We respectfully submit that the safe harbor provisions of Section 546 apply to the September Amendment, either by directly insulating the September Amendment from avoidance, or indirectly by protecting the individual transactions to which the Amendment applied.  Further, no matter how narrowly Sections 546 and 548(a)(1)(B) are construed, neither limits the applicability of the safe harbor in Section 560, which provides that Citibank's ability to exercise its contractual rights under the September Amendment to offset amounts it is owed in connection with swap agreements, "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title."  11 U.S.C. § 560 (2006).

Complaint, by contrast, has been updated to reflect the parties' May 2013 agreement resolving most of the issues with respect to this payable as well as Citi's CLS-related calculations. Under the parties' agreement, Citi paid LBCC $167 million with respect to CLS, Citi held back $32 million (the "LBCC holdback") to preserve its setoff rights against LBCC, and plaintiffs reserved the right to contest Citi's setoff rights as well as certain minor aspects of Citi's CLS-related calculations.[7] Ironically, the narrowing of the dispute has led to a proliferation of new counts in the Second Amended Complaint addressing the limited issues reserved in the 2013 agreement. As to those issues, Citi has a clear right to set off the remaining debt owed to LBCC against LBCC debts owed to Citi; further, Citi's CLS-related calculations are appropriate.[8]

## SPECIFIC RESPONSES

1.    Defendants deny the allegations in paragraph 1 of the SAC, except admit that LBHI deposited approximately $2 billion in cash with Citibank on or about June 12, 2008, and that defendants have filed claims totaling more than $2.2 billion against the Lehman estates. Defendants further admit that Citibank takes the position that it has the right under New York statutory and common law, applicable contractual provisions, the relevant safe harbor provisions and Section 553 of the Bankruptcy Code, to set off the $2 billion LBHI deposit against general obligations owing to it by LBHI.[9]

2.    Defendants deny the allegations in paragraph 2 of the SAC, except admit that defendants' derivatives claims total approximately $1.9 billion. Citi further states that it

---

[7]    Among other things, plaintiffs reserved the right to challenge approximately $6 million of Citi's calculation of amounts due to LBCC and approximately $10 million of Citi's calculation of amounts due from LBSF.

[8]    In the one new count unrelated to this agreement , plaintiffs object to Citibank's claim for post-petition interest against LBHI. Citibank, however, is an oversecured creditor and is therefore clearly entitled to post-petition interest from LBHI up to the value of its collateral.

[9]    In addition, defendants deny any and all averments in the headings of the SAC.

calculated its contractual damages arising from the sudden termination of over 30,000 Lehman-facing derivatives trades (with a combined notional amount of more than $1.18 trillion) in good faith, strictly in accordance with the industry-standard liquidated damages provision found in the parties' ISDA agreements.  Accordingly, Citi calculated the replacement cost for these terminated trades in a commercially reasonable manner, and as soon as reasonably practicable following Lehman's default.  To defeat Citi's commercially reasonable derivatives claims, plaintiffs have been forced to take extreme positions directly contrary to the governing contracts, longstanding industry practice, and governing law.  First, plaintiffs argue that unless Citi actually replaced a specific terminated trade at close-out, Citi can only recover the mid-market value – as opposed to the contractually mandated replacement value – of the terminated trades.  Second, plaintiffs argue that Citi should have netted trades that were not in fact offsetting.  Third, plaintiffs claim that Citi not only was required to close out all 30,000 trades on a single day (regardless of the organization and coordination required to do so in an efficient and effective manner), but was required to do so at the time of day most favorable to plaintiffs.  Versions of these three baseless arguments run through all of the derivatives allegations in the SAC, drive virtually all of the supposed "inflation" plaintiffs allege with respect to Citi's claims, and explain virtually all of the discrepancies plaintiffs depict in their many charts.

3.      Defendants deny the allegations in paragraph 3 of the SAC.  Defendants further state that, prior to Lehman's default, these more than 30,000 trades, with a combined notional amount of over $1.18 trillion, spanning all major OTC derivative products and markets worldwide, were substantially in-the-money for Citi.  Indeed, Lehman had posted over $700 million of margin for these trades, reflecting their mid-market value as of September 11, 2008.  Citi's claims of $1.9 billion with respect to these trades reflect both a substantial market move in

Citi's favor (which even plaintiffs concede) as well as the transaction costs (including bid/offer[10]

and liquidity[11] adjustments) necessary to arrive at the replacement value for these trades.

Moreover, Citi's $1.9 billion of derivatives claims is entirely consistent with the derivatives

exposure estimated by Citi's internal risk models (and shared with Citi's regulators) in the event

of a Lehman default.  From May 2008 to September 2008, Citi's standard risk metric for

predicting derivatives exposure upon a counterparty default estimated exposure of $1.6 billion to

$2.2 billion upon a Lehman default, with respect to LBSF alone.[12]

      4.     Defendants deny the allegations in paragraph 4 of the SAC, except admit

that the market moved substantially in Citi's favor from September 12 to September 15, 2008.

For example, the mid-market values that Citi recorded in its systems for just the Lehman-facing

credit trades[13] increased dramatically – jumping by more than $100 million from September 11

to 12 and jumping another $290 million from September 12 to 15, as reflected in the chart below.

---

[10]   The "bid/offer" spread refers to the difference between the price at which a dealer or other market participant will buy (the "bid") or sell (the "offer") a given position.  The width of the bid/offer spread is driven by the transaction costs associated with entering the trade and the amount of risk associated with buying or selling the position.  *See* Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions* 287 (4th ed. 2010).  Generally speaking, the greater the risk, the wider the bid/offer spread.  The "mid-market" value refers to the point between the bid and the offer price – it is not a price at which parties can actually transact in the market but, rather, a hypothetical value derived from actual market prices.

[11]   Dealers in the OTC derivatives market charge more to enter into trades that exceed the market standard size.  John C. Hull, *Risk Management and Financial Institutions* 448 (3d ed. 2012).  For trades above the standard size, dealers will increase the bid/offer spread.  *Id*.  As used in this answer, "liquidity premium" refers to the incremental cost of the increase in the bid/offer spread for a trade that is too large to buy or sell at a standard quoted bid/offer price.

[12]   This metric, referred to as "PSLE" (pre-settlement loan equivalent), is used by Citi to estimate its *expected* derivatives exposure upon a counterparty default.  Citi uses a separate risk metric, not discussed here, to estimate its maximum potential derivatives exposure upon a counterparty default.

[13]   As used in this Answer, "credit trades" refers to all credit default swaps ("CDS") between Citi and Lehman, including single-name and index CDS referencing corporate and sovereign debt, as well as CDS referencing securitized products, such as residential mortgage-backed securities ("RMBS") and collateralized debt obligations ("CDOs").  At the time of Lehman's bankruptcy, there were over 19,000 credit trades between Citi and Lehman.



It bears emphasizing that the system marks reflected in the chart were used generally across

Citi's derivatives portfolio to value all similar trades on those dates; these system values are in

no way specific to the Lehman portfolio.  The 25% increase in the mid-market value of the

Lehman-facing credit portfolio over a two-day period reflects the extreme volatility in the market

resulting from the financial crisis in general and Lehman's bankruptcy in particular.  This

volatility also explains why bid/offer spreads and other transaction costs widened over this

period and, in fact, stayed wide for months:  market participants were concerned about taking on

exposure – particularly, large or illiquid exposures – during this period of unprecedented

uncertainty.

     5.     Defendants deny the allegations in paragraph 5 and footnote 1 of the SAC.

Defendants further state that, even if Citi's $1.9 billion of claims is assumed to consist entirely of

transaction costs (when, in fact, a significant portion reflects an increase in mid-market values),

that would reflect only 0.16% of the combined notional amount of these trades of approximately

$1.18 trillion.  An aggregate bid/offer adjustment of 0.16% is facially reasonable, if not

conservative where, as here, Citi's claims include a large number of illiquid, bespoke, and

extremely large trades as well as an enormous purchase of credit protection on RMBS, during a

time of unprecedented market volatility.  In fact, the claim values Citi calculated are amply

supported by actual quotes, third-party market data, and the models and systems Citi uses in the

ordinary course of business – precisely the data the ISDA agreements direct parties to consult in

determining replacement cost.

6.      Defendants deny the allegations in paragraph 6 of the SAC, and refer to

Citi's public disclosures for their contents.

7.      Defendants deny the allegations in paragraph 7 of the SAC, and refer to

Citigroup Inc.'s Third Quarter 2008 Form 10-Q for its contents.  Defendants further state that

Citi's "fair value" estimates of derivatives positions, as reflected in Citigroup's disclosures, are

calculated in accordance with Financial Accounting Standards Board Statement of Financial

Accounting Standards No. 157 ("SFAS 157").  Contrary to plaintiffs' suggestion, the objectives

and requirements of SFAS 157 are entirely distinct from the objectives and requirements of

closing out derivatives transactions under an ISDA.

8.      Defendants deny the allegations in paragraph 8 of the SAC, except admit

that the majority of their derivatives trades facing Lehman were valued as of September 16,

2008, lack knowledge or information sufficient to form a belief about the valuation dates used by

other Lehman counterparties, and refer to the relevant contracts, Section 562 of the Bankruptcy

Code, and its legislative history for their contents.  Defendants further state that the relevant

contracts and bankruptcy law did not require Citi to value all 30,000 Lehman-facing trades as of

the termination date; instead, the relevant contracts provide that trades must be valued as of the

termination date "or, if that would not be commercially reasonable, as of the date or dates

following the [termination date] as would be commercially reasonable."  2002 ISDA Master

Agreement § 14 (definition "Close-out Amount").  Similarly, the legislative history of

18

Section 562 of the Bankruptcy Code specifically acknowledges that "in certain unusual
circumstances, such as . . . liquidation of very large portfolios, there may be no commercially
reasonable determinants of value . . . for liquidating all such agreements and contracts in a large
portfolio on a single day." H.R. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 134-35 (2005). Citi's
various derivatives businesses organized the close-out process in good faith and in the way each
considered commercially reasonable for the respective business, closing out the trades as soon as
reasonably practicable. Of the more than 30,000 Lehman-facing derivatives trades, Citi closed
out over 8,700 on September 15 (the termination date), over 18,600 on September 16, and over
2,600 on September 17, 2008, with only a relative few closed out thereafter.

        9.     Defendants deny the allegations in paragraph 9 of the SAC, except admit
that Citi is a market-maker with access to the interdealer market, and admit that Citi calculated
the replacement cost of the terminated trades even where, as in the majority of cases, Citi did not
execute a replacement trade at the close-out. Defendants further state that the liquidated
damages provisions in the relevant contracts expressly provide that the proper measure of
damages is the estimate of replacement costs "that are or would be incurred under then
prevailing circumstances." 2002 ISDA Master Agreement § 14 (definition "Close-out
Amount"). These replacement costs necessarily include bid/offer charges, as well as liquidity
adjustments for larger-sized trades. Plaintiffs' allegation that Citi could have avoided these
charges because it was "a market-maker with access to the inter-dealer market" is purely
fanciful. It is also specifically refuted by actual quotes in the interdealer market during the week
of September 15, 2008. For example, data from the GFI Group Inc. ("GFI")[14], a leading

---

[14]    GFI is a global provider of wholesale brokerage, clearing, execution, and trading support services, and a leading
interdealer broker of CDS. As such, GFI has access to one of the largest data sets of executable market pricing

interdealer broker for credit default swaps ("CDS"), clearly shows that bid/offer charges are in

fact quoted and paid even by large and sophisticated financial institutions in the interdealer

market.  In fact, were Citi to revalue its CDS trades using the quoted spreads found in the GFI

data, Citi's derivatives claims would have been *higher*, not lower.[15]  This interdealer market data

(which, upon information and belief, plaintiffs obtained years ago) corroborates that the bid/offer

adjustments Citi applied in calculating its claims were commercially reasonable under "then

prevailing circumstances."

   10. Defendants deny the allegations in paragraph 10 of the SAC.  Defendants

further state that whether or not Citi replaced a trade, replacement value is not only the

contractually mandated measure of damages, it is also, by definition, the measure of damages

required for Citi to obtain the benefit of its bargain.  Plaintiffs' essential theory – that, as a

market-maker with access to the interdealer market, Citi could have replaced the trades "at or

near mid-market" – is pure fiction and directly contradicted by readily available data from

interdealer brokers.  This same data refutes plaintiffs' contention that Citi "ballooned" its claims

by using bid/offer spreads "typically charged by market-makers to end users with limited market

access," instead of the supposedly advantageous prices available in the interdealer markets.  Had

Citi used the quoted spreads available from interdealer brokers such as GFI, Citi's claims would

have actually increased (*see supra* n.12).  Indeed, plaintiffs' theory that the interdealer market

---

in the interdealer market for CDS, including records of quotations and trades during the week of September 15, 2008.  This data can be obtained from GFI pursuant to a standard license agreement.

[15] GFI data contains two-sided quotes (*i.e.*, both a bid and an offer) for trades with the same or similar maturity to 1,422 trades in Citi's credit claim for which Citi's bid/offer charges are identified (using quotes that either match the maturity of a trade in Citi's claim, or come within one year of matching a trade in Citi's claim).  If these trades were revalued using the best (*i.e.*, most favorable to Lehman) GFI bid/offer spreads for standard-size trades, the bid/offer portion of Citi's claim (excluding any liquidity charges) would increase by $25.1 million – from $44.0 million to $69.1 million – or *an increase of over 57%*.  These numbers are, if anything, conservative.  Virtually all of the quotes in the GFI data are for trades with standard maturities (*i.e.*, five- and ten-year CDS).  The overwhelming majority of credit trades in Citi's claim were at nonstandard, comparatively less liquid maturities at the time of Lehman's default, and therefore would have been more costly to replace.

provides insider/wholesale prices whereas dealers always charge inflated retail prices to their

customers (*i.e.*, the end-user market), is simply not supported by available data.  For example, a

comparison of quotes from GFI, a leading interdealer broker for CDS, with pricing data from the

end-user market obtained from Credit Market Analysis Ltd. ("CMA"),[16] shows that the end-user

market had access to substantially *narrower* spreads than could be found in the interdealer

market during the week of September 15, 2008.[17]

       11.     Defendants deny the allegations in paragraph 11 of the SAC, and refer to

the quoted documents for their contents.  Defendants further state that, contrary to plaintiffs'

allegations, Citi did a substantial amount of netting (what plaintiffs sometimes refer to as

"aggregation") and consequently *reduced* its derivatives claims against Lehman by hundreds of

millions of dollars.  Indeed, it was Citi's objective to net all offsetting trades that existed under

any ISDA agreement; to the extent Citi has overlooked any such trades (where netting would

leave Citi in a neutral risk position) Citi will correct the error.  There is, in fact, no actual dispute

between the parties with respect to netting offsetting trades.  Rather, the dispute in this case

concerns plaintiffs' contention that Citi should have done substantially more netting, even as to

dissimilar trades, and, in the process, accepted uncompensated risks solely for purposes of

---

[16]    CMA is a leading provider of data to participants in the OTC derivatives market through its "Quotevision" and "Datavision" products.  Datavision is an aggregation service that collects, on a daily basis, quoted bids and offers from approximately 40 buy-side participants in the OTC derivatives market.  These participants represent some of the largest and most active credit investors, and include institutions across the U.S. and Europe, spanning the universe of credit hedge funds, as well as proprietary trading desks and credit correlation trading desks at tier 1 investment banks.  As a result, CMA is considered a leading provider of credible pricing data, and provides clients with end-of-day CDS bids and offers for over 1,000 reference entities based on actual quotes received from multiple sources.  This data can be obtained from CMA pursuant to a standard license agreement.

[17]    There are approximately 191 reference entities in Citi's claim (out of over 1,000 total corporate and sovereign reference entities) for which there are two-sided quotes available in both the GFI and CMA datasets from September 16, 2008 (using only five-year quotations in a running spread format to facilitate direct comparison).  The average bid/offer spread across these reference entities was 27.1 basis points ("bps") for GFI, but only 15.6 bps for CMA.  That is, the average bid/offer spread was almost twice as wide in the interdealer market.

diminishing its claims against Lehman – a position that has no support in the relevant contracts or applicable law.

12. Defendants deny the allegations in paragraph 12 of the SAC, except admit that Citi, Lehman, and funds controlled by Bracebridge Capital L.L.C. ("Bracebridge") consented to a trade collapse transaction that would have become effective on September 16, 2008 had Lehman not defaulted on September 15, 2008. Defendants further state that Lehman expressly agreed on September 15, 2008 that the proposed collapse transaction was null and void and the original trades between the parties remained in force. Plaintiffs' accusation that Citi is seeking to "resurrect" cancelled trades thus could not be further from the truth. Rather, it is plaintiffs who are improperly and opportunistically seeking to resurrect an abandoned transaction – the collapse transaction – to unjustly enrich the Lehman estate at Citi's expense. But this abandoned transaction is instructive with respect to the netting principles Citi applies in arm's-length transactions in the ordinary course of business. The netting contemplated by this proposed transaction was entirely consistent with the netting principles Citi applied in valuing the terminated derivatives trades:  trades had to be fully offsetting in *all* material terms so Citi would not be left with residual risk. The aggressive netting that plaintiffs advocate in the SAC is manifestly contrary to the way Citi conducts business in the ordinary course and is commercially unreasonable.

13. Defendants deny the allegations in paragraph 13 of the SAC, except admit that Citibank takes the position that it has the right under New York statutory and common law, applicable contractual provisions, and the relevant safe harbor provisions and Section 553 of the Bankruptcy Code, to set off the $2 billion LBHI deposit against general obligations owing to it by LBHI. Defendants further state that Citibank, pursuant to a stipulation between the parties,

22

has remitted $166,956,937 of the payable owed to LBCC, and that the remaining amount of the

LBCC payable is subject to setoff against the amount owing from LBCC to Citibank under the

ISDA Master Agreement between Citibank and LBCC arising from Citibank's early termination

of derivatives trades facing LBCC, plus interest and legal fees.

14.     Defendants deny the allegations in paragraph 14 of the SAC.  Defendants

further state that Citi's derivatives claims are consistent with exposure estimates generated by

Citi's internal risk models in the months leading up to Lehman's default.  The claims were

calculated in accordance with the parties' agreements and governing law and reflect the

estimated replacement cost of the terminated trades – the measure of damages necessary to

provide Citi with the benefit of its bargain.  In addition to its derivatives claims, Citibank asserts

the right to set off over $300 million of non-derivative claims against the $2 billion deposit under

applicable New York statutory and common law, relevant contractual provisions, and

Section 553 of the Bankruptcy Code.[18]  While disagreeing with Citibank's right of setoff,

plaintiffs' SAC does not otherwise object to these non-derivative claims.

15.     Defendants deny the allegations in paragraph 15 of the SAC, except admit

that plaintiffs seek the recovery of funds, the payment of funds, and the reduction or

disallowance of certain claims.

16.     Upon information and belief, Defendants admit the allegations in

paragraph 16 of the SAC.

17.     Upon information and belief, Defendants admit the allegations in

paragraph 17 of the SAC.

---

[18]   Citibank also asserts the right to set off certain guaranteed obligations of LBI (arising from foreign exchange
trades settled through CLS) on the same basis and by virtue of the safe harbors under the Bankruptcy Code.

18.     Upon information and belief, Defendants admit the allegations in paragraph 18 of the SAC.

19.     Upon information and belief, Defendants admit the allegations in paragraph 19 of the SAC.

20.     Upon information and belief, Defendants admit the allegations in paragraph 20 of the SAC.

21.     Defendants admit the allegations in paragraph 21 of the SAC.  Defendants further state that Citibank's main office, as set forth in its articles of association, is in Sioux Falls, South Dakota.

22.     Defendants admit the allegations in paragraph 22 of the SAC.

23.     Defendants admit the allegations in paragraph 23 of the SAC.

24.     Defendants admit the allegations in paragraph 24 of the SAC.

25.     Defendants admit the allegations in paragraph 25 of the SAC.

26.     Defendants admit the allegations in paragraph 26 of the SAC.

27.     Defendants admit the allegations in paragraph 27 of the SAC.

28.     Defendants admit the allegations in paragraph 28 of the SAC.

29.     Defendants admit that this is a core proceeding within the meaning of 28 U.S.C. § 157.

30.     Defendants admit that they have consented to the entry of a final order by the Bankruptcy Court, but deny the remaining allegations in paragraph 30 of the SAC. Defendants further state that pursuant to the parties' agreement, defendants have expressly preserved all of their appellate rights.

31.     Defendants admit the allegations in paragraph 31 of the SAC.

24

32.    Defendants admit the allegations in paragraph 32 of the SAC, except lack knowledge or information sufficient to form a belief as to whether Lehman was the fourth-largest investment bank in the United States.

33.    Defendants admit the allegations in paragraph 33 of the SAC, and refer to the CLS Agreement for its contents.

34.    Defendants admit the allegations in paragraph 34 of the SAC, except deny that Citibank "received tens of millions of dollars in fees from Lehman in exchange for providing" CLS services.

35.    Defendants deny the allegations in paragraph 35 of the SAC, except admit that Citibank extended credit to the Trading Subsidiaries by providing uncommitted intraday overdraft lines in connection with clearing and settling foreign exchange trades, admit that the Trading Subsidiaries regularly used these overdraft lines, and admit that the Trading Subsidiaries were obligated to eliminate any overdrafts by the end of the day and that, in the ordinary course, they would do so.  Defendants further state that these uncommitted overdraft lines were provided solely as an accommodation and could be withdrawn at any time in Citibank's sole discretion.

36.    Defendants deny the allegations in paragraph 36 of the SAC, except admit that Citibank performed CLS settlement and clearing services for LBI and LBCC from 2004 through 2008, and lack knowledge or information sufficient to form a belief as to whether "[t]he clearing services that Citibank provided to Lehman were vital to Lehman's ability to conduct its ordinary business operations."

37.    Defendants deny the allegations in paragraph 37 of the SAC, except admit that Citibank provided other clearing and settlement services (such as cash clearing and securities clearing around the world) to Lehman entities, including the Trading Subsidiaries,

25

admit that Citibank extended credit to these Lehman entities when it provided uncommitted

intraday overdraft lines in connection with those clearing and settlement services, and admit that

the Lehman entities regularly used these overdraft lines.  Defendants further state that the

Lehman entities were obligated to eliminate any overdrafts by the end of the day and that, in the

ordinary course, they would do so.  These uncommitted overdraft lines were provided solely as

an accommodation and could be withdrawn at any time in Citibank's sole discretion.

38.     Defendants deny the allegations in paragraph 38 of the SAC, except admit

that the 2004 Guaranty unconditionally guarantees the payment of all obligations of the specified

Lehman subsidiaries under any and all extensions of credit extended or maintained by any

Citigroup subsidiary, admit that LBI was not included as a guaranteed subsidiary under the 2004

Guaranty until the execution of the September Amendment, and refer to the 2004 Guaranty and

the September Amendment for their contents.  Defendants further state that by permitting

Lehman entities to incur overdrafts in connection with the clearing and settlement of their trades,

Citibank extended credit to such entities within the meaning of the 2004 Guaranty.

39.     Defendants deny the allegations in paragraph 39 of the SAC, except admit

generally the characterization of the financial markets following the collapse of Bear Stearns,

admit that Citibank has always been interested in the financial position and liquidity of its

broker-dealer customers, including Lehman, and admit that this interest intensified after the

collapse of Bear Stearns.

40.     Defendants deny the allegations in paragraph 40 of the SAC, except admit

that, on the morning of June 12, 2008, Citibank requested that LBHI deposit between $3–$5

billion with Citibank, admit that the request was made in light of the substantial exposure

Citibank had to LBHI and its subsidiaries, including, most prominently, the more than $19

26

billion of uncommitted intraday overdraft lines that Citibank, in its sole discretion, provided to

Lehman entities to facilitate the clearing and settlement of their trades, admit that the request was

made in the context of significant market uncertainty surrounding Lehman, and refer to the

quoted document for its contents.  Defendants further state that on June 9, 2008, Lehman

announced that it expected a $2.8 billion loss for the second quarter and, before the market

opened on June 12, 2008, Lehman announced it had replaced its Chief Financial Officer and

Chief Operating Officer.  The market responded very negatively to these and other

developments.  Over that week, Lehman's stock price fell dramatically, its usage of its intraday

overdraft lines at Citibank increased significantly and, on June 12, 2008, Citi received a record

number of novation requests from Lehman's counterparties seeking to get out of derivatives

trades facing Lehman.  On June 12, 2008, Citibank became concerned about accepting any

additional unsecured exposure to Lehman and a senior risk officer made the decision that Citi

traders should refuse these novation requests and that Citibank should lower the uncommitted

intraday overdraft lines it made available to Lehman entities.  That day, Citi requested that

Lehman keep some of its reported $45 billion in liquidity with Citibank to allay institutional

concerns about Lehman's credit.  Specifically, Citi requested that LBHI pledge $3–$5 billion of

cash to Citibank.  LBHI refused to pledge cash but agreed to deposit $2 billion in a call account

with Citibank's Risk Treasury desk.  The directive not to accept novations was reversed after the

$2 billion was received.

       41.      Defendants deny the allegations in paragraph 41 of the SAC, except admit

that, on June 12, 2008, discussions occurred among Citibank and LBHI executives, admit that

LBHI agreed to transfer $2 billion from its main demand deposit account ("DDA") at Citibank

into a time deposit account, callable daily, booked with Citibank's Risk Treasury desk, and refer

to the quoted document for its contents.  Defendants further state that the $2 billion deposit has

none of the hallmarks of a "special account."  LBHI never requested segregation of the $2 billion

and the $2 billion was never segregated; instead, the funds were commingled with Citibank Risk

Treasury's other funds in an account at Citibank's Nassau branch and earned interest at

Citibank's overnight rate (Fed Funds target minus $^{1}/_{8}$).  Time deposits and call accounts are

standard products in the Eurodollar market and LBHI routinely "sold" excess funds to Citibank's

Risk Treasury desk to earn overnight interest.  LBHI could withdraw the funds in the call

account on a same-day basis.  LBHI's own documents (cited in the Lehman Examiner's Report)

show that LBHI considered the deposit to be a "$2B term deposit, callable daily."  (*See* Report at

1238 n.4616 (quoting LBEX-AM 008660).)  A senior Citi risk officer did instruct the Risk

Treasury desk to notify him of any request by LBHI for a return of the $2 billion and that no

funds should be returned without his approval.  It was critical that Citi's risk officer be advised

of any such withdrawal request precisely because the availability of the $2 billion as a potential

setoff was a material consideration for Citi in determining the nature and amount of Lehman

exposure it was willing to accept.  If LBHI called the funds, Citi's risk officer would need to

determine what action, if any, to take with respect to Lehman's credit limits and whether to set

off any then-outstanding exposure before returning the funds to LBHI by the close of the

Fedwire that day.  Defendants further state that the Examiner, who was specifically charged with

investigating the $2 billion deposit, never even discussed the possibility that the $2 billion

deposit could be a "special account," even though the "special account" issue was being actively

litigated in the Bank of America adversary proceeding at the time.  The Examiner's Report

specifically contemplates that Citibank will set off its allowed derivative, loan, and other LBHI

28

claims against the $2 billion deposit.  (Report at 1826–27.)  The $2 billion deposit is plainly a

general deposit, available to Citibank to offset against general obligations owed to it by LBHI.

42.     Defendants deny the allegations in paragraph 42 of the SAC, except admit

that LBHI refused to pledge the $2 billion of cash it deposited in the call account at Citibank, and

refer to the quoted documents for their contents.  Defendants further state that Citibank never

agreed to waive its setoff rights with respect to the $2 billion deposit and LBHI was indisputably

aware that Citibank claimed setoff rights in the deposit.  As reflected in an internal Lehman "Call

Report" (cited by the Examiner), "Citi did point out" in an August 7, 2008 call with Lehman's

Treasurer discussing alternatives to the $2 billion deposit, "that according to NY law, Citi would

have the right to offset deposits, but not securities which were not pledged."  (*See* LBEX-

DOCID 1035842, cited in Report at 1258 n.4722.)  Lehman never objected to Citibank's stated

position that it had setoff rights in the deposit, much less assert that Citibank had expressly

waived any setoff rights.  Despite extensive document discovery in this proceeding, plaintiffs do

not provide any details or point to a single document supporting their position that Citibank

"knowingly relinquished" its setoff right with respect to the $2 billion deposit.  Indeed, on

September 13, 2008, when LBHI was trying to assess its liquidity position on the eve of

bankruptcy, Emil Cornejo, an LBHI Treasury official and principal player in discussions

surrounding the $2 billion deposit, stated in an internal email that the $2 billion is "a callable

deposit," but noted that "Accdg [according] to ny law, citi has a right of offset."  (*See* LBEX-

DOCID 1078385, cited in Report at 1262 n.4742.)  The SAC fails to identify who at Lehman

allegedly witnessed Citibank's purported waiver of setoff rights with respect to the $2 billion.  In

answer to interrogatories, however, plaintiffs have stated that they presently are aware of only

two individuals at Lehman who allegedly witnessed Citibank's purported waiver:  Paolo Tonucci

29

and Ian Lowitt.[19]   In fact, Mr. Tonucci testified in the Bank of America adversary proceeding

that, in the several instances in which banks requested deposits from Lehman in 2008 (including

a deposit in the billions of dollars), Tonucci was "not aware" that Lehman asked any bank to

waive its setoff rights with respect to those deposits, and was "not aware" of any request by

Lehman that those deposits be segregated from other funds.[20]   For his part, Mr. Lowitt has

previously told the staff of Congress's Financial Crisis Inquiry Commission that he "[did not]

recall being involved" in the June 12, 2008 discussions with Citibank concerning the $2 billion

deposit.   And in response to the question of whether he considered Citi's demand for the deposit

to be reasonable at the time, Lowitt answered:

> A:  Well I think that we, as a general matter often put money on deposit with
> different banks.  I mean, my sense of that deposit was it was just part of our
> liquidity pool that was on deposit with Citi; it didn't have, there weren't
> restrictions on it, and it certainly was a time where people were more nervous
> about exposure to Lehman, and while they were keen to be helpful, they also were
> looking, they were also focused on risk to a greater extent than possibly than they
> had been before.[21]

Plaintiffs' purported witnesses do not support – indeed, directly contradict – plaintiffs' claim that

Citi waived its setoff rights.

43.   Defendants deny the allegations in paragraph 43 of the SAC.  Defendants

further state that on June 12, 2008, LBHI agreed to transfer $2 billion from its main DDA at

Citibank into a time deposit, callable daily, with Citibank's Risk Treasury desk.  Two transfers

totaling $2 billion were made that day from LBHI's DDA account to a Citibank Risk Treasury

---

[19]   Lehman Pls.' Resps. and Objections to Defs.' First Set of Interrogs, Resp. 3.

[20]   Transcript of Evidentiary Hearing on Motions for Summary Judgment at 192:4-193:9, *Bank of Am, N.A.* v. *Lehman Bros. Special Fin. Inc.*, No. 08-13555-jmp (Bankr. S.D.N.Y. Feb. 1, 2010).

[21]   Interview by Fin. Crisis Inquiry Comm'n with Ian Lowitt (Aug. 25, 2010)  at 1:02:44, *available at* http://cybercemetery.unt.edu/archive/fcic/20110310171826/http://fcic.gov/resource/interviews (last accessed February 13, 2013).

account at Citibank's Nassau branch and Citibank's Risk Treasury desk booked two overnight

time deposits for LBHI that day.  Time deposits are a standard product in the Eurodollar market

in which the seller of funds (*i.e.*, Lehman) "sells" cash to the buyer of funds (*i.e.*, Citibank) for a

stated period at an agreed interest rate.  Because at that time onshore DDA accounts could not

pay interest, Lehman routinely "sold" excess funds to Citibank's Risk Treasury desk toward the

end of the day to earn overnight interest.  Indeed, Lehman did so over 190 times between

January 1, 2008 and June 11, 2008.  On June 13, 2008, the two time deposits were rolled into a

single LBHI call account of $2 billion booked with Citibank Risk Treasury at Citibank's Nassau

Branch.  Call accounts are also a standard product in the Eurodollar market, in which the seller

of funds earns interest on an overnight basis from the buyer; however, a call account has no

stated maturity and is not returned to the seller unless and until the seller requests its return (*i.e.*,

"calls" the funds).  Once called, the funds must be returned on a same-day basis before the close

of the Fedwire (usually 6:00 pm EST).  The LBHI call account paid interest at the Fed Funds

target rate minus $^1/_8$, which amounted to 1.88% over the relevant period.  Each business day,

Citibank credited the overnight interest to LBHI's DDA.  LBHI's $2 billion was never

segregated; instead, the funds were commingled with Citibank Treasury's other funds in its

account at Citibank's Nassau branch.  At no time did Citibank agree to waive its setoff rights

with respect to the $2 billion deposit.

     44. Defendants deny the allegations in paragraph 44 of the SAC, except admit

that on June 30, 2008, LBHI withdrew $210 million from its $2 billion call account to fund an

overdraft in one of its subsidiary's accounts, admit that LBHI deposited $210 million into the

call account the next day, and admit that LBHI never otherwise requested to withdraw, in whole

or in part, the funds in the call account.

31

45.     Defendants deny the allegations in paragraph 45 of the SAC, and refer to
the quoted documents for their contents.  Defendants further state that, read in context, the emails
discuss the two significant deficiencies that Citibank found with the $2 billion deposit:
(i) notwithstanding Citibank's setoff rights, Citibank did not control the deposit and the funds
could be withdrawn on a same-day basis; and (ii) while Citibank had significant exposure to non-
guaranteed subsidiaries, Citibank would not have the right to offset that exposure against the
deposit due to a lack of mutuality.

46.     Defendants deny the allegations in paragraph 46 of the SAC, except admit
that in July 2008 the parties discussed entering into a pledge agreement, admit that those
discussions contemplated a pledge of investment grade securities, and admit that any pledge
agreement would preserve Citibank's right of setoff.  Defendants further state that a substantial
portion of Citibank's Lehman exposure was to LBI, an unguaranteed subsidiary, whose
obligations to Citibank therefore could not be set off against the LBHI $2 million deposit due to
lack of mutuality.  A pledge agreement could have created a contractual setoff right with respect
to all Lehman subsidiaries to the extent of the pledged assets; a pledge also would have
eliminated Citi's concern that LBHI might withdraw the cash on a same-day basis, before Citi
could take appropriate action to limit its exposure.  Lehman, for its part, also wished to replace
the $2 billion of cash with securities.  While Lehman refused to pledge the $2 billion deposit,
Citibank made clear that it would only accept securities in lieu of cash if the securities were
pledged, so that Citibank could preserve its setoff rights.  As reflected in an internal Lehman
"Call Report" (cited by the Examiner), on an August 7, 2008 call with Lehman's Treasurer, "Citi
did point out that according to NY law, Citi would have the right to offset deposits, but not
securities which were not pledged."  (*See* LBEX-DOCID 1035842, cited in Report at 1258

32

n.4722.)  Lehman never objected to Citibank's stated position that it had setoff rights in the

deposit, much less assert that Citibank had expressly waived any setoff rights.

47.       Defendants deny the allegations in paragraph 47 of the SAC, except admit

that LBHI refused Citibank's request that LBHI pledge the $2 billion deposit, admit that the

parties discussed a potential pledge of investment grade securities as collateral to secure

overdrafts by LBHI subsidiaries, and admit that, in connection with the discussions concerning a

potential pledge of securities, Citibank established a collateral account with the name "Lehman

Brothers Holdings Inc., Pledge to Citibank," which account was never used.

48.       Defendants deny the allegations in paragraph 48 of the SAC, except admit

that discussions concerning a potential pledge of securities continued through August 2008,

admit that LBHI and Citibank never reached agreement on the terms of a pledge agreement or on

the collateral that might be pledged thereunder, admit that no pledge agreement was ever

executed and admit that on September 9, 2008, Citibank requested that LBHI execute an

amendment to the 2004 Guaranty.

49.       Defendants lack knowledge or information sufficient to form a belief

regarding the allegations in paragraph 49 of the SAC, except admit that on September 9, 2008,

the market was aware that Korea Development Bank would not make an equity investment in

LBHI, admit that LBHI's stock price dropped sharply on September 9, 2008, and admit that

LBHI accelerated its preliminary earnings report for the third quarter of 2008 to September 10,

2008.

50.       Defendants deny the allegations in paragraph 50 of the SAC, except admit

that on September 9, 2008, in view of the increasing market anxiety about Lehman's prospects,

Citibank requested that LBHI execute an amendment to the 2004 Guaranty before 6:00 pm that

day, admit that the draft amendment added 18 Lehman entities (including LBI) as guaranteed

subsidiaries of LBHI, admit that Citibank believed that adding these entities as guaranteed

subsidiaries of LBHI would give Citibank the right to set off the obligations of LBHI in respect

of these newly-guaranteed subsidiaries against the $2 billion LBHI deposit, and refer to the 2004

Guaranty and the September Amendment for their contents.  Defendants further state that –

wholly apart from the September Amendment – extensions of credit by Citi in connection with

CLS or any other clearing or settlement services were covered obligations under the 2004

Guaranty with respect to any subsidiary guaranteed under that document.

      51.     Defendants deny the allegations in paragraph 51 of the SAC, except admit

that on September 9, 2008, Citibank made the institutional decision not to accept any Lehman

exposure that could not be offset against the $2 billion deposit and thus Citibank requested that

18 unguaranteed subsidiaries, including Asian subsidiaries, be added to the 2004 Guaranty,

admit that Citibank exercised its discretion to reduce or eliminate certain overdraft lines, lack

knowledge or information sufficient to form a belief as to whether Lehman's September 10,

2008 earnings call was a matter of "life-or-death," and refer to the quoted document for its

contents.  Defendants further state that, without overdraft lines, Lehman entities could clear their

trades through Citibank so long as they prefunded their accounts.  LBHI was not "force[d] . . . to

accede to [Citi's] demands" and, in fact, by 6:00 pm, LBHI executed a guaranty for LBI only

(and none of the other 17 entities that Citi had initially requested), and LBHI subsequently

refused to add nine of the remaining subsidiaries to the amended guaranty.

      52.     Defendants deny the allegations in the first sentence of paragraph 52 of the

SAC, and refer to the September Amendment for its contents.  Defendants lack knowledge or

information sufficient to form a belief as to whether LBHI or LBI were insolvent or

34

undercapitalized on September 9, 2008, but, upon information and belief, deny that LBHI did not

receive reasonably equivalent value in exchange for executing the September Amendment.

Defendants further state that, in consideration for the September Amendment, Citi thereafter

extended billions of dollars of credit to the newly-guaranteed subsidiaries.

        53.     Defendants deny the allegations in paragraph 53 of the SAC, except admit

that on Sunday night, September 14, 2008, Citibank transferred $500 million from an LBHI

account at Citibank to an LBI account at Citibank (the "LBI DDA"), and admit that LBHI filed

for bankruptcy protection in the early morning hours of September 15, 2008.  Defendants further

state that it was LBHI – not Citibank – that requested the transfer so that LBI could fund its

obligations in connection with settling foreign exchange trades through the CLS system.  Upon

information and belief, LBHI made the transfer to keep LBI in business during the week of

September 15 to allow for an orderly sale of LBI's business to Barclays.  Upon information and

belief, such a sale was believed to be in the best interest of LBHI, its creditors, and the financial

markets generally.  Indeed, contemporaneous documents reflect that Lehman believed it was

critical for LBI's trades to settle in CLS if Lehman was to "have any chance to sell the broker."

(*See* CITI-LEH00440952.)  Citibank agreed to make this Sunday night transfer even though

LBHI had informed Citibank that LBHI would be filing for bankruptcy before Monday's open

and this $500 million in LBHI's account would otherwise have been available to Citibank to set

off against LBHI obligations.  The Lehman Examiner cites Citi's willingness to effect the

transfer on September 14, 2008 as one instance, among many, in which "Citi endeavored to

assist Lehman."  (Report at 1281–82.)

35

54.      Defendants deny the allegations in paragraph 54 of the SAC, except lack knowledge or information sufficient to form a belief as to whether LBHI or LBI were insolvent or undercapitalized at the time of the transfer.

55.      Defendants admit the allegations in paragraph 55 of the SAC.

56.      Defendants deny the allegations in paragraph 56 of the SAC, except admit that on September 19, 2008, Citibank set off $1 billion of LBI obligations owing to it against a $1 billion LBI deposit.  Defendants further state that the $1 billion deposit was not in the LBI DDA but was in a separate account at Citibank, one created on September 15, 2008 and funded with $700 million from an LBI account at JPMorgan Chase and $300 million from the LBI DDA.  Given the payments made in and out of the LBI DDA before this $300 million transfer, no more than approximately $136 million of the original $500 million from LBHI could have been used to fund the $1 billion LBI deposit.  Defendants further state, upon information and belief, that LBHI has already recovered some or all of this transfer from LBI, the initial transferee.

57.      Defendants deny the allegations in paragraph 57 of the SAC, except admit that on September 19, 2008, Citibank terminated the CLS Agreement with respect to LBI, effective September 22, 2008.  Defendants further state that LBHI has never, before filing the Complaint, formally requested the return of the $2 billion.  Indeed, LBHI's September 18, 2008 Motion of Debtors for Order, Pursuant to Section 105 of the Bankruptcy Code, Confirming Status of Citibank Clearing Advances (Docket No. 109) (the "Citibank Clearing Motion"), and the order granting that motion, expressly acknowledge that Citibank's continued maintenance of the $2 billion cash deposit "does not constitute a unilateral administrative hold or a violation of the automatic stay," and that an administrative hold would not be deemed to commence until

36

"LBHI requests a withdrawal . . . and Citibank refuses to comply." (*Id.* ¶ 16.) Following the

entry of that Order, LBHI has repeatedly stipulated to Citibank's continued maintenance of the

deposit.

58.    Defendants deny the allegations in paragraph 58 of the SAC, except admit

that Citibank asserts a right to set off its LBHI claims, including approximately $1.7 billion in

derivatives claims, against the $2 billion deposit. Defendants further state that Citi's derivatives

claims are entirely in line with estimates generated by Citi's internal risk models in the months

leading up to Lehman's default.

59.    Defendants deny the allegations in paragraph 59 of the SAC, except admit

that Citibank asserts rights as a secured creditor in its proof of claim against LBHI, admit that

Citibank asserts rights to set off LBHI obligations, including approximately $1.7 billion arising

under guaranteed swap agreements, against the $2 billion LBHI deposit, admit that Citibank

asserts that the derivatives claims referred to in paragraphs 59(i) and 59(iii)–(v) may be set off

against the $2 billion, and refer to proof of claim number 67736 for its contents. Defendants

further state that Citibank does not claim to be owed amounts under the LBI-Citibank ISDA (as

alleged in paragraph 59(ii)) and instead (as made clear in answer to plaintiffs' original Complaint

and First Amended Complaint) has reported a payable to LBI under that contract. Further, by

letter agreement dated January 31, 2013, Citibank agreed to withdraw the purported claim of

$60,015,440 (which had always been asserted as a payable owed by Citibank to LBI, rather than

a claim against LBI) from proof of claim number 67736.

60.    Defendants deny the allegations in paragraph 60 of the SAC, except admit

that Citibank asserts that the claims referred to in paragraphs 60(i)–(iii) and 60(v)–(vi) may be

set off against the $2 billion, state that Citibank intends to withdraw the $175,498 claim referred

to in paragraph 60(iv), and refer to proof of claim number 67736 for its contents.  Defendants

further state that the specific LBHI guarantees supporting the claims referred to in paragraphs

60(i), (ii), (v), and (vi) expressly state that Citi may "set off and apply any and all deposits

(general or special, time or demand, provisional or final but excluding any amounts held by

[Citi] in a trustee [or] fiduciary capacity . . .)" against covered obligations.[22]  Defendants further

state that the specific guarantee supporting the claim referred to in paragraph 60(i), (ii), (v), and

(vi) provides that Citi's setoff rights could not be waived or amended "unless the same is in

writing and signed by Citibank, N.A."[23]

      61.     Defendants deny the allegations in paragraph 61 of the SAC, except admit

that they assert the right to offset claims arising under the September Amendment against the $2

billion deposit, and refer to proof of claim number 67736 for its contents.  Defendants further

state that, as a result of a settlement between LBI and Citibank, Citibank has withdrawn, by letter

agreement dated January 31, 2013, the claims referenced in paragraph 61(iii)–(vi) and (viii)–(x).

Further, the obligation owed by LBSF referred to in paragraph 61(vii) may be offset against the

$2 billion deposit by virtue of numerous guarantees, including the 2004 Guaranty, without regard

to the September Amendment.

      62.     Defendants deny the allegations in paragraph 62 of the SAC.

      63.     Defendants deny the allegations in paragraph 63 of the SAC, except admit

that Citibank owed approximately $198 million as a result of settling LBCC's foreign exchange

trades in the CLS system, and refer to proof of claim number 67734 for the exact amount of the

obligation owed to LBCC.  Defendants further state that, pursuant to the Citibank CLS

---

[22]    LBHI-Citigroup, Inc. Guaranty § 8 (Aug. 30, 2007); 2004 Guaranty § 8; LBHI-Citigroup, Inc. Guaranty § 8
(July 26, 2005); 2004 Guaranty (as modified by the September Amendment) § 8.

[23]    LBHI-Citigroup, Inc. Guaranty § 11 (Aug. 30, 2007).

Settlement Services CCSS Third Party Customer Static Data Requirements executed by LBCC

on November 4, 2003 (the "Static Data Requirements"), Citibank was instructed to make CLS

payments due to LBCC into LBI accounts.  Prior to the commencement of this litigation,

Citibank explained to plaintiffs its concern that it may be vulnerable to a competing claim by

LBI and agreed to pay the $198 million to LBCC (subject to available setoffs) provided Citibank

receive a consent or release from LBI (and subject to an agreement on the amounts due and

owing in connection with CLS services).  In May 2013, following Citi's global settlement with

LBI  (in which LBI released any claim to this payable), the parties reached an agreement

resolving most of these issues.  Pursuant to that agreement, Citibank paid LBCC $167 million

and the parties reserved their rights with respect to Citibank's asserted setoff rights as well as

certain minor aspects of Citibank's CLS-related calculations, including the $4.5 million debit

referred to by plaintiffs.  Citibank appropriately debited the $4.5 million from the LBCC

account, in partial settlement of amounts due from LBIE under the CLS Agreement, because the

account was used by both LBCC and LBIE for CLS payments; indeed, Citibank routinely

debited the account for amounts due from LBIE with respect to CLS.

        64.     Defendants deny the allegations in paragraph 64 of the SAC, except admit

that, pursuant to the Stipulation and Order Between Plaintiffs Lehman Brothers Holdings Inc.,

Lehman Brothers Commercial Corp., Lehman Brothers Special Financing Inc., and Official

Committee of Unsecured Creditors and Defendants Citibank, N.A. and Citigroup Global Markets

Ltd. With Respect to Certain Continuous Linked Settlement Agreement Unwind Amounts (the

"Stipulation"), dated May 14, 2013, Citibank paid to LBCC an amount of $167 million, and refer

to the Stipulation for its contents.

65.    Defendants deny the allegations in paragraph 65 of the SAC, except admit that Citibank takes the position that it has the right to setoff the remainder of the LBCC payable against amounts owed to Citibank by LBCC under the ISDA Master Agreement between the parties, plus interest and legal fees.

66.    Defendants deny the allegations in paragraph 66 of the SAC, except admit, upon information and belief, that prior to LBHI's bankruptcy filing, Citi and Lehman were among the largest global dealers in derivatives, and admit that Citi has made substantial investments in people and systems to appropriately transact in the derivatives market.

67.    Defendants admit the allegations in paragraph 67 of the SAC.

68.    Defendants deny the allegations in paragraph 68 of the SAC, except admit that, in the ordinary course of business, Citi regularly marked-to-market its derivatives portfolio and calculated daily margin calls on a net basis under each of the Master Agreements. Defendants further state that margin was calculated using mid-market values (not replacement costs) and, from time to time, the parties had margin disputes that arose from differences in their mid-market calculations.  Margin disputes are common in the OTC derivatives market because trading counterparties, each acting reasonably and in good faith, may use different models and inputs to calculate mid-market prices.  At the time of LBHI's bankruptcy filing, Citi held net margin from the Lehman Subsidiaries of over $700 million, reflecting that Citi was substantially in-the-money with respect to the Lehman-facing trades.

69.    Defendants deny the allegations in paragraph 69 of the SAC, except admit that each Master Agreement provides that, in the event of a counterparty default (such as occurred here), the non-defaulting party shall calculate the overall net amount owed (in either direction) with respect to all outstanding terminated trades, admit that each Master Agreement

40

sets forth the methodology that the parties have agreed shall govern the non-defaulting party's

calculations, admit that commercial reasonableness and good faith are overarching obligations in

calculating amounts owed under each Master Agreement, and refer to the Master Agreements for

their contents.

70.    Defendants admit the allegations in paragraph 70 of the SAC.  Defendants

further state that, until August 2008, Market Quotation was the calculation method selected by

the parties under the majority of the ISDA Master Agreements.[24]  Under Market Quotation, the

non-defaulting party determines the amount owed on each terminated trade (or group of trades)

based on quotations for replacement transactions, regardless of whether any replacement

transactions are actually executed.  Specifically, the non-defaulting party is required to seek

quotations from leading market-makers for the amount that "would be paid" by (or to) the non-

defaulting party "in consideration of an agreement between [the non-defaulting party and the

quoting market-maker] to enter into a transaction (the 'Replacement Transaction') that would

have the effect of preserving for such [non-defaulting party] the economic equivalent" of the

terminated transaction or group of transactions.  1992 ISDA Master Agreement § 14 (definition

"Market Quotation").[25]  The Market Quotation method specifies that, if the non-defaulting party

receives more than three quotations, "the arithmetic mean of the quotations" should be used,

after excluding the highest and lowest quote; if exactly three quotations are received, the non-

defaulting party should use the middle quotation, disregarding the highest and lowest quote; and,

---

[24]    The LBCS-Global ISDA Agreement and LBCS-Energy Agreement selected the Loss calculation method.
These Agreements account for 672 of the terminated trades between Citi and Lehman.

[25]    See also 1987 ISDA Interest Rate and Currency Exchange Agreement § 14 (definition "Market Quotation") (the
non-defaulting party must "determine[] on the basis of quotations from Reference Market-makers . . . the
amount that would be or would have been payable on the relevant Early Termination Date . . . in consideration
of an agreement between such party and the quoting Reference Market-maker . . . that would have the effect of
preserving for such party the economic equivalent of the payment obligations . . .").

if fewer than three quotations are received, the Market Quotation for the transaction cannot be determined. *Id.* In that case, the non-defaulting party is required to use the Loss methodology to determine the amount owed on such terminated trade or group of trades. *Id.* (definition "Settlement Amount"). Under the Loss method, the non-defaulting party must determine, in good faith, the amount of its "total losses and costs . . . including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position." The Loss method specifies that the non-defaulting party "may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant market." *Id.* (definition "Loss"). Neither the Market Quotation nor Loss method says anything about, much less requires, the non-defaulting party to actually execute any replacement transactions.[26] Further, under both methods, transaction costs (including bid/offer charges and liquidity premium) that would be charged for entering into replacement transactions are unquestionably recoverable by the non-defaulting party, regardless of whether replacement trades are actually executed. These transaction costs are, by definition, incorporated into the quotations from market-makers on which Market Quotation must be determined and on which Loss (expressly) may be determined.

71.    Defendants admit the allegations in paragraph 71 of the SAC. Defendants further state that, in August 2008, virtually all of the major derivatives dealers (including all of the Lehman Subsidiaries and all of the Citi defendants other than Citi Canyon), executed the Close-out Amount Multilateral Agreement whereby all existing 1992 ISDA Master Agreements

---

[26] Indeed, Market Quotation is an "arithmetic mean" rather than an existing quotation at which the non-defaulting party could transact; alternatively, if only three quotes are obtained, Market Quotation is the middle quote at which, all things being equal, no party would ever transact.

between the signatories were amended to adopt certain provisions of the 2002 ISDA Master

Agreement and, specifically, the "Close-out Amount" measure of damages (replacing the

"Market Quotation" and "Loss" methods from the 1992 version).  As the User's Guide to the

ISDA 2002 Master Agreement explains, "Close-out Amount" was "developed to offer greater

flexibility" and to "address some of the potential weaknesses of Market Quotation that became

apparent during periods of market stress in the late 1990s."  User's Guide to the ISDA 2002

Master Agreement at 24 (2003).  In particular, the "need for increased flexibility was highlighted

during the market crises in 1998 and 1999," when many non-defaulting parties could not obtain

the requisite number of quotations from leading market-makers, as required under Market

Quotation.  *Id.*  Like Market Quotation, Close-out Amount contemplates that the non-defaulting

party will calculate the replacement costs for the terminated transactions (regardless of whether

replacement trades are actually executed), but it provides more flexibility in doing so.  "Close-

out Amount" is defined, with respect to each terminated trade (or groups of trades), as the

amount of "losses or costs . . . that *are or would be incurred* under then prevailing circumstances

. . . *in replacing*, or in providing . . . the economic equivalent of . . . the material terms of that

Terminated Transaction or group of Terminated Transactions . . . ."  2002 ISDA Master

Agreement § 14 (emphasis added).  In determining a Close-out Amount, the non-defaulting party

is expressly permitted to consider any relevant information including, specifically,

(i) "quotations (either firm or indicative) for replacement transactions supplied by one or more

third parties," (ii) other "relevant market data . . . supplied by one or more third parties," and

(iii) quotations or market data "from internal sources . . . if that information is of the same type

used by the Determining Party in the regular course of its business for the valuation of similar

transactions."  *Id.*  "Third parties," from whom quotations and market data may be sought,

43

"include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information." *Id.* The non-defaulting party is required to calculate the Close-out Amount "as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable." *Id.* In calculating the Close-out Amount, the non-defaulting party is required to "act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result." *Id.* The contract also expressly acknowledges that it may be commercially reasonable to apply "different valuation methods" to the terminated transactions depending on the type, complexity, size, or number of the transactions. *Id.*

72.     Defendants deny the allegations in paragraph 72 of the SAC, and refer to the Close-out Amount Agreement, the 2002 ISDA Master Agreement, and the 2002 ISDA User's Guide for their contents. Defendants further state that the Close-out Amount definition adopted by the derivatives industry in the 2002 ISDA Master Agreement – and adopted by all major dealers, including all Lehman Subsidiaries, in place of Market Quotation and Loss in all of the 1992 ISDA Master Agreements between them – expressly entitles the non-defaulting party to recover the estimated replacement costs of the terminated trades, whether or not replacement trades are actually executed.

73.     Defendants deny the allegations in paragraph 73 of the SAC, and refer to the Close-out Amount Agreement, the COA Master Agreements, the 2002 ISDA Agreement, and Section 562 of the Bankruptcy Code and its legislative history for their contents.

74.     Defendants admit the allegations in paragraph 74 of the SAC, and refer to the LBSF-Canyon Agreement and the 1992 ISDA Master Agreement for their contents.

44

Defendants further state that plaintiffs' quotation from the 1992 ISDA Master Agreement selectively omits critical language that appears in the standard form contract and the LBSF-Canyon Agreement. The language selectively omitted expressly provides that the quotations sought under Market Quotation should be for replacement transactions – and not for mid-market values, as plaintiffs apparently contend. Plaintiffs' quotation is reproduced below with the omitted material in bold:

> [A]n amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that **would be paid to such party . . . or by such party . . . in consideration of an agreement between such party . . . and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that** would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date.

1992 ISDA Master Agreement § 14 (emphasis added).

   75.  Defendants admit the allegations in paragraph 75 of the SAC.

   76.  Defendants deny the allegations in paragraph 76 of the SAC, and refer to the 1992 ISDA Master Agreement and 1992 ISDA User's Guide for their contents.

   77.  Defendants deny the allegations in paragraph 77 of the SAC, except admit that the LBCS-Global EFET Agreement was entered into using version 2.1(a) of the European Federation of Energy Traders General Agreement Concerning the Delivery and Acceptance of Electricity, and refer to the LBCS-Global EFET Agreement and the standard form EFET Agreement for their contents. Defendants further state that, while plaintiffs have quoted provisions from the standard form EFET Agreement, they fail to quote the materially different terms of the actual agreement between LBCS and Citi Global as set forth in the Election Sheet to the LBCS-Global EFET Agreement. Specifically, in part II, section 11 of the Election Sheet, the

parties expressly amended section 11.2 of the General Agreement by replacing the last sentence

of that section with the following:

> In calculating the Settlement Amounts, Gains and Losses shall, as far as
> reasonably practicable, be determined by reference to quotations of relevant rates
> or prices from one or more leading dealers in the relevant markets or from one or
> more first-class international financial information services such as Reuters or
> Bloomberg. ***For the avoidance of doubt, the Non-Defaulting Party shall not be
> required to enter into any replacement transactions in order to determine the
> Termination Amount***.

EFET Agreement, Election Sheet, part II, section 11 (emphasis added).  Contrary to plaintiffs'

assertion that, under the EFET Agreement, CGML "may only include costs reasonably incurred

in actual replacement transactions," the parties' agreement expressly provides that losses shall be

calculated by reference to market quotations, regardless of whether replacement transactions are

actually executed.  Accordingly, all of the Master Agreements at issue in this litigation expressly

provide that Citi can recover the replacement cost of the terminated trades (necessarily including

the transaction costs that any dealer would charge), regardless of whether Citi actually executed

replacement trades as of the close-out.

78.    Defendants admit the allegations in paragraph 78 of the SAC.

79.    Defendants admit the allegations in paragraph 79 of the SAC.

80.    Defendants deny the allegations in paragraph 80 and footnotes 2 and 3 of

the SAC, except admit that Citi has submitted claims under the Master Agreements for

approximately $1.9 billion against the Lehman Subsidiaries and LBHI as guarantor, and admit

that these claims consist of aggregate termination amounts of approximately $2.7 billion, less

collateral held by Citi, and less net Unpaid Amounts credited to the Lehman Subsidiaries.[27]

---

[27]    Based on reconciliation efforts with Lehman, as of the filing of Citi's Answer to the FAC on February 14, 2013,
Citi calculated that it is owed $1,913,700,725.  This net claim reflects aggregate termination amounts of
$2,721,136,704, unpaid amounts and cash breaks owed to Lehman in an amount of $95,482,388, and margin

81.    Defendants deny the allegations in paragraph 81 and footnotes 4 and 5 of

the SAC.  While plaintiffs allege that their purported "Market-Based Calculation of Close-out

Amount" (set forth in the chart in paragraph 81) is based on "independent, publicly available

market sources," plaintiffs have refused to disclose precisely what market data they are relying

on.  In all events, it is clear that plaintiffs are making an "apples-to-oranges" comparison.  Given

the extreme positions plaintiffs have staked out in the SAC, their so-called "Market-Based"

calculation, upon information and belief, reflects an estimate of mid-market value only, rather

than the replacement cost (including bid/offer charges and liquidity premiums) of the terminated

trades which is mandated by the parties' agreements and necessary to provide Citi with the

benefit of its bargain.  In addition, Citi disagrees with certain claim amounts, and a corrected

version of the chart appears below.[28]

---

held by Citi in an amount of $711,953,592.  Citi refers plaintiffs to the documents bearing Bates numbers CITI-LEH00962090-98 for the most up-to-date calculation of Citi's derivatives claim.

[28]    Defendants note that the tables in plaintiffs' SAC are identical to those in the First Amended Complaint.  Plaintiffs therefore have failed to correct even obvious errors (including typographical errors) pointed out by defendants in their Answer to the First Amended Complaint and have failed to incorporate any of the additional information obtained through the parties' continuing efforts (since the filing of the First Amended Complaint) to reconcile trade populations.  Following plaintiffs' lead, defendants, too, will reproduce in this Answer the tables set forth in their Answer to the First Amended Complaint and note that, in the context of this lawsuit, the modifications that would otherwise be required to the numbers in the tables are relatively minor.  Citi refers plaintiffs to the documents bearing Bates numbers CITI-LEH00962090-98 for the most up-to-date calculation of Citi's derivatives claim.

| Master Agreement | Citi Close-out Amount | ~~Market-Based Calculation of Closeout Amount~~ | ~~Difference ($)~~ |
|---|---|---|---|
| LBSF-Canyon | 763,043 | ~~958,630~~ | ~~195,587~~ |
| LBSF-Citibank | ~~(2,072,323,937)~~ **(2,072,960,601)** | ~~(249,608,958)~~ | ~~1,822,714,979~~ |
| LBSF-Financial | (248,852,591) | ~~(223,685,221)~~ | ~~25,167,370~~ |
| LBSF-Global | ~~(47,800,564)~~ **(40,190,400)** | ~~164,305,046~~ | ~~212,105,610~~ |
| LBCC-Citibank | (404,376,578) | ~~(296,364,126)~~ | ~~108,012,452~~ |
| LBCS-Energy | 10,413,248 | ~~23,885,115~~ | ~~13,471,867~~ |
| LBCS-Global ISDA | (7,825,571) | ~~(7,349,001)~~ | ~~476,570~~ |
| LBCS-Global EFET | 4,999,693 | ~~6,226,192~~ | ~~1,226,499~~ |
| LBSF-Swapco | 36,893,053 | ~~39,741,383~~ | ~~2,848,330~~ |
| TOTAL | ~~(2,728,110,204)~~ **(2,721,136,704)** | ~~(541,890,939)~~ | ~~2,186,219,265~~ |

82.     Defendants deny the allegations in paragraph 82 of the SAC, except admit that a majority of the terminated trades were valued by Citi as of September 16, 2008. Defendants further state that the terminated trades were closed out in good faith and as soon as it was commercially reasonable to do so, consistent with the requirements of the Master Agreements and the Bankruptcy Code.  Each of the Master Agreements allows the non-defaulting party some leeway to value the terminated trades as soon as "commercially reasonable," 2002 ISDA Master Agreement § 14, or "reasonably practicable," 1992 ISDA Master Agreement § 14.  The legislative history of Section 562 of the Bankruptcy Code (which applies to the termination and valuation of swap agreements), recognizes that in "unusual circumstances, such as dysfunctional markets or liquidation of very large portfolios," it may not be feasible or commercially reasonable to value all terminated transactions as of the termination date or to "liquidat[e] all such agreements and contracts in a large portfolio on a single day." H.R. 109-31, Pt. 1, 109th Cong. 1st Sess. 134-35 (2005).  Given the size and scope of Citi's Lehman-facing portfolio (consisting of over 30,000 trades across different products and markets

worldwide) and the turmoil in the markets caused by Lehman's bankruptcy, it was neither feasible nor commercially reasonable to value all of the transactions as of September 15, 2008.

83.     Defendants admit the allegations in paragraph 83 and footnote 6 of the SAC, and refer to the cited documents for their contents.

84.     Defendants deny the allegations in paragraph 84 of the SAC, and refer to the COA Master Agreements, the 2002 ISDA Master Agreement, Section 562 of the Bankruptcy Code, and the cited document for their contents.

85.     Defendants deny the allegations in paragraph 85 of the SAC, and refer to Section 562 of the Bankruptcy Code and its legislative history for their contents.

86.     Defendants deny the allegations in paragraph 86 of the SAC, except admit that Citi valued the majority of its trades as of September 16, 2008.

87.     Defendants deny the allegations in paragraph 87 of the SAC, except admit that Citi's credit and securitized products businesses – which, in aggregate, had almost 20,000 of the 30,000 terminated trades – predominantly valued the trades as of September 16, 2008 (the day following the Termination Date) so as to allow time for effective organization and coordination across businesses and desks.

88.     Defendants deny the allegations in paragraph 88 of the SAC, except admit that Citi valued its USD interest rate trades at approximately 8:30 am (EDT) on September 15, 2008 (the Termination Date), and admit, upon information and belief, that valuing this portfolio at the end of that day would have yielded values more favorable to Lehman.  Defendants further state that nothing in the parties' agreements or applicable law requires a non-defaulting party to calculate the Close-out Amount as of a particular time of day, much less at the time of day most favorable to the defaulting party.

49

89.     Defendants deny the allegations in paragraph 89 of the SAC.

90.     Defendants deny the allegations in paragraph 90 of the SAC, except admit that Citi did not execute replacement transactions for the majority of the 30,000 terminated trades at the time of the close-out. Defendants further state that the liquidated damages provision in each of the Master Agreements expressly entitles Citi, the non-defaulting party, to recover the replacement cost of the terminated trades, regardless of whether replacement trades were actually executed. Specifically, under the "Close-out Amount" method, the non-defaulting party is entitled to the costs "that are or would be incurred under then prevailing circumstances . . . in replacing, or in providing . . . the economic equivalent of," the material terms of the terminated trades. 2002 ISDA Master Agreement § 14. By including the conditional tense (i.e., "that are or would be incurred"), the contract unambiguously provides that the non-defaulting party is entitled to replacement cost even if it did not, in fact, enter into a replacement transaction.[29] Replacement cost necessarily includes cost components above mid-market value – specifically, "bid/offer" charges and liquidity premiums for oversized trades – that a party would have to pay in the market to enter into new trades. While Plaintiffs improperly refer to these elements of Citi's derivatives claim as "Hypothetical Charges," these charges are very real; they are charged by all dealers in the OTC derivatives markets to compensate for transaction costs and risks, and as such they are critical components of determining the Close-out Amount, whether or not a

---

[29]     Citi is also entitled to recover replacement costs under the express terms of the two Master Agreements that do not incorporate the "Close-out Amount" from the 2002 ISDA Master Agreement. The LBSF-Canyon Agreement, under which Citi Canyon claims approximately $760,000, is governed by "Market Quotation" and "Loss," as defined under the 1992 ISDA Master Agreement. As shown above, "Market Quotation" is expressly based on quotations from market-makers for replacement transactions, while "Loss" expressly permits non-defaulting parties to calculate their claims based on such quotes. The LBCS-Global EFET Agreement, under which CGML claims approximately $5 million, expressly provides (in language specifically inserted by the parties) that the non-defaulting party should calculate the amount owed based on quotes from leading dealers in the relevant market and that the non-defaulting party is not required to enter into any actual replacement transactions.

50

replacement trade is actually executed.  Indeed, it would be commercially unreasonable to

require the non-defaulting party to actually replace all terminated trades at the time of close-out

as a condition to recovering benefit-of-the-bargain damages.  A non-defaulting party may be

unable to enter into replacement trades at close-out for any number of reasons, including the

sheer number and size of the trades to be closed out, the illiquid nature of particular trades, or the

lack of funds to enter into costly replacements.  Further, a rule that required the non-defaulting

party to enter into replacement trades in order to recover benefit-of-the-bargain damages would

be contrary to the interests of all future debtors and their creditors.  In the face of such a rule,

counterparties would overrun the market seeking to transact; the increased demand would move

the market and substantially increase the derivatives claims against the defaulting party.

Consistent with the terms of the industry-standard liquidated damages provision, longstanding

industry practice and applicable law, Citi is properly claiming the replacement cost of its

terminated trades, without regard to whether Citi actually executed replacements at the time of

the close-out.

      91.    Defendants deny the allegations in paragraph 91 of the SAC, and refer to

the Master Agreements for their contents.  Defendants further state that replacement cost not

only is what Citi is expressly entitled to under the ISDA's liquidated damages provision, it also

corresponds directly to Citi's "actual damages" because it reflects the amount Citi would have to

pay to replace what was lost as a result of Lehman's default – *i.e.*, the amount required to

provide Citi with the benefit of its bargain.

      92.    Defendants deny the allegations in paragraph 92 of the SAC, and refer to

the COA Master Agreements and the 2002 ISDA Master Agreement for their contents.

93.     Defendants deny the allegations in paragraph 93 of the SAC, except admit that market-makers charge bid/offer spreads when executing trades, and refer to the quoted document for its contents.  Defendants further state that plaintiffs' contention that a non-defaulting party is somehow limited to recovering mid-market value where that party did not actually execute a replacement trade is directly contrary to the parties' agreement.  Indeed, the 2002 ISDA Master Agreement specifically identifies the very rare circumstances where Close-out Amount should be calculated as the mid-market value of the terminated trades. Section 6(e)(ii)(3) of the 2002 ISDA Master Agreement, entitled "Mid-Market Events," provides that if the agreement is terminated due to illegality or a force majeure event, then parties seeking quotations should ask for "mid-market quotations" and, in all events, parties should use "mid-market values" for purposes of determining the Close-out Amount.  Interestingly, in adopting "Close-out Amount" in the COA Agreement, the dealer community did not specifically adopt this provision from the 2002 ISDA Master Agreement concerning mid-market termination events.  Whatever the reason for that decision, it is abundantly clear that the drafters of the 2002 ISDA Master Agreement and the sophisticated signatories to the COA Agreement (which adopted certain provisions of the 2002 ISDA) knew how to specify that mid-market values should be used, rather than replacement cost, when that result was intended.  It was not intended here.

94.     Defendants deny the allegations in paragraph 94 of the SAC.  Defendants further state that Citi appropriately included transaction costs, such as bid/offer charges, in its derivatives claims consistent with the parties' contracts and applicable law.  Plaintiffs' contention that Citi somehow could have avoided paying bid/offer by transacting in the "inter-dealer market," where trades supposedly occur "at or very close to mid-market prices," is wrong.

52

It is specifically refuted by actual quotes from the interdealer market that Citi relied on in computing its claims and, in fact, submitted to Lehman as supporting documentation in 2009, when Citi completed the Derivatives Questionnaire pursuant to the Bar Date Order.[30]  Plaintiffs' contention is also easily refuted by data that anyone can purchase (and that, upon information and belief, Lehman has purchased) from interdealer brokers covering the week of September 15, 2008.  For example, data purchased from GFI, the leading interdealer broker for credit products, clearly shows that bid/offer charges were quoted, and paid, in the interdealer market.  In fact, if Citi had used the bid/offer spreads quoted by GFI, Citi's derivatives claim would have been *higher*, not lower.[31]

95.    Defendants deny the allegations in paragraph 95 of the SAC, except admit that, in appropriate instances, Citi included liquidity charges – which reflect the increased bid/offer spread market participants charge to deal in outsized positions – in the estimate of replacement costs for particular trades.  It is indisputable that, to execute a trade that is substantially larger than the standard size, a party typically will have to pay a wider bid/offer.  John C. Hull, *Risk Management and Financial Institutions* 448 (3d ed. 2012).[32]

96.    Defendants deny the allegations in paragraph 96 of the SAC, and refer to the Master Agreements for their contents.

97.    Defendants deny the allegations in paragraph 97 of the SAC, and refer to the cited documents for their contents.  Defendants further state that each of the Master

---

[30]  Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving of the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. July 2, 2009), Dkt. No. 4271 (the "Bar Date Order").

[31]  *See supra*, n.12, for a description of the calculation.

[32]  *See id.*  ("This is because the market maker knows that as the size of a trade increases, the difficulty of hedging the exposure created by the trade also increases.").

Agreements contains an enforceable liquidated damages provision governing the calculation of

damages in the event of breach.[33]  Under well-established New York law, a liquidated damages

provision will be upheld where, as here, "the amount liquidated bears a reasonable proportion to

the probable loss and the amount of actual loss is incapable or difficult of precise estimation."

*JMD Holdings Corp.* v. *Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (quoting *Truck Rent-A-Ctr.,*

*Inc.* v. *Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977)); *see also United Air Lines, Inc.* v.

*Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (liquidated damages provision will be

invalidated as unenforceable penalty only where liquidated amount "is plainly or grossly

disproportionate to the probable loss anticipated when the contract was executed").  Courts

evaluate a liquidated damages provision as of the time the parties executed the contract.

*Rattigan* v. *Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) ("The reasonableness

of the liquidated damages and the certainty of actual damages both must be measured as of the

time the parties enter the contract, not as of the time of the breach.") (internal quotation and

citation omitted); *see also Truck Rent-A-Ctr.*, 41 N.Y.2d at 425.  When the parties entered into

the various Master Agreements, they obviously could not have predicted the amount of actual

loss that would be suffered upon a breach.  Among other things, the parties had no idea which of

them would breach, what trades would be outstanding between them at the time, or what market

conditions would prevail.  Further, the liquidated amount clearly "bears a reasonable proportion"

---

[33]    The parties specifically agreed in the ISDA Master Agreements that "Close-out Amount" (under the 2002
version) and  "Market Quotation" (under the 1992 version) are each "a reasonable pre-estimate of loss and not a
penalty" and, further, that:

Such amount is payable for the loss of bargain and the loss of protection against future risks,
and, except as otherwise provided in this Agreement, neither party will be entitled to recover
any additional damages as a consequence of the termination of the Terminated Transactions.

2002 ISDA Master Agreement § 6(e)(v); *see also* 1992 ISDA Master Agreement § 6(e)(iv).

to the probable loss; in fact, it is a method of calculating the actual loss.[34]  The liquidated

measure is the estimated replacement cost of the terminated trades – that is, the amount that the

non-breaching party would have to pay in the market to replace the trades that had been lost and

thereby obtain the benefit of its bargain.  This is exactly what an award of actual damages is

meant to do.  *Freund* v. *Washington Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974) ("[S]o far as

possible, [New York] law attempts to secure to the [non-breaching] party the benefit of his

bargain . . . .") (cited at SAC ¶¶ 97, 98).

        98.     Defendants deny the allegations in paragraph 98 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that Citi's calculation of

damages with respect to the terminated derivatives trades is governed by an enforceable – and

industry-standard – liquidated damages provision.  Under controlling New York law, Citi's

actual damages as a result of Lehman's breach "have little relevance to the validity of a

liquidated damages clause."  *Walter E. Heller & Co.* v. *Am. Flyers Airline Corp.*, 459 F.2d 896,

898 (2d Cir. 1972).  "It thus makes no difference whether the actual damages are ultimately

higher or lower" than the liquidated amount.  *Id.* at 899.  Here, however, Citi's general contract

damages are essentially congruent with the liquidated amount asserted in Citi's claim.  If Citi

were, in fact, seeking general (rather than liquidated) damages, Citi would be entitled to recover

---

[34]   In a leading treatise, published before Lehman's bankruptcy, Weil Gotshal (lead bankruptcy counsel for the
Lehman plaintiffs) states that "*the [ISDA] formulae for calculating damages appear to strive to measure 'actual
damages' not 'anticipated damages.'*"  2 Weil, Gotshal & Manges LLP, Reorganizing Filing Businesses:  A
Comprehensive Review and Analysis of Financial Restructuring and Business Reorganization 20-36 (Marvin E.
Jacob & Sharon Youdelman eds., rev. ed. 2006) (emphasis added).  Weil's treatise acknowledges that there "is
some debate whether calculating damages by reference to the market quotations method . . . is a measure of
anticipated damages or actual damages," but notes that, "[b]ecause the market quotations method attempts to
determine the *replacement cost* of obtaining an identical swap, the calculation of those damages simply may be
*a method for calculating actual damages*."  *Id.* at 20-36 – 20-37 (emphasis added).  The treatise concludes that,
even if Market Quotation "measures liquidated damages from a theoretical standpoint," it is unlikely to
constitute a penalty because "[a]ctual damages following the termination of a swap agreement are difficult to
estimate" and "by measuring replacement cost, [Market Quotation] likely is to be considered a reasonable
estimation of anticipated loss."  *Id.* at 20-37.

the full replacement cost of the trades – benefit-of-the bargain damages – whether or not Citi

entered into replacement trades at the close-out.  Under New York law, courts award expectation

damages based on the market price of a substitute without regard to – and often with no

discussion whatsoever about – whether a substitute contract was actually executed.[35]  Indeed, the

U.C.C. – which governs many of the foreign exchange and commodities trades in Citi's claims

(and has been applied as persuasive precedent even to cases involving securities)[36] – specifically

provides that a non-breaching party's failure to "cover," by entering into a substitute contract,

does not affect his entitlement to all available damages.  N.Y. U.C.C. Law § 2-712(3)

(McKinney 2012) ("Failure of the [non-breaching] buyer to effect cover . . . does not bar him

from any other remedy.").  Under general New York contract law, Citi is entitled to recover the

market price of replacement trades – which market price necessarily includes the transaction

costs plaintiffs improperly refer to as "Hypothetical Charges" – regardless of whether Citi

actually executed replacement trades following Lehman's default.

---

[35]   *See*, *e.g.*, *Schonfeld* v. *Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("When a defendant's breach of contract
deprives a plaintiff of an asset, the courts look to compensate the plaintiff for the 'market value' of the asset,"
typically by reference to prices in an established market or based on a "hypothetical market standard"); *Maxim
Group LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293 (S.D.N.Y 2010) (holding that damages for
breach of obligation to issue or honor a warrant should be calculated "by comparing the warrant's strike price to
the market price of the stock on the date of attempted exercise") (internal quotation omitted); *Kovens* v. *Paul*,
No. 04 Civ. 2238(TPG), 2009 WL 562280, at *4 (S.D.N.Y. Mar. 4, 2009) ("[T]h[e] measure of [expectation]
damages does not require that a plaintiff be able to 'cover' the sale by acquiring the same quantity of the asset
from another source.") (cited at SAC ¶ 99); *Viacom Outdoor, Inc.* v. *Wixon Jewelers, Inc.*, 906 N.Y.S.2d 776
(Table) (N.Y. Sup. Ct. 2009) ("If there is a market for the performance, the market price will generally be the
standard used to measure damages, either by considering the market price in comparison to the contract price,
or by comparing the contract price to the cost of substitute performance actually obtained in the market.")
(citing 24 Lord, *Williston on Contracts* § 64.4, at 48–49 (4th ed. 2002)); Joseph M. Perillo, *Calamari and
Perillo on Contracts* § 14.20, at 592 (5th ed. 2003) ("The traditional measure of damages for a total breach of
contract by the seller is the difference between the market price of the goods and the contract price.  The UCC
continues this rule, but has *added an alternative measure* . . . .  The buyer *may choose* to cover . . . .") (emphasis
added).

[36]   *See Intershoe, Inc.* v. *Bankers Trust Co.*, 77 N.Y.2d 517, 521 (1991) ("There seems to be no question that the
UCC applies to foreign currency transactions."); *Kovens*, 2009 WL 562280 (S.D.N.Y. 2009) (cited at SAC ¶ 99)
(applying UCC measure of damages to breach of contract to sell securities); N.Y. U.C.C. Law § 2-105 cmt. 1
(McKinney 2012) ("'Goods' is intended to cover the sale of money when money is being treated as a
commodity.").

99.    Defendants deny the allegations in paragraph 99 of the SAC, and refer to the cited documents for their contents.  Defendants further state that, in the absence of a contractual clause governing when damages should be calculated, New York law generally provides that damages should be calculated as of the date of breach.  Here, however, the parties' agreements specifically address when damages should be calculated under the liquidated damages provisions.  They should be calculated as of the termination date or as soon as "commercially reasonable" (under the 2002 ISDA Master Agreement) or "reasonably practicable" (under the 1992 version).  Defendants complied with these contractual provisions and acted in good faith and in a commercially reasonable manner, closing out their more than 30,000 Lehman-facing trades on September 15, 2008 and the days that followed.

100.    Defendants deny the allegations in paragraph 100 of the SAC.  Defendants further state that liquidity charges reflect the increased bid/offer spread that dealers charge to enter into outsized trades.  Citi's claim calculation includes bid/offer and, where appropriate, liquidity charges because these are a necessary component of the replacement cost of the trades.  Plaintiffs appear to be arguing that, in including these charges without actually executing a replacement trade, Citi somehow "retained the upside market potential" while protecting itself "against a price decline."  This allegation makes no sense.  Citi calculated the replacement cost (including appropriate bid/offer and liquidity charges) at the time it closed out the trades.  The fact that Citi did not – and often could not – replace a terminated trade at close-out did not give Citi some type of "free option" to ride the market without risk of loss.  To the contrary, Citi faced substantial market risk with respect to these non-replaced trades, during a time of unprecedented market volatility.  The price to replace these trades could go up or down in the

57

future such that Citi's claim (as determined at the close-out) might be either more or less than

Citi would need to execute a replacement trade.

101.    Defendants deny the allegations in paragraph 101 of the SAC, and refer to

the cited documents for their contents.  Contrary to plaintiffs' assertion, New York law is clear

that a valid liquidated damages clause can set forth a formula or method for calculating the

liquidated amount, rather than specifying a single, fixed amount.  *See*, *e.g.*, *United Air Lines*, 867

F.2d at 740–41 (2d Cir. 1988) (enforcing liquidated damages clause setting forth a calculation

methodology); *JMD Holding Corp.*, 4 N.Y.3d at 382–83 (same); *Truck Rent-A-Ctr.*, 41 N.Y.2d

at 425 (same); *see also Merrill Lynch Capital Servs., Inc.*, v. *UISA Fin.*, No. 09 Civ. 2324 (RJS),

2012 WL 1202034, at *22–23 (S.D.N.Y. Apr. 10, 2012) (approving use of ISDA Market

Quotation and Loss methodologies to calculate damages).

102.    Defendants deny the allegations in paragraph 102 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that the liquidated damages

provision in the parties' agreements constitutes a reasonable "estimate, made by the parties at the

time they enter[ed] into their agreement, of the extent of the injury that would be sustained as a

result of breach of the agreement."  *Truck Rent-A-Ctr.*, 41 N.Y.2d at 424; *see also JMD Holdings*

*Corp.*, 4 N.Y.3d at 382–83.  Plaintiffs bear the burden of proving that these industry-standard

liquidated damages provisions – employed by the entire OTC derivatives market – are, instead,

unenforceable penalties that call for a measure of damages "plainly or grossly disproportionate to

the probable loss."  *Truck Rent-a-Ctr.*, 41 N.Y.2d at 425; *see also Rattigan*, 739 F. Supp. at 170

(breaching party "has the burden of proving that the liquidated damages clause to which it freely

contracted is, in fact, a penalty").  Plaintiffs will not remotely be able to carry their burden.  First,

it cannot seriously be questioned that actual damages upon breach of the Master Agreements

were "incapable or difficult of precise estimation" at the time the contracts were executed.

Indeed, courts in this jurisdiction cite "the complex nature of derivative transactions and the

difficulty in assessing damages efficiently after the fact" as grounds for enforcing the ISDA's

close-out methodology. *Merrill Lynch Capital Servs.*, 2012 WL 1202034, at *22.  Second, the

liquidated damages measure, which is the estimated replacement cost of the terminated trades, is

plainly proportional – indeed, likely identical – to the probable loss upon breach.  Replacement

cost – that is, the price Citi would have to pay in the market to replace the trades that were lost –

represents the damages necessary to provide Citi with the "benefit of its bargain" and to place

Citi in the same position it would have occupied "but for" Lehman's breach.  Replacement cost

necessarily includes the transaction costs (including bid/offer and liquidity premium for

oversized trades) charged in the market.  *See id.*, at *23 (enforcing a liquidated damages

calculation that included "the bid/offer spread to reflect the cost to MLCS of reestablishing the

positions that MLCS had under the Swap") (internal quotations omitted).  By contrast, mid-

market value is a manifestly unreasonable measure of damages for the terminated trades because,

by definition, it is insufficient to procure replacements in the market.  *Cf. United States* v.

*Cartwright*, 411 U.S. 546 (1973) (use of "asked" price to value shares was unreasonable where

shareholder could only sell at the "bid" price).  The industry-standard liquidated damages

provisions in the parties' agreements are, without doubt, enforceable.  *See JMD Holdings*, 4

N.Y.3d at 388 (reasonableness of liquidated damages provision bolstered by fact that it was a

"common feature in [industry agreements] negotiated by sophisticated commercial parties"); *GFI*

*Brokers, LLC* v. *Santana*, Nos. 06 Civ. 3988(GEL), 06 Civ. 4611(GEL), 2009 WL 2482130, at

*9 (S.D.N.Y. Aug. 13, 2009) (the "fact that similar liquidated damages clauses are prevalent in the industry" supports finding of reasonableness).[37]

103.     Defendants deny the allegations in paragraph 103 of the SAC.

104.     Defendants deny the allegations in paragraph 104 of the SAC, and refer to Section 502(b)(1) of the Bankruptcy Code for its contents.  Defendants further state that Citi calculated its derivatives claims pursuant to the enforceable liquidated damages provisions in the parties' agreements and therefore Citi's derivatives claims do not include any penalty component subject to disallowance under the Bankruptcy Code.  Indeed, Citi's liquidated damages are essentially congruent with the benefit-of-the-bargain damages Citi would be entitled to in the absence of a liquidated damages clause.

105.     Defendants deny the allegations in paragraph 105 of the SAC, and refer to Section 502(b)(1) of the Bankruptcy Code and the cited documents for their contents.

106.     Defendants deny the allegations in paragraph 106 of the SAC.

---

[37]   Plaintiffs cite only two cases where a liquidated damages provision was found to constitute a penalty.  The clauses at issue in those cases bear no conceivable resemblance to the industry-standard ISDA provisions at issue here.  *See In re MarketXT Holdings Corp.*, 376 B.R. 390, 417 (Bankr. S.D.N.Y. 2007) (invalidating prepayment penalty that "in effect charged the Debtor 76% of the principal amount of its own money if it repaid the putative loan after one day") (cited at SAC ¶ 102); *In re Ionosphere Clubs, Inc.*, 262 B.R. 604, 613 (Bankr. S.D.N.Y. 2001) (invalidating tax indemnification clause that would require debtor to compensate party based on 46% tax rate when party was only subject to 35% tax rate) (cited at SAC ¶ 102).

Plaintiffs also cite *In re Ionosphere* for the proposition that "courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty."  262 B.R. at 614.  Here, however, there can be no reasonable doubt that ISDA's industry-standard provision is enforceable.  In all events, New York's highest court has made clear that the presumption, in fact, should run the other way – *i.e.*,  in favor of enforcement.  While *Ionosphere* relied on older cases from lower courts, the New York Court of Appeals in *JMD Holding Corp.* recently cautioned against interfering with parties' agreements and favorably cited a Seventh Circuit decision noting "an emerging presumption against interpreting liquidated damages clauses as penalty clauses." *JMD Holdings Corp.*, 4 N.Y.3d at 380–81 (quoting *XCO Intl. Inc.* v. *Pac. Scientific Co.*, 369 F.3d 998, 1002-03 (7th Cir. 2004); *see also Koninklijke Philips Elecs. N.V.* v. *Cinram Int'l, Inc.*, Nos. 08-0515, 08-4068, 08-4070, 08-4071, 2012 WL 4074419, at *12 (S.D.N.Y. Aug. 13, 2012) (finding presumption in favor of enforcing liquidated damages provisions particularly strong when damages amount is "assessed among sophisticated parties to a negotiated agreement"); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189, 196 (Bankr. S.D.N.Y. 2012) (burden of proving that liquidated damages clause is punitive "must be considered in light of the admonition that the historical distinction between liquidated damages and penalties has become increasingly difficult to justify, and courts should not interfere with the parties' agreement regarding liquidated damages 'absent some persuasive justification.'") (quoting *GFI Brokers*, 2009 WL 2482130, at *2).

107.    Defendants deny the allegations in paragraph 107 and footnote 7 of the SAC, and refer to Section 506(b) of the Bankruptcy Code and the cited documents for their contents.

108.    Defendants deny the allegations in paragraph 108 and footnote 8 of the SAC, and refer to Sections 507(a)(8)(G) and 726(a)(3) of the Bankruptcy Code for their contents.

109.    Defendants deny the allegations in paragraph 109 of the SAC.

110.    Defendants deny the allegations in paragraph 110 of the SAC.  Defendants further state that in closing out the terminated trades, Citi did substantial netting (what plaintiffs sometimes refer to as "aggregation"), thereby reducing its derivatives claims against Lehman by hundreds of millions of dollars.  Indeed, Citi intended to net all offsetting trades that existed under any ISDA agreement; if Citi overlooked any such trades (where netting would leave Citi in a neutral risk position), Citi will correct the error.  There is, in fact, no actual dispute between the parties with respect to netting *offsetting* trades.  Rather, plaintiffs contend that Citi should have done substantially more netting of dissimilar trades, and accepted uncompensated risks solely for purposes of diminishing its claims against Lehman – a position that has no support in the relevant contracts or applicable law.

111.    Defendants deny the allegations in paragraph 111 of the SAC, except admit that Citi and the Lehman Subsidiaries were parties to several thousand interest rate swaps in which the floating rate was indexed to a commonly used reference such as LIBOR, and that Citi acted as a floating rate payer in certain trades and a floating rate receiver in other trades. Defendants further state that they performed substantial netting with respect to interest rate swaps.  For example, Citi's netting of its G10 USD vanilla interest rate swaps alone reduced its claim by approximately $150 million.

61

112.     Defendants deny the allegations in paragraph 112 of the SAC, except admit that, for risk management purposes, Citi looks at its derivatives trades under various scenarios and groupings (*i.e.*, "aggregation") and admit that Citi does not execute a specific hedging transaction to offset each and every one of the trades it executes with customers.

113.     Defendants deny the allegations in paragraph 113 of the SAC, except admit that Citi would not have been able to enter into replacements for all of the terminated trades on or around the date of LBHI's bankruptcy filing.  Defendants further state that there are over 30,000 terminated derivatives trades, not 20,000 as alleged by plaintiffs in paragraph 113 (indeed, there were nearly 20,000 credit trades alone).

114.     Defendants deny the allegations in paragraphs 114 of the SAC, and refer to Citigroup Inc.'s 2008 Annual Report for its contents.  Throughout the SAC, plaintiffs invoke Citi's "risk management practices" as a reason Citi supposedly was obligated to net more aggressively when calculating its derivatives claims against Lehman.  But Citi's risk management practices – whatever they might be, for plaintiffs' allegations lack any specificity – in no way limit Citi's entitlement to benefit-of-the-bargain damages upon Lehman's default.  As a fundamental part of its business model, Citi takes risks in order to earn profits.  Citi's risk management policies and practices are developed to contain these risks, but certainly not to eliminate them.  Where, as here, a counterparty has breached a contract with Citi, Citi is entitled to recover its replacement cost (*i.e.,* the benefit of its bargain) and cannot be forced to accept uncompensated risk simply because, in certain circumstances, Citi might be willing to take on similar risk in the pursuit of profit.  In calculating its claim, Citi appropriately netted transactions in a manner that did not expose Citi to undue and uncompensated risks.  It would not be commercially reasonable to require Citi to do more.

62

115.    Defendants deny the allegations in paragraph 115 of the SAC, and refer to the COA Master Agreements and 2002 ISDA Master Agreement for their contents.

116.    Defendants deny the allegations in paragraph 116 of the SAC, except admit that they netted offsetting rates and FX trades.

117.    Defendants deny the allegations in paragraph 117 of the SAC.

118.    Defendants deny the allegations in paragraph 118 of the SAC, and refer to the cited document for its contents.  Under the parties' agreements, Citi was required to calculate the replacement cost of the terminated trades in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result.  The netting principles Citi adopted were commercially reasonable and, in fact, wholly consistent with the netting to which Citi would agree in the ordinary course of business.

119.    Defendants deny the allegations in paragraph 119 of the SAC.

120.    Defendants deny the allegations in paragraph 120 of the SAC, except refer to the cited documents for their contents.  Defendants further state that under New York law, "[m]itigation of damages is not relevant when there is a valid liquidated damages clause." *Delvecchio v. Bayside Chrysler Plymouth Jeep Eagle, Inc.*, 271 A.D.2d 636, 639 (2d Dep't 2000).  Rather, "once liquidated damages are awarded pursuant to a valid contract provision, the plaintiff need not make efforts to mitigate those damages and subtract the mitigation from the liquidated damages award." *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 351 n.3 (S.D.N.Y. 2003).  Citi was obligated to calculate its damages pursuant to a valid liquidated damages clause and did so in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result.

121.    Defendants deny the allegations in paragraph 121 of the SAC.

63

122.    Defendants deny the allegations in paragraph 122 of the SAC, except admit that, prior to Lehman's bankruptcy, the parties entered into credit default swap ("CDS") trades under the LBSF-Citibank, LBSF-Global, and LBSF-Financial Agreements, and admit that Citi was the net buyer of protection.  Defendants further state that there were 17,673 CDS trades[38] under these agreements, for which Citi calculated a net claim of $1.731 billion pursuant to the industry-standard liquidated damages provision.  Plaintiffs have refused to disclose the alleged "readily available market data" underlying their so-called "Market-Based Calculation of Proper Close-out Amount" (as reflected in the chart at paragraph 122).  Given the extreme positions plaintiffs have staked out in the SAC, however, plaintiffs' chart clearly presents an illegitimate, "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' calculations reflect a mid-market value only, even though replacement cost is the measure of damages mandated by the parties' agreements and necessary to provide Citi with the benefit of its bargain.  Further, upon information and belief, plaintiffs' calculations are performed as of September 15, 2008, whereas Citi – following commercially reasonable procedures – closed out the majority of CDS trades on September 16, 2008.  Citi also disagrees with certain trade counts and claim amounts set forth in the chart, and a corrected version of the chart appears below.

---

[38]   Citi's credit derivatives businesses trade CDS on securitized products in addition to CDS on single names, indices, and index tranches.  In total, Citi's credit businesses closed out approximately 19,000 Lehman-facing trades.  Plaintiffs' SAC, however, treats CDS on securitized products as a separate category.  To prevent confusion, and in order to provide meaningful responses, Citi has attempted to follow plaintiffs' convention when responding to (and correcting) the charts and tables in the SAC.

| Close-out Amount Calculations for CDS Portfolios [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Master Agreement | Category | No. Trades | Citi Calculation of Close-out Amount | ~~Market-Based Calculation of Proper Close-out Amount~~ | ~~Difference~~ |
| LBSF-Citibank | Single Name CDS | ~~12,309~~ **12,348** | ~~(821,552,321)~~ **(815,865,570)** | ~~(116,487,932)~~ | ~~705,064,389~~ |
|  | Index CDS | ~~711~~ **706** | ~~(693,063,792)~~ **(674,571,215)** | ~~(502,481,629)~~ | ~~190,582,163~~ |
|  | Index Tranche | ~~371~~ **383** | ~~3,387,187~~ **(3,113,410)** | ~~115,038,873~~ | ~~111,651,686~~ |
|  | OTHER | ~~637~~ **647** | ~~(21,016,480)~~ **(47,979,880)** | ~~32,736,723~~ | ~~53,753,203~~ |
|  | TOTAL | ~~14,028~~ **14,084** | ~~(1,532,245,406)~~ **(1,541,530,074)** | ~~(471,193,966)~~ | ~~1,061,051,441~~ |
| ~~LBSF-Financial~~ **LBSF-Global** | Single Name CDS | ~~3,039~~ **3,045** | ~~(123,912,599)~~ **(127,163,130)** | ~~(9,116,039)~~ | ~~114,796,560~~ |
|  | Index CDS | ~~195~~ **193** | ~~(47,202,484)~~ **(46,004,249)** | ~~(10,281,440)~~ | ~~36,921,044~~ |
|  | Index Tranche | ~~130~~ **125** | ~~(2,713,695)~~ **(688,742)** | ~~36,229,572~~ | ~~38,943,267~~ |
|  | OTHER | ~~72~~ **70** | ~~(37,599,585)~~ **(38,763,161)** | ~~(26,080,649)~~ | ~~11,518,935~~ |
|  | TOTAL | ~~3,436~~ **3,433** | ~~(211,428,363)~~ **(212,619,282)** | ~~(9,248,557)~~ | ~~202,179,806~~ |
| ~~LBSF-Global~~ **LBSF-Financial** | Single Name CDS | ~~130~~ **132** | ~~(34,634,116)~~ **(57,512,823)** | ~~(28,268,069)~~ | ~~6,366,048~~ |
|  | Index CDS | ~~11~~ **8** | ~~24,557,472~~ **23,994,765** | ~~24,933,234~~ | ~~375,762~~ |
|  | Index Tranche | 11 | 53,987,807 | ~~59,732,919~~ | ~~5,745,112~~ |
|  | OTHER | ~~7~~ **5** | ~~(20,773,083)~~ **2,668,332** | ~~(16,769,041)~~ | ~~4,004,041~~ |
|  | TOTAL | ~~159~~ **156** | 23,138,081 | ~~39,629,043~~ | ~~16,490,963~~ |
|  | GRAND TOTAL | ~~17,623~~ **17,673** | ~~(1,720,535,689)~~ **(1,731,011,276)** | ~~(440,813,479)~~ | ~~1,279,722,210~~ |

123.  Defendants deny the allegations in paragraph 123 of the SAC, except admit that single name CDS and index CDS account for the substantial majority of credit derivatives in Citi's claim.  Defendants further state that, out of 17,673 CDS trades, 15,525 are single name CDS and 907 are index CDS.

124.  Defendants deny the allegations in paragraph 124 of the SAC, except admit that Citi closed out the substantial majority of its CDS trades on September 16, 2008, the day following the Early Termination Date.  Defendants further state that this one day provided

65

the time needed for Citi to organize and coordinate the close-out across Citi's various credit

businesses. Lehman's default was an unprecedented event in the OTC derivatives market; no

major dealer had ever before defaulted on its derivatives obligations and Citi had never before

closed out a derivatives portfolio anywhere near the size of its over 30,000 Lehman-facing

trades. Almost two-thirds – or nearly 20,000 – of these trades resided in Citi's various credit

businesses.[39] Because these businesses traded certain overlapping products (including single

name CDS), Citi undertook to transfer all such trades to the particular credit desk that acted as a

market-maker for the underlying reference entity (*e.g.*, General Motors Company (GM),

International Business Machines Corporation (IBM), JPMorgan Chase & Co. (JPM)). That way,

all trades referencing a particular name could be closed out at a consistent time and by traders

with the most market knowledge and experience trading that particular name. In light of this

effort (which resulted in the transfer of more than 2,300 credit trades), Citi traders did not begin

to close out most credit trades until the morning of September 16, 2008. The traders then

proceeded to close out the trades over the course of that day, as expeditiously as possible. The

overwhelming majority of CDS trades were closed out on September 16, 2008, with a minority

closed out over the following days. Plaintiffs' purported "Market Based Calculation of Close-

out Amounts" as of both "Citi's Close-out Date" and the "Early Termination Date" (as set forth

in the chart at paragraph 124), depict deeply flawed results because, upon information and belief,

they reflect only mid-market valuations, rather than replacement cost valuations, as mandated by

---

[39]   Citi's credit businesses include Global Credit Trading, Emerging Markets, Portfolio & Exotics Credit
      Derivatives, Global Securitized Markets, and the Subprime Portfolio Group. As previously noted, businesses
      that trade securitized products are considered part of Citi's credit business. In responding to and correcting the
      charts in the SAC, however, Citi follows plaintiffs' convention and treats CDS on securitized products
      separately.

the parties' agreements.  A corrected version of the chart in paragraph 124 of the SAC appears

below.

| Effect of Using a Close-out Date Other Than the Early Termination Date | | | | | |
|---|---|---|---|---|---|
| Early Termination Date | Citi Close-out Date | No. Trades | ~~Market-Based Calculation of Close-out Amounts as of Citi Close-out Date ($)~~ | ~~Market-Based Calculation of Close-out Amounts as of Early Termination Date ($)~~ | ~~Difference ($)~~ |
| 9/15/2008 | 9/16/2008 | ~~14,239~~ **14,288** | ~~(664,215,476)~~ | ~~(611,706,050)~~ | ~~52,509,426~~ |
| 9/15/2008 | 9/17/2008 | ~~1,715~~ **1,728** | ~~(41,948,991)~~ | ~~(46,614,107)~~ | ~~(4,665,116)~~ |
| 9/15/2008 | 9/18/2008 | ~~41~~ **47** | ~~(4,252,375)~~ | ~~(2,712,216)~~ | ~~1,540,159~~ |
| 9/15/2008 | 9/19/2008 | 44 | ~~3,136,883~~ | ~~2,152,160~~ | ~~(984,723)~~ |
| **TOTAL** | | ~~16,039~~ **16,107** | ~~(707,279,959)~~ | ~~(658,880,214)~~ | ~~48,399,745~~ |

   125. Defendants deny the allegations in paragraph 125 of the SAC, except

admit that Citi is a market-maker in CDS.  Defendants further state that, far from violating the

contracts or applicable law, Citi's effort to effectively organize the credit close-out was a

commercially reasonable – indeed, commendable – procedure, clearly aimed at producing a

commercially reasonable result.  Plaintiffs' allegation that "Citi has provided very little

information regarding the methodology or the specific timing of the close-out process for the

CDS portfolio," is disingenuous.  Citi submitted extremely detailed responses to the Derivatives

Questionnaire (far beyond what was required under the Bar Date Order)[40] and provided Lehman

with direct access to the head traders who oversaw the credit close-out process in a series of

lengthy, in-person meetings during the spring and summer of 2010.  During those meetings,

---

[40] These responses were subsequently updated and can be found at CITI-LEH00962090-98.

Citi's credit traders described the close-out process in detail, including the fact that Citi took the time to transfer trades to the relevant market-maker and that CDS trades were valued over the course of the day on September 16 and, to a lesser extent, the days that followed.

126.    Defendants deny the allegations in paragraph 126 of the SAC and footnote 9, except lack knowledge or information sufficient to form a belief about the valuation dates used by Lehman's other, unnamed counterparties or the composition of their CDS portfolios with Lehman.  Defendants further state, upon information and belief, that many of Lehman's big bank counterparties valued CDS on dates other than September 15, 2008.  Indeed, the Derivatives Settlement Framework that Lehman developed and used to settle the claims of ten of its largest bank counterparties, values a counterparty's credit trades on either September 15, 16, 17, 18, or 19, depending on which date each counterparty valued the "preponderance" of these trades. Defendants further state that they disagree with the trade counts reflected in plaintiffs' chart in paragraph 126 of the SAC, and a corrected version appears below.

| CDS Common between Citi and Other Large Financial Institutions where Other Institution was able to value as of September 15, 2008 | | | | |
|---|---|---|---|---|
| | Citi | | Other Large Institutions | |
| Category | Index or Single Name Present in Citi Population | No. Trades | Index or Single Name in Common with Citi | No. Trades |
| Index | ~~138~~ **135** | ~~906~~ **900** | ~~121~~ | ~~9,602~~ |
| Single Name | ~~961~~ **949** | ~~15,156~~ **15,207** | ~~911~~ | ~~111,605~~ |
| **TOTAL** | ~~1,099~~ **1,084** | ~~16,062~~ **16,107** | ~~1,032~~ | ~~121,207~~ |

127.    Defendants deny the allegations in paragraph 127 of the SAC, except admit that Citi valued CDS trades over the course of the day on September 16 and, to a lesser extent, the days that followed.  Defendants further state that nothing in the governing ISDA

agreements or applicable law required Citi to value its trades at any particular time of day, or at the same time of day. While plaintiffs allege that the chart at paragraph 127 of the SAC compares Citi's mid-market claim on its CDS trades with mid-market values plaintiffs have derived from "publicly available market data," plaintiffs have refused to disclose the data they are relying on for their supposedly market-based calculations. In fact, Citi's mid-market values for these CDS trades are *entirely consistent* with mid-market values implied by data from either GFI, the leading interdealer broker for CDS, or CMA, one of the world's leading sources of independent data on the OTC markets.[41] A corrected version of the chart in paragraph 127 of the SAC, reflecting the correct trade count and Citi's mid-market valuation for its CDS trades, appears below.

| Comparison of Citi Mid-Market Values to Proper Calculation [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Mid-Market Calculation ($)** | ~~**Market-Based Calculation as of the Close-out Date ($)**~~ | ~~**Difference ($)**~~ |
| LBSF-Citibank | ~~12,211~~ **12,820** | ~~(912,857,878)~~ **(645,155,075)** | ~~(847,305,621)~~ | ~~65,552,257~~ |
| LBSF-Financial | ~~123~~ **75** | ~~10,183,880~~ **19,682,687** | ~~11,116,009~~ | ~~932,129~~ |
| LBSF-Global | ~~2,993~~ **2,978** | ~~(34,418,037)~~ **(21,879,199)** | ~~(38,403,727)~~ | ~~(3,985,690)~~ |
| **TOTAL** | ~~**15,327**~~ **15,873** | ~~**(937,092,035)**~~ **(647,351,586)** | ~~**(874,593,339)**~~ | ~~**62,498,696**~~ |

128.    Defendants deny the allegations in paragraph 128 of the SAC. Defendants further state that, while the Master Agreements clearly permit netting – providing a "Close-out

---

[41]    GFI data contains two-sided quotes (*i.e.*, both a bid and an offer) for trades with the same or similar maturity to 1,422 CDS trades in Citi's claim for which Citi's mid-market values are identified (using quotes that either match the maturity of a trade in Citi's claim, or come within one year of matching a trade in Citi's claim). The "best" GFI spreads (*i.e.*, most favorable for Lehman) for these trades imply an aggregate mid-market value that is only $8.8 million lower than Citi's aggregate mid-market value for these trades. CMA data, by contrast, provides bid and offer curves based on actual observed quotations for 13,136 of the CDS trades in the close-out with identified mid-market values. The CMA data implies an aggregate mid-market value that is only $32.4 million lower than Citi's mid-market values across all 13,136 trades.

Amount" should be determined for each "Terminated Transaction or group of Terminated

Transactions" – they say nothing about the degree of netting that is appropriate, other than the

overriding obligation of commercial reasonableness.  Citi netted the terminated trades in a

commercially reasonable fashion when calculating its claim.  For credit trades, in particular, Citi

netted trades that had the same reference entity, maturity, and strike, even if the trades had

different notional amounts.[42]  This methodology is not, as plaintiffs allege, "excessively narrow."

Rather, it provides plaintiffs with the benefits of netting trades that are truly risk equivalent, but

charges Lehman for defaulting on trades that cannot be netted without imposing undue risks on

Citi.  This methodology is consistent with industry practice as well as the parties' own course of

dealing.  Plaintiffs' Second Amended Complaint supplies a perfect example.  In September 2008,

prior to LBHI's bankruptcy, a trade collapse transaction was proposed whereby Lehman would,

essentially, net down a portion of its CDS portfolio:  Citi would step into certain CDS trades

where Lehman faced Bracebridge and Citi would cancel offsetting trades where Citi faced

Lehman.  The initial proposal was that Citi would step into 93 trades with Bracebridge (where

Bracebridge had sold protection to Lehman on specific RMBS) and cancel 31 trades with

Lehman (where Lehman had sold protection to Citi on the exact same RMBS).  Citi agreed that

most of the proposed trades could be collapsed, because they had matching reference obligations,

maturities and strikes.  Citi, however, rejected one set of trades where the strikes differed by

seven basis points (or 0.07%) and Lehman flagged another set that differed on strikes by ten

basis points (or 0.1%).  The parties agreed that these mismatched trades would not be included in

---

[42]  For CDS, the "reference entity" refers to the underlying bond for which credit protection is bought or sold (*e.g.*, General Motors, IBM, News Corp., and the like).  The "notional amount" is the dollar amount of credit protection bought or sold.  "Maturity" refers to the date on which the CDS protection ends.  The "strike" is the annual coupon payment owed, which is a percentage of the notional amount, and is expressed in basis points. For example, if the protection buyer pays 5% annually for $10 million notional of protection, the strike price for the trade is 500 bps.

the proposed transaction because they were not, in fact, offsetting, and therefore netting them

would leave undue risk.  Indeed, commercial entities, including TriOptima AB, provide multi-

lateral netting services (sometimes referred to as "trade compression") to market participants, so

that parties with massive CDS portfolios – like Citi and other dealers – can net down these

portfolios to limit operational and other risks.  TriOptima AB nets trades only where, among

other things, they have the same reference entities, maturity, and strike.  The aggressive netting –

including across entirely different reference entities – that plaintiffs advocate in the SAC bears

no resemblance to the commercially reasonable netting Citi (like other market participants) is

willing to do in the ordinary course of business without additional compensation.

       129.   Defendants deny the allegations in paragraph 129 of the SAC.  While

plaintiffs have refused to disclose the alleged "available market data" underlying their purported

"Market-Based Calculation of Proper Close-out Amount" with respect to index CDS, plaintiffs'

chart, again, clearly presents an illegitimate comparison.  Upon information and belief, plaintiffs'

calculations reflect a mid-market value only (while replacement cost is the measure mandated by

the parties' agreements) and plaintiffs admit their calculation is as of September 15 (while Citi,

following commercially reasonable procedures, closed out the majority of its index CDS on

September 16).  In addition, there are various typographical errors in the list of indices and

certain mistakes with respect to trade count and claim amounts in plaintiffs' chart.  A corrected

version of the chart appears below.

| Largest Valuation Differences By Index for LBSF-Citibank Agreement [values in USD to LBSF] | | | | | |
|---|---|---|---|---|---|
| Index | Maturity Date | No. Trades | Citi Calculation of Close-out Amount ($) | ~~Market-Based Calculation of Proper Close-out Amount ($)~~ | ~~Difference ($)~~ |
| DJCDX-NAHYS5-5Y | 12/20/2010 | 8 | (32,684,631) | (9,750,860) | 22,933,771 |
| CDX-NAHYS8-3Y | 6/20/2010 | 3 | 100,260,707 | ~~122,102,719~~ | ~~21,842,012~~ |
| DJCDX-NAHYS4-5Y | 6/20/2010 | 10 | (20,174,064) | 78,972 | 20,253,036 |
| ~~ITRA XX EUROPES6-5Y~~ **ITRAXX-EUROPES6-10Y** | 12/20/2016 | 8 | (77,839,717) | (61,903,011) | 15,936,705 |
| ~~ITRA XX EUROPES7-5Y~~ **ITRAXX-EUROPES7-10Y** | 6/20/2017 | 6 | (51,335,588) | (39,983,229) | 11,352,359 |
| DJCDX-NAHYS3-5Y | 12/20/2009 | ~~12~~ **17** | (5,302,949) | 3,292,528 | 8,595,478 |
| ~~DJCDX-NAIGS7-10Y~~ **DJCDX-NAIGS7-5Y** | 12/20/2011 | 3 | (90,213,250) | (81,931,955) | 8,281,294 |
| DJCDX-NAIGS7-10Y | 12/20/2016 | 7 | (99,528,844) | (91,427,498) | 8,101,046 |
| ~~CDX-NAIGS8-3Y~~ **CDX-NAIGS8-5Y** | 6/20/2012 | 4 | (100,392,872) | (93,595,444) | 6,797,428 |
| ~~DJCDX-NAIGHVOLS4-4Y~~ **DJCDX-NAIGHVOLS4-5Y** | 6/20/2010 | ~~6~~ **7** | (46,972,614) | (40,354,147) | 6,618,467 |
| ~~CDX-NAIGS9-1Y~~ **CDX-NAIGS9-10Y** | 12/20/2017 | 5 | (71,958,594) | (65,875,651) | 6,082,943 |
| ~~LCDXNA S10-3Y~~ **LCDXNA S10-5Y** | 6/20/2013 | 28 | (34,218,178) | (29,912,466) | 4,305,712 |
| ~~CDX-NAHYS8-10Y~~ **CDX-NAHYS8-5Y** | 6/20/2012 | 4 | (43,449,365) | (39,148,984) | 4,300,382 |
| ~~DJCDX-NAIGHVOLS3-4Y~~ **DJCDX-NA IGHVOLS3-10Y** | 3/20/2015 | 2 | (14,835,643) | (10,865,728) | 3,969,915 |
| DJCDX-NAHYBS6-5Y | 6/20/2011 | 12 | 6,203,772 | 9,713,154 | 3,509,382 |
| Remaining 88 Index Positions | | ~~593~~ **582** | ~~(110,621,962)~~ **(92,129,385)** | (72,920,030) | 37,701,932 |
| **TOTAL** | | ~~711~~ **706** | ~~(693,063,792)~~ **(674,571,215)** | (502,481,629) | 190,582,163 |

130.     Defendants deny the allegations in paragraph 130 of the SAC, except admit that the two high-yield indices described by plaintiffs – the CDX-NAHYS8-3Y (the "HYS8") and the DCDX-NAHYS4-5Y (the "HYS4") – share 72 out of 100 component names in common and contain 28 unique names, and admit that Citi was a net seller of protection on the HYS8 and a net buyer of protection on the HYS4. Defendants further state that there was very little liquidity in these "off-the-run" indices – both the HYS8 and HYS4 were outdated products that did not trade with frequency over the time period specified in plaintiffs' chart. As a result,

defendants lack knowledge or information sufficient to form a belief about the "price correlation" for these products from March 2008 through September 2008 and plaintiffs have refused to disclose the data underlying their chart.  In any event, the alleged "price correlation" (even if it could be verified) is irrelevant to the question of whether trades in *different* indices nonetheless present offsetting risk that should be netted.  They do not.  More than a quarter of the high-yield names in each of these indices are different.  Thus, requiring Citi to net these trades at close-out would not be commercially reasonable, because doing so would have left Citi with substantial uncompensated risk.

131.    Defendants deny the allegations in paragraph 131 of the SAC.

132.    Defendants deny the allegations in paragraph 132 of the SAC, except admit that Citi did not execute replacement trades at close-out with respect to its massive positions in these "off-the-run" indices.  Defendants further state that plaintiffs' contention that Citi should have netted HYS4 trades against HYS8 trades ignores commercial reality, and seeks to impose unjustified costs and risks on Citi, solely to benefit Lehman, the defaulting party.  The fact that Citi did not replace its massive positions in the HYS8 (in which Citi, on a net basis, sold $2.7 billion of protection) and HYS4 (in which Citi, on a net basis, bought $1.1 billion of protection) at the close-out is factually and legally irrelevant – Citi calculated its claims reasonably and in good faith, in a manner consistent with the liquidated damages clause in the parties' agreements.  But, given the lack of liquidity in these "off-the-run" indices, it is doubtful that Citi could have replaced these extremely large positions at the close-out, if it had tried.

133.    Defendants deny the allegations in paragraph 133 of the SAC, except admit that plaintiffs' chart accurately notes whether LBSF was the buyer or seller of protection and accurately reflects Citi's mid-market values for the three indices listed.  Defendants further

state that plaintiffs have refused to identify the source of the "publicly available market data" used to calculate plaintiffs' alleged "market-based" mid-market values for these three "off-the-run" indices.

134.    Defendants deny the allegations in paragraph 134 of the SAC, except admit that the three indices referenced in paragraph 134 are high-yield indices, admit that two of these are the indices for which plaintiffs purported to calculate price correlation in paragraph 129 and admit that credit spreads generally widened and "credit protection generally became more expensive to purchase" in the aftermath of LBHI's bankruptcy.  Plaintiffs' allegation that "Citi is claiming that the market moved more favorably for Citibank (relative to LBSF) regardless of whether Citibank was a buyer or seller of protection" on the three high-yield indices referenced in paragraph 134 is utterly without foundation.  In support, plaintiffs point to their allegation that Citi's mid-market valuations on all three indices are higher than some other alleged "market-based" valuation (the source of which plaintiffs have refused to disclose).  But Citi's mid-market valuations are "point-in-time" calculations.  The fact that they may be higher (with respect to both buys and sells on different indices) than some other "point-in-time" valuations says nothing at all about Citi's view of the direction the market was moving on these trades or on credit protection more generally.  In all events, far from undermining Citi's mid-market calculations, the alleged valuation differences actually suggest *extremely small* disagreements over the mid-market value for these trades.  On each of the three indices, as a percentage of notional, Citi's valuation is no more than 0.7% apart from plaintiffs' alleged "market-based" valuation.  It is only because these positions are enormous – totaling nearly $5 billion in aggregate – that very minor differences in pricing can add up to a valuation difference of more than $30 million.

Plaintiffs' alleged "market-based" valuations with respect to these indices actually support the commercial reasonableness of Citi's claim values.

135.    Defendants deny the allegations in paragraph 135 of the SAC.  Defendants further state that, consistent with the ISDA agreements and applicable law, Citi calculated the replacement costs of the terminated trades.  These replacement costs included reasonable bid/offer charges and, where appropriate, liquidity premiums for large-size positions.  Off-setting CDS positions were netted.  Citi's Derivatives Questionnaire response (submitted to Lehman pursuant to the Bar Date Order and subsequently updated at CITI-LEH00962090-98) provided, wherever possible, a break-out of the specific components – mid-market, bid/offer and, if applicable, liquidity premium – of Citi's valuation.  In certain cases – including where Citi valued a trade based on a quotation that did not specify these components – Citi was unable to provide a breakdown of these components and, instead, provided an "all-in" close-out amount for the trade.  A corrected version of the chart in paragraph 135 of the SAC appears below.

| Citi Hypothetical Bid/Offer Charges [values in USD to Lehman] | | | | |
|---|---|---|---|---|
| Category | No. Trades | Citi Mid-Market Value ($) | Citi Final Close-out Amount ($) | Bid/Offer Charge [Includes Liquidity Premiums] ($) |
| SINGLE NAME CDS | ~~14,962~~ **14,743** | ~~(238,895,519)~~ **(105,682,264)** | ~~(975,650,237)~~ **(808,496,610)** | ~~736,754,718~~ **703,893,108** |
| INDEX CDS | ~~685~~ **689** | ~~(612,620,083)~~ **(596,998,194)** | ~~(776,931,814)~~ **(759,285,151)** | ~~164,311,731~~ **158,498,318** |
| INDEX TRANCHE | ~~489~~ **494** | ~~122,495,276~~ **118,944,041** | ~~(14,204,158)~~ **(18,239,095)** | ~~136,699,434~~ **137,183,135** |
| SINGLE NAME LCDS | ~~645~~ **633** | ~~(23,646,792)~~ **(53,122,509)** | ~~(52,953,970)~~ **(81,552,861)** | ~~29,307,178~~ **28,436,232** |
| RECOVERY LOCK | ~~29~~ **58** **(29 pairs)** | 7,971,418 | (7,384,142) | 15,355,560 |
| CDO | ~~8~~ **4** | ~~8,977,074~~ **9,721,181** | ~~5,127,746~~ **6,172,111** | ~~3,849,328~~ **3,549,070** |
| INDEX TRANCHE PO | 3 | (1,331,279) | (3,431,279) | 2,100,000 |
| CDO SQUARED | 1 | (2,271,644) | (2,697,643) | 425,999 |
| SPREAD OPTION | 2 | 3,564,277 | 3,490,494 | 73,783 |
| TOTAL | ~~16,824~~ **16,627** | ~~(735,757,271)~~ **(619,203,973)** | ~~(1,824,635,003)~~ **(1,671,424,174)** | ~~1,088,877,732~~ **1,049,515,205** |

136.    Defendants deny the allegations in paragraph 136 of the SAC, except

admit that Citi is a market-maker and that Citi has access to the interdealer market.  Defendants

further state that plaintiffs' allegation that Citi – as a market-maker with access to the interdealer

market – could have replaced the terminated trades "at mid-market valuations," is false and

directly contradicted by available data.  As discussed (*supra* ¶¶ 9, 10 & n.17 ), data from GFI –

the leading interdealer broker for CDS – clearly shows that bid/offer is charged in the interdealer

market.  Indeed, if Citi revalued the terminated CDS trades using the bid/offer spreads reflected

in the GFI data as of the close-out, Citi's claim would have been *higher,* not lower.  Comparing

the quotes from GFI (the interdealer broker) with those from CMA (which reports end-of-day

bids and offers derived from the end-user market (*supra* n.16)), shows that bid/offer spreads in

the interdealer market were consistently *wider* than CMA's quotes (*supra* ¶ 10 & n.17).  What is

more, the interdealer market tends to be a fairly narrow market, one typically restricted to only

the most liquid CDS, with a focus on standard maturities (*i.e.*, five- and ten-year ).  Thus, GFI

data has contemporaneous quotes for trades within one year of the maturity for only 1,422 of the

18,767 credit trades Citi closed out (*i.e.*, 7.5% of Citi's trades).  CMA, by contrast, provides full

bid/offer curves based on actual quotes for 13,136 of the 18,767 credit trades in Citi's claim – or

70%.  If Citi revalued these 13,136 trades using the bid/offer spreads in the CMA data, Citi's

CDS claim, again, would have been *higher* by more than $70 million.[43]  Publicly available

market data, including from GFI and CMA, clearly supports the commercial reasonableness of

Citi's bid/offer charges.

137.    Defendants deny the allegations in paragraph 137 of the SAC, except

admit that the CDX_IG indices were created to track a group of investment grade corporations

and admit that the CDX_IG_10 five-year and the CDX_IG_9 five-year indices were created six

months apart and track a list of corporations that substantially overlap.

138.    Defendants deny the allegations in paragraph 138 of the SAC, except

admit that there are multiple market-makers with respect to index CDS and lack knowledge or

information sufficient to form a belief about the Lehman Subsidiaries' trading activities on

September 12, 2008.

139.    Defendants deny the allegations in paragraph 139 of the SAC, except

admit that, in addition to charging reasonable bid/offer, Citi charged liquidity premiums for

---

[43]    This calculation compares CMA's bid or offer data that is based on actual quotes observed for standard-sized
trades on the day of the close-out, with Citi's mid-market plus bid/offer claim amounts (excluding liquidity
premiums for large-sized trades).

oversized positions, such as those reflected in the chart at paragraph 139. Defendants further state that the chart in paragraph 139 contains various errors, including clear mistakes in the names of certain indices, the size of Citi's net positions, the number of trades, and the dollar amount of Citi's bid/offer and liquidity charges. A corrected table appears below.

**LBSF-Citibank Index CDS Positions Related to "CDX_IG"**
[values in USD to LBSF]

| Index | Maturity Date | No. Trades | Average Size of Trade between Citibank and LBSF ($) | Citibank's Net Position with LBSF ($) | ~~Number of Average Size Trades Required to Close Out Citibank Position~~ | ~~Credit Spread of Index on 9/15/2008 (basis points)~~ | **Bid/Offer Charges and Liquidity Premiums Included by Citibank ($)** ~~Hypothetical Charges Included by Citibank ($)~~ | ~~Hypothetical Charges Included by Citibank (Basis Points)~~ |
|---|---|---|---|---|---|---|---|---|
| DJCDX-NAIGS1-5Y | 3/20/2009 | 6 | ~~34,802,667~~ **35,083,333** | ~~(139,376,000)~~ **(140,500,000)** | ~~4.0~~ | ~~186~~ | 112,878 | ~~16.1~~ |
| DJCDX-NAIGS2-5Y | 9/20/2009 | ~~3~~ **4** | ~~90,933,333~~ **68,750,000** | ~~(173,600,000)~~ **(175,000,000)** | ~~1.9~~ | ~~206~~ | ~~942,640~~ **273,726** | ~~15.8~~ |
| DJCDX-NAIGS4-5Y | 6/20/2010 | 3 | 33,166,667 | 500,000 | ~~0.0~~ | ~~244~~ | 489 | ~~6.0~~ |
| CDX-NAIGS10-3Y | 6/20/2011 | 2 | 592,500,000 | 1,185,000,000 | ~~2.0~~ | ~~194~~ | ~~5,897,464~~ **2,267,494** | ~~12.0~~ |
| DJCDX-NAIGS7-5Y | 12/20/2011 | 3 | 485,000,000 | (1,455,000,000) | ~~3.0~~ | ~~233~~ | ~~2,267,494~~ **6,515,474** | ~~7.6~~ |
| CDX-NAIGS8-5Y | 6/20/2012 | 4 | 386,875,000 | (1,547,500,000) | ~~4.0~~ | ~~217~~ | ~~273,726~~ **5,897,464** | ~~16.1~~ |
| CDX-NAIGS9-5Y | 12/20/2012 | 5 | 124,098,000 | (496,490,000) | ~~4.0~~ | ~~204~~ | ~~6,515,474~~ **2,130,814** | ~~16.0~~ |
| ~~DJCDX-NAIGS7-5Y~~ **DJCDX-NAIGS7-7Y** | 12/20/2013 | 2 | 303,875,000 | (387,750,000) | ~~1.3~~ | ~~224~~ | 2,553,642 | ~~16.0~~ |
| ~~DJCDX-NAIGS1-5Y~~ **DJCDX-NAIGS1-10Y** | 3/20/2014 | 6 | ~~22,320,000~~ **22,500,000** | ~~133,920,000~~ **135,000,000** | ~~6.0~~ | ~~184~~ | ~~9,351,415~~ **942,640** | ~~15.9~~ |
| ~~CDX-NAIGS9-5Y~~ **CDX-NAIGS9-7Y** | 12/20/2014 | 9 | 27,335,333 | 14,018,000 | ~~0.5~~ | ~~196~~ | ~~2,130,814~~ **81,565** | ~~12.0~~ |
| ~~DJCDX-NAIGS7-5Y~~ **DJCDX-NAIGS7-10Y** | 12/20/2016 | 7 | 145,928,571 | (1,021,500,000) | ~~7.0~~ | ~~209~~ | ~~81,565~~ **9,351,415** | ~~12.0~~ |
| ~~CDX-NAIGS9-5Y~~ **CDX-NAIGS9-10Y** | 12/20/2017 | 5 | 177,500,000 | (887,500,000) | ~~5.0~~ | ~~190~~ | 6,803,092 | ~~12.0~~ |
| **TOTAL** | | ~~55~~ **56** | | ~~(4,775,278,000)~~ **(4,776,722,000)** | | | 36,930,693 | |

140. Defendants deny the allegations in paragraph 140 of the SAC, except admit that Citi was left with extremely large net positions in these, mostly "off-the-run" indices and Citi's claims reflect the considerable bid/offer and liquidity premium that the market would

charge to replace these positions.  Defendants further state that plaintiffs' contentions regarding

the "average size" of the terminated trades between Citi and Lehman, or the number of "average

size trades Citibank would need to do if it were to replace the entire position," are disingenuous,

if not intentionally misleading.  The "average size" of the trades that happened to exist between

Citi and Lehman is irrelevant to the bid/offer and liquidity charges that would be applied in the

market to replace these positions; what matters is the *standard size of trades transacted in the

market* with respect to these mostly "off-the-run" indices.  Market quotations are typically good

only up to the standard sizes.  The market charges a liquidity premium (or increased bid/offer)

for trades that are larger than standard size.  For example, plaintiffs allege that, to replace Citi's

$1.185 billion position in CDX-NAIGS10-3Y, Citi only "would have needed to enter into two

average-sized new trades."  The average size of Citi's trades with Lehman on this index might

happen to be over $590 million, but that is many multiples higher than the standard-sized trade in

this index (the only "on-the-run" index in the list).  In using the patently irrelevant "average size"

of the trades Citi happened to have with Lehman, plaintiffs' chart grossly understates the number

of standard-sized trades that would be required to replace Citi's positions in these indices.  Citi's

bid/offer and liquidity charges with respect to these indices are commercially reasonable.

        141.    Defendants deny the allegations in paragraph 141 of the SAC.  Defendants

further state that a substantial proportion of their Lehman-facing trades are non-standard in a

variety of ways – including that they are large positions, have non-standard maturities, reference

off-the-run indices or are otherwise illiquid – and so could not feasibly be replaced at close-out.

Upon information and belief, had Citi actually attempted to enter into replacement trades for all

of the terminated CDS at close-out, the resulting claims would have been *higher*, not lower.[44]  In

the days, weeks, and months that followed LBHI's bankruptcy filing, Citi engaged in CDS

trading in an attempt to rebalance its trading book to the best of its ability given the turbulent

market conditions at the time.  But, these efforts are irrelevant under the industry-standard

liquidated damages measure that the entire OTC derivatives market has embraced:  damages are

determined at close-out based on the replacement cost of the terminated trades.

> 142.    Defendants deny the allegations in paragraph 142 of the SAC.

> 143.    Defendants deny the allegations in paragraph 143 of the SAC.

> 144.    Defendants deny the allegations in paragraph 144 of the SAC, except

admit that there are 79 – not 76 – CDS trades between LBSF and Citibank referencing the

monoline insurer Ambac Assurance Corporation ("Ambac").[45]  Defendants further state that

plaintiffs' chart in paragraph 144 makes an invalid "apples-to-oranges" comparison.

Specifically, upon information and belief, plaintiffs have charted (in green) alleged mid-market

values for September 15, 2008 on Ambac CDS at various maturities.  Plaintiffs then purport to

chart (in red and blue) Citi's close-out amounts with respect to Ambac CDS trades, which Citi

calculated on September 16, 2008, as the replacement cost of the terminated trades, consistent

with the industry-standard liquidated damages provision in the parties' agreement.  Plaintiffs,

therefore, are attempting to compare a mid-market value calculated as of one date against

replacement cost (including appropriate bid/offer and liquidity charges) calculated as of the

---

[44]  This is demonstrated by CMA data based on actual quotes observed in the market on the day of the close-out, which indicates that if Citi had managed to replace its trades at CMA-provided bid and offer prices for standard-sized trades, Citi's overall claim (excluding liquidity premiums for large trades) would have been higher by $70 million than Citi's calculated close-out amounts.  CMA quotes do not take account of the liquidity premium (or increased bid/offer) that would be charged in the market to replace trades where Citi had oversized positions.

[45]  The majority of Ambac's business was placed into rehabilitation by the Wisconsin Commissioner of Insurance in 2010, largely due to the vast amount of credit protection it had written on RMBS and CDOs.  *See Ambac May Seek Bankruptcy After Regulators Step In*, N.Y. Times, Mar. 25, 2010.

following day.  This comparison has nothing to say about the commercial reasonableness of

Citi's claim.

145.    Defendants deny the allegations in paragraph 145 and footnote 10 of the

SAC, except admit that Markit Partners is a leading data provider that collects mid-market data

from numerous financial institutions with respect to various CDS and, using proprietary

algorithms, creates a composite mid-market curve with respect to such CDS, and lack knowledge

or information sufficient to form a belief with respect to the rating Markit Partners gave to its

September 15, 2008 pricing curve for CDS on Ambac.  Defendants further state that, while

Markit Partners' pricing curve (generated by a proprietary model *after-the-fact*) may have "a

logical progression," the contemporaneous market data with respect to Ambac CDS was actually

quite variable and volatile over both September 15 and September 16, 2008.

146.    Defendants deny the allegations in paragraph 146 of the SAC.  Defendants

further state that the fact that Citi's protection purchases on Ambac were generally priced higher

than Citi's protection sales is hardly an anomaly; rather, it is the result of applying a reasonable

bid/offer (and, where applicable, liquidity premium) to the Ambac CDS trades that were not

offsetting.  By definition, application of a bid/offer moves the valuation of purchases and sales of

CDS protection in opposite directions.  Further, plaintiffs' contention that Citi valued certain

Ambac CDS at prices "more than 70 percent of their notional value" is demonstrably false, and

appears to reflect an arithmetic error by plaintiffs.  Similarly, plaintiffs' allegation that Citi

priced certain Ambac CDS at levels "greater than the assumed maximum loss that the market

was using in its pricing at the time" is equally unfounded; all of Citi's close-out values were

significantly lower than the maximum loss (70–77%) assumed in the market at the time, as

evidenced by prices on recovery swaps quoted at 23–30% as of September 16, 2008 (which

contemporaneous market data was relied on by Citi traders and submitted to Lehman in Citi's

Derivatives Questionnaire response).

147.    Defendants deny the allegations in paragraph 147, except admit that Citi

was a net buyer of protection on Venezuela CDS.  Defendants further state that plaintiffs' chart

in paragraph 147 reflects yet another invalid comparison.  Specifically, plaintiffs appear to have

charted (in green) alleged mid-market values for September 15, 2008, on Venezuela CDS at

various maturities.  Plaintiffs do not claim to be relying on pricing data from Markit Partners,

and they have refused to disclose the basis for their mid-market pricing curve on Venezuela

CDS.  Plaintiffs then purport to chart (in red and blue) Citi's close-out amounts with respect to

its Venezuela CDS trades, which Citi calculated on September 17, based on *actual market*

*quotes*.  These actual quotes – which Citi traders relied on in calculating the close-out values and

furnished to Lehman in response to the Derivatives Questionnaire – necessarily include

applicable bid/offer charges.  Plaintiffs therefore are attempting to compare a mid-market value

as of one date against the contractually mandated replacement cost (including appropriate

bid/offer and liquidity charges) based on a specific market quotation as of a later date.  This

comparison has nothing to say about the commercial reasonableness of Citi's claim.

148.    Defendants deny the allegations in paragraph 148 of the SAC, except

admit that the chart in paragraph 148 is accurate except with respect to plaintiffs' purported

"Market-Based Calculation of Value."  Defendants further state that none of the parties' CDS on

Venezuela were "perfectly offsetting," as plaintiffs allege.  In calculating the close-out amounts,

Citi netted CDS trades that presented equivalent risks, consistent with market practice and the parties' own course of dealings.[46]

       149.    Defendants deny the allegations in paragraph 149 of the SAC, except admit the calculations set forth in the paragraph.  Defendants further state that Citi netted CDS trades that had the same reference entities, maturity, and strike, even if the trades had different notional amounts.  Plaintiffs apparently contend that Citi should have netted trades even where the strikes – that is, the coupon payment owed – were different.  In fact, netting trades with different strikes presents obvious "annuity risk"[47] and Citi's unwillingness to net such trades is entirely consistent with Citi's approach to netting in the ordinary course of business and the parties' course of dealings, as evidenced by the proposed trade collapse transaction between Citi, Lehman, and Bracebridge discussed in the SAC.  In the proposed trade collapse transaction, which would have netted down a portion of LBSF's CDS portfolio, the parties agreed that trades with different strikes should not be included.  Indeed, the parties removed trades where the strikes differed by seven basis points – even less than the nine basis point difference in strikes on the two Venezuela CDS that plaintiffs allege Citi should have netted.  Indeed, the CDS market recognizes – and has attempted to address – the fact that parties will not net trades with mismatched strikes, due to the resulting "annuity risk."  In the Spring of 2009, ISDA

---

[46]  An updated version of Citi's derivatives claim correcting, among other things, isolated netting errors, can be found at Bates numbers CITI-LEH00962090-98.

[47]  "Annuity risk" refers to the risk associated with losing a running income stream resulting from CDS trades that are offsetting in all material respects other than strikes.  For example, among the terminated trades Citi had both a buy and a sell of protection on GMAC LLC, both for $1 million and both maturing on June 20, 2017, but with different strikes.  Citi was receiving 745 bps and paying 500 bps per year for these trades, which meant that over the life of these contracts, Citi would receive over $220,000 (although the income stream would stop if GMAC defaulted).  Had Citi simply netted these positions, as advocated by Lehman, Citi would have lost all of the value associated with these trades.  The close-out amount calculated by Citi for these trades, by contrast, totaled $97,226 – less than half of the annuity Citi might receive over the life of these trades.

promulgated the so-called "Big Bang Protocol," which urged the market to adopt standard

coupons for CDS – either 100 bps or 500 bps – to facilitate the netting of trades.[48]

150.    Defendants deny the allegations in paragraph 150 of the SAC.  Defendants

further state that, in closing out their CDS portfolios, defendants appropriately netted trades that

had the same reference entities, maturities, and strikes, even if the trades had different notional

amounts.

151.    Defendants deny the allegations in paragraph 151 of the SAC.

152.    Defendants deny the allegations in paragraph 152 of the SAC.  Defendants

further state that there were 7,905 interest rate trades under the Master Agreements, for which

Citi calculated a net payable to Lehman of $879 million, pursuant to the industry-standard

liquidated damages provisions in the parties' agreements.  Defendants further state that plaintiffs

have refused to disclose the "readily available market information" underlying their so-called

"Market-Based Calculation of Proper Close-out Amount" (as reflected in the chart at paragraph

152).  Plaintiffs' chart, once again, presents an invalid "apples-to-oranges" comparison.  In the

first place, plaintiffs' purported "Market-Based" calculations reflect a mid-market value only (as

plaintiffs concede) whereas Citi's "Calculation of Close-out Amount" is appropriately calculated

as the replacement cost of the terminated trades.  Even as a mid-market valuation, however,

plaintiffs' calculations are improper.  Upon information and belief, plaintiffs calculated mid-

market values for the USD interest rate trades in this portfolio as of 3:00 pm (EDT) on

September 15, 2008, whereas Citi valued these trades as of 8:30 am (EDT).  Given the extreme

volatility of interest rates over the course of that day, plaintiffs' cherry-picked 3:00 pm

---

[48]    *See, e.g.,* Frequently Asked Questions on Credit Derivatives Initiatives, ISDA (June 16, 2010), *available at*
http://www.isda.org/c_and_a/pdf/faqcdsstandardizedproducts.pdf.

termination time would significantly reduce Citi's claim.  Nothing in the contracts or applicable

law required Citi to calculate the close-out amount as of a particular time of day, much less as of

the time of day most beneficial to the defaulting party.  Citi also disagrees with certain trade

counts and claim amounts set forth in the chart, and a corrected version of the chart appears

below.

| Close-out Amount Calculations for Generic Interest Rate Swaps [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades[49]** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Proper Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Citibank | ~~6,748~~ **7,117** | ~~1,090,415,643~~ **1,090,095,303** | ~~1,525,065,437~~ | ~~434,669,794~~ |
| LBSF-Financial | ~~635~~ **660** | (264,857,651) | ~~(256,572,740)~~ | ~~8,284,911~~ |
| LBSF-Global | ~~107~~ **115** | 16,788,139 | ~~20,422,913~~ | ~~3,634,775~~ |
| LBSF-Swapco | 9 | ~~36,893,054~~ **36,893,053** | ~~39,741,383~~ | ~~2,848,330~~ |
| LBSF-Canyon | 4 | (313,500) | ~~(102,726)~~ | ~~210,774~~ |
| **TOTAL** | ~~**7,503**~~ **7,905** | ~~**878,925,684**~~ **878,605,345** | ~~**1,328,574,268**~~ | ~~**449,648,584**~~ |

153.    Defendants deny the allegations in paragraph 153 and footnote 11 of the

SAC.  Defendants further state that plaintiffs' chart at paragraph 153 improves upon the chart at

paragraph 152 because it at least purports to compare Citi's mid-market valuation with plaintiffs'

alleged "Market-Based Calculations" of mid-market value.  The comparison remains wholly

invalid, however, because Citi calculated the close-out amount for its USD interest rate trades as

of 8:30 am (EDT) whereas, upon information and belief, plaintiffs have calculated their mid-

---

[49]    Upon information and belief, the differences in trade count largely result from the parties' different methods of recording "straddles" – where a buyer purchases both a swaption to receive a fixed interest rate and a swaption to receive a floating interest rate.  Citi records straddles as two separate trades, whereas, upon information and belief, plaintiffs count both swaptions as a single trade.

market values for these trades as of 3:00 pm (EDT).  A corrected version of the chart appears

below.

| Valuation Differences by Trade Category [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| Trade Category | No. Trades | Citi Calculation of Close-out Amount | ~~Market-Based Calculation of Proper Close-out Amount~~ | ~~Difference~~ |
| SWAPTION/CALLABLE SWAP | ~~489~~ **780** | ~~(228,525,353)~~ **(228,453,783)** | ~~(102,347,460)~~ | ~~126,177,893~~ |
| SWAP – GENERIC | ~~6,179~~ **6,246** | ~~1,278,755,703~~ **1,271,263,191** | ~~1,379,650,648~~ | ~~100,894,945~~ |
| SWAP – XCCY | ~~191~~ **186** | ~~2,829,166~~ **2,474,337** | ~~14,837,552~~ | ~~12,008,385~~ |
| EXOTIC | ~~16~~ **8** | ~~(7,478,536)~~ **2,026,732** | ~~1,920,118~~ | ~~9,398,653~~ |
| INFLATION - SWAP/CAP | ~~81~~ **84** | ~~78,482,523~~ **77,982,329** | ~~84,831,088~~ | ~~6,348,565~~ |
| SWAP - AVG/BASIS | ~~316~~ **317** | ~~(16,358,738)~~ **(17,682,755)** | ~~(13,295,445)~~ | ~~3,063,293~~ |
| OTHER | ~~80~~ **82** | ~~(11,684,987)~~ **(27,578,862)** | ~~(8,831,413)~~ | ~~2,853,574~~ |
| CAP/FLOOR - CMS/CMT | ~~50~~ **63** | ~~(13,703,723)~~ **1,367,969** | ~~(11,189,128)~~ | ~~2,514,595~~ |
| CAP/FLOOR – GENERIC | ~~56~~ **94** | ~~(13,506,644)~~ **(13,502,670)** | ~~(13,482,313)~~ | ~~24,330~~ |
| FRA – GENERIC | 45 | (2,133,517) | (3,519,378) | (1,385,861) |
| **TOTAL** | ~~7,503~~ **7,905** | ~~1,066,675,895~~ **1,065,762,971** | ~~1,328,574,268~~ | ~~261,898,373~~ |

154.    Defendants deny the allegations in paragraph 154 of the SAC, except

admit that generic swaps and swaptions tend to be among the most common and liquid types of

derivatives products.  Defendants further state that, contrary to plaintiffs' allegation, the

purported $227 million difference in the parties' mid-market calculations is not traceable to any

supposed "extraordinarily aggressive close-out procedures employed by Citi"; there was none.

Instead, the purported $227 million difference is largely a product of Lehman's "extraordinarily

aggressive" effort to turn the ISDA on its head and claim the right, as the defaulting party, to

value the terminated trades itself and to do so at its preferred time of day – a time of day cherry-picked years after the fact.

155.    Defendants deny the allegations in paragraph 155 of the SAC.  Defendants further state that a large portion of the purported "valuation difference" with respect to the interest rate trades under the LBSF-Citibank Agreement is due to plaintiffs' decision to calculate mid-market values for USD swaps as of 3:00 pm (EDT), when, in fact, Citi closed out these trades as of 8:30 am (EDT) – as was Citi's prerogative under the governing contracts and applicable law.

156.    Defendants admit the allegations in paragraph 156 of the SAC.

157.    Defendants deny the allegations in paragraph 157 of the SAC, except admit that LBSF was the net receiver of the fixed rate/payer of the floating rate on the combined portfolio of swaps and swaptions under the LBSF-Citibank Agreement, and admit that LBSF was "long vega" on the combined portfolio.  Defendants further state that, contrary to the allegation in paragraph 157, LBSF was "short delta" – not "long delta" – on the combined portfolio.

158.    Defendants deny the allegations in paragraph 158 of the SAC, except admit that "implied volatility" for USD swaps generally increased over the course of the day on September 15, 2008.  Defendants further state that, contrary to plaintiffs' allegation, interest rates for USD swaps *increased* over the morning until approximately mid-day on September 15, after which they generally decreased.  Indeed, data obtained from ICAP plc ("ICAP"), a large interdealer broker in interest rate derivatives, demonstrates that the USD five-year par swap rate generally increased throughout the morning of September 15, hit its peak just before 11:00 am (EDT), and then decreased over the remainder of the day.

87

159.    Defendants deny the allegations in paragraph 159 of the SAC, except admit that Citibank closed out its USD swaps as of 8:30 am (EDT), and admit that closing out these positions as of 3:00 pm (EDT) would have resulted in more favorable close-out values for LBSF.  Defendants further state that plaintiffs provide no support for their allegation that a close-out time of 3:00 pm is "typical."  Indeed, under the Derivatives Settlement Framework that Lehman developed and used to settle with ten of its largest bank counterparties, USD interest rate trades must be valued as of 11:00 am (EDT) on September 15, 2008.  Data from ICAP, the leading interdealer broker for interest rate derivatives, show that Citi's claim on these USD vanilla interest rate swaps would have *increased* by more than $14 million if Citi had chosen to close out the trades at 11:00 am (EDT), rather than at 8:30 am (EDT).  Accordingly, plaintiffs' allegation that Citi "maximized its claims" by closing out as of 8:30 am (EDT) is demonstrably false.

160.    Defendants deny the allegations in paragraph 160 of the SAC, except admit that, for its generic swap trades, Citi provided Lehman with a mid-market value and a separate bid/offer charge with respect to swaps in the four major currencies – dollar ("USD"), euro ("EUR"), yen ("JPY"), and pound ("GBP") – and Australian Dollar and New Zealand Dollar.  Defendants further state that, contrary to plaintiffs' allegations, Citi provided Lehman with a mid-market value and a separate bid/offer charge with respect to Swiss Franc, Danish Krone, Norwegian Krone, and Swedish Krona.

161.    Defendants deny the allegations in paragraph 161 of the SAC, except admit that Citi is a market-maker in USD swaps, and admit that Citi generally applied a one-basis point bid/offer charge in closing out its Lehman-facing USD swap positions.  Defendants further state that Citi's one-basis point bid/offer charge is fully supported by contemporaneous

market quotations from Reuters, relied on by Citi traders in closing out Citi's USD swap

positions.  A computer screenshot of this Reuters data was specifically provided to Lehman, as

part of Citi's Derivatives Questionnaire response, in support of this bid/offer charge.  Further,

contemporaneous quotes obtained from two leading interdealer brokers in interest rate

derivatives – ICAP and Tullett Prebon plc ("Tullett") – also support Citi's one-basis point

bid/offer charge.  In fact, quotes from Reuters, ICAP and Tullett would actually support

application of a *two*-basis point bid/offer charge on Citi's USD swaps – *double* the amount that

Citi charged on these positions.  As this contemporaneous market data shows, Citi's USD

interest rate bid/offer charges were, if anything, conservative relative to the market at the time.

Further, Lehman's allegation that "trades are generally done at mid-market" in the interdealer

market is directly contradicted by this and other data easily obtainable (and, which, upon

information and belief, plaintiffs already have obtained) from interdealer brokers, such as ICAP

and Tullett, clearly demonstrating that bid/offer charges are regularly quoted and paid by

sophisticated financial institutions in the interdealer market.

     162.    Defendants deny the allegations in paragraph 162 of the SAC, and lack

knowledge or information sufficient to form a belief as to whether transaction volumes in the

USD swap market were "exceptionally high" on September 15, 2008.

     163.    Defendants deny the allegations in paragraph 163 of the SAC, except

admit that Citi was "a net payer of the fixed rate" on its USD swap positions with LBSF, and

lack knowledge or information sufficient to form a belief as to whether "there was substantial

interest from counterparties to receive the fixed rate" on September 15, 2008.  Defendants further

state that, contrary to Lehman's allegations, the USD swap rate did not decrease throughout the

day on September 15.  Rather, readily available data from ICAP shows that the USD five-year

par swap rate actually *increased* until approximately 11:00 am on September 15, then decreased

during the remainder of the day.

164.    Defendants deny the allegations in paragraph 164 of the SAC.

165.    Defendants deny the allegations in paragraph 165 of the SAC, except

admit that, given the compressed time frame in which Citi closed out its portfolio of interest rate

swaps, the fact that Citi performed its valuations in different time zones all over the world, and

the fact that interest rate swaps on emerging market currencies are in a separate business (they

are part of Citi's Foreign Exchange trading business rather than its Rates trading business), the

level of detail in the information provided in Citi's Derivatives Questionnaire response varies

with respect to the close-out of generic swaps in different non-major currencies.  Defendants

specifically deny that they "shifted mid-market curves in [their] favor" or "included

exaggerated" bid/offer charges in closing out their interest rate derivatives.  After reviewing the

allegations of the First Amended Complaint, however, Citi discovered certain minor calculation

errors in the close-out of generic swaps in emerging market currencies, the correction of which

would reduce Citi's claim by approximately $6.6 million.[50]

166.    Defendants deny the allegations in paragraph 166 of the SAC.

167.    Defendants deny the allegations in paragraph 167 of the SAC, except

admit that, having reviewed the 53 TWD generic swaps in response to the First Amended

Complaint, Citi concluded that it did not appropriately net these positions and subsequently

corrected this oversight; this correction reduced Citi's claim for TWD generic swaps by less than

$1 million.  Defendants further state that contemporaneous quotes from ICAP, which Citi relied

---

[50]    These minor corrections, among others, are reflected in the updated version of Citi's derivatives claim, which
can be found at Bates numbers CITI-LEH00962090-98.

on in closing out its TWD swaps (and provided to Lehman in Citi's Derivatives Questionnaire

response), specifically support both the mid-market value and the bid/offer charge Citi used in

valuing its TWD swaps.

168.    Defendants deny the allegations in paragraph 168 of the SAC, except

admit that, in valuing its MXN interest rate swaps, Citi used a MXN swap rate curve that is

"reasonable and supported by available data."  Defendants further state that, having reviewed the

MXN swaps in response to the First Amended Complaint, Citi found and corrected a valuation

error, which will reduce the MXN swap claim by approximately $5.8 million.

169.    Defendants deny the allegations in paragraph 169 of the SAC.  Defendants

further state that Citi closed out its swaption portfolio in a commercially reasonable manner,

applying appropriate bid/offer charges (and liquidity premiums for large-sized trades) in valuing

these positions, consistent with the parties' agreements and applicable law.

170.    Defendants deny the allegations in paragraph 170 of the SAC, except

admit that, given the significant number of Lehman-facing interest rate positions, the fact that

these positions were closed out in different businesses and different time zones across the world,

and the compressed time in which Citi performed the close-out, Citi did not, in certain instances,

appropriately net offsetting trades valued by different trading desks.  Defendants made clear in

their Answer to the First Amended Complaint that the netting protocols should have been applied

across trading desks, and Citi agreed to correct any oversight and has done so.[51]

171.    Defendants deny the allegations in paragraph 171 of the SAC, except

admit that Citi included a bid/offer charge of approximately $31 million on its USD interest rate

---

[51]  These corrections, among others, are reflected in the updated version of Citi's derivatives claim, which can be found at Bates number CITI-LEH 00962090-98.

claim across four separate trading desks, admit that Citi failed to appropriately net these positions across desks, and admit that correction of this oversight reduces Citi's USD interest rate claim by approximately $14 million.

172.    Defendants deny the allegations in paragraph 172 of the SAC.  Defendants further state that Citi's derivatives businesses adopted netting protocols that were commercially reasonable for the specific products they traded.  Contrary to plaintiffs' allegation, Citi netted virtually all interest rate products across maturities, using commercially reasonable maturity buckets.  Citi has applied substantial netting to its interest rate portfolio, which has reduced Citi's interest rate claim by hundreds of millions of dollars.

173.    Defendants deny the allegations in paragraph 173 of the SAC.

174.    Defendants deny the allegations in paragraph 174 of the SAC, except admit that Citi had a large portfolio of swaptions with LBSF at the time of LBHI's bankruptcy and that more than half of the trades in this portfolio were denominated in USD.  Defendants further state that plaintiffs have refused to disclose the "readily available market data" underlying their so-called "Market-Based Calculations of Proper Close-out Amount" (as reflected in the chart at paragraph 174).  Plaintiffs appear, however, to be making another invalid "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' purported "Market-Based" calculation is performed as of 3:00 pm (EDT) on September 15, 2008, whereas Citi closed out its USD swaptions as of 8:30 am (EDT) that day.  Citi also disagrees with certain trade counts and claim amounts, and a corrected version of the chart appears below.

| Master Agreement | Trade CCY | No. Trades | Citi Calculation of Close-out Amt. | ~~Market-Based Calculation of Proper Close-out Amt.~~ | ~~Difference~~ |
|---|---|---|---|---|---|
| | | | | | |
| LBSF-Citibank | Non-USD | ~~160~~ **288** | 25,082,049 | ~~30,337,705~~ | ~~5,255,656~~ |
| LBSF-Financial | Non-USD | ~~20~~ **40** | (5,480,881) | ~~(6,316,334)~~ | ~~(835,454)~~ |
| LBSF-Global | Non-USD | ~~10~~ **16** | 18,200,135 | ~~20,595,160~~ | ~~2,395,024~~ |
| LBSF-Citibank | USD | ~~271~~ **411** | ~~(244,118,307)~~ **(244,173,073)** | ~~(145,839,734)~~ | ~~98,278,573~~ |
| LBSF-Financial | USD | 25 | (22,082,013) | ~~(24,075,948)~~ | ~~(1,993,935)~~ |
| TOTAL | | ~~486~~ **780** | ~~(228,399,017)~~ **(228,453,783)** | ~~(125,299,153)~~ | ~~103,099,864~~ |

Close-out Amount Calculations for Swaptions
[values in USD to Lehman Subsidiaries]

175.    Defendants deny the allegations in paragraph 175 of the SAC, except

admit that Citi closed out its USD swaptions portfolio as of 8:30 am "New York time" on

September 15, 2008, and admit that closing out at 3:00 pm that day would have resulted in more

favorable claim values for Lehman.  Defendants further state that nothing in the parties'

agreement or applicable law required Citi to close out as of a particular time of day, or the time

of day preferred by the defaulting party, and plaintiffs provide no support for their claim that

their preferred close-out time is "standard."  Indeed, Lehman's own Derivatives Settlement

Framework mandates an 11:00 am valuation of all USD interest rate trades.

176.    Defendants deny the allegations in paragraph 176 of the SAC, except

admit that the claim values for the trades in Group A were not "the product of an 8:30 am

valuation time on September 15," because (as plaintiffs well know) they were valued based on

actual replacement trades Citi executed in the market.  Defendants further state that, contrary to

plaintiffs' allegations, the claim values for the trades in Group B were, in fact, "the product of an

8:30 valuation time on September 15."  Plaintiffs' purported "Market-Based Calculations" (as set

forth in the chart at paragraph 176) are invalid because, upon information and belief, they are

calculated using 3:00 pm (EDT) values on September 15, 2008, whereas Citi closed out its USD

swaptions as of 8:30 am (EDT) that day. Citi also disagrees with the trade counts and claim

amounts set forth in the chart, and a corrected version appears below.

| **Close-out Amount Calculations for USD Swaptions** [values in USD to Lehman Subsidiaries] | | | | | |
|---|---|---|---|---|---|
| Group | No. Trades | ~~Vega Exposure~~ | ~~Rates Exposure~~ | Citi Calculation of Close-out Amt. | ~~Market-Based Calculation of Proper Close-out Amt.~~ | ~~Difference~~ |
| Group A | ~~6~~ **9** | ~~(8,767,869)~~ | ~~2,184,174~~ | (414,905,000) | ~~(380,565,329)~~ | ~~34,339,671~~ |
| Group B | ~~9~~ **10** | ~~16,758,718~~ | ~~1,983,582~~ | (124,350,902) | ~~(101,503,614)~~ | ~~22,847,288~~ |
| Remaining | ~~281~~ **417** | ~~4,882,042~~ | ~~(1,906,511)~~ | ~~273,055,582~~ **273,000,816** | ~~312,153,260~~ | ~~39,097,679~~ |
| TOTAL | ~~296~~ **436** | ~~12,872,891~~ | ~~2,261,245~~ | ~~(266,200,320)~~ **(266,255,086)** | ~~(169,915,683)~~ | ~~96,284,637~~ |

177.    Defendants deny the allegations in paragraph 177 of the SAC, except

admit that the close-out values for the swaptions in Group A were not calculated based on an

8:30 am (EDT) close-out on September 15, 2008, because the claim values for these positions

are based on actual replacement trades Citi executed in the market. Defendants further state that

the trades in Group A did not belong to Citi's Rates trading business and therefore were not

closed out at 8:30 am (EDT) with trades from that business. These trades belonged to a separate

business – CitiMortgage – which executed replacement trades for the Group A positions and

assigned close-out values for the trades based on those replacements. Defendants further state

that Citi's close-out values for the Group A trades accurately reflect the costs (including relevant

bid/offer charges) incurred by CitiMortgage in replacing the Group A positions. Plaintiffs'

allegation that "Citi used an unknown methodology to determine values" for the Group A trades

is disingenuous.  Citi specifically informed Lehman, as recently as July 2011, that these trade

values were based on actual replacements and even furnished Lehman with the confirmations for

the replacement trades.

178.    Defendants deny the allegations in paragraph 178 of the SAC.  Defendants

further state that the Group B positions also were owned by a separate business at Citi – Citi

Corporate Treasury – but were, in fact, closed out using 8:30 am (EDT) valuations provided by

Citi's Rates trading business.  There is no truth to plaintiffs' allegation that Citi used inconsistent

close-out times to improperly increase its claim.

179.    Defendants deny the allegations in paragraph 179 of the SAC, except

admit that Citi closed out a minority of its interest rate trades on dates other than September 15,

2008.  Defendants further state that, of the trades closed out after September 15, the vast majority

– 1,338 out of 1,799 – were closed out on September 16 by Citi's derivatives trading desks in

Asia where September 15 was a public holiday and four Asian financial markets (Tokyo, Hong

Kong, Shanghai and Seoul) were closed.  The one-day delay in close-out by these desks was not

only commercially reasonable, but simply unavoidable.[52]

180.    Defendants deny the allegations in paragraph 180 of the SAC, except

admit that 305 USD swaps were closed out on September 17, 2008, and admit that, if these

trades had, instead, been closed out on September 15, at 8:30 am (EDT) – consistent with the

methodology of the Rates business – the claim values for these trades would be reduced by

approximately $2 million (not $3 million, as plaintiffs allege).  Defendants further state that these

---

[52]    Notably, Lehman's Derivatives Settlement Framework values a counterparty's Asian currency interest rate
trades on September 16 if the counterparty valued a "preponderance" of these trades on that date.

305 trades were owned and closed out by Citi's Foreign Exchange derivatives trading business, not by Citi's Rates trading business.

181.    Defendants deny the allegations in paragraph 181 of the SAC, except admit that, prior to Lehman's bankruptcy, the parties entered into CDS trades referencing securitized products, such as mortgage-backed securities and collateralized debt obligations, under the LBSF-Citibank, LBSF-Global, and LBSF-Canyon Agreements, and admit that Citi was the net buyer of protection.  Defendants further state that there were 820 CDS on securitized products under these agreements, for which Citi calculated a net claim of $1.473 billion pursuant to the industry-standard liquidated damages provision.  While plaintiffs have refused to disclose the alleged "publicly available market data" underlying their so-called "Market-Based Calculation of Close-out Amount" (as set forth in the chart at paragraph 181), plaintiffs appear to be making another "apples-to-oranges" comparison.  Upon information and belief, plaintiffs' calculation reflects a mid-market value only (rather than replacement value as mandated in the parties' agreements) as of September 15, 2008 (rather than as of the date Citi closed out the trades which, for most CDS trades, was September 16).  But, even as a mid-market calculation as of September 15, plaintiffs' valuations appear too low.  In fact, plaintiffs' alleged "Market-Based Calculation" closely approximates Citi's mid-market valuation for these same trades on September 12 at $1.2 billion – a valuation done for purposes of calculating a margin call to Lehman for September 15.[53]  As Lehman's own complaint acknowledges (*see* SAC at ¶ 134), the value of protection moved substantially higher (*i.e.*, in Citi's favor) over that weekend and

---

[53]    Because LBHI filed for bankruptcy in the early morning hours of September 15, 2008, the margin call was never made.  Citi has, however, previously furnished Lehman with these September 12, 2008, calculations.

following LBHI's bankruptcy.  Therefore, a mid-market valuation as of September 15 should be

higher than a valuation as of September 12.  A corrected version of the chart appears below.

| Close-out Amount Calculations for Securitized Products<br>[values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Canyon | 6 | ~~1,077,659~~<br>**1,077,658** | ~~1,076,217~~ | ~~(1,442)~~ |
| LBSF-Citibank | ~~758~~<br>**757** | ~~(1,626,664,467)~~<br>**(1,628,660,916)** | ~~(1,395,909,138)~~ | ~~230,755,329~~ |
| LBSF-Global | 57 | 154,438,917 | ~~153,130,689~~ | ~~(1,308,228)~~ |
| **TOTAL** | ~~**821**~~<br>**820** | ~~**(1,471,147,891)**~~<br>**(1,473,144,340)** | ~~**(1,241,702,233)**~~ | ~~**229,445,659**~~ |

182.    Defendants deny the allegations in paragraph 182 of the SAC.  Defendants

further state that plaintiffs' allegation that Citi "failed to engage in any portfolio aggregation"

with respect to CDS on securitized products is demonstrably false.  Citi netted CDS on

securitized products in the same manner it netted all other CDS in its portfolio:  purchases and

sales of protection were netted where they had the same reference obligation, maturity and strike,

even if their notional amounts differed.  In fact, plaintiffs are not complaining that Citi failed to

net offsetting positions; Citi did so.  Plaintiffs, instead, are insisting that Citi should have netted

entirely dissimilar positions.  Specifically, plaintiffs contend that Citi should have

indiscriminately netted *all* of its purchases of protection on *any* RMBS against *all* of its sales of

protection on *any* RMBS.  But RMBS are not remotely fungible, and what plaintiffs advocate is

commercially unreasonable.  The two businesses at Citi that held these trades netted positions

that were truly offsetting.  Because these CDS on RMBS were illiquid, the businesses solicited

quotations for replacement trades for a majority of the portfolio from the largest dealers in the

market that were most active in trading CDS on RMBS.  The New York-based business solicited

quotations on September 15, 2008; given the time difference, the London-based business was not

97

able to do so until September 16.  Where Citi obtained more than one quotation for a position,

Citi used the quote most favorable to Lehman in calculating the close-out amount.  It is clear that

Citi used commercially reasonable procedures in closing out its CDS on RMBS trades.

      183.    Defendants deny the allegations in paragraph 183 of the SAC, except

admit that a majority of the CDS on securitized products were CDS on RMBS.  Defendants

further state that Citi was a net buyer of protection, by an enormous amount, with respect to CDS

on RMBS.  Out of a total $3.6 billion notional amount, Citi had bought protection on $2.3 billion

from Lehman and sold protection on only $1.3 billion to Lehman.  Plaintiffs' allegation that CDS

on subprime or Alt-A RMBS carried "similar types of risk" is false and misleading, as evidenced

by the range of valuations present in Citi's claim:  Citi's close-out valuations for CDS on RMBS

range from less than 10% of notional (reflecting a relatively strong credit with a low implied

probability of loss) to more than 90% of notional (reflecting a credit near default), and cover the

entire spectrum in between.  These valuation differences stem from the fact that the market

values a particular RMBS, and judges its prospect of default, based on a range of factors specific

to that RMBS, including the date the underlying mortgages were originated, the FICO scores of

the borrowers, the geographic diversity of the mortgage pool, the identity of the originators, and

the particular tranche referenced in the CDS on RMBS.  Plaintiffs' alleged "Market-Based

Calculation of Close-out Amounts" (set forth in the chart at paragraph 183) is invalid because,

upon information and belief, it is based on mid-market values for September 15, 2008, whereas

Citi was entitled to recover replacement cost and, following commercially reasonable

procedures, closed out the majority of its CDS on RMBS as of September 16.  A corrected

version of the chart, adding a trade omitted by plaintiffs, appears below.

| Close-out Amount Calculations for Single Name CDS on RMBS [values in USD to LBSF] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBSF-Citibank | ~~508~~ **509** | ~~(1,057,278,227)~~ **(1,041,338,974)** | ~~(878,339,836)~~ | ~~178,938,391~~ |
| LBSF-Global | 38 | 147,990,013 | ~~148,906,789~~ | ~~916,776~~ |
| **TOTAL** | ~~**546**~~ **547** | ~~**(909,288,214)**~~ **(893,348,961)** | ~~**(729,433,047)**~~ | ~~**179,855,168**~~ |

184.    Defendants deny the allegations in paragraph 184 of the SAC, except admit that CDS on RMBS are less liquid and typically have wider bid/offer charges than other derivatives.  Defendants further state that Lehman's claim that "all [CDS on RMBS] relate to similar pools of residential mortgages" is plainly incorrect.  The mortgage pools backing any particular RMBS – and, specifically, the RMBS referenced in the trades between Citi and Lehman – vary dramatically based on vintage (*i.e.*, when the relevant mortgages were issued), the FICO score of the underlying borrowers, the identity of the originator, and the geographic diversity of the mortgage pools.  Each of these factors is critically important to assessing the likely performance of a specific RMBS.  Moreover, CDS on RMBS reference a particular tranche in the underlying RMBS transactions.  These tranches can vary dramatically in seniority, and thus on their rights to receive the cash flow generated by the RMBS.  In the particular trades at issue here, some CDS reference the 15th or 20th tranche in the RMBS (typically rated BBB or BBB- at issuance), while others reference the 3rd, 4th or 5th tranche (typically rated AA or AA+ at issuance).  When Citi solicited quotations on these products after Lehman's bankruptcy, the dealers did not remotely treat these positions as presenting "similar" risks.  Not only were the dealers selective about the particular CDS on RMBS they were willing to quote prices on, but the prices ranged dramatically over the different positions.

185.    Defendants deny the allegations in paragraph 185 and footnote 12 of the SAC, except lack knowledge or information sufficient to form a belief about the data used to construct the graph in paragraph 185 of the SAC because plaintiffs have refused to identify its source.  Defendants further state that, in this instance, plaintiffs (tellingly) do not claim to be relying on "publicly" or "readily available" data.  Citi is not aware of any third-party pricing service that provides daily marks for these positions.  Indeed, it is because of the illiquidity of many of these positions that Citi decided to solicit market quotations for most of its CDS on RMBS in connection with the close-out.

186.    Defendants deny the allegations in paragraph 186 of the SAC.  Defendants further state that Citi did not charge bid/offer on every CDS on RMBS and, consistent with its methodology for valuing terminated CDS trades, netted any offsetting positions that had the same reference obligation, maturity, and strike.  Plaintiffs' argument that Citi should have indiscriminately netted all of its CDS on RMBS based on the alleged fact that their overall price movements are correlated is specious.  Credit default swaps protect against default of a particular reference entity.  The fact that prices for credit default protection on different reference entities might move in a correlated fashion has no bearing whatsoever on whether a party would be left in a neutral risk position if it netted a sale of protection on one reference entity against a buy of protection on another.  Lehman itself presents an obvious example.  The prices of credit protection on Lehman and the other major broker-dealers – including Goldman Sachs, Morgan Stanley and Merrill Lynch – were highly correlated:



Source: Bloomberg

But a party that, on September 1, 2008, netted a five-year buy of protection on Lehman against a five-year sale of protection on Merrill Lynch obviously would not be left in a neutral risk position.

187.    Defendants deny the allegations in paragraph 187 of the SAC, except admit that Citi used market quotations provided by other dealers between September 15 and September 17, 2008, to value its positions, and admit that Citi obtained those quotations by requesting bids and offers separately.[54]  Defendants further state that Citi acted in good faith and followed commercially reasonable, standard business practices in seeking market quotations. Plaintiffs' contention that Citi's approach improperly confronted dealers with "the risk of acquiring a large 'one-way' position, which created a natural incentive to provide extremely wide, defensive quotes," is completely off the mark.  Plaintiffs apparently fault Citi for sending

---

[54]    Citi requested bids and offers by sending out "BWIC" and "OWIC" requests (bids or offers "wanted in competition").  BWICs and OWICs are typically sent out via Bloomberg or e-mail messages to a group of leading dealers.  BWICs and OWICs essentially create an auction process in which, pursuant to industry custom, recipients understand that the best bids or offers may be executed by the sender, although the sender is under no obligation to execute.

out the request for bids separately from the request for offers because it supposedly "created a situation where the institutions providing the quotes had no confidence that they would be able to acquire offsetting positions." This makes no sense. In the first place, Citi sent its requests for bids and its requests for offers to the same dealers at approximately the same time. Second, even if Citi had combined these requests into one document, no dealer could know whether it would "win" the auction (*i.e.*, have the best quote) on any particular position or whether Citi would actually execute against any particular quote. Under no circumstances could an institution have "confidence that [it] would be able to acquire offsetting positions." Third, if plaintiffs are arguing that Citi should have required dealers to bid on its entire portfolio of CDS on RMBS as a "block trade," dealers would have been confronted with the exact same risk that plaintiffs are worried about – "the risk of acquiring a large 'one-way' position" – but on an even larger scale: Citi was overwhelmingly the net buyer of protection. Moreover, it likely would have been impossible to negotiate a block sale for a large portfolio of distressed, illiquid, and high-risk positions in a timely fashion in the immediate aftermath of Lehman's bankruptcy filing. Few (if any) counterparties would be interested in acquiring a securitized products portfolio of this kind, as demonstrated by the fact that dealers were very selective and submitted prices only for particular positions, sometimes including size restrictions limiting their quotes to smaller quantities than Citi had requested. Portfolio sales of the kind plaintiffs appear to be suggesting would typically entail weeks of due diligence by the buyer even in less unsettled times.[55] Citi's approach to calculating close-out values for its CDS on RMBS was clearly commercially

---

[55]   If Citi had attempted to sell its entire portfolio of CDS on RMBS to a single buyer in the time available, one of two things would have happened. Either (i) Citi would have received no offers at all and plaintiffs would now be complaining that Citi had no market support for its valuations on these illiquid assets or (ii) Citi would have received an offer and plaintiffs would be complaining that the quote was "extremely wide" and highly "defensive" because Citi insisted on a block sale of a largely "one-way" portfolio of highly illiquid positions, yet provided inadequate time for due diligence.

reasonable, whereas plaintiffs' proposals – that Citi should have indiscriminately netted its entire

portfolio or should have attempted to sell the entire portfolio in a block sale – clearly are not.

188.    Defendants deny the allegations in paragraph 188 of the SAC, and refer to

the relevant Master Agreements for their contents.

189.    Defendants deny the allegations in paragraph 189 of the SAC.  Defendants

further state that Citi replaced certain CDS on RMBS at the close-out, but replacing many of the

trades at issue made no economic sense in light of their high probability of default.

190.    Defendants deny the allegations in paragraph 190 of the SAC, except

admit that Citi relied on certain market quotations made as of dates after the Early Termination

Date, and refer to the Master Agreements and Section 562 of the Bankruptcy Code for their

contents.

191.    Defendants deny the allegations in paragraph 191 of the SAC.

192.    Defendants deny the allegations in paragraph 192 of the SAC.  Defendants

further state that there were 3,012 foreign exchange ("FX") trades, for which Citi calculated a net

claim of $393 million.

193.    Defendants deny the allegations in paragraph 193 of the SAC, except lack

knowledge or information sufficient to form a belief about the data used to construct the graph in

paragraph 193 of the SAC because plaintiffs have refused to identify its source.  Defendants

further state that, contrary to plaintiffs' allegations, Citi closed out its USD/JPY FX forward

trades as of September 15, 2008.  The spot component[56] used to value Citi's forward positions –

---

[56]    The market convention for forwards is to quote both the current levels of exchange rates, or spot rates, as well as forward points, which are added to spot rates to determine the all-in forward rate for a given maturity.  This convention also reflects the underlying economics because the value of a forward position will depend on both the spot rate and the difference in the interest that can be earned in the two currencies over the maturity of the forward, where the forward points represent a prediction of that interest differential.  Spot rates are generally more volatile than interest rate differentials and therefore are more likely to have a substantial effect on the

103

including the USD/JPY forwards – was taken from the average price of the spot trades Citi executed in the market following Lehman's bankruptcy to hedge the very substantial spot risk (also known as "delta" risk) that Citi faced in each currency as a result of Lehman's default.  Citi executed these "macro-hedges" as soon as practicable following Lehman's bankruptcy.  As Citi previously explained to Lehman (including in a lengthy meeting with Citi's head FX traders in July 2010), Citi calculated the average price of these hedging trades in each currency and used that average price as the spot price component when computing the close-out value of its FX spot, forward, and option trades.  The spot component Citi used in calculating close-out values was, in fact, Citi's actual replacement cost for the spot risk.  Because Citi's spot replacement cost in each currency is a calculated average across multiple hedging trades, it will not necessarily match any particular reported price for a spot trade on that date.  However, the spot price Citi used with respect to USD/JPY – a calculated average of Citi's actual replacement cost – is within the range of prices for transactions executed in the market beginning at approximately 6:00 pm (EDT) on September 15 (opening hours for the Japan market on September 16).  Plaintiffs' graph in paragraph 193 is thus irrelevant and misleading for two independent reasons:  first, the "trend lines" plaintiffs have plotted, upon information and belief, reflect only prices seen during U.S. market hours on September 15 – whereas FX trading (and Citi's business) is global, and substantial FX volumes trade outside of U.S. market hours.  Second, the LBCC end-of-day valuations that plaintiffs have plotted in green on the chart, upon information and belief, reflect only mid-market values, whereas Citi's close-out amounts (plotted in red and blue) properly reflect Citi's estimated replacement cost, including an appropriate bid/offer charge.

---

value of the Lehman-facing forwards.  Thus, it was more important for Citi to hedge its spot risk following Lehman's default.

194.     Defendants deny the allegations in paragraph 194 of the SAC.  Defendants

further state that, contrary to plaintiffs' allegation, Citi closed out its USD/JPY FX forwards as

of September 15, 2008.  Citi used its actual replacement cost (*i.e.,* the average price of Citi's

USD/JPY spot trades in the market) as the spot component in the close-out calculation and then

added forward points, using points that are consistent with intra-day and end-of-day pricing

reported by ICAP (a leading interdealer broker for FX) for September 15.

195.     Defendants deny the allegations in paragraph 195 and footnote 13 of the

SAC, except admit that the FX market is large and liquid with excellent price transparency under

normal market conditions, admit that Citi is a major FX dealer with substantial access to the FX

market, admit that the USD/JPY exchange rate is the most common currency pair in the

terminated trades between Lehman and Citi, lack knowledge or information with respect to

whether "the USD/JPY exchange rate . . . experienced some of its highest trading volumes" on

September 15, 2008, and refer to the parties' Master Agreements, Section 562 of the Bankruptcy

Code, and the cited document for their contents.

196.     Defendants deny the allegations in paragraph 196 of the SAC, except lack

knowledge or information sufficient to form a belief about the market data used to construct the

graph in paragraph 196 of the SAC because plaintiffs have refused to identify its source.

Defendants further state that, contrary to plaintiffs' accusation, Citi did not close out its

USD/JPY FX trades as of September 19, 2008.  Instead, as described above (and as Citi's head

FX traders specifically described to Lehman), Citi priced these positions in a commercially

reasonable manner, using a spot rate derived from actual spot trades executed by Citi on

September 15 to replace its USD/JPY spot risk, and adding forward points at September 15

levels (which levels are fully supported by third-party data).

105

197.     Defendants deny the allegations in paragraph 197 of the SAC.  Defendants

further state that while plaintiffs have refused to disclose the source of the data underlying their

so-called "Market-Based Calculation of Close-out Amount" (as reflected in the chart at

paragraph 197), plaintiffs evidently are making another invalid "apples-to-oranges" comparison.

Plaintiffs' purported "Market-Based" calculations, upon information and belief, reflect mid-

market values only, even though replacement cost is the measure of damages mandated by the

parties' agreements and necessary to provide Citi with the benefit of its bargain.  Citi also

disagrees with certain trade counts and claim amounts set forth in the chart, and a corrected

version of the chart appears below.

| Close-out Amount Calculations for Foreign Exchange Trades [values in USD to Lehman Subsidiaries] | | | | |
|---|---|---|---|---|
| **Master Agreement** | **No. Trades** | **Citi Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| LBCC-Citibank | ~~2,975~~ **2,987** | ~~(391,347,954)~~ **(393,164,413)** | ~~(296,348,809)~~ | ~~94,999,145~~ |
| LBSF-Citibank | ~~23~~ **21** | ~~(695,859)~~ **6,884,674** | ~~928,305~~ | ~~1,624,164~~ |
| LBSF-Financial | 4 | (7,133,021) | ~~(6,741,524)~~ | ~~391,497~~ |
| **TOTAL** | ~~**3,002**~~ **3,012** | ~~**(399,176,833)**~~ **(393,412,760)** | ~~**(302,162,028)**~~ | ~~**97,014,805**~~ |

198.     Defendants deny the allegations in paragraph 198 of the SAC, except

admit that most of the FX trades between Lehman and Citi were entered into under the LBCC-

Citibank Agreement, and admit that plain vanilla forwards and plain vanilla European options

are among the most common and liquid types of FX trades.  Defendants further state that the

chart in paragraph 198 presents another illegitimate comparison:  plaintiffs' alleged "Market-

Based Calculation of Close-out Amount," upon information and belief, reflects a mid-market

valuation only, while Citi's claim is properly calculated as the replacement value of the

terminated trades.  Citi also disagrees with the trade counts and claim amounts set forth in the

chart, and a corrected version of the chart appears below.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| Product Type | No. Trades | Citibank Calculation of Close-out Amount | ~~Market-Based Calculation of Close-out Amount~~ | ~~Difference~~ |
| EUROPEAN OPTION | 867 | (135,880,236) | ~~(57,664,051)~~ | ~~78,216,185~~ |
| FORWARDS | ~~1,908~~ **2,039** | ~~(245,813,680)~~ **(246,632,728)** | ~~(238,123,032)~~ | ~~7,690,648~~ |
| AMERICAN OPTION | 11 | 2,900,203 | ~~4,069,206~~ | ~~1,169,003~~ |
| DIGITAL OPTION | ~~7~~ **8** | ~~(2,465,470)~~ **(2,495,470)** | ~~(3,994,651)~~ | ~~(1,529,181)~~ |
| BARRIER OPTION | ~~59~~ **62** | ~~(10,088,772)~~ **(11,056,183)** | ~~(12,592,762)~~ | ~~(2,503,990)~~ |
| Trades Citi Does Not Know | ~~123~~ | ~~n/a~~ | ~~11,956,481~~ | ~~11,956,481~~ |
| TOTAL | ~~2,975~~ **2,987** | ~~(391,347,954)~~ **(393,164,413)** | ~~(296,348,809)~~ | ~~94,999,145~~ |

199.    Defendants deny the allegations in paragraph 199 of the SAC, except

admit that the most common currency pair in the LBCC-Citibank Agreement was USD/JPY.

Defendants further state, upon information and belief, that plaintiffs' alleged "Market-Based

Calculation of Close-out Amount" (as reflected in the chart at paragraph 199) reflects a mid-

market valuation only, while Citi's claim is properly calculated as the replacement value of the

terminated trades.  For this reason, plaintiffs' attempted comparison is invalid.  Citi also

disagrees with the trade counts and claim amounts set forth in the chart, and a corrected version

of the chart appears below.

| Close-out Amount Calculations for FX Trades under LBCC-Citibank Agreement [values in USD to LBCC] | | | | |
|---|---|---|---|---|
| **Currency Pair** | **No. Trades** | **Citibank Calculation of Close-out Amount** | ~~**Market-Based Calculation of Close-out Amount**~~ | ~~**Difference**~~ |
| USD/JPY | ~~346~~ **371** | ~~(28,148,400)~~ **(28,745,808)** | ~~2,202,909~~ | ~~30,351,309~~ |
| EUR/USD | ~~246~~ **328** | ~~(95,465,061)~~ **(98,394,915)** | ~~(81,509,179)~~ | ~~13,955,882~~ |
| AUD/USD | ~~164~~ **173** | ~~(29,522,224)~~ **(23,919,010)** | ~~(20,372,623)~~ | ~~9,149,600~~ |
| GBP/USD | ~~65~~ **75** | ~~(69,091,410)~~ **(67,924,683)** | ~~(60,049,293)~~ | ~~9,042,117~~ |
| USD/BRL | ~~150~~ **153** | ~~(44,458,420)~~ **(47,595,958)** | ~~(39,162,456)~~ | ~~5,295,965~~ |
| USD/KRW | 62 | (24,422,594) | ~~(19,740,057)~~ | ~~4,682,537~~ |
| Other 66 Currency Pairs | ~~1,819~~ **1,825** | ~~(100,239,845)~~ **(102,161,446)** | ~~(89,674,591)~~ | ~~10,565,254~~ |
| **TOTAL** | ~~**2,852**~~ **2,987** | ~~**(391,347,954)**~~ **(393,164,413)** | ~~**(308,305,290)**~~ | ~~**83,042,664**~~ |

200.    Defendants deny the allegations in paragraph 200 of the SAC, except admit that the referenced USD/JPY options were maturing in less than one year and that the strike prices of these options were not close to the then-current exchange rate. Defendants further state that these trades, which can be viewed as a sort of "catastrophe bond," were valuable – and not almost worthless, as plaintiffs allege – in September 2008 at the height of the uncertainty in the financial markets. Indeed, plaintiffs' own graph, purporting to show the volatility of the USD/JPY exchange rate over this period (*see* SAC at ¶ 196) provides ample support for the value of the options. Citi's standard options pricing model yields a mid-market value for these options of many millions of dollars (consistent with Citi's ultimate close-out value, which added a reasonable bid/offer), giving the lie to plaintiffs' contention that they are worth only $340,000. Further, plaintiffs' purported "Market-Based Value" (as reflected in the chart at paragraph 200), upon information and belief, reflects only a (deeply flawed) mid-market valuation, whereas Citi is entitled to recover the replacement value of the terminated trades. In

addition, plaintiffs' chart mislabels the trades at issue – the "puts" are in fact "calls," while the

"calls" are actually "puts" – and a corrected version of the chart appears below.

| Portfolio of Low Delta Options [values in USD to LBCC] | | | | | | |
|---|---|---|---|---|---|---|
| Type (LBCC's perspective) | Strike (Yen) | Expiration Date | USD Notional | Citibank Value | Market-Based Value | Difference |
| ~~Buy Put~~ **Buy Call** | 118 | 9/24/2008 | 100,000,000 | 0 | ~~22~~ | ~~22~~ |
| ~~Buy Put~~ **Buy Call** | 120 | 11/6/2008 | 3,600,000 | 0 | ~~263~~ | ~~263~~ |
| ~~Buy Put~~ **Buy Call** | 120 | 11/6/2008 | 329,513 | 0 | ~~24~~ | ~~24~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 6,970,319 | 0 | ~~391~~ | ~~391~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 4,899,257 | 0 | ~~275~~ | ~~275~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 2,865,000 | 0 | ~~161~~ | ~~161~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 69,703 | 0 | ~~4~~ | ~~4~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 46,229 | 0 | ~~3~~ | ~~3~~ |
| ~~Buy Put~~ **Buy Call** | 125 | 1/16/2009 | 48,877 | 0 | ~~3~~ | ~~3~~ |
| ~~Sell Put~~ **Sell Call** | 110.35 | 9/17/2008 | 30,000,000 | 0 | ~~(1)~~ | ~~(1)~~ |
| ~~Sell Put~~ **Sell Call** | 117 | 9/26/2008 | 100,000,000 | (90,000) | ~~(284)~~ | ~~89,716~~ |
| ~~Sell Put~~ **Sell Call** | 125 | 10/23/2008 | 200,000,000 | (210,000) | ~~(228)~~ | ~~209,772~~ |
| ~~Sell Put~~ **Sell Call** | 120 | 11/6/2008 | 1,931,800 | (2,318) | ~~(141)~~ | ~~2,177~~ |
| ~~Sell Put~~ **Sell Call** | 120 | 11/6/2008 | 1,931,800 | (2,318) | ~~(141)~~ | ~~2,177~~ |
| ~~Sell Put~~ **Sell Call** | 120 | 11/6/2008 | 65,913 | (79) | ~~(5)~~ | ~~74~~ |
| ~~Sell Put~~ **Sell Call** | 125 | 1/16/2009 | 100,000,000 | (145,000) | ~~(5,611)~~ | ~~139,389~~ |
| ~~Sell Put~~ **Sell Call** | 125 | 1/16/2009 | 6,970,319 | (10,107) | ~~(391)~~ | ~~9,716~~ |
| ~~Sell Call~~ **Sell Put** | 65 | 5/8/2009 | 150,000,000 | (600,000) | ~~(16,193)~~ | ~~583,807~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 6/12/2009 | 150,000,000 | (645,000) | ~~(17,562)~~ | ~~627,438~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 6/12/2009 | 150,000,000 | (645,000) | ~~(17,562)~~ | ~~627,438~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 6/12/2009 | 100,000,000 | (430,000) | ~~(11,708)~~ | ~~418,292~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 6/12/2009 | 75,000,000 | (322,500) | ~~(8,781)~~ | ~~313,719~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 6/12/2009 | 75,000,000 | (322,500) | ~~(8,781)~~ | ~~313,719~~ |
| ~~Sell Call~~ **Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~ **Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~ **Sell Put** | 60 | 7/9/2009 | 150,000,000 | (637,500) | ~~(12,072)~~ | ~~625,428~~ |
| ~~Sell Call~~ **Sell Put** | 60 | 7/9/2009 | 100,000,000 | (425,000) | ~~(8,048)~~ | ~~416,952~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 7/31/2009 | 200,000,000 | (980,000) | ~~(55,191)~~ | ~~924,809~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 7/31/2009 | 200,000,000 | (980,000) | ~~(55,191)~~ | ~~924,809~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~ **Sell Put** | 63 | 7/31/2009 | 100,000,000 | (490,000) | ~~(27,596)~~ | ~~462,404~~ |
| ~~Sell Call~~ **Sell Put** | 60 | 8/21/2009 | 100,000,000 | (470,000) | ~~(17,123)~~ | ~~452,877~~ |
| **TOTAL** | | | 2,609,728,730 | (9,662,332) | ~~(340,800)~~ | ~~9,321,532~~ |

201.   Defendants deny the allegations in paragraph 201 and footnote 14 of the

SAC, except admit plaintiffs' hindsight allegation that, as it turned out, the options would have

expired worthless.

202.    Defendants deny the allegations in paragraph 202 of the SAC.

203.    Defendants deny the allegations in paragraph 203 of the SAC, except admit that, having reviewed these two option trades in response to the SAC, Citi concluded that it did not appropriately net these positions and admit that correcting this oversight reduces Citi's FX claim by approximately $170,000.  Defendants further state that plaintiffs' chart mislabels these trades – instead of "puts," these are "calls" – and a corrected version of the chart appears below.

| **Example of Exactly Offsetting FX Trades**<br>[values in USD to LBCC] | | | | | |
|---|---|---|---|---|---|
| **Type** | **Strike Price (Yen)** | **USD Notional ($)** | **Expiration Date** | **Market-Based Value ($)** | **Citibank Value ($)** |
| ~~Citibank Sells Put~~<br>**Citibank Sells Call** | 114 | 50,000,000 | 2/26/2009 | ~~175,865~~ | 72,500 |
| ~~Citibank Buys Put~~<br>**Citibank Buys Call** | 114 | 50,000,000 | 2/26/2009 | ~~(175,865)~~ | (242,500) |
| **Total** | | | | **0** | **(170,000)** |

204.    Defendants deny the allegations in paragraph 204 of the SAC, except lack knowledge or information sufficient to form a belief about the particular trades (allegedly 74 trades) that plaintiffs contend are offsetting, and where netting allegedly would reduce Citi's claim by approximately $2.7 million.  Defendants stated in their Answer to the First Amended Complaint that they would correct any netting errors and have amended their claim accordingly.[57]

205.    Defendants deny the allegations in paragraph 205 of the SAC.

206.    Defendants deny the allegations in paragraph 206 of the SAC.  Defendants further state that, on September 11, 2008, LBSF, Citibank, and Bracebridge attempted to enter

---

[57] These corrections, among others, are reflected in the updated version of Citi's derivatives claim, which can be found at Bates numbers CITI-LEH00962090-98.

into a three-way collapse transaction with an effective date of September 16, 2008.  Under the

proposed transaction, Citibank would terminate particular trades facing LBSF and step into

LBSF's position in particular trades between LBSF and Bracebridge.  The proposed three-way

collapse transaction was never a "successful novation," as plaintiffs allege, because LBSF

repudiated its obligations before the September 16 effective date of the transaction.  In the face

of this repudiation, all parties – including LBSF – specifically agreed that the three-way collapse

transaction was never effective and the original trades between the parties remained in force.

Even if (contrary to fact) the three-way collapse transaction had been effective and binding in

some way before September 16, LBSF's repudiation of its obligations and specific agreement on

September 15 that the collapse transaction was "null and void" would have been sufficient to

rescind whatever contract might have been formed between the parties.  Indeed, on

September 16, LBSF specifically requested Citibank's confirmation that the original trades

remained in full force and effect (which Citibank gave) and LBSF confirmed that the proposed

novations had been taken down from the DTC system.  Citibank acted in good faith and in a

commercially reasonable manner with respect to the proposed three-way collapse transaction and

the termination and close-out of the original trades.  Plaintiffs' accusation that Citibank is

opportunistically seeking to revive cancelled trades could not be further from the truth.  It is

plaintiffs who are improperly and opportunistically seeking to resurrect an abandoned transaction

– the proposed three-way collapse transaction – to unjustly enrich the Lehman estate at

Citibank's expense.

207.   Defendants deny the allegations in paragraph 207 of the SAC, except

admit that on or around September 11, 2008, LBSF was a protection seller to Citibank with

respect to 29 CDS on RMBS, admit that LBSF was a buyer of offsetting protection from

Bracebridge with respect to 87 CDS on RMBS, admit that Citibank, LBSF, and Bracebridge

sought to enter into a transaction in which Citibank would terminate its trades facing LBSF and

step into LBSF trades facing Bracebridge that had perfectly offsetting risk positions, and refer to

the quoted document for its contents. Citibank's consent to the three-way collapse transaction

demonstrates its regular and customary practice regarding netting offsetting CDS trades.

Citibank agreed to replace its Lehman-facing trades with Bracebridge-facing trades only when

the material terms of the trades all matched – here, the specific underlying RMBS, the specific

tranche of the underlying RMBS, the trade maturity date, and the strike price. In fact, Citibank

refused to collapse an additional proposed trade-pair because they were not truly offsetting; the

strike price on Citibank's trade with Lehman was 0.75, while the strike price on the proposed

corresponding trade between Lehman and Bracebridge was only 0.68. Citibank refused to step

into the proposed trade facing Bracebridge because Citi was unwilling to accept the annuity risk

created by a seven basis point – or 0.07% – difference in strikes (even where the annuity ran in

Bracebridge's favor). For its part, Lehman identified an additional trade pair that could not be

included in the collapse because the strike price on Citibank's trade with Lehman was 0.77 while

the strike price on Lehman's trade with Bracebridge was 0.67 – a ten basis point (or 0.10%)

difference in strike.

      208.    Defendants deny the allegations in paragraph 208 and footnotes 15 and 16

of the SAC, except admit that Citibank and LBSF were adherents to the ISDA Novation

Protocol II, lack knowledge or information with respect to whether Bracebridge was an adherent,

and refer to the quoted documents for their contents. Defendants further state that, consistent

with ISDA's standard novation agreements and published industry guidelines, the parties agreed

on September 11, 2008 that the three-way collapse transaction would not be effective until

September 16, 2008.  As of September 11, Citibank was in the money on its trades facing LBSF,

and LBSF was in the money on its trades facing Bracebridge.  Pursuant to the ISDAs and CSAs

governing the parties' respective trades, LBSF had posted collateral with Citibank and

Bracebridge had posted collateral with LBSF.  A central tenet of the three-way collapse

agreement was that each party holding collateral with respect to the original trades would return

that collateral on or before the effective date of the transaction.  Likewise, upon unwind and

novation, each party that was out of the money would pay its counterparty a termination fee

calculated under the ISDA governing its trades.  Citibank, LBSF, and Bracebridge agreed that

September 16 was the effective date as well as the date by which cash collateral and termination

fees had to change hands.  The parties' agreement to a future effective date was specifically

anticipated by the ISDA Novation Best Practices cited by plaintiffs, which provide that "[p]arties

may, as part of the consent process on the Novation Trade Date, agree that the transfer will be

effective from a forward starting Novation Date."[58]

209.    Defendants deny the allegations in paragraph 209 of the SAC, except

admit that LBHI (but not LBSF) filed for chapter 11 protection on September 15, 2008, admit

that LBHI's bankruptcy filing constituted an Event of Default under the Citibank-LBSF ISDA

Agreement, admit that Citibank sent a Notice of Termination declaring an Event of Default had

occurred, and refer to the cited document for its contents.  Defendants further state that, despite

LBHI's bankruptcy filing, Citibank and Bracebridge sought to consummate the proposed

transaction and sought assurance from LBSF that, notwithstanding the bankruptcy of its Credit

Support Provider under the ISDA, LBSF would perform its obligations under the proposed three-

---

[58]    "Best Practice Statement: Processing Novations," published by the Process Working Group of the ISDA
Operations Committee (May 4, 2004), *available at*
http://www.isda.org/publications/pdf/BestPracticeStatement.pdf at 2.

way collapse transaction.  LBSF declined to provide such assurances or to perform its

obligations.  Upon information and belief, LBSF determined to repudiate its obligations and treat

the proposed collapse transaction as null and void because LBSF concluded that it would be in

its economic interest to do so.  Under standard practices in the derivatives market, a hedge fund

such as Bracebridge must post more collateral to its counterparty (here, LBSF) than a market-

maker such as LBSF must post to its counterparty (Citibank) for an equivalent position.  Thus,

had the three-way proposed collapse transaction proceeded, LBSF would have had to pay out

more cash than it would have received on a net basis.  On September 15, LBSF refused to return

Bracebridge's collateral – no doubt so that LBSF could hold onto as much cash as possible, with

Bracebridge receiving only an unsecured claim should LBSF also file for bankruptcy.

210.    Defendants deny the allegations in paragraph 210 of the SAC, and refer to

the quoted document for its contents.  Defendants further state, upon information and belief, that

every step in the three-way collapse transaction – from proposal to abandonment – was taken

with LBSF's knowledge and consent.  Following LBSF's refusal to perform its key obligations

under the transaction, each party confirmed that its trading position had not changed:  Citibank

was still a buyer of protection from LBSF and LBSF was still a buyer of protection from

Bracebridge with respect to the relevant CDS on RMBS.

211.    Defendants deny the allegations in paragraph 211 of the SAC, and refer to

the quoted document for its contents.

212.    Defendants deny the allegations in paragraph 212 of the SAC.  Defendants

further state that LBSF specifically confirmed to Citibank that the parties' existing trading

positions were not altered by their attempt to enter into the three-way collapse transaction and

that the collapse transaction was to be treated as null and void.  Because the three-way collapse

transaction conceived by the parties on September 11, 2008 was never effective or otherwise null and void, Citibank properly calculated close-out amounts on the original trades in good faith and in a commercially reasonable manner pursuant to the Citibank-LBSF ISDA Agreement.

213.   Defendants deny the allegations in paragraph 213 and footnote 17 of the SAC, and refer to the quoted document for its contents.  Defendants further state that ISDA's standard novation documentation and industry guidelines distinguish between the "Novation Trade Date" and the "Novation Date" on which a novation becomes effective and binding on the parties.[59]  The ISDA Novation Best Practices cited by plaintiffs recognize that "[p]arties may, as part of the consent process on the Novation Trade Date, agree that the transfer will be *effective* from a forward starting Novation Date."[60]  Here, the parties understood and intended that the three-way collapse transaction would not be effective until September 16, 2008.

214.   Defendants deny the allegations in paragraph 214 of the SAC, and refer to the quoted documents for their content.  Defendants further state, upon information and belief, that the future effective date of the three-way collapse transaction was a key component of the transaction negotiated by the parties, and that LBSF agreed that the transaction would not be effective until September 16, 2008.  Plaintiffs' allegation that, as of September 11, there were "no steps remaining for LBSF to perform" with respect to the three-way collapse transaction is unfounded and absurd:  among other things, LBSF was under the obligation to return Bracebridge's collateral and pay Citibank's termination fee by September 16, obligations that it repudiated on or around September 15.

---

[59]   *See* 2004 ISDA Novation Definitions §§ 1.16–1.17, *available at* http://www.isda.org/publications/pdf/2004-Novations-Definitions.pdf.

[60]   *See* "Best Practice Statement: Processing Novations," at 2.

215.    Defendants deny the allegations in paragraph 215 of the SAC, except admit that Citibank's close-out amounts for the 29 trades subject to the proposed collapse transaction total $109,862,953, admit that Citibank asserts setoff rights against LBHI's $2 billion deposit, and lack knowledge or information regarding the close-out amounts calculated by Bracebridge.

216.    Defendants deny the allegations in paragraph 216 of the SAC, except admit that LBSF owes Citibank at least $91,480,404 with respect to these trades.  Defendants further state that, given the outlandish positions plaintiffs advocate in the SAC, plaintiffs' $91,480,404 figure presumably represents a mid-market value only, whereas Citibank is entitled to replacement cost.  In fact, plaintiffs' mid-market valuation effectively validates Citibank's close-out amount.  Assuming that plaintiffs' mid-market calculation of $91,484,404 is accurate (in fact, it is too low), the implied bid/offer adjustment in Citibank's replacement cost valuation of $109,862,953 would be 9.9% of the notional value of the trades.  As plaintiffs themselves concede (see SAC at ¶ 184), CDS on RMBS are "less liquid" and therefore command "wider" bid/offer charges in the market.  In the aftermath of LBHI's bankruptcy, a bid/offer charge of less than 10% of notional for distressed CDS on RMBS was not at all unreasonable.

217.    Defendants deny the allegations in paragraph 217 of the SAC.  Defendants further state that they at all times acted in good faith and in a commercially reasonable manner with respect to the proposed three-way collapse transaction and the close-out of the original trades.

218.    Defendants deny the allegations in paragraph 218 of the SAC.  Defendants further state that their derivatives claims calculations were made in good faith, in a commercially

116

reasonable manner, and consistent with the governing contracts and applicable law.  There is no

legal or factual basis for equitable subordination of defendants' allowed derivatives claims.

219.    Defendants deny the allegations in paragraph 219 and footnote 18 of the

SAC, and refer to Section 510(c) of the Bankruptcy Code and the cited documents for their

contents.

220.    Defendants deny the allegations in paragraph 220 of the SAC, and refer to

the cited documents for their contents.  Defendants further state that their derivatives claims were

calculated in good faith, in a commercially reasonable manner, and consistent with the governing

contracts and applicable law.  If this Court, however, finds any portion of defendants' derivatives

claims to be invalid under applicable law, then disallowance of that portion of the claims would

provide plaintiffs with a complete remedy.  Equitable subordination, which is reserved for the

worst kind of creditor conduct – described by courts in this district as "fraud, illegality or breach

of fiduciary duty," *In re Verestar, Inc.*, 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006), "fraud,

overreaching or spoliation to the detriment of others," *In re W.T. Grant Co.*, 4 B.R. 53, 75

(Bankr. S.D.N.Y. 1980), *aff'd* 699 F.2d 599, 609-10 (2d Cir. 1983), and "egregious, improper or

wrongful conduct that damages creditors," *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y.

2008) – is clearly unwarranted.

221.    Defendants deny the allegations in paragraph 221 of the SAC, and refer to

the cited document for its contents.  Defendants further state that applicable law does not

authorize the subordination of their derivatives claims.  Defendants' derivatives claims do not

include any penalties and, specifically, for the reasons set forth above, the bid/offer and liquidity

components of defendants' close-out amounts do not constitute penalties; they are, instead,

appropriate components of replacement value necessary to provide defendants with the benefit of

their bargain. Moreover, if (contrary to fact) any portion of defendants' derivatives claim were found to constitute a penalty, then that portion of the claim likely would be invalid under applicable law; in that circumstance, disallowance of that portion of the claim would provide plaintiffs with a complete remedy.

222.    Defendants deny the allegations in paragraph 222 of the SAC, and refer to the cited documents for their contents.

223.    Defendants deny the allegations in paragraph 223 of the SAC.

224.    Defendants admit the allegations in paragraph 224 of the SAC.

225.    Defendants admit the allegations in paragraph 225 of the SAC, and refer to proof of claim numbers 17895 and 17913 for their contents.

226.    Defendants deny the allegations in paragraph 226 of the SAC.

227.    Defendants admit the allegations in paragraph 227 of the SAC.

228.    Defendants admit the allegations in paragraph 228 of the SAC, and refer to proof of claim numbers 67733 and 67736 for their contents.

229.    Defendants deny the allegations in paragraph 229 of the SAC.

230.    Defendants admit the allegations in paragraph 230 of the SAC.

231.    Defendants admit the allegations in paragraph 231 of the SAC, and refer to proof of claim numbers 17926 and 29637 for their contents.

232.    Defendants deny the allegations in paragraph 232 of the SAC.

233.    Defendants admit the allegations in paragraph 233 of the SAC.

234.    Defendants admit the allegations in the first sentence in paragraph 234 of the SAC, deny the remaining allegations in paragraph 234 and footnote 19, and refer to proof of claim numbers 29881 and 29882 and Citi Global's Derivatives Questionnaire response for their

contents.  Defendants further state that the lower net claim amount asserted in the Derivatives

Questionnaire response does not represent, as plaintiffs allege, an "acknowledge[ment] [that] an

additional cash payment of $9,823,000 is due to LBSF," but rather reflects the parties' continued

efforts to reconcile and resolve discrepancies between the parties' derivatives trade populations.

Additionally, Citi Global's Derivatives Questionnaire response states that the claim amount

asserted in the response "supersedes and replaces the Early Termination Amount asserted in the

Proof of Claim."  Defendants have continued to engage in good faith efforts to resolve

discrepancies in the parties' trade populations, and as a result of this process, Defendants now

calculate that LBSF owes $215,002,740 under the LBSF-Global Agreement.

235.   Defendants deny the allegations in paragraph 235 of the SAC.

236.   Defendants admit the allegations in paragraph 236 of the SAC.

237.   Defendants admit the allegations in paragraph 237 of the SAC, and refer
to proof of claim numbers 67734 and 67736 for their contents.

238.   Defendants deny the allegations in paragraph 238 of the SAC.

239.   Defendants admit the allegations in paragraph 239 of the SAC.

240.   Defendants admit the allegations in paragraph 240 of the SAC, and refer
to proof of claim numbers 17936 and 17937 for their contents.

241.   Defendants deny the allegations in paragraph 241 of the SAC.

242.   Defendants admit the allegations in paragraph 242 of the SAC.

243.   Defendants admit the allegations in paragraph 243 of the SAC, and refer
to proof of claim numbers 29880 and 29882 for their contents.

244.   Defendants deny the allegations in paragraph 244 of the SAC.

245.   Defendants admit the allegations in paragraph 245 of the SAC.

246.    Defendants admit the allegations in paragraph 246 of the SAC, and refer to proof of claim numbers 29880 and 29882 for their contents.

247.    Defendants deny the allegations in paragraph 247 of the SAC.

248.    Defendants admit the allegations in paragraph 248 of the SAC.

249.    Defendants admit the allegations in paragraph 249 of the SAC, and refer to proof of claim numbers 17933 and 17934 for their contents.

250.    Defendants deny the allegations in paragraph 250 of the SAC.

251.    Defendants deny the allegations in paragraph 251 of the SAC.  Defendants further state that, as demonstrated above, the principal arguments plaintiffs advance in their objection to Citi's derivatives claims – and the only ones that could conceivably result in a material reduction of the claims – are directly contrary to the terms of the Master Agreements, standards of commercial reasonableness and applicable law.  Contrary to plaintiffs' allegations, Citi is not limited to claiming the mid-market value of trades it did not replace at close-out.  The enforceable, industry-standard liquidated damages provisions in the Master Agreements expressly provide that Citi is entitled to recover replacement cost for the terminated trades, whether or not Citi executed actual replacements.  Indeed, the same measure of damages would apply under New York contract law, in the absence of a liquidated damages provision.  Nor is Citi required to net dissimilar trades that would leave Citi with undue and uncompensated risk.  It would not be commercially reasonable to do so.  Finally, Citi was required to close out its more than 30,000 derivatives trades as soon as it was commercially reasonable to do so.  Citi was not required to close out its massive portfolio in a single day, as plaintiffs contend; nor was Citi required to close out the trades at the specific time of day that would be most advantageous to Lehman.  Plaintiffs' so-called "Market-Based Net Claim Amount" (as reflected in the chart at

120

paragraph 251) is patently invalid. It incorporates, upon information and belief, each of plaintiffs' wrongheaded arguments: mid-market valuations (rather than replacement cost) calculated as of plaintiffs' preferred date and time of day (rather than the time of Citi's close-out) and subject to unreasonable netting of dissimilar trades. A corrected version of the chart appears below. While plaintiffs have had more than three years to study Citi's derivatives claims, plaintiffs' 82 pages of derivatives-related arguments justify a reduction of Citi's claims by at most $20 million, based on minor calculation errors Citi has identified in responding to the SAC. Citi's $1.9 billion derivatives claim was calculated in good faith, using commercially reasonable procedures to arrive at a commercially reasonable result. Subject to very minor corrections, it should be allowed in full.

| | ~~Market-Based Close-out Amount~~ | Collateral Posted | Unpaid Amounts | ~~Market-Based Net Claim Amount~~ | Citi Net Claim Amount |
|---|---|---|---|---|---|
| **LBSF-Canyon** | ~~958,630~~ | ~~(899,430)~~ **(898,517)** | 0 | ~~59,200~~ | (135,474) |
| **LBSF-Citibank** | ~~(249,608,958)~~ | ~~416,280,591~~ **415,935,426** | ~~(9,252,290)~~ **16,304,277** | ~~157,419,343~~ | ~~(1,640,084,656)~~ **(1,640,720,898)** |
| **LBSF-Financial** | ~~(223,685,221)~~ | ~~230,698,657~~ **230,525,248** | ~~(456,250)~~ **(2,857,271)** | ~~6,557,186~~ | (21,184,614) |
| **LBSF-Global** | ~~164,305,046~~ | ~~(184,881,990)~~ **(184,737,740)** | ~~89,634~~ **9,925,401** | ~~(20,487,310)~~ | ~~(232,423,044)~~ **(215,002,740)** |
| **LBCC-Citibank** | ~~(296,364,126)~~ | ~~313,230,362~~ **313,086,000** | ~~58,172,328~~ **73,273,539** | ~~75,038,565~~ | (18,017,039) |
| **LBCS-Energy** | ~~23,885,115~~ | ~~(20,525,656)~~ **(20,510,000)** | ~~(477,130)~~ **(617,598)** | ~~2,882,329~~ | (10,714,350) |
| **LBCS-Global ISDA** | ~~(7,349,001)~~ | ~~2,600,485~~ **2,600,000** | ~~0~~ **(991,986)** | ~~(4,748,516)~~ | (6,217,557) |
| **LBCS-Global EFET** | ~~6,226,192~~ | ~~(6,168,904)~~ **(6,162,000)** | ~~0~~ **446,026** | ~~57,287~~ | (716,281) |
| **LBSF-Swapco** | ~~39,741,383~~ | ~~(37,912,560)~~ **(37,884,825)** | 0 | ~~1,828,824~~ | (991,772) |
| **TOTAL** | ~~(541,890,939)~~ | ~~712,421,555~~ **711,953,592** | ~~48,076,292~~ **95,482,388** | ~~218,606,907~~ | ~~(1,930,484,787)~~ **(1,913,700,725)** |

252.    Defendants deny the allegations in paragraph 252 of the SAC. Defendants further state that LBSF posted collateral to Citibank in the amount of $415,935,426 as of the Early Termination Date of the LBSF-Citibank Agreement, that $16,304,277 was due to Citibank, but unpaid, and that Citibank submitted a net claim of $1,640,720,898.

253.     Defendants deny the allegations in paragraph 253 of the SAC.

254.     Defendants deny the allegations in paragraph 254 of the SAC.  Defendants further state that they submitted claims in connection with the Master Agreements in the amount of $1,913,700,725.

255.     Regarding the allegations in paragraph 255 of the SAC, defendants repeat and reallege the responses in paragraphs 1–254 of this answer as if fully set forth herein.

256.     Defendants deny the allegations in paragraph 256 of the SAC.  Defendants further state that the $2 billion was deposited on June 12, 2008 into two time deposit accounts with Citibank Risk Treasury, and, on June 13, 2008, the funds were rolled into a single call account.  At all times, the $2 billion was commingled with Citibank's other funds, and earned regular interest, which was deposited each business day into LBHI's general DDA.  The funds were callable daily by LBHI, and could have been withdrawn by LBHI on a same-day basis.  The $2 billion deposit was a "general" deposit under New York law and, as such, was a debt owed by Citibank to LBHI, against which Citibank has setoff rights under New York common law, applicable contractual provisions, and Section 151 of the New York Debtor & Creditor Law.  Those rights are preserved by operation of Section 553 and the relevant safe harbor provisions of the Bankruptcy Code.  At no time did Citi waive, or promise to waive, its setoff rights against the $2 billion call account; nor did Citi ever segregate, or promise to segregate, the $2 billion.  Defendants further state that plaintiffs' allegations that Citi agreed to waive setoff rights, or to limit its setoff rights under New York law, are in any case irrelevant to Citi's rights to offset its claims under a Revolving Loan Agreement between Citi, LBHI, and LBCCA (the "LBCCA Loan Claim"), against the $2 billion.  Pursuant to a Guaranty by LBHI dated August 30, 2007 that specifically relates to the revolving loan, Citi has a contractual right to "set off and

apply any and all deposits (general or special, time or demand, provisional or final but excluding

any amounts held by Citi in a trustee [or] fiduciary capacity . . .)" to satisfy LBHI's obligations

arising from the defaulted loan.  Moreover, these contractual rights cannot be waived or amended

by oral agreement; the Guaranty specifically provides that any waiver or amendment of Citi's

rights under the Guaranty is ineffective "unless the same is in writing and signed by Citibank,

N.A."

257.    Defendants deny the allegations in paragraph 257 of the SAC, except

admit that defendants assert a right to set off derivatives and other LBHI obligations against

LBHI's $2 billion deposit, and refer to proof of claim number 67736 for its contents.  Defendants

further state that the Complaint in this action constitutes plaintiffs' first formal request for the

return of the $2 billion.

258.    Defendants deny the allegations in paragraph 258 of the SAC.  Defendants

further state that the purported waiver agreement alleged in the SAC – which is not mentioned in

the Examiner's Report, and which is contradicted by LBHI's own documents cited in that Report

and the testimony of Lehman's supposed witnesses – does not exist.  The parties' agreement with

respect to the $2 billion was for the funds to be deposited into a time deposit, callable daily,

paying interest at the Fed Funds target minus $1/8$.  Citibank performed its obligations under this

agreement, paying LBHI over $10 million in interest between June 12, 2008 and September 15,

2008 and returning funds the same day to LBHI on the one occasion a withdrawal (of $210

million) was requested.

259.    Defendants deny the allegations in paragraph 259 of the SAC.

260.    Regarding the allegations in paragraph 260 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–259 of this answer as if fully set forth herein.

261.    Defendants deny the allegations in paragraph 261 of the SAC.  Defendants further state that they did not make any promise to LBHI concerning setoff rights, liens, security interests, or segregation with respect to the $2 billion deposit; nor did LBHI ever request that the funds be placed into a segregated account.  As both the documentary record and the Examiner's Report show, Citi advised LBHI that it had setoff rights against the $2 billion under New York law.  LBHI never promised not to withdraw the funds, and Citi's internal emails throughout the summer of 2008 reflect Citi's persistent concern that LBHI might withdraw the $2 billion.  Defendants further state that, with regard to the LBCCA Loan Claim, LBHI contractually waived any right to assert any defense based on reliance on an oral waiver or agreement.

262.    Defendants deny the allegations in paragraph 262 of the SAC.  Defendants further state that LBHI's internal documents refute any claim that LBHI relied (much less reasonably relied) on an alleged agreement by Citibank to waive setoff rights in the account, or that any such reliance would be foreseeable by Citi.  Defendants further state that, with regard to the LBCCA Loan Claim, LBHI contractually waived any right to assert any defense based on reliance on an oral waiver or agreement.

263.    Defendants deny the allegations in paragraph 263 of the SAC.

264.    Regarding the allegations in paragraph 264 of the SAC, defendants repeat and reallege the responses in paragraphs 1–263 of this answer as if fully set forth herein.

265.    Defendants deny the allegations in paragraph 265 of the SAC.

266.    Defendants deny the allegations in paragraph 266 of the SAC.  Defendants further state that the Complaint in this action is the first formal request LBHI has made for the return of the $2 billion.

267.    Defendants deny the allegations in paragraph 267 of the SAC.

268.     Regarding the allegations in paragraph 268 of the SAC, defendants repeat
and reallege the responses in paragraphs 1–267 of this answer as if fully set forth herein.

269.     Defendants deny the allegations in paragraph 269 of the SAC.  Defendants
further state that the $2 billion deposit has none of the hallmarks of a "special account" under
New York law:  the funds were unsegregated, earned regular interest, and were callable daily by
LBHI.  The $2 billion deposit is a "general" deposit under New York law.  Defendants further
state specifically with respect to the LBCCA Loan, Citi has a contractual right of setoff against
all LBHI deposits, whether special or general, and those contractual rights cannot be waived or
amended by an oral agreement.

270.     Defendants deny the allegations in paragraph 270 of the SAC, except
admit that Citibank takes the position that under New York common law, applicable contractual
provisions, Section 151 of the New York Debtor & Creditor Law, and the relevant safe harbor
provisions and Section 553 of the Bankruptcy Code, Citibank may apply the $2 billion deposit to
offset general debts owed by LBHI to Citibank.

271.     Defendants admit the allegations in paragraph 271 of the SAC.

272.     Defendants deny the allegations in paragraph 272 of the SAC.  Defendants
further state that the $2 billion is not "property of [the] estate," but rather a debt owed by
Citibank to LBHI, against which debts owed by LBHI to Citibank may be offset.

273.     Regarding the allegations in paragraph 273 of the SAC, defendants repeat
and reallege the responses in paragraphs 1–272 of this answer as if fully set forth herein.

274.     Defendants deny the allegations in paragraph 274 of the SAC.

275.     Defendants deny the allegations in paragraph 275 of the SAC.  Defendants
further state that the $2 billion is not "property" of the estate, but rather a debt owed by Citibank

to LBHI, against which debts owed by LBHI to Citibank may be offset under Section 553 of the

Bankruptcy Code.  In addition, the safe harbor provisions of Sections 546(e), 546(f), 546(g),

546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the

Bankruptcy Code also apply to the $2 billion.  Consequently, the $2 billion is not subject to

turnover under Section 542.

      276.    Regarding the allegations in paragraph 276 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–275 of this answer as if fully set forth herein.

      277.    Defendants admit that the September Amendment constitutes the

incurrence of an obligation, but deny that such incurrence was for the benefit of Citibank.

Defendants further state that the September Amendment was for the benefit of the LBHI

affiliates, including but not limited to LBI, whose debts LBHI guaranteed pursuant to the

September Amendment.

      278.    Defendants deny the allegations in paragraph 278 of the SAC.  Defendants

further state, upon information and belief, that LBHI received reasonably equivalent value for

the September Amendment as a result of, among other things, Citi's continued extensions of

credit to the newly-guaranteed subsidiaries.  In fact, LBHI considered these extensions of credit

to be so valuable that, on September 18, 2008 – days after filing for bankruptcy – LBHI filed the

Citibank Clearing Motion to assure Citibank that any postpetition credit extended to Lehman

Clearance Parties (defined specifically to include LBI) would be allowed under the 2004

Guaranty (as amended by the September Amendment) and available for setoff against the $2

billion to the same extent as if the credit had been extended prepetition.

      279.    Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 279 of the SAC.

280.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 280 of the SAC.

281.    Defendants deny the allegations in paragraph 281 of the SAC.  Defendants further state, upon information and belief, that LBHI executed the September Amendment so that Citibank would continue to extend credit in connection with performing clearing and settlement services for the benefit of the newly-guaranteed entities in connection with securities contracts, commodity contracts, and forward contracts, among other things.  As a result, the September Amendment is insulated from avoidance under Section 546(e) of the Bankruptcy Code.

282.    Defendants deny the allegations in paragraph 282 of the SAC.  Defendants further state that, in addition to Section 546(e), the safe harbor provisions of Sections 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the September Amendment.  Consequently, the September Amendment is not subject to avoidance under Section 548(a)(1)(B).

283.    Regarding the allegations in paragraph 283 of the SAC, defendants repeat and reallege the responses in paragraphs 1–282 of this answer as if fully set forth herein.

284.    Defendants deny the allegations in paragraph 284 of the SAC.  Defendants further state, upon information and belief, that LBHI received fair value in exchange for the September Amendment as a result of, among other things, Citi's continued extension of credit to the newly-added subsidiaries.  In addition, Citi requested and received the September Amendment in good faith.

285.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 285 of the SAC.

286.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 286 of the SAC.

287.     Upon information and belief, defendants admit the allegations in paragraph 287 of the SAC.

288.     Defendants deny the allegations in paragraph 288 of the SAC.  Defendants further state, upon information and belief, that LBHI executed the September Amendment so that Citibank would continue to extend credit in connection with performing clearing and settlement services for the benefit of the newly-guaranteed entities in connection with securities contracts, commodity contracts, and forward contracts, among other things.  As a result, Section 546(e) of the Bankruptcy Code applies to the September Amendment.  In addition, the safe harbor provisions of Sections 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the September Amendment.  Consequently, the September Amendment is not subject to avoidance under Section 544.

289.     Defendants deny the allegations in paragraph 289 of the SAC.

290.     Regarding the allegations in paragraph 290 of the SAC, defendants repeat and reallege the responses in paragraphs 1–289 of this answer as if fully set forth herein.

291.     Defendants admit the allegations in paragraph 291 of the SAC.

292.     Defendants admit that the September Amendment was an obligation incurred by LBHI to Citibank, but deny that the September Amendment was incurred for the benefit of Citibank.

293.     Defendants deny the allegations in paragraph 293 of the SAC, except lack knowledge or information sufficient to form a belief about the truth of the allegations concerning

128

the solvency of LBHI and its subsidiaries.  Defendants further state, upon information and belief,

that LBHI's intent in entering into the September Amendment was to benefit its creditors and

customers, not to defraud them.  The Bankruptcy Examiner, whose mandate included the

investigation of potential avoidance actions, never even addressed intentional fraud in connection

with the September Amendment, presumably because he found no conceivable factual basis to

support such a claim.  Despite extensive document discovery in this matter, plaintiffs, too,

evidently have failed to unearth a single document to support their claim that LBHI entered into

the September Amendment with the intent to defraud its creditors.

294.    Defendants deny the allegations in paragraph 294 of the SAC.

295.    Defendants deny the allegations in paragraph 295 of the SAC.

296.    Defendants deny the allegations in paragraph 296 of the SAC.

297.    Regarding the allegations in paragraph 297 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–296 of this answer as if fully set forth herein.

298.    Defendants admit the allegations in paragraph 298 of the SAC.

Defendants further state that the transfer of $500 million also was for the benefit of LBHI, as

LBI's corporate parent.

299.    Defendants deny the allegations in paragraph 299 of the SAC.  Defendants

further state, upon information and belief, that LBHI made the $500 million transfer to keep LBI

in business and preserve its value while LBHI negotiated a sale of LBI's assets to Barclays.  The

sale of LBI's assets to Barclays, which was agreed to later in the week of September 15, 2008,

was made for the benefit of LBHI and its creditors.  Upon information and belief, the $500

million transfer conferred substantial direct and indirect benefit to LBHI and its creditors, and

LBI received the transfer in good faith.

300.    Upon information and belief, defendants admit the allegations in paragraph 300 of the SAC.

301.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 301 of the SAC.

302.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 302 of the SAC.

303.    Defendants admit the allegations in the first and second sentences of paragraph 303 of the SAC, but deny the remaining allegations in the paragraph.  Defendants further state that the $1 billion LBI account against which Citibank exercised a setoff was distinct from LBI's DDA account into which the $500 million was transferred by LBHI.  At most, $136 million of the $500 million transfer that LBHI made into LBI's DDA on September 14, 2008, was used to fund the $1 billion LBI deposit against which Citibank exercised a setoff.  Defendants further state, on information and belief, that LBHI has already recovered some or all of this transfer from LBI, the initial transferee.  In addition, exercising a setoff does not make Citibank an "immediate or mediate transferee" within the meaning of Section 550(a)(2) of the Bankruptcy Code.

304.    Defendants deny the allegations in paragraph 304 of the SAC.  Defendants further state that LBHI expressly made the $500 million transfer to ensure LBI would be able to fund its obligations under foreign exchange trades in the CLS system.  To the extent a portion of the $500 million can be traced into the $1 billion LBI deposit against which Citibank exercised a setoff, the funds were applied to satisfy LBI's obligations to Citibank in connection with CLS.  As the Examiner concluded, the September 14, 2008 transfer is a safe harbored transaction and is insulated from avoidance under Section 546(e) of the Bankruptcy Code.  In addition, the safe

harbor provisions of Sections 546(g), 546(j), 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555,

556, 560, and 561 of the Bankruptcy Code also apply to insulate the $500 million transfer.

Consequently, the $500 million transfer is not subject to avoidance under Section 548(a)(1)(B).

305.    Defendants deny the allegations in paragraph 305 of the SAC.

306.    Regarding the allegations in paragraph 306 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–305 of this answer as if fully set forth herein.

307.    Defendants admit the allegations in paragraph 307 of the SAC.

Defendants further state that the transfer of $500 million also was for the benefit of LBHI, as

LBI's corporate parent.

308.    Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in paragraph 308 of the SAC.

309.    Defendants deny the allegations in paragraph 309 of the SAC, except lack

knowledge or information sufficient to form a belief about the truth of the allegations concerning

the solvency of LBHI and its subsidiaries.  Defendants further state, upon information and belief,

that LBHI's intent in requesting the $500 million transfer to LBI was to benefit its creditors and

customers and not to defraud them.  The Bankruptcy Examiner, whose mandate included the

investigation of potential avoidance actions, never even addressed the possibility of actual fraud

in connection with that transfer, presumably because he found no conceivable factual basis to

support such a claim.  Despite extensive document discovery in this matter, plaintiffs, too,

evidently have failed to unearth a single document to support their claim that LBHI intended to

defraud its creditors when it made the $500 million transfer to LBI.

310.    Defendants admit the allegations in the first and second sentences of

paragraph 310 of the SAC, and deny the allegations in the third sentence of paragraph 310.

Defendants further state that the $1 billion LBI account against which Citibank exercised a setoff

was distinct from LBI's DDA account into which the $500 million was transferred by LBHI.  At

most, $136 million of the $500 million transfer that LBHI made into LBI's DDA on

September 14, 2008 was used to fund the $1 billion LBI deposit against which Citibank

exercised a setoff.  Defendants further state, on information and belief, that LBHI has already

recovered some or all of this transfer from LBI, the initial transferee.  In addition, exercising a

setoff does not make Citibank an "immediate or mediate transferee" within the meaning of

Section 550(a)(2) of the Bankruptcy Code.

311.    Defendants deny the allegations in paragraph 311 of the SAC.

312.    Regarding the allegations in paragraph 312 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–311 of this answer as if fully set forth herein.

313.    Defendants admit the allegations in the first sentence of paragraph 313 of

the SAC, admit that Citibank owed LBCC approximately $198 million (subject to available

setoffs) as a result of settling LBCC's foreign exchange trades in the CLS system, deny the

remaining allegations in the paragraph, and refer to proof of claim 67734 for the calculation of

the amount owed.

314.    Defendants deny the allegations in paragraph 314 of the SAC, except

admit that, pursuant to the Stipulation between the parties dated May 14, 2013, Citibank has paid

$167 million of the amount owed to LBCC.  Defendants further state that Citibank is entitled to

set off the remaining amount of the LBCC payable against amounts owed by LBCC to Citibank

under the ISDA Master Agreement between Citibank and LBCC, and that Citibank acted

appropriately in debiting $4.5 million from an LBCC account.

315.    Defendants deny the allegations in paragraph 315 of the SAC.

316.    Regarding the allegations in paragraph 316 of the SAC, defendants repeat and reallege the responses in paragraphs 1–315 of this answer as if fully set forth herein.

317.    Defendants deny the allegations in paragraph 317 of the SAC.

318.    Defendants deny the allegations in paragraph 318 of the SAC, except admit that, while Citibank acknowledged that it owed approximately $198 million (subject to available setoffs) with respect to LBCC trades, Citibank required consent from LBI before it could pay the amount to LBCC (in order to avoid the risk of having to pay the debt twice) as well as plaintiffs' general agreement to Citi's calculation of the amounts due, and admit that, pursuant to the Stipulation between the parties dated May 14, 2013, Citibank has paid $167 million of the amount owed to LBCC.  Defendants further state that Citibank is entitled to set off the remaining amount of the LBCC payable against the amount owed by LBCC to Citibank under the ISDA Master Agreement between Citibank and LBCC, and that Citibank acted appropriately in debiting $4.5 million from an LBCC account.

319.    Defendants deny the allegations in paragraph 319 of the SAC.

320.    Regarding the allegations in paragraph 320 of the SAC, defendants repeat and reallege the responses in paragraphs 1–319 of this answer as if fully set forth herein.

321.    Defendants deny the allegations in paragraph 321 of the SAC, except admit that, pursuant to the May 14, 2013 Stipulation between Citibank and LBCC, Citibank paid $167 million of the payable owed to LBCC.  Defendants further state that the remaining amount of the payable may be partially offset under Sections 553, 560, 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555, 556, and 561 of the Bankruptcy Code and applicable law against debts LBCC owes to Citibank.

322.    Defendants deny the allegations in paragraph 322 of the SAC.

323.     Regarding the allegations in paragraph 323 of the SAC, defendants repeat and reallege the responses in paragraphs 1–322 of this answer as if fully set forth herein.

324.     Defendants deny the allegations in paragraph 324 of the SAC to the extent plaintiffs allege that Citibank is liable under Section 542 of the Bankruptcy Code.

325.     Defendants deny the allegations in paragraph 325 of the SAC to the extent plaintiffs allege that property is recoverable from Citibank under Section 542 or 550 of the Bankruptcy Code.

326.     Regarding the allegations in paragraph 326 of the SAC, defendants repeat and reallege the responses in paragraphs 1–325 of this answer as if fully set forth herein.

327.     Defendants admit the allegations in paragraph 327 of the SAC, except deny that plaintiffs have met their burden to overcome the presumption that defendants' claims are valid.

328.     Defendants admit the allegations in the first sentence of paragraph 328 of the SAC, and admit that plaintiffs object to proof of claim number 67736 for the reasons alleged in the paragraph.

329.     Defendants deny the allegations in paragraph 329 of the SAC, except admit that plaintiffs object to the claims asserted in proof of claim number 67736 to the extent they arise under the September Amendment, and refer to proof of claim number 67736 for its contents.  Defendants further state that the fees claimed by Citibank are reimbursable under the CLS Agreement, since they were incurred as a direct result of Citibank unwinding the Lehman parties' foreign exchange trades starting on September 19, 2008.

330.     Defendants deny the allegations in paragraph 330, except admit that, in connection with settling an adversary proceeding with LBI, Citibank received an unsecured

claim against LBI in the approximate amount of $253 million, and admit that in January 2013,

Citibank sold this claim against LBI for approximately $161 million.  Defendants further state

that Citibank's sale of the LBI unsecured claim significantly benefited LBHI by reducing its

liability to Citibank, as guarantor.

331.    Defendants deny the allegations in paragraph 331 of the SAC, except

admit that plaintiffs object to the claims asserted in proof of claim numbers 17913, 17934,

17936, 29637, 67736, and 29882 to the extent they seek payment from LBHI as guarantor under

the relevant Master Agreements.  Defendants further state that their proofs of claim were timely

and properly filed and thus constitute *prima facie* evidence of their validity and amount.  To

overcome the presumption that defendants' claims are valid, plaintiffs are required to produce

substantial, affirmative evidence that refutes one of the allegations essential to the claim being

challenged.  For the reasons set forth herein, plaintiffs' objections are insufficient to overcome

the *prima facie* evidence of the validity and amount of the claims and present no basis for the

relief plaintiffs seek in this proceeding.

332.    Defendants deny the allegations in paragraph 332 of the SAC.

333.    Defendants deny the allegations in paragraph 333 of the SAC, and object

to the purported reservation of rights to the extent plaintiffs seek to enlarge or modify any of

their rights under applicable law.

334.    Regarding the allegations in paragraph 334 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–333 of this answer as if fully set forth herein.

335.    Defendants admit that Citibank asserts it is an oversecured creditor and is

therefore entitled to post-petition interest, and refer to proof of claim number 67736 for its

contents.

135

336.    Defendants deny the allegations in paragraph 336 of the SAC.  Defendants further state that, as an oversecured creditor, Citibank is entitled to post-petition interest under Sections 506(b) and 1129 of the Bankruptcy Code and the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors confirms this entitlement since it requires plaintiffs to pay secured claims "in full."  Defendants further state that the rates of interest claimed by Citibank are hardly "inflated," as plaintiffs assert.  The highest rate Citibank seeks on its oversecured claims is the rate mandated in the industry-standard ISDA Master Agreement:  Citibank's cost of funds plus one percent,[61] which, in Citibank's case, is a rate *substantially less than half* the rate Lehman claims it is owed by derivatives counterparties based on the *same* contractual provision.

337.    Defendants deny the allegations in paragraph 337 of the SAC.

338.    Defendants deny the allegations in paragraph 338 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

339.    Regarding the allegations in paragraph 339 of the SAC, defendants repeat and reallege the responses in paragraphs 1–338 of this answer as if fully set forth herein.

340.    Defendants deny the allegations in paragraph 340 of the SAC.  Defendants further state that Citi Canyon calculated the amount owed under the LBSF-Canyon Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

---

[61]    *See* 1992 ISDA Master Agreement §§ 6(d)(ii), 14 (definitions of "Applicable Rate" and "Default Rate").

341.      Defendants deny the allegations in paragraph 341 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

342.      Regarding the allegations in paragraph 342 of the SAC, defendants repeat and reallege the responses in paragraphs 1–341 of this answer as if fully set forth herein.

343.      Defendants deny the allegations in paragraph 343 of the SAC.

344.      Defendants deny the allegations in paragraph 344 of the SAC, except admit that, as the non-defaulting party under the LBSF-Canyon Agreement, Citi Canyon calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Canyon submitted a claim in the amount of $135,474, and refer to the LBSF-Canyon Agreement and proof of claim number 17895 for their contents.  Defendants further state that Citi Canyon calculated the amount owed under the LBSF-Canyon Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

345.      Defendants deny the allegations in paragraph 345 of the SAC.

346.      Regarding the allegations in paragraph 346 of the SAC, defendants repeat and reallege the responses in paragraphs 1–345 of this answer as if fully set forth herein.

347.      Defendants deny the allegations in paragraph 347 of the SAC.  Defendants further state that Citibank calculated the amount owed under the LBSF-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

348.    Defendants deny the allegations in paragraph 348 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

349.    Regarding the allegations in paragraph 349 of the SAC, defendants repeat and reallege the responses in paragraphs 1–348 of this answer as if fully set forth herein.

350.    Defendants deny the allegations in paragraph 350 of the SAC.

351.    Defendants deny the allegations in paragraph 351 of the SAC, except admit that, as the non-defaulting party under the LBSF-Citibank Agreement, Citibank calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citibank submitted a claim in the amount of $1,640,720,898, and refer to the LBSF-Citibank Agreement and proof of claim number 67733 for their contents.  Defendants further state that Citibank calculated the amount owed under the LBSF-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

352.    Defendants deny the allegations in paragraph 352 of the SAC.

353.    Regarding the allegations in paragraph 353 of the SAC, defendants repeat and reallege the responses in paragraphs 1–352 of this answer as if fully set forth herein.

354.    Defendants deny the allegations in paragraph 354 of the SAC.  Defendants further state that Citi Financial calculated the amount owed under the LBSF-Financial Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

355.     Defendants deny the allegations in paragraph 355 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

356.     Regarding the allegations in paragraph 356 of the SAC, defendants repeat and reallege the responses in paragraphs 1–355 of this answer as if fully set forth herein.

357.     Defendants deny the allegations in paragraph 357 of the SAC.

358.     Defendants deny the allegations in paragraph 358 of the SAC, except admit that, as the non-defaulting party under the LBSF-Financial Agreement, Citi Financial calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Financial submitted a claim in the amount of $21,184,614, and refer to the LBSF-Financial Agreement and proof of claim number 17926 for their contents.  Defendants further state that Citi Financial calculated the amount owed under the LBSF-Financial Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

359.     Defendants deny the allegations in paragraph 359 of the SAC.

360.     Regarding the allegations in paragraph 360 of the SAC, defendants repeat and reallege the responses in paragraphs 1–359 of this answer as if fully set forth herein.

361.     Defendants deny the allegations in paragraph 361 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBSF-Global Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

362.    Defendants deny the allegations in paragraph 362 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

363.    Regarding the allegations in paragraph 363 of the SAC, defendants repeat and reallege the responses in paragraphs 1–362 of this answer as if fully set forth herein.

364.    Defendants deny the allegations in paragraph 364 of the SAC.  Defendants further state that Citibank calculated the amount owed under the LBCC-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

365.    Defendants deny the allegations in paragraph 365 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

366.    Regarding the allegations in paragraph 366 of the SAC, defendants repeat and reallege the responses in paragraphs 1–365 of this answer as if fully set forth herein.

367.    Defendants deny the allegations in paragraph 367 of the SAC.

368.    Defendants deny the allegations in paragraph 368 of the SAC, except admit that, as the non-defaulting party under the LBCC-Citibank Agreement, Citibank calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citibank submitted a claim in the amount of $18,017,039, and refer to the LBCC-Citibank Agreement and proof of claim number 67734 for their contents.  Defendants further state that Citibank calculated the amount owed under the LBCC-Citibank Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

140

369.    Defendants deny the allegations in paragraph 369 of the SAC.

370.    Regarding the allegations in paragraph 370 of the SAC, defendants repeat and reallege the responses in paragraphs 1–369 of this answer as if fully set forth herein.

371.    Defendants deny the allegations in paragraph 371 of the SAC.  Defendants further state that Citi Energy calculated the amount owed under the LBCS-Energy Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

372.    Defendants deny the allegations in paragraph 372 of the Complaint, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

373.    Regarding the allegations in paragraph 373 of the SAC, defendants repeat and reallege the responses in paragraphs 1–372 of this answer as if fully set forth herein.

374.    Defendants deny the allegations in paragraph 374 of the SAC.

375.    Defendants deny the allegations in paragraph 375 of the SAC, except admit that, as the non-defaulting party under the LBCS-Energy Agreement, Citi Energy calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Energy submitted a claim in the amount of $10,714,350, and refer to the LBCS-Energy Agreement and proof of claim number 17937 for their contents.  Defendants further state that Citi Energy calculated the amount owed under the LBCS-Energy Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

376.    Defendants deny the allegations in paragraph 376 of the SAC.

377.    Regarding the allegations in paragraph 377 of the SAC, defendants repeat and reallege the responses in paragraphs 1–376 of this answer as if fully set forth herein.

378.    Defendants deny the allegations in paragraph 378 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBCS-Global ISDA Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

379.    Defendants deny the allegations in paragraph 379 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

380.    Regarding the allegations in paragraph 380 of the SAC, defendants repeat and reallege the responses in paragraphs 1–379 of this answer as if fully set forth herein.

381.    Defendants deny the allegations in paragraph 381 of the SAC.  Defendants further state that Citi Global calculated the amount owed under the LBCS-Global EFET Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

382.    Defendants deny the allegations in paragraph 382 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

383.    Regarding the allegations in paragraph 383 of the SAC, defendants repeat and reallege the responses in paragraphs 1–382 of this answer as if fully set forth herein.

384.    Defendants deny the allegations in paragraph 384 of the SAC.

385.    Defendants deny the allegations in paragraph 385 of the SAC, except admit that, as the non-defaulting party under the LBCS-Global EFET Agreement, Citi Global

142

calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Global submitted a claim in the amount of $716,281, and refer to the LBCS-Global EFET Agreement and proof of claim number 29880 for their contents. Defendants further state that Citi Global calculated the amount owed under the LBCS-Global EFET Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

386.    Defendants deny the allegations in paragraph 386 of the SAC.

387.    Regarding the allegations in paragraph 387 of the SAC, defendants repeat and reallege the responses in paragraphs 1–386 of this answer as if fully set forth herein.

388.    Defendants deny the allegations in paragraph 388 of the SAC. Defendants further state that Citi Swapco calculated the amount owed under the LBSF-Swapco Agreement in good faith using commercially reasonable procedures to produce commercially reasonable results consistent with the Master Agreement and governing law.

389.    Defendants deny the allegations in paragraph 389 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

390.    Regarding the allegations in paragraph 390 of the SAC, defendants repeat and reallege the responses in paragraphs 1–389 of this answer as if fully set forth herein.

391.    Defendants deny the allegations in paragraph 391 of the SAC.

392.    Defendants deny the allegations in paragraph 392 of the SAC, except admit that, as the non-defaulting party under the LBSF-Swapco Agreement, Citi Swapco calculated the net amount owed upon early termination of the parties' derivatives transactions, admit that Citi Swapco submitted a claim in the amount of $991,772, and refer to the LBSF-

Swapco Agreement and proof of claim number 17933 for their contents.  Defendants further

state that Citi Swapco calculated the amount owed under the LBSF-Swapco Agreement in good

faith using commercially reasonable procedures to produce commercially reasonable results

consistent with the Master Agreement and governing law.

393.    Defendants deny the allegations in paragraph 393 of the SAC.

394.    Regarding the allegations in paragraph 394 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–393 of this answer as if fully set forth herein.

395.    Defendants admit that Citibank is entitled under the CLS Agreement to

approximately $1.3 million from LBCC attributable to (1) the reasonable fee Citibank applied to

trades transacted in the market to unwind LBCC's foreign exchange positions, and (2) the costs

Citibank incurred in carrying LBCC's short currency positions, netted against the gain on

carrying LBCC's long currency positions, and refer to proof of claim number 67734 for its

contents.

396.    Defendants deny the allegations in paragraph 396 of the SAC.

397.    Defendants deny the allegations in paragraph 397 of the SAC, and object

to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under

applicable law.

398.    Regarding the allegations in paragraph 398 of the SAC, defendants repeat

and reallege the responses in paragraphs 1–397 of this answer as if fully set forth herein.

399.    Defendants admit that Citibank is entitled under the CLS Agreement to

approximately $700,000 from LBSF attributable to (1) the reasonable fee Citibank applied to

trades transacted in the market to unwind LBSF's foreign exchange positions, and (2) the costs

144

Citibank incurred in carrying LBSF's short currency positions, netted against the gain on carrying LBSF's long currency positions, and refer to proof of claim 67733 for its contents.

400.    Defendants deny the allegations in paragraph 400 of the SAC.

401.    Defendants deny the allegations in paragraph 401 of the SAC, and object to the reservation of rights to the extent plaintiffs seek to enlarge any of their rights under applicable law.

402.    Regarding the allegations in paragraph 402 of the SAC, defendants repeat and reallege the responses in paragraphs 1–401 of this answer as if fully set forth herein.

403.    Defendants deny the allegations in paragraph 403 of the SAC, except admit that the $9.8 million was included in the September 15, 2008 CLS pay-in/pay-out schedule as an amount due and owing from LBSF to Citibank, which amounts Citibank was authorized to debit from LBSF's CLS account in the normal course.

404.    Defendants deny the allegations in paragraph 404 of the SAC, except admit that CGML's Derivatives Questionnaire includes a cash break owed by CGML to LBSF under the ISDA Master Agreement between those parties in the amount of $9.8 million, and admit that the $9.8 million cash break bears the identification number C61F00856.

405.    Defendants deny the allegations in paragraph 405 of the SAC.

406.    Regarding the allegations in paragraph 406 of the SAC, defendants repeat and reallege the responses in paragraphs 1–405 of this answer as if fully set forth herein.

407.    Defendants deny the allegations in paragraph 407 of the SAC.

408.    Defendants deny the allegations in paragraph 407 of the SAC.

409.    Regarding the allegations in paragraph 409 of the SAC, defendants repeat and reallege the responses in paragraphs 1–408 of this answer as if fully set forth herein.

145

410.   Defendants deny the allegations in paragraph 410 of the SAC.  Defendants further state that it is CGML, not Citibank, that owes $9.8 million to LBSF in the form of a cash break that is included in CGML's Derivatives Questionnaire, bearing the identification number C61F00856.  To the extent plaintiffs assert it is Citibank, not CGML, that owes LBSF the $9.8 million, defendants further state that the $9.8 million was never "property" of the LBSF estate, but rather a debt owed by Citibank to LBSF, against which debts owed by LBSF to Citibank may be offset under Section 553 of the Bankruptcy Code.  In addition, the safe harbor provisions of Sections 546(e), 546(f), 546(g), 546(j), 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 555, 556, 559, 560, and 561 of the Bankruptcy Code also apply to the $9.8 million.  Consequently, the $9.8 million is not subject to turnover under Section 542.

411.   Defendants deny the allegations in paragraph 411 of the SAC.

412.   Regarding the allegations in paragraph 412 of the SAC, defendants repeat and reallege the responses in paragraphs 1–411 of this answer as if fully set forth herein.

413.   Defendants deny the allegations in paragraph 413 of the SAC.

414.   Regarding the allegations in paragraph 414 of the SAC, defendants repeat and reallege the responses in paragraphs 1–413 of this answer as if fully set forth herein.

415.   Defendants deny the allegations in paragraph 415 of the SAC.

416.   Defendants deny the allegations in paragraph 416 of the SAC.  Defendants further state that their derivatives claims were calculated in good faith, in a commercially reasonable manner, and consistent with the governing contracts and applicable law.  If any portion of defendants' derivatives claims is invalid under applicable law, then disallowance of that portion would provide plaintiffs with a complete remedy.

417.   Defendants deny the allegations in paragraph 417 of the SAC.

418.    Defendants deny the allegations in paragraph 418 of the SAC.

## AFFIRMATIVE DEFENSES

Defendants allege the following affirmative defenses with respect to the causes of action alleged in the SAC, without assuming the burden of proof where the burden of proof rests on plaintiffs.

## FIRST AFFIRMATIVE DEFENSE

The SAC fails to state a claim upon which relief may be granted against defendants with respect to each cause of action.

## SECOND AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrines of acquiescence, estoppel, and waiver.

## THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, by *res judicata* and collateral estoppel.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs fail to allege fraud with the required particularity.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs, collectively and individually, consented to, approved, ratified, and authorized the acts and transactions complained of and for which recovery is sought, which precludes them from recovery.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to plaintiffs.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages are nonexistent, speculative, and not of the nature or to the extent alleged.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because defendants' alleged conduct was not the actual or proximate cause of any injury, loss, or damage to plaintiffs.

## NINTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate or eliminate their damages, if any, and any recovery by plaintiffs should be reduced or denied accordingly.

## TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any claims asserted are subject to the defenses of *in pari delicto* and unclean hands.  Defendants have, at all times, acted in good faith.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred to the extent they lack standing to bring them.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims that defendants breached an alleged agreement concerning the $2 billion deposit are barred on the grounds that the alleged agreement is unenforceable for lack of consideration, failure of consideration, vagueness or indefiniteness, mutual or unilateral mistake, fraud or misrepresentation by LBHI, modification, and/or because the agreement is an illusory contract and void for lack of mutuality of obligation.

## THIRTEENTH AFFIRMATIVE DEFENSE

To the extent plaintiffs allege the existence of an oral agreement with defendants concerning the $2 billion deposit that was not capable of being performed within one year, such agreement is unenforceable under the statute of frauds.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are negated by, or are otherwise subject to, defendants' common law, statutory, and/or contractual rights of setoff.

## FIFTEENTH AFFIRMATIVE DEFENSE

The $2 billion is safe harbored and therefore not subject to turnover by virtue of Sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 555, 556, 559, 560, and/or 561 of the Bankruptcy Code.

## SIXTEENTH AFFIRMATIVE DEFENSE

The September Amendment is safe harbored and therefore not subject to avoidance by virtue of Sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 362(o), 546(e), 546(f), 546(g), 546(j), 555, 556, 559, 560, and/or 561 of the Bankruptcy Code.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The September Amendment is not subject to avoidance because Citibank took for value and in good faith within the meaning of Section 548(c) of the Bankruptcy Code.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The September Amendment is not subject to avoidance because Citibank gave fair consideration without knowledge of fraud at the time the obligation was incurred, and acted at all relevant times in good faith and without fraudulent intent, within the meaning of Section 278 of the New York Debtor & Creditor Law.

## NINETEENTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiffs with respect to the $500 million transfer, because plaintiffs have failed to seek avoidance of the $500 million transfer against the initial transferee, and have not alleged that the transfer has been avoided on any basis.

## TWENTIETH AFFIRMATIVE DEFENSE

The $500 million transfer is not subject to avoidance because, upon information and belief, LBI took for value and in good faith within the meaning of Section 548(c) of the Bankruptcy Code.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The $500 million transfer is not subject to avoidance because, upon information and belief, LBI gave fair consideration for the transfer without knowledge of fraud at the time the transfer was made, and acted at all relevant times in good faith and without fraudulent intent, within the meaning of Section 278 of the New York Debtor & Creditor Law.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The $500 million transfer is safe harbored and therefore not subject to avoidance by virtue of Sections 546(e), 546(g), 546(j), 362(b)(6), 362(b)(17), 362(b)(27), 362(o), 555, 556, 560, and/or 561 of the Bankruptcy Code.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs cannot recover the $500 million transfer from defendants because, to the extent that Citibank received any funds traceable to LBHI's initial transfer of $500 million, Citibank took for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer, within the meaning of Section 550(b)(1) of the Bankruptcy Code.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs cannot recover the $500 million transfer from defendants because plaintiffs are entitled to only a single satisfaction under Section 550(d) of the Bankruptcy Code.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs are not entitled to interest, costs, or disbursements in connection with this action, or to attorneys' fees.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs anticipatorily repudiated the proposed three-way collapse transaction between LBSF, Citibank, and Bracebridge.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

To the extent plaintiffs allege the existence of an oral agreement with defendants in which Citi waived contractual setoff rights provided for pursuant to LBHI's Guaranty of the Revolving Loan Agreement between Citi, LBCCA, and LBHI, dated August 30, 2007, that oral agreement is unenforceable pursuant to the parties' written agreement, the statute of frauds, and Section 15-301(1) of the N.Y. General Obligations Law.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' failure to return collateral held against Bracebridge and to pay a termination fee to Citibank constituted a failure to satisfy conditions precedent to the proposed three-way collapse transaction between LBSF, Citibank, and Bracebridge.

## RESERVATION OF RIGHT TO AMEND

Defendants expressly reserve the right to amend and supplement their answer, defenses, and all other pleadings.

152

## REQUEST FOR RELIEF

Accordingly, for all of the reasons set forth above, plaintiffs' SAC should be denied in its

entirety and dismissed with prejudice, with attorneys' fees and costs assessed against plaintiffs,

and awarding defendants such other relief as the Court deems just and proper.

Dated: February 28, 2014
      New York, New York

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

By: /s/ Claudia L. Hammerman_____

Brad S. Karp
Claudia L. Hammerman
Stephen J. Shimshak
Douglas R. Davis
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup
Global Markets Ltd., Citigroup Financial
Products Inc., Citigroup Energy Inc., Citi
Canyon Ltd., and Citi Swapco Inc.*

# Exhibit C

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                    :
In re:                                              :    Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS, INC., et al.              :    08-13555 (JMP)
                        Debtors.                    :
                                                    :    (Jointly Administered)
-------------------------------------------------------------- x

### STIPULATION AND ORDER AUTHORIZING (1) TRANSFER OF CERTAIN PREPETITION DEPOSITS, AND (2) PRESERVATION OF CITIBANK'S SETOFF RIGHTS, IF ANY, IN RESPECT OF AMOUNTS TRANSFERRED

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors as

debtors and debtors-in-possession (together with LBHI, the "Debtors,"), and Citigroup,

Inc. and its respective affiliates and subsidiaries, including, without limitation, Citibank,

N.A. (collectively, "Citibank"),[*] by and through their respective attorneys, hereby

stipulate as follows:

RECITALS

A.    On September 15, 2008, LBHI, and periodically thereafter, certain of its

subsidiaries, filed with this Court voluntary cases under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  This Court has consolidated those cases

for procedural purposes only, and is jointly administering them pursuant to Fed. R.

Bankr. P. 1015(b).  The Debtors continue to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

---

[*]    For convenience, and as the context may require, Citibank and each of the Debtors
shall each be referred to individually as a "Party" and collectively as the "Parties."

B.      LBHI currently maintains a USD $2,000,000,000 deposit with Citibank (the "Deposit") in account no. 3077-8171 (the "Original Account"), against which Deposit Citibank asserts rights of netting, offset, recoupment, or other claims of right in respect of claims held by Citibank and arising before and after the commencement of these cases (collectively, "Setoff Rights").

C.      The Original Account is a direct deposit account, which bears no interest and does not earn income with respect to the balance therein.

D.      The Debtors have requested that Citibank transfer the Deposit to an account at Citibank that will earn interest or income.

<u>AGREEMENT</u>

NOW THEREFORE, the Parties hereto, by and through their respective attorneys, hereby agree as follows:

1.      The Parties incorporate the Recitals herein as part of their agreement.

2.      Citibank will transfer the Deposit from the Original Account to a custody account, Citibank, N.A. account no. 204354 (the "Transfer Account"), in which income is paid with respect to the balance therein, and which is insured by the FDIC in connection with the Temporary Liquidity Guaranty Program.  All income earned on the Transfer Account shall constitute property of LBHI's estate.

3.      Citibank shall have no greater or lesser Setoff Rights (and the Debtors shall have no greater or lesser rights to dispute and object to the Setoff Rights) against the Deposit, and any income or interest earned thereon, after the transfer of the Deposit to the Transfer Account than Citibank possessed against the Deposit, and would have possessed against interest or income earned thereon, when held in the Original Account.

2

4.    Nothing contained herein shall constitute an admission by the Debtors of the existence of any Setoff Rights in favor of Citibank of any kind whatsoever, or constitute a finding by the Court of the existence of any such Setoff Rights.

5.    The terms and conditions of this Stipulation, and the Parties' respective obligations hereunder, shall become effective only upon entry of this Order, and this Order becoming a final order, not subject to appeal, rehearing, or other consideration.

6.    This Stipulation and Order shall be binding upon and inure solely to the benefit of the Parties hereto and their respective successors and permitted assigns, including any subsequent trustee elected or appointed for the Debtors.  Nothing contained herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Stipulation.

7.    Citibank consents to this Court's jurisdiction solely for the purpose of the enforcement of this Stipulation and Order.

8.    No amendment, waiver, or modification of any provision of this Stipulation and Order shall be effective unless the same shall be in writing and signed by Citibank and the Debtors.

9.    This Stipulation may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument. This Stipulation may be executed by facsimile or PDF signatures, and such facsimile or PDF signatures will be deemed to be as valid as an original signature whether or not confirmed by delivering the original signatures in person, by courier, or by mail.

10.    This Stipulation shall be governed by and shall be interpreted in accordance with the laws of the State of New York, except to the extent that the Bankruptcy Code applies,

without regard to principles of conflicts of laws that would require the application of laws

of another jurisdiction.

Dated:  New York, New York
        April 3, 2009

By:  ___/s/ Stephen J. Shimshak_____
Stephen J. Shimshak
(sshimshak@paulweiss.com)
Douglas R. Davis
(ddavis@paulweiss.com)
Claudia L. Hammerman
(chammerman@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citigroup, Inc. and its Respective
Affiliates and Subsidiaries, including, without
limitation, Citibank, N.A.*

By:  ___/s/ Lori R. Fife_____
Lori R. Fife
(lori.fife@weil.com)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings, Inc.
and its Affiliated Debtors and Debtors-in-
Possession*

SO ORDERED this 15th day of April, 2009

___s/ James M. Peck_____
UNITED STATES BANKRUPTCY JUDGE

# Exhibit D

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178

*Counsel for Lehman Plaintiffs*

    -and-

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Special Counsel for Plaintiff Intervenor, Official Committee of*
*Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------X | | |
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | |
| | : | |
| | : | |
| Debtors. | : | |
| ------------------------------------------------------------X | | |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | Adversary Proceeding No. 12-01044 |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | (JMP) |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP., and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | |
| INC., | : | |
| Plaintiffs and | : | **MEMORANDUM OF LAW IN** |
| Plaintiff Intervenor, | : | **SUPPORT OF PLAINTIFFS'** |
| | : | **MOTION, PURSUANT TO 11** |
| -against- | : | **U.S.C. §§ 105(a), 363(b)(1), 502(b),** |
| | : | **AND 509(a), FOR ENTRY OF AN** |
| | : | **ORDER PROVISIONALLY** |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | **ALLOWING CLAIMS FILED BY** |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | **CITIBANK, N.A. AND** |
| CITIGROUP ENERGY INC., CITI CANYON LTD., and | : | **AUTHORIZING LEHMAN** |
| CITI SWAPCO INC., | : | **BROTHERS HOLDINGS INC. TO** |
| Defendants. | : | **SATISFY THOSE CLAIMS WITH** |
| ------------------------------------------------------------X | | **FUNDS ON DEPOSIT** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT ............................................................................................2

II.  STATEMENT OF FACTS ..............................................................................................5

    A.  CLS AGREEMENT ................................................................................................5

    B.  $2 BILLION DEPOSIT ..........................................................................................5

    C.  SUBJECT CLAIMS ...............................................................................................7

    D.  PLAN ...................................................................................................................8

III.  ARGUMENT ................................................................................................................9

    A.  THERE IS A SIGNIFICANT DISPUTE CONCERNING CITIBANK'S ENTITLEMENT
        TO POST-PETITION INTEREST .............................................................................9

    B.  SUBJECT CLAIMS CAN BE ALLOWED PROVISIONALLY ...........................................11

    C.  PRACTICAL BENEFITS WARRANT PROVISIONALLY SATISFYING SUBJECT
        CLAIMS ..............................................................................................................15

CONCLUSION.................................................................................................................17

# TABLE OF AUTHORITIES

**Page**

**Cases**

In re Argiannis,
156 B.R. 683 (Bankr. M.D. Fla. 1993) ................................................................14

In re Denofa,
124 Fed. Appx. 729, 2005 WL 375703 (3d Cir. Feb. 17, 2005).............................14

Financial Security Assurance Inc. v. T-H Orleans Ltd. Partnership,
116 F.3d 790 (5th Cir. 1997) ...........................................................................10, 14

First Security Bank v. Garner (In re Garner),
663 F.3d 1218 (11th Cir. 2011) ............................................................................10

In re Frascella Enterprises, Inc.,
360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................................12

In re Gluth Bros. Const., Inc.,
426 B.R. 771 (Bankr. N.D. Ill. 2010) ...................................................................10

In re Harmony Holdings, LLC,
395 B.R. 350 (Bankr. D.S.C. 2008) ......................................................................12

Kochisarli v. Tenoso,
2008 WL 1882662 (E.D.N.Y. April 24, 2008) ................................................12, 13

Law Debenture Trust Co. of N.Y. v. Calpine Corp. (In re Calpine Corp.),
356 B.R. 585 (S.D.N.Y. 2007)...............................................................................11

In re Liberty Warehouse Assocs. Ltd. Partnership,
220 B.R. 546 (Bankr. S.D.N.Y. 1998) ....................................................................9

Litwak v. Wolkenberg,
515 N.Y.S.2d 559 (N.Y. App. Div. 1987) ............................................................14

In re NVF Co.,
309 B.R. 698 (Bankr. D. Del. 2004) .....................................................................10

Northerly Corp. v. Hermett Realty,
240 N.Y.S.2d 790 (1st Dept. 1963) ......................................................................14

Schreiber v. United States (In re Schreiber),
163 B.R. 327 (Bankr. N.D. Ill. 1994) ...................................................................14

Tanger v. Ferrer,
    853 N.Y.S.2d 316 (1st Dept. 2008) ........................................................................12

United States Sav. Ass'n v. Timbers of Inwood Forest,
    108 S. Ct. 626 (1988).............................................................................................13

### **Other Authorities**

4 Collier On Bankruptcy ¶ 506.04[2] ...........................................................................10

Plaintiffs in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"),

Lehman Brothers Holdings Inc. ("<u>LBHI</u>," and, with its affiliated debtors, "<u>Lehman</u>"), Lehman

Brothers Commodity Services Inc. ("<u>LBCS</u>"), Lehman Brothers Commercial Corp. ("<u>LBCC</u>"),

and Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), and the Official Committee of

Unsecured Creditors of Lehman Brothers Holdings Inc. (the "<u>Committee</u>" and, with LBHI,

LBCS, LBCC, and LBSF, "<u>Plaintiffs</u>"), respectfully submit this memorandum of law in support

of their motion (the "<u>Motion</u>"), pursuant to sections 105(a), 363(b)(1), 502(b), and 509(a) of title

11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), for

the entry of an order:

- allowing on a provisional basis the claims asserted by Citibank, N.A. ("<u>Citibank</u>") against (i) LBSF $1,640,669,553 (the "<u>LBSF Claims</u>"), LBCC $18,017,039 (the "<u>LBCC Claim</u>"), and LBCS $2,295,942 (the "<u>LBCS Claims</u>"); (ii) LBHI, solely as guarantor of the LBSF, LBCC, and LBSC Claims; (iii) LBHI, solely as guarantor of the claims asserted by Citibank against Lehman Brothers Commercial Corporation Asia ("<u>LBCCA</u>") ($318,086,925) (the "<u>LBCCA Claims</u>") in the High Court of the Hong Kong Special Administrative Region, and (iv) LBHI, solely as guarantor of the claims asserted by Citibank against Lehman Brothers Inc. ("<u>LBI</u>") ($252,736,357) (the "<u>LBI Claims</u>");

- authorizing LBHI to use funds currently on deposit in LBHI's Citibank Account No. 3077-8171 which, as of June 3, 2013, totaled $2,006,858,197 (the "<u>$2 Billion Deposit</u>") to satisfy -- to the full extent of the deposit -- LBHI's purported guaranty of the LBSF, LBCC, LBCS, LBCCA, and LBI Claims (collectively, the "<u>Subject Claims</u>") and stop the asserted accrual of post-petition interest pending the outcome of litigation over the Subject Claims;

- confirming the provisional allowance and satisfaction of the Subject Claims is without prejudice to any and all rights, claims, objections, and defenses of the parties with respect to the Subject Claims and the $2 Billion Deposit; and

- providing that LBHI, having satisfied the Subject Claims as guarantor (albeit on a provisional basis), will subrogate to the extent applicable to Citibank's rights against the primary obligors with respect to the Subject Claims pursuant to agreement, common law, or section 509(a) of the Bankruptcy Code

and, in support thereof, respectfully state as follows:

1

# I.    PRELIMINARY STATEMENT

In this Adversary Proceeding, Lehman and the Committee challenge the claims Citibank

filed against various estates, including claims Citibank filed against LBHI under parent

guarantees which Citibank alleges are secured by a right of setoff against the $2 Billion Deposit.[1]

Although the asserted amount of these claims exceeds the $2 Billion Deposit, Citibank

nonetheless claims entitlement to post-petition interest under section 506(b) of the Bankruptcy

Code.  Moreover, even though the $2 Billion Deposit has been sitting in a Citibank account for

the last 5 years, Citibank asserts that post-petition interest has been accruing at exorbitant rates

far in excess of the nominal interest rate Citibank is paying on the $2 Billion Deposit.  Plaintiffs

dispute Citibank's status as a secured creditor and its entitlement to any post-petition interest.

Plaintiffs also challenge the rate suggested by Citibank.  Needless to say, the magnitude of the

alleged interest due represents a wide chasm between the parties' expectations in this case.

Allowing the divide to grow will only reduce the prospect for a consensual resolution of this

case.

Moreover, if Citibank's legal position is correct, Citibank's interest-rate arbitrage during

the pendency of this litigation threatens to dissipate whatever equity LBHI has in the $2 Billion

Deposit, even if Plaintiffs succeed in reducing the principal amount of such claims.  By this

motion, Plaintiffs seek to eliminate the potential harm to LBHI's unsecured creditors from the

claim of post-petition interest against cash that does not generate returns on pace with the claims.

---

[1]    See First Amended Complaint And Claims Objection dated November 16, 2012 (Docket No. 13)
(the "Amended Complaint") Against Citibank, N.A., Citigroup Global Markets Ltd., Citigroup
Financial Products Inc., Citigroup Energy Inc., Citi Canyon Ltd, and Citi Swapco Inc.
(collectively, "Defendants"); Defendants' Answer To First Amended Complaint And Response
To Claims Objection dated February 14, 2012 (Docket No. 20).  The Amended Complaint differs
from the initial complaint (filed February 8, 2012) by, among other things, supplementing
Plaintiffs' objections (pursuant to, inter alia, section 502(b) of the Bankruptcy Code) to the
various claims Defendants filed against Lehman (collectively, the "Citibank Filed Claims").

While the merits of the claims and defenses asserted in this Adversary Proceeding will be litigated pursuant to the timeline contained in the parties' Scheduling Stipulation,[2] Plaintiffs request that the Court provisionally allow the Subject Claims and authorize LBHI to use the $2 Billion Deposit to satisfy those claims to the extent possible (to be allocated as Citibank sees fit) in order to stop the asserted accrual of post-petition interest.  Notwithstanding the provisional satisfaction of the Subject Claims, Plaintiffs would maintain the status quo regarding any and all rights with respect to the Subject Claims, including the right to dispute the validity and amount of the Subject Claims, Citibank's setoff rights (if any) against the $2 Billion Deposit, Citibank's entitlement to any post-petition interest through the date Citibank applies the $2 Billion Cash Deposit, or, to the extent that Citibank was entitled to post-petition interest, the appropriate rate.

The practicalities of pending litigation warrant the provisional allowance and satisfaction of the Subject Claims, especially when the parties have substantially divergent views.  For example, Plaintiffs challenge Citibank's entitlement to any post-post-petition interest, under section 506(b) of the Bankruptcy Code or otherwise.  They also submit the Plan[3] -- not section 506(b) -- dictates whether any interest is payable after the Effective Date.  Under the Plan, interest accrues on distributions to holders of Disputed Claims at the same rate Lehman earns on the disputed claims reserves.  On the other hand, Citibank claims entitlement to post-petition interest based on a setoff right until its claims are allowed and satisfied at the highest possible rates (totaling hundreds of millions of dollars).

The Court previously approved a similar arrangement earlier in these cases with LBHI's largest creditor, JPMorgan Chase Bank, N.A. ("JPMorgan").  JPMorgan agreed to provisional

---

[2]     Amended Scheduling Order And Discovery Plan, dated January 2, 2013 (Docket No. 19) (the "Scheduling Stipulation").

[3]     See Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc. And Its Affiliated Debtors (the "Plan") (confirmed by Order dated December 6, 2011 (Docket No. 23023) (the "Confirmation Order")).  Capitalized terms not defined herein shall have the meaning ascribed to those terms in the Plan.

allowance of its claims in exchange for a surrender of purported collateral.[4]  That arrangement
protected the estates against potential accruals of post-petition interest with respect to
JPMorgan's $26 billion claims while preserving the estates' challenges to those claims (including
JPMorgan's entitlement (if any) to post-petition interest).

Hoping Citibank likewise would recognize the fairness of such an arrangement without
the need for Court intervention, Plaintiffs requested that Citibank agree to it.[5]  Citibank refused,
deciding instead to use the arbitrage potential of post-petition interest as leverage against the
Lehman estates.  Indeed, the nominal interest rate Citibank pays on the $2 Billion Deposit --
approximately two basis points (or .02%) -- pales in comparison to the rates Citibank claims for
post-petition interest.  So if the Subject Claims ultimately are allowed, and the Court awards
post-petition interest at the rates claimed by Citibank through the date those claims are satisfied,
that interest would result in a windfall profit to Citibank (net of the de minimis interest earned on
deposit) caused solely by the passage of time.

Citibank's claims for post-petition interest under section 506(b) of the Bankruptcy Code
as a matter of law are limited to the value of the alleged collateral -- the entire amount of which
LBHI is offering to return to Citibank.  Once LBHI releases the $2 Billion Deposit to Citibank,
nothing remains to support any claim for post-petition interest.  Citibank can use the $2 Billion
Deposit in whatever way it sees fit, and Lehman will take the credit risk in the event Plaintiffs
succeed in this litigation.  Accordingly, the requested relief is appropriate because it will stop the
accrual of any alleged interest though a litigation-neutral solution that is fair to both sides.

---

[4]     See Debtors' Motion Pursuant To Section 363 Of Bankruptcy Code And Bankruptcy Rule 6004
         For Approval of Collateral Disposition Agreement With JPMorgan Chase Bank, N.A., et al.
         (Docket No. 7269, Ch. 11 Case No. 08-13555 (JMP))); Order approving same (Docket No. 7785)
         and corrected Collateral Disposition Agreement (Docket No. 7619).

[5]     See Exhibit A (Letter Dated July 29, 2013), Exhibit B (Letter Dated August 5, 2013).

## II.    STATEMENT OF FACTS

### A.    CLS AGREEMENT

Under the CLS Services Amended and Restated Agreement for CLS User Members (the "CLS Agreement"), Citibank provided clearing and settlement services, including FX-related services, for LBI, LBSF. LBCC, and Lehman Brothers International Europe ("LBIE," and, with LBI, LBSF and LBCC, the "Trading Subsidiaries").  When an FX transaction is settled under the CLS system, the trading counterparties each pay one currency into the CLS bank and receive a different currency in return.  Participation in the CLS FX netting and clearing service is only available by or through a "settlement member."  Citibank was one of only 69 settlement members and therefore was used to effectuate FX trades for the Trading Subsidiaries.  Citibank terminated the CLS Agreement in the week after LBHI filed for bankruptcy protection on September 15, 2008.[6]

### B.    $2 BILLION DEPOSIT

On the morning of June 12, 2008, Citibank requested that LBHI transfer cash to an account held at Citibank in order to cover intraday exposures arising out of the clearing and settlement activities of the Trading Subsidiaries.  After a rushed discussion among top Citibank and LBHI executives, LBHI agreed that same day to segregate $2 billion from its general deposit account at Citibank into a separate special purpose account.  The next day, on June 13, 2008, Citibank debited $2 billion from LBHI's general demand deposit account at Citibank and transferred those funds to a separate Citibank account in Nassau, Bahamas.[7]

The parties engaged in discussions in July and August 2008 regarding a substitution of collateral whereby LBHI would pledge cash or securities to Citibank to secure clearing and settlement-related obligations and grant Citibank a right of setoff against the pledged collateral.

---

[6]    See Am. Compl. at 11-12 (¶¶ 33-34), at 17 (¶ 57).

[7]    See id. at 13 (¶¶ 40-41, 44).

Those discussions did not result in an executed pledge agreement.  Instead, on September 9, 2008, Citibank presented LBHI with an amendment expanding the scope of an earlier guaranty dated January 7, 2004 (the "September Amendment") to cover additional LBHI subsidiaries and additional obligations, including (for the first time) LBI and its attendant clearing and settlement exposure.[8]  Plaintiffs challenge the validity of the September Amendment in the Amended Complaint.

Plaintiffs maintain the sole purpose of the $2 billion deposit was to provide comfort to Citibank as it continued to perform clearing and settlement services -- not to satisfy other indebtedness.  Citibank claims the funds are a general deposit and therefore accessible to satisfy any indebtedness, including claims under derivative contracts and credit agreements.  Plaintiffs contend the $2 billion is a special deposit dedicated solely to clearing and settlement exposure and therefore cannot be used to satisfy derivatives or credit-agreement claims.  Moreover, Plaintiffs argue the funds are not accessible to Citibank to satisfy LBHI's guaranty of LBI's clearing and settlement exposure to Citibank because the September Amendment (which obligates LBHI to satisfy LBI's debts) is invalid and avoidable.

Since April 2009, the $2 Billion Deposit has been held at Citibank in LBHI's account (No. 3077-8171), where it will remain absent further Order of the Court.[9]  Citibank has been paying a nominal rate of interest on the account, and the parties have reserved any and all rights with respect to the $2 Billion Deposit.[10]

---

[8]     See id. at 14-16 (¶¶ 46-51).

[9]     See Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, If Any, In Respect of Amounts Transferred, dated April 15, 2009 (Docket No. 3372 in Chapter 11 Case No. 08-13555 (JMP) (the "April 2009 Stipulation").

[10]     See April 2009 Stipulation ¶ 3 ("Citibank shall have no greater or lesser Setoff Rights (and the Debtors shall have no greater or lesser rights to dispute and object to the Setoff Rights) against the Deposit, and any income or interest earned thereon, after the transfer of the Deposit to the Transfer Account than Citibank possessed against the Deposit and would have possessed against interest or income earned thereon, when held in the Original Account."); ¶ 4 ("Nothing contained

C.    SUBJECT CLAIMS

Citibank asserts claims against various Lehman entities based on clearing and settlement

services it provided as well as various derivatives agreements and credit agreements to which it

was a party.  Citibank contends that LBHI guaranteed those claims and that Citibank is entitled

to set off against the $2 Billion Cash Deposit to satisfy the guaranty claims.  Specifically,

Citibank has asserted the Subject Claims based on claims against the following primary obligors:

- **LBSF**:  swap claims ($1,640,084,656) under an ISDA Master Agreement and claims under the CLS Agreement ($584,897);[11]

- **LBCCA**:  claims under a Revolving Credit Agreement ($281,225,562) and an ISDA Master Agreement ($841,032), securities claims ($35,844,833), and certain fees ($175,498), filed by Citibank against LBCCA in the Hong Kong Proceeding;[12]

- **LBI**:  claims under the CLS Agreement ($252,736,357);[13]

_____

herein shall constitute an admission by the Debtors of the existence of any Setoff Rights in favor of Citibank of any kind whatsoever, or constitute a finding by the Court of the existence of any such Setoff Rights.").

[11]    See Proof Of Claim No. 67733 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Special Financing Inc. (¶¶ 8, 11)); Proof Of Claim No. 67736 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Holdings Inc. (¶¶ 25, 28)); Stipulation And Order Between Plaintiffs Lehman Brothers Holdings Inc., Lehman Brothers Commercial Corp., Lehman Brothers Special Financing Inc., And Official Committee Of Unsecured And Defendants Citibank, N.A. And Citigroup Global Markets Ltd. With Respect To Certain Continuous Linked Settlement Agreement Unwind Amounts, dated May 14, 2013 (Docket No. 26 in Adv. Proc. 12-01044 (JMP)) (the "CLS Stipulation").

[12]    LBCCA became the subject of a winding-up proceeding in the High Court of the Hong Kong Special Administrative Region (the "Hong Kong Proceeding"), in which liquidators were appointed to manage and liquidate its assets.  See Proof Of Claim No. 67736 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Holdings Inc. (¶¶ 53, 56)).

[13]    See Proof Of Claim No. 67736 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Holdings Inc. (¶ 63)); compare CLS Stipulation at 7 (¶ 2) ("The Lehman Parties accept Citi's calculation of the Citi-LBI-CLS Unwind Amount ($1,260,326,894) as the amount due from LBI to Citi under the CLS Agreement"); with, Trustee's Motion Pursuant To Section 105(a) Of Bankruptcy Code And Federal Rule Of Bankruptcy Procedure 9019 For Entry Of An Order Approving Settlement Agreement With Citi Parties dated November 16, 2012 (Docket No. 5450 in SIPA Proc. 08-1420) and Notice Of Revised Exhibits To Settlement Agreement Between Trustee And Citi Parties (Docket No. 5490), dated November 30, 2012, at Ex. C ("Citi Allowed Secured Claims" for "CLS Services" of $1,007,590,537) at Ex. E ("Citi Allowed Unsecured Claim" for "CLS Services" $252,736,357).

- **LBCC**:  claims under an ISDA Master Agreement ($18,017,039);[14] and

- **LBCS**:  claims under an ISDA Master Agreement ($2,210,646) and an account overdraft claim ($85,296).[15]

### D.  PLAN

The Court confirmed the Plan in December 2011, and the Effective Date occurred on March 6, 2012.[16]  The Subject Claims are considered Disputed Claims under the Plan, and the Plan requires Lehman to establish reserves for Disputed Claims.  The Plan further specifies and limits the circumstances and amount of the Plaintiffs' obligations to pay interest on account of Disputed Claims under the Plan.

Specifically, it provides that Disputed Claims that become Allowed Claims will accrue interest from and after the Effective Date until the date of distribution.  Interest is paid on the lesser of the following two amounts:  (1) any distributions made under the Plan but withheld from the holder of the Disputed Claims and (2) the amounts Lehman held in reserve with respect to the disputed claim.  The rate paid with respect to any such interest is the rate Lehman earned on its disputed reserve accounts while the Disputed Claim was being litigated.[17]  The Plan also

---

[14]    See Proof Of Claim No. 67734 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Commercial Corp. (¶ 8); Proof Of Claim No. 67736 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Holdings Inc. (¶ 18)); CLS Stipulation.

[15]    See Proof Of Claim No. 17932 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Commodity Services Inc. (¶¶ 7, 9); Proof Of Claim No. 67736 (Attachment To Proof Of Claim Of Citibank, N.A. Against Lehman Brothers Holdings Inc. (¶¶ 10, 12)).

[16]    See  Notice Of Effective Date And Distribution Date In Connection With The Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors, dated March 6, 2012 (Docket No. 26039 in Chapter 11 Case No. 08-13555 (JMP)).

[17]    See Plan at 74-75 (§ 8.4) ("[A]fter the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor shall remit to the holder of such Allowed Claim Available Cash equal to the amount that would have been distributed from the Effective Date through and including the date of such Distribution on account of such Allowed Claim had such Claim been allowed as of the Effective Date, together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such claim pursuant to this provision, in each case, but only to the extent that such interest is attributable to the amount of the Allowed Claim."); at 1 (§ 1.4) ("[Allowed] shall not, for any purpose under the Plan, include interest on such … Claim from and after the Commencement Date."); at 77 (§ 8.12) (allocating distributions

8

preserves the Debtors' setoff and subrogation rights as well as creditors' setoff rights.[18]

## III.    ARGUMENT

### A.    THERE IS A SIGNIFICANT DISPUTE CONCERNING CITIBANK'S ENTITLEMENT TO POST-PETITION INTEREST

Plaintiffs challenge Citibank's entitlement to **any** post-petition interest.  In addition to challenging whether Citibank is entitled to post-petition interest under section 506(b), Plaintiffs challenge the rate of any such interest determined to be payable.  Moreover, Plaintiffs challenge Citibank's entitlement to post-effective date interest, contending the Plan specifically limits their obligations to pay interest on Citibank's Disputed Claims.

The law is clear that after the effective date of a confirmed plan, section 506(b) no longer applies.  The Bankruptcy Code provides "for three categories of interest:  (1) interest accrued prior to the filing of the bankruptcy petition, (2) interest accrued after the filing of a petition but prior to the reorganization plan's effective date, i.e., 'pendency interest,' and (3) interest to accrue

---

"first to the principal portion of any such Allowed Claim … and, only after the principal portion … is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim.").

[18]    See Plan at 77 (§ 8.10) (Setoff) ("Except as otherwise agreed by a Debtor, any Debtor may … set off against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims … that the Debtor may have against the claimant."); at 89-90 (§ 13.10) (Setoff) ("Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, defenses or Litigation Claims that the Debtors may have … under any provision of the Bankruptcy Code or any applicable nonbankruptcy law that the Debtors had prior to the Effective Date, including … any right of setoff."); at 79 (§ 8.14) (Subrogation) ("Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor … (i) such Creditor shall be deemed to have consented to the subrogation of its right against any third-party … or (ii) the Debtor shall have all rights, title and power as subrogee of the Creditor against any such third-party … to the fullest extent permitted by applicable law."); at 90 (§ 13.10) (Setoff) ("Except as otherwise agreed, the provisions of the Plan shall not … affect (A) the rights of any Creditor to (x) effectuate a recoupment pursuant to common law or setoff pursuant to common law or otherwise in accordance with (a) section 553 … subject to the Debtors' rights to contest the validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing sections of the Bankruptcy Code) …. or (B) any legal or equitable defense."); see also Confirmation Order at 41 (¶ 45) (Setoff); at 56-57 (¶ 76) (Setoff); at 57 (¶ 78) (Subrogation); and 48 (¶ 57) (Setoff).

under the reorganization plan." In re Liberty Warehouse Assocs. Ltd. Partnership, 220 B.R. 546,

548 (Bankr. S.D.N.Y. 1998) (examining whether oversecured creditor in solvent chapter 11 case

was entitled to contract or default rate) (citing Key Bank Nat'l Ass'n v. Milham (In re Milham),

141 F.3d 420, 422-23 (2d Cir. 1998) ("[P]endency interest does not continue to run post-

confirmation;" overruling objection from unsecured creditor to interest payable under chapter 13

plan and finding post-confirmation rate cannot result in claimant receiving recovery in excess of

claim value on confirmation date)).[19]

Citibank's entitlement (if any) to interest under section 506(b) of the Bankruptcy Code

stopped on the Plan Effective Date. Thereafter, the Plan governs interest entitlement. It provides

that Disputed Claims, such as the Subject Claims, accrue interest, from and after the Effective

Date until the date of distribution, at the rate that LBHI earned on account of the distribution

reserve established under the Plan for such Disputed Claims.[20] Through this provision, the Plan

terminates the accrual of interest for oversecured claims under section 506(b) of the Bankruptcy

Code. In place of the 506(b) interest rate, the Plan provides that the holder of a Disputed Claim

---

[19]    See also First Security Bank v. Garner (In re Garner), 663 F.3d 1218, 1220 (11th Cir. 2011) ("The
decisions of the bankruptcy and district courts, which held that Section 506(b) is inapplicable
following confirmation, are consistent with Supreme Court and circuit court decisions
interpreting the scope of 506(b);" overruling objection to oversecured creditor that objected to
confirmation of chapter 13 plan because it did not pay contract rate post-confirmation); T-H
Orleans, 116 F.3d at 797 ("[Section] 506(b) applies only from the date of filing through the
confirmation date;" reviewing inter alia rate of post-confirmation interest under chapter 11 plan));
In re Gluth Bros. Const., Inc., 426 B.R. 771, 777 (Bankr. N.D. Ill. 2010) (reviewing disallowance
of secured creditor's claim in chapter 11 case; "[s]ection 506(b) 'applies only from the date of
filing through the confirmation date.'"); In re NVF Co., 309 B.R. 698, 700 (Bankr. D. Del. 2004)
("A confirmed plan becomes a legally binding agreement and a creditors' rights are governed
exclusively by the terms of that plan;" finding plan set appropriate rate of interest for oversecured
creditor claim); 4 Collier On Bankruptcy ¶ 506.04[2] at 506-105 ("A distinction must be drawn in
the chapter 11, 12 and 13 contexts between postpetition interest and postconfirmation interest ….
[Section 506(b)] has no application to a secured creditor's entitlement to postconfirmation
interest, other than by assisting in fixing the amount of a secured creditor's claim for confirmation
purposes through establishing that the amount of an oversecured creditor's claim shall include
postpetition interest.").

[20]    See Plan at 1 (§ 1.4); at 77 (§ 8.10); at 88 (§ 8.12).

10

will receive the same amount of interest that LBHI receives on the distribution reserve after the Effective Date.

Notwithstanding the Plan, Citibank maintains it is entitled to accrue interest at the highest possible rates until its claims are allowed and satisfied. Given the divergence between the parties' positions with respect to the amount of interest accruing on the Subject Claims, the practicalities of this litigation, including its expected duration, justify provisional allowance and satisfaction of the Subject Claims.

### B.   SUBJECT CLAIMS CAN BE ALLOWED PROVISIONALLY

The Subject Claims can be allowed provisionally for the purpose of enabling LBHI to satisfy them with the $2 Billion Deposit while reserving all rights, claims, objections, and defenses with respect to the Subject Claims and the $2 Billion Deposit. In re Calpine Corp.[21] provides support for the provisional allowance and satisfaction of claims when warranted by the practicalities of pending litigation. The Calpine debtors issued secured notes under a pre-petition indenture that prohibited early repayment absent a make-whole premium. The debtors also sold certain natural gas assets that collateralized the notes, and the indenture required the debtors to deposit the sale proceeds into a designated bank account that earned interest at 4.42%. Yet the debtors continued paying interest on the notes at a rate of 9.625%, and that differential (4.42% versus 9.625%) cost the estates approximately $1.65 million per month.

When the debtor tried to prepay the notes before maturity, litigation concerning the make-whole premium ensued. To stop the monthly cash burn ($1.65 million), the debtor requested authority to repay the principal amount of the notes on a provisional basis, but without the make-whole premium, while reserving all parties' rights with respect to the premium. The Bankruptcy Court considered the request "'highly appropriate and in the best interest of the estate

---

[21]   Law Debenture Trust Co. of N.Y. v. Calpine Corp. (In re Calpine Corp.), 356 B.R. 585 (S.D.N.Y. 2007).

for Debtors to stop hemorrhaging cash and repay the outstanding principal of the Notes."  Id. at

590.  The District Court agreed, rejecting the noteholders' argument that payment of the principal

without the make-whole premium (or without a determination by the Bankruptcy Court that the

premium was not payable) violated the indenture.  See id. at 596 (noting "[n]othing could be

further from the truth because the bankruptcy court merely ordered the payment of the

outstanding principal of the Notes for now so Debtors' estates would stop losing money, and

preserved all parties' rights to litigate the [make-whole premium] later.").[22]

Similarly, the claims of LBHI's largest creditor, JPMorgan, were allowed provisionally in

these cases in connection with the Collateral Disposition Agreement.  That agreement involved

far more complicated facts (including the possible disposition of illiquid securities) than the

simple cash deposit at issue here.  The Order approving the Collateral Disposition Agreement

stated the allowance and satisfaction of $26 billion in purportedly secured claims (and

JPMorgan's satisfaction of the balance of those claims (after liquidating purported collateral)

with $5.6 billion in an LBHI account) had no bearing on the estates' (or JPMorgan's) rights,

claims, and defenses.  Any Order granting this Motion could contain the same protections.[23]

---

[22]    Courts have granted similar relief in analogous circumstances, e.g., allowing claims provisionally
        for voting purposes subject to the estate's right to later object to them.  See In re Harmony
        Holdings, LLC, 395 B.R. 350, 354 (Bankr. D.S.C. 2008) (ordering temporary allowance of
        secured creditors claims for voting purposes even though debtor had objected to them and filed
        affirmative contract and fraud claims against lenders; noting temporary claim allowance finds
        support "from the statutory scheme of § 502, which provides for both claims estimation … and
        reconsideration of allowed and disallowed claims."); In re Frascella Enterprises, Inc., 360 B.R.
        435, 457 n. 46, 458 (Bankr. E.D. Pa. 2007) (examining estimation request and considering it
        unnecessary based on status of confirmation; noting "estimation under § 502(c) determines
        distribution as well as voting rights …. The determination of whether and how to determine the
        temporary allowance of a claim is left to the sound discretion of the bankruptcy judge.").

[23]    See Order Pursuant To Sections 363 Of Bankruptcy Code And Bankruptcy Rule 6004 Approving
        Collateral Disposition Agreement Among Debtors And JPMorgan Chase Bank, N.A., et al.
        (Docket No. 7785 in Case No. 08-13555) at ¶ 9 ("The Agreement is without prejudice to any
        rights, remedies, claims or causes of action … under applicable law, contract or otherwise,
        including, without limitation, rights and remedies in connection with any such provisionally
        allowed secured or other Claim … the right to contest the validity and enforceability of any such

In rejecting LBHI's proposal, Citibank claimed provisional setoff is tantamount to "partial tender" and therefore will not stop the accrual of prejudgment interest under New York law.[24] The two cases cited by Citibank examine the affirmative defense of "tender and payment" under New York state law and do not prohibit the provisional allowance of a bankruptcy claim.  In fact, one case tacitly supports LBHI's argument that releasing the deposit to Citibank should stop interest accrual.  C.f., Kochisarli v. Tenoso, 2008 WL 1882662, at *5-6 (E.D.N.Y. April 24, 2008) (finding that deposit of sale proceeds from collateral in escrow account did not stop interest accrual on loan; neither debtor nor creditor had use of money, which was placed in escrow to resolve creditor's objection to section 363 sale).  LBHI is not proposing to place the $2 Billion Deposit in escrow and instead is offering to release the funds to Citibank on an unfettered basis.

Moreover, the argument that "partial tender" fails to stop interest accrual misses the point. This is a question of federal bankruptcy -- not state law.  LBHI is offering Citibank all that it can possibly be entitled to under section 506(b) of the Bankruptcy Code, that is, post-petition interest to the extent of the collateral.  Claims for pendency interest under section 506(b) are capped as a matter of law by the amount of the purported collateral -- in this proceeding by the $2 Billion

---

provisionally allowed secured or other Claim and/or to avoid or contest such Claims, any alleged guarantee thereof and any alleged security therefor …")).

[24]   See Exhibit B; see also Kochisarli v. Tenoso, 2008 WL 1882662, at *4-6 (E.D.N.Y. April 24, 2008) (finding mere "offers to pay" that were not "actual sums tendered" did not stop interest accrual under mortgage; noting "valid tender requires an unconditional offer to perform with a manifest ability to carry out the offer" and failure to tender was not due to creditor conduct); Tanger v. Ferrer, 853 N.Y.S.2d 316 (1st Dept. 2008) (conditional tender in legal malpractice action did not satisfy statutory requirements:  "[h]aving chosen the litigation strategy of employing a CPLR 3219 tender, defendants were obligated to execute the strategy in compliance with the statute."); N.Y.C.P.R. 3219 ("[A]ny party against whom a cause of action based upon contract … is asserted, and against whom a separate judgment may be taken, may, without court order, deposit with the clerk of the court … an amount deemed by him to be sufficient to satisfy the claim asserted against him, and serve upon the claimant a written tender of payment to satisfy such claim .... If the tender is not accepted and the claimant fails to obtain a more favorable judgment, he shall not recover interest or costs from the time of the offer, but shall pay costs for defending against the claim from that time.").

Deposit that LBHI has offered to surrender in its entirety.  Apart from the $2 Billion Deposit,

there is no other collateral in which Citibank claims an interest that would support a claim under

section 506(b) of the Bankruptcy Code.  See, e.g., United States Sav. Ass'n v. Timbers of Inwood

Forest, 108 S. Ct. 626, 631 (1988) (noting section 506 of Bankruptcy Code "denies oversecured

creditors post-petition interest to the extent that such interest, when added to the principal

amount of the claim, will exceed the value of the collateral."); Financial Security Assurance Inc.

v. T-H Orleans Ltd. Partnership, 116 F.3d 790, 797 (5th Cir. 1997) ("[T]he amount of interest

allowed under § 506(b) is limited to that amount of interest which, when added to the amount of

FSA's allowed claim, will not exceed the value of its collateral;" reviewing process for

determining whether creditor is oversecured and appropriate interest rate under chapter 11

plan).[25]

Lastly, to the extent the Court considers relevant the New York cases examining "tender

of payment," Plaintiffs submit that Citibank's refusal to accept the $2 Billion Deposit should

terminate any further claim for interest.  C.f., Litwak v. Wolkenberg, 515 N.Y.S.2d 559, 560

(N.Y. App. Div. 1987) ("The unwarranted refusal of tender operates to terminate all incidents of

the obligation, such as interest."); Northerly Corp. v. Hermett Realty, 240 N.Y.S.2d 790 (1st

---

[25]    See also In re Denofa, 124 Fed. Appx. 729, 2005 WL 375703, at *2 (3d Cir. Feb. 17, 2005)
("[T]he allowed secured claim of NLI that we must examine for purposes of post-petition interest
under § 506(b) is limited to the extent of the value of the property of the DeNofa's bankruptcy
which secures it;" reviewing secured claim amount purportedly reduced by oral agreement and
extent to which third-party property secured claim); Schreiber v. United States (In re Schreiber),
163 B.R. 327, 335 (Bankr. N.D. Ill. 1994) (examining value of tax lien attached to debtor house;
"[t]he total amount of the post-petition interest to be added to principal due is limited by the
collateral value.") (citation omitted); In re Argiannis, 156 B.R. 683, 688 (Bankr. M.D. Fla. 1993)
(examining extent to which vendor's claim for post-petition interest (secured by separate parcels
of property) continued to accrue after one parcel was abandoned; "[p]ursuant to § 506(b)
allowable post-petition interest accrues on the creditor's interest in the estate's interest in property.
After abandonment … the estate no longer had an interest in Ocala Downs on which Rickman's
interest could accrue.  However, the estate still had an interest in the Virginia property;
consequently, to the extent of the estate's interest in the Virginia property, Rickman may collect
interest on his claim after Ocala Downs was abandoned.").

Dept. 1963) (examining creditor's failure to accept payment; "Petitioner having made a tender …
is relieved of interest charges until it was put in default by refusing to accept a tender of the
documents."), aff'd, 13 N.Y.2d 1137 (N.Y. 1964).  While these decisions involve tenders of
payment equal to the full amount owing, LBHI submits they nonetheless remain instructive
because LBHI has offered to release the entire $2 Billion Deposit to Citibank, which constitutes
the alleged full amount under bankruptcy law.

### C.   PRACTICAL BENEFITS WARRANT PROVISIONALLY SATISFYING SUBJECT CLAIMS

Provisional satisfaction of the Subject Claims will minimize any harm to creditors
resulting from the passage of time in the event the Bankruptcy Court does not sustain Plaintiffs'
litigation positions at the conclusion of the Adversary Proceeding.  Neither side is disadvantaged
because all rights to litigate related issues will be preserved, including the questions of whether
the Subject Claims should be allowed on a final basis, whether Citibank is a secured creditor,
whether it is entitled to any post-petition interest, and the appropriate rate.  Plaintiffs seek only to
stop the accrual of asserted post-petition interest during the pendency of the Adversary
Proceeding with each side reserving all rights with respect to post-petition interest up and
through the date that Citibank applies the Cash Deposit.

Moreover, to the extent LBHI satisfies the Subject Claims as guarantor, LBHI will realize
the benefit of subrogating to the extent applicable to Citibank's rights with respect to the Subject
Claims against the respective primary obligors.  The Collateral Disposition Agreement provided
LBHI would subrogate to the rights of the JPMorgan entities whose claims were satisfied, and
the same result is warranted here.[26]  The Plan contains full reservations of subrogation and setoff

---

[26]    See, e.g., 11 U.S.C. § 509(a) ("[A]n entity that is liable with the debtor on, or that has secured, a
claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such
creditor to the extent of such payment"); Docket No. 7619 (Collateral Disposition Agreement) at
p. 3 (§ 3(a)(1)) ("In consideration of (i) the Cash Payment made by LBHI with respect to the
claims against LBI and other subsidiaries of LBHI, (ii) the application pursuant to Paragraph 1 of
Cash Collateral posted by LBHI to the payment of claims against LBI and other subsidiaries of

15

rights with respect to nearly every primary obligor and does not contain any impediment to the

requested relief.[27]

---

LBHI …  (1) LBHI shall be subrogated to the claims of the relevant JPMC Entities against LBI and such other subsidiaries to the full extent of the payments made by LBHI or applied from its property.").

[27]    See Plan at 77 (§ 8.10) (Setoff), at 89-90 (§ 13.8) (Setoff), at 79 (§ 8.14) (Subrogation), at 90 (§ 13.10) (Setoff).  See also Confirmation Order at 41 (¶ 45) (Setoff), at 57 (¶ 78) (Subrogation), at 56-57 (¶ 76), and 48 (¶ 57) (Setoff).

## CONCLUSION

For the foregoing reasons, the Motion should be granted.


Dated: August 14, 2013
      New York, New York

Respectfully submitted,

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

By: /s/ Peter J. Behmke
Turner P. Smith
L.P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178

*Counsel for Lehman Plaintiffs*

**QUINN EMANUEL URQUHART &
   SULLIVAN LLP**

By: /s/ James C. Tecce
Susheel Kirpalani
Andrew Rossman
James C. Tecce
Eric M. Kay
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Special Counsel for Plaintiff Intervenor,
Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc.*

# Exhibit E

Stephen J. Shimshak
Claudia L. Hammerman
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
chammerman@paulweiss.com
*Attorneys for Citibank Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiffs and<br>Plaintiff Intervenor<br><br>- against -<br><br>CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC., CITI CANYON LTD., CITI SWAPCO INC., FYI LTD., FFI FUND LTD., and OLIFANT FUND, LTC.,<br><br>Defendants and<br>Defendant Intervenors. | Adversary Proceeding<br>No. 12-01044 (JMP)<br><br>Re:  Docket Nos. 29, 30 |

**CITIBANK'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B)(1), 502(B), AND 509(A), FOR
ENTRY OF AN ORDER PROVISIONALLY ALLOWING CLAIMS FILED BY
CITIBANK, N.A. AND AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO
SATISFY THOSE CLAIMS WITH FUNDS ON DEPOSIT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 4

    A.    The $2 Billion Deposit ......................................................................... 4

    B.    Maintenance of the $2 Billion Deposit After Lehman's Bankruptcy ................... 7

    C.    The "Subject Claims" .......................................................................... 10

    D.    Lehman's Claim Objection and Adversary Proceeding ......................... 13

ARGUMENT ................................................................................................................ 17

I.    Plaintiffs' Motion to "Provisionally Allow" Defendants' Claims Has No Basis in the Bankruptcy Code, the Plan of Reorganization, or Other Applicable Law ................. 17

    A.    Nothing in the Bankruptcy Code or Rules Permits Provisional Allowance ........ 17

    B.    "Provisional Allowance" Violates the Plan and the Confirmation Order ............ 21

    C.    Controlling Precedent Is Clear that Only Final Payment Operates to Stop the Accrual of Interest ...................................................................... 23

    D.    Lehman's Collateral Disposition Agreement with JPMorgan Provides No Precedential Authority for the Provisional Relief Requested .............. 26

II.    Equitable Considerations Do Not Support Plaintiffs' Motion, as the Relief Requested Is Manifestly Unfair to Defendants ................................................ 27

III.    Plaintiffs' Extraneous Arguments About Citibank's Right to Post-Petition Interest Lack Merit ...................................................................................... 30

CONCLUSION ............................................................................................................ 34

Doc#: US1:8864898v1

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amtel, Inc.* v. *Sun Spec Indus. (In re Sun Spec Indus., Inc.)*,
    3 B.R. 703 (Bankr. S.D.N.Y. 1980) ........................................................................18

*Armstrong* v. *Ruston (In re Armstrong)*,
    294 B.R. 344 (10th Cir. 2003) ...............................................................................18

*ASM Capital, LP* v. *Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*,
    582 F.3d 422 (2d. Cir. 2009)..................................................................................18

*United States* v. *Arrow Air, Inc. (In re Arrow Air)*,
    101 B.R. 332 (S.D. Fla. 1989) ...............................................................................32

*Bell* v. *Bell (In re Bell)*,
    225 F.3d 203 (2d Cir. 2000)...................................................................................19

*In re Boylan Int'l, Ltd.*,
    452 B.R. 43 (Bankr. S.D.N.Y. 2011) ......................................................................22

*Contrarian Funds, LLC* v. *WestPoint Stevens, Inc. (In re WestPoint Stevens, Inc.)*,
    333 B.R. 30 (S.D.N.Y. 2005)..................................................................................19

*Fawcett* v. *United States (In re Fawcett)*,
    758 F.2d 588 (11th Cir. 1985) .........................................................................32, 33

*Findley* v. *Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*,
    982 F.2d 721 (2d Cir. 1992)...................................................................................22

*In re Frascella Enter.*,
    360 B.R. 435 (Bankr. E.D. Penn. 2007) ................................................................18

*Garigen* v. *Morrow*,
    757 N.Y.S.2d 422 (4th Dep't 2003).......................................................................25

*Goldberg* v. *Pac. Indem. Co.*,
    627 F.3d 752 (9th Cir. 2010) .................................................................................25

*Indu Craft, Inc.* v. *Bank of Baroda (In re Indu Craft Inc.)*,
    Nos. 11-cv-5996, 11-cv-6303, 11-cv-6304, 2012 WL 3070387
    (S.D.N.Y. July 27, 2012) .......................................................................................23

*Ionosphere Clubs, Inc.* v. *Doral Ctr., Inc. (In re Ionosphere Clubs, Inc.)*,
    208 B.R. 812 (Bankr. S.D.N.Y. 1997)....................................................................22

ii

*Kochisarli* v. *Tenoso*,
  No. 02-cv-4320, 2008 WL 1882662 (E.D.N.Y. Apr. 24, 2008) ...........................................26

*Law Debenture Trust Co.* v. *Calpine Corp. (In re Calpine Corp.)*,
  356 B.R. 585 (Bankr. S.D.N.Y. 2007) ...................................................2, 20, 23, 24

*Litwik* v. *Wolkenberg*,
  130 A.D.2d 630 (2d Dep't 1987) ...........................................................................26

*Michaels* v. *U.S. Tennis Assoc.*,
  744 N.Y.S.2d 375 (1st Dep't 2002) .......................................................................25

*MPEG LA, L.L.C.* v. *Dell Global B.V.*,
  No. 7016-VCP, 2013 WL 812489 (Del. Ch. Mar. 6, 2013)...................................25

*New England Dairies, Inc.* v. *Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
  Convenience Stores, Inc.)*,
  351 F.3d 86 (2d. Cir. 2003)....................................................................................20

*Northerly Corp.* v. *Hermett Realty Corp.*,
  240 N.Y.S.2d 709 (1st Dep't 1963) .......................................................................26

*Northerly Corp.* v. *Hermett Realty Corp.*,
  13 N.Y.2d 1137 (1964) ..........................................................................................26

*Rickel & Assocs., Inc.* v. *Smith (In re Rickel & Assocs., Inc.)*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002) .....................................................................19

*Solow* v. *Kalikow (In re Kalikow)*,
  602 F.3d 82 (2d Cir. 2010).....................................................................................20

*Tanger* v. *Ferrer*,
  853 N.Y.S.2d 316 (1st Dep't 2008) .......................................................................25

*Terex Corp.* v. *Metro. Life Ins. Policy (In re Terex Corp.)*,
  984 F.2d 170 (6th Cir. 1993) .................................................................................32

*U.S. Bank Trust Nat'l Assoc.* v. *AMR Corp. (In re AMR Corp.)*,
  --- F.3d ---, 2013 WL 4840474 (2d Cir. Sept. 12, 2013) .....................................24

STATUTES

11 U.S.C. § 105 .....................................................................................................1, 17, 20

11 U.S.C. § 331 .............................................................................................................18

11 U.S.C. § 363 .................................................................................................1, 17, 18, 19

11 U.S.C. § 502 ............................................................................................1, 17, 18

11 U.S.C. § 509 ........................................................................................1, 17, 19, 20

11 U.S.C. § 553 ...........................................................................................................19

11 U.S.C. § 1101 .........................................................................................................22

11 U.S.C. §1127 ..........................................................................................................22

11 U.S.C. §1141 ..........................................................................................................22

RULES

Fed. R. Bankr. P. 3018 ................................................................................................17

Fed. R. Bankr. P. 2003 .......................................................................................... 17-18

OTHER AUTHORITY

Braum, Martin Z., *Lehman Reached Beyond Grave Seeking Millions from Nonprofits*,
    Bloomberg (May 14, 2013, 11:20 AM), http://www.bloomberg.com/news/2013-05-
    14/lehman-reaches-beyond-grave-to-grab-millions-from-nonprofits.html ............................28

Doc#: US1:8864898v1

Defendants Citibank, N.A. ("Citibank"), Citigroup Global Markets Ltd., Citigroup

Financial Products Inc., Citigroup Energy Inc., Citi Canyon Ltd., and Citi Swapco Inc.

(collectively, together with Citibank, "Citi") respectfully submit this Memorandum of Law in

Opposition to Plaintiffs' Motion, Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 502(b), and 509(a),

for Entry of an Order Provisionally Allowing Claims Filed by Citibank, N.A. and Authorizing

Lehman Brothers Holdings Inc. to Satisfy Those Claims with Funds on Deposit.

## PRELIMINARY STATEMENT

Having delayed bringing its objections to Citibank's claims for more than three

years, plaintiffs (collectively, "Lehman"), led by Lehman Brothers Holdings Inc. ("LBHI"), now

seek unprecedented judicial relief from the further accrual of interest on Citibank's oversecured

claims.  Lehman asks this Court (i) to "provisionally allow" Citibank's claims, (ii) to compel

Citibank to exercise a "provisional setoff" of those claims against a $2 billion LBHI deposit

maintained at Citibank, (iii) to permit Lehman—notwithstanding the "provisional allowance"

and "provisional setoff"—to continue to dispute and litigate in this adversary proceeding both

the allowance of Citibank's claims and the propriety of the setoff, and (iv) to rule that this ploy

somehow cuts off Citibank's right to further post-petition interest on its oversecured claims.  In

fact, there is nothing in the Bankruptcy Code, the Bankruptcy Rules, or other applicable law that

permits Lehman to cut off Citibank's right to post-petition interest other than by full payment of

Citibank's Allowed Claim, together with all accrued interest.  There is no precedent for imposing

the requested relief on an unwilling creditor, and the equities in this case do not remotely support

it.

While the cover page of Lehman's brief invokes four Code provisions—

Sections 502(b), 363(b)(1), 509(a), and 105(a)—as putative statutory bases for the motion,

Lehman's brief conspicuously avoids discussing any of these provisions, and none of them justifies the unprecedented relief Lehman seeks here. Lehman's brief also fails to confront the crucial fact that the requested relief is foreclosed by the terms of Lehman's confirmed Plan. Only "Allowed Claims"—defined as Claims that are undisputed or, if disputed, have been adjudicated by final order—may be paid under the Plan. Nothing in the Plan allows Lehman to "provisionally" satisfy claims while continuing to dispute them.

Nor can Lehman point to a single precedent in support of the relief it seeks here. While Lehman invokes *Law Debenture Trust Co.* v. *Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585 (Bankr. S.D.N.Y. 2007) and the Collateral Disposition Agreement it entered into with JPMorgan Chase Bank, N.A. ("JPMorgan"),[1] neither one helps Lehman. The court in *Calpine* approved the debtor's payment—final and unconditional, not provisional—of the outstanding principal and interest due on secured notes to stop further interest accruals. The noteholders' claim for an additional make-whole payment, however, was left unresolved and subject to further litigation. Citibank agrees completely with *Calpine*'s ruling that unconditional allowance and full satisfaction of any portion of Citibank's claims would stop interest accruals on that portion. Citibank would welcome a decision by Lehman to abandon its "take no prisoners" and "scorched earth" approach to every aspect of Citibank's claims; Lehman can and should unconditionally allow Citibank to satisfy subsets of its claims as to which, Citibank submits, Lehman has no credible objection.

As for the Collateral Disposition Agreement between Lehman and JPMorgan, the very title of the instrument proclaims its irrelevance to Lehman's current effort to *force* its

---

[1]   Corrected Notice of Filing of Executed Collateral Disposition Agreement Among Lehman Brothers Holdings Inc. and JPMorgan Chase Bank, N.A. *et al.*, Ex. A, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, (Bankr. S.D.N.Y. Mar. 16, 2010), Docket No. 7619 (the "CDA" or "Collateral Disposition Agreement").

Doc#: US1:8864898v1

desired outcome on Citibank.  It is not hard to understand why JPMorgan was willing to agree, as part of the Collateral Disposition Agreement, to cut off further interest accruals on its secured claims:  the centerpiece of that agreement involved Lehman making a cash payment of more than $550 million to JPMorgan to secure JPMorgan's claims, in place of distressed and illiquid securities (of dubious value) that JPMorgan held as collateral.  By contrast, the relief Lehman requests here would confer no benefit on Citibank, but would simply deprive Citibank of its legal right to further post-petition interest for so long as this litigation continues and Citibank's claims remain disputed.

Beyond these inapposite "precedents," Lehman offers no legal basis for cutting off Citibank's rights.  Instead, Lehman's brief rehearses its arguments that Citibank, supposedly, is not a secured creditor, or if it is a secured creditor, is not entitled to post-petition interest, or if it is entitled to post-petition interest, is not entitled to post-confirmation interest beyond the rate Lehman is earning on its unsecured claims reserves.  Of course, none of these arguments on the merits of Citibank's right to interest provides any basis for "provisional allowance" and "provisional setoff."  Indeed, if Lehman were right on *any* of these arguments, this motion— whose sole purpose is to cut off future post-confirmation interest—would be unnecessary.  These arguments, which Citibank vigorously disputes, appear inserted by Lehman solely as make-weight, designed to divert this Court's attention from the fact that Lehman has provided no legal support for the extraordinary relief it is asking for.

Finally, Lehman's brief invokes "fairness" and "the practicalities of pending litigation" to justify its motion.  According to Lehman, Citibank is asserting a right to post-petition interest at "exorbitant rates" and is using the "potential of post-petition interest as leverage against the Lehman estates."  Thus, Lehman argues, the "practicalities of this litigation,

3

including its expected duration, justify provisional allowance and satisfaction of the Subject

Claims."  In fact, the equitable considerations run entirely in Citibank's favor.  First, the highest

post-petition interest rate Citibank demands on its oversecured claims is hardly exorbitant—it is

the contractually mandated rate of Citibank's "cost of funds plus 1%," which, in Citibank's case,

is a rate substantially *less than half* the rate Lehman claims it is owed by derivatives

counterparties, based on the *same* contractual provisions.  Second, it is Lehman that has dictated

the timing and duration of this litigation:  it waited three years to bring this action; it

contractually disabled itself from negotiating a fair resolution of Citibank's claims unless and

until it litigated with Citibank for more than 18 months; it has taken unprecedented legal

positions that would seek to invalidate the industry-standard liquidated damages clause in the

ISDA agreements; and it has pursued a "scorched earth" discovery program, including firing off

blunderbuss subpoenas on thirty major market participants on the last days it was permitted to do

so, presumably in a search to somehow bolster its extreme litigation positions.  Throughout,

Citibank has sought an early resolution of this matter on reasonable terms or, if necessary, an

early start to the claims objection process.  The fact that five years after its bankruptcy Lehman is

still litigating with Citibank over the allowance of Citibank's secured claims is a problem of

Lehman's own making.

There is no basis in law or equity for the relief Lehman seeks, and its motion

should be denied.

## **STATEMENT OF FACTS**

### A.    **The $2 Billion Deposit**

Citibank's claims against LBHI are principally secured by a $2 billion LBHI

deposit at Citibank.

LBHI made the $2 billion deposit on June 12, 2008, at a time of significant market uncertainty surrounding Lehman's prospects and in light of the substantial credit exposure Citibank had to LBHI and its subsidiaries.  As of that morning, Lehman's stock price had fallen precipitously, Lehman had announced the replacement of its Chief Financial Officer and Chief Operating Officer, Citibank had received a record number of novation requests from Lehman counterparties seeking to get out of derivatives trades with Lehman, and Lehman's use of intraday, unsecured credit lines from Citibank increased significantly.  Citibank became concerned about accepting any additional unsecured exposure to Lehman unless Lehman agreed to keep some of its reported $45 billion in liquidity with Citibank.[2]

Citibank asked LBHI to deposit $3 to $5 billion in cash with Citibank.  While LBHI would not agree to that amount, it did agree to deposit $2 billion in a standard time deposit account, callable daily, with Citibank's Risk Treasury desk—a desk to which Lehman routinely "sold" excess cash in order to earn interest.[3]

Contrary to Lehman's assertion, the $2 billion was never "segregate[d]," and it has none of the hallmarks of a "special purpose account."[4]  Lehman never requested segregation of the $2 billion, and the funds were commingled with Citibank Risk Treasury's other funds. The $2 billion earned interest at Citibank's overnight rate (Fed Funds target minus $\frac{1}{8}$), and

---

[2]    Answer to First Amended Complaint and Response to Claims Objection ¶ 40, Feb. 14, 2013, Docket No. 20 ("Answer").

[3]    *Id.* ¶¶ 40, 41, 43.

[4]    Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 502(b), and 509(a), for Entry of an Order Provisionally Allowing Claims Filed by Citibank, N.A., and Authorizing Lehman Brothers Holdings Inc. to Satisfy Those Claims with Funds on Deposit at 5, Aug. 14, 2013, Docket No. 30 ("Pls.' Br.").

Lehman could withdraw the funds on a same day basis.[5]  Lehman's own internal documents

(quoted by the Examiner) show that Lehman, too, considered the deposit to be a "$2B term

deposit, callable daily."[6]

No written agreement governed the $2 billion deposit or restricted Citibank's

setoff rights in the deposit.[7]  Indeed, Lehman's own documents (also quoted by the Examiner)

show that Lehman understood—and was specifically told by Citibank—that Citibank had a

general right of setoff against the deposit.  For example, an internal Lehman "Call Report,"

describing a conversation Lehman's Treasurer had with Citibank to discuss alternatives to the $2

billion deposit, states:  "Citi did point out that according to NY law, Citi would have the right to

offset deposits, but not securities which were not pledged."[8]  Similarly, a Lehman Treasury

official with substantial involvement in the discussions surrounding the $2 billion deposit

describes it, in an internal email, as "a callable deposit," and notes that "Accdg [according] to ny

law, Citi has a right of offset."[9]

Lehman has offered no evidence whatsoever to support its theory that there was a

meeting of the minds to segregate the $2 billion deposit into a "special purpose" account or

---

[5]    Answer ¶¶ 41-43.

[6]    *Id.* ¶ 41(quoting documents cited in the Report of Anton R. Valukas, Examiner, dated March 11, 2010 ("Examiner's Report")).

[7]    Although Citibank and Lehman discussed a potential pledge of investment-grade securities that would be specifically available for offset against Citibank's clearing exposure to LBHI's subsidiaries, no such agreement was ever reached.  *Id.* ¶¶ 46-48.

[8]    *Id.* ¶ 42 (quoting LBEX-DOCID 1035842, cited in the Examiner's Report at 1258 n.4722).

[9]    *Id.* (quoting LBEX-DOCID 10783885, cited in the Examiner's Report at 1262 n.4742).

Doc#: US1:8864898v1

otherwise restrict Citibank's setoff rights in the deposit.[10]  The $2 billion deposit is clearly a

general deposit, available to Citibank to offset general obligations owed to it by LBHI.

### B.    Maintenance of the $2 Billion Deposit After Lehman's Bankruptcy

When LBHI filed for bankruptcy on September 15, 2008, the $2 billion remained

in the call account.[11]  Lehman has repeatedly agreed in various stipulations to allow Citibank to

maintain the $2 billion and to preserve all parties' rights.  For example:

- On September 22, 2008, the parties stipulated that Citibank's "maintenance . . . as its collateral of the cash in the [$2 billion] Account does not constitute a unilateral administrative hold or a violation of the automatic stay."  The stipulation provided that "Citibank may set off" against the $2 billion deposit any post-petition clearing advances to Lehman Brothers Inc. ("LBI") "to the same extent as if they had been made" pre-petition.[12]

- On April 15, 2009, the parties stipulated that Citibank should transfer the $2 billion to an interest-bearing account with FDIC protection.  All interest earned on the account became property of the estate.  The stipulation confirmed that Citibank "shall have no greater or lesser Setoff Rights (and the Debtors shall have

---

[10]    Lehman's First Amended Complaint and Claims Objection, Nov. 16, 2012, Docket No. 13 ("FAC"), offers an additional theory as to why Citibank supposedly has no setoff rights in the account.  According to the FAC, Citibank verbally waived its setoff rights during the calls with Lehman on June 12.  FAC ¶ 42.  This theory lacks any factual support and is expressly contradicted by plaintiffs' own documents acknowledging Citibank's setoff rights in the account.  Moreover, while the FAC fails to identify who at Lehman allegedly witnessed Citibank's purported waiver, the two Lehman individuals plaintiffs have subsequently identified (in response to interrogatories)—Ian Lowitt and Paolo Tonucci—have already gone on record in other proceedings to the contrary.  Mr. Lowitt previously stated that he "[did not] recall being involved" in the June 12 discussions with Citibank concerning the $2 billion deposit, and Mr. Tonucci has testified that he was "not aware" that Lehman asked any bank to waive its setoff rights with respect to deposits requested from Lehman in 2008, and was "not aware" of any request by Lehman that those deposits be segregated.  Answer ¶ 42 (quoting Interview by Fin. Crisis Inquiry Comm'n with Ian Lowitt at 1:02:44 (Aug. 25, 2010), *available at* http://cybercemetery.unt.edu/archive/fcic/20110310171826/http://fcic.gov/resource/interviews (last accessed September 25, 2013); Tr. of February 1, 2010 Evidentiary Hearing on Motions for Summary Judgment at 192:4-193:9, *Bank of Am., N.A.* v. *Lehman Bros. Special Fin. Inc.*, No. 08-01753 (Bankr. S.D.N.Y. Feb. 9, 2010)), Docket No. 81.  It is, therefore, not surprising that plaintiffs fail to raise this "verbal waiver" theory in the present motion.

[11]    Answer ¶ 44.

[12]    Order Pursuant to Section 105 of the Bankruptcy Code Confirming Status of Citibank Clearing Advances at 2-3, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y.), Docket No. 284.

Doc#: US1:8864898v1

no greater or lesser rights to dispute and object to the Setoff Rights) against the Deposit" as a result of the transfer.[13]

- On September 10, 2010, the parties entered into a tolling agreement—renewed 11 times until February 1, 2012—extending the time for either party to assert claims, including turnover or avoidance claims. These stipulations left intact the parties' prior agreements with respect to Citibank's maintenance of the $2 billion deposit and the preservation of each party's position with respect to Citibank's asserted setoff rights in the deposit.[14]

- On July 21, 2011, the Court "so ordered" a stipulation permitting Citibank to "continue to maintain as its collateral the cash (including any interest or income earned thereon) in" a number of accounts, including the account holding the $2 billion.[15]

- On February 27, 2012, the Court "so ordered" the Scheduling Order and Discovery Plan in this action, which stated that "Citibank's maintenance during this proceeding of Plaintiffs' cash deposits, purported interests, or any other item that may be the subject of the Complaint shall not be held to violate the stay."[16] The amended scheduling orders contain substantially identical language.[17]

- On March 5, 2012, the parties stipulated—"subject to the Citi Setoff Rights and the Debtors' rights to dispute, contest or challenge the Citi Setoff Rights"—to use Lehman's prepetition deposits at Citibank, including the $2 billion deposit, as a

---

[13]   Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, If Any, In Respect of Amounts Transferred ¶¶ 2-3, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (JPM) (Bankr. S.D.N.Y.), Docket No. 3372. While Lehman now complains about the rate of interest it earns on the $2 billion deposit, the relatively low rate was, at least in part, a function of Lehman's desire for FDIC protection on the account.

[14]   Declaration of William A. Clareman in Support of Citibank's Memorandum of Law in Opposition to Plaintiffs' Motion, Pursuant to 11 U.S.C. §§ 105(a), 363(b), 502(b), and 509(a), for Entry of an Order Provisionally Allowing Claims Filed by Citibank, N.A. and Authorizing Lehman Brothers Holdings Inc. to Satisfy Those Claims with Funds on Deposit (Oct. 2, 2013) ("Clareman Decl."), Ex. 1, Tolling and Forbearance Agreement ¶ 5 (Sept. 10, 2010); *Id.*, Ex. 2, Amended and Restated Tolling and Forbearance Agreement ¶¶ 3, 9 (Feb. 1, 2012).

[15]   Stipulation and Order Regarding (1) Transfer and Turnover of Certain Deposits, (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Deposits Transferred or Turned Over, (3) Maintenance of Certain Deposit Accounts, (4) Indemnification of Citibank in Respect of Any Third Party Claims Arising From the Turnover of Deposits and (5) Payment of Account Fees, Schedule at 4, *In re Lehman Bros. Holdings, Inc.*, No 08-13555 (Bankr. S.D.N.Y.), Docket No. 18687.

[16]   Scheduling Order and Discovery Plan at 3, Feb. 27, 2012, Docket No. 5.

[17]   *See, e.g.*, Second Amended Scheduling Order and Discovery Plan at 2-3, Sept. 13, 2013, Docket No. 32.

Doc#: US1:8864898v1

reserve for Citibank's claims under Lehman's plan of reorganization.[18]  This stipulation was amended on February 25, 2013.[19]

From the outset of this bankruptcy case, Lehman has been acutely aware that Citibank asserts rights as a secured creditor and claims a right of setoff against the $2 billion deposit.  Nonetheless, it was not until 2013 that Lehman raised any concern about the accrual of post-petition interest on Citibank's oversecured claims.  Lehman wrote to Citibank on July 29, 2013, proposing an arrangement whereby Lehman would agree to the "provisional" allowance of Citibank's claims and permit Citibank to take a "provisional" setoff against the $2 billion deposit.[20]  By this maneuver, Lehman sought to stop any further accrual of post-petition interest on Citibank's claims, while continuing to dispute those claims, the interest already accrued, and any right to setoff.  Lehman's letter threatened to seek Court intervention to impose this result if Citibank rejected the proposal.  Citibank responded on August 5, 2013, rejecting Lehman's proposal, explaining that the proposed arrangement conferred no benefit at all on Citibank, and that there was no legal basis to compel the result Lehman wanted.[21]

In a follow-up conversation, Citibank explained to Lehman why the proposal offered no conceivable benefit to Citibank.  As Citibank explained, the $2 billion deposit is not an identifiable pot of money that Citibank could somehow "use" during the time its claims were

---

[18]   Clareman Decl., Ex. 3, Stipulation Establishing Distribution Reserves for Claims Filed by Citibank, N.A., Citigroup Global Markets Ltd. and Citigroup Global Markets, Inc. in Connection with the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors ¶ 1(a)(i)-(ii).

[19]   *Id.*, Ex. 4, Amended Stipulation Establishing Distribution Reserves for Claims Filed by Citibank, N.A., Citigroup Global Markets Ltd. and Citigroup Global Markets, Inc. in Connection with the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors ¶ 2(a)(i)-(ii).

[20]   Pls.' Br. Ex. A.

[21]   Pls.' Br. Ex. B.

Doc#: US1:8864898v1

"provisionally allowed" and "provisionally setoff," subject to clawback.[22]  Instead, the $2 billion

deposit is simply a ledger entry on Citibank's books reflecting a debt that Citibank owes to

LBHI.  The setoff Citibank seeks would not give it money to "use"; it would merely provide an

accounting outcome whereby the debt Citibank owes LBHI (the $2 billion deposit) would be

"crossed off" in tandem with an equal amount of debt that LBHI owes Citibank (Citibank's

claims).  If, as plaintiffs propose, LBHI will continue to challenge both Citibank's claims and

setoff rights in the $2 billion, Citibank has no ability to cancel the $2 billion debt owed to

Lehman and record the satisfaction of the debts owed by Lehman.[23]

     While Citibank invited Lehman to justify its proposal in light of Citibank's

response, this motion followed two weeks later.

### C.    The "Subject Claims"

     By this motion, Lehman seeks "provisional allowance" of Citibank's guarantee

claims against LBHI based on the underlying obligations of Lehman Brothers Special Financing

Inc. ("LBSF"), Lehman Brothers Commercial Corporation Asia Limited ("LBCC Asia"), LBI,

Lehman Brothers Commercial Corporation ("LBCC") and Lehman Brothers Commodity

Services Inc. ("LBCS") (together the "Subject Claims").[24]  The major components of the

Subject Claims are:

---

[22]    Plaintiffs' motion continues to embrace this misconception:  plaintiffs contend that, under their proposal, "Citibank can use the $2 Billion Deposit in whatever way it sees fit."  Pls.' Br. at 4.

[23]    Declaration of Sugam Mehta ("Mehta Decl.") ¶ 21 (Oct. 2, 2013).

[24]    Pls.' Br. at 7-8.  Citibank filed two proofs of claim on account of LBHI's guarantees of its various affiliates:  Proof of Claim No. 29883, filed on September 22, 2009, and Proof of Claim No. 67736, filed on November 18, 2011, amending the original claim by reducing the amount sought.  Proof of Claims No. 29883 and 67736, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.).  The Subject Claims include most, but not all, of the secured claims asserted against LBHI.  The Subject Claims exclude certain secured claims asserted against LBHI which are also oversecured.  These excluded claims total approximately $38 million, of which roughly

10

(i)     Citibank's claim (in the principal amount of $1,640,084,656[25]) arising from the termination of an ISDA Master Agreement with LBSF, where LBHI was the credit support provider and guarantor (the "LBSF ISDA Claim");

(ii)    Citibank's claim (in the principal amount of $281,225,562) arising from LBCC Asia's default under a revolving loan facility guaranteed by LBHI (the "LBCC Asia Loan Claim"); and

(iii)   Citibank's claim (in the principal amount of $252,736,357) arising from the termination of the Continuous Linked Settlement ("CLS") Services Amended and Restated Agreement for CLS User Members under which Citi provided clearing services to LBI, and for which LBHI executed an amended guarantee on September 9, 2008, which added LBI as a guaranteed subsidiary, expressly to induce Citibank to continue extending credit to LBI for the clearance and settlement of trades (the "LBI CLS Claim").

Under the governing terms of the ISDA, the LBSF ISDA Claim accrues interest at "a rate per annum equal to the cost (without proof or evidence of actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1%."[26] Under the terms of the revolving loan agreement, the LBCC Asia Loan Claim accrues interest at a rate of "1.50% p[er] a[nnum] over 1 m[onth], 2 m[onth], [or] 3 m[onth] [Hong Kong Interbank Offered Rate] depending on the interest period."[27]

The aggregate principal amount of the Subject Claims, as filed, is $2,195,785,485.[28] Thus, plaintiffs assert that Citibank's claims exhaust the $2 billion deposit

---

$31 million remains outstanding.  *See* Proofs of Claim No. 17918, 29873, and 67736, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.).

[25]   All Subject Claims are stated as of the Petition Date, exclusive of all interest accrued since that date.

[26]   Clareman Decl., Ex. 5, 1992 ISDA Master Agreement §§ 6(d)(ii), 14.

[27]   *Id.*, Ex. 7, Second Amendment to Committed Revolving Loan Agreement with Guaranty § 13 (Aug. 18, 2008). Citibank's claims against LBI also include interest, but there is no rate specified in the governing contracts.

[28]   Plaintiffs' definition of Subject Claims includes two claims for which LBCC Asia is the primary obligor that should not be part of the analysis of Citibank's claims and collateral.  The claim for certain fees ($175,498) has been completely satisfied and is no longer asserted against LBHI, and the securities claim ($35,844,833) is a contingent claim that remains contingent.

and Citibank is not an oversecured creditor for purposes of post-petition interest.  Not so.  As

plaintiffs well know, the principal amounts owed have been reduced, and will continue to be

reduced, as a result of Citibank's extensive efforts to recover its losses from the primary obligors

and indemnitors, in addition to LBHI.  These efforts have already succeeded in reducing the

Subject Claims by approximately $200 million:  a $162 million reduction in the LBI CLS Claim

and a $39 million reduction in the LBCC Asia Loan Claim.[29]  In fact, Citibank expects to recover

substantially more from LBCC Asia on the LBCC Asia Loan Claim, and Citibank is currently

pursuing Barclays with respect to the remaining deficiency on the LBI CLS Claim.[30]

The recovery efforts to date render Citibank an oversecured creditor as to the

Subject Claims simply by virtue of the $2 billion deposit; the additional recoveries Citibank

expects will substantially increase its position as an oversecured creditor.  Further, plaintiffs have

chosen to ignore that the Subject Claims benefit from additional setoff rights against LBHI and

the primary obligors, separate and apart from the $2 billion deposit, adding to Citibank's position

as an oversecured creditor.[31]  Specifically, Citibank holds other LBHI deposits with a combined

balance of approximately $62 million, and Citibank asserts setoff rights against various assets of

---

[29]    Mehta Decl. ¶ 5.  In January 2013, Citibank sold the $252,736,357 unsecured claim against LBI—allowed as
part of Citibank's settlement with LBI—for $161,119,427.59 following an auction.  Id. ¶ 6.  Factoring in these
sale proceeds, as well as the application of $829,249.46 in additional deposits that reverted to Citibank under its
settlement with LBI, Citibank reduced its CLS-related principal losses to $90,787,679.95.  Id.  The settlement
with LBI did not provide Citibank with any recovery on its interest claim with respect to its CLS-related
principal losses.  Accordingly, Citibank continues to seek interest, along with legal fees, from both LBHI (as
guarantor) and Barclays (as indemnitor).  Id. ¶¶ 6-7.  On or about July 13, 2012, Citibank received a distribution
payment from the Official Liquidators of LBCC Asia on account of Citibank's Re-Amended Proof of Debt,
filed June 10, 2010, against LBCC Asia.  The amount of the distribution payment was HKD 305,520,680,
which, using then-prevailing foreign exchange rates, equaled approximately $39 million.  Id. ¶ 8.

[30]    Id. ¶ 8.

[31]    Plaintiffs' brief incorrectly states that there is no collateral other than the $2 billion deposit "in which Citibank
claims an interest that would support a claim under Section 506(b) of the Bankruptcy Code."  Pls.' Br. at 14.

12

the primary obligors that would reduce the Subject Claims by, at the very least, an additional $21 million.[32]

### D.    Lehman's Claim Objection and Adversary Proceeding

Although Lehman filed for bankruptcy more than five years ago, this adversary proceeding and claims objection will not be tried until 2015, under the current scheduling order.[33]  This protracted schedule—and its implications for the accrual of post-petition interest—is entirely of Lehman's own making.  Lehman has dictated the timing and duration of this litigation:  waiting three years to commence this action; cutting off bi-lateral settlement negotiations regarding Citi's derivatives claims; contractually disabling itself from resolving Citi's derivative claims on fair terms unless and until it had litigated with Citi for more than 18 months; taking unprecedented legal positions seeking to invalidate the industry-standard liquidated damages clause in the ISDA agreements; and insisting on blunderbuss discovery to support this extreme position.  By contrast, Citi has made every effort from the outset of this bankruptcy to engage with the debtors in good faith in the hopes of quickly resolving its claims on a fair and reasonable basis.  For example:

- **Additional derivatives information:**  At the outset of this bankruptcy case and to further bi-lateral settlement discussions, Citi provided substantial information to

---

[32]    Stipulation and Order Regarding (1) Transfer and Turnover of Certain Deposits, (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Deposits Transferred or Turned Over, (3) Maintenance of Certain Deposit Accounts, (4) Indemnification of Citibank in Respect of Any Third party Claims Arising From the Turnover of Deposits and (5) Payment of Account Fees, Schedule at 4, *In re Lehman Bros. Holdings, Inc.*, No 08-13555 (Bankr. S.D.N.Y. July 21, 2011), Docket No. 18687; Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Right, if Any, in Respect of Amounts Transferred, Schedule at 1, *In re Lehman Bros. Holdings, Inc.*, No 08-13555 (Bankr. S.D.N.Y. Apr. 6, 2010), Docket No. 8099; Stipulation and Order between Plaintiffs Lehman Brothers Holdings Inc., Lehman Brothers Commercial Corp., Lehman Brothers Special Financing Inc., and Official Committee of Unsecured Creditors and Defendants Citibank, N.A. and Citigroup Global Markets Ltd. with Respect to Certain Continuous Linked Settlement Agreement Unwind Amounts at 5, May 14, 2013, Docket No. 26;  Mehta Decl. ¶¶ 10-13.

[33]    Second Amended Scheduling Order and Discovery Plan ¶ 3(d), Sept. 13, 2013, Docket No. 32.

13

Lehman about its derivatives claims—which claims constitute the vast majority of the claims at issue in this litigation, approximately $1.65 billion for Citibank, and $1.9 billion for Citi overall—months before Lehman moved for an order requiring supplemental information pursuant to the Derivatives Questionnaire.[34]

- **Derivatives Questionnaire response:**  In addition to the wealth of information already provided to Lehman, Citi then complied thoroughly with the Derivatives Questionnaire requirements and took great pains to provide trade data and supporting documentation in a clear and coherent manner.[35]

- **Interviews with Desk Heads and Senior Traders:**  To further the parties' bi-lateral settlement discussions, Citi agreed to make witnesses available to Lehman to explain, in detail, Citi's methodology for valuing the terminated derivatives trades.  Citi arranged numerous interviews over the spring and summer of 2010, covering all of the major derivatives products in Citi's claim.  These interviews were attended by the senior traders and desk heads who personally oversaw and directed the closeout and valuation of the trades in September 2008.[36]

- **Lehman terminates bi-lateral negotiations over Citi's derivatives claims:**  In December 2010, however, Lehman abruptly announced that it was unwilling to continue bi-lateral negotiations with respect to the commercial reasonableness of Citi's derivatives claim.[37]  Instead, Lehman decided to re-value the terminated derivatives trades of its 13 largest counterparties (the "Big Banks" or "Big Bank Counterparties") using a mechanical, one-size-fits-all approach and extend "take-it-or-leave-it" settlement offers to these 13 Big Banks based on the numerical output of its mechanical re-valuation.[38]  The estate developed the "Derivatives Claims Settlement Framework," which revalued the counterparties' trades based on standardized dates and times, mid-market prices selected by Lehman (and not disclosed to the counterparties), and standardized, rule-based bid/offer

---

[34]    Mehta Decl. ¶ 15; Notice of Presentment of Debtors' Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. May 26, 2009), Docket No. 3654.

[35]    Mehta Decl. ¶ 16.

[36]    *Id.* ¶ 17.

[37]    *Id.* ¶ 18

[38]    *Id.* ¶¶ 18-19.

Doc#: US1:8864898v1

adjustments and liquidity premiums across trade types, without regard to unique valuation issues with respect to particular trades.[39]

- **Lehman inserts MFN provisions in "Framework" settlements:** Citi received its "Framework" offer in the summer of 2011, which it did not accept.[40] A number of the Big Banks did accept their "Framework" offers, however, and Lehman entered into settlement agreements with those banks that contained a Most Favored Nations provision ("MFN").[41] The MFN made it cost-prohibitive for Lehman to settle with any of the Big Banks (including Citi) on terms more favorable than their "Framework" offers. Lehman could only escape the MFN by litigating with a non-settling bank for 18 months—that date came and went on August 18, 2013.[42]

- **Lehman delays bringing this claim objection:** Even then, Lehman did not immediately start the "18 month clock" by objecting to Citi's derivatives claims. Rather, as evidenced by the parties' final tolling agreement, only after Citi threatened in January 2012 to bring a motion to lift the automatic stay to set off its claims against the $2 billion deposit (which would force Lehman to interpose its claim objection) did Lehman finally agree to bring this claim objection simultaneous with the adversary proceeding it proposed to begin over the $2 billion deposit.[43]

- **Lehman's original complaint:** As a result of that agreement, plaintiffs commenced this adversary proceeding on February 8, 2012. Plaintiffs' complaint

---

[39] Derivatives Claims Settlement Framework (May 27, 2011), *available at* http://dm.epiq11.com/LBH/Document#maxPerPage=25&page=1 (follow "Derivatives Claims Settlement Framework" hyperlink) (last visited Sept. 24, 2013).

[40] Mehta Decl. ¶ 19.

[41] Derivatives Claims Settlement Framework § 1.1.

[42] Debtors' Motion for Approval of Settlement Agreements with (i) Bank of America, N.A. and (ii) Merrill Lynch International and its Affiliates, Ex. A (Termination and Settlement Agreement § 13(a)-(b)(i) (Bank of America)), Ex. B (Termination and Settlement Agreement § 12(a)-(b)(i) (Merrill Lynch)), *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 28, 2011), Docket No. 20367. The MFN made settlement cost prohibitive by guaranteeing that, if Lehman settled with a Big Bank for an amount that exceeded that bank's Framework number (a "non-Framework Settlement") before litigating with that bank for 18 months, all banks that had accepted a Framework offer would receive a premium payment equal to the percentage by which the non-Framework Settlement exceeded the relevant Framework offer. For example, if Lehman had agreed to settle Citi's derivatives claims for 30% more than its Framework offer and without litigating for at least 18 months, each bank that accepted the Framework settlement would receive an additional payment of 30% of its Framework number.

[43] Clareman Decl., Ex. 2.

Doc#: US1:8864898v1

alleged that Citi's $1.9 billion in total derivatives claims were overstated by "over $1 billion."[44]

- **Lehman's amended complaint:**  Nine months later, plaintiffs amended their complaint, filing the FAC on November 16, 2012.  The new allegations were not based on any facts uncovered in discovery since no documents—beyond those Lehman had for years from the parties' settlement negotiations—had been produced.  In the FAC, plaintiffs decided to more than "double down" on their derivatives claim objection, alleging that Citi's derivatives claims are overstated by $2.2 billion such that Citi in fact *owes Lehman* $243 million from the termination of these trades.  To support its extreme position, plaintiffs' FAC declares war on the industry-standard liquidated damages provision in the ISDA agreements, arguing that the provision does not mean what it plainly says[45] or, if it does mean what it says, that it is an unenforceable penalty provision.[46]

- **Lehman's "scorched earth" tactics:**  To support Lehman's new, extreme theories, plaintiffs have also pursued a "scorched-earth" litigation strategy in this case.  To take the most extreme example, on April 29 and 30, 2013—after defendants agreed to a thirty-day extension of time to serve third-party subpoenas—plaintiffs served thirty vastly overbroad subpoenas on nearly all of the Big Banks, all third party vendors of derivatives trade data, all major interdealer brokers and trade compression services, and miscellaneous hedge funds, seeking derivatives information over time periods extending from six months to one year.[47]  Citi, by contrast, did not serve a single third-party subpoena, and had been comfortable relying on witness testimony, contemporaneous quotes and screenshots (already shared with Lehman in connection with the Derivative Questionnaire), and contemporaneous market data which both Citi and Lehman had already licensed from vendors to support the reasonableness of Citi's derivatives valuations.[48]

---

[44]   Compl. and Claims Objection ¶ 9, Feb. 8, 2012, Docket No. 1.

[45]   FAC ¶¶ 90-91.

[46]   *Id.* ¶¶ 100-02.  Among other extreme positions, Lehman argues that Citi is not entitled to any bid/offer adjustment on the mid-market value of a terminated trade unless Citi executed a specific replacement transaction.  *Id.* ¶¶ 92-95.  This position ignores the terms of the ISDA (which direct the non-defaulting party to calculate the replacement value of trades whether or not a replacement transaction is executed), standard contract law (providing for replacement value damages upon a breach of contract), and the commercial reality of the derivatives market.  In fact, had Citi actually tried to replace all of its 30,000 trades (with a total notional value of $1.18 trillion), the increased market demand would have substantially increased both the cost of transacting and Citi's damages claim.

[47]   Clareman Decl., Exs. 8-37.

[48]   Clareman Decl. ¶ 2.

Doc#: US1:8864898v1

Given Lehman's responsibility for the duration of this dispute, this Court should have no sympathy for Lehman's current complaint about the further accrual of post-petition interest on Citibank's oversecured claims. The accrual of post-petition interest on oversecured claims is a product of the Bankruptcy Code and state law; it is also a direct by-product of claim objection litigation with an oversecured creditor that Lehman should have expected.

## ARGUMENT

**I.      Plaintiffs' Motion to "Provisionally Allow" Defendants' Claims Has No Basis in the Bankruptcy Code, the Plan of Reorganization, or Other Applicable Law**

Lehman's motion asks for unprecedented relief:  an order compelling Citibank to take a provisional setoff of provisionally allowed claims that will remain subject to continued challenge through litigation.  Authority for this remedy is purportedly drawn from four Bankruptcy Code sections—502(b), 363(b)(1), 509(a), and 105(a)—but plaintiffs' brief does not even attempt to explain how any of these sections apply or provide a basis for the relief sought; they do not.  The other purported grounds cited by Lehman—bankruptcy court precedent and state law—fare no better.  There is no basis for the relief Lehman seeks in either the Bankruptcy Code or Rules, the Plan of Reorganization, bankruptcy court precedents, or other applicable law.

### A.      Nothing in the Bankruptcy Code or Rules Permits Provisional Allowance

Under the Bankruptcy Code, creditor claims generally fall into one of two categories:  allowed or disputed, and if disputed, the claim's allowance (or disallowance) must be adjudicated by the bankruptcy court.  11 U.S.C. § 502(b).  The Bankruptcy Code and Rules recognize only three, narrow circumstances in which a claim may be allowed on a temporary or provisional basis, and none applies here.  First, Rule 3018(a) permits the court to temporarily allow a disputed claim for the sole purpose of permitting a creditor to vote on the plan.  Fed. R. Bankr. P. 3018(a).  Second, Rule 2003(b)(3) permits the United States Trustee to tabulate votes

17

cast by creditors with disputed claims in the election of a trustee or member of a creditors'

committee in a chapter 7 liquidation.  Fed. R. Bankr. P. 2003(b)(3).  Third, Section 331 permits

the court to approve the interim payment of fees for professional services provided to the debtor

which remain subject to clawback and final approval under Section 330.  11 U.S.C. § 331.  None

of these provisions is even arguably germane to plaintiffs' motion, and none operates to alter or

impair the substantive legal rights of creditors as Lehman is trying to do here.[49]

Section 502(b)—relied upon by Lehman—is a bar to, rather than a basis for,

provisional allowance.  Section 502(b) mandates that, "if [an] objection to a claim is made, the

court . . . shall determine the amount of such claim . . . and shall allow such claim in such

amount."  11 U.S.C. § 502(b).  Nothing in this section contemplates, much less permits,

provisional allowance of a creditor's claims.  The statute's instruction is clear:  when a debtor

objects to a claim, that dispute must be resolved by the court's determination of whether the

claim is allowed, and if so, in what amount.[50]

Section 363(b)—relied upon by Lehman—also provides no basis for "provisional

allowance" or "provisional setoff" of Citibank's claims for the simple reason that this Code

provision ceases to apply post-confirmation.  Section 363(b), by its terms, allows trustees to

---

[49]    All three of these sections operate to ensure that the bankruptcy *process* is fair.  The first two prevent debtors
from abusing the provisional disallowance provision of Section 502(b) by strategically objecting to claims from
hostile creditors.  *See Armstrong* v. *Ruston (In re Armstrong)*, 294 B.R. 344, 354 (10th Cir. 2003); *In re
Frascella Enter.*, 360 B.R. 435, 457 (Bankr. E.D. Penn. 2007).  The third ensures that debtors receive quality
legal and professional services by ensuring that the provision of those services does not cause economic
hardship.  *See Amtel, Inc.* v. *Sun Spec Indus. (In re Sun Spec Indus., Inc.)*, 3 B.R. 703, 706 (Bankr. S.D.N.Y.
1980) (explaining that the "primary purpose" of Section 331 "is to alleviate economic hardship of counsel who
otherwise would have to carry the case").

[50]    *See ASM Capital, LP* v. *Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 582 F.3d 422, 429 (2d. Cir.
2009) ("Under section 502(a), such claims are deemed allowed when filed unless a party in interest objects, in
which case section 502(b) requires the court to provide notice and a hearing and then determine the allowable
amount of the claim.").

Doc#: US1:8864898v1

"use, sell, or lease . . . property *of the estate*" outside of the normal course of business.  11 U.S.C.

§ 363(b)(1) (emphasis added).  The Lehman estate no longer exists—the Plan and Confirmation

Order explicitly vested *all* of the Debtors' property in the Reorganized Debtors.[51]  Since there is,

at present, no estate, the $2 billion deposit cannot be "property of the estate," and Section 363(b)

cannot provide a basis for this motion.[52]

>Section 509(a)—relied upon by Lehman—also provides no basis for provisionally

allowing Citibank's claims.  Indeed, Section 509(a) is a subrogation provision that has nothing

whatsoever to do with claim allowance.[53]

---

[51]    The Plan provides that "[u]pon the Effective Date, pursuant to Section 1141(b) and (c) of the Bankruptcy Code,
*all Property of the Estate of a Debtor shall vest in that Debtor* free and clear of all Claims, Liens,
encumbrances, charges and other interests, except as provided herein."  Notice of Filing of Modified Third
Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, Ex. A § 13.1 *In
re Lehman Bros. Holding Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 6, 2011), Docket No. 23023 ("Plan")
(emphasis added).  The Confirmation Order, in slightly different language, states the same.  Order Confirming
Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors
¶ 39, *In re Lehman Bros. Holding Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Dec. 5, 2011), Docket No. 22973
("Confirmation Order").  *See Bell* v. *Bell (In re Bell)*, 225 F.3d 203, 216 (2d Cir. 2000) ("Under 11 U.S.C.
§ 1141(b), the confirmation of a plan vests all of the property of the estate in the debtor.") (internal quotations
omitted).

[52]    *Cf. Rickel & Assocs., Inc.* v. *Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 97-98 (Bankr. S.D.N.Y. 2002)
("The turnover claim is legally insufficient for a more basic reason.  Confirmation vests the property of the
estate in the debtor, unless the plan or confirmation order provide otherwise.  As a consequence, the bankruptcy
estate ceases to exist, and the debtor in possession disappears. . . .  Since there is no estate and no trustee after
confirmation, there can be no turnover.").

But even if plaintiffs could properly invoke Section 363(b) (and they cannot), Section 553 of the Bankruptcy
Code precludes Lehman's attempt to force a "provisional setoff" to limit Citibank's right to further post-petition
interest.  Section 553 provides, in pertinent part, that, except as provided in Section 362 (the automatic stay and
its exceptions) and 363 (setoff as part of credit bidding under Section 363(k)), nothing in Title 11 other than
disallowance shall affect a creditor's pre-petition setoff right.  Unless and until Citibank's claims are disallowed
(not "provisionally allowed," subject to later disallowance), Section 553 prevents Lehman from using Section
363(b) to abridge Citibank's right to the full benefit of its setoff rights.

Further, "[n]othing in the language or relevant subsections of Bankruptcy Code Section 363 . . . provide[] the
Bankruptcy Court with authority to impair the claim satisfaction rights of objecting creditors" and 363(b)
cannot be used "to determine or preempt plan issues," *Contrarian Funds, LLC* v. *WestPoint Stevens, Inc. (In re
WestPoint Stevens, Inc.)*, 333 B.R. 30, 51-52 & n.25 (S.D.N.Y. 2005), *rev'd in part on other grounds*, 600 F.3d
231 (2d Cir. 2010), such as creditors' entitlement to post-petition interest.

[53]    Lehman presumably invokes Section 509(a) because, by this motion, LBHI seeks subrogation to Citibank's
rights against the primary obligors—LBSF, LBCC Asia, LBI, LBCC and LBCS—"to the extent LBHI satisfies

19

Section 105(a)—relied upon by Lehman—likewise provides no basis for the

"provisional allowance" and "provisional setoff" Lehman seeks to compel here.  Section 105(a)

plays a purely supplemental role in the Code; it enables the court to implement the Code's other

express provisions, but does not create any additional substantive rights.  11 U.S.C. § 105(a).  As

the Second Circuit explained:  "[S]ection 105(a) *limits* the bankruptcy court's equitable powers,

which 'must and can only be exercised within the confines of the Bankruptcy Code.'

Section 105 'does not authorize the bankruptcy courts to create substantive rights that are

otherwise unavailable under applicable law, or constitute a roving commission to do equity.'"

*Solow* v. *Kalikow (In re Kalikow)*, 602 F.3d 82, 96 (2d Cir. 2010) (quoting *New England Dairies,*

*Inc.* v. *Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc..)*, 351

F.3d 86, 92 (2d. Cir. 2003)) (emphasis added) (citations omitted).[54]  Because Lehman cannot

identify a single Bankruptcy Code provision that would authorize the "provisional allowance" or

"provisional setoff" of a creditor's claim for the purpose of cutting off a creditor's right to

interest—and no such Code provision exists—plaintiffs cannot invoke Section 105(a) as support

for their motion.

---

the Subject Claims as guarantor."  Pls.' Br. at 15.  While plaintiffs' brief is not particularly clear on this point, if plaintiffs are seeking subrogation rights on the basis of "provisional allowance" and "provisional setoff" of Citibank's claims against the $2 billion deposit, subrogation would appear to be foreclosed by the plain language of Section 509(a).  That section provides that "an entity that is liable with the debtor on . . . a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."  11 U.S.C. § 509(a).  Temporary and conditional satisfaction (subject to clawback) hardly constitutes "payment"—in the ordinary, plain English meaning of that word—for purposes of triggering subrogation rights under Section 509(a).

[54]    *See also Calpine*, 356 B.R. at 590 (cited in plaintiffs' brief at 11-12) (referring to Section 105 as a "back stop" to the substantive rights conferred in Section 363 and stating that Section 105 does not authorize courts to create any additional substantive rights).

Doc#: US1:8864898v1

**B.**    **"Provisional Allowance" Violates the Plan and the Confirmation Order**

In addition to finding no support in the Bankruptcy Code or Rules, the requested

relief is foreclosed by the Plan and Confirmation Order.

Section 9.2 of the Plan directs that, "[n]otwithstanding any other provision hereof

and unless otherwise agreed, *if any portion of a Claim is a Disputed Claim*, no Distribution shall

be made on account of such Claim unless and until such Disputed Claim becomes an Allowed

Claim."  Plan § 9.2 (emphasis added).  Under the Plan, "Allowed Claims" (as relevant here) are

claims that (i) are not Disputed, or (ii) if the claim is Disputed, has been allowed by Final Order.

Plan § 1.4.  "Disputed Claims," on the other hand, include any claim "as to which a timely

objection . . . has been interposed, which objection . . . has not been withdrawn or determined by

Final Order."  Plan § 1.46.  The Plan contemplates that all claims are either "Allowed" or

"Disputed" and does not recognize any intermediate category of "temporarily" or "provisionally"

allowed claims.  Accordingly, a Final Order resolving any objection is required before a

Disputed Claim can become an Allowed Claim, eligible for satisfaction under the Plan.

Because Lehman's motion seeks to preserve all of Lehman's objections to

Citibank's claims, those objections by definition have not been withdrawn or determined by

Final Order.  Citibank's claims would remain Disputed under the Plan, and payment in

satisfactions of these Claims—provisionally or otherwise—is expressly prohibited.  *See* Plan §

9.2; Plan § 4.2(b) ("[E]ach holder of an Allowed Claim in LBHI Class 2 shall be satisfied

by . . . . "); Plan § 6.1(b)(ii) (authorizing LBHI to "make Distributions to holders of Allowed

Claims in accordance with the Plan"); Plan § 8.3 ("[E]ach Debtor shall make a Distribution of its

Doc#: US1:8864898v1

Available Cash in accordance with the provisions of the Plan to holders of Allowed Claims

against such Debtor.").[55]

      The provisions of the Plan are binding on LBHI and, under the Confirmation

Order, LBHI is authorized to make Distributions only "pursuant to, and as provided for in, the

Plan."[56]  Lehman's motion, seeking to provisionally satisfy Citibank's Disputed Claims, thus

amounts to a motion to modify the Plan since the requested relief contravenes Section 9.2 (and

other provisions) of the Plan and would alter the legal relationship between Citibank and LBHI

in a manner that would have a substantive effect on Citibank's payment rights under the Plan.[57]

Pursuant to Section 1127 of the Bankruptcy Code and Section 15.8 of the Plan, LBHI may not

modify the terms of the Plan after it has been substantially consummated.[58]  Here, there can be

no question that the Plan has been substantially consummated.[59]  Accordingly, Lehman's motion

should be denied as an impermissible attempt to modify the Plan post-confirmation.

---

[55]    Although not cited in Lehman's opening brief, we note that Section 9.4 of the Plan also provides no basis for its motion.  Section 9.4 provides that Lehman "shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, settle or otherwise resolve any Disputed Claims in accordance with Section 6.1(b)(i) of the Plan."  The request to provisionally allow and satisfy Citibank's claims, while simultaneously reserving all rights to object to such claims, is not a compromise, settlement, or other form of resolution authorized by Section 9.4 of the Plan.

[56]    Confirmation Order ¶¶ 6, 8; *see also* 11 U.S.C. § 1141 (stating that "the provisions of a confirmed plan bind the debtor").

[57]    *See Findley* v. *Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721 (2d Cir. 1992) (holding that an alteration of creditor's payment rights constitutes a plan modification);  *In re Boylan Int'l, Ltd.*, 452 B.R. 43, 47 (Bankr. S.D.N.Y. 2011) (stating that modification occurs where there is an alteration of the legal relationships among the debtor and its creditors; *see also infra*, Section 3.

[58]    *See, e.g.*, *Ionosphere Clubs, Inc.* v. *Doral Ctr., Inc. (In re Ionosphere Clubs, Inc.)*, 208 B.R. 812, 815 (Bankr. S.D.N.Y. 1997) ("Subsection 1127(b) provides the sole means for modification of the plan of reorganization after it has been confirmed.  Moreover, any modification must take place before it is substantially consummated.") (internal citation and quotation marks omitted).

[59]    The Bankruptcy Code defines substantial consummation as requiring "(A) the transfer of all or substantially all of the property proposed by the plan to be transferred, (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan, and (C) commencement of distribution under the plan."  11 U.S.C. § 1101(2).  The first two

### C.    Controlling Precedent Is Clear that Only Final Payment Operates to Stop the Accrual of Interest

Lehman's requested relief is not only prohibited by the Bankruptcy Code and Rules as well as Lehman's own Plan and Confirmation Order, it is contrary to the very case law Lehman cites as precedent. While it tries to portray "provisional" allowance and satisfaction of claims as an ordinary remedy, the only case Lehman relies on, *Calpine*, 356 B.R. 585, directly undermines Lehman's position. *Calpine* demonstrates the only way a debtor can terminate accrual of post-petition interest on oversecured claims: by paying those claims unconditionally. In that regard, *Calpine* stands for the broader, unanimous principle, found in both federal bankruptcy and state law, that only a final, unconditional payment of the amount owed can have any legal effect on a party's entitlement to interest.

In *Calpine*, noteholders claimed two distinct rights to payment with respect to certain oversecured notes: (i) payment of principal and accrued interest, and (ii) payment under a "make whole" provision designed to compensate noteholders if the debtor chose to repay the notes early. 356 B.R. at 589-90. The debtor did not dispute the noteholders' claim for principal and accrued interest and sought to pay that amount—finally and unconditionally—to stop the accrual of interest on it. *Id.* at 589. The payment would not be subject to further challenge or clawback, and any remaining litigation would be limited to the noteholders' right to the

---

conditions, to the extent applicable, have been satisfied because all property of LBHI's bankruptcy estate has revested with the reorganized debtor and is being managed by LBHI's board of directors or the Plan Administrator. *See* Plan §§ 13.1, 6.1, 7.2 and 7.6; *see also Indu Craft, Inc.* v. *Bank of Baroda (In re Indu Craft Inc.)*, Nos. 11-cv-5996, 11-cv-6303, 11-cv-6304, 2012 WL 3070387, at *14 (S.D.N.Y. July 27, 2012) ("[W]here a plan . . . revests all assets in a reorganized debtor . . . substantial consummation occurs upon satisfaction of only the two conditions set forth in Section 1102(2)(B) and (C).").) The third condition has undoubtedly been met since Lehman will shortly make its fourth interim distribution to creditors. *See* Notice of Fourth Distribution Date and Record Date in Connection with the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Aug. 16, 2013), Docket No. 39492.

Doc#: US1:8864898v1

additional "make whole" payment.  *Id.*  The trustee objected to this proposal, arguing that no

payments should be made until the dispute regarding the "make whole" premium was resolved.

*Id.* at 596.  The court rejected this position in light of the fact that the noteholders' right to

principal and accrued interest was undisputed, the continued accrual of interest on this amount

would harm other creditors, and this portion of the noteholders' claim could be fully resolved

without prejudice to the continuing dispute over the "make whole" payment.  *Id.* at 597.[60]

       What Lehman proposes here, however, is the polar opposite of *Calpine*.  Unlike

*Calpine*, Lehman's proposed payment is not final; indeed, the "provisional setoff" is explicitly

subject to clawback.  While *Calpine* provides no support for Lehman's motion, it does suggest

the route Lehman should have chosen to address concerns about the further accrual of post-

petition interest:  plaintiffs should agree to allow and satisfy those portions of Citibank's claims

as to which there is no credible basis for objection, and post-petition interest would then stop

accruing on those amounts.[61]  However, Lehman has made a different choice, deciding to "go for

---

[60]    The Second Circuit's recent decision in the American Airlines bankruptcy, which also concerns a dispute over a
make-whole provision, further underscores that only full and final payment of a debt can terminate a debtor's
interest obligation.  *See U.S. Bank Trust Nat'l Assoc.* v. *AMR Corp. (In re AMR Corp.)*, --- F.3d ---, 2013 WL
4840474 (2d Cir. Sept. 12, 2013).  Citing historically low interest rates, the debtors in *AMR* obtained authority
during the bankruptcy case to procure $1.5 billion in post-petition financing in order to "indefeasibly repay"
certain prepetition secured notes that were accruing interest at higher rates.  *Id.* at *1, 3; Motion of Debtors for
Order Pursuant to 11 U.S.C. §§ 105(a), 362, 363, 364, 503(b) and 507 and Fed. R. Bankr. P. 4001 and 6004 (i)
Authorizing Debtors to Obtain Postpetition Secured First Priority Aircraft Financing and Grant Security
Interests and Liens with Respect Thereto, (ii) Authorizing Debtors to Repay Existing Prepetition Debt Relating
to Certain Aircraft and (iii) Granting Related Relief at 2, 7-8, *In re AMR Corp.*, Nos. 13-cv-1204, 13-cv-1207,
13-cv-1208 (Bankr. S.D.N.Y. Oct. 9, 2012), Docket No. 4959 (the "AMR Motion").

[61]    For example, there is no credible basis for LBHI to object to the amount due on the LBCC Asia Loan.  No such
objection is raised in the FAC.  The only objection raised in the FAC with respect to this claim is the general
objection Lehman has interposed to all of Citibank's claims:  that the claims are not secured by—and cannot be
set off against—the $2 billion deposit because it is allegedly a "special deposit" unavailable for setoff against
all of Citibank's unsecured claims.  As weak as Lehman's "special deposit" argument is, it has no relevance to
the LBCC Asia Loan Claim.  As Citibank has pointed out to Lehman on numerous occasions, the LBHI
guarantee for the LBCC Asia Loan explicitly provides that Citibank has the right to setoff amounts due under
the loan against "any and all deposits (general or special, . . .)" of LBHI.  *See* Clareman Decl., Ex. 6, Guaranty
made by Lehman Brothers Holdings Inc. in favor of Citibank ¶ 8 (Aug. 30, 2007).  Therefore, even if (contrary
to fact) the $2 billion were a "special deposit," Citibank could still set off its LBCC Asia Loan Claim against

24

broke" in its claims objection, thereby significantly delaying resolution of all of Citibank's

claims.  The continuing accrual of post-petition interest is simply a predictable consequence of

this approach.

New York law aligns precisely with bankruptcy law in rejecting the arrangement

Lehman proposes.[62]  Under New York law, tendered payments must be unconditional to be

effective.  *See Tanger* v. *Ferrer*, 853 N.Y.S.2d 316, 317 (1st Dep't 2008) (stating that tender

offers made under CPLR 3219 "must be unconditional"); *Michaels* v. *U.S. Tennis Assoc.*, 744

N.Y.S.2d 375, 375 (1st Dep't 2002) ("Absent an unconditional tender of payment of a judgment,

postjudgment interest continues to accrue.").  Nearly any condition, no matter how subtle, is

enough to prevent a tender offer from terminating the right to further interest accrual.  *See*

*Garigen* v. *Morrow*, 757 N.Y.S.2d 422, 422 (4th Dep't 2003) (holding that a tender of payment

was legally ineffective even when the condition was only "implicit[]").  Lehman's conditional

---

that deposit.  One would have thought Lehman would have attempted long ago to limit its interest exposure by allowing this Citibank claim and its setoff against the $2 billion deposit.

Similarly, plaintiffs' original claim objection alleged that Citi's $1.9 billion of derivatives claims were inflated by "more than $1 billion."  While Citi vehemently disputes the charge that its derivatives claims are inflated, plaintiffs' initial claim objection clearly implied that a very sizable portion of Citi's derivatives claims was not disputed.  Lehman might also have sought to settle that undisputed portion of the derivatives claims—thereby ending any further accrual of post-petition interest on that amount—while continuing to challenge and litigate over the remainder.  Instead, nine months later plaintiffs decided to "double down" on their derivatives claim objection and advance outlandish theories to support new arguments that Citi's claims are inflated by $2.2 billion, such that Citi in fact owes Lehman $243 million.

[62]  New York law provides that, under certain circumstances, an unconditional tender of payment by the defendant can terminate a plaintiff's right to further interest accrual.  Whether those rules apply in federal court, however, presents a complicated *Erie* question.  *See Goldberg* v. *Pac. Indem. Co.*, 627 F.3d 752, 757 (9th Cir. 2010); *MPEG LA, L.L.C.* v. *Dell Global B.V.*, No. 7016-VCP, 2013 WL 812489, at *5-7 (Del. Ch. Mar. 6, 2013).  That issue does not need to be resolved, however, because plaintiffs' conditional offer—and the "provisional" satisfaction that plaintiffs' propose—does not remotely satisfy the requirements to terminate interest accrual under New York law.

Doc#: US1:8864898v1

offer, one expressly made subject to potential clawback, falls far short of what the cases require, and would therefore have no effect under New York law.[63]

### D.    Lehman's Collateral Disposition Agreement with JPMorgan Provides No Precedential Authority for the Provisional Relief Requested

Lehman invokes the CDA between LBHI and JPMorgan as some sort of precedential authority for the relief sought here.  But the CDA is readily distinguishable—the most obvious difference being that the CDA was a consensual arrangement, while plaintiffs seek to impose one facet of the CDA, provisional allowance and setoff, on Citibank against its will. The other obvious difference between Lehman's proposal and the CDA—a difference which no doubt explains the consensual nature of the CDA—is that JPMorgan received substantial benefits under that agreement.  Most notably, JPMorgan received a payment of $557 million from LBHI in exchange for illiquid securities (of doubtful value) that JPMorgan had been holding as security for its claims.[64]  The benefit to JPMorgan was obvious:  JPMorgan received cash in exchange for

---

[63]   The cases Lehman cites in its brief do not contradict the clear rule that full and final payment is required to terminate further interest accrual under New York law.  *Kochisarli* v. *Tenoso*, No. 02-cv-4320, 2008 WL 1882662, at *5-6 (E.D.N.Y. Apr. 24, 2008) (cited Pls.' Br. at 13), for example, does not "tacitly support[ ]" the proposition that provisional setoff should terminate Citibank's right to interest.  That case held that placing funds in an escrow account does *not* terminate interest because the party due to receive the funds did not have access to them.  *Id.*  Nothing in the case suggests that access alone is sufficient to cut off interest, or that a conditional payment subject to clawback would suffice.  *Litwik* v. *Wolkenberg*, 515 N.Y.S.2d 559, 560 (2d Dep't 1987) (cited Pls.' Br. at 14), applied the unconditional tender rule in finding that defendants' right to interest was terminated when they refused plaintiffs' tender of bank checks for the full amount of principal and interest accrued up to the date of the tender.  *Id.* at 631-32.  There is no suggestion that anything less than full and unconditional payment would have been enough to halt the further accrual of interest.  *Northerly Corp.* v. *Hermett Realty Corp.*, 240 N.Y.S.2d 709 (1st Dep't 1963), *aff'd*, 13 N.Y.2d 1137 (1964) (cited Pls.' Br. at 14-15), also plainly supports the unconditional tender rule.  That case involved two different tender offers by the same party, one with conditions—it would remain subject to further legal challenge—and the other without.  13 N.Y.2d at 1137.  The court ruled that only the unconditional offer had any legal effect.  240 N.Y.S.2d at 709.

[64]   *See* Debtors' Motion Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Approval of Collateral Disposition Agreement with JPMorgan Chase Bank N.A., *et al.* ¶ 24, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Feb. 24, 2010), Docket No. 7269 ("CDA Motion"); Tr. of March 17, 2010 Hearing re: Debtors' Motion for Approval of Collateral Disposition Agreement with JPMorgan Chase Bank, N.A., *et al.* at 62:6-10, *In re Lehman Bros. Holdings Inc.*, No. 08-1355 (Bankr. S.D.N.Y. Mar. 19, 2010), Docket No. 7703 ("CDA Hearing Transcript").

26

distressed and illiquid securities that, according to objective observers, were at that time worth far less than the cash received.[65]  Further, JPMorgan was relieved of any duty to manage those securities, thereby eliminating the associated risk that Lehman would complain that JPMorgan had mismanaged them.[66]  The CDA also provided JPMorgan with the right to reallocate its setoffs—$20 billion of which it had already exercised before the CDA was signed.[67]  The agreement thus ensured that JPMorgan would not lose the right to use collateral simply because the claim against which it had been set off was later disallowed.

In exchange for these substantial benefits, JPMorgan agreed that no further post-petition interest would accrue on its claims.  By contrast, Lehman's proposal to Citibank and the relief requested by this motion provide absolutely no benefit to Citibank.  It is simply disingenuous to argue, as plaintiffs have, that this motion resembles in any material respect what the Court approved in connection with the consensual CDA.

## II.    Equitable Considerations Do Not Support Plaintiffs' Motion, as the Relief Requested Is Manifestly Unfair to Defendants

Lacking any legal foundation, Lehman invokes "fairness" as justification for its motion.[68]  Lehman claims that Citibank is asserting a right to interest at "exorbitant rates" and is

---

[65]    For example, at the hearing on LBHI's motion to approve the CDA, counsel for the LBI SIPA Trustee stated that the illiquid collateral to be transferred had "very little value," and "if JPMorgan were to liquidate [the collateral], there would be a substantial deficit that would still be owing to JPMorgan."  CDA Hearing Transcript at 62:6-10.

[66]    See CDA Motion ¶ 21 ("The Securities Collateral requires long-term, active and effective management.  LBHI believes that in the current poor economic environment, a forced liquidation of the illiquid Collateral would result in highly diminished recoveries to the detriment of all parties."); id. ¶ 27 ("The Securities Collateral is illiquid and requires long-term management to enhance recoveries.  LBHI and the Debtors are best equipped to fulfill this objective.").

[67]    The CDA provided that any collateral against which a claim had been set off could be "reallocated and applied by a JPMC Entity to an unpaid Claim . . . that has not been disallowed, avoided or invalidated."  CDA Motion ¶ 24.

[68]    Pls.' Br. at 4.

Doc#: US1:8864898v1

"using the potential of post-petition interest as leverage against the estate."[69]  Thus, Lehman

argues, the "practicalities of this litigation, including its expected duration, justify provisional

allowance and satisfaction of the Subject Claims," so as to cut off Citibank's further right to

post-petition interest.[70]  Lehman asserts that Citibank will not be prejudiced because it can "use

the $2 billion in whatever way it sees fit" after the provisional set off.[71]  These arguments are

baseless, and the equitable considerations run entirely in Citibank's favor.

Contrary to Lehman's allegations, the interest Citibank seeks is not remotely

"exorbitant."[72]  The highest rate Citibank seeks on its oversecured claims is the rate mandated in

the industry-standard ISDA Master Agreement:  Citibank's cost of funds plus one percent.[73]  In

fact, Lehman is seeking to recover interest on amounts allegedly owed by its derivatives

counterparties based on this same contractual rate.  In the pending adversary proceedings under

the caption *Lehman Brothers Special Financing Inc.* v. *Bank of America* (No. 10-03547 (JMP))

(Bankr. S.D.N.Y.) (also known as the "flip clause" litigations), Lehman seeks interest using the

ISDA formula:  cost of funds plus one percent.  We understand Lehman claims, pursuant to this

formula, that it is entitled to interest of as much as 14%[74]—a rate vastly higher than would apply

---

[69]    *Id.* at 2, 4.

[70]    *Id.* at 11.

[71]    *Id.* at 4.  Lehman's argument that, following a provisional setoff, Citibank will be free to "use the $2 billion deposit in whatever way it sees fit," subject to clawback at a later date, ignores commercial reality.  Mehta Decl. ¶ 21.

[72]    *Id.* at 2.

[73]    *See* 1992 ISDA Master Agreement §§ 6(d)(ii), 14 (definitions of "Applicable Rate" and "Default Rate").

[74]    Martin Z. Braum, *Lehman Reached Beyond Grave Seeking Millions from Nonprofits*, Bloomberg (May 14, 2013, 11:20 AM), http://www.bloomberg.com/news/2013-05-14/lehman-reaches-beyond-grave-to-grab-millions-from-nonprofits.html.  Citibank has also seen evidence that, in certain contexts, Lehman is claiming interest on derivatives claims at a rate of 9%—a rate that is also vastly higher than would apply to Citibank.

28

to an A-rated company like Citibank.[75]  When defendants in the pending flip clause litigations

objected to Lehman's repeated requests to stay those litigations—specifically complaining that

Lehman was using the threat of post-petition interest as settlement leverage, and asking the court

to terminate Lehman's right to further interest, if any, to the extent a further stay was granted[76]—

Lehman vigorously defended its right to this interest.  Lehman argued that the interest it was

charging was "based on [its] cost of funds," as "specifically provided for in the ISDA master

agreement."[77]  Lehman's argument that Citibank's much lower rate, calculated under the self-

same provision, is somehow "exorbitant" or creating unfair settlement "leverage" is simply

hypocritical.  Apparently, for Lehman, interest is only improper when someone else earns it.

Further, Lehman cannot conceivably complain—unlike the defendants in the flip

clause litigations—that Citibank is responsible for the timing and duration of this litigation.

Citibank has always sought an early resolution of this dispute on reasonable terms.  It was

Lehman that waited three years to bring this action; it was Lehman that broke off bi-lateral

---

[75]   Fitch Long Term Issuer Default Rating (Bloomberg, Sept. 23 2013).

[76]   Tr. of July 17, 2013 Hearing re: Motion of Lehman Brothers Holdings, Inc., Pursuant to Section 105(a) of the
Bankruptcy Code and Bankruptcy Rule 7004(a)(1), to Extend Stay of Avoidance Actions and Grant Certain
Related Relief at 26:5-18, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y.); Objection of
U.S. Bank National Association, as Trustee, to Motion of Lehman Brothers Holdings Inc. Pursuant to Section
105(a) of the Bankruptcy Code and Rule 7004(a)(1), to Extent Stay of Avoidance Actions and Grant Certain
Related Relief ¶ 12, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. July 3, 2013), Docket
No. 38414; Objection of U.S. Bank National Association, as Trustee, to Joint Motion of Lehman Brothers
Holdings Inc. and Litigation Subcommittee of Creditors' Committee, Pursuant to Section 105(a) of the
BankruptcyCode, to Extend Stay of Avoidance Actions ¶ 12, *In re Lehman Bros. Holdings Inc.*, No. 08-13555
(Bankr. S.D.N.Y. July 11, 2012), Docket No. 29343; Objection of the Nebraska Investment Finance Authority
to Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1) to Stay
Avoidance Actions and Grant Certain Related Relief ¶¶ 22-26, *In re Lehman Bros. Holdings Inc.*, No. 08-13555
(Bankr. S.D.N.Y. Oct. 13, 2010), Docket No. 11960.

[77]   Tr. of July 18, 2012 Hearing re: Joint Motion of Lehman Brothers Holdings Inc. and Litigation Subcommittee
of Creditors' Committee to Extend Stay of Avoidance Actions at 17:23-18:1, *In re Lehman Bros. Holdings,
Inc.*, No. 08-13555 (Bankr. S.D.N.Y. July 20, 2012), Docket No. 29594; *see also* Omnibus Reply in Support of
Joint Motion of Lehman Brothers Holdings Inc. and Litigation Subcommittee of Creditors' Committee,
Pursuant to Section 105(a) of the Bankruptcy Code, to Extend Stay of Avoidance Actions ¶ 11, *In re Lehman
Bros Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. July 16, 2012), Docket No. 29409.

negotiations with Citi to pursue the mechanical, one-size-fits-all Framework approach; it was

Lehman that contractually disabled itself (by virtue of the MFN clause in other derivatives

settlements) from resolving this dispute without litigating with Citibank for more than 18

months; and it has been Lehman that has pursued increasingly extreme legal theories to support

increasingly over-reaching arguments.  Lehman's current position—that Citi's $1.9 billion in

derivatives claims are overstated by more than $2.2 billion, and that Citi in fact owes Lehman

$243 million, notwithstanding the fact that Citi's overall derivatives positions facing Lehman

was significantly in-the-money as Lehman itself alleges in the FAC that the market moved $150

million *in Citi's favor* from September 12 to September 15, 2008[78]—has only served to move the

parties farther apart.  Lehman's efforts to substantiate its extreme legal theories, including

serving 30 subpoenas on non-parties seeking virtually every piece of market data pertaining to

derivatives over a six-month period, will only expand the scope of discovery and delay

resolution of Citi's claims.

Lehman has always known that Citibank is a secured creditor, yet, by these

tactics, it has made the strategic decision to postpone resolution of Citibank's claims.  The

predictable result is the continued accrual of post-petition interest on Citibank's claims.  There is

no basis in law or equity for the Court to relieve Lehman of its self-inflicted injury and in the

process deprive Citibank of its statutory and contractual rights without any compensating benefit.

### III.    Plaintiffs' Extraneous Arguments About Citibank's Right to Post-Petition Interest Lack Merit

Lehman's brief contains numerous arguments in support of its litigation position

that Citibank is not entitled to any post-petition interest.  These arguments are entirely

---

[78]    FAC ¶ 4.

Doc#: US1:8864898v1

extraneous to this motion and, to the extent Lehman had confidence in *any* of them, this motion

would be unnecessary.  Lehman, however, claims to include these arguments to demonstrate that

"there is a significant dispute concerning Citibank's entitlement to post-petition interest."[79]

Lehman contends that the "divergence" of the parties' positions with respect to interest, in itself,

somehow justifies cutting off further accrual of post-petition interest on Citibank's claims.[80]  Of

course, the parties' "divergent" views cannot possibly justify relief that has no basis in—and

would contravene—the Bankruptcy Code, the Bankruptcy Rules, the Plan, and other applicable

law.  Lehman's arguments on the merits of Citibank's right to interest (all of which are, indeed,

vigorously disputed by Citibank) are irrelevant to its motion and should be disregarded by this

Court.

We will, however, briefly address Lehman's new argument that Section 8.4 of the

Plan somehow restricts Citibank's rate for post-confirmation interest to "the rate that LBHI

earned on account of the distribution reserve established under the Plan for such Disputed

Claims."[81]  This argument, which Lehman never raised in previous discussions on this issue, is

manifestly wrong based on the clear terms of the Plan, and we dispose of it briefly here.

*First*, Lehman's reliance on Section 8.4 of the Plan is misplaced, because that

section applies only to unsecured claims.  It obligates the Debtors to reserve "Available Cash" to

pay out Disputed Claims that do not become allowed until post-confirmation.  "Available Cash"

is defined by the Plan as "all cash of a Debtor . . . *less* the amount of Cash (i) necessary to pay

holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax

---

[79]    Pls.' Br. at 9.

[80]    *Id.* at 11.

[81]    *Id.* at 10.

31

Claims, *Secured Claims*, Convenience Claims and Convenience Guarantee Claims . . . ."  Plan

§ 1.5 (emphasis added).  If secured claims could only be paid from this definition of Available

Cash, the formula would be circular and unintelligible.  Section 8.4 and the post-confirmation

interest rate it establishes for Disputed Claims have no relevance to Citibank's secured claims.

    ***Second***, plaintiffs' interpretation of Section 8.4 cannot be squared with

Section 4.2(b) of the Plan, which expressly sets forth the treatment of secured creditors.  The

Plan states that Allowed Secured Claims will be paid "in full."  Plan § 4.2(b).  Courts have

recognized that language providing for "full payment" means that creditors should expect to

receive every part of their claims, including both pre- and post-confirmation interest.[82]  A

secured creditor's reliance on Section 4.2(b) as providing for payment "in full"—including all

interest components—is the only reasonable interpretation, particularly in light of the Plan's

drafting history.  LBHI's original Plan, filed in March 2010, permitted LBHI to satisfy secured

claims by "payment in Cash by LBHI in an amount equal to the Allowed amount of such

Secured Claim . . . ."[83]  However, the "Allowed" amount was defined to exclude any interest

from the petition date,[84] which would have violated black letter law concerning the right of

secured creditors to recover interest.  LBHI's First Amended Plan, filed in January 2011,

addressed this defect and modified Section 4.2(b) to provide secured creditors "payment in Cash

---

[82]  *See, e.g.*, *Fawcett* v. *United States (In re Fawcett)*, 758 F.2d 588, 591 (11th Cir. 1985) (holding that creditors are entitled to interpret a plan's statement that all secured claims were to be "paid in full-100%" as guaranteeing "the payment of each and every part of the creditor's claim"); *Terex Corp.* v. *Metro. Life Ins. Policy (In re Terex Corp.)*, 984 F.2d 170, 174 (6th Cir. 1993) (interpreting plan to require payment "in full" and ordering payment of post-confirmation interest); *United States* v. *Arrow Air, Inc. (In re Arrow Air)*, 101 B.R. 332, 334-36 (S.D. Fla. 1989) (same).

[83]  Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors § 4.2(b), *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. March 15, 2010), Docket No. 7572.

[84]  *Id.* § 1.64.

32

Doc#: US1:8864898v1

by LBHI in full . . . ."[85]  By revising Section 4.2(b) to require payment "in full," LBHI

demonstrated that it would satisfy secured creditors' claims, including all interest due.

Section 8.4, by its terms, does not limit the rate of post-confirmation interest due

to a secured creditor.  But even if Section 8.4 were found to be at all ambiguous on this score

(and it is not), that ambiguity would be construed against the debtors.  Where, as here, a Plan

provides that secured creditors will be paid "in full," debtors are required to specifically detail

any exception in order to put secured creditors on notice, which did not happen here.[86]  The Plan

does not limit Citibank's right to—or rate for—post-confirmation interest.

---

[85]   First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors § 4.2(b), *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 25, 2011), Docket No. 14150.

[86]   *See Fawcett*, 758 F.2d at 591 ("If the debtor wished to be more specific and secure a confirmed plan that modifies the plain language of a 100% payment guarantee, it is the debtor's duty to put the creditor on notice by specifically detailing any exceptions.  Failing this, the debtor as draftsman of the Plan has to pay the price if there is any ambiguity about the meaning of the terms of the Plan.").

33

## CONCLUSION

For the foregoing reasons, defendants respectfully request that plaintiffs' motion

be denied.

Dated:   New York
         October 2, 2013

                                    PAUL, WEISS, RIFKIND, WHARTON &
                                      GARRISON LLP

                                    By:        */s/ Claudia L. Hammerman*
                                              Stephen J. Shimshak
                                              Claudia L. Hammerman


                                    PAUL, WEISS, RIFKIND, WHARTON &
                                    GARRISON LLP
                                    1285 AVENUE OF THE AMERICAS
                                    NEW YORK, NEW YORK  10019-6064
                                    chammerman@paulweiss.com

                                    *Attorneys for Citi Defendants*

Doc#: US1:8864898v1

# Exhibit F

Page 1

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 4   In re:

 5                                      08-13555(JMP)

 6   LEHMAN BROTHERS HOLDINGS INC.,     (Jointly Administered)

 7   et al.,

 8                 Debtors.

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In re:

11                                      08-01420(JMP)(SIPA)

12   LEHMAN BROTHERS INC.,

13                 Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   In re:

16                                      12-10063(JMP)

17   LEHMAN BROTHERS AUSTRALIA

18   LIMITED,

19                 Debtor.

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25
```

Page 2

1   LEHMAN BROTHERS HOLDINGS

2   INC., et al.,

3                    Plaintiffs,

4        v.                          12-01044(JMP)

5   CITIBANK, N.A., et al.,

6                    Defendants.

7   - - - - - - - - - - - - - - - - - - - - - - - - - x

8   LEHMAN BROTHERS HOLDINGS

9   INC., et al.,

10                   Plaintiffs,

11       v.                          13-01431(JMP)

12  DR HC TSCHIRA BETEILIGUNGS

13  GmbH & Co. KG,

14                   Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - - - x

16  FIRST BANK PUERTO RICO,

17                   Plaintiff,

18       v.                          10-04103(JMP)

19  BARCLAYS CAPITAL, INC.,

20                   Defendant.

21  - - - - - - - - - - - - - - - - - - - - - - - - - x

22                   U.S. Bankruptcy Court

23                   One Bowling Green

24                   New York, New York

25

1          THE COURT:  Good morning.

2          MR. KIRPALANI:  Good morning, Your Honor, for the

3    record Sushell Kirpalani of Quinn Emanuel Urquhart &

4    Sullivan speaking for efficiency sake on behalf of the

5    Lehman estates, and technically we're here as counsel to the

6    committee, but we're working on behalf of both fiduciaries,

7    Your Honor.

8          It's been a long time since I had the pleasure of

9    appearing before the Court in this case, and I hope Your

10   Honor understands that I've become reengaged recently with

11   the hope of resolving some of the big last disputes.

12         With me in the courtroom are my colleagues from

13   Quinn Emanuel, but also Mr. Matt Cantor (ph), head of legal

14   affairs and a member of the board of reorganized Lehman.

15         We actually took the morning off from tending to

16   another matter, but we'll be going back to that mediation

17   after court, Your Honor, and we are here today to express

18   our sincere wish that we can bring this as well as other

19   matters to a close.  We're very focused on trying to resolve

20   and not litigate remaining big issues.

21         Frankly we had hoped -- I had hoped over a month

22   ago that we might be here on a motion to approve an interim

23   pragmatic solution to deal with an interesting, unique

24   situation where Citibank is holding $2 billion of cash and

25   saying that it doesn't have the ability to use it.

Page 21

1          So we're here today on Lehman's motion to permit

2     Citibank to take the $2 billion it has been holding and to

3     make some productive use of it thereby cutting off any

4     arguments concerning additional post-petition interest.

5          In opposition Citibank set up a fiction, namely

6     that a creditor has an absolute right to sleep peacefully at

7     night with an unconditionally allowed claim and a full

8     release of any counterclaims or else he can assert post-

9     petition interest as a secured creditor by right of setoff.

10          If Citi were right in that fiction then every

11     creditor who is owed money by an estate who's also sued by

12     the estate would be a secured creditor and be able to charge

13     post-petition interest until he gets a release.  That can't

14     be right.

15          Sure you can imagine numerous situations, Your

16     Honor, where a claim objection results in the secured

17     creditor charging post-petition interest until he actually

18     gets the money.  That would compensate the creditor for

19     being without access to the funds.

20          Where a secured creditor is owed money and not

21     given the money it would be unfair to let the debtors keep

22     it, use it while the creditor is stuck waiting.

23          And even if he has a lien on property he wouldn't

24     be permitted to liquidate that collateral and use those

25     proceeds either.  He's just stuck between a rock and a hard

Page 22

1    place and 506(b) fills in that injustice.

2              So the Bankruptcy Code gives him compensation for

3    that, but neither of those situations actually apply to this

4    unique situation for Citibank.

5              Your Honor, can I just approach, I want to give

6    you one piece of paper?  Is that --

7              THE COURT:  That's fine.

8              MR. KIRPALANI:  Okay.

9              THE COURT:  Thank you.

10             MR. KIRPALANI:  Your Honor, this is Citibank's

11   account statement, which we get one of these every month.

12   You can see it, it says this one is from June 28th, 2013,

13   it's got a QSIP, a security ID with a certain number, it

14   says in the issue name dollars on deposit cash account, and

15   then a couple of places over it says where it's held, at the

16   Citibank vault.  Okay?  Two billion plus is in there.

17             Your Honor may recall that in April 2009 there was

18   a stipulation where Citi was required to hold Lehman's cash

19   in a custodial account.  This statement in fact shows us, or

20   so we thought until we saw their opposition to this motion,

21   that the funds were sitting in the vault and really just

22   wasting away, just sitting there.  But the estate could not

23   use that money or distribute it to its creditors obviously

24   because we're probably not got for the money if we wound up

25   losing our litigation.

1           So it was basically held hostage to a variety of

2    over inflated claims by Citi, so Citi was not going to let

3    that money go.

4           When Lehman emerged from bankruptcy there was a

5    significant change of the guard at Lehman.  The main event

6    affording a consensual global Chapter 11 plan was

7    accomplished and the estates had been trying to wind down

8    and clean up the affairs.

9           Now various seasoned bankruptcy veterans joined

10   the board, assumed positions of leadership within Lehman,

11   and they asked what could be done to insure that estate

12   assets were not just wasting away somewhere?

13          So we thought cash in a vault at Citibank that

14   just sits there while Citi's, we believe, inflated claims

15   are resolved seems to be a poor use of $2 billion.

16          So we then understood that Citi is asserting,

17   despite the fact that their claims exceeded $2 billion, that

18   they may be over secured if we succeed in knocking down

19   their claims.  So that doesn't make sense either.

20          But we were never told whether Citibank was using

21   the cash or not, so the board told us at a minimum make sure

22   they start using it now so we can cut off any interest

23   arbitrage they may be playing, because we earn 0.02 percent

24   interest, and they are asserting who knows something 7

25   percent plus in post-petition interest.

1          So we asked them to take the cash and we'll just

2     sue them like any counterclaim defendant.  They said no,

3     they preferred to assert a right to post-petition interest

4     for the next year and a half while we litigate the right

5     amount of their very complicated claims.

6          Of course if they're right in the way they assert

7     their claims they'd get no post-petition interest because

8     they'd be under secured.

9          But the trick is if we are right and their claims

10    are overstated then Citi laughs all the way to their own

11    vault.

12         So we filed this motion seeking to pay them down

13    but to reserve our rights to sue them if they were wrongly

14    holding our money all this time.  We'll take the credit risk

15    that Citi is good for the money.

16         THE COURT:  I think that's a good credit risk.

17         MR. KIRPALANI:  Okay.  We expected them to say

18    frankly as JPMorgan --

19         THE COURT:  I hope it's a good credit risk.

20         MR. KIRPALANI:  We expected them to say as

21    JPMorgan did, Your Honor, that yeah, that probably makes

22    sense.

23         It's not perfect, we're not saying this is the

24    perfect solution for them either, but it just makes sense

25    and it's equitable.  They can invest the money.  We thought

Page 25

1    they'd say, okay, we'll invest the money and there's no

2    point in holding that amount of cash in the vault.

3              But then look what they actually say in their

4    opposition of this motion, which frankly was a surprise to

5    everybody at Lehman.  Not only -- especially in light of the

6    one page I gave Your Honor.

7              Not only do they admit that they want the interest

8    rate arbitrage, because Lehman deserves punishment for

9    spending all of its energy on global issues these past few

10   years rather than caring about Citibank's entitlement to get

11   paid, but this is really quite shocking, that there's no

12   money in the vault at all.

13             But what did they do with the cash?  They say they

14   never sought to lift the automatic stay, they say they never

15   sought permission to setoff, but what did they do that we

16   don't know, it's really of no moment, we don't think, but we

17   think they took the cash, they put down their marker

18   instead, and they've enjoyed the use of the cash probably

19   since April 2009 since that stipulation.

20             And so that's why they come to court now and they

21   say giving us the cash does nothing for it, it serves us no

22   benefit, because they've already been enjoying that benefit.

23             And they submit some affidavit, Your Honor, which

24   I don't think we're going to be getting into in detail,

25   saying that there's a bunch of accounting rules that I don't

Page 26

```
 1    think have any place in this courtroom about how a creditor

 2    accounts for its risks and reserves, and frankly that's up

 3    to each creditor.  Every creditor that's sued by an estate

 4    has to deal with taking reserves against what they think is

 5    appropriate and what they think management believes is

 6    reasonable.

 7            But what they're saying in essence is we don't get

 8    anything by exchanging our we're holding your money hostage

 9    setoff right for a pay down because we already treat the

10    money as our own and we do with it as we please.  And that

11    was news when we read the affidavit.

12            But until and unless you release us from potential

13    claims they say or give us a peaceful night sleep they say

14    we will assert we are owed post-petition interest and that's

15    going cost you at least $400,000 a day.

16            This is inequitable to the creditors of Lehman,

17    Your Honor, so we request -- we respectfully request that

18    our motion be granted.

19            I'd like to just touch briefly on the -- some of

20    the points in the motion, I know Your Honor and I know your

21    staff has reviewed our authorities, but I'm going to be

22    perfectly blunt and frank, Your Honor, there are no

23    significant controlling -- certainly no controlling

24    authorities, and there really aren't that many significant

25    authorities for this fact pattern.
```

1          Calpine we do think --

2          THE COURT:  Can I break in no a second --

3          MR. KIRPALANI:  Uh-huh.

4          THE COURT:  -- because I have looked at the

5     Calpine order from 2006 and the Calpine transcript attached

6     to your most recently filed papers, and I'm also generally

7     familiar, although it's certainly not an authority, it's

8     just my experience as a mediator in another major case which

9     is currently pending in this district, where issues relating

10    to the pay down of significant cash owed to a creditor

11    constituency represented one possible way to deal with a

12    claim for post-petition interest.

13         And so I'm not talking in code for purposes of the

14    transcript, I'm referring to the Rescap bankruptcy case and

15    the current dispute with holders of junior secured notes.

16    That matter is currently on trial before Judge Glenn.

17         And so I recognize that there is a convention -- I

18    wouldn't call it precedent, in major bankruptcy cases for

19    parties in interest, especially unsecured creditors, to make

20    the business judgment, together with the trustee or debtor

21    in possession, to pay down undisputed secured obligations so

22    as to stop the running of interest that may be ticking away

23    at significantly high rates thereby making the pay down a

24    prudent business judgment.

25         The situation we're in now is probably

Page 28

1    unprecedented in that it's about five years after the

2    posting of $2 billion in cash collateral that I understand

3    was placed in a Nassau branch of Citi, I don't know what

4    happened to that cash thereafter, I don't know that I need

5    to know that for these purposes, but Mr. Shimshak, if he

6    wishes, can tell me about it.

7            And I am reminded of other comparable situations

8    in this case, some of which have ripened into litigation or

9    some of which have ripened into stipulations.

10           One comparable situation involved JPMorgan Chase,

11   a stipulation relating to the treatment of their claim.

12           Another comparable situation involves Bank of

13   America where we had litigation over the posting of half a

14   billion dollars in an account in the Cayman Islands and a

15   determination that I made that there was a stay violation in

16   offsetting those funds.

17           I don't know to what extent there are any reserved

18   rights on the part of the estate in reference to what Citi

19   has done with the $2 billion, and I'm not predicting nor

20   suggesting that anything needs to be done, but I recognize

21   the possibility that certain claims might be made.

22           So with that background, recognizing that there is

23   authority that can be looked to by analogy, I think we're

24   probably dealing with a unprecedented set of facts.

25           MR. KIRPALANI:  I agree with that, Your Honor.

```
 1              And I want to just address one legal issue and

 2      then I think I'll sit down and Your Honor can hear what the

 3      opposition is.  It's the 105(a) argument.  I actually argued

 4      the New England Dairies case in the Second Circuit, it's my

 5      rare opportunities to do that.

 6              New England Dairies doesn't say that 105(a)

 7      doesn't have any import.  What it says is it's supposed to

 8      fix the play and the joints.  It can't stand alone.  It

 9      needs to be coupled with something.

10              So I'm sure Mr. Shimshak is going to attack us on

11      what's it's coupled with.  He'll say Section 363 doesn't

12      apply, he'll say we're post-confirmation, he'll say we're

13      post-effective, he'll say there's no estate, he'll say all

14      of those things, but the one thing he can't say is that 502

15      still applies.

16              And I think as Your Honor knows -- and I know Your

17      Honor does -- if Your Honor looks at 502 in its totality

18      there's a lot of play in the joints.

19              There's a 502(c) play in the joins, and this isn't

20      contingent or unliquidated, it's a disputed claim, and I

21      can't really creditably argue, I did think at it, of this is

22      going to unduly delay the administration of the estate

23      because that's a bit of a stretch, we are past confirmation

24      and we have gone effective, so I didn't want to pursue that

25      line.
```

```
 1              502(j) is another one.  You can allow a claim,
 2     Your Honor can, and then subject to reconsideration of it
 3     later.
 4              And we looked at the case law there and it wasn't
 5     favorable, because in order to reconsider I'd have to show
 6     what you usually show for reconsideration type of things.
 7              But I don't think that means that 105(a) does not
 8     provide authority combined with 502 to fix the play in the
 9     joints from this really unprecedented and unique situation.
10              So that's what we'll submit, Your Honor, as our
11     statutory basis.
12              I agree with the Court that there is no actual
13     precedent for this and it was not an easy motion to us to
14     bring on, but we do have a constituency.  Shame on us, shame
15     on me if we didn't think of it years ago, but we do have a
16     constituency that is continuing to suffer and we have to do
17     something about it at some point and so the some point is
18     now.
19              THE COURT:  I wasn't ever thinking shame on you or
20     shame on your colleagues, but I'll admit I was thinking what
21     took so long?
22              MR. KIRPALANI:  Yeah, you know, Your Honor, I
23     don't have a good answer.  Don't have a good answer.
24              THE COURT:  Okay.
25              MR. KIRPALANI:  Thank you.
```

```
 1              MR. SHIMSHAK:  Good morning.

 2              THE COURT:  Good morning.

 3              MR. SHIMSHAK:  I may need this periodically

 4   because I'm getting over a cold, so.

 5              THE COURT:  It's very nice, it's like an ad for

 6   Avian Water.

 7              MR. SHIMSHAK:  Before I get started we'd like to

 8   engage in a little housekeeping.

 9              We have prepared some demonstratives for the

10   Argument, which I would like to hand up to you.

11              MR. KIRPALANI:  Now we know where the money in the

12   vault is going.

13              THE COURT:  Okay.  At least we're not dealing with

14   projection equipment.

15              MR. SHIMSHAK:  We'll get to that in a moment.

16              I'd also like to introduce my colleague, Claudia

17   Hammerman.  For purposes of the argument today we've divided

18   it.  I will address the relief requested, the basis for the

19   relief requested, and the many ways that the relief

20   requested violates the terms of Lehman's plan.

21   Ms. Hammerman, who has been living with the case for five

22   years and living with the adversary proceeding for over 20

23   months, will address any questions that the Court may have

24   about this history and about the derivative claims and

25   interest rates and things of that sort, but she's going to
```

1    be focusing primarily on the equitable arguments that are

2    made, to the extent those are relevant for the Court's

3    consideration.

4            THE COURT:  That's fine.  I'm going to ask you an

5    impertinent question to start.

6            MR. SHIMSHAK:  Of course.

7            THE COURT:  You were expecting it.

8            MR. SHIMSHAK:  No, but go ahead.

9            THE COURT:  Okay.  It's been five years, more than

10   five years actually since Citibank and other big banks

11   deemed themselves insecure in the period leading up to

12   Lehman's bankruptcy filing and exercised self-help remedies.

13           It's now many years later, we have a confirmed

14   plan, we have late term litigation involving JPMorgan Chase,

15   we have most of the other big banks that were involved in

16   major derivative disputes that have settled with this

17   estate, and Citibank is conspicuous in being an outlier in

18   terms of now saying yes to anything.

19           My question is this.  I'm certainly prepared to

20   make a ruling that's courageous that will be disadvantageous

21   to you, and I think you come in knowing that that's at least

22   a possibility, notwithstanding the fact that we're dealing

23   with an unprecedented set of facts and circumstances, and

24   Mr. Kirpalani acknowledged that during our discussion.

25           But why can't you and the estate reach an

Page 33

1    agreement comparable to an agreement that was reached in

2    2009 with JPMorgan Chase regarding what amounts to

3    provisional allowance of a claim with all rights reserved?

4            MR. SHIMSHAK:  Let me speak to that and this gets

5    into what I would say -- and I don't mean this critically --

6    the mischaracterization of the legal relationship between

7    the parties as it relates to the deposit and when that the

8    properly understood you will understand that the relief that

9    they're offering us is completely illusory and confers no

10   benefit on us whatsoever.

11           So while I can't speak to what JPMorgan was

12   thinking, I do know that there were evident -- evident in

13   the record and evident in the pleadings in connection with

14   that matter benefits associated with the relief they were

15   getting.

16           Specifically they were being relieved of the

17   burden of managing securities and the risk that they would

18   be accused of mismanaging those securities.  So they were

19   relieved of another potential liability.  They were given

20   over $500 million of cash rather than having to liquidate

21   and realize on those securities.

22           So that transaction had its own independent

23   motivations.  It's completely different from the situation

24   that we find ourself in properly understood.

25           So let me elaborate on what I mean and let's start

Page 34

1    because I think when we're talking about deposit accounts

2    and we're talking about setoff rights we have to be very

3    precise in understanding this problem and understanding the

4    relationships of the parties -- and the starting point is

5    the deposit account itself.  I

6              On -- on June 12th --

7              THE COURT:  But before you get into --

8              MR. SHIMSHAK:  Uh-huh.

9              THE COURT:  -- your -- your main argument --

10             MR. SHIMSHAK:  Uh-huh.

11             THE COURT:  -- recognizing that we're not making a

12   direct comparison between this situation and the JPMorgan

13   Chase situation from 2009, are you telling me that you are

14   incapable of working out some kind of consensual arrangement

15   with the estate that avoids a coercive outcome that I create

16   for you?

17             MR. SHIMSHAK:  Incapable, I can't say incapable,

18   you have to be able to negotiate.  If there was -- if there

19   was a -- if there was a solution that was fully protective

20   of our rights of course we're prepared to entertain that and

21   to negotiate that.

22             THE COURT:  Okay.

23             MR. SHIMSHAK:  The proposal that's been made is

24   not that proposal.

25             So let's start with the $2 billion deposit which

1    was created in June of 2008.  That deposit has always been

2    and always will be nothing more than a debt that we owe

3    Lehman.  We have owed Lehman $2 billion absent anything else

4    since June 12th, 2008 when that deposit was created.

5            And the nature of a deposit account is the first

6    tab, Your Honor.  This has been recognized at the Supreme

7    Court level in the Strouth (ph) decision which dealt with

8    the application of the administrative freeze.  It's the

9    leading case on the administrative freeze.  And that case

10   states that no matter how people think of it, no matter how

11   you and I think of putting money in the bank and having cash

12   in the bank, in fact a deposit account is nothing more than

13   a debt that the bank owes to the depositor.

14           So when you start with that proposition that we've

15   owed them a debt you then move to what our claims are

16   against that debt.  And what we claim are offsetting rights.

17           In other words, we say we have claims that enable

18   us to say to Lehman we owe you $2 billion but we don't have

19   to pay it.  We owe you $2 billion but you can't instruct us

20   what to do in respect of that debt until the issues of our

21   offsetting claims are resolved.  And the Bankruptcy Code

22   cannot be clearer on that.

23           Section 542(b) makes clear that we don't have to

24   turn over, to the extent we assert rights of setoff, and

25   Section 553 fully protects rights of setoff from any other

1    provision of the Bankruptcy Code.

2           So when you think of this situation in its correct

3    substantive terms that we owe them a debt, but we are saying

4    we don't have to pay it, the proposal that they're making

5    immediately becomes illusory and of absolutely no benefit to

6    Citi.

7           Because here's what they're saying.  That debt you

8    owe us we'll step back and we'll say we're not going to

9    characterize it anymore as a special versus general account,

10   and those claims you're asserting against the account you

11   are free to offset them.  Because that's all we can do.  We

12   don't get money, we only reduce our own exposure to the

13   extent of our offsetting claims.

14          But when they tell us to provisionally allow the

15   claims and exercise the right of offset and couple that with

16   their preservation of rights provision they are saying the

17   following things.  That simultaneously you no longer owe us

18   the debt, but you continue to owe us the debt.  You can

19   reduce the debt, but you can't reduce the debt.  Your claims

20   are valid for purposes of reducing the debt, but your claims

21   are still in dispute for purposes of reducing the debt.

22   That gives us absolutely nothing.  It confers no benefit on

23   us whatsoever and it takes away from us our protected rights

24   under section 506(b) and under the bankruptcy -- under the

25   plan and other provisions of the Bankruptcy Code to recover

Page 37

1   post-petition interest and post-confirmation interest to the

2   extent we don't think they will, but to the extent Lehman

3   succeeds in dramatically reducing our claims.

4           The notion of a litigation arbitrage as they call

5   it is really a quarrel with Congress about the ability of an

6   unsecured creditor to have the benefit of -- excuse me -- an

7   oversecured creditor to have the benefit of excess

8   collateral.

9           But -- so that is why the provision is completely

10  illusory, it's offering us nothing.

11          THE COURT:  But I hear your argument.  The

12  argument assumes to some extent the existence of a fund

13  doesn't it?

14          MR. SHIMSHAK:  No, it assumes the existence of a

15  debt.

16          THE COURT:  Well, I know your argument is that

17  this is just a deposit account so you have an obligation

18  ultimately to pay over the $2 billion that was deposited

19  with you subject to offset.

20          MR. SHIMSHAK:  It's more than an argument.  That

21  is the reality of the relationships between the parties.

22          They gave us $2 billion, we maintained in the

23  litigation this was a general deposit.  They argue only that

24  it was a special deposit for limited purposes.  That issue

25  will be resolved in the adversary proceeding.

```
 1              THE COURT:  Isn't that very similar to the issue
 2   that was litigated in the Bank of America case?
 3              MR. SHIMSHAK:  The -- there are similarities
 4   between those -- between those two cases, yes, but we
 5   believe on all the points of comparison with that litigation
 6   our position is much, much stronger than Bank of America's
 7   in litigating that with you.  That boiled down -- before you
 8   -- that boiled down to issues about how that arrangement
 9   went into place and the construction of the operative
10   documents between the parties.
11              THE COURT:  Understood.  But one of the things
12   that I'm concerned about, just so I understand your
13   argument, is what happened to this money?  It's debtor money
14   which is deposited with Citibank and it ends up, as I
15   understand it, in an offshore account, correct?
16              MR. SHIMSHAK:  No, well this --
17              THE COURT:  Was there not an offshore account
18   here?
19              MR. SHIMSHAK:  No, there was originally a Bahamian
20   account, but I'm sorry to interrupt the Court, but I want to
21   be clear about this because this is very fundamental to what
22   banking is.
23              When someone makes a deposit they give the bank
24   the money.  The money doesn't -- the money doesn't sit in a
25   box in the bank, whether it's in the Bahamas, whether it's
```

Page 39

1    in New York, whether it's in Switzerland, where it's any

2    place else.  They give the bank the money, and in exchange

3    they're saying I will take your credit risk and I will take

4    an interest factor on that.  The bank then goes, uses the

5    money, does whatever it wants to do.  It still has that debt

6    to the creditor -- to the depositor, and it has an

7    obligation to pay interest if the account carries an

8    interest feature.  But that other money belongs to the bank.

9    That was the essence of the contract that was made at the

10   time of the deposit.

11          So there's not dollars sitting around that

12   represent the deposit, it is only an obligation of the bank

13   that is owed to that depositor.

14          THE COURT:  Okay.  But in the ordinary course of

15   being a secured creditor you're able to look to an

16   identified asset and claim a security interest in that

17   asset.  That's one of the reasons why in lending cash

18   collateral accounts are set up, why possession is such an

19   important part of the notion of a security interest.

20          And my understanding is that this money has

21   basically filtered into the Citibank system and there is no

22   identified deposit account.

23          MR. SHIMSHAK:  There --

24          THE COURT:  At this point.

25          MR. SHIMSHAK:  No, what has happened -- what

Page 40

1   happened was that the movie -- excuse me -- the money was

2   moved to New York and then by agreement a separate account

3   arrangement was opened up with Lehman.  But those are just

4   different book entries.  That's not -- that's not a box of

5   $2 billion --

6            THE COURT:  I understand.

7            MR. SHIMSHAK:  -- moving from one place to

8   another.

9            THE COURT:  I understand that we're not talking

10  about a box with $2 billion in it.  It would be interesting

11  to actually observe such a box some day, but --

12           MR. SHIMSHAK:  Your Honor, I'd like to make one

13  other point too, because in many ways issues -- issues

14  concerning setoff, because setoff is treated as a secured

15  claim under the Bankruptcy Code, there's no question of

16  that, it's expressed in Section 506, but the issues are

17  unique when one thinks of it, and you cannot start

18  analogizes to your traditional understandings of collateral

19  in the sense of having property of the debtor.

20           When the property of the debtor is an obligation

21  that is owed to the debtor it's basically a receivable and

22  you're talking about what defenses you have, that's what

23  setoff is, defenses to the payment of that receivable.  That

24  again goes to what is fundamentally flawed and illusory

25  about this relief.

Page 41

```
 1              Because they're saying to us pay yourself, which
 2       they can't do any way, we're not obligated to follow their
 3       instructions, they're saying all right we'll step back from
 4       the $2 billion deposit and surrender it to you, but that has
 5       only one meaning in this circumstance given the relationship
 6       between the parties.  We are free to reduce the payment
 7       obligation to Lehman by our claims, but they are
 8       simultaneously saying without interruption your obligation
 9       to pay us that same $2 billion and your ability to reduce it
10       by your claims remains in dispute.
11              So nothing from our perspective has been
12       accomplished.  There's been no benefit to us of this
13       arrangement, there's only been the curtailment of existing
14       rights.
15              THE COURT:  Well, one of the existing rights that
16       you assert and insist on preserving is the right to claim
17       post-petition interest, and this is mostly about that I
18       think.  This is mostly about your insistence upon being able
19       to assert an interest claim that is significantly burdensome
20       to the estate and its creditors, because as it clicks away
21       at seven and a half percent or whatever the right number
22       is --
23              MR. SHIMSHAK:  That's not the right number, but --
24              THE COURT:  Well, what is the right number?
25              MR. SHIMSHAK:  The right number for the cost of
```

1    funds by analogy to another situation, and I'm straying into

2    Ms. Hammerman's area right now, is under five --

3            THE COURT:  It's okay.  Just because --

4            MR. SHIMSHAK:  -- under five --

5            THE COURT:  Just because you wanted to --

6            MR. SHIMSHAK:  Under five percent.

7            THE COURT:  -- set a neat division doesn't mean

8    that I did.

9            MR. SHIMSHAK:  No, but it's -- this is the kind of

10   that lawyers do.

11           Lehman has been out there insisting on a 14

12   percent rate in -- for its own derivative-related claims.

13   We made -- we made the mistake in retrospect of saying the

14   rate we are seeking is less than half of what they are

15   seeking.  So they immediately tag us with seeking seven

16   percent.  But in fact the rate is below five percent.

17           Now, on the post-petition interest point let me

18   address that.  Here's the dynamic.  We think our claims are

19   -- exceed the $2 billion deposit and in that case we'd

20   exhaust it, there wouldn't -- there wouldn't be an issue of

21   post-petition interest.

22           Lehman is focused on a very narrow situation.

23   Lehman maintains that we have grossly inflated our claims,

24   that we're dragging our feet in the litigation, and you

25   know, a bunch of stuff related to the process and the

Page 43

1    dynamic that we're involved in now.  And they're saying to

2    themselves if we're wildly successful and we were right and

3    we push Citi's claims way down it's a pyrrhic victory

4    because they're an oversecured creditor at that point as a

5    result of our reducing their claims and they're therefore

6    going to make a claim for post-petition interest at whatever

7    rate they're going to make that claim.  And they're

8    dissatisfied with that result.

9               I have two responses to that.

10              The first response is that is a normal incident of

11   the claims allowance process.  Parties assert claims, they

12   have claims reduced, and if they have additional protection

13   and collateral or an additional right of setoff that right

14   is recognized.  It's not -- it should not be punitive that

15   as a result of the claims allowance process and you find

16   yourself with the smaller claim but more protection you're

17   able to recover post-petition interest.  That shouldn't be

18   taken away from you.

19              But to the extent there is an element of fault or

20   wrong doing that Lehman is asserting, that it's really

21   bothered by this potential, they've already protected

22   themselves against that possibility.

23              Their adversary proceeding complaint contains

24   allegations that we inflated our derivative claims, that the

25   inflated derivative claims have been harmful to the estate,

Page 44

1    and they seek the remedy of equitable subordination.

2            So there is the remedy in that circumstance if

3    they're considered -- if they can prove up the equitable

4    subordination standards.  There is the remedy if we've

5    engaged in any kind of misconduct.

6            But it should not be cutting off our statutorily

7    created rights and our rights reserved under the plan in a

8    circumstance of us finding ourselves with derivative claims

9    that are less than we believe them to be but sufficient to

10   offset in combination with interest our payment obligation.

11   That's a protected right.  That's not -- that's not

12   something that can be taken away from a creditor.

13           THE COURT:  Okay.

14           MR. SHIMSHAK:  Now, Mr. Kirpalani was right when

15   he said I was going to get up in addition to talking about

16   the nature of the relief -- relief sought.  And by the way,

17   I want to make one other point, because this goes to the

18   dynamic between the parties in your talking to us about

19   whether something could be worked out.

20           When this motion was filed -- when this concept

21   was introduced we said to Lehman, please explain to us how

22   we're getting any benefit out of this?  We never got an

23   explanation.

24           As the situation advanced we then said to Lehman,

25   not only does what you're saying make no sense, it's

Page 45

1    internally inconsistent that you can both dispute and allow

2    a claim, you can both owe and not owe a debt.  Not only does

3    that make any common sense, as a matter of accounting, and

4    we included the last exhibit in here, the relevant account

5    standard, this setoff can't be taken.  You can't make a bank

6    take a setoff and then tell the bank that it still owes the

7    debt and that the claims that it used to offset are still in

8    dispute.  It just can't be done under the applicable

9    accounting standard.

10            We asked Lehman, please, tell us if we're wrong

11   about this accounting treatment, -- if we're wrong about

12   this accounting treatment please explain to us why we're

13   wrong.

14            We also said to them, we will make our accounting

15   personnel available for a deposition.  You can take their

16   deposition, you can hear from -- they'll educate you about

17   why what you're saying as an accounting matter is

18   impermissible.  They refused to take the deposition.

19            They then in their response say this accounting

20   issue is a Citi specific issue, which is itself an

21   accounting conclusion by the way, an unsubstantiated

22   accounting conclusion.

23            And they then go on to say -- they cite some cases

24   which have nothing to do with the application of the

25   generally accepted accounting principals on the FAZBI (ph)

Page 46

1    provisions that we've identified to them.

2           So it's a complete -- it's a complete nonsense

3    from the standpoint of its internal contradictions and an

4    accounting impossibility.

5           But putting all of that aside they have to have --

6    they have to come to you for authority to impose this on us

7    and they have to have a statutory basis for it.  They have

8    to have a statutory basis for it.  They know that.

9           They talk about four statutes.  363(b).  Let's

10   talk about 363(b).

11          We're not being cute when we say 363(b) no longer

12   applies, all the assets have vested in the debtor, it's no

13   longer property of the estate.  That's a provision of their

14   own plan.  Section 13.1 of their own plan says that.

15          And when I saw Lehman's response I was really

16   curious, I was thinking why is Lehman taking the position

17   that Section 363(b) still applies for non-ordinary course

18   transactions?  Why would a debtor with a confirmed plan ever

19   want to be out there in the world dealing with third parties

20   now and having them uncertain as to whether or not there was

21   a need to run back to Your Honor to get approval for

22   something?  It made no sense.

23          So we went to the docket.  And Your Honor is

24   intimately familiar with the Archstone transaction.  Can

25   someone help me?  What tab is that?

Page 47

```
 1                MS. HAMMERMAN:  It's 6.

 2                MR. SHIMSHAK:  Tab 6.  Your Honor, look at tab 6

 3      of -- no, no, that's not tab 6.  Yeah, look at tab 6 of your

 4      materials.

 5                As you recall there was an issue concerning the

 6      ability to exercise a right of first out offer regarding

 7      certain securities of Archstone, and that issue emerged in

 8      the period between confirmation of the plan and the

 9      effective date.

10                And what was Lehman's position on that?  Well, as

11      you can see from the highlighted language the plan has not

12      yet gone effective.  Consequently the debtors are continuing

13      to operate as debtors in possession as to which court-

14      approval is required for transactions out of the ordinary

15      course.

16                Then a footnote, "The debtors reserve the right to

17      withdraw the motion if the plan effective date occurs prior

18      to the hearing on this motion."

19                So clearly at that time Lehman was recognizing two

20      things.  The need for 363(b) approval in this gap period as

21      to transactions outside the ordinarily course, and

22      recognizing under the terms of their own plan in 13.1 that

23      when the effective date occurred that was not going to be

24      necessary.

25                But -- so this matter is the first instance to my
```

1    knowledge.

2              THE COURT:   I think you're overstating it.   It's a

3    reserved right.   It's not an acknowledgment of legal

4    position.

5              MR. SHIMSHAK:   But this was -- this is the first

6    instance to my knowledge that despite 13.1, which says that

7    all of the property of the estate is vested in the

8    reorganized debtors, it is unqualified, that Lehman has

9    taken the position that somehow 363(b) has continued

10   vitality.   I do not -- you know, this is the first instance.

11             But to see if this marked a change of position as

12   recently as Monday in the next tab in a dispute involving a

13   2004 examination where the challengers -- where the parties

14   bringing the 2004 examination were questioning actions that

15   the plan administrator had taken under the authority granted

16   him under the plan and seeking to involve the Court in

17   reviewing those actions Lehman responded by saying it's no

18   longer in bankruptcy, it's free to -- free to negotiate and

19   enter into transactions involving its assets free of any

20   restrictions of the Bankruptcy Code or rule -- rules.

21             So what does Lehman say in response to our

22   argument about 363(b) not being available as a basis for

23   granting them the relief requested?

24             They simply say a complete non sequitur, well,

25   there are continuing jurisdiction provisions in the case.

Page 49

1    The Court has continuing jurisdiction over the adversary

2    proceeding.  And therefore what?  And therefore Section

3    363(b) applies?  The one doesn't follow from the other.  The

4    fact of continuing jurisdiction does not revest or recreate

5    the estate and property of the estate for purposes of

6    invoking section 363(b).

7         The statement itself is not even legal argument,

8    it's really an ipsi Dickson in which they're just saying,

9    well, see these continuing jurisdiction provisions, that

10   means 363(b) still applies.  No it doesn't.  It doesn't mean

11   that at all.

12        502.  Let's talk about 502.  It's section 502(b).

13        What does section 502(b) actually say?  Section

14   502(b) says, "Claims somebody allowed unless ..." and then

15   there are enumerated basis for not allowing claims.  That is

16   the function of Section 502(b).  To allow -- it does not say

17   anything about provisional allowance, it just says the Court

18   shall allow claims unless one of these enumerated conditions

19   occur.

20        There's nothing in there remotely reassembling the

21   issues that are being presented by this motion.

22        Section 502(c) deals with estimation.  But

23   estimation for what purpose?  For purposes of allowance.

24   Not provisional allowance, purposes of allowance so you can

25   get a distribution.

Page 50

1          So 502(c) by -- you know, has no application.

2          There was such a wonderful phrase in their brief.

3     Oh, this is where they're trying to say, you know, they can

4     breathe into Section 502 enough substance for you to do what

5     they're proposing that you do.  They have this wonderful

6     phrase in there.

7          They're asking the Court to exercise its equitable

8     powers within the confines of Section 502(b) to facilitate

9     the estate's reconciliation of the subject claims.

10         Your Honor, I must have read that 10 times.  This

11    will make the eleventh.  I still have -- I have no idea what

12    that -- what that phrase means.  I have no idea what that

13    phrase means.

14         502(b) is very clear, it's very clear on what it's

15    purpose is, it's very clear on what it's mechanic is.  It

16    has nothing to do with the facilitating the estate's

17    reconciliation of the subject claims.

18         Their argument for 502(b) -- their argument for

19    502(b), let's call it what it is.  It is a gloss that they

20    want you to impose on the statute.  But I -- to allow you to

21    provisionally allow claims when there's nothing in that

22    provision that allows the provisional allowance of claims.

23    It's a gloss that they want to put on 502(b), and I would

24    maintain that it is a gloss that completely obscures and

25    deviates from the stated purpose of the statute.

Page 51

1          So in simple terms 363(b) is not available, 502(b)

2     is not available.  They refer to 509.  509 is the not a

3     basis for relief, because 509 presumes the outcome.  It

4     presumes that claims have been paid and fully satisfied

5     before you can get to 509.  So 509 could never have

6     application here because we're never going to be fully paid

7     under the -- by the terms of their own order.

8          But that doesn't stop them.  When you look at the

9     terms of their proposed order -- when you look at the terms

10    of their proposed order they actually say that as a

11    consequence of the provisional allowance they are fully

12    subrogated to our rights.

13         So that means when we get paid from some other

14    estate because of this provisional allowance of our claim,

15    this nonpayment payment we have to turn the money over to

16    them.  That's the effect of that order.  That seems to be an

17    enormous overreach.  And in fact in trying to get to that

18    overreach they even misconstrue the statute.

19         We have one of the parties -- one of the parties

20    that owes us money is a Lehman entity that is not a debtor

21    here.  Lehman Brothers Commercial Creditor -- Commercial

22    Corp. Asia, it's in a liquidation proceeding in Hong Kong.

23    They owe us -- this is what we refer to as the Hong Kong

24    loan.  They owe us about $300 million and Lehman guaranteed

25    that obligation.  509 says, "An entity that is liable with

Page 52

1    the debtor is entitled to subrogation."  Well LBCCA is not a

2    debtor.  Lehman can't assert subrogation rights through

3    Section 509 because of -- for a LBCCA payment.  But that's

4    not the way the order reads.  That's not the way the order

5    reads.

6           So the implication of 509 is the a complete

7    overreach.

8           So let's reprise where we are.  The relief makes

9    no sense.  It doesn't offer us anything.  All this talk

10   about how it's fair, how it's balanced, how we have a

11   benefit.  There's no benefit to us.  We end up being in the

12   exact same place.  We can't do it as an accounting matter,

13   and they have not, despite our invitation, demonstrated that

14   we can.  There is no statutory basis for the relief.

15          363(b) is not available.  502(b) is not available.

16   509 has nothing to do with it.  And 105, which supplements

17   all of them, can't even be invoked if the underlying

18   statutes aren't operative.

19          But that's not enough.  That's not enough.  What

20   they propose also violates the terms of their own plan.

21          Now their argument in response to this was, well,

22   there's nothing in the plan that says we can't provisionally

23   allow claims.  Well, all right, those words don't literally

24   appear anywhere in the plan.  But certainly -- certainly

25   it's the case, and no one would dispute this, that a Chapter

Page 53

1   11 plan is in essence a contract between the debtor and its

2   creditors as to the resolution of the claims.  It creates

3   rights.  It creates procedural rights and it creates

4   substantive rights.  It tells us how we're going to be

5   treated, it tells us how we're going to get finality, and it

6   describes the process under which we will get all of those

7   issues resolved.

8          What does their plan provide?  Their plan provides

9   that they cannot make any payments, make any distributions

10  on claims that are disputed.  Our claims are always disputed

11  under this arrangement.  Yet they're purporting to make a

12  distribution.  Distributions that are made are supposed to

13  be free of all claims, liens, and encumbrances.  The

14  distribution that we're getting through this provisional

15  allowance is coming with the entire litigation attached to

16  it.  It's by no means a permissible distribution within the

17  plan.

18         It says that rights of setoff are fully protected.

19  What are the rights of setoff that we're asserting?  It's

20  the right to assert the full extent of our claim, including

21  claims for post-petition interest and post-confirmation

22  interest against our payment obligation to Lehman.

23         This is an attempt to cut back on that right

24  outside of the plan, and I would argue and I maintain in

25  derogation of the plan.

Page 54

1           Now, you know, they may say that it's not

2    prohibited by the plan, but every creditor has the right to

3    expect that their conduct is going to be consistent with the

4    plan and it is not going to reduce the rights that are

5    available to us under the plan.  But that is the effect of

6    this proposal.

7           It doesn't work substantively, it doesn't work

8    from an accounting perspective, there's no basis for the

9    relief, and it violates the terms of their own plan.  That's

10   why we think this motion is improper, that's why we think it

11   should be denied.

12          If Lehman wants to continue to discuss with us

13   some arrangement that is protective of our rights under the

14   Bankruptcy Code, under Section 553, and under the plan we're

15   always open to discuss that.

16          Our questions to them, please explain how this

17   works for us, please explain how this can be done from an

18   accounting perspective.  Evidence is our willingness to have

19   a dialogue with them.  It's the opposite.  They cut off the

20   discussions, they would not respond, they ran into court to

21   get this relief from you.  We think it's improper, we think

22   the motion should be denied.

23          At this point I'm prepared to yield the podium to

24   Ms. Hammerman to talk a little bit about the equities.

25          THE COURT:  Okay.  Thank you, Mr. Shimshak.

Page 55

1          MS. HAMMERMAN:  Your Honor, Claudia Hammerman from

2    Paul, Weiss.

3          I -- I am the master of the facts, I have been

4    dealing and living with this case for five years and that's

5    why I think Mr. Shimshak ceded this portion of the argument

6    to me.  So I'd like to address some of the factual questions

7    that you raised initially with Mr. Shimshak and he bravely

8    tried to counter.

9          In one question you had is how is this different

10   from B of A?  In the B of A situation -- and this is -- this

11   is, you know, way beyond this motion, but I understand

12   you're trying to figure out why this is a different

13   situation from others that you have faced.

14         In the B of A situation there was an agreement.

15   There was a security agreement that covered a deposit and it

16   limited the definition of indebtedness, and that definition

17   of indebtedness was limited to clearing and was -- and Your

18   Honor found that there was no reservation of common law

19   rights to go broader than clearing.

20         Now here there is no security agreement covering

21   this deposit.  In fact there is no written agreement at all.

22         This is a deposit in the same way that you and I

23   deposit money in the bank, we all use the colloquial terms

24   that there's money in the bank.  In fact there's no money in

25   the bank.

Page 56

1              You asked what did Citibank do with this money?

2     Citibank treated this as a general deposit, the same way

3     whenever Lehman had to park its funds at night extra funds

4     to earn interest on them Citi commingled these with its own

5     funds and Citi views itself as having a contract, a debt to

6     pay this back subject to the negotiated rate of interest.

7              You also asked whether the relief sought here is

8     impossible.  And we submit based on consultations with

9     senior accountants at Citibank that it is impossible, and we

10    offered those senior Citibank accountants in the accounting

11    policy group at Citibank, we offered them up for deposition.

12             Our understanding, and you can look all though the

13    last tab in the binder, our understanding is that even a

14    layperson looking at the conditions for setoff would

15    absolutely see why as a matter of prudent accounting during

16    this hard fought litigation Citi cannot take the setoff.

17             So Your Honor could I guess -- well, as

18    Mr. Shimshak described, we don't think there's a legal basis

19    for Your Honor to cut off our rights to post-petition

20    interest, we think it's in violation of the plan, but

21    putting those problems aside Your Honor could I guess issue

22    an order that says no interest will accrue on Citibank's

23    claims.  But you can't -- and you could say for purposes of

24    this proceeding those have been provisionally satisfied

25    until they're allowed.  But Citi would not be able to do

1    anything with the $2 billion debt it owes and the

2    countervailing debts that Citi says Lehman owes.

3            Now you asked about another precedent, which was

4    Calpine.  And you know that's very interesting, because at

5    the time of the arguments before the -- before the

6    Bankruptcy Court and before the Appellate Court there was no

7    hint that the payments that were being made were disputed

8    payments at the exact time they were being made.

9            All of the briefing in those cases makes clear

10   that this is a debt that's owed and the reservation of

11   rights -- the reservation of rights are with respect to the

12   make whole.

13           And the question that was presented is can the

14   judge allow payment of the principal and accrued interest up

15   to that moment but not permit -- but not decide the question

16   of the make whole and whether it also needed to be paid at

17   the same time?

18           The question of whether those were inextricably

19   intertwined and whether it abridged any rights by permitting

20   payment of one but not the other, that was the -- that was

21   the situation before the Bankruptcy Court and before the

22   Appeals Court.

23           Now it is absolutely true as Lehman has noted that

24   later on in the bankruptcy proceeding the creditors'

25   committee asked for permission to actually challenge the

1  secured status of those claims and the debtor opposed that,

2  and the debtor argued that -- and I think we have that at a

3  tab, maybe you can do we the favor, Steve, of telling which

4  tab it is -- but the debtor -- the debtor opposed the

5  motion.  The debtor said there is no colorable basis --

6            MR. SHIMSHAK:  Tab 11.

7            MS. HAMMERMAN:  -- to argue --

8            MR. SHIMSHAK:  Tab 11, Claudia.

9            MS. HAMMERMAN:  I'm sorry, tab 11.

10           The debtor argued that there is no colorable claim

11  that this is not a secured debt.  In fact the debtor had

12  always referred to it as first lien debt, so had the UCC in

13  their previous submissions, and the only reservation of

14  rights in their previous submissions both to the Bankruptcy

15  Court and the court of -- and the District Court were with

16  respect to the make whole provision and certain professional

17  fees.

18           Now --

19           MR. SHIMSHAK:  Oh, tab 10.  I'm sorry, tab 10.

20           MS. HAMMERMAN:  Apologies.

21           MR. SHIMSHAK:  My apologies.

22           MS. HAMMERMAN:  It's tab 10.

23           THE COURT:  I enjoyed reading the other tab any

24  way.

25           MS. HAMMERMAN:  Okay.

1          MR. SHIMSHAK:  Thank you, Your Honor.

2          MS. HAMMERMAN:  So in tab 10 you can see that the

3     debtors state that there was no colorable basis.

4          As things are wont to do in Bankruptcy Court the

5     dispute was settled and by stipulation the authority was

6     granted to the UCC to bring that claim later.  But it

7     doesn't change the fact that when Calpine, the decision that

8     they referred to as the basis for what they're seeking here,

9     at the time that was decided there was not a hint that there

10    would be any dispute to the -- to the claims that were being

11    paid with those monies.

12         So we submit that there is no authority, no

13    analogous situation where claimants would -- I'm sorry --

14    where the debtors force the creditors to provisionally

15    satisfy a claim that is disputed.

16         I think there was also discussion with

17    Mr. Shimshak about the rate and what rate applies -- would

18    apply here.

19         Now we have been accused of charging exorbitant

20    rates, those were the words repeated over and over again in

21    the brief.  The highest interest rate that Citi is seeking

22    is under the industry standard is the master agreement, that

23    calls for Citibank's cost of funds plus one percent.

24         In our opposition we -- we reflected the fact that

25    Lehman itself is seeking post-petition interest or seeking

1    interest under the selfsame provision.  We also noted that

2    there are public reports that the amount that it is seeking

3    is as much as 14 percent.  There was no dispute about either

4    of those two statements in the reply papers.  But what the

5    in fact the reply papers didn't touch that.

6            Instead what they looked at, they argued that Citi

7    is seeking at least seven percent and Mr. Kirpalani repeated

8    that before Your Honor.

9            And we respectfully submit that that is simply

10   disingenuous.  It's disingenuous as a matter of mathematics,

11   because what we said in our opposition where they claim to

12   have derived this at least seven percent from our

13   opposition, what we said there was that Citibank's rate of

14   interest or the rate of interest applicable to Citibank as

15   an A-rated financial institution is going to be

16   substantially -- and what's amazing is that actually in

17   their reply papers Lehman quotes this exact language in

18   footnote 39 I believe.  They -- what we said is

19   substantially less than half of what Lehman is claiming.

20           So 14 percent -- substantially less than half of

21   14 percent is not at least 7 percent.

22           But the problem that we have with the -- with the

23   claims that have been made with respect to this seven

24   percent go beyond that.

25           As we stated in our papers, Citi is assiduously

Page 61

1    trying to collect from other obligors on the claims that it

2    is making against LBHI.

3            In one of those proceedings Citi has filed

4    publicly an estimation of its cost of funds over an

5    analogous period.  That estimation was 4.65.  So it would be

6    4. -- what Citi would claim it's owed here is it's cost to

7    funds plus would you be percent.

8            Now Lehman is absolutely familiar with this

9    litigation, they have been following it, and in fact they

10   recently served us with a discovery request asking for all

11   documents produced by either side in that litigation.

12           So it's not clear what Your Honor will determine

13   Citi's cost to funds is, Citi has estimated it, but the cost

14   to funds plus 1 percent can be no more than 5.6 percent, and

15   Citi would essentially be judicially estopped from

16   estimating it at a higher rate.  So we don't think this

17   amount is exorbitant at all.

18           The other thing that Lehman has suggested, they've

19   suggested that Citi is using the accrual of post-petition

20   interest as leverage and as litigation arbitrage.

21           Now we find that accusation ironic, because this

22   situation isn't like the situation Your Honor faced where

23   derivative's counterparties to the debtor were making those

24   kind of allegations in connection with the flip clause

25   litigation.

1              In the flip clause litigation Lehman is seeking

2      interest under this selfsame provision, perhaps as much as

3      14 percent, they didn't respond to the public report, and

4      they are simultaneously seeking stays -- lengthy stays of

5      that litigation.  By our count now they have sought two

6      years worth of stays.

7              So we can at least sympathize and understand why

8      the derivative's counterparties are saying that that is

9      litigation arbitrage and using the threat of interest as

10     leverage.

11             Now we will concede that in any litigation – in

12     any litigation at all where interest can be paid that

13     exasserts some amount of leverage on the parties.  That just

14     is part of their cost benefit calculus.  And that's the

15     situation here.

16             Citi maintains that by contract under bankruptcy

17     law and under the plan it's entitled to full post-petition

18     interest to the extent of its collateral at the time its

19     claims are allowed.  And that is our legal position.

20             Plaintiffs try to suggest that Citibank could only

21     access that collateral for purposes of post-petition

22     interest if Citi has behaved wrongfully here and has grossly

23     inflated its claim, and that is simply untrue as a matter of

24     fact.

25             As we stated in our papers Citibank is assiduously

Page 63

1    pursuing other sources of recovery here.  It has already

2    recovered $200 million on the claims that it is making

3    against LBHI.  It stands to recover hundreds of millions of

4    dollars more.

5          Moreover, we have pointed to other sources of

6    collateral that Citi faces with respect to these claims.

7    And Citi has unsecured claims against LBSF and the

8    underlying debtors here.

9          So it is simply not the case that Citibank will

10   only have post-petition interest if Citi has wrongfully,

11   grossly inflated its claim.

12          In fact right now if Citibank recovers everything,

13   every penny of the claim that it is seeking there would

14   still be substantial room for post-petition interest through

15   2014.

16          Now is Citibank using this as leverage?  I think

17   the -- our position is that the law has given us this right.

18   This right exists and it should -- you know, it will be part

19   of the calculus that debtors have to make as to whether they

20   want to make a reasonable offer in terms of settling this

21   dispute.

22          And we would -- we would also note that the --

23          THE COURT:  Do you have a provisional calculation

24   of how much interest we're talking about?

25          MS. HAMMERMAN:  I'm afraid that I don't have that

Page 64

1    right here, Your Honor, but we have done the calculations at

2    least to the extent that I can stand up here and say that it

3    is possible under the interest rates we're claiming for us

4    still if we recover against the other estates for us to

5    continue to get post-petition interest on these claims.  And

6    in fact the interest rate that you would apply in doing

7    those calculations, that's not set either.

8          We have our position as to what the contractual

9    rate is, that we're entitled to the contractual rate under

10   506 pre plan, and post-effective date we argue that the plan

11   gives us our full amount of our claim, and that would

12   include the contractual interest up to the limit of our

13   security.  But Your Honor will decide that at the

14   appropriate time.

15         And so it's simply -- since the variables are

16   unknown here, will Citibank recover from all of the primary

17   obligors and thus have a lot of room in -- in its security

18   for further post-petition interest, what interest rate will

19   ultimately apply since Lehman has made clear that they will

20   challenge that interest as to -- as grossly inflated?

21         But the other point if we're going to talk about

22   grossly inflated claims, and I certainly, you know, don't

23   mean the fling mud, but this claim objection started out

24   challenging Citi's claims as overstated by $1 billion, and

25   we vigorously contest that.

Page 65

1          But Lehman -- and I think this does factor into

2     the equities here -- Lehman decided to double down on that

3     claim.  Lehman now claims that our derivative's claims are

4     overstated by more than 2.2 billion and to the extent that

5     Citi now owes money to Lehman.

6          So this -- and in fact I think in their counts 18

7     and 24 on a combined basic under the derivative's claims

8     they are asking -- they claim that Citi owes them

9     $230 million.

10          So this motion and Citi's right to post-petition

11     interest only makes sense if Lehman has grossly inflated its

12     claim objection, has grossly inflated the amount that it

13     calculates Citi is due under these derivative's claims -- or

14     correcting that what Citi now owes Lehman.

15          So the impossibility of canceling out Citi's debt

16     to Lehman of $2 billion and canceling out the claims Citi

17     owes I think you can see why that would not be prudent

18     accounting in the circumstances.

19          I think that in addition all we would note is

20     Lehman does claim to be giving something up here.  We submit

21     that Citi has no benefit, but maybe fairness is that they're

22     giving something up.

23          They claim that under the 2009 stipulation, April

24     2009, which they have attached as Exhibit A to their reply

25     papers, that they have the benefit under that stipulation of

Page 66

1    FDIC protection on the $2 billion account.

2            Well in fact that FDIC protection, if you look at

3    the stipulation itself, that FDIC protection is provided

4    under the temporary liquidity guaranteed program, and the

5    TLGP by its terms was temporary, it was expected to be

6    temporary, it was a temporary response to the acute moments

7    of the crisis, and it lapsed, it lapsed long ago, and the

8    debtors can see that if they look on the FDIC website.

9            So long ago the debtors faced and fully absorbed

10   this is what they say they're giving up -- they're going to

11   absorb the collection risk from Citibank.  They've always

12   had that risk.

13           So I guess while I understand that Your Honor

14   has expressed some discomfiture with Citi continuing to

15   accrue interest here, Citi claims that is their right under

16   the law.

17           Citi would also submit that the equities here do

18   not favor Lehman.  Lehman has not tried to simplify and

19   settle this case.  If anything they've expanded it.  They

20   have controlled the timing of the litigation, the pace of

21   the litigation, but also the scope of the litigation.

22           As we stated in our papers, Lehman could have

23   easily decided to satisfy -- resolve and satisfy those

24   portions of the -- of Citibank's claims as to which they had

25   no reasonable dispute, and we submit there are plenty of

1    those, and we have given examples in our papers to Your

2    Honor in the opposition, and the reply papers from

3    plaintiffs do not address that.  They simply do not address

4    that.

5            So while the injury that they're claiming is we

6    say a product of the legal regime here and is simply what

7    they had to figure into their calculations in suing an

8    oversecured creditor, we also submit that to a certain

9    extent this is a self-inflicted injury.  Because to the

10   extent they could see themselves clear to acknowledging that

11   there's a large portion of Citibank's claim as to which they

12   have no conceivable argument they could cut off that

13   principal which would be accruing post-petition interest.

14           So in closing, Your Honor, and thank you very much

15   for being patient with a long-winded argument, we submit

16   that there's no legal basis under the -- under the

17   Bankruptcy Code for Your Honor to grant this motion.  That

18   granting this motion would abridge Citi's settled

19   expectations and vested rights under the plan.  And that in

20   these circumstances there is -- it would simply be

21   inequitable to Citi and it would remove the one -- the one

22   little amount of leverage -- and I'll accept leverage --

23   that Citi has in moving this case along to an appropriate

24   resolution.

25           We will note, and Your Honor pointed out, that

Page 68

1    JPMC agreed to give up post-petition interest.  They got a

2    whole lot of other benefits, but they agreed to give it up.

3    That -- in that case -- that case the initial scheduling

4    order has now slipped and the scheduling order that exists

5    now it's two years later.

6              So we submit that the equities do not favor

7    granting this motion, not that any free floating appeal to

8    equity could be a basis for this motion, and I thank you

9    very much for hearing me.

10             THE COURT:  Okay, thank you.

11             Mr. Kirpalani, you have a lot to respond to.

12             MR. KIRPALANI:  Yeah, I'm not sure I'm going to be

13   able to respond to everything that was said, Your Honor, but

14   I'm going do my best.

15             The first thing I want to start with is counsel I

16   believe said I think wrongly that in the Calpine decision,

17   and I think I did acknowledge that it's not on all fours,

18   and it's certainly not controlling precedent, and that it is

19   analogous I do believe, but there's a factual statement that

20   was made that is wrong.  I believe she said that there was

21   not a hint that the debtors might have claims, that it just

22   came as a surprise, nobody realized.  So I just want to read

23   from the transcript, which is attached to our papers.

24             On June 21 of 2006 before the Honorable Judge

25   Lifland counsel for the debtors said, I quote, "As we set

Page 69

1    forth in our papers of course we are reserving all of our

2    other rights, and I don't suggest we are waiving any rights,

3    including the right to ultimately attack or challenge the

4    first lien holder's liens."  And then it goes on to talk

5    about, "and of course we're going to challenge the make

6    whole too."  So I just think that is an incorrect statement.

7              However, I also want to caution that we are not

8    suggesting that Calpine is on all fours.  Calpine for the

9    record and for Your Honor's clarity does rely on 105 coupled

10   with 363(b).

11             I accept Mr. Shimshak's statements.  Mistake, it

12   is not a Section 363 issue before the Court here.

13             We do believe that 105 and 502 does give Your

14   Honor enough play in the joints to accomplish a just and

15   equitable outcome.

16             I'd just like to read a provision from the Calpine

17   appeal in the District Court where the Court noted, "A

18   bankruptcy" -- quote, at page 593, "A Bankruptcy Court's

19   exercise of its equitable authority is reviewed for abuse of

20   discretion.

21             Abuse of discretion is one, a decision resting on

22   an error of law such as application of the wrong legal

23   principal or a clearly erroneous factual finding, or two, a

24   decision that, though not necessarily the product of a legal

25   error or a clearly erroneous factual finding, cannot be

Page 70

1    located within the range of permissible decisions."   End

2    quote.

3              "Moreover, to further the purposes of Chapter 11

4    reorganization a bankruptcy judge must have substantial

5    freedom to tailor his or her orders to meet differing

6    circumstances and the citation as to integrated resources,

7    and to the Second Circuit's decision in Lyonell (ph)."

8              And what we would submit, Your Honor, is this is

9    an entirely unique situation.  We're getting a tutorial from

10   Mr. Shimshak about the way banks work.  We're getting a

11   tutorial about how this is their God-given right to assert a

12   setoff claim.  And somehow as a setoff creditor they are a

13   secured creditor under 506, and even though it seems

14   inequitable on these facts they're entitled to assert it,

15   admittedly, as leverage the post-petition interest.

16             But, Your Honor, they also talk about -- I almost

17   I thought I heard Ms. Hammerman say that if Your Honor

18   thought -- rather than forcing a setoff or a provisional

19   allowance that would disrupt their accounting mechanics I

20   thought I heard her say -- but I don't want to misstate it

21   that Your Honor could always if you thought it was unfair

22   just not do that but stop the accrual of post-petition

23   interest, just on the equities, it doesn't seem right.

24             We'd be fine with that, Your Honor.  It's not the

25   mechanic that we're thrilled with or trying to push down

1    anybody's throat, it is the inequitable situation that we're

2    stuck with.

3           And I -- again, I'm concerned about the integrity

4    of the court, I'm concerned about, you know, making an

5    argument that Your Honor takes away and then later finds

6    out, you know, that was an improper thing for me to try to

7    persuade you on.  So I'm not doing that.

8           I'm not going to tell you, Your Honor, that 506(b)

9    gives you discretion to determine interest rates, no matter

10   what.  I can't do that.  I can't do that.  I am stuck with

11   what the case law provides.

12          But I do think, Your Honor, you definitely have

13   the power under 1059a) and 502 to provisionally allow, if

14   they're not comfortable with that result and they would

15   prefer for their internal purposes to simply accept that

16   from today forward we can argue about what happened in the

17   past and what the reasonable rate was or what they're

18   charging, from today forward in order to accomplish their

19   legitimate accounting integrity issues and the interests and

20   needs of creditors of Lehman we can stop the burn of

21   interest.  And they are obviously using the cash in a

22   productive way.

23          It is very disanalogous from a situation of a

24   secured creditor who is really being precluded and injured

25   by the automatic stay and not being able to move on with

Page 72

```
 1    life.  They are making good use of the funds, which they

 2    should be doing.  But they shouldn't be charging the estate

 3    at the same time.

 4              Another area, Your Honor, that I'd like to cover

 5    is Mr. Shimshak said our plan.  We got a tutorial on what

 6    our plan provides.

 7              But what I would like to point out is the issue

 8    that they simply can't or chose not to respond to is

 9    Mr. Shimshak said we have a contract, the plan is a contract

10    and it creates rights, and they told us how the plan works.

11              There's another contract that Mr. Shimshak didn't

12    mention, and that's the stipulation on reserves.  The

13    stipulation on reserves with Citi specifically cites

14    Section 8.4 as applying to their claims.

15              Section 8.4 of the plan says, rather than contract

16    rate or applicable law we're no longer in the pendency

17    interest world of petition date to effective date, Supreme

18    Court says that's dependency interest world, we're not in

19    there.  After that you have to look to what the plan says.

20              They say Section 8.4, which limits interest post-

21    confirmation to whatever Lehman's estate is earning on the

22    money to prevent this exact problem.  It says that's all

23    they get.

24              So what's their answer as to why that doesn't seem

25    to work?  That's the contract, the plan that they say they
```

Page 73

1    accept, and they have another contract, their stipulation,

2    which specifically says 8.4 governs their claims.

3            Their answer is, well the plan says elsewhere that

4    we're entitled to get all, we're entitled to it be paid in

5    full.  Quote/unquote.  And so they jam into the words in

6    full this reading that they're entitled to do what the

7    Supreme Court says stops at the effective date and get post-

8    petition interest at whether it's five percent or what have

9    you, with the compounding this is hundreds of millions of

10   dollars.  Even from March 2012, the effective date till

11   today, it's probably $250 million.

12           So if Your Honor -- if we can get a decision from

13   the Court that even the plan, Section 8.4, does stop the

14   alleged 506(b) interest that they are asserting and now it's

15   governed by the plan I think Your Honor certainly has the

16   power to interpret the plan and the confirmation order, the

17   contract, and that would be a result that would be of great

18   value to testate, and it was alternatively sought in our

19   motion, Your Honor.  It does not have to be the mechanic

20   that we came up with.  Just because JPMorgan seemed to be

21   able to be comfortable with it we don't understand why Citi

22   is not.

23           I will tell Your Honor that JPMorgan, there was

24   cash that they also applied on disputed claims.  So it's not

25   entirely different the way Citibank makes it seem.

1          I think --

2          THE COURT:  Mr. Kirpalani let me ask you

3    something.

4          MR. KIRPALANI:  Uh-huh.

5          THE COURT:  It's been a very interesting argument.

6    And one of the thoughts that occurs to me now is that it may

7    be premature.  One of the issues that bubbled up in my mind

8    as I was hearing the argument about the calculation of

9    interest and the fact that interest was being used as a form

10   of leverage, in fact Ms. Hammerman acknowledged that it was

11   a form of leverage, but a permissible form of leverage and

12   one that Lehman and the plan administrator has been using

13   apparently successfully in ongoing negotiations in the

14   mediation and ADR process.

15          My thought is this.  I don't even know at this

16   point whether interest even applies, because the dispute is

17   not really ripe for determination unless the parties choose

18   to settle it, and at some point in the future there may in

19   fact be a litigation in which there's a determination made

20   one way or the other as to whether Citi is or is not over

21   secured.  Only then really is the question of entitlement to

22   interest ripe for determination, and at that point,

23   presumably, parties will be making arguments as to what the

24   rate should be, what the entitlement is, why the facts and

25   the law justify such an outcome.

1           As I've been thinking about the argument I've been

2    characterizing it in my own mind as an incredibly

3    interesting and novel argument both on the part of the plan

4    administrator, the committee, the estate, whoever it is you

5    represent right now, and Citi arguing a whole host of

6    largely theoretical propositions, which admittedly would

7    require, if I were to grant you the relief that you seek, me

8    to make a number of leaps.  I don't know that those leaps

9    would constitute an abuse of discretion.

10          But as I'm thinking about this and the exercise of

11   my discretion I'm questioning why I need to do it now.  And

12   the fact that you have waited this long to bring this to my

13   attention is something of a double-edged sword.

14          It suggests on the one hand that perhaps the

15   estate or the plan administrator had not focused on the

16   negative impact of the hypothetical interest accrual or it

17   may reflect a desire on the part of the plan administrator

18   now to seek to tilt the playing field a little bit in

19   ongoing negotiations by removing the ongoing accrual of

20   post-petition interest as part of the calculation to be made

21   in thinking about how to settle this, if as and when the

22   parties do that.

23          To the extent that may be, and I'm simply thinking

24   out loud with you, to the extent that may be one of the

25   motivations for doing this I begin to question whether

1   that's a place I should choose to tread at this point in the

2   exercise of discretion.  Because regardless of the merits of

3   the various legal arguments that have been made the real

4   economic issue seems to be, and don't think I'm disparaging

5   you when I say this, something of a shell game in which

6   there's a provisional allowance of a claim with all rights

7   reserved around that, but it's not happening in 2009, it's

8   not happening leading up to the confirmation of the plan,

9   it's happening almost two years after confirmation of the

10  plan while active litigation is pending between your clients

11  and Citi.

12          And so I end up thinking, not knowing everything

13  that's behind the curtains, because there's always something

14  behind the curtains that you don't see in court, well, why

15  is this being presented to me for determination today as

16  opposed to three years ago or two years from now?

17          And so one of my questions to you in this long-

18  winded musing is why do I need to do it now and is it really

19  ripe, and it is appropriate for me to do it if it has an

20  impact upon negotiations that may take place in the future

21  to hopefully bring this dispute to a conclusion?

22          MR. KIRPALANI:  Thank you, Your Honor.

23          I think the easiest and most direct way to answer

24  the Court's question is as Your Honor knows from your work

25  as a mediator it's very, very difficult to engage in any

1    attempt to resolve big ticket litigation where you're

2    talking about billions of dollars when every single day the

3    bookends are moving further apart.

4           So I don't even mean to disparage Citibank about

5    the interest rate arbitrage, it's a fact of life.  And if

6    the purpose of the bankruptcy is to get claims resolved, and

7    that is in fact the core function of a Bankruptcy Court to

8    resolve them using equitable means, to do so and to stop

9    wasting so much behemoth (ph) money back and forth, the

10   debtors, the plan administrator, the creditors' committee

11   plead in that vein for equitable powers to be used to stop

12   the bookends from moving.  Every day they move in one

13   direction and it's making it more and more difficult to get

14   to resolution.

15          In terms of the equities on the other side they

16   Have, and we've only learned through this process,

17   Mr. Shimshak would say I should have gone to better law

18   school or something if I don't understand the debt

19   relationship between banks and deposits -- I did think there

20   was cash sitting somewhere.  I did.

21          So this became an illuminating fact for us that

22   now they've actually had full use -- full enjoyment of

23   $2 billion for five years, and yet at the same time they

24   have asserted they will be charging -- I'm not going pick

25   the interest rate because I didn't follow it -- some amount

Page 78

1   of interest that is definitely hundreds of thousands of

2   dollars a day, and that that's going to happen every day,

3   because under the stipulation that they entered in April

4   2009 they only have to pay us two basis points.

5          From the estate's perspective whatever equity the

6   estate has into this collateral, i.e., the setoff right, the

7   deposit, is wasting and diminishing.

8          And so in the interest of getting the litigation

9   resolved we believe, and I would actually challenge Citibank

10  to disagree, we believe eliminating some of the moving

11  pieces is a good thing, and that's our position, Your Honor.

12         This is a moving piece.  We thought about frankly

13  making a motion for partial summary judgment in the

14  adversary over the interest issue, and that may be something

15  that we seek permission to do if Your Honor is not inclined

16  to do this on an equitable basis, but it is an issue that

17  although there are a bunch of theoreticals embedded in it,

18  and we appreciate that, it's very difficulty even for us to

19  get our arms around this and we live this, there are certain

20  principals that should apply.  And cutting off the post-

21  petition burn, certainly post-effective date, when Citibank

22  has had the full use and enjoyment of the cash, subject to

23  the credit risk that they have to pay us $2 billion, you

24  know, at some point if we're right, suggests to us that it

25  is ripe for determination and that is the basis of the

1    motion.

2         THE COURT:  Let me ask you this follow-up question

3    with particular reference to your suggestion that one of the

4    alternatives you thought about was maybe seeking leave to

5    bring a motion for partial summary judgment that I presume

6    would seek a determination as a matter of law that post-

7    petition interest or post-confirmation interest should not

8    be accruing any longer.

9         One way to look then at this pending motion is

10   that it is in effect the functional equivalent of a motion

11   for partial summary judgment with respect to the right to

12   continue to accrue post-confirmation interest, because if I

13   were to grant you the extraordinary relief that you seek

14   under 105 dealing with those moving parts of 502 the impact

15   of this would be that henceforth there would be no ongoing

16   interest accrual.

17        Now, I'm questioning in my own mind whether it's

18   appropriate for this to be what amounts to a -- an

19   unconventional alternative to that kind of substantive

20   motion, which would be record-based based on the law and

21   presumably would not be a 105 motion, because I've never

22   seen a 105 motion for summary judgment.  Maybe you have, but

23   I haven't.

24        So you've given me another reason to sit back a

25   little bit in my chair and think twice about whether or not

1   this is the right thing to be doing now.  Quite apart from

2   whether or not someone is sitting here courageously might

3   stake out a claim for advancing jurisprudence along the

4   lines that you've suggested.  I'm not saying it's

5   impermissible, although Mr. Shimshak has said that, but it

6   may be unwise.

7           Mr. Shimshak, do you wish to say something?

8           MR. SHIMSHAK:  Yes, Your Honor, I have a number of

9   comments, and I want to come to the introductory comments

10  that you made in the last exchange about this potentially

11  being not ripe, but I want to clear some other things away

12  first and then focus on that, because that's very important.

13          Lehman said that a determination of the

14  appropriate rate of interest was one of the alternative

15  forms of relief that it had sought on this motion.  I

16  believe that's what we just heard.

17          I'm looking at page 1 where -- of their motion

18  where they outline the forms of relief they're seeking.

19  That is not one of the forms of relief.

20          So the statement that determining the appropriate

21  rate of interest is one of the forms of relief they've been

22  seeking on this motion is belied by the bullet points that

23  outline the relief they're seeking.

24          Second, there was a -- there was a discussion

25  about the stipulation of reserve stipulation that went into

Page 81

1    -- that went into place.  The amended stipulation

2    establishing distribution reserve.  And there was the

3    suggestion that there was a conspicuous silence on our part

4    in not addressing the supposed or the perceived impact of

5    that reserve on the interest rate.  But the reserve itself

6    states that the reserve, and I quote, "In the event that the

7    Bankruptcy Court by a final, non-appealable order determines

8    that any of Citibank's claims identified in the stipulation

9    are allowed unsecured claims."

10          The purpose of the reserve -- the purpose of the

11   reserve stipulation was a mechanic that took place at the

12   time of the confirmation of the plan -- or the submission of

13   the plan.  Because we had potentially large claims and we

14   had this $2 billion reserve or this debt that we owe Lehman.

15   And the negotiation was, well, if it's determined that you

16   have unsecured claims that would be one of the places that

17   you'll look.  Effectively you'll be able to reduce your

18   claims even though unsecured by offset against that --

19   against the $2 billion obligation, so that Lehman did not

20   have to put more cash into the cash reserve for the benefit

21   of our potentially unsecured claims.  So that's what the

22   stipulation did.

23          I was gratified to hear that Lehman has abandoned

24   any effort to bring this within Section 363(b).  I think

25   that's long overdue.  It was evident from the filing of the

Page 82

1    motion that 363(b) was not an available form of relief and

2    one would assume familiarity with their own plan.

3            The discussion about Calpine is equally irrelevant

4    in that regard, because Calpine -- one thing Calpine was,

5    was relief granted under Section 363(b).  It's right on the

6    face of Judge Sheindlin's decision.

7            There was also reference somewhat sarcastically to

8    our God-given rights of setoff.  No, they're not God-given,

9    their congressionally given though.  Section 553 is

10   explicit.  It says in 553(a) except for enumerated

11   exceptions, "Nothing in this title …" meaning all of title

12   11, "… shall affect the right of setoff."

13           I would submit that includes section 502(b) if it

14   is diminishing our right of setoff in any fashion.

15           There was again reference to the fact that we've

16   had this $2 billion and it's really unfair for us now to be

17   seeking post-petition interest if the claim is reduced to a

18   level where that becomes a meaningful consideration, that

19   that's somehow inequitable.

20           But what that argument really means is even though

21   we've caused you independent economic harm as evidenced by

22   the claims that you have asserted against us, the derivative

23   claims that we've asserted, the Hong Kong loan guarantee

24   claim, which they haven't paid, the derivative claims that

25   they haven't paid, even though we've caused you separate and

Page 83

1  independent economic harm you're not entitled to be

2  compensated for that harm through the passage of time.  That

3  argument makes no sense.

4          We're entitled under the Bankruptcy Code and as a

5  matter of substantive law to protection of our setoff right

6  to the full extent permitted and we maintain that includes

7  post-petition interest and post-confirmation interest.

8          553 can't be tampered with.

9          You can't use 502(b) to put a gloss on

10 Section 363.

11         Nothing in Title 11 can reduce those rights.

12         Then there was a retreat to 502(b) again.  And,

13 Your Honor, you will have to decide, if you decide this to

14 go forward with this at this point or at some later point,

15 whether your equitable powers to enforce the provisions, to

16 implement the provisions of an expressed statute -- a

17 provision of a statute which talks about allowance of claims

18 except in enumerated circumstances where claims are

19 disallowed -- whether that provision allows you to breathe

20 in to Section 502(b) through Section 105, the ability to cut

21 off a creditor with a setoff right that creditor's

22 entitlement to post-petition interest.

23         Now let me come back to the introductory comment

24 about ripeness.

25         I certainly can't quarrel with that proposition,

1    it's one we've made in our papers, that this entire

2    controversy is not ripe for determination at that time.

3    There are a million things that can happen between now and

4    the point where this issue should be legitimately addressed,

5    and that anything right now is purely hypothetical, purely

6    speculative, and the other word for that is purely advisory.

7    There are not a ripe set of issues before you.  The claims

8    have not been --

9             THE COURT:  Excuse me.

10            MR. SHIMSHAK:  -- the claims have not been

11   determined, the interest rate has not been determined, the

12   litigation outcome in its entirety has not been determined.

13   All of these matters should await another day.

14            And depending on the facts -- depending on the

15   facts as I said in our earlier comments, the means exist to

16   deal with the situation.

17            You can rule straight up on the law on that point

18   to the extent of our secured rights and our rights of

19   setoff, you can deal with their claim that we've done

20   something wrong through the count of their complaint that

21   seeks equitable subordination.

22            The moving goal posts that were described as Your

23   Honor correctly observed are nothing more than the

24   consequence of the inner play between our rights -- our

25   rights -- our protected rights and a litigation that they

1    brought and that is lasting a long time, and that's

2    regrettable that it has to last as long as it has.  As

3    Ms. Hammerman indicated, that's not a matter that's been

4    within our control.  We would love to see the scope of

5    discovery narrowed.  We would love to see the litigation

6    move at a better -- at a better pace.  We would have loved

7    to have been in settlement discussions with them.  They

8    discontinued the settlement discusses.

9           So the notion that this is inequitable, that the

10   moving goal post is somehow inequitable is tantamount to

11   saying that a creditor's rights with setoff rights in the

12   event that his claim is oversecured it's inequitable for him

13   to get what the Bankruptcy Code has prescribed.

14          I liked your description of this as tilting the

15   field, I think that's what this boils down to.  That's what

16   we've been maintaining, that this is really an attempt to

17   tilt the field in Lehman's favor through extraordinary

18   relief that's not available to bring us to a negotiation

19   with having lost or having lost substantive rights to which

20   we're entitled.

21          I think the whole matter is premature, it should

22   it should not be decided, there's no basis even I would

23   maintain for the kind of provisional determination of the

24   appropriate interest rate because that issue too is not ripe

25   at this time.

```
 1                    Thank you, Your Honor.

 2                    MR. KIRPALANI:  Thirty seconds, I promise.

 3                    You've given us a lot of Your Honor's and your

 4        staff's time, and I just want to be very brief.

 5                    First, the reason why we didn't choose to proceed

 6        by writing a letter requesting permission to file a motion

 7        for summary judgment or partial summary judgment was not

 8        because we didn't think it was ripe, but rather I don't

 9        believe Your Honor has had the opportunity to fully

10        understand what this lawsuit has been doing to the estate,

11        and I thought -- we thought that a letter seeking partial

12        summary judgment without any background would look like we

13        are trying to tilt the playing field, if Your Honor will.

14        We're not trying to tilt the playing field, we're trying to

15        even the playing field so we can have a rational discussion.

16                    And I won't go into any back and forth discussions

17        that have taken place, but we thought this was an

18        appropriate way to address the Court as to the current

19        inequitable situation facing the estate and its creditors

20        when there is absolutely no injury on either side, rather

21        what we would call almost a gotcha situation by a very

22        powerful creditor.

23                    That's it, Your Honor.

24                    THE COURT:  Okay.  Thank you.

25                    I almost left the bench during the last three
```

Page 87

1    minutes of Mr. Shimshak's argument because I was choking,

2    but it had nothing to do --

3            MR. SHIMSHAK:  I'm the one with the cold.

4            THE COURT:  -- but it had nothing to do -- it had

5    nothing to do with his argument.

6            This is a very challenging and innovative argument

7    and I'd say that applies on both sides.  And the estate has

8    made what I consider to be a very creative argument and a

9    persuasive one relative to the ability in concept to

10   provisionally allow the secured claim.  But of course it's

11   not a secured claim.

12           And as I was reading the papers I will confess I

13   did not have a full appreciation of the nature of the

14   relationship that existed between Citi and the estate.  And

15   for that reason what Mr. Kirpalani has characterized as the

16   tutorial was actually quite helpful.

17           I will note however that I am generally familiar

18   with how banks work, that's not to say that I'm specifically

19   aware of how each espoke (sic) arrangement may work between

20   a depositor and a financial institution.

21           In this instance Citi, through counsel, has made a

22   coherent argument about preservation of rights, and that is

23   in effect the essence of their position here.  It is an

24   argument based upon rights of setoff preserved under the

25   Bankruptcy Code, and I'm familiar with how that works and

Page 88

1    have written on that topic.

2              So the question really becomes one of whether or

3    not it is appropriate for this Bankruptcy Court in this

4    extraordinary bankruptcy case to do something unprecedented.

5    And I believe even the movants would concede that what we're

6    talking about here has never been done before.

7              There are a couple of ways to analyze this.

8              One is just because it has never been done before

9    doesn't mean it isn't permissible to do, assuming that it's

10   the right thing to do.

11             Another is in a case of this global prominence is

12   it appropriate after the plan has been confirmed and while

13   significant litigation is pending to take action such as

14   this that would have the economic effect of depriving a

15   major creditor of substantive economic rights?

16             I conclude that the latter alternative is what

17   applies here and that it would be an inappropriate exercise

18   of this Court's discretion in the present context to

19   provisionally allow a claim with all rights reserved if the

20   economic impact of so doing would be to cut off a claim for

21   post-confirmation interest.

22             In saying that I do not wish to dignify that

23   claim.  That claim may for other substantive reasons not be

24   allowable as a matter of law or not be allowable as a matter

25   of fact or not be appropriate given the equities of the

Page 89

1    case, and as to that issue or series of issues the Court

2    reserves all judgment for future hearings.

3              I'm also motivated in reaching this conclusion by

4    the mental impression earlier described that this is not the

5    right time to deal with this question.

6              As Mr. Kirpalani has pointed out in his argument,

7    while this case has been pending for quite some time this is

8    really the first major proceeding that has taken place in

9    the case that has involved significant interaction between

10   counsel and the Court.

11             Unlike other adversary proceedings that are

12   pending on my docket in the Lehman case this one has been

13   running silent and running deep in the sense that it hasn't

14   surfaced as a dispute that has required by attention.

15             I'll contrast it with an earlier matter on the

16   docket, Giant Stadium.  I've heard all too much from them

17   and so I have a pretty good understanding as to what that

18   dispute is about.

19             That's another reason why I believe it is unwise

20   for the Court to exercise what would be a truly unusual,

21   unprecedented, and extraordinary reach of 105 coupled with

22   502 power to preemptively cut off legal rights of Citi.

23             This is all without prejudice of course to

24   reconsidering the question at some future date, and I would

25   consider today to be a marker of sorts.  This is the date

Page 90

1    when the Court could have cut off the running of post-

2    petition interest, and as a result it might be argued by

3    somebody in the future, to the extent that the facts and

4    legal argument might support the proposition that the

5    effective date for cutting off interest might be today.

6              Thank you for the argument, we'll move on to the

7    next matter.

8              MR. SHIMSHAK:  Thank you, Your Honor.

9              MR. KIRPALANI:  Thank you, Your Honor.

10             MR. SHIMSHAK:  Your Honor, may we have permission

11   to leave?

12             THE COURT:  Everyone who's involved or interested

13   in the matter that was just argued may be excused.

14             MR. SHIMSHAK:  Thank you.

15        (Pause)

16             THE COURT:  Now, before we start, I've been at

17   this now for two and a quarter hours.  I'm assuming that

18   this matter involving the litigation against Tschira --

19             MR. TAMBE:  That's right, Your Honor.

20             THE COURT:  -- will not be particularly time

21   consuming unless you tell me otherwise.

22             MR. TAMBE:  I don't anticipate it will be, Your

23   Honor.  I think it'll be relatively short, but Mr. Brilliant

24   may have something to say about that.

25             MR. BRILLIANT:  What do you mean by -- I mean

Page 177

```
 1                  C E R T I F I C A T I O N

 2

 3    I, Dawn South, certify that the foregoing transcript is a

 4    true and accurate record of the proceedings.

 5

 6        Dawn        Digitally signed by Dawn South
                      DN: cn=Dawn South, o, ou,
                      email=digital1@veritext.com,
 7        South       c=US
                      Date: 2013.10.25 16:09:06 -04'00'

 8

 9    AAERT Certified Electronic Transcriber CET**D-408

10

11    I, William J. Garling, certify that the foregoing transcript

12    is a true and accurate record of the proceedings.

13

14        William     Digitally signed by William
                      Garling
          Garling     DN: cn=William Garling, o, ou,
15                    email=digital1@veritext.com,
                      c=US
                      Date: 2013.10.25 16:09:41 -04'00'

16

17    AAERT Certified Electronic Transcriber CET**D-543

18

19

20    Veritext

21    200 Old Country Road

22    Suite 580

23    Mineola, NY 11501

24

25    Date:  October 24, 2013
```

# Exhibit G

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
| | : | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------------------x


**THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession


Dated: New York, New York
August 31, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND CONSTRUCTION OF TERMS ....................... 1

ARTICLE II     TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
               AND PRIORITY TAX CLAIMS ...................................................... 17

2.1    Administrative Expense Claims ................................................ 17

2.2    Professional Compensation and Reimbursement Claims ........................ 17

2.3    Priority Tax Claims ................................................................ 18

ARTICLE III    CLASSIFICATION OF CLAIMS AND EQUITY
               INTERESTS .................................................................... 18

3.1    LBHI ................................................................................ 18

3.2    LCPI ................................................................................ 19

3.3    LBCS ................................................................................ 19

3.4    LBSF ................................................................................ 19

3.5    LOTC ................................................................................ 20

3.6    LBCC ................................................................................ 20

3.7    LBDP ................................................................................ 20

3.8    LBFP ................................................................................ 21

3.9    LB 745 .............................................................................. 21

3.10   PAMI Statler ...................................................................... 21

3.11   CES ................................................................................. 22

3.12   CES V ............................................................................... 22

3.13   CES IX .............................................................................. 22

3.14   East Dover .......................................................................... 22

3.15   LS Finance .......................................................................... 23

3.16   LUXCO .............................................................................. 23

3.17   BNC ................................................................................. 23

3.18   LB Rose Ranch .................................................................... 23

3.19   SASCO .............................................................................. 24

3.20   LB 2080 ............................................................................. 24

3.21   Merit ................................................................................ 24

3.22   Preferred Somerset .............................................................. 24

# TABLE OF CONTENTS
## (continued)

Page

3.23    Somerset ................................................................ 25

ARTICLE IV    TREATMENT OF CLAIMS AGAINST AND EQUITY
INTERESTS IN LBHI ................................................ 25

4.1    LBHI Class 1 – Priority Non-Tax Claims against LBHI ...................... 25

4.2    LBHI Class 2 – Secured Claims against LBHI ...................... 25

4.3    LBHI Class 3 – Senior Unsecured Claims against LBHI ...................... 25

4.4    LBHI Class 4A – Senior Affiliate Claims against LBHI ...................... 26

4.5    LBHI Class 4B – Senior Affiliate Guarantee Claims against LBHI ....... 26

4.6    LBHI Class 5 – Senior Third-Party Guarantee Claims against
LBHI ................................................................ 26

4.7    LBHI Class 6A – Convenience Claims against LBHI ...................... 26

4.8    LBHI Class 6B – Convenience Guarantee Claims against LBHI ........... 27

4.9    LBHI Class 7 – General Unsecured Claims against LBHI ...................... 27

4.10    LBHI Class 8 – Affiliate Claims against LBHI ...................... 27

4.11    LBHI Class 9A – Third-Party Guarantee Claims against LBHI ............. 27

4.12    LBHI Class 9B – Third-Party Guarantee Claims of the Racers
Trusts against LBHI ................................................ 27

4.13    LBHI Class 10A – Subordinated Class 10A Claims against LBHI ......... 28

4.14    LBHI Class 10B – Subordinated Class 10B Claims against LBHI ......... 28

4.15    LBHI Class 10C – Subordinated Class 10C Claims against LBHI ......... 28

4.16    LBHI Class 11 – Section 510(b) Claims against LBHI ...................... 28

4.17    LBHI Class 12 – Equity Interests in LBHI ...................... 29

ARTICLE V    TREATMENT OF CLAIMS AGAINST AND EQUITY
INTERESTS IN SUBSIDIARY DEBTORS ...................... 29

5.1    LCPI Class 1 – Priority Non-Tax Claims against LCPI ...................... 29

5.2    LCPI Class 2 – Secured Claims against LCPI ...................... 30

5.3    LCPI Class 3 – Convenience Claims against LCPI ...................... 30

5.4    LCPI Class 4A – General Unsecured Claims other than those of
Designated Entities against LCPI ...................... 30

5.5    LCPI Class 4B – General Unsecured Claims of Designated Entities
against LCPI ................................................ 30

5.6    LCPI Class 5A – Affiliate Claims of LBHI against LCPI ...................... 31

## TABLE OF CONTENTS
### (continued)

Page

5.7     LCPI Class 5B – Affiliate Claims of Participating Subsidiary
        Debtors against LCPI ................................................................................ 31

5.8     LCPI Class 5C – Affiliate Claims other than those of Participating
        Debtors against LCPI ................................................................................ 31

5.9     LCPI Class 6 – Equity Interests in LCPI ................................................ 31

5.10    LBCS Class 1 – Priority Non-Tax Claims against LBCS ....................... 32

5.11    LBCS Class 2 – Secured Claims against LBCS ...................................... 32

5.12    LBCS Class 3 – Convenience Claims against LBCS .............................. 32

5.13    LBCS Class 4 – General Unsecured Claims against LBCS .................... 32

5.14    LBCS Class 5A – Affiliate Claims of LBHI against LBCS .................... 33

5.15    LBCS Class 5B – Affiliate Claims of Participating Subsidiary
        Debtors against LBCS ............................................................................... 33

5.16    LBCS Class 5C – Affiliate Claims other than those of Participating
        Debtors against LBCS ............................................................................... 33

5.17    LBCS Class 6 – Equity Interests in LBCS .............................................. 33

5.18    LBSF Class 1 – Priority Non-Tax Claims against LBSF ........................ 34

5.19    LBSF Class 2 – Secured Claims against LBSF ....................................... 34

5.20    LBSF Class 3 – Convenience Claims against LBSF ............................... 34

5.21    LBSF Class 4A – General Unsecured Claims other than those of
        the Racers Trusts against LBSF ................................................................ 34

5.22    LBSF Class 4B – General Unsecured Claims of the Racers Trusts
        against LBSF ............................................................................................. 35

5.23    LBSF Class 5A – Affiliate Claims of LBHI against LBSF ..................... 35

5.24    LBSF Class 5B – Affiliate Claims of Participating Subsidiary
        Debtors against LBSF ............................................................................... 35

5.25    LBSF Class 5C – Affiliate Claims other than those of Participating
        Debtors against LBSF ............................................................................... 35

5.26    LBSF Class 6 – Equity Interests in LBSF ............................................... 36

5.27    LOTC Class 1 – Priority Non-Tax Claims against LOTC ....................... 36

5.28    LOTC Class 2 – Secured Claims against LOTC ..................................... 36

5.29    LOTC Class 3 – Convenience Claims against LOTC ............................. 37

5.30    LOTC Class 4 – General Unsecured Claims against LOTC .................... 37

## TABLE OF CONTENTS
### (continued)

Page

5.31   LOTC Class 5A – Affiliate Claims of LBHI against LOTC ................... 37

5.32   LOTC Class 5B – Affiliate Claims of Participating Subsidiary
Debtors against LOTC ................................................................. 37

5.33   LOTC Class 5C – Affiliate Claims other than those of Participating
Debtors against LOTC ................................................................. 37

5.34   LOTC Class 6 – Equity Interests in LOTC............................................ 38

5.35   LBCC Class 1 – Priority Non-Tax Claims against LBCC...................... 38

5.36   LBCC Class 2 – Secured Claims against LBCC .................................... 38

5.37   LBCC Class 3 – Convenience Claims against LBCC ............................ 39

5.38   LBCC Class 4 – General Unsecured Claims against LBCC................... 39

5.39   LBCC Class 5A – Affiliate Claims of LBHI against LBCC .................. 39

5.40   LBCC Class 5B – Affiliate Claims of Participating Subsidiary
Debtors against LBCC ................................................................. 39

5.41   LBCC Class 5C – Affiliate Claims other than those of Participating
Debtors against LBCC ................................................................. 39

5.42   LBCC Class 6 – Equity Interests in LBCC............................................ 40

5.43   LBDP Class 1 – Priority Non-Tax Claims against LBDP ...................... 40

5.44   LBDP Class 2 – Secured Claims against LBDP..................................... 40

5.45   LBDP Class 3 – General Unsecured Claims against LBDP ................... 41

5.46   LBDP Class 4A – Affiliate Claims of LBHI against LBDP................... 41

5.47   LBDP Class 4B – Affiliate Claims other than those of LBHI
against LBDP. ............................................................................. 41

5.48   LBDP Class 5 – Equity Interests in LBDP ............................................ 41

5.49   LBFP Class 1 – Priority Non-Tax Claims against LBFP ....................... 41

5.50   LBFP Class 2 – Secured Claims against LBFP ..................................... 42

5.51   LBFP Class 3 – General Unsecured Claims against LBFP .................... 42

5.52   LBFP Class 4A – Affiliate Claims of LBHI against LBFP .................... 42

5.53   LBFP Class 4B – Affiliate Claims other than those of LBHI
against LBFP................................................................................ 42

5.54   LBFP Class 5 – Equity Interests in LBFP ............................................. 43

5.55   LB 745 Class 1 – Priority Non-Tax Claims against LB 745 .................. 43

5.56   LB 745 Class 2 – Secured Claims against LB 745 ................................. 43

iv

# TABLE OF CONTENTS
## (continued)

Page

5.57   LB 745 Class 3 – General Unsecured Claims against LB 745 ............... 43

5.58   LB 745 Class 4A – Affiliate Claims of LBHI against LB 745 ............... 44

5.59   LB 745 Class 4B – Affiliate Claims other than those of LBHI against LB 745 ...................................................................................... 44

5.60   LB 745 Class 5 – Equity Interests in LB 745 ......................................... 44

5.61   PAMI Statler Class 1 – Priority Non-Tax Claims against PAMI Statler ...................................................................................................... 44

5.62   PAMI Statler Class 2 – Secured Claims against PAMI Statler .............. 45

5.63   PAMI Statler Class 3 – General Unsecured Claims against PAMI Statler ...................................................................................................... 45

5.64   PAMI Statler Class 4A – Affiliate Claims of LBHI against PAMI Statler ...................................................................................................... 45

5.65   PAMI Statler Class 4B – Affiliate Claims other than those of LBHI against PAMI Statler ................................................................................ 45

5.66   PAMI Statler Class 5 – Equity Interests in PAMI Statler ...................... 46

5.67   CES Class 1 – Priority Non-Tax Claims against CES ............................ 46

5.68   CES Class 2 – Secured Claims against CES ........................................... 46

5.69   CES Class 3 – General Unsecured Claims against CES .......................... 46

5.70   CES Class 4A – Affiliate Claims of LBHI against CES ......................... 47

5.71   CES Class 4B – Affiliate Claims other than those of LBHI against CES ........................................................................................................... 47

5.72   CES Class 5 – Equity Interests in CES ................................................... 47

5.73   CES V Class 1 – Priority Non-Tax Claims against CES V ..................... 47

5.74   CES V Class 2 – Secured Claims against CES V .................................... 47

5.75   CES V Class 3 – General Unsecured Claims against CES V .................. 48

5.76   CES V Class 4A – Affiliate Claims of LBHI against CES V .................. 48

5.77   CES V Class 4B – Affiliate Claims other than those of LBHI against CES V ........................................................................................... 48

5.78   CES V Class 5 – Equity Interests in CES V ........................................... 48

5.79   CES IX Class 1 – Priority Non-Tax Claims against CES IX .................. 49

5.80   CES IX Class 2 – Secured Claims against CES IX ................................. 49

5.81   CES IX Class 3 – General Unsecured Claims against CES IX .............. 49

# TABLE OF CONTENTS
## (continued)

Page

5.82   CES IX Class 4A – Affiliate Claims of LBHI against CES IX .............. 49

5.83   CES IX Class 4B – Affiliate Claims other than those of LBHI against CES IX .................................................................................. 50

5.84   CES IX Class 5 – Equity Interests in CES IX ........................................ 50

5.85   East Dover Class 1 – Priority Non-Tax Claims against East Dover ........ 50

5.86   East Dover Class 2 – Secured Claims against East Dover ...................... 50

5.87   East Dover Class 3 – General Unsecured Claims against East Dover ........................................................................................................ 51

5.88   East Dover Class 4A – Affiliate Claims of LBHI against East Dover ........................................................................................................ 51

5.89   East Dover Class 4B – Affiliate Claims other than those of LBHI against East Dover .................................................................................. 51

5.90   East Dover Class 5 – Equity Interests in East Dover .............................. 51

5.91   LS Finance Class 1 – Priority Non-Tax Claims against LS Finance ....... 52

5.92   LS Finance Class 2 – Secured Claims against LS Finance ...................... 52

5.93   LS Finance Class 3 – General Unsecured Claims against LS Finance ...................................................................................................... 52

5.94   LS Finance Class 4A – Affiliate Claims of LBHI against LS Finance ...................................................................................................... 52

5.95   LS Finance Class 4B – Affiliate Claims other than those of LBHI against LS Finance .................................................................................. 53

5.96   LS Finance Class 5 – Equity Interests in LS Finance ............................. 53

5.97   LUXCO Class 1 – Priority Non-Tax Claims against LUXCO ............... 53

5.98   LUXCO Class 2 – Secured Claims against LUXCO .............................. 53

5.99   LUXCO Class 3 – General Unsecured Claims against LUXCO ............. 54

5.100  LUXCO Class 4A – Affiliate Claims of LBHI against LUXCO ............. 54

5.101  LUXCO Class 4B – Affiliate Claims other than those of LBHI against LUXCO .................................................................................... 54

5.102  LUXCO Class 5 – Equity Interests in LUXCO ...................................... 54

5.103  BNC Class 1 – Priority Non-Tax Claims against BNC .......................... 55

5.104  BNC Class 2 – Secured Claims against BNC ......................................... 55

5.105  BNC Class 3 – General Unsecured Claims against BNC ....................... 55

# TABLE OF CONTENTS
## (continued)

Page

5.106  BNC Class 4A – Affiliate Claims of LBHI against BNC ....................... 55

5.107  BNC Class 4B – Affiliate Claims other than those of LBHI against BNC ..................................................................................................... 55

5.108  BNC Class 5 – Equity Interests in BNC .................................................. 56

5.109  LB Rose Ranch Class 1 – Priority Non-Tax Claims against LB Rose Ranch ............................................................................................... 56

5.110  LB Rose Ranch Class 2 – Secured Claims against LB Rose Ranch ........ 56

5.111  LB Rose Ranch Class 3 – General Unsecured Claims against LB Rose Ranch ............................................................................................... 57

5.112  LB Rose Ranch 4A – Affiliate Claims of LBHI against LB Rose Ranch .................................................................................................. 57

5.113  LB Rose Ranch Class 4B – Affiliate Claims other than those of LBHI against LB Rose Ranch .................................................................. 57

5.114  LB Rose Ranch Class 5 – Equity Interests in LB Rose Ranch ............... 57

5.115  SASCO Class 1 – Priority Non-Tax Claims against SASCO ................. 57

5.116  SASCO Class 2 – Secured Claims against SASCO ................................ 58

5.117  SASCO Class 3 – General Unsecured Claims against SASCO .............. 58

5.118  SASCO Class 4A – Affiliate Claims of LBHI against SASCO ............. 58

5.119  SASCO Class 4B – Affiliate Claims other than those of LBHI against SASCO ....................................................................................... 58

5.120  SASCO Class 5 – Equity Interests in SASCO ....................................... 59

5.121  LB 2080 Class 1 – Priority Non-Tax Claims against LB 2080 .............. 59

5.122  LB 2080 Class 2 – Secured Claims against LB 2080 ............................. 59

5.123  LB 2080 Class 3 – General Unsecured Claims against LB 2080 ........... 59

5.124  LB 2080 Class 4A – Affiliate Claims of LBHI against LB 2080 ........... 60

5.125  LB 2080 Class 4B – Affiliate Claims other than those of LBHI against LB 2080 ...................................................................................... 60

5.126  LB 2080 Class 5 – Equity Interests in LB 2080 ..................................... 60

5.127  Merit Class 1 – Priority Non-Tax Claims against Merit......................... 60

5.128  Merit Class 2 – Secured Claims against Merit........................................ 61

5.129  Merit Class 3 – General Unsecured Claims against Merit...................... 61

5.130  Merit Class 4A – Affiliate Claims of LBHI against Merit ..................... 61

## TABLE OF CONTENTS
### (continued)

Page

5.131 Merit Class 4B – Affiliate Claims other than those of LBHI against Merit ................................................................................................ 61

5.132 Merit Class 5 – Equity Interests in Merit ................................................. 61

5.133 Preferred Somerset Class 1 – Priority Non-Tax Claims against Preferred Somerset ..................................................................................... 62

5.134 Preferred Somerset Class 2 – Secured Claims against Preferred Somerset ..................................................................................................... 62

5.135 Preferred Somerset Class 3 – General Unsecured Claims against Preferred Somerset ..................................................................................... 62

5.136 Preferred Somerset Class 4A – Affiliate Claims of LBHI against Preferred Somerset ..................................................................................... 63

5.137 Preferred Somerset Class 4B – Affiliate Claims other than those of LBHI against Preferred Somerset ............................................................ 63

5.138 Preferred Somerset Class 5 – Equity Interests in Preferred Somerset ..................................................................................................... 63

5.139 Somerset Class 1 – Priority Non-Tax Claims against Somerset ............. 63

5.140 Somerset Class 2 – Secured Claims against Somerset ............................ 64

5.141 Somerset Class 3 – General Unsecured Claims against Somerset ........... 64

5.142 Somerset Class 4A – Affiliate Claims of LBHI against Somerset .......... 64

5.143 Somerset Class 4B – Affiliate Claims other than those of LBHI against Somerset ......................................................................................... 64

5.144 Somerset Class 5 – Equity Interests in Somerset .................................... 65

ARTICLE VI        IMPLEMENTATION OF THE PLAN ............................................ 65

6.1 Plan Administrator ................................................................................... 65

6.2 LAMCO .................................................................................................... 67

6.3 Debtor Allocation Agreement .................................................................. 67

6.4 Redistribution of Subordinated Claims Recoveries ................................ 67

6.5 Plan Settlement ........................................................................................ 68

6.6 Closing of Chapter 11 Case ..................................................................... 70

6.7 Indenture Trustee and Creditors' Committee Members Fees .................. 70

ARTICLE VII       CORPORATE GOVERNANCE ...................................................... 71

7.1 Corporate Form ........................................................................................ 71

viii

# TABLE OF CONTENTS
## (continued)

Page

7.2    LBHI Board of Directors and Officers ..................................................... 71

7.3    Subsidiary Debtor Post-Effective Date Management ............................. 72

7.4    Plan Trust. ............................................................................................... 73

7.5    Corporate Existence ................................................................................ 73

7.6    Wind-Down.............................................................................................. 73

7.7    Certificate of Incorporation and By-Laws .............................................. 74

7.8    Stock Trading Restrictions....................................................................... 74

ARTICLE VIII    PROVISIONS REGARDING VOTING AND
DISTRIBUTIONS UNDER THE PLAN .......................................... 74

8.1    Voting of Claims...................................................................................... 74

8.2    Nonconsensual Confirmation................................................................... 74

8.3    Distributions of Available Cash ............................................................... 74

8.4    Disputed Claims Holdback. ..................................................................... 75

8.5    Minimum Distribution and Manner of Payment...................................... 76

8.6    Distributions Free and Clear .................................................................... 76

8.7    Delivery of Distributions and Undeliverable Distributions..................... 76

8.8    Withholding and Reporting Requirements ............................................... 76

8.9    Time Bar to Cash Payment Rights........................................................... 77

8.10    Setoffs and Recoupment .......................................................................... 77

8.11    Claims Register........................................................................................ 77

8.12    Allocation of Distributions ...................................................................... 77

8.13    Maximum Distribution............................................................................. 78

8.14    Rights of Reimbursement ........................................................................ 79

8.15    Distributions to Non-Controlled Affiliates ............................................. 80

ARTICLE IX    PROCEDURES FOR TREATING DISPUTED CLAIMS .............. 80

9.1    Objections ................................................................................................ 80

9.2    No Distributions Pending Allowance ...................................................... 80

9.3    Estimation of Claims................................................................................ 80

9.4    Resolution of Disputed Claims ................................................................ 81

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE X        LIQUIDATING TRUST ................................................................. 81

   10.1    Execution of Liquidating Trust Agreement ............................. 81

   10.2    Purpose of the Liquidating Trust ............................................ 81

   10.3    Liquidating Trust Assets ........................................................ 81

   10.4    Administration of the Liquidating Trust ................................. 81

   10.5    Liquidating Trustee's Tax Power for Debtors ......................... 82

   10.6    Cash Investments .................................................................... 82

   10.7    Distribution of Liquidating Trust Interests ............................. 82

   10.8    Federal Income Tax Treatment of Liquidating Trust ............. 82

   10.9    Tax Reporting ......................................................................... 82

   10.10   Dissolution ............................................................................. 84

ARTICLE XI       TREATMENT OF EXECUTORY CONTRACTS AND
                           UNEXPIRED LEASES ......................................... 84

   11.1    Executory Contracts and Unexpired Leases ........................... 84

   11.2    Approval of Assumption and Rejection of Executory Contracts and
        Unexpired Leases .................................................................... 85

   11.3    Cure of Defaults ..................................................................... 85

   11.4    Bar Date for Filing Proofs of Claim Relating to Executory
        Contracts and Unexpired Leases Rejected Pursuant to the Plan .............. 85

   11.5    Insurance Policies ................................................................... 85

   11.6    Indemnification Obligations ................................................... 85

ARTICLE XII      EFFECTIVENESS OF THE PLAN ................................................. 86

   12.1    Conditions Precedent to the Confirmation of the Plan ........... 86

   12.2    Conditions Precedent to the Effective Date of the Plan ......... 86

   12.3    Waiver of Conditions .............................................................. 86

ARTICLE XIII     EFFECTS OF CONFIRMATION ................................................... 87

   13.1    Vesting of Assets .................................................................... 87

   13.2    Binding Effect ......................................................................... 87

   13.3    Release and Exculpation ......................................................... 87

   13.4    Discharge ................................................................................ 88

   13.5    Injunction ................................................................................ 88

x

# TABLE OF CONTENTS
### (continued)

Page

13.6    United States Government ............................................................ 88

13.7    Terms of Injunctions or Stays .................................................... 89

13.8    Retention of Litigation Claims and Reservation of Rights ..................... 89

13.9    Barclays Sale Order. ............................................................... 89

ARTICLE XIV    RETENTION OF JURISDICTION ................................................ 89

14.1    Retention of Jurisdiction ........................................................ 89

ARTICLE XV    MISCELLANEOUS PROVISIONS .................................................. 91

15.1    Post-Effective Date Role of Creditors' Committee and Fee
        Committee ....................................................................... 91

15.2    Issuance of New Securities ...................................................... 91

15.3    Exemption from Securities Laws .................................................. 92

15.4    Exemption from Transfer Taxes ................................................... 92

15.5    Plan Supplement ................................................................. 92

15.6    Post-Effective Date Reporting. .................................................. 92

15.7    Payment of Statutory Fees. ...................................................... 94

15.8    Amendment or Modification of Plan ............................................... 94

15.9    Withdrawal or Revocation of the Plan ............................................ 94

15.10   Courts of Competent Jurisdiction ................................................ 94

15.11   Transactions on Business Days ................................................... 94

15.12   Notices ......................................................................... 95

15.13   Severability .................................................................... 95

15.14   Governing Law ................................................................... 95

15.15   Headings ........................................................................ 95

15.16   Exhibits ........................................................................ 95

15.17   Successors and Assigns .......................................................... 96

**<u>Schedules</u>**

Plan Adjustment Percentages............................................................................Schedule 1

Debtors' Claims Schedule................................................................................Schedule 2

Bankhaus Settlement Agreement .....................................................................Schedule 3

PSA Creditors ..................................................................................................Schedule 4

Hong Kong Settlement Agreement ..................................................................Schedule 5

LBT Settlement Agreement .............................................................................Schedule 6

Singapore Settlement Agreement ....................................................................Schedule 7

# ARTICLE I
## Definitions and Construction of Terms

Definitions.    As used in the Plan, the following terms shall have the respective meanings specified below:

1.1    Administrative Expense Claim means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estates of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business from and after the Commencement Date, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code.

1.2    Affiliate shall have the meaning assigned to such term in section 101(2) of the Bankruptcy Code, excluding a Designated Entity.

1.3    Affiliate Claim means (a) in the case of LBHI, any Claim asserted by an Affiliate of LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Affiliate Claim or a Senior Affiliate Guarantee Claim, or (b) in the case of a Subsidiary Debtor, any Claim asserted by an Affiliate of that Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim or a Secured Claim.

1.4    Allowed means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any Claim allowed hereunder, (c) any Claim that is not Disputed, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court, including, without limitation, the Derivatives Procedures Order, or under Section 9.4 of the Plan, or (e) any Claim that, if Disputed, has been Allowed by Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Commencement Date.  For purposes of a Foreign Proceeding, an Allowed Claim includes a Claim that has been accepted or allowed in a Foreign Proceeding by settlement with a Foreign Administrator or Final Order of a court of competent jurisdiction.

1.5    Available Cash means (a) all Cash of a Debtor realized from its business operations, the sale or other disposition of its assets, the interest earned on its invested funds, recoveries from Litigation Claims or from any other source or otherwise less (b) the amount of Cash (i) necessary to pay holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims and Convenience Guarantee Claims against such Debtor in accordance with the Plan, and (ii) estimated and

reserved by such Debtor to (A) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Debtor on and after the Effective Date, (B) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code and (C) fund and maintain any postpetition reserve requirements in connection with any agreements or otherwise.  Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with <u>Section 8.4</u> of the Plan, (ii) amounts represented by undeliverable Distributions in accordance with <u>Section 8.7</u>, or (iii) amounts attributable to voided checks in accordance with <u>Section 8.9</u> of the Plan.

1.6     <u>Avoidance Actions</u> means any actions commenced or that may be commenced before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

1.7     <u>Ballot</u> means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan.

1.8     <u>Bankhaus Settlement Agreement</u> means that certain Amended and Restated Settlement Agreement, dated March 1, 2011, among the Debtors and certain Debtor-Controlled Entities and the LBB Administrator, as amended by that certain Amendment #1, dated March 18, 2011, to the Amended and Restated Settlement Agreement, which are annexed hereto as <u>Schedule 3</u>.

1.9     <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.10    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.11    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.12    <u>Barclays Sale Order</u> means the *Order Under 11 U.S.C. § §  105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases*, entered by the Bankruptcy Court on September 20, 2008 in the Chapter 11 Cases [Docket No. 258] and the concurrent order entered in the LBI Proceeding on September 19, 2008 [Case No. 08-1420; Docket No. 3].

1.13    <u>Bar Date Order</u> means the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice thereof and Approving the Proof of Claim Form* approved and entered by the Bankruptcy Court on July 2, 2009 [Docket No. 4271], as the same may be amended from time to time.

1.14    <u>BNC</u> means BNC Mortgage LLC.

2

1.15    <u>Business Day</u> means any day other than a Saturday, a Sunday, and any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.16    <u>Cash</u> means legal tender of the United States of America.

1.17    <u>Causes of Action</u> means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.18    <u>CES</u> means CES Aviation LLC.

1.19    <u>CES V</u> means CES Aviation V LLC.

1.20    <u>CES IX</u> means CES Aviation IX LLC.

1.21    <u>Chapter 11 Cases</u> means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court, styled *In re Lehman Brothers Holdings Inc.*, *et al.*, Chapter 11 Case No. 08-13555 (JMP).

1.22    <u>Claim</u> shall have the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

1.23    <u>Class</u> means a category of holders of Claims or Equity Interests as set forth in <u>Article III</u> of the Plan.

1.24    <u>Class 10A Subordinated Notes</u> means, collectively, (a) the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2035 issued pursuant to the Eighth Supplemental Indenture, dated as of August 19, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (b) the Fixed/Floating Rate Subordinated Notes due 2016 Series 5065, issued pursuant to a final term sheet dated as of September 26, 2006 under the Euro Medium-Term Note Program; (c) the Floating Rate Subordinated Notes due 2037 Series EB17, issued pursuant to a final term sheet dated as of January 23, 2007 under the Euro Medium-Term Note Program; (d) the Fixed/Floating Rate Subordinated Notes due 2019 Series 6222, issued pursuant to the final term sheet dated as of February 14, 2007 under the Euro Medium-Term Note Program; and (e) the Floating Rate Subordinated Notes due 2037 Series EB 18, issued pursuant to a final term sheet, dated as of May 30, 2007, under the Euro Medium-Term Note Program.

1.25    <u>Class 10B Subordinated Notes</u> means, collectively, (a) the 6.375% Subordinated Deferrable Interest Debentures due 2052, issued pursuant to the Fourth Supplemental Indenture, dated as of March 17, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (b) the 6.375% Subordinated Deferrable Interest Debentures due October 2052, issued pursuant to the Fifth Supplemental Indenture, dated as of October 31, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (c) the 6.00% Subordinated Deferrable Interest Debentures due 2053, issued

pursuant to the Sixth Supplemental Indenture, dated as of April 22, 2004, between LBHI and JPMorgan Chase Bank, as trustee; (d) the 6.24% Subordinated Deferrable Interest Debentures due 2054, issued pursuant to the Seventh Supplemental Indenture, dated as of January 18, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (e) the 5.75% Subordinated Notes due 2017, issued pursuant to the Ninth Supplemental Indenture, dated as of October 24, 2006, between LBHI and JPMorgan Chase Bank, as trustee; (f) the Fixed and Floating Rate Subordinated Notes Due 2032, issued pursuant to the Tenth Supplemental Indenture, dated as of May 1, 2007, between LBHI and JPMorgan Chase Bank, as trustee; (g) the 6.50% Subordinated Notes Due 2017, issued pursuant to the Thirteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (h) the 6.875% Subordinated Notes Due 2037, issued pursuant to the Fourteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (i) the 6.75% Subordinated Notes Due 2017, issued pursuant to the Fifteenth Supplemental Indenture, dated as of December 21, 2007, between LBHI and The Bank of New York, as trustee; and (j) the 7.50% Subordinated Notes Due 2038, issued pursuant to the Sixteenth Supplemental Indenture, dated as of May 9, 2008, between LBHI and The Bank of New York, as trustee.

1.26    Class 10C Subordinated Notes means, collectively, (a) the 5.707% Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Eleventh Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee; and (b) the Floating Rate Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Twelfth Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee.

1.27    Closing Date means the date upon which all of the Chapter 11 Cases have been closed in accordance with Section 6.6 of the Plan.

1.28    Collateral means any property or interest in Property of the Estates of the Debtors subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

1.29    Commencement Date means (a) September 15, 2008 with respect to LBHI, (b) September 16, 2008 with respect to LB 745, (c) September 23, 2008 with respect to PAMI Statler, (d) October 3, 2008 with respect to LBCS, LBSF and LOTC, (d) October 5, 2008 with respect to LBDP, LCPI, LBCC, LBFP, CES, CES V, CES IX, East Dover and LS Finance, (e) January 7, 2009 with respect to LUXCO, (f) January 9, 2009 with respect to BNC, (g) February 9, 2009 with respect to SASCO and LB Rose Ranch, (h) April 23, 2009 with respect to LB 2080, (i) December 14, 2009 with respect to Merit, and (j) December 22, 2009 with respect to Somerset and Preferred Somerset.

1.30    Confirmation Date means the date upon which the Bankruptcy Court enters a Confirmation Order on the docket of the Chapter 11 Cases as applicable to each Debtor.

1.31    Confirmation Hearing means the hearing held by the Bankruptcy Court, as the same may be continued from time to time, to consider confirmation of the Plan.

1.32    Confirmation Order means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each Debtor.

1.33    Contributing Class means each of LBHI Class 5, LBHI Class 9A, LCPI Class 4A, LCPI Class 4B, LCPI Class 5B, LCPI Class 5C, LBCS Class 4, LBCS Class 5B, LBCS Class 5C, LBSF Class 4A, LBSF Class 5B, LBSF Class 5C, LOTC Class 4, LOTC Class 5B, LOTC Class 5C, LBCC Class 4, LBCC Class 5B and LBCC Class 5C.

1.34    Convenience Claim means any Senior Unsecured Claim or General Unsecured Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.35    Convenience Guarantee Claim means any Senior Third-Party Guarantee Claim or Third-Party Guarantee Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Guarantee Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Guarantee Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.36    Creditor shall have the meaning assigned to such term in section 101(10) of the Bankruptcy Code.

1.37    Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.38    Debtor means BNC, CES, CES V, CES IX, East Dover, LB 745, LB 2080, LB Rose Ranch, LBCC, LBCS, LBDP, LBFP, LBHI, LBSF, LCPI, LOTC, LS Finance, LUXCO, Merit, PAMI Statler, Preferred Somerset, SASCO and Somerset, each in its individual capacity as debtor and debtor in possession in its Chapter 11 Case pursuant to sections 101(13), 1107(a) and 1108 of the Bankruptcy Code.

1.39    Debtor Allocation Agreement means the agreement contained in the Plan Supplement among two or more of the Debtors that identifies, allocates and sets forth other agreed rights and obligations with respect to (a) the costs and benefits of Jointly Owned Litigation Claims, (b) commonly held tax benefits and obligations, (c) expenses of administration of the Chapter 11 Cases, and (d) certain other inter-Debtor related issues.

1.40    Debtors' Claims Schedule means the schedule attached hereto as Schedule 2 setting forth the amounts of Senior Affiliate Claims, Senior Affiliate Guarantee Claims or Affiliate Claims, as applicable, of a Debtor against another Debtor.

1.41    Debtor-Controlled Entity means a non-Debtor Affiliate of the Debtors that is managed and controlled by a Debtor as of the Effective Date.

1.42    Designated Entity means each of the Racers Trusts and the holder of the Fenway Claims.

1.43    Derivatives Procedures Order means the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption or Assignment of Prepetition Derivatives Contracts*, approved and entered by the Bankruptcy Court on December 16, 2008 [Docket No. 2257], as amended or may be amended from time to time.

1.44    Director Selection Committee means the committee established pursuant to Section 7.2(b) of the Plan, the members of which are identified in the Plan Supplement.

1.45    Disclosure Statement means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.46    Disputed means, with reference to any Claim, (a) any Claim proof of which was timely and properly filed that is (i) disputed in whole or in part under the Plan, including, without limitation, any Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim that is not Allowed in accordance with Section 6.5(b) of the Plan, or (ii) as to which a timely objection and/or request for estimation has been interposed, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, or (b) any Claim, proof of which was required to be filed by the Bar Date Order or another Final Order of the Bankruptcy Court in a form and manner proscribed in such order, but as to which a proof of Claim was not timely or properly filed.

6

1.47    Distribution means any initial or subsequent payment or transfer made under the Plan.

1.48    Distribution Date means any date on which a Distribution is made upon at least fourteen (14) Business Days written notice filed on the docket of the Chapter 11 Cases or otherwise communicated to holders of Allowed Claims.

1.49    East Dover means East Dover Limited.

1.50    Effective Date means the first Business Day on which the conditions to effectiveness of the Plan set forth in Article XII have been satisfied or waived and on which the Plan shall become effective with respect to a Debtor.

1.51    Equity Interest means (a) shares of common stock, preferred stock, other forms of ownership interest, or any interest or right to convert into such an equity or ownership interest or to acquire any equity or ownership interest or any interest or right for which the amount owing is determined by reference to an equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, the LBHI 2005 stock incentive plan or the LBHI employee incentive plan, in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor, and (b) Allowed Claims against LBHI arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

1.52    Excess LBSF Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(f) of the Plan to holders of Allowed Claims in LBSF Class 5A in the event holders of Allowed Claims in LBSF Class 4A are satisfied in full.

1.53    Excess LCPI Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(e) of the Plan to holders of Allowed Claims in LCPI Class 5A in the event holders of Allowed Claims in LCPI Class 4A are satisfied in full.

1.54    Excess Plan Adjustment means the Distributions (including the Plan Adjustment), if any, made in accordance with the last sentence of Section 6.5(a) of the Plan in the event that holders of Allowed Claims in an LBHI Class 3 or LBHI Class 7 are satisfied in full to Participating Debtors for the exclusive benefit of (i) holders of Allowed Claims in such Participating Debtors' Contributing Classes and, in addition to the foregoing, (ii) (A) in the case of LBHI, LBHI Class 9B or (B) in the case of LBSF, LBSF Class 4B.

1.55    Excess Plan Adjustment Portion means, with respect to each Contributing Class and LBHI Class 9B and LBSF Class 4B, (a) if the Excess Plan Adjustment is equal to the Plan Adjustment, the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B and (b) if the Excess Plan Adjustment is less than the Plan Adjustment, the portion of the Excess Plan Adjustment that bears the same relationship to the Excess Plan Adjustment as the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B bears to the Plan Adjustment, contributed by all Contributing Classes and LBHI Class 9B and LBSF Class 4B.

7

1.56    Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

1.57    Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.58    Foreign Administrator means each of the persons or entities that is managing the affairs and representing the insolvency estate of a Non-Controlled Affiliate that is subject to a Foreign Proceeding.

1.59    Foreign Proceeding means an insolvency, administration, liquidation, rehabilitation, receivership or like proceeding commenced by or initiated against a Non-Controlled Affiliate in a jurisdiction outside of the United States.

1.60    General Unsecured Claim means, (a) in the case of LBHI, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, a Senior Affiliate Claim, a Senior Affiliate Guarantee Claim, a Senior Third-Party Guarantee Claim, an Affiliate Claim, a Third-Party Guarantee Claim, a Subordinated Claim or a Section 510(b) Claim, or (b) in the case of each Subsidiary Debtor, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim or an Affiliate Claim.

1.61    Governmental Unit shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

1.62    Guarantee Claim means a Claim asserted against LBHI on the basis of a guarantee, promise, pledge, indemnity or similar agreement by LBHI (a) to satisfy an obligation or liability of another entity or (b) with respect to asset values, collection or net worth of another entity.

1.63    Hong Kong Lehman Entities In Liquidation shall have the meaning assigned to such term in the Hong Kong Settlement Agreement.

1.64    Hong Kong Settlement Agreement means that certain Settlement and Plan Support Agreement, dated July 31, 2011, among the Debtors and the Hong Kong Lehman Entities In Liquidation, which is annexed hereto as Schedule 5.

1.65     Independent Directors means Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Jerry A. Grundhofer, Roland A. Hernandez, Henry Kaufman and John D. Macomber.

1.66     Intercompany Funding Balance means that portion of LBHI's Claim against a Subsidiary Debtor, in the amount reflected on page 3 of the Debtors' Claims Schedule, that relates to the funding of operations of such Subsidiary Debtor but does not relate to specific transactions, such as derivative contracts or repurchase agreements.

1.67     IRS means the Internal Revenue Service.

1.68     Jointly Owned Litigation Claims means any Litigation Claims that may be, are or are asserted to be owned, either jointly or individually, by one or more of the Debtors.

1.69     LAMCO means LAMCO Holdings LLC and its subsidiary Affiliates.

1.70     LB 745 means LB 745 LLC.

1.71     LB 2080 means LB 2080 Kalakaua Owners LLC.

1.72     LBB means Lehman Brothers Bankhaus AG (in Insolvenz).

1.73     LBB Administrator means Dr. Michael C. Frege in his capacity as insolvency administrator (*Insolvenzverwalter*) of LBB.

1.74     LBCC means Lehman Brothers Commercial Corporation.

1.75     LBCS means Lehman Brothers Commodities Services Inc.

1.76     LBDP means Lehman Brothers Derivative Products Inc.

1.77     LBFP means Lehman Brothers Financial Products Inc.

1.78     LBHI means Lehman Brothers Holdings Inc.

1.79     LBHI Stock means the common or preferred stock of LBHI outstanding on the Effective Date.

1.80     LBI means Lehman Brothers Inc.

1.81     LBI Proceeding means the proceeding commenced under the Securities Investor Protection Act of 1970, as amended, with respect to LBI.

1.82     LB Rose Ranch means LB Rose Ranch LLC.

1.83     LBSF means Lehman Brothers Special Financing Inc.

1.84     LBSF Additional Settlement Amount means the first $70 million that is recovered by LBSF in respect of "Total Assets" in excess of $14,156,000,000, the amount of "Total

Assets" of LBSF estimated in Exhibit 4 to the Disclosure Statement, dated June 29, 2011, which shall be distributed to only holders of Allowed Claims in LBSF Class 4A and LBSF Class 5C in accordance with <u>Section 6.5(d)</u> of the Plan.

1.85    <u>LBSF Settlement Amount</u> means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LBSF that shall be automatically redistributed in accordance with <u>Section 6.5(f)</u> of the Plan.

1.86    <u>LBSN</u> means Lehman Brothers Securities N.V.

1.87    <u>LBT</u> means Lehman Brothers Treasury Co. B.V.

1.88    <u>LBT Trustees</u> means Rutger J. Schimmelpenninck and Frédéric Verhoeven, in their capacity as bankruptcy trustees (*curatoren*) for LBT.

1.89    <u>LBT Settlement Agreement</u> that certain Settlement Agreement, dated August 30, 2011, among the Debtors and the LBT Trustees, which is annexed hereto as <u>Schedule 6</u>.

1.90    <u>LCPI</u> means Lehman Commercial Paper Inc.

1.91    <u>LCPI Settlement Amount</u> means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LCPI that shall be automatically redistributed in accordance with <u>Section 6.5(e)</u> of the Plan.

1.92    <u>Lehman</u> means LBHI together with all of its direct and indirect Affiliates existing on or after the LBHI Commencement Date.

1.93    <u>Lehman ALI</u> means Lehman ALI Inc.

1.94    <u>Lehman Singapore Entities</u> means the Lehman Singapore Liquidation Companies and the Lehman Singapore Non-Liquidation Companies as such terms are defined in the Singapore Settlement Agreement.

1.95    <u>Lien</u> shall have the meaning assigned to such term in section 101(37) of the Bankruptcy Code.

1.96    <u>Liquidating Trust</u> means a trust that may be created after the Effective Date in accordance with the provisions of <u>Article X</u> of the Plan and a Liquidating Trust Agreement for the benefit of holders of Allowed Claims or Equity Interests and as determined by the Plan Administrator consistent with the purposes of any such Liquidating Trust pursuant to <u>Section 10.2</u> of the Plan.

1.97    <u>Liquidating Trust Agreement</u> means an agreement evidencing the terms and provisions governing a Liquidating Trust that shall be entered into prior to the establishment of such Liquidating Trust and pursuant to which a Liquidating Trustee shall manage and administer Liquidating Trust Assets.

1.98    Liquidating Trust Assets means the assets of a Debtor or Debtor-Controlled Entity to be transferred to a Liquidating Trust as may be determined by the Plan Administrator, which shall be described in a Liquidating Trust Agreement.

1.99    Liquidating Trust Beneficiaries means those holders of Allowed Claims against or Equity Interests in a Debtor to the extent such holders receive Liquidating Trust Interests.

1.100    Liquidating Trustee means the person or entity appointed by the Plan Administrator prior to the creation of a Liquidating Trust to administer such Liquidating Trust in accordance with the provisions of Article X of the Plan and a Liquidating Trust Agreement; provided, however, that under no circumstance shall a Liquidating Trustee be a director or officer with respect to any entity over which the Liquidating Trust has control.

1.101    Liquidating Trust Interests means the non-certificated beneficial interests of a Liquidating Trust allocable to holders of Allowed Claims and/or Equity Interests in accordance with the terms and conditions of a Liquidating Trust Agreement, which may or may not be transferable.

1.102    Litigation Claims means any and all Causes of Action held by a Debtor.

1.103    LOTC means Lehman Brothers OTC Derivatives Inc.

1.104    LS Finance means Lehman Scottish Finance L.P.

1.105    LUXCO means Luxembourg Residential Properties Loan Finance S.a.r.l.

1.106    Merit means Merit, LLC.

1.107    New Securities means the securities that may be distributed by a Debtor or Debtor-Controlled Entity after the Effective Date to the holders of Allowed Claims against or Equity Interests in such Debtor representing an interest in an existing or newly formed entity of a Debtor or Debtor-Controlled Entity pursuant to and in a manner consistent with Section 15.2 of the Plan.

1.108    Non-Controlled Affiliate means an Affiliate of the Debtors that is not currently managed and controlled by a Debtor as of the Effective Date, including, without limitation, all Affiliates that are subject to a Foreign Proceeding and LBI.

1.109    Opco Plan Proponents means those entities that are "Non-Consolidation Plan Proponents," as identified in Schedule A to the *Joint Chapter 11 Plan For Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset, LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents*, filed on April 25, 2011 [Docket No. 16229], that have Claims against LBSF and LCPI.

1.110    Ordinary Course Professional Order means the *Amended Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business*, approved and entered by the

Bankruptcy Court on March 25, 2010 [Docket No. 7822], as the same may be amended from time to time.

1.111   PAMI Statler means PAMI Statler Arms LLC.

1.112   Participating Debtors means LBHI together with each of the Participating Subsidiary Debtors.

1.113   Participating Subsidiary Debtor means LCPI, LBSF, LOTC, LBCC or LBCS.

1.114   Plan means, collectively, the chapter 11 plans of each of the Debtors, and (where specified herein) individually, the chapter 11 plan of each Debtor, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as each of the foregoing may be altered, amended or modified from time to time.

1.115   Plan Administrator means LBHI pursuant to the authority granted in Section 6.1 of the Plan.

1.116   Plan Adjustment means the sum of (a) the Racers Adjustment and (b) the sum of (i) each of the Distributions (excluding Distributions on account of the LBSF Settlement Amount, the LBSF Additional Settlement Amount and the LCPI Settlement Amount) made to holders of Allowed Claims in each Contributing Class, multiplied by (ii) the Plan Adjustment Percentage applicable to each such Contributing Class, that shall be redistributed in accordance with Section 6.5(a) of the Plan.

1.117   Plan Adjustment Percentage means the percentage applicable to a Contributing Class of a Participating Debtor as set forth on Schedule 1 hereto.

1.118   Plan Supplement means the document containing the forms of documents specified in Section 15.5 of the Plan.

1.119   Plan Support Agreement means an agreement to support the Plan that has been or will be executed by a PSA Creditor.

1.120   Plan Trust means the trust established under New York law to hold the Plan Trust Stock on and after the Effective Date.

1.121   Plan Trust Agreement means the agreement contained in the Plan Supplement creating and setting forth the terms and conditions that shall govern the Plan Trust.

1.122   Plan Trust Stock means one new share of LBHI common stock to be issued to the Plan Trust upon cancellation of the LBHI Stock in accordance with Section 4.17(b) of the Plan.

1.123   Plan Trustee means any of the persons acting as trustee of the Plan Trust pursuant to Section 7.4 of the Plan.

1.124   Preferred Somerset means LB Preferred Somerset LLC.

12

1.125   <u>Primary Claim</u> means a Claim against a Primary Obligor for which a corresponding Guarantee Claim has been asserted.

1.126   <u>Primary Obligor</u> means an entity other than LBHI that is purportedly obligated or liable on a Claim with respect to which a Guarantee Claim has been asserted.

1.127   <u>Priority Non-Tax Claim</u> means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.128   <u>Priority Tax Claim</u> means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.129   <u>Property of the Estate</u> means all property of a Debtor pursuant to section 541 of the Bankruptcy Code.

1.130   <u>Pro Rata Share</u> means with respect to an Allowed Claim or Equity Interest (a) within the same Class, the proportion that an Allowed Claim or Equity Interest bears to the sum of all Allowed Claims and Disputed Claims or Allowed Equity Interests and Disputed Equity Interests within such Class, or (b) among all Classes, the proportion that a Class of Allowed Claims bears to the sum of all Allowed Claims and Disputed Claims; *provided*, *however*, that Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims, Convenience Guarantee Claims and Section 510(b) Claims shall not be considered for purposes of "Pro Rata Share" among all Classes; *provided*, *further*, *however*, that only the following Claims shall be considered in the determination of "Pro Rata Share" among all Classes with respect to the following Distributions:

(i)      Available Cash in the case of LBHI:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, General Unsecured Claims, Affiliate Claims, Third-Party Guarantee Claims and Subordinated Claims.

(ii)      Available Cash in the case of a Subsidiary Debtor:  General Unsecured Claims and Affiliate Claims.

(iii)     LBSF Settlement Amount: General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts.

(iv)     LBSF Additional Settlement Amount: (1) General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts, and (2) Affiliate Claims against LBSF other than Claims of any of the Participating Debtors.

(v)      LCPI Settlement Amount:  General Unsecured Claims against LCPI other than Claims of any Designated Entity.

(vi)     Plan Adjustment:  Senior Unsecured Claims against LBHI and General Unsecured Claims against LBHI.

(vii)   Subordinated Class 10A Distribution:   Senior Unsecured Claims and Senior Affiliate Claims.

(viii)   Subordinated Class 10B Distribution:   Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Senior Third-Party Guarantee Claims.

(ix)   Subordinated Class 10C Distribution:   Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, Subordinated Class 10A Claims and Subordinated Class 10B Claims.

1.131   PSA Creditor means any Creditor identified on Schedule 4 (as the same may be amended from time to time) that is a party to a Plan Support Agreement with the Debtors that has not been terminated, and the Ad Hoc Group of Lehman Brothers Creditors, and each former, current and future member thereof that executes a Plan Support Agreement prior to the hearing to consider approval of the Disclosure Statement, and each of its officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.132   Racers 2007-A Trust means the Restructured Assets with Enhanced Returns Series 2007-A Trust.

1.133   Racers Adjustment means the Distributions made to the Racers 2007-A Trust on account of (a) in the case of LBSF, $1 billion of its Allowed Claim against LBSF or (b) in the case of LBHI, $1 billion of its Allowed Guarantee Claim against LBHI.

1.134   Racers MM Trust means the Restructured Assets with Enhanced Returns 2007-7-MM Trust.

1.135   Racers Trusts means the Racers 2007-A Trust and the Racers MM Trust.

1.136   Released Parties means, collectively, and in each case, solely in such capacity, the Debtors, the Independent Directors, the Plan Administrator, the Creditors' Committee, each current and former member of the Creditors' Committee and, with respect to each of the foregoing, their respective officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.137   SASCO means Structured Asset Securities Corporation.

1.138   Schedules means the schedules of assets and liabilities, schedules of current income and current expenditures and the statements of financial affairs filed by the Debtors as

required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.139    Secured Claim means any Claim (a) to the extent reflected in the Schedules or upon a proof of Claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.140    Section 510(b) Claim means any Claim against LBHI that is subject to section 510(b) of the Bankruptcy Code other than any Claim arising out of, relating to, or in connection with Equity Interests in LBHI.

1.141    Senior Affiliate Claim means any Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Guarantee Claim.

1.142    Senior Affiliate Guarantee Claim means any Guarantee Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.143    Senior Notes means, collectively, the various notes issued by LBHI as to which Wilmington Trust Co. serves as indenture trustee.

1.144    Senior Third-Party Guarantee Claim means any Guarantee Claim asserted by a third-party that is not an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.145    Senior Unsecured Claim means any Claim against LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Claim, Senior Affiliate Guarantee Claim and Senior Third-Party Guarantee Claim.

1.146    Singapore Settlement Agreement means that certain Settlement Agreement, dated August 24, 2011, among the Debtors, certain Debtor-Controlled Entities and the Lehman Singapore Entities, which is annexed hereto as Schedule 7.

1.147    SIPA Trustee means James W. Giddens as trustee appointed under the Securities Investor Protection Act of 1970 to administer LBI's estate.

1.148    Somerset means LB Somerset LLC.

1.149    Stock Trading Restrictions Order means the *Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto* [Docket No. 1386], as the same may be amended from time to time.

1.150    Structured Securities Claims means the Claims against LBHI arising out of structured securities issued or guaranteed by LBHI, which Claims are listed in Exhibit A to the Structured Securities Motion.

1.151    Structured Securities Motion means the *Motion Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Procedures for Determining the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc.*, filed substantially contemporaneously with the Plan.

1.152    Structured Securities Order means an order of the Bankruptcy Court granting the Structured Securities Motion and approving the procedures for the allowance of Structured Securities Claims pursuant to the Structured Securities Valuation Methodologies.

1.153    Structured Securities Valuation Methodologies means the methodologies annexed as Exhibit 11 to the Disclosure Statement for the valuation of Structured Securities Claims.

1.154    Subordinated Class 10A Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10A Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.155    Subordinated Class 10B Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10B Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.156    Subordinated Class 10C Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10C Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.157    Subordinated Claim means any Subordinated Class 10A Claim, Subordinated Class 10B Claim or Subordinated Class 10C Claim.

1.158    Subordinated Class 10A Claim means any Claim against LBHI arising under the Class 10A Subordinated Notes.

1.159    Subordinated Class 10B Claim means any Claim against LBHI arising under the Class 10B Subordinated Notes.

1.160    Subordinated Class 10C Claim means any Claim against LBHI arising under the Class 10C Subordinated Notes.

1.161    Subordinated Notes means, collectively, the Class 10A Subordinated Notes, Class 10B Subordinated Notes and Class 10C Subordinated Notes.

16

1.162   Subsidiary Debtor means each of the Debtors other than LBHI.

1.163   Third-Party Guarantee Claim means any Guarantee Claim asserted by an entity that is not an Affiliate of LBHI other than a Senior Third-Party Guarantee Claim.

1.164   Voting Deadline means the date fixed by the Bankruptcy Court as the last date upon which holders of Claims may vote to accept or reject the Plan

Rules of Construction.   Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.   Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.   The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.   The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.   The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II
## Treatment of Administrative
## Expense Claims and Priority Tax Claims

2.1   Administrative Expense Claims.   Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by a Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash from the Debtor obligated for the payment of such Allowed Administrative Expense Claim in an amount equal to the Allowed amount of such Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by a Debtor or other obligations incurred by such Debtor shall be paid in full and performed by such Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2   Professional Compensation and Reimbursement Claims.   Other than a professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred on behalf of the Debtors and the Creditors' Committee through and including the Effective Date under section 105(a), 363(b), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is 120 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) be paid by or on behalf of the Debtor in full and in Cash in the amounts Allowed upon (i) the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (ii) such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment

17

result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

7.7    <u>Certificate of Incorporation and By-Laws</u>.    As of the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan.    The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement.

7.8    <u>Stock Trading Restrictions</u>.    The restrictions imposed by the Stock Trading Restrictions Order shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

## ARTICLE VIII
## Provisions Regarding Voting and Distributions Under the Plan

8.1    <u>Voting of Claims</u>.    Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to <u>Article III</u>, <u>Article IV</u> and <u>Article V</u> of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in an order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

8.2    <u>Nonconsensual Confirmation</u>.    If any impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with <u>Section 15.6</u> of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.    With respect to impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Code confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

8.3    <u>Distributions of Available Cash</u>.    On the Effective Date, or as soon thereafter as practicable, after the satisfaction in full of (or the establishment of reserves sufficient for the satisfaction in full of) Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Debtor determines to pay such Allowed Secured Claim in Cash) against a Debtor, each Debtor shall make a Distribution of its Available Cash in accordance with the provisions of the Plan to holders of Allowed Claims against such Debtor.    After the initial Distribution, each Debtor shall make Distributions of Available Cash in accordance with the Plan to holders of Allowed Claims against such Debtor semi-annually on March 30 and September 30 of each year, provided that each such Distribution in the aggregate is not less than $10,000,000 of such Debtor's Available Cash.    Notwithstanding the foregoing, the Plan Administrator may determine, in its sole discretion (a) to make a Distribution that is less than $10,000,000 in the aggregate of a Debtor's Available Cash, or (b) not to make a Distribution to the holder of an Allowed Claim (other than a Claim that has become Allowed pursuant to clauses (b), (d) and (e) of <u>Section 1.4</u> of the Plan) on the basis that it has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator determines (i) not to object to such Claim (or the time to object to Claims expires),

(ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.  To the extent that a Liquidating Trust is established for a Debtor in accordance with Article X of the Plan, any Distributions to be made to holders of Allowed Claims thereafter shall be made by the Liquidating Trustee to such holders as holders of Liquidating Trust Interests in accordance with the provisions of the Plan.  Distributions of Cash on account of such Liquidating Trust Interests shall be made in accordance with Section 10.7 of the Plan.

8.4     Disputed Claims Holdback.  From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Plan Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.  On the date of the first Distribution that is at least forty-five (45) days (or such fewer days as may be agreed between the applicable Debtor and the holder of the applicable Disputed Claim) after the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor shall remit to the holder of such Allowed Claim Available Cash equal to the amount that would have been distributed from the Effective Date through and including the date of such Distribution on account of such Allowed Claim had such Claim been Allowed as of the Effective Date, together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such Claim pursuant to this provision, in each case, but only to the extent that such interest is attributable to the amount of the Allowed Claim; *provided*, that (x) such amount shall be paid first out of the Available Cash retained on account of such Allowed Claim and second out of Available Cash other than Available Cash retained on account of other Disputed Claims and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent date(s) of Distribution before the holders of any other Claims against such Debtor receive any further Distributions out of Available Cash (other than Available Cash retained on account of other Disputed Claims) from such Debtor.  To the extent that a Disputed Claim against a Debtor is disallowed by Final Order or becomes an Allowed Claim in an amount less than the amount retained with respect to such Claim pursuant to this provision, the amount that would have been distributed on account of such Disputed Claim, or the excess of the amount of Available Cash that would have been distributed on account of such Disputed Claim over the amount of Available Cash actually distributed on account of such Disputed Claim, shall become Available Cash for Distributions to the holders of Allowed Claims.  Nothing in this Section 8.4 of the Plan shall preclude any holder of a Disputed Claim from seeking, on notice to the Plan Administrator, an order of the Bankruptcy Court in respect of or relating to the amount retained with respect to such holder's Disputed Claim.  Unless otherwise ordered by the Bankruptcy Court, Available Cash retained on account of Disputed Claims shall not be used by, on behalf of or for the benefit of a Debtor for operating expenses, costs or any purpose other than as set forth in this section.  If the Plan Administrator determines, in its sole discretion, that the value of a Debtor's assets (other than

such Debtor's Available Cash) exceeds the amount of Available Cash necessary to be retained pursuant to this section on account of Disputed Claims against such Debtor, the Plan Administrator may, subject to Bankruptcy Court approval, on proper notice to all holders of Disputed Claims against such Debtor, release such Available Cash for Distribution to holders of Allowed Claims and retain, in lieu thereof, such Debtor's non-Cash assets to satisfy its Disputed Claims if such Claims become Allowed Claims.

      8.5   <u>Minimum Distribution and Manner of Payment</u>.  Other than with respect to a Convenience Claim or Convenience Guarantee Claim, no payment of Cash of less than $500 shall be made by any Debtor to any holder of an Allowed Claim against such Debtor unless a request therefor is made in writing to the Plan Administrator.  Any payment of Cash made pursuant to the Plan may be made at the option of the Plan Administrator either by check or by wire transfer.

      8.6   <u>Distributions Free and Clear</u>.  Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and no other entity, including the Debtors or the Plan Administrator shall have any interest, legal, beneficial or otherwise, in assets transferred pursuant to the Plan.

      8.7   <u>Delivery of Distributions and Undeliverable Distributions</u>.  Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by a new address as set forth (a) on a proof of Claim filed by a holder of an Allowed Claim or (b) in another writing notifying the Plan Administrator (at the addresses set forth in <u>Section 15.12</u>) of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Administrator is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder at its then-current address, without interest.  All demands for undeliverable Distributions shall be made on or before six (6) months after the date such undeliverable Distribution was initially made.  Thereafter, the amount represented by such undeliverable Distribution shall irrevocably revert to the applicable Debtor as Available Cash for Distributions to the holders of Allowed Claims, and any Claim in respect of such undeliverable Distribution shall be discharged and forever barred from assertion against such Debtor or its respective property.

      8.8   <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator or the Liquidating Trustee (as applicable) shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions shall be subject to any such withholding or reporting requirements.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as distributed to such holders.  Notwithstanding the above, each holder of an Allowed Claim or Liquidating Trust Interest that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Plan Administrator or the Liquidating Trustee (as applicable), has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  The Plan Administrator or the Liquidating

Trustee (as applicable), may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim or Liquidating Trust Interest provide a completed Form W-8, W-9 and/or other tax information deemed necessary in the sole discretion of the Plan Administrator or Liquidating Trustee, as applicable to each such holder, provided that if the Plan Administrator or Liquidating Trustee (as applicable) makes such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the applicable Debtor or Liquidating Trust and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Debtor, Liquidating Trust, or its respective property.

8.9    Time Bar to Cash Payment Rights.    Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.    Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check.    Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property.

8.10    Setoffs and Recoupment.    Except as otherwise agreed by the Debtors, any Debtor may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that the claimant is provided written notice of the proposed setoff or recoupment at least ten (10) Business Days prior thereto, and, if such claimant files a written objection to such proposed setoff or recoupment, the Debtor shall not proceed with the setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection but may withhold such payment pending resolution of such objection; *provided, further, however*, that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any such Claim the Debtor may have against such claimant.

8.11    Claims Register.    The register of Claims maintained by the Debtors shall remain open after the Effective Date and the Debtors and Plan Administrator shall recognize any transfer of Claims at any time thereafter other than during the period commencing fourteen (14) calendar days prior to and concluding fourteen (14) calendar days after a Distribution Date.    Except as otherwise provided in the Plan, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim under the Plan and any such transferred Claim shall be subject to classification and treatment under the Plan as if such Claim was held by the transferor who held such Claim on the Commencement Date.

8.12    Allocation of Distributions.    Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

8.13    <u>Maximum Distribution</u>.

(a)     An (i) Allowed Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in the Allowed amount of such Claim or (ii) Allowed Guarantee Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) equal the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors) shall, in each case, be deemed satisfied in full as to such Allowed Claim or Allowed Guarantee Claim against the applicable Debtor.   To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI shall be entitled to receive future Distributions or consideration on account of the corresponding Primary Claim as subrogee pursuant to <u>Section 8.14(a)</u> of the Plan to the extent of LBHI's Distribution on account of such Guarantee Claim less any amounts received by LBHI by way of disgorgement thereof.   Except as specifically provided with respect to LBHI's rights of subrogation set forth above, nothing contained herein shall in any way affect the rights of the holder of a Guarantee Claim with respect to a corresponding Primary Claim against a Primary Obligor that is not a Debtor.

(b)     In no event shall (i) an Allowed Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in excess of the Allowed amount of such Claim or (ii) an Allowed Guarantee Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) are in excess of the Allowed amount of the Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors).

(c)     To the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan, each holder of each such Allowed Claim shall receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate) until such time as all postpetition interest on all such Allowed Claims has been paid in full.

(d)     For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with <u>Section 8.13(a)</u> of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date.   Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

(e)     The Plan Administrator may, in its sole discretion, request that a holder of an Allowed Guarantee Claim, except holders of Allowed Guarantee Claims for which a Subsidiary Debtor is the Primary Obligor, certify in writing and provide evidence reasonably

satisfactory to the Plan Administrator to confirm whether: (i) the Primary Claim has been Allowed or disallowed against the Primary Obligor, and, if Allowed, the amount of such Allowed Primary Claim, (ii) the Primary Claim is disputed or subject to objection by a Foreign Administrator or other party, (iii) the consideration, if any, received to date on account of such Allowed Primary Claim from the Primary Obligor, (iv) such holder has been notified by or on behalf of the Primary Obligor of any future distributions or payment anticipated or estimated to be made on account of such Primary Claim from the Primary Obligor; or (v) the holder (A) has sufficient assets to satisfy an order or judgment to disgorge any Distributions received with respect to such Allowed Guarantee Claim if it is ultimately determined that such holder is required to disgorge all or a portion of such Distributions and (B) will submit to the jurisdiction of the Bankruptcy Court for purposes of such order or judgment and will not contest the enforcement of such order or judgment in any foreign jurisdiction.  If the holder does not also certify, in addition to the foregoing, that the holder has sufficient assets in the United States of America to satisfy an order to disgorge any Distributions with respect to such Allowed Guarantee Claim, unless the Bankruptcy Court orders otherwise, the Plan Administrator may require that the holder post security for any obligation to disgorge Distributions made to such holder on account of such Allowed Guarantee Claim as a condition to the receipt of future Distributions on such Claim if the Plan Administrator reasonably determines that such security is necessary to ensure the recovery of any amount of Distributions made by LBHI to such holder that is ordered to be disgorged.   If (i) the Plan Administrator determines, based on the foregoing, that an Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, then unless the Bankruptcy Court orders otherwise, no Distributions shall thereafter be made on account of such Allowed Guarantee Claim, or (ii) a holder of an Allowed Guarantee Claim does not comply with this section, then unless the Bankruptcy Court orders otherwise, the Plan Administrator shall not be required to make Distributions on account of such Allowed Guarantee Claim, *provided* that nothing herein shall preclude a holder of an Allowed Guarantee Claim from challenging the determination of the Plan Administrator in the Bankruptcy Court; *provided, further*, that the Plan Administrator shall reserve Distributions with respect to such Allowed Guarantee Claim and, unless such Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, promptly after compliance with this section the Plan Administrator shall remit to the holder of such Allowed Guarantee Claim the lesser of (x) the amount reserved pursuant to this section on account of such Allowed Guarantee Claim or (y) the amount necessary to satisfy such Allowed Guarantee Claim in full in accordance with Section 8.13(a) of the Plan.

(f)     Any portion of any Distribution made by LBHI to the holder of an Allowed Guarantee Claim that is recovered pursuant to Section 8.13 or 8.14 of the Plan, whether by way of subrogation, disgorgement or otherwise, shall be treated as Available Cash of LBHI and distributed accordingly.

8.14   Rights of Reimbursement.

(a)     Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor on account of Distributions made to such Creditor, including, without limitation, on account of any Distributions made to holders of Allowed Guarantee Claims, (i) such Creditor shall be deemed to have consented to the subrogation of its right against any third-party, including, without

limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and power as subrogee of the Creditor against any such third-party, including, without limitation, a Primary Obligor, to the fullest extent permitted by applicable law.

(b)     Except as otherwise agreed by the Debtors, the Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

8.15    <u>Distributions to Non-Controlled Affiliates</u>.    Except as otherwise agreed by the Debtors and a Non-Controlled Affiliate or with respect to LBT or LBSN, the Plan Administrator may determine, in its sole discretion, to withhold all or a portion of a Distribution to a Non-Controlled Affiliate if such Distribution would be distributed by such Non-Controlled Affiliate to satisfy a Claim of a different Non-Controlled Affiliate against which a Debtor has a Claim but the latter Non-Controlled Affiliate has refused to honor such Claim of a Debtor without subordination, reduction or offset unless (a) otherwise agreed to by the Plan Administrator or (b) the priority and amount of a Debtor's Claim against the latter Non-Controlled Affiliate has been determined by Final Order.

## ARTICLE IX
## Procedures for Treating Disputed Claims

9.1    <u>Objections</u>.    The Debtors' rights to object to, oppose and defend against all Claims on any basis are fully preserved.    Notwithstanding that a Primary Claim is Allowed against a Primary Obligor, the Debtors reserve the right to object to, oppose and defend against all Guarantee Claims.    As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, which shall consult with the applicable Debtor regarding the same.    Objections to and requests for estimation of Claims shall be filed with the Court and served on the claimant on or before the later of (a) the date that is 2 years after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

9.2    <u>No Distributions Pending Allowance</u>.    Notwithstanding any other provision hereof and unless otherwise agreed, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

9.3    <u>Estimation of Claims</u>.    The Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.

15.17  <u>Successors and Assigns</u>.  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

Dated:      New York, New York
            August 31, 2011

LEHMAN BROTHERS HOLDINGS INC.

By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer

LB 745 LLC

By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer

PAMI STATLER ARMS LLC

By:      /s/ John Suckow
         Name:   John Suckow
         Title:   Authorized Signatory

LEHMAN BROTHERS COMMODITY SERVICES INC.

By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer

LEHMAN BROTHERS SPECIAL FINANCING INC.


By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS OTC DERIVATIVES INC.


By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.


By: _____/s/ Daniel Ehrmann_____
      Name:   Daniel Ehrmann
      Title:   Vice-President


LEHMAN COMMERCIAL PAPER INC.


By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LEHMAN BROTHERS COMMERCIAL CORP.


By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LEHMAN BROTHERS FINANCIAL PRODUCTS INC.


By: _____/s/ Daniel Ehrmann_____
      Name:   Daniel Ehrmann
      Title:   Vice-President

CES AVIATION LLC

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

CES AVIATION V LLC

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

CES AVIATION IX LLC

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

EAST DOVER LIMITED

By: _____/s/ Daniel Ehrmann_____
      Name:   Daniel Ehrmann
      Title:   Duly Authorized Officer

LEHMAN SCOTTISH FINANCE L.P., by its general
   partner Property Asset Management Inc.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

98

LUXEMBOURG RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L.


By:      /s/ Daniel Ehrmann
      Name:   Daniel Ehrmann
      Title:   Manager


BNC MORTGAGE LLC


By:      /s/ John Suckow
      Name:   John Suckow
      Title:   Authorized Signatory


LB ROSE RANCH LLC


By:      /s/ John Suckow
      Name:   John Suckow
      Title:   Authorized Signatory


STRUCTURED ASSET SECURITIES CORPORATION


By:      /s/ John Suckow
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LB 2080 KALAKAUA OWNERS LLC, by its managing
member PAMI LLC


By:      /s/ John Suckow
      Name:   John Suckow
      Title:   President and Chief Operating Officer

MERIT, LLC, by its Manager
LEHMAN COMMERCIAL PAPER INC.


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer


LB SOMERSET LLC, by its managing member
PAMI LLC


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer

LB PREFERRED SOMERSET LLC, by its managing
member PAMI LLC


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer


Counsel:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

# Exhibit H

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
In re                                                          :      Chapter 11 Case No.
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                       :      08-13555 (JMP)
                                                               :
                                    Debtors.                   :      (Jointly Administered)
                                                               :
---------------------------------------------------------------x

## ORDER CONFIRMING MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

Lehman Brothers Holdings Inc. and its affiliated debtors,[1] (collectively, the "Debtors"), each having proposed and filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (as subsequently supplemented, amended or modified, including by the Plan Supplement, the "Plan")[2] and the Disclosure Statement for the Plan, dated August 31, 2011 (as amended, the "Disclosure Statement"); and the Court having entered the *Amended Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan*, dated September 1, 2011 [ECF No. 19631] (the "Disclosure Statement Order");

---

[1] The Debtors are: Lehman Brothers Holdings Inc., LB 745 LLC, PAMI Statler Arms LLC, Lehman Brothers Commodity Services Inc., Lehman Brothers Special Financing Inc., Lehman Brothers OTC Derivatives Inc., Lehman Brothers Derivatives Products Inc., Lehman Commercial Paper Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Financial Products, Inc., Lehman Scottish Finance L.P., CES Aviation LLC, CES Aviation V LLC, CES Aviation IX LLC, East Dover Limited, Luxembourg Residential Properties Loan Finance S.a.r.l., BNC Mortgage LLC, Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is defined in title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

and the Disclosure Statement, the Plan and the Solicitation Packages (as defined below) having

been distributed to holders of Claims entitled to vote on the Plan as provided in the Disclosure

Statement Order; and due notice of (i) entry of the Disclosure Statement Order, (ii) the hearing

on confirmation of the Plan (the "Confirmation Hearing"), and (iii) the deadline for voting on,

and/or objecting to, the Plan having been provided to holders of Claims against and Equity

Interests in the Debtors and other parties in interest in accordance with the Disclosure Statement

Order, the Bankruptcy Code and the Bankruptcy Rules, as established by the affidavits of

service, mailing, and/or publication filed with the Court; and the following documents having

been filed in support of or in connection with the confirmation of the Plan:

(i)       Affidavit of Solicitation Mailing [ECF No. 20882] (the "Notice Affidavit");

(ii)      Affidavits of Publication of Notice of (a) Approval of the Disclosure Statement, (b) Establishing the Record Date, (c) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan and (d) Procedures and Deadline for Voting on Plan [ECF No. 21695] (the "Publication Affidavits");

(iii)     Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Cast on Debtors' Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated as of November 29, 2011 [ECF No. 22743] (as supplemented on December 5, 2011 [ECF No. 22972], the "Voting Certification");

(iv)     the Plan Supplement, dated October 25, 2011 and amendments thereto (the "Plan Supplement") [ECF Nos. 21254, 21665, 22156, 22590, 22742, 22876, 22975 and 22980];

(v)      the Debtors' Memorandum of Law Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, In Support

2

of Plan Settlements, dated November 29, 2011 (the "Debtors' Memorandum of Law In Support of the Global Settlement") [ECF No. 22749];

(vi)    the Debtors' Memorandum of Law in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 (the "Debtors' Memorandum of Law In Support of Confirmation") [ECF No. 22747];

(vii)    the Declaration of John K. Suckow in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22759] (the "Suckow Declaration");

(vii)    the Declaration of Daniel J. Ehrmann in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22760] (the "Ehrmann Declaration");

(ix)    the Declaration of Steven J. Cohn in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22761] (the "Cohn Declaration");

(x)    the Debtors' Response to Objections to Confirmation, dated November 29, 2011 (the "Debtors' Response") [ECF No. 22751];

(xi)    the Statement of Official Committee of Unsecured Creditors (I) In Support of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and (II) In Response to Objections to Such Plan, dated as of November 29, 2011 [ECF No. 22773];

(xii)    the statements of numerous other Creditors in support of confirmation of the Plan; and

(xiii)    objections to confirmation of the Plan by certain parties;

3

and each of the objections having been resolved, overruled, or withdrawn at or prior to the

Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on

December 6, 2011; and after full consideration of the record of the Chapter 11 Cases, including,

without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing

documents, and the evidence admitted and arguments of counsel made at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

DETERMINED, FOUND, ADJUDGED, AND DECREED:

## **FINDINGS OF FACT**

A.  <u>Findings of Fact</u>.  The findings set forth herein and in the record of the

Confirmation Hearing constitute the Court's findings of fact pursuant to Rule 52 of the Federal

Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the

extent any of the following findings of fact constitute conclusions of law, they are adopted as

such.

B.  <u>Separate Chapter 11 Plans for Each Debtor</u>.  Unless otherwise expressly

contemplated herein, any statement regarding the Plan or the satisfaction of any requirements by

the Plan or the Debtors, or approval of Plan, shall be deemed to apply separately to the chapter

11 plan of each of the Debtors.  Unless otherwise expressly contemplated herein, any statements

included herein referring to actions taken by the Debtors shall be deemed to mean actions taken

by each Debtor in connection with its Plan.

C.  <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2),</u>

<u>1334(a))</u>.  This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction

to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

D.    Commencement of Chapter 11 Cases.  Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its Affiliates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.    Judicial Notice.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and the evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the adequacy of the Disclosure Statement.

F.    Burden of Proof.  The Debtors have met their burden of proving the elements of section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

G.    Transmittal and Mailing of Materials; Notice.  On, September 1, 2011, the Court entered the Disclosure Statement Order, which, among others things, approved the Disclosure Statement, finding the Disclosure Statement contained "adequate information" under section 1125 of the Bankruptcy Code, established the procedures for the solicitation, voting, and tabulation of votes on the Plan, and approved the form of ballots and master ballots (the "Ballots").  The Disclosure Statement, the Plan, the Ballots, the Disclosure Statement Order, the notice of the scheduling of the Confirmation Hearing (the "Confirmation Hearing Notice"), and a

5

letter from the Creditors' Committee in support of the Plan (translated into five languages) (such documents, collectively, the "Solicitation Package"), were transmitted and served in compliance with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and such transmittal and service, as evidenced by the Notice Affidavit was adequate and sufficient.  The Debtors' publication of the Confirmation Hearing Notice in *The New York Times, The Wall Street Journal, the Financial Times, The Times of London, the Sydney Morning Herald, the Tribune De Geneve, the DE Telegraaf, the Apple Daily, the Tages Anzeiger, the Luxemburger Wort, the Corriere Del Ticino, the Frankfurter Allgemeine Zeitung,* and *Yomiuri Shimbun*, as set forth in the Publication Affidavits (i) complied with the Disclosure Statement Order, (ii) was adequate and sufficient under the circumstances of these Chapter 11 Cases, (iii) provided adequate notice of the deadline for objecting to confirmation of the Plan, and the date, time and location of the Confirmation Hearing, and (iv) provided due process to all parties in interest in these Chapter 11 Cases.  No other or further notice is required.

       H.     Voting.  Votes on the Plan were solicited after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code.  As described in the Voting Certification, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.

       I.     Plan Supplement.  On October 25, 2011, the Debtors filed the Plan Supplement, which included certain documents and agreements contemplated by the Plan, including the forms of revised certificates of incorporation and by-laws, or similar documents, for each Debtor other than Lehman Scottish Finance L.P. and East Dover Limited; the schedules of executory contracts and unexpired leases to be assumed pursuant to the Plan; the Plan Trust

6

Agreement; the form of Debtor Allocation Agreement; copies of settlement agreements that are incorporated into the Plan pursuant to sections 6.5(b)(viii) and (j) of the Plan; an amendment to the Plan; an updated recovery and liquidation analysis for SASCO and LBCC; a schedule of Claims by Debtor-Controlled Entities against the Debtors; a reconciliation of the ownership of certain assets as between certain Debtors; and a list of Debtor-Controlled Entities that may be dissolved or merged in accordance with the Plan.  The Plan Supplement was amended on October 25, 2011, November 4, 2011, November 15, 2011, November 22, 2011, November 29, 2011, December 2, 2011 and December 5, 2011.  The Plan Supplement complies with the provisions of section 15.5 of the Plan.

J.      <u>Modifications to the Plan</u>.  The Plan, and documents, amendments or supplements to the Plan included in the Plan Supplement and any amendments thereto, as modified by the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, filed on November 29, 2011 and December 5, 2011 (the "<u>Plan Modifications</u>"), shall constitute the Plan.

K.      <u>Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

L.      <u>Compliance with Bankruptcy Rule 3016(a)</u>.  The Plan is dated and identifies the entities submitting the Plan as proponents, thereby satisfying Bankruptcy Rule 3016(a).

M.      <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Expense Claims and Priority Tax Claims which need not be designated, the Plan designates 16 Classes of Claims against LBHI, 8 Classes of Claims against each of LCPI and LBSF, 7 Classes of Claims against each of LBCS, LBCC and LOTC and 5 Classes of Claims

against each of the other Debtors, and one Class of Equity Interests for each Debtor.  As required

by section 1122(a) of the Bankruptcy Code, the Claims and Equity Interests placed in each Class

are substantially similar to other Claims and Equity Interests, as the case may be, in each such

Class.

       (i)    <u>Justification for Separate Classification</u>.  Valid business, factual, and legal

reasons exist for separately classifying the various Classes of Claims and Equity Interests created

under the Plan.  The classification takes into account the nature of Claims and the differing legal

rights of the holders of such Claims.  The nature of Claims and legal rights of the holders differ

for (i) Claims asserted by Affiliates and third-party Creditors, (ii) direct Claims against a Debtor

and Guarantee Claims, (iii) Claims subject to contractual or statutory subordination, and (iv)

Claims entitled to be treated as senior obligations.  In addition, the classification of Claims

pursuant to the Plan takes into account the nature and risks of certain Claims in respect of the

Plan Issues.  These issues include: whether the equitable doctrine of substantive consolidation

may be applied to the Debtors and their Affiliates; the characterization of the intercompany

balances owed to LBHI by Subsidiary Debtors; the Allowed amounts of Affiliate Claims; the

ownership and rights of various Debtors and their Affiliates with respect to certain assets; the

allocation of costs and expenses of administration among the Debtors; and the post-effective date

governance of the Debtors (collectively, the "<u>Plan Issues</u>"). The relative risks and benefits of

potential litigation of the Plan Issues is a reasonable basis for the Plan to provide for separate

classification of such Claims.  If the Debtors and their Affiliates were substantively consolidated,

generally, all Claims based on LBHI's guarantees of the obligations of its Affiliates and all

Claims of Affiliates would be disregarded.  The different nature of Claims, the legal rights of the

holders of Claims and the recovery entitlements of Claims in the separate Classes, are a

reasonable basis for separately classifying Claims.

(ii)    <u>Contractual Subordination Agreements</u>.  The contractual terms of the

indentures pursuant to which LBHI issued Subordinated Notes provide that upon the bankruptcy

of LBHI, no payments will be made to holders of the Subordinated Notes until all obligations of

LBHI designated as "senior" in the indentures have been satisfied in full.  The Plan gives effect

to these provisions by separately classifying Claims based on their respective priority in relation

to the Subordinated Notes and the entitlement to receive amounts that would otherwise have

been distributed to holders of Claims based on the Subordinated Notes.

(iii)    <u>Convenience Claims and Convenience Guarantee Claims (11 U.S.C. §</u>

<u>1122(b))</u>.  The definition and classification of Convenience Claims and Convenience Guarantee

Claims are reasonable and necessary for administrative convenience.  The inclusion of

convenience Classes in the Plans of LBHI, LBCS, LBCC, LBSF, LCPI and LOTC will permit

those Debtors to make a single Distribution on account of Convenience Claims and Convenience

Guarantee Claims against such Debtors and avoid the administrative burden of tracking the

transfers of these Claims, repeating the calculations of the Distributions to holders of such

Claims, providing notices to holders of such Claims and preparing and mailing or wiring

Distributions to holders of such Claims on each Distribution Date.  The definitions of

Convenience Claims and Convenience Guarantee Claims, including the exclusions of Claims

based on public debt securities issued or guaranteed by LBHI or a Claim filed by a nominee on

behalf of one or more beneficial holders of Claims, is reasonable and necessary for

administrative convenience.

N.    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  The Plan does

not include any Classes of Claims that are unimpaired under the Plan.  The Plan satisfies section

1123(a)(2) of the Bankruptcy Code.

O.    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).  All

Classes of Claims are impaired under the Plan.  Articles III, IV and V of the Plan specify the

treatment for each Class of Claims, thereby satisfying section 1123(a)(3) of the Bankruptcy

Code.

P.    No Discrimination (11 U.S.C. § 1123(a)(4)).  The Plan provides for the

same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless

the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of

such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

Q.    Implementation of Plan (11 U.S.C. § 1123(a)(5)).  The Plan, including the

various documents and agreements set forth in the Exhibits to the Plan and the Plan Supplement,

provide adequate and proper means for the Plan's implementation, including (i) the appointment

of a Plan Administrator with the duties and responsibilities set forth in Section 6.1(b) of the Plan

to administer and maximize the value of the Debtors' estates; (ii) the Global Settlement and

Bilateral Settlements incorporated into the Plan; (iii) the provisions governing Distributions

under the Plan; (iv) the procedures governing the allowance of Claims under the Plan; (v) the

dissolution or wind down of a Debtor or Debtor-Controlled Entity in accordance with applicable

law and consistent with the implementation of the Plan; and (vi) the liquidating trust vehicles

that may be created under the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy

Code. *See* Plan, Arts. VI-X.

R.    Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6)).  To the extent

applicable, each Debtor's certificate of incorporation, bylaws or limited liability company

agreement, as applicable, shall be amended as of the Effective Date to contain a provision that

prohibits the issuance of nonvoting equity securities prohibited by section 1123(a)(6), thereby

satisfying section 1123(a)(6) of the Bankruptcy Code.

10

S.      <u>Selection of Officers, Directors, or Trustees (11 U.S.C. § 1123(a)(7))</u>.

Sections 7.2, 7.3 and 7.4 of the Plan provide for the manner in which the boards of directors of

each of the Debtors will be appointed following the Effective Date.  Such provisions are

consistent with the interests of Creditors, equity security holders, and public policy, thereby

satisfying section 1123(a)(7) of the Bankruptcy Code.  Prior to the Confirmation Hearing, the

Debtors have filed with the Court a list of the persons selected to serve on the board of directors

of LBHI following the Effective Date [ECF No. 22931].

T.      <u>Additional Plan Provisions (11 U.S.C. § 1123(b))</u>.  The provisions of the

Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a

provision of the Bankruptcy Code in this Confirmation Order shall not diminish or impair the

effectiveness of this Confirmation Order.

U.      <u>Assumption and Rejection (11 U.S.C. § 1123(b)(2))</u>.  Article XI of the

Plan and the Plan Supplement (as amended) provide for the rejection of executory contracts and

unexpired leases of the Debtors as of the Effective Date, except for any executory contract or

unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court prior to

the Effective Date, (ii) as to which a motion for approval of the assumption of such executory

contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) that

is specifically designated as an executory contract or unexpired lease to be assumed in the Plan

Supplement, and any amendment thereto.  Pursuant to the notices sent out by the Debtors to each

party to a contract proposed to be assumed by the Debtors (each, a "<u>Cure Notice</u>"), the Debtors

provided notice of any defaults to be cured with respect to each contract to be assumed by the

Debtors.  Numerous parties filed objections to the assumption of their contracts; a hearing before

the Court on the assumption of such contracts has been scheduled for February 14, 2012 at 10:00

11

a.m.  In addition, the Debtors have agreed with certain other parties to defer without date

disputes regarding whether a particular contract is executory and, if executory, whether (i) the

obligations thereunder are severable and (ii) whether the contract will be assumed or rejected.

The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

V.      Settlement/Retention of Claims or Interests (11 U.S.C. § 1123(b)(3)).  The

Plan includes a settlement and compromise of the Plan Issues that is designed to achieve a fair

and efficient resolution of the Chapter 11 Cases.  Pursuant to Section 1123(b)(3) of the

Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes a settlement of potential

litigation of the Plan Issues.  The terms of the Plan reflect an integrated and comprehensive

settlement that resolves the various Plan Issues through (i) the Plan Adjustment; (ii) Distributions

to LBHI on only 80% of the portion of its Claims against the Subsidiary Debtors relating to

intercompany funding; (iii) the reallocation of the first $100 million distributed to LBHI on

account of its Claims against LBSF and LCPI to holders of General Unsecured Claims in LBSF

Class 4A and LCPI Class 4A; (iv) the Distribution to holders of General Unsecured Claims in

LBSF Class 4A and Affiliate Claims in LBSF Class 5C of the first $70 million recovered by

LBSF on account of its assets in excess of $14.156 billion; (v) the Allowed amount of Claims

asserted by Designated Entities; (vi) the allowance of LBT's intercompany Claim against LBHI

in the amount of $34.548 billion; (vii) the allocation of costs and expenses incurred in the

administration of the estates pursuant to the Debtor Allocation Agreement; and (viii) the

principles included in the Structured Securities Valuation Methodologies (the "Global

Settlement").  Each component of the Global Settlement is an integral part thereof.  The Plan was

accepted by Creditors holding 95.00% of voting Claims in the aggregate amount of

approximately $400 billion.  The Creditors supporting the Global Settlement include the

Creditors' Committee, the Ad Hoc Group,[3] certain of the Non-Con Plan Proponents[4] and certain

Foreign Affiliates (as defined below), each of which is a sophisticated party and represented by

counsel that is recognized as being knowledgeable and experienced in the field of complex

chapter 11 cases. The Global Settlement is a result of good faith arms'-length negotiations. The

Global Settlement is consistent with section 1123(b)(3) of the Bankruptcy Code.

(i)    Substantive Consolidation.

a.    The Debtors and the Creditors' Committee have conducted

a thorough factual and legal analysis to determine whether the substantive consolidation of the

Debtors and their Affiliates is appropriate. The facts and analysis set forth in the Disclosure

Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the

Suckow Declaration, reflect that there are facts that support and facts that militate against the

substantive consolidation of the Debtors and their Affiliates based upon the law in this

jurisdiction. There is a possibility that if litigated to final judgment, a court may find that the

substantive consolidation of the Debtors and their affiliates, including their Foreign Affiliates, is

appropriate.

b.    The Global Settlement gives due consideration to the

strengths and weaknesses of potential arguments that have been made for and against substantive

---

[3] The Ad Hoc Group consists of California Public Employees' Retirement System, Canyon Capital Advisors LLC, City of Costa Mesa, City of Fremont, County of San Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek Asset Management, L.P., on behalf of the funds it manages or advises, Paulson & Co. Inc., Perry Capital LLC, on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner, Taconic Capital Advisors L.P. and Vallejo Sanitation and Flood Control District.

[4] The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

consolidation.  Litigation regarding substantive consolidation of the Debtors would require vast amounts of discovery and investigation into the operations of Lehman prior to the Commencement Date, would be extraordinarily complex and costly for all parties involved, and would significantly delay Distributions to all Creditors.

c.      The Plan Adjustment, which is a key element of the Global Settlement, ensures that recoveries to all Creditors are within the range of possible litigated outcomes and fall between the estimated Distributions to each Class if the Participating Debtors and their affiliates were substantively consolidated or if the Participating Debtors had strict non-consolidation plans.

(ii)      Characterization of Intercompany Claims.

a.      Prior to the Commencement Date, the Debtors and their Affiliates entered into tens of thousands of transactions daily involving billions of dollars.  The transactions were recorded on Lehman's general ledger.  The Debtors reviewed a sampling of the transactions between Debtors and considered the relevant legal standards for the recharacterization of indebtedness as equity interests.  Based on the facts and analysis set forth in the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the Cohn Declaration, there is a risk that certain portions of the intercompany balances owed to LBHI by the Subsidiary Debtors could be recharacterized as equity contributions if such matter were litigated to final judgment.

b.      The Global Settlement gives due consideration to the strengths and weaknesses of potential arguments for and against the recharacterization of intercompany balances.  Litigation regarding characterization of a vast number of intercompany balances would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

   c.  By providing that the Distribution that LBHI will receive is based only on a portion of its Claims against the Subsidiary Debtors, the Plan provides recoveries to all Creditors that are within the range of possible litigated outcomes.

   (iii)  <u>Amount of Intercompany Claims/ Ownership of Assets</u>.

   a.  As a result of the large number of intercompany transactions among the Debtors and their Affiliates prior to the Commencement Date, there are many intercompany receivables and payables between Debtors.  The Debtors and their advisors have reviewed some of the transactions and the transfer of assets among the Debtors and determined that it is in the best interests of all Debtors and their Creditors to agree to the intercompany Claims among the parties in the amounts set forth on the books and records, subject to certain adjustments, and not to pursue any avoidance actions.

   b.  The Plan establishes the Allowed amount of Claims among the Debtors and Claims of the Debtor-Controlled Entities against the Debtors and provides that all other Claims or causes of action are irrevocably released and waived.  The terms of the Global Settlement give due consideration to the strengths and weaknesses of potential arguments regarding the Claims among such entities and the ownership of assets.  Litigation regarding the amount or validity of thousands of intercompany balances and ownership of the Debtors' assets would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

   c.  The settlement of all Claims among the Debtors in the amounts set forth on the books and records, subject to certain adjustments, is within the range of possible litigated outcomes.

(iv)     Settlements with Foreign Affiliates and Certain Third-Party Creditors Incorporated in the Plan.

a.     Lehman was a worldwide enterprise prior to the Commencement Date which included affiliates organized and doing business in many international jurisdictions.  Following the Commencement Date, insolvency or liquidation proceedings were commenced with respect to 80 of the Foreign Affiliates of the Debtors in 16 jurisdictions.  Due to the manner in which Lehman operated prior to the Commencement Date, upon the fracturing of the Lehman enterprise, the Foreign Affiliates and the Debtors had significant Claims against each other.

b.     The Debtors have entered into settlement agreements with Lehman Brothers Bankhaus AG, Lehman Brothers Treasury Co. B.V., Lehman Brothers Securities N.V., Lehman Brothers International (Europe) and the Lehman UK Entities, Lehman Brothers (Luxembourg) Equity Finance S.A. (*en faillite*), Lehman Brothers (Luxembourg) Equity Finance S.A. (in liquidation), the Hong Kong Lehman Entities In Liquidation, the Lehman Singapore Entities, the Lehman Japan Entities (collectively, the "Foreign Affiliates"), Deutsche Bundesbank ("Bundesbank"), Bundesverband deutscher Banken E.V. ("BdB"), Entschädigungseinrichtung deutscher Banken GmbH ("EdB"), and Deutsche Bank and certain holders of participations in Claim Nos. 59006 and 58233 (collectively, the "Bilateral Settlements").  Each of the Bilateral Settlements with the Foreign Affiliates, BdB, EdB and Bundesbank takes into account the various Plan Issues, specifically substantive consolidation, and the validity and enforceability of asserted Guarantee Claims.  Many of the Foreign Affiliates asserted Guarantee Claims against LBHI based upon certain corporate resolutions, pursuant to which LBHI purportedly guaranteed the obligations of certain of its Affiliates.  LBHI has reviewed such Claims and has challenged the enforceability of such Claims.

16

c.       The Bilateral Settlements, other than the agreement with Deutsche Bank, take into account the fact that Claims of the affiliates and Guarantee Claims would be disregarded if the Debtors and its affiliates were substantively consolidated and the risk that certain Guarantee Claims may be unenforceable against LBHI, and, therefore, allow the Claims of the Foreign Affiliates in amounts substantially less than the asserted amounts.

d.       The Bilateral Settlement with Deutsche Bank takes into account the relative strengths of the arguments regarding the classification of certain Claims and the interpretation of the applicable agreements in which such Claims were settled and Allowed.

e.       The Bilateral Settlements resulted in a reduction of Claims asserted against the Debtors by more than $295 billion.

f.       Each of the Bilateral Settlements was negotiated in good faith and at arm's length.

W.       <u>Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.  The Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and related documents and notices and in soliciting and tabulating votes on the Plan.

X.       <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the

17

Debtors' estates and effectuating an orderly liquidation of the Debtors. The Plan was negotiated at arm's length among representatives of the Debtors, the Creditors' Committee, the Ad Hoc Group, certain of the Non-Con Plan Proponents, certain holders of notes issued by LBT and guaranteed by LBHI, various Foreign Affiliates and other Creditors. More than 150 parties that asserted approximately $450 billion in Claims have entered into Plan Support Agreements in connection with the Plan.

        Y.      <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. All payments made or to be made by any of the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

        Z.      <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Sections 7.2 and 7.3 of the Plan provide for the manner in which the board of directors of each of the Debtors will be selected. The Debtors have filed with the Court a list of the directors selected by the Director Selection Committee to serve on the board of directors of LBHI following the Effective Date. The appointment to such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in the Debtors and with public policy. The Plan, therefore, complies with section 1129(a)(5) of the Bankruptcy Code.

        AA.      <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

        BB.      <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Disclosure Statement, the Plan Supplement, the

Cohn Declaration and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired Claim or Equity Interest in each Debtor will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the applicable Debtor were hypothetically liquidated under chapter 7 of the Bankruptcy Code on such date. The assumptions and estimates in the liquidation analysis that are set forth in Exhibit 5 to the Disclosure Statement are reasonable in the context of these Chapter 11 Cases, including the assumption that the compromises and settlements incorporated in the Plan would also be consummated in a hypothetical chapter 7 liquidation. Conversion of the Chapter 11 Cases to chapter 7 would result in substantial additional delay and expense, as well as diminished asset value.

CC.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Other than classes of Claims identified in the Voting Certification for which no votes were cast (the "Non-Voting Classes"), at each Debtor, all Classes in which Creditors were entitled to vote have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code. Under these circumstances and in light of the overwhelming support for the Plan, the Non-Voting Classes are deemed to have accepted the Plan. Claims in LBHI Class 10A, 10B, 10C and 11 (the "Deemed Rejecting Classes of Claims"), and Equity Interests in each of the Debtors are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes of Claims and the Classes of Equity Interests in each Debtor, each Debtor's Plan is confirmable because each Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.

19

DD.    <u>Treatment of Administrative Expenses, Priority Non-Tax Claims, and</u>

<u>Priority Tax Claims (11 U.S.C. § 1129(a)(9))</u>.    The treatment of Administrative Expense Claims

and Priority Non-Tax Claims pursuant to Sections 2.1 of the Plan satisfies the requirements of

sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the treatment of Priority Tax Claims

pursuant to Section 2.3 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the

Bankruptcy Code.    Each Debtor has sufficient Cash to pay Allowed Administrative Expense

Claims, Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims.

EE.    <u>Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10))</u>.    At least one

Class of Claims against each Debtor that is impaired under the Plan has accepted the Plan,

determined without including any acceptance of the Plan by any insider, thus satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code.

FF.    <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.    The Debtors' Memorandum of Law

in Support of Confirmation, the Disclosure Statement and the Suckow Declaration are persuasive

and credible evidence that each Debtor will have sufficient funds to continue to manage its assets

and make all payments required under the Plan.    Accordingly, the Plan satisfies the requirements

of section 1129(a)(11) of the Bankruptcy Code.

GG.    <u>Payment of Fees (11 U.S.C. § 1129(a)(12))</u>.    All fees payable under

section 1930 of title 28, United States Code, as determined by the Court, have been paid or will

be paid pursuant to Section 15.7 of the Plan.    Thus, the Plan satisfies the requirements of section

1129(a)(12) of the Bankruptcy Code.

HH.    <u>Benefit Plans (11 U.S.C. § 1129(a)(13))</u>.    Section 1123(a)(13) is

inapplicable to the Debtors.

II.     Inapplicable Sections of Section 1129 of the Bankruptcy Code.  Sections

1129(a)(14), 1129(a)(15), 1129(a)(16) and 1129(e) are inapplicable in the Debtors' Chapter 11

Cases.

JJ.     Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).

Based on the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global

Settlement, the Debtors' Memorandum of Law In Support of Confirmation of the Plan, the

Suckow Declaration, and the Debtors' Response, the Plan (i) does not discriminate unfairly, and

(ii) is fair and equitable as to LBHI Classes 10A, 10B, 10C and 11 and the Equity Interests in

each Debtor, which Classes were deemed to reject the Plan, as required by section 1129(b)(1) of

the Bankruptcy Code.

KK.     Only One Plan (11 U.S.C. § 1129(c)).  The Plan is the only plan being

prosecuted in these Chapter 11 Cases, thereby satisfying section 1129(c) of the Bankruptcy

Code.  The Ad Hoc Group and certain of the Non-Con Plan Proponents that signed plan support

agreements have agreed to support the Plan and hold their plans in abeyance and not prosecute or

seek confirmation of the Plan subject to certain termination rights set forth in the Stipulation and

Order, dated June 30, 2011 [ECF Nos. 18306 and 18686].  Neither the Ad Hoc Group nor the

Non-Con Plan Proponents have terminated the Stipulation and Order and both are supporting the

confirmation of the Plan.

LL.     Principal Purpose of the Plan (11 U.S.C. § 1129(d)).  The principal

purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5

of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

MM.     Good Faith Solicitation (11 U.S.C. § 1125(e)).  Based on the record before

the Court in these Chapter 11 Cases, the Debtors and their directors, officers, employees,

members, agents, advisors, attorneys and professionals, the Released Parties and the PSA

21

Creditors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy

Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy

Rules in connection with all their respective activities relating to the solicitation of acceptance or

rejection of the Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code and the exculpation provisions set forth in Section 13.3 of the Plan.

      NN.    <u>Assumption and Rejection</u>.  Article XI of the Plan governing the

assumption and rejection of executory contracts and unexpired leases satisfies the requirements

of section 365(b) of the Bankruptcy Code.

      OO.    <u>Releases, Injunction and Exculpation</u>.  In the context of these unique

Chapter 11 Cases, each of the releases, and the injunction and exculpation provisions set forth in

the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a),

1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section

1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated

into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their

estates, and their Creditors; (e) is important to the overall objectives of the Plan; and (f) is

consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the

Bankruptcy Code, and other applicable law.

      PP.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the

requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

      QQ.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all

issues raised in the objections (excluding any timely filed objections that relate solely to

assumption of any executory contract), or which might have been raised, and the objections

(excluding any timely filed objections that relate solely to assumption of any executory contract) have been fully and fairly litigated.

RR.    Retention of Jurisdiction.  The Court is authorized to retain jurisdiction over the matters set forth in Article XIV of the Plan and section 1142 of the Bankruptcy Code, as well as any motions filed prior to the Effective Date requesting authorization to use, sell, or lease assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code.

## **CONCLUSIONS OF LAW**

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    Confirmation.  The Plan is approved and confirmed under section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement are authorized and approved.  The terms of the Plan, all Exhibits thereto, and the Plan Supplement are incorporated by reference into and are an integral part of the Plan and this Confirmation Order and are all approved.

2.    Objections.  All objections (excluding any timely filed objections that relate solely to assumption of any executory contract) that have not been withdrawn, waived, or settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are overruled on the merits for the reasons set forth in the Response, the Debtors' Memorandum of Law In Support of Confirmation and the Debtors' Memorandum of Law In Support of the Global Settlement.

3.    Conclusions of Law.  The conclusions of law set forth herein and in the record of the Confirmation Hearing constitute the Court's conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052

23

and 9014.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4.      Modifications to the Plan.  The Plan Modifications meet the requirements of sections 1127(a) and (c) of the Bankruptcy Code and do not adversely change the treatment of the Claim of any Creditor or the Equity Interest of any equity security holder within the meaning of Bankruptcy Rule 3019, and, therefore, all holders of Claims against the Debtors who voted to accept the Plan are hereby deemed to have accepted the Plan as amended by the Plan Modifications, and no further solicitation or voting is required.  No holder of a Claim against the Debtors who has voted to accept the Plan shall be permitted to change its acceptance or rejection as a consequence of the Plan Modifications.

5.      Solicitation and Notice.  Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based upon the circumstances of the Debtors' Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  The solicitation of votes on the Plan complied with the solicitation procedures in the Disclosure Statement Order, was appropriate and satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  Notice of the Plan Supplement and all related documents, was appropriate and satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

6.      Implementation.  On and after the Effective Date, the Debtors, and the Plan Administrator are authorized to (i) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, including, without limitation, those contained in the Plan Supplement, (ii) make any and all Distributions and transfers contemplated

24

pursuant to, and as provided for in, the Plan, and (iii) take such other actions as may be necessary

to effectuate, implement, and further evidence the terms and conditions of the Plan.

       7.     <u>Plan Classification Controlling</u>.  The classification of Claims and Equity

Interests for purposes of the Distributions to be made under the Plan shall be governed solely by

the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the

Debtors' Creditors in connection with voting on the Plan (a) were set forth on the Ballots for

purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no way

affect, the actual classification of such Claims and Equity Interests under the Plan for

Distribution purposes, and (c) shall not be binding on the Debtors.

       8.     <u>Binding Effect</u>.  The Plan and its provisions shall be binding on the

Debtors, any entity acquiring or receiving property or a Distribution under the Plan, and any

holder of a Claim against or Equity Interest in the Debtors, including all governmental entities,

whether or not the Claim or Equity Interest of such holder (a) is impaired under the Plan or (b)

has accepted the Plan.

**<u>The Global Settlement</u>**

       9.     <u>Global Settlement Provisions</u>.  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the Global Settlement set forth in section 6.5 of the Plan, and each

component of the Global Settlement, are hereby approved pursuant to Bankruptcy Rule 9019 as

fair and reasonable and in the best interests of each of the Debtors, their estates and Creditors.

The settlement is within the range of reasonable results if the issues were litigated and falls

above the lowest point in the range of reasonableness.

**The Bilateral Settlements**

10.     The Plan constitutes a motion for approval of each of the Bilateral Settlements pursuant to Bankruptcy Rule 9019.  The settlement agreements were included in the Plan or the Plan Supplement, which provided adequate and sufficient notice to all Creditors.

11.     <u>Approval of Bankhaus Settlement.</u>  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and Lehman Brothers Bankhaus AG ("<u>Bankhaus</u>") described in the Disclosure Statement and incorporated into the Plan pursuant to Section 6.5(b)(ii) of the Plan (the "<u>Bankhaus Settlement Agreement</u>") is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the Bankhaus Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, Bankhaus shall have Allowed Claims against the Debtors in the amounts set forth in the Bankhaus Settlement Agreement.

12.     <u>Approval of LBT Settlement.</u>  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and Lehman Brothers Treasury Co. B.V. ("<u>LBT</u>") described in the Disclosure Statement and incorporated into the Plan pursuant to Section 6.5(b)(iii) of the Plan (the "<u>LBT Settlement Agreement</u>") is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents, and papers and to take any and all

actions reasonably necessary or appropriate to consummate the LBT Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, LBT shall

have Allowed Claims against the Debtors in the amounts set forth in the LBT Settlement

Agreement.

13.     Approval of Hong Kong Settlement.  Based on the Debtors' Memorandum

of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration,

and the Disclosure Statement, the settlement between the Debtors and the Hong Kong Lehman

Entities In Liquidation described in the Disclosure Statement and incorporated into the Plan

pursuant to Section 6.5(b)(v) of the Plan (the "Hong Kong Settlement Agreement") is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the Hong Kong

Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to

perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy

Code, the Hong Kong Lehman Entities shall have Allowed Claims against the Debtors in the

amounts set forth in the Hong Kong Settlement Agreement

14.     Approval of Singapore Settlement.  Based on the Debtors' Memorandum

of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration,

and the Disclosure Statement, the settlement between the Debtors and the Lehman Singapore

Entities described in the Disclosure Statement and incorporated into the Plan pursuant to

6.5(b)(vi) of the Plan (the "Singapore Settlement Agreement") is fair and reasonable and is in the

27

best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy

Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform

any and all obligations, instruments, documents, and papers and to take any and all actions

reasonably necessary or appropriate to consummate the Singapore Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, Lehman

Singapore shall have Allowed Claims against the Debtors in the amounts set forth in the

Singapore Settlement Agreement.

          15.    <u>Approval of Lehman UK Entities Settlement.</u>  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and the

Lehman UK Entities set forth in the agreement, dated October 24, 2011 included in the Plan

Supplement (the "<u>Lehman UK Entities Settlement Agreement</u>") and incorporated into the Plan

pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors

and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019. The Debtors are

duly authorized to execute, deliver, implement and fully perform any and all obligations,

instruments, documents, and papers and to take any and all actions reasonably necessary or

appropriate to consummate the Lehman UK Entities Settlement Agreement, including waiving

any conditions precedent to its effectiveness, and to perform any and all obligations

contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the Lehman UK Entities

shall have Allowed Claims against the Debtors in the amounts set forth in the Lehman UK

Entities Settlement Agreement.

          16.    <u>Approval of LBJ Settlement.</u>  Based on the Debtors' Memorandum of Law

In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the

Disclosure Statement, the settlement between the Debtors and the Lehman Japan Entities set

forth in the agreement, dated as of October 24, 2011, included in the Plan Supplement (the "LBJ

Settlement Agreement") and incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the LBJ Settlement

Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the

Lehman Japan Entities shall have Allowed Claims against the Debtors in the amounts set forth in

the LBJ Settlement Agreement.

17.     Approval of LBSN Settlement.  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and the Lehman Brothers

Securities N.V. ("LBSN") set forth in the agreement, dated as of October 19, 2011, included in

the Plan Supplement (the "LBSN Settlement Agreement") and incorporated into the Plan

pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors

and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are

duly authorized to execute, deliver, implement and fully perform any and all obligations,

instruments, documents, and papers and to take any and all actions reasonably necessary or

appropriate to consummate the LBSN Settlement Agreement, including waiving any conditions

precedent to its effectiveness, and to perform any and all obligations contemplated therein.

Pursuant to section 502 of the Bankruptcy Code, LBSN shall have Allowed Claims against the

Debtors in the amounts set forth in the LBSN Settlement Agreement.

18. <u>Approval of LB Lux Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and Lehman Brothers

(Luxembourg) Equity Finance S.A. (*en faillite*) ("<u>LB Lux</u>") set forth in the agreement, dated as

of October 25, 2011, included in the Plan Supplement (the "<u>LB Lux Settlement Agreement</u>") and

incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best

interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule

9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and

all obligations, instruments, documents, and papers and to take any and all actions reasonably

necessary or appropriate to consummate the LB Lux Settlement Agreement, including waiving

any conditions precedent to its effectiveness, and to perform any and all obligations

contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, LB Lux shall have

Allowed Claims against the Debtors in the amounts set forth in the LB Lux Settlement

Agreement.

19. <u>Approval of BdB Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and BdB set forth in the

agreement, dated as of September 30, 2011, included in the Plan Supplement (the "<u>BdB</u>

<u>Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the BdB Settlement

Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, BdB

shall have Allowed Claims against the Debtors in the amounts set forth in the BdB Settlement

Agreement.

20.     Approval of EdB Settlement.  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and EdB set forth in the agreement,

dated as of September 30, 2011, included in the Plan Supplement (the "EdB Settlement

Agreement") and incorporated into the Plan pursuant to Section 6.5(j), is fair and reasonable and

is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to

Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents, and papers and to take any and all

actions reasonably necessary or appropriate to consummate the EdB Settlement Agreement,

including waiving any conditions precedent to its effectiveness, and to perform any and all

obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, EdB shall

have Allowed Claims against the Debtors in the amounts set forth in the EdB Settlement

Agreement.

21.     Approval of Bundesbank Settlement.  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and

Bundesbank set forth in the agreement, dated as of October 11, 2011, included in the Plan

Supplement (the "Bundesbank Settlement Agreement") and incorporated into the Plan pursuant

to Section 6.5(j), is fair and reasonable and is in the best interests of the Debtors and their

Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly

authorized to execute, deliver, implement and fully perform any and all obligations, instruments,

documents, and papers and to take any and all actions reasonably necessary or appropriate to

consummate the Bundesbank Settlement Agreement, including waiving any conditions precedent

to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to

section 502 of the Bankruptcy Code, Bundesbank shall have Allowed Claims against the Debtors

in the amounts set forth in the Bundesbank Settlement Agreement.

22.     <u>Approval of Deutsche Bank Settlement.</u>  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the LBHI, LCPI,

Deutsche Bank AG, Monarch Alternative Capital LP, Stone Lion Portfolio L.P., Permal Stone

Lion Fund Ltd., Centerbridge Credit Advisors LLC, and Anchorage Capital Group, L.L.C. set

forth in the agreement, dated as of November 23, 2011, included in the Plan Supplement (the

"<u>DB Claims Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is

fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby

approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute,

deliver, implement and fully perform any and all obligations, instruments, documents, and papers

and to take any and all actions reasonably necessary or appropriate to consummate the DB

Claims Settlement Agreement, including waiving any conditions precedent to its effectiveness,

and to perform any and all obligations contemplated therein.

23.     <u>Implementation of the Bilateral Settlements</u>.  The Debtors are authorized

to take all actions to implement the terms of each of the Bilateral Settlements.  The Debtors are

authorized to direct Epiq Bankruptcy Solutions, LLC, the court-appointed claims agent (the

"<u>Claims Agent</u>") to modify the official claims register (the "<u>Claims Register</u>") to reflect the

terms of the Bilateral Settlements.

24.    Debtors' Claims Schedule.  Pursuant to the Bar Date Order, the Debtors

were not required to file Claims against each other.  Pursuant to Section 6.5(b)(i) of the Plan,

Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Affiliate Claims of a Debtor

against another Debtor are Allowed in the applicable Classes in the net amounts set forth on

pages 1 and 2 of the Debtors' Claims Schedule.  Other than any Claims that arise out of the

Debtor Allocation Agreement, the amounts included on the Debtors' Claims Schedule shall be

the only prepetition Claims of the Debtors against each other that are Allowed.  The Claims

Agent is authorized to take all actions to reflect the Claims set forth in the Debtor Claims

Schedule on the Claims Register.

25.    Schedule of Claims of Debtor-Controlled Entities.  Pursuant to the Bar

Date Order, the Debtor-Controlled Entities were not required to file proofs of Claim against the

Debtors prior to the Bar Date.  The Schedule of Claims of Debtor-Controlled Entities included in

the Plan Supplement sets forth the prepetition Claims of the Debtor-Controlled Entities against

each of the Debtors that will be Allowed pursuant to the Plan upon the occurrence of the

Effective Date.  The Claims will be Allowed as Senior Affiliate Claims (LBHI Class 4A), Senior

Affiliate Guarantee Claims (LBHI Class 4B) and Affiliate Claims (LBHI Class 8) against LBHI

as set forth in the Schedule of Claims of Debtor-Controlled Entities and against each of the

Subsidiary Debtors in the Class of Claims of Affiliates Other Than Participating Debtors.

Except for Claims that may arise between the Debtors and the Debtor-Controlled Entities in

accordance with the Debtor Allocation Agreement or Claims for which a proof of Claim was

timely filed, (i) the amounts included on the Schedule of Claims of Debtor-Controlled Entities

shall be the only prepetition Claims of the Debtor-Controlled Entities that are Allowed against

the Debtors and (ii) to the extent any Debtor-Controlled Entity is not included on the Schedule of

Claims of Debtor-Controlled Entities, such Debtor-Controlled Entity shall not have any Allowed

prepetition Claims against the Debtors. Notwithstanding the foregoing, the Schedule of Claims

of Debtor-Controlled Entities provides that LB Re Financing No. 2 Limited shall have an

Allowed Claim against LBHI in LBHI Class 4A in the amount of $6,761,074,231, which amount

shall supersede in all respects the Claim filed by LB Re Financing No. 2 Limited against LBHI

(Claim No. 23568), which proof of Claim shall be disregarded for all purposes. In addition, the

Debtor-Controlled Entities Claims Schedule provides that LB Offshore Partners Ltd. shall have

an Allowed Claim against LBSF in LBSF Class 5C in the amount of $144,992. The Allowed

Claims set forth on this schedule shall supersede in all respects the claim filed by LB Offshore

Partners Ltd (Claim No. 27448). However, this shall not have any effect on Claim Nos. 24609

and 24611, which LB Offshore Partners Ltd. acquired from a third party. The Claims Agent is

authorized to take all actions to reflect the Claims set forth in the Debtor-Controlled Entities

Claims Schedule on the Claims Register.

26. <u>Debtor Allocation Agreement</u>. The Debtor Allocation Agreement, which

provides for the manner in which (a) expenses of the administration of the assets and liabilities of

the Debtors and certain of their affiliates, (b) the costs and benefits of Jointly Owned Litigation

Claims, (c) tax liabilities, refunds or readjustments for periods prior to, during and after the

Effective Date, will be allocated among the Debtors, is approved. Pursuant to the Debtor

Allocation Agreement, LBSF shall have an Allowed Administrative Expense Claim against

LBHI in the amount of $300 million to be satisfied in accordance with Section 6.3 of the Plan.

The Debtors and the Plan Administrator are authorized to take all actions necessary to allocate

such costs and expenses in accordance with the Debtor Allocation Agreement.

27. <u>Resolution of Inter-Debtor Issues</u>. In order to "close" the various inter-

company repurchase transactions, remove encumbrances, and to simplify the accounting for the

estates, the Debtors are authorized to make the transfers set forth in the Exhibit 10 of the Plan

Supplement.  Except as set forth in the preceding sentence, all Claims and disputes among the

Debtors or a Debtor and any Debtor-Controlled Entity regarding the title or beneficial ownership

of assets are hereby resolved in favor of the Debtor or Debtor-Controlled Entity whom the

Debtors have determined have beneficial ownership of these assets.  All Avoidance Actions of

any Debtor against another Debtor or Debtor-Controlled Entity are fully and irrevocably

released.  All reservations of rights of any of the Debtors or affiliates of the Debtors or their

respective Creditors, to assert any arguments or challenge any transaction entered into by any

other Debtors contained in any order entered by this Court prior the date hereof or agreement

entered into by any Debtor or affiliate of any Debtor are fully and finally extinguished.

          28.     <u>Plan Trust Agreement</u>.  The Plan Trust Agreement, which provides that

the Plan Trust will hold the Plan Trust Stock, is approved.  The members of the Director

Selection Committee who are serving in such capacity as of the Effective Date, or their

replacements designated in accordance with the Court's Order Pursuant to Sections 105(a),

363(b), and 1142(b) of the Bankruptcy Code, Appointing the Director Selection Committee,

Approving Retention of Korn/Ferry International, and Authorizing Certain Related Relief [ECF

No. 22871], shall serve as the Plan Trustees and shall have the rights and obligations set forth in

section 7.4 of the Plan and the Plan Trust Agreement.

**<u>Executory Contracts and Unexpired Leases</u>**

          29.     Pursuant to Section 11.1 of the Plan, all prepetition executory contracts

and unexpired leases to which any of the Debtors are parties shall be deemed to be rejected

pursuant to section 365 of the Bankruptcy Code, except for any executory contract or unexpired

lease (a) that has been assumed pursuant to an order of the Court entered prior to the Effective

Date, (b) as to which a motion for approval of the assumption or rejection of such executory

contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is

specifically designated in the Plan Supplement as a contract or lease to be assumed by the

Debtor.

30.     Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the

assumption of each executory contract and unexpired lease designated in the Plan Supplement

other than any executory contracts set forth on Schedules 1 and 2 hereto, or that are the subject

of the objections listed on Schedules 1 and 2 hereto, is approved.  To the extent any provision of

an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan

limits such Debtor's ability to assign such executory contract or unexpired lease, the

effectiveness of such provision is hereby limited or unenforceable to the full extent provided in

section 365(f) of the Bankruptcy Code.  The hearing regarding the Debtors' ability to assume, or

assume and assign, any executory contract or unexpired lease set forth on Schedule 1 hereto or

that is the subject of the objections listed on Schedule 1 hereto (the "February 14 Contracts")

shall be held by the Court **on February 14, 2011 at 10:00 a.m.**  The inclusion on the Plan

Supplement of the executory contracts set forth on Schedule 2 hereto (the "Deferred Contracts")

constitutes a motion for assumption of the executory contract or unexpired lease, which has been

adjourned without date and shall be scheduled by the Debtors, with leave from the Court, on a

date to be determined with at least 30 days notice to the counterparty, or as otherwise agreed.

All of the Debtors' rights with respect to the February 14 Contracts and the Deferred Contracts

are reserved.

31.     If the Court determines either before or after the Effective Date that the

cure amount or requirements for adequate assurance for any Deferred Contract is in excess of the

amount asserted by the Debtors, or if the Debtors determine not to proceed to assume any

Deferred Contract, the Debtors' rights are fully preserved to amend Exhibit 2 to the Plan

Supplement to remove the applicable contract(s), and upon such removal the applicable

contract(s) shall be deemed rejected as of the Effective Date in accordance with Section 11.1 of the Plan.

32.     The filing and service of the Plan and the Plan Supplement, the service of a notice of the cure amount, and the publication of the Confirmation Order is adequate notice of the assumption of executory contracts and unexpired leases that are assumed pursuant to this Order and the Plan (the "Assumed Contracts").

33.     Except as may otherwise be agreed to by the parties to a particular contract, within thirty (30) days after the Effective Date, the applicable Debtor shall cure any and all payment defaults under its respective Assumed Contracts in accordance with section 365(b) of the Bankruptcy Code, by payment of the amount specified by the applicable Debtor in the Cure Notice sent by the Debtor with respect to such Assumed Contract.  With respect to February 14 Contracts and Deferred Contracts, disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.  Notwithstanding any requirement in the Bankruptcy Code that executory contracts be assumed or rejected on or prior to the Confirmation Date, the Debtors shall (i) be entitled to assume any executory contract that the Court determines the Debtors are entitled to assume, or (ii) reject any executory contract that either the Court determines the Debtors are not entitled to assume, or that the Debtors elect to reject at any time prior to the hearing on February 14, 2011, in which case, such assumption or rejection shall be effective as of the Effective Date.

34.     All counterparties to Assumed Contracts have been provided with adequate assurance of future performance pursuant to section 365(f) of the Bankruptcy Code.

35.     The assumption of a prepetition executory contract shall not enhance any contractual rights of a counterparty that were otherwise unenforceable under the Bankruptcy

37

Code immediately prior to the assumption or rejection of such contract; *provided, however,* that

the rights of all counterparties to assert that a contractual right was enforceable under the

Bankruptcy Code immediately prior to assumption or rejection and the Debtors' rights to dispute

any such assertions are fully preserved.

36.     With respect to the Assumed Contracts, any defaults on the part of the

Debtors that may arise because of a condition of the kind specified in section 365(b)(2) of the

Bankruptcy Code ("Ipso Facto Defaults") are not subject to the requirements under section

365(b)(1) of the Bankruptcy Code and no party shall be permitted to declare a default, terminate,

cease payment, delivery or any other performance under any executory contract, or any

agreement relating thereto, or otherwise modify any such executory contract, assert any Claim or

right to termination payment, or impose any penalty or otherwise take action against a Debtor as

a result of an Ipso Facto Default.

37.     Bar Date for Rejection Damage Claims.  Pursuant to Section 11.4 of the

Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant

to Section 11.1 of the Plan results in damages to the other party or parties to such contract or

lease, if not evidenced by a previously filed proof of Claim, a Claim for such damages shall be

forever barred and shall not be enforceable against the Debtors, or any property to be distributed

under the Plan, unless a proof of Claim is filed with the Court and served upon the Debtors, on or

before the date that is forty-five (45) days after the later of (a) notice of entry of an order

approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the

Confirmation Order and occurrence of the Effective Date, and (c) notice of an amendment to the

Plan Supplement relating to such executory contract or unexpired lease.  All Claims filed against

the Debtors as a result of the rejection of an executory contract or unexpired lease must be filed

in accordance with the procedures for the filing of Claims set forth in the Bar Date Order,

including the requirements to complete the Derivatives Questionnaire and/or the Guarantee

Questionnaire, as applicable.  Service of the Confirmation Notice shall be sufficient notice to the

applicable counterparties to executory contracts and unexpired leases of the rejection of their

executory contracts and unexpired leases pursuant to the Plan and the deadlines and procedures

for filing and Claims against the Debtors resulting from such rejection.

38.  <u>Insurance Contracts</u>.  To the extent that any of the Debtors' insurance

policies and any agreements, documents or instruments with insurers relating thereto constitute

executory contracts, such contracts shall be deemed assumed under the Plan.

**Title to Assets**

39.  <u>Vesting of Assets</u>.  Pursuant to Section 13.1 of the Plan, except as

otherwise provided in the Plan, all property of each of the Debtor's estates shall vest in that

Debtor free and clear of all Claims, liens, encumbrances, charges and other interests.  From and

after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action,

including, without limitation, the operation of their businesses, the use, acquisition, sale, lease

and disposition of property, and the entry into transactions, agreements, understandings or

arrangements, whether or not in the ordinary course of business, and execute, deliver, implement,

and fully perform any and all obligations, instruments, documents and papers or otherwise in

connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the

Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or

provision of the Bankruptcy Code, except as explicitly provided in the Plan.

**Distributions and Reserves**

40.    <u>Initial Distributions</u>.  If the Debtors make the initial Distribution after January 31 but before March 30, 2012, then notwithstanding the provisions of Section 8.3 of the Plan, the Debtors shall not be required to make a Distribution on March 30, 2012 and the second Distribution will be made on September 30, 2012.  All subsequent Distributions shall be made on the semi-annual dates set forth in Section 8.3 of the Plan.

41.    <u>Effective Date Payments and Transfers by the Debtors</u>.  Pursuant to Section 2.1 of the Plan, and subject to Sections 8.3 and 8.4 of the Plan, on the Effective Date, or as soon thereafter as is practicable, the Debtors shall remit to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims Cash in an amount equal to the Allowed amount of such Claims.

42.    <u>Reserve Requirements</u>.  Pursuant to Section 8.4 of the Plan, the Debtors shall reserve an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim as set forth on the Claims Register maintained by the Claims Agent, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may have been agreed upon by the holder of such Disputed Claim and the Debtors or may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.

43.    <u>No Reserve for Disallowed or Expunged Claims</u>.  None of the Debtors shall be required to establish reserves for Claims that have been disallowed or expunged by order

of the Court in the absence of an order of the Court expressly directing the Debtor to establish a

reserve.

44.    <u>Distributions to Holders of Allowed Convenience Claims and Allowed</u>
<u>Convenience Guarantee Claims</u>.  A single Distribution to holders of Convenience Claims and

Convenience Guarantee Claims in the amounts set forth in the Plan shall satisfy such Claims in

full.  Such Creditors shall not have any further right to a Distribution from any Debtor in respect

of their Convenience Claims or Convenience Guarantee Claims.  Holders of Convenience

Claims subject to the *Order Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and*

*Bankruptcy Rule 9019 Approving Procedures for the Determination of the Allowed Amount of*

*Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers*

*Holdings Inc.* [ECF No. 19120] (the "<u>Structured Securities Procedures Order</u>") shall be bound by

this paragraph even if the Debtors determine subsequent to the date hereof that the value of a

structured security is greater than the amount previously proposed by the Debtors pursuant to the

Structured Securities Valuation Methodologies and Structured Securities Procedures Order.

45.    <u>Setoffs and Recoupment</u>.  Except as otherwise agreed by a Debtor,

including in the Plan, any Debtor may, but shall not be required to, setoff against or recoup from

any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims

of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that

the claimant shall be served with written notice of the proposed setoff or recoupment at least

twenty-eight (28) days prior to exercising any asserted setoff or recoupment right, and, if such

claimant serves a written objection to such asserted setoff or recoupment on or before twenty-

eight (28) days of receipt of such written notice, (i) the objection shall be deemed to initiate a

contested matter governed by, *inter alia*, Bankruptcy Rule 9014 and Local Rules 9014-1 and

9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with

such contested matter, and (iii) the Debtor shall not proceed with the asserted setoff or

recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such

objection but the Debtor may withhold such payment pending resolution of such objection;

*provided, further*, that neither the failure to setoff against or recoup from any Claim nor the

allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any

such Claim the Debtor may have against such claimant.

**Post-Effective Date Management of the Debtors**

46. <u>Boards of Directors</u>.  Following the Effective Date, the board of directors

of LBHI shall be: Frederick Arnold, Robert S. Gifford, Thomas A. Knott, Sean O. Mahoney,

David Pauker, Ronald K. Tanemura and Owen D. Thomas.

47. Following the Effective Date, the board of directors of LBSF and LCPI

shall each consist of three (3) individuals as follows: (i) an individual who is a concurrently

serving member of the LBHI board of directors who is selected by the LBHI board of directors;

(ii) an individual who is a concurrently serving member of the LBHI board of directors who is

selected by the LBHI board of directors and acceptable to the Opco Plan Proponents who are

PSA Creditors; and (iii) an individual who is selected by the individuals appointed pursuant to (i)

and (ii) of this section and who is independent from LBHI, the members of the Director

Selection Committee and, in the case of LBSF, LBSF, or in the case of LCPI, LCPI.  Pursuant to

the Plan, the boards of directors of each of the Subsidiary Debtors, other than LBSF and LCPI,

shall consist of one (1) director which shall be a member of the LBHI board of directors.  With

respect to a Subsidiary Debtor incorporated or formed under the laws of a jurisdiction outside of

the United States, if the laws of such foreign jurisdiction require the appointment of more than

one (1) director or manager to the board of directors or managers of such Subsidiary Debtor or of

a director or manager that is not an individual concurrently serving as a member of the LBHI

42

board of directors, such additional or alternative directors or managers shall be appointed by the

LBHI board of directors

48.     Post Effective Date Role of Creditors' Committee.  On the Effective Date,

the Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the

Plan through the date of the initial Distribution in accordance with Section 8.3 of the Plan; (ii)

defending any appeals from this Confirmation Order until final disposition of such appeals; and

(iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11

Cases for the period prior to the Effective Date.  Following the Effective Date, the litigation and

derivatives subcommittees of the Creditors' Committee may continue functioning for the limited

purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date

board of directors of LBHI, other litigation and derivatives matters as to which, currently, the

subcommittees are involved, and which shall be recommended by the applicable subcommittee

and the Plan Administrator.  Other than with respect to the foregoing, the members of the

Creditors' Committee shall be released and discharged of and from all further authority, duties,

responsibilities, and obligations related to and arising from and in connection with the Chapter

11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants,

and other agents shall terminate.  The Debtors shall pay the reasonable fees and expenses of the

professionals retained by and shall reimburse the members of the remaining subcommittees for

reasonable disbursements incurred, including the reasonable fees of counsel, in connection with

the foregoing from and after the Effective Date.  If a member of a subcommittee becomes unable

to serve on a subcommittee or resigns after the Effective Date, the remaining members may

replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority

vote of the remaining members.  Each of the subcommittees shall be deemed dissolved upon the

earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the completion of the subcommittee's responsibilities, and (iii) the Closing Date.

49. <u>Post-Effective Date Role of Fee Committee</u>. The fee committee appointed in the Chapter 11 Cases shall continue to exist after the Effective Date to perform its duties under the Amended Fee Protocol approved by the Court [ECF No. 15998] in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications. The Debtors shall pay the reasonable fees and expenses of the independent member and counsel retained by the fee committee in connection with the foregoing from and after the Effective Date.

50. <u>Post Effective Date Reporting</u>. Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator shall file with the Court reports consistent with the obligations set forth in section 15.6 of the Plan.

51. <u>General Authorizations</u>. The Plan Administrator on behalf of the Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan and any securities issued pursuant to the Plan. The Debtors and their directors, officers, members, agents, and attorneys are authorized and empowered to issue, execute, deliver, file, or record any agreement, document, or security, including, without limitation, the documents contained in the Plan Supplement and the Exhibits to the Plan, as modified, amended, and supplemented, in substantially the form included therein, and to take any action necessary or appropriate to implement, effectuate, and consummate the Plan in accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, including merger of any of the Debtors and the dissolution of each of the Debtors, and any release, amendment, or restatement

of any bylaws, certificates of incorporation, or other organizational documents of the Debtors,

whether or not specifically referred to in the Plan or the Plan Supplement, without further order

of the Court, and any or all such documents shall be accepted by each of the respective state

filing offices and recorded in accordance with applicable state law and shall become effective in

accordance with their terms and the provisions of state law.

**Releases, Discharge and Injunction**

52.    _Releases, Exculpations, and Injunctions_.  The release, exculpation, and

injunction provisions contained in the Plan are fair and equitable, are given for valuable

consideration, and are in the best interests of the Debtors and their estates, and such provisions

shall be effective and binding on all persons and entities.

53.    _Release and Exculpation_.  On and after the Effective Date, the Debtors and

all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the

Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their

respective present or former employees, agents, officers, directors or principals, shall be deemed

to have released (a) the Released Parties from, and none of the Released Parties shall have or

incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any

act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out

of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation,

consummation or administration of the Plan, property to be distributed under the Plan or any

other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure

Statement, the Plan Support Agreements or any contract, instrument, document or other

agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors shall

have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability

for any act taken or omitted to be taken in connection with, or arising out of, the negotiation,

45

formulation, dissemination or confirmation, consummation or administration of the Plan, or any

other act or omission in connection with the Plan, the Disclosure Statement, the Plan Support

Agreements, including the filing of any alternative chapter 11 plan and any determination to not

pursue solicitation or confirmation of such alternative plan, or any contract, instrument,

document or other agreement related thereto; *provided, however*, that (i) other than as may be

otherwise provided in any releases included in settlement agreements between the Debtors and

the Foreign Affiliates, BdB, EdB and Bundesbank that are incorporated into the Plan, in no event

shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any

Released Party or PSA Creditor for any act taken or omitted to be taken prior to the

Commencement Date be released by the Plan, (ii) nothing herein or in the Plan shall affect or

release any obligation of the Debtors under the Plan, and (iii) nothing herein shall affect the

liability of any person that otherwise would result from any such act or omission to the extent

such act or omission is determined by a Final Order to have constituted willful misconduct or

gross negligence; *provided, further*, that nothing in this Plan shall limit the liability of the

professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective

clients pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

      54.    <u>Term of Injunctions and Automatic Stay</u>.  Pursuant to Section 13.7 of the

Plan, unless otherwise expressly provided herein or in the Plan or in a Final Order of the Court,

all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105

or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall

remain in full force and effect until the Closing Date.

      55.    <u>Injunction</u>.  Pursuant to Section 13.5 of the Plan, except as expressly

provided in the Plan, herein, or a separate order of the Court or as agreed to by a Creditor and the

Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims

against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity

Interests has been filed or not) and other parties in interest, along with their respective present or

former employees, agents, officers, directors or principals, are permanently enjoined, on and

after the Effective Date, solely with respect to any Claims and Causes of Action that will be or

are extinguished or released pursuant to the Plan from (i) commencing, conducting, or

continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind

(including, without limitation, any proceeding in a judicial, arbitral, administrative or other

forum) against or affecting the Released Parties or the property of any of the Released Parties;

(ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment),

collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree, or order against the Released Parties or the property of any of the

Released Parties; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or

indirectly, any encumbrance of any kind against the Released Parties or the property of any of

the Released Parties; (iv) asserting any right of setoff, directly or indirectly, against any

obligation due the Released Parties or the property of any of the Released Parties, except as

contemplated or Allowed by the Plan; (v) acting or proceeding in any manner, in any place

whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking

any actions to interfere with the implementation or consummation of the Plan

     56.    <u>Discharge</u>.  Pursuant to Section 13.4 of the Plan, except as expressly

provided therein, upon the date that all Distributions under the Plan have been made, (a) each

holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity

Interest in a Debtor shall be deemed to have forever waived, released and discharged the

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any

and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b)

all such holders shall be forever precluded and enjoined, pursuant to section 524 of the

Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated

Equity Interest in the Debtors.

57.    No Waiver of Rights and Defenses. Except as otherwise agreed, the

provisions of the Plan and this Confirmation Order shall not enjoin, impair, prejudice, have any

preclusive effect upon, or otherwise affect (A) the rights of any Creditor to (x) effectuate a

recoupment pursuant to common law or setoff pursuant to common law or otherwise in

accordance with (a) section 553 and (b) sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27),

555, 556, 559, 560 or 561 of the Bankruptcy Code (subject to the Debtors' rights to contest the

validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing

sections of the Bankruptcy Code) or (y) continue to assert the validity of a setoff previously

taken by such Creditor or to seek authority from the Bankruptcy Court to exercise a right of

setoff or recoupment (subject in each case to the Debtors' right to contest the validity of any such

setoff or recoupment), or (B) any legal or equitable defense, including any defensive right of

setoff or recoupment, that has been, or may be, asserted by any entity in response to a Litigation

Claim, Avoidance Action of a Debtor or objections to Claims against a Debtor.

58.    Indemnification Obligations.  The obligations of each Debtor to

indemnify, defend, reimburse or limit the liability of (a) directors, officers and any other

employee who is held responsible for obligations of the Debtor incurred after the

Commencement Date who are directors, officers or employees of such Debtor or a Debtor-

Controlled Entity on or after the Commencement Date and (b) Released Parties, respectively,

against any Claims or Causes of Action as provided in the Debtor's articles of organization,

certificates of incorporation, bylaws, other organizational documents or applicable law, shall be

assumed by such Debtor and will remain in effect after the Effective Date.  Any such assumed

48

obligations owed in connection with an event occurring after the Commencement Date shall be

paid as an Administrative Expense Claim under the Plan.  Any such obligations owed in

connection with an event occurring before the Commencement Date shall be treated as pre-

petition Claims under the Plan.  Nothing in the Plan shall in any way limit, modify, alter or

amend the Debtor's limitation of liability of the Independent Directors set forth in Section 10.1

of the Restated Certificate of Incorporation of LBHI.

        59.      <u>Special Provisions for United States Government</u>.

        a.      As to the United States, its agencies, departments or agents,

nothing in the Plan or Confirmation Order shall: (i) discharge, release or otherwise preclude (A)

any liability of the Debtors arising on or after the Confirmation Date (defined for purposes of this

section as the date the Confirmation Order becomes final and non appealable), (B) with respect

to the Debtors, any liability that is not a Claim against a Debtor, (C) any valid right of setoff or

recoupment, or (D) any liability of the Debtors arising under environmental or criminal laws as

the owner or operator of property that such Debtor owns or operates after the Confirmation Date

(defined for purposes of this section as the date the Confirmation Order becomes final and non-

appealable); or (ii) limit or expand the scope of the discharge to which the Debtors are entitled

under the Bankruptcy Code. The discharge and injunction provisions contained in the Plan and

Confirmation Order are not intended and shall not be construed to bar the United States from,

subsequent to the Effective Date, pursuing any police or regulatory action.

        b.      Nothing in the Plan, Plan Trust Agreement, or this

Confirmation Order shall provide to any person or entity (other than a Debtor) any exculpation,

release, discharge, preclusion of, or injunction against (i) any liability or other obligation owed

by such person or entity to the United States, its agencies or departments, or (ii) or any Claim,

Cause of Action, or other right held by the United States, its agencies or departments.

c.    Nothing contained in the Plan or this Confirmation Order shall be deemed to have determined, or to bind the United States with respect to the determination of, the federal tax treatment of any item, distribution, person or entity, or the tax liability of any person or entity, including but not limited to the Debtors and the Liquidating Trust; *provided, however*, that the foregoing shall not affect the rights, claims, defenses and obligations of the United States or the Debtors under the Plan or otherwise with respect to the allowance, disallowance or treatment of Claims of the United States (including, without limitation, under the Bar Date Order and any stipulations between the Internal Revenue Service or United States and the Debtors), nor shall it affect any right of any Debtor or successor to a Debtor to request a determination of tax liability pursuant to section 505(b) of the Bankruptcy Code, or any defenses or objections of the United States with respect to a request for a determination of taxes by any person or entity pursuant to section 505(b) of the Bankruptcy Code.

**Miscellaneous**

60.    <u>Resolution of Potential Plan Objections</u>.  Each of the (i) Stipulation Among Debtors and Fidelity National Title Insurance Company Resolving Disputes in Connection with the Plan; and (ii) Stipulation and Agreement By and Among Fannie Mae, Freddie Mac and the Debtors Regarding the Debtors' Third Amended Plan, are approved.

61.    <u>Agreement with LBF With Respect to Section 8.15</u>.  The Debtors and the Plan Administrator shall not withhold pursuant to Section 8.15 of the Plan any Distribution to any Non-Controlled Affiliate on the basis that the Non-Controlled Affiliate may use such Distribution to satisfy a Claim of LBF against such Non-Controlled Affiliate.  The Debtors or the Plan Administrator also shall not withhold pursuant to Section 8.15 of the Plan any Distributions

50

to LBF on account of any Allowed Claims of LBF on the basis that LBF may use such

Distribution to satisfy a claim of another Non-Controlled Affiliate against LBF.

62.    Certain Pending Securities Litigations.

a.    Nothing in the Plan or this Confirmation Order shall affect

the rights and obligations of the Debtors and of any party in interest as set forth in the Order

Discharging Examiner And Granting Related Relief [ECF No. 10169].

b.    Nothing in the Plan or in this Confirmation Order shall

preclude any of (i) the Alameda County Employees' Retirement Association, Government of

Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation

Committee, City of Edinburgh Council as Administering Authority of the Lothian Pension Fund

and Operating Engineers Local 3 Trust Fund, the court-appointed lead plaintiffs (collectively, the

"Securities Action Lead Plaintiffs") or (ii) The Local 302 and 612 of the International Union of

Operating Engineers–Employers Construction Industry Retirement Trust (the "MBS Action Lead

Plaintiffs," and together with the Securities Action Lead Plaintiffs, the "Lead Plaintiffs"), lead

plaintiffs in *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-05523 (LAK),

and *In re Lehman Brothers Mortgage Backed Securities Litigation*, Case No. 08-6762 (LAK)

(the "Securities Litigation"), respectively, from seeking relief from the Court to pursue their

Claims against the Debtors solely to collect from any available insurance proceeds.  All rights of

the Debtors to object or respond to requests for such relief or assert any defenses are fully

preserved.

c.    In the event that the pending settlements involving the Lead

Plaintiffs in the Securities Litigation are not approved by final order or judgment of the United

States District Court, Southern District of New York and do not become effective by their terms,

nothing in the Plan or this Confirmation Order shall preclude the Lead Plaintiffs from seeking

51

discovery from any of the Debtors, the Plan Administrator or the Liquidating Trustee in accordance with the Federal Rules of Civil Procedure following the Effective Date. All rights of the Debtors, the Plan Administrator or the Liquidating Trustee under the Federal Rules of Civil Procedure to object or respond to requests or assert any defenses are fully preserved.

63.    Alternative Dispute Resolution Procedures.  The following Court Orders shall continue to apply and be binding on all parties following the Effective Date through the Closing Date: (a) *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors* [ECF No. 8474]; (b) *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts* [ECF No. 5207]; (c) *Tier 2 Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts for Amounts Not More than $1 Million* [ECF No. 11649]; and (d) *Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties* [ECF No. 14789].

64.    Claims Settlement Procedures.  The following Court orders permitting the Debtors to compromise and settle Claims against the Debtors shall continue to apply and be binding on all parties following the Effective Date through the Closing Date:  (a) *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts* [ECF No. 2257], and all supplements to such order and (b) *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) Approving Settlement Procedures* [ECF No. 7936].

65.    Debtors' Right Under Bankruptcy Rule 2004.  The Debtors' shall retain following the Effective Date the same rights they had prior to the Effective Date under

52

Bankruptcy Rule 2004 and this Court's *Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities* [ECF No. 5910], shall remain in full force and effect following the Effective Date until the Closing Date.

66.     Issuance of New Securities.  The Plan Administrator, each Debtor or Debtor Controlled-Entity is authorized to (a) form and transfer certain assets of the Debtors and/or Debtor Controlled Entities to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) issue New Securities for Distribution under the Plan.  In the event that the Plan Administrator issues New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan.

67.     Exemption from Securities Laws.  The offering, issuance, or distribution of the New Securities in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.

68.     Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition or acquisition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in

53

connection with any disposition or acquisition of assets contemplated by the Plan (including by a Liquidating Trust) in each case whether as a result of sale, assignment, foreclosure or deed-in-lieu of foreclosure, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

69. <u>Governmental Approvals Not Required</u>. Except as otherwise expressly provided in this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto.

70. Each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments and (b) all actions of the Plan Administrator and those acting on its behalf, that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Confirmation Order, and the agreements created or contemplated by the Plan, without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

71. <u>Structured Securities</u>. As provided in the Structured Securities Procedures Order, the Debtors are determining the Allowed amount of each Claim based on a Structured Security in accordance with the Structured Securities Valuation Methodologies. In accordance with the Structured Securities Procedures Order, the Debtors sent notices of a proposed Allowed Claim amount ("<u>Structured Securities Notices</u>") to each holder of a Claim based on a Structured Security. To the extent that holders of such Claims agreed with the proposed amount or did not

54

respond by the established deadline (as such may have been extended by the Debtors), such

Claim will be Allowed in the amount set forth on the Structured Securities Notice, subject to the

Debtors' right to object to Claims based on Structured Securities on the grounds that such claims

do not include a blocking number or include an invalid blocking number, are duplicative of other

claims, have been amended and superseded, or otherwise do not comply with the provisions of

the Bar Date Order is fully preserved; *provided* that, the Allowed amount of such Claims may be

increased to the extent that in connection with the resolution of a disputed Structured Securities

Notice, the Debtors determine that the value of a structured security is greater than the amount

previously proposed by the Debtors. As indicated in paragraph 44 hereof, holders of

Convenience Claims or Convenience Guarantee Claims shall not be entitled to any increase in

the Allowed amount of their Claims.

72.     <u>Final Fee Applications</u>.  Pursuant to Section 2.2 of the Plan, all entities

seeking an award by the Court of compensation for services rendered or reimbursement of

expenses incurred through and including the Effective Date under sections 327, 328, 330, 331,

503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their

respective final applications for allowance of compensation for services rendered and

reimbursement of expenses incurred by the date that is one hundred twenty (120) days after the

Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Court (A) on

the date on which the order relating to any such application is entered, or as soon thereafter as

practicable, or (B) upon such other terms as may be mutually agreed upon between the claimant

and the Debtors.

73.     The Debtors are authorized to pay, in the ordinary course of business and

without the need for Court approval, the reasonable fees and expenses, incurred after the

Effective Date, of the professional persons employed by the Debtors and the Creditors'
Committee.

74.    <u>Fees and Expenses of Indenture Trustees and Creditors' Committee
Members</u>.  The reasonable fees and expenses, including attorneys' fees, of (i) the indenture
trustees for the Senior Notes and the Subordinated Notes issued by LBHI and the (ii) individual
members of the Creditors' Committee shall be paid in accordance with Section 6.7 of the Plan
upon application to, and subject to approval of, the Bankruptcy Court, after reasonable notice to
and with opportunity to object for the United States Trustee and all parties in interest; *provided,*
that nothing in the Plan or this Confirmation Order shall affect any party in interest's right to
object to or defend any such application.  All objections to any such application are expressly
reserved, including, without limitation, any objections regarding the appropriate legal standard
for such applications, and any objections that payment of such fees is unauthorized under the
Bankruptcy Code and Bankruptcy Rules.

75.    <u>Definition of Equity Interests</u>.  The definition of Equity Interest included
in the Plan is without prejudice to the Debtors' rights to object to, or seek to subordinate, any
Claim, and any Creditor's rights to defend against such action.

76.    <u>Retention of Litigation Claims</u>.  Except as expressly provided in the Plan,
nothing contained in the Plan or herein shall be deemed to be a waiver or the relinquishment of
any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf
of their respective estates under any provision of the Bankruptcy Code or any applicable
nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation,
(a) any and all Claims against any person or entity, to the extent such person or entity asserts a
crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the
Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under

56

any tax sharing agreement among the Debtors and their Affiliates, (c) any and all Claims for

reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the

disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff

or other legal or equitable defense and remedies.  The Debtors shall have, retain, reserve, and

may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the

Chapter 11 Cases had not been commenced.

77.     <u>Retention of Jurisdiction</u>. This Court may properly and, upon the Effective

Date shall, consistent with Article XIV of the Plan, retain exclusive jurisdiction over all matters

arising under or related to, the Chapter 11 Cases, including, without limitation, the matters set

forth in Article XIV of the Plan.

78.     <u>Debtors' Rights of Subrogation</u>.

a.     Except as otherwise agreed by the Debtors, to the extent

that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor,

including on account of any Distributions received by holders of Allowed Guarantee Claims that

are satisfied in full in accordance with Section 8.13(a) of the Plan, (i) such Creditor shall be

deemed to have consented to the subrogation of its right against any third-party, including,

without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the

Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and

power as subrogee of the Creditor against any such third-party, including, without limitation, a

Primary Obligor, to the fullest extent permitted by applicable law.

b.     Except as otherwise agreed by the Debtors, the Debtors'

rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment

or any similar right, including, without limitation, any right to setoff with respect to any of the

foregoing, against any entity, including, without limitation, a Primary Obligor, on account of

Distribution made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

79.     The Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

80.     <u>Trading Restrictions</u>.  The restrictions imposed by the *Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto* [ECF No. 1386], as the same may be amended from time to time, shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

81.     <u>Equity Interests in LBHI</u>.  On the Effective Date, the LBHI Stock shall be canceled and one new share of LBHI common stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative priority and economic entitlements; *provided, however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan.

82.     <u>Equity Interests in Subsidiary Debtors</u>.  On the Effective Date, the Equity Interests in each of the Subsidiary Debtors shall be unaffected by the Plan, in which case the Debtor holding such Equity Interests shall continue to hold such Equity Interests.

83.     <u>Nonoccurrence of Effective Date</u>.  In the event that the Effective Date does not occur, then (a) the Plan, (b) the assumption or rejection of executory contracts or unexpired leases pursuant to the Plan, (c) any document or agreement executed pursuant to the

Plan, and (d) any actions, releases, waivers, or injunctions authorized by this Confirmation Order

or any order in aid of consummation of the Plan shall be deemed null and void; *provided* that this

paragraph shall not have any affect on any provisions of the Bilateral Settlement agreements, if

any, that survive the termination of such agreements.  In such event, nothing contained in this

Confirmation Order, any order relating to consummation of the Plan, or the Plan, and no acts

taken in preparation for consummation of the Plan shall be (i) deemed to constitute a waiver or

release of any Claims or Equity Interests by or against the Debtors or any other person or

entities, to prejudice in any manner the rights of the Debtors or any person or entity in any

further proceedings involving the Debtors or otherwise, or to constitute an admission of any sort

by the Debtors or any other persons or entities as to any issue, or (ii) construed as a finding of

fact or conclusion of law in respect thereof.

84. <u>Notice of Entry of Confirmation Order</u>.  On or before the thirtieth (30th)

Business Day following the date of entry of this Confirmation Order, the Debtors shall serve

notice of entry of this Confirmation Order (which, in the Debtors' discretion, may be combined

with the Notice of the Effective Date) pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and

3020(c) on all Creditors and interest holders, the United States Trustee, and other parties in

interest, by causing notice of entry of the Confirmation Order (the "<u>Notice of Confirmation</u>"), to

be delivered to such parties by first-class mail, postage prepaid.  The notice described herein is

adequate under the particular circumstances, and no other or further notice is necessary.  The

Debtors also shall cause the Notice of Confirmation to be published as promptly as practicable

after the entry of this Confirmation Order once in each of *the Financial Times*, *The Wall Street*

*Journal* (Global Edition – North America, Europe, and Asia), and *The New York Times*

(National).

85. <u>Notice of Effective Date</u>.  Within five (5) Business Days following the

occurrence of the Effective Date, the Plan Administrator shall file the notice of the occurrence of

the Effective Date and shall serve a copy of same on the Master Service List, as defined in the

*Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy*

*Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* [ECF

No. 9635].

86. <u>No Amendments to Proofs of Claim</u>.  After the Effective Date, other than

a proof of Claim relating to an executory contract or unexpired lease that is rejected pursuant to

the Plan, a proof of Claim relating to a prepetition Claim may not be filed or amended without

the authority of the Court.

87. <u>Barclays Sale Order</u>.  Nothing contained in the Plan, the Disclosure

Statement or the Confirmation Order constitutes or shall be construed as any modification or

amendment to the Barclays Sale Order and the rights and defenses of each of the Debtors, the

SIPA Trustee (on behalf of LBI), Barclays Bank PLC and Barclays Capital Inc., with respect to

any litigation, adversary proceeding, contested matter, claims adjudication, appeal or other

dispute against the other are fully preserved, including, without limitation, any rights, defenses,

counterclaims and/or cross-claims asserted in connection with or related to the Sale Order.

88. <u>Payment of Statutory Fees</u>.  On the Effective Date and thereafter, the Plan

Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred

pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant

to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a

final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's

case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's

case is entered.

89.     <u>Effectiveness of Plan Provisions</u>.  Each term and provision of the Plan, as it may have been altered or interpreted by the Bankruptcy Code in accordance with section 15.13, is valid and enforceable pursuant to its terms.

90.     <u>Immediate Effectiveness</u>.  Any stay of this Order provided by any Bankruptcy Rule, including Bankruptcy Rule 3020(e) is hereby waived, and the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

91.     <u>Conflicts Between Order and Plan</u>.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and provisions contained in this Confirmation Order shall govern.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of the Court.


Dated: New York, New York
        December 6, 2011


        <u>      *s/ James M. Peck*                          </u>
        HONORABLE JAMES M. PECK
        UNITED STATES BANKRUPTCY JUDGE

# Exhibit I

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                     :

**In re**                   :       **Chapter 11 Case No.**
                     :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :     **08-13555 (JMP)**
                     :

           **Debtors.**     :     **(Jointly Administered)**
                     :

---------------------------------------------------------------x

**NOTICE OF EFFECTIVE DATE AND**
**DISTRIBUTION DATE IN CONNECTION WITH THE**
**MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

         PLEASE TAKE NOTICE that all conditions precedent to the Effective Date[1] of the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*, dated December 5, 2011 [ECF No. 22973], have been satisfied, and the Effective Date was declared for each of the Debtors on March 6, 2012 at 12:01 A.M.

         PLEASE TAKE FURTHER NOTICE that in accordance with sections 1.48 and 8.3 of the Plan, the initial Distribution Date shall be, and Distributions under the Plan shall commence on, April 17, 2012.

         PLEASE TAKE FURTHER NOTICE that pursuant to section 8.11 of the Plan, for purposes of the initial Distribution Date, the Debtors and the Plan Administrator will not recognize any transfer of Claims recorded on the claims register after March 18, 2012.

         PLEASE TAKE FURTHER NOTICE that the Debtors will not make any Distribution to a holder of an Allowed Claim unless such Claim holder submits, on or before March 23, 2012, both the appropriate (i) Internal Revenue Service tax form ("Tax Form") and (ii) certification pertaining to Office of Foreign Assets Control compliance ("OFAC Certification"). For further information concerning the Tax Form and OFAC Certification,

---

[1] Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan.

please review the *Notice to Holders of Allowed Claims Regarding Plan Distributions*, dated February 15, 2012 [ECF No. 25392].

PLEASE TAKE FURTHER NOTICE that copies of the Confirmation Order, the Plan, the Plan Supplement, and related documents are available for inspection during regular business hours in the office of the Clerk of the Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. Copies of the Confirmation Order, the Plan, the Plan Supplement, and related documents are also available for registered users of the Bankruptcy Court's filing system by accessing the Bankruptcy Court's website (www.nysb.uscourts.gov) and for all parties at www.lehman-docket.com.

Dated: March 6, 2012
     New York, New York

                                       /s/ Lori R. Fife
                                       Lori R. Fife

                                       WEIL, GOTSHAL & MANGES LLP
                                       767 Fifth Avenue
                                       New York, New York 10153
                                       Telephone: (212) 310-8000
                                       Facsimile: (212) 310-8007

                                       Attorneys for Debtors
                                       and Debtors in Possession

# Exhibit J

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**AMENDED STIPULATION ESTABLISHING DISTRIBUTION RESERVES FOR**
**CLAIMS FILED BY CITIBANK, N.A., CITIGROUP GLOBAL MARKETS**
**LTD. AND CITIGROUP GLOBAL MARKETS, INC. IN CONNECTION**
**WITH THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

Lehman Brothers Holdings Inc., as Plan Administrator (the "Plan Administrator")

under the *Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc.*

*And Its Affiliated Debtors* [ECF No. 22737] (the "Plan")[1] for the entities in the above referenced

chapter 11 cases (collectively, the "Debtors"), and Citibank, N.A. ("Citibank"), Citigroup Global

Markets Ltd. ("CGML") and Citigroup Global Markets, Inc. ("CGMI," together with Citibank

and CGML, "Citi"),[2] hereby stipulate and agree (the "Stipulation") as follows:

---

[1] Capitalized used but not defined in this Stipulation shall have the meanings ascribed to them in the Plan.

[2] For convenience, Citi and the Plan Administrator (acting on behalf of the Debtors) shall each be referred to individually as a "Party" and collectively, as the "Parties."

## RECITALS

A.   On March 5, 2012, the Debtors and Citi entered into that certain *Stipulation Establishing Distribution Reserves For Claims Filed By Citibank, N.A., Citigroup Global Markets Ltd. and Citigroup Global Markets, Inc. In Connection With The Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliates* (the "Prior Stipulation"). Pursuant to the Prior Stipulation, the Debtors and Citi agreed upon the form, manner and amount of cash (or other property, as applicable) to be maintained in respect of the Citi Claims (defined below) in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented (the "Distribution Reserves"). As a result of the settlement and compromise among Citi and Lehman Brothers Inc., dated November 16, 2012, and due to the withdrawal or resolution of certain claims since the Prior Stipulation, the Parties have agreed to amend the Prior Stipulation to reduce the amount of certain Distribution Reserves on the terms set forth herein.

B.   On September 15, 2008 and on various dates thereafter, the Debtors filed voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (the "Lehman Bankruptcy Cases").

C.   Pursuant to an order entered on July 2, 2009, the Bankruptcy Court established September 22, 2009 at 5:00 p.m. (Prevailing Eastern Time) as the last date and time for the filing of proofs of claim against any of the Debtors based upon pre-chapter 11 transactions.

2

D.     On December 6, 2011, the Bankruptcy Court entered an order confirming the

Plan. The Plan became effective on March 6, 2012. The Plan Administrator is authorized to

carry out and implement all provisions of the Plan.

Citi Claims

E.     Citibank filed various proofs of claim against the Debtors (the "Citibank

Claims"), including those identified on Schedule A annexed hereto. Citibank has asserted that

many of the Citibank Claims are secured.

F.     Certain Debtors maintained prepetition deposits at Citibank. Pursuant to previous

agreements entered into during the Lehman Bankruptcy Cases, Citibank and the Debtors agreed

to consolidate such prepetition deposits into the five interest-bearing accounts at Citibank

identified in the chart below (collectively, the "Prepetition Accounts").[3] Citibank and certain of

its affiliates assert rights of netting, offset, recoupment, or other claims of right against these

Prepetition Accounts. Because consolidation of the Debtors' deposit accounts is still underway,

the precise dollar value of deposits currently held or expected to be held in each such Prepetition

Account cannot be determined at this time. Accordingly, the Parties have agreed for the limited

purpose of determining reserves in accordance with this Stipulation to estimate the balances of

---

[3] *See Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 3372]; *Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 8099]; *Stipulation and Order Regarding (1) Transfer and Turnover of Certain Deposits, (2) Preservation of Citibank's Setoff Rights, if Any, in Respect of Deposits Transferred or Turned Over, (3) Maintenance of Certain Deposit Accounts, (4) Indemnification of Citibank in Respect of any Third Party Claims Arising from the Turnover of Deposits and (5) Payment of Account Fees* [Docket No. 18687] (the "Third Prepetition Deposits Stipulation"). In addition, certain Debtors maintained prepetition deposits at affiliates of Citibank. Pursuant to the Third Prepetition Deposits Stipulation, these deposits have been or will be consolidated into interest-bearing accounts 3087-0189 and 3087-0154 at Citibank. This Stipulation does not address such affiliate deposits.

US_ACTIVE\44193643\6\58399.0011

the Prepetition Accounts in the following amounts (for each account, the "Estimated Balance for Reserve"):

| Debtor | Prepetition Account | Estimated Balance for Reserve |
|---|---|---|
| Lehman Brothers Holdings Inc. | 204354 | $2,006,000,000 |
| Lehman Brothers Holdings Inc. | 3082-6233 | $54,000,000 |
| Lehman Brothers Commercial Corp. | 3082-6356 | $4,900,000 |
| Lehman Brothers Commodity Services Inc. | 3082-6292 | $4,900,000 |
| Lehman Brothers Special Financing Inc. | 3082-6305 | $600,000 |

G.     CGML filed various proofs of claim against the Debtors (the "CGML Claims"), including those identified on Schedule B annexed hereto. CGML has asserted that the CGML Claims are secured. CGML does not presently assert or hold an interest in any property of any Debtor to secure the CGML Claims.

H.     CGMI filed various proofs of claim against the Debtors (the "CGMI Claims," together with the Citibank Claims and the CGML Claims, the "Citi Claims"), including those identified on Schedule C annexed hereto. CGMI has asserted that the CGMI Claims are secured. CGMI does not presently assert or hold an interest in any property of any Debtor to secure the CGMI Claims.

I.     In each of the Citi Claims, each Citi entity has reserved its purported rights of setoff against the applicable Debtor whether in respect of claims directly between the applicable Citi entity and the applicable Debtor, claims between affiliates of the applicable Citi entity and the applicable Debtor or claims between the applicable Citi entity, or its affiliates, and affiliates of the applicable Debtor, including, without limitation, under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 553, 555, 556, 559, 560 and 561 of the Bankruptcy Code, under any agreement or other instruments, under applicable non-bankruptcy law or otherwise (the "Citi Setoff Rights").

4

J.      This Stipulation shall not affect the form, manner, or amount of Distribution Reserves to be maintained in respect of Claims asserted against the Debtors by any Citi affiliate other than Citibank, CGML, or CGMI, which shall be established and maintained in accordance with section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented.

## AGREEMENT

1.      This Stipulation amends, restates and supersedes the Prior Stipulation in its entirety.

2.      The Plan Administrator and Citibank agree that, solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the Citibank Claims, and subject to the Citi Setoff Rights and the Plan Administrators' rights to dispute, contest or challenge the Citi Setoff Rights:

a.      so long as the Prepetition Accounts are maintained with Citibank, the following Distribution Reserves shall be maintained with respect to the Citibank Claims identified on Schedule A:

(i)      the Prepetition Accounts maintained at Citibank by each of LBHI, Lehman Brothers Commercial Corporation ("LBCC"), Lehman Brothers Commodities Services Inc. ("LBCS") and Lehman Brothers Special Financing Inc. ("LBSF") (including any deposits in the Prepetition Accounts in excess of the Estimated Balance for Reserve) shall constitute a Distribution Reserve for Citibank's Claims identified on Schedule A; and

(ii)      the Plan Administrator (on behalf of LBHI, LBCC, LBCS and LBSF) shall maintain additional Distribution Reserves based on the following unsecured claim amounts in the identified Plan Class, which represent the difference between (1) the aggregate

5

Citibank Claims identified on Schedule A asserted against the applicable Debtor and (2) the Estimated Balance for Reserve:

| Debtor | Unsecured Claim Amount[4] | |
|---|---|---|
| Lehman Brothers Holdings Inc. | LBHI Class 5: | $732,619,993 |
| | LBHI Class 7: | $18,213,955 |
| Lehman Brothers Commercial Corp. | LBCC Class 4: | $13,117,039 |
| Lehman Brothers Commodity Services Inc. | LBCS Class 4: | $0 |
| Lehman Brothers Special Financing Inc. | LBSF Class 4A: | $1,640,069,553 |

      b.    in the event that the Bankruptcy Court, by a final non-appealable order, determines that any of the Citibank Claims identified on Schedule A are allowed unsecured claims and directs Citibank to turn over any portion or all of the Prepetition Accounts to the applicable Debtor (the "Turnover Amount"), then (i) Citibank shall (A) be entitled to retain that portion of the Turnover Amount that is equal to the amount of Distributions that would have been distributed by the applicable Debtor to Citibank on account of such allowed Citibank Claim in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented, from the Effective Date through the date of such turnover (such amount, as confirmed by the Plan Administrator, the "Retained Amount") in lieu of a Distribution by the applicable Debtor, and (B) promptly pay to the applicable Debtor the amount equal to the difference between the Turnover Amount and the Retained Amount (the "Net Turnover Amount"); and (ii) for the avoidance of doubt, once Citibank has paid the Net Turnover Amount to the applicable Debtor(s), Citibank shall be entitled to receive Distributions in accordance with the Plan on account of any Citibank Claims identified on Schedule A that have been allowed as unsecured claims;

---

[4] For the avoidance of doubt, the Unsecured Claim Amount shall not operate to limit the reserves to be maintained by the Plan Administrator in respect of any Claim that is not identified on Schedule A.

6

c.     in the event that the Bankruptcy Court, by a final non-appealable order, directs Citibank to turn over any portion or all of the Prepetition Accounts to the applicable Debtor prior to a final non-appealable determination as to whether the Citibank Claims identified on Schedule A should be allowed as unsecured claims, the Plan Administrator (on behalf of the applicable Debtors) shall establish and maintain Distribution Reserves for any Citibank Claims identified on Schedule A asserted as unsecured claims in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

d.     with respect to any Citibank Claim that is not identified on Schedule A, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such Citibank Claim in accordance with section 8.4 of the Plan, as the same may be modified, amended or supplemented.

3.     The Plan Administrator and CGML agree solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the CGML Claims that:

a.     with respect to the CGML Claims identified on Schedule B, subject to the Citi Setoff Rights and the Plan Administrator's rights to dispute, contest or challenge the Citi Setoff Rights, the Plan Administrator (on behalf of the applicable Debtors) shall reserve Distributions on account of the CGML Claims identified on Schedule B on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

b.     with respect to any claim of CGML that is not identified on Schedule B, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such CGML Claim in accordance with section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented.

7

4. The Plan Administrator and CGMI agree solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the CGMI Claims that:

a. with respect to the CGMI Claims identified on <u>Schedule C</u>, subject to the Citi Setoff Rights and the Plan Administrator's rights to dispute, contest or challenge the Citi Setoff Rights, the Plan Administrator (on behalf of the applicable Debtors) shall reserve Distributions on account of the CGMI Claims identified on <u>Schedule C</u> on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

b. with respect to any claim of CGMI that is not identified on <u>Schedule C</u>, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such CGMI Claim in accordance with section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented.

5. This Stipulation is without prejudice to any of the Parties' respective rights and obligations under and pursuant to the Plan, applicable bankruptcy and non-bankruptcy law, and equitable principles. Nothing herein is or shall be deemed to be (a) a determination, allowance or disallowance of any of Citi's claims against any of the Debtors or their estates for any purpose whatsoever, (b) an admission, release or a waiver of each of the Parties' rights, claims and defenses with respect to any claims each Party might have against the other, including, without limitation, (i) any proofs of claim filed by Citi against the Debtors and the Plan Administrator's objections, defenses or counterclaims with respect thereto, including, without limitation, with respect to the amount, extent, validity, classification or priority of any of Citi's claims against any of the Debtors, and (ii) the Plan Administrator's claims to recover the Prepetition Accounts or any other funds posted in deposit accounts with Citi and Citi's rights to object to, oppose, or

8

otherwise dispute such claims, or (c) an agreement or admission by Citi or the Plan Administrator as to the existence of any setoff right in favor of Citi of any kind whatsoever.

6.      Neither this Stipulation, any of the provisions hereof, nor any act performed or document executed pursuant to or in furtherance of this Stipulation, is or may be deemed to be or may be used as an admission of, or evidence of, the validity or invalidity of any aspect of the Citi Claims or of any other claim or right of any kind of the Parties, or of any wrongdoing or liability of any of the Plan Administrator, the Debtors, or Citi in the Lehman Bankruptcy Cases or any other matter.

7.      Nothing in this Stipulation, express or implied, is intended or shall be construed to confer upon, or to give to, any person other than the Parties hereto, and their respective successors and assigns, any right, remedy or claim under or by reason of this Stipulation. The provisions contained in this Stipulation are and shall be for the sole and exclusive benefit of the Parties hereto.

8.      This Stipulation shall become effective immediately upon its execution by the Parties.

9.      This Stipulation contains the entire agreement between the Parties as to the subject matter hereof and supersedes all previous agreements and undertakings among the Parties relating thereto.

10.      This Stipulation may not be modified other than by signed writing executed by all Parties and delivered to each Party.

11.      The Plan Administrator represents and warrants that it has authority to enter into this Stipulation on behalf of the respective Debtors, including LBHI.

9

12.     Each person who executes this Stipulation represents that he or she is duly authorized to do so on behalf of the applicable Party and that each such Party has full knowledge of, and has consented to, this Stipulation.

13.     This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies, or facsimiles signed by the Parties.

14.     This Stipulation shall inure to the benefit of, and shall be binding upon, the Parties and their respective successors, assignees, heirs, executors and administrators.

15.     This Stipulation shall be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

16.     Citi consents to the jurisdiction of the Bankruptcy Court solely for the purpose of the enforcement of this Stipulation.

US_ACTIVE:\44193643\6\58399.0011

17.     The Bankruptcy Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Stipulation. Should the Bankruptcy Court abstain from exercising its jurisdiction or be found not to have jurisdiction over a matter relating to this Stipulation, such matter shall be adjudicated in either the United States District Court, for the Southern District of New York or a court of competent jurisdiction in the State of New York.

Dated: February 25, 2013
        New York, New York

Lori R. Fife
(lori.fife@weil.com)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Plan Administrator*

Stephen J. Shimshak
(sshimshak@paulweiss.com)
Douglas R. Davis
(ddavis@paulweiss.com)
Claudia L. Hammerman
(chammerman@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global Markets, Ltd. and Citigroup Global Markets, Inc.*

11

| Schedule A | | | | | |
|---|---|---|---|---|---|
| **Citi Entity** | **Debtor** | **Claim Number** | **Asserted Amount of Claim** | **Estimated Balance for Reserve** | **Unsecured Claim Amount** |
| **Citibank, N.A.** | | | | | |
| | Lehman Brothers Holdings Inc | 67736 | $ 2,792,619,993 | $ 2,060,000,000 | $732,619,993 |
| | | 29873 | $ 18,213,955 | | $18,213,955 |
| | | | | | |
| | LBHI Subtotal | | $ 2,810,833,948 | $ 2,060,000,000 | $ 750,833,948 |
| | | | | | |
| | Lehman Brothers Special Financing Inc. | 67733 | 1,640,669,553 | 600,000 | 1,640,069,553 |
| | | | | | |
| | Lehman Brothers Commercial Corporation | 67734 | 18,017,039 | 4,900,000 | 13,117,039 |
| | | | | | |
| | Lehman Brothers Commodity Services Inc | 17932 | 2,295,942 | 4,900,000 | - |
| | | | | | |
| **Citibank NA Total** | | | $ 4,471,816,482 | $ 2,070,400,000 | $ 2,404,020,540 |

| Schedule B | | |
|---|---|---|
| **Citi Entity   Debtor** | **Claim Number** | **Unsecured Claim Amount** |
| Ctigroup Global Markets, Ltd. | | |
| Lehman Brothers Holdings Inc. | 29882 | $ 308,778,533 |
| Lehman Brothers Special Financing Inc. | 29881 | 232,423,044 |
| Lehman Brothers Commodity Services Inc. | 29880 | 6,933,838 |
| Citigroup Global Markets, Ltd. Total | | $ 548,135,415 |

Schedule C

| CitiEntity | Debtor | Claim Number | Unsecured Claim Amount |
|---|---|---|---|
| Citigroup Global Markets, Inc. | | | |
| | Lehman Brothers Holdings Inc | 68119 | $13,819,773 |
| | | | |
| Citigroup Global Markets, Inc. Total | | | $ 13,819,773 |