**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                    Debtors. | Chapter 11<br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC. ,<br><br>                    Plaintiffs and<br>                    Plaintiff Intervenor<br><br>            v.<br><br>CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC., CITI CANYON LTD., CITI SWAPCO INC., FYI LTD., FFI FUND LTD., and OLIFANT FUND, LTC.,<br><br>                    Defendants and<br>                    Defendant Intervenors. | Adversary Proceeding<br>No. 12-01044 (SCC) |

**DECLARATION OF WILLIAM A. CLAREMAN IN SUPPORT OF CITIBANK'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION, PURSUANT TO FED. R. CIV. P. 56(a), FOR PARTIAL SUMMARY JUDGMENT ON COUNT 16 OF SECOND AMENDED COMPLAINT AND DISALLOWING AND EXPUNGING CLAIMS OF CITIBANK, N.A. AGAINST LBHI FOR INTEREST AND FEES UNDER 11 U.S.C. §§ 502, 506 AND 553**

William A. Clareman declares, pursuant to 28 U.S.C. § 1746, as follows:

A.      I am associated with the firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, counsel for defendants Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products Inc., Citigroup Energy Inc., Citi Canyon Ltd., and Citi Swapco Inc. (collectively, "Citi").

B.      Attached hereto, at the tabs indicated below, are true and correct copies of the following documents referenced in Citibank's Memorandum of Law in Opposition to Plaintiffs' Motion, Pursuant to Fed. R. Civ. P. 56(a), for Partial Summary Judgment on Count 16 of Second Amended Complaint and Disallowing and Expunding Claims of Citibank, N.A. Against LBHI for Interest and Fees Under 11 U.S.C. §§ 502, 506 and 553.

1.      Exhibit 1 is a true and correct copy of a Lehman Brothers document entitled "Global Creditor Relations – Highlights – Citigroup," dated June 16, 2008, which was produced to the Lehman Examiner as LBEX-AM 008660-67.

2.      Exhibit 2 is a true and correct copy of Amendment 1 to Guaranty, dated September 9, 2008 (the "September Amendment"), which was produced to the Lehman Examiner as LBEX-DOCID 4263143.

3.      Exhibit 3 is a true and correct copy of an email from Emil Cornejo to Huw Rees and Sterling Fielding, dated September 13, 2008, which was produced to the Lehman Examiner as LBEX-DOCID 1078385.

4.      Exhibit 4 is a true and correct copy of the Lehman Plaintiffs'

Responses and Objections to Defendants' First Set of Interrogatories, dated May 30,

2012.

5.      Exhibit 5 is a true and correct copy of a Lehman-created summary

of an August 7, 2008 meeting between executives from Citi and Lehman entitled

"CITIGROUP Call Report," dated August 7, 2008, which was produced to the Lehman

Examiner as LBEX-DOCID 1035842.

6.      Exhibit 6 is a true and correct copy of a letter to Claudia

Hammerman from Peter Behmke, dated March 10, 2014.

7.      Exhibit 7 is a true and correct copy of the 1992 ISDA Master

Agreement.

8.      Exhibit 8 is a true and correct copy of the Second Amendment to

Committed Revolving Loan Agreement with Guaranty, dated August 18, 2008, which

was produced in this litigation as CITI-LEH00305956.

9.      Exhibit 9 is a true and correct copy of the Guaranty, dated August

30, 2007 (the "August 30, 2007 Guaranty") governing the LBCC Asia loan, which was

produced in this litigation as CITI-LEH01309837.

10.     Exhibit 10 is a true and correct copy of the Stipulation Establishing

Distribution Reserves for Claims Filed by Citibank, N.A., Citibank Global Markets Ltd.,

and Citibank Global Markets, Inc. in Connection with the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, dated

March 5, 2012.

11.    Exhibit 11 is a true and correct copy of the Amended Stipulation
Establishing Distribution Reserves for Claims Filed by Citibank, N.A., Citigroup Global
Markets Ltd., and Citigroup Global Markets, Inc. in Connection with the Modified Third
Amended Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and Its Affiliated
Debtors, dated Feb. 25, 2013.

12.    Exhibit 12 is a true and correct copy of the letter to the Hon. Shelly
C. Chapman from Andrew Rossman, dated April 28, 2014.

13.    Exhibit 13 is a true and correct copy of the letter to J. Derek Mize,
Rex Lee, and Kristina Moree from Neil Kelly, dated July 11, 2014.

14.    Exhibit 14 is a true and correct copy of excerpts from the transcript
of the October 23, 2013 hearing before Judge Peck.  The excerpts contain the entire
argument on plaintiffs' Motion, Pursuant to 11 U.S.C. §§ 105(a), 363(b)(1), 502(b), and
509(a), for Entry of an Order Provisionally Allowing Claims Filed by Citibank, N.A. and
Authorizing Lehman Brothers Holdings Inc. to Satisfy Those Claims with Funds on
Deposit (the "Provisional Allowance Motion"), and omits only those portions unrelated
to this adversary proceeding.

15.    Exhibit 15 is a true and correct copy of the 2002 ISDA Master
Agreement.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  New York, New York
        July 28, 2014
                                    _____
                                        William A. Clareman


3

# Exhibit 1

## LEHMAN BROTHERS

**Global Creditor Relations- Highlights**

## Citigroup

Date updated:
6/16/08
RM:
Analyst: JH

### Bank Profile

| Relationship Tier | Committed Credit | Total Cash Cap | Projected Fees 08 | Long Term Debt Ratings | Financial Last 12 Months | | | | Market Cap |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Assets | Net Inc | ROE | Tier 1 | 06/16/2008 |
| 1 | $545M | $545M | $40M | Aa3/AA-/AA | $2187B | $3.6B | -5.75% | 7.12% | $100B |

### Treasury Relationship Priorities

| Lehman | Citigroup |
|---|---|
| 1. **Determine Citi's concern about Lehman intraday credit exposure and its subsequent tightening of limits.** <br> 2. Raise opportunistic funding for Lehman by tapping Citigroup's distribution channels for fixed income, local currency syndications and structured notes. <br> 3. Retain Citigroup's commitments in the US and European flagship facilities and cash capital in Asia. <br> 4. Tap Citigroup to meet Lehman's less liquid regional funding requirements in Asia, Latin America and CEE. <br> 5. Identify opportunities for Citigroup to meet Lehman's growing infrastructure needs globally. <br> 6. Increase AUM in Lehman liquidity funds to support the Firm's IMD strategy. | 1. Increase total relationship fees by 15% by winning new operating business mandates globally or by increasing volumes. <br> 2. Identify other structured product and added value opportunities, e.g. local currency debt raising, conduit financing. <br> 3. Act as co-manager on Lehman debt/preferred issuances, bookrunner on LBBAG and joint bookrunner on LBHI flagship. <br> 4. Increase corporate trust fees by directing investments to Lehman's liquidity funds. |

### Bank Overview

| Relationship History | • Although a competitor in capital markets and M & A, Citigroup is among the Firm's largest providers of credit and operating services globally. Citigroup supports Lehman through its significant international branch network, which Lehman has been able to leverage as we expand in emerging markets. <br> • Citigroup provides well-coordinated and relationship driven global coverage from New York, London, and Hong Kong. Citi RM's and Senior Management feel they have excellent access to all levels of Lehman's Treasury team. Michael Maurestein is the Global RM based in New York. Chris Fostkett is Global Head of Financial Institutions. <br> • Citi's RM's have a strong understanding and sophistication, across all operating, financial and capital market products. Early in 2008, the reporting lines for the relationship teams in London and Asia was moved back from Investment Banking to Global Transaction Services. Michael Mauerstein, who has credit experience, continues to report to the Investment Bank. |
|---|---|
| Reliability /Credit Incident Update | • Until June 12, 2008, Citi has consistently been Lehman's strongest provider of credit. However, due to a substantial increase in novation requests from counterparties, Citi requested that we collateralize $3-$5 B in intraday exposure. Lehman declined, but did agree to a $2B term deposit, callable daily. Meeting scheduled with CRO on June 17, 2008. <br><br> • In 2007, Citigroup increased its cash capital unsecured commitments to Lehman from $120M |

1

**LBEX-AM 008660**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LEHMAN BROTHERS   **Global Creditor Relations- Highlights**
**Citigroup**

| | |
|---|---|
| | to $545 M. It is important to point out that Citi extended a $300 M, three year unsecured facility in Asia during the height of the market turmoil in August. Citi has also committed $200M as joint book runner on the renewal of the LBHI flagship facility in 2008 (allocated $175 M). Citi is joint arranger of the LBBAG flagship. ($175M allocated). Citi routinely provides LC's /guarantees and short term loans in local currencies. |
| | • As a result of Citi's financial performance, Citi' RM's have been informed that they cannot add any additional risk assets to their portfolio unless offset by a correspondingly decrease to another borrower. |
| **Market Update/News** | • On December 11, 2007, Citi Board named Vikram Pandit CEO and Sir Win Bischoff Chairman.  Brian Leach has been hired as Chief Risk Officer. |
| **Bank Profile** | • Citigroup ranks among the five largest bank in the world with total assets of $2.2 Trillion. With total market cap of $100B, Citi has dropped to the 3rd largest U.S. bank. Citi is a diversified financial institution with three major business groups, Global Consumer, Institutional Client Group and Global Wealth Management.  Citi has over 200 Million customer accounts in more than 100 countries. |
| | • Through the market disruption, Citi has continued to be a major partner of Lehman based on its balance sheet capacity, capital strength, product capabilities and geographic reach. However today, it is important to stay on top of any changes in Lehman credit appetite resulting from its recent financial hits.  Citi's June 12 request to Lehman may also be a result of its internal concerns on limiting potential losses. |
| **Lehman Research** | 1-Overweight |

**Bank's Credit Environment**

| | |
|---|---|
| Credit Appetite | • Citi is committed to the broker dealer industry, particularly since it is a major provider of operating services to the industry in the US and globally.  Citi ranks among the top providers of unsecured cash capital facilities to the firm totaling $500 M+. Citi also consistently provides credit in illiquid markets on a timely basis both for LC's, guarantees and short term borrowings. Citi ranks 3rd in total uncommitted and gross intraday liquidity with $20B provided to the firm. As of June 12, Citi is limiting net exposures for the US to $3B.  CLS exposure limit is $3 B and Asia exposure limit is $1.2 B. |
| Bank Return Hurdles | • Citi's pricing levels take into consideration the relationship revenues which for Lehman is driven by the approximately $30+M in fees directed in operating services. |
| Estimated Max Lending Limit | • Citi manages credit on a portfolio basis and will use CDS to hedge exposure above its desired hold level. Citi's max limit for Lehman is $2.47B, exclusive of trading lines and daylight. |
| Competition for Credit | • Historically, Lehman credit was managed without constraints from the combined broker-dealer portfolio. However, due to recent write-offs, this is expected to become more of an issue internally at Citi. |

2

**LBEX-AM 008661**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# LEHMAN BROTHERS

## Global Creditor Relations- Highlights
## Citigroup

### Treasury and Business Funding Relationship Summary

#### Credit Lines

| | |
|---|---|
| **Flagship Facilities** | • LBHI (03/08): Committed $200m, allocated $160m as co-arranger.<br>• LBBAG (04/07): Joint book runner; committed $225m, allocated $175m |
| **Uncommitted Facilities** | • Citi provides over $20bn in gross uncommitted and intraday lines to Lehman in the US, Europe, Asia and Latam for operating liquidity. Citi consistently steps up to provide credit to support Lehman business, particularly in emerging market countries. |
| **Non-recourse Facilities** | • Citi commits $25 mm to the $150 mm, 364 day redemption facility for Neuberger Berman. |
| **Other Committed Cash Capital** | • LBCCA (08/07): HKD 2.34 B ($300M)2 year bilateral facility |

#### Other Treasury

| | |
|---|---|
| **Lehman Debt Issuance** | Citi was awarded co-lead of Lehman's $2B 8.75% non-cumulative mandatory convertible preferred stock issuance in March, 2008. Citi ranks #1 among all bank in all other co-manager fees directed. |
| **Operating Services** | Citigroup is a major operating bank for Lehman providing cash and clearing services globally with largest fees earned in Australia, Korea, Turkey, Switzerland, UK, and Japan. Other major markets with fees > $1 M include China, Hungary, Poland, Russian Federation, and Mexico. 20% of total fees are generated in the US from cash management and issuing and paying services. In 2007, operating fees increased 21%. |
| | |

| Sum of USD Equivalent Limit (MM) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Status** | **Product Type** | **Recourse** | **Entity** | **Region** | **Secured / Unsecured** | **Committed / Uncommitted** | **Tenor Bucket** | **Tenor Details** | **Pricing Base** | **Total** |
| Completed | Cash Cap | Recourse | TL II Asset | Asia | Unsecured | Uncommitted | <=1YR | 18 mo perpetua | Taiwan Sec | 23 |
| | Committed Facility | Recourse | LBBAG | Europe | Unsecured | Committed | >1YR | 3yr | 1 ML | 175 |
| | | | LBCCA | Asia | Unsecured | Committed | >1YR | (blank) | 1 ML | 301 |
| | | | LBHI | US | Unsecured | Committed | >1YR | 3 year | 1 ML | 160 |
| | Dayloan | Recourse | LBI | US | Unsecured | Uncommitted | <=1YR | intraday | N A | 2,000 |
| | Intraday | Recourse | LBI | US | Unsecured | Uncommitted | <=1YR | intraday | N A | 3,100 |
| | | | | | | | | Intraday - CLS | N A | 2,000 |
| | | | | | | | | (blank) | 1 ML | 267 |
| | | | | | | | | | N A | 0 |
| | | | LBIE | Europe | Unsecured | Uncommitted | <=1YR | (blank) | N A | 11,600 |
| | | | LBIE Seoul | Asia | Unsecured | Uncommitted | <=1YR | (blank) | N A | 180 |
| | | | LBJI | Asia | Unsecured | Uncommitted | <=1YR | (blank) | N A | 562 |
| | LC | Recourse | LB Pte | Asia | Unsecured | Uncommitted | <=1YR | (blank) | N A | 2 |
| | | | LBCCA | Asia | Unsecured | Uncommitted | <=1YR | (blank) | N A | 21 |
| | | | LBSF | US | Unsecured | Uncommitted | <=1YR | (blank) | N A | 70 |
| | Loan | Recourse | Finance Am | US | Unsecured | Committed | <=1YR | (blank) | N A | 1 |
| | | | LBIE Seoul | Asia | Unsecured | Uncommitted | <=1YR | (blank) | 3M Korean | 30 |
| | | | LBJI | Asia | Unsecured | Uncommitted | <=1YR | 30 days | 1 ML | 25 |
| | | | LBSA | Asia | Unsecured | Uncommitted | <=1YR | 7 days | N A | 20 |
| | | | Lehman Bro | US | Unsecured | Uncommitted | <=1YR | (blank) | Libor | 100 |
| | RTGS | Recourse | LBJI | Asia | Unsecured | Uncommitted | <=1YR | intraday | N A | 504 |

3

**LBEX-AM 008662**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LEHMAN BROTHERS

**Global Creditor Relations- Highlights**

**Citigroup**

**Global Treasury Fees Paid Regional Break Down**

| Region | 2005 | 2006 | 2007 | Q1 2008 |
|--------|------|------|------|---------|
| Americas | 16,489,905 | 13,901,097 | 16,448,235 | 1,073,302 |
| Asia | 847,655 | 3,537,339 | 5,613,948 | 42,779 |
| Europe | 5,285,568 | 6,994,064 | 6,839,231 | 1,167,142 |
| Multi | 38,500 | 108,750 | 617,125 | |
| Grand Total | 22,661,628 | 24,541,250 | 29,518,539 | 2,283,223 |

**Global Treasury Fees Paid Category Break Down**

| Category | 2005 | 2006 | 2007 | Q1 2008 |
|----------|------|------|------|---------|
| Capital Markets Activity | 10,370,276 | 6,601,390 | 4,334,316 | |
| Financing Lines Spread | 375,968 | 718,628 | 626,876 | 44,848 |
| Liquidity Placed | 1,133,949 | 1,921,006 | 6,100,236 | 1,185,268 |
| Operating Services | 9,810,069 | 14,430,086 | 17,971,986 | 1,044,282 |
| Trustee Services and Administration | 971,365 | 870,140 | 485,125 | 8,825 |
| Grand Total | 22,661,628 | 24,541,250 | 29,518,539 | 2,283,223 |

4

**LBEX-AM 008663**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LEHMAN BROTHERS

**Global Creditor Relations- Highlights**
**Citigroup**





**With total GSS of $127M, Citi ranks #2 after JPMorgan among all US banks.**

5

**LBEX-AM 008664**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# LEHMAN BROTHERS

**Global Creditor Relations- Highlights**

## Citigroup

### Business Highlights (Top 3)

| Product | Contact | Status |
|---|---|---|
| IBD | | No coverage. |
| IMD | Nick Hoar, MD | Lehman's Liquidity Funds added to Citi's cash management and corporate trust platforms in 2007. |
| DCM | Jim Merli, MD | Citi named Co-lead on HK 559M, 10year debt issuance for Lehman, the largest offering for a broker dealer in Hong Kong. Citi named co-lead on Lehman's $2 B preferred issuance.  (Fees = 12m+) |
| FID Sales & Trading | Lehman Asia | #1 counterparty for structured equity - linked notes in Asia accessing  Citi's Private Bank and Retail banks.  In 2007, total fees increased to $30.4M from $ 6.2MM in 2006. |

### IBD Report

IBD Report as of February 29, 2008 for CITIGROUP INC.

| Client | Transaction Type | 2004 Total | 2005 Total | 2006 Total | 2007 Total | Grand Total |
|---|---|---|---|---|---|---|
| CITIBANK, N.A. | Asset Backed Securities | | | | | 2,972,468 |
| | US Corporate Bonds | 44,267 | | | | 44,267 |
| **Grand Total** | | **1,121,902** | **7,512,254** | **610,726** | **(61,924)** | **15,250,498** |

### Lehman Stock and Debt

**Stock**

*report taken as of 4 March 08

| Investor Name | Position 03/04/08 | Position 12/17/07 | Position 12/31/06 | Position 12/31/05 | Position  12/31/04 |
|---|---|---|---|---|---|
| Citi Investment Research (US) | 3,417,683 | 3,687,447 | 2,775,772 | 0 | 0 |
| Citibank (Switzerland) | 569 | 1,536 | | | |

**Debt**

**2008: Americas Debt Purchased**
**$USD**

| Sum of Amount Invested | |
|---|---|
| Investor | Total |
| CITIBANK | 15,000,000 |
| Grand Total | 15,000,000 |

6

**LBEX-AM 008665**

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

LEHMAN BROTHERS

**Global Creditor Relations- Highlights**

## Citigroup

### Organizational Chart



* Pat Ryan reports indirectly to Brian Leach.

7

LBEX-AM 008666

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# LEHMAN BROTHERS

## Global Creditor Relations- Highlights
## Citigroup

### Global Bank Meeting History

| Meeting Date | Region | Bank Participants Chris Foskett Tom Fontana | LB Participants Chris O'Meara, Paolo Tonucci | Subject/Purpose |
|---|---|---|---|---|
| June, 2008 | US | | | Credit Meeting |
| March 27, 2008 | Asia | Dave Phillips, Global Head Broker Dealers, Financial Institutions Paul Egan, Asian Head Broker Dealers, Financial Institutions Asia Pacific Kathy Ong, Regional Relationship Manager, Financial Institutions Asia Pacific | Herbert Moos, Rowena Cameon, Nigel Watters, Aireen Phang | Introductory meeting for Rowena / Relationship Review |
| March 13, 2008 | Europe | Reto Faber - Head of Broker Dealers EMEA Satvinder Singh - Head of Direct Clearing and Custody EMEA Paul Salariya - GRM Andrew Gelb - Global Head of Direct Clearing and Custody | Alastair Blackwell Simon Gaston, Carlo Pellerani, Geoff Spindler | Citibank Senior Management meeting |
| March 12, 2008 | Europe | Reto Faber | Huw Rees, Joe Igoe | Discuss senior level meeting taking place Thursday and Citibank's desire to engage us in a strategic dialogue |
| March 5, 2008 | Europe | (blank) | Joe Igoe | Event |
| | | Paul Salariya - GRM Rowena Romula - EMEA head of client services Cluster Heads | NWM Ops | Service Review |
| | | Gunsel Topbas Joe Mernagh Derek Stalley | Steve Durrant Sarah Malvisi Stefano Dallafina Sey Ozbesli Maris Bartio Andrew Cochrane | To discuss the implementation of Citi's Account Operator services in Turkey |
| March 3, 2008 | Asia | Yo Naito Hiroko Sakaguchi | Tatsushi Kishimoto Keiko Nishida | FX settlement |
| | New York | Kate Lucas, Adrian Garza Cadona, Pedro Guerra, Raul Patemo, Edmundo Fajardo, Antonia Blazquez, Mauricio Schwartmann, Oscar Pagani, Maeles Deifin | Maria Chalco, Emily Critchett, Bill Gallagher, Anthony Ghibesi, Shaun Lawrence, Jechly Leung-David, Paul Reinen | Annual Citibank event to obtain market information on LATAM |
| February 27, 2008 | Asia | Kathy Ong, Regional Relationship Manager, Financial Institutions Asia Alfonso Martin, Direct Custody and Clearing Sales, HK Lyle Williams, Head of Direct Custody and Clearing Product Development, Asia Ada Chan, Product Manager, HK | Nigel Watters, Shaun Brennham Ben Oldham Jamie Kwok Jesse Kavanagh Susan Lam | Update on HK third party clearing, with specific mention of stamp duty processes |
| | Europe | David Levy (SCM) Paul Salariya - Relationship Manager | Steve Durrant Katie Gillingham Barry Felltrick | Israel RfP - Citibank |
| February 25, 2008 | Europe | Rob Penn - GRM Paul Salariya - GRM | Jon Seeranj Geoff Spindler | Catch up |
| February 13, 2008 | Europe | Rob Penn - GRM Paul Salariya - new GRM Joe Mernagh - Product Manager | John Wren Jon Gardner Maria Barro Lesley Hughes Kris Parry Irina Volkova Ekaterina Seredinskaya | Russia local branch follow-up meeting |
| | | Rob Penn - GRM Paul Salariya - new GRM | Huw Rees Steve Durrant Jon Seeranj Sara Mahoney Joe Igoe Geoff Spindler | Introduction |
| February 4, 2008 | Europe | TBC | Steve Durrant | Account Operator Services in Turkey |
| January 28, 2008 | Europe | Rob Penn - GRM | Geoff Spindler | To discuss bid plan for 2008 |
| January 21, 2008 | Europe | Rob Penn - GRM Derek Stalley - Assistant GRM | Steve Durrant Sara Mahoney Jon Seeranj Geoff Spindler | To discuss progress on tasklist |
| | | Rob Penn (GRM) Derek Stalley (RM) Cristian Agalopol (Local RM) | Huw Rees Joe Igoe Jon Seeranj | Romania Market Update |
| January 18, 2008 | Asia | (blank) | Miyuki Ebara, SVP, Head of Ops Tatsushi Kishimoto, VP, Treasury | Citibank New Year Reception |
| | New York | Chris Foskett, MD, Global Head of Financial Institutions Micheel Mauerstein, MD, Global RM | Erin Callan Julie Boyle Janet Birnoy- (depends on agenda) Emil Cornejo | Sr Mgmt Calling Plan Luncheon |

8

LBEX-AM 008667

CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS, INC.

# Exhibit 2

## AMENDMENT 1 TO GUARANTY

AMENDMENT date as of September 9, 2008, among Lehman Brothers Holding Inc., a corporation organized and existing under the laws of the State of Delaware ("Guarantor") and Citibank, N.A., on behalf of Citigroup Inc. and each subsidiary or affiliate thereof (including Citibank, N.A. and each of its branches wherever located) ("Citigroup").

Reference is made to the Guaranty dated as of January 7, 2004 executed by the Guarantor in favor of Citigroup (the "Guaranty"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Citigroup to extend and/or maintain credit to or for the account of the Guarantor's subsidiaries listed on Schedule A to the Guaranty as amended by this Amendment, Citigroup and the Guarantor agree as follows:

1. Section 1 of the Guaranty is amended by replacing the first sentence thereof in its entirety with the following:

The Guarantor unconditionally guarantees to Citigroup, Citibank, N.A. and each other Citigroup Entity (as defined below), individually and collectively, the punctual payment when due, whether upon maturity, by acceleration or otherwise of all obligations (now or hereafter existing) of each Borrower (i) under any agreements with Citigroup or any Citigroup Entity pursuant to which any Citigroup Entity opens and maintain accounts for the custody of cash, securities, and/or other assets of such Borrower or provides custodial and related services for such Borrower ("Custody Agreements") and (ii) to any Citigroup Entity under any and all extensions of credit, including without limitation cash loans and loans of securities, extended and or maintained by any Citigroup Entity ("Credit Agreements"), whether for principal, interest, fees, expenses or otherwise, in each case strictly in accordance with the terms thereof (all such obligations of the Borrowers being the "Obligations"). For purposes of this Guaranty, the term "Citigroup Entity" means any entity that is included within Citigroup. For the avoidance of doubt, the full amount of the guaranteed Obligations are guaranteed by the Guarantor to each and every Citigroup Entity (including Citibank, N.A.) individually and collectively even though the underlying obligation that is guaranteed may be owing to a different Citigroup Entity.

2. Schedule A of the Guaranty is amended by adding the entities set forth on Schedule I hereto, each of which shall be a "Borrower" for all purposes of the Guaranty.

3. The Guarantor represents and warrants that (i) it has the power to execute and deliver this Amendment and to perform its obligations under this Amendment and has taken all necessary action to authorize such execution and delivery and performance of such obligations, (ii) its execution and delivery of this Amendment do not violate or conflict with any law, rule or regulation applicable to it, any provision of its charter or by-laws (or comparable constituent documents), any order or judgment of any court or other agency of government applicable to it or any of its assets, (iii) all authorizations of and exemptions, actions or approvals by, and all notices to or filings with any governmental or other authority that are required to have been obtained or made and are in full force and effect and all conditions of any such authorizations, exemptions, actions or approvals have been complied with, and (iv) this Amendment constitutes

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                                    LBEX-DOCID 4263143

the party's legal, valid and binding obligation, enforceable against the party in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application, (regardless of whether enforcement is sought in a proceeding in equity or at law).

4. This Amendment shall be governed by and construed in accordance with the laws of the State of New York without regard to the conflicts of law principles of such State.

5. This Amendment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
     Name:
     Title:

Accepted and Agreed,

CITIBANK, N.A., on behalf of Citigroup

By: _____
     Name:
     Title:

-2-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 4263143

**SCHEDULE I**

To Amendment 1, dated as of September 9, 2008,
to Guaranty dated as of January 4, 2004
from Lehman Brothers Holding Inc.

<u>Additional Borrowers</u>:

Lehman Brothers Incorporated

-3-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 4263143

# Exhibit 3

| | |
|---|---|
| **From:** | Cornejo, Emil [emil.cornejo@lehman.com] |
| **Sent:** | Saturday, September 13, 2008 5:35 PM (GMT) |
| **To:** | Rees, Huw [hrees@lehman.com]; sterling@fielding [sterling@fielding] |
| **Subject:** | Re: Citi |

Accdg to ny law, citi has a right of offset.  The dlrs will flow through our cash acct with citi so if it is negative balance, the cash will not be released.


---------------------------------

----- Original Message -----
From: Rees, Huw
To: Cornejo, Emil; Ratanghayra, Amberish
Cc: Pellerani, Carlo; Fielding, Stirling
Sent: Sat Sep 13 13:14:05 2008
Subject: Re: Citi

Emil,
Thanks for that. So Citi have no lien over the deposit in any shape or form.


----- Original Message -----
From: Cornejo, Emil
To: Rees, Huw; Ratanghayra, Amberish
Sent: Sat Sep 13 18:10:55 2008
Subject: Citi

There is no agmt .  It is a callable deposit.


---------------------------------

FOIA CONFIDENTIAL TREATMENT REQUESTED BY
LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 1078385

# Exhibit 4

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**
Turner P. Smith
L.P. Harrison 3rd
Peter J. Behmke
101 Park Avenue
New York, New York 10178
*Counsel for the Lehman Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | |

------------------------------------------------------------ X

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS COMMODITY SERVICES INC., LEHMAN BROTHERS COMMERCIAL CORP., and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.* | Adversary Proceeding No.: 12-01044 (JMP) |
| Plaintiffs, | |
| -against- | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS LTD., CITIGROUP FINANCIAL PRODUCTS INC., CITIGROUP ENERGY INC. and CITI CANYON LTD. | |
| Defendants. | |

------------------------------------------------------------ X

## LEHMAN PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, as incorporated by Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 7026 and 7033, Lehman Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Brothers Commodity Services Inc., and Lehman Brothers Commercial Corp. (collectively "Lehman Plaintiffs"), by their undersigned counsel, hereby respond and object to the First Set of Interrogatories to Lehman Plaintiffs (the "Interrogatories"; or each individually, an "Interrogatory") by Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products Inc., Citigroup Energy Inc., and Citi Canyon Ltd. (collectively "Citi" or "Defendants").

## GENERAL OBJECTIONS

1.      Lehman Plaintiffs object to the Interrogatories to the extent they seek to impose obligations on the Lehman Plaintiffs that exceed those required by the Federal Rules of Civil Procedure, the Local Civil Rules, the Federal Rules of Bankruptcy Procedure, or the Local Bankruptcy Rules.

2.      Lehman Plaintiffs' responses are based upon information presently known to the Lehman Plaintiffs and their attorneys, and are set forth herein without prejudice to the Lehman Plaintiffs' right to assert additional objections or supplemental responses should the Lehman Plaintiffs discover additional information or grounds for objections.

3.      Lehman Plaintiffs object to the Interrogatories to the extent they seek, without limitation, identification of "all" individuals with knowledge relating to a given subject matter. Lehman Plaintiffs further object to the Interrogatories to the extent they purport to require Lehman Plaintiffs to perform anything more than a good-faith and diligent search for responsive information. Lehman Plaintiffs have conducted a diligent,

- 2 -

good-faith search to identify individuals responsive to each Interrogatory within the requirements of the applicable law.

4.    Lehman Plaintiffs object to the Interrogatories on the grounds that they are overly broad and unduly burdensome.

5.    Lehman Plaintiffs object to the definition of "Lehman" as overly broad and inclusive of non-party entities which are not relevant to this litigation.

6.    Lehman Plaintiffs object to the Interrogatories to the extent they seek the production of information outside the possession, custody or control of the Lehman Plaintiffs, and to the extent they purport to require Lehman Plaintiffs to produce information in the possession, custody or control of its present or former employees, agents, or representatives. Lehman Plaintiffs disclaim any obligations to collect or produce information from any entity other than the Lehman Plaintiff entities.

7.    Lehman Plaintiffs object to the Interrogatories to the extent they call for information which Citi has in its possession, custody or control or to which it has equal or greater access.

8.    Lehman Plaintiffs object to the Interrogatories to the extent they call for information protected from disclosure by the attorney-client privilege, attorney work product doctrine, common interest privilege, or any other applicable law, privilege, immunity, doctrine or other ground for limiting disclosure.

9.    Lehman Plaintiffs object to the Interrogatories to the extent they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

- 3 -

10.     Lehman Plaintiffs object to the Interrogatories to the extent they are not sufficiently limited as to time.  Lehman Plaintiffs also object to the Interrogatories to the extent they seek information from time periods neither relevant nor reasonably calculated to lead to the discovery of relevant or admissible evidence.

11.     All of these General Objections apply to each and every one of Lehman Plaintiffs' responses.  The inclusion of specific objections, or the restatement of certain General Objections in a specific response, shall not be construed as, and is not intended to be, a waiver of other General Objections.

## RESPONSES TO INTERROGATORIES

### Interrogatory No. 1

Identify all Persons with knowledge or information concerning Plaintiffs' allegations in paragraphs 37, 38, 63, 71, 72, 76, 77, and 84 of the Complaint that:

a)  LBHI refused Citibank's request for setoff rights with respect to the $2 Billion Deposit;

b)  Citibank agreed to waive its setoff rights with respect to the $2 Billion Deposit;

c)  Citibank agreed or promised to segregate the $2 Billion Deposit;

d)  Citibank held the $2 Billion Deposit in a special purpose account; and

e)  LBHI requested that Citibank return the $2 Billion Deposit to LBHI subsequent to the Bankruptcy.

### Response

Lehman Plaintiffs incorporate each of the foregoing General Objections. Subject to and without waiving these objections, Lehman Plaintiffs identify the following individuals presently or formerly affiliated with the Lehman Plaintiffs who, potentially

- 4 -

among others, Lehman Plaintiffs currently believe may have had knowledge or

information at the time regarding the issues identified in this Interrogatory:

Janet Birney
Emil Cornejo
Steven Engel
Daniel Fleming
David Forsyth
Patrick Fruzzetti
Craig Jones
Ian Lowitt
Carlo Pellerani
Paolo Tonucci

### Interrogatory No. 2

Identify the Person or Persons at LBHI who you allege "specifically

refused Citibank's request for setoff rights with respect to" the $2 Billion Deposit in

paragraph 38 of the Complaint, and the Person or Persons at Citibank who you allege

agreed to waive Citibank's setoff rights with respect to the $2 Billion Deposit in

paragraph 71 of the Complaint.

### Response

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs further object on the grounds that this Interrogatory seeks information

that Citi has in its possession, custody, or control or to which Citi has equal or greater

access. Subject to and without waiving these objections, Lehman Plaintiffs identify the

following individuals who Lehman Plaintiffs currently believe may have been involved

in the negotiations or discussions identified in this Interrogatory:

Ian Lowitt
Paolo Tonucci

- 5 -

Thomas Fontana
Christopher Foskett
Michael Mauerstein

**Interrogatory No. 3**

Identify all witnesses to the communications referred to in Interrogatory

No. 2.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs also object on the grounds that this Interrogatory seeks information

that Citi has in its possession, custody, or control or to which Citi has equal or greater

access. Subject to and without waiving these objections, Lehman Plaintiffs identify the

following individuals who Lehman Plaintiffs currently believe may have witnessed the

communications identified in this Interrogatory:

Ian Lowitt
Paolo Tonucci

Thomas Fontana
Christopher Foskett
Michael Mauerstein

**Interrogatory No. 4**

Identify the Person or Persons at LBHI who requested that Citi return the

$2 Billion Deposit to LBHI subsequent to the Bankruptcy, and the Person or Persons at

Citi to whom the request was made.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs further object on the grounds that this Interrogatory seeks information

- 6 -

that Citi has in its possession, custody, or control or to which Citi has equal or greater access.

Subject to and without waiving the foregoing objections, Lehman Plaintiffs state that the $2 Billion Deposit has been the subject of ongoing negotiations with Citi for years, the starting premise of which has been the Lehman Plaintiffs' position that Citi is not entitled to set off that deposit against purported LBHI obligations and that Citi should return the $2 Billion Deposit to the LBHI estate. Those negotiations have been conducted largely through counsel. In addition to those negotiations, Steven Cohn of Alvarez & Marsal requested the return of the $2 Billion Deposit.

**Interrogatory No. 5**

Identify all Persons with knowledge or information concerning the $2 Billion Deposit to the extent not previously identified in response to Interrogatories 1-4 above, inclusive of subparts.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections as well as the specific objections set forth in responses to Interrogatories 1-4. Subject to and without waiving the foregoing objections, Lehman Plaintiffs respond as follows: none.

**Interrogatory No. 6**

Identify all Persons with knowledge or information concerning the September Amendment.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections. Lehman Plaintiffs further object on the grounds that this Interrogatory is vague, overly

broad and unduly burdensome. Subject to and without waiving these objections, Lehman

Plaintiffs identify the following individuals presently or formerly affiliated with the

Lehman Plaintiffs who, potentially among others, Lehman Plaintiffs currently believe

may have had relevant knowledge or information at the time:

Janet Birney
Rowena Carreon
Emil Cornejo
Emily Critchett
Paul Hespel
Gregory Ito
James Killerlane III
Ian Lowitt
Paolo Tonucci
Andrew Yeung

**Interrogatory No. 7**

Identify all Persons with knowledge or information concerning the $500

Million Transfer.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs further object on the grounds that this Interrogatory seeks information

that Citi has in its possession, custody, or control or to which Citi has equal or greater

access. Subject to and without waiving these objections, Lehman Plaintiffs identify the

following individuals presently or formerly affiliated with the Lehman Plaintiffs who,

potentially among others, Lehman Plaintiffs currently believe may have had relevant

knowledge or information at the time:

Emil Cornejo
Dan Fleming
Craig Jones
Ian Lowitt
Paolo Tonucci

**Interrogatory No. 8**

Identify all Persons with knowledge or information concerning the financial condition or solvency of LBHI or LBI on or before September 14, 2008.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections. Lehman Plaintiffs further object on the grounds that this Interrogatory is vague, overly broad and unduly burdensome, particularly with regard to the time frame. Lehman Plaintiffs' response is specifically limited to the time frame of September 9, 2008 through September 14, 2008. Subject to and without waiving these objections, Lehman Plaintiffs identify the following individuals presently or formerly affiliated with the Lehman Plaintiffs who, potentially among others, Lehman Plaintiffs currently believe may have had relevant knowledge or information at the time:

Robert Azerad
Dan Fleming
Craig Jones
Martin Kelly
Ian Lowitt
Christopher O'Meara
Paolo Tonucci
Irina Veksler

**Interrogatory No. 9**

Identify all Persons with knowledge or information concerning any Derivatives Trades between Citi and Lehman that are subject to any claim objection or breach of contract claim in paragraphs 140 – 174 of the Complaint, including:

a) all Persons with knowledge or information concerning such Derivatives Trades before the Bankruptcy; and

- 9 -

b) all Persons with knowledge or information concerning the valuation of such
Derivatives Trades after the Bankruptcy.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.
Lehman Plaintiffs also object to this Interrogatory on the grounds that it is vague,
ambiguous, unduly broad, and overly burdensome. Among other things, the
Interrogatory refers to any trader, affiliated with any number of LBHI subsidiaries, who
engaged in derivatives trading with Citi, on tens of thousands of trades, without limitation
on the time frame of that activity. Such individuals and time frames have no relevance to
the claim objections or breach of contract claims in this case, and identification of such
individuals would not lead to relevant or admissible evidence.

Lehman Plaintiffs' response is expressly limited to sub-question (b), "all
Persons with knowledge or information concerning the valuation of such Derivatives
Trades after the Bankruptcy." Subject to this limitation and without waiving these
objections, Lehman Plaintiffs identify the following individuals presently or formerly
affiliated with the Lehman Plaintiffs who, potentially among others, Lehman Plaintiffs
currently believe may have relevant knowledge or information:

Nate Abebe
Parag Bhutada
Ian Burke
John Cupolo
Emmanuel Dahan
Jean-Francois Dreyfus
Daryl Droughton-Fehr
Ellen Duke
Daniel Ehrmann
Gil Gallego
Vinay Gupta
Steven Harris

- 10 -

Katherine Hofer
Haroon Jawadi
Simon Johnson
Abhishek Kalra
David Kaufman
Sumit Kumar
Dean Melchior
Steven Mullaney
Christopher O'Meara
Olu Oni
Marc Packles
Mark Patrick
Witek Petrusewicz
Nitin Rangraj
Ajeeth Sankaran
Mahavir Sarda
David Schiffmann
Josh Streckert
Constantine Tziligakis
Michael Vaughn
Chaka Wade
Frank Xia

**Interrogatory No. 10**

Identify the computations underlying the allegation in paragraph 9 of the

Complaint that "[t]he correct calculation of the termination amounts owed under [the

parties'] derivatives contracts demonstrates that Defendants' [Derivatives] claims are

inflated by over $1 billion," including the methodology of calculation, the mid-market

value, and any adjustments or add-ons for each Derivatives Trade executed under any

swap agreements referred to in paragraphs 54 – 62 of the Complaint.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs object to the extent the Interrogatory calls for information protected

from disclosure by the attorney-client privilege, attorney work product doctrine, and/or

common interest privilege. All such computations were performed after Citi filed its

- 11 -

claims against the Lehman Plaintiffs, in anticipation of assessing or challenging Citi's

claims in litigation, or for the purpose of bringing the Lehman Plaintiffs' own claims

against Citi. Lehman Plaintiffs further object because the Interrogatory calls for

information that will be the subject of the expert discovery phase in this case and is

therefore premature.

**Interrogatory No. 11**

Identify the location and source of all information responsive to these

Interrogatories, and all information responsive to Defendants' Requests for the

Production of Documents to Plaintiffs, served on Plaintiffs on April 9, 2012, including

electronically stored information.

**Response**

Lehman Plaintiffs incorporate each of the foregoing General Objections.

Lehman Plaintiffs object on the grounds that this Interrogatory is vague, overly broad and

unduly burdensome. Lehman Plaintiffs also object on the basis that the requested

information is neither relevant nor reasonably calculated to lead to the discovery of

relevant or admissible evidence. Lehman Plaintiffs further object to the extent the

Interrogatory calls for information protected from disclosure by the attorney-client

privilege, attorney work product doctrine, and/or common interest privilege.

Subject to and without waiving these objections, documents and

information responsive to these Interrogatories and Citi's Requests for the Production of

Documents to Plaintiffs, served on Plaintiffs on April 9, 2012, are kept at Lehman Estate

facilities, Alvarez & Marsal facilities, or other information storage facilities. Document

production in response to any particular Request, subject to the privileges and objections

- 12 -

detailed in Lehman Plaintiffs' Responses and Objections to Citi's Requests, will be made

from the offices of Lehman Plaintiffs' counsel, Curtis, Mallet-Prevost, Colt & Mosle

LLP, 101 Park Avenue, New York, NY 10178-0061.

Dated: May 30, 2012
　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　**CURTIS, MALLET-PREVOST,
　　　　　　　　　　　　　　　　　　　　COLT & MOSLE LLP**

　　　　　　　　　　　　　　　　　　　　By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿

　　　　　　　　　　　　　　　　　　　　Turner P. Smith
　　　　　　　　　　　　　　　　　　　　L.P. Harrison 3rd
　　　　　　　　　　　　　　　　　　　　Peter J. Behmke
　　　　　　　　　　　　　　　　　　　　101 Park Avenue
　　　　　　　　　　　　　　　　　　　　New York, New York 10178

　　　　　　　　　　　　　　　　　　　　*Counsel for the Lehman Plaintiffs*

- 13 -

## VERIFICATION OF RESPONSES

1.    I, Martha E. Solinger, declare that I am Co-General Counsel and a Managing Director of Plaintiff Lehman Brothers Holdings Inc. ("LBHI"). I have read the foregoing Lehman Plaintiffs' Responses and Objections to Defendants' First Set of Interrogatories ("Lehman Plaintiffs' Responses and Objections") and know the contents thereof.

2.    I declare under penalty of perjury that the Responses contained within the Lehman Plaintiffs' Responses and Objections are true and correct to the best of my knowledge, information and belief.

3.    I reserve the right at any time to further revise, correct, add to or clarify the Lehman Plaintiffs' Responses and Objections.

Executed on May 30, 2012, in New York, NY.

By: _Martha E. Solinger_

Title: MANAGING DIRECTOR

On behalf of Lehman Brothers Holdings Inc.

# Exhibit 5

## CITIGROUP Call Report

| | Date | Time | Venue |
|---|---|---|---|
| **Meeting** | 08-07-08 New York | 1:00-2:30pm | 1301 Avenue of the Americas |
| **Bank Participants** | Chris Foskett, MD, Global Head of FIG Banking<br>Michael Mauerstein, MD, Global RM | | |
| **Lehman Participants** | Paolo Tonucci, Global Treasurer<br>Emil Cornejo, SVP | | |

| **AGENDA** | <ul><li>Update on Citi's request for Lehman to post $2 Billion of collateral to support intraday credit lines for LBHI and LBI as a replacement of cash deposit.</li><li>Discuss pricing for renewal of the $275 million 2 year HK cash capital facility. Current pricing is HIBOR + 22BPS (approximately one month LIBOR + 48BPS).</li><li>Request that Citi not resign as trustee on Lehman's MTN program given today's market conditions, SEC filing requirement and DTC notification.</li><li>Update on Lehman's 3rd quarter results.</li></ul> |
|---|---|

| **RESULTS**<br><br>**Collateral**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Additional Credit**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Operational** | <ul><li>Citi understood Lehman's interest in posting $2 B in collateral with Citi particularly less liquid collateral, but still investment grade since this would have the least impact on our balance sheet. Citi recognizes Lehman's interest in pulling the deposit and not having the $2B in exposure to Citi. Citi did point out that according to NY law, Citi would have the right to offset deposits, but not securities which were not pledged.</li><li>Paolo also pointed out that Dan Fleming was still completing our analysis of the size of our intraday in Europe and we would come back with our findings in mid-August. Citi complimented Lehman on how we are now managing the intraday limits since discussions began, particularly in the US where we have managed below the $3B intraday limit. Citi also admitted that their systems in Europe have limitations in measuring the intraday exposure.</li><li>Portfolio #1: Although Citi analyzed Spruce and Verano CLO's as potential collateral, there is no market price for these securities. Citi's secondary CDO desk though was willing to analyze the individual loans in the portfolio to try to come up with a market price—but Lehman declined to disclose this information. Paolo admitted that these securities trade only occasionally.</li><li>Portfolio #2: Citi has now been presented with a $3B portfolio of investment grade private label ABS, CMOs. Lehman is awaiting feedback.</li><li>Documentation: Still under review by Lehman. There are legal issues in terms of the pledge agreement since Citi will only have rights to collateral in the event of a default. Also, the type of collateral will determine the mechanical requirements particularly since Lehman requires the right of substitutability.</li></ul><br><ul><li>Citi's $275 M (HK denominated) 2 year bilateral facility will be extended an additional year at the end of August and retain its cash capital status. Citi has requested increased pricing to meet internal pricing hurdles. (Loans up to 3 years internal cost is L+ 130bps). Paolo pointed out he did not want to squeeze Citi or make Citi lend at a loss. He agreed to pricing of L + 150bps ( HIBOR + 125bps).</li><li>At Lehman Asia's request, we asked for an additional $25 M in credit in the Philippines. Citi agreed to support our Philippines' needs with an LBHI guaranty and also pointed out that Citi would prefer to support our emerging market needs where value can be added.</li><li>Paolo also asked Citi's relationship management team to try to work with their Treasury to close by month-end the secured mortgage facility that our Executive Management had discussed (V. Primiano coordinating).</li><li>Paolo also asked Citi to consider third party credit/liquidity support of our private equity funds, specifically Global Mezz and Real Estate Mezz. Citi agreed to consider, but would need to run pricing through their model.</li></ul><br><ul><li>Paolo pointed out that we would prefer not to raise potential flags which would result if we were to designate Wilmington Trust as MTN successor trustee. Citi will discuss internally with their Corporate Trust whether this transfer can be delayed.</li><li>No discussion on China, Israel or Brazil RFP's.</li></ul> |
|---|---|

| | |
|---|---|
| **New Business** | • Citi would like to be considered as underwriter on new debt/equity issuances.  No issuances under consideration at this time. |
| **Financial** | • No comment on 3rd quarter results due to public disclosure considerations. |

FOIA CONFIDENTIAL TREATMENT
REQUESTED BY LEHMAN BROTHERS HOLDINGS INC.                    LBEX-DOCID 1035842

Exhibit 6

## CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

ALMATY
ASHGABAT
ASTANA
BEIJING
BUENOS AIRES
DUBAI
FRANKFURT
HOUSTON

ISTANBUL
LONDON
MEXICO CITY
MILAN
MUSCAT
PARIS
WASHINGTON, D.C.

ATTORNEYS AND COUNSELLORS AT LAW

101 PARK AVENUE
NEW YORK, NEW YORK 10178-0061

TELEPHONE 212-696-6000
FACSIMILE 212-697-1559
WWW.CURTIS.COM

WRITER'S DIRECT:
TEL.: 212-696-6146
E-MAIL: PBEHMKE@CURTIS.COM

March 10, 2014

**BY E-MAIL**

Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Re:    *Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.,*
       **Adv. Proc. No. 12-01044 (S.D.N.Y.) (SCC)**

Dear Claudia:

We write in furtherance of our correspondence regarding deposition planning. Plaintiffs intend to depose the former and current employees of Citibank, N.A. listed on the enclosed Schedule A. Please note that Plaintiffs reserve the right to modify or supplement this list of deponents.

In accordance with your letter of December 17, 2013, we presume that Paul Weiss will represent each of these witnesses. Please confirm by March 21 that Paul Weiss will represent each of these individuals or, to the extent that is not the case, please provide us with the contact information for any witnesses' counsel.

Sincerely,

Peter J. Behmke

cc:    Counsel of Record

## Schedule A

1.   Roger Barnes

2.   Robert Blackburn

3.   Catherine Devlin

4.   Richard Evans

5.   Reto Faber

6.   Thomas Fontana

7.   Christopher Foskett

8.   Gregory Frenzel

9.   Paul Galant

10.  John Havens

11.  Edward Hewitt

12.  Thomas Isaac

13.  Brian Leach

14.  Katherine Lukas

15.  Michael Mauerstein

16.  Thomas Obermaier

17.  Jerry Olivo

18.  Vikram Pandit

19.  Patrick Ryan

20.  Paul Salariya

21.  Thomas Schwartz

22.  Zion Shohet

23.  Richard Stuckey

24.  Melissa Torres

25.  James Trefry

26.  Vivek Tyagi

Exhibit 7

(Multicurrency — Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ......................................

......…………….…………..……..…...……… and ………..…………….…...…………………….........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    *Liability*. If: —

(1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)   X does not so deduct or withhold; and

(3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    ***Default Interest***; ***Other Amounts***. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

**ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.**    **Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*.

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

*Upon Merger* if the event is specified pursuant to (iv) below or an *Additional Termination Event* if the event is specified pursuant to (v) below:—

    (i)    ***Illegality***. Due to the adoption of, or any change in, any applicable *law* after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable *law* after such date, it becomes unlawful (other than as a result of a breach by the party of *Section 4(b)*) for such party (which will be the *Affected Party*): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any *Credit Support Document* relating to such Transaction;

    (ii)    ***Tax Event***. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a *Change in Tax Law*, the party (which will be the *Affected Party*) will, or there is a substantial likelihood that it will, on the next succeeding *Scheduled Payment Date* (1) be required to pay to the other party an additional amount in respect of an *Indemnifiable Tax* under *Section 2(d)(i)(4)* (except in respect of interest under *Section 2(e), 6(d)(ii)* or *6(e)*) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a *Tax* (except in respect of interest under *Section 2(e), 6(d)(ii)* or *6(e)*) and no additional amount is required to be paid in respect of such *Tax* under *Section 2(d)(i)(4)* (other than by reason of *Section 2(d)(i)(4)(A)* or *(B));*

    (iii)    ***Tax Event Upon Merger***. The party (the *"Burdened Party"*) on the next succeeding *Scheduled Payment Date* will either (1) be required to pay an additional amount in respect of an *Indemnifiable Tax* under *Section 2(d)(i)(4)* (except in respect of interest under *Section 2(e), 6(d)(ii)* or *6(e)*) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any *Indemnifiable Tax* in respect of which the other party is not required to pay an additional amount (other than by reason of *Section 2(d)(i)(4)(A)* or *(B),* in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the *Affected Party*) where such action does not constitute an event described in *Section 5(a)(viii);*

    (iv)    ***Credit Event Upon Merger***. If *"Credit Event Upon Merger"* is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable *Specified Entity* of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in *Section 5(a)(viii)* but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such *Specified Entity,* as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the *Affected Party);* or

    (v)    ***Additional Termination Event***. If any *"Additional Termination Event"* is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the *Affected Party* or Affected Parties shall be as specified for such *Additional Termination Event* in the Schedule or such Confirmation).

(c)    ***Event of Default and Illegality***. If an event or circumstance which would otherwise constitute or give rise to an *Event of Default* also constitutes an *Illegality,* it will be treated as an *Illegality* and will not constitute an *Event of Default.*

**ISDA® 1992**

**6.**   **Early Termination**

(a)   *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event*.

(i)   *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)   *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)   *Right to Terminate*. If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   ***Effect of Designation.***

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)   ***Statement***. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)   *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination*. If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   ***Events of Default***. If the Early Termination Date results from an Event of Default: —

(1)   *First Method and Market Quotation*. If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

*Non-defaulting Party*) in respect of the Terminated Transactions and the *Termination Currency Equivalent* of the *Unpaid Amounts* owing to the *Non-defaulting Party* less (B) the *Termination Currency Equivalent* of the *Unpaid Amounts* owing to the *Defaulting Party*. If that amount is a positive number, the *Defaulting Party* will pay it to the *Non-defaulting Party;* if it is a negative number, the *Non-defaulting Party* will pay the absolute value of that amount to the *Defaulting Party*.

(4)  *Second Method and Loss*. If the Second Method and *Loss* apply, an amount will be payable equal to the *Non-defaulting Party's Loss* in respect of this Agreement. If that amount is a positive number, the *Defaulting Party* will pay it to the *Non-defaulting Party;* if it is a negative number, the *Non-defaulting Party* will pay the absolute value of that amount to the *Defaulting Party*.

(ii)  ***Termination Events.***  If the *Early Termination Date* results from a *Termination Event:* —

(1)  *One Affected Party*. If there is one *Affected Party,* the amount payable will be determined in accordance with *Section 6(e)(i)(3)*, if *Market Quotation* applies, or Section 6(e)(i)(4), if *Loss* applies, except that, in either case, references to the *Defaulting Party* and to the *Non-defaulting Party* will be deemed to be references to the *Affected Party* and the party which is not the *Affected Party,* respectively, and, if *Loss* applies and fewer than all the Transactions are being terminated, *Loss* shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if *Market Quotation applies,* each party will determine a *Settlement Amount* in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the *Settlement Amount* of the party with the higher *Settlement Amount* ("X") and the *Settlement Amount* of the party with the lower *Settlement Amount* ("Y") and (b) the *Termination Currency Equivalent* of the *Unpaid Amounts* owing to X less (II) the *Termination Currency Equivalent* of the *Unpaid Amounts* owing to Y; and

(B) if *Loss applies,* each party will determine its *Loss* in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the *Loss* of the party with the higher *Loss* ("X") and the *Loss* of the party with the lower *Loss* ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  ***Adjustment for Bankruptcy***. In circumstances where an *Early Termination Date* occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this *Section 6(e)* will be subject to such adjustments as are appropriate and permitted by *law* to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant *Early Termination Date* to the date for payment determined under *Section 6(d)(ii)*.

(iv)  ***Pre-Estimate***. The parties agree that if *Market Quotation* applies an amount recoverable under this *Section 6(e)* is a reasonable pre-estimate of *loss* and not a penalty. Such amount is payable for the *loss* of bargain and the *loss* of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For tbe purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.    Miscellaneous**

(a)    ***Entire Agreement***. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    ***Amendments***. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    ***Survival of Obligations***. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    ***Remedies Cumulative***. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    ***Counterparts and Confirmations***.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall he entered into as soon as practicable and may he executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    ***No Waiver of Rights***. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    ***Headings***. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    ***Effectiveness***. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    ***Change of Addresses***. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    ***Governing Law***. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    ***Jurisdiction***. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    ***Service of Process***. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

***"Defaulting Party"*** has the meaning specified in Section 6(a).

***"Early Termination Date"*** means the date determined in accordance with Section 6(a) or 6(b)(iv).

***"Event of Default"*** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

***"Illegality"*** has the meaning specified in Section 5(b).

***"Indemnifiable Tax"*** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

***"law"*** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and ***"lawful"*** and ***"unlawful"*** will be construed accordingly.

***"Local Business Day"*** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

***"Loss"*** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

***"Market Quotation"*** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

**"Non-default Rate"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

**"Non-defaulting Party"** has the meaning specified in Section 6(a).

**"Office"** means a branch or office of a party, which may be such party's head or home office.

**"Potential Event of Default"** means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

**"Reference Market-makers"** means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

**"Relevant Jurisdiction"** means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meanings specified in the Schedule.

**ISDA® 1992**

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Stamp Tax"** means any stamp, registration, documentation or similar tax.

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"Tax Event"** has the meaning specified in Section 5(b).

**"Tax Event Upon Merger"** has the meaning specified in Section 5(b).

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Currency"** has the meaning specified in the Schedule.

**"Termination Currency Equivalent"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"Termination Event"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17                                                                                    **ISDA® 1992**

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


..................................................................                  ....................................................................
            (Name of Party)                                                                (Name of Party)


By: ..........................................................          By: ..................................................................
     Name:                                                                   Name:
     Title:                                                                  Title:
     Date:                                                                   Date:

18                                                          **ISDA® 1992**

**(Multicurrency — Cross Border)**



International Swap Dealers Association, Inc.

# SCHEDULE
## to the
## Master Agreement

dated as of ..................................................................

between ................................................................ and ................................................................................

("Party A")                                                    ("Party B")

Part 1.    **Termination Provisions.**

(a)     *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),    ........................................................................................................................

Section 5(a)(vi),    ........................................................................................................................

Section 5(a)(vii),    ........................................................................................................................

Section 5(b)(iv),    ........................................................................................................................


and in relation to Party B for the purpose of:—


Section 5(a)(v),    ........................................................................................................................

Section 5(a)(vi),    ........................................................................................................................

Section 5(a)(vii),    ........................................................................................................................

Section 5(b)(iv),    ........................................................................................................................

(b)     *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here    ........................................................................................

........................................................................................................................

........................................................................................................................

(c)     The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A

will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here ........................................................................................

........................................................................................................................

---

*    Delete as applicable.

19                                                              **ISDA® 1992**

*"Threshold Amount"* means ...........................................................................................................

...........................................................................................................................................................

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A
will/will not * apply to Party B

(e)   The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A
will/will not * apply to Party B

(f)   *Payments on Early Termination*. For the purpose of Section 6(e) of this Agreement: —

(i)   Market Quotation/Loss * will apply.

(ii)   The First Method/The Second Method * will apply.

(g)   *"Termination Currency"* means ........................................... , if such currency is specified and
freely available, and otherwise  United States Dollars.

(h)   *Additional Termination Event* will/will not apply*. The following shall constitute  an  Additional
Termination Event: —   ...................................................................................................................

…………… .........................................................................................................................

...........................................................................................................................................................

...........................................................................................................................................................

...........................................................................................................................................................

...........................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected  Parties shall be: —   ...

...........................................................................................................................................................

Part 2. **Tax Representations**.

(a)   *Payer Representations*. For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the
following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue
authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made
by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy
of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the
satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy
and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of
this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of
this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on
clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of
material prejudice to its legal or commercial position.

(b)   *Payee Representations*. For the purpose of Section 3(f) of this Agreement, Party A and Party B make the
representations specified below, if any:

(i)   The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits"
provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the
Specified Treaty with  respect  to any  payment described in such provisions and received or to be received

---

*   Delete as applicable.

**ISDA® 1992**

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Treaty"* means with respect to Party A    ........................................................................................

*"Specified Jurisdiction"* means with respect to Party A    ........................................................................

*"Specified Treaty"* means with respect to Party B    ........................................................................................

*"Specified Jurisdiction"* means with respect to Party B    ........................................................................

(ii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Jurisdiction"* means with respect to Party A    ........................................................................

*"Specified Jurisdiction"* means with respect to Party B    ........................................................................

(iii)  The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A)  It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)    Other Payee Representations: —    ........................................................................................

........................................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

* Delete as applicable.

**ISDA® 1992**

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ...................................... | ...................................................... | ...................................................... |
| ...................................... | ...................................................... | ...................................................... |
| ...................................... | ...................................................... | ...................................................... |
| ...................................... | ...................................................... | ...................................................... |
| ...................................... | ...................................................... | ...................................................... |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| .................................. | ............................................ | .................................... | Yes/No* |
| .................................. | ............................................ | .................................... | Yes/No* |
| .................................. | ............................................ | .................................... | Yes/No* |
| .................................. | ............................................ | .................................... | Yes/No* |
| .................................. | ............................................ | .................................... | Yes/No* |

Part 4. **Miscellaneous**.

(a)    *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address:    ...........................................................................................................

Attention:    ...........................................................................................................

Telex No.:    ............................................................    Answerback:    ...........................................

Facsimile No.:    ............................................................    Telephone No:    ...........................................

Electronic Messaging System Details:    ...........................................................................

Address for notices or communications to Party B: —

Address:    ...........................................................................................................

Attention:    ...........................................................................................................

Telex No.:    ............................................................    Answerback:    ...........................................

---

*  Delete as applicable.

**ISDA® 1992**

Facsimile No.: ................................................................    Telephone No.: ................................................

Electronic Messaging System Details: .......................................................................

(b)    **_Process Agent._** For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent ...............................................................................................

Party B appoints as its Process Agent ...............................................................................................

(c)    **_Offices._** The provisions of Section 10(a) will/will not* apply to this Agreement.

(d)    **_Multibranch Party_**. For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

……………………………    ……………………………    ………………………………..

……………………………    ……………………………    ………………………………..

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

……………………………    ……………………………    ………………………………..

……………………………    ……………………………    ………………………………..

(e)    **_Calculation Agent_**. The Calculation Agent is …………………………………………, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    **_Credit Support Document_**. Details of any Credit Support Document: — ……………………………..

………………………………………………………………………………………………………………...

………………………………………………………………………………………………………………...

………………………………………………………………………………………………………………...

(g)    **_Credit Support Provider_**. Credit Support Provider means in relation to Party A, …………………………..

………………………………………………………………………………………………………………...

………………………………………………………………………………………………………………...

Credit Support Provider means in relation to Party B, …………………………………………………...

………………………………………………………………………………………………………………...

………………………………………………………………………………………………………………...

(h)    **_Governing Law_**. This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference  to  choice of law doctrine) *.

_____

\*  Delete as applicable.

**ISDA® 1992**

(i)    ***Netting of Payments***. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the

following Transactions or groups of Transactions (in each case starting from the date of this

Agreement/in each case starting from  ………………………… \*) …………………….……….

………………………………………………………………………………………………….

………………………………………………………………………………………………….

(j)    ***"Affiliate"*** will have the meaning specified in Section 14 of this Agreement unless another meaning is

specified here

………………………………………………………………………………………………….

………………………………………………………………………………………………….

Part 5. **Other Provisions**.

---

\*   Delete as applicable.

**ISDA® 1992**

Exhibit 8

## Second Amendment to Committed Revolving Loan Agreement with Guarantee

This amendment agreement (this "**Agreement**") is made this *18th August* day of 2008 between:

(1)    Lehman Brothers Commercial Corporation Asia Limited (the "**Borrower**"),

(2)    Lehman Brothers Holdings Inc. ("**Guarantor**"), and

(3)    Citibank, N.A., Hong Kong Branch (including its successors and assigns, the ("**Lender**").

**WHEREAS**

(A)    On August 28, 2007, a loan agreement (the "**Original Agreement**") for a HKD2,340,000,000 committed revolving credit facility was entered into between the Borrower, the Lender and Lehman Brothers Holdings Inc. as Guarantor.

(B)    On 11 April 2008, the parties to this Agreement entered into an agreement entitled "Prepayment of and Amendment to Committed Revolving Loan Agreement with Guarantee" (the "**First Amendment**") with an effective date of 31 March 2008 to document, amongst other matters, the:

    (1)    a reduction in the <u>Available Amount</u> of the Facility to HKD2,145,000,000 following a prepayment of the Facility;

    (2)    the meaning of "<u>Obligor</u>";

    (3)    the substituted clause 30 (Disclosure of Information).

(C)    With the consent of the Guarantor, the Borrower has now requested an extension of the Maturity Date to 28 August 2010 (the "**Extended Maturity Date**") and the parties now wish to set out the terms upon which such extension will be entered into.

The parties agree as follows:-

1.    **Definitions And Interpretation**

1.1    **Incorporation of defined terms**

    Unless a contrary indication appears, terms and expressions defined in or construed for the purposes of the Loan Agreement shall have the same meaning herein.

1.2    **Defined Terms**

    In addition, in this Agreement:

    "**Effective Date**" means the date on which the Lender is satisfied that all the conditions set out in paragraph 3 (Conditions Precedent) below have been satisfied in form and substance; and

    "**Loan Agreement**" means the Original Agreement as amended and supplemented by the First Amendment.

Confidential
Confidential

CITI-LBI00061739
CITI-LEH00305956

2. **Amendment**

2.1    For the avoidance of doubt, the parties hereto wish to ratify and confirm that in the Guarantee dated 30 August 2007 executed by the Guarantor in favour of the Lender, the **"Credit Agreement"** referred to therein shall be deemed to refer to the Loan Agreement as amended by this Agreement and from time to time.

2.2    In respect of clause 36 (Communications) of the Loan Agreement, the parties wish to notify each other with respect to the following information which shall be deemed to have been duly communicated in accordance with the terms of the Loan Agreement so as to take effect from the date of this Agreement:

   (i)    for the Borrower:

   | | |
   |---|---|
   | Address: | Unit 2706-2714 25-26/F & 27/F Two International Finance Centre, 8 Finance Street Central, Hong Kong |
   | Fax number: | +852 2297 1461 / +852 2297 1465 |
   | Email: | aireen.phang@lehman.com / siddharth.sharad@lehman.com |
   | Attention: | Aireen Phang / Siddharth Sharad |

   (ii)    for the Guarantor:

   | | |
   |---|---|
   | Address: | 745 Seventh Avenue, New York, New York 10019 |
   | Fax number: | +1 212-520-0838 / +1 212-299-0233 |
   | Email: | emil.cornejo@lehman.com / james.killerlane@lehman.com |
   | Attention: | Emil Cornejo / James Killerlane |

   (iii)    for the Lender:

   Address:  Global Transaction Services Asia Pacific, 39/F ICBC Tower, Citibank Plaza, 3 Garden Rd, Central, Hong Kong
   Fax number: +852-2868-6403
   Email: kathy.el.ong@citi.com/paul.egan@citi.com
   Attention: Kathy Ong/Paul Egan

2.3    In respect of paragraph (ii) (Compliance Certificate) of Clause 21(Information Covenants) and Schedule 2 of the Loan Agreement, the parties hereto agree to accept the pro-forma certificate as set out in the Annex as being substantially in the form of that set out in the Schedule 2 of the Loan Agreement, notwithstanding that the minimum Consolidated Tangible Net Worth referred to therein is US$12,900,000,000 and accordingly Schedule 2 of the Original Loan Agreement shall be deleted and replaced in its entirety by the Annex with effect from and on the Effective Date.

2.4    With effect from and on the Effective Date, the parties hereto agree that the Loan Agreement shall be amended such that the clause 11 (Extension of Maturity Date), 12 (Conditions Precedent), 13 (Interest Rate), 14 (Commitment Fee) and 22 (Financial Covenants) and paragraph (ii) of Clause 30 (Disclosure of Information) of the Loan Agreement shall be deleted in their entirety and substituted by the following corresponding clauses or paragraphs (as the case may be) and the Loan Agreement shall be read and construed accordingly:

Confidential
Confidential

CITI-LBI00061740
CITI-LEH00305957

| 10. | Maturity Date | 2 years from the date of this Agreement, provided that if an Extension Request has been made by the Borrower in accordance with Clause 11 and accepted and signed by the Lender, then the Maturity Date shall be the "**Extended Maturity Date**" specified in the Extension Request. |
|---|---|---|
| 11. | Extension of Maturity Date | The Borrower may, by delivering an Extension Request to the Lender not more than 10 nor less than 3 Hong Kong Business Days before an anniversary date of the date of this Agreement, request for an extension of the Maturity Date to a date falling <u>up to</u> 24 months from the date of such anniversary date. The Lender shall have the sole discretion to accept or refuse such request. If the Lender accepts such request by countersigning the Extension Request, the Maturity Date shall be extended to the "Extended Maturity Date" as specified in the Extension Request. |
| 13. | Interest Rate | <u>1.50</u>% p.a. over 1mth, 2mth, 3mth HIBOR depending on the interest period, payable on the last day of each Interest Period in arrears calculated on an actual/365-day basis. |
| | | "**HIBOR**" means, in relation to any relevant sum and any relevant period, the rate determined by the Lender to be the rate shown on Reuters page "HIBOR=" as being the interest rate per annum at which Hong Kong dollar deposits are being offered for the relevant period at or about 11:00 a.m. (Hong Kong time) at the first day of such period, provided that if no screen rate is available for the relevant sum or the relevant period, HIBOR shall be the rate determined by the Lender to be the rate per annum at which Hong Kong Dollar deposits in an amount comparable to such sum are or would be offered to the Lender for such period by prime banks in the Hong Kong interbank market at or about 11:00a.m. (Hong Kong time) on the first day of such period; or if such rate for the relevant period is not quoted, the cost of fund of the Lender for the relevant period shall apply. |
| 14. | Commitment Fee | <u>0.125</u>% p.a. on undrawn balance of the Available Amount accruing from day to day, payable quarterly in arrears from the start of the Availability Period to the Maturity Date and calculated on an actual/365-day basis. |
| 22 | Financial Covenants | For the purposes of this Clause, any amount in a currency other than US Dollars is to be taken into account at its US Dollar equivalent calculated on the basis of: |
| | | (a) the Lender's spot rate of exchange for the purchase of the relevant currency in the London foreign exchange market with US Dollars at or about 11.00 a.m. on the day the relevant amount falls to be calculated; or |
| | | (b) if the amount is to be calculated on the last day of a financial period of the Guarantor, the relevant rates of exchange used by the Guarantor in, or in connection with, its financial statements for that period. |
| | | No item must be credited or deducted more than once in any calculation used in connection with this Clause. |
| | | The Guarantor must ensure that its Consolidated Tangible Net Worth is not at any time less than US$<u>12,900,000,000</u>. |
| 30 | Disclosure of Information | (ii) The Lender may disclose to an Affiliate or any person with whom it may enter, or has entered into, any kind of transfer, participation or other agreement in relation to this Agreement or to any person who has (or is considering acquisition of any) exposure (directly or indirectly) to payments payable by the Borrower <u>and/or Guarantor</u> whether under the <u>Finance Documents</u> (as amended from time to time) <u>or otherwise</u> or is involved (or considering being involved) with administering, managing, acting as a trustee or agent for, <u>advising on, evaluating,</u> any scheme or |

Committed Revolving Loan Agreement with Guarantee                    3/6

Confidential
Confidential

CITI-LBI00061741
CITI-LEH00305958

arrangement that provides such exposure: (a) a copy of any Finance Document; and (b) any information which the Lender has acquired under or in connection with any Finance Document. However, before a participant may receive confidential information, it must have entered into a Confidentiality Undertaking.

**39.  Process Agent**    Without prejudice to any other mode of service allowed under any relevant law, the Guarantor irrevocably appoints:

**Lehman Brothers Asia Holdings Limited**

presently located at

**Unit 1907-9, 1913-5 of 19/F, 2201, 2210-7 of 22/F, 25-26/F, 2706-2714 of 27/F, Two International Finance Center**
**8 Finance Street**
**Central**
**HONG KONG**
**Attention : General Counsel / Legal Corporate Counsel /Hong Kong Treasury**

as its agent for service of process in relation to any proceedings before the Hong Kong courts in connection with this Agreement and the Guarantee and agrees that failure by such process agent to notify the Guarantor of the process will not invalidate the proceedings concerned.

## 3.    Conditions Precedent

3.1    The original copy of this Agreement duly signed by the Borrower and the Guarantor has been delivered to the Lender.

3.2    The Borrower has delivered its certified board resolutions to approve the execution and performance of this Agreement and procured the delivery of the incumbency certificate of the authorized signatory of the Guarantor for execution of this letter and the Guarantee.

## 4.    Full Force and Effect of Loan Agreement & Counterparts

4.1    All of the respective parties' rights in respect of, and the provisions of, the Loan Agreement, save as expressly amended by this Agreement, shall continue in full force and effect. The Loan Agreement shall be read and construed as amended by the terms of this Agreement (in the case of clauses 2.3 and 2.4, on and from the Effective Date and in all other cases, with immediate effect) and read and construed accordingly and this Agreement shall constitute a "**Finance Document.**"

4.2    Any provision of this Agreement which is prohibited or unenforceable in any applicable jurisdiction shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of the Agreement. This Agreement may be executed by fax and in any number of counterparts, all of which taken together shall constitute one and the same agreement.

## 5.    Governing Law and Courts

This Agreement shall be governed and construed in accordance of the laws of Hong Kong and the parties hereby submit to the non-exclusive jurisdiction of the courts of Hong Kong.

Confidential
Confidential

CITI-LBI00061742
CITI-LEH00305959

Signed for and on behalf of **Lehman Brothers Commercial Corporation Asia Limited**

Name: *Gregory Ito / Ian Walker*
Title:

Signed for and on behalf of **Lehman Brothers Holdings Inc.**

Name: *Gregory Ito / Ian Walker.*
Title:
Address:

Signed for and on behalf of **Citibank, N.A., Hong Kong Branch**

Name:
Title:
  Kathy Ong
  Vice President

Confidential
Confidential

CITI-LBI00061743
CITI-LEH00305960

**Annex**

**Form of Compliance Certificate/Officer's Certificate**

I, <<Name of Officer>>, Global Treasurer of Lehman Brothers Holdings Inc., a Delaware Corporation (the "**Corporation**"), pursuant to paragraph (ii) (Compliance Certificate) of Clause 21(Information Covenants) of the Committed Revolving Loan Agreement with Guarantee dated 28 August 2007 (as amended and supplemented from time to time, the "**Agreement**"), entered into between the Corporation, Lehman Brothers Commercial Corporation Asia Limited and Citibank N.A., Hong Kong Branch, do certify that as of <<Date>>:

1.      No Default or Event of Default has occurred and is continuing.

2.      The Corporation is in compliance with the Agreement's Tangible Net Worth covenant, Clause 22 (Financial Covenants), requiring that the Consolidated Tangible Net Worth shall not be less than US$12,900,000,000. In accordance with the Agreement, the calculation supporting this statement is attached hereto as Exhibit A.

3.      Attached hereto as Exhibit B is a list of the Subsidiaries of the Corporation that constitutes its Significant Subsidiaries.

Capitalized terms used herein without definition have the meanings ascribed to them in the Agreement.

**IN WITNESS WHEREOF**, I have hereunto set my hand and caused this certificate to be delivered this ____ day of _____, 200___.


**LEHMAN BROTHERS HOLDINGS INC.**



_____
<<Name>>
Global Treasurer

Confidential
Confidential

CITI-LBI00061744
CITI-LEH00305961

Exhibit 9

GUARANTY

GUARANTY, dated as of August 30 , 2007, made by Lehman Brothers Holdings Inc., a corporation organized and existing under the laws of the State of Delaware (the "Guarantor"), in favor of Citigroup Inc. and each subsidiary or affiliate thereof (including Citibank, N.A. and each of its branches wherever located) ("Citi").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and to induce Citi to extend and/or maintain credit to or for the account of Lehman Brothers Commercial Corporation Asia Limited (the "Borrower"), the Guarantor agrees as follows:

1.  Guaranty.  The Guarantor unconditionally guarantees the punctual payment when due, whether upon maturity, by acceleration or otherwise, of all obligations (now or hereafter existing) of the Borrower to Citi under any and all extensions of credit extended and/or maintained by Citi pursuant to the Committed Revolving Loan Agreement with Guarantee dated August 30, 2007, between the Borrower, Citibank, N.A., Hong Kong Branch and the Guarantor ("Credit Agreement"), whether for principal, interest, fees, expenses or otherwise, in each case strictly in accordance with the terms thereof (all such obligations of the Borrower being the "Obligations"). If any Borrower fails to pay any of its Obligations in full when due (whether at stated maturity, by acceleration or otherwise), the Guarantor will promptly pay the same to Citi.  The Guarantor will also pay to Citi any and all expenses (including without limitation, reasonable legal fees and expenses) incurred by Citi in enforcing its rights under this Guaranty.  This Guaranty is a guaranty of payment and not merely of collection.

2.  Guaranty Absolute.  The Guarantor's liability under this Guaranty is unconditional irrespective of (i) any illegality, lack of validity or enforceability of any Obligation (other than as a result of the unenforceability of the Credit Agreement against Citi), (ii) any amendment, modification, waiver or consent to departure from the terms of any Obligation, including any renewal or extension of the time or change of the manner or place of payment, (iii) any exchange, substitution, release, non-perfection or impairment of any collateral securing payment of any Obligation, (iv) any change in the corporate existence, structure or ownership of any Borrower, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Borrower or its assets or any resulting release or discharge of any Obligation, (v) the existence of any claim, set-off or other rights that the Guarantor may have at any time against any Borrower, Citi, or any other corporation or person, whether in connection herewith or any unrelated transactions, provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim, (vi) any law, regulation or order of any jurisdiction, or any other event, affecting any term of any Obligation or Citi's rights with respect thereto, including, without limitation: (A) the application of any such law, regulation, decree or order, including any prior approval, which would prevent the exchange of a Non-USD Currency (as hereinafter defined) for U.S. Dollars or the remittance of funds outside of such jurisdiction or the unavailability of U.S. Dollars in any legal exchange market in such jurisdiction in accordance with normal commercial practice; or (B) a declaration of banking moratorium or any suspension of payments by banks in such jurisdiction or the imposition by such jurisdiction or any governmental authority thereof of any moratorium on, the required rescheduling or restructuring of, or required approval of payments on, any indebtedness in such jurisdiction; or (C) any expropriation, confiscation, nationalization or requisition by such country or any governmental authority that directly or indirectly deprives the companies in such jurisdiction of any payment obligation under any Obligations; or (D) any war (whether or not declared), insurrection, revolution, hostile act, civil strife or similar events occurring in such jurisdiction which has the same effect as the events described in clause (A), (B) or (C) above (in each of the cases contemplated in clauses (A) through (D) above, to the extent occurring or existing on or at any time after the date of this Guaranty), and (vii) any other circumstance or any existence of or reliance on any representation by Citi that might otherwise constitute a defense to, or a legal or equitable discharge of, any Borrower or the Guarantor or any other guarantor or surety (excluding the defenses of payment and statute of limitations, neither of



                                                                CITI-LEH01309837

which is waived); *provided*, however, that the Guarantor shall be entitled to exercise any right that any Borrower could have exercised (i) to cure any default in respect of its obligations or (ii) to setoff, counterclaim or withhold payment in respect of any event of default or similar event in respect of Citi, but only to the extent such right is provided to Borrower under the Credit Agreement.

Without limiting the generality of the foregoing, with respect to any Obligations that, in accordance with the express terms of any agreement pursuant to which such Obligations were created, were denominated in U.S. Dollars or any currency other than the currency of the jurisdiction where the Borrower is principally located, the Guarantor guarantees that it shall pay Citi strictly in accordance with the express terms of such agreement, including in the amounts and in the currency expressly agreed to thereunder, irrespective of and without giving effect to any laws of the jurisdiction where such Borrower is principally located in effect from time to time, or any order, decree or regulation in the jurisdiction where such Borrower is principally located to the extent the same are not binding upon Guarantor..

It is the intent of this Section 2 that the Guarantor's obligations hereunder are and shall be absolute and unconditional under any and all circumstances other than as expressly stated herein.

3.  Waiver.  The Guarantor waives promptness, diligence, notice of acceptance, notice of dishonor and any other notice with respect to any Obligation and this Guaranty and any requirement that Citi exercise any right or take any action against the Borrower or any collateral security or credit support.

4.  Reinstatement.  This Guaranty will continue to be effective or be reinstated, as the case may be, if at any time any payment of any Obligation is rescinded or must otherwise be returned by Citi upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

5.  Subrogation.  The Guarantor will not assert, enforce or otherwise exercise any rights which it may acquire by way of subrogation under this Guaranty, by any payment made hereunder or otherwise, until payment in full of the Obligations and the termination of any and all commitments of Citi under Credit Agreement to provide extensions of credit.

6.  Taxes.  Any and all payments by the Guarantor hereunder will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding income or franchise taxes imposed on Citi's net income by the jurisdiction under the laws of which Citi is organized or any political subdivision thereof or by the jurisdiction of Citi's lending office or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being "Taxes").  If the Guarantor is required by law to deduct any Taxes from or in respect of any sum payable hereunder (i) the sum payable will be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) Citi will receive an amount equal to the sum it would have received had no such deductions been made, (ii) the Guarantor will make such deductions, and (iii) the Guarantor will pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.  In addition, the Guarantor will pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Guaranty or the Obligations ("Other Taxes").  The Guarantor will promptly furnish to Citi the original or a certified copy of a receipt evidencing payment thereof.  The Guarantor will indemnify Citi for the full amount of Taxes or Other Taxes paid by Citi or any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted, within 30 days of Citi's request therefor.  Without prejudice to the survival of any other agreement

2

CITI-LEH01309838

contained herein, the Guarantor's agreements and obligations contained in this Section will survive the payment in full of the Obligations, principal and interest hereunder and any termination of this Guaranty.

7. <u>Place and Currency of Payment</u>. If any Obligation is payable in U.S. Dollars, the Guarantor will make payment hereunder to Citi in U.S. Dollars at 388 Greenwich Street, New York, New York 10013. If any Obligation is payable in a currency other than U.S. Dollars (a "Non-USD Currency") and/or at a place other than the United States, and such payment is not made as and when agreed, the Guarantor will (i) make payment in such Non-USD Currency and at the place where such Obligation is payable or (ii) if payment in accordance with the preceding clause (i) is not permitted or is otherwise restricted by any applicable law, rule, regulation or policy promulgated by any governmental authority (including, without limitation, any central bank), pay Citi in U.S. Dollars at 388 Greenwich Street, New York, New York 10013. In the event of a payment pursuant to clause (ii) above, the Guarantor will pay Citi the equivalent of the amount of such Obligation in U.S. Dollars calculated at the rate of exchange at which, in accordance with normal banking procedures, Citi may buy such Non-USD Currency in New York, New York on the date the Guarantor makes such payment; *provided, however,* that the foregoing provisions of this sentence shall not apply to any payments hereunder in respect of Obligations that have been re-denominated into a Non-USD Currency as a result of the application of any law, order, decree or regulation in any jurisdiction other than the United States, which Obligations shall, for purposes of this Guaranty, be deemed to remain denominated in U.S. Dollars and payable to Citi in accordance with the first sentence of this Section 7.

8. <u>Set-Off</u>. If the Guarantor fails to pay any of its obligations hereunder when due and payable, Citi is authorized at any time and from time to time, to set off and apply any and all deposits (general or special, time or demand, provisional or final but excluding any amounts held by Citi in a trustee of fiduciary capacity and, if applicable to the Borrower, any amounts held in customer accounts required by law or applicable regulation or SRO rules to be segregated) at any time held and other indebtedness at any time owing by Citi to or for the Guarantor's credit or account against any and all of the Obligations, whether or not Citi has made any demand under this Guaranty. Citi will promptly notify the Guarantor after any such set-off and application, provided that the failure to give such notice will not affect the validity of such set-off and application. Citi's rights under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) that Citi may have.

9. <u>Representations and Warranties</u>. The Guarantor represents and warrants that: (i) the execution, delivery and performance by the Guarantor of this Guaranty are within its corporate powers, have been duly authorized by all necessary corporate action, and do not contravene (x) its charter or by-laws or (y) any law or any contractual restriction binding on or affecting the Guarantor or any entity that controls it, (ii) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for the due execution, delivery and performance by the Guarantor of this Guaranty, and (iii) this Guaranty has been duly executed and delivered by the Guarantor and is its legal, valid and binding obligation, enforceable against the Guarantor in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether the issue of enforceability is considered in a proceeding in equity or at law).

10. <u>Continuing Guaranty</u>. This is a continuing guaranty and applies to all Obligations whenever arising. This Guaranty will remain in full force and effect until the first to occur of (a) Citigroup Inc.'s receipt of a written notice from Guarantor that Guarantor is terminating this Guaranty or (b) the payment in full of the Obligations and all amounts payable hereunder and the termination of the Credit Agreement relating to the Obligations. Termination of this Guaranty shall not affect Guarantor's liability and obligations hereunder as to Obligations incurred on prior to the termination hereof.

3

CITI-LEH01309839

11.  Amendments, Etc.  No amendment or waiver of any provision of this Guaranty, and no consent to departure by the Guarantor herefrom, will in any event be effective unless the same is in writing and signed by Citibank, N.A., on behalf of Citi, and then such waiver or consent will be effective only in the specific instance and for the specific purpose for which given.

12.  Addresses.  All notices and other communications provided for hereunder will be in writing (including telecopier communication), and mailed, telecopied or delivered to it, if to the Guarantor, at its address at 745 Seventh Avenue, New York, New York 10019, Attention: Treasurer, fax: (212) 520-0838, and if to Citi, at its address at 388 Greenwich Street , Attention: Michael Mauerstein, fax: (212) 816-4141, or, as to either party, at such other address as is designated by such party in a written notice to the other party.  All such notices and other communications will, when mailed or telecopied, be effective five days deposited in the mails or when telecopied (with confirmation of transmission from the sending machine), respectively.

13.  Guarantor's Credit Decision, Etc.  The Guarantor has, independently and without reliance on Citi and based on such documents and information as the Guarantor has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty.  The Guarantor has adequate means to obtain from the Borrower on a continuing basis information concerning the financial condition, operations and business of the Borrower, and the Guarantor is not relying on Citi to provide such information now or in the future.  The Guarantor acknowledges that it will receive substantial direct and indirect benefit from the extensions of credit contemplated by this Guaranty.

14.  Judgment.  If for the purposes of obtaining judgment in any court it is necessary to convert a sum due hereunder in U.S. Dollars into a Non-USD Currency, the Guarantor agrees that the rate of exchange used will be that at which, in accordance with normal banking procedures, Citi could purchase U.S. Dollars with such non-USD Currency on the business day preceding that on which final judgment is given.  The obligation of the Guarantor in respect of any sum due hereunder with respect to an Obligation payable in U.S. Dollars will, notwithstanding any judgment in a Non-USD Currency, be discharged only to the extent that on the date the Guarantor makes payment to Citi of any sum adjudged to be so due in such Non-USD Currency, Citi may, in accordance with normal banking procedures, purchase U.S. Dollars with such Non-USD Currency; if the U.S. Dollars so purchased are less than the sum originally due to Citi in U.S. Dollars, the Guarantor agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Citi against such loss, and if the U.S. Dollars so purchased exceed the sum originally due to Citi in U.S. Dollars, Citi agrees to remit to the Guarantor such excess.

15.  Governing Law.  This Guaranty shall be governed by, and construed in accordance with, the law of the State of New York.

16.  Consent to Jurisdiction, Etc.  The Guarantor irrevocably (i) submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan, New York City, in any action or proceeding arising out of or relating to this Guaranty, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court, (iii) waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding, and (iv) irrevocably consents to the service of any and all process in any such action or proceeding by the mailing of copies of such process to the Guarantor at 745 Seventh Avenue, New York, New York 10019, Attention: General Counsel.  A final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing herein will affect Citi's right to serve legal process in any other manner permitted by law or affect Citi's right to bring any action or proceeding against the Guarantor or its property in the courts of other jurisdictions.  To the extent that the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice,

4

Confidential

CITI-LEH01309840

attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, the Guarantor irrevocably waives such immunity in respect of its obligations under this Guaranty.

17. Further Assurances. The Guarantor shall execute all such other documents and instruments and do all such other acts and things as Citi may reasonably require to carry out the transactions and intent contemplated hereby.

18. Particular Guaranties. In the event that, with respect to the Credit Agreement with a Borrower, the Guarantor shall have heretofore delivered or shall hereafter deliver, and Citi shall have accepted or shall accept, another guaranty, whether in this or a different form (a "Particular Guaranty"), the Particular Guaranty shall supersede this Guaranty to the extent of the obligations guaranteed in the Particular Guaranty.

19. WAIVER OF JURY TRIAL. THE GUARANTOR IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS GUARANTY OR CITI'S ACTIONS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

LEHMAN BROTHERS HOLDINGS INC.

By:
Name:  James J. Killerlane
Title:   Vice President

5

Confidential

CITI-LEH01309841

# Exhibit 10

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
**In re**                                :    **Chapter 11 Case No.**
                                       :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :    **08-13555 (JMP)**
                                       :
               **Debtors.**          :    **(Jointly Administered)**
----------------------------------------------------------------x

**STIPULATION ESTABLISHING DISTRIBUTION RESERVES FOR
CLAIMS FILED BY CITIBANK, N.A., CITIGROUP GLOBAL MARKETS
LTD. AND CITIGROUP GLOBAL MARKETS, INC. IN CONNECTION
WITH THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF
LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, as debtors in

possession (together with LBHI, the "Debtors"), and Citibank, N.A. ("Citibank"), Citigroup

Global Markets Ltd. ("CGML") and Citigroup Global Markets, Inc. ("CGMI," together with

Citibank and CGML, "Citi"),[1] hereby stipulate and agree (the "Stipulation") as follows:

<u>RECITALS</u>

        A.     On September 15, 2008 and on various dates thereafter, the Debtors filed

voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")

in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"), which cases are being jointly administered under Case Number 08-13555 (the "Lehman

---

[1] For convenience, Citi and the Debtors shall each be referred to individually as a "Party" and
collectively, as the "Parties."

Bankruptcy Cases"). The Debtors are authorized to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

      B.    Pursuant to an order entered on July 2, 2009, the Bankruptcy Court established

September 22, 2009 at 5:00 p.m. (Prevailing Eastern Time) as the last date and time for the filing

of proofs of claim against any of the Debtors based upon pre-chapter 11 transactions.

      C.    On December 6, 2011, the Bankruptcy Court entered an order confirming the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

Affiliated Debtors [Docket No. 23023] (the "Plan").[2]

Citi Claims

      D.    Citibank filed various proofs of claim against the Debtors (the "Citibank

Claims"), including those identified on Schedule A annexed hereto. Citibank has asserted that

many of the Citibank Claims are secured.

      E.    Certain Debtors maintained prepetition deposits at Citibank. Pursuant to previous

agreements, the Parties agreed to consolidate such prepetition deposits into the five interest-

bearing accounts at Citibank identified in the chart below (collectively, the "Prepetition

Accounts").[3] Citibank and certain of its affiliates assert rights of netting, offset, recoupment, or

---

[2] Capitalized used but not defined in this Stipulation shall have the meanings ascribed to them in the Plan.

[3] *See Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 3372]; *Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 8099]; *Stipulation and Order Regarding (1) Transfer and Turnover of Certain Deposits, (2) Preservation of Citibank's Setoff Rights, if Any, in Respect of Deposits Transferred or Turned Over, (3) Maintenance of Certain Deposit Accounts, (4) Indemnification of Citibank in Respect of any Third Party Claims Arising from the Turnover of Deposits and (5) Payment of Account Fees* [Docket No. 18687] (the "Third Prepetition Deposits Stipulation"). In addition, certain Debtors maintained prepetition deposits at affiliates of Citibank. Pursuant to the Third Prepetition Deposits Stipulation, these deposits have been or will be

other claims of right against these Prepetition Accounts. Because consolidation of the Debtors'

deposit accounts is still underway, the precise dollar value of deposits currently held or expected

to be held in each such Prepetition Account cannot be determined at this time. Accordingly, the

Parties have agreed for the limited purpose of determining reserves in accordance with this

Stipulation to estimate the balances of the Prepetition Accounts in the following amounts (for

each account, the "Estimated Balance for Reserve"):

| Debtor | Prepetition Account | Estimated Balance for Reserve |
|---|---|---|
| Lehman Brothers Holdings Inc. | 204354 | $2,006,000,000 |
| Lehman Brothers Holdings Inc. | 3082-6233 | $54,000,000 |
| Lehman Brothers Commercial Corp. | 3082-6356 | $4,900,000 |
| Lehman Brothers Commodity Services Inc. | 3082-6292 | $4,900,000 |
| Lehman Brothers Special Financing Inc. | 3082-6305 | $600,000 |

F.      CGML filed various proofs of claim against the Debtors (the "CGML Claims"),

including those identified on Schedule B annexed hereto. CGML has asserted that the CGML

Claims are secured. CGML does not presently assert or hold an interest in any property of any

Debtor to secure the CGML Claims.

G.      CGMI filed various proofs of claim against the Debtors (the "CGMI Claims,"

together with the Citibank Claims and the CGML Claims, the "Citi Claims"), including those

identified on Schedule C annexed hereto. CGMI has asserted that the CGMI Claims are secured.

CGMI does not presently assert or hold an interest in any property of any Debtor to secure the

CGMI Claims.

H.      In each of the Citi Claims, each Citi entity has reserved its purported rights of

setoff against the applicable Debtor whether in respect of claims directly between the applicable

Citi entity and the applicable Debtor, claims between affiliates of the applicable Citi entity and

---

consolidated into interest-bearing accounts 3087-0189 and 3087-0154 at Citibank. This Stipulation does
not address such affiliate deposits.

the applicable Debtor or claims between the applicable Citi entity, or its affiliates, and affiliates of the applicable Debtor, including, without limitation, under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 553, 555, 556, 559, 560 and 561 of the Bankruptcy Code, under any agreement or other instruments, under applicable non-bankruptcy law or otherwise (the "Citi Setoff Rights").

I.        The Debtors, together with Citibank, CGML, and CGMI, enter into this Stipulation to establish the form, manner and amount of cash (or other property, as applicable) to be maintained in respect of the Citi Claims in accordance with Section 8.4 of the Plan, as the same may be modified, amended or supplemented (the "Distribution Reserves").

J.        This Stipulation shall not affect the form, manner, or amount of Distribution Reserves to be maintained in respect of Claims asserted against the Debtors by any Citi affiliate other than Citibank, CGML, or CGMI, which shall be established and maintained in accordance with section 8.4 of the Plan, as the same may be modified, amended or supplemented.

## AGREEMENT

1.        The Debtors and Citibank agree that, solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the Citibank Claims, and subject to the Citi Setoff Rights and the Debtors' rights to dispute, contest or challenge the Citi Setoff Rights:

a.        so long as the Prepetition Accounts are maintained with Citibank, the following Distribution Reserves shall be maintained with respect to the Citibank Claims identified on Schedule A:

(i)        the Prepetition Accounts maintained at Citibank by each of LBHI, Lehman Brothers Commercial Corporation ("LBCC"), Lehman Brothers Commodities Services Inc. ("LBCS") and Lehman Brothers Special Financing Inc. ("LBSF") (including any deposits in

the Prepetition Accounts in excess of the Estimated Balance for Reserve) shall constitute a

Distribution Reserve for Citibank's Claims identified on Schedule A; and

(ii)    each of LBHI, LBCC, LBCS and LBSF shall maintain additional

Distribution Reserves based on the following unsecured claim amounts in the identified Plan

Class, which represent the difference between (1) the aggregate Citibank Claims identified on

Schedule A asserted against the applicable Debtor and (2) the Estimated Balance for Reserve:

| Debtor | Unsecured Claim Amount[4] | |
|--------|------------------|---|
| Lehman Brothers Holdings Inc. | LBHI Class 5: | $1,258,701,205 |
| | LBHI Class 7: | $22,688,281 |
| Lehman Brothers Commercial Corp. | LBCC Class 4: | $13,117,039 |
| Lehman Brothers Commodity Services Inc. | LBCS Class 4: | $0 |
| Lehman Brothers Special Financing Inc. | LBSF Class 4A: | $1,640,069,553 |

b.    in the event that the Bankruptcy Court, by a final non-appealable order,

determines that any of the Citibank Claims identified on Schedule A are allowed unsecured

claims and directs Citibank to turn over any portion or all of the Prepetition Accounts to the

applicable Debtor (the "Turnover Amount"), then (i) Citibank shall (A) be entitled to retain that

portion of the Turnover Amount that is equal to the amount of Distributions that would have

been distributed by the applicable Debtor to Citibank on account of such allowed Citibank Claim

in accordance with Section 8.4 of the Plan, as the same may be modified, amended or

supplemented, from the Effective Date through the date of such turnover (such amount, as

confirmed by the Plan Administrator, the "Retained Amount") in lieu of a Distribution by the

applicable Debtor, and (B) promptly pay to the applicable Debtor the amount equal to the

difference between the Turnover Amount and the Retained Amount (the "Net Turnover

---

[4] For the avoidance of doubt, the Unsecured Claim Amount shall not operate to limit the reserves to be maintained by the Debtors in respect of any Claim that is not identified on Schedule A.

Amount"); and (ii) for the avoidance of doubt, once Citibank has paid the Net Turnover Amount

to the applicable Debtor(s), Citibank shall be entitled to receive Distributions in accordance with

the Plan on account of any Citibank Claims identified on Schedule A that have been allowed as

unsecured claims;

        c.     in the event that the Bankruptcy Court, by a final non-appealable order,

directs Citibank to turn over any portion or all of the Prepetition Accounts to the applicable

Debtor prior to a final non-appealable determination as to whether the Citibank Claims identified

on Schedule A should be allowed as unsecured claims, the applicable Debtor shall establish and

maintain Distribution Reserves for any Citibank Claims identified on Schedule A asserted as

unsecured claims in accordance with Section 8.4 of the Plan, as the same may be modified,

amended or supplemented; and

        d.     with respect to any Citibank Claim that is not identified on Schedule A,

each Debtor shall maintain Distribution Reserves on account of such Citibank Claim in

accordance with section 8.4 of the Plan, as the same may be modified, amended or

supplemented.

        2.     The Debtors and CGML agree solely for purposes of Distribution Reserves to be

maintained pursuant to the Plan in respect of the CGML Claims that:

        a.     with respect to the CGML Claims identified on Schedule B, subject to the

Citi Setoff Rights and the Debtors' rights to dispute, contest or challenge the Citi Setoff Rights,

each Debtor shall reserve Distributions on account of the CGML Claims identified on Schedule

B on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as

the same may be modified, amended or supplement; and

b.    with respect to any claim of CGML that is not identified on Schedule B,

each Debtor shall maintain Distribution Reserves on account of such CGML Claim in

accordance with section 8.4 of the Plan, as the same may be modified, amended or

supplemented.

3.    The Debtors and CGMI agree solely for purposes of Distribution Reserves to be

maintained pursuant to the Plan in respect of the CGMI Claims that:

a.    with respect to the CGMI Claims identified on Schedule C, subject to the

Citi Setoff Rights and the Debtors' rights to dispute, contest or challenge the Citi Setoff Rights,

each Debtor shall reserve Distributions on account of the CGMI Claims identified on Schedule C

on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as the

same may be modified, amended or supplemented; and

b.    with respect to any claim of CGMI that is not identified on Schedule C,

each Debtor shall maintain Distribution Reserves on account of such CGMI Claim in accordance

with section 8.4 of the Plan, as the same may be modified, amended or supplemented.

4.    This Stipulation is without prejudice to any of the Parties' respective rights and

obligations under and pursuant to the Plan, applicable bankruptcy and non-bankruptcy law, and

equitable principles.  Nothing herein is or shall be deemed to be (a) a determination, allowance

or disallowance of any of Citi's claims against any of the Debtors or their estates for any purpose

whatsoever, (b) an admission, release or a waiver of each of the Parties' rights, claims and

defenses with respect to any claims each Party might have against the other, including, without

limitation, (i) any proofs of claim filed by Citi against the Debtors and the Debtors' objections,

defenses or counterclaims with respect thereto, including, without limitation, with respect to the

amount, extent, validity, classification or priority of any of Citi's claims against any of the

Debtors, and (ii) the Debtors' claims to recover the Prepetition Accounts or any other funds

posted in deposit accounts with Citi and Citi's rights to object to, oppose, or otherwise dispute

such claims, or (c) an agreement or admission by Citi or any Debtor as to the existence of any

setoff right in favor of Citi of any kind whatsoever.

5.      Neither this Stipulation, any of the provisions hereof, nor any act performed or

document executed pursuant to or in furtherance of this Stipulation, is or may be deemed to be or

may be used as an admission of, or evidence of, the validity or invalidity of any aspect of the Citi

Claims or of any other claim or right of any kind of the Parties, or of any wrongdoing or liability

of any of the Parties in the Lehman Bankruptcy Cases or any other matter.

6.      Nothing in this Stipulation, express or implied, is intended or shall be construed to

confer upon, or to give to, any person other than the Parties hereto, and their respective

successors and assigns, any right, remedy or claim under or by reason of this Stipulation.  The

provisions contained in this Stipulation are and shall be for the sole and exclusive benefit of the

Parties hereto.

7.      This Stipulation shall become effective immediately upon its execution by the

Parties.

8.      This Stipulation contains the entire agreement between the Parties as to the

subject matter hereof and supersedes all previous agreements and undertakings among the Parties

relating thereto.

9.      This Stipulation may not be modified other than by signed writing executed by all

Parties and delivered to each Party.

10.     The Debtors represent and warrant that they have authority to enter into this

Stipulation.

11.     Each person who executes this Stipulation represents that he or she is duly authorized to do so on behalf of the applicable Party and that each such Party has full knowledge of, and has consented to, this Stipulation.

12.     This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies, or facsimiles signed by the Parties.

13.     This Stipulation shall inure to the benefit of, and shall be binding upon, the Parties and their respective successors, assignees, heirs, executors and administrators.

14.     This Stipulation shall be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

15.     Citi consents to the jurisdiction of the Bankruptcy Court solely for the purpose of the enforcement of this Stipulation

16.    The Bankruptcy Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Stipulation. Should the Bankruptcy Court abstain from exercising its jurisdiction or be found not to have jurisdiction over a matter relating to this Stipulation, such matter shall be adjudicated in either the United States District Court, for the Southern District of New York or a court of competent jurisdiction in the State of New York.

Dated: March 5, 2012
        New York, New York

_____
Lori R. Fife
(lori.fife@weil.com)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

_____
Stephen J. Shimshak
(sshimshak@paulweiss.com)
Douglas R. Davis
(ddavis@paulweiss.com)
Claudia L. Hammerman
(chammerman@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global*
*Markets, Ltd. and Citigroup Global Markets,*
*Inc.*

16.     The Bankruptcy Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Stipulation.  Should the Bankruptcy Court abstain from exercising its jurisdiction or be found not to have jurisdiction over a matter relating to this Stipulation, such matter shall be adjudicated in either the United States District Court, for the Southern District of New York or a court of competent jurisdiction in the State of New York.

Dated: March **5**, 2012
New York, New York

_____
Lori R. Fife
(lori.fife@weil.com)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

_____
Stephen J. Shimshak
(sshimshak@paulweiss.com)
Douglas R. Davis
(ddavis@paulweiss.com)
Claudia L. Hammerman
(chammerman@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global*
*Markets, Ltd. and Citigroup Global Markets,*
*Inc.*

Schedule A

| Citi Entity | Debtor | Claim Number | Asserted Amount of Claim | Estimated Balance for Reserve | Unsecured Claim Amount |
|---|---|---|---|---|---|
| Citibank, N.A. | | | | | |
| | Lehman Brothers Holdings Inc. | 67736 | $  3,318,701,205 | | |
| | | 29873 | $  18,213,955.00 | | |
| | | 29636 | $  4,474,325.51 | | |
| | | LBHI Subtotal | $  3,341,389,486 | $  2,060,000,000 | $ 1,281,389,486 |
| | Lehman Brothers Special Financing Inc. | 67733 | 1,640,669,553 | 600,000 | 1,640,069,553 |
| | Lehman Brothers Commercial Corporation | 67734 | 18,017,039 | 4,900,000 | 13,117,039 |
| | Lehman Brothers Commodity Services Inc. | 17932 | 2,295,942 | 4,900,000 | - |
| Citibank NA Total | | | $  . 5,002,372,020 | $  2,070,400,000 | $ 2,934,576,078 |

Schedule B

| Citi Entity | Debtor | Claim Number | Asserted Amount of Claim |
|---|---|---|---|
| **Citigroup Global Markets, Ltd.** | | | |
| | Lehman Brothers Holdings Inc. | 29882 | $ 308,778,533 |
| | Lehman Brothers Special Financing Inc. | 29881 | 232,423,044 |
| | Lehman Brothers Commodity Services Inc. | 29880 | 6,933,838 |
| **Citigroup Global Markets, Ltd. Total** | | | **$ 548,135,415** |

Schedule C

| Citi Entity | Debtor | Claim Number | Asserted Amount of Claim |
|---|---|---|---|
| Citigroup Global Markets, Inc. | | | |
| | Lehman Brothers Holdings Inc. | 67735 | $  173,376,027 |
| | | | |
| Citigroup Global Markets, Inc. Total | | | $  173,376,027 |

# Exhibit 11

Execution Version

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | |
|---|---|
| **In re** | :    **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | :    **08-13555 (JMP)** |
| | : |
| **Debtors.** | :    **(Jointly Administered)** |

-------------------------------------------------------------------x

**AMENDED STIPULATION ESTABLISHING DISTRIBUTION RESERVES FOR
CLAIMS FILED BY CITIBANK, N.A., CITIGROUP GLOBAL MARKETS
LTD. AND CITIGROUP GLOBAL MARKETS, INC. IN CONNECTION
WITH THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF
LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

       Lehman Brothers Holdings Inc., as Plan Administrator (the "Plan Administrator")

under the *Modified Third Amended Joint Chapter 11 Plan Of Lehman Brothers Holdings Inc.*

*And Its Affiliated Debtors* [ECF No. 22737] (the "Plan")[1] for the entities in the above referenced

chapter 11 cases (collectively, the "Debtors"), and Citibank, N.A. ("Citibank"), Citigroup Global

Markets Ltd. ("CGML") and Citigroup Global Markets, Inc. ("CGMI," together with Citibank

and CGML, "Citi"),[2] hereby stipulate and agree (the "Stipulation") as follows:

---

[1] Capitalized used but not defined in this Stipulation shall have the meanings ascribed to them in the Plan.

[2] For convenience, Citi and the Plan Administrator (acting on behalf of the Debtors) shall each be referred
to individually as a "Party" and collectively, as the "Parties."

## RECITALS

A.      On March 5, 2012, the Debtors and Citi entered into that certain *Stipulation Establishing Distribution Reserves For Claims Filed By Citibank, N.A., Citigroup Global Markets Ltd. and Citigroup Global Markets, Inc. In Connection With The Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliates* (the "Prior Stipulation").  Pursuant to the Prior Stipulation, the Debtors and Citi agreed upon the form, manner and amount of cash (or other property, as applicable) to be maintained in respect of the Citi Claims (defined below) in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented (the "Distribution Reserves").  As a result of the settlement and compromise among Citi and Lehman Brothers Inc., dated November 16, 2012, and due to the withdrawal or resolution of certain claims since the Prior Stipulation, the Parties have agreed to amend the Prior Stipulation to reduce the amount of certain Distribution Reserves on the terms set forth herein.

B.      On September 15, 2008 and on various dates thereafter, the Debtors filed voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (the "Lehman Bankruptcy Cases").

C.      Pursuant to an order entered on July 2, 2009, the Bankruptcy Court established September 22, 2009 at 5:00 p.m. (Prevailing Eastern Time) as the last date and time for the filing of proofs of claim against any of the Debtors based upon pre-chapter 11 transactions.

2

D.      On December 6, 2011, the Bankruptcy Court entered an order confirming the

Plan.  The Plan became effective on March 6, 2012.  The Plan Administrator is authorized to

carry out and implement all provisions of the Plan.

Citi Claims

E.      Citibank filed various proofs of claim against the Debtors (the "Citibank

Claims"), including those identified on Schedule A annexed hereto.  Citibank has asserted that

many of the Citibank Claims are secured.

F.      Certain Debtors maintained prepetition deposits at Citibank.  Pursuant to previous

agreements entered into during the Lehman Bankruptcy Cases, Citibank and the Debtors agreed

to consolidate such prepetition deposits into the five interest-bearing accounts at Citibank

identified in the chart below (collectively, the "Prepetition Accounts").[3]  Citibank and certain of

its affiliates assert rights of netting, offset, recoupment, or other claims of right against these

Prepetition Accounts.  Because consolidation of the Debtors' deposit accounts is still underway,

the precise dollar value of deposits currently held or expected to be held in each such Prepetition

Account cannot be determined at this time.  Accordingly, the Parties have agreed for the limited

purpose of determining reserves in accordance with this Stipulation to estimate the balances of

---

[3] *See Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 3372]; *Stipulation and Order Authorizing (1) Transfer of Certain Prepetition Deposits, and (2) Preservation of Citibank's Setoff Rights, if any, in Respect of Amounts Transferred* [Docket No. 8099]; *Stipulation and Order Regarding (1) Transfer and Turnover of Certain Deposits, (2) Preservation of Citibank's Setoff Rights, if Any, in Respect of Deposits Transferred or Turned Over, (3) Maintenance of Certain Deposit Accounts, (4) Indemnification of Citibank in Respect of any Third Party Claims Arising from the Turnover of Deposits and (5) Payment of Account Fees* [Docket No. 18687] (the "Third Prepetition Deposits Stipulation").  In addition, certain Debtors maintained prepetition deposits at affiliates of Citibank.  Pursuant to the Third Prepetition Deposits Stipulation, these deposits have been or will be consolidated into interest-bearing accounts 3087-0189 and 3087-0154 at Citibank.  This Stipulation does not address such affiliate deposits.

3

the Prepetition Accounts in the following amounts (for each account, the "Estimated Balance for Reserve"):

| Debtor | Prepetition Account | Estimated Balance for Reserve |
|--------|--------------------|------------------------------|
| Lehman Brothers Holdings Inc. | 204354 | $2,006,000,000 |
| Lehman Brothers Holdings Inc. | 3082-6233 | $54,000,000 |
| Lehman Brothers Commercial Corp. | 3082-6356 | $4,900,000 |
| Lehman Brothers Commodity Services Inc. | 3082-6292 | $4,900,000 |
| Lehman Brothers Special Financing Inc. | 3082-6305 | $600,000 |

G.    CGML filed various proofs of claim against the Debtors (the "CGML Claims"), including those identified on Schedule B annexed hereto. CGML has asserted that the CGML Claims are secured. CGML does not presently assert or hold an interest in any property of any Debtor to secure the CGML Claims.

H.    CGMI filed various proofs of claim against the Debtors (the "CGMI Claims," together with the Citibank Claims and the CGML Claims, the "Citi Claims"), including those identified on Schedule C annexed hereto. CGMI has asserted that the CGMI Claims are secured. CGMI does not presently assert or hold an interest in any property of any Debtor to secure the CGMI Claims.

I.    In each of the Citi Claims, each Citi entity has reserved its purported rights of setoff against the applicable Debtor whether in respect of claims directly between the applicable Citi entity and the applicable Debtor, claims between affiliates of the applicable Citi entity and the applicable Debtor or claims between the applicable Citi entity, or its affiliates, and affiliates of the applicable Debtor, including, without limitation, under sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 553, 555, 556, 559, 560 and 561 of the Bankruptcy Code, under any agreement or other instruments, under applicable non-bankruptcy law or otherwise (the "Citi Setoff Rights").

4

J.      This Stipulation shall not affect the form, manner, or amount of Distribution

Reserves to be maintained in respect of Claims asserted against the Debtors by any Citi affiliate

other than Citibank, CGML, or CGMI, which shall be established and maintained in accordance

with section 8.4 of the Plan, as the same has been or may be modified, amended or

supplemented.

## AGREEMENT

1.      This Stipulation amends, restates and supersedes the Prior Stipulation in its

entirety.

2.      The Plan Administrator and Citibank agree that, solely for purposes of

Distribution Reserves to be maintained pursuant to the Plan in respect of the Citibank Claims,

and subject to the Citi Setoff Rights and the Plan Administrators' rights to dispute, contest or

challenge the Citi Setoff Rights:

      a.      so long as the Prepetition Accounts are maintained with Citibank, the

following Distribution Reserves shall be maintained with respect to the Citibank Claims

identified on Schedule A:

      (i)      the Prepetition Accounts maintained at Citibank by each of LBHI,

Lehman Brothers Commercial Corporation ("LBCC"), Lehman Brothers Commodities Services

Inc. ("LBCS") and Lehman Brothers Special Financing Inc. ("LBSF") (including any deposits in

the Prepetition Accounts in excess of the Estimated Balance for Reserve) shall constitute a

Distribution Reserve for Citibank's Claims identified on Schedule A; and

      (ii)      the Plan Administrator (on behalf of LBHI, LBCC, LBCS and

LBSF) shall maintain additional Distribution Reserves based on the following unsecured claim

amounts in the identified Plan Class, which represent the difference between (1) the aggregate

5

Citibank Claims identified on Schedule A asserted against the applicable Debtor and (2) the Estimated Balance for Reserve:

| Debtor | Unsecured Claim Amount[4] | |
|---|---|---|
| Lehman Brothers Holdings Inc. | LBHI Class 5: | $732,619,993 |
| | LBHI Class 7: | $18,213,955 |
| Lehman Brothers Commercial Corp. | LBCC Class 4: | $13,117,039 |
| Lehman Brothers Commodity Services Inc. | LBCS Class 4: | $0 |
| Lehman Brothers Special Financing Inc. | LBSF Class 4A: | $1,640,069,553 |

        b.        in the event that the Bankruptcy Court, by a final non-appealable order, determines that any of the Citibank Claims identified on Schedule A are allowed unsecured claims and directs Citibank to turn over any portion or all of the Prepetition Accounts to the applicable Debtor (the "Turnover Amount"), then (i) Citibank shall (A) be entitled to retain that portion of the Turnover Amount that is equal to the amount of Distributions that would have been distributed by the applicable Debtor to Citibank on account of such allowed Citibank Claim in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented, from the Effective Date through the date of such turnover (such amount, as confirmed by the Plan Administrator, the "Retained Amount") in lieu of a Distribution by the applicable Debtor, and (B) promptly pay to the applicable Debtor the amount equal to the difference between the Turnover Amount and the Retained Amount (the "Net Turnover Amount"); and (ii) for the avoidance of doubt, once Citibank has paid the Net Turnover Amount to the applicable Debtor(s), Citibank shall be entitled to receive Distributions in accordance with the Plan on account of any Citibank Claims identified on Schedule A that have been allowed as unsecured claims;

---

[4] For the avoidance of doubt, the Unsecured Claim Amount shall not operate to limit the reserves to be maintained by the Plan Administrator in respect of any Claim that is not identified on Schedule A.

6

c.       in the event that the Bankruptcy Court, by a final non-appealable order, directs Citibank to turn over any portion or all of the Prepetition Accounts to the applicable Debtor prior to a final non-appealable determination as to whether the Citibank Claims identified on Schedule A should be allowed as unsecured claims, the Plan Administrator (on behalf of the applicable Debtors) shall establish and maintain Distribution Reserves for any Citibank Claims identified on Schedule A asserted as unsecured claims in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

d.       with respect to any Citibank Claim that is not identified on Schedule A, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such Citibank Claim in accordance with section 8.4 of the Plan, as the same may be modified, amended or supplemented.

3.       The Plan Administrator and CGML agree solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the CGML Claims that:

a.       with respect to the CGML Claims identified on Schedule B, subject to the Citi Setoff Rights and the Plan Administrator's rights to dispute, contest or challenge the Citi Setoff Rights, the Plan Administrator (on behalf of the applicable Debtors) shall reserve Distributions on account of the CGML Claims identified on Schedule B on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

b.       with respect to any claim of CGML that is not identified on Schedule B, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such CGML Claim in accordance with section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented.

7

4.    The Plan Administrator and CGMI agree solely for purposes of Distribution Reserves to be maintained pursuant to the Plan in respect of the CGMI Claims that:

a.    with respect to the CGMI Claims identified on <u>Schedule C</u>, subject to the Citi Setoff Rights and the Plan Administrator's rights to dispute, contest or challenge the Citi Setoff Rights, the Plan Administrator (on behalf of the applicable Debtors) shall reserve Distributions on account of the CGMI Claims identified on <u>Schedule C</u> on the basis that all such claims are unsecured in accordance with Section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented; and

b.    with respect to any claim of CGMI that is not identified on <u>Schedule C</u>, the Plan Administrator (on behalf of the applicable Debtors) shall maintain Distribution Reserves on account of such CGMI Claim in accordance with section 8.4 of the Plan, as the same has been or may be modified, amended or supplemented.

5.    This Stipulation is without prejudice to any of the Parties' respective rights and obligations under and pursuant to the Plan, applicable bankruptcy and non-bankruptcy law, and equitable principles.  Nothing herein is or shall be deemed to be (a) a determination, allowance or disallowance of any of Citi's claims against any of the Debtors or their estates for any purpose whatsoever, (b) an admission, release or a waiver of each of the Parties' rights, claims and defenses with respect to any claims each Party might have against the other, including, without limitation, (i) any proofs of claim filed by Citi against the Debtors and the Plan Administrator's objections, defenses or counterclaims with respect thereto, including, without limitation, with respect to the amount, extent, validity, classification or priority of any of Citi's claims against any of the Debtors, and (ii) the Plan Administrator's claims to recover the Prepetition Accounts or any other funds posted in deposit accounts with Citi and Citi's rights to object to, oppose, or

8

otherwise dispute such claims, or (c) an agreement or admission by Citi or the Plan

Administrator as to the existence of any setoff right in favor of Citi of any kind whatsoever.

6.      Neither this Stipulation, any of the provisions hereof, nor any act performed or

document executed pursuant to or in furtherance of this Stipulation, is or may be deemed to be or

may be used as an admission of, or evidence of, the validity or invalidity of any aspect of the Citi

Claims or of any other claim or right of any kind of the Parties, or of any wrongdoing or liability

of any of the Plan Administrator, the Debtors, or Citi in the Lehman Bankruptcy Cases or any

other matter.

7.      Nothing in this Stipulation, express or implied, is intended or shall be construed to

confer upon, or to give to, any person other than the Parties hereto, and their respective

successors and assigns, any right, remedy or claim under or by reason of this Stipulation.  The

provisions contained in this Stipulation are and shall be for the sole and exclusive benefit of the

Parties hereto.

8.      This Stipulation shall become effective immediately upon its execution by the

Parties.

9.      This Stipulation contains the entire agreement between the Parties as to the

subject matter hereof and supersedes all previous agreements and undertakings among the Parties

relating thereto.

10.      This Stipulation may not be modified other than by signed writing executed by all

Parties and delivered to each Party.

11.      The Plan Administrator represents and warrants that it has authority to enter into

this Stipulation on behalf of the respective Debtors, including LBHI.

9

12.     Each person who executes this Stipulation represents that he or she is duly authorized to do so on behalf of the applicable Party and that each such Party has full knowledge of, and has consented to, this Stipulation.

13.     This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies, or facsimiles signed by the Parties.

14.     This Stipulation shall inure to the benefit of, and shall be binding upon, the Parties and their respective successors, assignees, heirs, executors and administrators.

15.     This Stipulation shall be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

16.     Citi consents to the jurisdiction of the Bankruptcy Court solely for the purpose of the enforcement of this Stipulation.

US_ACTIVE:\44193643\6\58399.0011

17.     The Bankruptcy Court shall have exclusive jurisdiction over any and all disputes arising out of or otherwise relating to this Stipulation.  Should the Bankruptcy Court abstain from exercising its jurisdiction or be found not to have jurisdiction over a matter relating to this Stipulation, such matter shall be adjudicated in either the United States District Court, for the Southern District of New York or a court of competent jurisdiction in the State of New York.

Dated: February 25, 2013
       New York, New York

Lori R. Fife
(lori.fife@weil.com)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Plan Administrator*

Stephen J. Shimshak
(sshimshak@paulweiss.com)
Douglas R. Davis
(ddavis@paulweiss.com)
Claudia L. Hammerman
(chammerman@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Attorneys for Citibank, N.A., Citigroup Global Markets, Ltd. and Citigroup Global Markets, Inc.*

11

| Schedule A | | | | | |
|---|---|---|---|---|---|
| **Citi Entity** | **Debtor** | **Claim Number** | **Asserted Amount of Claim** | **Estimated Balance for Reserve** | **Unsecured Claim Amount** |
| **Citibank, N.A.** | | | | | |
| | Lehman Brothers Holdings Inc. | 67736 | $ 2,792,619,993 | $ 2,060,000,000 | $732,619,993 |
| | | 29873 | $ 18,213,955 | | $18,213,955 |
| | | | | | |
| | | | | | |
| | | LBHI Subtotal | $ 2,810,833,948 | $ 2,060,000,000 | $ 750,833,948 |
| | | | | | |
| | Lehman Brothers Special Financing Inc. | 67733 | 1,640,669,553 | 600,000 | 1,640,069,553 |
| | | | | | |
| | Lehman Brothers Commercial Corporation | 67734 | 18,017,039 | 4,900,000 | 13,117,039 |
| | | | | | |
| | Lehman Brothers Commodity Services Inc. | 17932 | 2,295,942 | 4,900,000 | - |
| | | | | | |
| **Citibank NA Total** | | | **$ 4,471,816,482** | **$ 2,070,400,000** | **$ 2,404,020,540** |

| | Schedule B | | | |
|---|---|---|---|---|
| | **Citi Entity** | **Debtor** | **Claim Number** | **Unsecured Claim Amount** |
| | **Citigroup Global Markets, Ltd.** | | | |
| | | Lehman Brothers Holdings Inc. | 29882 | $    308,778,533 |
| | | | | |
| | | Lehman Brothers Special Financing Inc. | 29881 | 232,423,044 |
| | | | | |
| | | Lehman Brothers Commodity Services Inc. | 29880 | 6,933,838 |
| | | | | |
| | **Citigroup Global Markets, Ltd. Total** | | | $    548,135,415 |

| | Schedule C | | | |
|---|---|---|---|---|
| | **Citi Entity** | **Debtor** | **Claim Number** | **Unsecured Claim Amount** |
| | **Citigroup Global Markets, Inc.** | | | |
| | | Lehman Brothers Holdings Inc. | 68119 | $13,819,773 |
| | | | | |
| | | | | |
| | **Citigroup Global Markets, Inc. Total** | | | $    13,819,773 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# Exhibit 12

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7282**

WRITER'S INTERNET ADDRESS
**andrewrossman@quinnemanuel.com**

April 28, 2014

**VIA HAND DELIVERY**

Hon. Shelley C. Chapman
United States Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, New York 10006

Re:   *Lehman Brothers Holdings Inc., et al v. Citibank, N.A., et al.,*
      **Adv. Proc. No. 12-01044 (Bankr. S.D.N.Y.) (SCC)**

Dear Judge Chapman:

    We write on behalf of Plaintiffs Lehman Brothers Holdings, Inc. and certain of its affiliates (collectively, "Lehman") and the Official Committee of Unsecured Creditors (together with Lehman, "Plaintiffs") in response to the April 23, 2014 letter submitted by defendants Citibank, N.A. and its affiliates (collectively, "Citi").

    Introduction

    The current discovery dispute is part of a calculated campaign by Citi to gain strategic advantage in the discovery process by delaying the production of relevant documents until the 13th hour, redacting key information from those documents on questionable grounds, denying Plaintiffs discovery of basic information about Citi's businesses, disrupting Plaintiffs' effort to take depositions in a logical and efficient order that builds from the bottom and then trying to jam Plaintiffs by forcing them to take top-level depositions without these essential building blocks.

    This litigation centers around Citi's improper use of $2 billion that Lehman left in a segregated account at Citi (for clearing services) to pay itself on artificially inflated claims against the Lehman Estate that arose from the termination of 30,000 derivatives trades between the parties. In calculating those derivatives claims, Citi was required to use commercially reasonable methods so as to achieve a commercially reasonable result that restores Citi to the material economic equivalent of the portfolio of trades it had facing Lehman.  Instead, Citi claimed some $2 billion of phantom losses in order to extract a windfall from Lehman's bankruptcy.  Citi concedes that the derivatives

Hon. Shelley C. Chapman
April 28, 2014
Page 2 of 8

dispute by itself is a very complex multibillion dollar claim against the Lehman Estate that requires substantial discovery across a wide range of Citi's businesses. Discovery is necessary to show how Citi's various derivatives businesses actually operated across the many different products, regions and currencies that underlie Citi's massive claim. By contrasting Citi's actual market practices, including trading, hedging, risk management and valuation in the ordinary course of conducting its derivatives business, with Citi's artificial calculation of its claims against Lehman, Plaintiffs will show that Citi's closeout was the furthest thing from commercially reasonable. We anticipate that discovery will also confirm that Citi's actual losses resulting from the Lehman default were minimal and its claimed losses of $2 billion entirely fictional. The sheer breadth and magnitude of this dispute necessitates extensive discovery and Citi's effort to cut it off through gamesmanship should not be tolerated.

<u>Document Discovery Is Still Continuing And Needs To Continue</u>

At the outset of the case, Plaintiffs made a conscious effort to design a staged discovery program that would allow for the efficient conduct of depositions. Thus, the scheduling orders have long provided that no depositions should commence until the parties have completed substantial production of documents. Under the current scheduling order, the deadline for substantial production was January 31, 2014. Plaintiffs met that deadline, but Citi most assuredly did not. And the lion's share of Citi's deficiency is in the derivatives realm. Since December 31, 2013, Citi produced an estimated 750,000 pages of derivatives documents, comprising approximately 78% of its total derivatives-related production. Of these, Citi produced an estimated 430,000 pages or 45% of the production after the January 31, 2014 deadline. That included productions on February 28, March 15, March 21, March 31, April 4 and April 25 (or two days *after* Citi represented in its letter to the Court that document discovery is over). When, in frustration, we asked Citi to certify that it had in fact completed substantial production of its documents (Letter from D. Hutnyan to C. Hammerman dated April 9, 2014, attached hereto as Exhibit 1, at 5), we were told just the opposite—that we "should expect that additional productions of diminishing size will be made in the coming weeks." (Letter from C. Hammerman to D. Hutnyan and D. Mize dated April 11, 2014, attached hereto as Exhibit 2, at 2.)[1]

---

[1]    In Appendix B to its letter, Citi purports to "summarize" the parties' correspondence over depositions, among other issues. That "summary" is inaccurate and self-serving. For example, Citi suggests that, on April 9, 2014, Plaintiffs agreed to depose several of Citi's 30(b)(6) representatives in both their corporate and individual capacities. In reality, Plaintiffs informed Citi by letter under the heading "Citi's 'general' 30(b)(6) designees are unacceptable" that "while we will work in good faith to limit the burden of testifying on Citi witnesses where possible, where Citi selects 30(b)(6) designees that will also be fact witnesses, it exposes those individuals to the risk of being deposed twice." (*See* Ex. 21 to Apr. 23 Ltr. at 2-3.) In just another example, Citi claims that, on April 2, 2014, Plaintiffs rejected Citi's request for a meet and confer. Citi omits that there was no ripe dispute at that time warranting a meet and confer. As Plaintiffs (footnote continued)

Hon. Shelley C. Chapman
April 28, 2014
Page 3 of 8

Plaintiffs have devoted and continue to devote substantial resources to conducting an expedited review of the late-produced volumes of Citi documents, many of which require particular market expertise to decipher. What Plaintiffs are finding confirms that Citi's document production has serious defects that require remediation. Plaintiffs are concerned that Citi has made a conscious effort to focus its production efforts on documents that concern merely the mechanical calculation of its derivatives claims against the Estate, while avoiding production of documents that reveal its actual trading and risk management practices and the true economic value of the defaulted Lehman positions, which belie Citi's claims. Put another way, there is a difference between the fictional amounts that Citi calculated and claimed against the Estate and the real-world money that Citi actually lost, if any, as a result of terminating the trades. To date, the production has been primarily about the former to the exclusion of the latter.

To remedy that defect, Plaintiffs have concluded based on a careful review and analysis of the existing (albeit still incomplete Citi production) that it is necessary to seek discovery from a number of additional Citi custodians, who were not identified by Citi at the start of discovery as the custodians in possession of this critical information related to the derivatives trading and support activity that is in dispute or whose roles or significance could not be ascertained without Citi's documents; to add certain search parameters to the electronic review of documents; and to identify certain discrete categories of documents that should have been produced as responsive to one or more of Plaintiffs' document requests but were not. Contrary to Citi's suggestion, Plaintiffs are not proposing any additional document requests, but are simply tailoring the list of custodians and search terms to ensure that the existing requests actually result in production of the relevant documents. To minimize the burden on Defendants of producing these documents, Plaintiffs have largely narrowed their requests to just a two week window that covers the most critical time period immediately surrounding the LBHI chapter 11 filing. The full history and description of the discovery required is set forth in Plaintiffs' April 28, 2014 letter to Citi, attached as Exhibit 3. While we do not believe this dispute is yet ripe for judicial intervention and remain committed to resolving it consensually, we flag it now because it directly affects the deposition scheduling issue that Citi is pressing. The simple point is that Citi is still several months away from genuinely achieving substantial production and Plaintiffs can hardly be expected to take critical top level depositions before then.

<u>Citi's Decision To Designate Its Senior Personnel As Rule 30(b)(6) Witnesses Was Strategic</u>

In an effort to move the case along productively despite Citi's foot-dragging on document production, Plaintiffs commenced the process of derivatives depositions by issuing a basic Rule

---

indicated, "There is no current need for a meet and confer, at least to our knowledge … until we have your actual designees and proposed dates, another meet and confer does not seem necessary. Further, putting your designations and proposed dates in writing is an economical and efficient approach because it permits us to review them and prepare a response before we discuss them." (Ex. 17 to Apr. 23 Ltr. at 1.)

Hon. Shelley C. Chapman
April 28, 2014
Page 4 of 8

30(b)(6) notice (described below) as well as 11 individual deposition notices of relatively low to
mid-level traders and other personnel across a sampling of Citi's derivatives operations. (*See* Letter
from P. Behmke to C. Hammerman dated March 5, 2014, attached hereto as Exhibit 4 (enclosing
30(b)(6) deposition notices); Letter from E. Ward to C. Hammerman dated March 20, 2014, attached
hereto as Exhibit 5 (enclosing fact deposition notice).)  On March 5, Plaintiffs served their initial
Rule 30(b)(6) deposition notice (the "30(b)(6) Notice" or "Notice") on Citi, which was designed to
obtain valuable background information about Citi's complex derivatives businesses, including who
reported to whom and how trades were processed in the ordinary course.  (*See* March 5 Rule
30(b)(6) notice, attached hereto as Exhibit 6 (requesting witnesses on topics such as "[t]he structure
and organization of Citi's Derivatives business and operations" and "identification and description of
any models, tools, or spreadsheets on which Citi trading, sales and marketing, or credit or risk
management personnel relied in the daily trading, marketing, or risk management of Derivatives and
related exposure").)  These requests were made all the more essential by Citi's failure to produce
meaningful organizational charts or other documentary information that would enlighten Plaintiffs as
to the structure and basic functioning of Citi's business.

On March 11, the parties conferred over depositions, including the Notice.  There, Citi took
the position that, because the Notice sought basic information about Citi's derivatives businesses,
numerous individuals from top to bottom were capable of testifying (or could be educated to testify)
in response to the Notice.  (*See* Letter from C. Hammerman to D. Hutnyan and P. Behmke dated
March 13, 2014, attached hereto as Exhibit 7, at 4 ("[T]he majority of these topics can be
addressed—and are best addressed—by the individual witnesses plaintiffs choose to depose in
connection with the derivatives close-out conducted by the various derivatives businesses.").)  Yet,
in blatant violation of Rule 30(b)(6), which states "[t]he ***named organization must … designate*** one
or more officers, directors, or managing agents, or designate other persons who consent to testify on
its behalf," Citi simply refused to designate anyone on any of the topics, insisting that *Plaintiffs*
select Citi's corporate representatives instead.  (*See id*. at 5.)

Weeks later, Citi finally retreated from this position, having found a way to still obstruct the
depositions but blame it on Plaintiffs.  Rather than designating any of the supposedly fungible low-
level personnel Citi had previously suggested would make appropriate designees, Citi designated its
most senior derivatives personnel, many of whom it knew Plaintiffs would eventually seek to depose
for their percipient knowledge, and insisted that they could only be deposed once.  (*See* Apr. 23 Ltr.
at 2.)  Plaintiffs had not individually noticed these senior individuals and intended to wait until later
in discovery, after Defendants substantially completed their document production and after Plaintiffs
had taken foundational depositions, to decide whether and when to notice them.  When Plaintiffs
reiterated they intended to take the noticed Rule 30(b)(6) depositions, and not the ***un-noticed*** Rule
30(b)(1) depositions at this time, Citi unilaterally cancelled the scheduled dates and refused to
provide any Rule 30(b)(6) testimony at all.  (*See* Letter from C. Hammerman to D. Hutnyan dated
April 17, 2014, attached here as Exhibit 8, at 3 n.1.)

Citi thus deprived Plaintiffs of the opportunity to take the Rule 30(b)(6) depositions they had
noticed early on and wait to take the most relevant and crucial witnesses until later, with the benefit

Hon. Shelley C. Chapman
April 28, 2014
Page 5 of 8

of complete document discovery and the foundational testimony that would permit them to make those later depositions as efficient and effective as possible. The transparent purpose of Citi's position is to hamstring Plaintiffs' deposition effort by forcing them to take several of the most important individual witnesses in the case prematurely. There is no authority to support Citi's positions that a party can force its opponent to take depositions it has not noticed, or that a party may condition its designee's appearance on Plaintiffs also simultaneously deposing the witness in that person's individual capacity.

<u>Plaintiffs Should Not Be Denied The Right to Take Individual Depositions Of Citi's Senior Personnel In Addition To Rule 30(b)(6) Depositions</u>

Citi's conduct is pure gamesmanship and runs counter to the text of Federal Rule of Civil Procedure 30(b), which expressly contemplates separate individual and organizational depositions. If Citi insists on offering its most senior employees upfront to testify on topics concerning ordinary day-to-day operations, it must accept the consequence that these witnesses are likely to be noticed individually later. *See Pecover v. Electronic Arts, Inc.*, 2012 WL 951255, at *3 (N.D. Ca. Mar. 20, 2012) (noting that requirement in Rule 30 that party must seek leave to depose a person twice does not apply to 30(b)(6) representative whose individual deposition is later sought); *Williams v. Sprint/United Mgmt. Co.*, 2006 WL 334643, at *1 (D. Kan. Feb. 8, 2006) (permitting individual deposition of a witness who already appeared as a corporate representative). Any supposed hardship that would come to Citi's senior personnel in potentially having to appear twice—once as a corporate designee and a second time in their individual capacity—is purely of Citi's own making. Further, if Citi's corporate representatives also appeared in their individual capacities, then they would be subject to two independent seven-hour time limits and, given their critical importance to the claims in this case, would have to appear for two days in any event. *See Sabre v. First Dominion Capital, LLC*, 2001 WL 1590544, at *1 (S.D.N.Y. Dec. 12, 2001) (noting that a witness appearing in both individual and corporate capacities is subject to two independent seven-hour time limits). Thus, if Citi were really concerned about exposing its high-level witnesses to multiple depositions, it would simply designate individuals with less demanding schedules or who do not have relevant percipient testimony.[2]

---

[2] Many mid-level or junior level personnel that could testify on the topics at issue would not have to be deposed twice because they may not have substantial percipient knowledge. In fact, Citi's suggestion that Plaintiffs intend to depose *any* corporate designee twice is simply inaccurate. (*See* Apr. 23 Ltr. at 5.) To the extent Citi designated a more junior witness whose involvement was limited or particularized and whose individual deposition Plaintiffs also sought, Plaintiffs would endeavor to complete that witness' testimony in one day. For example, Citi has designated one of the individual witnesses that Plaintiffs noticed, Shahed Shafi, as its corporate representative as to one of the topics in Plaintiffs' 30(b)(6) Notice. Plaintiffs anticipate being able to depose Mr. Shafi in both his individual and corporate capacities in a single day. The senior (footnote continued)

Hon. Shelley C. Chapman
April 28, 2014
Page 6 of 8

In addition, Citi's representation to this Court that Rule 30(b)(6) "presumes" corporate testimony should only be provided by high-level personnel is inaccurate (*see* Apr. 23 Ltr. at 4 n.4). The portion of the Rule Citi omitted indicates that the corporation may designate a junior employee, former employee, or non-employee.  Fed. R. Civ. P. 30(b)(6) (permitting the corporation to designate "one or more officers, directors, or managing agents, *or designate other persons who consent to testify on its behalf*") (emphasis added).  Citi declined to designate junior employees for strategic purposes, not because it is disfavored by the Rule.

Citi's remaining arguments are unpersuasive:

<u>Plaintiffs Have No Reason To Delay Their Recovery From Citi</u>

As an initial matter, Citi forfeits any credibility when it claims that Plaintiffs have instigated this discovery dispute as a delay tactic.  Plaintiffs are seeking to recover over $2 billion in Lehman's cash that Citi has wrongfully retained and enjoyed the benefit of for over five and a half years. Plaintiffs do not relish a single day's delay in achieving that recovery for the benefit of Lehman's creditors, but they cannot effectively litigate this case without gathering the relevant evidence.

Plaintiffs are pursuing this evidence and fulfilling their own discovery obligations diligently. As explained above, Plaintiffs substantially completed their production by the January 31, 2014 deadline under the Scheduling Order.  Plaintiffs have since noticed 11 derivatives-related individual depositions and requested Rule 30(b)(6) testimony on 15 topics from Citi relating to its derivatives businesses, and taken or noticed ten non-derivatives individual depositions and requested Rule 30(b)(6) testimony on 6 related topics.  In stark contrast, Citi continues to produce hundreds of thousands of pages of critical documents months past the deadline for production, has taken or noticed 5 non-derivatives individual depositions, and has formally requested but not yet scheduled only 1 derivatives-related witness for deposition.  This record hardly supports Citi's suggestion that it is Plaintiffs that have been dilatory in pursuing discovery.[3]

As recognized by Citi's own request for a new "reasonable deadline" for completion of depositions, modification of the discovery schedule in this matter is necessitated by the complexities

_____

traders and business heads that Citi designated, however, are far differently situated given their importance to the claims and Citi's attempt to proffer them prematurely.

[3] Citi also wrongly claims that efforts to delay are Plaintiffs' *modus operandi*.  (*See* Apr. 23 Ltr. at 6 n.7.)  Curiously, Citi refers to its opposition on Plaintiffs' application to toll the interest accruing on Citi's claim.  There, Citi blamed Lehman for not filing its complaint sooner.  That assertion ignores that, in September 2010, the parties mutually agreed to toll the dispute, so as to explore potential settlement without the need for Court action.  That tolling agreement was renewed numerous times over a two-year period, with Citi's willing consent.

Hon. Shelley C. Chapman
April 28, 2014
Page 7 of 8

of this case. Citi's attempt to dress this fact as arising from the current discovery dispute between the parties, or as some delay tactic by Plaintiffs, is both without basis and unproductive.

<u>Plaintiffs Have A Genuine Need For Testimony On The Noticed Topics</u>

Citi's argument that the noticed topics are unnecessary because Plaintiffs have employed a few former Citi traders from time to time is not only unmeritorious but absurd. There is no factual basis for Citi to suggest that these individuals have, or are at liberty to share, the information (much less all the information) sought in the Notice about Citi's derivatives businesses. In addition, any information that could be provided by these individuals would be wholly different than Citi's admissions given during its binding Rule 30(b)(6) testimony under oath. Further, the suggestion that all the information sought by the topics could be provided by one or two former Citi traders is completely inconsistent with Citi's position that multiple Citi personnel from the nine different derivatives businesses at issue are necessary to testify about these topics.

<u>Plaintiffs Never Agreed To Forego Taking Individual Depositions Of High Level Witnesses</u>

Citi makes the false and misleading assertion that Plaintiffs have violated a supposed agreement to never take multiple depositions of any Citi witness. The record is to the contrary. *Prior* to Citi's designation of its senior traders and business managers as 30(b)(6) witnesses, Plaintiffs merely indicated that as a general proposition they would make reasonable efforts to work with Citi to avoid taking the same deponent twice. But upon learning of Citi's stratagem, Plaintiffs made it clear that Citi's calculated selection of 30(b)(6) representatives would likely result in multiple depositions of its witnesses because those witnesses are among the most central to this dispute, and individual depositions of them are inappropriate at this stage. (Letter from D. Hutnyan to C. Hammerman dated March 31, 2014, attached hereto as Exhibit 9, at 1 ("… we will recall any 30(b)(6) deponent if we feel that facts uncovered during the discovery process require further testimony from that deponent. Therefore, if you choose to designate individuals for these depositions that will also likely be fact witnesses, then you put them in the position of having their deposition taken twice.").) While Plaintiffs are certainly willing to take reasonable steps to avoid unnecessarily burdening witnesses, we have not agreed to give up our case strategy to do so, and any argument that Plaintiffs seek to burden Citi's witnesses is especially weak when it was *Citi's* choice to designate them that created the likelihood that they would have to be deposed twice.

<u>The Scheduling Order Should Be Amended</u>

Plaintiffs do agree that the Third Amended Scheduling Order requires revision to accommodate the required discovery of Citi's claims. As noted above, document discovery is still ongoing. Plaintiffs' review of Citi's recently produced documents is still continuing and we anticipate shortly bringing to the Court's attention disputes over Citi's questionable assertion of privilege over many salient documents. Further, as also noted above, additional document discovery is very much needed. While Citi attempts to cast that request as a delay tactic, in reality, Plaintiffs have spent this time assessing the documents Citi has belatedly produced so as to come to a

Hon. Shelley C. Chapman
April 28, 2014
Page 8 of 8

comprehensive understanding of the additional information they believe is necessary to measure how Citi treated the terminated derivative trades with Lehman and what losses, if any, Citi has actually incurred.  To that end, Plaintiffs have identified for Citi the deficiencies in the existing document production and proposed remedies, including the need for a targeted search of additional custodians whose significance became apparent upon review of the discovery record and could not be grasped in a vacuum at the outset of discovery when Plaintiffs were forced to rely largely on Citi.  (*See* Ex. 3.)

For these reasons, the Court should direct Citi to comply with its obligations under Federal Rule of Civil Procedure to produce corporate representative witnesses without delay on the topics Plaintiffs have identified and deny Citi's requests for an order that no witness in the case may be deposed more than once absent compelling circumstances and for an order placing a cap on the number of depositions each side can take.  Plaintiffs join in Citi's request to adjourn the June 27, 2014 completion date for all fact discovery and respectfully suggest that the Court await the resolution of the document production issues identified in the attached Exhibit 3 prior to setting a new deadline.[4]

Respectfully submitted,

Andrew J. Rossman

cc:    Counsel of record (via email)

_____

[4]   In an epilogue to its letter, Citi requests a discovery master, despite acknowledging that the Bankruptcy Rules do not provide for it absent the parties' mutual consent.  There is no cause for a discovery master even if the rules provided for one.  The parties have appeared sparingly before the Court on discovery issues, and, respectfully, the specter of having to do so reaps benefits in forcing the parties to resolve issues consensually.  No doubt Citi would prefer to have the ability to take recalcitrant positions on discovery without having its tactical choices in discovery laid bare before this Court.  The Plaintiffs have a well-earned reputation throughout this Chapter 11 case of cooperative conduct with adversaries that has led to a minimum of discovery disputes.  In the comparably complex JPMorgan adversary proceeding, the parties have litigated for almost four years and have needed Court intervention on discovery issues only a handful of times.  In that time, the parties had 17 amendments to the scheduling order and never had to go to Court for one.  They exchanged millions of pages documents and took over three hundred depositions, including depositions of all of JPMorgan's top management.  The scheduling and management of this case should be no different.

# EXHIBIT 1

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3666**

WRITER'S INTERNET ADDRESS
**dianehutnyan@quinnemanuel.com**

April 9, 2014

Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Re: *Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.*
Adv. Proc. No. 12-01044 (SCC)

Dear Claudia:

I write with regard to the deposition scheduling issues outlined in your letters of April 3 and April 8, 2014.

Your April 3 letter accuses Plaintiffs of, among other things, "desir[ing] to drag out the deposition process for as long as possible" and demonstrating "a deliberate effort to delay the commencement of derivatives-related depositions."  Yet since March 25, Plaintiffs have received three different substantial waves of documents from Defendants, including a production as recently as April 4.  *See* Letter from Ezra Sternstein to Derek Mize and Rex Lee dated March 26, 2014; Letter from Ezra Sternstein to Derek Mize and Rex Lee dated March 31, 2014; Letter from Ezra Sternstein to Derek Mize and Rex Lee dated April 4, 2014.  In fact, Citi has produced over 150,000 documents since the Court's deadline for substantial completion of document production.  Each of these belated productions by Citi "drag[s] out" discovery and "delay[s] the commencement" of depositions; indeed, they delay the entire case schedule.  And without having received any useful organizational charts, Plaintiffs wanted to start their depositions with 30(b)(6) witnesses, which Citi has stymied by refusing to provide any witness names until quite recently.  Accordingly, any suggestion that it is Plaintiffs who have delayed the scheduling of depositions is clearly frivolous.

Moreover, the consistent accusations that we have refused to cooperate in promptly scheduling depositions in this case do not have any basis, and in fact highlight Citi's own negative attitude toward cooperating in this process.  It is Defendants who argued over the plain

**quinn emanuel urquhart & sullivan, llp**
NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

words of Rule 30(b)(6), thus delaying Plaintiffs' noticed 30(b)(6) depositions, and have offered concrete dates for only three of the eleven fact witnesses that Plaintiffs noticed nearly three weeks ago.

We also do not accept Defendants' attempt to impose artificial deadlines and threats to "consider the proposed dates as confirmed" in the event that Plaintiffs don't adhere to them. We understand and appreciate the sacrifices that witnesses make during this time, when *both* parties are asking their respective employees (or former employees) to remain flexible and patient as the parties reach a mutually agreeable schedule. We do not accept that Citi's witnesses are unable to wait for a definitive answer for more than your arbitrary deadline of 48 hours following each proposal. To be very clear, if we do not confirm a date by your unilaterally imposed deadline, the date is not confirmed. If there is some reason you need an expedited answer as to a particular witness, please let us know; but otherwise we will expect you to be patient and courteous as we prepare our response, and we will do the same.

The statement that Defendants find Plaintiffs' desire to be cooperative in deposition scheduling "difficult to square with the simultaneous refusal to discuss our differences in a meet and confer" is nonsensical. Again, there is no need for a meet and confer unless there is a dispute; parties that are cooperating with respect to scheduling have no need for a meet and confer. We remain, however, happy to continue discussions to cooperatively schedule witnesses on both sides. Further, Plaintiffs have found that—particularly given how much consultation is required to come up with workable dates for a given deposition, as your April 8 letter outlines— the process of proposing and accepting dates in writing by letter or e-mail is a very functional one. We propose to continue moving forward with this productive scheduling process, and hope that Defendants will demonstrate their commitment to cooperation by focusing on scheduling rather than *ad hominem* attacks.

In that spirit, we seek to address the following discovery issues in an effort to make our positions clear and move both parties towards resolution.

## I.    Citi's 30(B)(6) Designees

With regard to your 30(b)(6) designees, we have identified the following issues:

A.    Citi's "general" 30(b)(6) designees are unacceptable.

Regarding Topic 1, Citi has proposed to, "as a general matter, designate the first current employee whose deposition is taken from each of the various derivatives trading businesses in response to Topics 1(a) and 1(b) for their respective businesses." Plaintiffs object to this default designation. As we have previously explained, Rule 30(b)(6) of the Federal Rules of Civil Procedure obligates you to designate corporate representatives to testify in response to a 30(b)(6) notice, and does not permit you to impose prerequisites on those designations or to shift the obligation to designate onto the noticing party. *See* Letter from Diane Hutnyan to Claudia Hammerman dated March 17, 2014. We request that you immediately designate witnesses for outstanding 30(b)(6) topics (particularly Topics 1(a) and (b), 5, 14, and 15) and businesses (particularly rates businesses). We also remind you that, while we will work in good faith to limit the burden of testifying on Citi witnesses where possible, where Citi selects 30(b)(6)

2

designees that will also be fact witnesses, it exposes those individuals to the risk of being deposed twice. *See* Letter from Diane Hutnyan to Claudia Hammerman dated March 31, 2014.

B.    Clarification on Topics 14 and 15.

In light of Defendants' inability to understand Topics 14 and 15, we offer these brief clarifications:

Topic 14: "Citi's policies and procedures for processing Derivatives transactions in Citi's ticketing, risk management, and accounting systems." This topic seeks to understand the migration of the Lehman trades to Citi's management book. We are aware that certain Derivatives businesses use a ticketing system to generate trade details, which are then inputted into risk and account systems. The designee for this topic should be able to explain how this process worked at Citi.

Topic 15: "Citi's policies and procedures for managing the collection of cash related to settlements of Derivatives positions." This topic seeks to understand the operational process for how cash was taken in and recorded at Citi in connection with the settlement of derivatives positions. This includes the processes for both cash due under the trades and cash due to meet margin calls.

Please promptly designate witnesses who can testify regarding these topics.

## II.    **Deposition Scheduling**

With regard to deposition scheduling, we have identified the following issues:

A.    Plaintiffs' March 20 deposition notices.

In its April 3 letter, Citi unilaterally selected and proposed dates for two "derivatives traders who are located in New York, and who are still employed by Citi": Jay Huang and Ted Counihan. While we appreciate your suggestions for additional fact witnesses that we have not noticed, we intend to proceed with the witnesses we notice in the order we notice them, to the extent permitted by the witnesses' schedules. We do not accept your proposed dates for these witnesses.

At the same time that your proposed deposition schedule in the April 3 letter adds non-noticed witnesses, it omits five of the Citi employees that Plaintiffs *did* notice: Brian Connors, Robert Dockray, Antoine Pain, Tom Giardi, and Richard Skeet.[1] Please provide dates for these witnesses promptly.

---

[1]    We acknowledge and appreciate that you are "working with" the remaining Citi employees or former employees noticed on March 20 but absent from your deposition schedule proposal: Alain Verdickt, Varadarajan Subbaraman, and Didier Magloire.

B.    Additional deposition scheduling.

While, as described above, we object to Defendants' method of demanding confirmation of dates for Stuart Staley, Thomas Schwartz, and Melissa Torres, our responses to these dates are as follows[2]:

- Stuart Staley: Plaintiffs accept April 30 for the deposition of Mr. Staley.

- Thomas Schwartz: Your suggested date of May 20 for Mr. Schwartz's deposition does not work with our schedule.  Please propose an alternative date for Mr. Schwartz during the week of June 2.

- Melissa Torres: In spite of Citi's unilateral declaration that "we do not consider the date of Melissa Torres's deposition to be an open issue," given that Citi has produced over a thousand custodial documents for Ms. Torres since March 21, Plaintiffs can no longer agree to a date of April 29 for her deposition. Furthermore, we have made changes to "confirmed" deposition dates for Reto Faber and Thomas Isaac at Citi's request, and expect you to extend us the same courtesy.  Please propose an alternative date for Ms. Torres during the week of May 26.

We also accept the dates proposed in your April 3 letter for Vikram Prasad, Shahed Shafi, Itay Tuchman, John Heppolette, and Marc Pagano.

C.    Contact information for former Lehman employees.

In your letter of April 8, you asked us to provide current contact information for former Lehman employees who reside in foreign countries.  As was discussed in our meet and confer on April 1, there are laws in many of the foreign jurisdictions in which the former Lehman employees reside that do not allow the disclosure of personal identifying information.  For example, the United Kingdom's Data Protection Act of 1998, which was enacted by the United Kingdom Parliament in accordance with the European Union Data Protection Directive of 1995, prohibits the disclosure of an individual's name and contact information without consent.  The requirements of notice and consent vary between jurisdictions, and we do not intend to fully research this highly developed area of law for every jurisdiction in which one of the former Lehman employees reside.  We believe this information is accessible to you through social media and other sources such as Lexis Nexis and Bloomberg.

## III.    Citi's Ongoing Document Production

As previously mentioned, although we are now over two months out from the substantial completion deadline for document production, Citi has continued to make ongoing, voluminous

---

[2]    Your letter does not appear to propose a new date for Joshua Kogan.

document productions.[3]  Given that Citi appears to be producing more and more documents every week, Plaintiffs cannot reliably commit to offered deposition dates unless we have received a comprehensive set of documents with which to prepare for those depositions—and indeed, these late productions threaten to throw off the entire case schedule.  Accordingly, we request that Citi certify that its document production is now, in fact, substantially complete.  Our acceptance of deposition dates for several deponents, set forth above, is conditioned on Citi providing such a certification.  Additionally, to the extent that Citi's late production of documents leaves Plaintiffs with insufficient time to review and understand those documents prior to a deposition, we reserve the right to reschedule the deposition or recall the witness.

Kind regards,

Diane C. Hutnyan

cc:     William A. Clareman, Esq. (via email)
        George Kroup, Esq. (via email)
        Ezra Sternstein, Esq. (via email)
        James Wright, Esq. (via email)
        Peter Behmke, Esq. (via email)
        J. Derek Mize, Esq. (via email)
        Ada Añon, Esq. (via email)
        Rex Lee, Esq. (via email)
        Ellison Ward, Esq. (via email)

---

[3]   Citi's late productions are having a direct impact on our ability to prepare for the upcoming depositions.  For example, within the past month we have received 1,337 custodial documents for Melissa Torres, whom you proposed that Plaintiffs depose on April 29.  Similarly, within the past month Citi has produced 3,587 documents for Vikram Prasad, whom you have offered for deposition on May 1.  For Stuart Staley, whose deposition you propose for April 30, you have produced a total of 1,009 documents – 596 of which were produced within the last month.

# EXHIBIT 2

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON     (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS     (1927-1950)
JOHN F. WHARTON     (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212.373.3321

WRITER'S DIRECT FACSIMILE
212.492.0321

WRITER'S DIRECT E-MAIL ADDRESS
chammerman@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
KELLEY A. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
ANDREW C. FINCH
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
LORETTA A. IPPOLITO
JAREN JANGHORBANI

MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
MARIA T. VULLO
ALEXANDRA M. WALSH*
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

April 11, 2014

**By Email**

Diane C. Hutnyan
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543

J. Derek Mize
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178

*Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.*
Adv. Proc. No. 12-01044 (SCC)

Dear Diane and Derek:

I write in response to your April 9, 2014 letter regarding deposition scheduling in this case.

At the outset, we vehemently disagree that there is any legitimate justification for counsel to delay more than 48 hours to respond to a proposed deposition date. All that is required for counsel to consult their respective schedules, and then respond as to whether they are available or not. If for reasons we cannot understand, more than 48 hours are needed, we expect some form of explanation that we can convey to the witness in order to justify the continued inconvenience and need to block out an entire trading day for the deposition. Moreover, the failure to respond promptly is hindering our ability to move forward efficiently with scheduling. For example, we proposed dates on April 3, 2014 for the depositions of Brian Archer, Mickey Bhatia, and Eliot Rubenzahl, but have heard no response from plaintiffs. Are these dates unworkable, such that we need to find alternatives? Or are we to understand these dates are acceptable? Was the lack of a response simply an oversight? We simply cannot fathom

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Diane C. Hutnyan & J. Derek Mize                                                              2

why it would take counsel more than a week to determine if they are available to take a deposition on a proffered date. You have insisted on addressing scheduling matters entirely in writing on the grounds that doing so is more efficient than on the phone in a meet and confer. That is obviously not the case if written proposals are ignored.

We also reject the accusation that defendants' production of documents has caused any delay, or that the production was not "substantially complete" on January 31, 2014. By January 31, 2014, defendants had produced approximately 300,000 documents. Since that time, we produced an additional 56,000 documents – not 150,000, as alleged in your letter – the majority of which was due to a processing error, which we promptly disclosed to you upon its discovery. More than 10,000 of the more recently produced documents consist of productions from archives of P&L reports that plaintiffs requested, and as to which the parties reached agreements late in the document discovery period; approximately 1,500 of the more recently produced documents are from the "Bear Stearns" production for which we only reached an agreement regarding search parameters in February.

You should expect that additional productions of diminishing size will be made in the coming weeks. We also expect that this will be a two-way street. For example, we have just today received the "Group C" discovery. Although the most recent delay may have been caused by the dispute with the big bank group regarding the confidentiality order, the record is clear that plaintiffs never intended to make that production by January 31, 2014. Indeed, we understood that plaintiffs did not even contact the banks about making this production until February 13, 2014. As you also may recall, plaintiffs produced 150 documents relating to Sean Rahavy *the day before* his deposition (including documents reflecting the booking and tracking of the very $2 billion deposit central to this case) and we did not complain or cry foul or demand that the deposition be adjourned. We recognize that issues like this are inevitable in a case of this size and complexity. We expect there to be a reciprocal understanding that issues along these lines are going to arise, and that if the delayed production truly requires a deposition to be adjourned, a specific justification be proffered.

## I.    Plaintiffs' Deposition Notices

### A.    Deposition Dates Offered in Defendants' April 3 Letter

We appreciate your confirmation of the deposition dates for Stuart Staley (April 30), Vikram Prasad (May 1), Shahed Shafi (May 7), Itay Tuchman (May 30), John Heppolette (June 10), and Marc Pagano (July 1). As noted above, your April 8 letter neglected to confirm several additional deposition dates we offered for Eliot Rubenzahl (May 9), Mickey Bhatia (May 16), and Brian Archer (June 5), all of whom were offered both in their individual capacities and as corporate representatives in response to plaintiffs' derivatives-related Rule 30(b)(6) notice. (*See* April 3, 2014 Letter at 4.) We expect a response with respect to these depositions by the end of the day on Monday, April 14, 2014.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Diane C. Hutnyan & J. Derek Mize                                                    3

B.  Additional Proposals for Derivatives Related Depositions

Since our last correspondence, we have been able to contact the following witnesses and can offer their depositions on the following dates:

- May 1, 2014:  Didier Magloire (based in Hong Kong) will be in New York and can sit for a deposition on May 1.[1]

- May 30, 2014:  Varadarajan Subbaraman (based in Singapore) will be in New York and can sit for a deposition on May 30, 2014.

- June 20, 2014:  Brian Connors (a former employee based in New York) is available for deposition on June 20, 2014.

- June 26, 2014:  Tom Giardi (a former employee based in North Carolina) is available for deposition on June 26, 2014.

- July 3, 2014:  Frederic Jallot (based in London) will be available for deposition in New York on July 3, 2014.  Mr. Jallot will testify both in his individual capacity and as Citi's corporate representative regarding Topics 2–4, and 6–13 in plaintiffs' derivatives-related Rule 30(b)(6) notice pertaining to SPG.

In addition, we have been discussing alternative dates for Joshua Kogan in May.  Mr. Kogan is finalizing his May schedule, and we expect to be able to propose an alternative date sometime next week.

C.  Former Citi Employees Located Abroad

Three of the depositions noticed by plaintiffs on March 20, 2014 are addressed to former employees of Citi who are located abroad – Richard Skeet, Robert Dockray, and Antoine Pain.  We have attempted to reach all three, but have not yet made contact with any of them (although we have spoken with the in-house counsels of the current employers for Mr. Dockray and Mr. Pain).  We expect that by the end of next week, we will be in a position to either propose dates, or inform plaintiffs if the witnesses

---

[1]  Although the parties have agreed that Mr. Prasad's deposition will go forward on May 1, 2014, the case management schedule is such that – given the number of depositions plaintiffs intend to take – multiple depositions will inevitably need to go forward on certain dates.  We therefore propose that plaintiffs take both Mr. Prasad's deposition and Mr. Magloire's deposition on May 1, 2014.  Moreover, since Mr. Magloire is based in Hong Kong, he will have limited availability for a deposition in the United States.  He has informed us that other than May 1, 2014, he has no other availability for a deposition in the United States until late July 2014.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Diane C. Hutnyan & J. Derek Mize                                              4

will not agree to voluntarily submit to a deposition in New York without compulsory process under the Hague Convention.

### D. Plaintiffs' Rule 30(b)(6) Notices

We have by now written at length regarding our objections to plaintiffs' approach to scheduling depositions and their Rule 30(b)(6) notice pertaining to derivatives. We need not rehash all of those arguments here. As you know, we have offered more than a dozen witnesses in response to your requests, and are continuing to evaluate which additional designations would be appropriate in response to any outstanding issues, including appropriate designees for Topic 5. We appreciate the clarification in your April 9, 2014 letter regarding Topics 14 and 15, and will attempt to locate appropriate witnesses.

Your letter repeats the threat that you may seek to depose Citi's Rule 30(b)(6) designees more than once. We have explained repeatedly that we will not make these witnesses available more than once, and so you are on notice that any additional depositions you might seek to take of these witnesses will be vigorously opposed and likely will require intervention by the Court.

*          *          *

We write without prejudice to any of defendants' rights, all of which are expressly reserved.

Very truly yours,

Claudia Hammerman /RF

Claudia L. Hammerman

cc:    Counsel of Record

**EXHIBIT 3**

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7282**

WRITER'S INTERNET ADDRESS
**andrewrossman@quinnemanuel.com**

April 28, 2014

Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Re:    *Lehman Brothers Holdings Inc. v. Citibank, N.A. et al*.
       Adv. Proc. No. 12-01044

Dear Claudia:

        We write to discuss discovery issues in the above-referenced action.

        From the outset of discovery in this matter, Plaintiffs have been clear in their request for production of documents related not only to the manner in which Citibank, N.A. et al. ("Defendants" or "Citi") assigned close-out values to its Lehman-facing derivatives trades pursuant to the ISDA Master Agreements governing those trades, but also to the manner in which Citi actually replaced, hedged or otherwise managed the economic risk that arose from the termination of Lehman-facing derivatives trades in Citi's trading books, including Citi's *actual losses*, if any, arising from that portfolio of terminated trades.  *See, e.g.*, Plaintiffs' Request for Production ("RFP") 57 ("All documents concerning Citi's actual loss in connection with the Lehman Terminated Transactions, including the methodology by which Citi calculated that amount."); Plaintiffs' RFP 58 ("All documents concerning Citi's efforts to mitigate its alleged losses or damages."); Plaintiffs' RFP 62 ("All documents concerning any actions Citi took to hedge its positions in connection with the Terminated Transactions."); Plaintiffs' RFP 92 ("All documents concerning your actual loss in connection with the Terminated Trades . . . ."); Plaintiffs' RFP 99 ("All documents concerning any actions Citi took to hedge its positions in connection with its Subprime Portfolio Group, Portfolio & Exotic Credit Derivatives, Emerging Markets Credit Trading, Credit Trading/Distressed, Global Securitized Markets, Municipal Derivatives, Rates, Foreign Exchange, and Commodities, and Citi Canyon Ltd. between September 14, 2008 and December 31, 2008.").  As Plaintiffs have long explained, the actual cost that Citi incurred in putting on new hedging positions or otherwise managing the risk

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

resulting from Lehman's withdrawal from the market constitutes the best evidence of the actual cost to re-establish the economic equivalent of the Lehman-facing trades.  *See, e.g.*, November 30, 2012 Letter from P. Behmke to C. Hammerman 2012 ("November 30 Letter") (noting discovery into Citi's actual losses would be "particularly germane to whether Citi's close out amounts were calculated in a commercially reasonable way").

In response to Plaintiffs' clearly explained requests—which were discussed by the parties during several meet and confer sessions, *see, e.g.*, June 14, 2012 Letter from C. Hammerman to A. Rossman and P. Behmke at 11 ("June 14 Letter"); October 11, 2012 Letter from C. Hammerman to A. Rossman and P. Behmke at 9 ("October 11 Letter"); November 30 Letter at 3-4—Citi implausibly maintained that it was unable to understand what Plaintiffs meant by Citi's "actual losses," and argued that "Citi's hedging or efforts to mitigate are not relevant to this adversary proceeding, given the liquidated damages provision in the ISDA agreement governing derivatives trades," *see, e.g.*, June 14 Letter at 11; December 20, 2012 Letter from W. Clareman to P. Behmke and A. Rossman at 9.  When Plaintiffs insisted that they were entitled to receive this highly relevant evidence, Citi maintained that the evidence would be "impossible to isolate" and "unreasonable" to collect.  June 14 Letter at 11; October 11 Letter at 10.

Additionally, although Plaintiffs clearly explained that "the scope of custodians was *never intended to be limited to only those individuals who were involved in the close-out transactions*," Letter from R. Lee to W. Clareman dated June 6, 2013 at 2 (emphasis added), Citi continually denied the relevance of custodians who did not have "substantive involvement in the Lehman close-out or in the calculation of Citi's claims," and offered up custodians who had "been identified as having substantial involvement in Citi's decision-making process concerning hedging related to Lehman 'management books,'" Letter from W. Clareman to D. Hutnyan dated October 4, 2013 ("October 4 Letter"), at 2, 6-7.  Meanwhile, notwithstanding Plaintiffs' near-constant requests for additional information about the role of various potential Citi custodians—including interrogatories to which Defendants failed to adequately respond, and about which the parties met and conferred on multiple occasions in August and September, 2013—Citi produced virtually no organizational charts to Plaintiffs, leaving Plaintiffs with only minimal descriptions of the role played of Citi's hand-selected list of custodians.  *See, e.g.*, Plaintiffs First Set of Interrogatories No. 1 (seeking information relating to Citi personnel "who have knowledge or information concerning any Claim in this adversary proceeding or the objection of the Debtors to Your Claims").

While the parties reached a preliminary agreement as to Citi's production relating to its "actual losses" and hedging of the Lehman transactions, Plaintiffs expressly stated that they were accepting the proposed production from Citi "pending receipt" of that discovery and reserved their rights to "raise issues as [they] learn new facts in the course of discovery."  November 30 Letter at 4; Letter from W. Clareman to R. Lee dated August 1, 2013 at 11.

Notwithstanding that Citi had agreed at the very start of the case to produce relevant documents on a rolling basis in advance of the deadline for substantial completion of party document discovery, *see* Scheduling Order & Discovery Plan § 3(a)(ii) (Feb. 27, 2012) (Dkt. #5), Citi waited months before even *beginning* to produce documents.  Indeed, Citi had produced

only approximately two hundred thousand pages of derivatives-related documents by December 31, 2013—one month prior to the deadline for substantial completion of party document discovery under the Third Amended Scheduling Order.  Since January 1 of this year, Defendants have produced more than seven hundred and fifty thousand pages of additional documents, including nearly half a million pages *since the January 31 deadline*—nearly half the total volume of derivatives-related material produced to date.

Now, having finally received Citi's belated (although apparently still incomplete) production, and having dedicated substantial resources to promptly reviewing and analyzing the produced documents, Plaintiffs can for the first time assess whether Defendants' derivatives-related document production complies with Plaintiffs' document requests.  Based on our review, we have concluded that Citi's production is materially deficient, particularly with respect to Citi's "actual losses" and hedging and other relevant trading activity.

As an initial matter, although Citi's production to date appears to show that Citi's Lehman-facing derivatives trades were "transferred" from Citi's derivatives trading desks to central "management books" apparently designed to collect and value those trades on a central basis, Plaintiffs have been unable to locate any substantial volume of documents showing who performed such valuations and what specific steps they took to do so.  Given that this is precisely the type of information that Citi expressly agreed to produce, its absence from the production strongly suggests that Citi's existing document custodians were not in fact the individuals with direct responsibility for managing the Lehman-related management books.

Additionally, although Citi maintained throughout the parties' discovery negotiations that only custodians "substantively involved" in close-out calculations or hedging Citi's "management books" are relevant to claims in this case, documents produced to date show that Citi does not appear to have hedged the "management books" containing its Lehman-facing derivatives trades on a central basis in any meaningful way.  Indeed, it appears that Citi's productions do not contain any substantial volume of documents showing how (or even *whether*) Citi managed the risk associated with those Lehman-facing trades by, for instance, entering into comparable new trades that would hedge or offset the risk posed by Lehman's inability to perform on its trade obligations.  As noted above, such trading activity would constitute probative evidence of the actual costs, if any, Citi incurred in re-establishing the economic equivalent of its Lehman-facing derivatives trades.

It is inconceivable that, faced with the sudden withdrawal of one of its biggest derivatives trading counterparties and the resulting change in risk exposure across its derivatives products, Citi would not have acted immediately to mitigate its risk by engaging in new trading activity.  In fact, trade data produced by third parties in response to subpoenas in this case indicates that Citi did precisely that.  The absence of any significant volume of documents in Citi's production detailing this trading activity would appear to suggest that either (a) Citi is withholding obviously relevant information from the custodian files of the individuals it identified as being the best sources of such information, and/or (b) the trading activity in question was in fact directed and conducted by Citi personnel other than those individuals identified by Citi as being the best sources of relevant information.

3

If Citi is withholding discovery material related to the close-out valuation or management of its Lehman-related risk from the files of the document custodians whose documents it has produced to date, Plaintiffs demand immediate production of all such material.

If Citi's existing document custodians were not sufficiently involved in the management of the Lehman-related management books or the trading activity by which Citi managed its Lehman-related risk in the immediate aftermath of the bankruptcy filing, then it is clear that additional document custodians will be required.

In fact, although Citi has consistently refused to produce documents sufficient to show the organization and staffing of its derivatives-related business units in any significant detail, a painstaking analysis of the documents that it has produced to date have allowed Plaintiffs to learn a great deal more about the roles and responsibilities of the existing document custodians and the identities of those Citi employees whom Plaintiffs believe were in fact most likely to have been actively engaged in the management of Citi's Lehman-related management books and its Lehman-related risk on and after September 15, 2008.

As set forth in the chart attached as Appendix A hereto, Plaintiffs have determined that the existing derivatives-related document custodians generally held senior trading or management roles that would have made them unlikely to have been involved in the actual day-to-day trading activity by which Citi's trading desks managed their risk. Indeed, Citi has previously explicitly taken the position that the individuals most likely to possess relevant information were only head traders and those "substantively involved" in close-out calculations. *See* October 4 Letter at 6-7. But while these individuals may have had primary responsibility for overseeing the purported close-out valuation of Citi's Lehman-facing derivatives trades, the absence of documents in Citi's production relating to the management of the management books or the risk resulting from the termination of all derivatives trades between Lehman and Citi strongly suggests that, contrary to Citi's representations, these individuals did not have primary responsibility for managing either the management books or the Lehman-related risk. Moreover, none of the existing custodians appears to have had direct responsibility for many of the specific types of derivatives trades that are the subject of the greatest valuation differences between Plaintiffs and Defendants.

Instead, using documents produced to date, Plaintiffs have identified hundreds of additional Citi employees who appear to have had direct responsibility for trading, selling, or otherwise managing the specific types of derivatives trades at issue. From among these hundreds of employees, Plaintiffs have identified the seventy individuals listed in Appendix B hereto as being far more likely than the current custodians to have had actual responsibility for managing Citi's Lehman-related management books and the risk resulting from Lehman's withdrawal from the derivatives market, including by conducting actual trades of the products at issue in this case. These individuals fall into four categories, each of which we discuss in turn.

First, we have identified twenty-three <u>traders</u> who had responsibility for trading many of the specific derivatives products found in Citi's portfolio of Lehman-facing trades. In the

immediate aftermath of Lehman's bankruptcy filing, the risk positions which these traders managed would have changed as a result of the termination of the Lehman trades. To address and mitigate this sudden change in risk exposure, these traders would likely have entered into certain new trades to re-balance the risk in their books and, to the extent desirable, substantially replace the economic benefits of the Lehman trades. These traders are therefore likely to possess relevant information regarding the costs, if any, they incurred in identifying and executing these new trades, which, as previously noted, constitutes probative evidence of the actual cost to Citi to re-establish the economic equivalent of its Lehman-facing trades.

Second, we have identified twenty-one salespeople who had responsibility for providing, soliciting and facilitating bids and offers on many of the specific derivatives products found in Citi's portfolio of Lehman-facing trades. These salespeople would have worked closely with the traders discussed above to identify and execute new trades designed to mitigate any risk resulting from Lehman's default. They are also likely to have information relevant to Citi's very substantial "add-ons" to its claims based on alleged bid/offer spreads, and to whether Citi as a market maker was a payer or receiver of such spreads.

Third, we have identified twenty individuals with middle office responsibilities related to many of the specific derivatives products found in Citi's portfolio of Lehman-facing trades, including product or financial controllers, operations specialists, and risk managers. Many of these individuals are specifically identified in documents produced by KPMG LLP as having immediate knowledge of the close-out valuation process. In addition, these middle-office personnel would have been directly involved in setting up the "management books" and "swing accounts" through which Citi collected and assigned close-out values to its Lehman-facing derivatives trades; in "transferring" Lehman-facing derivatives trades from trading desks to swing accounts and management books; and in booking new trades designed to mitigate Lehman-related risk.

Fourth, we have identified six business unit heads or chief administrative officers who, by Citi's own reasoning, would have been the most likely source of relevant information regarding the close-out valuation process for their business units, but whom Citi omitted from their initial set of proposed custodians.

Given the absence of any significant volume of documents in Citi's production detailing the management of Citi's Lehman-related management books, or the trading activity by which Citi managed the risk that resulted from the termination of Lehman derivative trades on and after September 15, 2008, and given the likelihood that such information is likely to be found in the custodian files of the traders, salespeople, middle-office personnel and administrators mentioned above, Plaintiffs hereby request that Citi promptly search and produce relevant documents and communications (including electronic communications such as e-mails and all forms of Bloomberg correspondence) from the files and accounts of the individuals listed in Appendix B hereto.

To assist Citi in its identification, collection, and production of relevant documents, and to ensure that this supplemental production is appropriately limited in scope, Plaintiffs propose that Citi apply the product-related search terms and date ranges identified in Appendix C hereto.

In addition to identifying the individuals listed in Appendix B, Plaintiffs, with the knowledge gleaned from their review of Citi's derivatives documents produced to date, have now identified the names of the trading books and management books through which Citi traded or to which it transferred its Lehman derivative trades. These books are listed in Appendix D hereto. As noted above, Plaintiffs have repeatedly requested information regarding trading activity that would have been conducted in and through these books, including documents concerning Citi's efforts to mitigate its losses resulting from the termination of the Lehman derivative trades (Plaintiffs' RFP 58), documents concerning Citi's efforts to hedge its positions in connection with its credit, rates, foreign exchange, securitized products, and other derivatives product portfolios (Plaintiffs' RFP 99); documents concerning Citi's actions to hedge its positions in connection with the Lehman derivative trades in particular (Plaintiffs' RFP 62); and documents concerning Citi's actual losses in connection with the Lehman derivative trades, including documents concerning replacement trades, efforts to mitigate losses, and actions taken to hedge positions (Plaintiffs' RFP 92).

These clear and repeated requests were designed to identify documents reflecting the day-to-day management of the trading and management books. Responsive documents include (1) documents showing the day-to-day management of the positions in each book, including position management spreadsheets, records from derivatives management systems such as "Calypso" and "Summit," or records from web-based position management applications; (2) documents reflecting executed trades associated with each book, including trade blotters; activity reports; and confirmations from electronic trading platforms; (3) documents reflecting Citi's profit and loss from, or valuation of, executed trades associated with each book, including sales credit reports, profit and loss reports, profit and loss explanation reports, profitability-per-trade reports, and profitability-per-counterparty reports; (4) documents reflecting Citi's valuation of reference entities, obligations, or curves held on the trading books, including quote sheets and blotters reflecting quotes given or received; (5) documents reflecting Citi's evaluation of its position for each book, including end-of-day commentaries, market condition summaries, interdealer counterparty summaries, and reports reflecting liquidity, capital, financing, or other charges or reserves; and (6) policies or procedures for determining sales credits, profitability per transaction, risk-adjusted return per transaction, counterparty credit charges per transaction, or liquidity, capital, financing, or other charges or reserves.

Our review of the documents produced to date indicates that Citi has failed to produce any of the foregoing categories of documents for any of the trading or management books listed in Appendix D in any substantial volume. Given the relevance of each of these categories of documents to Citi's management of its Lehman-related risk, Plaintiffs hereby request that Citi promptly locate and produce all documents responsive to Plaintiffs RFPs 58, 62, 92, and 99, including specifically the categories of documents listed above.

In order to ease the burden of production of both the documents responsive to the custodians and search terms identified in Appendices B and C and the categories of documents identified above, Plaintiffs are willing to limit the time window to the period September 8, 2008 to September 22, 2008 inclusive.

Finally, given the pace of Citi's document productions to date, it seems clear that Citi will be unable to collect and produce the requested materials within a time frame that would allow the parties to complete fact discovery by the existing June 27, 2014 deadline. Indeed, in light of Defendants' production of nearly half a million pages of documents *after* the deadline for substantial completion of party document discovery, as well as defendants' weeks-long refusal to designate witnesses or schedule depositions in response to Plaintiffs' Rule 30(b)(6) notices, it appears unlikely that the parties would be able to complete fact discovery by the current deadline in any event. We therefore propose that the parties agree to an amended discovery schedule that would extend the deadline for completion of fact discovery and that the parties meet and confer to agree upon significantly revised dates for the remaining deadlines in the existing scheduling order. That proposed deadline is, of course, dependent on Citi's ability to collect and produce these documents promptly.

Please confirm by May 2, 2014 your agreement to collect and produce documents from the custodians identified in Appendix B through the application of search terms set forth in Appendix C as requested. Alternatively, please advise us of dates and times when you are available to meet and confer this week regarding our requests herein.

Very truly yours,

Andrew J. Rossman

## Citi Custodians

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product: Credit** | | | | Carey Lathrop | | | | | | | | |
| | US | | | | Brian Archer<br>Marc Pagano (EM) | Michelle Berard | | | | Arthur Valdes | Shahed Shafi | Declan Hogan |
| | | Single Name | | | | | | | | | | |
| | | | Financials | | | | | Tom Giardi<br>Scott Balkan | | | | |
| | | | Emerging Markets | | | | | | | | | |
| | | | Consumer Services | | | | | | | | | |
| | | | Consumer Goods | | | | | | | | | |
| | | | Industrials | | | | | Derek Hafer | | | | |
| | | | Basic Materials | | | | | Derek Hafer | | | | |
| | | | Telecom | | | | | Brian Connors | | | | |
| | | | Technology | | | | | Brian Connors<br>Scott Goodwin | | | | |
| | | | Oil and Gas | | | | | | | | | |
| | | | Health Care | | | | | | | | | |
| | | | Utilities | | | | | | | | | |
| | | Index | | | | | Vikram Prasad | | | | | |
| | | | Investment Grade | | | | | Jia Chen | | | | |
| | | | High Yield | | | | | Bis Chatterjee | | | | |
| | | Index Tranche | | | | | | | | | | |
| | Europe | | | | Mickey Bhatia | Virginia Laird | | | | | | |
| | | Single Name | | | | | Tim Gately | | | | | |
| | | | Consumer Services | | | | | | | | | |
| | | | Basic Materials | | | | | | | | | |
| | | | Industrials | | | | | Conor Davis | | | | |
| | | | Consumer Goods | | | | | Robert Dockray | | | | |
| | | | Utilities | | | | | | | | | |
| | | | Telecom | | | | | Alan Pierce | | | | |
| | | | All Other Sectors | | | | | Matt Watson<br>Rob Smith | | | | |
| | | Index | | | | | | | | | | |
| | | | | | | | | Antoine Pain | | | | |
| | | Index Tranche | | | | | | | | | | |
| | Asia | | | | | Kevin Green | | | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product: Rates** | | | | Stephen Compton | | | | | | | | |
| | US | | | | Brendan Lavelle | Stuart Bancroft | | | | | Michael Gambelli | Michasel Silvestro |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Swaptions/Callable Swap | | | | | | | | | | Karen Taylor |
| | | Swap/FRA - Generic | | | | | | | | | | Attilio Zotti |
| | | Inflation | | | | | | | | | | |
| | | Exotics | | | | | | | | | | |
| | | Rates structuring | | | | | | | | | | |
| | Europe | | | | Matthew Jerman | Anthony Gardiner | | Andrew Thursfield / Karol Tokarczyk | | Eric Hirschhorn | | |
| | | Inflation | | | | | | | | | | |
| | | Swaptions/Callable Swap | | | | | | | | | | |
| | | Swap/FRA - Generic | | | | | | | | | | |
| | | Exotic - $10mm diff | | | | | | | | | | |
| | | Cross Currency Swap | | | | | | No Traders | Alain Verdickt | | | | |
| | Asia | | | | | | Barry Clark | | | | | |
| | | Swap/FRA - Generic | | | | | | | Varadarajan Subbaraman | | | | |
| | | Swaptions/Callable Swap | | | | | | | | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product: Securitized Products** | | | | Frederic Jallot / Richard Stuckey | | | | | | | | |
| | US | | | | | | | | Jim Wohlbruck | Joshua Kogan / Theron Howard / Adam Knowles / Alex Manton | | Laura Cloughley |
| | | Single Name CDS on RMBS | | | | | Eliot Rubenzahl | Simon D. Jones / Jennifer Podurgiel / Richard Skeet / Mark Tsesarsky / Brian Yarringson | | | | |
| | | CDS on Index RMBS | | | | | Jay Huang | Teddy Counihan | | | | |
| | | Other | | | | | No Trader | Warren Geiger | | | | |
| | Europe | Single Name CDS on RMBS | | | | | | Rohit Hemdev | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Product: Foreign Exchange** | | | | Jeff Feig | | | | | | | | |
| | Europe | | | | James Bindler / Anil Prasad | Michael Page | Nigel Khakoo | Itay Tuchman / Matthew Turnbull | Katherine Lukas | Murali Enamandram | Christopher Dale | |
| | | European Options | | | | | | | | | | |
| | | Forwards | | | | | | Chad Shampine | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Spot/CLS | | | | | | Robert Degroot Giles Page | | | | |
| | Asia | | | | Nadir Mahmud | | Umesh Jagtiani | | | | | |
| | | European Options | | | | | Pritpal Gill | | | | | |
| | | Forwards | | | | | Arnold Bengco | | | | | |
| | | Spot/CLS | | | | | | | | | | |
| | US | Spot/CLS | | | Jose Luis Yepez | | Nilton David | Simon Jones | Ajay Kasuganti | | | |
| | | Options | | | | | | | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Product: Commodities | | | | John Casaudoumecq | | | | | | | | |
| | US | | | | Stuart Staley | John Borin | | | | | | |
| | | Swap/Forward | | | | | Charles Carlton (NYMEX/Natural Gas) | Eric Elder (power) Mark Sickafoose (Nat Gas & TraderPower) | | | | |
| | | Option | | | | | | | | | | |
| | Europe | | | | | | | Navin Parasram | | | | |
| | Asia | | | | | | | | | | | |

| | Region/Currency | Subtype | Sector | Senior Mgmt | Business Head | Admin | Trading Desk Head | Traders | Salespeople | Operations | Risk Mgmt | Product Control |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Munis | | | | | Ward Marsh | | John Heppolette | Peter O'Connor | | | | |
| Equities | | | | | | | | | | Margaret Abullarage | | |

| Middle / Back Office | | | Oher | |
|---|---|---|---|---|
| Product Control | Naomi Benson | | Barlett, Mali | Global Transaction Services |
| | Gary Crittenden | | Blackburn, Robert | Global Transaction Services |
| | John Gerspach | | Byrne, Ciaran | Global Transaction Services |
| | Nayan Kisnadwala | | Chesakis, joseph | Global Transaction Services |
| | Frank Marsigliano | | Dehaan, Peter | Global Transaction Services |
| | William Mills | | Deukmejdjian, Chris | Global Transaction Services |
| | James Ollivierre | | Dock, Joyce | Global Transaction Services |
| | Carmine Pennella | | Faber, Reto | Global Transaction Services |
| | Brian Sewald | | Galant, Paul | Global Transaction Services |
| | David Sharland | | Galguera, Ilia | Global Transaction Services |
| | Steve Stone | | Gupte, Amol | Global Transaction Services |
| | Gordon Tanner | | Hewett, Edward A. | Risk |
| | Cliff Verron | | Isaac, Thomas | Global Transaction Services |
| | Charles Wainhouse | | Karimi, Amir | Global Transaction Services |
| Compliance | Cindy Armine | | Klimashousky, William | Legal |

| Legal | Scott Flood |
|---|---|
| | Karen Kirchen |
| | Zion Shohet |
| **Risk** | Yasmine Anavi |
| | Darryl Castro |
| | Greg Chin |
| | Colin Church |
| | John Dorans |
| | Richard Evans |
| | Gregory Frenzel |
| | Aldona Kowalska |
| | Brian Leach |
| | Didier Magloire |
| | Steve O'Leary |
| | Nancy Rochford |
| | James Trefry |
| **Counterparty Credit** | Andrew Anemone |
| | Gary Efterfield |
| | Shawn Feeney |
| | Tom Fontana |
| | Christopher Foskett |
| | Sugam Mehta |
| | Naresh Narayan |
| | Patrick Ryan |
| | Thomas Schwartz |
| | Melissa Torres |
| **Senior Management** | Sandeep Arora, COO FICC |
| | James Forese |
| | John Havens |
| | Jeff Perlowitz |
| | Paco Ybarra |

| Knorr, Michael | FX IT (CLS) |
|---|---|
| Letzelter, Brian | Middle Office |
| Mallek, William | Middle Office |
| Mauerstein, Michael | Financial Institutions, Broker Dealers |
| Obermaier, Tom | Global Transaction Services |
| Olivo, Jerry | Global Transaction Services |
| Omori, Shigeo | Risk Treasury |
| Ong, Kathy | Global Transaction Services |
| O'Shea, Sean | Operations, Cash |
| Pajnee, Sidharth | Total mystery |
| Saez-Benito, Jose-Maria | Global Transaction Services |
| Sahai, Neeraj | Global Transaction Services |
| Schneggenburger, Maddie | Global Transaction Services |
| | |
| Shareef, Sharika | Global Transaction Services |
| Silbiger, Julius | Global Transaction Services |

**Appendix B**

| Credit | Traders | Salespeople | Middle Office | Administrative |
|---|---|---|---|---|
| | Agrest, Alberto | Andrews, Steve | Lu, Grace | Meyer, Carl |
| | Bonner, Sean | Berkeley, James | Patel, Neel | |
| | Desplinter, Mark | Enright, Thomas | Phelan, William | |
| | Djunic, Luka | Fleming, Ryan | Schwartz, Josh | |
| | Dolan, Brendan | Gallen, Craig | | |
| | Kenney, Gonzalo Garcia | Gibbons, Jeffrey | | |
| | Martinic, Michael | Haider, Syedi | | |
| | Mills, Richard | Totman, Christopher | | |
| | Stooksbury, Chris | Alex May | | |
| | Wilson, Paul | Michael Fishkin | | |

| Rates | Traders | Salespeople | Middle Office | Administrative |
|---|---|---|---|---|
| | Berenger, Mathias | Brooks, Mark | Brown, Phillip | |
| | Bradbury, David | Chang, Roger | Showell, John | |
| | Bronsnick, Lee | Katz, Philippe | Kohli, Amit | |
| | Elsley, David | Lurensky, Steve | | |
| | Goldenberg, Sebastian | Ristine, Peter | | |
| | Karthik, Marangatty | Staniford, Daniel | | |
| | Nakano, Hideki | Von May, Alex | | |
| | Ozdemir, Bogac | | | |
| | Sagui, Patrick | | | |

| Foreign Exchange | Traders | Salespeople | Middle Office | Administrative |
|---|---|---|---|---|
| | Edwards, Ian | Widmer, Bruno | Bell, Mark | Cooper, Daniel |
| | Maitra, Bapi | Jayanti, Anu | Winkler, David | Herman, Rachelle |
| | Patel, Chriag | | | Goh, Geraldine |

| Securitized Products | Traders | Salespeople | Middle Office | Administrative |
|---|---|---|---|---|
| | Cappasso, Marta | Laroche, Manon | | Paulson, Nancy |
| | | Wohlbruck, Jim | | |

| Other | Traders | Salespeople | Middle Office | Administrative |
|---|---|---|---|---|
| | | | Asselta, Joe | Braga, Ricardo |
| | | | Carella, Pat | |
| | | | Green, Stephen | |
| | | | Kumar, Naresh | |
| | | | Loft, Daniel | |
| | | | Navalka, Rajesh | |

| | | | Nudge, Gerald | |
|---|---|---|---|---|
| | | | Puskuldjian, Paul | |
| | | | Roda, Ron | |
| | | | Stratton, Chris | |
| | | | Trombetta, Santo | |

**Appendix C**

| Custodian Group | Date Range | Search Term |
|---|---|---|
| Credit Traders<br>Credit Salespeople | 9/8/2008 – 9/22/2008 | VENZ or Vene or Venez or Venezuela or VE or VZ or Ven or<br>ABK-AssurCorp or Ambac or ABK or ABK2 or monoline or insurers or<br>ARGENT or AR or Argy or Argen or Argent or Argentina or<br>F-MotCrLLC or Ford or Fmot or FMC or<br>PHILIP or Philippines or PH or<br>GM-ResCLLC or rescap or GMACLL or GM or "Gen Mot" or GMAC or<br>MBI or MBIA or MBI-InsCorp or<br>BRAZIL or BR or BZ or WM or Wamu or "Washington Mutual" or<br>PMI or MGIC or Magic or GAZPRU or Gaz or Gazprom or ECUA or ECU or EC or Ecuador or HNZ or HEINZ or CBS! or UPS or Parcel or "Big Brown" or VOD or Vodafone or Main! CDX! or ITRAXX! or ITX! or IG! or HY! |
| Rates Traders<br>Rates Salespeople | 9/8/2008 – 9/22/2008 | ((rate! or swap! or straddl!) and (Closeout or "Close out" or close-out or "claim determination" or price or "claim amount" or "claim construction" or "Termination Time") and (morning or AM or open) and (close or EOD or COB or "closing levels") and ("September 15th" or "9/15" or "15-Sep"))<br><br>((rate! or swap! or straddl!) and (pay or receive or payer or receiver or fixed or "fixed- |

| | | |
|---|---|---|
| | | float" or Libor or callable or cancellable or Berm! or skew or ATM or "risk reversal" or TWD or TIIE or MXN or "cross currency" or XCCY or "initial exchange" or principal or "AUD/USD" or "bank bills" or "EUR/USD" or euribor or "low strike" or INR or (bp w/3 vol!) or (norm w/3 vol!) or volatility or skew or gamma or vega)) |
| Foreign Exchange Traders Foreign Exchange Salespeople | 9/8/2008 – 9/22/2008 | "AUD/USD" or AUDUSD or "EUR/USD" or EURUSD or "EUR/ZAR" or EURZAR or "GBP/USD" or GBPUSD or "USD/JPY" or USDJPY or "USD/KRW" or USDKRW or "USD/TRY" or USDTRY or "USD/BRL" or USDBRL or "USD/CLP" or USDCLP or "USD/INR" or USDINR or "USD/MXN" or USDMXN or "USD/CHF" or USDCHF or delta or spot or forward or "forward points" or "forward pts" or vega or EBS or vol or volatility or smile or "risk reversal" or skew or ATM or butterfly or OTM or "vol surface" or Reuters or ITM or basis curve or RR or BF or riskie or fly or NDF or call or put or strike or premium or strangle or straddle or pips |
| Securitized Products Traders Securitized Products Salespeople | 9/8/2008 – 9/22/2008 | CMBS or CMBX! or RMBS ABX! or subprime or CDO or CLO or mortgage! or "ABS CDO" or mtge or ABS or ABSCDS |

| | | |
|---|---|---|
| Credit Middle Office<br>Rates Middle Office<br>Foreign Exchange Middle<br>Office<br>Securitized Products Middle<br>Office<br>Other Middle Office | 9/8/2008 – 9/22/2008 | p&l or pnl or "p and l" or p/l<br>or pl or "p & l" or "profit &<br>loss" or "profit and loss" or<br>reserve! or adjust! or book! or<br>transfer! or terminat! or hedg!<br>or replac! |
| Credit Administrative<br>Foreign Exchange<br>Administrative<br>Securitized Products<br>Administrative | Group C Date Range | Group C Search Terms |

Appendix D

| | | TRADING BOOKS | | LEHMAN ACCOUNTS | | |
|---|---|---|---|---|---|---|
| Strtgy | DESK | POD | BOOK | LEH (M3C) | HEDGE (M3D) | ENTITY |
| **FLOW CREDIT TRADING** | | | | | | |
| A05 | HGT | POD51 | BANKS / BROKERS / FINANCE | LEHUSHG | HDGUSHG | CBNA |
| A94 | HGT | POD 94 | HYBRIDS / DRDs / PRFDS LEGACY | | | |
| A17 | HGT | POD 17 | HYBRIDS / DRDs / PRFDS | | | |
| A01 | HGT | POD 11 | RETL / CONS / PHARMS & HLTH / G&L | | | |
| A07 | HGT | POD 71 | DIV INDS / CHEM / REITS | | | |
| A60 | HGT | POD 60 | UTES / PIPES / ENERGY | | | |
| A75 | HGT | POD ST | SHORT TERM / FRNS | | | |
| A03 | HGT | POD 31 | HG TMT | | | |
| A55 | HGT | POD 55 | PAPER & PKG / HOME / M&M / RAIL & DEF | | | |
| A16 | HGT | POD 16 | INSURANCE | | | |
| A04 | CTA | IT | INDEX REPLICATION TRADES | | | |
| A30 | CTA | IT | INDEX FLOW TRADES | | | |
| A21 | HGT | HG MGMT | HG MGMT / ERRORS / TOPSIDES | | | |
| A21 | HGT | HG MGMT | HG MGMT / ERRORS / TOPSIDES | | | |
| A54 | HGT | POD 54 | HG MGMT / ERRORS / TOPSIDES | | | |
| A50 | HGT | POD 50 | MONOLINES / MTG INS | LEHMONO | HDGMONO | CBNA |
| A21 | HGT | GPO | | LEHGPO | HDGGPO | CBNA |
| A21 | HGT | GPO | | LEHGPO2 | HDGGPO2 | CGML |
| A21 | HGT | COLLECTOR | | LEHCOLL | HDDGCOLL | CGML |
| C5M | ACT | JPY | JPY CREDIT TRADING | LEHJPY | HDGJPY | CBNA |
| A02 | HYT | POD 21 | AUTO / AUTOPARTS | LEHUSHY | HDGUSHY | CBNA |
| A06 | HYT | POD 61 | HY TECH / INTELESAT | | | |
| A20 | HYT | POD 20 | HY MM / IPG / TSG | | | |
| A2A | HYT | POD 62 | HY PAPER / PKG / PUB | | | |
| A08 | HYT | POD 81 | RETAIL / CHEM / HLTHCARE | | | |
| A40 | HYT | POD 41 | RETL & SM / TOB / GAMING / FOOD & REST | | | |
| AA1 | HYT | POD A1 | LETTERS OF CREDIT | | | |
| AA2 | HYT | POD A2A | FIAT SWAPS | | | |
| A09 | HYT | POD 91 | UTES / PIPES / ENERGY | | | |
| A22 | HYT | HYR | HY RESEARCH | | | |
| A22 | HYT | HY MGMT | HY MGMT / ERRORS / TOPSIDES | | | |
| A22 | HYT | HY MGMT | HY MGMT / ERRORS / TOPSIDES | | | |
| | HYT | | | LEHCOLL2 | HDGCOLL2 | CGML |
| A10 | CAN | CCAT | US CAPITAL STRUCTURE | LEHCAN | HDGCAN | CBNA |
| A14 | CAN | CCAT1 | US CAPITAL STRUCTURE | | | |
| M3B | CAN | CCAT3 | US CAPITAL STRUCTURE | | | |
| 974 | EHG | BSP | BROKERS, SUBS, PERPS | LEHEHG | HDGEHG | CGML |
| 974 | EHG | SCP | SENIOR, CORPS, PREFS | | | |
| 974 | EHG | BC | BANK CAP & INSURACE | | | |
| 974 | EHG | BBI | BANK CDS & LT2 | | | |
| 975 | EHG | TMT | TMT | | | |
| L35 | EHG | MM | MATERIALS & MINING | | | |
| 973 | EHG | UEA | UTILITIES / EURO AUTOS | | | |
| L29 | EHG | UAP | INDUSTRIALS & PERPS | | | |
| 804 | EJM | MGMT | CHARGES | | | |
| 65H | EJM | MGMT | EUR HG MGMT | | | |
| 996 | EHG | SOV | SOVEREIGNS | | | |
| 978 | EHG | IJV | ILLIQUIDS JV | | | |
| 766 | EHG | IJV | ILLIQUIDS JV | | | |
| 742 | EHG | IJV | ILLIQUIDS JV | | | |
| 942 | EHG | SOV | ILLIQUIDS JV | | | |
| | EHG | | | LEHCNAL | HDGCNAL | 2C |
| 385 | EJM | GPO | GPO TRADES | LEHGPOE | HDGGPOE | CGML |
| | EHG | | | LEHCITI | HDGCITI | 3C |
| | EHG | | | LEHNEW | HDGNEW | 3C |
| 976 | EHY | EHY | EUR HY TRADING 1 | LEHEHY | HDGEHY | CGML |
| 976 | EHY | EHY | EUR HY TRADING 2 | | | |
| 976 | EHY | EHY | EUR HY TRADING 3 | | | |
| 990 | CAE | CAE | EUROPE CAP STRUCTURE | LEHCAE | HDGCAE | CGML |
| **DISTRESSED FLOW** | | | | | | |
| A95 | DFN | DFNA | US DISTRESSED FLOW | LEHDFN | HDGDFN | CBNA |

Appendix D

| | TRADING BOOKS | | | | LEHMAN ACCOUNTS | | |
|---|---|---|---|---|---|---|---|
| Strtgy | DESK | POD | BOOK | | LEH (M3C) | HEDGE (M3D) | ENTITY |
| A42 | DFN | POD 42 | HOMEBUILDERS | | LEHA42 | HDGA42 | CBNA |
| 95J | DFE | DFE | EUROPE DISTRESSED FLOW | | LEHDFE | HDGDFE | CGML |
| 68H | DFE | DFE | EUROPE DISTRESSED FLOW | | | | |
| 95K | DFA | DFA | AP DISTRESSED FLOW | | LEHDFA | HDGDFA | CBNA |
| | | | | | | | |
| **EM CREDIT TRADING** | | | | | | | |
| 064 | EML | YANK | LDC YANKEES | | LEHEM3C | HDGEM3C | CBNA |
| 074 | EML | LABL | LAT AM BRADY / LOAN | | LEHEM02 | HDGEM02 | CBML |
| 076 | EML | LADLCL | NY LAT AM EM DERIV LCL MKTS | | LEHEM2C | HDGEM2C | CITILND |
| 079 | EML | LAEMOPT | NY EM OTC OPTIONS | | LEHEM3CC | HDGEM3CC | CBNA |
| 178 | EML | LAEMDEXT | NY LAT AM EM DERIV EXT DEBT | | LEHEM02C | HDGEM02C | CBML |
| 179 | | | | | LEHEM2CC | HDGEM2CC | CITILND |
| 180 | EML | LADED1 | LA DERIV EXT DEBT 1 | | LEHEM06 | HDGEM06 | CFPI |
| 19H | EML | LADED2 | LA DERIV EXT DEBT 2 | | LEHEM93 | HDGEM93 | CGMPI |
| 19K | EML | LADED3 | LA DERIV EXT DEBT 3 | | | | |
| 07D | EML | LAC | NY FI EM CASH-S | | | | |
| | | | | | | | |
| 071 | EME | HYE | LDC HIGH YIELD EUROBONDS | | | | |
| 083 | EME | EEEMD | EUROPEAN EM DERIVATIVES | | | | |
| 181 | EME | EEEMDEXT | EM EUROPEAN DERIV EXT DEBT | | | | |
| 189 | EME | CITIEMD | EM CREDIT DERIV CITI | | | | |
| 345 | EME | EEEMOPT | EUROPEAN EM OPTIONS TRADING | | | | |
| 856 | EME | EMEB | EM EUROBONDS | | | | |
| 18A | EME | EMEU2 | EM EUROBONDS 2 | | | | |
| | | | | | | | |
| 080 | EMA | APEMF | AP EM FLOW | | | | |
| 780 | EMA | APEMD | AP CREDIT DERIVATIVES | | | | |
| 918 | EMA | APEMD | AP CREDIT DERIVATIVES | | | | |
| 79C | EMA | APMGT | AP CREDIT TRADING MGT | | | | |
| 79J | EMA | APCB | AP CREDIT TRADING CB | | | | |
| 79P | EMA | APCTSC | APCT STRUCTURED CREDIT | | | | |
| 79Q | EMA | APLC | APCT LOCAL CHAMPION | | | | |
| C3R | EMA | APLTH | AP CRED TRDG LONG TERM HOLD | | | | |
| | | | | | | | |
| **PECD** | | | | | | | |
| A11 | PECD | | NY CORRELATION | | LEHPSN | HDGPSN | CBNA |
| A11 | PECD | | NY CORRELATION | | LEHPID | HDGPID | CBNA |
| A11 | PECD | | NY CORRELATION | | LEHPIT | HDGPIT | CBNA |
| A11 | PECD | | NY CORRELATION | | LEHPBT | HDGPBT | CBNA |
| A11 | PECD | | NY CORRELATION | | LEHPLT | HDGPLT | CBNA |
| A11 | PECD | | NY CORRELATION | | LEHPSN2 | HDGPSN2 | CGML |
| A11 | PECD | | NY CORRELATION | | LEHPID2 | HDGPID2 | CGML |
| A11 | PECD | | NY CORRELATION | | LEHPIT2 | HDGPIT2 | CGML |
| A11 | PECD | | NY CORRELATION | | LEHPBT2 | HDGPBT2 | CGML |
| A11 | PECD | | NY CORRELATION | | LEHPLT2 | HDGPLT2 | CGML |
| | | | | | | | |
| 981 | PECD | | ABS CDO SECONDARY | | LEHCDO2 | HDGCDO2 | CBNA |
| | | | | | | | |
| C5S | PECD | | CLO MGMT | | LEHCLOMG | HDGCLOMH | CBNA |
| C6I | PECD | | CLO MGMT | | | | |
| C9T | PECD | | CLO SECONDARY | | LEHCLO2 | HDGCLO2 | CBNA |
| C9T | PECD | | CLO SECONDARY | | LEHCLO2S | HDGCLO2S | CBNA |
| | | | | | | | |
| 393 | PECD | | LONDON CORELATION | | LEHBCDS | HDGBCDS | 2C |
| 393 | PECD | | LONDON CORELATION | | LEHINCDS | HDGINCDS | 2C |
| 393 | PECD | | LONDON CORELATION | | LEHINTRN | HDGINTRN | 2C |
| 393 | PECD | | LONDON CORELATION | | LEHBTRN | HDGBTRN | 2C |
| 393 | PECD | | LONDON CORELATION | | LEHOPTN | HDGOPTN | 2C |
| 753 | PECD | | LONDON CORELATION | | LEHCDSCG | HDGCDSCG | CGML |
| 753 | PECD | | LONDON CORELATION | | LEHINCCG | HDGINCCG | CGML |
| 753 | PECD | | LONDON CORELATION | | LEHINTCG | HDGINTCG | CGML |
| 753 | PECD | | LONDON CORELATION | | LEHTRNCG | HDGTRNCG | CGML |
| 753 | PECD | | LONDON CORELATION | | LEHOPTCG | HDGOPTCG | CGML |

# EXHIBIT 4

# CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

| | | | |
|---|---|---|---|
| ALMATY | ISTANBUL | **ATTORNEYS AND COUNSELLORS AT LAW** | TELEPHONE 212-696-6000 |
| ASHGABAT | LONDON | | FACSIMILE 212-697-1559 |
| ASTANA | MEXICO CITY | 101 PARK AVENUE | WWW.CURTIS.COM |
| BEIJING | MILAN | NEW YORK, NEW YORK 10178-0061 | |
| BUENOS AIRES | MUSCAT | | |
| DUBAI | PARIS | | |
| FRANKFURT | WASHINGTON, D.C. | | |
| HOUSTON | | | |

WRITER'S DIRECT:
TEL.: 212-696-6146
E-MAIL: PBEHMKE@CURTIS.COM

March 5, 2014

**BY E-MAIL**

Claudia Hammerman, Esq.
Paul, Weiss, Rifkand, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Re:    *Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.*,
       **Adv. Proc. No. 12-01044 (S.D.N.Y.) (SCC)**

Dear Claudia:

Enclosed please find two notices for deposition pursuant to FRCP 30(b)(6).  Of course, we are amenable to discussing mutually convenient dates and times for the scheduling of these depositions.  Please note that Plaintiffs reserve the right to modify or supplement these notices and the listed deposition topics.

We are also in receipt of your March 4 letter regarding the scheduling of depositions.  We are coordinating and will revert with dates and times that work for a meet and confer to discuss the deposition process.

Sincerely,

Peter J. Behmke

cc:    Counsel of record

# EXHIBIT 5

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7362**

WRITER'S INTERNET ADDRESS
**ellisonward@quinnemanuel.com**

March 20, 2014

Claudia Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019

Re:    ***Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.***
 ***(In re Lehman Bros. Holdings Inc.),*** **No. 12-01044 (Bankr. S.D.N.Y.)**

Dear Claudia:

Enclosed please find a notice for the depositions of Brian Connors, Robert Dockray, Shahed Shafi, Antoine Pain, Josh Kogan, Itay Tuchman, Didier Magloire, Alain Verdickt, Tom Giardi, Richard Skeet, and Varadarajan Subbaraman.  Please let us know no later than March 27, 2014, if you do not represent any of these individuals.

We are generally available to meet and confer with you regarding these deposition notices.

Sincerely yours,

Ellison S. Ward

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Andrew J. Rossman
Daniel P. Cunningham
Diane C. Hutnyan
51 Madison Avenue, 22nd Floor
New York, New York 10010
*Counsel for the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP., and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | Adversary Proceeding |
| INC., *et al*. | : | No.:  12-01044 (JMP) |
| Plaintiffs and Plaintiff Intervenor, | : | |
| | : | |
| -against- | : | |
| | : | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | |
| CITIGROUP ENERGY INC., CITI CANYON LTD., CITI | : | |
| SWAPCO INC., FYI LTD., FFI FUND LTD, AND | : | |
| OLIFANT FUND, LTD. | : | |
| | : | |
| Defendants and Defendant Intervenors. | : | |

------------------------------------------------------------------------ X

## NOTICE OF DEPOSITIONS OF BRIAN CONNORS, ROBERT DOCKRAY, SHAHED SHAFI, ANTOINE PAIN, JOSH KOGAN, ITAY TUCHMAN, DIDIER MAGLOIRE, ALAIN VERDICKT, TOM GIARDI, RICHARD SKEET, AND VARADARAJAN SUBBARAMAN PURSUANT TO FED. R. BANKR. P. 7030

PLEASE TAKE NOTICE that, pursuant to Rule 7030 of the Federal Rules of Bankruptcy

Procedure and Rule 30 of the Federal Rules of Civil Procedure, Plaintiffs Lehman Brothers

Holdings Inc, Lehman Brothers Special Financing Inc,. Lehman Brothers Commodity Services

Inc., Lehman Brothers Commercial Corp., and Intervenor-Plaintiff Official Committee of

Unsecured Creditors of Lehman Brothers Holdings, Inc., by and through their attorneys, will

take the depositions upon oral examination of Brian Connors, Robert Dockray, Shahed Shafi,

Antoine Pain, Josh Kogan, Itay Tuchman, Didier Magloire, Alain Verdickt, Tom Giardi, Richard

Skeet, and Varadarajan Subbaraman at the following dates and times:

1. DEPONENT: Brian Connors

   DATE: April 21, 2014

   TIME: 9:00 a.m.

2. DEPONENT: Robert Dockray

   DATE: April 22, 2014

   TIME: 9:00 a.m.

3. DEPONENT: Shahed Shafi

   DATE: April 23, 2014

   TIME: 9:00 a.m.

4. DEPONENT:Antoine Pain

   DATE: April 24, 2014

   TIME: 9:00 a.m.

5. DEPONENT: Josh Kogan

   DATE: April 25, 2014

   TIME: 9:00 a.m.

6. DEPONENT: Itay Tuchman

   DATE: April 28, 2014

   TIME: 9:00 a.m.

2

7.  DEPONENT: Didier Magloire

DATE: April 29, 2014

TIME: 9:00 a.m.

8.  DEPONENT: Alain Verdickt

DATE: April 30, 2014

TIME: 9:00 a.m.

9.  DEPONENT: Tom Giardi

DATE: April 28, 2014

TIME: 9:00 a.m.

10. DEPONENT: Richard Skeet

DATE: April 29, 2014

TIME: 9:00 a.m.

11. DEPONENT: Varadarajan Subbaraman

DATE: April 30, 2014

TIME: 9:00 a.m.

All depositions will take place at the offices of Quinn Emanuel, Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, or at another time and place as may be agreed upon by counsel, and will continue from day to day until completed. The depositions will be taken before a person qualified to administer oaths and will be videotaped

and recorded stenographically.

Dated:  March 20, 2014                 QUINN EMANUEL URQUHART & SULLIVAN LLP


                                       By:/s/ Diane C. Hutnyan
                                       _____

                                           Andrew J. Rossman
                                           Daniel P. Cunningham
                                           Diane C. Hutnyan
                                           51 Madison Avenue, 22nd Floor
                                           New York, New York 10010
                                           Telephone: (212) 849-7000
                                           Facsimile: (212) 849-7100

                                           *Special Counsel for Official Committee of
                                           Unsecured Creditors of Lehman Brothers Holdings
                                           Inc.*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on March 20, 2014 a true and correct

copy of the foregoing DEPOSITION NOTICE was caused to be served by e-mail on the parties

listed below:


Claudia Hammerman, Esq. – CHammerman@paulweiss.com
Stephen J. Shimshak, Esq. – Sshimshak@paulweiss.com
William Clareman, Esq. – Wclareman@paulweiss.com
George Kroup, Esq. – Gkroup@paulweiss.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
51 West 52nd Street
New York, New York 10019
*Counsel for Citibank, N.A.*

D. Ross Martin, Esq. – Ross.Martin@ropesgray.com
James A. Wright, Esq. – James.Wright@ropesgray.com
Lisa Coyle, Esq. – Lisa.Coyle@ropesgray.com
Michael Jo, Esq. – Michael.Jo@ropesgray.com
Catherine Mondell, Esq. – Catherine.Mondell@ropesgray.com

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
*Counsel for FYI Ltd., FFI Fund Ltd., and Olifant Fund Ltd.*

Turner P. Smith, Esq. – tsmith@curtis.com
L.P. Harrison 3rd, Esq. – lharrison@curtis.com
Andrew H. Seiden, Esq. – aseiden@curtis.com
Peter J. Behmke, Eqs. – pbehmke@curtis.com

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178
*Counsel for the Lehman Plaintiffs*


*/s/* Ellison S. Ward

# EXHIBIT 6

**QUINN EMANUEL**
**URQUHART & SULLIVAN, LLP**
51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
*Counsel for the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------------------ X

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS INC., LEHMAN | : | |
| BROTHERS SPECIAL FINANCING INC., LEHMAN | : | |
| BROTHERS COMMODITY SERVICES INC., LEHMAN | : | |
| BROTHERS COMMERCIAL CORP. and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF LEHMAN BROTHERS HOLDINGS | : | |
| INC., | : | |
| Plaintiffs | : | |
| | : | |
| | : | |
| -against- | : | |
| | : | Adversary Proceeding |
| | : | |
| CITIBANK, N.A., CITIGROUP GLOBAL MARKETS | : | No.: 12-01044 (JMP) |
| LTD., CITIGROUP FINANCIAL PRODUCTS INC., | : | |
| CITIGROUP ENERGY INC., CITI CANYON LTD., CITI | : | |
| SWAPCO INC., FYI LTD., FFI FUND LTD., and | : | |
| OLIFANT FUND, LTD. | : | |
| | : | |
| | : | |
| | : | |
| Defendants and | | |
| Defendant Intervenors. | : | |

------------------------------------------------------------------------ X

### PLAINTIFFS' RULE 30(b)(6) DEPOSITION NOTICE TO CITIBANK *ET AL.*

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, Plaintiffs and Lehman Brothers Holdings Inc., Lehman Brothers Special Financing

Inc., Lehman Brothers Commodity Services Inc., Lehman Brothers Commercial Corp., and

Intervenor-Plaintiff Official Committee of Unsecured Creditors of Lehman Brothers Holdings

Inc., by and through its attorneys, will take the deposition, upon oral examination, under oath, of

Defendants Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products Inc.,

Citigroup Energy Inc., Citi Canyon Ltd., and Citi Swapco Inc., through the officers, directors,

agents, or other persons with the most knowledge concerning the topics listed in Schedule A

hereto.  The deposition will commence at 9:30 a.m. on May 5, 2014 at 51 Madison Avenue, 22nd

Floor, New York, New York 10010, or at such date, time, and place as is otherwise agreed to by

the parties or ordered by the Court.  The deposition will be taken by a notary public or other

authorized officer and will continue from day to day until completed at a future date or dates.

PLEASE TAKE FURTHER NOTICE that, pursuant to Federal Rule of Civil

Procedure 30(b)(3), the deposition will be videotaped and recorded stenographically.

Dated:       New York, NY
             March 5, 2014

QUINN EMANUEL URQUHART & SULLIVAN
LLP

By: ___/s/ Andrew J. Rossman_____

Daniel Cunningham
Andrew J. Rossman
Diane C. Hutnyan
51 Madison Avenue
New York, New York 10010

*Special Counsel for the Official Committee Of
Unsecured Creditors Of Lehman Brothers Holdings
Inc.*

## SCHEDULE A

### Definitions

As used herein,

1.  "Business Unit" means any front office, middle office, or back office function, desk, or group, including but not limited to any trading desks, risk management groups, operations units, collateral management groups, market making and non-market making groups, management trading books, proprietary trading groups, asset/liability management groups.

2.  "Citi" means Citibank, N.A., Citigroup Global Markets Ltd., Citigroup Financial Products, Inc., Citigroup Energy Inc., Citi Canyon Ltd., and/or Citi Swapco Inc.

3.  "Derivatives" means any transaction whose value is derived from an underlying asset, index, or other determinant of value, including but not limited to credit derivatives (including credit default swaps referred to as structured products and securitized products), interest rate derivatives, foreign exchange derivatives, equity derivatives, and commodity derivatives.

4.  "Derivatives Information" means any information pertaining to Derivatives transactions, including but not limited to trade details, indications, bid/offers, pricing, mark to market values, risk management, profit and loss, performance management such as sales credits, profitability of individual transactions, profitability per counterparty, and collateral management of derivatives and related exposure including cash securities and exchange traded products.

### Examination Topics

Each topic herein seeks information regarding the period from January 1, 2008 to December 31, 2008.  The topics on which examination is requested are:

1.  The structure and organization of Citi's Derivatives business and operations, including but not limited to:

    (a) the structure and organization of all of Citi's Business Units engaged in Derivatives trading or Derivatives-related activities, including, but not

limited to, operations, sales and marketing, risk management, and counterparty credit risk management; and

(b) the identification and description, including primary business purpose, of each trading desk engaged in Derivatives trading, including but not limited to identification of traders, sales staff/marketers, and other personnel responsible for communicating with Derivative counterparties and other Derivative market-makers.

2.    The identification and description of any systems or databases used by Citi to process, gather, and store Derivatives Information, or to which Citi contributed or provided Derivatives Information.

3.    The identification and description of any models, tools, or spreadsheets on which Citi trading, sales and marketing, or credit or risk management personnel relied in the daily trading, marketing, or risk management of Derivatives and related exposure.

4.    The identification and description of any outside services that Citi used or relied on for the management of Derivatives, including, but not limited to, any services used for purposes of trade compression, netting, or otherwise offsetting, reducing, or managing Derivatives and related exposure.

5.    Citi's policies and procedures for maintaining, archiving, indexing, and storing data related to Derivatives trades and positions, including, but not limited to, electronic and telephonic communications.

6.    Citi's policies and procedures regarding the authority of Citi's Derivatives desks to enter into trades with one another, including but not limited to which desks had such authority and which did not.

7.    Citi's policies and procedures for marking Derivatives trades to market, including but not limited to the sources and uses of mid-market values and other market data, and any adjustments made to market values, whether for trading, profit and loss, risk management, or collateral management purposes.

8.    Citi's policies and procedures for valuing Derivatives positions for financial reporting, management reporting, regulatory capital, and tax or accounting purposes, including but not limited to the use of mid-market values and other market data, compliance with FAS 157, any adjustments made to market values, and any control process for reviewing and adjusting marks on a daily, monthly or quarterly basis.

9.    Citi's policies and procedures for establishing reserves or valuation adjustments related to Derivatives trades, whether for trading, risk management, collateral

management, financial reporting, regulatory capital, tax, accounting, or other purposes, including but not limited to the timing and frequency of such reserves.

10.     Citi's policies and procedures regarding the measurement, valuation, or management of counterparty credit risk for Derivatives trades, including but not limited to the use of credit value adjustments ("CVA"), counterparty exposure limits, trading in counterparty credit default swaps, hedging practices, and collateralization.

11.     Citi's policies and procedures for providing or receiving prices and quotations for Derivatives trades to or from third parties, including but not limited to customers, brokers, and market data providers.

12.     Citi's policies and procedures for managing exposure with respect to Derivatives trades, including the calculation and use of all metrics employed to measure such exposure, such as DV01, CV01, value-at-risk ("VaR"), and any other potential future exposure metrics.

13.     Citi's policies and procedures for calculating profit-and-loss, sales credits, and any other performance or compensation measurements for Business Units, traders, salespersons, or other personnel involved in Derivatives transactions.

14.     Citi's policies and procedures for processing Derivatives transactions in Citi's ticketing, risk management, and accounting systems.

15.     Citi's policies and procedures for managing the collection of cash related to settlements of Derivatives positions.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that, on March 5, 2014, a true and correct

copy of the foregoing RULE 30(b)(6) DEPOSITION NOTICE was served by e-mail on the

parties listed below:

Claudia Hammerman, Esq. – CHammerman@paulweiss.com
Stephen J. Shimshak, Esq. – SShimshak@paulweiss.com
William. Clareman, Esq. – WClareman@paulweiss.com
George Kroup, Esq. – GKroup@paulweiss.com

PAUL, WEISS, RIFKAND, WHARTON & GARRISON LLP
51 West 52nd Street
New York, New York 10019
*Counsel for Citibank, N.A.*

D. Ross Martin, Esq. – Ross.Martin@ropesgray.com
James A. Wright, Esq. – James.Wright@ropesgray.com
Lisa Coyle, Esq. – Lisa.Coyle@ropesgray.com
Michael Jo, Esq. – Michael.Jo@ropesgray.com
Catherine Mondell, Esq. –  Catherine.Mondell@ropesgray.com

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
*Counsel for FYI Ltd., FFI Fund Ltd., and Olifant Fund Ltd.*

Daniel Cunningham, Esq. – danielcunningham@quinnemanuel.com
Andrew J. Rossman, Esq. – andrewrossman@quinnemanuel.com
James C. Tecce, Esq. – jamestecce@quinnemanuel.com
Diane C. Hutnyan, Esq. – dianehutnyan@quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
*Special Counsel for Official Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc.*

_/s/ Ada V. Añon_____

# EXHIBIT 7

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212.373.3321

WRITER'S DIRECT FACSIMILE
212.492.0321

WRITER'S DIRECT E-MAIL ADDRESS
chammerman@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIOMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMANN
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
LORETTA A. IPPOLITO
JAREN JANGHORBANI

MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. NARSNITZ
JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
ANDREW J. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
MARIA T. VULLO
ALEXANDRA M. WALSH*
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JORDAN E. YARETT
KAYE N. YOSHINO
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

March 13, 2014

**By Email**

Diane C. Hutnyan
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543

Peter Behmke
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178

*Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.*
Adv. Proc. No. 12-01044 (JMP)

Dear Diane and Peter:

We write further to our March 11, 2014 meet-and-confer regarding deposition planning, and to address the topic of third party depositions (which we did not discuss on March 11).

As a general matter, we feel that yesterday's meet-and-confer was productive. Although we expect that the deposition process over the next few months will be intense and, at times, complicated, we hope that the parties can continue to work together to make it as efficient and productive as possible. Set forth below is a summary of the items we discussed during our call and what we understand to be the parties' current postures with respect to each item.

I.    **Witnesses Represented by Plaintiffs' Counsel**

On December 17, 2013, we sent a letter setting out an initial list of potential deponents and asking you to tell us whether plaintiffs' counsel or separate

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Diane C. Hutnyan & Peter Behmke                                         2

counsel will represent them.  We have since exchanged multiple letters addressing this topic.

        During yesterday's call we discussed two categories of former Lehman employees: those located in New York and those located abroad.  As to former Lehman employees who are based in New York, you told us that plaintiffs' counsel would represent Steven Engel, James Killerlane, and Sean Rahavy.  You stated that plaintiffs will likely also represent Irina Veksler, although you have not yet confirmed this, and that you have not yet been able to reach Vincent DiMassimo.  You told us that Scott Alvey, Robert Azerad, Jonathan Debrich, Dan Fleming, David Forsyth, and Craig Jones are currently employed by Barclays, and that, based on your discussions with Barclays' counsel (David Nelson at Boies Schiller & Flexner), these witnesses will be represented by Boies Schiller.  Finally, you told us that Julie Boyle is critically ill, and will not be able to sit for a deposition.  Schedule A to this letter summarizes our understanding, based on our correspondence and yesterday's call, of the witnesses who are currently represented by plaintiffs' counsel or subject to process in New York.  Please confirm that this summary is accurate.

        As to former Lehman employees located abroad, you stated that you have contacted Joseph Igoe, Carlo Pellerani, Aireen Phang, and Huw Rees, and they have all responded that they will not sit for deposition voluntarily.  You stated, however, that if depositions of these witnesses are compelled via the Hague Convention, these witnesses may choose to be represented by plaintiffs' counsel at deposition.  You told us that, in addition to these witnesses, you have contacted some, but not all, of the foreign witnesses listed in our March 4 letter whom we expect to testify about derivatives-related issues (apparently, you are having difficulty locating some of these former Lehman employees).  We asked whether you could provide a sense of your timetable for contacting the remaining witnesses and you stated that you will provide rolling updates as information becomes available.  We expressed our view that it is important to contact these people as soon as possible because pursuing their depositions via the Hague Convention is time-consuming and we need to know soon whether that is the route we will need to pursue.

        Finally, we asked about your experience seeking testimony from Ian Lowitt and Paolo Tonucci in connection with other adversary proceedings.  Specifically, we asked if these two witnesses had appeared voluntarily in prior proceedings, or if they had required the parties to compel their testimony via the Hague Convention.  You told us that both gave testimony voluntarily but that Mr. Tonucci had previously appeared in London, following significant negotiation; you also noted that Mr. Tonucci now resides in Australia.  Given that Messrs. Lowitt and Tonucci are the only persons plaintiffs have identified as having witnessed Citi's alleged oral waiver of its setoff rights in the $2 billion deposit, we assume that plaintiffs will be seeking testimony from these witnesses and we asked when and how plaintiffs intended to initiate the process to obtain their testimony.  You responded that plaintiffs have not yet determined when or how they will pursue testimony from these witnesses.  We observed that it makes sense to coordinate, as we do not want to duplicate efforts, but we also do not want to overlook important

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Diane C. Hutnyan & Peter Behmke                                                    3

people or delay initiating any time-consuming processes (via the Hague convention or its analogues) that may be necessary. You agreed that it makes sense to coordinate, but stated that you have not yet decided how you plan to pursue these witnesses' testimony, and that you will get back to us on this issue. We hope that you do so in relatively short order.

## II.    Depositions Requested by Plaintiffs

With respect to the March 10 letter from Curtis Mallet, providing notice that you wish to depose twenty-six current and former Citi employees, we advised that we would contact the former employees on the list and determine whether they will be represented by Paul, Weiss or by separate counsel. We also observed that some of the witnesses you have noticed are or were among the most senior officers at Citi ("Citi seniors") and have, to our knowledge, little or no personal involvement with the issues in this case. Because we believe you can obtain information sufficient to your purposes by deposing the obvious central (and lower level) players in the case, we asked that you depose the more knowledgeable, less senior Citi witnesses first, and reserve your rights to depose Citi seniors until later. At the very least, this will streamline the areas that might remain to be covered in the depositions of any Citi seniors. You stated that you agreed in principal to this approach, and that it was your present intention to proceed with depositions of lower-level Citi employees in the first instance. You reserved your right to seek the testimony of Citi senior executives at a later date, and we reserved our right to seek a protective order to the extent we viewed testimony from such Citi seniors to be needlessly duplicative, cumulative or irrelevant.

## III.    Plaintiffs' Rule 30(b)(6) Deposition Notices

We also discussed the 30(b)(6) deposition notices plaintiffs served on March 5. As a preliminary matter, we expressed our general view that Citi witnesses should be deposed only once (and by only one of plaintiffs' lawyers, whether from Curtis Mallet or Quinn Emanuel); that is, if Citi chooses to designate a witness with independent knowledge of the facts in dispute for one or more of plaintiffs' 30(b)(6) topics, plaintiffs will have a single opportunity to question that witness on both the 30(b)(6) topics and the witness's direct knowledge. You agreed that, in general, 30(b)(6) depositions and individual depositions should be combined in order to avoid unnecessarily burdening any witness, but reserved your right to revisit this general understanding on a case-by-case basis if the need arose. You also stated that you would have to consider our request that only one lawyer depose each witness.

Regarding the 30(b)(6) topics listed in the notice prepared by Curtis Mallet, we noted that Tom Fontana (one of the 26 witnesses you noticed in the March 10 letter) is likely the person most knowledgeable with respect to topics one and two (concerning the $500 million transfer from LBHI to LBI on September 14 and Citi's partial setoff of the $2 billion deposit and subsequent reversal). You agreed that it will likely make sense to address these topics during Mr. Fontana's deposition, assuming he is

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Diane C. Hutnyan & Peter Behmke                                                    4

the witness we designate on these issues. We suggested that topics three and four (concerning a September 19 transfer from an LBCC account and a payable owed by CGML to LBSF, respectively) appear very detailed and might better be addressed in writing in the first instance. You agreed that some topics could probably be treated in writing, though you stated that you may still need a 30(b)(6) deposition following a written exchange.[1]  We noted that Jeff Feig is likely the person most knowledgeable with respect to topic 5, concerning Citi's unwind of the CLS build-up incurred for various Lehman entities between September 15 and 19, 2008. We noted that, since Jeff Feig was a derivatives custodian and was Global Head of the G10 FX business at the time of the closeout, we expect that plaintiffs intend to depose him in his individual capacity in connection with derivatives issues (although we have not yet received notice from plaintiffs as to which derivatives-related witnesses they intend to depose). Finally, we noted that we will likely present expert testimony concerning topic number six, which addresses the costs that Citi incurred for carrying long and short CLS positions for Lehman prior to LBI's bankruptcy, and we can confirm that we have produced the underlying documents supporting our calculation of this component of the CLS claim.

Regarding the 30(b)(6) topics listed in the notice prepared by Quinn Emanuel, we expressed our view that the majority of these topics can be addressed—and are best addressed—by the individual witnesses plaintiffs choose to depose in connection with the derivatives close-out conducted by the various derivatives businesses.[2]  As we explained, even with significant preparation no single person could give meaningful testimony on most of these topics across all of the derivatives businesses because the subject matter—including policies and procedures, databases and models—vary across the different derivatives businesses. For this reason, Citi would likely be required to designate a different individual from each business to address even a "single" topic identified by plaintiffs. Because plaintiffs doubtless will be seeking the individual deposition of a witness from each of the derivatives businesses, we suggested that the appropriate way to proceed was for plaintiffs to identify which individual depositions they intended to take because those persons likely also would be appropriate designees for the 30(b)(6) topics. Indeed, we note that the derivatives custodians include the heads of the Credit, SPG, GSM, PECD, Rates and FX businesses who will almost certainly be in a position to testify about many, if not all, of the topics in the notice in addition to testifying about the Lehman close-out. Since we assume plaintiffs will be seeking their

---

[1]   You recently requested additional custodians and search terms intended to capture documents associated with these transactions. (*See* March 10 letter from D. Mize to G. Kroup, at 3–4.) We are currently assessing your request. Should we agree to produce additional documents, any 30(b)(6) deposition on these topics should obviously be delayed until after production.

[2]   The exceptions we noted during the call were your topics fourteen and fifteen, which we explained we do not understand as drafted. You agreed that you would try to provide additional clarification regarding these topics.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Diane C. Hutnyan & Peter Behmke                                                              5

individual depositions anyway, we will be able to designate their testimony in response to these 30(b)(6) topics—an efficient and routine way of proceeding in the Second Circuit.[3]

In sum, we believe the efficient way to proceed is for you to depose Citi's derivatives traders—including head traders, from whom you will no doubt seek testimony—and other percipient witnesses concerning the policies, procedures, and practices in their particular businesses at Citi. This will give you the understanding you need regarding the topics in your 30(b)(6) notice, while avoiding needless multiplication and duplication of depositions. We will either designate specific testimony as Citi's corporate position from fact witnesses after their depositions have taken place, or designate the particular 30(b)(6) topics on which fact witnesses will testify prior to their depositions.

You suggested that you understood our rationale but did not wish to identify derivatives-related fact witnesses for deposition prior to our designation of 30(b)(6) witnesses. Because you have articulated no reason that testimony from fact witnesses will be insufficient for the majority of topics in your notice, we see no reason to designate corporate representatives on those topics in a vacuum and without understanding which percipient witnesses plaintiffs will seek to depose from these businesses. Nevertheless, in order to avoid an impasse on this subject, we will agree to leave your 30(b)(6) deposition notice open until you have had an opportunity to depose Citi's witnesses with direct knowledge of Citi's derivatives trading businesses and the Lehman close-out. If, following those depositions, you feel that there are certain topics which have not been addressed to your satisfaction, we can revisit the issue at that time.

Finally, without pointing to any specific documents, you suggested during our call that you require 30(b)(6) testimony at the outset of discovery in order to understand certain derivatives-related documents in Citi's production. Given the complexity of this case, we are of course sympathetic to this need, and we are open to helping you understand particular documents or types of documents generated by the various derivatives businesses at Citi. If you provide us more detail on the types of materials that you feel require further explanation right now—and cannot reasonably be addressed at the depositions of percipient witnesses—we will work with you to provide either (formal or informal) explanations of the documents and, if necessary, a witness who can help you along. In any event, such a request was not obvious on the face of your 30(b)(6) notice, which, for the most part, requests a Citi designee on various "policies and procedures." Moreover, to the extent you were seeking to rely on 30(b)(6) depositions to explain particular derivatives-related documents, you would be better served by identifying those documents for us in advance so that we can adequately prepare our witnesses.

---

[3]    See, e.g., *Dongguk University v. Yale University*, 270 F.R.D. 70, 75–79 (D. Conn. 2010); *Cipriani v. Dick's Sporting Goods, Inc.*, 2012 WL 5869818, at *2 (D. Conn. Nov. 19, 2012); *Bellinger v. Astrue*, 2011 WL 4529602, at *4 (E.D.N.Y. Sept. 28, 2011).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Diane C. Hutnyan & Peter Behmke                                                    6

### IV.    <u>Limiting Depositions to a Reasonable Number</u>

Finally, we asked whether plaintiffs would agree to set an upper limit on the number of fact witnesses deposed in this case. Although we do not recall counsel for Lehman replying, counsel for the Unsecured Creditors Committee responded that plaintiffs would probably not be willing to set such a limit. You did, however, ask us what number we would propose. We suggested that sixty fact depositions per side should be more than enough, considering that this case centers on the $2 billion deposit, for which there were fewer than fifteen central players, and the derivatives close-out, for which there were fewer than a dozen relevant businesses.[4] You agreed to consider our proposal.

At the end of the call, we agreed to send you preferred dates for scheduling depositions of witnesses whom you represent, and you agreed to tell us if they are available on those dates.

### V.    <u>Third-Party Depositions</u>

Although we did not discuss it on our call yesterday, we note that plaintiffs have scheduled the first of their third-party depositions for the last week of March, and they continue (essentially every day) throughout the month of April. Given that a number of these parties—including the big bank counterparties, ICAP, TriOptima, and Bloomberg—have not yet produced any documents in response to plaintiffs' subpoenas, we expect that plaintiffs intend to put off third party depositions until a later date. Please let us know, no later than Monday, March 17, whether plaintiffs intend to pursue any of these depositions on the date of notice, and if so, which ones.

                        *                *                *

We write without prejudice to any of defendants' rights, all of which are expressly reserved.

                                    Very truly yours,

                                    Claudia Hammerman

cc:    Counsel of Record

---

[4]    We note that the Federal Rules of Civil Procedure currently provide a default maximum of ten depositions per party, Fed. R. Civ. P. 30(a)(2), and proposed amendments would reduce that number to five. *See Preliminary Draft of Proposed Amendments to the Fed. R. of Bankr. & Civ. Proc.*, at 300, *available at* http://www.uscourts.gov/uscourts/rules/preliminary-draft-proposed-amendments.pdf. Sixty depositions per side, not including the thirty third-party depositions plaintiffs have noticed, is more than reasonable, even for a case of this size.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

## Schedule A

1. Scott Alvey (Boies, Schiller & Flexner LLP)

2. Robert Azerad (Boies, Schiller & Flexner LLP)

3. Janet Birney (Plaintiffs' Counsel)

4. Debra Cash (Plaintiffs' Counsel)

5. Emil Cornejo (Richards, Kibbe & Orbe LLP)

6. Aileen Daversa (Plaintiffs' Counsel)

7. Jonathan Debrich (Boies, Schiller & Flexner LLP)

8. Daniel Ehrmann (Plaintiffs' Counsel)

9. Steven Engel (Plaintiffs' Counsel)

10. Eric Felder (Debevoise & Plimpton LLP)

11. Daniel Fleming (Boies, Schiller & Flexner LLP)

12. David Forsyth (Boies, Schiller & Flexner LLP)

13. Craig Jones (Boies, Schiller & Flexner LLP)

14. James Killerlane (Plaintiffs' Counsel)

15. Chris O'Meara (Plaintiffs' Counsel)

16. Sean Rahavy (Plaintiffs' Counsel)

**EXHIBIT 8**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212 373 3321

WRITER'S DIRECT FACSIMILE

212 492 0321

WRITER'S DIRECT E MAIL ADDRESS

chammerman@paulweiss.com

UNIT 3601 OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86 10) 5828 6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846 0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU  U K
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2 2 UCHISAIWAICHO 2 CHOME
CHIYODA KU TOKYO 100 0011 JAPAN
TELEPHONE (81 3) 3597 8101

TORONTO DOMINION CENTRE
77 KING STREET WEST SUITE 3100
P.O. BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE  416) 504 0520

2001 K STREET NW
WASHINGTON  DC  20006 1047
TELEPHONE (202) 223 7300

500 DELAWARE AVENUE  SUITE 200
POST OFFICE BOX 32
WILMINGTON  DE 19899 0032
TELEPHONE (302) 655 4410

MATTHEW W ABBOTT
ALLAN J ARFFA
ROBERT A ATKINS
DAVID J BALL
JOHN F BAUGHMAN
LYNN B BAYARD
DANIEL J BELLER
CRAIG A BENSON
MITCHELL L BERG
MARK S BERGMAN
BRUCE BIRENBOIM
H CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L BROCHIN
RICHARD J BRONSTEIN
DAVID W BROWN
SUSANNA M BUERGEL
PATRICK S CAMPBELL*
JESSICA S CAREY
JEANETTE K CHAN
YVONNE Y F CHAN
LEWIS R CLAYTON
JAY COHEN
KELLEY A CORNISH
CHRISTOPHER J CUMMINGS
CHARLES E DAVIDOW
DOUGLAS R DAVIS
THOMAS V DE LA BASTIDE III
ARIEL J DECKELBAUM
ALICE BELISLE EATON
ANDREW J EHRLICH
GREGORY A EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A FIELDSTON
ANDREW C FINCH
BRAD J FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E FISCH
ROBERT C FLEDER
MARTIN FLUMENBAUM
ANDREW J FOLEY
HARRIS B FREIDUS
MANUEL S FREY
ANDREW L GAINES
KENNETH A GALLO
MICHAEL E GERTZMAN
ADAM M GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D GOLDBAUM
NEIL GOLDMAN
ERIC S GOLDSTEIN
ERIC GOODISON
CHARLES H GOOGE JR
ANDREW G GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A GUTENPLAN
GAINES GWATHMEY III
ALAN S HALPERIN
JUSTIN G HAMILL
CLAUDIA HAMMERMAN
GERARD E HARPER
BRIAN S HERMANN
ROBERT M HIRSH
MICHELE HIRSHMAN
MICHAEL S HONG
DAVID S HUNTINGTON
LORETTA A IPPOLITO
JAREN JANGHORBANI

MEREDITH J KANE
ROBERTA A KAPLAN
BRAD S KARP
PATRICK N KARSNITZ
JOHN C KENNEDY
ALAN W KORNBERG
DANIEL J KRAMER
DAVID K LAKHDHIR
STEPHEN P LAMB*
JOHN E LANGE
DANIEL J LEFFELL
XIAOYU GREG LIU
JEFFREY D MARELL
MARCO V MASOTTI
EDWIN S MAYNARD
DAVID W MAYO
ELIZABETH R McCOLM
MARK F MENDELSOHN
WILLIAM B MICHAEL
TOBY S MYERSON
CATHERINE NYARADY
JANE B O'BRIEN
ALEX YOUNG H OH
BRAD R OKUN
KELLEY D PARKER
MARC E PERLMUTTER
VALERIE E RADWANER
CARL L REISNER
WALTER G RICCIARDI
WALTER REHMAN
RICHARD A ROSEN
ANDREW N ROSENBERG
JACQUELINE P RUBIN
RAPHAEL M RUSSO
JEFFREY D SAFERSTEIN
JEFFREY B SAMUELS
DALE M SARRO
TERRY E SCHIMEK
KENNETH M SCHNEIDER
ROBERT B SCHUMER
JAMES H SCHWAB
JOHN M SCOTT
STEPHEN J SHIMSHAK
DAVID R SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J SIMONS
MARILYN SOBEL
AUDRA J SOLOWAY
SCOTT M SONTAG
TARUN M STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F TARNOFSKY
MONICA K THURMOND
DANIEL J TOAL
LIZA M VELAZQUEZ
MARIA T VULLO
ALEXANDRA M WALSH*
LAWRENCE G WEE
THEODORE V WELLS JR
BETH A WILKINSON
STEVEN J WILLIAMS
LAWRENCE I WITDORCHIC
MARK B WLAZLO
JULIA MASON WOOD
JORDAN E YARETT
KAYE N YOSHINO
TONG YU
TRACEY A ZACCONE
T ROBERT ZOCHOWSKI JR

NOT ADMITTED TO THE NEW YORK BAR

April 17, 2014

**By Email**

Diane C. Hutnyan
Quinn Emanuel
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543

J. Derek Mize
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178

*Lehman Brothers Holdings Inc., et al. v. Citibank, N A , et al*
Adv. Proc. No. 12-01044 (SCC)

Dear Diane:

I am in receipt of your letter of yesterday regarding deposition scheduling for derivatives-related witnesses.

As you know, defendants have objected, repeatedly, to any deposition schedule in this case that contemplates any witnesses being deposed more than once. Although plaintiffs previously assured us that they shared this goal (*see* March 17, 2014 Letter from D. Hutnyan, at 2 ("[i]f Citi's concern is that a witness designated as a 30(b)(6) representative will have to sit for a deposition a second time in an individual capacity, Citi can rest assured that plaintiffs will make reasonable efforts to avoid that result")), your letter of yesterday completely repudiates that promise and asserts that all Rule 30(b)(6) depositions of any witnesses that have not yet been served with a Rule 30(b)(1) deposition notice will be taken solely as a Rule 30(b)(6) deposition, and that you "expect to notice these individuals in their individual capacities" later "when plaintiffs are prepared to do so."  (April 16, 2014 Letter from D. Hutnyan, at 2.)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Diane C. Hutnyan & J. Derek Mize                                                          2

Plaintiffs' position on this issue is completely unacceptable. You have, to date, noticed individual depositions of only 11 derivatives-related custodians, five of whom are former employees and only one of whom is a current employee who resides in New York. The other five current employees reside in London, Singapore, Hong Kong, Japan and Australia. Instead of identifying additional individual deponents – and despite your claimed need for more than 60 depositions in this case – you have focused exclusively on your Rule 30(b)(6) deposition notice spanning 15 sweeping topics touching on virtually every facet of the management and operations of nine global derivatives businesses that are at issue in the case.

We have already explained that the Rule 30(b)(6) notice will require more than 10 witnesses to furnish a complete response. As a result, in the hopes of scheduling the deposition phase of this case in an efficient manner, we tried to work cooperatively with plaintiffs to identify appropriate fact witnesses (in addition to the 11 noticed by plaintiffs) whose depositions would be sought, so that the substantive topics identified in your Rule 30(b)(6) notice could be addressed simultaneously with fact depositions to limit the overall burden and expense associated with needlessly increasing the overall number of depositions. You repeatedly rejected our invitation to take this collaborative approach and, instead, insisted that Citi designate 30(b)(6) witnesses on these sweeping topics without any input from plaintiffs.

Thus, over a month ago we proposed designating senior traders and/or heads of the various businesses whose depositions will necessarily be taken in this case, and who are in a position to address a majority of the fifteen topics identified in your Rule 30(b)(6) notice. (See March 20, 2014 Letter from C. Hammerman, at 2-3.) At that time, you accepted these designations, acknowledged that these witnesses would be deposed simultaneously in their individual and representative capacities, and reserved the right to recall these witnesses only if you determined that facts later "uncovered during the discovery process require[d] further testimony." (See March 31, 2014 Letter from D. Hutnyan, at 1.) Now – after we have spent the better part of a month scheduling the depositions of these incredibly busy heads of global businesses – plaintiffs have suddenly done an about-face, and take the position that these Rule 30(b)(6) depositions would in effect be the first round of depositions for these witnesses, to be followed by another round of individual depositions at some unspecified time in the future when plaintiffs are "prepared."

We cannot countenance such a fundamentally inefficient, duplicative-by-design discovery program, and the unreasonable costs and burdens associated with it. We reluctantly have come to the conclusion that the parties are at an impasse and require Court intervention. As you know, we have repeatedly requested a meet and confer on the issue of scheduling derivatives-related depositions but you have, to date, refused our requests on the ground that there is no "actual dispute." (See April 2, 2014 Letter from D. Hutnyan, at 2.) Clearly, we disagree with your assessment. The parties have a fundamental disagreement about how deposition discovery should proceed, the number of depositions that may be taken by either side, and how best to accomplish all of this

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Diane C. Hutnyan & J. Derek Mize                                                    3

within the time allotted under the scheduling order – an issue that has been conspicuously ignored in your letters. Given the limited amount of time remaining before the close of fact discovery (which ends on June 27, 2014), we believe it is imperative to seek Court assistance immediately. Of course, if you believe that there is a way to resolve this dispute cooperatively and in a way that does not needlessly increase the number of depositions or require witnesses to be deposed more than once, we – as ever – would welcome the opportunity to meet and confer and reach an amicable resolution. We are available for a meet and confer between now and Monday (including nights and weekends) at your convenience. Absent a consensual resolution by Tuesday, we have no choice but to seek relief from the Court.[1]

                    *              *              *

        We write without prejudice to any of defendants' rights, all of which are expressly reserved.

                              Very truly yours,

                              Claudia L. Hammerman

cc:    Counsel of Record

---

[1]    Given the position set forth in your April 16, 2014 letter, we are also compelled to suspend the depositions of Stuart Staley, Vikram Prasad, Eliot Rubenzahl, Mickey Bhatia, Brian Archer, John Heppolette, Marc Pagano, and Frederic Jallot until we obtain a ruling by the Court. The agreed-upon dates for the individual depositions noticed by plaintiffs of Didier Magloire, Shahed Shafi, Brian Connors, Tom Giardi, and Varadarajan Subbaraman will remain on the calendar. We will contact Itay Tuchman to determine whether he can be rescheduled. Joshua Kogan's travel schedule for May has been in flux, but we are continuing to work to determine his availability in May or June. With respect to Alain Verdickt, we have already explored the possibility of alternative dates, and May 5, 2014 is his only foreseeable availability in the U.S. Plaintiffs in this case are represented by two firms of considerable talent, and must be able to staff a deposition on that date. Under the circumstances, it is far more reasonable to ask plaintiffs' counsel to adjust their schedules to accommodate the witness from Australia, rather than insist that the witness arrange roundtrip travel to New York (approximately 24 hours each way) on a different date.

**EXHIBIT 9**

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S INTERNET ADDRESS
dianehutnyan@quinnemanuel.com

March 31, 2014

<u>VIA E-MAIL</u>
Claudia L. Hammerman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Re:    *Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.*
       Adv. Proc. No. 12-01044 (JMP)

Dear Claudia:

We are in receipt of your March 20 and March 30, 2014 letters regarding, *inter alia*, our Rule 30(b)(6) notices offering to designate senior traders and business heads as Citi's corporate representatives. However, even now, we have still not received actual designations for any of the topics notifying us who will be presented to testify on each of them. Stating that you would "designate senior traders and business heads – such as" nine listed people does not even tell us whether the eventual designees will be culled from among the names on that list, or whether those names were meant to be merely illustrative of what level of employee we can expect to depose. Please immediately notify us, in writing, of your actual designations for each topic, along with proposed dates for the depositions, so that we can resolve this issue without burdening the Court with it.

We reject Citi's "proposal" to designate senior traders and business heads that will only be deposed once. It is Citi's obligation to designate witnesses, not to "propose" them. And it must live with the consequences of those decisions. You have decided to designate senior traders and business heads despite your previous assertions that the 30(b)(6) topics we propounded could be answered by any number of Citi employees. As we already explained in our March 17 letter, we will recall any 30(b)(6) deponent if we feel that facts uncovered during the discovery process require further testimony from that deponent. Therefore, if you choose to designate individuals for these depositions that will also likely be fact witnesses, then you put them in the position of having their deposition taken twice.

**quinn emanuel urquhart & sullivan, llp**
NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS

Finally, your March 30 letter acknowledges receipt of our March 20 deposition notices but we have not yet received confirmation of those, or alternate, dates.  Please confirm that the deponents will be presented on the dates noticed, or let us know of any scheduling issues in writing, right away so that we can prepare for any meet and confer that might still be necessary.

We will respond to the balance of your March 30 letter shortly.

Kind regards,

Diane C. Hutnyan

Cc:    Rex Lee, Esq.
       Ellison Ward, Esq.
       Peter Behmke, Esq.
       J. Derek Mize, Esq.
       William A. Clareman, Esq.
       Erika Berg, Esq.
       James Wright, Esq.

# Exhibit 13

# PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON     (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS     (1927-1950)
JOHN F. WHARTON     (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212-373-3037

WRITER'S DIRECT FACSIMILE
212-492-0037

WRITER'S DIRECT E-MAIL ADDRESS
nkelly@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86 10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597 8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARCO V. MASOTTI
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
LORETTA A. IPPOLITO
JAREN E. JANGHORBANI

MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSHNITZ
JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
MARIA T. VULLO
ALEXANDRA M. WALSH*
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 11, 2014

## By Hand, FedEx, and Email

J. Derek Mize
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178

Rex Lee                                    Kristina Moree
Quinn Emanuel Urquhart & Sullivan, LLP     Ropes & Gray LLP
51 Madison Avenue, 22nd Floor              1 Metro Center, 700 12th St. NW, Suite 900
New York, New York 10010                   Washington, D.C. 20005

*Lehman Brothers Holdings Inc., et al. v. Citibank, N.A., et al.,*
Adv. Proc. No. 12-01044 (S.D.N.Y.) (SCC)

Dear Derek and Rex,

Enclosed please find a production of two DVDs containing documents Bates numbered CITI-LEH01537621 through CITI-LEH01541361. This production consists of the following:

- Non-privileged derivatives-related documents;
- Documents reflecting policies and procedures responsive to plaintiffs' requests; and
- Hard copy documents from the custodial file of Thomas Fontana.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON

J. Derek Mize & Rex Lee                                                                    2

        This production also contains replacement images for documents delivered in prior productions.

        Certain documents included in this production have been designated as "Confidential" or "Highly Confidential" pursuant to the Amended Confidentiality Stipulation and Protective Order entered on March 7, 2014.

                    Sincerely,

                    Neil P. Kelly

Enclosures

cc:     D. Ross Martin (by e-mail w/o enclosures)
         James Wright (by e-mail w/o enclosures)
         Claudia L. Hammerman (by e-mail w/o enclosures)
         William A. Clareman (by e-mail w/o enclosures)
         George W. Kroup (by email w/o enclosures)
         Ezra B. Sternstein (by email w/o enclosures)
         Diane Hutnyan (by e-mail w/o enclosures)
         Peter Behmke (by e-mail w/o enclosures)
         Ellison Ward (by e-mail w/o enclosures)
         Amanda Philips (by e-mail w/o enclosures)

Exhibit 14

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5                                        08-13555(JMP)

6    LEHMAN BROTHERS HOLDINGS INC.,     (Jointly Administered)

7    et al.,

8                Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In re:

11                                       08-01420(JMP)(SIPA)

12   LEHMAN BROTHERS INC.,

13                Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   In re:

16                                       12-10063(JMP)

17   LEHMAN BROTHERS AUSTRALIA

18   LIMITED,

19                Debtor.

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25

1                  THE COURT:  Good morning.

2                  MR. KIRPALANI:  Good morning, Your Honor, for the

3      record Sushell Kirpalani of Quinn Emanuel Urquhart &

4      Sullivan speaking for efficiency sake on behalf of the

5      Lehman estates, and technically we're here as counsel to the

6      committee, but we're working on behalf of both fiduciaries,

7      Your Honor.

8                  It's been a long time since I had the pleasure of

9      appearing before the Court in this case, and I hope Your

10     Honor understands that I've become reengaged recently with

11     the hope of resolving some of the big last disputes.

12                 With me in the courtroom are my colleagues from

13     Quinn Emanuel, but also Mr. Matt Cantor (ph), head of legal

14     affairs and a member of the board of reorganized Lehman.

15                 We actually took the morning off from tending to

16     another matter, but we'll be going back to that mediation

17     after court, Your Honor, and we are here today to express

18     our sincere wish that we can bring this as well as other

19     matters to a close.  We're very focused on trying to resolve

20     and not litigate remaining big issues.

21                 Frankly we had hoped -- I had hoped over a month

22     ago that we might be here on a motion to approve an interim

23     pragmatic solution to deal with an interesting, unique

24     situation where Citibank is holding $2 billion of cash and

25     saying that it doesn't have the ability to use it.

1          So we're here today on Lehman's motion to permit

2     Citibank to take the $2 billion it has been holding and to

3     make some productive use of it thereby cutting off any

4     arguments concerning additional post-petition interest.

5          In opposition Citibank set up a fiction, namely

6     that a creditor has an absolute right to sleep peacefully at

7     night with an unconditionally allowed claim and a full

8     release of any counterclaims or else he can assert post-

9     petition interest as a secured creditor by right of setoff.

10          If Citi were right in that fiction then every

11     creditor who is owed money by an estate who's also sued by

12     the estate would be a secured creditor and be able to charge

13     post-petition interest until he gets a release.  That can't

14     be right.

15          Sure you can imagine numerous situations, Your

16     Honor, where a claim objection results in the secured

17     creditor charging post-petition interest until he actually

18     gets the money.  That would compensate the creditor for

19     being without access to the funds.

20          Where a secured creditor is owed money and not

21     given the money it would be unfair to let the debtors keep

22     it, use it while the creditor is stuck waiting.

23          And even if he has a lien on property he wouldn't

24     be permitted to liquidate that collateral and use those

25     proceeds either.  He's just stuck between a rock and a hard

Page 22

1    place and 506(b) fills in that injustice.

2              So the Bankruptcy Code gives him compensation for

3    that, but neither of those situations actually apply to this

4    unique situation for Citibank.

5              Your Honor, can I just approach, I want to give

6    you one piece of paper?  Is that --

7              THE COURT:  That's fine.

8              MR. KIRPALANI:  Okay.

9              THE COURT:  Thank you.

10             MR. KIRPALANI:  Your Honor, this is Citibank's

11   account statement, which we get one of these every month.

12   You can see it, it says this one is from June 28th, 2013,

13   it's got a QSIP, a security ID with a certain number, it

14   says in the issue name dollars on deposit cash account, and

15   then a couple of places over it says where it's held, at the

16   Citibank vault.  Okay?  Two billion plus is in there.

17             Your Honor may recall that in April 2009 there was

18   a stipulation where Citi was required to hold Lehman's cash

19   in a custodial account.  This statement in fact shows us, or

20   so we thought until we saw their opposition to this motion,

21   that the funds were sitting in the vault and really just

22   wasting away, just sitting there.  But the estate could not

23   use that money or distribute it to its creditors obviously

24   because we're probably not got for the money if we wound up

25   losing our litigation.

Page 23

```
 1              So it was basically held hostage to a variety of
 2    over inflated claims by Citi, so Citi was not going to let
 3    that money go.
 4              When Lehman emerged from bankruptcy there was a
 5    significant change of the guard at Lehman.  The main event
 6    affording a consensual global Chapter 11 plan was
 7    accomplished and the estates had been trying to wind down
 8    and clean up the affairs.
 9              Now various seasoned bankruptcy veterans joined
10    the board, assumed positions of leadership within Lehman,
11    and they asked what could be done to insure that estate
12    assets were not just wasting away somewhere?
13              So we thought cash in a vault at Citibank that
14    just sits there while Citi's, we believe, inflated claims
15    are resolved seems to be a poor use of $2 billion.
16              So we then understood that Citi is asserting,
17    despite the fact that their claims exceeded $2 billion, that
18    they may be over secured if we succeed in knocking down
19    their claims.  So that doesn't make sense either.
20              But we were never told whether Citibank was using
21    the cash or not, so the board told us at a minimum make sure
22    they start using it now so we can cut off any interest
23    arbitrage they may be playing, because we earn 0.02 percent
24    interest, and they are asserting who knows something 7
25    percent plus in post-petition interest.
```

```
 1              So we asked them to take the cash and we'll just

 2     sue them like any counterclaim defendant.  They said no,

 3     they preferred to assert a right to post-petition interest

 4     for the next year and a half while we litigate the right

 5     amount of their very complicated claims.

 6              Of course if they're right in the way they assert

 7     their claims they'd get no post-petition interest because

 8     they'd be under secured.

 9              But the trick is if we are right and their claims

10     are overstated then Citi laughs all the way to their own

11     vault.

12              So we filed this motion seeking to pay them down

13     but to reserve our rights to sue them if they were wrongly

14     holding our money all this time.  We'll take the credit risk

15     that Citi is good for the money.

16              THE COURT:  I think that's a good credit risk.

17              MR. KIRPALANI:  Okay.  We expected them to say

18     frankly as JPMorgan --

19              THE COURT:  I hope it's a good credit risk.

20              MR. KIRPALANI:  We expected them to say as

21     JPMorgan did, Your Honor, that yeah, that probably makes

22     sense.

23              It's not perfect, we're not saying this is the

24     perfect solution for them either, but it just makes sense

25     and it's equitable.  They can invest the money.  We thought
```

1    they'd say, okay, we'll invest the money and there's no

2    point in holding that amount of cash in the vault.

3            But then look what they actually say in their

4    opposition of this motion, which frankly was a surprise to

5    everybody at Lehman.  Not only -- especially in light of the

6    one page I gave Your Honor.

7            Not only do they admit that they want the interest

8    rate arbitrage, because Lehman deserves punishment for

9    spending all of its energy on global issues these past few

10   years rather than caring about Citibank's entitlement to get

11   paid, but this is really quite shocking, that there's no

12   money in the vault at all.

13           But what did they do with the cash?  They say they

14   never sought to lift the automatic stay, they say they never

15   sought permission to setoff, but what did they do that we

16   don't know, it's really of no moment, we don't think, but we

17   think they took the cash, they put down their marker

18   instead, and they've enjoyed the use of the cash probably

19   since April 2009 since that stipulation.

20           And so that's why they come to court now and they

21   say giving us the cash does nothing for it, it serves us no

22   benefit, because they've already been enjoying that benefit.

23           And they submit some affidavit, Your Honor, which

24   I don't think we're going to be getting into in detail,

25   saying that there's a bunch of accounting rules that I don't

Page 26

1    think have any place in this courtroom about how a creditor

2    accounts for its risks and reserves, and frankly that's up

3    to each creditor.  Every creditor that's sued by an estate

4    has to deal with taking reserves against what they think is

5    appropriate and what they think management believes is

6    reasonable.

7           But what they're saying in essence is we don't get

8    anything by exchanging our we're holding your money hostage

9    setoff right for a pay down because we already treat the

10   money as our own and we do with it as we please.  And that

11   was news when we read the affidavit.

12          But until and unless you release us from potential

13   claims they say or give us a peaceful night sleep they say

14   we will assert we are owed post-petition interest and that's

15   going cost you at least $400,000 a day.

16          This is inequitable to the creditors of Lehman,

17   Your Honor, so we request -- we respectfully request that

18   our motion be granted.

19          I'd like to just touch briefly on the -- some of

20   the points in the motion, I know Your Honor and I know your

21   staff has reviewed our authorities, but I'm going to be

22   perfectly blunt and frank, Your Honor, there are no

23   significant controlling -- certainly no controlling

24   authorities, and there really aren't that many significant

25   authorities for this fact pattern.

1          Calpine we do think --

2          THE COURT:  Can I break in no a second --

3          MR. KIRPALANI:  Uh-huh.

4          THE COURT:  -- because I have looked at the

5   Calpine order from 2006 and the Calpine transcript attached

6   to your most recently filed papers, and I'm also generally

7   familiar, although it's certainly not an authority, it's

8   just my experience as a mediator in another major case which

9   is currently pending in this district, where issues relating

10  to the pay down of significant cash owed to a creditor

11  constituency represented one possible way to deal with a

12  claim for post-petition interest.

13         And so I'm not talking in code for purposes of the

14  transcript, I'm referring to the Rescap bankruptcy case and

15  the current dispute with holders of junior secured notes.

16  That matter is currently on trial before Judge Glenn.

17         And so I recognize that there is a convention -- I

18  wouldn't call it precedent, in major bankruptcy cases for

19  parties in interest, especially unsecured creditors, to make

20  the business judgment, together with the trustee or debtor

21  in possession, to pay down undisputed secured obligations so

22  as to stop the running of interest that may be ticking away

23  at significantly high rates thereby making the pay down a

24  prudent business judgment.

25         The situation we're in now is probably

1    unprecedented in that it's about five years after the

2    posting of $2 billion in cash collateral that I understand

3    was placed in a Nassau branch of Citi, I don't know what

4    happened to that cash thereafter, I don't know that I need

5    to know that for these purposes, but Mr. Shimshak, if he

6    wishes, can tell me about it.

7            And I am reminded of other comparable situations

8    in this case, some of which have ripened into litigation or

9    some of which have ripened into stipulations.

10           One comparable situation involved JPMorgan Chase,

11   a stipulation relating to the treatment of their claim.

12           Another comparable situation involves Bank of

13   America where we had litigation over the posting of half a

14   billion dollars in an account in the Cayman Islands and a

15   determination that I made that there was a stay violation in

16   offsetting those funds.

17           I don't know to what extent there are any reserved

18   rights on the part of the estate in reference to what Citi

19   has done with the $2 billion, and I'm not predicting nor

20   suggesting that anything needs to be done, but I recognize

21   the possibility that certain claims might be made.

22           So with that background, recognizing that there is

23   authority that can be looked to by analogy, I think we're

24   probably dealing with a unprecedented set of facts.

25           MR. KIRPALANI:  I agree with that, Your Honor.

1          And I want to just address one legal issue and

2     then I think I'll sit down and Your Honor can hear what the

3     opposition is.  It's the 105(a) argument.  I actually argued

4     the New England Dairies case in the Second Circuit, it's my

5     rare opportunities to do that.

6          New England Dairies doesn't say that 105(a)

7     doesn't have any import.  What it says is it's supposed to

8     fix the play and the joints.  It can't stand alone.  It

9     needs to be coupled with something.

10          So I'm sure Mr. Shimshak is going to attack us on

11     what's it's coupled with.  He'll say Section 363 doesn't

12     apply, he'll say we're post-confirmation, he'll say we're

13     post-effective, he'll say there's no estate, he'll say all

14     of those things, but the one thing he can't say is that 502

15     still applies.

16          And I think as Your Honor knows -- and I know Your

17     Honor does -- if Your Honor looks at 502 in its totality

18     there's a lot of play in the joints.

19          There's a 502(c) play in the joins, and this isn't

20     contingent or unliquidated, it's a disputed claim, and I

21     can't really creditably argue, I did think at it, of this is

22     going to unduly delay the administration of the estate

23     because that's a bit of a stretch, we are past confirmation

24     and we have gone effective, so I didn't want to pursue that

25     line.

Page 30

```
 1              502(j) is another one.  You can allow a claim,

 2      Your Honor can, and then subject to reconsideration of it

 3      later.

 4              And we looked at the case law there and it wasn't

 5      favorable, because in order to reconsider I'd have to show

 6      what you usually show for reconsideration type of things.

 7              But I don't think that means that 105(a) does not

 8      provide authority combined with 502 to fix the play in the

 9      joints from this really unprecedented and unique situation.

10              So that's what we'll submit, Your Honor, as our

11      statutory basis.

12              I agree with the Court that there is no actual

13      precedent for this and it was not an easy motion to us to

14      bring on, but we do have a constituency.  Shame on us, shame

15      on me if we didn't think of it years ago, but we do have a

16      constituency that is continuing to suffer and we have to do

17      something about it at some point and so the some point is

18      now.

19              THE COURT:  I wasn't ever thinking shame on you or

20      shame on your colleagues, but I'll admit I was thinking what

21      took so long?

22              MR. KIRPALANI:  Yeah, you know, Your Honor, I

23      don't have a good answer.  Don't have a good answer.

24              THE COURT:  Okay.

25              MR. KIRPALANI:  Thank you.
```

1           MR. SHIMSHAK:  Good morning.

2           THE COURT:  Good morning.

3           MR. SHIMSHAK:  I may need this periodically

4     because I'm getting over a cold, so.

5           THE COURT:  It's very nice, it's like an ad for

6     Avian Water.

7           MR. SHIMSHAK:  Before I get started we'd like to

8     engage in a little housekeeping.

9           We have prepared some demonstratives for the

10    Argument, which I would like to hand up to you.

11          MR. KIRPALANI:  Now we know where the money in the

12    vault is going.

13          THE COURT:  Okay.  At least we're not dealing with

14    projection equipment.

15          MR. SHIMSHAK:  We'll get to that in a moment.

16          I'd also like to introduce my colleague, Claudia

17    Hammerman.  For purposes of the argument today we've divided

18    it.  I will address the relief requested, the basis for the

19    relief requested, and the many ways that the relief

20    requested violates the terms of Lehman's plan.

21    Ms. Hammerman, who has been living with the case for five

22    years and living with the adversary proceeding for over 20

23    months, will address any questions that the Court may have

24    about this history and about the derivative claims and

25    interest rates and things of that sort, but she's going to

1    be focusing primarily on the equitable arguments that are

2    made, to the extent those are relevant for the Court's

3    consideration.

4              THE COURT:  That's fine.  I'm going to ask you an

5    impertinent question to start.

6              MR. SHIMSHAK:  Of course.

7              THE COURT:  You were expecting it.

8              MR. SHIMSHAK:  No, but go ahead.

9              THE COURT:  Okay.  It's been five years, more than

10   five years actually since Citibank and other big banks

11   deemed themselves insecure in the period leading up to

12   Lehman's bankruptcy filing and exercised self-help remedies.

13             It's now many years later, we have a confirmed

14   plan, we have late term litigation involving JPMorgan Chase,

15   we have most of the other big banks that were involved in

16   major derivative disputes that have settled with this

17   estate, and Citibank is conspicuous in being an outlier in

18   terms of now saying yes to anything.

19             My question is this.  I'm certainly prepared to

20   make a ruling that's courageous that will be disadvantageous

21   to you, and I think you come in knowing that that's at least

22   a possibility, notwithstanding the fact that we're dealing

23   with an unprecedented set of facts and circumstances, and

24   Mr. Kirpalani acknowledged that during our discussion.

25             But why can't you and the estate reach an

1   agreement comparable to an agreement that was reached in

2   2009 with JPMorgan Chase regarding what amounts to

3   provisional allowance of a claim with all rights reserved?

4           MR. SHIMSHAK:  Let me speak to that and this gets

5   into what I would say -- and I don't mean this critically --

6   the mischaracterization of the legal relationship between

7   the parties as it relates to the deposit and when that the

8   properly understood you will understand that the relief that

9   they're offering us is completely illusory and confers no

10   benefit on us whatsoever.

11           So while I can't speak to what JPMorgan was

12   thinking, I do know that there were evident -- evident in

13   the record and evident in the pleadings in connection with

14   that matter benefits associated with the relief they were

15   getting.

16           Specifically they were being relieved of the

17   burden of managing securities and the risk that they would

18   be accused of mismanaging those securities.  So they were

19   relieved of another potential liability.  They were given

20   over $500 million of cash rather than having to liquidate

21   and realize on those securities.

22           So that transaction had its own independent

23   motivations.  It's completely different from the situation

24   that we find ourself in properly understood.

25           So let me elaborate on what I mean and let's start

1    because I think when we're talking about deposit accounts

2    and we're talking about setoff rights we have to be very

3    precise in understanding this problem and understanding the

4    relationships of the parties -- and the starting point is

5    the deposit account itself.  I

6              On -- on June 12th --

7              THE COURT:  But before you get into --

8              MR. SHIMSHAK:  Uh-huh.

9              THE COURT:  -- your -- your main argument --

10             MR. SHIMSHAK:  Uh-huh.

11             THE COURT:  -- recognizing that we're not making a

12   direct comparison between this situation and the JPMorgan

13   Chase situation from 2009, are you telling me that you are

14   incapable of working out some kind of consensual arrangement

15   with the estate that avoids a coercive outcome that I create

16   for you?

17             MR. SHIMSHAK:  Incapable, I can't say incapable,

18   you have to be able to negotiate.  If there was -- if there

19   was a -- if there was a solution that was fully protective

20   of our rights of course we're prepared to entertain that and

21   to negotiate that.

22             THE COURT:  Okay.

23             MR. SHIMSHAK:  The proposal that's been made is

24   not that proposal.

25             So let's start with the $2 billion deposit which

1    was created in June of 2008.  That deposit has always been

2    and always will be nothing more than a debt that we owe

3    Lehman.  We have owed Lehman $2 billion absent anything else

4    since June 12th, 2008 when that deposit was created.

5            And the nature of a deposit account is the first

6    tab, Your Honor.  This has been recognized at the Supreme

7    Court level in the Strouth (ph) decision which dealt with

8    the application of the administrative freeze.  It's the

9    leading case on the administrative freeze.  And that case

10   states that no matter how people think of it, no matter how

11   you and I think of putting money in the bank and having cash

12   in the bank, in fact a deposit account is nothing more than

13   a debt that the bank owes to the depositor.

14           So when you start with that proposition that we've

15   owed them a debt you then move to what our claims are

16   against that debt.  And what we claim are offsetting rights.

17           In other words, we say we have claims that enable

18   us to say to Lehman we owe you $2 billion but we don't have

19   to pay it.  We owe you $2 billion but you can't instruct us

20   what to do in respect of that debt until the issues of our

21   offsetting claims are resolved.  And the Bankruptcy Code

22   cannot be clearer on that.

23           Section 542(b) makes clear that we don't have to

24   turn over, to the extent we assert rights of setoff, and

25   Section 553 fully protects rights of setoff from any other

Page 36

1    provision of the Bankruptcy Code.

2          So when you think of this situation in its correct

3    substantive terms that we owe them a debt, but we are saying

4    we don't have to pay it, the proposal that they're making

5    immediately becomes illusory and of absolutely no benefit to

6    Citi.

7          Because here's what they're saying.  That debt you

8    owe us we'll step back and we'll say we're not going to

9    characterize it anymore as a special versus general account,

10   and those claims you're asserting against the account you

11   are free to offset them.  Because that's all we can do.  We

12   don't get money, we only reduce our own exposure to the

13   extent of our offsetting claims.

14         But when they tell us to provisionally allow the

15   claims and exercise the right of offset and couple that with

16   their preservation of rights provision they are saying the

17   following things.  That simultaneously you no longer owe us

18   the debt, but you continue to owe us the debt.  You can

19   reduce the debt, but you can't reduce the debt.  Your claims

20   are valid for purposes of reducing the debt, but your claims

21   are still in dispute for purposes of reducing the debt.

22   That gives us absolutely nothing.  It confers no benefit on

23   us whatsoever and it takes away from us our protected rights

24   under section 506(b) and under the bankruptcy -- under the

25   plan and other provisions of the Bankruptcy Code to recover

Page 37

1    post-petition interest and post-confirmation interest to the

2    extent we don't think they will, but to the extent Lehman

3    succeeds in dramatically reducing our claims.

4          The notion of a litigation arbitrage as they call

5    it is really a quarrel with Congress about the ability of an

6    unsecured creditor to have the benefit of -- excuse me -- an

7    oversecured creditor to have the benefit of excess

8    collateral.

9          But -- so that is why the provision is completely

10   illusory, it's offering us nothing.

11         THE COURT:  But I hear your argument.  The

12   argument assumes to some extent the existence of a fund

13   doesn't it?

14         MR. SHIMSHAK:  No, it assumes the existence of a

15   debt.

16         THE COURT:  Well, I know your argument is that

17   this is just a deposit account so you have an obligation

18   ultimately to pay over the $2 billion that was deposited

19   with you subject to offset.

20         MR. SHIMSHAK:  It's more than an argument.  That

21   is the reality of the relationships between the parties.

22         They gave us $2 billion, we maintained in the

23   litigation this was a general deposit.  They argue only that

24   it was a special deposit for limited purposes.  That issue

25   will be resolved in the adversary proceeding.

1            THE COURT:  Isn't that very similar to the issue

2     that was litigated in the Bank of America case?

3            MR. SHIMSHAK:  The -- there are similarities

4     between those -- between those two cases, yes, but we

5     believe on all the points of comparison with that litigation

6     our position is much, much stronger than Bank of America's

7     in litigating that with you.  That boiled down -- before you

8     -- that boiled down to issues about how that arrangement

9     went into place and the construction of the operative

10    documents between the parties.

11           THE COURT:  Understood.  But one of the things

12    that I'm concerned about, just so I understand your

13    argument, is what happened to this money?  It's debtor money

14    which is deposited with Citibank and it ends up, as I

15    understand it, in an offshore account, correct?

16           MR. SHIMSHAK:  No, well this --

17           THE COURT:  Was there not an offshore account

18    here?

19           MR. SHIMSHAK:  No, there was originally a Bahamian

20    account, but I'm sorry to interrupt the Court, but I want to

21    be clear about this because this is very fundamental to what

22    banking is.

23           When someone makes a deposit they give the bank

24    the money.  The money doesn't -- the money doesn't sit in a

25    box in the bank, whether it's in the Bahamas, whether it's

1    in New York, whether it's in Switzerland, where it's any

2    place else.  They give the bank the money, and in exchange

3    they're saying I will take your credit risk and I will take

4    an interest factor on that.  The bank then goes, uses the

5    money, does whatever it wants to do.  It still has that debt

6    to the creditor -- to the depositor, and it has an

7    obligation to pay interest if the account carries an

8    interest feature.  But that other money belongs to the bank.

9    That was the essence of the contract that was made at the

10   time of the deposit.

11          So there's not dollars sitting around that

12   represent the deposit, it is only an obligation of the bank

13   that is owed to that depositor.

14          THE COURT:  Okay.  But in the ordinary course of

15   being a secured creditor you're able to look to an

16   identified asset and claim a security interest in that

17   asset.  That's one of the reasons why in lending cash

18   collateral accounts are set up, why possession is such an

19   important part of the notion of a security interest.

20          And my understanding is that this money has

21   basically filtered into the Citibank system and there is no

22   identified deposit account.

23          MR. SHIMSHAK:  There --

24          THE COURT:  At this point.

25          MR. SHIMSHAK:  No, what has happened -- what

1    happened was that the movie -- excuse me -- the money was

2    moved to New York and then by agreement a separate account

3    arrangement was opened up with Lehman.  But those are just

4    different book entries.  That's not -- that's not a box of

5    $2 billion --

6              THE COURT:  I understand.

7              MR. SHIMSHAK:  -- moving from one place to

8    another.

9              THE COURT:  I understand that we're not talking

10   about a box with $2 billion in it.  It would be interesting

11   to actually observe such a box some day, but --

12             MR. SHIMSHAK:  Your Honor, I'd like to make one

13   other point too, because in many ways issues -- issues

14   concerning setoff, because setoff is treated as a secured

15   claim under the Bankruptcy Code, there's no question of

16   that, it's expressed in Section 506, but the issues are

17   unique when one thinks of it, and you cannot start

18   analogizes to your traditional understandings of collateral

19   in the sense of having property of the debtor.

20             When the property of the debtor is an obligation

21   that is owed to the debtor it's basically a receivable and

22   you're talking about what defenses you have, that's what

23   setoff is, defenses to the payment of that receivable.  That

24   again goes to what is fundamentally flawed and illusory

25   about this relief.

Page 41

1          Because they're saying to us pay yourself, which

2     they can't do any way, we're not obligated to follow their

3     instructions, they're saying all right we'll step back from

4     the $2 billion deposit and surrender it to you, but that has

5     only one meaning in this circumstance given the relationship

6     between the parties.  We are free to reduce the payment

7     obligation to Lehman by our claims, but they are

8     simultaneously saying without interruption your obligation

9     to pay us that same $2 billion and your ability to reduce it

10    by your claims remains in dispute.

11         So nothing from our perspective has been

12    accomplished.  There's been no benefit to us of this

13    arrangement, there's only been the curtailment of existing

14    rights.

15         THE COURT:  Well, one of the existing rights that

16    you assert and insist on preserving is the right to claim

17    post-petition interest, and this is mostly about that I

18    think.  This is mostly about your insistence upon being able

19    to assert an interest claim that is significantly burdensome

20    to the estate and its creditors, because as it clicks away

21    at seven and a half percent or whatever the right number

22    is --

23         MR. SHIMSHAK:  That's not the right number, but --

24         THE COURT:  Well, what is the right number?

25         MR. SHIMSHAK:  The right number for the cost of

Page 42

1    funds by analogy to another situation, and I'm straying into

2    Ms. Hammerman's area right now, is under five --

3             THE COURT:  It's okay.  Just because --

4             MR. SHIMSHAK:  -- under five --

5             THE COURT:  Just because you wanted to --

6             MR. SHIMSHAK:  Under five percent.

7             THE COURT:  -- set a neat division doesn't mean

8    that I did.

9             MR. SHIMSHAK:  No, but it's -- this is the kind of

10   that lawyers do.

11            Lehman has been out there insisting on a 14

12   percent rate in -- for its own derivative-related claims.

13   We made -- we made the mistake in retrospect of saying the

14   rate we are seeking is less than half of what they are

15   seeking.  So they immediately tag us with seeking seven

16   percent.  But in fact the rate is below five percent.

17            Now, on the post-petition interest point let me

18   address that.  Here's the dynamic.  We think our claims are

19   -- exceed the $2 billion deposit and in that case we'd

20   exhaust it, there wouldn't -- there wouldn't be an issue of

21   post-petition interest.

22            Lehman is focused on a very narrow situation.

23   Lehman maintains that we have grossly inflated our claims,

24   that we're dragging our feet in the litigation, and you

25   know, a bunch of stuff related to the process and the

Page 43

1    dynamic that we're involved in now.  And they're saying to

2    themselves if we're wildly successful and we were right and

3    we push Citi's claims way down it's a pyrrhic victory

4    because they're an oversecured creditor at that point as a

5    result of our reducing their claims and they're therefore

6    going to make a claim for post-petition interest at whatever

7    rate they're going to make that claim.  And they're

8    dissatisfied with that result.

9              I have two responses to that.

10             The first response is that is a normal incident of

11   the claims allowance process.  Parties assert claims, they

12   have claims reduced, and if they have additional protection

13   and collateral or an additional right of setoff that right

14   is recognized.  It's not -- it should not be punitive that

15   as a result of the claims allowance process and you find

16   yourself with the smaller claim but more protection you're

17   able to recover post-petition interest.  That shouldn't be

18   taken away from you.

19             But to the extent there is an element of fault or

20   wrong doing that Lehman is asserting, that it's really

21   bothered by this potential, they've already protected

22   themselves against that possibility.

23             Their adversary proceeding complaint contains

24   allegations that we inflated our derivative claims, that the

25   inflated derivative claims have been harmful to the estate,

1      and they seek the remedy of equitable subordination.

2              So there is the remedy in that circumstance if

3      they're considered -- if they can prove up the equitable

4      subordination standards.  There is the remedy if we've

5      engaged in any kind of misconduct.

6              But it should not be cutting off our statutorily

7      created rights and our rights reserved under the plan in a

8      circumstance of us finding ourselves with derivative claims

9      that are less than we believe them to be but sufficient to

10     offset in combination with interest our payment obligation.

11     That's a protected right.  That's not -- that's not

12     something that can be taken away from a creditor.

13              THE COURT:  Okay.

14              MR. SHIMSHAK:  Now, Mr. Kirpalani was right when

15     he said I was going to get up in addition to talking about

16     the nature of the relief -- relief sought.  And by the way,

17     I want to make one other point, because this goes to the

18     dynamic between the parties in your talking to us about

19     whether something could be worked out.

20              When this motion was filed -- when this concept

21     was introduced we said to Lehman, please explain to us how

22     we're getting any benefit out of this?  We never got an

23     explanation.

24              As the situation advanced we then said to Lehman,

25     not only does what you're saying make no sense, it's

1    internally inconsistent that you can both dispute and allow

2    a claim, you can both owe and not owe a debt.  Not only does

3    that make any common sense, as a matter of accounting, and

4    we included the last exhibit in here, the relevant account

5    standard, this setoff can't be taken.  You can't make a bank

6    take a setoff and then tell the bank that it still owes the

7    debt and that the claims that it used to offset are still in

8    dispute.  It just can't be done under the applicable

9    accounting standard.

10           We asked Lehman, please, tell us if we're wrong

11   about this accounting treatment, -- if we're wrong about

12   this accounting treatment please explain to us why we're

13   wrong.

14           We also said to them, we will make our accounting

15   personnel available for a deposition.  You can take their

16   deposition, you can hear from -- they'll educate you about

17   why what you're saying as an accounting matter is

18   impermissible.  They refused to take the deposition.

19           They then in their response say this accounting

20   issue is a Citi specific issue, which is itself an

21   accounting conclusion by the way, an unsubstantiated

22   accounting conclusion.

23           And they then go on to say -- they cite some cases

24   which have nothing to do with the application of the

25   generally accepted accounting principals on the FAZBI (ph)

1    provisions that we've identified to them.

2              So it's a complete -- it's a complete nonsense

3    from the standpoint of its internal contradictions and an

4    accounting impossibility.

5              But putting all of that aside they have to have --

6    they have to come to you for authority to impose this on us

7    and they have to have a statutory basis for it.  They have

8    to have a statutory basis for it.  They know that.

9              They talk about four statutes.  363(b).  Let's

10   talk about 363(b).

11             We're not being cute when we say 363(b) no longer

12   applies, all the assets have vested in the debtor, it's no

13   longer property of the estate.  That's a provision of their

14   own plan.  Section 13.1 of their own plan says that.

15             And when I saw Lehman's response I was really

16   curious, I was thinking why is Lehman taking the position

17   that Section 363(b) still applies for non-ordinary course

18   transactions?  Why would a debtor with a confirmed plan ever

19   want to be out there in the world dealing with third parties

20   now and having them uncertain as to whether or not there was

21   a need to run back to Your Honor to get approval for

22   something?  It made no sense.

23             So we went to the docket.  And Your Honor is

24   intimately familiar with the Archstone transaction.  Can

25   someone help me?  What tab is that?

Page 47

1          MS. HAMMERMAN:  It's 6.

2          MR. SHIMSHAK:  Tab 6.  Your Honor, look at tab 6

3     of -- no, no, that's not tab 6.  Yeah, look at tab 6 of your

4     materials.

5          As you recall there was an issue concerning the

6     ability to exercise a right of first out offer regarding

7     certain securities of Archstone, and that issue emerged in

8     the period between confirmation of the plan and the

9     effective date.

10          And what was Lehman's position on that?  Well, as

11     you can see from the highlighted language the plan has not

12     yet gone effective.  Consequently the debtors are continuing

13     to operate as debtors in possession as to which court-

14     approval is required for transactions out of the ordinary

15     course.

16          Then a footnote, "The debtors reserve the right to

17     withdraw the motion if the plan effective date occurs prior

18     to the hearing on this motion."

19          So clearly at that time Lehman was recognizing two

20     things.  The need for 363(b) approval in this gap period as

21     to transactions outside the ordinarily course, and

22     recognizing under the terms of their own plan in 13.1 that

23     when the effective date occurred that was not going to be

24     necessary.

25          But -- so this matter is the first instance to my

1    knowledge.

2              THE COURT:   I think you're overstating it.   It's a

3    reserved right.   It's not an acknowledgment of legal

4    position.

5              MR. SHIMSHAK:   But this was -- this is the first

6    instance to my knowledge that despite 13.1, which says that

7    all of the property of the estate is vested in the

8    reorganized debtors, it is unqualified, that Lehman has

9    taken the position that somehow 363(b) has continued

10   vitality.   I do not -- you know, this is the first instance.

11             But to see if this marked a change of position as

12   recently as Monday in the next tab in a dispute involving a

13   2004 examination where the challengers -- where the parties

14   bringing the 2004 examination were questioning actions that

15   the plan administrator had taken under the authority granted

16   him under the plan and seeking to involve the Court in

17   reviewing those actions Lehman responded by saying it's no

18   longer in bankruptcy, it's free to -- free to negotiate and

19   enter into transactions involving its assets free of any

20   restrictions of the Bankruptcy Code or rule -- rules.

21             So what does Lehman say in response to our

22   argument about 363(b) not being available as a basis for

23   granting them the relief requested?

24             They simply say a complete non sequitur, well,

25   there are continuing jurisdiction provisions in the case.

1    The Court has continuing jurisdiction over the adversary

2    proceeding.  And therefore what?  And therefore Section

3    363(b) applies?  The one doesn't follow from the other.  The

4    fact of continuing jurisdiction does not revest or recreate

5    the estate and property of the estate for purposes of

6    invoking section 363(b).

7          The statement itself is not even legal argument,

8    it's really an ipsi Dickson in which they're just saying,

9    well, see these continuing jurisdiction provisions, that

10   means 363(b) still applies.  No it doesn't.  It doesn't mean

11   that at all.

12         502.  Let's talk about 502.  It's section 502(b).

13         What does section 502(b) actually say?  Section

14   502(b) says, "Claims somebody allowed unless ..." and then

15   there are enumerated basis for not allowing claims.  That is

16   the function of Section 502(b).  To allow -- it does not say

17   anything about provisional allowance, it just says the Court

18   shall allow claims unless one of these enumerated conditions

19   occur.

20         There's nothing in there remotely reassembling the

21   issues that are being presented by this motion.

22         Section 502(c) deals with estimation.  But

23   estimation for what purpose?  For purposes of allowance.

24   Not provisional allowance, purposes of allowance so you can

25   get a distribution.

1          So 502(c) by -- you know, has no application.

2          There was such a wonderful phrase in their brief.

3    Oh, this is where they're trying to say, you know, they can

4    breathe into Section 502 enough substance for you to do what

5    they're proposing that you do.  They have this wonderful

6    phrase in there.

7          They're asking the Court to exercise its equitable

8    powers within the confines of Section 502(b) to facilitate

9    the estate's reconciliation of the subject claims.

10          Your Honor, I must have read that 10 times.  This

11    will make the eleventh.  I still have -- I have no idea what

12    that -- what that phrase means.  I have no idea what that

13    phrase means.

14          502(b) is very clear, it's very clear on what it's

15    purpose is, it's very clear on what it's mechanic is.  It

16    has nothing to do with the facilitating the estate's

17    reconciliation of the subject claims.

18          Their argument for 502(b) -- their argument for

19    502(b), let's call it what it is.  It is a gloss that they

20    want you to impose on the statute.  But I -- to allow you to

21    provisionally allow claims when there's nothing in that

22    provision that allows the provisional allowance of claims.

23    It's a gloss that they want to put on 502(b), and I would

24    maintain that it is a gloss that completely obscures and

25    deviates from the stated purpose of the statute.

1          So in simple terms 363(b) is not available, 502(b)

2     is not available.  They refer to 509.  509 is the not a

3     basis for relief, because 509 presumes the outcome.  It

4     presumes that claims have been paid and fully satisfied

5     before you can get to 509.  So 509 could never have

6     application here because we're never going to be fully paid

7     under the -- by the terms of their own order.

8          But that doesn't stop them.  When you look at the

9     terms of their proposed order -- when you look at the terms

10    of their proposed order they actually say that as a

11    consequence of the provisional allowance they are fully

12    subrogated to our rights.

13         So that means when we get paid from some other

14    estate because of this provisional allowance of our claim,

15    this nonpayment payment we have to turn the money over to

16    them.  That's the effect of that order.  That seems to be an

17    enormous overreach.  And in fact in trying to get to that

18    overreach they even misconstrue the statute.

19         We have one of the parties -- one of the parties

20    that owes us money is a Lehman entity that is not a debtor

21    here.  Lehman Brothers Commercial Creditor -- Commercial

22    Corp. Asia, it's in a liquidation proceeding in Hong Kong.

23    They owe us -- this is what we refer to as the Hong Kong

24    loan.  They owe us about $300 million and Lehman guaranteed

25    that obligation.  509 says, "An entity that is liable with

1    the debtor is entitled to subrogation."  Well LBCCA is not a

2    debtor.  Lehman can't assert subrogation rights through

3    Section 509 because of -- for a LBCCA payment.  But that's

4    not the way the order reads.  That's not the way the order

5    reads.

6            So the implication of 509 is the a complete

7    overreach.

8            So let's reprise where we are.  The relief makes

9    no sense.  It doesn't offer us anything.  All this talk

10   about how it's fair, how it's balanced, how we have a

11   benefit.  There's no benefit to us.  We end up being in the

12   exact same place.  We can't do it as an accounting matter,

13   and they have not, despite our invitation, demonstrated that

14   we can.  There is no statutory basis for the relief.

15           363(b) is not available.  502(b) is not available.

16   509 has nothing to do with it.  And 105, which supplements

17   all of them, can't even be invoked if the underlying

18   statutes aren't operative.

19           But that's not enough.  That's not enough.  What

20   they propose also violates the terms of their own plan.

21           Now their argument in response to this was, well,

22   there's nothing in the plan that says we can't provisionally

23   allow claims.  Well, all right, those words don't literally

24   appear anywhere in the plan.  But certainly -- certainly

25   it's the case, and no one would dispute this, that a Chapter

Page 53

1    11 plan is in essence a contract between the debtor and its

2    creditors as to the resolution of the claims.  It creates

3    rights.  It creates procedural rights and it creates

4    substantive rights.  It tells us how we're going to be

5    treated, it tells us how we're going to get finality, and it

6    describes the process under which we will get all of those

7    issues resolved.

8              What does their plan provide?  Their plan provides

9    that they cannot make any payments, make any distributions

10   on claims that are disputed.  Our claims are always disputed

11   under this arrangement.  Yet they're purporting to make a

12   distribution.  Distributions that are made are supposed to

13   be free of all claims, liens, and encumbrances.  The

14   distribution that we're getting through this provisional

15   allowance is coming with the entire litigation attached to

16   it.  It's by no means a permissible distribution within the

17   plan.

18             It says that rights of setoff are fully protected.

19   What are the rights of setoff that we're asserting?  It's

20   the right to assert the full extent of our claim, including

21   claims for post-petition interest and post-confirmation

22   interest against our payment obligation to Lehman.

23             This is an attempt to cut back on that right

24   outside of the plan, and I would argue and I maintain in

25   derogation of the plan.

1            Now, you know, they may say that it's not

2    prohibited by the plan, but every creditor has the right to

3    expect that their conduct is going to be consistent with the

4    plan and it is not going to reduce the rights that are

5    available to us under the plan.  But that is the effect of

6    this proposal.

7            It doesn't work substantively, it doesn't work

8    from an accounting perspective, there's no basis for the

9    relief, and it violates the terms of their own plan.  That's

10   why we think this motion is improper, that's why we think it

11   should be denied.

12           If Lehman wants to continue to discuss with us

13   some arrangement that is protective of our rights under the

14   Bankruptcy Code, under Section 553, and under the plan we're

15   always open to discuss that.

16           Our questions to them, please explain how this

17   works for us, please explain how this can be done from an

18   accounting perspective.  Evidence is our willingness to have

19   a dialogue with them.  It's the opposite.  They cut off the

20   discussions, they would not respond, they ran into court to

21   get this relief from you.  We think it's improper, we think

22   the motion should be denied.

23           At this point I'm prepared to yield the podium to

24   Ms. Hammerman to talk a little bit about the equities.

25           THE COURT:  Okay.  Thank you, Mr. Shimshak.

1              MS. HAMMERMAN:  Your Honor, Claudia Hammerman from

2      Paul, Weiss.

3              I -- I am the master of the facts, I have been

4      dealing and living with this case for five years and that's

5      why I think Mr. Shimshak ceded this portion of the argument

6      to me.  So I'd like to address some of the factual questions

7      that you raised initially with Mr. Shimshak and he bravely

8      tried to counter.

9              In one question you had is how is this different

10     from B of A?  In the B of A situation -- and this is -- this

11     is, you know, way beyond this motion, but I understand

12     you're trying to figure out why this is a different

13     situation from others that you have faced.

14             In the B of A situation there was an agreement.

15     There was a security agreement that covered a deposit and it

16     limited the definition of indebtedness, and that definition

17     of indebtedness was limited to clearing and was -- and Your

18     Honor found that there was no reservation of common law

19     rights to go broader than clearing.

20             Now here there is no security agreement covering

21     this deposit.  In fact there is no written agreement at all.

22             This is a deposit in the same way that you and I

23     deposit money in the bank, we all use the colloquial terms

24     that there's money in the bank.  In fact there's no money in

25     the bank.

1          You asked what did Citibank do with this money?

2     Citibank treated this as a general deposit, the same way

3     whenever Lehman had to park its funds at night extra funds

4     to earn interest on them Citi commingled these with its own

5     funds and Citi views itself as having a contract, a debt to

6     pay this back subject to the negotiated rate of interest.

7          You also asked whether the relief sought here is

8     impossible.  And we submit based on consultations with

9     senior accountants at Citibank that it is impossible, and we

10    offered those senior Citibank accountants in the accounting

11    policy group at Citibank, we offered them up for deposition.

12         Our understanding, and you can look all though the

13    last tab in the binder, our understanding is that even a

14    layperson looking at the conditions for setoff would

15    absolutely see why as a matter of prudent accounting during

16    this hard fought litigation Citi cannot take the setoff.

17         So Your Honor could I guess -- well, as

18    Mr. Shimshak described, we don't think there's a legal basis

19    for Your Honor to cut off our rights to post-petition

20    interest, we think it's in violation of the plan, but

21    putting those problems aside Your Honor could I guess issue

22    an order that says no interest will accrue on Citibank's

23    claims.  But you can't -- and you could say for purposes of

24    this proceeding those have been provisionally satisfied

25    until they're allowed.  But Citi would not be able to do

Page 57

1    anything with the $2 billion debt it owes and the

2    countervailing debts that Citi says Lehman owes.

3             Now you asked about another precedent, which was

4    Calpine.  And you know that's very interesting, because at

5    the time of the arguments before the -- before the

6    Bankruptcy Court and before the Appellate Court there was no

7    hint that the payments that were being made were disputed

8    payments at the exact time they were being made.

9             All of the briefing in those cases makes clear

10   that this is a debt that's owed and the reservation of

11   rights -- the reservation of rights are with respect to the

12   make whole.

13            And the question that was presented is can the

14   judge allow payment of the principal and accrued interest up

15   to that moment but not permit -- but not decide the question

16   of the make whole and whether it also needed to be paid at

17   the same time?

18            The question of whether those were inextricably

19   intertwined and whether it abridged any rights by permitting

20   payment of one but not the other, that was the -- that was

21   the situation before the Bankruptcy Court and before the

22   Appeals Court.

23            Now it is absolutely true as Lehman has noted that

24   later on in the bankruptcy proceeding the creditors'

25   committee asked for permission to actually challenge the

1    secured status of those claims and the debtor opposed that,

2    and the debtor argued that -- and I think we have that at a

3    tab, maybe you can do we the favor, Steve, of telling which

4    tab it is -- but the debtor -- the debtor opposed the

5    motion.  The debtor said there is no colorable basis --

6              MR. SHIMSHAK:  Tab 11.

7              MS. HAMMERMAN:  -- to argue --

8              MR. SHIMSHAK:  Tab 11, Claudia.

9              MS. HAMMERMAN:  I'm sorry, tab 11.

10             The debtor argued that there is no colorable claim

11   that this is not a secured debt.  In fact the debtor had

12   always referred to it as first lien debt, so had the UCC in

13   their previous submissions, and the only reservation of

14   rights in their previous submissions both to the Bankruptcy

15   Court and the court of -- and the District Court were with

16   respect to the make whole provision and certain professional

17   fees.

18             Now --

19             MR. SHIMSHAK:  Oh, tab 10.  I'm sorry, tab 10.

20             MS. HAMMERMAN:  Apologies.

21             MR. SHIMSHAK:  My apologies.

22             MS. HAMMERMAN:  It's tab 10.

23             THE COURT:  I enjoyed reading the other tab any

24   way.

25             MS. HAMMERMAN:  Okay.

1           MR. SHIMSHAK:  Thank you, Your Honor.

2           MS. HAMMERMAN:  So in tab 10 you can see that the

3    debtors state that there was no colorable basis.

4           As things are wont to do in Bankruptcy Court the

5    dispute was settled and by stipulation the authority was

6    granted to the UCC to bring that claim later.  But it

7    doesn't change the fact that when Calpine, the decision that

8    they referred to as the basis for what they're seeking here,

9    at the time that was decided there was not a hint that there

10   would be any dispute to the -- to the claims that were being

11   paid with those monies.

12          So we submit that there is no authority, no

13   analogous situation where claimants would -- I'm sorry --

14   where the debtors force the creditors to provisionally

15   satisfy a claim that is disputed.

16          I think there was also discussion with

17   Mr. Shimshak about the rate and what rate applies -- would

18   apply here.

19          Now we have been accused of charging exorbitant

20   rates, those were the words repeated over and over again in

21   the brief.  The highest interest rate that Citi is seeking

22   is under the industry standard is the master agreement, that

23   calls for Citibank's cost of funds plus one percent.

24          In our opposition we -- we reflected the fact that

25   Lehman itself is seeking post-petition interest or seeking

Page 60

1   interest under the selfsame provision.  We also noted that

2   there are public reports that the amount that it is seeking

3   is as much as 14 percent.  There was no dispute about either

4   of those two statements in the reply papers.  But what the

5   in fact the reply papers didn't touch that.

6        Instead what they looked at, they argued that Citi

7   is seeking at least seven percent and Mr. Kirpalani repeated

8   that before Your Honor.

9        And we respectfully submit that that is simply

10  disingenuous.  It's disingenuous as a matter of mathematics,

11  because what we said in our opposition where they claim to

12  have derived this at least seven percent from our

13  opposition, what we said there was that Citibank's rate of

14  interest or the rate of interest applicable to Citibank as

15  an A-rated financial institution is going to be

16  substantially -- and what's amazing is that actually in

17  their reply papers Lehman quotes this exact language in

18  footnote 39 I believe.  They -- what we said is

19  substantially less than half of what Lehman is claiming.

20       So 14 percent -- substantially less than half of

21  14 percent is not at least 7 percent.

22       But the problem that we have with the -- with the

23  claims that have been made with respect to this seven

24  percent go beyond that.

25       As we stated in our papers, Citi is assiduously

1  trying to collect from other obligors on the claims that it

2  is making against LBHI.

3          In one of those proceedings Citi has filed

4  publicly an estimation of its cost of funds over an

5  analogous period.  That estimation was 4.65.  So it would be

6  4. -- what Citi would claim it's owed here is it's cost to

7  funds plus would you be percent.

8          Now Lehman is absolutely familiar with this

9  litigation, they have been following it, and in fact they

10 recently served us with a discovery request asking for all

11 documents produced by either side in that litigation.

12          So it's not clear what Your Honor will determine

13 Citi's cost to funds is, Citi has estimated it, but the cost

14 to funds plus 1 percent can be no more than 5.6 percent, and

15 Citi would essentially be judicially estopped from

16 estimating it at a higher rate.  So we don't think this

17 amount is exorbitant at all.

18          The other thing that Lehman has suggested, they've

19 suggested that Citi is using the accrual of post-petition

20 interest as leverage and as litigation arbitrage.

21          Now we find that accusation ironic, because this

22 situation isn't like the situation Your Honor faced where

23 derivative's counterparties to the debtor were making those

24 kind of allegations in connection with the flip clause

25 litigation.

1          In the flip clause litigation Lehman is seeking

2     interest under this selfsame provision, perhaps as much as

3     14 percent, they didn't respond to the public report, and

4     they are simultaneously seeking stays -- lengthy stays of

5     that litigation.  By our count now they have sought two

6     years worth of stays.

7          So we can at least sympathize and understand why

8     the derivative's counterparties are saying that that is

9     litigation arbitrage and using the threat of interest as

10    leverage.

11         Now we will concede that in any litigation – in

12    any litigation at all where interest can be paid that

13    exasserts some amount of leverage on the parties.  That just

14    is part of their cost benefit calculus.  And that's the

15    situation here.

16         Citi maintains that by contract under bankruptcy

17    law and under the plan it's entitled to full post-petition

18    interest to the extent of its collateral at the time its

19    claims are allowed.  And that is our legal position.

20         Plaintiffs try to suggest that Citibank could only

21    access that collateral for purposes of post-petition

22    interest if Citi has behaved wrongfully here and has grossly

23    inflated its claim, and that is simply untrue as a matter of

24    fact.

25         As we stated in our papers Citibank is assiduously

Page 63

1    pursuing other sources of recovery here.  It has already

2    recovered $200 million on the claims that it is making

3    against LBHI.  It stands to recover hundreds of millions of

4    dollars more.

5            Moreover, we have pointed to other sources of

6    collateral that Citi faces with respect to these claims.

7    And Citi has unsecured claims against LBSF and the

8    underlying debtors here.

9            So it is simply not the case that Citibank will

10   only have post-petition interest if Citi has wrongfully,

11   grossly inflated its claim.

12           In fact right now if Citibank recovers everything,

13   every penny of the claim that it is seeking there would

14   still be substantial room for post-petition interest through

15   2014.

16           Now is Citibank using this as leverage?  I think

17   the -- our position is that the law has given us this right.

18   This right exists and it should -- you know, it will be part

19   of the calculus that debtors have to make as to whether they

20   want to make a reasonable offer in terms of settling this

21   dispute.

22           And we would -- we would also note that the --

23           THE COURT:  Do you have a provisional calculation

24   of how much interest we're talking about?

25           MS. HAMMERMAN:  I'm afraid that I don't have that

Page 64

1    right here, Your Honor, but we have done the calculations at

2    least to the extent that I can stand up here and say that it

3    is possible under the interest rates we're claiming for us

4    still if we recover against the other estates for us to

5    continue to get post-petition interest on these claims.  And

6    in fact the interest rate that you would apply in doing

7    those calculations, that's not set either.

8           We have our position as to what the contractual

9    rate is, that we're entitled to the contractual rate under

10   506 pre plan, and post-effective date we argue that the plan

11   gives us our full amount of our claim, and that would

12   include the contractual interest up to the limit of our

13   security.  But Your Honor will decide that at the

14   appropriate time.

15          And so it's simply -- since the variables are

16   unknown here, will Citibank recover from all of the primary

17   obligors and thus have a lot of room in -- in its security

18   for further post-petition interest, what interest rate will

19   ultimately apply since Lehman has made clear that they will

20   challenge that interest as to -- as grossly inflated?

21          But the other point if we're going to talk about

22   grossly inflated claims, and I certainly, you know, don't

23   mean the fling mud, but this claim objection started out

24   challenging Citi's claims as overstated by $1 billion, and

25   we vigorously contest that.

1              But Lehman -- and I think this does factor into

2      the equities here -- Lehman decided to double down on that

3      claim.  Lehman now claims that our derivative's claims are

4      overstated by more than 2.2 billion and to the extent that

5      Citi now owes money to Lehman.

6              So this -- and in fact I think in their counts 18

7      and 24 on a combined basic under the derivative's claims

8      they are asking -- they claim that Citi owes them

9      $230 million.

10             So this motion and Citi's right to post-petition

11     interest only makes sense if Lehman has grossly inflated its

12     claim objection, has grossly inflated the amount that it

13     calculates Citi is due under these derivative's claims -- or

14     correcting that what Citi now owes Lehman.

15             So the impossibility of canceling out Citi's debt

16     to Lehman of $2 billion and canceling out the claims Citi

17     owes I think you can see why that would not be prudent

18     accounting in the circumstances.

19             I think that in addition all we would note is

20     Lehman does claim to be giving something up here.  We submit

21     that Citi has no benefit, but maybe fairness is that they're

22     giving something up.

23             They claim that under the 2009 stipulation, April

24     2009, which they have attached as Exhibit A to their reply

25     papers, that they have the benefit under that stipulation of

Page 66

1    FDIC protection on the $2 billion account.

2           Well in fact that FDIC protection, if you look at

3    the stipulation itself, that FDIC protection is provided

4    under the temporary liquidity guaranteed program, and the

5    TLGP by its terms was temporary, it was expected to be

6    temporary, it was a temporary response to the acute moments

7    of the crisis, and it lapsed, it lapsed long ago, and the

8    debtors can see that if they look on the FDIC website.

9           So long ago the debtors faced and fully absorbed

10   this is what they say they're giving up -- they're going to

11   absorb the collection risk from Citibank.  They've always

12   had that risk.

13          So I guess while I understand that Your Honor

14   has expressed some discomfiture with Citi continuing to

15   accrue interest here, Citi claims that is their right under

16   the law.

17          Citi would also submit that the equities here do

18   not favor Lehman.  Lehman has not tried to simplify and

19   settle this case.  If anything they've expanded it.  They

20   have controlled the timing of the litigation, the pace of

21   the litigation, but also the scope of the litigation.

22          As we stated in our papers, Lehman could have

23   easily decided to satisfy -- resolve and satisfy those

24   portions of the -- of Citibank's claims as to which they had

25   no reasonable dispute, and we submit there are plenty of

Page 67

1    those, and we have given examples in our papers to Your

2    Honor in the opposition, and the reply papers from

3    plaintiffs do not address that.  They simply do not address

4    that.

5         So while the injury that they're claiming is we

6    say a product of the legal regime here and is simply what

7    they had to figure into their calculations in suing an

8    oversecured creditor, we also submit that to a certain

9    extent this is a self-inflicted injury.  Because to the

10   extent they could see themselves clear to acknowledging that

11   there's a large portion of Citibank's claim as to which they

12   have no conceivable argument they could cut off that

13   principal which would be accruing post-petition interest.

14        So in closing, Your Honor, and thank you very much

15   for being patient with a long-winded argument, we submit

16   that there's no legal basis under the -- under the

17   Bankruptcy Code for Your Honor to grant this motion.  That

18   granting this motion would abridge Citi's settled

19   expectations and vested rights under the plan.  And that in

20   these circumstances there is -- it would simply be

21   inequitable to Citi and it would remove the one -- the one

22   little amount of leverage -- and I'll accept leverage --

23   that Citi has in moving this case along to an appropriate

24   resolution.

25        We will note, and Your Honor pointed out, that

1    JPMC agreed to give up post-petition interest.  They got a

2    whole lot of other benefits, but they agreed to give it up.

3    That -- in that case -- that case the initial scheduling

4    order has now slipped and the scheduling order that exists

5    now it's two years later.

6            So we submit that the equities do not favor

7    granting this motion, not that any free floating appeal to

8    equity could be a basis for this motion, and I thank you

9    very much for hearing me.

10           THE COURT:  Okay, thank you.

11           Mr. Kirpalani, you have a lot to respond to.

12           MR. KIRPALANI:  Yeah, I'm not sure I'm going to be

13   able to respond to everything that was said, Your Honor, but

14   I'm going do my best.

15           The first thing I want to start with is counsel I

16   believe said I think wrongly that in the Calpine decision,

17   and I think I did acknowledge that it's not on all fours,

18   and it's certainly not controlling precedent, and that it is

19   analogous I do believe, but there's a factual statement that

20   was made that is wrong.  I believe she said that there was

21   not a hint that the debtors might have claims, that it just

22   came as a surprise, nobody realized.  So I just want to read

23   from the transcript, which is attached to our papers.

24           On June 21 of 2006 before the Honorable Judge

25   Lifland counsel for the debtors said, I quote, "As we set

1     forth in our papers of course we are reserving all of our

2     other rights, and I don't suggest we are waiving any rights,

3     including the right to ultimately attack or challenge the

4     first lien holder's liens."  And then it goes on to talk

5     about, "and of course we're going to challenge the make

6     whole too."  So I just think that is an incorrect statement.

7              However, I also want to caution that we are not

8     suggesting that Calpine is on all fours.  Calpine for the

9     record and for Your Honor's clarity does rely on 105 coupled

10    with 363(b).

11             I accept Mr. Shimshak's statements.  Mistake, it

12    is not a Section 363 issue before the Court here.

13             We do believe that 105 and 502 does give Your

14    Honor enough play in the joints to accomplish a just and

15    equitable outcome.

16             I'd just like to read a provision from the Calpine

17    appeal in the District Court where the Court noted, "A

18    bankruptcy" -- quote, at page 593, "A Bankruptcy Court's

19    exercise of its equitable authority is reviewed for abuse of

20    discretion.

21             Abuse of discretion is one, a decision resting on

22    an error of law such as application of the wrong legal

23    principal or a clearly erroneous factual finding, or two, a

24    decision that, though not necessarily the product of a legal

25    error or a clearly erroneous factual finding, cannot be

Page 70

```
1    located within the range of permissible decisions."   End

2    quote.

3              "Moreover, to further the purposes of Chapter 11

4    reorganization a bankruptcy judge must have substantial

5    freedom to tailor his or her orders to meet differing

6    circumstances and the citation as to integrated resources,

7    and to the Second Circuit's decision in Lyonell (ph)."

8              And what we would submit, Your Honor, is this is

9    an entirely unique situation.  We're getting a tutorial from

10   Mr. Shimshak about the way banks work.  We're getting a

11   tutorial about how this is their God-given right to assert a

12   setoff claim.  And somehow as a setoff creditor they are a

13   secured creditor under 506, and even though it seems

14   inequitable on these facts they're entitled to assert it,

15   admittedly, as leverage the post-petition interest.

16             But, Your Honor, they also talk about -- I almost

17   I thought I heard Ms. Hammerman say that if Your Honor

18   thought -- rather than forcing a setoff or a provisional

19   allowance that would disrupt their accounting mechanics I

20   thought I heard her say -- but I don't want to misstate it

21   that Your Honor could always if you thought it was unfair

22   just not do that but stop the accrual of post-petition

23   interest, just on the equities, it doesn't seem right.

24             We'd be fine with that, Your Honor.  It's not the

25   mechanic that we're thrilled with or trying to push down
```

Page 71

1   anybody's throat, it is the inequitable situation that we're

2   stuck with.

3            And I -- again, I'm concerned about the integrity

4   of the court, I'm concerned about, you know, making an

5   argument that Your Honor takes away and then later finds

6   out, you know, that was an improper thing for me to try to

7   persuade you on.  So I'm not doing that.

8            I'm not going to tell you, Your Honor, that 506(b)

9   gives you discretion to determine interest rates, no matter

10  what.  I can't do that.  I can't do that.  I am stuck with

11  what the case law provides.

12           But I do think, Your Honor, you definitely have

13  the power under 1059a) and 502 to provisionally allow, if

14  they're not comfortable with that result and they would

15  prefer for their internal purposes to simply accept that

16  from today forward we can argue about what happened in the

17  past and what the reasonable rate was or what they're

18  charging, from today forward in order to accomplish their

19  legitimate accounting integrity issues and the interests and

20  needs of creditors of Lehman we can stop the burn of

21  interest.  And they are obviously using the cash in a

22  productive way.

23           It is very disanalogous from a situation of a

24  secured creditor who is really being precluded and injured

25  by the automatic stay and not being able to move on with

1    life.  They are making good use of the funds, which they

2    should be doing.  But they shouldn't be charging the estate

3    at the same time.

4            Another area, Your Honor, that I'd like to cover

5    is Mr. Shimshak said our plan.  We got a tutorial on what

6    our plan provides.

7            But what I would like to point out is the issue

8    that they simply can't or chose not to respond to is

9    Mr. Shimshak said we have a contract, the plan is a contract

10   and it creates rights, and they told us how the plan works.

11           There's another contract that Mr. Shimshak didn't

12   mention, and that's the stipulation on reserves.  The

13   stipulation on reserves with Citi specifically cites

14   Section 8.4 as applying to their claims.

15           Section 8.4 of the plan says, rather than contract

16   rate or applicable law we're no longer in the pendency

17   interest world of petition date to effective date, Supreme

18   Court says that's dependency interest world, we're not in

19   there.  After that you have to look to what the plan says.

20           They say Section 8.4, which limits interest post-

21   confirmation to whatever Lehman's estate is earning on the

22   money to prevent this exact problem.  It says that's all

23   they get.

24           So what's their answer as to why that doesn't seem

25   to work?  That's the contract, the plan that they say they

Page 73

1    accept, and they have another contract, their stipulation,

2    which specifically says 8.4 governs their claims.

3            Their answer is, well the plan says elsewhere that

4    we're entitled to get all, we're entitled to it be paid in

5    full.  Quote/unquote.  And so they jam into the words in

6    full this reading that they're entitled to do what the

7    Supreme Court says stops at the effective date and get post-

8    petition interest at whether it's five percent or what have

9    you, with the compounding this is hundreds of millions of

10   dollars.  Even from March 2012, the effective date till

11   today, it's probably $250 million.

12           So if Your Honor -- if we can get a decision from

13   the Court that even the plan, Section 8.4, does stop the

14   alleged 506(b) interest that they are asserting and now it's

15   governed by the plan I think Your Honor certainly has the

16   power to interpret the plan and the confirmation order, the

17   contract, and that would be a result that would be of great

18   value to testate, and it was alternatively sought in our

19   motion, Your Honor.  It does not have to be the mechanic

20   that we came up with.  Just because JPMorgan seemed to be

21   able to be comfortable with it we don't understand why Citi

22   is not.

23           I will tell Your Honor that JPMorgan, there was

24   cash that they also applied on disputed claims.  So it's not

25   entirely different the way Citibank makes it seem.

1          I think --

2          THE COURT:  Mr. Kirpalani let me ask you

3     something.

4          MR. KIRPALANI:  Uh-huh.

5          THE COURT:  It's been a very interesting argument.

6     And one of the thoughts that occurs to me now is that it may

7     be premature.  One of the issues that bubbled up in my mind

8     as I was hearing the argument about the calculation of

9     interest and the fact that interest was being used as a form

10    of leverage, in fact Ms. Hammerman acknowledged that it was

11    a form of leverage, but a permissible form of leverage and

12    one that Lehman and the plan administrator has been using

13    apparently successfully in ongoing negotiations in the

14    mediation and ADR process.

15         My thought is this.  I don't even know at this

16    point whether interest even applies, because the dispute is

17    not really ripe for determination unless the parties choose

18    to settle it, and at some point in the future there may in

19    fact be a litigation in which there's a determination made

20    one way or the other as to whether Citi is or is not over

21    secured.  Only then really is the question of entitlement to

22    interest ripe for determination, and at that point,

23    presumably, parties will be making arguments as to what the

24    rate should be, what the entitlement is, why the facts and

25    the law justify such an outcome.

1            As I've been thinking about the argument I've been

2    characterizing it in my own mind as an incredibly

3    interesting and novel argument both on the part of the plan

4    administrator, the committee, the estate, whoever it is you

5    represent right now, and Citi arguing a whole host of

6    largely theoretical propositions, which admittedly would

7    require, if I were to grant you the relief that you seek, me

8    to make a number of leaps.  I don't know that those leaps

9    would constitute an abuse of discretion.

10           But as I'm thinking about this and the exercise of

11   my discretion I'm questioning why I need to do it now.  And

12   the fact that you have waited this long to bring this to my

13   attention is something of a double-edged sword.

14           It suggests on the one hand that perhaps the

15   estate or the plan administrator had not focused on the

16   negative impact of the hypothetical interest accrual or it

17   may reflect a desire on the part of the plan administrator

18   now to seek to tilt the playing field a little bit in

19   ongoing negotiations by removing the ongoing accrual of

20   post-petition interest as part of the calculation to be made

21   in thinking about how to settle this, if as and when the

22   parties do that.

23           To the extent that may be, and I'm simply thinking

24   out loud with you, to the extent that may be one of the

25   motivations for doing this I begin to question whether

1   that's a place I should choose to tread at this point in the

2   exercise of discretion.  Because regardless of the merits of

3   the various legal arguments that have been made the real

4   economic issue seems to be, and don't think I'm disparaging

5   you when I say this, something of a shell game in which

6   there's a provisional allowance of a claim with all rights

7   reserved around that, but it's not happening in 2009, it's

8   not happening leading up to the confirmation of the plan,

9   it's happening almost two years after confirmation of the

10  plan while active litigation is pending between your clients

11  and Citi.

12          And so I end up thinking, not knowing everything

13  that's behind the curtains, because there's always something

14  behind the curtains that you don't see in court, well, why

15  is this being presented to me for determination today as

16  opposed to three years ago or two years from now?

17          And so one of my questions to you in this long-

18  winded musing is why do I need to do it now and is it really

19  ripe, and it is appropriate for me to do it if it has an

20  impact upon negotiations that may take place in the future

21  to hopefully bring this dispute to a conclusion?

22          MR. KIRPALANI:  Thank you, Your Honor.

23          I think the easiest and most direct way to answer

24  the Court's question is as Your Honor knows from your work

25  as a mediator it's very, very difficult to engage in any

Page 77

1    attempt to resolve big ticket litigation where you're

2    talking about billions of dollars when every single day the

3    bookends are moving further apart.

4           So I don't even mean to disparage Citibank about

5    the interest rate arbitrage, it's a fact of life.  And if

6    the purpose of the bankruptcy is to get claims resolved, and

7    that is in fact the core function of a Bankruptcy Court to

8    resolve them using equitable means, to do so and to stop

9    wasting so much behemoth (ph) money back and forth, the

10   debtors, the plan administrator, the creditors' committee

11   plead in that vein for equitable powers to be used to stop

12   the bookends from moving.  Every day they move in one

13   direction and it's making it more and more difficult to get

14   to resolution.

15          In terms of the equities on the other side they

16   Have, and we've only learned through this process,

17   Mr. Shimshak would say I should have gone to better law

18   school or something if I don't understand the debt

19   relationship between banks and deposits -- I did think there

20   was cash sitting somewhere.  I did.

21          So this became an illuminating fact for us that

22   now they've actually had full use -- full enjoyment of

23   $2 billion for five years, and yet at the same time they

24   have asserted they will be charging -- I'm not going pick

25   the interest rate because I didn't follow it -- some amount

1    of interest that is definitely hundreds of thousands of

2    dollars a day, and that that's going to happen every day,

3    because under the stipulation that they entered in April in

4    2009 they only have to pay us two basis points.

5           From the estate's perspective whatever equity the

6    estate has into this collateral, i.e., the setoff right, the

7    deposit, is wasting and diminishing.

8           And so in the interest of getting the litigation

9    resolved we believe, and I would actually challenge Citibank

10   to disagree, we believe eliminating some of the moving

11   pieces is a good thing, and that's our position, Your Honor.

12          This is a moving piece.  We thought about frankly

13   making a motion for partial summary judgment in the

14   adversary over the interest issue, and that may be something

15   that we seek permission to do if Your Honor is not inclined

16   to do this on an equitable basis, but it is an issue that

17   although there are a bunch of theoreticals embedded in it,

18   and we appreciate that, it's very difficulty even for us to

19   get our arms around this and we live this, there are certain

20   principals that should apply.  And cutting off the post-

21   petition burn, certainly post-effective date, when Citibank

22   has had the full use and enjoyment of the cash, subject to

23   the credit risk that they have to pay us $2 billion, you

24   know, at some point if we're right, suggests to us that it

25   is ripe for determination and that is the basis of the

1    motion.

2            THE COURT:  Let me ask you this follow-up question

3    with particular reference to your suggestion that one of the

4    alternatives you thought about was maybe seeking leave to

5    bring a motion for partial summary judgment that I presume

6    would seek a determination as a matter of law that post-

7    petition interest or post-confirmation interest should not

8    be accruing any longer.

9            One way to look then at this pending motion is

10   that it is in effect the functional equivalent of a motion

11   for partial summary judgment with respect to the right to

12   continue to accrue post-confirmation interest, because if I

13   were to grant you the extraordinary relief that you seek

14   under 105 dealing with those moving parts of 502 the impact

15   of this would be that henceforth there would be no ongoing

16   interest accrual.

17           Now, I'm questioning in my own mind whether it's

18   appropriate for this to be what amounts to a -- an

19   unconventional alternative to that kind of substantive

20   motion, which would be record-based based on the law and

21   presumably would not be a 105 motion, because I've never

22   seen a 105 motion for summary judgment.  Maybe you have, but

23   I haven't.

24           So you've given me another reason to sit back a

25   little bit in my chair and think twice about whether or not

1    this is the right thing to be doing now.  Quite apart from

2    whether or not someone is sitting here courageously might

3    stake out a claim for advancing jurisprudence along the

4    lines that you've suggested.  I'm not saying it's

5    impermissible, although Mr. Shimshak has said that, but it

6    may be unwise.

7              Mr. Shimshak, do you wish to say something?

8              MR. SHIMSHAK:  Yes, Your Honor, I have a number of

9    comments, and I want to come to the introductory comments

10   that you made in the last exchange about this potentially

11   being not ripe, but I want to clear some other things away

12   first and then focus on that, because that's very important.

13             Lehman said that a determination of the

14   appropriate rate of interest was one of the alternative

15   forms of relief that it had sought on this motion.  I

16   believe that's what we just heard.

17             I'm looking at page 1 where -- of their motion

18   where they outline the forms of relief they're seeking.

19   That is not one of the forms of relief.

20             So the statement that determining the appropriate

21   rate of interest is one of the forms of relief they've been

22   seeking on this motion is belied by the bullet points that

23   outline the relief they're seeking.

24             Second, there was a -- there was a discussion

25   about the stipulation of reserve stipulation that went into

1    -- that went into place.  The amended stipulation

2    establishing distribution reserve.  And there was the

3    suggestion that there was a conspicuous silence on our part

4    in not addressing the supposed or the perceived impact of

5    that reserve on the interest rate.  But the reserve itself

6    states that the reserve, and I quote, "In the event that the

7    Bankruptcy Court by a final, non-appealable order determines

8    that any of Citibank's claims identified in the stipulation

9    are allowed unsecured claims."

10           The purpose of the reserve -- the purpose of the

11   reserve stipulation was a mechanic that took place at the

12   time of the confirmation of the plan -- or the submission of

13   the plan.  Because we had potentially large claims and we

14   had this $2 billion reserve or this debt that we owe Lehman.

15   And the negotiation was, well, if it's determined that you

16   have unsecured claims that would be one of the places that

17   you'll look.  Effectively you'll be able to reduce your

18   claims even though unsecured by offset against that --

19   against the $2 billion obligation, so that Lehman did not

20   have to put more cash into the cash reserve for the benefit

21   of our potentially unsecured claims.  So that's what the

22   stipulation did.

23           I was gratified to hear that Lehman has abandoned

24   any effort to bring this within Section 363(b).  I think

25   that's long overdue.  It was evident from the filing of the

Page 82

1    motion that 363(b) was not an available form of relief and

2    one would assume familiarity with their own plan.

3              The discussion about Calpine is equally irrelevant

4    in that regard, because Calpine -- one thing Calpine was,

5    was relief granted under Section 363(b).  It's right on the

6    face of Judge Sheindlin's decision.

7              There was also reference somewhat sarcastically to

8    our God-given rights of setoff.  No, they're not God-given,

9    their congressionally given though.  Section 553 is

10   explicit.  It says in 553(a) except for enumerated

11   exceptions, "Nothing in this title …" meaning all of title

12   11, "… shall affect the right of setoff."

13             I would submit that includes section 502(b) if it

14   is diminishing our right of setoff in any fashion.

15             There was again reference to the fact that we've

16   had this $2 billion and it's really unfair for us now to be

17   seeking post-petition interest if the claim is reduced to a

18   level where that becomes a meaningful consideration, that

19   that's somehow inequitable.

20             But what that argument really means is even though

21   we've caused you independent economic harm as evidenced by

22   the claims that you have asserted against us, the derivative

23   claims that we've asserted, the Hong Kong loan guarantee

24   claim, which they haven't paid, the derivative claims that

25   they haven't paid, even though we've caused you separate and

1      independent economic harm you're not entitled to be

2      compensated for that harm through the passage of time.  That

3      argument makes no sense.

4               We're entitled under the Bankruptcy Code and as a

5      matter of substantive law to protection of our setoff right

6      to the full extent permitted and we maintain that includes

7      post-petition interest and post-confirmation interest.

8               553 can't be tampered with.

9               You can't use 502(b) to put a gloss on

10     Section 363.

11               Nothing in Title 11 can reduce those rights.

12               Then there was a retreat to 502(b) again.  And,

13     Your Honor, you will have to decide, if you decide this to

14     go forward with this at this point or at some later point,

15     whether your equitable powers to enforce the provisions, to

16     implement the provisions of an expressed statute -- a

17     provision of a statute which talks about allowance of claims

18     except in enumerated circumstances where claims are

19     disallowed -- whether that provision allows you to breathe

20     in to Section 502(b) through Section 105, the ability to cut

21     off a creditor with a setoff right that creditor's

22     entitlement to post-petition interest.

23               Now let me come back to the introductory comment

24     about ripeness.

25               I certainly can't quarrel with that proposition,

1    it's one we've made in our papers, that this entire

2    controversy is not ripe for determination at that time.

3    There are a million things that can happen between now and

4    the point where this issue should be legitimately addressed,

5    and that anything right now is purely hypothetical, purely

6    speculative, and the other word for that is purely advisory.

7    There are not a ripe set of issues before you.  The claims

8    have not been --

9              THE COURT:  Excuse me.

10             MR. SHIMSHAK:  -- the claims have not been

11   determined, the interest rate has not been determined, the

12   litigation outcome in its entirety has not been determined.

13   All of these matters should await another day.

14             And depending on the facts -- depending on the

15   facts as I said in our earlier comments, the means exist to

16   deal with the situation.

17             You can rule straight up on the law on that point

18   to the extent of our secured rights and our rights of

19   setoff, you can deal with their claim that we've done

20   something wrong through the count of their complaint that

21   seeks equitable subordination.

22             The moving goal posts that were described as Your

23   Honor correctly observed are nothing more than the

24   consequence of the inner play between our rights -- our

25   rights -- our protected rights and a litigation that they

Page 85

1    brought and that is lasting a long time, and that's

2    regrettable that it has to last as long as it has.  As

3    Ms. Hammerman indicated, that's not a matter that's been

4    within our control.  We would love to see the scope of

5    discovery narrowed.  We would love to see the litigation

6    move at a better -- at a better pace.  We would have loved

7    to have been in settlement discussions with them.  They

8    discontinued the settlement discusses.

9            So the notion that this is inequitable, that the

10   moving goal post is somehow inequitable is tantamount to

11   saying that a creditor's rights with setoff rights in the

12   event that his claim is oversecured it's inequitable for him

13   to get what the Bankruptcy Code has prescribed.

14           I liked your description of this as tilting the

15   field, I think that's what this boils down to.  That's what

16   we've been maintaining, that this is really an attempt to

17   tilt the field in Lehman's favor through extraordinary

18   relief that's not available to bring us to a negotiation

19   with having lost or having lost substantive rights to which

20   we're entitled.

21           I think the whole matter is premature, it should

22   it should not be decided, there's no basis even I would

23   maintain for the kind of provisional determination of the

24   appropriate interest rate because that issue too is not ripe

25   at this time.

1            Thank you, Your Honor.

2            MR. KIRPALANI:  Thirty seconds, I promise.

3            You've given us a lot of Your Honor's and your

4    staff's time, and I just want to be very brief.

5            First, the reason why we didn't choose to proceed

6    by writing a letter requesting permission to file a motion

7    for summary judgment or partial summary judgment was not

8    because we didn't think it was ripe, but rather I don't

9    believe Your Honor has had the opportunity to fully

10   understand what this lawsuit has been doing to the estate,

11   and I thought -- we thought that a letter seeking partial

12   summary judgment without any background would look like we

13   are trying to tilt the playing field, if Your Honor will.

14   We're not trying to tilt the playing field, we're trying to

15   even the playing field so we can have a rational discussion.

16           And I won't go into any back and forth discussions

17   that have taken place, but we thought this was an

18   appropriate way to address the Court as to the current

19   inequitable situation facing the estate and its creditors

20   when there is absolutely no injury on either side, rather

21   what we would call almost a gotcha situation by a very

22   powerful creditor.

23           That's it, Your Honor.

24           THE COURT:  Okay.  Thank you.

25           I almost left the bench during the last three

1    minutes of Mr. Shimshak's argument because I was choking,

2    but it had nothing to do --

3            MR. SHIMSHAK:  I'm the one with the cold.

4            THE COURT:  -- but it had nothing to do -- it had

5    nothing to do with his argument.

6            This is a very challenging and innovative argument

7    and I'd say that applies on both sides.  And the estate has

8    made what I consider to be a very creative argument and a

9    persuasive one relative to the ability in concept to

10   provisionally allow the secured claim.  But of course it's

11   not a secured claim.

12           And as I was reading the papers I will confess I

13   did not have a full appreciation of the nature of the

14   relationship that existed between Citi and the estate.  And

15   for that reason what Mr. Kirpalani has characterized as the

16   tutorial was actually quite helpful.

17           I will note however that I am generally familiar

18   with how banks work, that's not to say that I'm specifically

19   aware of how each espoke (sic) arrangement may work between

20   a depositor and a financial institution.

21           In this instance Citi, through counsel, has made a

22   coherent argument about preservation of rights, and that is

23   in effect the essence of their position here.  It is an

24   argument based upon rights of setoff preserved under the

25   Bankruptcy Code, and I'm familiar with how that works and

1    have written on that topic.

2              So the question really becomes one of whether or

3    not it is appropriate for this Bankruptcy Court in this

4    extraordinary bankruptcy case to do something unprecedented.

5    And I believe even the movants would concede that what we're

6    talking about here has never been done before.

7              There are a couple of ways to analyze this.

8              One is just because it has never been done before

9    doesn't mean it isn't permissible to do, assuming that it's

10   the right thing to do.

11             Another is in a case of this global prominence is

12   it appropriate after the plan has been confirmed and while

13   significant litigation is pending to take action such as

14   this that would have the economic effect of depriving a

15   major creditor of substantive economic rights?

16             I conclude that the latter alternative is what

17   applies here and that it would be an inappropriate exercise

18   of this Court's discretion in the present context to

19   provisionally allow a claim with all rights reserved if the

20   economic impact of so doing would be to cut off a claim for

21   post-confirmation interest.

22             In saying that I do not wish to dignify that

23   claim.  That claim may for other substantive reasons not be

24   allowable as a matter of law or not be allowable as a matter

25   of fact or not be appropriate given the equities of the

1   case, and as to that issue or series of issues the Court

2   reserves all judgment for future hearings.

3           I'm also motivated in reaching this conclusion by

4   the mental impression earlier described that this is not the

5   right time to deal with this question.

6           As Mr. Kirpalani has pointed out in his argument,

7   while this case has been pending for quite some time this is

8   really the first major proceeding that has taken place in

9   the case that has involved significant interaction between

10  counsel and the Court.

11          Unlike other adversary proceedings that are

12  pending on my docket in the Lehman case this one has been

13  running silent and running deep in the sense that it hasn't

14  surfaced as a dispute that has required by attention.

15          I'll contrast it with an earlier matter on the

16  docket, Giant Stadium.  I've heard all too much from them

17  and so I have a pretty good understanding as to what that

18  dispute is about.

19          That's another reason why I believe it is unwise

20  for the Court to exercise what would be a truly unusual,

21  unprecedented, and extraordinary reach of 105 coupled with

22  502 power to preemptively cut off legal rights of Citi.

23          This is all without prejudice of course to

24  reconsidering the question at some future date, and I would

25  consider today to be a marker of sorts.  This is the date

```
1    when the Court could have cut off the running of post-

2    petition interest, and as a result it might be argued by

3    somebody in the future, to the extent that the facts and

4    legal argument might support the proposition that the

5    effective date for cutting off interest might be today.

6              Thank you for the argument, we'll move on to the

7    next matter.

8              MR. SHIMSHAK:  Thank you, Your Honor.

9              MR. KIRPALANI:  Thank you, Your Honor.

10             MR. SHIMSHAK:  Your Honor, may we have permission

11   to leave?

12             THE COURT:  Everyone who's involved or interested

13   in the matter that was just argued may be excused.

14             MR. SHIMSHAK:  Thank you.

15        (Pause)

16             THE COURT:  Now, before we start, I've been at

17   this now for two and a quarter hours.  I'm assuming that

18   this matter involving the litigation against Tschira --

19             MR. TAMBE:  That's right, Your Honor.

20             THE COURT:  -- will not be particularly time

21   consuming unless you tell me otherwise.

22             MR. TAMBE:  I don't anticipate it will be, Your

23   Honor.  I think it'll be relatively short, but Mr. Brilliant

24   may have something to say about that.

25             MR. BRILLIANT:  What do you mean by -- I mean
```

# Exhibit 15

# ISDA®

International Swaps and Derivatives Association, Inc.

# 2002 MASTER AGREEMENT

dated as of.....................................................................

.................................................................    and    ...............................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this 2002 Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master Agreement".

Accordingly, the parties agree as follows:—

**1.     Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and elsewhere in this Master Agreement will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement, such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.     Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other condition specified in this Agreement to be a condition precedent for the purpose of this Section 2(a)(iii).

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the Scheduled Settlement Date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting of Payments.* If on any date amounts would otherwise be payable: —

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by which the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount and payment obligation will be determined in respect of all amounts payable on the same date in the same currency in respect of those Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or any Confirmation by specifying that "Multiple Transaction Payment Netting" applies to the Transactions identified as being subject to the election (in which case clause (ii) above will not apply to such Transactions). If Multiple Transaction Payment Netting is applicable to Transactions, it will apply to those Transactions with effect from the starting date specified in the Schedule or such Confirmation, or, if a starting date is not specified in the Schedule or such Confirmation, the starting date otherwise agreed by the parties in writing. This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will: —

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

2

ISDA® 2002

(4)     if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)     the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)     the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)     *Liability.* If:—

(1)     X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)     X does not so deduct or withhold; and

(3)     a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

**3.     Representations**

Each party makes the representations contained in Sections 3(a), 3(b), 3(c), 3(d), 3(e) and 3(f) and, if specified in the Schedule as applying, 3(g) to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement). If any "Additional Representation" is specified in the Schedule or any Confirmation as applying, the party or parties specified for such Additional Representation will make and, if applicable, be deemed to repeat such Additional Representation at the time or times specified for such Additional Representation.

(a)     *Basic Representations.*

(i)     *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)     *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

ISDA® 2002

(iii)   *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)   *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it, any of its Credit Support Providers or any of its applicable Specified Entities any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)   *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)   *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

(g)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

**4.   Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information.* It will deliver to the other party or, in certain cases under clause (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)   any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)   any other documents specified in the Schedule or any Confirmation; and

**ISDA® 2002**

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.*  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply With Laws.*  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.*  It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.*  Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled or considered to have its seat, or where an Office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction"), and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes (subject to Sections 5(c) and 6(e)(iv)) an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) required to be made by it if such failure is not remedied on or before the first Local Business Day in the case of any such payment or the first Local Delivery Day in the case of any such delivery after, in each case, notice of such failure is given to the party;

(ii)    *Breach of Agreement; Repudiation of Agreement.*

(1)    Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 9(h)(i)(2) or (4) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied within 30 days after notice of such failure is given to the party; or

(2)    the party disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, this Master Agreement, any Confirmation executed and delivered by that party or any

5                                    **ISDA® 2002**

Transaction evidenced by such a Confirmation (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document, or any security interest granted by such party or such Credit Support Provider to the other party pursuant to any such Credit Support Document, to be in full force and effect for the purpose of this Agreement (in each case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or 3(f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

ISDA® 2002

(vi)   ***Cross-Default.*** If "Cross-Default" is specified in the Schedule as applying to the party, the occurrence or existence of:—

(1)   a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) where the aggregate principal amount of such agreements or instruments, either alone or together with the amount, if any, referred to in clause (2) below, is not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments before it would otherwise have been due and payable; or

(2)   a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments under such agreements or instruments on the due date for payment (after giving effect to any applicable notice requirement or grace period) in an aggregate amount, either alone or together with the amount, if any, referred to in clause (1) above, of not less than the applicable Threshold Amount;

(vii)   ***Bankruptcy.*** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4)(A) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (B) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (A) above and either (I) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (II) is not dismissed, discharged, stayed or restrained in each case within 15 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) above (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

7

**ISDA® 2002**

(viii)   *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, reincorporates or reconstitutes into or as, another entity and, at the time of such consolidation, amalgamation, merger, transfer, reorganisation, reincorporation or reconstitution:—

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes (subject to Section 5(c)) an Illegality if the event is specified in clause (i) below, a Force Majeure Event if the event is specified in clause (ii) below, a Tax Event if the event is specified in clause (iii) below, a Tax Event Upon Merger if the event is specified in clause (iv) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to clause (v) below or an Additional Termination Event if the event is specified pursuant to clause (vi) below:—

(i)   *Illegality.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, due to an event or circumstance (other than any action taken by a party or, if applicable, any Credit Support Provider of such party) occurring after a Transaction is entered into, it becomes unlawful under any applicable law (including without limitation the laws of any country in which payment, delivery or compliance is required by either party or any Credit Support Provider, as the case may be), on any day, or it would be unlawful if the relevant payment, delivery or compliance were required on that day (in each case, other than as a result of a breach by the party of Section 4(b)):—

(1)   for the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction to perform any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   for such party or any Credit Support Provider of such party (which will be the Affected Party) to perform any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, to receive a payment or delivery under such Credit Support Document or to comply with any other material provision of such Credit Support Document;

(ii)   *Force Majeure Event.* After giving effect to any applicable provision, disruption fallback or remedy specified in, or pursuant to, the relevant Confirmation or elsewhere in this Agreement, by reason of force majeure or act of state occurring after a Transaction is entered into, on any day:—

(1)   the Office through which such party (which will be the Affected Party) makes and receives payments or deliveries with respect to such Transaction is prevented from performing any absolute or contingent obligation to make a payment or delivery in respect of such Transaction, from receiving a payment or delivery in respect of such Transaction or from complying with any other material provision of this Agreement relating to such Transaction (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or

8                                                                      ISDA® 2002

impracticable for such Office so to perform, receive or comply (or it would be impossible or impracticable for such Office so to perform, receive or comply if such payment, delivery or compliance were required on that day); or

(2)    such party or any Credit Support Provider of such party (which will be the Affected Party) is prevented from performing any absolute or contingent obligation to make a payment or delivery which such party or Credit Support Provider has under any Credit Support Document relating to such Transaction, from receiving a payment or delivery under such Credit Support Document or from complying with any other material provision of such Credit Support Document (or would be so prevented if such payment, delivery or compliance were required on that day), or it becomes impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply (or it would be impossible or impracticable for such party or Credit Support Provider so to perform, receive or comply if such payment, delivery or compliance were required on that day),

so long as the force majeure or act of state is beyond the control of such Office, such party or such Credit Support Provider, as appropriate, and such Office, party or Credit Support Provider could not, after using all reasonable efforts (which will not require such party or Credit Support Provider to incur a loss, other than immaterial, incidental expenses), overcome such prevention, impossibility or impracticability;

(iii)    *Tax Event.* Due to (1) any action taken by a taxing authority, or brought in a court of competent jurisdiction, after a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (2) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Settlement Date (A) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (B) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 9(h)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iv)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Settlement Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 9(h)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets (or any substantial part of the assets comprising the business conducted by it as of the date of this Master Agreement) to, or reorganising, reincorporating or reconstituting into or as, another entity (which will be the Affected Party) where such action does not constitute a Merger Without Assumption;

(v)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X") and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party). A "Designated Event" with respect to X means that:—

(1)    X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the

9                                                                                            **ISDA® 2002**

date of this Master Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)     any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)     X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest; or

(vi)     *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties will be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     *Hierarchy of Events.*

(i)     An event or circumstance that constitutes or gives rise to an Illegality or a Force Majeure Event will not, for so long as that is the case, also constitute or give rise to an Event of Default under Section 5(a)(i), 5(a)(ii)(1) or 5(a)(iii)(1) insofar as such event or circumstance relates to the failure to make any payment or delivery or a failure to comply with any other material provision of this Agreement or a Credit Support Document, as the case may be.

(ii)     Except in circumstances contemplated by clause (i) above, if an event or circumstance which would otherwise constitute or give rise to an Illegality or a Force Majeure Event also constitutes an Event of Default or any other Termination Event, it will be treated as an Event of Default or such other Termination Event, as the case may be, and will not constitute or give rise to an Illegality or a Force Majeure Event.

(iii)     If an event or circumstance which would otherwise constitute or give rise to a Force Majeure Event also constitutes an Illegality, it will be treated as an Illegality, except as described in clause (ii) above, and not a Force Majeure Event.

(d)     *Deferral of Payments and Deliveries During Waiting Period.* If an Illegality or a Force Majeure Event has occurred and is continuing with respect to a Transaction, each payment or delivery which would otherwise be required to be made under that Transaction will be deferred to, and will not be due until:—

(i)     the first Local Business Day or, in the case of a delivery, the first Local Delivery Day (or the first day that would have been a Local Business Day or Local Delivery Day, as appropriate, but for the occurrence of the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event) following the end of any applicable Waiting Period in respect of that Illegality or Force Majeure Event, as the case may be; or

(ii)     if earlier, the date on which the event or circumstance constituting or giving rise to that Illegality or Force Majeure Event ceases to exist or, if such date is not a Local Business Day or, in the case of a delivery, a Local Delivery Day, the first following day that is a Local Business Day or Local Delivery Day, as appropriate.

(e)     *Inability of Head or Home Office to Perform Obligations of Branch.* If (i) an Illegality or a Force Majeure Event occurs under Section 5(b)(i)(1) or 5(b)(ii)(1) and the relevant Office is not the Affected Party's head or home office, (ii) Section 10(a) applies, (iii) the other party seeks performance of the relevant obligation or

compliance with the relevant provision by the Affected Party's head or home office and (iv) the Affected Party's head or home office fails so to perform or comply due to the occurrence of an event or circumstance which would, if that head or home office were the Office through which the Affected Party makes and receives payments and deliveries with respect to the relevant Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and such failure would otherwise constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) with respect to such party, then, for so long as the relevant event or circumstance continues to exist with respect to both the Office referred to in Section 5(b)(i)(1) or 5(b)(ii)(1), as the case may be, and the Affected Party's head or home office, such failure will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1).

## 6.   Early Termination; Close-Out Netting

(a)     *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event.*

(i)     *Notice.* If a Termination Event other than a Force Majeure Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction, and will also give the other party such other information about that Termination Event as the other party may reasonably require. If a Force Majeure Event occurs, each party will, promptly upon becoming aware of it, use all reasonable efforts to notify the other party, specifying the nature of that Force Majeure Event, and will also give the other party such other information about that Force Majeure Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event.* If a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, other than immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)     *Two Affected Parties.* If a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice of such occurrence is given under Section 6(b)(i) to avoid that Termination Event.

ISDA® 2002

(iv)    *Right to Terminate.*

(1)    If:—

(A)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(B)    a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there are two Affected Parties, or the Non-affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, if the relevant Termination Event is then continuing, by not more than 20 days notice to the other party, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(2)    If at any time an Illegality or a Force Majeure Event has occurred and is then continuing and any applicable Waiting Period has expired:—

(A)    Subject to clause (B) below, either party may, by not more than 20 days notice to the other party, designate (I) a day not earlier than the day on which such notice becomes effective as an Early Termination Date in respect of all Affected Transactions or (II) by specifying in that notice the Affected Transactions in respect of which it is designating the relevant day as an Early Termination Date, a day not earlier than two Local Business Days following the day on which such notice becomes effective as an Early Termination Date in respect of less than all Affected Transactions.  Upon receipt of a notice designating an Early Termination Date in respect of less than all Affected Transactions, the other party may, by notice to the designating party, if such notice is effective on or before the day so designated, designate that same day as an Early Termination Date in respect of any or all other Affected Transactions.

(B)    An Affected Party (if the Illegality or Force Majeure Event relates to performance by such party or any Credit Support Provider of such party of an obligation to make any payment or delivery under, or to compliance with any other material provision of, the relevant Credit Support Document) will only have the right to designate an Early Termination Date under Section 6(b)(iv)(2)(A) as a result of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2) following the prior designation by the other party of an Early Termination Date, pursuant to Section 6(b)(iv)(2)(A), in respect of less than all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or 6(b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 9(h)(i) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date will be determined pursuant to Sections 6(e) and 9(h)(ii).

**ISDA® 2002**

(d)     *Calculations; Payment Date.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (l) showing, in reasonable detail, such calculations (including any quotations, market data or information from internal sources used in making such calculations), (2) specifying (except where there are two Affected Parties) any Early Termination Amount payable and (3) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation or market data obtained in determining a Close-out Amount, the records of the party obtaining such quotation or market data will be conclusive evidence of the existence and accuracy of such quotation or market data.

(ii)    *Payment Date.* An Early Termination Amount due in respect of any Early Termination Date will, together with any amount of interest payable pursuant to Section 9(h)(ii)(2), be payable (1) on the day on which notice of the amount payable is effective in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default and (2) on the day which is two Local Business Days after the day on which notice of the amount payable is effective (or, if there are two Affected Parties, after the day on which the statement provided pursuant to clause (i) above by the second party to provide such a statement is effective) in the case of an Early Termination Date which is designated as a result of a Termination Event.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the amount, if any, payable in respect of that Early Termination Date (the "Early Termination Amount") will be determined pursuant to this Section 6(e) and will be subject to Section 6(f).

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default, the Early Termination Amount will be an amount equal to (1) the sum of (A) the Termination Currency Equivalent of the Close-out Amount or Close-out Amounts (whether positive or negative) determined by the Non-defaulting Party for each Terminated Transaction or group of Terminated Transactions, as the case may be, and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If the Early Termination Amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of the Early Termination Amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)     *One Affected Party.* Subject to clause (3) below, if there is one Affected Party, the Early Termination Amount will be determined in accordance with Section 6(e)(i), except that references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and to the Non-affected Party, respectively.

(2)     *Two Affected Parties.* Subject to clause (3) below, if there are two Affected Parties, each party will determine an amount equal to the Termination Currency Equivalent of the sum of the Close-out Amount or Close-out Amounts (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions, as the case may be, and the Early Termination Amount will be an amount equal to (A) the sum of (I) one-half of the difference between the higher amount so determined (by party "X") and the lower amount so determined (by party "Y") and (II) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to Y. If the Early Termination Amount is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of the Early Termination Amount to Y.

(3)   *Mid-Market Events*. If that Termination Event is an Illegality or a Force Majeure Event, then the Early Termination Amount will be determined in accordance with clause (1) or (2) above, as appropriate, except that, for the purpose of determining a Close-out Amount or Close-out Amounts, the Determining Party will:—

(A)   if obtaining quotations from one or more third parties (or from any of the Determining Party's Affiliates), ask each third party or Affiliate (I) not to take account of the current creditworthiness of the Determining Party or any existing Credit Support Document and (II) to provide mid-market quotations; and

(B)   in any other case, use mid-market values without regard to the creditworthiness of the Determining Party.

(iii)   *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because Automatic Early Termination applies in respect of a party, the Early Termination Amount will be subject to such adjustments as are appropriate and permitted by applicable law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Adjustment for Illegality or Force Majeure Event.* The failure by a party or any Credit Support Provider of such party to pay, when due, any Early Termination Amount will not constitute an Event of Default under Section 5(a)(i) or 5(a)(iii)(1) if such failure is due to the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event. Such amount will (1) accrue interest and otherwise be treated as an Unpaid Amount owing to the other party if subsequently an Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions and (2) otherwise accrue interest in accordance with Section 9(h)(ii)(2).

(v)   *Pre-Estimate.* The parties agree that an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks, and, except as otherwise provided in this Agreement, neither party will be entitled to recover any additional damages as a consequence of the termination of the Terminated Transactions.

(f)   *Set-Off.* Any Early Termination Amount payable to one party (the "Payee") by the other party (the "Payer"), in circumstances where there is a Defaulting Party or where there is one Affected Party in the case where either a Credit Event Upon Merger has occurred or any other Termination Event in respect of which all outstanding Transactions are Affected Transactions has occurred, will, at the option of the Non-defaulting Party or the Non-affected Party, as the case may be ("X") (and without prior notice to the Defaulting Party or the Affected Party, as the case may be), be reduced by its set-off against any other amounts ("Other Amounts") payable by the Payee to the Payer (whether or not arising under this Agreement, matured or contingent and irrespective of the currency, place of payment or place of booking of the obligation). To the extent that any Other Amounts are so set off, those Other Amounts will be discharged promptly and in all respects. X will give notice to the other party of any set-off effected under this Section 6(f).

For this purpose, either the Early Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by X into the currency in which the other is denominated at the rate of exchange at which such party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

14

**ISDA® 2002**

If an obligation is unascertained, X may in good faith estimate that obligation and set off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this Section 6(f) will be effective to create a charge or other security interest. This Section 6(f) will be without prejudice and in addition to any right of set-off, offset, combination of accounts, lien, right of retention or withholding or similar right or requirement to which any party is at any time otherwise entitled or subject (whether by operation of law, contract or otherwise).

## 7.    Transfer

Subject to Section 6(b)(ii) and to the extent permitted by applicable law, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any Early Termination Amount payable to it by a Defaulting Party, together with any amounts payable on or with respect to that interest and any other rights associated with that interest pursuant to Sections 8, 9(h) and 11.

Any purported transfer that is not in compliance with this Section 7 will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in good faith and using commercially reasonable procedures in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in clause (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purpose of such judgment or order and the rate of exchange at which such party is able, acting in good faith and using

commercially reasonable procedures in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party.

(c)     *Separate Indemnities.* To the extent permitted by applicable law, the indemnities in this Section 8 constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)     *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.     Miscellaneous**

(a)     *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter. Each of the parties acknowledges that in entering into this Agreement it has not relied on any oral or written representation, warranty or other assurance (except as provided for or referred to in this Agreement) and waives all rights and remedies which might otherwise be available to it in respect thereof, except that nothing in this Agreement will limit or exclude any liability of a party for fraud.

(b)     *Amendments.* An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

(c)     *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations.*

   (i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission and by electronic messaging system), each of which will be deemed an original.

   (ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation will be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes, by an exchange of electronic messages on an electronic messaging system or by an exchange of e-mails, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex, electronic message or e-mail constitutes a Confirmation.

(f)     *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

(h)    *Interest and Compensation.*

(i)    *Prior to Early Termination.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction:—

(1)    *Interest on Defaulted Payments.* If a party defaults in the performance of any payment obligation, it will, to the extent permitted by applicable law and subject to Section 6(c), pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (3)(B) or (C) below), at the Default Rate.

(2)    *Compensation for Defaulted Deliveries.* If a party defaults in the performance of any obligation required to be settled by delivery, it will on demand (A) compensate the other party to the extent provided for in the relevant Confirmation or elsewhere in this Agreement and (B) unless otherwise provided in the relevant Confirmation or elsewhere in this Agreement, to the extent permitted by applicable law and subject to Section 6(c), pay to the other party interest (before as well as after judgment) on an amount equal to the fair market value of that which was required to be delivered in the same currency as that amount, for the period from (and including) the originally scheduled date for delivery to (but excluding) the date of actual delivery (and excluding any period in respect of which interest or compensation in respect of that amount is due pursuant to clause (4) below), at the Default Rate. The fair market value of any obligation referred to above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party that was entitled to take delivery.

(3)    *Interest on Deferred Payments.* If:—

(A)    a party does not pay any amount that, but for Section 2(a)(iii), would have been payable, it will, to the extent permitted by applicable law and subject to Section 6(c) and clauses (B) and (C) below, pay interest (before as well as after judgment) on that amount to the other party on demand (after such amount becomes payable) in the same currency as that amount, for the period from (and including) the date the amount would, but for Section 2(a)(iii), have been payable to (but excluding) the date the amount actually becomes payable, at the Applicable Deferral Rate;

(B)    a payment is deferred pursuant to Section 5(d), the party which would otherwise have been required to make that payment will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the amount of the deferred payment to the other party on demand (after such amount becomes payable) in the same currency as the deferred payment, for the period from (and including) the date the amount would, but for Section 5(d), have been payable to (but excluding) the earlier of the date the payment is no longer deferred pursuant to Section 5(d) and the date during the deferral period upon which an Event of Default or Potential Event of Default with respect to that party occurs, at the Applicable Deferral Rate; or

(C)    a party fails to make any payment due to the occurrence of an Illegality or a Force Majeure Event (after giving effect to any deferral period contemplated by clause (B) above), it will, to the extent permitted by applicable law, subject to Section 6(c) and for so long as the event or circumstance giving rise to that Illegality or Force Majeure Event

17

ISDA® 2002

continues and no Event of Default or Potential Event of Default with respect to that party has occurred and is continuing, pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as the overdue amount, for the period from (and including) the date the party fails to make the payment due to the occurrence of the relevant Illegality or Force Majeure Event (or, if later, the date the payment is no longer deferred pursuant to Section 5(d)) to (but excluding) the earlier of the date the event or circumstance giving rise to that Illegality or Force Majeure Event ceases to exist and the date during the period upon which an Event of Default or Potential Event of Default with respect to that party occurs (and excluding any period in respect of which interest or compensation in respect of the overdue amount is due pursuant to clause (B) above), at the Applicable Deferral Rate.

(4)    *Compensation for Deferred Deliveries.* If:—

(A)    a party does not perform any obligation that, but for Section 2(a)(iii), would have been required to be settled by delivery;

(B)    a delivery is deferred pursuant to Section 5(d); or

(C)    a party fails to make a delivery due to the occurrence of an Illegality or a Force Majeure Event at a time when any applicable Waiting Period has expired,

the party required (or that would otherwise have been required) to make the delivery will, to the extent permitted by applicable law and subject to Section 6(c), compensate and pay interest to the other party on demand (after, in the case of clauses (A) and (B) above, such delivery is required) if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

(ii)    *Early Termination.* Upon the occurrence or effective designation of an Early Termination Date in respect of a Transaction:—

(1)    *Unpaid Amounts.* For the purpose of determining an Unpaid Amount in respect of the relevant Transaction, and to the extent permitted by applicable law, interest will accrue on the amount of any payment obligation or the amount equal to the fair market value of any obligation required to be settled by delivery included in such determination in the same currency as that amount, for the period from (and including) the date the relevant obligation was (or would have been but for Section 2(a)(iii) or 5(d)) required to have been performed to (but excluding) the relevant Early Termination Date, at the Applicable Close-out Rate.

(2)    *Interest on Early Termination Amounts.* If an Early Termination Amount is due in respect of such Early Termination Date, that amount will, to the extent permitted by applicable law, be paid together with interest (before as well as after judgment) on that amount in the Termination Currency, for the period from (and including) such Early Termination Date to (but excluding) the date the amount is paid, at the Applicable Close-out Rate.

(iii)    *Interest Calculation.* Any interest pursuant to this Section 9(h) will be calculated on the basis of daily compounding and the actual number of days elapsed.

                                                                ISDA® 2002

**10.     Offices; Multibranch Parties**

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to and agrees with the other party that, notwithstanding the place of booking or its jurisdiction of incorporation or organisation, its obligations are the same in terms of recourse against it as if it had entered into the Transaction through its head or home office, except that a party will not have recourse to the head or home office of the other party in respect of any payment or delivery deferred pursuant to Section 5(d) for so long as the payment or delivery is so deferred.  This representation and agreement will be deemed to be repeated by each party on each date on which the parties enter into a Transaction.

(b)     If a party is specified as a Multibranch Party in the Schedule, such party may, subject to clause (c) below, enter into a Transaction through, book a Transaction in and make and receive payments and deliveries with respect to a Transaction through any Office listed in respect of that party in the Schedule (but not any other Office unless otherwise agreed by the parties in writing).

(c)     The Office through which a party enters into a Transaction will be the Office specified for that party in the relevant Confirmation or as otherwise agreed by the parties in writing, and, if an Office for that party is not specified in the Confirmation or otherwise agreed by the parties in writing, its head or home office.  Unless the parties otherwise agree in writing, the Office through which a party enters into a Transaction will also be the Office in which it books the Transaction and the Office through which it makes and receives payments and deliveries with respect to the Transaction.  Subject to Section 6(b)(ii), neither party may change the Office in which it books the Transaction or the Office through which it makes and receives payments or deliveries with respect to a Transaction without the prior written consent of the other party.

**11.     Expenses**

A Defaulting Party will on demand indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, execution fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.     Notices**

(a)     *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner described below (except that a notice or other communication under Section 5 or 6 may not be given by electronic messaging system or e-mail) to the address or number or in accordance with the electronic messaging system or e-mail details provided (see the Schedule) and will be deemed effective as indicated:—

(i)     if in writing and delivered in person or by courier, on the date it is delivered;

(ii)     if sent by telex, on the date the recipient's answerback is received;

(iii)     if sent by facsimile transmission, on the date it is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date it is delivered or its delivery is attempted;

(v)     if sent by electronic messaging system, on the date it is received; or

(vi)     if sent by e-mail, on the date it is delivered,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication will be deemed given and effective on the first following day that is a Local Business Day.

(b)     **Change of Details.**  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system or e-mail details at which notices or other communications are to be given to it.

**13.     Governing Law and Jurisdiction**

(a)     **Governing Law.**  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     **Jurisdiction.**  With respect to any suit, action or proceedings relating to any dispute arising out of or in connection with this Agreement ("Proceedings"), each party irrevocably:—

(i)     submits:—

(1)     if this Agreement is expressed to be governed by English law, to (A) the non-exclusive jurisdiction of the English courts if the Proceedings do not involve a Convention Court and (B) the exclusive jurisdiction of the English courts if the Proceedings do involve a Convention Court; or

(2)     if this Agreement is expressed to be governed by the laws of the State of New York, to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City;

(ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party; and

(iii)     agrees, to the extent permitted by applicable law, that the bringing of Proceedings in any one or more jurisdictions will not preclude the bringing of Proceedings in any other jurisdiction.

(c)     **Service of Process.**  Each party irrevocably appoints the Process Agent, if any, specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings.  If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party.  The parties irrevocably consent to service of process given in the manner provided for notices in Section 12(a)(i), 12(a)(iii) or 12(a)(iv).  Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by applicable law.

(d)     **Waiver of Immunities.**  Each party irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction or order for specific performance or recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

ISDA® 2002

**14.    Definitions**

As used in this Agreement:—

*"Additional Representation"* has the meaning specified in Section 3.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Force Majeure Event, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event (which, in the case of an Illegality under Section 5(b)(i)(2) or a Force Majeure Event under Section 5(b)(ii)(2), means all Transactions unless the relevant Credit Support Document references only certain Transactions, in which case those Transactions and, if the relevant Credit Support Document constitutes a Confirmation for a Transaction, that Transaction) and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Agreement"* has the meaning specified in Section 1(c).

*"Applicable Close-out Rate"* means:—

(a)    in respect of the determination of an Unpaid Amount:—

(i)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(ii)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate;

(iii)    in respect of obligations deferred pursuant to Section 5(d), if there is no Defaulting Party and for so long as the deferral period continues, the Applicable Deferral Rate; and

(iv)    in all other cases following the occurrence of a Termination Event (except where interest accrues pursuant to clause (iii) above), the Applicable Deferral Rate; and

(b)    in respect of an Early Termination Amount:—

(i)    for the period from (and including) the relevant Early Termination Date to (but excluding) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable: —

(1)    if the Early Termination Amount is payable by a Defaulting Party, the Default Rate;

(2)    if the Early Termination Amount is payable by a Non-defaulting Party, the Non-default Rate; and

(3)    in all other cases, the Applicable Deferral Rate; and

21                                                    **ISDA® 2002**

(ii)      for the period from (and including) the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable to (but excluding) the date of actual payment:—

(1)      if a party fails to pay the Early Termination Amount due to the occurrence of an event or circumstance which would, if it occurred with respect to a payment or delivery under a Transaction, constitute or give rise to an Illegality or a Force Majeure Event, and for so long as the Early Termination Amount remains unpaid due to the continuing existence of such event or circumstance, the Applicable Deferral Rate;

(2)      if the Early Termination Amount is payable by a Defaulting Party (but excluding any period in respect of which clause (1) above applies), the Default Rate;

(3)      if the Early Termination Amount is payable by a Non-defaulting Party (but excluding any period in respect of which clause (1) above applies), the Non-default Rate; and

(4)      in all other cases, the Termination Rate.

*"Applicable Deferral Rate"* means:—

(a)      for the purpose of Section 9(h)(i)(3)(A), the rate certified by the relevant payer to be a rate offered to the payer by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market;

(b)      for purposes of Section 9(h)(i)(3)(B) and clause (a)(iii) of the definition of Applicable Close-out Rate, the rate certified by the relevant payer to be a rate offered to prime banks by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the payer after consultation with the other party, if practicable, for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market; and

(c)      for purposes of Section 9(h)(i)(3)(C) and clauses (a)(iv), (b)(i)(3) and (b)(ii)(1) of the definition of Applicable Close-out Rate, a rate equal to the arithmetic mean of the rate determined pursuant to clause (a) above and a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount.

*"Automatic Early Termination"* has the meaning specified in Section 6(a).

*"Burdened Party"* has the meaning specified in Section 5(b)(iv).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs after the parties enter into the relevant Transaction.

*"Close-out Amount"* means, with respect to each Terminated Transaction or each group of Terminated Transactions and a Determining Party, the amount of the losses or costs of the Determining Party that are or would be incurred under then prevailing circumstances (expressed as a positive number) or gains of the Determining Party that are or would be realised under then prevailing circumstances (expressed as a negative number) in replacing, or in providing for the Determining Party the economic equivalent of, (a) the material terms of that Terminated Transaction or group of Terminated Transactions, including the payments and deliveries by the parties under Section 2(a)(i) in respect of that Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date (assuming satisfaction of the conditions precedent in

Section 2(a)(iii) and (b) the option rights of the parties in respect of that Terminated Transaction or group of Terminated Transactions.

Any Close-out Amount will be determined by the Determining Party (or its agent), which will act in good faith and use commercially reasonable procedures in order to produce a commercially reasonable result. The Determining Party may determine a Close-out Amount for any group of Terminated Transactions or any individual Terminated Transaction but, in the aggregate, for not less than all Terminated Transactions. Each Close-out Amount will be determined as of the Early Termination Date or, if that would not be commercially reasonable, as of the date or dates following the Early Termination Date as would be commercially reasonable.

Unpaid Amounts in respect of a Terminated Transaction or group of Terminated Transactions and legal fees and out-of-pocket expenses referred to in Section 11 are to be excluded in all determinations of Close-out Amounts.

In determining a Close-out Amount, the Determining Party may consider any relevant information, including, without limitation, one or more of the following types of information:—

(i)      quotations (either firm or indicative) for replacement transactions supplied by one or more third parties that may take into account the creditworthiness of the Determining Party at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Determining Party and the third party providing the quotation;

(ii)      information consisting of relevant market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other relevant market data in the relevant market; or

(iii)      information of the types described in clause (i) or (ii) above from internal sources (including any of the Determining Party's Affiliates) if that information is of the same type used by the Determining Party in the regular course of its business for the valuation of similar transactions.

The Determining Party will consider, taking into account the standards and procedures described in this definition, quotations pursuant to clause (i) above or relevant market data pursuant to clause (ii) above unless the Determining Party reasonably believes in good faith that such quotations or relevant market data are not readily available or would produce a result that would not satisfy those standards. When considering information described in clause (i), (ii) or (iii) above, the Determining Party may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilised. Third parties supplying quotations pursuant to clause (i) above or market data pursuant to clause (ii) above may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

Without duplication of amounts calculated based on information described in clause (i), (ii) or (iii) above, or other relevant information, and when it is commercially reasonable to do so, the Determining Party may in addition consider in calculating a Close-out Amount any loss or cost incurred in connection with its terminating, liquidating or re-establishing any hedge related to a Terminated Transaction or group of Terminated Transactions (or any gain resulting from any of them).

Commercially reasonable procedures used in determining a Close-out Amount may include the following:—

(1)      application to relevant market data from third parties pursuant to clause (ii) above or information from internal sources pursuant to clause (iii) above of pricing or other valuation models that are, at the time of the determination of the Close-out Amount, used by the Determining Party in the regular course of its business in pricing or valuing transactions between the Determining Party and unrelated third parties that are similar to the Terminated Transaction or group of Terminated Transactions; and

(2)    application of different valuation methods to Terminated Transactions or groups of Terminated Transactions depending on the type, complexity, size or number of the Terminated Transactions or group of Terminated Transactions.

*"Confirmation"* has the meaning specified in the preamble.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Contractual Currency"* has the meaning specified in Section 8(a).

*"Convention Court"* means any court which is bound to apply to the Proceedings either Article 17 of the 1968 Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters or Article 17 of the 1988 Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Cross-Default"* means the event specified in Section 5(a)(vi).

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Designated Event"* has the meaning specified in Section 5(b)(v).

*"Determining Party"* means the party determining a Close-out Amount.

*"Early Termination Amount"* has the meaning specified in Section 6(e).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"electronic messages"* does not include e-mails but does include documents expressed in markup languages, and *"electronic messaging system"* will be construed accordingly.

*"English law"* means the law of England and Wales, and *"English"* will be construed accordingly.

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Force Majeure Event"* has the meaning specified in Section 5(b).

*"General Business Day"* means a day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits).

*"Illegality"* has the meaning specified in Section 5(b).

**ISDA® 2002**

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority), and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means (a) in relation to any obligation under Section 2(a)(i), a General Business Day in the place or places specified in the relevant Confirmation and a day on which a relevant settlement system is open or operating as specified in the relevant Confirmation or, if a place or a settlement system is not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) for the purpose of determining when a Waiting Period expires, a General Business Day in the place where the event or circumstance that constitutes or gives rise to the Illegality or Force Majeure Event, as the case may be, occurs, (c) in relation to any other payment, a General Business Day in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment and, if that currency does not have a single recognised principal financial centre, a day on which the settlement system necessary to accomplish such payment is open, (d) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), a General Business Day (or a day that would have been a General Business Day but for the occurrence of an event or circumstance which would, if it occurred with respect to payment, delivery or compliance related to a Transaction, constitute or give rise to an Illegality or a Force Majeure Event) in the place specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (e) in relation to Section 5(a)(v)(2), a General Business Day in the relevant locations for performance with respect to such Specified Transaction.

*"Local Delivery Day"* means, for purposes of Sections 5(a)(i) and 5(d), a day on which settlement systems necessary to accomplish the relevant delivery are generally open for business so that the delivery is capable of being accomplished in accordance with customary market practice, in the place specified in the relevant Confirmation or, if not so specified, in a location as determined in accordance with customary market practice for the relevant delivery.

*"Master Agreement"* has the meaning specified in the preamble.

*"Merger Without Assumption"* means the event specified in Section 5(a)(viii).

*"Multiple Transaction Payment Netting"* has the meaning specified in Section 2(c).

*"Non-affected Party"* means, so long as there is only one Affected Party, the other party.

*"Non-default Rate"* means the rate certified by the Non-defaulting Party to be a rate offered to the Non-defaulting Party by a major bank in a relevant interbank market for overnight deposits in the applicable currency, such bank to be selected in good faith by the Non-defaulting Party for the purpose of obtaining a representative rate that will reasonably reflect conditions prevailing at the time in that relevant market.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Other Amounts"* has the meaning specified in Section 6(f).

*"Payee"* has the meaning specified in Section 6(f).

*"Payer"* has the meaning specified in Section 6(f).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Proceedings"* has the meaning specified in Section 13(b).

*"Process Agent"* has the meaning specified in the Schedule.

*"rate of exchange"* includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Schedule"* has the meaning specified in the preamble.

*"Scheduled Settlement Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Stamp Tax Jurisdiction"* has the meaning specified in Section 4(e).

**ISDA® 2002**

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means, with respect to any Early Termination Date, (a) if resulting from an Illegality or a Force Majeure Event, all Affected Transactions specified in the notice given pursuant to Section 6(b)(iv), (b) if resulting from any other Termination Event, all Affected Transactions and (c) if resulting from an Event of Default, all Transactions in effect either immediately before the effectiveness of the notice designating that Early Termination Date or, if Automatic Early Termination applies, immediately before that Early Termination Date.

*"Termination Currency"* means (a) if a Termination Currency is specified in the Schedule and that currency is freely available, that currency, and (b) otherwise, euro if this Agreement is expressed to be governed by English law or United States Dollars if this Agreement is expressed to be governed by the laws of the State of New York.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Close-out Amount is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Force Majeure Event, a Tax Event, a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Threshold Amount"* means the amount, if any, specified as such in the Schedule.

*"Transaction"* has the meaning specified in the preamble.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) or due but for Section 5(d)) to such party under Section 2(a)(i) or 2(d)(i)(4) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date, (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) or 5(d)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered and (c) if the Early Termination Date results from an Event of Default, a Credit Event Upon Merger or an Additional Termination Event in respect of which all outstanding Transactions are Affected Transactions, any Early Termination Amount due prior to such Early Termination Date and which remains unpaid as of such Early Termination Date, in each case together with any amount of interest accrued or other

compensation in respect of that obligation or deferred obligation, as the case may be, pursuant to Section 9(h)(ii)(1) or (2), as appropriate. The fair market value of any obligation referred to in clause (b) above will be determined as of the originally scheduled date for delivery, in good faith and using commercially reasonable procedures, by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it will be the average of the Termination Currency Equivalents of the fair market values so determined by both parties.

*"Waiting Period"* means:—

(a)       in respect of an event or circumstance under Section 5(b)(i), other than in the case of Section 5(b)(i)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of three Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance; and

(b)       in respect of an event or circumstance under Section 5(b)(ii), other than in the case of Section 5(b)(ii)(2) where the relevant payment, delivery or compliance is actually required on the relevant day (in which case no Waiting Period will apply), a period of eight Local Business Days (or days that would have been Local Business Days but for the occurrence of that event or circumstance) following the occurrence of that event or circumstance.


IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.



................................................................    ................................................  ....................
                      (Name of Party)                                              (Name of Party)



By: ..........................................................    By: ...............................................  ..............
       Name:                                                          Name:
       Title:                                                         Title:
       Date:                                                          Date:

ISDA® 2002

# ISDA®

International Swaps and Derivatives Association, Inc.

# SCHEDULE
## to the
## 2002 Master Agreement

dated as of.....................................................................

between ....................................................    and    ........................................................................
("Party A")                                                            ("Party B")

[*established as a [COUNTERPARTY TYPE]*]           [*established as a [COUNTERPARTY TYPE]*]

[*with company number [NUMBER]*]                   [*with company number [NUMBER]*]

[*under the laws of [JURISDICTION]*]               [*under the laws of [JURISDICTION]*]

[*acting through its [BRANCH]*]*                    [*acting through its [BRANCH]*]*


Part 1.  **Termination Provisions.**

(a)      ***"Specified Entity"*** means in relation to Party A for the purpose of:—

Section 5(a)(v), ..................................................................................................................

Section 5(a)(vi), ................................................................................................................

Section 5(a)(vii), ...............................................................................................................

Section 5(b)(v), .................................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v), ..................................................................................................................

Section 5(a)(vi), ................................................................................................................

Section 5(a)(vii), ...............................................................................................................

Section 5(b)(v), .................................................................................................................

---

\*      Include if applicable.

(b)   *"Specified Transaction"* [will have the meaning specified in Section 14 of this Agreement.][means .............

.......................................................................................................................................................................

................................................................................................................................................................ ] *

(c)   The *"Cross-Default"* provisions of Section 5(a)(vi) [will][will not]* apply to Party A
                                                                                     [will][will not]* apply to Party B

[*"Specified Indebtedness"* [will have the meaning specified in Section 14 of this Agreement.][means ..........

................................................................................................................................................................ ] *

*"Threshold Amount"* means ...........................................................................................................................

................................................................................................................................................................ ] **

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(v) [will][will not]* apply to Party A
                                                                                     [will][will not]* apply to Party B

(e)   The *"Automatic Early Termination"* provision of Section 6(a) [will][will not]* apply to Party A
                                                                                     [will][will not]* apply to Party B

(f)   *"Termination Currency"* [will have the meaning specified in Section 14 of this Agreement.][means ...........

................................................................................................................................................................ ] *

(g)   *Additional Termination Event* [will][will not]* apply.   [The following will constitute an Additional

Termination Event:— ...........................................................................................................................................

.......................................................................................................................................................................

.......................................................................................................................................................................

.......................................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected Parties will be:— .........

................................................................................................................................................................ ] ***

## Part 2.  Tax Representations.****

(a)   *Payer Representations.* For the purpose of Section 3(e) of this Agreement[, Party A and Party B do not make any representations.][:—

[[(i)]   [Party A] [and] [Party B] [each] make[s] the following representation:—

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 9(h) of this Agreement) to

---

*     Delete as applicable.
**     Include if Cross-Default will apply to either Party A or Party B.
***     Include if Additional Termination Event will apply.
****     N.B.: the following representations may need modification if either party is a Multibranch Party.

                                                                                                              **ISDA® 2002**

be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, except that it will not be a breach of this representation where reliance is placed on clause (ii) above and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.]*

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation[s]: — .....................................

.........................................................................................................................................................

.........................................................................................................................................................

......................................................................................................................................... ]] *

(b)    **_Payee Representations._** For the purpose of Section 3(f) of this Agreement[, Party A and Party B do not make any representations.][:—

[[(i)]    [Party A] [and] [Party B] [each] make[s] the following representation: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "interest" provision or the "Other Income" provision, if any, of the Specified Treaty with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

**_"Specified Treaty"_** means with respect to Party A ...................................................................................

**_"Specified Jurisdiction"_** means with respect to Party A ...................................................................................

**_"Specified Treaty"_** means with respect to Party B ...................................................................................

**_"Specified Jurisdiction"_** means with respect to Party B ........................................................................... ] *

[[(ii)]    [Party A] [and] [Party B] [each] make[s] the following representation: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

**_"Specified Jurisdiction"_** means with respect to Party A ...................................................................................

**_"Specified Jurisdiction"_** means with respect to Party B ........................................................................... ] *

[[(iii)]    [Party A] [and] [Party B] [each] make[s] the following representation: —

It is a "U.S. person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

---

*        Delete as applicable.

[[(iv)]   [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(v)]   [Party A] [and] [Party B] [each] make[s] the following representation:—

With respect to payments made to an address outside the United States or made by a transfer of funds to an account outside the United States, it is a "non-U.S. branch of a foreign person" (as that term is used in section 1.1441-4(a)(3)(ii) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vi)]   [Party A] [and] [Party B] [each] make[s] the following representation:—

It is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of United States Treasury Regulations) for United States federal income tax purposes.]*

[[(vii)]   [Party A] [and] [Party B] [each] make[s] the following representation[s]:—

.......................................................................................................................................................

.......................................................................................................................................................

...........................................................................................................................................]] *

**Part 3.   Agreement to Deliver Documents.**

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:—

(a)      Tax forms, documents or certificates to be delivered are[: none][:—

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ............................ | ................................................... | ................................................... |
| ............................ | ................................................... | ................................................... |
| ............................ | ................................................... | ................................................... |
| ............................ | ................................................... | ................................................... |
| ............................ | ................................................... | ...............................................] * |

---

\*     Delete as applicable.

**ISDA® 2002**

(b)    Other documents to be delivered are[: none][: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ............................ | ......................................................... | ............................... | [Yes][No] |
| ............................ | ......................................................... | ............................... | [Yes][No] |
| ............................ | ......................................................... | ............................... | [Yes][No] |
| ............................ | ......................................................... | ............................... | [Yes][No] |
| ............................ | ......................................................... | ............................... | [Yes][No]]* |

Part 4.    **Miscellaneous.**

(a)    *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:—

Address for notices or communications to Party A:—

Address: ...........................................................................................................................................................

Attention: .........................................................................................................................................................

Telex No.: .....................................................................    Answerback: ........................................................

Facsimile No.: ..............................................................    Telephone No.: ....................................................

E-mail: ..............................................................................................................................................................

Electronic Messaging System Details: .........................................................................................................

Specific Instructions: ....................................................................................................................................

Address for notices or communications to Party B:—

Address: ...........................................................................................................................................................

Attention: .........................................................................................................................................................

Telex No.: .....................................................................    Answerback: ........................................................

Facsimile No.: ..............................................................    Telephone No.: ....................................................

E-mail: ..............................................................................................................................................................

Electronic Messaging System Details: .........................................................................................................

Specific Instructions: ....................................................................................................................................

---

*    Delete as applicable.

**ISDA® 2002**

(b)    *Process Agent.* For the purpose of Section 13(c) of this Agreement:—

Party A appoints as its Process Agent: [not applicable][ ........................................................... ] *

Party B appoints as its Process Agent: [not applicable][ ........................................................... ] *

(c)    *Offices.* The provisions of Section 10(a) [will][will not]* apply to this Agreement.

(d)    *Multibranch Party.* For the purpose of Section 10(b) of this Agreement:—

Party A [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

................................................    ................................................    ................................................
................................................    ................................................    ............................................. ]*

Party B [is not a Multibranch Party.][is a Multibranch Party and may enter into a Transaction through any of the following Offices:—

................................................    ................................................    ................................................
................................................    ................................................    ............................................. ]*

[(e)    *Calculation Agent.* The Calculation Agent is ................................................................. , unless otherwise specified in a Confirmation in relation to the relevant Transaction.]**

[(f)]    *Credit Support Document.* Details of any Credit Support Document:— [none][ ...........................................
................................................................................................................................................................
................................................................................................................................................................
................................................................................................................................ ] *

[(g)]    *Credit Support Provider.* Credit Support Provider means in relation to Party A, [none][...............................
................................................................................................................................................................
................................................................................................................................ ] *

Credit Support Provider means in relation to Party B, [none][.......................................................................
................................................................................................................................................................
................................................................................................................................ ] *

[(h)]    *Governing Law.* This Agreement will be governed by and construed in accordance with [English law][the laws of the State of New York (without reference to choice of law doctrine)]*.

---

\*        Delete as applicable.
\*\*      Include if applicable.

**ISDA® 2002**

[(i)]    *Netting of Payments.* "Multiple Transaction Payment Netting" [will not apply for the purpose of Section 2(c) of this Agreement.][will apply for the purpose of Section 2(c) of this Agreement to [all Transactions][the following Transactions or groups of Transactions:— ...........................................................

...........................................................................................................................................................]

(in each case starting from [the date of this Agreement][ ...........................................................])] *

[(j)]    *"Affiliate"* [will have the meaning specified in Section 14 of this Agreement.][means ...................................

........................................................................................................................................................ ] *

[(k)]    *Absence of Litigation.* For the purpose of Section 3(c):—

*"Specified Entity"* means in relation to Party A, ...........................................................................................

*"Specified Entity"* means in relation to Party B, ...........................................................................................

[(l)]    *No Agency.* The provisions of Section 3(g) [will][will not]* apply to this Agreement.

[(m)]    *Additional Representation* [will][will not]* apply. [For the purpose of Section 3 of this Agreement, the following will constitute an Additional Representation:—

[[(i)    *Relationship Between Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

[(1)]    *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

[(2)]    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

[(3)]    *Status of Parties.* The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.]]*

[[(n)]    *Recording of Conversations.* Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.]**

---

\*    Delete as applicable.
\*\*    Include if applicable.

           **ISDA® 2002**

Part 5.  **Other Provisions.**


......................................................................          ............................................................  ........................
            (Name of Party)                                                    (Name of Party)


By : ...........................................................          By : ............................................................  ..................

    Name:                                                        Name:

    Title:                                                        Title:

    Date:                                                        Date:

**ISDA® 2002**